## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **LISA G. FINCH**, Individually, as Co-Adminis-trator of the Estate of Andrew Thomas Finch, deceased, and as Next Friend for her Minor Grand-daughter **AF**; **DOMINICA C. FINCH**, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased; and **ALI ABDELHADI**, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | )   Case No. _____ ) |
| **CITY OF WICHITA, KANSAS;** **JOHN DOE POLICE OFFICERS 1 – 10,** | ) ) ) |
| Defendants. | ) |

## COMPLAINT

COMES NOW the Plaintiffs, by and through their counsel, and for their causes of action against Defendants state as follows:

### INTRODUCTION

1.      This is a Section 1983 Civil Rights action against Defendants for violations of Plaintiffs' constitutional rights.

2.      On December 28, 2017, at approximately 5:00 p.m., Andrew Finch was inside his home at 1033 West McCormick Street in Wichita, Kansas enjoying a peaceful evening with his mother, niece and two friends. Unknown to him, several heavily armed Wichita police officers had surrounded the house. Shortly after opening the front door to see what was happening outside, he lost his life to a single bullet fired from a police sniper's rifle fifty yards away. Andrew was 28 years old.

3.      Immediately after the shooting, Wichita police officers forced Andrew's mother,

niece and two friends from the house in handcuffs, held them against their wills for approximately an hour in 24-degree weather, and then transported them to the Wichita Police Department and interrogated them for an hour before releasing them without explanation.

4.     The City of Wichita and its Police Department admit that its police officers were present at 1033 West McCormick Street, Wichita, Kansas on December 28, 2017 solely as a result of a prank call placed by someone outside the State of Kansas.

## JURISDICTION AND VENUE

5.     This court has subject matter jurisdiction of these claims pursuant to the Civil Rights Act, 42 U.S.C. § 1983 et seq; the Judicial Code, 18 U.S.C. §§ 1331 and 1343(a); and the 4th and 14th Amendments to the Constitution the United States.

6.     The amount in controversy exceeds $75,000, exclusive of costs and interest.

7.     Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to the plaintiff's claims occurred in this judicial district.

## PARTIES

8.     Plaintiff Lisa G. Finch is a resident of Sedgwick County, Kansas, the mother of Andrew Finch, and the Co-Administrator of the Estate of Andrew Thomas Finch, deceased, which was filed in the 18th Judicial District of Sedgwick County, Kansas, Case No. 2018-PR-000050. She is also the Next Friend of AF, her minor granddaughter.

9.     Plaintiff Dominica C. Finch is a resident of Sedgwick County, Kansas, the sister of Andrew Finch, and the Co-Administrator of the Estate of Andrew Thomas Finch, deceased, which was filed in the 18th Judicial District of Sedgwick County, Kansas, Case No. 2018-PR-

000050.  Plaintiff Ali Abdelhadi is a resident of Sedgwick County, Kansas.

10.     Defendant City of Wichita, Kansas, (hereinafter "City") is a city and municipality organized under the laws of the State of Kansas. The City may be served with process at 455 N. Main, Wichita, Kansas 67202. The City is responsible for the policies, practices and customs of its Police Department.

11.     Defendant City of Wichita John Doe Officers 1-10 (hereinafter "Defendant Officers") are officers employed by the City of Wichita Police Department. As such, they were duly appointed agents authorized to enforce the laws of the City of Wichita, and the State of Kansas and acted under the color of law and in the scope of their employment at all times relevant to this action. They may be served with process at Wichita Police Department, Patrol South Bureau, 211 E. Pawnee, Wichita, Kansas 67211. They are sued in their individual capacities.

## FACTS

12.     On December 28, 2017, at approximately 5:00 p.m. a prank caller in the State of California placed a call to Wichita 911 (hereinafter "Prank Call"), falsely claiming that he had shot his father, was holding his mother at gunpoint, was going to burn down the house, and was going to commit suicide. The prank caller falsely gave a local Wichita address as his location.

13.     As a result of the Prank Call, Wichita Police officers, including the Defendant Officers, were dispatched to a local Wichita address.

14.     That local address is 1033 West McCormick Street in Wichita, Kansas (hereinafter "1033 West McCormick").

15.     Based on the information from the Prank Call, Defendant Officers went to 1033

West McCormick knowing or having reason to know that they may be confronted with:

      a.     a situation involving someone in a mental health crisis;

      b.     a suicide situation involving hostages;

      c.     a situation involving a person who had shot his father, who was holding his mother at gun point, who had threatened to burn down the house, and who had threatened to commit suicide.

16.     Defendant Officers surrounded the house at 1033 West McCormick.

17.     The Defendant Officers who surrounded 1033 West McCormick were not:

      a.     Crisis Intervention Team Officers (CIT Officers);

      b.     specifically trained to deal with mentally ill citizens; or

      c.     specifically trained to de-escalate situations by using de-escalating techniques

18.     At the time the Defendant Officers surrounded 1033 West McCormick, the occupants in the house were: Andrew Finch, the deceased; Lisa G. Finch, his mother and plaintiff; AF, his minor niece and plaintiff; Ali Abdelhadi, one of two family friends (hereinafter "Occupants of 1033 West McCormick").

19.     At the time the Defendant Officers surrounded 1033 West McCormick:

      a.     No Occupant of 1033 West McCormick was in a mental health crisis;

      b.     No Occupant of 1033 West McCormick had shot any person;

      c.     No Occupant of 1033 West McCormick had threatened to hold or was holding any person at gun point;

      d.     No Occupant of 1033 West McCormick had threatened or was threatening to burn the house down;

      e.     No Occupant of 1033 West McCormick had threatened or was threatening to commit suicide;

f.     No Occupant of 1033 West McCormick was armed;

g.     No Occupant of 1033 West McCormick presented a threat to the Defendant Officers or to any one else;

h.     No Occupant of 1033 West McCormick had committed a crime;

i.     No Occupant of 1033 West McCormick was the target of an arrest warrant; and

j.     1033 West McCormick was not the object of a search warrant.

20.     After the Defendant Officers surrounded 1033 West McCormick, they made no attempt to determine whether an occupant of the house:

a.     Was in a mental health crisis;

b.     Had shot someone;

c.     Had threatened to hold or was holding someone at gun point;

d.     Had threatened or was threatening to burn the house down;

e.     Had threatened or was threatening to commit suicide;

f.     Was in possession of a firearm; or

g.     Posed a danger to themselves or to others.

21.     After the Defendant Officers surrounded 1033 West McCormick, Andrew Finch opened the front door in order to investigate what was happening outside the house. One of the Defendant Officers, without cause or provocation and with the intention of killing Andrew Finch, fired a high-powered rifle at him from fifty yards away. Andrew Finch was killed by this shot.

22.     The Defendant Officer who fired the high-powered rifle that killed Andrew Finch was the only Defendant Officer to discharge a weapon at Andrew Finch.

23.    After the shooting of Andrew Finch, Wichita police officers:

    a.    Ordered the Occupants of 1033 West McCormick exit the house through the door and forcing the minor niece to walk over the body of Andrew Finch;

    b.    Handcuffed the Occupants of 1033 West McCormick and forced them to wait outside in 24-degree weather for over an hour;

    c.    Interrogated each of the Occupants of 1033 West McCormick where each of them was questioned for approximately an hour before being released without explanation; and

    d.    Ransacked 1033 West McCormick and seized the front door of the house, two cell phones, a computer, router, an Xbox and other items of personal property belonging to the Occupants of 1033 West McCormick.

24.    Andrew Finch left as his sole heirs two minor children, a boy, AF, and a girl, DF.

**Count 1**
**42 U.S.C. § 1983 Claim for Excessive Force**
**(Estate of Andrew Thomas Finch Claim)**

25.    Plaintiffs Lisa G. Finch and Dominca C. Finch, as Co-Administrators of the Estate of Andrew Thomas Finch repeat and reallege the preceding paragraphs of this Complaint as if they were fully set out in this Count.

26.    The actions of the Defendant Officers alleged in this Complaint which resulted in the shooting of Andrew Finch without just cause violated Andrew Finch's rights under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable seizure, and his right to due process under the Fourteenth Amendment to the United States Constitution.

27.    The actions of the Defendant Officers as alleged in this Complaint were done maliciously, wantonly, or oppressively, with the intent to cause injury to Andrew Thomas Finch

and the plaintiffs or in reckless disregard of the probability that they would cause injury to Andrew Thomas Finch and the plaintiffs.

28.     The actions of the Defendant Officers alleged in this Complaint were the direct and proximate cause of the constitutional violations set forth above and of the Plaintiff's injuries.

**Count 2**
**42 U.S.C. § 1983 Claim for Unconstitutional Seizure**
**(Lisa G. Finch Individual Claim)**

29.     Plaintiff Lisa G. Finch, individually, repeats and realleges the preceding paragraphs of this Complaint as if they were fully set out in this Count.

30.     The actions of the Defendant Officers alleged in this Complaint which resulted in the detention and arrest of Lisa G. Finch without just cause violated her rights under the Fourth Amendment to the United States Constitution to be secure in her person against unreasonable seizure, and her right to due process under the Fourteenth Amendment to the United States Constitution.

31.     The actions of the Defendant Officers as alleged in this Complaint were done maliciously, wantonly, or oppressively, with the intent to cause injury to the plaintiff or in reckless disregard of the probability that they would cause injury to the plaintiff.

32.     The actions of the Defendant Officers as alleged in this Complaint were the direct and proximate cause of the constitutional violations set forth above and of the Plaintiff's injuries.

**Count 3**
**42 U.S.C. § 1983 Claim for Unconstitutional Seizure**
**(Ali Abdelhadi Individual Claim)**

33.    Plaintiff Ali Abdelhadi repeats and realleges the preceding paragraphs of this complaint as if they were fully set out in this Count.

34.    The actions of the Defendant Officers as alleged in this Complaint which resulted in the detention and arrest of Ali Abdelhadi without just cause violated his rights under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable seizure, and his right to due process under the Fourteenth Amendment to the United States Constitution.

35.    The actions of the Defendant Officers as alleged in this Complaint were done maliciously, wantonly, or oppressively, with the intent to cause injury to the plaintiff or in reckless disregard of the probability that they would cause injury to the plaintiff.

36.    The actions of the Defendant Officers as alleged in this Complaint were the direct and proximate cause of the constitutional violations set forth above and of the Plaintiff's injuries.

**Count 4**
**42 U.S.C. § 1983 Claim for Unconstitutional Seizure**
**(Claim of Lisa G. Finch, as Next Friend for her Minor Granddaughter AF)**

37.    Plaintiff Lisa G. Finch, as Next Friend for her Minor Grand Child AF, repeats and realleges the preceding paragraphs of this Complaint as if they were fully set out in this Count.

38.    The actions of the Defendant Officers as alleged in this Complaint which resulted in the detention and arrest of AF without just cause violated her rights under the Fourth

Amendment to the United States Constitution to be secure in her person against unreasonable seizure, and her right to due process under the Fourteenth Amendment to the United States Constitution.

39.     The actions of the Defendant Officers as alleged in this Complaint were done maliciously, wantonly, or oppressively, with the intent to cause injury to the plaintiff or in reckless disregard of the probability that they would cause injury to the plaintiff.

40.     The actions of the Defendant Officers as alleged in this Complaint were the direct and proximate cause of the constitutional violations set forth above and of the Plaintiff's injuries.

## Count 5
## 42 U.S.C. § 1983 Monell Claim
## (Estate of Andrew Thomas Finch Claim)

41.     Plaintiffs repeat and reallege the preceding paragraphs of this Complaint as if they were fully set out in this Count.

42.     The actions of the Defendant Officers as alleged in this Complaint were done under the authority of one or more interrelated de facto policies, practices and/or customs of the City of Wichita.

43.     The actions of the Defendant Officers as alleged in this Complaint were part and parcel of a widespread municipal policy, practice and custom is further established by the involvement in, and ratification of, these acts by municipal supervisors and policy makers, including Wichita Mayor Jeff Longwell and Wichita City Manager Robert Layton, as well as by a wide range of police officials, including Wichita Police Chief Gordon Ramsay.

**Wichita Police Department Mental Health Policy**

44.     Wichita police officers are governed by Wichita Police Department Policies, Regulations, and each Bureau's Standard Operating Procedures.

45.     Wichita Police Department Policy 5.19 addresses how Wichita Police Department Officers are to handle individuals with mental illness.

46.     Wichita Police Department Policy 5.19 defines "Mental Illness" as "A condition characterized by impairment of an individual's normal cognitive, emotional, or behavioral functioning which can be caused through a variety of means, including but not limited to: social, psychological, biochemical, genetic, illness or injury."

47.     The Wichita Police Department has officers called Crisis Intervention Team Officers (CIT Officers) who are specifically trained to deal with mentally ill citizens and de-escalate situations by using specific de-escalating techniques. These CIT Officers receive special training from Sedgwick County, Kansas.

48.     According to Sedgwick County's information on CIT training, "[L]aw enforcement officers are trained to de-escalate potentially dangerous situations involving individuals with mental illness, intellectual disabilities and/or developmental disabilities (ID/DD).[1] **Because police officers are often the first responders in these incidents, it is essential that they know how critical periods of mental illness alter behaviors and perceptions, can assess what is needed in the moment, and can bring understanding and compassion to bear when they are handling these difficult**."[2]    (Emphasis added.)

49.     The Wichita Police Department Policy Manual, Policy 519.02 "Mentally Ill

---

1   http://www.sedgwickcounty.org/cddo/facts_and_details/Community%20Resources.pdf

2   http://www.sedgwickcounty.org/criminal_justice/documents/2013%20CJCC%20Briefing%20Book.pdf

Persons/Crisis Intervention Team" states that CIT Officers are the "preferred response to all calls involving mental health crises."

50.     According to former Wichita Police Department Deputy Chief Tom Stolz:

    a.     Wichita has seen a marked increase in the number of police cases involving mentally ill people, with Wichita officers handling more than 1,900 cases involving the mentally ill in 2008.

    b.     The number of cases involving the mentally ill had risen to more than 2,600, and 2012 is expected to be higher.

    c.     In 2012, Wichita police officers were trained to talk to the mentally ill and be as helpful and understanding as possible.

51.     Despite recognition by the Wichita Police Department that cases involving the mentally ill were steadily rising every year, and that its officers would likely encounter situations with citizens suffering a mental health crisis, the Wichita City leadership and the Wichita Police Department failed to properly train and supervise its officers to deal with the mentally ill.

**Wichita Police Department Policy on Suicide Calls**

52.     The Wichita Policy Department policy about suicidal people recognizes that:

    a.     The first responding officers should not attempt to breach the home when suicidal person is home alone, unless there is imminent danger to the officers or others;

    b.     Time is the most important asset when dealing with people in crisis and allows for better intelligence, a better response and the passage of time calms people down;

    c.     The first few minutes of a crisis event are the most critical and set the stage for future actions in a mental health crisis incident;

    d.     The passage of time tends to calm a person down and make it easier to convince them that they are doing something wrong and should stop;

    e.     If within an officer's control, it is best to allow time to pass and let a

11

person calm down before making the initial contact;

    f.    Suicide calls are often cries for help by the person threatening to commit suicide;

    g.    When responding to a suicide call, safety is of the utmost concern;

    h.    Unnecessarily placing officers or the suicidal person at risk of harm should be avoided.

**Wichita Police Department Use Force Policy**

53.    Wichita Police Department Regulation 4.1 governs "Weapons/Use of Force".

54.    Wichita Police Department Regulation 4.101 ("Reg. 4.101") issued and revised as of February 16, 2012 states the following in pertinent part:

> In a stressful situation, **a police member's first reaction should be to determine whether the objective can be accomplished without the use of a weapon**. A member's decision, relative to the use of force, must be legally justifiable, and thoroughly articulated, **considering both the nature of the crime and circumstances surrounding it**.

> This Department recognizes and respects the value and special integrity of each human life. In vesting police members with the lawful authority to use force to protect the public welfare, **a careful balancing of all human interests is required**. Therefore, **it is the policy of this Department that police members shall use only that force that is objectively reasonable** based on the totality of the circumstances, to effectively bring an incident under control, in making a lawful arrest, while protecting the life of the member, or the life of another person. (Emphasis added.)

55.    Wichita Police Department Regulation 4.105 "Situations When Discharging a Firearm Is Not Justified" states that "an officer is not justified in discharging a firearm **when use of less force would safely accomplish the objective.**" (Emphasis added.)

56.    Wichita Police Department Regulation 4.106 "Use of Less-Lethal Force" states "Where lethal force is not authorized, members should assess the incident in order to determine

which less-lethal force technique or weapon will best de-escalate and bring the incident under control in a safe manner."

57.     The Wichita Police Department uses a "Threat Assessment" policy regarding the use of force.

58.     The Wichita Police Department "Threat Assessment" policy teaches the officers to imagine the worst scenario possible and act on that assumption rather than the objective facts before them.


**Pattern and Practice of Concealing Misconduct**

59.     Information on officer-involved shootings is difficult to obtain, particularly in regards to the identity of officers involved, because of Defendant City's policy of refusing to release information. Despite the City's position in *Fettke v. City of Wichita*, that Wichita Police Officers as public officials do not have a right to privacy, the City refuses to release the names of the officers involved citing privacy rights of the officer.[3]

60.     The City's policy of not releasing information on the officers involved in a shooting creates a veil of secrecy surrounding the shooting that casts doubt on the investigation into the shooting because it impairs verifying or refuting the findings that a use of force was reasonable.

61.     Prior to questioning, Wichita Police Department officers participating in officer-involved shootings are allowed to meet privately with Critical Stress Incident Team members in a room without any recording devices. These Critical Stress Incident Team members are familiar

---

3   *Fettke v. City of Wichita*, 264 Kan. 629, 632, 957 P.2d 409, 412 (1998), wherein City of Wichita argued the city owed no duty of silence to Fettke, who was a police officer and a public official with no right of privacy and therefore the City should not be liable for the release of his name to the media.

with the process, procedures and standards for police shootings and are given unfettered access to the officer prior to questioning and have the opportunity to coach the officer on what to say and what not to say.

62.     Defendant City of Wichita does not have a civilian review board or police oversight committee regarding officer-involved shootings or claims of excessive force, leaving the City's police department free to investigate itself.

63.     Officer-involved shootings by Wichita Police Department officers remain cloaked in secrecy because the shooting files have been made part of the Wichita Police Department secret confidential records file.

64.     Current and past leadership at the City have implemented a pattern and practice of concealing and covering up misconduct by its officers and leadership.

65.     This pattern and practice of concealing misconduct is demonstrated by numerous incidents of misconduct by leadership actively concealed from the public and not disclosed, including but not limited to:

     a.     Incidents of domestic violence committed by senior leadership that went unreported;

     b.     Destruction of internal affair records of senior members of the police department by order of senior leadership;

     c.     Implementation of "training systems" designed to prevent the discovery of information about officers' use of force by classifying certain documents as "training aides";

     d.     Refusal to provide the identities of the officers involved to the victims and families of victims of deadly force of deadly force used by officers in an effort to stall or delay the filing of lawsuits against Wichita Police Department and its officers;

     e.     The lack of any meaningful internal review regarding the use of lethal

force by officers;

    f.    The lack of any meaningful civilian oversight regarding claims of excessive force;

    g.    The lack of any meaningful criminal investigation into officer-involved shootings.

66.    This pattern and practice of concealing misconduct and concealing the identities of officers involved in misconduct encourages officers to believe that their unconstitutional behavior will be protected and that they will suffer no discipline, thereby emboldening them to act with impunity.

**Wichita Police Department Officer Involved Shootings from 2010-2015**

67.    Officers of the Wichita Police Department have been involved in at least 29 shootings incidents from 2010-2015, resulting in at least 15 deaths. In over 95% of these cases, the Defendant City of Wichita refused to publicly release the names of the involved officer.

68.    Defendant City of Wichita has exonerated the officers in all 29 officer-involved shootings between 2010 and the present and has taken the position that they were all reasonable and justifiable.

69.    On information and belief, Defendant City of Wichita has exonerated all officers in officer-involved shootings from 2016 to the present.

**Wichita Investigations of Officer-Involved Shootings**

70.    The Wichita Police Department considers investigations of officer-involved shootings to be criminal investigations.

71.    Despite treating investigations of officer-involved shootings as criminal

investigations, Defendant City of Wichita immediately designates every officer-involved shooting resulting in death as a "Justifiable Homicide" despite the lack of such determination by the Sedgwick County District Attorney.

72.     Once the officer-involved shooting death is arbitrarily classified as a "Justifiable Homicide," Defendant City of Wichita's investigation is conducted in such a manner as to support its predetermined conclusion that the shooting was justified.

73.     Facts and leads that might suggest the shooting was not justified are ignored and disregarded.

74.     The Kansas Bureau of Investigation is tasked with "overseeing" the investigation of Wichita Police Department officer involved shootings.

75.     The Kansas Bureau of Investigation's involvement in investigations is limited at best, and non-existent at worst, leaving Defendant City of Wichita and its police department to primarily conduct the investigation of its own officers.

76.     Civilians involved in shootings are locked in an interrogation room with audio and video recording equipment to record what occurs in the room. Civilians are not afforded access to anyone other than legal counsel prior to questioning.

77.     In contrast, Wichita Police Department officers involved in shootings are allowed to sit in accessible offices that are open to anyone passing by who want to stop and speak with the officer, rather than isolated in a locked interrogation room.

78.     Unlike civilian suspects in a homicide, the Wichita Police Department officers involved in shootings are allowed to make phone calls prior to questioning.

79.     Pursuant to the contractual arrangements between the City and the police officers'

union, the Wichita Police Department officers are allowed to meet privately with their union representative in a room without any recording devices prior to questioning after a shooting. These union representatives are familiar with the process, procedures, and standards for police shootings and are given unfettered access to the officer prior to questioning and have the opportunity to coach the officer on what to say and what not to say.

80.     The interviews of officers involved in a shooting are conducted by Wichita Police Department Homicide Detectives, with a Kansas Bureau of Investigation agent sitting in on the interview, but rarely participating in the interview.

81.     Investigators ask inappropriate leading questions of the officers thereby suggesting the legally correct answer to find a shooting is justified such as "At that point, you thought he was going to shoot you, correct?"

82.     Investigators often ignore evidence contrary to the shooting officer's version of the events, such as:

      a.   the presence of stippling on victim's body even though the officer said he was too far away for stippling to be present;

      b.   failing to conduct bullet angle analysis or other testing to confirm or contest the physical position of the officer and victim at the time of the shooting;

      c.   failing to critically probe important details when questioning witnesses and the shooter; and

      d.   failing to determine whether less-lethal options were available, or whether the officer attempted de-escalation techniques.

83.     Defendant City of Wichita has never found that an officer-involved shooting causing serious harm or death was excessive or violated policy.

84.     Defendant City of Wichita refuses to make administrative findings on the reasonableness of an officer-involved shooting when litigation is pending.

## Wichita Shooting Death Ratio Compared National and Other City Ratios

85.     The number of police shootings by the Wichita Police Department is disproportionally large for a city of its size, which shows an unwritten de facto policy of the unconstitutional use deadly force.

86.     In Wichita[4], there is a ratio of 1 shooting death for every 120 officers. This is:

a.      Eleven times greater than the national ratio[5];

b.      Twelve times greater than the ratio of Chicago, Illinois[6]; and

c.      Nine times greater than the ratio of Detroit, Michigan.[7]

## Wichita's Under Funding of Officer Training and Officer Staffing

87.     According to the Wichita Chief of Police, the Wichita Police Department has an annual budget for training its officers or approximately $160,000, which 1/10[th] of the 1.6 million dollar budget it needs to properly train its officers.

88.     The national average for the police officer to population ratio is 3.4 officers per 1000 citizens.

---

4   http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-78-state-cuts2013/table_78_full-time_law_enforcement_employees_kansas_by_city_2011.xls

5   http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/expanded-homicide-data-table-14; http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/expanded-homicide-data-table-78 (full time law enforcement employees by state and city)

6   http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/table-78-state-cuts-2011/Table_78_Full-time_Law_Enforcement_Employees_Illinois_by_City_2011.xls; http://www.chicagotribune.com/ct-police-shooting-data-ipra-20151203-htmlstory.html

7   http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/table-78-state-cuts-2011/table_78_full-time_law_enforcement_employees_michigan_by_city_2011.xls

89.    By contrast, the Wichita average for the police officer to population ratio is 1.6 officers per 1000 citizens, less than half of the national average.

90.    The consequence of the understaffing and inadequate training of officers on the Wichita police department is that officers engage in the unnecessary and unconstitutional use of lethal force against citizens.

91.    Defendant City of Wichita knew or should have known that its consistent understaffing and inadequate training results in a pattern and practice of the unnecessary and unconstitutional use of deadly force by its police department officers.

92.    At all times material to the allegations contained in this Complaint, the conduct of the City of Wichita created and implemented these interrelated de facto policies, practices, and customs which included, among other things described in the preceding paragraphs of this Complaint:

    a.    The failure to properly implement a procedure for making an assessment about the potential that a call to Wichita 911 is a prank call;

    b.    The failure to adequately investigate and assess an alleged suicide situation with hostages;

    c.    The failure to dispatch properly trained officers to scene of a potential suicide situation with hostages;

    d.    The failure to properly train officers to properly handle a potential suicide situation with hostages;

    e.    The failure to properly train officers to use de-escalation techniques before resort to the use of lethal force in a potential suicide situation with hostages;

    f.    The encouragement of excessive and unreasonable force against civilians in situations involving a potential suicide with hostages;

    g.    The failure to properly train and supervise officers with regard to discharging their weapons at civilians involved in a potential suicide

situation with hostages;

h.      A code of silence.

93.     The policies, practices and/or customs and their failures as alleged in this Complaint, separately and together, are the proximate cause of the injury and death of Andrew Thomas Finch and of the injury to his heirs.

94.     The interrelated policies, practices and customs, as alleged in this Complaint, individually and together, were maintained and implemented with deliberate indifference, and encouraged the Defendant Officers to commit the acts alleged in this Complaint against Andrew Finch; those policies, practices and customs, therefore, are the direct and proximate causes of the injuries to Andrew Thomas Finch and his heirs.

95.     By insulating Defendant Officers from the consequences of their misconduct, the policies, practices and customs alleged in this Complaint encouraged the lack of training, supervision, and appropriate conduct by Defendant Officers which resulted in the unlawful shooting of Andrew Thomas Finch. These policies, practices and customs, therefore, are the moving forces behind, and the direct and proximate causes of, the unconstitutional acts committed by the Defendant Officers in this case and the injuries to Andrew Thomas Finch and his heirs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lisa G. Finch, Individually, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased, and as Next Friend for her Minor Grand Child AF, Plaintiff Dominica C. Finch, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased, and Plaintiff Ali Abdelhadi pray for damages in excess of $75,000 in an amount to be determined at

trial on each count, exclusive of interest, costs and attorney fees, including punitive damages against the individual officers, attorney fees and costs pursuant to 42 U.S.C. §1988 for each of the applicable claims, pre- and post-judgment interest on any damages awarded at the statutory rate, and for other and such further relief as the Court deems just and equitable.

## JURY TRIAL DEMAND

Plaintiff respectfully requests that this matter be tried to a jury on all of the claims against the Defendants.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Wichita, Kansas as the place of trial in this matter.

Respectfully submitted,

Conlee, Schmidt & Emerson, LLP


/s/Rick E. Bailey
Rick E. Bailey, KS # 11583
200 W. Douglas, Ste. 300
Wichita, Kansas 67202
(316) 264-3300
(316) 264-3423 (Fax)
rbailey@fcse.net


/s/Andrew M. Stroth
Andrew M. Stroth (Pro Hac Vice Pending)
Carlton Odim (Pro Hac Vice Pending)
Action Injury Law Group, LLC
191 North Wacker Drive
Suite 2300
Chicago, IL 60606
(312) 771-2444
(312) 641-6866 (Fax)
astroth@actioninjurylawgroup.com
carlton@actioninjurylawgroup.com