## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LISA G. FINCH, Individually, as Co-Adminis-   )
trator of the Estate of Andrew Thomas Finch,  )
deceased, ADELINA FINCH; DOMINICA C.  )
FINCH, as Co-Administrator of the Estate of   )
Andrew Thomas Finch, deceased; and        )
ALI ABDELHADI,                        )
                                  )
            Plaintiffs,        )
                                  )
vs.                          )    Case No. 18-cv-1018-JWB-KGS
                                  )
CITY OF WICHITA, KANSAS; WICHITA    )
POLICE OFFICER JUSTIN RAPP; SGT.     )
BENJAMIN JONKER; JOHN DOE POLICE  )
OFFICERS 1 – 8,                )
                                  )
           Defendants.    )

## FIRST AMENDED COMPLAINT

COMES NOW the Plaintiffs, by and through their counsel, and for their causes of action against Defendants state as follows:

## INTRODUCTION

1.      This is a Section 1983 Civil Rights action against Defendants for violations of Plaintiffs' constitutional rights.

2.      On December 28, 2017, at approximately 5:00 p.m. Andrew Finch was inside his home at 1033 West McCormick Street in Wichita, Kansas enjoying a peaceful evening with his mother, sister, niece, and two friends. Unknown to him, over ten heavily-armed Wichita Police Department (WPD) officers had surrounded the house. Shortly after opening the front door to see what was happening outside, he lost his life to a single bullet fired by Defendant Officer Justin Rapp from a sniper's rifle fifty yards away.

1

3.     Before the shooting, the WPD Officers on the scene, including Rapp and his commanding officer, Defendant Sergeant Jonker, made no effort to ascertain whether Andrew Finch actually presented any threat to either officers or the public before the shooting.  In fact Finch presented no such threat – he was an innocent, unarmed man who was killed less than 10 seconds after entering the porch of his own house.  WPD Officers, and Rapp in particular, had no reasonable justification for shooting and killing Andrew Finch.

4.     Immediately after the shooting, WPD Officers forced Andrew's mother, sister, niece and two friends from the house in handcuffs, held them against their wills for over an hour in 24-degree weather, and then transported them to WPD and interrogated them for over an hour before releasing them without explanation.

5.     The WPD Officers on the scene, including Defendant Jonker, who was in charge of the police response to the incident, made no effort to ensure immediate life-saving medical treatment for Finch after the shooting.  Finch was left to bleed out in the front hall of the house where he fell after the shooting.

6.     Andrew Finch died as a result of the actions and inactions of the WPD Officers who responded unlawfully when they surrounded his house and used lethal force on December 28, and because of the failures in policy and practice of the City of Wichita that facilitated such egregious law enforcement misconduct.

## JURISDICTION AND VENUE

7.     This court has subject matter jurisdiction of these claims pursuant to the Civil Rights Act, 42 U.S.C. § 1983 et seq; the Judicial Code, 18 U.S.C. §§ 1331 and 1343(a); and the 4th and 14th Amendments to the Constitution the United States.

2

8. The amount in controversy exceeds $75,000, exclusive of costs and interest.

9. Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to the plaintiffs' claims occurred in this judicial district.

## PARTIES

10. Plaintiff Lisa G. Finch is a resident of Sedgwick County, Kansas, the mother of Andrew Finch, the Co-Administrator of the Estate of Andrew Thomas Finch, deceased, which was filed in the 18th Judicial District of Sedgwick County, Kansas, Case No. 2018-PR-000050.

11. Plaintiff Adelina Finch is a resident of Sedgwick County, Kansas.

12. Plaintiff Dominica C. Finch is a resident of Sedgwick County, Kansas, the sister of Andrew Finch, and the Co-Administrator of the Estate of Andrew Thomas Finch, deceased, which was filed in the 18th Judicial District of Sedgwick County, Kansas, Case No. 2018-PR-000050.

13. Plaintiff Ali Abdelhadi is a resident of is a resident of Sedgwick County, Kansas.

14. Defendant City of Wichita, Kansas, (hereinafter "City") is a city and municipality organized under the laws of the State of Kansas. The City may be served with process at 455 N. Main, Wichita, Kansas 67202. The City is responsible for the policies, practices and customs of its Police Department.

15. Defendant Police Officer Justin Rapp is employed by WPD and engaged in the conduct complained of in the course and scope of his employment with the City of Wichita. At the times material to this complaint, Officer Rapp was a duly appointed agent authorized to enforce the laws of the City of Wichita, and the State of Kansas and acted under the color of law

at all times relevant to this action.  He is sued in his individual capacity.

16.     Defendant Police Officer Sergeant Benjamin Jonker is employed by WPD and engaged in the conduct complained of in the course and scope of his employment with the City of Wichita. At the times material to this complaint, Sergeant Benjamin Jonker was a duly appointed agent authorized to enforce the laws of the City of Wichita, and the State of Kansas and acted under the color of law at all times relevant to this action.  He is sued in his individual capacity.

17.     Defendant City of Wichita John Doe Officers 1-8 (hereinafter "Defendant Officers") are officers employed by the WPD.  As such, they were duly appointed agents authorized to enforce the laws of the City of Wichita, and the State of Kansas and acted under the color of law and in the scope of their employment at all times relevant to this action. They may be served with process at WPD, Patrol South Bureau, 211 E. Pawnee, Wichita, Kansas 67211. They are sued in their individual capacities.

## FACTS

18.     On December 28, 2017, at approximately 5:00 p.m. a prank caller in the State of California placed a call to the City of Wichita 911 (hereinafter "Prank Call"), falsely claiming that he had shot his father, was holding his mother at gun point, was going to burn down the house, and was going to commit suicide. The prank caller falsely gave a local Wichita address as his location.  The WPD had no history of responding to criminal calls at that address.

19.     As a result of the Prank Call, Wichita Police officers, including the Defendant Officers, were dispatched to that local Wichita address.

20.     That local address is 1033 West McCormick Street in Wichita, Kansas

(hereinafter "1033 West McCormick").

21.     Based on the information from the Prank Call, WPD Officers, including

Defendant Officers, went to 1033 West McCormick knowing or having reason to know that they

may be confronted with

    a.   A  situation involving someone in a mental health crisis;

    b.   a suicide situation involving hostages;

    c.   A situation involving a barricaded person who had shot his father, who was

       holding his mother and other family members at gunpoint, who had threatened to

       burn down the house, and who had threatened to commit suicide.

22.     Defendant Officers, including Defendants Rapp and Jonker, surrounded the house

at 1033 West McCormick.

23.     Defendant Officers, including Defendants Rapp and Jonker, who surrounded 1033

West McCormick were not:

    a.   Responding as Crisis Intervention Team Officers (CIT Officers);

    b.   Responding as officers who were specifically trained to deal with mentally ill

       civilians; or

    c.   Responding as members of a SWAT team, specifically trained to respond to high-

       stakes scenarios and to de-escalate situations by using well-established de-

       escalation techniques and less-lethal force.

24.     At the time Defendant Officers, including Defendants Rapp and Jonker,

surrounded 1033 West McCormick, the occupants in the house were: Andrew Finch, the

deceased; Lisa G. Finch, his mother and plaintiff; Domenica C. Finch, his sister and plaintiff; his

minor niece and plaintiff, Adelina Finch; and Ali Abdelhadi, one of two family friends

(hereinafter "Occupants of 1033 West McCormick").

25.   At the time Defendant Officers, including Defendants Rapp and Jonker,

surrounded 1033 West McCormick:

   a.   No occupant of 1033 West McCormick had shot any person;

   b.   No occupant of 1033 West McCormick had threatened to hold or was holding any person at gunpoint;

   c.   No occupant of 1033 West McCormick had threatened or was threatening to burn the house down;

   d.   No occupant of 1033 West McCormick had threatened or was threatening to commit suicide;

   e.   No occupant of 1033 West McCormick was armed or possessed a weapon;

   f.   No occupant of 1033 West McCormick presented a threat to the Defendants, WPD Officers, or anyone else;

   g.   No occupant of 1033 West McCormick had committed or was committing a crime;

   h.   No occupant of 1033 West McCormick was the target of an arrest warrant; and

   i.   1033 West McCormick was not the object of a search warrant.

26.   After Defendant Officers, including Defendants Rapp and Jonker, surrounded

1033 West McCormick, they made no attempt to determine whether an occupant of the house:

   a.   Was in a mental health crisis;

   b.   Had shot someone;

   c.   Had threatened to hold or was holding someone at gunpoint;

   d.   Had threatened or was threatening to burn the house down;

   e.   Had threatened or was threatening to commit suicide;

   f.   Was in possession of a firearm; or

       g.     Posed a danger to themselves or to others.

27.     After Defendant Officers, including Defendants Rapp and Jonker, surrounded 1033 West McCormick, Andrew Finch opened the front door in order to investigate what was happening outside his house.  Less than 10 seconds after Finch opened the door, Defendant Rapp, without cause or provocation and with the intention of killing Andrew Finch, fired a high-powered rifle at him from fifty yards away.  Andrew Finch was ultimately killed by this shot. Defendant Rapp was the only WPD Officer to fire a weapon at Andrew Finch that night.

28.     At the time Rapp shot the rifle, the visibility from Rapp's position to the porch where Finch was standing was poor; the scene was dark and Rapp lacked a clear view of Andrew from where he was stationed.  Rapp also was unable to see the other officers who surrounded the Finch house, including those who were much closer to the porch and had a much better view of Andrew at the time of the shooting.

29.     After the shooting of Andrew Finch, WPD Officers:

    a.   Ordered the occupants of 1033 West McCormick to exit the house through the side door;

    b.   Handcuffed the occupants of 1033 West McCormick and forced them to wait outside in 24-degree weather for over an hour;

    c.   Interrogated each of the occupants of 1033 West McCormick before being releasing them without explanation; and

    d.   Ransacked 1033 West McCormick and seized the front door of the house, two cell phones, a computer, router an Xbox and other items of personal property belonging to the occupants of 1033 West McCormick.  No weapons were recovered.

30.     Sergeant Jonker, who was the commanding officer in charge of the scene and who directly supervised all the responding WPD Officers, including by issuing directives and

radioing each of the officers who responded throughout the incident, knowingly failed to call

SWAT to respond to the incident as required by WPD policy; knowingly failed to establish an

operational perimeter; knowingly failed to establish a contact team; knowingly failed to appoint

a primary point of contact between the police and Finch; knowingly failed to provide any

instruction to the armed WPD officers, including Rapp, who surrounded the Finch household;

knowingly failed to ensure WPD Officers identified themselves and issued instructions to Finch

and the other members of the household; knowingly failed to ensure a negotiating team was

present and active at the scene; knowingly failed to ensure CIT officers were present and active

at the scene; and knowingly failed to issue warnings to Finch prior to the fatal shot.

31.     Despite obvious warning signs that the Prank Call was false, Jonker also failed to

conduct any kind of investigation or inquiry that would have alerted him and the other WPD

Officers at the scene to that fact and which would have prevented Rapp's use of lethal force.

32.     Jonker's supervisory failures, both his actions and inactions, facilitated and

promoted Rapp's unlawful shooting of Andrew Finch.

33.     Andrew Finch left as his sole heirs two minor children, a boy, AF, and a girl, DF.

### Count 1
### 42 U.S.C. § 1983 Claim for Excessive Force
### (Estate of Andrew Thomas Finch Claim)

34.     Plaintiffs Lisa G. Finch and Dominca C. Finch, as Co-Administrators of the Estate

of Andrew Thomas Finch repeat and reallege the preceding paragraphs of this Complaint as if

they were fully set out in this Count.

35.     The actions of Defendant Officers, including Defendants Rapp and Jonker,

alleged in this Complaint, which resulted in the shooting of Andrew Finch without just cause,

violated Andrew Finch's rights under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable seizure, and his right to due process under the Fourteenth Amendment to the United States Constitution.

36.     The actions of Defendant Officers, including Defendants Rapp and Jonker, as alleged in this Complaint were done maliciously, wantonly, or oppressively, with the intent to cause injury to the plaintiff or in reckless disregard of the probability that they would cause injury to the plaintiff.

37.     The actions of Defendant Officers, including Defendants Rapp and Jonker, alleged in this Complaint were the direct and proximate cause of the constitutional violations set forth above and of the Plaintiff's injuries.

## Count 2
## 42 U.S.C. § 1983 Claim for Unconstitutional Seizure
## (Lisa G. Finch Individual Claim)

38.     Plaintiff Lisa G. Finch, individually, repeats and realleges the preceding paragraphs of this Complaint as if they were fully set out in this Count.

39.     The actions of Defendant Officers, including Defendants Rapp and Jonker, alleged in this Complaint, which resulted in the detention and arrest of Lisa G. Finch without just cause, violated her rights under the Fourth Amendment to the United States Constitution to be secure in her person against unreasonable seizure, and her right to due process under the Fourteenth Amendment to the United States Constitution.

40.     The actions of Defendant Officers, including Defendants Rapp and Jonker, as alleged in this Complaint were done maliciously, wantonly, or oppressively, with the intent to cause injury to the plaintiff or in reckless disregard of the probability that they would cause

injury to the plaintiff.

41.     The actions of the Defendant Officers as alleged in this Complaint were the direct and proximate cause of the constitutional violations set forth above and of the Plaintiff's injuries.

**Count 3**
**42 U.S.C. § 1983 Claim for Unconstitutional Seizure**
**(Ali Abdelhadi Individual Claim)**

42.     Plaintiff Ali Abdelhadi repeats and realleges the preceding paragraphs of this complaint as if they were fully set out in this Count.

43.     The actions of the Defendant Officers as alleged in this Complaint, which resulted in the detention and arrest of Ali Abdelhadi without just cause, violated his rights under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable seizure, and his right to due process under the Fourteenth Amendment to the United States Constitution.

44.     The actions of the Defendant Officers as alleged in this Complaint were done maliciously, wantonly, or oppressively, with the intent to cause injury to the plaintiff or in reckless disregard of the probability that they would cause injury to the plaintiff.

45.     The actions of the Defendant Officers as alleged in this Complaint were the direct and proximate cause of the constitutional violations set forth above and of the Plaintiff's injuries.

**Count 4**
**42 U.S.C. § 1983 Claim for Unconstitutional Seizure**
**(Adelina Finch Individual Claim)**

46.     Plaintiff Adelina Finch repeats and realleges the preceding paragraphs of this Complaint as if they were fully set out in this Count.

47.     The actions of the Defendant Officers as alleged in this Complaint, which resulted

in the detention and arrest of Adelina Finch without just cause, violated her rights under the Fourth Amendment to the United States Constitution to be secure in her person against unreasonable seizure, and her right to due process under the Fourteenth Amendment to the United States Constitution.

48.     The actions of the Defendant Officers as alleged in this Complaint were done maliciously, wantonly, or oppressively, with the intent to cause injury to the plaintiff or in reckless disregard of the probability that they would cause injury to the plaintiff.

49.     The actions of the Defendant Officers as alleged in this Complaint were the direct and proximate cause of the constitutional violations set forth above and of the Plaintiff's injuries.

**Count 5**
**42 U.S.C. § 1983 Supervisory Liability Claim**
**(Estate of Andrew Thomas Finch Claim)**

50.     Plaintiffs repeat and reallege the preceding paragraphs of this Complaint as if they were fully set out in this Count.

51.     Defendant Sergeant Jonker exercised control over, directed, facilitated, affirmatively approved and acquiesced in the unconstitutional misconduct of the Defendant Officers, including Defendant Rapp, who responded to 1033 W. McCormick the night of the Finch shooting.

52.     The actions and inactions of Defendant Jonker, as alleged in this Complaint, were done maliciously, wantonly, or oppressively, with the intent to cause injury to the plaintiff or in reckless disregard of the probability that they would cause injury to the plaintiff.

53.      The actions and inactions of Defendant Sergeant Jonker, as described in this Complaint, were the direct and proximate cause of the constitutional violations set forth above

and of the Plaintiff's injuries.

**Count 6**
**42 U.S.C. § 1983 Monell Claim**
**<u>(Estate of Andrew Thomas Finch Claim)</u>**

54.     Plaintiffs repeat and reallege the preceding paragraphs of this Complaint as if they were fully set out in this Count.

55.     The actions of the Defendant Officers as alleged in this Complaint were done under the authority of one or more interrelated de facto policies, practices and/or customs of the City of Wichita.

56.     The actions and inactions of the Defendant Officers as alleged in this Complaint were the result of widespread municipal policy, practice and custom, as further established by the involvement in, and ratification of, these acts by municipal supervisors and policy makers, including Wichita Mayor Jeff Longwell and Wichita City Manager Robert Layton, as well as by a wide range of police officials, including WPD Chief Gordon Ramsay.

### <u>Wichita Police Department Mental Health Policy</u>

57.     Wichita police officers are governed by WPD Policies, Regulations, and each Bureau's Standard Operating Procedures.

58.     WPD Policy 5.19 addresses how Wichita Police Department Officers are to handle individuals with mental illness.

59.     WPD Policy 5.19 defines "Mental Illness" as "[a] condition characterized by impairment of an individual's normal cognitive, emotional, or behavioral functioning which can be caused through a variety of means, including but not limited to: social, psychological, biochemical, genetic, illness or injury."

60.     WPD has officers called Crisis Intervention Team (CIT) Officers who are specifically trained to deal with mentally ill citizens and de-escalate situations by using specific de-escalation techniques. These CIT Officers receive special training from Sedgwick County, Kansas.

61.     According to Sedgwick County's information on CIT training, "[L]aw enforcement officers are trained to de-escalate potentially dangerous situations involving individuals with mental illness, intellectual disabilities and/or developmental disabilities (ID/DD).[1]"  (Emphasis added.)

62.     The WPD Policy Manual, Policy 519.02 "Mentally Ill Persons/Crisis Intervention Team" states that CIT Officers are the "preferred response to all calls involving mental health crises."

63.     According to former Wichita Police Department Deputy Chief Tom Stolz:

   a.   Wichita has seen a marked increase in the number of police cases involving mentally ill people, with Wichita officers handling more than 1,900 cases involving the mentally ill in 2008.

   b.   The number of cases involving the mentally ill had risen to more than 2,600, and 2012 is expected to be higher.

64.     Despite recognition by WPD that cases involving the mentally ill were steadily rising every year, and that its officers would likely encounter situations with citizens suffering a mental health crisis, the Wichita City leadership and the WPD failed to properly train and supervise its officers to deal with the mentally ill, in particular in responding to high-stakes scenarios.

**Wichita Police Department Policy on Suicide Calls**

---

1   http://www.sedgwickcounty.org/cddo/facts_and_details/Community%20Resources.pdf

65.     WPD policy concerning people who are suicidal or who exhibit suicidal

tendencies recognizes that:

a.     The first responding officers should not attempt to breach the home when the suicidal person is home alone, unless there is imminent danger to the officers or others;

b.     Time is the most important asset when dealing with people in crisis and allows for better intelligence, a better response and the passage of time calms people down;

c.     The first few minutes of a crisis event are the most critical and set the stage for future actions in a mental health crisis incident;

d.     If within an officer's control, it is best to allow time to pass and let a person calm down before making the initial contact;

e.     Suicide calls are often cries for help by the person threatening to commit suicide;

f.     When responding to a suicide call, safety is of the utmost concern;

g.     Unnecessarily placing officers or the suicidal person at risk of harm should be avoided.

**Wichita Police Department Use Force Policy**

66.     WPD Regulation 4.1 governs "Weapons/Use of Force".

67.     WPD Regulation 4.101 ("Reg. 4.101") issued and revised as of February 16, 2012

states the following in pertinent part:

In a stressful situation, **a police member's first reaction should be to determine whether the objective can be accomplished without the use of a weapon**. A member's decision, relative to the use of force, must be legally justifiable, and thoroughly articulated, **considering both the nature of the crime and circumstances surrounding it**.

This Department recognizes and respects the value and special integrity of each human life. In vesting police members with the lawful authority to use force to protect the public welfare, **a**

14

**careful balancing of all human interests is required**. Therefore, **it is the policy of this Department that police members shall use only that force that is objectively reasonable** based on the totality of the circumstances, to effectively bring an incident under control, in making a lawful arrest, while protecting the life of the member, or the life of another person. (Emphasis added.)

68.     WPD Regulation 4.105, "Situations When Discharging a Firearm Is Not Justified," states that "an officer is not justified in discharging a firearm **when use of less force would safely accomplish the objective.**" (Emphasis added.)

69.     WPD Regulation 4.106, "Use of Less-Lethal Force," states "Where lethal force is not authorized, members should assess the incident in order to determine which less-lethal force technique or weapon will best de-escalate and bring the incident under control in a safe manner."

70.     WPD uses a "Threat Assessment" policy regarding the use of force.

71.     WPD "Threat Assessment" policy teaches the officers to imagine the worst scenario possible and act on that assumption rather than the objective facts before them.

## Pattern and Practice of Concealing Officer Misconduct and Promoting a Culture of Impunity

72.     As a matter of City-wide policy, practice and custom, information about officer-involved shootings and other uses of excessive force, including WPD investigations into such conduct, is kept internally and away from the public view. This lack of municipal transparency ensures that officers are not held accountable for even egregious misconduct. Further, there is no independent oversight of WPD investigations into its own officers, allowing WPD to conduct faulty investigations of officers without consequence.

73.     The Defendant City maintains a policy of refusing to publicly release information about officer-involved shootings or uses of excessive force. Despite the City's position in *Fettke*

*v. City of Wichita* that WPD Officers, as public officials, do not have a right to privacy, the City refuses to release the names of the officers involved, citing privacy rights of the officer.[3]

74.     Defendant City of Wichita, through WPD, fails to conduct objective and evidence-based investigations into officer and supervisory officer misconduct.  As a result, Officers come to believe that they can violate the rights of civilians, including through the unlawful use of lethal force, with impunity and without fear of discipline or consequence.

75.     Officer-involved shootings and other acts of excessive force by WPD officers remain cloaked in secrecy because internal WPD records relating to such acts are made part of the WPD secret confidential records file.  Further, WPD fails to release the results of officer-involved misconduct investigations even to the officers under investigation.

76.     This pattern and practice of concealing officer misconduct is demonstrated by numerous incidents of misconduct by leadership actively concealed from the public and not disclosed, including but not limited to:

a. Destruction of internal affair records of senior members of the police department by order of senior leadership;

b. Implementation of "training systems" designed to prevent the discovery of information about officers' use of force by classifying certain documents as "training aides";

c. Refusal to provide the identities of the officers involved to the victims and families of victims of deadly force by officers, in an effort to stall or delay the filing of lawsuits against WPD and its officers;

d. The lack of any meaningful internal administrative or criminal review regarding the use of lethal force by officers;

e. The lack of any meaningful civilian oversight and City regarding claims of

---

3   *Fettke v. City of Wichita*, 264 Kan. 629, 632, 957 P.2d 409, 412 (1998), wherein City of Wichita argued the city owed no duty of silence to Fettke, who was a police officer and a public official with no right of privacy and therefore the City should not be liable for the release of his name to the media.

excessive force;

    f.   The lack of any meaningful administrative or criminal investigation into officer-involved shootings.

    g.   The lack of any meaningful administrative or criminal investigation into officer-involved misconduct in high-stakes scenarios.

77.    Defendant City of Wichita does not have an operational civilian review board or police oversight committee regarding officer-involved shootings or claims of excessive force, leaving the City's police department free to investigate itself.  There is no adequate mechanism for City review of WPD's internal investigations of officer-involved misconduct.

78.    Current and past leadership within the City have furthered the culture of officer impunity and a lack of police transparency by authorizing, approving and facilitating WPD's inadequate handling of alleged misconduct committed by its own officers and by failing to establish adequate municipal oversight of the police.

79.    This municipal pattern and practice of concealing WPD officer and supervisory officer misconduct and of concealing the identities of officers involved in alleged misconduct encourages officers to believe that their unconstitutional behavior will be protected and that they will suffer no discipline, thereby emboldening them to act unlawfully.

**Wichita Police Department Officer-Involved Shootings from 2010-2015**

80.    WPD Officers have been involved in at least 29 shootings incidents from 2010-2015, resulting in at least 15 deaths.  In over 95% of these cases, the Defendant City of Wichita refused to publicly release the names of the involved officer.

81.    Defendant City of Wichita has exonerated the officers in virtually all officer-involved shootings between 2010 and the present and has taken the position that they were all

reasonable and justifiable.

82.     On information and belief, Defendant City of Wichita has exonerated virtually all officers in officer-involved shootings from 2016 to the present.

**Wichita Investigations of Officer-Involved Shootings**

83.     WPD considers investigations of officer-involved shootings to be criminal investigations.

84.     Despite treating investigations of officer-involved shootings as criminal investigations, Defendant City of Wichita immediately designates every officer-involved shooting resulting in death as a "Justifiable Homicide," despite the lack of such determination by the Sedgwick County District Attorney.

85.     Once the officer-involved shooting death is arbitrarily classified as a "Justifiable Homicide," Defendant City of Wichita's investigation is conducted in such a manner as to support its predetermined conclusion that the shooting was justified.

86.     Facts and leads that might suggest the shooting was not justified are ignored and disregarded.

87.     The Kansas Bureau of Investigation is tasked with "overseeing" the investigation of WPD officer-involved shootings.

88.     The Kansas Bureau of Investigation's involvement in investigations is limited at best, and non-existent at worst, leaving Defendant City of Wichita and its police department to primarily conduct the investigation of its own officers.

89.     Civilians involved in shootings are locked in an interrogation room with audio and video recording equipment to record what occurs in the room. Civilians are not afforded access

to anyone other than legal counsel prior to questioning.

90.     In contrast, WPD Officers involved in shootings are allowed to sit in accessible offices that are open to anyone passing by who want to stop and speak with the officer, rather than isolated in a locked interrogation room.

91.     Unlike civilian suspects in a homicide, WPD officers involved in shootings are allowed to make phone calls prior to questioning.

92.     WPD Officers are also allowed to view evidence in the case under investigation prior to the conclusion of the investigation.

93.     Pursuant to the contractual arrangements between the City and the police officers' union, WPD Officers are allowed to meet privately with their union representative in a room without any recording devices prior to questioning after a shooting. These union representatives are familiar with the process, procedures, and standards for police shootings and are given unfettered access to the officer prior to questioning and have the opportunity to coach the officer on what to say and what not to say.

94.     The interviews of officers involved in a shooting are conducted by WPD Homicide Detectives, with a Kansas Bureau of Investigation agent sitting in on the interview, but rarely participating in the interview.

95.     Investigators ask inappropriate leading questions of the officers thereby suggesting the legally correct answer to find a shooting is justified.

96.     Investigators often ignore evidence contrary to the shooting officer's version of the events, such as:

    a.  the presence of stippling on victim's body even though the officer said he was too far away for stippling to be present;

b.   failing to conduct bullet angle analysis or other testing to confirm or contest the physical position of the officer and victim at the time of the shooting;

c.   failing to probe important details when questioning witnesses and the shooter;

d.   failing to determine whether less-lethal options were available, or whether the officer attempted de-escalation techniques.

97.   Defendant City of Wichita has never found that an officer-involved shooting causing serious harm or death was excessive or violated policy.

98.   Defendant City of Wichita refuses to make administrative findings on the reasonableness of an officer-involved shooting when litigation is pending.

**Wichita's Failure to Adequately Train WPD Officers**

99.   WPD Officers do not receive sufficient training in how to avoid the use of excessive and lethal force in the scope of their employment.  The consequence of this under-training is that officers regularly engage in the unnecessary and unconstitutional use of lethal and excessive force against civilians.

100.   Defendant City of Wichita knew or should have known that WPD Officers engage in a pattern and practice of using unnecessary and unconstitutional use of deadly force against civilians in the scope of their employment.

101.   At all times material to the allegations contained in this complaint, the City of Wichita maintained interrelated de facto policies, practices, and customs relating to the failure to properly train and supervise officers involved in responding to high-stakes scenarios, including:

a.   The failure to improperly implement a procedure for making a assessments about the potential that a high-stakes call to Wichita 911 or the badge on the floor is a prank call;

b.   The failure to dispatch properly trained officers to any scene involving a potential armed person in mental health crisis and/or hostage-taking and/or barricaded gunmen and/or any high-stakes scenario;

20

    c.   The failure to properly train officers to adequately respond to any scene involving a potential armed person in mental health crisis and/or hostage-taking and/or barricaded gunmen and/or any high-stakes scenario;

    d.   The failure to properly train officers to use adequate de-escalation techniques before resorting to the use of lethal force in any scenario involving a potential armed person in mental health crisis and/or hostage-taking and/or barricaded gunmen and/or any high-stakes scenario;

    e.   Encouraging excessive and unreasonable force against civilians in situations involving potential mental health crisis;

    f.   The failure to properly train and supervise officers with regard to discharging their weapons at civilians involved in a potential mental health crisis;

    g.   The maintenance and perpetuation of a culture of impunity or code of silence in regards to officer-misconduct committed during a police response to any scenario involving a potential armed person in mental health crisis and/or hostage-taking and/or barricaded gunmen and/or any high-stakes scenario;

102.    The interrelated municipal policies, practices and customs, as alleged in this Complaint, individually and together, were maintained and implemented with deliberate indifference to the constitutional rights of civilians, and were the moving force behind the Defendant Officers' unconstitutional acts alleged herein.  As such, these policies, practices and customs are also the direct and proximate causes of the injuries to Andrew Thomas Finch and his heirs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Lisa G. Finch, Individually, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased, Plaintiff Adelina Finch, Plaintiff Dominica C. Finch, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased, and Plaintiff Ali Abdelhadi pray for damages in an amount to be determined at trial on each count, exclusive of interest, costs and attorney fees, including punitive damages against the individual officers, attorney fees and costs

pursuant to 42 U.S.C. §1988 for each of the applicable claims, pre- and post-judgment interest on

any damages awarded at the statutory rate, and for other and such further relief as the Court

deems just and equitable.

## JURY TRIAL DEMAND

Plaintiff respectfully requests that this matter be tried to a jury on all of the claims against

the Defendants.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Wichita, Kansas as the place of trial in this matter.


Respectfully submitted,

Conlee, Schmidt & Emerson, LLP


/s/Rick E. Bailey
Rick E. Bailey, KS # 11583
200 W. Douglas, Ste. 300
Wichita, Kansas 67202
(316) 264-3300
(316) 264-3423 (Fax)
rbailey@fcse.net


/s/Andrew M. Stroth
Andrew M. Stroth (Pro Hac Vice)
Carlton Odim (Pro Hac Vice)
Action Injury Law Group, LLC
191 North Wacker Drive
Suite 2300
Chicago, IL 60606
(312) 771-2444
(312) 641-6866 (Fax)
astroth@actioninjurylawgroup.com
carlton@actioninjurylawgroup.com

/s/ Alexa Van Brunt

Alexa Van Brunt (Pro Hac Vice)
MacArthur Justice Center
Northwestern Pritzker School of Law
375 E. Chicago Avenue
Chicago, IL 60647
(312) 503-1336
a-vanbrunt@law.northwestern.edu

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 13th day of November 2018, a true and correct copy of the above and foregoing **First Amended Complaint** was filed with the Clerk of the District Court by using the CM/ECF system which will send a notice of electronic filing to counsel for Defendant City of Wichita at:

J. Steven Pigg
FISHER, PATTERSON, SAYLER & SMITH, L.L.P.
3550 S.W. 5th St.
Topeka, Kansas 66606
Email:  spigg@fisherpatterson.com
*Attorney for Defendant City of Wichita*

Jennifer L. Magana
*City Attorney*
Sharon L. Dickgrafe
*Chief Deputy City Attorney*
City Hall – 13th Floor
455 N. Main
Wichita, Kansas 67202
*Attorney for Defendant City of Wichita*

                                                          /s/   Rick E. Bailey