IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA G. FINCH and DOMINICA C. FINCH as
Co-Administrators of the Estate of Andrew
Thomas Finch, deceased,

                Plaintiffs,

     vs.                         Case No. 18-CV-01018-JWB-ADM

CITY OF WICHITA, KANSAS, et al.;

                Defendants.

## MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

Defendants submit this memorandum in support of their motion for summary judgment.

**NATURE OF THE CASE.** Defendants Benjamin Jonker and Justin Rapp responded with other WPD officers to a dispatch of a shooting at 1033 W. McCormick in Wichita based on a call that the caller had shot his dad in the head and that he was holding family members at gunpoint. Rapp covered the front door of the residence as officers formed a perimeter. Shortly after Rapp took position, while the perimeter was still being established, Finch walked out onto the porch. Finch disregarded officer's commands to show his hands and moved his right hand towards his waist. Rapp reasonably perceived Finch to be drawing a gun towards officers to the east of him and fired a single, fatal shot to protect the officers. The officers' actions were based on their reasonable belief that they were responding to a call involving a shooting and hostages. Unknown to the officers at the time, the dispatch was based on a false call.

**STATEMENT OF UNCONTROVERTED FACTS.** Defendants present the following facts taken in the light most favorable to plaintiffs. Defendants reserve the right to controvert these

{T0464613}                       1

facts if trial becomes necessary.

1.  At 6:10 p.m. on December 28, 2017, the downtown City "Badge on the Floor" received a call and referred the call to 911 emergency dispatchers.  The caller hung up and called back multiple times.  (ECF Doc. 158, ¶ 2(a)(11).

2.  At 6:18 p.m., Sedgwick County 911 dispatchers made contact with the caller.  The caller told the 911 dispatchers that he was located at 1033 W. McCormick in Wichita ("the residence"); that he had shot his father in the head and his father was not breathing; that he was holding his mother and brother hostage at gun point in a closet; and that he wanted to kill himself and light the house on fire.  *Id.* at ¶ 2(a)(12).

3.  At 6:19 p.m., dispatchers transmitted alerts by tone to officers that a shooting had occurred. Forty-two seconds later, a dispatcher radioed over the air that a suspect at 1033 W. McCormick in Wichita had shot his father in the head, that his father was not breathing, and that he was holding his mother and brother hostage at gun point in a closet.  *Id.* at ¶ 2(a)(13).

4.  Officers normally respond to calls based on the information received from dispatch, even if the information is not correct.  (DeFoe, 82:17-20; Jonker, 67:16 to 68:3; Rapp, 124:17-21).

5.  As a result of the dispatch on December 28, WPD officers and Sedgwick County Sheriff's deputies responded to the scene believing they were responding to a barricaded shooter scenario with hostages where a male reported shooting his father and holding additional family members at gunpoint.  (ECF Doc. 158, ¶ 2(a)(18); Jonker, 72:15-24; Rapp, 128:5-14, 132:21 to 133:1).

6.  The coordinated police response was understood by the responding officers to establish the perimeter, investigate the incident, and make contact only after the perimeter was established. (Rapp, 158:6-24; Fussell, 124:4 to 125:1; Jonker, 42:6-7, 15-19, 128:17-25).

7.  Sedgwick County deputies David Headings and Noah Stephens-Clark, who were part of

the high risk warrant entry team, responded within a minute or two of the call and were the first officers on scene. (Headings, 4:13-19, 12:7-21, 22:21 to 24:13; Stephens-Clark, 4:13-17, 8:4-10, 12:22 to 13:1, 14:24 to 15:4). Headings grabbed a ballistic shield and Stephens-Clark was armed with a rifle. (Headings, 34:21 to 35:9; Stephens-Clark, 22:11-23, 16:4-5).

8. The deputies parked to the east of the residence and approached the residence from the east on foot, walking through the yards between the houses and sidewalk as additional officers began arriving on the west side. (Headings, 25:22 to 26:21; Stephens-Clark, 14:13 to 15:4).

9. WPD officers Kyle Perry and Chris Ronen also responded from the east and joined Headings and Stephens-Clark to the east of the residence. (Perry, 4:13-18, 25:1-16, 26:9-19, 30:13-21; Ronen, 4:13-17, 17:13 to 18:16, 19:12-24, 23:18 to 24:8).

10. Stephens-Clark was closest to the residence, Deputy Headings was to his right, and the WPD officers filled in behind the deputies. (Stephens-Clark, 17:9-23).

11. The officers saw officers west of the house, patrol vehicles with lights flashing blocking traffic on McCormick, and officers to the north of the house. (Perry, 31:12 to 33:1; Headings, 36:20 to 37:14).

12. WPD Sgt. Benjamin Jonker was driving when dispatch broadcast the shooting call. (Jonker, 4:13-17, 74:1-12). Jonker asked dispatch about other calls from that address, and the only prior call was a call of a stroke. (Jonker, 77:22 to 78:13, 80:13-25).

13. Jonker was the only supervisor he saw when he first arrived so he took charge of the scene. (Jonker, 85:1-9).

14. Jonker parked to the southwest of the residence and began to assess how many officers he had. (Jonker, 90:21 to 91:6, 91:19-23).

15. WPD officers Justin Rapp and Powell, both SCAT officers, responded and parked on the

southwest side of the residence.  Rapp retrieved his rifle on which he had been trained and is certified to use at 50 yards.  (Powell, 35:3-9; Rapp, 83:14-16, 84:5-12, 85:7-9, 137:11-22, 139:23 to 140:3, 160:20 to 161:5).

16.     Rapp was told by another officer that he could see movement in the upstairs window of the residence that looked like someone was doing CPR.  (Rapp, 205:24 to 206:9).

17.     Jonker quickly realized there were no apparent exits on the west side of the house, and he knew Gumm and Rapp both had their weapons pointed towards the upper level of the residence and that Gumm indicated movement was coming from the windows.  (Jonker, 92:17 to 93:5).

18.     Jonker commanded Rapp and Powell to follow him to the front of the house.  Gumm stayed as cover on the back of the residence. (Jonker, 93:25 to 95:3; Powell, 35:16-21).

19.     Jonker decided to move to the front of the house because he wanted officers on the front of the residence.  (Jonker, 95:14 to 96:13; Rapp, 145:11-24).

20.     Jonker was checking on the radio whether there were sufficient officers on the perimeter, and giving instructions on where to block traffic.  (Ronen, 26:15 to 27:19; Rapp, 150:21 to 151:14). Jonker asked the next incoming units to block off McCormick.  (Jonker, 99:4-15).

21.     WPD officer Dustin Fussell responded to the scene and pulled his patrol car onto McCormick to block the eastbound lanes off of Seneca as requested by Jonker.  (Fussell, 79:16 to 80:11).  Jonker, Rapp, and Powell were running by from the south side of McCormick, so Fussell followed them and heard Jonker asking dispatch for more information on where the call came from.  (Fussell, 80:18 to 81:8, 101:17 to 102:9).

22.     Jonker told Rapp to be long cover because Rapp had a rifle, at which point Rapp's duties were to provide long cover.  (Jonker, 101:7 to 102:20).

23.     Jonker did not tell Rapp how to be long cover or to raise his rifle, and he did not give him

additional commands. (Jonker, 101:7 to 102:12; Rapp, 157:6-24, 160:9-13, 201:9-14).

24.     Based on his years of law enforcement experience, Rapp knew his duties as cover officer were to look out for the safety of everyone in the general vicinity, including perimeter officers, to keep watch of the residence, to identify any movement, to alert other officers of movement, and to assist in identifying any potential threats.  (Rapp, 145:25 to 146:5, 146:13-19, 147:5-14).

25.     Rapp positioned himself with an unobstructed view of the residence from across the street, about 40 yards from the residence.  (Jonker, 103:13-17; Rapp, 161:8-12, 187:10-14).  Rapp could see the entire front of the residence with a good view of the front porch, most of the front yard, and the entire sidewalk.  (Rapp, 185:2-22, 200:12-23).

26.     Rapp raised his rifle and pointed it south as he scanned the entire front of the house looking for movement.  (Rapp, 164:21 to 165:15).

27.     Powell was within arm's distance to Rapp's right, and Jonker was little further to Rapp's right.  (Rapp, 162:20 to 163:11).

28.     Rapp understood from Jonker and radio traffic that officers were present on the east and west sides of the residence.  (Rapp, 151:25 to 153:11).

29.     Because there were four officers on the east side, one with a bunker, Perry communicated to Jonker that they would make a contact team if necessary.  (Perry, 39:4-19, 40:5-13).

30.     As soon as Perry relayed they would be the contact team, Finch walked out of the house. (Perry 42:10-15).

31.     Jonker thought the officers had a decent perimeter in place, but everything happened so quick that he was still only in the beginning stages of making sure it was complete.  (Jonker, 111:12 to 112:4, 129:1-10).  When Finch came out, Jonker was still setting up the response to the call and formulating a plan on how to respond to the incident, which would include the officers east of the

residence as the takedown team.  (Jonker, 105:1-16, 129:11-21).

32.    After Rapp had been in position for about 40 seconds, Finch opened the main door of the house, pushed the screen door open with his left hand, and stepped out onto the porch.  (Rapp, 207:9-16, 210:22 to 211:2).

33.    The only information from dispatch that Rapp could use to compare the suspect to Finch was that the caller was male.  (Rapp, 214:3-8).

34.    Jonker heard someone say "the door's opening" or "he's coming out," and he looked up and saw Finch standing just outside the main threshold.  (Jonker, 136:10-22).

35.    Stephens-Clark turned on the light on his rifle when Finch came onto the porch.  (Stephens-Clark, 48:15-20; Jonker, 133:18 to 134:1).

36.    Jonker commanded "let me see your hands" or "put your hands up."  He also heard officers to the east and other officers giving commands.  (Jonker, 141:23 to 142:12).

37.    Jonker wanted to be the primary contact person because he had not yet assigned anyone else to do it. (Jonker, 112:22 to 113:14, 155:1-11).

38.    Stephens-Clark started giving Finch verbal commands to put his hands up and to step off the porch.  (Stephens-Clark, 27:22 to 28:4; Headings, 45:3 to 46:3).

39.    The officers were giving similar commands and it was clear that they were yelling for Finch to put his hands up.  (Jonker, 142:18 to 143:1; Ronen, 36:12 to 37:6).  No commands were conflicting.  (Jonker, 143:22-24; Headings, 81:4-12).

40.    Jonker gave Finch a command to "walk this way."  (Jonker, 143:25 to 145:6).

41.    Finch initially complied with the commands and raised his hands to about ear level, but as quickly as he complied, he stopped complying and dropped both hands back to his waist level. (Rapp, 225:6-13, 227:5-16).

42.     Finch looked across the street as if he was squinting, and then he looked at the officers to the east and put his hands up only part way but quickly put them down.  (Ronen, 36:12 to 37:6, 43:23 to 44:10, 48:7-17).  Officers again started yelling "police, show me your hands," and Finch put them back up.  (Ronen, 48:7 to 50:7).  Finch turned towards the officers to the east, put his hand down, and then a shot was fired.  (Ronen, 50:8-22).

43.     Based on Finch's actions with his hands and his facial expressions—agitated or frustrated— and turning and lowering his hands, Ronen believed Finch was acting as if he was the shooter. (Ronen, 43:2-8, 53:4-21).  Ronen interpreted Finch's facial expression and movements as sizing up the officers across the street and to the east and then challenging the officers by lowering his hands.  (Ronen, 55:15 to 57:6).

44.     Ronen thought Finch was reaching for a gun and thought the shot made sense given the way Finch turned and his hand went down and based on the information the officers knew.  (Ronen, 99:23 to 101:5).

45.     Stephens-Clark perceived Finch initially to put his hands up, then lower them and take a step back.  He yelled again to put his hands up.  Finch again put up his hands then lowered them and stepped backward.  Stephens-Clark gave the command again, and Finch brought his hands up but less high and started to bring them back down and step back into the doorway.  (Stephens-Clark, 28:22 to 29:9).  At the moment Finch was shot, he had backed into the threshold of the doorway out of Stephens-Clark's sight.  (Stephens-Clark, 31:14-19).

46.     Stephens-Clark did not think Finch was a hostage because most hostages do not go back into the building where they are being held.  He thought Finch was either the shooter or a third-party.  (Stephens-Clark, 46:14 to 47:1).

47.     Perry observed Finch initially raise his hands to about shoulder height, glance around, and

then drop his hands with one hand reaching across his body towards his waistband with his elbow and shoulder dipping down. (Perry, 46:25 to 49:10, 65:1-8). Finch's mannerisms, his actions, and the way he bladed his body would be similar to the way Perry would draw a gun, the way he had been trained to draw a gun. Perry believed Finch was drawing a weapon. (Perry, 48:4 to 50:2, 59:12-14, 60:6-16).

48.     Based on the situation and the call, Perry perceived Finch's movements to constitute a lethal threat, and the only reason Perry did not shoot is because he did not have a safe shot due to crossfire concerns. (Perry, 67:7-24, 86:11 to 87:4).

49.     Headings observed Finch come out the front door, step forward halfway across the porch, look north with a few glances either way, and initially put his hands up and then slowly back down. Someone yelled "hands up" and Finch's hands went up again. Headings observed his hands go up and down numerous times, and he was slowly stepping backwards to go back inside while still facing north. (Headings, 49:22 to 50:15; 81:13-21).

50.     Headings then observed Finch reach behind his back towards the small of his back where individuals sometimes wear firearms as he approached the threshold. As Finch's hand neared the small of his back, he had broken the threshold enough that Headings could not see what his hands were doing or whether he raised his arms. (Headings, 50:16 to 51:8, 81:25 to 82:14).

51.     As Finch reached behind his back, Headings perceived a potential threat had presented itself because he could not tell what Finch was doing, he was reaching towards the small of his back which is a normal place a handgun could be placed, was not complying with commands, and based on the information from dispatch. (Headings, 50:16 to 52:8).

52.     Headings was concerned that Finch presented a threat, and because others were in the house who could be in danger, he moved his finger to the trigger on his gun. (Headings, 85:3-20).

Headings did not fire because Finch backed out of his sight and because he was concerned about other people in his line of fire.  (Headings, 85:14-25).

53.     Finch was facing north-northeast and appeared to Rapp to be focused on the east officers. (Rapp, 226:12-20).

54.     When the officers to the east began yelling additional commands at Finch after he put his hands down, Finch grabbed the right side of his hoodie or sweatshirt, lifted it up and out away from his body, made a motion like he was grabbing something on his waistband and drawing a firearm, rolled or dipped his shoulder forward, and put his hand back down on the back half of his right thigh out of Rapp's view, with the entire movement lasting less than a second.  (Rapp, 227:17-24, 228:21 to 229:16, 230:9-12; Rapp Declaration, ¶ 4).

55.     After Finch put his hand back down, Rapp could not clearly see his right hand and could only see it moving in the vicinity of Finch's waistband and then go down behind the right leg. (Rapp, 232:2 to 233:1).

56.     Finch then turned to his right towards the east officers and began raising his right hand in the direction of the officers.  (Rapp, 232:17-19, 235:1-21).

57.     Rapp thought he had a clear view of Finch's hand as it raised.  He believed Finch had a gun in his hand, a belief that turned out to be mistaken.  (Rapp, 236:11-25, 238:16-20).

58.     Rapp believed Finch was in the process of raising the gun towards the officers to the east. (Rapp, 239:6-13).

59.     When Finch first entered the porch, Rapp did not know if Finch was the shooter, but he thought it possible because he was male.  Within 10 seconds, Rapp believed Finch was the suspect who had called 911 based on the information received from dispatch and Finch's motions and noncompliance, and Rapp believed Finch was going to use his firearm to fire on police.  (Rapp,

233:2-15, 249:8 to 250:20).

60.     Rapp fired one shot to protect the other officers because he believed Finch presented a threat of imminent serious injury or death to officers on the east side of the residence.  (Rapp, 245:12-16; Rapp Declaration, ¶ 5).

61.     Finch potentially presented a lethal threat to the hostages the officers believed were inside.  (Rapp, 247:5-10).

62.     Rapp did not believe it was possible to wait to see what Finch was going to do with his hand before shooting, and he did not believe there was time for a verbal warning that lethal force was going to be used.  (Rapp, 256:9-18).

63.     Rapp had to make a decision as to whether Finch had a gun in his hand in a fraction of a second.  (Rapp, 259:23 to 360:10).

64.     Rapp fired when he did because in his experience in firing firearms at the range and his use of force training, the time it takes for a person such an Finch to raise a firearm and begin to fire and the officer's brain to register the person has a gun and is firing, the person would be able to fire 3 to 5 rounds in that amount of time.  If Rapp waited to fire, he would have allowed Finch to fire 3 to 5 bullets at officers.  (Rapp, 360:20 to 361:7).

65.     Rapp clearly saw Finch raising his arm toward the other officers, but he did not clearly see that Finch did not have a gun in his hand.  (Rapp, 360:11-16).

66.     Powell's body camera shows essentially what Powell saw from his location just to Rapp's right and shows Finch's hand going down behind Finch out of Powell's sight.  (Powell, 98:12 to 100:2; Powell's Axon Camera Video (being filed conventionally as Exhibit K)).

67.     Jonker recalls Finch having his hands down, and then they started coming back up, but not up in the air.  Jonker glanced at officers to the west and then heard the shot.  (Jonker, 145:24 to

146:15).  Jonker did not see Finch do anything else because he changed his focus to the west officers as he began to worry about crossfire.  (Jonker, 148:15-21).

68.    Jonker did not give any officer, including Rapp, any instructions on when to shoot or what to do when Finch came onto the porch.  (Jonker, 152:9-20).

69.    From the time Finch stepped onto the porch until the shot was within 10 seconds.  (Fussell, 133:12-15; Jonker, 151:2-7; Rapp, 240:8-15).

70.    Once Finch appeared, there was not enough time for the officers to communicate about who was going to do what or to try a less lethal force.  (Rapp, 248:9-17).

71.    Rapp estimated the time from when he arrived at the scene until the shooting happened was two and a half to three minutes and the time from when he arrived on the north side of the street to the shooting to be 42 or 43 seconds.  (Rapp, 266:17 to 267:4).

72.    The shot occurred less than three minutes after Jonker arrived on scene and within 40 seconds to a minute after he arrived on the north side of the residence.  (Jonker, 123:20-25, 124:5-17, 129:22-25).

73.    Jonker did not request SWAT because the situation happened so quickly.  Before requesting SWAT, he would make sure a decent perimeter was in place and assess the situation. He would not request SWAT based solely on information from dispatch.  (Jonker, 115:24 to 118:5).  If he felt the situation warranted a SWAT call, Jonker could request it but the duty chief or watch commander would have to make the ultimate decision.  (Jonker, 25:19 to 26:3).

74.    Once called, it would take SWAT 45 minutes to an hour to arrive on scene.  (Kochenderfer, 80:25 to 81:21).

75.    The initial call to 911 was a false swatting call for which Tyler Barriss has since been charged and sentenced, but this was unknown to officers at the time.  (ECF 158, ¶ 2(a)(14)-(15).

76.     Plaintiffs' expert Scott DeFoe acknowledged that when officers arrive on a scene, they set up a perimeter, form a contact team, and then try to communicate with the suspect after the perimeter is contained.  (DeFoe, 25:15 to 26:5).  A SWAT team would have long cover with a rifle if SWAT set up the perimeter.  (DeFoe, 33:2-14).  DeFoe agrees that it was appropriate for Jonker to have Rapp deployed to the north side of the house with a rifle.  (DeFoe, 37:11-20).

77.     DeFoe agrees that the situation reported to the officers presented a situation of significant danger to the occupants of the house and to the officers and that it would be reasonable to not let Finch back into the house if the officers believed he had hostages.  (DeFoe, 36:2-10, 77:3-19, 253:18 to 255:16).

78.     DeFoe's only criticism of Rapp is Rapp's decision to pull the trigger.  (DeFoe, 118:20 to 119:6, 119:10-20).

79.     DeFoe criticizes Jonker only for the tactical approach Jonker took.  (DeFoe, 68:21 to 69:12).  The Finch case is the only case he reviewed where DeFoe is critical of the scene command and control.  (DeFoe, 295:14-21).  The Finch case is unique as to the other cases DeFoe reviewed as none of them involved a barricaded suspect.  (DeFoe, 295:9-13).

80.     DeFoe acknowledged that all officers present believed Finch to be the suspect and that a reasonable officer would perceive an individual who comes to the door and matches the description, even a limited description of male, and disregards police orders and tries to go back into the house to be the suspect and not a hostage.  (DeFoe, 79:5-19).

81.     The WPD and KBI share responsibility for investigating officer-involved shootings, jointly participate in witness interviews, and jointly present the case to the district attorney.  (Jacobs, 27:8 to 28:24, 56:24 to 57:5, 72:6-25).

82.     When an officer causes death or serious bodily injury, the Sedgwick County District

Attorney Marc Bennett generally responds to the scene of an officer involved shooting and observes the initial interviews and watches body camera footage.  When the investigation is complete, Bennett and a charging attorney in the DA's office confirm the investigation is complete and review the case for charging decisions.  (Bennett, 11:7 to 12:23, 18:6-25).

83.     Bennett reviews all officer fatality shootings to determine whether a crime occurred. (Bennett, 18:6 to 19:7).

84.     Bennett concluded that he could not establish that Rapp was not engaging in defense of self or others under Kansas law.  (Bennett, 59:6-12).

85.     Every officer-involved shooting is investigated by criminal investigators and reviewed by the district attorney for objective reasonableness.  (DeFoe, 208:1-5).

86.     Lt. Blake Mumma oversees the WPD's Professional Standards Bureau ("PSB") which handles internal and external complaints of officer conduct for conformance to WPD rules, regulations policies and procedures, and standard operating policies.  (Mumma, 7:18 to 8:6).

87.     WPD policy 901 requires PSB investigate all incidents involving the discharge of a firearm. (Mumma, 39:3 to 40:18, 92:5 to 94:6; Mumma Depo. Exh. 80).

88.     WPD policy 904.01 requires WPD also to perform a criminal investigation whenever an officer is involved in an action that either could have resulted in serious injury or death or did result in serious injury or death.  (Mumma, 100:6-23; Mumma Depo. Exh. 76).

89.     By policy, the criminal investigation must be completed before the administrative investigation so that the administrative investigation does not taint, and to ensure the integrity of, the criminal investigation.  (Mumma, 33:22 to 34:18; Ramsay, 62:19 to 64:7).  The administrative detective may open a file and collect information that comes in, but they are not actively involved in an investigation until the criminal investigation is complete.  (Ramsay, 68:22 to 69:5).  An

officer involved shooting criminal investigation is generally expedited, and command staff generally will have some insight as to whether initially there is a questionable situation before the administrative investigation begins.  (Ramsay, 64:8 to 65:2).

90.    Chief Gordon Ramsay has not reviewed any criminal investigations of officer-involved shootings where he was concerned that homicide detectives were not objective, and if he did have concerns, he would investigate further.  (Ramsay, 85:2 to 86:2).

91.    The PSB investigation can be based on a review of the criminal investigation, it can include follow up investigation, or it can include a completely separate investigation.  (Mumma, 94:7 to 97:12).  When reviewing the criminal investigation, detectives view interviews of witnesses, watch all of the videos, listen to reports, read transcripts, review all evidence gathered in the criminal investigation, and do whatever follow-up deemed necessary.  (Mumma, 96:18 to 97:12, 101:6-20; Real, 12:10 to 14:2).  The relevant information has generally been gathered during the criminal investigation, and there is no need to duplicate those efforts unless additional investigation is required.  (Mumma, 43:4 to 44:5; Ramsay, 87:24 to 89:19).

92.    The PSB investigation will include analysis of any policy that WPD command staff or PSB detectives reasonably believe was implicated.  (Mumma, 142:6 to 143:1).

93.    Rapp was aware before December 28, 2017 that the WPD investigates and reviews all incidents in which an officer employs lethal force and that the DA reviews all incidents of use of lethal force by a Wichita police officer to evaluate whether to file criminal charges.  He understood that the WPD would impose discipline, up to and including termination, if an officer used unnecessary or excessive force.  (Rapp Declaration, ¶ 8).

94.     Rapp's split-second decision to shoot was not caused or affected by any belief that the WPD would not hold him accountable for violations of policy or training.  He understood that the

WPD disciplines officers who use unreasonable force. (Rapp Declaration, ¶ 9).

95.    In December, 2017, Jonker understood that any officer involved shooting would be investigated and reviewed both criminally and administratively and that officers could be prosecuted criminally and disciplined internally for unlawful actions or violations of training or policy.  (Jonker Declaration, ¶ 4).

96.    Jonker did not take any action or fail to take any action on December 28, 2017 because of any belief or understanding that his conduct would not be investigated and reviewed or any perception that the WPD would not discipline him or other officers for unlawful conduct or violations of policy or training.  He did not have any such perception.  (Jonker Declaration, ¶ 5).

97.    Plaintiff's expert, DeFoe, acknowledged that WPD policy requires all officer-involved shootings be investigated, he knows of none that were not investigated, and he is not critical of the fact that PSB detectives identify areas of concern but any discipline comes from command staff. That arrangement is consistent with his law enforcement experience also.  (DeFoe, 240:21 to 241:5, 241:21 to 242:7).  There is no recognized standard requiring independent oversight of a police department and no national standard that requires a separate investigation by PSB.  (DeFoe, 208:6-16, 242:14-16).

98.    DeFoe acknowledged that several WPD officers involved in use of force situations have been disciplined.  (DeFoe, 198:15 to 199:6, 217:1-7).

99.    DeFoe acknowledges that the WPD utilizes an early intervention system which requires review of all uses of force by an officer if a threshold is met in a set period of time.  His only criticism of this system is no audit is made to ensure the officers accurately report uses of force, but he knows of no instances of any officer failing to file a use of force report.  (DeFoe, 255:17 to 258:7).

## STATEMENT OF THE ISSUES

Defendants are entitled to summary judgment (1) because Rapp used objectively reasonable force that was justified under the circumstances and did not violate any clearly established right, (2) the supervisory liability claim fails, and (3) the *Monell* claim fails.

## ARGUMENTS AND AUTHORITIES

**Standard on Summary Judgment.**  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Id.* Put differently, "[t]he question ... is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007) (quotation omitted).  Courts review summary judgment based on qualified immunity differently than other summary judgment cases. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  Further, when qualified immunity is at issue, the court "considers only the facts that were knowable to the defendant officers."  *White v. Pauly*, __ U.S. __, 137 S.Ct. 548, 550 (2017) (citing *Kingsley v. Hendrickson,* 576 U.S. __, 135 S.Ct. 2466, 2474 (2015)).

**Qualified Immunity Standards.**  Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez,* 540 U.S. 551, 567 (2004).  Qualified immunity is "an immunity from suit rather than a mere defense to liability," and it is "lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985).  Because it is "the norm" in private actions against public officials, officials enjoy a presumption of immunity when the defense of qualified immunity is raised.  *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010); s*ee Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011).

A plaintiff overcomes this presumption of immunity "only by carrying the heavy burden of showing both that (1) the defendant-officer in question violated one of his constitutional rights, and (2) the infringed right at issue was clearly established at the time of the allegedly unlawful activity such that 'every reasonable official would have understood that what he was doing' violated the law." *Kerns*, 663 F.3d at 1180 (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731 (2011)). "Failure on either qualified immunity element is fatal to the plaintiff's cause." *Id.*  The court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Provided officers act reasonably in deciding to use deadly force, qualified immunity applies even if the officers were mistaken on the need to use such force.  *E.g. Thomson v. Salt Lake County*, 584 F.3d 1304, 1319 (10th Cir. 2009) (noting that a reasonable but mistaken belief regarding the need to use deadly force justifies the use of such deadly force); *Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010) (officer's act of shooting at vehicle reasonable, even if mistaken) (citing

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) and *Saucier v. Katz*, 533 U.S. 194, 206–07 (2009)). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City and County of San Francisco, Calif. v. Sheehan*, __ U.S. __, 135 S. Ct. 1765, 1774 (2015) (internal quotations omitted).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015) (quotation omitted).  To be clearly established, existing caselaw must place a constitutional question beyond debate.  *Id.*; *see also Pauly v. White*, 874 F.3d 1197, 1222 (10th Cir. 2017) (requiring a United States Supreme Court or Tenth Circuit decision on point).  The right cannot be defined at high levels of generality, but instead the focus is on "whether the violative nature of particular conduct is clearly established." *Mullenix*, 136 S. Ct. at 308 (internal emphasis removed) (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 741, 131 S. Ct. 2074 (2011)).  The contours of a right must be sufficiently clear so that every "reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (quotations omitted). This is because qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 136 S. Ct. at 308 (quotation omitted).

## A.  Rapp Used Objectively Reasonable Force that Was Justified Under the Circumstances.

Fourth Amendment excessive force claims are subject to an objective reasonableness standard as judged by the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight.  *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).  "Because 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation,' the

reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Saucier v. Katz,* 533 U.S. 194, 205 (2001) (quoting *Graham,* 490 U.S. at 397). Objective reasonableness is based on the totality of the circumstances, and deference is given to the judgment of reasonable officers on the scene. *Id.* A plaintiff is required to establish that the force used was objectively unreasonable to establish a constitutional violation. *Estate of Larson ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008). The use of deadly force is not unlawful if a reasonable officer would have had probable cause to believe that there was a threat of serious physical harm to himself or others. *Tennessee v. Garner,* 471 U.S. 1, 11 (1985); *Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010).

The officers responded to a dispatch involving an active, barricaded shooter who reportedly had killed one individual and was holding at least two others hostage. Officers relied on their training and began forming a perimeter to contain the shooter. Once on scene, Rapp learned that another officer saw movement from a window that resembled CPR, tending to confirm the initial dispatch. Jonker ordered Rapp to provide long cover, a reasonable precaution given the nature of the call. When Finch came onto the porch, he initially complied with officers' commands to raise his hands, but then he changed course and lowered his hands behind him. "An individual's failure to comply with an officer's commands is relevant to determining the degree of threat posed by that individual." *Cordova v. City of Albuquerque*, 816 F.3d 645, 660 (10th Cir. 2016) (citing *Thompson*, 584 F.3d at 1314).

Rapp perceived Finch to stop complying, lower his hands, look at the officers to the east, turn his body and reach to the small of his back, and start to raise his right arm towards the officers to the east. Rapp reasonably believed that Finch was reaching for a weapon based on his movements towards his waistline, a place where guns are commonly carried. Perry and Ronen

also believed Finch was reaching for a gun based on his noncompliance and his movements. Powell's bodycam video from near Rapp's location corroborates the officers' perception that Finch lowered his hand towards his waist and then began to raise it.  Rapp was forced to make a split-second decision as to whether Finch had a weapon in his hand.  Based on his training and experience, he knew if he waited, Finch would be able to fire 3 to 5 shots at the officers.  The constitution does not require Rapp to wait until a gun is pointed at officers "before taking self-protective action; by then, it is often ... too late to take safety precautions." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (internal quotation omitted.  Rapp reasonably believed Finch was armed with a gun, and Finch's actions and defiance of police commands necessitated immediate reaction.

That officers ultimately learned Finch was unarmed does not control the outcome.  *Blossom v. Yarbrough,* 429 F.3d 963, 967-68 (10th Cir. 2005) ("We have previously rejected the argument that only a suspect armed with a deadly weapon poses a physical threat sufficient to justify use of deadly force."); *see also Milstead v. Kibler,* 243 F.3d 157, 165 (4th Cir. 2001) ("a mistaken understanding of the facts that is reasonable under the circumstances can render a seizure reasonable under the 4th Amendment").  An officer who reasonably believes that the suspect presents an imminent danger of death or serious injury to the officer or others does not transgress the 4th Amendment rights of the suspect merely because the officer ultimately is determined to be mistaken.  In *Billingsley v. City of Omaha,* 277 F.3d 990, 995 (8th Cir. 2002), the court held an officer did not violate an unarmed suspects rights by shooting him because, even though unarmed, "a police officer can still employ deadly force if objectively reasonable."

> Further, the jury could properly draw the inference of an immediate threat of death or serious bodily harm to Officer Pfeffer from his inability to observe Billingsley's hand and his shoulder movement.  [Cites omitted]  Therefore, probable cause for the use of deadly force is satisfied by the immediate threat of death or serious bodily

harm, as observed through the Fourth Amendment prism of objective reasonableness. *Id.*

*See also Reece v. Anderson,* 926 F.2d 494 (5th Cir. 1991) (officer justified in using deadly force where, after pursuing bank robbery suspects in high speed chase, passenger repeatedly reached below officer's line of sight in defiance of orders to raise his hands and officer could reasonably have believed that passenger had retrieved a gun and was about to shoot); *Loch v. City of Litchfield,* 837 F. Supp. 2d 1032 (D. Minn. 2011) *aff'd* 689 F.3d 961 (8th Cir. 2012) (officer's use of deadly force did not violate suspect's rights when officer had been told that suspect had a gun, suspect failed to follow orders to get on the ground, was agitated and in the moment before he shot, officer saw suspect move his hand toward a black bulge on his hip); *Wyche v. City of Franklinton,* 837 F.Supp. 137 (E.D.N.C 1993).

In *Thomas v. Durastanti,* 607 F.3d 655, 666 (10th Cir. 2010), the Tenth Circuit noted that the officer's "reasonable perceptions are what matters, he had mere seconds to react, and his actions in firing the first couple of shots were reasonable, even if mistaken.  An officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances." *Id.* at 666 (citations omitted).  The Tenth Circuit has noted that "a reasonable but mistaken belief that the suspect is likely to fight back justifies using more force than is actually needed."  *Thomson v. Salt Lake City,* 584 F.3d 1304, 1315 (10th Cir. 2009).  And in *Estate of Larson*, the court noted that where police officers were "forced to make split second judgments," even if the officers' "assessment of their threat was mistaken, it was not objectively unreasonable."  511 F.3d at 1260-61.

Similarly, in *Thompson v. Hubbard*, 257 F.3d 896 (8th Cir. 2001), an officer responded to an armed robbery call that reported shots fired. The suspects had fled and the officer approached a man (Thompson) who fit the description of one of the suspects and was in an area where the

officer believed the suspects might be.  Thompson fled on foot, stopped, "looked over his shoulder at [the officer], and moved his arms as though reaching for a weapon at waist level." *Id.* at 898. Thompson's back remained towards the officer, who could not see Thompson's hands. The officer "yelled, 'stop,' and when Thompson's arms continued to move, he fired a single shot into Thompson's back," killing him.  *Id.*  No weapon was found on Thompson's body.  The court concluded that the officer had probable cause to believe that the fleeing suspect posed a threat of serious physical harm, and therefore the use of deadly force was objectively reasonable.  The court noted that "[a]n officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun." *Id.*

Rapp was forced to make a split-second decision under tense, quickly changing circumstances.  While Finch ultimately was not armed, Rapp's split-second decision to use force while performing his job duties to provide cover to other officers in a dangerous situation is not constitutionally unreasonable.  Based on the information he had from dispatch, Rapp reasonably believed that Finch's noncompliance and his body movements consistent with drawing a firearm created a lethal threat to the officers to the east of the residence.  Indeed, Perry had the same perception as Rapp that Finch presented a lethal threat but did not shoot because of crossfire concerns.   Rapp's decision to eliminate the threat was objectively reasonable under the circumstances.  Rapp did not violate Finch's 4th Amendment rights.

While plaintiffs complain that Rapp did not shoot to prevent Finch from re-entering the home, his subjective motivation is immaterial—only the objective reasonableness of the use of force based on the facts and information reasonably knowable to the defendant officers. *Graham*, 490 U.S. at 397.  Based on the information the responding officers had, it was objectively

reasonable to shoot Finch to prevent him from going back into the house with the hostages. Plaintiffs' own expert agreed an objectively reasonable officer would shoot Finch if the officer reasonably believed hostages were inside.  Regardless of whether Finch was reaching for a gun or trying to reenter the home, Rapp's use of force was objectively reasonable to protect against the threat of death or serious bodily injury to other officers or to the hostages in the house.

Even if the use of force was objectively unreasonable, no United States Supreme Court or Tenth Circuit decisions clearly establish that the use of force in this situation was unconstitutional. *See Pauly*, 874 F.3d at 1222.  No case squarely governs this situation with the severity of the initial call, Finch's noncompliance and body movements in the few seconds after he emerged on the porch, the significant potential for deadly force by Finch against officers and potential hostages, and the necessity of reacting in a split-second.  Plaintiffs cannot overcome either element of qualified immunity regarding the use of force against Finch, and their § 1983 claims against Rapp fails.

**B.  The Supervisory Claim Against Jonker Fails.**

Plaintiffs assert a § 1983 supervisory claim against Jonker.  Jonker did not use any force. Supervisory liability requires "a deliberate, intentional act by [Jonker] to violate constitutional rights." *Serna v. Colorado Dept. of Corrections*, 455 F.3d 1146, 1151 (10th Cir. 2006) (quotation omitted).  Simply being in charge fails to satisfy the burden.  Instead, plaintiffs must establish that Jonker was personally "involved in the constitutional violation" with a "sufficient causal connection" between him and the constitutional violation.  *Id.* (quoting *Rios v. City of Del Rio,* 444 F.3d 417, 425 (5th Cir.2006)).  "In this context, the supervisor's state of mind is a critical bridge between the conduct of a subordinate and his own behavior. Because 'mere negligence' is not enough to hold a supervisor liable under § 1983, a plaintiff must establish that the supervisor acted

knowingly or with "deliberate indifference" that a constitutional violation would occur." *Id.* at 1151-52 (citations omitted).

To prevail, plaintiffs must establish that (1) Rapp applied excessive force, that (2) an "affirmative link" exists between Jonker and Rapp's decision to use force (a) by actively participating in or acquiescing to Rapp's use of force, and (b) that he was deliberately indifferent to its application. *Id.* at 1152. Plaintiffs can meet none of these elements.

First, Rapp did not apply constitutionally excessive force. *See* Part A, *supra*. Second, no "affirmative link" exists. Jonker did not "actively participate[] or acquiesce[] in the constitutional violation." *Holland v. Harrington,* 268 F.3d 1179, 1187 (10th Cir. 2001). To meet this hurdle, there must be evidence of "the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Serna*, 455 F.3d at 1152-53 (quotations omitted). "A plaintiff may also establish an affirmative link where the supervisor 'tacitly authorized the offending acts.'" *Id.* (quoting *Wever v. Lincoln County,* 388 F.3d 601, 606 (8th Cir.2004)). "In the end, however, supervisory liability must be based upon active unconstitutional behavior and more than a mere right to control employees." *Id.* (quotation omitted).

Jonker did not direct the use of force. Instead, plaintiffs' expert DeFoe complains about alleged negligence in Jonker's overall supervision in failing to have a finalized plan in place at the time Finch emerged, in failing to communicate more, in failing to direct a single contact person, in failing to direct which officers would form the contact team (despite those officers notifying him they would be the contact team), and in locating himself north of the house instead of behind it. None of these actions establish an affirmative link to unconstitutional conduct. The officers east of the residence knew they would be the contact team. Jonker's failure to explicitly direct this part of the plan has no bearing on Finch's failure to obey commands. Once Finch came out,

multiple officers gave consistent commands.  Even if DeFoe's criticisms were justified, they amount at most to negligence and fail to establish causation for the injury.  Jonker did not give explicit commands to Rapp, he simply gave the reasonable command for Rapp to serve as long cover.  *See Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 394-95 (S.D.N.Y. 2013) (supervisor telling other officers to provide lethal cover prior to entry into an apartment was not an order to perform an unlawful act and did not support supervisory liability claim based on officer's independent decision to shoot).  Plaintiffs cannot establish any unconstitutional behavior by Jonker that can serve as an affirmative link to any constitutional violation.

Third, no evidence of deliberate indifference by Jonker exists.  *See Serna*, 455 F.3d at 1154 ("liability of a supervisor under § 1983 must be predicated on the supervisor's deliberate indifference" because "mere negligence is not enough"); *see also Sheehan*, 135 S. Ct. at 1777 (quotation omitted) (poor tactics do not establish a constitutional violation).   Deliberate indifference requires that Jonker "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1154-55.  No evidence suggests Jonker was aware that commanding Rapp to serve as long cover would create a substantial risk that harm exists, and no evidence suggests Jonker drew such an inference.

In the three minutes that Jonker was on scene before Finch unexpectedly stepped onto the porch, Jonker was organizing the scene and implementing a plan.  Plaintiffs' criticisms of Jonker were not a cause of Finch's death.  For example, plaintiffs complain that Jonker had not called out SWAT, but it is undisputed that SWAT could not have mobilized and arrived in the brief time between the dispatch and the shot being fired.  Plaintiffs' tactical complaints regarding Jonker's personal location on the scene and his failure to have a plan fully in place do not rise even close to the level of deliberate indifference. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) (stating that

deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.").  Plaintiffs' supervisory claim against Jonker fails.

Further, qualified immunity applies because no case law clearly establishes that Jonker's supervision violated Finch's constitutional rights.  *See Pauly*, 874 F.3d at 1222.

## C.  The *Monell* Claim Fails.

Plaintiffs assert a claim under § 1983 against the City of Wichita, alleging that the City had an official policy, practice or custom permitting officers to use deadly force in violation of the Fourth Amendment.  (ECF 158, ¶ 4.a.(iii)). Plaintiffs base this claim on two theories.  First, they allege a custom by the City of excessive lethal force against civilians. Second, they allege inadequate disciplinary and accountability procedures for officers who use lethal force. Plaintiffs' premises are based on unsubstantiated violations of policy and manufactured deficiencies in investigations of uses of force as opposed to violations of the constitution. (ECF 158, ¶ 3(a), p. 7-11).

Cities are not liable under § 1983 merely because an officer commits a constitutional tort. "[I]n other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Social Serv.*, 436 U.S. 658, 691 (1978). A city may only be held liable under Section 1983 "for its own unconstitutional or illegal policies." *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir. 1998). Thus, "a municipality is liable only when the official policy [or unofficial custom] is the moving force behind the injury alleged." *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 404 (1997)).  A plaintiff must identify the government's policy or custom that caused the injury and show "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v.*

*City of Grand Junction Police Dept.,* 717 F.3d 760, 769 (10th Cir. 2013).  Thus, to establish

liability under § 1983 against a City for the actions of its police officers, plaintiffs must prove that

"(1) An officer committed a constitutional violation and (2) a municipal policy or custom was the

moving force behind the constitutional deprivation that occurred."  *Estate of Larson*, 511 F.3d at

1259 (citing *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004)).

Here, no officer committed a constitutional violation, and the City cannot be liable because

even if the customs, policies, and procedures were unconstitutional, there can be no municipal

liability absent a constitutional violation by the individual officer.  *E.g. Trigalet v. City of Tulsa,*

*Oklahoma,* 239 F.3d 1150, 1155-56 (10th Cir. 2001); *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th

Cir. 1996) ("a municipality may not be held liable where there was no underlying constitutional

violation by any of its officers").  Regardless, plaintiffs cannot establish the other elements

necessary to support their claim.

Plaintiffs' allegations and evidence are insufficient to establish the required elements of

municipal liability.  Even if Rapp had violated constitutional rights of Finch, plaintiffs' allegation

that the City had a custom of failing to investigate adequately officer-involved shootings fails to

establish a *Monell* claim.  To establish *Monell* liability based upon an alleged custom or practice

of failing to investigate or condone the use of excessive force, plaintiffs must prove: "(1) A

continuing, widespread, and persistent pattern of misconduct; (2) deliberate indifference to or tacit

authorization of the conduct by policy-making officials after notice of the conduct; and (3) a

resulting injury to the plaintiff."  *Richard v. City of Wichita, Kansas*, Case No. 15-1279-EFM,

2016 WL 5341756, at *11 (D. Kan. Sept. 23, 2016) (citing *Rost ex rel. K.C. v. Steamboat Springs*

*RE-2 Sch. Dist.*, 511 F.3d 1114, 1125 (10th Cir. 2008)).  Even if plaintiffs establish such a custom

or practice, plaintiffs must also establish that the alleged Fourth Amendment violations by Rapp

was directly caused by such an unconstitutional custom, policy or practice.  *Id.* (citing *Cordova v. Aragone*, 569 F.3d 1183, 1194 (10th Cir. 2009).

Plaintiffs allege that the WPD has inadequate disciplinary and accountability procedures for officers who use lethal force and thereby ratified and permitted officers to engage in patterns of policy violations and misconduct.  However, the continuing, widespread, or persistent pattern of misconduct requires the misconduct be unconstitutional misconduct.  *Gates v. Unified School Dist. No. 449 of Leavenworth County, Kan.*, 996 F.2d 1035, 1041 (10th 1993); *see Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).  Plaintiffs allege no unconstitutional misconduct. Instead, they refer to a number of uses of force against civilians that they allege violated WPD policies or general police practices.  (ECF 158, p. 7).  There is no evidence of a widespread pattern of unconstitutional misconduct by WPD officers.

Further, the criticisms leveled by plaintiffs fail to establish any causal relationship between the alleged policy and the shooting of Finch.  WPD performs a criminal investigation of all officer-involved shootings.  The KBI is involved in the investigation and provides follow-up as needed. The results of the investigation are presented to the Sedgwick County DA for charging determinations, including in the Finch shooting.  After the criminal investigation, PSB performs an investigation that typically involves a review the evidence gathered in the criminal investigation with any necessary follow-up investigation.  Command staff review the PSB report and make determinations on policy violations and any disciplinary decisions—both practices that plaintiffs' expert DeFoe agreed were typical.  DeFoe acknowledged that several WPD officers involved in use of force situations have been disciplined.

No logical inference is permissible that WPD officers, even if they were aware of inadequate WPD investigations, would have been sufficiently emboldened to violate a suspect's

4th Amendment rights even though aware that they would face potential criminal prosecution. "To establish the causation element, the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'" *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013); *see Richard*, 2016 WL 5341756, at *11 (noting that "even if the City had a custom of not earnestly investigating excessive force cases, there is no reason to believe that such a custom directly caused the shooting of" the plaintiff).

No evidence suggests that officers generally were aware of any deficiencies in use of force investigations. To the contrary, the undisputed declarations of Rapp and Jonker indicates that both officers were aware prior to December 28, 2017 that WPD would investigate all uses of lethal force by officers and that officers could be prosecuted criminally or internally, up to and including termination, for unlawful actions or violations of training or policy. Rapp's split-second decision to shoot was not caused or affected by any belief that the WPD would not hold him accountable for violations of policy or training, and he understood the WPD disciplines officers who use unreasonable force. Likewise, Jonker did not take any action or fail to take any action on December 28, 2017 because of any belief or understanding that his conduct would not be investigated and reviewed or based on any perception that the WPD would not discipline him or other officers for unlawful conduct or violations of policy or training.

Plaintiffs' allegations that deficiencies existed in the criminal investigation of officer involved shootings are likewise insufficient to establish liability of the City of Wichita. First, an investigation that occurs after the shooting, cannot cause the shooting. See *Cordova v. Arrogone*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("basic principles of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation."). Second, the evidence does not support either the existence of an unconstitutional custom or

practice of inadequate investigations nor the required deliberate indifference of the city.  Chief

Ramsay testified that he had no knowledge of improper criminal investigations and if he had such

knowledge, he would correct the deficiency.   The KBI is involved, the DA reviews all

investigations and Bennett assures himself that the criminal investigation is complete.

Plaintiffs' evidence does not show that the City's "custom was the moving force behind

the constitutional deprivation" or that the City's custom "must have actually caused" the

constitutional violation.  *Richard*, *supra* at *11 citing *Cordova* at 1194.   Plaintiffs' § 1983 claim

against the City should be dismissed with prejudice.

**Conclusion.**  All claims by plaintiffs should be dismissed with prejudice.

Respectfully submitted,

/s/ Samuel A. Green

| | |
|---|---|
| J. Steven Pigg               #09213 | JENNIFER L. MAGAÑA, #15519 |
| Samuel A. Green              #24221 | City Attorney |
| FISHER, PATTERSON, SAYLER | SHARON L. DICKGRAFE  #14071 |
|   & SMITH, L.L.P. | Chief Deputy City Attorney |
| 3550 S.W. 5th St. | City Hall-13th Floor |
| Topeka, KS  66606 | 455 North Main |
| (785) 232-7761 / (785) 232-6604 – fax | Wichita, KS 67202 |
| E-mail:  spigg@fisherpatterson.com | (316) 268-4681 / (316) 268-4335 – fax |
| E-mail:  sgreen@fisherpatterson.com | Email:  sdickgrafe@wichita.gov |
| **Attorneys for Defendants** | **Attorneys for Defendant City of Wichita** |

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2019, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Rick E. Bailey, rbailey@fcse.net; Alexa Van Brunt, a-vanbrunt@law.northwestern.edu; Sheila Bedi, sheila.bedi@law.northwestern.edu; Andrew M. Stroth, astroth@actioninjurylawgroup.com; Carlton Odim, carlton@actioninjurylawgroup.com

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:  No one.

/s/ Samuel A. Green
Samuel A. Green