# Exhibit A

```
 1        IN THE DISTRICT COURT OF THE UNITED STATES
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   LISA G. FINCH,                  )
     Individually, as                )
 4   Co-Administrator, of the        )
     Estate of ANDREW THOMAS         )
 5   FINCH, deceased, ADELINA        )
     FINCH, DOMINICA C. FINCH,       )
 6   as Co-Administrator of the      )
     Estate of ANDREW THOMAS         )
 7   FINCH, Deceased; and ALI        )
     ABDELHADI,                      )
 8                                   )
                   Plaintiffs,       )
 9                                   )
              -vs-                   ) No. 18-CV-01018
10                                   ) JWB-KGS
     CITY OF WICHITA, KANSAS;        )
11   WICHITA POLICE OFFICER          )
     JUSTIN RAPP; SGT. BENJAMIN      )
12   JONKER; JOHN DOE POLICE         )
     OFFICERS 1-8,                   )
13                                   )
                   Defendants.       )
14

15          Deposition of SCOTT A. DeFOE, taken before

16   NANCY DECOLA EATINGER, C.S.R., and Notary Public,

17   pursuant to the Federal Rules of Civil Procedure for

18   the United States Courts pertaining to the taking of

19   depositions for the purpose of discovery, at Suite

20   2300, 191 North Wacker Drive, Chicago, Illinois,

21   commencing at 9:00 o'clock a.m., taken on

22   June 24, 2019.

23

24

25
```

Scott Defoe
June 24, 2019                                                          22 to 25

Page 22

1  with SWAT.
2      But SWAT is always subservient to the
3  incident commander on a number of things. They won't
4  dictate how you tactically perform or what you put in
5  place, but other than just giving you the approval
6  maybe to deploy a chemical agent, whatever it may be,
7  so they're kind of the sounding board or the
8  approving authority for some of the things that you
9  do to follow up.
10     Q  So if I'm following you then, the incident
11  commander is a situation that modifies, it's
12  essentially the initial officer on the scene, and
13  then if he's not the ranking officer, then as
14  officers with more rank arrive, they become and take
15  over as incident commander?
16     A  That's correct. And they may not. If the
17  officer is doing a good job or the detective, he may
18  maintain his position unless it's beyond his
19  capabilities where you're dealing with incident
20  command systems that are being put in place. Now you
21  want someone at the command level to make some of
22  these decisions because you're dealing with
23  deployment, time, overtime, resources, so beyond the
24  typical pay grade of a detective or a sergeant.
25     Q  Now, at LAPD, after the initial alert is

Page 23

1  given but there's not an actual call out, who makes
2  the decision then whether to actually call SWAT to
3  the scene?
4      A  It could be anyone. It could be the first
5  responder knowing that. Once again, that's why in
6  SWAT, I was one of the training sergeants that would
7  train all sergeants on a monthly basis. This is what
8  our criteria is.
9          We've got a structure, you've got someone
10  who is armed, presumed to be armed, position of
11  advantage. That's something that SWAT is going to
12  handle based on our criteria.
13         So sergeants are pretty good at knowing what
14  will meet our criteria. The first thing we're going
15  to ask typically is have you contained the location
16  and have you tried to call that person out. That's
17  typically the criteria --
18     Q  Okay.
19     A  -- while we're responding because, you know,
20  plenty of times I'm -- I would be in route to a call,
21  and the question would be to the sergeant at the
22  scene have you tried to call him or her out of the
23  residence. No, stand by. He's coming out, he's in
24  custody. Then we cancel the SWAT call-up.
25         So typically it's the refusal to submit to

Page 24

1  arrest is kind of the catchall for the SWAT call-up
2  unless there's no contact at all. They maybe
3  bullhorned it, used a PA, person didn't come out, and
4  we'll assume that's a refusal because of the
5  non-compliance.
6      Q  So the incident commander on the scene
7  initially is going to set up a perimeter to contain
8  the situation?
9      A  We're taught that you're -- other than if
10  it's something where you need to direct a contact
11  team, like an active shooter where there's an
12  immediate defensive life situation, you want to
13  contain that person to establish some type of in or
14  an out of containment if resources allow, as
15  resources come up, but in a case where you may have
16  someone who is barricaded in the house, potentially
17  armed, you're going to want to establish containment,
18  but you're more importantly going to want to
19  establish we call it Emergency Assault Team, and
20  that's really if the behavior continues with the
21  shots fired that you're going to need to make entry
22  into that structure to stop the behavior if you hear
23  shots being fired, and that's kind of what the theory
24  is, you know, post Columbine. We're not going to sit
25  and wait for SWAT, if there's an active shooter

Page 25

1  situation, we're going to need to take some proactive
2  response to that.
3      Q  So if the incident commander arrives and
4  hears shots, there's active shooting going on or
5  appears to be, then they would attempt immediate
6  entry?
7      A  Unless it's a lone gunman. Then you've got
8  somebody who maybe just fired off rounds in the house
9  or is maybe suicidal, but if you have either declared
10  hostages or you have undeclared hostages where you
11  don't know if there's someone else in the house,
12  typically we're not going to wait until people get
13  there from everywhere, we're going to take some type
14  of proactive action.
15     Q  And if you arrive and that's not occurring,
16  that's a static situation without active shooting,
17  you set up a perimeter and start to develop a contact
18  team in the event that it is necessary to go in
19  because shooting starts?
20     A  That's exactly right.
21     Q  And the incident commander will be assessing
22  those situations, and then if it remains static
23  generally would attempt to contact the suspect
24  inside?
25     A  Sure. Once it's contained, they'll either

Scott Defoe
June 24, 2019                                    26 to 29

Page 26
1  use a bullhorn, a PA system, you know, voice to
2  voice, try to yell in there and have that person come
3  out and to see if they'll comply, and hopefully they
4  do, which they do a lot of the times, sometimes they
5  don't, and then the SWAT would continue to respond.
6      Q  When you were at LAPD, was there a policy
7  that related to response to a barricaded suspect
8  hostage situation?
9      A  Yes.
10     Q  And was it called an unusual incident
11 situation?
12     A  I don't know what it's called now. It's
13 typically going to be a barricaded subject incident.
14         (Whereupon, Exhibit 118 and Exhibit 119 were
15         marked for identification.)
16     MR. PIGG:  Q  Mr. DeFoe, Exhibit 118 is an LAPD
17 policy off their website. Exhibit 119 is where I
18 copy and pasted the words "unusual incidents" portion
19 of that policy just because it's small and it's
20 easier to see.
21     MR. ODIM:  Steve, do you have copies?
22     MR. PIGG:  Q  I've got a copy of that one. I'm
23 afraid I don't.
24        Let me know once you've had a chance to
25 review that.

Page 27
1     A  I'm ready, sir.
2     Q  Is that similar to the policy that was in
3  effect when you were there?
4     A  It is.
5     Q  Do you know if it's identical? I didn't see
6  a revision date.
7     A  It appears to be almost identical. I know
8  the manual -- I left in 2016, would be the last time
9  I looked at the manual. I was required to do so, so
10 I think it looks as consistent as my entire time on
11 LAPD.
12    Q  According to this policy, SWAT would only be
13 called out if all of the following criteria were met:
14 The suspect is probably armed, believed to have been
15 involved in a criminal act or is a significant threat
16 to the lives or safety of citizens or police, is in a
17 position of advantage and refuses to submit to
18 arrest.
19        SWAT would not be called out until all four
20 of those criteria are met under this policy, correct?
21    A  It does, but as I mentioned regarding the
22 refusal part of it, if you've got an active shooter,
23 you're not going to look for compliance, a verbal
24 compliance, so it's based on the totality of the
25 circumstances, but traditionally that is upwards of

Page 28
1  90 percent unless it's something extraordinary,
2  that's the policy that we would follow.
3     Q  An active shooter would be considered a
4  refusal, I presume?
5     A  Yes.
6     Q  In comparing to that the Wichita Police
7  Department policy 602, it's very similar, isn't it?
8     A  It is.
9     Q  At the LAPD, once the incident commander made
10 the decision to call out SWAT, how long would it
11 typically take for SWAT to arrive and be in place at
12 the scene?
13    A  It really depends on if it's during off
14 hours, on hours, the location. SWAT at the time is
15 -- or it still is housed in Central Division, which
16 is downtown Los Angeles, so depending on if we had to
17 go to the valley, which, once again, it's 465-square
18 miles. It's about three times bigger than Wichita in
19 the sense of the area they have to coverage.
20       So it's dependent on traffic in LA
21 unfortunately. There's a number of things that will
22 impact your response, so it could be 15, 20 minutes
23 would be a low end conservative because you're
24 looking at getting ballistic vehicles, the BEAR, the
25 BEARCAT.

Page 29
1         People are getting those things, but
2  everyone, we keep our cars 24 hours a day, so once
3  the SWAT calls, no matter where you are, everyone
4  just drives themselves to that location, so we don't
5  show up together, we just show up as quickly as we
6  can get there.
7         I've responded from home on Huntington Beach
8  where it's taken me 45 minutes to an hour with
9  traffic to get there, and I've also been there in
10 five or six minutes when the SWAT call-up is in south
11 LA and we're close maybe training in that area, south
12 central or somewhere around there.
13    Q  Once a decision has been made to call SWAT,
14 does SWAT respond immediately to the location? For
15 example, if it's a barricaded suspect in the house,
16 do you respond to the house or do you respond to a
17 rallying point?
18    A  Respond to the command post, we're going to
19 want to respond to the command post because typically
20 we're stripping off something we're wearing to put on
21 something else. It could be PT gear, physical
22 training gear. Now we're going to be putting on the
23 stuff that we're going to wear.
24       So typically a CP never in front of the
25 structure if it's that, but close enough where a

Page 30

1  command post is where you can effectively manage the
2  incident but not within line of sight from where the
3  structure would be or structures. That's typically
4  the proximity, so a couple blocks away is the typical
5  distance to a command post.
6      Q  And once at that location what happens? You
7  said you might change clothes. Has that happened
8  there or somewhere else?
9      A  It depends. I mean, depending on the nature
10 of the call, if it's an active shooter, I may throw
11 on a tac vest, a helmet, grab a rifle and then go
12 down range regardless of what I'm wearing. It could
13 be shorts, it could be fatigues, whatever the uniform
14 of the day is.
15     But it just depends on the circumstances. I
16 mean, if it's contained we're going to slow things
17 down, and then we're going to get dressed
18 appropriately, and then we're going to go ahead and
19 assume the containment of the location from those
20 officers.
21     We're going to obviously automatically have
22 an Emergency Assault Team get down range, put eyes on
23 what would be the best breach point, the easiest way
24 to get into that structure, which obviously with
25 explosive breach capabilities and manual breach

Page 31

1  capabilities to be able to enter that area and
2  possibly multiple areas depending on the venue.
3      And then slowly we will remove the patrol
4  from containment and augment that with SWAT personnel
5  as they arrive as well as equipment.
6      So we'll have officers pick up the heavy
7  vehicles. As a sergeant I'll direct people to do
8  that. Typically that's already scripted out for the
9  day, so if I know -- I wouldn't be doing it, but if
10 an officer had to pick up the BEAR, they know there's
11 a SWAT call-up, no one is wondering who is picking up
12 the ballistic vehicles, Officer Smith is going to get
13 that vehicle.
14     And you also know what your assignment is
15 going to be. I got to know who the snipers will be
16 on that team, who your Emergency Assault Team is
17 going to be, who your negotiators are going to be.
18 As I mentioned, they're inclusive as part of the SWAT
19 team. That's kind of already scripted out so we know
20 our roles.
21     That will probably change, but at least on
22 the initial part we know where we're going.
23     Q  And if it is a static situation, no active
24 gunshots being fired, once you're at the rallying
25 point, do you wait until the entire SWAT team is

Page 32

1  assembled before actually replacing the regular
2  street patrol officers that have established the
3  initial perimeter?
4      A  As a supervisor, I'm going to want to -- if
5  it's a barricaded subject with -- that you may have
6  hostages involved, I'm going to get a team, an
7  Emergency Assault Team, a supervisor plus a minimum
8  of four to five officers down range right away to get
9  eyes on -- and part of that is for the intelligence
10 component to be able to know what I'm looking at at
11 the time.
12     And then as officers arrive, we don't wait
13 for everyone to show up. As they'll arrive, the
14 tactic supervisor, which I may be, and the SWAT -- at
15 LAPD SWAT, you have a tactic supervisor who is in
16 charge of the overall tactical plan.
17     You have an emergency assault supervisor who
18 will be with the Emergency Assault Team in the event
19 there's a breach to go into the residence.
20     Then you have a negotiation supervisor who
21 will deal with the intelligence gathering, working
22 with detectives, seeing if we're going to try to get
23 negotiation component up, and then you have the SWAT
24 lieutenant who is kind of the intermediary between
25 you and the incident commander. That's typically how

Page 33

1  the process works.
2      Q  And typically as a part of the SWAT
3  establishing a perimeter once it took over, would it
4  have a long cover with a rifle?
5      A  Sure. If you can get high-ground capability
6  at any point, that's always recommended you do that
7  for the intelligence gathering first and foremost and
8  obviously with the -- you know, you want that
9  long-range capability, .223 round, .308 round,
10 whatever something is going to be able to -- someone
11 is going to be able to get eyes into a structure by
12 use of a weapon system that will have a sighting
13 system on it, a Neotec ACOG, something like that
14 where you can see into that structure.
15     Q  Explain that a little more. You said see
16 into that structure?
17     A  Well, sure. The sniper component, the number
18 one thing a sniper does is provide intelligence to
19 the tactic supervisor, and they do that typically
20 hopefully from an elevated position if you can get
21 that, and you're doing that to try to get -- if you
22 see movement inside the residence, what are you
23 seeing, and so they're a kind of good set of eyes to
24 try to get as much intel as they can from their best
25 position.

Page 34

1  So typically you're going to want a sniper
2  component to cover all four sides of the residence if
3  possible depending on where the openings are.
4      Q  So you typically have more than one sniper?
5      A  Sure. It'll depend on, for instance, if you
6  look at a residence and side one is one, two is on
7  the left side, three to the rear, and on the right
8  side of the house is side four, is the typical
9  numbering system.
10     If you don't have windows on either side two
11 and three, there's no reason to have a sniper
12 component, but typically front and back of the house,
13 and then if you can get someone in position safely
14 that can see on the side of the house if there are
15 openings, that would be important. That's what the
16 optimal is.
17     Q  But when you were saying see inside the
18 house, you weren't talking about some type of
19 infrared heat detection or some other device, you're
20 just talking about what you could see through
21 windows, for example?
22     A  Yeah, through windows, just movement from an
23 elevated position.
24     Q  Okay. I wasn't familiar with some of the
25 terms you used.

Page 35

1  That was not some kind of equipment that
2  allows visual or other views of what's going on
3  inside the house other than windows?
4      A  That equipment exists, but for the primary
5  typical SWAT barricaded subject incident, you're
6  looking at getting eyes, and that eyes could be
7  through an optic, it could be through the system on
8  the rifle whatever rifle you're deploying at the
9  time, so it just depends. It might be my eyes just
10 looking through a window.
11     Q  You mentioned a .233 rifle.
12        That's the same type of rifle that Officer
13 Rapp had?
14     A  Yeah, an M4, .223 is the round capability.
15 It's the same, it's the same.
16     Q  So if I'm following you, best-case scenario
17 in LA with a full-time SWAT would be 20 to 30 minutes
18 for SWAT to arrive from the time called out?
19     A  I think that's a good general -- I think
20 that's generally what the optimal is by the time you
21 get everyone there to be able to start changing out
22 positions.
23        Hopefully sooner, but typically with traffic
24 it could be longer than that if it's off hours, of
25 course by the time you get the call, get the car and

Page 36

1  then drive to wherever that may be.
2      Q  Okay. In this Finch situation, officers are
3  dispatched to a call that is reported to be a man has
4  shot his father and is holding his mother and brother
5  hostage at gunpoint.
6      A  Yes.
7      Q  You would agree that presents a situation of
8  significant danger to the occupants of the house and
9  to the police officers when they respond?
10     A  I do.
11     Q  Sergeant Jonker, do you know how long it was
12 after he arrived before the shot was fired?
13     A  Probably about five minutes. My
14 understanding based on my review that officers
15 arrived at around 18:23 hours, and the shots were
16 fired at 18:28 hours. I don't know -- so sometime
17 between 18:23 and 18:28.
18     Q  18:23 was the first officer, it's not
19 necessarily Officer Jonker?
20     A  That's correct.
21     Q  Did you review Officer Jonker's Axon video?
22     A  I did.
23     Q  If you watch it, I think it shows that the
24 shot occurs a minute and 55 seconds after the video
25 starts?

Page 37

1      A  Okay.
2      Q  Do you recall anything that would be
3  inconsistent with that?
4      A  I think that I believe it was Powell stated
5  that he was standing around for about one to two
6  minutes before being deployed upon getting there, so
7  that seems about right by the time they worked their
8  way over to the north side of the street.
9      Q  And Powell and Rapp arrived before Jonker?
10     A  That's correct.
11     Q  And if you watch Powell's video, you can see
12 when Jonker first arrives or when he first appears in
13 the video, and he asks for Rapp to go with him across
14 the street because he has a rifle?
15     A  That's correct.
16     Q  That was an appropriate decision?
17     A  I don't believe it was appropriate for Jonker
18 to go across the street. I believe it was
19 appropriate for him to deploy Rapp across the street
20 with the rifle.
21     Q  Why would it not be appropriate for Jonker to
22 go across the street?
23     A  Because he's the only supervisor at the scene
24 at the time, and my concern is not going to be as a
25 sergeant to be on a containment position, nor am I

Page 66

1  investigations to see if they were boilerplate
2  language to see if a particular sergeant investigated
3  a certain way, and so we would pull all the use of
4  force investigations, for instance, from a respective
5  division, look for anomalies, look for boilerplate
6  language to make sure that the investigation was done
7  appropriately and thoroughly, and that was for both
8  use of force and Internal Affairs investigations.
9      Q   Maybe I'm confused.
10         So you were looking at officers who were
11 believed to have committed criminal conduct off duty?
12     A   No, this is on-duty behavior, and what we did
13 as part of the Corruption Task Force is we not only
14 looked at the rampart area, but we looked at all of
15 the other divisions throughout the City in making
16 sure that, you know, use of force is being reported
17 appropriately, that this type of what they considered
18 was possible wide-spread corruption through the
19 department, but after the result of the
20 investigation, which I helped write the document, was
21 that it was localized.
22         There was some missteps along the way, but
23 nothing that would be considered corruption, and that
24 corruption was germane only to Rampart Division.
25     Q   But none of those involved officer-involved

Page 67

1  shootings?
2      A   No.  That was not within our scope.  That's
3  robbery, Homicide Division, Force Investigation
4  Division and obviously at the time Internal Affairs.
5  They run through investigations concurrently.
6      Q   So you've never investigated an officer's use
7  of lethal force?
8      A   That is correct.
9      Q   And your time in PSB or IA was temporary on
10 loan if I'm following you?
11     A   It was temporary on loan, and after that I
12 was, right after my loan I was promoted to a vice
13 sergeant, so I left my six-month loan.  I was offered
14 a full-time position there, but I opted to go work a
15 vice position instead.
16     Q   How many officers in the LAPD?
17     A   At the time when I was there, at the time I
18 left, probably about 9300.  I think there were
19 several hundred, I think about 300 or so sergeants
20 and detectives in Internal Affairs, 3 to 400.
21     Q   After Officer Rapp and Sergeant Jonker had
22 arrived while they were still at the back of the
23 Breakfast Club next door to 1033 West McCormick.
24 Officers observed a figure, a silhouette in a window
25 going up and down that was perceived perhaps to be

Page 68

1  somebody giving CPR.  Do you recall that?
2      A   Officer Rapp testified to that.
3      Q   I'm sorry, officer who?
4      A   Rapp testified to that, excuse me.
5      Q   Would that information be consistent with
6  there having been an injury inside the house?
7      A   Possibly.
8      Q   Consistent with possibly a shooting inside
9  the house?
10     A   Possibly.
11     Q   Are you asserting that Officer -- Sergeant
12 Jonker violated WPD Policy 602 in any way?
13     A   What's the policy?
14     Q   That's the barricaded suspect policy?
15         (Whereupon, Exhibit 64 was previously marked
16         for identification.)
17     MR. PIGG:  Q   I'll show you what's previously
18 marked as Exhibit 64, Policy 602.
19     A   Yes, got it.  Yes under D, 602.02, Subsection
20 D.
21     Q   You're contending that he violated 602.02
22 Capital D to assess the need to respond?
23     A   Yes.  He testified that it wasn't his
24 responsibility to do that.
25     Q   Any other aspects of 602 that you contend

Page 69

1  were violated by Sergeant Jonker?
2      A   Well, I don't believe he stabilized the
3  situation by isolating based on my review of all the
4  facts in this case, that he never other than
5  deploying Officer Rapp on the north side, he didn't
6  give anyone any direction as to what they were going
7  to do there, so part of that was responsible to
8  stabilize the situation by isolating and containing
9  the suspect.
10         There was no direction or supervision or
11 oversight commanding control at the time based on the
12 testimony I've read in this case.
13     Q   You can see from Sergeant Jonker's video that
14 it is visibly apparent that officers are situated on
15 the east side of the porch?
16     A   Yes.
17     Q   And he had just walked by officers that were
18 on the west side of the porch, correct?
19     A   Yes.
20     Q   And he had knowledge that there were officers
21 in the back including an officer with a rifle?
22     A   One, yes.
23     Q   So that would cover all sides of the
24 residence, correct?
25     A   It would, yes.

Page 74

1 going to make entry from because what you don't want
2 to happen is if shots are fired and now an officer on
3 rear containment decides he's going to make entry, an
4 officer in the front containment decides they're
5 going to make entry. Now you've got a blue-on-blue
6 situation, which has happened unfortunately many
7 times in law enforcement in this country where you
8 have officers shooting one another.
9     That's why we specifically say if there are
10 shots fired we're going to make entry, we'll breach
11 through side one, opening one, whatever the opening
12 may have been, or we're going to make entry. These
13 are the officers, everyone else hold your position,
14 is what should have went out initially while he's
15 setting containment once that Emergency Assault Team,
16 which would have been the officers that were
17 positioned east of the door, would have been
18 responsible for.
19     MR. PIGG: Move to strike the answer as
20 completely non-responsive.
21     Read back the question, please.
22     MR. ODIM: I object. The answer is completely
23 responsive.
24     (Record read.)
25     THE WITNESS: I don't understand that question.

Page 75

1     MR. PIGG: Q What do you not understand about
2 that question?
3     A Never came to pass, no. The answer is no,
4 they didn't breach the house because Mr. Finch came
5 out of the house and was subsequently shot on the
6 porch, so no, they didn't breach and go in until
7 obviously after to clear the occupants out of the
8 house, but there was never a breach into the
9 residence because Mr. Finch came out on the porch, if
10 that's what the question was.
11     Q Well, there was never a shot, an active shot
12 heard while the officers were there that created a
13 need for them to breach the house?
14     A Sir, respectively, the plan comes long before
15 the shot occurs. The plan comes --
16     Q That wasn't my question.
17     A Well, that's what my response was. The plan
18 comes before the shots are fired. Putting out the
19 plan in the event the shot is fired is that's how the
20 team will know to respond based on the plan. We
21 don't wait for the shot to be fired, then formulate
22 the plan.
23     MR. PIGG: Again, move to strike as
24 non-responsive.
25     MR. ODIM: Again, you're trying to put words in

Page 76

1 his mouth, and you don't accept what he -- what his
2 response is. It is completely responsive, so I
3 object to striking it.
4     MR. PIGG: Read back that last question one time,
5 please.
6     (From the record above, the reporter read
7     the following:
8     "Q Well, there was never a shot, an
9     active shot heard while the officers were
10     there that created a need for them to
11     breach the house?"
12     THE WITNESS: Correct, they never breached the
13 house.
14     MR. PIGG: Q And until after the shot of
15 Mr. Finch, there was no need to breach the house?
16     A Yeah, not until after, that is correct.
17     Q And in fact, to breach the house prior to
18 then would have been countered to good practice
19 because you don't want to create a situation, you
20 want to stabilize it and keep the status quo?
21     A Unless you knew at the time that you had
22 people that are in peril, then even without shots
23 being fired, if you had information that someone was
24 dying inside or was injured or even without shots
25 fired, the decision may be at that time to make entry

Page 77

1 to -- you know, as a contact team to rescue people or
2 stop behavior inside the residence.
3     Q And if officers were present under the
4 perception that hostages had been held at gunpoint
5 and are still in the residence and an individual has
6 already been murdered by the suspect and a person
7 comes to the door that is perceived to be the
8 suspect, you wouldn't let that person back in the
9 house with the hostages, would you?
10     A Try not to, no.
11     Q Because that would create an imminent risk of
12 injury and death to those hostages?
13     A Possibly if you reasonably believe that that
14 is the person that is your suspect. If you believe
15 it's the brother of the person being held or a
16 potential hostage themselves, then yes, you would
17 not, but if you reasonably believe that's the
18 suspect, you do not want to allow that suspect back
19 into the residence.
20     Q And an officer who observed a male come to
21 the porch and then try to go back in the house, you
22 wouldn't perceive -- that officer would reasonably
23 perceive that individual to be the suspect and not
24 the hostage?
25     A I don't know. It just depends on the

Page 78

1  officer, but you would hope that if the hostage would
2  -- once again, it all goes back to commands, ability
3  to respond to commands, reasonable amount of time to
4  comply, best information at the time, so it's
5  depending on the totality of the circumstances.
6      Q  We're talking about a reasonable officer, a
7  reasonable officer that perceives a person that is
8  consistent with the description of the suspect, who
9  comes to the porch, disregards commands and then is
10 reentering the house, a reasonable officer would not
11 perceive that individual to be the hostage?
12     A  Well, I don't know if there was a suspect
13 description put out in this case.
14     Q  A male?
15     A  Right, but there's also a male being held
16 hostage as well.  There's also the concern that is
17 this a legitimate call.  There's also a concern that
18 -- there's a number of other things that would come
19 into play that you don't -- could not with a hundred
20 percent certainty know if a person comes out and it's
21 a male that it's your suspect.
22        It could be the neighbor, it could be --
23 once again, it could be a location where there's not
24 actually been a crime that occurred like in this
25 case, it could be the brother who is being allegedly

Page 79

1  held hostage.  It could be a number of people that
2  could have came to that door, and you need to
3  consider that if someone does come to the door at
4  that time.
5      Q  And my question was if the individual who
6  comes to the door who matches the description even
7  though it's a limited description that he's a male
8  and that individual disregards police orders and
9  tries to go back in the house, a reasonable officer
10 would not perceive that individual to be a hostage?
11     A  Possibly, yes.
12     Q  And on the other side, a reasonable officer
13 would consider that individual to be the suspect?
14     A  Possibly.
15     Q  And you've reviewed the transcripts of the
16 interviews of all of the officers that were there,
17 and they all perceived this individual, Mr. Finch, to
18 be the suspect, isn't that correct?
19     A  That's what they testified to, yes.
20     Q  And you understand that in Wichita there is
21 not a full-time, always-on-duty SWAT team?
22     A  I'm aware of that, yes.
23     Q  And do you have anything to disagree with the
24 testimony that it would take a minimum of 45 minutes
25 for a SWAT to deploy to the location after being

Page 80

1  called out?
2      A  I do not.
3      Q  Sergeant Jonker testified that he was
4  assessing the situation to report to the watch
5  commander who ultimately would make a decision
6  whether SWAT would be called out.  Do you recall
7  that?
8      A  Yes.
9      Q  And as I understand it, that's consistent
10 with the LAPD practice as well, the incident
11 commander would assess the situation after he's there
12 and then report to the watch commander who would make
13 the decision whether to call SWAT?
14     A  That's consistent on most occasions, yes.
15     Q  From your review of the video about 12 times,
16 what did you see Mr. Finch do?
17     A  He appeared to be -- after he came out of the
18 residence?
19     Q  Yes.
20     A  He appeared to be complying with the
21 officers' commands by putting his hands up.  He
22 appeared -- once again, it's hard to make a
23 perception based on video what he was feeling.
24 Obviously I can't do that.
25     Q  I'm just asking for what you saw on the

Page 81

1  video.
2      A  Okay.  That he put his hands up.  His hands
3  came down a little bit, and then the -- shortly after
4  that the shot occurred.
5      Q  Did you see the movement of the shoulder dip?
6      A  No, I didn't.
7      Q  Did you see the hand, the right hand go out
8  of view?
9      A  I don't recall.
10     Q  Did you see the arm come back up?
11     A  I just saw some slight movement at the front
12 of his torso, is all I saw.
13     Q  Slight movement of his arms, arm or arms in
14 front of his torso?
15     A  Right, his arms.
16     Q  Did you see his change of where he was
17 looking to look to the officers to the east?
18     A  No, I didn't notice that.
19     Q  Do you agree that if a suspect had a gun and
20 raised it toward officers to the east, that would
21 present an imminent threat of serious injury or death
22 to those officers?
23     A  Yes.
24     Q  And that would justify the use of lethal
25 force?

Page 82

1  A  It could.
2  Q  Officer Rapp did not have the luxury of
3  reviewing video multiple times but had to make his
4  decision in a split second based on what he saw and
5  the information he had, correct?
6  A  He did not look at any videos, that's
7  correct, until afterwards I'm assuming.
8  Q  And in the moment when he pulls the trigger,
9  he has to make a split-second decision based on what
10 he knows or believes, reasonably believes and what he
11 sees?
12 A  I don't know what -- that's his decision to
13 shoot his weapon at that time, would be something
14 that he must perceive and articulate as an immediate
15 threat or imminent threat.
16 Q  I'm not sure I understand your answer.
17    A law enforcement officer has to make his
18 decisions based upon what he reasonably perceives and
19 what information he has?
20 A  That's correct.
21 Q  And in a lethal force situation where it's
22 perceived that a gun is pointed toward others, other
23 officers or other people, that decision has to be
24 made immediately?
25 A  Possibly.

Page 83

1  Q  I mean, if you wait and the suspect pulls the
2  trigger, it's too late?
3  A  Possibly, yes.
4  Q  In the LAPD situation, the officer that has
5  long cover with a rifle, is part of that officer's
6  responsibility protection of the other officers?
7  A  It's called over watch or cover, yes.
8  Q  Is that what you understood Rapp's position
9  was in this case?
10 A  More so cover.  I disagree with the SWAT
11 lieutenant from Wichita Police Department's comment
12 regarding or statement regarding that the use of --
13 the only use of a long rifle -- or the only cover
14 that can be acquired is by the use of a long rifle.
15    I believe officers can provide cover up
16 close.  There could be less lethal cover, there could
17 be lethal cover from close proximity, but to answer
18 your question, yes, typically in a position where
19 Officer Rapp is is to provide long cover and to cover
20 that north side of the residence is where -- or side
21 one of the residence, excuse me, is where he's
22 positioned.
23    That's why he should be there, and as I
24 mentioned earlier, to be able to see if he can gather
25 any intelligence from looking at windows that others

Page 84

1  may not be able to see into.
2  Q  Well, officer training is that when
3  confronted with lethal force, officers don't employ
4  less than lethal force, do they?
5  A  It depends, it just depends on the
6  circumstances.  People that have come out of
7  residences that I've been present with a gun in their
8  hand not coming out in an aggressive manner we've
9  shot effectively with 40 millimeter or 37 millimeter
10 less lethal rounds.
11    Once that weapon is coming up in an
12 aggressive manner where an officer can articulate
13 that use of lethal force is necessary, then, of
14 course, you use lethal force.
15 Q  Because less lethal is quite often
16 ineffective?
17 A  I don't agree with that.  I think that the
18 technology training and I think ammunitions today are
19 quite effective.  I think the super stock round from
20 the Remington 87 is an effective less lethal force
21 option.  The 40-millimeter rounds, the foam rubber
22 baton rounds are quite effective from distance as
23 well as the 37 millimeter.  I think they're quite
24 effective now.
25    I think technology has been to the officer's

Page 85

1  advantage recently with some of these vendors, like
2  Safariland and other vendors have put out that have
3  been I think really advantageous for officers in the
4  field.
5  Q  Were any of those weapons available in the
6  Wichita Police Department at all to your knowledge?
7  A  I would hope that a law enforcement
8  organization has the 870, a beanbag shotgun.  I would
9  hope they have 40 millimeter for officers in the
10 field, I would hope in 2017 that would have been the
11 case.
12    So yes, most agencies are equipping officers
13 with a number of less lethal force options, you know,
14 obviously tasers, 40 millimeter, 37 millimeter.
15 Q  What's the effective range of the beanbag
16 shotgun?
17 A  About 75 feet.
18 Q  I've seen cases where the beanbags just
19 bounce off the suspect and it's not effective at all.
20 Are you familiar with that?
21 A  It depends.  I've also seen cases where a
22 single beanbag round in the torso has buckled a
23 full-sized man's body into the ground and then taken
24 him into custody.
25    It depends on intoxication, it depends on

Page 118

1 someone has raised a gun toward another officer to
2 have a discussion about it?
3   A  If the perception is real and it's
4 objectively reasonable, then no, I expect them to
5 take proper action to stop that imminent threat, but
6 I don't believe it applies to the facts in this case.
7   Q  Overreaction is excessive force is another
8 bullet point.
9       That's because he made the decision to shoot
10 rather than not shoot?
11  A  Yes.
12  Q  Anything else?
13  A  No, sir.
14  Q  The bottom paragraph you have, the
15 ratification of use of deadly force and Officer
16 Justin Rapp's conduct prior to use of deadly force in
17 this manner can be seen as endorsing and perpetuating
18 inadequate training and failure to enforce written
19 policies, et cetera.
20      First, what conduct of Officer Rapp prior to
21 the use of deadly force are you referencing?
22  A  Ultimately just -- well, the prior would be
23 up and to including the use of deadly force.  There's
24 nothing that he did -- I don't think there's anything
25 that Officer Rapp did prior to the use of lethal

Page 119

1 force that was inappropriate other than -- I thought
2 him taking that position was appropriate on the north
3 side, I think being directed by the supervisor there
4 was an appropriate tactic to get into that position,
5 so ultimately my opinion is just at the time of the
6 use of force but not prior to.
7       The prior to deals with my opinions, and I
8 should have clarified that better in my report, as it
9 relates to Sergeant Jonker's actions.
10  Q  So if I'm following you, your only criticism
11 of Officer Rapp is his perception of the need to pull
12 the trigger?
13  A  I'm not -- I don't make a credibility
14 determination, so I have nothing to do with his
15 perception.  I'm critical of the actual use of force.
16  Q  The decision to pull the trigger?
17  A  Yes.
18  Q  And that's the only thing you're criticizing
19 regarding Officer Rapp?
20  A  Yes.
21  Q  On the next page you say you base your review
22 on Officer Rapp stating he had not been trained on a
23 SWATing call.
24      How does that play into your opinion?
25  A  I think that's important.  I mean, I don't

Page 120

1 think the SWATing call or the SWATing phenomenon
2 is -- as I mentioned earlier, officers have been
3 responding to calls that have been bogus for decades
4 or as long as law enforcement has been in existence,
5 so the term of SWATing became kind of topical in
6 2008, 2009 is when the concept really came into
7 fruition, and a lot of that had to do with a lot of
8 celebrities that were targeted and things such as
9 that, so officers now are trained, and the FBI put a
10 term on it I think in 2013 where they actually called
11 it -- the FBI really put a term on it in 2008, it
12 became a term actually in about 2013 for law
13 enforcement, and with that officers now need to
14 recognize that these type of events, especially with
15 the videos and things such as that, which seems like
16 it generates these type of calls for some odd reason,
17 that officers need to be trained that this may be a
18 bogus call, this may be not what you think it is, so
19 we need to slow down and take other precautions if
20 possible, and he stated he was never trained on
21 anything relating to SWATing.  So that's my
22 criticism.
23  Q  You would agree that an officer has to
24 consider the information provided by dispatch as
25 accurate when he goes to a call?

Page 121

1  A  With the caveat that there are times that
2 calls for whatever reason are false and they're bogus
3 and can't take because they're getting the best
4 information, and sometimes that information there's
5 maybe a gap in translating that information or
6 getting it to the officers.  That happens on
7 occasion.
8      Or the call could be, just like in this case
9 just outright bogus, and they wouldn't know that, but
10 with that being able to go there and then slow things
11 down to see, properly contain, as I mentioned, see if
12 we have a legitimate call here, and that's where we
13 get there.
14     We request additional information from
15 dispatch, we slow things down, we contain, put people
16 in position to be able to be the eyes for us, that
17 being a container position, such as sniper component,
18 and see if we have any legitimate call here or, in
19 fact, in this case that it's bogus.
20  Q  When, in fact, here that's what they were
21 doing, they were setting up a perimeter and had taken
22 no action to accelerate the call?
23  A  They didn't do anything to accelerate the
24 call, but what they did do is they didn't do anything
25 preceding the use of force, which goes back into my

Page 174

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                    FOR THE DISTRICT OF KANSAS
 3
 4   LISA G. FINCH, Individually, as
     Co-Administrator of the Estate of
 5   Andrew Thomas Finch, deceased,
     ADELINA FINCH; DOMINICA C. FINCH,
 6   as Co-Administrator of the Estate
     of Andrew Thomas Finch, deceased;
 7   and ALI ABDELHADI,
 8                         Plaintiffs,
 9      vs.                              CASE NO. 18-CV-01018
                                                   JWB-ADM
10   CITY OF WICHITA, KANSAS; WICHITA
     POLICE OFFICER JUSTIN RAPP; SGT.
11   BENJAMIN JONKER; JOHN DOE POLICE
     OFFICERS 1-8,
12
                           Defendants.
13   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
14           VIDEOCONFERENCE DEPOSITION OF EXPERT
15                     SCOTT ALLEN DEFOE
16                        VOLUME II
17
18                     August 13, 2019
19                        9:04 a.m.
20
                535 Anton Boulevard, Suite 400
21
                     Costa Mesa, California
22
23
24         Reported by Liz Zehner, CSR No. 8425
25
```

Page 195

1  Let me start over the question.
2  You agree that it's widely recognized that
3  officers must have time within which to perceive that
4  the threat is abated to stop shooting once they've
5  already started shooting?
6  A  There can be. Once again, it just depends on a
7  number of factors. There can be sometime a delay. It
8  just depends on the officer, the officer's training, the
9  totality of the circumstances, positioning, lighting.
10 All of those are all factors, so it depends. In most
11 cases there can be a time delay, but I've never heard it
12 to the point where you need to tell your hand to stop
13 shooting. I think we make those conscious decisions on
14 our own, based on if there's a threat that's still
15 viable to the officers.
16 Going back to the Finch matter. Detective
17 Joseph Pichler stated that there was no focus on
18 compliance with the SWAT policy 602 or policies related
19 to interacting with the mentally ill. I discussed that
20 earlier in my prior deposition.
21 Q  Let's get back to my question. My question was
22 of the investigations that you reviewed where you
23 believe the PSB detective needed to do additional
24 investigation. You've been responding to something
25 other than that.

Page 196

1  A  No, I mean, I agree that those same areas that
2  those detectives cited, I agree if that question was in
3  those detectives' minds, that that should have been a
4  follow-up to ascertain if those things were in fact
5  true, based on those other examples that I provided.
6  I provided their deposition testimony because I
7  agree that based on their statements, there should have
8  been additional follow-up questions that were not
9  conducted.
10 Q  Any other than these that you've discussed,
11 Randolph, Quintero, Villa and Smith?
12 A  Yeah, I'm still looking. I mentioned follow-up
13 on the Smith matter too. There was no follow-up
14 regarding the officer's account that they believed that
15 other officers were behind the car, and therefore in
16 danger. I don't believe there's any follow-up. That
17 should have been explored in that as well.
18 Q  What follow-up?
19 A  To ascertain exactly their position, based on
20 when they fired their weapons, if they reasonably
21 believed that that vehicle was a threat. We know that
22 there were three officers involved, Pearce, Faulkner and
23 Eller. They stepped to the left of the car as they
24 fired their weapons into the vehicle. And my
25 understanding is Pearce fired into the windshield of the

Page 197

1  vehicle.
2  And then specifically too to follow-up, I
3  believe as to why you would get out on foot and approach
4  a vehicle if that vehicle was a threat. You would not
5  stay in your vehicle and then conduct a felony vehicle
6  pull-over if you reasonably believed that the vehicle is
7  a threat, and not put yourself in an open air
8  environment that does not provide any cover.
9  There was no training regarding -- no
10 additional training is my understanding regarding the --
11 Bautista reaching inside of Mr. Garner's vehicle.
12 That's the Nicholas Garner on August 22nd, 2015.
13 Q  Remember my question, Mr. DeFoe. The question
14 you're answering is were there any other investigations
15 in which you thought that the PSB detective needed to do
16 additional investigation, as opposed to review of the
17 information already ascertained in the criminal
18 investigation?
19 A  Yes, regarding training. There was no training
20 or further questioning by PSB regarding officers that --
21 for reaching into the vehicle. There was no training,
22 why he did that. There was no plausible reason as to
23 why he would have reached into the vehicle to try to --
24 what he believe was reaching for a weapon.
25 We discussed this at my last deposition. I

Page 198

1  believe that should have been explored by PSB as well
2  regarding the poor tactics that were displayed by
3  Officer Bautista preceding the shooting.
4  Q  That would not involve any additional
5  investigation, would it?
6  A  It could, sure, as to -- the investigation,
7  specifically tactics of reaching into that vehicle.
8  Because the result of the investigation, there was no
9  training that was imposed on Bautista. So either that
10 which was not a violation of training obviously, there
11 was no specific policy as to best practices or tactics
12 related to reaching into cars and putting yourself in
13 such a poor position, and now ultimately you have to use
14 your firearm to stop the threat.
15 Q  Any others?
16 A  Detective Harty did not do any independent
17 investigation separate from the criminal investigation
18 in the Marcus Mitchell matter. Once again, that being
19 using your firearm to strike the side of the window, and
20 then using force, that being lethal force after, and
21 specifically shooting into a moving vehicle.
22 I did not read anywhere that there was any
23 questions that were asked regarding policy and
24 procedures regarding shooting into or from a moving
25 vehicle. And that was not asked during the criminal

Page 199

1  investigation. And Detective Harty never did any
2  independent investigation regarding the tactics of
3  shooting into or from a moving vehicle.
4      Q  And that officer was disciplined as a result of
5  his shooting into the vehicle?
6      A  Yes. He was disciplined for that. But
7  specifically it's not just the result that he was
8  disciplined as he should have been, it's developing best
9  practices and training so officers don't do this in the
10 future. We know that shooting into or from moving
11 vehicles is a significant concern for law enforcement,
12 as well as for citizens, because typically the results
13 are catastrophic. You typically don't stop the car.
14     Typically there's a potential for uninvolved or
15 unintended victims to be shot. And then the aftermath
16 of the vehicle that operates on its own after an
17 individual has been shot has had traumatic consequences
18 in many matters, many of which I've been retained on
19 throughout the United States.
20     Q  You don't know what training was provided after
21 the Mitchell incident, do you?
22     A  I don't know. It wasn't noted in the
23 investigation that I received if there was in fact any
24 training provided to both Bautista, or officers in
25 general, not just Bautista. Because the best part about

Page 200

1  conducting, looking at policies and procedures is
2  develop best practices, and then provide training to
3  those officers to ensure that hey, we could probably do
4  things differently, or what's safer for officers.
5     We don't reach into cars because there's a
6  chance the person may drive off with you reaching into
7  the car, and then ultimately you may have to shoot the
8  person, or you could have been killed or dragged to your
9  death, which could have happened to that officer.
10 Fortunately, that did not happen.
11     Q  All you have reviewed is the PSB reports, so
12 you do not know what occurred as a result of any further
13 training provided by administration of the WPD following
14 this review, do you?
15     MR. STROTH: Objection; calls again for
16 speculation.
17     THE WITNESS: I don't know if there was any
18 training. I just know that there was not any
19 independent investigation separate from the criminal
20 investigation. And I don't know if during the criminal
21 investigation -- I do know the fact that those areas
22 were not explored. If there was follow-up training to
23 the officers, and not just the officers that are
24 involved, but if there were policies that were crafted
25 or reinforced or training was conducted, I think that

Page 201

1  would be a good thing. I don't know if it happened or
2  not.
3      Q  There was no vehicle involved in the Finch
4  incident, was there?
5      A  No, there was not.
6      Q  Any others where you claim there should have
7  been some additional investigation?
8      A  On the Villa matter, I don't know if I
9  mentioned this, on page 29 of his deposition, which was
10 confounding to me, he stated that Detective Harty stated
11 that he does not believe that he had an obligation to
12 ask officer -- excuse me, Sergeant Ryan if he could have
13 done anything other than lethal force at that moment.
14     So there wasn't -- part of the administrative
15 review should be, if you're looking at policies,
16 procedures, tactics, best practices, everything from
17 communication, planning, considerations of less lethal
18 force options, warnings, all those things should be
19 explored by detectives on the administrative side to see
20 if, though criminally it may have not met a threshold of
21 a criminal violation based on the district attorney
22 Bennett's review -- B-e-n-n-e-t-t, I believe, Marc,
23 M-a-r-c -- but there wasn't any -- he didn't even ask
24 the question, was there something you could have done
25 different, looking back at this incident. He didn't

Page 202

1  feel that he had an obligation. If he's conducting the
2  administrative investigation, if it's not him, I don't
3  understand who would that -- that would be.
4      Q  And Mr. Villa was a fellow who had just been
5  involved in a burglary and an incident with someone at a
6  gas station, there was a car chase, and he then got into
7  the vehicle of two elderly people in the front seat with
8  a gun; correct?
9      A  Well, he was never -- the facts leading up to
10 the point with a gun is correct, but my understanding is
11 that he was not armed, and never pointed or displayed a
12 weapon. I believe that Sergeant Pearce testified that
13 he believed he had a gun, but there was no gun found
14 inside of the vehicle when he was shot.
15     Q  Any others?
16     A  I think that is it for now. Some other
17 information may jog my memory as we go through, but --
18 can I take a two-minute break to use the restroom?
19     MR. PIGG: Sure.
20     THE WITNESS: Thank you.
21     (Recess, 9:48 to 9:51)
22 BY MR. PIGG:
23     Q  Of the 18,000 or so law enforcement agencies in
24 the nation, how many do separate administrative
25 investigations as opposed to administrative reviews of

Page 207

1  he stated, he's not looking for violations of policies.
2  He's looking to see if there's -- his inquiry is solely
3  based on a charging decision is what he stated. That's
4  what he's looking at. He's looking at it not from the
5  department's policies.
6      And to be quite frank, a district attorney is
7  not going to have that background, education, and
8  training to look for things in law enforcement as
9  relates to command and control, verbal communication,
10 de-escalation, containment, tactics. All those things
11 he's not going to have the background, education and
12 training to opine on that, so that's really not within
13 his wheelhouse, I believe.
14     That's why I think it's critical for PSB to be
15 able to conduct -- fill in any gaps that may exist, that
16 may not have been ascertained during the homicide
17 investigation.
18     Q  I realize you want to argue your point, but
19 just answer this question.
20     MR. STROTH: I'll object. Objection, Steve.
21 He's answering your questions.
22     MR. PIGG: That's incorrect. He's espousing
23 his position.
24     MR. STROTH: I disagree.
25 BY MR. PIGG:

Page 208

1      Q  And the question was, isn't it true that in
2  Mr. Bennett's reports, he evaluates whether the
3  officer's shooting was objectively reasonable under the
4  totality of the circumstances?
5      A  That is correct.
6      Q  You didn't like my word "redundant
7  investigation," but you agree that there's no standard
8  that requires a separate investigation by the Internal
9  Affairs or PSB branch?
10     A  You said "requirement." Based on Wichita
11 Police Department, there's no requirement, that's
12 correct.
13     Q  Is there any recognized national standard that
14 you can cite that requires a separate investigation, a
15 separate administrative investigation?
16     A  No.
17     Q  And you complain that the reports fail to
18 resolve discrepancies?
19     A  I wasn't complaining about anything. But what
20 I'm concerned about and what I've opined on is that if
21 there are discrepancies in some of these areas that I
22 previously mentioned in 18 of the shootings that I've
23 looked at, at least the PSB investigations, that there
24 was no follow-up in many of these matters.
25     As I mentioned just a moment ago, that

Page 209

1  detectives, and Detective Harty stated in the Villa
2  matter he didn't believe that he had an obligation to
3  ask if there were any other considerations at that time.
4      Q  That's a different subject than discrepancies,
5  isn't it? Let's stick with the question. We're talking
6  about discrepancies now. Of the reports that you looked
7  at that you thought contain some discrepancies, what
8  were they?
9      A  I don't know how to answer that question. I
10 mentioned earlier, I answered earlier that based on -- I
11 can go through them again. There were some areas that
12 were not followed up on as relates to -- specifically if
13 we look at the Finch matter, I'm not saying there's a
14 discrepancy. There was just a -- there was information
15 not, or there were areas that were not investigated as
16 relates to policy, tactics, procedure that were not
17 included in the investigation; that the only information
18 that was derived in many of these cases were solely from
19 the Homicide interviews.
20     Q  We'll get to that, but I want to talk to you
21 about your report, which says that one of your
22 complaint -- you don't like the word complaint. One of
23 your opinions is that there's a failure to resolve
24 discrepancies, which has nothing to do with what you're
25 talking about now.

Page 210

1      A  Which opinion are we talking about?
2      Q  On page 4 you have an observation or opinion
3  that detectives include a discrepancies section, but
4  don't resolve the discrepancies. Is that your opinion?
5      A  It is, and I note that on three bullet points
6  starting on page 3 of 16. I can read them into the
7  record if you'd like. Detective Oldridge stated in his
8  deposition --
9      Q  I don't need you to read your report to me.
10     A  Okay.
11     Q  You're just wasting time.
12     MR. STROTH: Steve, the witness is answering
13 the questions, so I'd appreciate if you're respectful.
14     MR. PIGG: And I'm trying to get through the
15 deposition in a timely fashion. If we keep having
16 nonresponsive questions and additional information, it's
17 going to take a lot longer than it should.
18 BY MR. PIGG:
19     Q  Mr. DeFoe, do you agree there's often in an
20 investigation discrepancies between witnesses that can't
21 be resolved?
22     A  At times.
23     Q  Witnesses have different perspectives, they see
24 things from different angles, they have different
25 personal views. All those create differences in their

Page 215

1   time as it relates to discrepancies between Homicide and
2   the PSB investigators.
3       Q   I think the question deals with discrepancies
4   in the evidence that wasn't addressed by the PSB
5   investigator.
6       A   No, because as I mentioned earlier, very rarely
7   are the -- does PSB conduct investigations or interviews
8   other than -- on the majority of the cases they use the
9   Homicide interviews as the interviews for their
10  investigation.
11      Q   But you identified -- you can identify no
12  discrepancies in the facts that were investigated by the
13  criminal investigators and reviewed by a PSB, other than
14  the two that you've mentioned relating to the Randolph
15  and the Quintero shooting?
16          MR. STROTH:  Objection; form.  Go ahead.
17          THE WITNESS:  Yes, at this time.
18  BY MR. PIGG:
19      Q   By yes, you mean that's correct?
20      A   That's correct.
21      Q   Then the next portion of your opinion
22  criticizes a failure to address whether supervisors at
23  scene complied with policy.
24      A   Yes.
25      Q   It's page 4.  Do you see that?

Page 216

1       A   I do.
2       Q   And of the shootings you reviewed, which ones
3   had supervisors at the scene?
4       A   The Stacy Richard matter, Sergeant O'Brien at
5   scene.  The Orme shooting, Sergeant Crouch was at scene.
6       Q   Which shooting, Ortiz?
7       A   No, Orme, O-r-m-e, 12/30/2017.
8       Q   Is that the name of the officer or the suspect?
9       A   No, Sergeant Crouch, C-r-o-u-c-h.
10      Q   I'm not recognizing an Orme shooting.  Tell me
11  generally the circumstances.
12      A   That was the one where Betts fired and struck
13  the girl in the eye.  Betts is B-e-t-t-s.  The
14  nine-year-old child that was -- a shot ricochet and
15  struck her in the eye, regarding the dog issue.
16      Q   Okay.  Any others?
17      A   Yes.  The Ortiz matter, Sergeant Bower was at
18  scene.
19      Q   Any others?
20      A   Still looking.  The Reed shooting on 12/4/15.
21  Sergeant Crouch again.  The Villa matter, Sergeant Ryan.
22  And that's all I have.
23      Q   Sergeant Ryan was actually the shooter in the
24  Villa matter?
25      A   That's correct.

Page 217

1       Q   With Stacy Richard, there was an evaluation of
2   the supervision and planning by Officer Mackey and
3   Sergeant O'Brien; correct?
4       A   Yes.
5       Q   And they were both disciplined as a result of
6   their conduct?
7       A   Yes.
8       Q   And you're aware from Lieutenant Kochderfer's
9   deposition that the city did provide additional
10  training, I think it was a two-day training with
11  scenarios related to supervisors involved in situations?
12      A   I believe that's what he testified to, yes.
13      Q   The Betts shooting, that officer was
14  discharged; correct?
15      A   Yes.
16      Q   What criticisms do you have of the sergeant's
17  conduct in the Betts shooting?
18      A   I don't have any criticism at this time of
19  Sergeant Crouch.
20      Q   And in the Ortiz shooting, that's where
21  Mr. Ortiz had his significant other in the house
22  with him, tied up with ties or something, and with a
23  knife at her back?
24      A   That's correct.
25      Q   And the investigator, that was Detective Amy,

Page 218

1   wasn't it?
2       A   Yes.
3       Q   Detective Amy looked at the situation from the
4   perspective of whether policies related to barricaded
5   suspects had been followed, didn't he?
6       A   I believe he testified to that, yes.
7       Q   But when the lady is screaming, it was time to
8   go in and take care of the matter, wasn't it?
9       A   The officers made the decision to do that, yes.
10      Q   And in fact had to shoot Mr. Ortiz, and saved
11  his significant other?
12      A   That's correct.
13      Q   And in the Reed matter, any criticisms of
14  Sergeant Crouch?  That's where the drug dealer was
15  running with a gun toward the high school that had a
16  gymnasium full of people.
17      A   The issue of the decision of where to stop that
18  vehicle, I've got a criticism of, knowing that, based on
19  Crouch's testimony, that he was aware that the gym was
20  busy and typically had events, basketball games that
21  went on there.
22          Reed, who was actually a student at the school,
23  and was not the person Quincy Carter, who Sergeant
24  Crouch testified they were looking for, the question is
25  that -- the officer said during the PSB incident review,

Page 239

1  thought this area of my report was. That the
2  researching of civilian witnesses' histories, they're
3  not suspect in any crime, they're just witnesses to an
4  event that they're providing information to law
5  enforcement, or not providing information to law
6  enforcement.
7  BY MR. PIGG:
8    Q  And then you have a criticism that there's no
9  specific policy on command review; correct?
10   A  Yes.
11   Q  But we know the review occurs because there's
12  sign-offs by at least three different command staff?
13   A  Yes.
14   Q  And we know that occurs because there was
15  discipline issued by command staff in Richard, Betts,
16  and Jameson shootings?
17   A  Correct.
18   Q  Are personnel matters confidential at LAPD?
19   A  Yes.
20   Q  So if an officer was disciplined for some
21  policy violation in connection with an officer-involved
22  shooting, that would be confidential?
23   A  It would be on their team's report, which is a
24  synopsis of their training and discipline. It would
25  show possibly the OIS, the number, and maybe a violation

Page 240

1  of a policy or a training issue or tactical issue. That
2  would be listed on there, but with the corresponding CF
3  number, which is the IA number, Internal Affairs number.
4    But the actual complaint itself would be
5  confidential, and only reviewed by, with a need to know
6  and right to know basis, by typically an investigator or
7  a supervisor, sergeant or above, could review that file.
8    Q  So the line officer would not have knowledge of
9  discipline meted out to other officers because that's
10  confidential?
11   A  It depends. As we know, officers talk, so if
12  someone got 22 days for driving under the influence,
13  most people would know. And in fact, what my experience
14  was, what LAPD used to do is read the monthly -- they
15  would call it a hit sheet. Wouldn't name the officer,
16  but we would know who it is, even with a large
17  department like LAPD, what people had done.
18   Specifically, no, that is confidential, and an
19  officer could be terminated for either discussing or
20  reviewing any files that were not authorized to do so.
21   Q  You point out some testimony of Lieutenant
22  Mumma, that the chief is the only one who can initiate
23  an administrative investigation; correct?
24   A  Yes.
25   Q  But did you see that the policy requires all

Page 241

1  officer-involved shootings to be investigated?
2    A  Yes.
3    Q  And you know of no officer-involved shootings
4  that have not been investigated?
5    A  Correct.
6    Q  Your report indicates that Lieutenant Mumma
7  testified that the FOP agreement prevents investigators
8  from making recommendations. Where is that in his
9  deposition?
10   A  I don't know the actual page. I don't have
11  that with me. I don't recall the page.
12   Q  You do recall the testimony that the chief is
13  next door to the Professional Standards Bureau and
14  interacts frequently with the investigators?
15   A  Yes.
16   Q  Stays up to speed on what's going on with the
17  investigations?
18   A  That's what he testified to, yes.
19   Q  Do you have any evidence to disagree with that?
20   A  No, sir, I do not.
21   Q  Are you criticizing the fact that command staff
22  is the staff -- is the decision-maker of whether
23  discipline results from an officer's conduct as a result
24  of an officer-involved shooting?
25   A  No.

Page 242

1    Q  You did recognize that the PSB detectives
2  identify areas of concern, whether they make a decision
3  about discipline or not?
4    A  Yes. They don't make decisions on discipline;
5  that's from command level. That's pretty consistent
6  with my understanding. That was my experience with my
7  agency as well.
8    Q  I think the next topic you, in your report was
9  a criticism -- maybe not a criticism, but just pointing
10  out that there's no, quote, independent oversight of --
11   A  Yes. That would be D on page 7 of 16.
12   Q  Yes.
13   A  Yes, sir.
14   Q  There's no recognized standard requiring
15  independent oversight of a police department, is there?
16   A  No, there's not. But according to Chief
17  Ramsay, he even states on page 86 of his deposition that
18  he agrees it's best to have an external agency conduct
19  the reviews into officer-involved shootings.
20   Q  He was saying it would be best to have
21  independent -- another law enforcement agency do the
22  investigation; correct?
23   A  Yes. I believe that's what he was referring
24  to.
25   Q  But that wasn't practical because neither the

Page 251

1 criminal investigator who's doing an interview of the
2 shooting officer with the assistance of the KBI?
3     A   Right. It was on page 4 of the report. When
4 Chisolm says in there, he's saying, "You know me John,"
5 speaking to Sergeant Ryan. Sergeant Ryan states, "Yes,
6 we've known each other for a number of years."
7         I don't think that's -- that is not a form for
8 that type of discussion, because what the reader would
9 look -- someone that's looking at it objectively would
10 say, well, hey, we know each other. At that point if
11 he's known him for a number of years, even on a smaller
12 department and he has a relationship or perceived
13 relationship, probably should recuse himself from that
14 interview because it -- especially in a time where
15 you've got a lethal use of force situation.
16    Q   When you referred to making Sergeant Ryan
17 comfortable, I think you're confused. You're talking
18 about the interview of Pearce?
19    A   Yes.
20    Q   So it's not Sergeant Ryan, it was Pearce. And
21 you understand the circumstances was that Pearce -- that
22 the vehicle was being accelerated backwards towards
23 Pearce with his initial shots going in the rear, along
24 the side, and then into the corner of the windshield.
25 And his initial perception was that he was on the other

Page 252

1 side of the vehicle, and obviously he was on the right
2 side?
3     A   Yes.
4     Q   That's what they were talking about, it's
5 helping him understand how the mind works in those
6 critical stress situations so that those kind of details
7 can be misperceived.
8     A   Right. But once again, that's something for a
9 footnote for an investigator, but not to be told to the
10 person who's being interviewed at the time to either --
11 he should provide a statement that's objective, based on
12 the best information he has at the time. And if you
13 need to, during the adjudication process or the review
14 process, to state that based on a human factor, this is
15 what people will react in a certain way is one thing,
16 but to let him know that by the way, you're probably off
17 because during the time of stress, this is how the body
18 reacts to that. It's not in the place in an interview
19 to say that. That might be a place during the
20 adjudication process as to were his reactions reasonable
21 or not, but not to him during the course of the
22 interview.
23    Q   And your reference to Detective Do's testimony
24 doesn't identify any specific leading question asked to
25 any officer. It just relates to Detective Do saying, if

Page 253

1 the officer's already told you this, it's okay to
2 confirm it.
3     A   What he stated was what I read into the record
4 earlier, which is even more problematic because it's not
5 specific to an individual interview or individual
6 incident. It's the way in which basically he does
7 business, is what I glean from reading that in his
8 deposition, is that -- "What you're saying is
9 self-defense, is that correct?" If that's the way that
10 he handles his interviews, that's concerning, due to the
11 fact that he may conduct all of his interviews like
12 that.
13    Q   You had the interviews themselves of the
14 officers who were the shooting officers. You did not
15 review them to evaluate whether there were any improper
16 leading questions?
17    A   That's correct.
18    Q   You criticized that Detective Pichler addressed
19 whether it was proper to prevent Mr. Finch from going
20 back in the residence under the circumstances because
21 that wasn't the reason articulated by Officer Rapp for
22 his shot; is that correct?
23    A   Yes.
24    Q   But Officer Powell did testify that his
25 perception was that that was why the shot was made, to

Page 254

1 prevent him from going back inside since he was
2 perceived to be the suspect with hostages inside?
3     A   I need to review my initial report if I may.
4     Q   Sure.
5     A   Yes, that's what Powell testified, that he
6 described Mr. Finch as startled by the police response,
7 which caused him to try to retreat in the house.
8     Q   We already discussed in your first deposition
9 that under circumstances where you have a suspect who is
10 believed to be armed, to have killed somebody, and has
11 two other hostages inside, that you would not allow that
12 person to go back in the house?
13    A   That is true, but once again, Officer Rapp did
14 not use that as a determining factor when he used lethal
15 force, based on his testimony. Powell didn't fire his
16 weapon. Rapp never stated that he fired his weapon for
17 the fear that Mr. Finch, or whoever the suspect was, was
18 going to retreat back into the house and then
19 potentially harm hostages.
20         So it doesn't matter what the rest of the
21 people in the perimeter think, it matters what the
22 person who used force thinks as the determining factors
23 as to why they used lethal force that day. I think
24 that's what's critical here.
25    Q   But do you agree that if that had been Officer

Page 255

1  Rapp's perception and reason, that that would be an
2  appropriate reason to use lethal force?
3       A  He would have to articulate that he reasonably
4  believed, he had objective reasonable belief that
5  Mr. Finch was in fact the suspect, based on the best
6  information at the time, and he reasonably believed that
7  allowing him back into the house would present imminent
8  threat of immediate defense of life or danger to
9  potential hostages. That would be his justification.
10 But it doesn't apply to the facts in this matter because
11 that's not what he testified to.
12      Q  A hypothetical, if a SWAT team is there,
13 they're not going to allow a suspect back in the house
14 with hostages?
15      A  That would be the objective is to not allow him
16 back in the house, that is correct.
17      Q  Explain your criticism of the city's early
18 intervention system with the officers.
19      A  My criticism is the issue of the officers
20 inputting their own information into the system, and
21 then not having an oversight auditing if in fact they
22 did in fact put that information in. And why that's
23 critical is that if I know that I have a number of use
24 of forces and I'm going to be put into a system where
25 now I could possibly be restricted from field duty or to

Page 256

1  have some type of action taken against me, I may not put
2  that information regarding the use of force into that
3  system.
4       And just based on their document, I didn't see
5  anything, unless I missed it, that shows that they audit
6  -- there's an audit to ensure compliance with an officer
7  who in fact does utilize that blue team's web
8  application by putting that information in there, and
9  then the supervisor following up to ensure compliance
10 with that. That's the issue that I have with that
11 particular system.
12      I think primarily the order is fine, just that
13 I've never -- I've not heard of officers putting that
14 information, based on their evaluation forms, in the
15 system themselves. That should be a supervisory duty to
16 ensure compliance and ensure that there's not a --
17 either an oversight or an intentional oversight by the
18 officer, not putting that information into the system.
19      Q  Do you understand that officers complete blue
20 team or use of force reports on each use of force, and
21 that that goes into the system?
22      A  Yes. I'm aware of how they do it. The issue
23 that I have, the criticism that I have is that insuring
24 that in fact they put that into the system. Like ensure
25 the compliance with them putting that in the system is

Page 257

1  where I didn't see that there's any audit system in
2  place to ensure compliance with 28 -- 218.17.
3       Q  Do you have any information that any officer
4  failed to file a use of force report when he used force?
5       A  I do not, sir.
6       Q  And specifically do you have any information
7  that any officer involved in an officer-involved
8  shooting -- strike that.
9       They don't put those into the system, that they
10 do the interviews and the investigation for the
11 shooting?
12      A  That's correct.
13      Q  So your complaint is possibly if you have a bad
14 officer out there, that he just doesn't complete a use
15 of force report?
16      A  Or he doesn't put the information into the
17 system. Somehow there's an oversight or he
18 intentionally doesn't do it, that there's no audit
19 system in place to ensure that the person puts that into
20 the system.
21      Q  Are you familiar with IAPro?
22      A  Yes.
23      Q  When an officer completes a use of force report
24 in IAPro, it automatically goes into the system; isn't
25 that correct?

Page 258

1       A  It is, but the question is completing the use
2  of force report, insuring compliance with that, is what
3  my --
4       Q  If you have a bad officer who just doesn't
5  complete a report at all, it doesn't go in the system;
6  that's your observation?
7       A  That's it.
8       Q  That officer would be risking another officer
9  having seen him or a supervisor knowing about it or a
10 complaint coming from it, and then they identify that he
11 hadn't done a use of force report?
12      A  That's correct.
13      Q  Then you suggest that officers are not
14 disciplined despite clear violations of policy. And you
15 talk about Garner; correct?
16      A  Yes.
17      Q  And your complaint is that he reached into the
18 vehicle to prevent Garner from reaching a weapon?
19      A  Yes.
20      Q  That's your only complaint about the Garner
21 incident?
22      A  Well, there was not any discipline. There was
23 no training as relates to that. You interject yourself
24 inside of a vehicle that then takes off, now you're
25 inside the car. Ultimately you have to use lethal

Page 295

1  the actual beanbag is much stronger, the Super-Sock,
2  than it was in the past. Trying to negate or mitigate
3  eye injuries and other things.
4      MR. PIGG: Let's take five. I'm going to
5  review my notes. We're close, if not done.
6      MR. STROTH: Okay, great.
7      (Recess, 12:37 to 12:41)
8  BY MR. PIGG:
9      Q  Mr. DeFoe, of the cases you reviewed, none of
10  them involved the situation like the Finch situation
11  with a barricaded hostage suspect, did it?
12     A  No, it did not. It was quite unique to any of
13  the other cases.
14     Q  And none of those cases involved the same
15  criticisms that you have about officer, or Sergeant
16  Jonker's performance; correct?
17     A  No. I mean, we've talked about other cases
18  like the Richards case and others that I have different
19  criticisms on. But as relates to command and control of
20  a scene similar to the Finch matter, this one was
21  unique.
22     Q  Have I covered all of the supplemental opinions
23  in your deposition today?
24     A  You have, sir, yes.
25     Q  Do you have anything else to add?

Page 296

1      A  At this time, I do not, sir.
2      MR. PIGG: I don't have any other questions at
3  this time.
4      MR. STROTH: The plaintiff does haven't any
5  questions. Thank you.
6      MR. PIGG: I assume you want to read and sign,
7  Mr. DeFoe?
8      THE WITNESS: I would like to, yes.
9      MR. PIGG: Okay. We are done. Off the record.
10     (Deposition concluded at 12:42 p.m.)
11            * * *

Page 297

1            REPORTER'S CERTIFICATION.
2
3      I, Liz Zehner, Certified Shorthand Reporter, in and
4  for the State of California, do hereby certify:
5
6      That the forgoing witness was by me duly sworn;
7  that the deposition was then taken before me at the time
8  and place herein set forth; that the testimony and
9  proceedings were reported stenographically by me and
10  later transcribed into typewriting under my direction;
11  that the foregoing is a true record of the testimony and
12  proceedings taken at that time.
13
14     IN WITNESS WHEREOF, I have subscribed my name this
15  23rd day of August, 2019.
16
17
18
19
20     _____
            Liz Zehner, CSR No. 8425
21
22
23
24
25

Page 298

1            ESQUIRE ERRATA SHEET
2
3
4  Esquire Job ID: J4353604
5  Case Caption: Finch vs. City of Wichita, Kansas
6
7      DECLARATION UNDER PENALTY OF PERJURY
8
9      I declare under penalty of perjury that I have
10  read the entire transcript of my deposition taken in the
11  above-captioned matter or the same has been read to me
12  and the same is true and accurate, save and except for
13  changes and/or corrections, if any, as indicated by me
14  on the DEPOSITION ESQUIRE ERRATA SHEET hereof, with the
15  understanding that I offer these changes as if still
16  under oath.
17
18     Signed on the _____ day of
19     _____, 2019,
20
21     _____
22     Scott Allen DeFoe
23
24
25