# Exhibit B

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF KANSAS
 2

 3

 4    LISA G. FINCH, Individually, as  )
      Co-Administrator of the Estate   )
 5    of Andrew Thomas Finch,          )
      deceased, and as Next Friend     )
 6    for her minor granddaughter,     )
      AF; DOMINICA C. FINCH, as        )
 7    Co-Administrator of the Estate   .)
      of Andrew Thomas Finch,          )
 8    deceased; and ALI ABDELHADI,     )
                                       )
 9                      Plaintiffs,    )
                                       )
10        vs.                          )Case No.
                                       )18-CV-01018-JWB-KGS
11    CITY OF WICHITA, KANSAS;         )
      JOHN DOE POLICE OFFICERS 1-10,   )
12                                     )
                        Defendants.    )
13                                     )

14

15                   D E P O S I T I O N

16

17        The videotape deposition of SERGEANT BENJAMIN JONKER

18    taken on behalf of the Plaintiffs pursuant to the Federal

19    Rules of Civil Procedure before:

20                   RICK J. FLORES, CSR
                     KELLEY REPORTING ASSOCIATES, LTD.
21                   515 South Main, Suite 108
                     Wichita, Kansas  67202
22

23    a Certified Shorthand Reporter of Kansas, at 455 North

24    Main, 13th Floor, Wichita, Sedgwick County, Kansas, on

25    the 18th day of October, 2018, at 9:02 a.m.

26

27
```

## Page 2

APPEARANCES

PLAINTIFFS:
CONLEE SCHMIDT & EMERSON, LLP
Mr. Rick E. Bailey
Suite 300
200 West Douglas
Wichita, KS 67202
(316) 264-3300
Fax: (316) 264-3423
rbailey@fleeske.net
MACARTHUR JUSTICE CENTER
Ms. Alexa Van Brunt
Northwestern Pritzker School of Law
375 East Chicago Avenue - 8th Floor
Chicago, IL 60611
Fax: (785) 232-6604
a-vanbrunt@law.northwestern.edu

ACTION INJURY LAW GROUP, LLC
Mr. Andrew M. Stroh
Mr. Carlton Odim
191 North Wacker Drive
Suite 2300
Chicago, IL 60606
(312) 771-2444
Fax: (312) 641-6866
astroth@actioninjurylawgroup.com

DEFENDANTS:
FISHER PATTERSON SAYLER & SMITH, LLP
Mr. J. Steven Pigg
3550 S.W. 5th Street
Topeka, KS 66606
(785) 232-7761
Fax: (785) 232-6604
spigg@fisherpatterson.com
VIDEOGRAPHER:
Advanced Document Imaging
Ms. Cindy Rosales
515 S. Main, Suite 105
Wichita, KS 67202
(316) 267-9380
Fax: (316) 267-8200
video@kelleyreporting.com

Also present: Ms. Lisa Finch and Ms. Dominica Finch.

## Page 3

INDEX

SERGEANT BENJAMIN JONKER
Direct Examination by Ms. Van Brunt:        4
Cross-Examination by Mr. Pigg:        231
Redirect Examination by Ms. Van Brunt:        232

Jonker Exhibits
No. 62 - Performance Appraisal 6-6-14        40
    (28 pgs)
No. 63 - Aerial Map of 1033 W. McCormick        90
    Area w/Markings (1 pg)

No. 64 - WPD Policy 602 - Barricaded        126
    Suspect, Sniper & Hostage
    Situations - SWAT Procedures
    (3 pgs)

SIGNATURE OF WITNESS        233
CERTIFICATE        234

## Page 4

1  VIDEOGRAPHER: Good morning.
2  This begins the videotape deposition of
3  Sergeant Benjamin Jonker. Today is Thursday,
4  October 18, 2018. Current time is 9:02 a.m.
5  Would the court reporter please swear
6  in the witness.
7  SERGEANT BENJAMIN JONKER
8  having been first duly sworn on his oath to
9  state the truth, the whole truth, and nothing
10  but the truth, testifies as follows:
11  DIRECT EXAMINATION
12  BY MS. VAN BRUNT:
13  Q. Good morning, Sergeant Jonker. Could you
14  please state your name and your full rank for
15  the record.
16  A. It's Benjamin Jonker, and I'm a sergeant for
17  the Wichita Police Department.
18  Q. Great. Have you ever given a deposition
19  before?
20  A. No.
21  Q. Have you ever testified under oath before?
22  A. Yes.
23  Q. Okay. So just some introductory remarks: A
24  deposition is like formal testimony. You're
25  under oath and subject to penalty of perjury.

## Page 5

1  Obviously, there's no judge or jury here, but
2  because we're making a record that will be
3  used in this case, I ask that you answer all
4  questions unambiguously and verbally. No
5  shakes of the head, uh-huh, huh-uh, that kind
6  of thing.
7  If you don't understand a question,
8  please let me know and I'll rephrase it
9  because you're entitled to a clear question,
10  but if you answer, I'm going to assume you
11  understood the question. Make sense?
12  A. Yep.
13  Q. Okay. You can take a break at anytime. I
14  just ask you answer the question that's
15  pending first.
16  A. Okay.
17  Q. All right. Are you under a doctor's care for
18  any illness that could affect your ability to
19  testify here today?
20  A. No.
21  Q. Taking any medication that could affect your
22  ability to testify?
23  A. No.
24  Q. Any reason whatsoever you can't give clear,
25  accurate, truthful testimony today?

Page 22

1   A. Not for the promotion tests.
2   Q. Okay. Do you intend to stay in your current
3      position in the near future?
4   A. Yes.
5   Q. Have you ever at anytime applied to be a SWAT
6      officer?
7   A. Yes.
8   Q. And when did you do that?
9   A. A long time ago. It was -- when I was still
10     a patrol officer is when I did that, so it's
11     been many years.
12  Q. And why did you apply?
13  A. Why?
14  Q. Correct.
15  A. 'Cause at the time I thought that's what I
16     wanted to do.
17  Q. And were you selected to be a SWAT officer?
18  A. No.
19  Q. Do you know why not?
20  A. Yeah, physical fitness.
21  Q. I see. What, in particular, about physical
22     fitness?
23  A. I mean, I -- you -- to -- to go through that
24     process, the first thing they do is a PT day
25     to see if you move onto the interviews and

Page 23

1   what they call -- I mean, their selection
2   day. So they pick a specific amount of
3   people based off of your -- that day which is
4   sit-ups, pushups, runs, and I never was moved
5   on from there.
6   Q. Got it. And what made you want to apply, in
7      particular, to SWAT?
8          What about the SWAT duties appealed to
9      you?
10  A. At the time it was just excitement of the
11     calls.
12  Q. Got it. And what calls do SWAT respond to?
13  A. They respond to anything that -- you know,
14     barricaded suspects, hostage situations.
15     They serve search warrants. They -- anything
16     that typical -- that is above the scope of
17     what a typical patrol would handle.
18  Q. And is it your understanding that SWAT
19     policy, in facts, mandates that SWAT respond
20     to incidents involving barricaded suspects?
21  A. I don't -- I don't think that it says it
22     mandates it, but I think it would --
23     depending on supervisor.
24  Q. What do you mean by that?
25  A. I don't think there's anything in policy that

Page 24

1   says that they're mandated to respond to
2   specifically any calls. I think that they
3   can go out on specific calls that are listed
4   out in policy.
5   Q. Would that answer be the same for hostage
6      scenarios?
7   A. What do you mean?
8   Q. Does policy mandate that SWAT responds to the
9      scene of any scenario involving potential
10     hostages?
11  A. I think I just said I don't think policy says
12     that they mandate that SWAT gets -- responds
13     to any specific call.
14  Q. Okay.
15  A. Like I don't think it's an automatic that
16     just because a call's dispatched, SWAT's --
17     that's not how it works.
18  Q. Well, is it your understanding as a
19     supervisor that if you respond to a scene
20     involving, for instance, a barricaded
21     suspect, it's your duty to call in SWAT?
22  A. Repeat the question.
23  Q. If, as a supervisor, or the commanding
24     officer on a scene involving a potential
25     barricaded suspect or gunman, is it your duty

Page 25

1   to call in SWAT?
2   A. I don't think -- I would say no.
3   Q. And why not?
4   A. I mean, there's other things that go into
5      that first. It would certainly be my duty if
6      I think that it rose to the level of having
7      or needing SWAT, but I don't think just
8      because you're dispatched to that type of
9      call that you would start SWAT.
10  Q. And what goes into the calculation as to
11     whether SWAT should be called in from a
12     commanding officer's perspective?
13  A. The severity of the crime, resources. If I
14     thought that it was something that could be
15     handled with patrol officers or the CRT guys
16     or with my K-9 guys, there's a myriad of
17     different things, I guess, that would go into
18     that determination.
19  Q. And if you are the commanding officer on the
20     scene, is that your decision to make?
21  A. It's -- well, it's -- to ultimately get SWAT
22     to come in, that's not my decision to make.
23     I can request them, and then you would
24     typically run everything that you have by a
25     duty chief or a watch commander.

Page 26

1  Q.  It's your responsibility to make the initial
2      request; is that fair to say?
3  A.  As a supervisor on scene, yes.
4  Q.  On December 28th, 2017, what shift were you
5      working?
6  A.  Well, it's -- we work a third shift, sort of
7      hybrid third shift.
8  Q.  And what are the times?
9  A.  I come in at 1630.
10 Q.  Okay.  Till?
11 A.  0200.  2:00 o'clock in the morning.
12 Q.  And what days of the week?
13 A.  I work that shift on Thursday, Fridays and
14     Saturdays, and then Wednesdays I work during
15     the day for dog training.
16 Q.  Do you know what day of the week December
17     28th was?
18 A.  I believe it was a Thursday.
19 Q.  And did you have a regular partner at that
20     time?
21 A.  My dog.
22 Q.  Okay.  So no one rode in your car with you
23     regularly?
24 A.  No.
25 Q.  Did you wear a uniform as a K-9 officer?

Page 27

1  A.  Yes, ma'am.
2  Q.  And is it the uniform you're wearing today?
3  A.  It -- very similar.  The external vest, I
4      think I had a hoodie on that night, but
5      that's -- it's a similar uniform.
6  Q.  And you had a hoodie because it was winter?
7  A.  Yes, it was cold.
8  Q.  And it was cold that night?
9         Sorry.  Can you answer?
10 A.  Yes.
11 Q.  Were you wearing multiple layers that night?
12 A.  I believe so, yes.
13 Q.  What color's the hoodie?
14 A.  Black.
15 Q.  Did you have the hood up that night?
16 A.  I don't recall.
17 Q.  And you can still see your badge if you're
18     wearing the hoodie?
19 A.  Yes.
20 Q.  And it's the badge you can see on the video
21     on your left side breast?
22 A.  Yes, and I also have a badge on my -- on my
23     duty belt.
24 Q.  And were you driving a WPD-issued car?
25 A.  Yes.

Page 28

1  Q.  Is it marked?
2  A.  It is not marked.
3  Q.  What is it?  What kind of car is it?
4  A.  It's a black Dodge Charger.
5  Q.  Okay.  And did you drive it to the scene that
6      night?
7  A.  Yes, ma'am.
8  Q.  Did anyone drive with you?
9  A.  No.
10 Q.  So you went to the academy, of course;
11     correct?
12 A.  Yes, ma'am.
13 Q.  And what -- for how long?
14 A.  Good question.  Seems like forever.
15 Q.  Just estimate, that's fine.
16 A.  I can't even -- it's like a 6-month academy.
17 Q.  Okay.  Did you receive training on use of
18     force at the academy?
19 A.  Yes.
20 Q.  And specifically when use of force was
21     allowable for law enforcement officers?
22 A.  Yes.
23 Q.  Sorry.  Is that a yes in there?
24 A.  Yes.
25 Q.  And when use of force was not allowable;

Page 29

1      correct?
2  A.  Yes.
3  Q.  Meaning when it became excessive?
4  A.  I mean, they discussed excessive force in the
5      academy, yes.
6  Q.  Okay.  And did you receive training on lethal
7      use of force?
8  A.  Yes.
9  Q.  Did you receive training on less lethal use
10     of force options?
11 A.  What's your definition of less lethal?
12 Q.  For instance, weapons or any type of force
13     that can be employed in lieu of using deadly
14     force.
15 A.  When I went to the academy, we didn't have
16     beanbag shotguns if that's what you're
17     talking -- we didn't have Tasers so we have
18     batons and whatnot that, I guess, if you want
19     to consider that less lethal, then yes, we'd
20     receive training on that.
21 Q.  Okay.  So at the academy, you received
22     training on things like batons or OC spray?
23 A.  Uh-huh.
24 Q.  And currently officers on WPD have access to
25     beanbag shotguns; is that correct?

8  (Pages 26 to 29)

Page 42

```
1     coordinated a perimeter?
2   A. Okay.
3   Q. Have you, in the past, in your job
4     coordinated perimeters?
5   A. Many.
6   Q. And what is the purpose of a perimeter?
7   A. Containment.
8   Q. And how does one set up a perimeter?
9   A. Rephrase the question, I guess.
10  Q. What's the process of setting up a perimeter?
11  A. The easy way to answer -- I mean, the -- I
12    guess, the -- you go over here, you go over
13    here. I mean, we want to contain all sides.
14    So on the radio, verbally, I guess.
15  Q. So you assign officers to all sides of the
16    scene to contain the suspect?
17  A. Not necessarily. We want to -- I mean, the
18    purpose of a perimeter is to be able to have
19    eyes on all sides of the scene.
20  Q. Okay. And one of the reasons for that is to
21    keep civilians safe, correct, who are in the
22    area?
23  A. Yes.
24  Q. And to keep law enforcement safe?
25  A. Correct.
```

Page 43

```
1   Q. Okay. And is it typical for you to create a
2     perimeter when faced with a person who is
3     suicidal as in this incident that's relayed
4     in your assessment?
5   A. What was your question?
6   Q. Would you typically set up a perimeter if you
7     had a armed suicidal person to whom you were
8     responding?
9   A. It just depends.
10  Q. On what?
11  A. On the location, I mean, on a lot of things.
12  Q. Okay. And this report says that you got in
13    contact with the suspect.
14        Is that a typical response that you
15    would use?
16  A. I honestly have zero recollection of this
17    specific. If you have --
18  Q. And I understand. I'm just asking,
19    generally, if the tactics relayed here are
20    tactics you would use in the course of your
21    work as an officer.
22  A. If -- are you -- as an officer responding to
23    an armed suicidal person --
24  Q. Correct.
25  A. -- you would want to contain that person, try
```

Page 44

```
1     to, where they're not going to be out walking
2     around with a handgun. And obviously you're
3     going to want to try and make contact with
4     them.
5   Q. For what purpose?
6   A. 'Cause if you didn't make contact with them,
7     you can't do anything.
8   Q. Okay. And you'd try to engage --
9   A. You could try and deescalate or try and
10    disarm, take them into custody, whatever. At
11    some point you have to make contact with
12    them.
13  Q. Got it. And would the goal of using those
14    tactics be to disarm him without anyone
15    getting hurt?
16  A. Correct.
17  Q. All right. We'll put that away. Thank you.
18        Did you receive training in in-service
19    sessions on active shooters?
20  A. Yes.
21  Q. And do you recall any of what you learned in
22    those sessions?
23  A. I mean, specific -- yes.
24  Q. And what do you recall?
25  A. Just how to respond to active shooting
```

Page 45

```
1     situations, you know, making contact teams.
2     We learned different movements to go through
3     on active shooting situations.
4   Q. When you say teams, do you mean contact
5     teams?
6   A. Yes.
7   Q. And what is a contact team?
8   A. I guess I'll give a scenario.
9   Q. Okay.
10  A. If you had a school shooting -- well, that's
11    not a good scenario. Let's say that your
12    first arriving officers on scenes would be
13    your contact team. So our policy, if you
14    have a -- say that you had three patrol
15    officers and a SWAT guy that showed up on
16    scene, your SWAT guy's going to be the team
17    leader because he's been through much more
18    advanced training on active shooting
19    situations. So your contact team is
20    basically just that: Your team that's going
21    to go in and make contact with your active
22    shooter.
23  Q. Okay. And what will they do in the process
24    of making contact with the shooter?
25        Or what techniques are they expected
```

KELLEY REPORTING ASSOCIATES, LTD     515 S. MAIN, STE 105
316.267.8200

WICHITA, KANSAS
67202

Page 66

1   Q.  More than 10?
2   A.  Of armed --
3   Q.  -- shooters.
4   A.  Like actively shooting?
5   Q.  Correct, or you receive a report that the
6       person had shot.
7   A.  Yeah, I mean, would a shooting call count as
8       that?
9   Q.  Yeah.
10  A.  Yeah, hundreds.
11  Q.  Okay.  Pretty typical?
12  A.  Yes.
13  Q.  How typical are barricaded gunman calls?
14  A.  Less typical.  I mean, I've responded to
15      them.
16  Q.  Do you know how many, about?
17  A.  I couldn't tell you.
18  Q.  Less than 10, more than 10?
19  A.  I would say more than 10.
20  Q.  Do any stand out for you?
21  A.  No.
22  Q.  Have you ever responded to a false call?
23  A.  Yes.
24  Q.  And what is a false call?
25  A.  My definition of what a false call is?

Page 67

1   Q.  Sure.
2   A.  Somebody calls 911 and basically says
3       something to elicit a police or fire, medical
4       response that's not truthful.
5   Q.  Would you say such calls are pretty typical
6       on the job?
7   A.  I wouldn't say they were typical.  They
8       happen.
9   Q.  How many, over the course of your career,
10      would you estimate?
11  A.  I couldn't tell you.
12  Q.  Again, more than 10?
13  A.  More than 10.
14  Q.  More than 20?
15  A.  Probably more than 20.
16  Q.  All right.  Is it fair to say that you
17      frequently respond to crime scenes based on
18      information you receive from dispatch?
19  A.  That we respond to crime scenes based off of
20      what dispatch gives us?
21  Q.  Yep.
22  A.  Very frequently.
23  Q.  Okay.  That's the norm, in fact?
24  A.  Correct.
25  Q.  And you would agree, I assume, based on your

Page 68

1       prior statement that the information received
2       from dispatch is not always correct?
3   A.  Correct.
4   Q.  And especially when the person who is, in
5       fact, reporting a crime gives dispatch
6       incorrect information?
7   A.  Correct.
8   Q.  Okay.  Do you receive training on any methods
9       law enforcement officers can use to verify
10      the accuracy of a emergency call?
11  A.  Formal training?
12  Q.  Any kind of training.
13  A.  Yes.
14  Q.  And what kind of training did you receive?
15  A.  I would say most of it would be on-the-job
16      training.
17  Q.  Okay.
18  A.  Being able to look stuff up on your computer,
19      checking with dispatch to find out if we've
20      had prior calls there and whatnot.
21  Q.  Okay.  And what kind of info would you be
22      looking up on the computer?
23  A.  People, addresses, calls.
24  Q.  Okay.  So you'd look to see if police had
25      previously responded to the supposed suspect

Page 69

1       location?
2   A.  More or less, yes.
3   Q.  And what would be the importance of doing
4       that?
5   A.  To find out if we've been there before?
6   Q.  Right.  Why would that be important?
7   A.  I mean, in my computer you could pull up if
8       we've been out on false calls there or if
9       there's somebody that is classified as a
10      mental is living at that address and is
11      somebody that frequently calls in all the
12      time.
13  Q.  Okay.  What's a mental?
14  A.  The -- somebody that has been classified
15      through our system as a -- somebody with
16      mental issues.
17  Q.  And is it fair to say you would also look to
18      see if there were legitimate police responses
19      to that house?
20  A.  Yes.
21  Q.  Because that would tend --
22  A.  Domestic violence or --
23  Q.  Right, because that would tend to confirm the
24      accuracy of the call?
25  A.  Correct.

18  (Pages 66 to 69)

Page 70

1    Q. Would you try to ascertain demographic detail
2       about the suspect from dispatch, like the
3       person's age, sex, race, physical
4       description?
5    A. From our dispatcher?
6    Q. Correct.
7    A. On -- what scenario are we on now?
8    Q. Just in any scenario which you're responding
9       to a 91 call involving an identified suspect,
10      would you attempt to know who you were
11      responding to by asking identifying details
12      from dispatch?
13   A. Dispatch would typically give us that
14      information.
15   Q. And if they didn't, would you ask?
16   A. Possibly.
17   Q. And what would be the importance of asking?
18   A. To find out who you're going to deal with.
19   Q. Okay. Would you say it'd also be important
20      to then confirm the details you received
21      based on what you saw at the scene?
22   A. What do you mean by that?
23   Q. Well, if dispatch said you were dealing with
24      a 6-foot-4, white, 40-year-old man; you came
25      to the scene and all you saw was a

Page 71

1    18-year-old African American teenager, that
2       would cause you to suspect that perhaps there
3       were some discrepancies in the call?
4    A. Yes.
5    Q. Okay. And you're familiar with the term
6       swatting?
7    A. Yes.
8    Q. Were you familiar with it on December 28th?
9    A. Yes.
10   Q. And how had you heard the term?
11   A. I remember being asked this in my interview.
12      And when I think of swatting, I think of like
13      Los Angeles PD, you know, and people calling
14      911 on actors or sports figures, somebody
15      famous.
16   Q. Right.
17   A. And having -- you know, saying something in
18      order to elicit a large response from the
19      police.
20   Q. So you knew it was a phenomenon; correct?
21   A. Correct.
22   Q. Had you ever heard of it being used against
23      non-celebrities?
24   A. You know, I don't recall if I had or not.
25   Q. Okay. Do you agree sitting here now that the

Page 72

1       call that stimulated the police response to
2       McCormick on December 28th, 2017, was likely
3       a swatting call?
4    A. Absolutely.
5    Q. All right. And I'm going to refer to 1033
6       West McCormick going forward.
7          Would you agree that's the location at
8       which the Finch shooting --
9    A. Yes.
10   Q. -- incident occurred?
11         At the time you responded to the call
12      that night, before any shots were fired, did
13      you believe it to be a swatting call?
14   A. No.
15   Q. Okay. And is it fair to say, when you
16      responded to the scene, you believed you were
17      dealing with a barricaded shooter scenario?
18   A. Yes.
19   Q. An active shooter scenario, perhaps?
20   A. I wouldn't say active. Your first --
21   Q. Barricaded gunman?
22   A. Yes.
23   Q. And a hostage scenario; correct?
24   A. Correct.
25   Q. All right. And you had, as we discussed

Page 73

1       earlier, responded to such cases before?
2    A. Correct.
3    Q. Now the evening of December 28th, when did
4       you start your shift?
5    A. I believe probably around 4:30.
6    Q. Okay. And you didn't have assigned partner;
7       right?
8    A. My dog.
9    Q. Okay. And what were your assigned duties
10      that night, as you understood them?
11   A. As a CR -- or a SCAT supervisor and the K-9
12      supervisor.
13   Q. And did you do anything on the job prior to
14      going to 1033 West McCormick?
15   A. Yes.
16   Q. What did you do?
17   A. We had a meeting at a citizen's house with
18      all of our dogs.
19   Q. All right. For what purpose?
20   A. Just 'cause she likes the dogs.
21   Q. Did you do anything else that night prior to
22      going?
23   A. No.
24   Q. Did you make any arrests?
25   A. No.

Page 74

1  Q. At some point, you learned about an incident
2      taking place at 1033 West McCormick?
3  A. Correct.
4  Q. And how did you learn of it?
5  A. I was actually driving to our FOP lodge to
6      vote on a contract. So I was heading west on
7      Kellogg when the dispatcher simulcast a
8      shooting call at 1033 West McCormick.
9  Q. Simulcast meaning what?
10 A. They broadcast it on all the police channels.
11 Q. Citywide?
12 A. Yes.
13 Q. Okay. And you decided to respond?
14 A. Yes.
15 Q. For what reason?
16 A. I was close and, typically, SCAT responded to
17     all shootings in the city.
18 Q. Okay. And what area of SCAT were you in,
19     again?
20 A. Patrol south.
21 Q. Okay. And this was in the western division;
22     correct?
23 A. Correct.
24 Q. But that didn't matter because SCAT responds
25     to all such incidents?

Page 75

1  A. Correct.
2  Q. Okay. What information did you receive via
3      the simulcast at that point in time about the
4      incident?
5  A. On the simulcast?
6  Q. Yeah.
7  A. That there was just a shooting at 1033 West
8      McCormick.
9  Q. Do you receive any other information at that
10     time from dispatch?
11 A. During the simulcast?
12 Q. At any point prior to going to the scene, did
13     you receive it?
14 A. Yes.
15 Q. And what information do you receive?
16 A. That the calling party reported that he had
17     shot his dad, and I believe he said that he
18     wasn't breathing. And that at some point
19     after that, there was a part of the call that
20     had come in that he said that his mom and dad
21     had been in an argument or something like
22     that, and that he was holding his mom and
23     brother or sister in the closet.
24 Q. Did you have a description of the suspect at
25     that time?

Page 76

1  A. No.
2  Q. Did you have information about the ages of
3      the people being held?
4  A. No.
5  Q. Their races?
6  A. No.
7  Q. Okay. From the time you received that first
8      information until the time of the shooting,
9      did you receive any other information about
10     the suspected shooter?
11 A. Not that I recall.
12 Q. Okay. Any other information about the
13     incident at all from any secondhand sources?
14 A. Secondhand meaning who?
15 Q. Meaning anyone or any source that wasn't your
16     own eyes.
17 A. You know, I don't -- I remember hearing that
18     at one point he said that it was an accident,
19     that his mom and dad were arguing, and then
20     that he was -- had his mom and brother or
21     sister in a closet at gunpoint.
22 Q. Okay. Is that additional information you
23     learned from dispatch?
24 A. I believe so, yes.
25 Q. While you were on the scene?

Page 77

1  A. Or en route to, yes.
2  Q. Okay. At any point in time prior to the
3      shooting, did you learn a description of the
4      suspect?
5  A. No.
6  Q. You only knew he was a male?
7  A. I assumed that he was a male because of the
8      way that he was saying he, yes.
9  Q. Okay. But that's all you knew?
10 A. (Witness nods.)
11 Q. Did you know anything about the house to
12     which you were responding --
13 A. Just the address.
14 Q. -- West McCormick?
15     Did you recognize that address?
16 A. No.
17 Q. Had you ever responded to it?
18 A. There's a possibility, but I don't recall
19     responding to any calls there.
20 Q. It didn't ring a bell at the time?
21 A. Absolutely not.
22 Q. And did the dispatch give you the history of
23     any police response to that location at the
24     time?
25 A. Not specifically police response.

20  (Pages 74 to 77)

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105                    WICHITA, KANSAS
                                    316.267.8200                                    67202

Page 78

1  Q.  What information did you have?
2  A.  I asked dispatch if we had had any calls from
3      that address or from the phone number in the
4      past.
5  Q.  And when did you ask dispatch that?
6  A.  While I was driving to there.  Shortly after
7      they'd broadcast the call.
8  Q.  Okay.  And what did dispatch tell you?
9  A.  That there had been a call of a stroke.
10 Q.  Okay.  Just a medical call?
11 A.  Correct.
12 Q.  No law enforcement response?
13 A.  Not that they ever told me.
14 Q.  Did you find out at that time that you
15     responded to the scene -- or the initial
16     information you received, rather, that it was
17     coming via the badge on the floor?
18 A.  No.
19 Q.  Did you ever find that out that night?
20 A.  Yes.
21 Q.  And when did you find that out?
22 A.  Well after the shooting, after we'd cleared
23     the -- most of the residence.
24 Q.  Did anything about the initial information
25     you received via simulcast strike you as

Page 79

1      suspect or unusual?
2  A.  No.  It's an unusual call.
3  Q.  In what sense?
4  A.  I mean, it's not every day that we go to a
5      call where somebody says that they shot their
6      dad and they're holding their mom and
7      siblings hostage.  I mean, it's a very high
8      priority call.
9  Q.  Right.  Was there anything about that call
10     that suggested to you you might be dealing
11     with a mental health issue?
12 A.  No.
13 Q.  Did anything about the circumstances of the
14     call suggest that the person who was holding
15     their family hostage and who had shot a
16     member of their family might have a mental
17     health problem?
18 A.  No, but one could assume that if you shoot
19     your dad and are holding two people hostage
20     that you may have a mental health problem.
21 Q.  So was it in your mind that mental health
22     issues may be involved as you responded?
23 A.  Not really.
24 Q.  Did you ever learn the name Andrew Finch
25     prior to the shooting?

Page 80

1  A.  No.
2  Q.  When did you first find out that name?
3  A.  I don't recall.  I mean, I don't even
4      remember, during my interview, if I knew his
5      name.
6  Q.  You know it today, of course; right?
7  A.  Yes.
8  Q.  Are you familiar with the name outside this
9      case?
10 A.  No.
11 Q.  Had you ever come across Mr. Finch before?
12 A.  Not that I recall.
13 Q.  After hearing the call, you drove to the
14     scene; correct?
15 A.  Correct.
16 Q.  And what route did you take?
17 A.  West on Kellogg and I got off on Seneca and
18     then I went south -- I think in my tape -- my
19     transcript, it says north, but I went south
20     on Seneca from Kellogg to McCormick
21     basically.
22 Q.  Then were you talking to dispatch during this
23     drive?
24 A.  The only thing I said to dispatch was I asked
25     them what the call history was.

Page 81

1  Q.  Did it strike you as unusual that such a high
2      priority incident would be happening at a
3      residence with no history of law enforcement
4      response?
5  A.  No.  Can you rephrase that -- or ask that
6      question again.
7  Q.  Sure.  You learned that there wasn't a
8      history of law enforcement responding to that
9      house?
10 A.  Uh-huh.
11 Q.  Did it then strike you as, perhaps, unusual
12     that such a high priority incident was, thus,
13     taking place there?
14 A.  No, just the opposite, actually.  What would
15     make me believe that maybe this isn't a real
16     call would be if there was 40 calls from a
17     guy that reports, you know -- constantly
18     calls 911 and because he is mentally ill
19     or -- that's what would -- that's what I'm
20     looking for when I'm asking that, you know,
21     is this a guy that calls 911 and reports off
22     the wall things all the time, which is not
23     what we had in this situation.
24 Q.  Right.  You also didn't have a history of
25     violent acts at that house; correct?

21  (Pages 78 to 81)

Page 82

1 A. No.
2 Q. Did you respond with your sirens on?
3 A. Yes.
4 Q. And ran red lights?
5 A. Uh-huh.
6 Q. Called running hot?
7 A. Yep.
8 Q. And why did you decide to do that?
9 A. Just to get there quicker.
10 Q. 'Cause it was a high priority incident?
11 A. Yeah.
12 Q. You weren't assigned to respond to the scene;
13 right?
14 A. No.
15 Q. You just thought, as a member of SCAT, it was
16 your duty to respond?
17 A. Yes.
18 Q. And do you believe this kind of incident that
19 it's sort of all hands on deck type of
20 incident?
21 A. Yes.
22 Q. So officers from all over the city were
23 likely to respond?
24 A. Typically, all your SCAT guys are going to
25 respond to that. I wouldn't say officers

Page 83

1 from all over the city are going to respond
2 to -- I mean, people still have to answer 911
3 calls.
4 Q. All right. And how many SCAT officers are
5 there in WPD, do you know?
6 A. We don't have SCAT anymore.
7 Q. Sorry. At the time of this incident, how
8 many SCAT officers were there?
9 A. You know, specific numbers I couldn't tell
10 you. We have four down south, but then at
11 some points we have a day SCAT team, too,
12 that had four or five, and that's pretty
13 consistent citywide. So there's,
14 potentially, at night, 16 officers from --
15 four from each bureau, five, six from each
16 bureau.
17 Q. And it would have been appropriate for all 16
18 to respond to this kind of scene?
19 A. I said 16; 12 probably. And you're not going
20 to have 12 guys working at the same time.
21 People take off. It's -- it is very common
22 where there's a shooting or a very high
23 priority call for SCAT to respond.
24 Q. And how many SCAT officers did you see once
25 you got to the scene?

Page 84

1 A. When I first got there?
2 Q. Sure.
3 A. Well, so I -- my K-9 guy is technically
4 assigned to SCAT, or was at the time. So if
5 you would include him, then I saw Rapp and
6 Gumm.
7 Q. And just prior to the shooting, had more SCAT
8 officers arrived by that point?
9 A. Just when I got on the north side of
10 McCormick, I saw two other SCAT officers east
11 of the house.
12 Q. And who were they?
13 A. I couldn't -- I couldn't tell you. I know
14 now. I couldn't tell you at the time.
15 Q. Do you know now that they are Ronen and
16 Perry?
17 A. Yes.
18 Q. And were there non-SCAT officers at the scene
19 right prior to the shooting?
20 A. Yes.
21 Q. And how many total, would you say?
22 A. Just prior to the shooting?
23 Q. Correct. How many total officers were at the
24 scene just prior to the shooting?
25 A. I guess maybe 12, 13. I don't know.

Page 85

1 Q. When you got to the scene, were you the
2 commanding officer?
3 A. I was the one who took charge. I don't know
4 if there was other supervisors. When I first
5 got there, I was the only supervisor that I
6 had seen, so yes.
7 Q. So you knew you were in charge because you
8 were the only one there; is that correct?
9 A. At the time, yes.
10 Q. All right. Were you the only supervisor
11 present through the point of the shooting?
12 A. That I knew of.
13 Q. Okay. After the shooting, were other
14 commanding officers present at the scene?
15 A. Yes.
16 Q. How many sergeants?
17 A. What timeframe? Like immediately after the
18 shooting or --
19 Q. Right in the aftermath of the shooting.
20 A. I guess rephrase the -- I need to narrow down
21 a timeframe. There were supervisors that
22 were there immediately after the shooting.
23 When we started -- when I asked for a Tahoe
24 to come up, that was a supervisor.
25 Q. Who was that?

## Page 90

1  MS. VAN BRUNT: Thanks. All
2  right. So we're -- take that back. We're
3  going to remark this as Jonker Exhibit 63.
4  (Jonker Exhibit No. 63 was marked for
5  identification.)
6  BY MS. VAN BRUNT:
7  Q. And I'll just put that -- okay. It's
8  identical to the one you just had. Okay. So
9  let's start again. There are no markings on
10  this.
11  A. Okay.
12  Q. And if you could just put a mark where you
13  first parked when you responded to the scene
14  and notate it as location 1.
15  A. Want me to write location 1 on here?
16  Q. Or just loc 1, whatever is easier.
17  A. (Witness complies.)
18  Q. And it looks like you are indicating behind
19  what is indicated as Gabby's Restaurant?
20  A. Yeah, I know it as the breakfast club.
21  Q. So I'll refer to it as that going forward.
22  How did you choose to park there?
23  A. I did not know where 1033 West McCormick was
24  at. I knew, generally. I did not expect it
25  to be the first house.

## Page 91

1  Q. Okay.
2  A. And as I pulled up, I saw that is where
3  other officers had parked.
4  Q. And who was there when you arrived?
5  A. There were several officers. The two that I
6  remember being Rapp and Gumm.
7  Q. Was it your understanding that they were
8  responding to dispatch, as well?
9  A. Oh, yeah.
10  Q. And they're both SCAT?
11  A. K-9 and SCAT, yes.
12  Q. And they were both -- well, you were their
13  supervising officer; correct?
14  A. Yes.
15  Q. All right. At the time you parked and got
16  out of your car, did you have a plan in your
17  head as to how to respond to this incident?
18  A. Absolutely not.
19  Q. All right. What is the first thing you did
20  once you got to the scene?
21  A. I tried to assess what resources that I had.
22  Q. Okay. And meaning how many officers you had?
23  A. Correct.
24  Q. And how many officers did you have when you
25  first got there?

## Page 92

1  A. I mean, just a glance, I wanted to -- I don't
2  know. To answer your question is I don't
3  know.
4  Q. Okay. Less than 10?
5  A. At the time, yes, but I knew that many more
6  were coming in.
7  Q. And how did you know that?
8  A. Because it's a -- it came out as a shooting
9  call.
10  Q. And you knew that many officers would respond
11  to such a call?
12  A. Correct.
13  Q. Okay. And what is the first thing that you
14  did, physically, once you arrived to the
15  scene?
16  A. What do you mean physically?
17  Q. Well, did you issue any commands to any
18  officers who were at the scene?
19  A. Eventually, yes. I mean, very quickly. This
20  is all, I mean, very quick. So I asked -- I
21  saw that there were no apparent exits on this
22  side of the house that it appeared. I knew
23  Gumm was back there. The -- Gumm and Rapp, I
24  believe, were -- had their weapons pointed up
25  towards the upper level of the residence.

## Page 93

1  And somebody had pointed out that there
2  were -- was a movement coming from those
3  windows.
4  Q. And that was Officer Gumm?
5  A. I believe it was Officer Gumm, yes.
6  Q. Did you ever see movement in the house?
7  A. Just shadow.
8  Q. And did you identify that shadow as a man or
9  a woman?
10  A. No.
11  Q. As a child or adult?
12  A. No.
13  Q. Did you report seeing that movement in your
14  WPD interview?
15  A. I don't recall. I remember seeing the lights
16  on in the house. That wasn't really my focus
17  at that time. I don't recall if I had said
18  that or not.
19  Q. But you now have a clear memory of seeing
20  somebody in the upstairs window?
21  A. The shadow.
22  Q. Okay. Did you see what that shadow was
23  doing?
24  A. No.
25  Q. And how long were you at that location where

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105    WICHITA, KANSAS
316.267.8200    67202

Page 94

```
1    you parked?
2    A. Not very at all.
3    Q. Meaning less than two minutes?
4    A. Yes.
5    Q. All right. Did you give Officer Rapp any
6       orders at that location?
7    A. Yes.
8    Q. What did you say?
9    A. I had pointed at Officer Rapp, and I didn't
10      know at the time, but I believe it's Officer
11      Powell to follow me around to the front of
12      the house.
13   Q. So Officer Powell was also at that location?
14   A. I believe so, yes.
15   Q. Because he came with Rapp?
16   A. Yes.
17   Q. Okay. Did you give Officer Gumm any
18      commands?
19   A. No.
20   Q. Do you know, did Officer Gumm, to your
21      knowledge, know what to do while he was at
22      that location?
23   A. Yes.
24   Q. How do you know?
25   A. 'Cause I've worked with him for a long time.
```

Page 95

```
1    Q. What was he doing at that location?
2    A. He was basically covering off the back of the
3       residence.
4    Q. Okay. But you never said "cover back the
5       residence"?
6    A. Not that I recall.
7    Q. You just assumed he'd do so?
8    A. Correct.
9    Q. And what kind of weapon did he have?
10   A. A handgun.
11   Q. Was it out?
12   A. I believe so. I don't -- specifically, I
13      don't recall, but I believe so.
14   Q. And why did you choose to move to the north
15      side of McCormick?
16   A. Because this did not look like an egress or
17      ingress point.
18   Q. Sorry. This being the back of the 1033 West
19      McCormick?
20   A. Yes. The rear where officers were at did not
21      appear to be utilized for moving in and out,
22      and I wanted to get a better view of the
23      front of the residence.
24   Q. Okay. And why did you take Powell and Rapp
25      with you?
```

Page 96

```
1    A. Because I wanted officers on the front of the
2       residence.
3    Q. Okay. More than one?
4    A. Correct.
5    Q. Any specific reason why you chose those
6       officers?
7    A. There was absolutely zero reason why I chose
8       Powell other than he was standing right next
9       to me. And the reason that I chose Rapp was
10      because he was the only one out there with a
11      rifle.
12   Q. Okay. And you knew he had a rifle on him?
13   A. Correct.
14   Q. How did you know that?
15   A. He had it up and out and trained on the back
16      of the house.
17   Q. Okay. Did you have prior knowledge that he
18      was rifle certified?
19   A. Yes.
20   Q. How did you have that knowledge?
21   A. I just did. He was one of my employees.
22   Q. Okay. Had you worked for him -- with him for
23      some time?
24   A. Yes.
25   Q. How many months or years?
```

Page 97

```
1    A. I think he was -- I was trying to think of
2       this last night. Maybe a year and a half.
3    Q. Okay. And he was your subordinate officer
4       during that time?
5    A. Correct.
6    Q. Did you find him to be a good officer?
7    A. Yes.
8    Q. Honest?
9    A. Yes.
10   Q. Trustworthy?
11   A. Yes.
12   Q. Do you think he was reliable with a weapon?
13   A. Yes.
14   Q. Had you ever seen him engaged in any
15      excessive use of force while on the job?
16   A. Absolutely not.
17   Q. Any improper conduct whatsoever while on the
18      job?
19   A. No.
20   Q. Could you mark the location on the map and
21      call it location 2 where you went on the
22      north side of McCormick, please.
23   A. (Witness complies.) In general, it was I
24      believe right up -- I can't tell because of
25      the trees.
```

25 (Pages 94 to 97)

Page 98

1    Q.  Okay.
2    A.  Or the leaves on the trees, but I believe
3        that it was -- I'm old and I can't see very
4        well anymore, but that is -- if that's the
5        fence line, I believe the two vehicles were
6        parked right there and that was where we were
7        at.
8    Q.  Okay.  And the fence line beside the building
9        that looks like it has black markings on a
10       white roof?
11   A.  Correct.  So I'll mark that and put location
12       2.
13   Q.  That's perfect.  Thank you.
14   A.  Do you have a pen that works on these?
15   Q.  Does this one -- oh, it's the same as yours.
16           VIDEOGRAPHER:  Should be extras
17       on the table.
18   BY MS. VAN BRUNT:
19   Q.  Try this.  Do you happen to know the address
20       of the place you were marking?
21   A.  I do not.
22   Q.  Do you know if that was a household or a
23       business?
24   A.  I believe it was a business.
25   Q.  Do you know the name of the business?

Page 99

1    A.  I do not.
2    Q.  Was anybody present when you arrived --
3    A.  No.
4    Q.  -- there?  Was McCormick shut down at that
5        point?
6    A.  No.
7    Q.  At some point was it shut down?
8    A.  Yes.
9    Q.  How did it come to be shut down?
10   A.  I asked for -- and this is, I believe, when I
11       was still back at location 1.  When I was
12       still back there, I asked for the next
13       incoming units, unless they were SCAT, to
14       block off McCormick.  That was my priority at
15       that time was to get McCormick shut down.
16   Q.  And that was a citywide call you issued?
17   A.  It was just on patrol west channel.
18   Q.  Got it.  And why, unless they were SCAT?
19   A.  Because of this unfolded and -- I would want
20       SCAT on my inner perimeter.
21   Q.  Okay.  Once you got to location 2, as I'll
22       refer to it from here on out, who else was
23       with you?
24   A.  Rapp was directly to my left.  And then I
25       know now it was Fussell and Powell.  I did

Page 100

1        not know that at the time.
2    Q.  Had you ever worked with them before?
3    A.  No -- well, yes, but not -- not directly.
4    Q.  Powell was a new officer?
5    A.  I believe so, yes.
6    Q.  And how did Fussell come to be at that
7        location?
8    A.  You know, I originally thought that he was
9        back here, but Fussell was one of the
10       officers who blocked the intersection at
11       McCormick and had followed us over there.
12   Q.  So the intersection was blocked soon after
13       you got to location number 2?
14   A.  I believe the intersection was blocked just
15       as we were starting to make our approach
16       across -- going north across the street is
17       when -- just the -- this -- the McCormick and
18       Seneca was -- I still eventually had cars
19       coming down to here.  I don't know who
20       blocked that or when.
21   Q.  But somebody did?
22   A.  Yeah, traffic was not an issue.
23   Q.  All right.  And McCormick is a wide street;
24       correct?
25   A.  Fairly, yes.

Page 101

1    Q.  It's four lanes?
2    A.  Yes.
3    Q.  Was Rapp raising his rifle at the point in
4        time that you got to location number 2?
5    A.  What do you mean?
6    Q.  I take that back.
7           Did you order Rapp to raise his rifle
8        when you got to location number 2?
9    A.  No.
10   Q.  It was still down?  He was just holding it?
11   A.  I don't -- I told Rapp that I wanted -- when
12       we're still over here or shortly after, that
13       I wanted him to go across the street and I
14       think -- I don't recall if I specifically
15       said, "let's go over behind these cars", but
16       I said, "let's go over here", and I wanted
17       him to be the long cover over there.
18   Q.  Okay.  So while you were at location 1, you
19       commanded Rapp to come with you to provide
20       long cover on 1033?
21   A.  At location 1 specifically, no.  It was as I
22       believe when I came around the corner of --
23       the northwest corner of the breakfast club
24       there.
25   Q.  And why did you ask Rapp to be long cover?

26  (Pages 98 to 101)

Page 102

1    A.  'Cause he had the rifle.
2    Q.  All right.  And did he comply with that
3         command?
4    A.  Yes.
5    Q.  So when you arrived at location 2, did he, in
6         fact, raise his rifle and provide cover?
7    A.  His -- I saw his -- I mean, he was -- he had
8         his rifle pointed at the front of 1033 West
9         McCormick.
10   Q.  Okay.  And did you give him particular
11        instructions as to how to provide cover?
12   A.  No.
13   Q.  And do you -- what did you understand his
14        duties to be?
15   A.  To provide a long angle cover on 1033 West
16        McCormick.
17   Q.  And what does that mean?
18   A.  Over watch.  I mean, he's got the best
19        picture of the -- of the front of the
20        residence.
21   Q.  And what were his job duties in that
22        position?
23   A.  I just thought I answered that.
24   Q.  In specifics, what was he expected to do
25        while providing cover?

Page 103

1    A.  Provide cover.
2    Q.  What does that mean?
3         Pretend I have no knowledge of law
4    enforcement.
5         What does it mean to provide cover?
6    A.  I mean, he would be the one that if somebody
7         popped out onto the porch, he would let us
8         know that.  You know, he could verbalize
9         that.  He's watching that.  He has the best
10        angle to see what's going on from across the
11        street.  There was officers to the east.
12        He's the cover officer.
13   Q.  So you say he had the best angle.
14        Is that because he was facing the
15        entryway head on?
16   A.  I mean, he had the unobstructed view from
17        across the street, yes.
18   Q.  Okay.  How many feet away from the house were
19        you at that point?
20   A.  I don't know.
21   Q.  Can you guess?
22        MR. PIGG:  Object to form; calls
23   for speculation.
24   A.  40 to 50 yards.
25   Q.  Okay.  And at the time you got to location 2,

Page 104

1         had you given any instructions to Powell?
2    A.  No.
3    Q.  To Fussell?
4    A.  Not that I recall.
5    Q.  Had you issued any other instructions to
6         other specific officers beyond telling Rapp
7         to provide cover?
8    A.  No.  I had -- I had -- I was going through a
9         million things in my head on what needed to
10        be done.  And there was -- so when I first
11        got over there, I'm just taking an overview
12        of what we have.  I had -- I remember in my
13        interview, I was unsure if I verbalized it
14        over the radio or if that's what I was
15        thinking in my head at the time for my -- the
16        cover -- or the takedown team, but I don't
17        recall specifically ordering any commands at
18        that point.
19   Q.  Okay.  So it's still your statement that
20        you're not sure whether you relayed a plan to
21        anyone over the radio once you were at
22        location 2?
23   A.  Correct.
24   Q.  Did you intend to relay a plan at some point?
25   A.  Certainly, yes.

Page 105

1    Q.  And what was that plan going to be?
2    A.  So we have the cover over here so we have the
3         eyes on it.  I had looked up.  You could see
4         on the house to the east, there were a couple
5         of sheriff's deputies and at least two SCAT
6         guys and that, ultimately, would have been
7         my -- the -- we call it QRF or a takedown
8         team.  So my -- what I would have verbalized
9         over the radio would be that we would give
10        commands from across the street so basically
11        he wouldn't know -- or whoever came out of
12        the house wouldn't know that these people
13        were even there.  And that they would,
14        ultimately, be the ones -- we would give
15        commands out across, and then they would take
16        him into custody in that front yard.
17   Q.  Okay.  So I'll break that down a little bit.
18        You said you saw some east side
19        officers; correct?
20   A.  No, I saw officers on the east of the house.
21   Q.  Okay.  Sorry.  You saw officers on the east
22        of the house, and that included two sheriff's
23        deputies?
24   A.  There were some sheriff's deputies over
25        there.  I don't recall specifically how many.

27  (Pages 102 to 105)

## Page 110

1  A. Out of my peripheral vision, I saw them
2  moving milliseconds prior to the shooting.
3  Q. Do you know how many officers there were?
4  A. I remember two.
5  Q. And who were they?
6  A. What? Pardon me?
7  Q. Which officers?
8  A. I have no idea.
9  Q. Were there other officers located in another
10 location we haven't discussed prior to the
11 shooting?
12 A. I'm certain that there were.
13 Q. Do you know where?
14 A. Well, I knew that I would have officers
15 blocking the street down here. I did not --
16 Q. Sorry. For the record, down where?
17 A. East of our location, somewhere blocking
18 westbound traffic on McCormick.
19 Q. Okay.
20 A. I knew -- the problem that you run into on
21 scenes like this is people come from
22 everywhere. Officers come from everywhere.
23 So I don't know -- those are the officers
24 that I knew at the time -- specifically at
25 the time of the shooting.

## Page 111

1  Q. Because those are the officers that you could
2  see clearly?
3  A. Correct. And I knew that Gumm -- at least
4  Gumm and -- was on the back of the house.
5  Q. And by that point had you issued any commands
6  to Gumm?
7  A. No.
8  Q. Did you set up a perimeter?
9  A. That's what we were in the process of -- I
10 mean, we had just gotten across the street,
11 and that's what I was looking at right there.
12 Q. Okay. Was the perimeter in place at the time
13 of the shooting?
14 A. I think I had -- I think there was a decent
15 perimeter at the time of the shooting.
16 Q. Okay. What was missing, in your view, from
17 the perimeter?
18 A. Like I said, I thought we had a decent -- I
19 mean, a -- if you -- if I had all the time in
20 the world to set something up, I would have
21 liked to have had a less lethal shotgun with
22 this QRF team to the east of the house. I
23 would have probably liked to have had a dog
24 on the front of the house somewhere. And
25 this is just the very beginning of setting

## Page 112

1  up. It happened so quick that this was the
2  very beginning stages of just making sure
3  that we had a decent perimeter to start
4  moving forward.
5  Q. Okay. So you intended to have the east
6  officers be the QRF team?
7  A. Correct.
8  Q. QRF is -- is that quick reaction force?
9  A. Correct.
10 Q. And what does a QRF do?
11 A. They're the ones who are going to go hands on
12 with a potential bad guy.
13 Q. Okay. Would they be the primary points of
14 contact with the suspect?
15 A. No.
16 Q. Who is the primary point of contact with the
17 suspect -- or who was the primary point of
18 contact with the suspect in the Finch
19 shooting incident?
20 A. Well, I would hope that that was going to be
21 me.
22 Q. Okay. You intended yourself to be that
23 contact person?
24 A. At the time, yes. I'll rephrase that. When
25 he came out on the porch, I wanted to be at

## Page 113

1  that point because I hadn't assigned anyone
2  else to do that.
3  Q. Okay. Did you radio to other officers that
4  you were the primary point?
5  A. No.
6  Q. Did you intend to do so eventually?
7  A. Yes.
8  Q. And did you radio --
9  A. Let me rephrase that.
10 Q. Sure.
11 A. I would have -- I would have assigned
12 somebody with me to have been the primary
13 point of contact over the radio if I had
14 time.
15 Q. Okay. And the job of the primary contact
16 point people would have been to actually
17 communicate with the suspect?
18 A. Attempt to, correct.
19 Q. And issue commands?
20 A. Correct.
21 Q. And warnings?
22 A. Correct.
23 Q. So the QRF was not in charge of actually
24 communicating with the suspect?
25 A. In this instance?

29 (Pages 110 to 113)

Page 114

1   Q.  In your plan of how the QRF would respond to
2       the scene, they would not be the people
3       communicating with the suspect?
4   A.  Correct, at first.
5   Q.  Okay.  But you did not relay to the east side
6       officers that they were to be the QRF team?
7   A.  And you're saying east side officers and
8       you're referring to the officers east of the
9       house.
10  Q.  Correct.  Sorry.
11  A.  Okay.  'Cause we call them west side
12      officers, south side officers, north side
13      officers 'cause there's different bureaus.
14  Q.  I see, yeah.  Can we just use east side in
15      this context for their physical location?
16  A.  Yes.
17  Q.  So did you relate to the east side officers
18      that they were to be the QRF team?
19  A.  No, and I -- no.
20  Q.  Is that because everything happened so fast?
21  A.  That and they -- there's a lot of things in
22      law enforcement with experience that you just
23      don't have to relay.  Like they were set up
24      for that.  You know, they were staged right
25      there.  And it was clear in my mind that

Page 115

1       that's -- I mean, they were there already.
2       By the time I got around there, I saw them
3       right there, and bam, that's my QRF right
4       there.
5   Q.  And that's because they were closest to the
6       entryway?
7   A.  They are closest to the entryway.  They are
8       concealed at that point from view of the
9       front of the house, yes.
10  Q.  How far away were they in yards or feet,
11      would you guess?
12  A.  I don't -- I mean, I guess it's hard to let
13      the picture speak for itself, but --
14  Q.  Yeah.
15  A.  I mean, it's next door.  I don't -- I
16      wouldn't feel comfortable guessing on yards
17      or feet.
18  Q.  Closer than you were?
19  A.  Much.
20  Q.  Okay.  And did they have a good line of
21      sight, in your opinion, to the porch?
22  A.  I couldn't tell the angle from where I was
23      at.
24  Q.  At any point while you were on McCormick --
25      well, while you were on the scene at all but

Page 116

1       prior to the shooting, did you call to
2       request a SWAT unit to respond?
3   A.  No.
4   Q.  And why not?
5   A.  That is certainly something that could have
6       happened, but like I said before, this was --
7       this happened so fast that I was just -- just
8       getting across the street and trying to get
9       the resources that I had in place.  So, I
10      mean, before I'm requesting a SWAT unit, I
11      want to make sure that I have a decent
12      perimeter set up around the residence.
13  Q.  Okay.  And that hadn't been completed yet?
14  A.  Ultimately, there was a pretty decent
15      perimeter, but, I mean, that -- that was --
16      that was step one.
17  Q.  Okay.  If you had had more time, would you
18      have called SWAT?
19          MR. PIGG:  Objection; calls for
20      speculation.
21  A.  I -- potentially, I guess, would be a good
22      answer.  I mean, I would go through a lot of
23      other things to make that determination.
24  Q.  Like what?
25  A.  I would want to look up criminal history.  I

Page 117

1       would want to make sure that my perimeter
2       was, in fact, set up.  I would have the QRF
3       team -- 'cause SWAT doesn't respond
4       immediately.  It takes -- I can tell you many
5       a times that we have called SWAT on a
6       situation and it's over by the time the SWAT
7       team gets there.  Somebody finally comes out
8       or -- so I would have set up, made sure that
9       the QRF knew that they were the QRF and that
10      we would be giving commands.  I would want
11      to -- when we make that call, we immediately
12      start getting phone calls from people that
13      have no idea what's going on.  So I like to
14      have a good idea about what's going on.  So
15      we would have tried to do some history on the
16      house, history on the people in the house.
17  Q.  And that would have been through dispatch?
18  A.  Or having somebody on scene look up in the
19      computer to see if they can pull that address
20      up.  So I just don't show up to a scene and
21      say start SWAT.  There's -- I want to have my
22      ducks in a row before I make that call.
23  Q.  So you wanted more recognizance before you
24      called SWAT in?
25  A.  Correct.

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105                    WICHITA, KANSAS
                                        316.267.8200                                      67202

Page 118

1  Q. And just the nature of the call you're
2     responding to is not sufficient, in your
3     view, to justify calling SWAT?
4  A. Just specifically off being told something by
5     dispatch is not enough for me to start SWAT.
6  Q. Okay. And I don't know if I had you do it,
7     but would you mind marking where the west
8     side officers were, meaning the officers that
9     were west of 1033 McCormick prior to the
10    shooting.
11 A. Like milliseconds prior to the shooting,
12    'cause I don't recall seeing them other than
13    in my peripheral and that was right --
14 Q. Sure, so I guess your best estimate would
15    be --
16 A. So how do you want me to mark that?
17 Q. Just with a star and WS, please.
18 A. (Witness complies.)
19 Q. And it looks like you're marking near the
20    corner of Seneca and McCormick?
21 A. It's actually on the corner of the building,
22    but yes, on the corner of the breakfast club
23    area.
24 Q. Okay. And what was your understanding as to
25    their distance from the entryway at 1033?

Page 119

1  A. The west side officers?
2  Q. Yeah.
3  A. The only thing that I saw that those -- I
4     didn't need officers over there. What I
5     assumed in my head was that these officers
6     were people who just showed up and they're
7     coming around the corner. So I had just
8     caught a glimpse of -- out of my peripheral
9     vision that these -- that potentially I am
10    going to -- and this is as soon -- I saw this
11    after Mr. Finch came out onto the porch that
12    there was officers there. And I thought we
13    have some -- potentially that there's a
14    crossfire problem with the east side officers
15    and the west side officers.
16 Q. Okay. So to be clear, the west side officers
17    weren't on the corner of Seneca and West
18    McCormick so much as right at the corner of
19    the breakfast club building?
20 A. In my recollection, that's where the west
21    side officers were at was closer -- like
22    there's a sidewalk that goes by there and
23    that's just -- I don't know. That's just how
24    I recall seeing it. It was so fast that
25    that's where I remember seeing them at.

Page 120

1  Q. And at the time of the shooting, you said
2     officers were still basically in front of
3     that blue roofed house?
4  A. Correct.
5  Q. Okay. You said you worried about crossfire.
6        What did you worry about in
7     particular?
8  A. We always -- if you have two crossfire --
9     if -- say somebody comes out of the house and
10    one of the east side officers or the west
11    side officers had to shoot at something that
12    was right in between both of them, there's a
13    potential that they would be shooting at
14    officers.
15 Q. And you intended the east side officers to be
16    the first line of defense in this case,
17    correct, as members of a QRF?
18 A. No.
19 Q. No. You intended them to be the first people
20    to have physical contact with the suspect?
21 A. Correct.
22 Q. Okay. Did you ever issue a command to the
23    west side officers to ceasefire because east
24    side officers would be handling the first
25    contact with the suspect?

Page 121

1  A. It was over by the time that I even realized
2     that west side -- that those guys were there
3     on that west side.
4  Q. Got it. Prior to the shot, did you -- while
5     you were still on the scene, did you speak to
6     dispatch about any further information about
7     the incident?
8  A. I was in contact with dispatch on the
9     scene -- I guess restate your question,
10    please.
11 Q. Did -- you were in contact with dispatch
12    while you were on the scene; correct?
13 A. Correct.
14 Q. Did they provide you any substantive
15    information about the incident while you were
16    on the scene that you did not have already?
17 A. Prior to or after the shooting?
18 Q. Prior to the shooting.
19 A. I do not believe so.
20 Q. Okay. Did you ask them to track down any
21    information that you might have wanted about
22    the incident?
23 A. Prior to the shooting?
24 Q. Correct.
25 A. No.

Page 122

1    Q. Did you ask any officers to look on their
2        computers for any of the information that you
3        had discussed earlier?
4    A. No.
5    Q. Did you intend to do that at some point?
6    A. Yes.
7    Q. Was there -- well, I'll take a step back.
8        Is other officers with WPD who have
9        specific negotiations experience?
10   A. Yes.
11   Q. In your understanding?
12       Are they a member of a specific squad
13       or unit?
14   A. The negotiators?
15   Q. Correct.
16   A. Yes.
17   Q. Are they a member of SWAT?
18   A. They are assigned to the SWAT team, yes.
19   Q. And they are in particularly -- they are
20       particularly skilled in negotiating with
21       suspects; is that correct?
22   A. They have been to additional training, yes.
23   Q. Were there any negotiators present at 1033
24       McCormick?
25   A. In the role of a negotiator, I don't know.

Page 123

1    No, no, not in the role of a negotiator. I
2    don't know if there were negotiators --
3    they're not full time. So I'm not sure if
4    any of the -- I don't believe so, but I'm not
5    sure if any officers that were on scene were
6    negotiators, but they were not there in that
7    role.
8    Q. Prior to the shooting, did you call to
9        request any negotiators --
10   A. No.
11   Q. -- come to the scene? Did you think
12       negotiators could be helpful in defusing the
13       situation at hand?
14   A. At the time?
15   Q. Correct.
16   A. I mean, eventually, yes. At the time, that
17       wasn't where I was at in that stage.
18   Q. Because you didn't have time again?
19   A. Correct.
20   Q. How many minutes passed from the time you got
21       to the scene to the time the shot was fired
22       in your best estimate?
23   A. From the time that I parked my patrol vehicle
24       to the time that the shot was fired, maybe a
25       little less than three minutes.

Page 124

1    Q. Okay. And how long passed between when you
2        moved from location 1 to location 2 until the
3        time of the shot?
4    A. I'm sorry?
5    Q. How much time passed between when you moved
6        from location 1 to location 2 and the time of
7        the shot?
8        A better way to say it is how much
9        time passed between when you arrived at
10       location 2 and the time of the shot?
11   A. By the time that we got over to location 2, I
12       would say 40 seconds to a minute. I don't --
13       it's hard to judge. It was very quick. It's
14       hard to judge time, though, after something
15       like this. So it was -- it was very quick.
16       I would -- definitely less than two minutes
17       in my mind.
18   Q. Okay. And to be clear on this: It was your
19       duty to order a QRF at the scene as the sole
20       commanding officer at the scene at that
21       point; correct?
22       MR. PIGG: Object to form of the
23       question.
24   A. No.
25   Q. Could anybody else have ordered a QRF?

Page 125

1    A. I would venture to say that half of the
2        supervisors on this department don't even
3        know what a QRF is.
4    Q. Why do you say that?
5    A. That's a tactical thing. I mean, it's a --
6        it's -- we're not -- there's not a policy
7        that says: You will set up a QRF. You will
8        do this.
9        I mean, it's -- we want to set up our
10       perimeter.
11   Q. You had the authority to order a QRF, though;
12       correct?
13   A. Correct.
14   Q. And in fact, you intended to do so?
15   A. Yes.
16   Q. And did anybody else at the scene at the time
17       right before the shooting have that authority
18       other than you?
19   A. I was -- I don't know. I don't know who else
20       was at the scene. The people that I knew, I
21       was -- I was it. I was in charge.
22   Q. Okay. I was going to read you a principle
23       from the Policy 602 governing barricaded
24       suspects.
25       Would it be helpful for you to see

32  (Pages 122 to 125)

Page 126

1  that policy while I read it out loud?
2  A.  Sure.
3  Q.  Okay.  Let me make sure I have it in here.
4      Okay.
5          (Jonker Exhibit No. 64 was marked for
6      identification.)
7  Q.  All right.  So I am -- trying to find a good
8      place for this -- going to mark this as
9      Exhibit 64.  It's the WPD Policy 602
10     governing Barricaded Suspects, Sniper and
11     Hostage Situations, SWAT Procedures.
12         Are you familiar with this policy?
13 A.  Yes.
14 Q.  All right.  So I was just going to direct
15     your attention to 602.05 in general
16     principles.  I'm going to read it and then
17     just ask you a question.
18 A.  Okay.
19 Q.  "The primary initial concern in any hostage,
20     barricaded suspect, or sniper situation is
21     containment.  If at all possible, do not
22     force the suspect into a do-or-die situation.
23     The longer the department has to negotiate,
24     the better the chances of a successful
25     resolution of the incident."

Page 127

1          Do you agree with this principle?
2  A.  Yes.
3  Q.  Have you been trained on this principle?
4  A.  Yes.
5  Q.  Do you think it was a problem that there were
6      no negotiations conducted during the Finch
7      incident?
8          MR. PIGG:  Object to form of the
9      question.
10 A.  No.
11 Q.  And why not?
12 A.  We didn't have time.
13 Q.  If you had time, you would have; is that
14     correct?
15 A.  If circumstances didn't play out as they did,
16     that would have definitely been the
17     appropriate way to go would be to try and
18     communicate.
19 Q.  And to, in particular, try to get the suspect
20     to come into custody without incident;
21     correct?
22 A.  Correct.
23 Q.  All right.  Just to circle around, once you
24     got to the north side position, or location
25     number 2, did you issue any commands to any

Page 128

1  officers at the scene at all?
2  A.  Not that I recall.
3  Q.  Did you talk to Rapp about what he should do
4      as the long cover if someone came onto the
5      porch prior to the shooting?
6  A.  No.
7  Q.  Did you talk to any officers about what they
8      should do?
9  A.  No.
10 Q.  Did you give any instructions to the people
11     in 1033 West McCormick prior to the shooting
12     over a PA system?
13 A.  No.
14 Q.  Did you issue any instructions without a PA
15     system, like over a bullhorn, for instance?
16 A.  No.
17 Q.  Did anyone at the scene, prior to the
18     shooting, announce to the people inside that
19     police had surrounded the house?
20 A.  No, but I'd like to clarify.
21 Q.  Sure.
22 A.  Prior to doing anything like that, I would
23     want to have a perimeter established and make
24     sure that we knew what was going to happen
25     when people started coming out of the house.

Page 129

1  Q.  Okay.  And if I'm understanding you
2      correctly, the perimeter was not sufficiently
3      established to make announcements to the
4      residents inside?
5  A.  We're not going to -- I was just in the
6      process of making sure that that was in
7      place.
8  Q.  Just in the process of making sure it was in
9      place when Mr. Finch entered the porch?
10 A.  Correct.
11 Q.  Okay.  So is it fair to say that at that point
12     in time when Mr. Finch entered the porch, you
13     were still setting up the response to the
14     incident?
15 A.  Definitely.
16 Q.  And you were still formulating a plan about
17     how to respond to the incident?
18 A.  Definitely.
19 Q.  And you were still deciding who was going to
20     do what?
21 A.  Correct.
22 Q.  Okay.  Would you agree that the shot was
23     fired pretty quickly after you moved to
24     location number 2?
25 A.  Yes.

33  (Pages 126 to 129)

Page 130

1    Q. Okay. At anytime before the shooting, did
2       you hear any gunshots from inside the house?
3    A. No.
4    Q. Any screaming?
5    A. No.
6    Q. Any cries of distress?
7    A. No.
8    Q. At anytime before the shooting, were you made
9       aware of any reports from neighbors that they
10      had heard shots?
11   A. No.
12   Q. Did that concern you at all?
13   A. No.
14   Q. And why is that?
15   A. Experience.
16   Q. What do you mean by that?
17   A. A lot of times you won't hear that. I mean,
18      if the shooting's already done, you wouldn't
19      hear that. If everyone inside the house is
20      dead, you wouldn't hear screams coming from
21      inside. It's not -- it's not typical for
22      people not to hear things.
23   Q. Did you ask dispatch if they had received any
24      emergency calls from neighbors?
25   A. Not at that time, no.

Page 131

1    Q. Did you ever?
2    A. No.
3    Q. All right. So I'm going to show you a
4       previously marked exhibit.
5    A. You want this one back?
6    Q. Sure. We're just going to collect these and
7       keep them here. All right. I just have to
8       find it. One second. I'm looking for the
9       PS -- nope. Okay.
10      I am going to show you Exhibit 57,
11      previously marked yesterday. It's titled
12      Administrative Investigative Review. It's
13      what I understand to be the PSB file in this
14      case.
15   A. Okay.
16   Q. Take a look at it and then I'm going to
17      direct you to, in particular, Page 16.
18      First of all, have you ever seen this
19      document before?
20   A. I have not.
21   Q. You have not?
22   A. I have not.
23   Q. This is the first time?
24   A. Correct.
25   Q. Okay. Do you have any reason to take issue

Page 132

1       with my representation that it is a document
2       created by the Professional Standards Bureau
3       in relation to the Finch shooting incident?
4    A. No.
5    Q. Okay. If you could go to Page 16 of the
6       document. And you should see two pictures
7       there. And in particular, looks like screen
8       shots from Officer Powell's Axon video
9       camera; correct?
10   A. That is what that is labeled. I -- I would
11      almost think that that looks more like my
12      angle on -- from my camera, but I'm not sure.
13      That's -- that's -- that's the view that I
14      remember having.
15   Q. Okay. So I don't know if that's what I was
16      going to ask. Is picture number 1, the top
17      one, is that an accurate representation of
18      the vantage that you had just prior to the
19      shooting of 1033?
20   A. That is what the scene looked like. This is
21      a pretty blurry picture.
22   Q. Okay. Is that picture an accurate
23      description of the light that was available
24      at the time?
25   A. Well, so -- I mean the top picture?

Page 133

1    Q. Correct.
2    A. Prior to the shooting?
3    Q. Correct, just prior to the shooting.
4    A. Prior to Mr. Finch coming outside, that is
5       about the light.
6    Q. Okay. Once he was on the front porch, was
7       there more light on the porch?
8    A. Yes.
9    Q. Stemming from what?
10   A. I had my weapon-mounted light on, activated,
11      and I believe that Officer Rapp had his light
12      on also on his firearm.
13   Q. Do you believe the light on your handgun was
14      able to reach the porch?
15   A. It lightened it up. I don't -- it wasn't a
16      direct light, but it -- I mean, it -- there
17      was light on the porch.
18   Q. Is it your understanding that Officer Rapp's
19      light provided additional lighting source on
20      the porch?
21   A. I remember when -- I remember that it got a
22      lot brighter that wasn't from mine. And I
23      don't remember if that was from a flashlight
24      or from the -- his rifle light, but it was --
25      something lit the porch up significantly

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105
316.267.8200

WICHITA, KANSAS
67202

Page 134

1  brighter than what it was.
2  Q. Would you consider the porch, at the time
3     Finch came out, to be dark?
4  A. Clarify what you mean by -- like it was not
5     pitch dark. You could see, but I don't
6     recall there being any lights on or anything
7     on the porch.
8  Q. Did you have any concerns that officers on
9     the scene did not have sufficient visibility
10    as to what was happening on the porch because
11    of how dark it was?
12 A. No.
13 Q. You thought it was light enough for them to
14    see?
15 A. I mean, at the time, yes.
16 Q. Did you ask that additional light be placed
17    on the porch at anytime?
18 A. Eventually, yes.
19 Q. After the shooting?
20 A. Yes.
21 Q. And what light was placed there?
22 A. The spotlight to the Tahoe when we first
23    moved up.
24 Q. Okay. And I forgot to ask you this earlier,
25    but could -- well, you moved it up after the

Page 135

1  shooting; correct?
2  A. Correct.
3  Q. All right. So we'll wait on that.
4     But you did not have a spotlight on
5     the porch prior to the shooting?
6  A. Correct.
7  Q. Okay. So, of course, at some point,
8     Mr. Finch came onto the porch at 1033; right?
9  A. Yes, ma'am.
10 Q. And at the moment he entered the porch, what
11    emotions were you feeling?
12 A. When he entered the porch?
13 Q. Correct.
14 A. Surprise.
15 Q. And why is that?
16 A. That everything -- I mean, that we had just
17    gotten set up and he was coming outside
18    already.
19 Q. Were you feeling stressed?
20 A. No.
21 Q. Were you feeling any adrenaline?
22 A. I'm sure I was.
23 Q. Were you feeling frustrated that you hadn't
24    put your plan in action yet?
25 A. That didn't cross my mind at that time, no.

Page 136

1  Q. Later, did you have a feeling that you wish
2     you had gotten your plan in place before he
3     entered the porch?
4  A. I absolutely had no time to get my plan in
5     place by the time he entered the porch.
6  Q. Right. I'm just asking if you wished you had
7     had the time to put it in place before he
8     entered the porch?
9  A. Certainly.
10 Q. Could you describe Mr. Finch's entrance onto
11    the porch?
12 A. I honestly don't recall seeing him. I
13    remember somebody in my group saying "the
14    door's opening" or "he's coming out", and
15    then when I looked up, I just saw him
16    standing there.
17 Q. He was standing there?
18 A. Right.
19 Q. Was he fully outside the house at that point?
20 A. I don't -- I think he had just crossed
21    through the main exit, the threshold there,
22    that main exit door.
23 Q. And was there one door, two doors to the
24    house?
25 A. There was a screen door.

Page 137

1  Q. Was there a primary door, as well?
2  A. Yes.
3  Q. And what happened to the primary door when he
4     entered the porch?
5  A. I don't recall.
6  Q. What happened to the screen door?
7  A. When what?
8  Q. When he entered the porch, where was the
9     screen door?
10 A. So being able to go back and review reports
11    and Axon after the fact, I think he was
12    holding the screen door with his foot or the
13    screen door was open, ajar. And I don't know
14    if he was holding it with his hand or with
15    his foot pushing it open, but I recall the
16    screen door being ajar.
17 Q. Do you recall it independently or based on
18    your review of the evidence after the fact?
19 A. Well, it's been a long time since the
20    incident, so it was based off of the review
21    of -- after the fact.
22 Q. Sitting here today, can you have -- do you
23    have a clear vision in your head of how
24    Mr. Finch looked when he entered the porch?
25 A. Yeah.

Page 138

1  Q. And is that based on your memory of that
2     night?
3  A. Yes.
4  Q. Okay. And what was his physical appearance
5     when he stepped on the porch?
6  A. What do you mean by his physical appearance?
7  Q. What did he look like?
8  A. Just standing there with -- I believe he had
9     a gray sweatshirt on, blue jeans and was
10    standing on the porch.
11 Q. Could you tell his race at the time?
12 A. White male.
13 Q. Could you tell his hair color?
14 A. Dark.
15 Q. The hairstyle?
16 A. No.
17 Q. Could you see any facial hair?
18 A. You know, at this point, no. I recall when I
19    gave my interview, I thought maybe he had a
20    goatee, but I don't recall at this point.
21 Q. Could you see from your vantage location to
22    a -- any facial expressions on his face?
23 A. Not that I recall.
24 Q. Could you see the direction in which he was
25    looking?

Page 139

1  A. Towards us, yes.
2  Q. And that's because that's the way his head
3     was facing?
4  A. Coming out the door, yes.
5  Q. At the time he came out, did you radio any
6     instructions to officers about what to do,
7     given that he was now on the porch?
8  A. No. As a matter of fact, one of the
9     officers, and I believe that it was Officer
10    Rapp but I'm not a hundred percent sure is
11    the one who said that he's coming out. And
12    just as that was going on, some officer had
13    keyed up and asked for me on the radio and
14    said that it was in reference to that case.
15    So I had my radio depressed as they're saying
16    "he's coming out." So I acknowledge this
17    officer and I actually say "he's coming out"
18    or "the door's opening", I forget
19    specifically what I said, but I relayed that
20    over the radio system.
21 Q. Do you know which officer was on the radio?
22 A. It was -- I don't -- I don't believe it was
23    an officer on the scene. I want to say it
24    was a community policing officer from north
25    side, but I don't recall his name.

Page 140

1  Q. And why was he radioing you?
2  A. Have no idea. No idea. I did not -- once he
3     said that, I had never gotten a hold of him
4     after the -- after the fact. I don't know if
5     investigators did or if he relayed his -- I
6     didn't talk to anyone after the shooting
7     so. . .
8  Q. Did he say he had information about the
9     incident?
10 A. I think he said it was pertaining to the call
11    that I was on.
12 Q. Okay. But you have no idea what that
13    information was?
14 A. No.
15 Q. Did you shut down radio communications with
16    him after that?
17 A. Immediately after that was when the shooting
18    occurred.
19 Q. Okay. So when you said to that community
20    policing officer "he's coming out" --
21 A. It wasn't specifically directed towards him.
22    I was keying the radio up to find out what he
23    wanted. And then that was when he came out,
24    and I had just said that so everybody knew
25    that he was coming out.

Page 141

1  Q. Did you see him come out or were you relaying
2     what Rapp was telling you?
3  A. I recall him being standing on the porch.
4     I -- I mean, at the -- we're talking
5     milliseconds that we're discussing so. . .
6  Q. Right.
7  A. I don't recall if -- if I looked up and saw
8     him as I'm talking on the radio or if I'm
9     just relaying what Rapp's saying. I mean, I
10    don't recall that timeframe.
11 Q. Okay. Did you hear other officers at that
12    point radioing about him coming out on the
13    porch?
14 A. No.
15 Q. Did Rapp say anything to you other than "he's
16    coming out"?
17 A. No.
18 Q. Did Powell or Fussell say anything?
19 A. To me?
20 Q. Well, just out loud in your presence.
21 A. A lot of people started saying "let me see
22    your hands."
23 Q. Okay. When you say a lot of people, do you
24    mean -- well, first of all, did you issue any
25    commands to him?

36  (Pages 138 to 141)

Page 142

1  A.  I did.
2  Q.  What did you say?
3  A.  I said -- at the beginning, I think I said
4      "let me see your hands" or "put your hands
5      up." Specifically, I don't recall. But
6      there were people from across the street.
7      Specifically if it was to the east I'm not
8      sure, I'm assuming, and then some of the
9      officers behind me were also yelling
10     commands.
11 Q.  Powell or Fussell or both?
12 A.  Or Rapp, I'm not sure.
13 Q.  Were west side officers issuing commands?
14 A.  I don't -- I don't know.
15 Q.  Could they have been?
16 A.  Certainly, yes. There was -- there was
17     multiple people yelling.
18 Q.  And were they all yelling the same thing?
19     Different commands?
20 A.  They were all yelling "let me see your hands"
21     or "show me your hands" or "put your hands
22     up."
23 Q.  Okay.
24 A.  Clear -- clear -- I mean, it was clear that
25     they were yelling to put your hands up or to

Page 143

1      let me see your hands.
2  Q.  Did anybody announce themselves as WPD at
3      that time?
4  A.  Not that I recall. Not that I recall
5      hearing.
6  Q.  Would that have been proper procedure to do
7      that?
8  A.  Probably.
9  Q.  And it's fair to say, then, the commands were
10     coming from different directions; correct?
11 A.  As I recall, yes.
12 Q.  And is it also fair to say that the commands
13     were being screamed at Mr. Finch?
14 A.  I don't recall them being -- I mean, I don't
15     recall there being like out of control
16     screams. I just remember hearing very loud
17     commands.
18 Q.  Okay. Would it be fair to say that everyone
19     started screaming at him the moment he came
20     on the porch?
21 A.  No.
22 Q.  Were any of the commands conflicting in any
23     way?
24 A.  Not that I recall.
25 Q.  Did you issue a command at some point telling

Page 144

1      him to walk forward?
2  A.  Walk this way.
3  Q.  Walk this way being what way?
4  A.  Towards me.
5  Q.  Did you indicate in what direction he was
6      supposed to move?
7  A.  Walk this way, towards my voice.
8  Q.  Right. And you were issuing that command at
9      the same time all the east -- the east side
10     officers were issuing their commands and Rapp
11     was issuing his command; correct?
12 A.  I -- with the plan that I had in my head, I
13     didn't want him to know that these officers
14     to the east were even there. So I vividly
15     remember wanting to yell louder so he would
16     pay attention to me and walk this way, walk
17     this way. I believe I was the only person
18     saying "walk this way." Everyone else had
19     said "put your hands up" or something to that
20     effect to do with your hands. I wanted him
21     to come off of the porch and come towards me.
22     So I remember in my head, I got to be louder
23     than these guys so he is focusing on me and
24     not figuring about this. 'Cause we're still
25     operating off of the basis that somebody had

Page 145

1      shot his dad. I mean, at this point this
2      is -- we have absolutely zero information
3      that this is a -- a bad call.
4  Q.  And you wanted to be the point person;
5      correct?
6  A.  Absolutely.
7  Q.  And did you ever tell, via radio, the east
8      side officers that you were to be the point
9      person; they should stop yelling?
10 A.  We did not have time for that, no.
11 Q.  Would you have done so if you had more time?
12 A.  Had he kept coming out and -- and -- I would
13     have hoped that I would have said that on the
14     radio, yes.
15 Q.  Okay. Did anyone, yourself included, give
16     Mr. Finch a warning, meaning a warning as to
17     what would happen if he did not comply with
18     commands?
19 A.  Not that I heard.
20 Q.  Is it in accordance with WPD policy for
21     multiple officers to issue commands at the
22     same time?
23 A.  No.
24 Q.  All right. And what was Finch's response to
25     the commands that were issued?

37 (Pages 142 to 145)

Page 146

1    A.  Again, I would -- when he first came out, I
2    recall his hands being down, and then -- and
3    then I remember his hand coming back up. So
4    we're talking -- I mean, you'd have to break
5    it down by milliseconds on the way that this
6    is processing through my head.
7         As his hand starts to come back up, it
8    was not -- his hands were not up in the air
9    like this. His hands were -- I just remember
10   them on its way back up from being down here,
11   and that's when, in my peripheral, I see
12   these other officers. This is when I see the
13   west side officers coming. So I'm glancing
14   off over there, and that's when I hear the --
15   the shot.
16   Q.  I'm going to ask you to do something I asked
17   Officer Rapp to do yesterday just because we
18   have a video camera and it's hard to describe
19   movements in verbal form.
20        Would you mind demonstrating what you
21   saw Mr. Finch doing in response to the
22   commands while standing, please.
23   A.  Yeah. This reach?
24   Q.  Yeah, should be.
25   A.  When -- so when we say he's coming out as

Page 147

1    everyone's yelling "let me see your hands",
2    and I remember his hands being down.
3    Q.  Correct.
4    A.  I remember his hands starting to come back
5    up. And they were about -- right about here
6    (demonstrating) is when I see the -- at some
7    point when -- his hands were never up like
8    this, like you would expect, but I do
9    remember his hands coming back up, and that's
10   when I turn my attention over to these
11   officers that are on that side. So after --
12   after the shot went off is when I refocused
13   my attention back on him.
14   Q.  So you saw his hands come partway up and then
15   fall back down. Is that accurate?
16   A.  You mean from the beginning?
17   Q.  At any point in that instance when he came
18   onto the porch until the shot was fired.
19   A.  I remember his hands being down, and then his
20   hand coming back -- his right hand
21   specifically coming back up partway. And at
22   this point, without reviewing my report, I
23   wouldn't -- I mean, I -- vividly, I don't
24   remember it like I did that day, that time.
25   Q.  Okay. Do you believe his hands fell at some

Page 148

1    point near his waist or are you not sure
2    about that?
3    A.  Oh, no, his hand was down by his waist when
4    I -- at the very beginning.
5    Q.  Okay. And at some point, they may or may not
6    have come back up.
7         You're not a hundred percent sure?
8    A.  Based off of commands is when I saw it
9    starting to come back up, and that's when I
10   changed my focus to the other officers.
11   Q.  Okay. So he was starting to comply with
12   commands at the time you changed your focus?
13   A.  His hand were coming back up, and in my head,
14   that was what was happening.
15   Q.  Okay. And is it fair to say you did not see
16   him do anything else after that because your
17   focus changed to the west side officers?
18   A.  My focus -- yes, that's when I saw the
19   officers coming from the -- or I saw the
20   officers at that point, and I started to
21   worry about the crossfire.
22   Q.  And just prior to changing your focus to the
23   west side, when you did see Mr. Finch's hands
24   start to come back up, could you see his
25   hands clearly?

Page 149

1    A.  I -- I don't -- I don't recall.
2    Q.  Did you see a weapon in his hands?
3    A.  No.
4    Q.  Do you believe you would have seen one had he
5    had one?
6    A.  I think that I probably would have, but that
7    was -- I did not.
8    Q.  At any point while Mr. Finch was on the
9    porch, did you see him holding a weapon?
10   A.  No.
11   Q.  At any point while he was on the porch, did
12   you believe you saw him holding a weapon?
13   A.  No.
14   Q.  Did any of the officers standing by you in
15   location to say out loud or to you "that man
16   has a weapon"?
17   A.  No. Visibly, is that what you mean?
18   Q.  Well, I mean did they say "he has a weapon"?
19   A.  No.
20   Q.  Did they say "I believe he has a weapon"?
21   A.  No.
22   Q.  Were the officers located on the east side
23   within shooting distance of the porch using a
24   handgun based on your experience?
25   A.  Shooting distance?

## Page 150

1    Q.  Correct.
2    A.  That house is within shooting distance based
3       off of my experience.  I don't know what type
4       of angle they had at that time.
5    Q.  Okay.  Do you know if any of them had on them
6       the less lethal weapons we discussed?
7    A.  I don't know.
8    Q.  Beanbag shotgun, for instance?
9    A.  I would -- an experienced answer would be
10      that the WPD officers didn't.  I didn't know
11      what the sheriff's department had.
12   Q.  Got it.  In an ideal world, would you have
13      wanted those officers who were to be your QRF
14      team to have had such weapons on them?
15   A.  I would have eventually had somebody with a
16      beanbag shotgun on that QRF.
17   Q.  And in particular, somebody who was close
18      enough to shoot it; right?
19   A.  Correct.
20   Q.  What's the range of a beanbag shotgun?
21   A.  I believe it will go up to 60 feet, but I'm
22      not a hundred percent sure.  I'd have to
23      review policy.
24   Q.  Okay.  And they were -- you said officers
25      were probably within 60 feet of the porch?

## Page 151

1    A.  Oh, yeah.
2    Q.  How much time passed between when Finch
3       stepped on the porch and when you heard the
4       rifle shot?
5    A.  Seconds.
6    Q.  Less than 10?
7    A.  To my recollection, yes.
8    Q.  Did you physically see Officer Rapp shoot his
9       gun -- or his rifle, rather?
10   A.  What do you mean by that?
11   Q.  Did you see him pull the trigger?
12   A.  No.
13   Q.  Did you see the shot fire out of --
14   A.  I saw, through my peripheral, the muzzle
15      flash.
16   Q.  And you heard it, of course?
17   A.  Oh, yeah.
18   Q.  It was very loud?
19   A.  Very.
20   Q.  Is it fair to say that it surprised you?
21   A.  It absolutely surprised me.
22   Q.  Did it shock you?
23   A.  It didn't shock me.  It was -- it was
24      startling.
25   Q.  Okay.  Is that because you absolutely weren't

## Page 152

1       expecting it to be fired?
2    A.  I could tell you that I was going to fire my
3       handgun in here, and it would still make
4       you -- I mean, it would -- it would startle
5       you just 'cause it's so loud.
6    Q.  Well, were you expecting that shot to be
7       fired?
8    A.  No.
9    Q.  Just to be clear:  Had you given, at anytime,
10      any instructions to any officer about when to
11      shoot Mr. Finch prior to the shot going off?
12   A.  No.
13   Q.  Did you give any instructions to Officer Rapp
14      about when to shoot?
15   A.  No.
16   Q.  Had you given any instructions to any officer
17      on the scene about what to do about the
18      suspect who was on the porch prior to the
19      shot being fired?
20   A.  No.
21   Q.  Should the east side officers have known that
22      they should not issue commands to that
23      suspect on the porch without your say so?
24   A.  Not necessarily.  I will say through
25      experience that I think adrenaline and it

## Page 153

1       just happens on a lot of calls where unless
2       it's specifically said, that people will
3       just -- because it's just out of nature you
4       want to try and resolve it.  So and, you
5       know, we're told -- taught from the academy
6       that we want to give good verbal commands.
7       So I think when a situation arises, unless
8       you are specifically -- even when people are
9       specifically told "I will give commands",
10      it's hard for people to not sometimes.
11   Q.  Okay.  And no one in this case was given a
12      command --
13   A.  No.
14   Q.  -- not to issue --
15   A.  No.
16   Q.  -- a command?
17   A.  I didn't have a chance to give that yet.
18   Q.  All right.  Is it your belief that Mr. Finch
19      was not complying with police orders at the
20      time he was shot?
21   A.  He was not doing what he was told to when he
22      was shot.
23   Q.  And what's that statement based on?
24   A.  Put your hands up.  Walk this way.
25   Q.  Okay.  It's because he didn't have his hands

KELLEY REPORTING ASSOCIATES, LTD      515 S. MAIN, STE 105              WICHITA, KANSAS
316.267.8200                                              67202

Page 154

```
1        fully up in the air, to your understanding;
2        correct?
3    A.  Correct.
4    Q.  Though own -- to be fair, you did not see him
5        at the time Officer Rapp shot the rifle?
6    A.  That's correct.
7    Q.  And he had not walked towards you?
8    A.  Correct.
9    Q.  Do you believe that Mr. Finch had the
10       opportunity, in the time between when he came
11       on the porch and when he was shot, to comply
12       with officer commands?
13   A.  Yes.
14   Q.  In the less than 10 seconds, that was
15       sufficient time for him to comply, in your
16       opinion?
17   A.  Oh, yeah.
18   Q.  Did anybody give a verbal warning to him that
19       deadly force would be used if he did not
20       comply?
21   A.  No.
22   Q.  Should have that warning have been given?
23   A.  No.
24   Q.  It's not proper procedure?
25   A.  That's not a command that we give.
```

Page 155

```
1    Q.  If you had had sufficient time, which I
2        understand you say you did not, what would
3        have been the proper police response to
4        Mr. Finch coming out on the porch?
5            MR. PIGG:  Object to form; calls
6        for speculation.
7    A.  Had we had time to set everything up, I -- we
8        would have had one person giving commands.
9    Q.  That person being you?
10   A.  Or somebody that I -- by me that I had
11       assigned to give commands.
12   Q.  Correct.  Continue.  Sorry.
13   A.  The -- and then it would have played out
14       as -- as the -- Mr. Finch or whoever,
15       hypothetically, we're putting in this
16       situation, responded to the commands that he
17       was given.
18   Q.  Okay.  With an assigned QRF team being the
19       first point of contact -- physical contact
20       with Mr. Finch?
21   A.  Had he cooperated, we would have given
22       commands.  I would have told the officer to
23       give him commands to walk out to the
24       sidewalk, and then to sidestep off to the
25       side, still giving us cover.  And then in a
```

Page 156

```
1        perfect world, he wouldn't have known that
2        these guys were even here, and that we would
3        have had him go down to his knees, and we
4        would have went out there where these
5        officers still have cover from any potential
6        threats that are still at the house.
7    Q.  Do you believe Officer Rapp could have waited
8        long enough to have you put that plan into
9        place before shooting Mr. Finch?
10   A.  Rephrase the question.
11   Q.  Do you believe it was possible for Officer
12       Rapp to have waited a longer period of time
13       before shooting his gun so that you could put
14       that plan in place?
15           MR. PIGG:  Object to form.
16   A.  I don't know what -- what other -- at the
17       time, I don't know what other movements or --
18       that were seen to 'cause him to fire.  So I
19       think in many situations that we're forced to
20       do specific things rather than if you wait,
21       other bad things could happen.
22   Q.  Would you agree that use of force is based on
23       an objective reasonableness standard?
24   A.  Yes.
25   Q.  And would you also agree that you were not in
```

Page 157

```
1        a physical position to comment on whether
2        Officer Rapp's actions were reasonable or not
3        at the time he shot?
4    A.  Like I said, I didn't see the movements from
5        Mr. Finch that caused him to fire.
6    Q.  So would that be a yes?
7    A.  For what question?
8    Q.  That you are not in a position to judge
9        whether Officer Rapp's actions --
10   A.  Correct.  Yes.
11   Q.  -- were reasonable or not at the time he
12       fired.
13           Did you see anybody near Mr. Finch's
14       body after the shooting?
15   A.  Timeframe.
16   Q.  Right after the shooting.
17   A.  No.
18   Q.  Did his body fall inside the house?
19   A.  Yes.
20   Q.  Inside the door frame?
21   A.  The majority, yes.
22   Q.  Okay.  Was the screen door still open at that
23       time?
24   A.  Very little.
25   Q.  Did the shot hit his body directly?
```

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105    WICHITA, KANSAS
316.267.8200    67202