# Exhibit C

Page 1

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF KANSAS
2

3
    LISA G. FINCH, Individually, as    )
4   Co-Administrator of the Estate     )
    of Andrew Thomas Finch,            )
5   deceased, and as Next Friend       )
    for her minor granddaughter,       )
6   AF; DOMINICA C. FINCH, as          )
    Co-Administrator of the Estate     )
7   of Andrew Thomas Finch,            )
    deceased; and ALI ABDELHADI,       )
8                                      )
                      Plaintiffs,      )
9                                      )
                                       )
10      vs.                            )Case No.
                                       )18-CV-01018-JWB-KGS
11                                     )
    CITY OF WICHITA, KANSAS;           )
12  JOHN DOE POLICE OFFICERS 1-10,     )
                                       )
13                    Defendants.      )
                                       )
14

15

16                D E P O S I T I O N

17

18        The videotape deposition of JUSTIN RAPP taken on

19   behalf of the Plaintiffs pursuant to the Federal Rules of

20   Civil Procedure before:

21                RICK J. FLORES, CSR
                  KELLEY REPORTING ASSOCIATES, LTD.
22                515 South Main, Suite 108
                  Wichita, Kansas  67202
23

24   a Certified Shorthand Reporter of Kansas, at 515 South

25   Main, Suite 108, Wichita, Sedgwick County, Kansas, on the

26   17th day of October, 2018, at 12:04 p.m.

27

Page 82

1    Q. Okay. If that happened today, would you call
2       CIT?
3    A. Yes.
4    Q. And is that because CIT has special training
5       on how to deal with individuals who are in
6       mental health distress?
7    A. Yes.
8    Q. And you know WPD has a use of force policy;
9       correct?
10   A. Yes.
11   Q. And you reviewed it prior to your deposition;
12      right?
13   A. Yes.
14   Q. And just for the record, sound right if I say
15      it's Regulation 4?
16   A. Yes, ma'am.
17   Q. On weapons/use of force requirements?
18   A. Yes.
19   Q. And is there anything about that use of force
20      policy that you are, sitting here today, able
21      to summarize?
22   A. There's quite a few parts that I could
23      summarize.
24   Q. Okay. Could you summarize the main points of
25      the policy as you recall them sitting here

Page 83

1       today?
2    A. The policy says that we will only use
3       force -- or use force and use the correct
4       amount of force when objectively reasonable.
5       It says that we will report all incidents of
6       using force. It talks about the various
7       weapon systems that may be used by officers
8       on the Wichita Police Department, as well as
9       addressing the patrol rifles, in addition to
10      our other weapon systems.
11   Q. It discusses when you can use lethal force;
12      correct?
13   A. Yes, ma'am.
14   Q. At the time of the Finch shooting, were you
15      certified to use the police rifle?
16   A. Yes, ma'am.
17   Q. How many people in the department are
18      certified to use a rifle, to your knowledge?
19   A. I don't know the answer to that.
20   Q. Do you know if it's many people, a select
21      few?
22   A. It's more than a select few, but I don't know
23      how many.
24   Q. Okay. Is it just SCAT officers that receive
25      rifle training?

Page 84

1    A. No, ma'am.
2    Q. It's officers at all different levels in the
3       force?
4    A. Yes, ma'am.
5    Q. And you receive special training on that
6       firearm?
7    A. Yes.
8    Q. And how often?
9    A. There's a -- I believe it was a week-long
10      training course and then the rifle is
11      qualified with biannually just like our
12      handguns and shotguns.
13   Q. Did you request to receive certification on
14      the rifle?
15   A. No.
16   Q. You were assigned to?
17   A. Yes.
18   Q. Do you know why?
19   A. No, I don't.
20   Q. Is it because of your military background?
21   A. Could be.
22   Q. Do you think biannual training is sufficient?
23   A. I believe so.
24   Q. And when were you last certified?
25   A. This past spring.

Page 85

1    Q. Spring 2018?
2    A. Uh-huh.
3    Q. And you passed?
4    A. Yes, ma'am.
5    Q. Have you ever failed?
6    A. No.
7    Q. And what distance are you certified on with
8       the rifle?
9    A. 50 yards.
10   Q. And did you -- have you received
11      certification on other firearms other than
12      the rifle?
13   A. Yes.
14   Q. And which firearms are those?
15   A. Handgun and shotgun.
16   Q. Does that also entail biannual training?
17   A. Yes.
18   Q. And have you ever failed that certification?
19   A. No.
20   Q. And what are WPD officers certified on
21      distance wise as to handguns and shotguns?
22   A. 25 yards.
23   Q. For each weapon?
24   A. Yes, ma'am.
25   Q. Were you trained on using a sidearm?

22 (Pages 82 to 85)

Page 122

1    A.  Not a mental health issue, no.
2    Q.  Okay. Was there a time then you responded to
3        somebody who was armed with a fireman —
4        firearm who was not in mental health crisis?
5    A.  Yes.
6    Q.  And what — how many incidents?
7    A.  Quite a few.
8    Q.  How many over the course of your career would
9        you say?
10   A.  Maybe 20 or more.
11   Q.  Did you use force in any of those incidents?
12   A.  It depends on your definition of use of
13       force. We consider — on the Wichita Police
14       Department, we consider me drawing and
15       pointing my firearm at someone, without
16       firing a round, to be a use of force, so yes,
17       in that — to that regard, yes.
18   Q.  How many occasions did you — of that 20-plus
19       incidents did you draw and point your
20       firearm?
21   A.  All of them.
22   Q.  But you never shot?
23   A.  Correct.
24   Q.  Did you ever use some of the less lethal
25       options that we discussed earlier - Taser, OC

Page 123

1        spray?
2    A.  No.
3    Q.  And you never shot a firearm?
4    A.  Correct.
5    Q.  Did any of them result in harm to the
6        suspect?
7    A.  If they did, it was minor harm towards the
8        end.
9    Q.  In the apprehension process?
10   A.  Yes.
11   Q.  Have any of those incidents resulted in a PSB
12       investigation?
13   A.  I don't know.
14   Q.  You don't recall ever being interviewed in
15       connection to one?
16   A.  No.
17   Q.  And you've never received discipline for one?
18   A.  No.
19   Q.  Have you ever responded to a false call in
20       the line of duty?
21   A.  Yes.
22   Q.  What do you understand a false call to be?
23   A.  A call where the information provided by the
24       calling party turns out to be not true.
25   Q.  And how typical is that in your line of work?

Page 124

1    A.  Not very.
2    Q.  But it's happened to you before?
3    A.  Yes.
4    Q.  How many times over the course of your
5        career?
6    A.  Oh, maybe 10 or 15.
7    Q.  And do you recall the types of incidents in
8        those 10 or 15 calls?
9    A.  I think a couple have been like domestic
10       violence or just a general type of
11       disturbance, and that would probably be it.
12       Something along the lines of general
13       disturbance, a fight going on somewhere and
14       we're never able to find any indication that
15       a fight occurred by looking for evidence or
16       speaking with other people in the area.
17   Q.  Is it fair to say that both in your job as
18       patrol and then in SCAT, you would respond to
19       crime scenes based on information received
20       from dispatch?
21   A.  Yes.
22   Q.  Okay. And you'd agree, based on what we just
23       discussed, that some of the times the
24       information received from dispatch is not
25       correct?

Page 125

1    A.  Correct.
2    Q.  And that's because the person providing the
3        information to dispatch, the civilian, is
4        providing false information?
5    A.  Yes.
6            MR. PIGG: Object to form.
7    BY MS. VAN BRUNT:
8    Q.  Okay. Do you use any law enforcement
9        techniques to root out false calls when
10       you're responding?
11   A.  Yes.
12   Q.  And what would those be?
13   A.  I'm sorry. By when responding, do you mean
14       while on the way or upon arriving?
15   Q.  Well, let's start with on the way, what would
16       you do?
17   A.  On the way, one of the things that you could
18       do would be to try to search a phone number
19       or find out history at that location to see
20       if there's prior history that does match.
21   Q.  And how do you find out a history of a
22       particular location?
23   A.  Typically just asking dispatch or there may
24       be officers who work the area of that call
25       that might be familiar with that location.

Page 126

1    Q.  So you would reach out to them?
2    A.  Or, ideally, they would just pipe up and
3        provide the information.
4    Q.  Okay.  Is that because when a dispatch call
5        goes out, it goes out to all the radios?
6    A.  The way we do our radio system, it's north,
7        south, east and west.
8    Q.  Okay.
9    A.  Just matches with our four patrol bureaus.
10       So if a call occurs in a particular patrol
11       bureau, it will go out on the radio as
12       everybody in that bureau that's on that radio
13       channel would hear it.  Certain types of
14       calls are broadcast citywide.  Just kind of
15       depends on the severity of the call.
16   Q.  Are more severe incidents broadcast citywide?
17   A.  Yes.
18   Q.  And then how -- what would you do to root out
19       a false call once you got to the scene?
20   A.  Attempt to make contact with the people at
21       that location, speak with neighbors, do those
22       kinds of things and determine whether or not
23       the information provided through dispatch was
24       valid.
25   Q.  Are you familiar with the term swatting?

Page 127

1    A.  Well, I am now.
2    Q.  Okay.  And prior to December 28th, 2017, were
3        you familiar with it?
4    A.  Not really, no.
5    Q.  Have -- other than the Finch swatting
6        incident, have you ever been involved in a
7        potential swatting incident?
8    A.  I don't believe so.
9    Q.  Have you ever heard about it on the media?
10   A.  Since then, yes.
11   Q.  But prior to December 28th?
12   A.  I don't believe so.
13   Q.  Okay.  Would you agree that the call relaying
14       a threat from 1033 West McCormick on December
15       28th, 2017, was likely a swatting call?
16   A.  Can you clarify that.
17   Q.  Do you believe that the call to dispatch that
18       resulted in your response to the Finch
19       residence was a swatting call?
20       MR. PIGG:  Based on --
21   A.  Now or then?
22   Q.  Right now.
23   A.  Right now?
24   Q.  Based on your information right now.
25   A.  Yes, I do believe now that it -- that it was.

Page 128

1    Q.  And at anytime prior to the shooting, did you
2        suspect you were responding to a swatting
3        call?
4    A.  No.
5    Q.  Would you say you believed you were dealing,
6        instead, with a hostage scenario?
7    A.  I believed that was likely, yes.
8    Q.  An armed shooter scenario?
9    A.  Yes.
10   Q.  A barricaded gunman scenario?
11   A.  Possibly.
12   Q.  You call it a high risk scenario in your
13       police experience?
14   A.  Yes.
15   Q.  Okay.  Now turning to the evening of
16       December 28th, 2017, what shift were you
17       working?
18   A.  Third shift.
19   Q.  And remind me the hours.
20   A.  5:00 p.m. to 3:00 a.m.
21   Q.  And you started at 5:00 that night?
22   A.  Yes, ma'am.
23   Q.  What were your assigned duties that night?
24   A.  We were going to assist with 911 calls in the
25       Patrol West Bureau because staffing levels

Page 129

1        were pretty low.  And then we were going to
2        go down to -- I think it was St. Francis
3        hospital -- might have been Wesley -- to act
4        as a guard for an individual that was in
5        custody down there.
6    Q.  Did you actually respond to any 911 calls?
7    A.  Yes.
8    Q.  Any high risk situations that night prior to
9        the Finch shooting incident?
10   A.  No.
11   Q.  Did you make any arrests?
12   A.  No.
13   Q.  Did you stop anyone?
14   A.  I don't remember.
15   Q.  Were you partnered with Powell throughout the
16       evening?
17   A.  Yes.
18   Q.  So your assigned duties that night were not
19       typical of your SCAT duties?
20   A.  Correct.
21   Q.  Was it an issue of holiday coverage?
22   A.  That's what I remember.
23   Q.  And at some point in time that night, you
24       learned about an incident taking place at
25       1033 West McCormick; correct?

33  (Pages 126 to 129)

Page 130

1    A. Yes.
2    Q. And that's in your west side territory?
3    A. Sorry. Yes.
4    Q. And how did you come to find out about that
5      incident?
6    A. It was broadcast by dispatch.
7    Q. And was it a citywide broadcast?
8    A. I believe so.
9    Q. Is there any way to detect whether a
10      broadcast is going just to you on the west
11      side or to the city at large?
12    A. Typically, an all channels broadcast will be
13      preceded by some alert tones. It's my
14      working knowledge of how 911 functions that
15      that alert tone goes out citywide, but I
16      don't know that it did for sure.
17    Q. And is your understanding that the
18      information you received from dispatch was
19      coming via 911?
20    A. Yes.
21    Q. And there is a term called badge on the floor
22      used by WPD; correct?
23    A. Yes.
24    Q. Could you explain what the difference is
25      between 911 and badge on the floor?

Page 131

1    A. 911 is run by Sedgwick County. It's our
2      emergency communications center. They have
3      their own separate building and we use badge
4      on the floor as -- to refer to our city hall
5      security screeners. It can be an officer
6      working the front desk at one of our patrol
7      bureaus. That's just kind of a general term
8      for someone that's not actively out working
9      the street. They're at a desk helping
10      citizens that way.
11    Q. Did any of the information you received prior
12      to the shooting, about the Finch incident on
13      December 28th, come from the badge on the
14      floor?
15    A. I know now that the answer to that is yes. I
16      did not know that that evening.
17    Q. Is it made clear in any way whether the
18      information you're receiving over the radio
19      is coming from 911 or the badge on the floor?
20      MR. PIGG: Object to form.
21    A. Can you ask that again.
22    Q. Sure. So you received specific information
23      about an incident via dispatch; correct?
24    A. Yes.
25    Q. And that information originates either with

Page 132

1      911 or, possibly, with the badge on the
2      floor?
3    A. Correct.
4      MR. PIGG: Object to form.
5    Q. And is there any way for you to know, when
6      you're hearing the information relayed over
7      dispatch, where it originated from?
8    A. Only if dispatch were to tell us that.
9    Q. Okay. There's not some ring tone or
10      something like that?
11    A. No. And point of clarification: The badge
12      on the floor cannot actually dispatch
13      anything to us.
14    Q. Okay. Does the badge on the floor relay the
15      information to 911?
16    A. Yes.
17    Q. I see. And then 911 passes that on to
18      dispatch?
19    A. 911 and dispatch are the same thing.
20    Q. One and the same, okay. Gotcha'.
21      What did you learn via dispatch that
22      first time you heard about the incident at
23      1033 West McCormick?
24    A. That a male caller was reporting shooting his
25      father in the head and holding his mother and

Page 133

1      brother at gunpoint.
2    Q. Did you learn via dispatch at that point in
3      time the suspect's race?
4    A. No.
5    Q. Did you learn anything about his general
6      appearance?
7    A. No.
8    Q. Did you know anything about his criminal
9      background?
10    A. No.
11    Q. Did you learn the location at which the
12      incident was taking place at that point in
13      time?
14    A. Yes.
15    Q. 1033 West McCormick?
16    A. Yes.
17    Q. Did you receive any information about that
18      location via dispatch?
19    A. I believe it was asked for, and there was an
20      answer given.
21    Q. Do you know who asked for it?
22    A. I think Sergeant Jonker, but I'm not a
23      hundred percent sure.
24    Q. Did that occur prior to you getting to the
25      scene or after you were at the scene?

34 (Pages 130 to 133)

Page 134

1    A. I don't remember.
2    Q. Okay. Did you respond -- did you find out
3       the ages of the people who were allegedly
4       being held?
5    A. No.
6    Q. And did you find out their race?
7    A. No.
8    Q. Did you find out a description of the
9       building 1033 West McCormick?
10   A. No.
11   Q. Any other information that you received from
12      dispatch at that first point in time other
13      than what you've already stated?
14   A. No.
15   Q. When you received that information, did
16      anything strike you as suspect about it?
17   A. No.
18   Q. As potentially being untrue?
19   A. No.
20   Q. Okay. So I'm going to try a question and you
21      tell me if this makes sense; otherwise, I'll
22      try to reword.
23          At any point in time between when you
24      first heard about the incident and when you
25      fired your rifle that night, did you receive

Page 135

1       any additional information about that alleged
2       incident taking place at 1033 West McCormick
3       beyond what you found out from dispatch and
4       what you personally saw at the scene?
5    A. I'm sorry. Can you ask that again.
6    Q. Yeah.
7    A. That was a long question.
8    Q. It is. What I'm trying to get at is did you
9       receive information about the incident at any
10      point prior to shooting from any other
11      secondhand sources beyond dispatch?
12   A. No, I don't believe so.
13   Q. Okay. Any details about who was inside, what
14      their motive was, what they looked like, et
15      cetera?
16   A. No.
17   Q. So you were acting on the information you
18      received from dispatch?
19   A. Yes.
20   Q. And then based on what you saw with your own
21      eyes once you got to the scene?
22   A. Yes.
23   Q. Did you ever learn the name Andrew Finch
24      prior to the shooting?
25   A. No.

Page 136

1    Q. When did you first find out his name?
2    A. I believe the next morning.
3    Q. December 29th?
4    A. Yes.
5    Q. And who did you find it out from?
6    A. The news.
7    Q. Not from a superior officer?
8    A. (Witness nods.)
9    Q. Had you ever personally responded to 1033
10      West McCormick in your career?
11   A. I don't believe so.
12   Q. Were you aware of that house in any context?
13   A. No.
14   Q. Did anyone at the scene, prior to the
15      shooting, tell you that they were familiar
16      with that house?
17   A. No.
18   Q. All right. Can you please describe what you
19      did next after hearing the dispatch call.
20   A. Officer Powell and I got into our patrol
21      vehicle. I got in the passenger seat and he
22      was the driver.
23   Q. Where were you leaving from?
24   A. We were on a call; I believe it was at
25      University and -- I can't remember the other

Page 137

1       name of the street. General ballpark, we
2       were near the intersection of Maple and
3       Ridge.
4    Q. Okay. And what were you doing at that point
5       in time?
6    A. We were on a suspicious character call.
7       Supposed to be a woman sitting in a truck at
8       that location.
9    Q. Did you see the woman?
10   A. Nope.
11   Q. Why did you respond to the scene at 1033 West
12      McCormick?
13   A. Because it's a high priority call and one of
14      our responsibilities as a SCAT officer is to
15      respond to violent crimes.
16   Q. Okay. So you were never personally assigned
17      to respond to the scene by a commanding
18      officer?
19   A. No.
20   Q. You just understand it -- understood it to be
21      your duty to respond?
22   A. Correct.
23   Q. What route did you take to get to the scene
24      from where you were?
25   A. When we got out to Ridge Road, we went south

35 (Pages 134 to 137)

Page 138

1    on Ridge to Kellogg, took Kellogg east to
2    Seneca, and Seneca south down to McCormick.
3    Q. How long did it take you?
4    A. Several minutes.
5    Q. And did you have your sirens on?
6    A. Yes.
7    Q. Did you run red lights?
8    A. We might have.
9    Q. Okay. Is that called running hot?
10   A. Running hot is a term used for using your
11   lights and siren.
12   Q. Okay. And why were you using your lights and
13   siren?
14   A. Because per policy, that's how we respond to
15   calls of shootings.
16   Q. Because it was a high stake scenario?
17   High risk incident, rather?
18   A. High priority call.
19   Q. High priority call. And what other kinds of
20   calls are considered high priority such that
21   you would run sirens?
22   A. Rape in progress, officer in trouble,
23   paramedic in trouble, firefighter in trouble,
24   occasionally, a burglary in progress if
25   someone's still on scene at that point in

Page 139

1    time.
2    Q. Okay. Now you said you responded to the
3    incident because it was part of your duties
4    as a member of cat -- SCAT; correct?
5    A. Yes.
6    Q. Did non-SCAT officers also respond to the
7    scene --
8    A. Yes.
9    Q. -- to your knowledge?
10   And why do you believe that was?
11   MR. PIGG: Object to form.
12   A. Every -- every officer in the city that is
13   available and within a reasonable distance
14   would respond to a shooting. There's no SCAT
15   only may respond type thing. The reasoning
16   behind SCAT, typically, having a heavy
17   presence at those scenes is we are kind of
18   the field investigative arm of our
19   investigative section.
20   Q. So this kind of scenario is kind of a all
21   hands on deck kind of incident?
22   A. Absolutely.
23   Q. Where did you park once you got to the scene?
24   A. Officer Powell parked our patrol vehicle just
25   on the south side of -- I believe it was

Page 140

1    called Mary's Supper Club. It'd be the first
2    structure on the southeast corner of the
3    intersection.
4    Q. Sorry. How did he decide where to park?
5    A. I believe that's a question best answered by
6    him, but my opinion is that he saw other
7    patrol vehicles there and decided to pull in
8    there.
9    Q. Okay. Did he talk to you about where he
10   should park before doing so?
11   A. I actually had told him to park at the
12   Johnson's General Store across on the west
13   side of Seneca and he pulled in where he
14   pulled in.
15   Q. Okay. I'm going to mark an exhibit. We're
16   on 56, I believe.
17   (Rapp Exhibit No. 56 was marked for
18   identification.)
19   Q. If you could take a look at that. I'll
20   represent to you that it is a Google map of
21   the area surrounding 1033 West McCormick
22   printed on 10-9-2018.
23   Does this represent to you an accurate
24   depiction of the area surrounding the
25   shooting?

Page 141

1    A. Yes.
2    Q. Finch shooting incident. Okay.
3    And there is a little red bubble that
4    marks 1033 West McCormick on the map;
5    correct?
6    A. Yes.
7    Q. And that is accurate --
8    A. Yes.
9    Q. -- as to its location; correct?
10   A. (Witness nods.)
11   Q. Okay. So we might use this a little bit
12   going forward.
13   A. Okay.
14   Q. Could you mark on the map with some kind of
15   star or indication an approximation of where
16   you first parked the vehicle and just call it
17   location number 1 -- or sorry -- where Powell
18   first parked the vehicle in which you were
19   riding.
20   A. It'd be just kind of -- if you're looking at
21   that blue truck, it'd be just kind of
22   generally in the back end vicinity of that
23   blue truck.
24   Q. Behind Gabby's Peruvian Restaurant &
25   Catering?

36 (Pages 138 to 141)

Page 142

1    A.  Yes.
2    Q.  Okay.  Could you just state -- mark that
3    location 1 in some manner.
4    A.  Yep.  (Witness complies.)
5    Q.  Thank you.  How long did you stay in that
6    location?
7    A.  Maybe a minute and a half, two minutes.
8    Q.  Did you get out of your car?
9    A.  Yes.
10   Q.  And who else was at that location when you
11   got out of your car?
12   A.  Officer Gumm was there.  There was a
13   sheriff's deputy and I'm not sure what his
14   name is that was there, and Sergeant Jonker
15   was there.
16   Q.  So it was the five of you at that location?
17   A.  Possibly more.  I'm just naming people I know
18   were there.
19   Q.  Okay.  You said a sheriff's deputy responded
20   to the scene.
21        Was that typical that Sedgwick County
22   sheriffs would respond to a priority call?
23   A.  Yes.
24   Q.  And why is that?
25   A.  Because they have law enforcement powers and

Page 143

1    privileges all over Sedgwick County.  And
2    their squad room is actually just down the
3    street from there, so it wouldn't have been
4    uncommon to have one or more sheriff's
5    deputies in the area.
6    Q.  Fair to say you often cooperate on responses
7    to high priority calls?
8    A.  Yes.
9    Q.  Are sheriff's deputies armed?
10   A.  Yes.
11   Q.  Do you know what they're armed with?
12   A.  Bare minimum, handguns.  I believe most of
13   them have rifles.
14   Q.  Do you know if the sheriff's deputies on the
15   scene that night had rifles?
16   A.  I don't know.
17   Q.  Did you see one on the deputy who was at
18   location number 1?
19   A.  I don't know, but I'm not positive.
20   Q.  What was your plan once you got to the scene?
21   A.  My personal plan?
22   Q.  Correct.
23   A.  To see how I could be of assistance and where
24   I could be of assistance.
25   Q.  And who was in charge of the scene, to your

Page 144

1    knowledge, when you first arrived?
2    A.  Sergeant Jonker was the supervisor on scene
3    at the time of my arrival.
4    Q.  And how -- sorry.  How did you know that?
5    A.  I physically saw him there.
6    Q.  How did you know that he was the person in
7    charge of the entire scene at that point?
8    A.  At that point, I don't believe any other
9    supervisors had made it to the location yet.
10   Q.  You didn't see any other sergeants on scene?
11   A.  Correct.
12   Q.  Or any other lieutenants?
13   A.  No.
14   Q.  Did you know Jonker prior to this incident?
15   A.  Yes.
16   Q.  And how did you know him?
17   A.  I worked for Sergeant Jonker when I was in
18   Patrol South SCAT, and I had worked around
19   him once he became the K-9 unit supervisor.
20   Q.  What do you mean around him?
21   A.  As a member of SCAT, it was not uncommon for
22   us to utilize police K-9s for narcotic
23   sniffs.  And since he was the supervisor of
24   that K-9 unit, as well as a K-9 handler
25   himself, it would not be uncommon for him to

Page 145

1    assist on traffic stops.
2    Q.  Was he your commanding officer at Patrol
3    South SCAT?
4    A.  Yes.
5    Q.  How long did you report for him -- to him?
6    A.  Approximately a year, I believe.
7    Q.  When you parked, did you receive any
8    instructions from Sergeant Jonker at location
9    number 1?
10   A.  Not when we parked, no.
11   Q.  When you got out of the car, did you receive
12   any instructions?
13   A.  Yes, ma'am.
14   Q.  And what instructions were those?
15   A.  He wanted me to come around to the north side
16   of McCormick Street with him.
17   Q.  Okay.  And did he say why he wanted you to do
18   that?
19   A.  Because I had a rifle.
20   Q.  All right.  And what did he expect you to do
21   with that rifle?
22   A.  Provide a point of cover on the north side of
23   the street as officers were setting up a
24   perimeter.
25   Q.  What is a cover?

KELLEY REPORTING ASSOCIATES, LTD    515 S.MAIN, STE 105    WICHITA, KANSAS
316.267.8200                                                        67202

Page 146

```
1       A.  The cover officer is going to be looking out
2           for the safety and security not only of
3           officers on the perimeter, but everyone else
4           in the general vicinity of the -- of the
5           location.
6       Q.  Was there just one cover officer at the Finch
7           shooting incident?
8       A.  There would have been more, I believe.
9           Typically, there would be more than just one.
10      Q.  Do you know who else was serving as a cover
11          officer?
12      A.  I don't.
13      Q.  And what were your duties as a cover officer?
14      A.  To keep -- keep watch of the front of the
15          residence, identify any movement to alert
16          other officers that, you know, there was
17          movement at that location or assist in
18          identifying any potential threats at that
19          location.
20      Q.  How would you alert officers to movement or
21          to a threat?
22      A.  Verbally.
23      Q.  Through the radio?
24      A.  Yes.
25      Q.  You had a radio on you at the time?
```

Page 147

```
1       A.  Yes.
2       Q.  And with that radio, you could communicate to
3           all the officers who were at the scene?
4       A.  Yes.
5       Q.  Okay.  Did those duties that you just listed,
6           did those come from Jonker specifically?
7       A.  No.
8       Q.  He did not assign you those responsibilities
9           when you got to the location number 1?
10      A.  No.
11      Q.  Okay.  So how did you know what your duties
12          were?
13      A.  From just experience over 8, 9 years of law
14          enforcement career.
15      Q.  So Jonker decided come with me; I want you to
16          be cover?
17      A.  Yeah.
18      Q.  Did he ask Powell to accompany him, as well?
19      A.  I think so, but I'm not sure.
20      Q.  Did he ask any other officers to accompany
21          him?
22      A.  I don't know.
23      Q.  What were -- well, step back.
24              What other officers could you see at
25          the scene at the time you got out of your car
```

Page 148

```
1           at location 1?
2       A.  I believe I've already named everybody that I
3           could see.
4       Q.  Okay.  Those are the only officers you could
5           see at all on the scene at that time?
6       A.  Yes.
7       Q.  And what was Officer Gunn (sic) doing at the
8           time that you got out of your car?
9       A.  He was standing at the back of a police Tahoe
10          looking at the second floor of 1033 West
11          McCormick.
12      Q.  What was he looking at, in particular?
13      A.  He had actually drawn my attention to a
14          subject who could be seen in a second story
15          window on the west side of the residence.
16      Q.  Could you also see that subject?
17      A.  Yes.
18      Q.  What did you see?
19      A.  I saw what appeared to me to be a male figure
20          that was moving up and down in the window.
21      Q.  And when you say up and down, do you mean
22          standing up and squatting down or what do you
23          mean exactly?
24      A.  No.  Kind of a chest up profile almost that
25          was almost doing a kind of a bouncing up and
```

Page 149

```
1           down motion.
2       Q.  And how tall was that subject?
3       A.  I don't know.
4       Q.  And how do you know he was a male?
5       A.  It just appeared to be a male figure.  There
6           was no longer hair, no ponytail, something
7           that would point, obviously, to -- or more
8           than likely to being a female.
9       Q.  Was it a full -- a bigger figured person?
10      A.  No.
11      Q.  Was there any indication as to the person's
12          age?
13      A.  No.
14      Q.  Or their race?
15      A.  No.
16      Q.  Did you hear anything coming from that window
17          at that point?
18      A.  No.
19      Q.  Is that the only time you saw any movement in
20          the house while you were on the scene?
21      A.  No.
22      Q.  Okay.  Other than Mr. Finch entering the
23          porch, was that the only other time you saw
24          movement from the house?
25      A.  Yes.
```

38 (Pages 146 to 149)

Page 150

1   Q. Okay. Do you ever communicate with the
2       person in the second floor window?
3   A. I did not, no.
4   Q. Did Officer Gunn, to your knowledge?
5   A. I don't know.
6   Q. Did anyone suggest getting in touch or in
7       communication with that person in the second
8       floor window?
9   A. Not to my knowledge.
10  Q. You never heard Sergeant Jonker attempt to
11      make contact with that person in your
12      presence?
13  A. I did not hear him, no.
14  Q. Okay. You also said there was a sheriff's
15      deputy at location number 1?
16  A. Yes, ma'am.
17  Q. What was that officer doing?
18  A. I just remember seeing them there. I don't
19      remember any specific actions they were
20      taking.
21  Q. And then Sergeant Jonker, of course, and what
22      was Sergeant Jonker doing when you arrived?
23  A. He was trying to make sure that we had a good
24      perimeter set all the way around this
25      location.

Page 151

1   Q. And how do you know that's what he was trying
2       to do?
3   A. 'Cause I heard him talking about it over the
4       radio.
5   Q. What was he saying?
6   A. I couldn't quote him. I just know he was in
7       the -- in the -- in the process of trying to
8       make sure that we had a good perimeter set up
9       around the house.
10  Q. Was he talking to various officers?
11  A. He was talking on the radio.
12  Q. And what was the gist of what he was saying?
13  A. That he was trying to make sure we had a good
14      perimeter set up around the location.
15  Q. And what does a good perimeter look like to
16      your understanding?
17  A. A good perimeter would have multiple officers
18      on the north, south, east and west sides of
19      the location.
20  Q. When you stepped out of your vehicle at
21      location 1, was the perimeter complete?
22  A. No.
23  Q. And what sides of the perimeter were missing?
24  A. I believe the north side.
25  Q. And there was somebody -- there were officers

Page 152

1       on the east side?
2   A. Yes.
3   Q. But you couldn't see them?
4   A. No, because I was on the southwest corner of
5       the residence.
6   Q. Okay. So how did you know there were
7       officers there?
8   A. Because I believe that's what I heard.
9   Q. Heard from whom?
10  A. From Sergeant Jonker and the radio traffic
11      that was being discussed.
12  Q. Okay. And there were sergeants -- there were
13      officers, to your knowledge, on the west side
14      of the house?
15  A. Yes.
16  Q. And how do you know that?
17  A. I saw them.
18  Q. Okay. So you saw them when you were in
19      location number 1?
20  A. No, not until I was moving to my location
21      across the street on the north side of
22      McCormick.
23  Q. Okay. So let's stick with location number 1,
24      could you see west side officers?
25  A. No.

Page 153

1   Q. Did you believe them to be there?
2   A. Yes.
3   Q. Based on what?
4   A. Based on radio traffic.
5   Q. And at location number 1, you could also not
6       see east side officers; correct?
7   A. That is correct.
8   Q. But you believed them to be there?
9   A. Yes.
10  Q. Based on radio traffic?
11  A. Yes.
12  Q. Was anyone behind the building 1033 West
13      McCormick?
14  A. No. Where we were at location 1 served as a
15      good enough vantage point for the south side
16      of 1033 West McCormick.
17  Q. Okay. Did Officer Gunn have assigned duties,
18      to your knowledge, at location 1?
19  A. I don't believe so.
20  Q. Did he indicate to you what he thought he was
21      supposed to be doing?
22  A. No.
23  Q. Did anyone in your vicinity seem confused as
24      to what was happening at the time?
25  A. No.

39 (Pages 150 to 153)

## Page 154

1  Q.  They all felt like they understood what their
2    duties were at that point in time, to your
3    understanding?
4  A.  That was my understanding.
5  Q.  And at some point, you moved to the north
6    side of the incident house; correct?
7  A.  Yes.
8  Q.  And could you mark and put location number 2
9    where you moved to.
10  A.  (Witness complies.)
11  Q.  Let's take a peak at that --
12  A.  Sure.
13  Q.  -- and see.
14  A.  It's kind of partially covered by trees, but
15    right in there.
16  Q.  Okay.  So across the street on McCormick from
17    1033 West McCormick?
18  A.  Yes.
19  Q.  Do you know the address of that location,
20    approximately?
21  A.  No, not accurate enough to give you the
22    numbers.
23  Q.  Would 1038 sound accurate?
24  A.  That could be.
25  Q.  Okay.  And what is that building that you

## Page 155

1    were in front of?
2  A.  I believe it was a business of some sort.  I
3    think now it may be like apartments or some
4    kind of housing.
5  Q.  Was it a business when you responded on
6    December 28th?
7  A.  As far as I know.
8  Q.  Were any individuals inside that building?
9  A.  I don't know.
10  Q.  You never saw anyone?
11  A.  Not inside that building, no.
12  Q.  Okay.  Why did you move to the north side?
13  A.  Because Sergeant Jonker asked me to.
14  Q.  Do you know why he ordered you to go there?
15  A.  Because that was the part of our perimeter
16    that was not established.
17  Q.  Okay.  And you moved about a minute and a
18    half after going to location number 1?
19  A.  I think.  My time estimate could be off.
20  Q.  So it was pretty quick?
21  A.  Yes.
22  Q.  And who else other than Sergeant Jonker moved
23    with you?
24  A.  Officer Powell.
25  Q.  And when you moved, Jonker was still in

## Page 156

1    charge of the entire scene, to your
2    knowledge; correct?
3  A.  To my knowledge.
4  Q.  Were any other sergeants assisting him at
5    that point?
6  A.  I think so, but I'm not a hundred percent
7    sure.
8  Q.  What makes you say that?
9    What makes you think that other
10    officers were assisting him?
11  A.  Other sergeants or officers?
12  Q.  Sorry.  Other commanding officers were
13    assisting him.
14  A.  That would be very typical for more than just
15    one supervisor to respond to an incident like
16    this.
17  Q.  And why is that?
18  A.  Because there's a lot of moving parts and
19    pieces involved in an investigation like
20    this.
21  Q.  And you need more than one person to
22    coordinate them all?
23  A.  Yes.
24  Q.  Did you actually see any other sergeants or
25    commanding officers at the scene when you

## Page 157

1    moved to the north side location?
2  A.  No.
3  Q.  Did you have rules of engagement once you got
4    to that north side location?
5  A.  What do you mean?
6  Q.  Were there assigned duties that you had from
7    Jonker as to how you were to act at the north
8    side location?
9  A.  No.
10  Q.  Is that typical?
11  A.  Yes.
12  Q.  And why is that?
13    Is it not typical for -- let's strike
14    that.
15    You don't usually receive explicit
16    instructions from the commanding officer at a
17    high priority situation to which you respond?
18  A.  At times we do, but it just kind of depends
19    on the situation and what all's going on.
20  Q.  And what occasions do you receive
21    instructions?
22  A.  Like when Sergeant Jonker told me to move to
23    the front side of the building with him on
24    the north end of the street.
25  Q.  Was there a planned response to the incident

40 (Pages 154 to 157)

Page 158

1  in place at that point in time that you moved
2  to the north side, to your knowledge?
3          MR. PIGG: Could you repeat that.
4  I didn't understand it.
5  BY MS. VAN BRUNT:
6  Q.  Was there a planned police response to the
7      incident in place at the time that you moved
8      to the north side of the street?
9  A.  Yes.
10 Q.  And what was that?
11 A.  We were going to set up a perimeter around
12     the location.
13 Q.  And beyond setting up a perimeter, was there
14     a planned law enforcement response in place?
15 A.  I believe so.
16 Q.  And what was it?
17 A.  To attempt to make contact with anyone inside
18     the residence of 1033 West McCormick.
19 Q.  And what makes you say that?
20 A.  That would be what we would do in a situation
21     like this would be to try to make contact
22     with any occupant of that structure to
23     determine, you know, who is hurt, how many
24     people are hurt and investigate the incident.
25 Q.  Did you actually receive instructions from

Page 159

1  Jonker to attempt to make contact with
2  somebody in the house?
3  A.  Not me personally, no.
4  Q.  Did you hear him issuing such instructions
5      over the radio?
6  A.  I think he at some point, I couldn't tell you
7      what point, had asked dispatch about
8      calling -- calling back the calling party and
9      had checked on are there -- were there
10     previous calls at that location.
11 Q.  Do you believe that happened prior to the
12     shooting?
13 A.  I believe so, but I'm not a hundred percent
14     sure.
15 Q.  Do you know what dispatch's response was?
16 A.  Dispatch said that they were not able to call
17     the person back.  And I don't recall on the
18     location history.
19 Q.  Did that -- did you hear that response
20     personally from dispatch?
21 A.  I believe so.
22 Q.  Did that raise any alarm bells in your mind
23     that they couldn't reach the caller?
24 A.  No.
25 Q.  Why is that?

Page 160

1  A.  Because it's not uncommon in a situation like
2      this for people to not answer their phones
3      when they're disconnected for whatever
4      reason.
5  Q.  Did you hear Jonker assign any officers over
6      the radio to be a contact person to the
7      person in the house?
8  A.  Not that I recall.
9  Q.  Did you receive instructions from Jonker as
10     to what to do if someone came to the door of
11     the house once you were at the north side
12     location?
13 A.  No.
14 Q.  You had a gun on your person this entire
15     time; correct?
16 A.  Yes.
17 Q.  You actually had a rifle and a handgun;
18     correct?
19 A.  Yes, ma'am.
20 Q.  And at what point did you take that rifle out
21     of your car?
22 A.  Immediately upon arriving to the address at
23     location 1.
24 Q.  Why did you do that?
25 A.  Because I believed that there was a high

Page 161

1  probability of an armed encounter with
2  someone at this location.
3  Q.  And why did you believe that?
4  A.  Based on the call information I was provided
5      by Sedgwick County 911.
6  Q.  Was your firearm in your holster?
7  A.  Yes.
8  Q.  Once you moved to the north side, the second
9      location, can you describe where you were
10     standing?
11 A.  I was standing at the rear driver corner of a
12     small dark colored car.
13 Q.  Whose car was it?
14 A.  I don't have any idea.
15 Q.  It was parked there?
16 A.  Yes, ma'am.
17 Q.  And so you were behind the car?
18 A.  Yes.
19 Q.  Was that providing cover for you?
20 A.  For the most part, yes.
21 Q.  And who else was present at that exact
22     location?
23 A.  Officer Powell, Sergeant Jonker and Officer
24     Fussell.
25 Q.  Where did Fussell come from?

41 (Pages 158 to 161)

Page 162

1  A. I don't know, to be honest with you.
2  Q. Was he there when you arrived?
3  A. At location 1 or 2?
4  Q. Sorry. At location 2, was he there when you
5     arrived?
6  A. No.
7  Q. He joined later?
8  A. I believe so.
9  Q. And do you know is Fussell SCAT, as well?
10 A. No.
11 Q. Fussell's patrol?
12 A. Yes.
13 Q. Did you know him prior to this incident?
14 A. Yes.
15 Q. Had you worked with him before?
16 A. Some, off and on.
17 Q. Were you standing the whole time you were at
18    location number 2?
19 A. Prior to the shooting incident, yes.
20 Q. And was Sergeant Jonker close to you —
21 A. Yes.
22 Q. — prior to the shooting?
23    Where was he in relation to you?
24 A. To my right.
25 Q. Close enough to touch?

Page 163

1  A. Maybe just slightly farther than that.
2  Q. Was he the officer who was closest to you of
3     the four — of the three?
4  A. I believe Powell was closest to me.
5  Q. Where was Powell located?
6  A. Just probably within arm's length to my
7     right.
8  Q. So it was you, then Powell, then Jonker?
9  A. I believe so, yes.
10 Q. And where was Fussell?
11 A. I don't know, ma'am.
12 Q. You just know he was there?
13 A. That's my understanding is that he joined us
14    over there later.
15 Q. Okay. What was Powell doing?
16    Was he standing, crouching?
17 A. I couldn't tell you.
18 Q. You couldn't tell me 'cause you can't
19    remember or you never saw?
20 A. I just don't remember.
21 Q. Do you know what Fussell was doing?
22    Standing, crouching?
23 A. I do not know.
24 Q. Did Powell have his gun raised once he got to
25    location 2?

Page 164

1  A. I don't know.
2  Q. You don't remember or you couldn't say 'cause
3     you didn't see?
4  A. I didn't see.
5  Q. You couldn't see whether he had his gun
6     raised while he was standing next to you?
7  A. Correct.
8  Q. And why is that?
9  A. Because I was paying attention to my own
10    weapon and to the front of 1033 West
11    McCormick.
12 Q. Do you know if Jonker had his weapon raised?
13 A. I don't.
14 Q. For the same reason?
15 A. Correct.
16 Q. What about Fussell, do you know if he had his
17    gun raised?
18 A. I do not.
19 Q. Same reason?
20 A. Yes.
21 Q. And once you got to location number 2, did
22    you raise your rifle?
23 A. Yes.
24 Q. And what direction were you pointing your
25    rifle?

Page 165

1  A. South.
2  Q. At the house?
3  A. Yes.
4  Q. And what particular point at the house were
5     you pointing at?
6  A. I was actually scanning the entire front of
7     the house, the second story windows, ground
8     level windows, the front door area.
9  Q. For what purpose?
10 A. To see if we could see any additional
11    movement beyond what we had seen in the
12    west — or sorry — the second floor window
13    on the west side of the house.
14 Q. And could you?
15 A. No.
16 Q. You saw no movement?
17 A. Not until Mr. Finch opened the front door.
18 Q. Okay. At the point that you were standing
19    there with your rifle raised before Mr. Finch
20    came on the porch, was Jonker close enough to
21    you to hear him speaking?
22 A. Yes.
23 Q. And could you hear him speaking?
24 A. Yes.
25 Q. And was he issuing commands during that time

42 (Pages 162 to 165)

Page 182

1    A. To the best of my recollection I saw two, but
2       there may have been more than that.
3    Q. Did you recognize them?
4    A. No.
5    Q. Did you recognize their uniforms?
6    A. Yes.
7    Q. Were they WPD?
8    A. Yes.
9    Q. Were they officers or commanding officers?
10   A. Just officers.
11   Q. Okay. And the east side officers, how many
12      did you come to find out later were present
13      there?
14   A. I believe there was a mixture of sheriff's
15      deputies and Wichita police officers. I
16      don't know a total number.
17   Q. Were sheriff's deputies just located on the
18      east side, to your knowledge, or were they
19      elsewhere, as well?
20   A. From my time at location 1 when I first
21      arrived, I know there was at least one deputy
22      there, but I couldn't tell you where else
23      deputies had arrived.
24   Q. Do you know how many sheriff's deputies total
25      there were on the scene?

Page 183

1    A. I don't, ma'am.
2    Q. This is going to sound silly, but I'm going
3       to ask it: Could you see, while you were at
4       the north side location, anyone behind 1033
5       West McCormick?
6    A. No.
7    Q. Did you believe officers to be there?
8    A. Physically on the property of 1033?
9    Q. Correct.
10   A. Not to my knowledge, no.
11   Q. Did you believe any officers to remain behind
12      Gabby's Peruvian Restaurant --
13   A. Yes.
14   Q. -- prior to shooting?
15   A. I believed that there were still officers
16      there.
17   Q. Okay. And based on what information?
18   A. Based on the fact that they were there when I
19      left that position, and there wasn't, in my
20      opinion, a good likelihood that they would
21      leave that location.
22   Q. Okay. And that included Officer Gunn?
23   A. Yes.
24   Q. Is it Gunn or Gumm?
25   A. Gumm.

Page 184

1    Q. Gumm, with two M's?
2    A. Yes.
3    Q. So Officer Gumm and the sheriff's deputy?
4    A. Yes.
5    Q. Okay. Could you mark south side officers
6       where you believe they were.
7    A. It'd be -- basically be where I've already --
8    Q. That's fine. Do you mind just doing a double
9       mark?
10   A. No. (Witness complies.)
11   Q. So the officers you saw on the west side were
12      not the same officers as the ones you saw in
13      the south side?
14   A. Correct.
15   Q. They're two different locations?
16   A. Yes.
17   Q. At some point we covered the fact that
18      Officer Schepis was on scene?
19   A. Yes.
20   Q. Do you know where he was?
21   A. I do not.
22   Q. Now how come you could not see the officers
23      on the east side while you were at the 1038
24      location or the north side location?
25   A. There was a truck and a tree row in my -- in

Page 185

1       my field of vision to see over there.
2    Q. Okay. So could you see, from your vantage at
3       the north side, the entirety of 1033 West
4       McCormick?
5    A. I could see the entire front end of the
6       residence.
7    Q. Could you see the entire porch?
8    A. Yes.
9    Q. The entire front yard?
10   A. Most of the front yard.
11   Q. Could you see the entire sidewalk?
12   A. Yes.
13   Q. Okay. And you say most of the front yard.
14      What part couldn't you see?
15   A. I guess it might be a little ticky-tacky,
16      but if you consider the area kind of over
17      here on the northeast corner and moving south
18      part of the front yard, I could not see that
19      part -- portion, but as far as the width of
20      the front porch of the residence, I could see
21      all of that and the front yard in line with
22      it and the sidewalk.
23   Q. Okay. And could you see that driveway that
24      is present between 1033 West McCormick and
25      the blue roofed house?

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105    WICHITA, KANSAS
316.267.8200    67202

**Page 186**

1  A. No.
2  Q. And that's where the east side officers were?
3  A. To my understanding.
4  Q. And sorry if this was said before, but was it
5  your understanding that you said officers
6  were located there when you were at the north
7  side location prior to the shot?
8  A. I believe so, but I'm not sure.
9  Q. You don't remember or you didn't know at the
10  time?
11  A. I didn't know at the time.
12  Q. So you first found out that there were
13  officers located there after the shooting?
14  A. No, when Mr. Finch stepped onto the porch and
15  they began yelling verbal commands at him.
16  Q. That was the first indication you had that
17  there were officers located there?
18  A. Yes.
19  Q. Which officers, all the ones we have just
20  discussed who were at the scene, were
21  physically closest to the Finch residence
22  entryway in front?
23  A. To my understanding, it would be the officers
24  here on the east side of the residence.
25  Q. At the time you were on the scene prior to

**Page 187**

1  the shooting, did you have an idea of how far
2  away they were?
3  A. No, ma'am.
4  Q. After the fact, did you learn how far away
5  they were?
6  A. Yes.
7  Q. And how far away were they?
8  A. I believe 40 or 50 feet, somewhere in that
9  range.
10  Q. And how far away were you at the time of the
11  shooting from the front of the Finch
12  residence?
13  A. I believe, from the measurements that were
14  done, just over 40 yards.
15  Q. And how many feet is that?
16  A. 120-some feet.
17  Q. And you say the measurements that were done,
18  done by whom?
19  A. By our crime scene investigators.
20  Q. Okay. And do you know how far away the west
21  side officers were?
22  A. I do not.
23  Q. Do you know how far away the south side
24  officers were?
25  A. I do not.

**Page 188**

1  Q. At any point while you were on McCormick and
2  prior to the shooting, did you see any SWAT
3  officers respond to the scene?
4  A. In a SWAT capacity or just in their daily
5  duties?
6  Q. That's a good question.
7  Do SWAT officers wear special
8  uniforms?
9  A. No, not unless they've been activated as an
10  entire unit.
11  Q. I see. So let's break down -- that down a
12  little bit.
13  How does a SWAT -- a SWAT team come to
14  be activated as an entire unit to a scene?
15  A. A supervisor would make the determination
16  that SWAT was needed on a particular call.
17  Q. And then they would put on a special uniform?
18  A. Yes.
19  Q. Do you know what that looks like?
20  A. Camouflage with their entry vests and
21  helmets.
22  Q. Okay. Bulletproof vests?
23  A. Yes.
24  Q. All right. If -- is it regular practice for
25  a SWAT officer to respond by his -- by him or

**Page 189**

1  herself in response to a call for SWAT?
2  A. I don't know that I understand your question.
3  Q. Yeah, it was poorly phrased.
4  Can SWAT respond in an official
5  capacity only as a team?
6  MR. PIGG: Object to form; lack
7  of foundation.
8  A. I'm still not sure I understand exactly what
9  you're getting at.
10  Q. Right. I'm trying to flesh out the comment
11  you made about the fact that were they -- as
12  to whether a SWAT member was there in his
13  official capacity as SWAT.
14  A. Sure.
15  Q. Is it possible for a SWAT team member to
16  respond individually in his or her capacity
17  as SWAT without the rest of the team?
18  MR. PIGG: Object to form; lack
19  of foundation.
20  A. Not in their SWAT capacity, no, they would
21  not respond individually.
22  Q. Okay. If they are responding just as normal
23  officers and not as SWAT officers, are they
24  not allowed to use certain techniques that
25  they learn as SWAT officers when they

48 (Pages 186 to 189)

Page 198

1   A. Yes, ma'am.
2   Q. And stepping back a minute, are you familiar
3      with Detective Joseph Pichler?
4   A. I know who he is.
5   Q. Okay. And he's a detective with the PSB?
6   A. Yes, ma'am.
7   Q. Is it your understanding that he wrote this
8      report that we're looking at right now?
9   A. I believe so, yes.
10  Q. Okay. Is it your understanding that he
11     gathered the evidence that's included in this
12     report?
13  A. I believe he compiled it for this report. I
14     don't believe he was actually involved in the
15     collection of evidence.
16  Q. Okay. Do you have any reason to doubt the
17     accuracy of the evidence that is included in
18     this report?
19  A. No, ma'am.
20  Q. Okay. My question is looking at the first
21     picture on the page -- well, first of all,
22     Officer Powell was standing next to you;
23     correct?
24  A. Yes.
25  Q. And what was the distance between you and

Page 199

1      Officer Powell prior to the shooting, once
2      you were at the north side location?
3   A. I believe that we were in arm's length of one
4      another.
5   Q. Okay. About a foot or two?
6   A. Sure.
7   Q. Possibly closer?
8   A. A foot or two is probably pretty accurate.
9   Q. Okay. Is the picture, the top picture on
10     this page, an accurate portrayal of the
11     visual conditions of the Finch entryway at
12     the time Finch entered the porch?
13  A. Yes.
14  Q. Okay. Is it a correct indication of how far
15     away you were from the porch?
16  A. Yes.
17  Q. Correct indication of how much light there
18     was on the porch?
19  A. Yes.
20  Q. Correct indication of visibility, generally?
21  A. Yes, ma'am.
22  Q. And your rifle did have a light on it;
23     correct?
24  A. That's correct.
25  Q. That's the light we talked about earlier, the

Page 200

1      Streamlight?
2   A. Yes, ma'am.
3   Q. Did you find that it helped illuminate the
4      entryway of the house when you were pointing
5      it in that direction that night?
6   A. No, ma'am.
7   Q. And why is that?
8   A. Just -- I don't know particularly why it was
9      not, but when I turned it on, it did not seem
10     to help much.
11  Q. Okay. Were -- strike that.
12        Would you say that you had a
13     particularly good view of the porch at the
14     time you were raising your rifle on it?
15        MR. PIGG: Object to form; it's
16     vague.
17  A. Yeah, I guess to what -- to what regard do
18     you mean?
19  Q. To see anything that was happening on the
20     porch.
21  A. Yes.
22  Q. You didn't think it was too dark?
23  A. It was definitely dark.
24  Q. Did you ever ask Jonker to call for more
25     light on the porch?

Page 201

1   A. No, I didn't.
2   Q. Did you ever articulate to Sergeant Jonker
3      that it was too dark for you to see?
4   A. No.
5   Q. Okay. Did anyone around you indicate that it
6      was too dark to see what was happening on the
7      porch?
8   A. Not to my knowledge.
9   Q. While you were at the north side location but
10     prior to firing, did you receive any
11     instructions from Jonker as to what to do if
12     someone came out of the house out of the
13     front door?
14  A. No.
15  Q. And did you have a plan as to what would
16     happen if somebody came out of the front
17     door?
18  A. Yes.
19  Q. And what was that plan?
20  A. That they would be given verbal commands and
21     be given the opportunity to comply with those
22     verbal commands.
23  Q. And that was your personal plan?
24  A. That was what I assumed would have been
25     everyone's plan, but that was my personal

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105    WICHITA, KANSAS
316.267.8200    67202

Page 202

1   plan, yes.
2   Q. And why do you assume it would have been
3   everyone's plan?
4   A. Because that would be the normal course of
5   action to take in a scenario similar to this.
6   Q. Okay. That's what WPD policy required?
7   MR. PIGG: Object to form.
8   A. It'd be just generally a police understanding
9   of what would occur. I don't know that it
10  would necessarily fit particularly to any one
11  policy.
12  Q. Would you call it good law enforcement
13  practice —
14  A. Yes.
15  Q. — in responding to a potential suspect?
16  A. Yes.
17  Q. But did you hear Sergeant Jonker at any point
18  issuing any commands to other officers as to
19  what to do if somebody came out on the porch?
20  A. Not that I recall, no.
21  Q. Okay. I just want to clarify some issues
22  with the radio.
23  Is dispatch — dispatch was coming
24  through on your radio; correct?
25  A. Yes.

Page 203

1   Q. And you were also receiving communications
2   from other officers on the scene; correct?
3   A. Yes.
4   Q. So they all come through on one wavelength,
5   or channel, rather?
6   A. Channel, yes.
7   Q. Okay. And at that point, were you also
8   receiving communications from other officers
9   on the west side who were not at the scene?
10  A. At this point there would have been what we
11  call emergency traffic given, which would
12  mean that if you don't have anything that
13  must be put out over the air in relation to
14  this serious incident, you will just hold off
15  and not transmit whatever your traffic is
16  about another call.
17  Q. Okay. Did you hear Sergeant Jonker's
18  commands coming through your radio in the
19  point of time while you had your rifle raised
20  but prior to shooting?
21  A. I don't recall specifically from my radio,
22  but, I mean, he was feet away from me.
23  Q. Okay. So you heard him talking?
24  A. Yes.
25  Q. It could have been that he was just talking

Page 204

1   in the vicinity or it could have been that
2   you were hearing his voice over the radio;
3   you can't tell now?
4   A. Correct.
5   Q. Did — do you recall anything you heard from
6   dispatch while you were at the north side
7   location about the incident?
8   A. No.
9   Q. Do you believe you heard anything from
10  dispatch; you just can't remember?
11  A. Prior to or after the shooting?
12  Q. Prior to the shooting.
13  A. I don't recall hearing anything from them
14  prior to the shooting.
15  Q. Okay. Is it possible they were relaying
16  information you just don't remember, or is it
17  likely that they were not?
18  A. I remember other radio traffic, so I believe
19  it's likely that dispatch was not relaying
20  information at that time.
21  Q. And what other radio traffic do you recall?
22  A. There was radio traffic, someone trying to
23  get a hold of Sergeant Jonker. I don't know
24  what it was in regards to because almost
25  simultaneously, Mr. Finch stepped out onto

Page 205

1   the porch.
2   Q. Do you know who was trying to get a hold of
3   Sergeant Jonker?
4   A. Not off the top of my head, ma'am.
5   Q. Was it an officer?
6   A. I believe so.
7   Q. Do you have any idea as to what purpose they
8   wanted Officer Jonker — Sergeant Jonker,
9   rather?
10  A. It's hard to say, ma'am.
11  Q. And why is it hard to say?
12  A. Because it could have been any number of
13  things regarding this call.
14  Q. Is it because you don't recall specifically?
15  A. Correct.
16  Q. But you did hear it at the time?
17  A. Yes.
18  Q. You just don't recall sitting here now?
19  A. I don't recall — they never — they never
20  had an opportunity to say what they were
21  trying to get in touch with Sergeant Jonker
22  for because Mr. Finch stepped out onto the
23  porch.
24  Q. Okay. Going back some moments, you said that
25  Officer Gumm drew your attention to movement

52 (Pages 202 to 205)

## Page 206

1   in upstairs window while you were at location
2   1; correct?
3   A.  Yes, ma'am.
4   Q.  And how did he draw your attention?
5   A.  He verbalized that there was movement up in
6       that window and stated that it looked like
7       someone was doing CPR.
8   Q.  So he told you what he saw?
9   A.  Yes.
10  Q.  Okay.  And then one of your jobs while you
11      were covering or one of your responsibilities
12      was to alert other officers as to any
13      potential threats you identified while you
14      were providing cover --
15  A.  Correct.
16  Q.  -- is that correct?
17          And I think we discussed one way you
18      would do that is by relaying that information
19      via the radio --
20  A.  Yes.
21  Q.  -- correct?  Is there any other way you would
22      relay a threat to officers other than using
23      the radio?
24  A.  Just verbally without using the radio if the
25      officers were in close proximity.

## Page 207

1   Q.  Okay.  There's no other mechanism you would
2       use?
3   A.  No, not off the top of my head.
4   Q.  Okay.  At the point that Andrew Finch came
5       onto the porch, how long had you been at
6       location number 1?
7   A.  I was no longer at location number 1 when he
8       came on the porch.
9   Q.  I misstated.  By the time you came onto
10      the -- by the time Andrew Finch came onto the
11      porch, how long had you been at location
12      number 2?
13  A.  Approximately 40 seconds.
14  Q.  And how do you recall it was 40 seconds
15      sitting there now?
16  A.  But reviewing my Axon video.
17  Q.  I see.  And you reviewed that yesterday?
18  A.  Yes, ma'am.
19  Q.  Okay.  Prior to yesterday, were you aware it
20      was 40 seconds?
21  A.  I knew it was a short amount of time.  I did
22      not know 40 seconds as the number.
23  Q.  So it happened pretty quickly?
24  A.  Yes, ma'am.
25  Q.  In the time that you were standing there with

## Page 208

1       your rifle providing cover prior to the time
2       he came on the porch, what were you feeling
3       emotionally?
4   A.  Nothing.
5   Q.  Were you stressed?
6   A.  There was a small amount of stress, yes.
7   Q.  And why is that?
8   A.  Because we don't know what's going to happen
9       or what is happening inside that house.
10  Q.  Did you feel adrenaline?
11  A.  Not really.
12  Q.  And why is that?
13          MR. PIGG:  Object to form.
14  A.  Because nothing had happened at that point.
15  Q.  Did you feel any fear?
16  A.  No.
17  Q.  What was your mindset at the time that you
18      were providing cover for the house but before
19      Finch came on the -- came on the porch?
20  A.  I was running through different scenarios
21      that could happen.
22  Q.  Could you expand upon that?
23  A.  Sure.  We might be able to contact occupants
24      of the house via a phone number and they may
25      refuse to have any contact with us and we

## Page 209

1       might end up holding the perimeter for our
2       SWAT team to actually be activated.
3           Someone could come running out of the
4       house arms up in the air yelling and
5       screaming help me.  Just any number of
6       scenarios that could have unfolded.
7   Q.  Okay.  And while you were thinking through
8       those scenarios, were you also thinking
9       through what your response would be
10      personally?
11  A.  Yes.
12  Q.  You said we might contact the occupants of
13      the house; correct?
14  A.  Yes.
15  Q.  Was that something you intended to do at some
16      point?
17  A.  Not personally.
18  Q.  Who did you expect to do that?
19  A.  I assumed that that would be either done by
20      another supervisor responding to the scene
21      who had time to get a good phone number for
22      that residence; or, it could have been
23      something tasked out to other officers that
24      were closer to the front side of the house.
25  Q.  Okay.  Is that something Sergeant Jonker

KELLEY REPORTING ASSOCIATES, LTD     515 S. MAIN, STE 105
316.267.8200
WICHITA, KANSAS
67202

Page 210

1     could have done?
2     A.  Yes.
3     Q.  And were you aware of a phone number for the
4     house at the time you were at location 2?
5          Had you heard that over dispatch?
6     A.  No, ma'am.
7     Q.  And you've mentioned, you know, what you
8     would do if there was a SWAT response, as
9     well; correct?
10    A.  Yes.
11    Q.  And did you expect, at some point, there
12    would be a SWAT response to that house?
13    A.  It just depended on how -- which one of the,
14    you know, unimaginable scenarios as far as
15    number go played out.
16    Q.  But that was certainly one of the scenarios
17    you did imagine?
18    A.  Yes, ma'am.
19    Q.  Of course, it would have been appropriate in
20    that context to have SWAT respond?
21    A.  Depending on how the events unfolded, yes.
22    Q.  Now could you describe Finch's entrance onto
23    the porch, the physical entrance onto the
24    porch?
25    A.  Sure.  He put -- opened the main door of the

Page 211

1     residence, pushed the screen door open with
2     his left hand and stepped out onto the porch.
3     Q.  What direction did the main door open on or
4     open towards?
5     A.  I believe the main door swung -- if you're
6     standing outside going inside, I believe it
7     swung in and to the right.
8     Q.  It swung into the house towards the right?
9     A.  Yes.
10    Q.  And what was that door made of?
11    A.  I don't know.
12    Q.  And then you said there was a screen door?
13    A.  Yes.
14    Q.  And how did that screen door open?
15    A.  It opened -- if you -- again, if you were
16    standing on the porch, you would reach to the
17    left side of the door and pull it out and
18    open to the right.
19    Q.  Okay.  So the screen door swung out?
20    A.  Yes.
21    Q.  And where were the door's -- the screen
22    door's hinges?
23    A.  Looking at the door, on the right-hand side
24    of the door.
25    Q.  Okay.  Did -- when Mr. Finch entered the

Page 212

1     porch, did the main door remain open?
2     A.  As far as I know, yes.
3     Q.  Did the screen door remain open?
4     A.  Yes.
5     Q.  Did he prop it?
6     A.  It looked like it could have been leaning on
7     his left shoulder.
8     Q.  I see.  So he still had contact with the door
9     when he entered the porch?
10    A.  That's the way it looked, yes.
11    Q.  Okay.  Such that he was supporting it with
12    his left shoulder?
13    A.  Possibly, yes.
14    Q.  Okay.  At any point in time, did the screen
15    door slam shut while he was still on the
16    porch?
17    A.  No, I don't believe so.
18    Q.  Okay.  Can you describe Andrew Finch's
19    physical appearance at the time he came out
20    on the porch?
21    A.  He appeared to be approximately 6-foot tall,
22    about 210 to maybe 220 pounds wearing kind of
23    a dark colored or grayish sweatshirt.
24    Q.  Could you see his race?
25    A.  I'm sorry?

Page 213

1     Q.  Could you see what race he was?
2     A.  Oh, I could tell that he was either a white
3     or Hispanic male.
4     Q.  Could you see whether he had any facial hair?
5     A.  No, I could not.
6     Q.  Could you see any -- his facial expressions?
7     A.  No.
8     Q.  You weren't close enough for that purpose?
9     A.  Correct.
10    Q.  Could you see what color his hair was?
11    A.  No, ma'am.
12    Q.  Could you see the styling of his hair?
13    A.  No.
14    Q.  How long it was?
15    A.  No.
16    Q.  Could you see what shoes he was wearing?
17    A.  No.
18    Q.  Could you see what pants he was wearing?
19    A.  No.
20    Q.  Did you have any information from dispatch at
21    the time at which Mr. Finch appeared on the
22    porch with which you could compare the
23    information you received from dispatch to
24    Mr. Finch?
25         Does that make sense?

54  (Pages 210 to 213)

Page 214

1    A.  No.
2    Q.  Okay.  Let me restate it.
3         At the time that Mr. Finch entered the
4    porch, had you received any information from
5    dispatch as to the suspected shooter's
6    physical appearance with which you could use
7    to compare that description to Mr. Finch?
8    A.  Other than it being a male caller, no.
9    Q.  Okay.  Did you hear anyone on the radio ever
10   request a description of the suspected
11   shooter while you were at the scene prior to
12   the shooting?
13   A.  I don't recall.
14   Q.  Did you ever hear Jonker request it?
15   A.  No, I don't think so.
16   Q.  As Mr. Finch came out, did you say anything?
17   A.  Yes.
18   Q.  And what did you say?
19   A.  I said someone's at the — something to the
20   effect of "someone's at the door" or
21   "someone's coming outside."
22   Q.  Did you say that into the radio?
23   A.  No, I did not.
24   Q.  You just said that out loud?
25   A.  Yes.

Page 215

1    Q.  Did Officer Powell say anything, to your
2    knowledge?
3    A.  I don't know.  He may have have relayed my radio
4    traffic.
5    Q.  What does that mean relayed your radio
6    traffic?
7    A.  When you're operating the rifle or even a
8    shotgun in the same or a different scenario,
9    those weapon systems require both of your
10   hands so you're not able to really utilize
11   your radio; therefore, when I saw movement at
12   the front door, I notified the officers close
13   to me, Powell and Jonker, verbally, so that
14   they either, A, were aware themselves, or B,
15   could put that information out to other
16   officers via the radio.
17   Q.  So they were acting essentially as your voice
18   to relay any potential threats?
19   A.  Yes.
20   Q.  Did they understand that to be their
21   responsibility?
22   A.  I don't know.
23   Q.  Did you ask them to do so?
24   A.  I did not.
25   Q.  Did Officer Powell say anything to you at the

Page 216

1    moment that Mr. Finch came out the door?
2    A.  I don't think so.
3    Q.  You don't recall?  He could have?
4    A.  I don't recall.  He might have.
5    Q.  What about Officer Fussell, did you see —
6    hear him say anything?
7    A.  No, I did not.
8    Q.  Definitively you did not?
9    A.  Correct.
10   Q.  And Sergeant Jonker, did you hear him say
11   anything?
12   A.  Not that I recall.
13   Q.  Did anybody respond to your statement
14   "somebody's coming out"?
15   A.  I don't believe so.
16   Q.  Did you hear anything over the radio at the
17   time he entered the porch?
18   A.  No, because I began yelling at him, giving
19   him a verbal command.
20   Q.  And what command did you give him?
21   A.  I would have to listen to my video to give
22   you an exact quote, but something to the
23   effect of "get your hands up" or "show me
24   your hands."
25   Q.  And why did you relay that command in

Page 217

1    particular?
2    A.  Because we were responding to a shooting.  We
3    believe that the suspect is a male.  And we
4    don't know his status at this point in time,
5    and so one of the things that we would do is
6    order him to show his hands so we can either
7    confirm or eliminate him as a suspect in the
8    incident.
9    Q.  Is that training you receive to issue those
10   types of commands in a suspected shooter
11   case?
12   A.  We'd give those commands anytime we feel that
13   they're necessary, but yes.
14   Q.  And you said by relaying that command you
15   could confirm whether or not the person was a
16   suspected shooter?
17   A.  It would go to the decisionmaking process of
18   they're involved or they're not involved.
19   Q.  And how so?
20   A.  A compliant person typically is going to —
21   as long as he was compliant with verbal
22   commands, he'd be given the opportunity to
23   come out and be briefly detained and speak
24   with us.
25   Q.  I see.  And if he was not compliant?

55  (Pages 214 to 217)

Page 222

1   Q.  Would that have been practice to do so?
2   A.  No.
3   Q.  Why is that?
4   A.  Because it wasn't practical in that
5       circumstance in that point in time.
6   Q.  Did anyone say that you were the police?
7   A.  I don't know.
8   Q.  Did anyone say that you were armed?
9   A.  No.
10  Q.  Did anyone say that he must put his hands up
11      or he would be shot?
12  A.  I don't believe so.
13  Q.  Okay. At the time you had your rifle raised,
14      was the badge on your hoodie still visible?
15  A.  Yes.
16  Q.  Okay. So you -- if you could, could you
17      describe the manner in which your rifle is
18      raised at that point.
19  A.  At this point, it would be right here placed
20      into my right shoulder, and my hands would be
21      basically like this (demonstrating).
22  Q.  Would you be facing forward?
23  A.  Yes.
24  Q.  So you're facing with your left arm and where
25      is your badge at this point?

Page 223

1   A.  Right here, right where this one is
2       (demonstrating).
3   Q.  And your left arm is not covering it?
4   A.  It shouldn't be.
5   Q.  Would it have been visible to Andrew Finch
6       120 feet away?
7   A.  I don't know.
8   Q.  Is it in accordance with WPD policy for
9       multiple officers to give multiple commands
10      during a high stakes scenario?
11          MR. PIGG: Object to form; lack
12      of foundation.
13  A.  It's -- I don't know that it's within policy,
14      but it wouldn't be without -- or outside of
15      policy either.
16  Q.  So whoever is on the scene, it's proper for
17      them to issue whatever commands they want at
18      that time?
19  A.  It would be best to have a limited number of
20      officers or a single officer issuing verbal
21      commands.
22  Q.  And why is that?
23          Sorry if I cut you off.
24  A.  No, you're fine. Because sometimes, no
25      matter how clear commands are, whether

Page 224

1       they're conflicting with each other or not,
2       they can be confusing at times.
3   Q.  And would you say that'd be particularly true
4       if they're coming from multiple directions?
5   A.  Sure.
6   Q.  And if they were coming from multiple
7       different people?
8   A.  Sure.
9   Q.  And if they were perhaps relaying slightly
10      different information?
11  A.  Yes.
12  Q.  And should -- would it have been appropriate
13      in the circumstances presented in this case
14      for there to have been one contact person who
15      was in charge of communicating with
16      Mr. Finch?
17  A.  If things had gone perfectly, yes, that would
18      have happened.
19  Q.  And the purpose of that would have been to
20      have one line of communication such as to cut
21      down on the risk of confusion that you just
22      discussed?
23  A.  Correct.
24  Q.  And to make sure that there were clear
25      communications to Mr. Finch about what he

Page 225

1       should be doing?
2   A.  Correct.
3   Q.  And the possible consequences if he didn't
4       comply?
5   A.  Yes.
6   Q.  What was Mr. Finch's response to the commands
7       that were being issued by the officers on the
8       scene?
9   A.  He initially complied with the commands, put
10      his -- both hands up to approximately his ear
11      level. And just as quickly as he complied,
12      he dropped both of his hands back to his
13      waist level.
14  Q.  Could you show me for the video what that
15      action looked like to you.
16  A.  Him raising his arms?
17  Q.  And then dropping them, please.
18  A.  Sure. He put his arms up to approximately
19      here (demonstrating), and then immediately
20      put both hands back down to his waistband.
21  Q.  Okay. And -- I'm sorry.
22  A.  Or waist level.
23  Q.  Do you mind standing up just so we can see
24      your waist 'cause I think it's -- all right.
25          Do you mind repeating that action.

57 (Pages 222 to 225)

1   A.  No.  Arms up to about here (demonstrating),
2       and then immediately back down like this.
3   Q.  So they were below his waist level then?
4   A.  Generally, his waist level, however far down
5       his arms reached.
6   Q.  So he let his arms go slack; is that correct?
7   A.  Yes.
8   Q.  Okay.  You can sit down again.
9           And how much time passed over the
10      course of him making that motion?
11  A.  Less than one second.
12  Q.  All right.  And where was he facing while he
13      made that motion?
14  A.  He was facing kind of north-northeast.
15  Q.  So in between you and the east side officers?
16  A.  Yes.
17  Q.  Could you see what he was looking at?
18  A.  He appeared to be focused more towards the
19      east side officers.  I'm not positive that he
20      knew where I was.
21  Q.  Okay.  You couldn't see his eyes, though;
22      right?
23  A.  Correct.
24  Q.  You were just saying that based on the
25      direction of his head?

1   A.  The direction his body was kind of oriented.
2   Q.  Okay.  But you couldn't see what he was
3       looking at?
4   A.  That's correct.
5   Q.  And in that one and a half seconds or so in
6       which that happened, is that -- did I get
7       that right?
8   A.  Probably even less.
9   Q.  Okay.  In the less than second -- one second
10      in which that happened, did any thoughts
11      cross your mind?
12  A.  I initially thought, okay, he's not being
13      compliant.
14  Q.  And why did you think that?
15  A.  Because he briefly complied and then put his
16      hands back down.
17  Q.  Okay.  And what happened next?
18  A.  Then officers to the east began yelling at
19      him again.  I'm not sure exactly what they
20      were yelling at that point in time, but they
21      were giving him additional verbal commands.
22      And that would be -- that's it for right now.
23  Q.  You don't recall what those commands were?
24  A.  No, ma'am, I don't.
25  Q.  At the moment you were there, you heard them?

1   A.  Yes.
2   Q.  You just aren't recalling now what they are?
3   A.  I don't know exactly what the wording they
4       were using was.
5   Q.  You mean you don't recall it or you never
6       knew?
7   A.  No, I don't recall it.
8   Q.  Okay.  Did you issue any other commands at
9       that point?
10  A.  I did not.
11  Q.  Did Officer Powell?
12  A.  I don't believe so.
13  Q.  Did Officer Fussell?
14  A.  I don't think so.
15  Q.  Did officer -- or Sergeant Jonker?
16  A.  I don't think so.
17  Q.  Okay.  So there's basically no command being
18      issued from the north side at the time he
19      dropped his hands?
20  A.  Correct.
21  Q.  Okay.  What happened after he dropped his
22      hands and the east side officers reissued
23      commands?
24  A.  Then he grabbed the right side of his hoodie
25      or sweatshirt, whatever he was wearing,

1   lifted it up, made a motion like he was
2   drawing a firearm and dipped his shoulder
3   forward just as I demonstrated for you
4   earlier when you asked me to demonstrate
5   drawing a firearm, and put his hand straight
6   back down kind of on the back half of his
7   right thigh.
8   Q.  Could you demonstrate that motion standing up
9       again, please.
10  A.  Sure.  Pulled his sweatshirt up and kind of
11      out away from his body (demonstrating),
12      appeared to grab at something here on his
13      waistband, his arm came up, shoulder rolled
14      forward, and then he put his hand back down
15      here kind of hidden from my view where I was
16      north across the street from him.
17  Q.  Okay.  And at the time, at the beginning, you
18      said he pulled up his hoodie, where was the
19      end of his hoodie hanging?
20  A.  Somewhere in the ballpark of where his hands
21      were hanging.
22  Q.  Okay.  So below the waist?
23  A.  I believe so, yes.
24  Q.  Somewhere below hip level?
25  A.  That's the way it appeared to me.

Page 230

1    Q.  Okay.  And can you demonstrate the gun
2       drawing -- the gun drawing motion you believe
3       you saw that night?
4    A.  Yes.  He appeared to grab here at his
5       waistband (demonstrating), and his arm came
6       up as his shoulder rolled forward, and then
7       he put his hand back down here towards the
8       back of his right leg.
9    Q.  Okay.  And you can have a seat.  Thank you.
10       How long did that entire movement
11       take?
12    A.  Maybe a second.
13    Q.  Okay.  So how much time has passed at this
14       point from the time he's gotten on the porch
15       to when he's made what you believe was a gun
16       drawing motion and put his arm back down?
17    A.  Just a couple seconds.
18    Q.  All right.  Could you see, from the time he
19       came on the porch till the time we were just
20       discussing when he put his hand back down
21       after making the gun drawing motion, his
22       hands, both hands at all times?
23    A.  No.
24    Q.  And when did they become obstructed?
25    A.  When he started -- or, well, when he was

Page 231

1       finishing his gun drawing motion and put his
2       right hand back down kind of on the back half
3       of his right leg.
4    Q.  You could no longer see his hand at that
5       time?
6    A.  Correct.
7    Q.  Okay.  Could you see his left hand?
8    A.  I believe I could.
9    Q.  All right.  Was there anything in his left
10       hand?
11    A.  No.
12    Q.  You could clearly see that there was nothing
13       in his left hand at that point in time?
14    A.  Correct.
15    Q.  Okay.  When Finch was drawing his hand
16       upwards, did you have a clear view of his
17       hand?
18    A.  At which point are you talking about?
19    Q.  Well, when he was drawing it upwards after
20       going -- putting it by his hoodie end.
21    A.  When he's coming up and away during the gun
22       drawing motion?
23    Q.  Correct.
24    A.  No, I couldn't see it clearly at that point.
25    Q.  Okay.  At what points could you see it

Page 232

1       clearly?
2       If you could go through them again and
3       tell me when you could clearly see his hand
4       and when you could not.
5    A.  When he -- from the very beginning when he
6       comes out and is briefly compliant and put
7       his hands to his ear level, I could see his
8       right hand; I knew there was nothing in it.
9       When he put his hands down to his waistband
10       and started the gun drawing motion, I was not
11       able to clearly see his hand.  I could still
12       see his hand moving in the waistband area of
13       his body.  Saw the shoulder dip and his arm
14       coming back up and then punching down behind
15       his right leg.  I'm just using the phrase
16       punching down for putting his hand down.  And
17       then not again could I see it until he
18       pivoted back and to his right and brought his
19       hand up towards the officers.
20    Q.  Okay.  When you saw him bring the arm back up
21       after -- with the shoulder dip that you
22       described, could you see it then clearly?
23    A.  No.
24    Q.  So you couldn't see what was in it, if
25       anything?

Page 233

1    A.  Correct.
2    Q.  Okay.  And what were you thinking during this
3       secondary phase of the event that we've just
4       described, meaning the -- what you described
5       as the gun drawing motion?
6    A.  I believed that he was our suspect who had
7       called 911 and reported that he'd killed his
8       father and was holding hostages.  That he had
9       come out on the porch.  He was obviously not
10       compliant with our commands, and that he was
11       going to use his firearm to fire on police.
12    Q.  And you believed all that based on the motion
13       you just described?
14    A.  In addition to the 911 call information
15       given.
16    Q.  Okay.  And that's the information you
17       described that you received when you first
18       got the call?
19    A.  Correct.
20    Q.  Okay.  When Mr. Finch exited the house, did
21       you see him with a weapon in his hand?
22    A.  No.
23    Q.  And at that point, you could see both hands;
24       correct?
25    A.  That's correct.

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105    WICHITA, KANSAS
316.267.8200    67202

Page 234

1    Q.  All right.  And then at some point, you said,
2        he turned, after dropping his hand, after
3        this motion you just described, he turned
4        towards the east side officers?
5    A.  Yes.
6    Q.  Did he turn completely east?
7    A.  Not completely.
8    Q.  So he wasn't just in profile to you?
9        What was your viewpoint of him at that
10       point?
11   A.  Almost -- if I could orient myself to you to
12       show you.
13   Q.  Sure.
14   A.  Almost like this (demonstrating).
15   Q.  Okay.  You could see his chest?
16   A.  Yes.
17   Q.  You could see his left hand?
18   A.  Yes.
19   Q.  You could see a profile of his face?
20   A.  Yes.
21   Q.  And his neck?
22   A.  Yes.
23   Q.  And his ear?
24   A.  Yes.
25   Q.  What direction was his -- what direction was

Page 235

1        he -- his face facing?
2    A.  To the -- the same direction as his body, to
3        the east.
4    Q.  So fully to the east side at this point?
5    A.  Again, not quite fully, but generally more
6        east than not.
7    Q.  Okay.  And at that point, what was he doing
8        with his hands?
9    A.  His left hand was not doing anything, and his
10       right hand had started to come up pointing in
11       the direction of the officers.
12   Q.  And if you could stand up to demonstrate that
13       action, please.
14   A.  Yes.  Again, orienting myself to you --
15   Q.  Yes.
16   A.  -- as you are me.
17   Q.  Yep.
18   A.  Generally, like this and arm comes up
19       (demonstrating).
20   Q.  Okay.  Straight up?
21   A.  Yes.
22   Q.  His arm was straight?
23   A.  Like that (demonstrating).
24   Q.  Okay.  And at that point, could you clearly
25       see his hand?

Page 236

1    A.  Well, I could see his hand, yes.
2    Q.  You said that with some hesitation.
3        Could you see the entirety of his
4        right hand as it was lifting up?
5    A.  Yes.
6    Q.  Okay.  Now you know at this point in time, I
7        mean today, sitting here today, that Andrew
8        Finch did not have a weapon on him on that
9        porch; correct?
10   A.  That's correct.
11   Q.  All right.  So knowing that and sitting here
12       today, you are also saying that you had a
13       clear view of his hand at the time it was
14       raised?
15   A.  Yes.
16   Q.  So does not that mean that you clearly saw he
17       did not have a gun at that point?
18   A.  It means that I believed at that point in
19       time that he had a gun in his hand.
20   Q.  Okay.  You believed he had a gun in his hand,
21       and you also say you could clearly see his
22       hand; correct?
23   A.  Yes.
24   Q.  So that belief was mistaken; correct?
25   A.  That's correct.

Page 237

1    Q.  At any point during the interaction with
2        Finch on the porch, did you actually see him
3        holding a weapon?
4    A.  I now know that I did not.
5    Q.  At that point in time, did you see him with a
6        weapon?
7    A.  I believed that I did.
8    Q.  But did you is my question?
9            MR. PIGG:  Object to form.
10   A.  In hindsight, I did not.
11   Q.  All right.  But at the point in time when you
12       saw him on the porch, did you see him with a
13       weapon?
14           MR. PIGG:  Object to form; it's
15   asked and answered.
16           REPORTER:  I'm sorry.  I didn't
17   get an answer.
18   Q.  Do you mind saying that again.
19   A.  I believed that I did.
20   Q.  All right.  At the time he was lifting his
21       arm, were any of the officers that were
22       standing near you, namely, Powell, Jonker and
23       Fussell, saying, in your presence, anything
24       about Finch having a weapon?
25   A.  I don't think so.

60  (Pages 234 to 237)

Page 238

1    Q.  Did you hear anything on the radio about
2    Finch having a weapon on him at that point?
3    A.  No.
4    Q.  Okay.  And to be clear, you could not see the
5    east side officers at this point in time;
6    right?
7    A.  That's correct.
8    Q.  You could just hear them?
9    A.  Yes.
10   Q.  All right.  You couldn't see their faces?
11   A.  Correct.
12   Q.  Or their expressions?
13   A.  Correct.
14   Q.  Or their stances?
15   A.  Correct.
16   Q.  What kind of weapon did you believe you saw
17   that night?
18   A.  A handgun.
19   Q.  What kind of handgun?
20   A.  I don't know.  Just a handgun.
21   Q.  Did you believe you saw a holster?
22   A.  No.  I never could see enough of his hip to
23   see a holster.
24   Q.  Was his right hip obstructed?
25   A.  By clothing, yes.

Page 239

1    Q.  Okay.  And also at the point he was facing
2    near the east side, he was more in profile,
3    right, so you wouldn't have had a view of his
4    hip?
5    A.  That's correct.
6    Q.  And where was the barrel of the weapon
7    pointing at the time you shot your rifle?
8    A.  It was in the process of being raised to
9    those officers to the east.
10   Q.  So you're saying his arm was in the process
11   of moving up to a 90-degree angle; is that
12   correct?
13   A.  Parallel with the ground or with the porch.
14   Q.  All right.  At your -- to your understanding,
15   at that point in time that we're discussing
16   right now, were the officers located on the
17   east side within shooting distance of that
18   porch?
19   A.  I believe so.
20   Q.  Meaning within 25 feet?
21   A.  I don't know if they were within 25 feet.
22   Q.  Sorry.  25 yards.  I have got to stop doing
23   that.
24       So you believed at that time the east
25   side officers were within 25 yards of the

Page 240

1    porch?
2    A.  I believe now, based on what I know, that
3    they were.  I didn't know where they were at
4    that point in time other than on the east
5    side.
6    Q.  Okay.  Again, because you couldn't see them?
7    A.  Correct.
8    Q.  How much time passed between when Mr. Finch
9    entered the porch and when you shot your
10   rifle?
11   A.  Just a few seconds.
12   Q.  Do you know how many seconds?
13   A.  I don't, ma'am.
14   Q.  Less than 10?
15   A.  I believe so.
16   Q.  In that time period between when he entered
17   the porch and when you fired your rifle, we
18   discussed that there were many commands being
19   given; correct?
20   A.  Yes, ma'am.
21   Q.  Is it your belief that Mr. Finch had the
22   opportunity to respond to those commands in
23   that 10 -- less than 10 seconds?
24   A.  Yes.
25   Q.  Was anyone issuing a command in the -- in the

Page 241

1    process of issuing a command, to your
2    knowledge, at the exact time that you fired
3    your weapon?
4    A.  Not to my knowledge, no.
5    Q.  Would you be surprised to find out that
6    someone was?
7    A.  No.
8    Q.  How far were you from Mr. Finch at the time
9    you fired your weapon?
10   A.  I think we've already discussed it was
11   120-something feet.
12   Q.  So that distance remained the same as --
13   A.  Yes.
14   Q.  -- of the time when you first move over to
15   location 2?
16   A.  Yes.
17   Q.  Do you believe you had a good line of sight
18   at the time you shot him?
19   A.  Yes.
20   Q.  And where -- in what direction did you fire
21   when you did fire?
22   A.  South.
23   Q.  And did you aim in particular -- in a
24   particular part of Mr. Finch's body when you
25   shot your weapon?

61 (Pages 238 to 241)

Page 242

1    A.  The chest.
2    Q.  And why was that?
3    A.  Because that's what we're trained to do.
4    Q.  You were trained to shoot to kill?
5    A.  We're trained to shoot for the largest
6        portion of the body.
7    Q.  And why is that?
8    A.  Because in law enforcement shootings or any
9        kind of shooting whether it's law enforcement
10       or not, it's a stressful event and you
11       don't -- you're far less likely to hit a
12       shoulder or a knee or a toe than you are the
13       largest portion of a body.
14   Q.  At the time you fired your rifle, which
15       direction was Mr. Finch facing?
16   A.  Kind of north-northeast.
17   Q.  Had he brought his arm up all the way to that
18       90-degree position we discussed at that point
19       in time?
20   A.  I don't believe so.  I believe it was in the
21       process of being raised.
22   Q.  So he wasn't facing head-on to you, so where
23       in his chest did you aim?
24   A.  I was aimed at chest level, which, after he
25       turned, would have been approximately here

Page 243

1        (indicating).
2    Q.  At that point that you fired, could you see
3        Mr. Finch's face?
4    A.  The side of it.
5    Q.  And could you see his expression?
6    A.  No.
7    Q.  When you fired, did the bullet hit Mr. Finch
8        directly?
9    A.  I believe it hit the screen door first.
10   Q.  Okay.  And then it ricocheted off?
11   A.  I believe it went through, but I could be
12       mistaken.
13   Q.  So it hit the screen door and then hit
14       Mr. Finch?
15   A.  Yes.
16   Q.  What happened to Mr. Finch's body after the
17       shot was fired?
18   A.  He fell backwards and into the entryway of
19       the residence.
20   Q.  So the screen door was still open at the time
21       you fired; correct?
22   A.  Yes.
23   Q.  Was he holding it with his shoulder still?
24   A.  Yes, I believe so.
25   Q.  So he fell inside the door frame at the time

Page 244

1        of the shot?
2    A.  He fell back into the residence from my
3        understanding and from what I saw.
4    Q.  And what happened to the screen door?
5    A.  I believe it closed.
6    Q.  Behind him?
7    A.  Yes.
8    Q.  Did you see anyone else near his body right
9        after the shooting?
10   A.  Shortly after, there was a female.  I don't
11       know who she was, fairly tall and thin, and
12       she was standing over him.
13   Q.  When you say shortly after, how many minutes
14       or seconds?
15   A.  A handful of seconds.  I didn't time that on
16       the video.  I know that she was brought to my
17       attention by Officer Powell.
18   Q.  Do you believe that your line of sight that
19       night when you fired was just as good as the
20       line of sight of the east side officers you
21       believed to be in the location you've
22       previously indicated?
23   A.  Yes.
24   Q.  Despite the fact that you were much further
25       away than they were?

Page 245

1    A.  Yes.
2    Q.  And why is that?
3    A.  Because I had just as good of a line of
4        sight.
5    Q.  Do you think it was appropriate for you to be
6        the one providing cover when you were much
7        further away than other officers?
8    A.  Yes.
9    Q.  And why is that?
10   A.  Because the rifle is designed to be used from
11       a distance.
12   Q.  Can you tell me why you fired your rifle that
13       night?
14   A.  Because I believed Andrew Finch presented a
15       lethal threat to officers on the east side of
16       the residence.
17   Q.  Did you have a subjective fear of their --
18       for their life?
19   A.  Yes.
20   Q.  Did you have a subjective fear for your life?
21   A.  No.
22   Q.  What about for the officers -- subjective
23       fear of the law officers who -- the lives of
24       the officers who were standing near you?
25   A.  No.

62 (Pages 242 to 245)

Page 246

1  Q. What about a subjective fear for the officers
2     on the west side?
3  A. No.
4  Q. Was there any other reason why you fired your
5     weapon that night other than the one you just
6     articulated?
7  A. No.
8  Q. So to be clear: The reason you fired was
9     because of the subjective fear of Mr. Finch
10    shooting at the east side officers?
11       MR. PIGG: Object to form of the
12    question; misstates his testimony. It's not
13    complete.
14 A. Can you ask your question again. I'm sorry.
15 Q. So the reason you shot your rifle that
16    night -- the one and only reason you shot
17    your rifle that night was because of the
18    subjective fear that you had for the lives of
19    the officers on the east side of that house
20    that night?
21       MR. PIGG: Same objection.
22 A. I fired my rifle that night because I was
23    operating with the information that was given
24    to me by dispatch that, unfortunately, it
25    turns out, was false. That information,

Page 247

1  coupled with Mr. Finch's actions on the porch
2  led me to believe that he was a lethal threat
3  to the officers to the east, and I feared for
4  their safety, so I fired at him.
5  Q. Did you believe he was a lethal threat to
6     anyone else at the time you fired, other than
7     the east side officers?
8  A. He could potentially be a lethal threat to
9     the hostages we believed were inside at that
10    point in time.
11 Q. Okay. Did you articulate that to any of the
12    officers who interviewed you after the
13    shooting?
14 A. Did I articulate what, ma'am?
15 Q. That you feared that he could be a threat to
16    the people inside the house at the time that
17    you shot him.
18 A. No, I did not.
19 Q. Did you articulate that to any prosecutors
20    who spoke to you about the incident following
21    the shooting?
22 A. No, I don't believe so.
23 Q. Did you articulate that to PSB when they
24    investigated the shooting?
25 A. I've never spoken to PSB about my shooting.

Page 248

1  Q. Okay. Have you ever articulated that reason
2     for the shooting prior to today?
3  A. I'm not sure.
4  Q. You have no recollection of doing so?
5  A. No.
6  Q. Did you at anytime that night consider using
7     a less lethal weapon on Mr. Finch?
8  A. Me personally, no.
9  Q. Did you consider asking Sergeant Jonker to
10    have an officer who was closer to him do so?
11 A. No, we didn't have time for that.
12 Q. Why do you say that?
13 A. Because at the point that Mr. Finch appeared,
14    we didn't have time to communicate about who
15    was going to do what, whether we were going
16    to try a less lethal, and there just simply
17    wasn't enough time.
18 Q. And to be clear: There had been no such
19    communication about what to do with a
20    possible suspect entering the porch prior to
21    him entering the porch?
22 A. That's correct.
23 Q. Do you have any knowledge as to what weapons
24    the east side officers had on them at the
25    time of the shooting?

Page 249

1  A. I would surmise that they all had handguns at
2     a minimum, but other than those, I don't
3     know.
4  Q. You don't know whether they had other less
5     lethal options on them, as well?
6  A. They may have had Tasers, but that would have
7     been it.
8  Q. At the moment that Mr. Finch opened the door
9     and then the screen door, did you believe
10    that he was the shooter described by
11    dispatch?
12 A. There was no real description other than a
13    male subject, and I was not sure who he was
14    when he first stepped onto the porch.
15 Q. Okay. Did you have any reason at that exact
16    point in time, meaning when he opened the
17    door to enter the porch, to believe that he
18    was the shooter?
19 A. I believed it possible.
20 Q. Based on what?
21 A. Just simply that we knew the male -- male
22    caller was a male.
23 Q. You knew the caller was a male and that
24    Mr. Finch was a male --
25 A. Yes.

63 (Pages 246 to 249)

Page 250

1   Q. — correct? And that's all the information
2       you had?
3   A. Correct.
4   Q. And you also knew at that point that he could
5       have been a hostage; correct?
6   A. Correct.
7   Q. Another inhabitant of the house?
8   A. Yes.
9   Q. And somebody who is unarmed?
10  A. Correct.
11  Q. And at the time you shot your rifle, less
12      than 10 seconds later, did you believe
13      Mr. Finch was the shooter?
14  A. Yes, I did.
15  Q. Rather than the hostage?
16  A. Yes.
17  Q. And what changed in your analysis of the
18      situation in those seconds between when he
19      left the house and when you fired your rifle?
20  A. His noncompliance with simple commands.
21  Q. Okay. When you first arrived at the scene,
22      were you operating under the assumption that
23      the suspect who you received information
24      about through dispatch had possible mental
25      health issues?

Page 251

1   A. No.
2   Q. Did the fact that you were responding to a
3       scene where a person had shot his father and
4       was holding his family hostage at gunpoint,
5       did that suggest any indication that he may
6       have possible mental health issues?
7   A. Everyone could potentially have mental health
8       issues, but if you're asking did the context
9       of the call make me think he had mental
10      health problems, no, not necessarily.
11  Q. Okay. So when you shot Mr. Finch, you were
12      not acting under the assumption that he had
13      mental health issues?
14  A. Correct.
15  Q. Were you actually acting under the assumption
16      that he did not have mental health issues?
17  A. I was operating under the assumption that he
18      was trying to kill police officers after
19      killing his father.
20  Q. Okay. So mental health did not play into
21      your decision at all?
22  A. No, ma'am.
23  Q. To your understanding, was anybody from CIT
24      present at the scene?
25  A. I believe there was probably at least one.

Page 252

1   Q. Who was that?
2   A. I think Officer Fussell may be CIT certified.
3   Q. What makes you think so?
4   A. From our meeting yesterday. I can't remember
5       if he is or is not, but I believe he said he
6       is.
7   Q. Did you know at the time that he was —
8   A. No.
9   Q. — when you were on the scene?
10      Did you ever hear Sergeant Jonker call
11      for CIT to respond to the scene?
12  A. No, ma'am.
13  Q. Did Officer Fussell indicate to you that he
14      had CIT training while he was at the scene?
15  A. No.
16  Q. Did he appear to suggest certain — strike
17      that.
18      Did he suggest in your vicinity any
19      responses that would be appropriate for a
20      possible mental health crisis at the scene?
21  A. Not that I heard.
22  Q. Is it possible, based on what you personally
23      observed that night, that when you saw what
24      you thought was a gun drawing motion was just
25      Finch going back into the house because he

Page 253

1       was frightened by the armed police response?
2           MR. PIGG: Object to form; calls
3       for speculation.
4   A. I suppose it's possible.
5   Q. Okay. Is it possible that at the time he was
6       shot, he was turning towards the door to go
7       back inside?
8           MR. PIGG: Same objection.
9   A. It would be possible, yes.
10  Q. Would you agree that not everyone reacts the
11      same when confronted by police?
12  A. Yes, ma'am.
13  Q. You would agree some people are naturally
14      compliant?
15  A. Yes.
16  Q. And some people are, in fact, the exact
17      opposite; they are not compliant?
18  A. Yes.
19  Q. And they are, in fact, hostile to police?
20  A. Yes.
21  Q. And you've seen that range of reactions in
22      your experience as a law enforcement officer?
23  A. Yes, ma'am.
24  Q. You're experienced enough to expect every
25      kind of reaction from civilians when

64 (Pages 250 to 253)

Page 254

1  confronted with law enforcement?
2  A.  Yes, ma'am.
3  Q.  And particularly armed law enforcement?
4  A.  Yes.
5  Q.  Did anyone else at the scene that night shoot
6  a firearm?
7  A.  I don't believe so.
8  Q.  Did any of the officers on the east side
9  shoot a firearm?
10  A.  I don't believe so.
11  Q.  And how do you account for that?
12      MR. PIGG:  Object to form.
13  A.  Account for what, ma'am?
14  Q.  Well, you've previously elucidated a reason
15  for shooting Mr. Finch as fearing for the
16  lives of the east side officers, and those
17  very officers themselves did not shoot a
18  firearm at Mr. Finch, despite the fact that
19  they were closer to him than you were.
20      How do you account for that
21  discrepancy?
22      MR. PIGG:  Object to form; lack
23  of foundation, calls --
24  A.  I can't answer what was going on in other
25  people's minds, ma'am.

Page 255

1  Q.  Had you undeniably observed a gun on
2  Mr. Finch that night, meaning had you seen
3  one clearly in his hand, would your actions
4  have been any different that night?
5  A.  Had I undeniably seen a gun in his hand?
6  Q.  Correct.
7  A.  No.
8  Q.  They would have been the same?
9  A.  Yes.
10  Q.  If you were certain that Mr. Finch did not
11  have a gun and his actions in every other way
12  remained the same, meaning he was
13  noncompliant, as you called him, how would
14  you have responded?
15      MR. PIGG:  Objection; calls for
16  speculation.
17  A.  I'm sorry.  Can you ask that one again.
18  Q.  Sure.  If you were certain on the night in
19  question that Mr. Finch did not have a gun,
20  and his actions otherwise remained exactly
21  the same as you've described them tonight --
22  or this afternoon, how would you have
23  responded?
24      MR. PIGG:  Same objection.
25  A.  I don't know.

Page 256

1  Q.  Well, if Mr. Finch entered the porch and you
2  knew him to be unarmed, but he was
3  noncompliant in the way that you've described
4  or believed him to be, how would you have
5  responded?
6      MR. PIGG:  Object to form; calls
7  for --
8  A.  Personally?
9  Q.  Personally, yes.
10  A.  I don't know.
11  Q.  Well --
12  A.  I would not have shot if that's the question
13  that you're asking.
14  Q.  Yeah.  That's part of the question and what
15  law enforcement techniques would you have
16  used?
17  A.  Personally, I would not have done anything
18  other than stay where I was just in case
19  there was still a shooter inside the house.
20  At that point we would still be trying to
21  figure out who's who and what's going on
22  inside the residence, so my job would still
23  be to maintain my position and cover off the
24  residence as other officers moved up and
25  dealt with Mr. Finch.

Page 257

1  Q.  What would have been, based on your
2  experience and training, the appropriate WPD
3  response to Mr. Finch, in particular, had he
4  been unarmed on that porch and you knew him
5  to be unarmed that night?
6      MR. PIGG:  Objection; it's an
7  insufficient hypothetical.
8  A.  I mean, if you can give me a better scenario
9  than that, I'm happy to answer your question.
10  Q.  Sure, and I'll try to do that.
11      The scenario is the exact one that
12  you've described except with officers knowing
13  that he's unarmed, knowing that he has no
14  weapon on him, no lethal item on him.
15  A.  Okay.
16  Q.  What would the appropriate WPD response have
17  been to him based on policy and your
18  experience and your training in response to
19  Mr. Finch, in particular?
20      MR. PIGG:  Objection; it's an
21  insufficient hypothetical.
22  A.  To answer your question a couple different
23  ways, first off, it would depend on what
24  Mr. Finch, ultimately, decided to do.  If he
25  decided to eventually become compliant with

65 (Pages 254 to 257)

Page 258

1 officers, it would depend on if he decided to
2 take off running back into the house or take
3 off running off the front porch. Possible
4 responses could range from pepper spraying
5 him, Tasing him, getting in a physical
6 altercation without weapons.
7 It's -- your question is really hard
8 to answer, but I'm trying to answer it to the
9 best that I can.
10 Q. I see. So there could have been multiple
11 responses based on what happened next at the
12 point in time when, in this case, he was
13 shot?
14 A. Yes.
15 Q. Okay. And it could have ended in no
16 altercation at all; correct?
17 A. If he would have been compliant, it would
18 have ended in no altercation at all.
19 Q. Is it possible it could have ended in no
20 altercation at all even if he had been
21 noncompliant and gone back into the house?
22 A. Probably not.
23 Q. Why do you say that?
24 A. Because there was still the belief that he
25 was our shooter and that he was potentially

Page 259

1 still armed and going to kill hostages inside
2 the house.
3 Q. Okay. What about in the hypothetical
4 scenario where you know him to be unarmed?
5 A. That's still difficult to answer.
6 Q. What happened immediately after you fired the
7 shot?
8 A. Mr. Finch fell back into the residence.
9 Q. Did you say anything at that point in time?
10 A. I don't believe so.
11 Q. Did Sergeant Jonker say anything to you at
12 that point in time?
13 A. Not at that point in time, no.
14 Q. Did any officer say anything to you at that
15 point in time?
16 A. I don't think so.
17 Q. Did you hear any officer speaking over the
18 radio?
19 A. Yes.
20 Q. And what did you hear them saying?
21 A. Sergeant Jonker said that we had shots fired.
22 Q. Okay. So Sergeant Jonker said that over the
23 radio. He did not direct that to you?
24 A. Correct.
25 Q. And did he say anything else at that point in

Page 260

1 time?
2 A. I'm not sure, ma'am.
3 Q. Did you hear the east side officers saying
4 anything?
5 A. Not that I recall, no.
6 Q. Did you hear west side officers speaking?
7 A. I don't think so.
8 Q. The south side officers speaking?
9 A. No.
10 Q. Was dispatch speaking at that point?
11 A. I think they responded to Sergeant Jonker,
12 but I don't recall what they said.
13 Q. Did Sergeant Jonker, in the seconds or
14 minutes following the shot, give you any
15 orders?
16 A. He asked me to remain -- remain in my spot
17 and cover off the top floors of the residence
18 as officers made entry into the house.
19 Q. And for what purpose?
20 A. Just because we still were not sure exactly
21 what was going on at this house at that
22 point, and for safety reasons for officers
23 moving up onto the porch, wanted somebody
24 watching the second story windows.
25 Q. So you remained in your location after the

Page 261

1 shooting?
2 A. Yes, ma'am.
3 Q. And how long did you remain at the location?
4 A. I believe it was in the ballpark of 20
5 minutes. Maybe a little bit more, maybe a
6 little bit less.
7 Q. Did Jonker stay at that location?
8 A. No, ma'am.
9 Q. Where did he go?
10 A. I believe he moved up with multiple other
11 officers and assisted with moving in and
12 clearing the residence.
13 Q. When you say moved up, do you mean moved to
14 the house?
15 A. Yes, ma'am, physically moved up -- I'm sorry.
16 That wasn't very clear. Moved forward to
17 the -- to the residence.
18 Q. Okay. And did Fussell and Powell go with
19 him?
20 A. Powell did not. I don't know if Fussell did
21 or not.
22 Q. What did Powell do?
23 A. Powell stayed with me.
24 Q. Powell say anything to you at that point in
25 time?

66 (Pages 258 to 261)

Page 262

1    A.  I don't remember.
2    Q.  Is it likely that he said something to you in
3        the aftermath of the shot?
4    A.  I think once or twice he asked me if I was
5        okay.
6    Q.  And what did you tell him?
7    A.  I said yes.
8    Q.  Were you okay?
9    A.  Yes.
10   Q.  What were you feeling after you fired that
11       shot?
12   A.  I really don't even recall.
13   Q.  You don't recall any emotions you were
14       feeling at that time?
15   A.  I remember that several minutes after, as we
16       started getting conflicting information as to
17       what had gone on at the house, I remember
18       thinking, who was that guy and what's going
19       on here.
20   Q.  And what emotion did you feel at that time?
21   A.  Fear.
22   Q.  Fear for what?
23   A.  Fear of maybe that wasn't the bad guy.
24   Q.  Fear that you had shot the wrong person?
25   A.  Possibly, yes.

Page 263

1    Q.  At the time you shot, in the seconds that you
2        shot the rifle, what were you feeling
3        emotionally?
4    A.  I was feeling fear for the officers to the
5        east.
6    Q.  Were you feeling stressed?
7    A.  Sure.
8    Q.  Were you feeling adrenaline?
9    A.  A little.
10   Q.  Only a little bit at that point in time?
11   A.  I believe so.
12   Q.  What was your belief as to Andy Finch's
13       condition when you fired the shot?
14           After you fired the shot?
15   A.  I believed he was seriously, if not mortally,
16       wounded.
17   Q.  What did you do with your rifle at that point
18       in time right after the shot?
19   A.  Kept scanning the front of the house.
20   Q.  Okay.  So you kept it raised?
21   A.  Yes.
22   Q.  You never lowered it?
23   A.  Not immediately.
24   Q.  Did you keep it raised the 20 minutes after
25       the shooting when you were providing cover?

Page 264

1    A.  No.  At one point I believe I knelt down
2        behind the car that I had been standing
3        behind and used the trunk area kind of as a
4        support.
5    Q.  Why'd you do that?
6    A.  20 minutes is a long time to hold a rifle up,
7        ma'am.
8    Q.  At some point did you hand over your rifle?
9    A.  No.
10   Q.  You kept it on you?
11   A.  Yes.
12   Q.  When's the last time that night that you had
13       possession of your rifle?
14   A.  When we got down to the city building so that
15       I could be interviewed.  I had had it with me
16       the entire time, placed it in the trunk of
17       the patrol vehicle I was transported to the
18       city building in, and then I believe the lab
19       took possession of my rifle from that point.
20   Q.  Did you give it to the lab personally?
21   A.  No, it was just in the trunk.
22   Q.  So the lab came and got it from your trunk?
23   A.  Yes.
24   Q.  What happened to the extra magazines that
25       night?

Page 265

1    A.  I still have the one that never left my case.
2        And then the one I had in my pocket I believe
3        is with my rifle, wherever those two items
4        are.  I don't have them.  I believe they're
5        still locked up as evidence.
6    Q.  What was your understanding immediately after
7        the shooting as to what would happen to you
8        as a result of shooting a civilian in the
9        line of duty?
10   A.  That I'd be interviewed by our homicide
11       detectives, as well as the KBI.  And there
12       would be an internal -- internal
13       investigation conducted and the case would be
14       presented to the district attorney's office
15       for a determination of charges.
16   Q.  And what was your basis for believing that
17       those steps would precede the shooting?
18   A.  That's kind of the normal process of things
19       in an officer-involved shooting.
20   Q.  What's KBI?
21   A.  The Kansas Bureau of Investigation.
22   Q.  And why would they be involved in the
23       investigation?
24   A.  They oversee the investigation just as a --
25       kind of a third party type thing.

67 (Pages 262 to 265)

Page 266

1    Q. After covering, following the shooting, for
2       20 minutes, did you change locations at some
3       point?
4    A. Not until I went to leave the entire area to
5       go to the city building.
6    Q. And at that point, did you leave in the car
7       in which you came?
8    A. No, ma'am.
9    Q. What happened to the car in which you came?
10   A. I believe Officer Powell ended up driving it
11      back down to the city building later on.
12   Q. At what time did the shooting occur?
13   A. I'd have to look at this to tell you for
14      sure, ma'am.
15   Q. Do you know what time you left the scene?
16   A. No, I don't.
17   Q. And could you guess how much time passed
18      between when you showed up at the scene and
19      when the shooting happened?
20   A. Between my arrival and the shooting
21      happening?
22   Q. Correct.
23   A. If I were to guess, maybe two and a half to
24      three minutes.
25   Q. Okay. And not sure I asked you this, but

Page 267

1    just remind me, what was the time passage
2    between the time you got to location number 2
3    and when you fired your rifle?
4    A. Approximately 42 or '3 seconds.
5    Q. When you did leave the scene, did you do so
6       based on someone's orders?
7    A. Yes.
8    Q. Whose orders?
9    A. Lieutenant Kennedy.
10   Q. And Lieutenant Kennedy is a commanding
11      officer?
12   A. Yes, ma'am.
13   Q. And what is he in charge of?
14   A. I don't know his current assignment, but at
15      the time, he was a lieutenant in the Patrol
16      South Bureau.
17   Q. And when did he come to the scene, to your
18      knowledge?
19   A. I don't know, ma'am.
20   Q. And why did he order you to leave?
21   A. Because I was the involved officer in the
22      shooting.
23   Q. What did he order you to do specifically?
24   A. To go with my sergeant, Sergeant Stevens, and
25      be transported down to the city building.

Page 268

1    Q. Sergeant Stevens was also on the scene?
2    A. Yes, ma'am.
3    Q. When did he get to the scene?
4    A. I don't know.
5    Q. Did you see him prior to the shooting?
6    A. No, ma'am.
7    Q. Was it your understanding after the shooting
8       that Sergeant Jonker was still in charge of
9       the scene?
10   A. No.
11   Q. Was he not in charge of the scene to your
12      understanding?
13   A. I believe at that point he was one of several
14      supervisors in charge of the scene.
15   Q. What made you believe that?
16   A. As I had previously stated, that's kind of
17      how these larger events go. There will be
18      one supervisor in charge of this part of the
19      investigation, another supervisor in charge
20      of another part, and so on and so forth.
21   Q. Do you know who was in charge of clearing the
22      house?
23   A. No, I do not.
24   Q. But you did say, I believe, that Sergeant
25      Jonker moved forward to begin clearing the

Page 269

1    house after the shooting?
2    A. Correct. He was there with Sergeant Beard,
3       Lieutenant Bruno and then Sergeant Jonker, as
4       well. I don't know who specifically was in
5       charge, but he was one of the supervisors
6       there.
7    Q. So Sergeant Beard and Lieutenant Bruno were
8       involved in clearing the house; correct?
9    A. Yes, ma'am.
10   Q. And you saw them that night do so?
11   A. I saw Sergeant Beard, and I did see
12      Lieutenant Bruno, as well, yes.
13   Q. And is that the first time you saw them on
14      the scene was after the shooting while they
15      were clearing the house?
16   A. Yes, ma'am.
17   Q. And what is Sergeant Beard in charge of?
18   A. He's currently the -- I think he's the fourth
19      shift patrol north lieutenant. At the time
20      of the incident, he was the -- he was a
21      sergeant over the gang unit.
22   Q. And at the time of the incident, what was
23      Lieutenant Bruno in charge of?
24   A. I think he was in the Patrol West Bureau, but
25      I'm not sure, ma'am.

68 (Pages 266 to 269)

Page 270

1  Q. Had you worked under either of them before?
2  A. Lieutenant Bruno, when I was on the Patrol
3     South SCAT team, but not Sergeant Beard, no.
4  Q. Did you see, after the shooting, any other
5     commanding officers other than Lieutenant
6     Kennedy, Sergeant Stevens, Sergeant Beard and
7     Lieutenant Bruno?
8  A. Out on the scene?
9  Q. Correct.
10 A. No, ma'am.
11 Q. At anytime prior to leaving the scene, did
12    you see any other commanding officers beyond
13    those you've just named?
14 A. No.
15 Q. Okay. Prior to leaving the scene, what did
16    you see other officers doing?
17 A. There were still officers maintaining a
18    perimeter so traffic wasn't driving up and
19    down McCormick Street. Officers were still
20    in the process of clearing the residence.
21    And that's all I recall seeing officers do.
22 Q. Do you know what the east side officers were
23    doing at that point?
24 A. No, ma'am, I don't.
25 Q. Do you know what the west side officers were

Page 271

1     doing?
2  A. Blocking traffic.
3  Q. Had that been their job prior to the
4     shooting, as well?
5  A. I'm not sure, ma'am.
6  Q. But somebody was blocking traffic; correct?
7  A. Yes, ma'am.
8  Q. Do you know what the south side officers were
9     doing?
10 A. I do not.
11 Q. Do you know what Fussell did after the
12    shooting?
13 A. I do not.
14 Q. And Powell remained with you after the
15    shooting; correct?
16 A. Until Lieutenant Kennedy came and relieved
17    me.
18 Q. And then where did he go?
19 A. Powell?
20 Q. Correct.
21 A. I'm not sure, ma'am.
22 Q. All right. He did not drive back to you at
23    the -- to the station -- or to the city
24    building?
25 A. No.

Page 272

1  Q. Did anyone drive back with you?
2  A. Yes, Sergeant Stevens.
3  Q. All right. And no one else in the car?
4  A. Correct.
5  Q. While you were at the scene, prior to
6     leaving, after the shooting, did you see
7     officers clearing the house?
8  A. Yes.
9  Q. And how many officers in particular?
10 A. A lot, ma'am. I'm not sure. I didn't count.
11 Q. More than five?
12 A. Yes.
13 Q. More than 10?
14 A. Probably in the ballpark of 10.
15 Q. After the shooting, did more officers arrive
16    than had been there prior to the shooting?
17 A. I think so.
18 Q. And you say that just because there were more
19    officers on the scene?
20 A. It appeared that there were an awful lot more
21    officers when I was getting ready to leave
22    than when I got there.
23 Q. Can you be certain when they arrived?
24 A. No, ma'am.
25 Q. Were you ever tasked with clearing the house?

Page 273

1  A. No.
2  Q. Did you ever see Mr. Finch being taken to
3     EMT?
4  A. Yes.
5  Q. How -- can you describe what you saw?
6  A. Several different officers were carrying him
7     over to the area of McCormick and Seneca
8     where there was an ambulance waiting.
9  Q. Can you describe how they carried him?
10 A. To the best of what I could tell, they had
11    kind of one officer on each hand, each foot,
12    and then maybe one also kind of helping
13    support under his knees and carrying him in
14    probably the best fashion that they could for
15    that point in time, given their resources.
16 Q. Did you recognize which officers those were?
17 A. No, ma'am.
18 Q. How far away were you from Mr. Finch at that
19    point?
20 A. I was still in my same spot that I'd been in
21    location 2, and they came off the front
22    porch, went down the south -- the sidewalk on
23    the south side of McCormick and headed west.
24 Q. And you said there was an ambulance at
25    McCormick and Seneca at that point?

69 (Pages 270 to 273)

Page 274

1    A.  In that -- in that general vicinity, yes,
2        ma'am.
3    Q.  One ambulance?
4    A.  I know that they had called for two, but I
5        don't recall seeing two exactly.
6    Q.  And who called for two?
7    A.  Someone.  I don't remember exactly who called
8        for a second one.
9    Q.  You heard ambulances being called or summoned
10       over the radio?
11   A.  Yes.
12   Q.  After the shooting or before?
13   A.  After.
14   Q.  And how much after the shooting did you hear
15       ambulances being summoned over the radio?
16   A.  I don't know, ma'am.
17   Q.  Was it seconds, minutes?
18   A.  Probably seconds, but I'm not sure.
19   Q.  Did you ever see any EMT officers go into the
20       house?
21   A.  I did not.
22   Q.  Did you ever see any officers provide medical
23       treatment to Mr. Finch?
24   A.  I did -- I did not see that, no.
25   Q.  How long after the shooting did you see the

Page 275

1        officers carrying Mr. Finch to the ambulance?
2    A.  Maybe a couple minutes.
3    Q.  A couple minutes.  Did you see him getting
4        medical treatment at the ambulance?
5    A.  No, because they put him inside the ambulance
6        and I couldn't see into it.
7    Q.  Did you ever talk to any officers after the
8        fact about the provision of medical care to
9        Mr. Finch?
10   A.  No, ma'am.
11   Q.  While you were leaving the scene, in the
12       process of leaving the scene, did you talk to
13       anyone?
14   A.  Sergeant Stevens and sergeant or -- and
15       Lieutenant Kennedy, excuse me.
16   Q.  What did you say to Lieutenant Kennedy?
17   A.  Something to the effect of I was the officer
18       that had shot him, and I believed my shell
19       casing would be up in the general vicinity of
20       the door for the address I was standing in
21       front of.
22   Q.  Did he ask you any questions at the time?
23   A.  I don't remember, ma'am.
24   Q.  Do you think it's likely he did?
25           MR. PIGG:  Object to form; it's

Page 276

1        asked and answered.
2    A.  I don't think it was probably anything more
3        than that.
4    Q.  Where was the casing found, do you know?
5    A.  I'm not sure.
6    Q.  You know it was found, though; correct?
7    A.  Yes.
8    Q.  And you only fired a single shot; correct?
9    A.  That's correct.
10   Q.  And you said you also spoke to Sergeant
11       Stevens?
12   A.  Yes, ma'am.
13   Q.  What did you say to Sergeant Stevens?
14   A.  He had asked how I was doing, and I said I'm
15       okay.  And that was pretty well the extent of
16       our conversation.
17   Q.  And you drove back with him; correct?
18   A.  He drove me, yes, ma'am.
19   Q.  Were you in the passenger seat?
20   A.  Yes, ma'am.
21   Q.  How long was the drive between McCormick and
22       the city building?
23   A.  Couple minutes.
24   Q.  Where's the city building located?
25   A.  455 North Main.

Page 277

1    Q.  So downtown Wichita?
2    A.  Yes, ma'am, just up the street from here.
3    Q.  And what's in the city building?
4        Why did you go there?
5    A.  The city building is home to our Wichita
6        police investigations section.  Several
7        other -- it'd be basically the headquarters
8        for the police department.
9    Q.  While you were on that several minute or more
10       drive, did Sergeant Stevens talk to you at
11       all about the Finch incident?
12   A.  No.
13   Q.  Did he ask you questions about how the
14       shooting happened?
15   A.  No.
16   Q.  Did he ask you any questions about what you
17       had done that night prior to being in his
18       car?
19   A.  No.
20   Q.  And did you find that odd?
21   A.  No.
22   Q.  Why?
23   A.  Because we know not to discuss these kinds of
24       incidents with each other after they happen.
25       Because there is going to be the

70 (Pages 274 to 277)

Page 278

1   investigation done by detectives,
2   professional standards will investigate, and
3   one of the things that we're not supposed to
4   do is talk to each other about specifics of
5   an incident.
6   Q.  I mean, what's your understanding as to the
7   reason for that policy?
8   A.  So we don't taint witness statements because
9   even -- even the police can be -- you know,
10  have their memory of an event tainted by
11  talking about it too much or hearing a
12  different perspective.
13  Q.  Even the police are suggestible?
14  A.  Yes.
15  Q.  When did you first find out that Finch was
16  not armed?
17  A.  I think that evening after my interview was
18  complete.
19  Q.  What time was your interview conducted,
20  approximately?
21  A.  I think it started at about 12:30 in the
22  morning and went till -- I'm not sure what
23  time we got done.
24  Q.  Who told you that he was not armed?
25  A.  I think either Detective Chisholm or

Page 279

1   Lieutenant Ojile.
2   Q.  Did you ask or did they just offer that
3   information to you?
4   A.  I think they told me once my interview was
5   over with.
6   Q.  What was your reaction upon hearing that?
7   A.  I was -- I didn't feel good about it.
8   Q.  Did you feel regret?
9   A.  I felt like it was a tragic event for
10  everybody involved.  And at that moment in
11  time, I believed I didn't have another choice
12  but to shoot him.
13  Q.  But did you regret shooting him at the time
14  you found out he was unarmed?
15  A.  I felt that that made it a much more tragic
16  incident, ma'am.
17  Q.  Were you upset?
18  A.  I was upset before I knew he was unarmed.
19  Q.  Were you more upset after finding out he was
20  unarmed?
21  A.  I don't know that I would say that.
22  Q.  What did you do once you got to the
23  station -- or to the city building, rather?
24  A.  I was put into the quiet room and sat and
25  waited to be interviewed.

Page 280

1   Q.  How long did you wait?
2   A.  I don't know.  It would depend on what time I
3   got there.
4   Q.  Do you know what time you got there?
5   A.  No, ma'am, I don't.
6   Q.  Do you have an estimate?
7   A.  I probably waited four to maybe five hours.
8   Q.  Alone in the quiet room?
9   A.  There was a member of the crisis -- or
10  Critical Incident Stress Management Team.
11  Q.  And what is that person's duty or
12  responsibility?
13  A.  To just kind of be there so if you have
14  questions about the process as everything
15  moves forward.  They're forbidden by policy
16  to talk to us.  They have -- there's no
17  privilege between us and them.  So even if we
18  did have a conversation, they would have to
19  divulge the contents of that conversation.
20  But they are there more to offer guidance,
21  offer help, and I mean guidance as far as
22  here are resources available to you, here's
23  how this process goes, here's what to expect
24  kind of thing.
25  Q.  Did you talk to that officer that night?

Page 281

1   A.  Well, yes.
2   Q.  What did you say?
3   A.  I told him that I was hungry.  I told him
4   that I needed to use the bathroom.  And we
5   had general conversation about some cases
6   that we had worked together on in the past
7   that had nothing at all to do with this
8   incident.
9   Q.  What officer was that?
10  A.  Derek Purcell.
11  Q.  And you had worked with him previously?
12  A.  On a couple cases.  We were not ever regular
13  coworkers.
14  Q.  Did you talk about the Finch shooting
15  incident?
16  A.  No, ma'am.
17  Q.  Did you seek out any resources, personal
18  resources as a result of the incident?
19  A.  No.
20  Q.  Did you ever receive counseling as a result
21  of the incident?
22  A.  Yes.
23  Q.  Did you request counseling or was it
24  mandatory?
25  A.  It was mandatory.

71  (Pages 278 to 281)

Page 282

1   Q.  How many hours?
2   A.  I don't know off the top of my head.
3   Q.  And were -- well, let's try to nail it down a
4       little bit more.
5           Would you say more than 10 hours
6       counseling?
7   A.  No.
8   Q.  Less than 10?
9   A.  Yes.
10  Q.  And was it with a certified therapist?
11  A.  Yes.
12  Q.  Somebody employed by the police department?
13  A.  No.
14  Q.  An outside therapist?
15  A.  Yes.
16  Q.  And is it policy that anyone involved in the
17      officer-involved shooting attend counseling
18      afterwards?
19  A.  Yes.
20  Q.  And that's something you have to do in order
21      to get back on duty?
22  A.  Correct.
23  Q.  Did you seek any other treatment following
24      the shooting other than the WPD-mandated
25      counseling?

Page 283

1   A.  No.
2   Q.  Did you talk to anyone else while you were in
3       the quiet room?
4   A.  Yes.
5   Q.  Who?
6   A.  My wife.
7   Q.  You called her?
8   A.  Yes.
9   Q.  How long did you talk to her for?
10  A.  Maybe 4 to 5 minutes.
11  Q.  So you were allowed to place personal phone
12      calls --
13  A.  Yes.
14  Q.  -- at that point?
15          You told her about the shooting?
16  A.  I told her that I was involved in a shooting,
17      that I would be busy, and that she would
18      probably need to find a ride to her surgery
19      in the morning because I didn't know what
20      time I was going to be home.
21  Q.  Did you think you might be there all night?
22  A.  Yes.
23  Q.  Did you talk to any other family members that
24      night?
25  A.  No.

Page 284

1   Q.  Since that time, have you spoken to other
2       family members about this incident?
3   A.  Not in detail, no.
4   Q.  You've spoken to your wife about the
5       incident?
6   A.  Yes.
7   Q.  And in detail, I assume?
8   A.  Yes.
9   Q.  Have you spoken to your parents about this
10      incident?
11  A.  Yes, they know that the incident happened and
12      they know I was involved in it.
13  Q.  Did you speak to anyone else while you were
14      in the quiet room?
15  A.  My attorney.
16  Q.  And who is your attorney?
17  A.  Jess Hoeme.
18  Q.  And has he represented you prior to -- did he
19      represent you prior to the incident on
20      December 28th?
21  A.  No.
22  Q.  How did you find out his name and contact
23      information?
24  A.  The union, actually, once they learned of the
25      shooting, had contacted him and -- on my

Page 285

1       behalf.
2   Q.  What's the name of the union in Wichita?
3   A.  The Fraternal Order of Police.
4   Q.  And how did they find out about the shooting?
5   A.  I don't know.
6   Q.  When did you find out that an attorney had
7       been contacted on your behalf?
8   A.  The FOP president showed up and let me know
9       that they had contacted an attorney for me.
10  Q.  Who's the president?
11  A.  Robert Schmeidler.
12  Q.  And he showed up while you were in the quiet
13      room?
14  A.  Yes, ma'am.
15  Q.  Why do they call it the quiet room?
16  A.  It's actually a room that's typically used
17      for interviewing victims of domestic violence
18      or sexual assault or things like that.
19  Q.  Is there anything special about the room?
20  A.  It's not a typical interview room, but other
21      than just not being one of our typical
22      interview rooms, no, there's nothing special
23      about it.
24  Q.  Did you talk to the FOP president about the
25      shooting?

Page 286

1  A. No, ma'am.
2  Q. Did he ask you any questions about it?
3  A. No.
4  Q. That night did you talk to any other FOP
5     representatives?
6  A. No.
7  Q. And remind me how you pronounce Jess's last
8     name.
9  A. Hoeme.
10 Q. Hoeme. Were you aware of him prior to that
11    night?
12 A. I don't think so.
13 Q. Had never heard his name before?
14 A. No, ma'am.
15 Q. Did you accept his representation?
16 A. Yes.
17 Q. And that was based on the recommendation of
18    the FOP president?
19 A. That was based on my own personal
20    conversation with him about his
21    qualifications.
22 Q. And what did you find his qualifications to
23    be?
24 A. Exactly what I was looking for in a criminal
25    defense attorney.

Page 287

1  Q. Which is?
2  A. He's well qualified. He handled a lot of
3     criminal cases. He's worked on both sides of
4     the law, prosecution and criminal defense.
5  Q. Had he represented police officers before?
6  A. I'm not sure.
7  Q. Did you ask if he had ever represented police
8     officers in shooting cases before?
9  A. No, I didn't.
10 Q. Do you have any idea what his connection is
11    to FOP?
12 A. No, I don't.
13 Q. Do you know -- well, first of all, to go
14    back, did you talk to anybody else other than
15    who we've discussed already when you were in
16    the quiet room?
17 A. Not that I recall.
18 Q. Did any of your supervising officers stop by?
19 A. I think Sergeant Stevens poked his head in,
20    again, just to make sure I was doing okay.
21    Lieutenant Ojile, who was the homicide
22    lieutenant at the time, came in, said "hey,
23    it's going to be a little while, we're still
24    interviewing other folks."
25 Q. Did you know who they were interviewing at

Page 288

1     that time?
2  A. No.
3  Q. Lieutenant Ojile was a homicide lieutenant at
4     that time?
5  A. Yes.
6  Q. Did he have any other connection to the Finch
7     case other than he helped with the
8     investigation afterwards?
9  A. I don't understand your question.
10 Q. Strike that.
11    What was his role in the Finch
12    shooting incident?
13 A. He handled the back end investigation of the
14    shooting itself.
15 Q. Do you know why he did that?
16 A. Because he's the homicide lieutenant.
17 Q. Did you talk to any of the officers who
18    eventually interviewed you prior to entering
19    the interview room?
20 A. No.
21 Q. Is there anybody else that you talked to at
22    that time?
23 A. I don't think so.
24 Q. What happened to your -- well, step back.
25    You were wearing a body camera the

Page 289

1     entirety of -- during the entirety of this
2     incident; correct?
3  A. Yes, ma'am.
4  Q. When did you first turn it on?
5  A. Just basically upon arriving.
6  Q. When you parked?
7  A. Yeah.
8  Q. And why did you turn it on then?
9  A. Because it is part of our body camera policy
10    that we're going to turn our cameras on when
11    we have contact with people.
12 Q. Okay. And what kind of body camera were you
13    wearing that night?
14 A. It's made by Axon, but other than that I
15    don't -- I don't know.
16 Q. You don't know the specific model?
17 A. No, ma'am, I don't.
18 Q. Was it working the entire night that you know
19    of?
20 A. Yeah.
21 Q. Have you ever had your body camera
22    malfunction on you?
23 A. Yes.
24 Q. In what way?
25 A. Sometimes it's a -- it's a double press to

73 (Pages 286 to 289)

Page 290

1  start the recording. Sometimes if you do it
2  too quickly, it doesn't start. Sometimes
3  it's had other issues as far as when it does
4  or does not start, but that's been the only
5  issue I've experienced with it is for
6  whatever reason, it didn't get going when you
7  wanted it to.
8  Q. Is there some way to tell as the officer
9      wearing the device that it's, in fact,
10     recording?
11 A. Yes.
12 Q. How do you tell?
13 A. It will actually beep, the camera portion, up
14     in -- however you choose to wear it as an
15     officer, the camera will actually give a
16     little beep-beep sound so you know when it is
17     recording.
18 Q. So you are alerted if it is not, in fact, on?
19 A. Correct.
20 Q. And if your camera malfunctions or human
21     error occurs, as you described, is there a
22     reporting requirement involved with that?
23 A. What do you mean?
24 Q. Meaning if you are involved in an incident
25     that should have been recorded using the body

Page 291

1  camera but it wasn't because of a machine
2  malfunction or human error, is it necessary
3  to report that fact in some way?
4  A. Yes, that would generally be included in the
5      officer's incident report or a supplemental
6      report if you didn't do the main incident
7      report.
8  Q. Is it -- based on your understanding -- have
9      you reviewed body camera footage in the past;
10     correct?
11 A. Yes.
12 Q. And is it fair to say that all footage starts
13     with silence for a short period of time?
14 A. Yes, the cameras that we operate with at this
15     point in time, I think, they've tested some
16     new ones, but the ones we currently have,
17     there's a 30 second lag time for the audio.
18     So it is -- it is video recording for that
19     first 30 seconds, but by design from the
20     manufacturer, that first 30 seconds of audio
21     just -- you don't get it.
22 Q. And that's always the case from when you turn
23     it on to 30 seconds later, it'll start with
24     audio?
25 A. Yes.

Page 292

1  Q. And it's designed to work that way; correct?
2  A. Yes, ma'am.
3  Q. And then when it does, the audio does come
4      on, are there always a series of beeps?
5  A. I believe so, yes.
6  Q. And that alerts you that here comes the
7      audio?
8  A. Do you mean as I'm wearing the --
9  Q. As you're watching it. Sorry.
10 A. Yes. As you're watching, yes, it should do
11     the audible here comes the sound tones.
12 Q. Do you receive any indication as -- while
13     wearing it that the sound is starting?
14 A. No.
15 Q. You just know that it will be 30 seconds
16     after you press start?
17 A. Yes.
18 Q. What happened to your body camera that you
19     were wearing the night of the Finch shooting
20     incident?
21 A. It was collected and the video was
22     downloaded.
23 Q. Do you know who collected it?
24 A. I don't remember.
25 Q. Was it somebody at the city building?

Page 293

1  A. Yes.
2  Q. Was it collected before you entered the quiet
3      room?
4  A. Yes.
5  Q. And was it by a detective or by an officer?
6  A. I think it was actually a sergeant.
7  Q. A sergeant, a different one than we have been
8      discussing?
9  A. Yes, ma'am.
10 Q. Do you know what that person intended to do
11     with it?
12 A. To download it so investigators could watch
13     the video.
14 Q. Okay. And you just surmise that's what he
15     did with it; correct?
16 A. Yes.
17 Q. 'Cause that's policy?
18 A. Yes.
19 Q. Prior to seeing your footage yesterday in
20     preparation for the deposition, did you watch
21     your body camera footage at any other time?
22 A. I had watched it. Or I had watched a portion
23     of it maybe a month after the incident. But
24     if you've seen it yourself, you know there's
25     not really a whole lot to my video.

74  (Pages 290 to 293)

Page 294

1   Q.  What made you watch it a month after the
2       incident?
3   A.  I was talking with Lieutenant Ojile, and he
4       asked if I wanted to see it, and I said yes,
5       and so he showed it to me.
6   Q.  What made him ask a month after?
7   A.  I'm not sure, ma'am.
8   Q.  And you said you watched part of it?
9   A.  Yes.
10  Q.  When you watched it, did everything that you
11      remembered about the incident line up with
12      what you saw on the video?
13  A.  Yes.
14  Q.  And at some point, you were, in fact,
15      interviewed by WPD about the incident;
16      correct?
17  A.  The night of, yes, ma'am.
18  Q.  Starting at what 12:30 a.m.?
19  A.  I believe that was the start time.
20  Q.  So on the 29th at this point; correct?
21  A.  Yes.
22  Q.  And who was present during that interview?
23  A.  Detective Chisholm, a KBI agent and I don't
24      remember his name, myself and my attorney
25      Mr. Hoeme.

Page 295

1   Q.  Okay. And Detective Chisholm, he was the
2       primary interviewer?
3   A.  Yes.
4   Q.  Did you know him prior to that night?
5   A.  Yes, ma'am.
6   Q.  How did you know him?
7   A.  I've worked and assisted on several homicide
8       investigations that he's been the case
9       detective on.
10  Q.  Do you know why he was in charge of
11      interviewing you?
12  A.  No, I don't.
13  Q.  Had he been -- so he had been your direct
14      commanding supervisor in the past?
15  A.  Detective Chisholm?
16  Q.  Correct.
17  A.  No, ma'am.
18  Q.  He'd just been on investigations with you?
19  A.  Yes.
20  Q.  Had you ever reported to him directly?
21  A.  No.
22  Q.  Had he ever given you any kind of assessment?
23  A.  No.
24  Q.  And Lieutenant Ojile was also present?
25  A.  Yes.

Page 296

1   Q.  Do you know why he was present?
2   A.  I'm sorry. Do you mean was he present for my
3       interview?
4   Q.  Correct.
5   A.  Not in the interview room.
6   Q.  Okay.
7   A.  There were only four people in the interview
8       room.
9   Q.  Let me just mark this while I'm at it. You
10      know, before I mark it, let's take a quick
11      break.
12  A.  Okay.
13          VIDEOGRAPHER: Going off the
14      record. It's now 5:10.
15      (A recess was taken from 5:10 p.m. to
16      5:27 p.m.)
17      (Rapp Exhibit No. 58 was marked for
18      identification.)
19          VIDEOGRAPHER: Back on the
20      record, currently 5:27 p.m.
21  BY MS. VAN BRUNT:
22  Q.  Okay. We are going to mark as an Exhibit
23      No. 58 which I believe is a transcript of the
24      interview that was conducted with you
25      following the shooting incident about 12:30

Page 297

1       a.m. on the 29th. It's bates marked Wichita
2       2065 to Wichita 2102.
3           And I'm going to start by asking you
4       if you've seen this document before.
5   A.  Let me take a quick look, but I believe the
6       answer to that is yes.
7   Q.  Okay. And do you recall the last time you
8       saw it?
9   A.  Yesterday.
10  Q.  And that was for deposition preparation;
11      correct?
12  A.  Yes, ma'am.
13  Q.  And had you seen it prior to yesterday?
14  A.  Yes, ma'am.
15  Q.  When had you seen it?
16  A.  I believe shortly after the transcriptionist
17      typed it up, I was given an opportunity to
18      review it for accuracy.
19  Q.  Sometime early in the morning of the 29th?
20  A.  Oh, no, ma'am. It was a week or so after
21      that.
22  Q.  Okay. Did you ever review a transcript of
23      some sort right after the interview?
24  A.  No.
25  Q.  So when you received it a week or so after

75  (Pages 294 to 297)

Page 298

1  the interview, was it in the mail, in person;
2  how did you receive it?
3  A. Via e-mail.
4  Q. Okay. And you reviewed it at that time?
5  A. Yes, ma'am.
6  Q. Did you find everything in it to be
7  accurately recorded?
8  A. I believed so, yes.
9  Q. And the top right corner of this document
10  says 17C88615.
11      Can you tell me what that number
12  refers to?
13  A. That would be the police case associated with
14  this incident.
15  Q. Okay. In particular with the Finch shooting
16  incident?
17  A. Yes.
18  Q. Now at the top it says "Q: Detective Robert
19  K. Chisholm, 1301", and I assume that means
20  that Detective Chisholm was the primary
21  questioner?
22  A. Yes.
23  Q. And then below it says "Randy Ewy -- Ewy,
24  KBI."
25      Did I pronounce that correctly?

Page 299

1  A. I think it's Ewy, but --
2  Q. Oh, Ewy.
3  A. I'm not sure either.
4  Q. Okay. It's maybe Polish.
5      And he was also a questioner present
6  at the interview; correct?
7  A. Yes.
8  Q. And did you know Officer Ewy before this
9  interview?
10  A. I don't think so.
11  Q. You hadn't come across him before in your
12  duties?
13  A. I don't believe so.
14  Q. And then it says Lieutenant Todd Ojile is Q2,
15  but you don't believe Todd Ojile was actually
16  present during the interview?
17  A. I know that he was not present in the
18  interview room. Right as we were getting
19  started, he was standing in the doorway.
20  That's why his voice is heard saying that the
21  recorder's on, as I'm in the room with my
22  attorney. It says if you want, I'll go turn
23  it in -- or turn it off, whatever it is that
24  he said there, and then he was not physically
25  present in the interview room at the time my

Page 300

1  interview was actually conducted.
2  Q. Okay. And your attorney was present and you
3  were, of course, present?
4  A. Yes, ma'am.
5  Q. And there was a court reporter there, as
6  well, or a transcriptionist; correct?
7  A. No.
8  Q. The transcribe -- how was it transcribed?
9  A. Via the audio/video at a later date by a
10  transcriptionist.
11  Q. I see. So it was being videotaped --
12  A. Yes.
13  Q. -- correct? And then a transcriptionist just
14  relayed the information to paper after the
15  fact?
16  A. Yes, ma'am.
17  Q. And we sort of touched on this, but Detective
18  Chisholm is a detective in what division
19  again?
20  A. Homicide.
21  Q. And is he always in charge of conducting the
22  interviews in officer-involved shootings?
23  A. No.
24  Q. Do you have any idea why he was assigned on
25  this particular case?

Page 301

1  A. No, ma'am.
2  Q. Did you confer with your attorney prior to
3  the interview?
4  A. Yes.
5  Q. For how long?
6  A. Maybe 45 minutes to an hour.
7  Q. Was it your understanding that Detective
8  Chisholm and/or KBI Officer Ewy were familiar
9  with your attorney?
10  A. I think Ewy -- Agent Ewy knew him somehow,
11  but I don't know that Chisholm and my
12  attorney knew each other.
13  Q. And are you claiming privilege over your
14  conversation with your attorney?
15      MR. PIGG: He is.
16  A. Yes.
17  Q. At the point you were interviewed on
18  December 29th early morning hours, what was
19  your understanding as to the purpose of that
20  interview?
21  A. I'm sorry. Can you ask that again.
22  Q. What was your understanding as to the purpose
23  of the taped interview with WPD?
24  A. That they were doing an investigation into
25  the shooting of Andrew Finch.

76 (Pages 298 to 301)

Page 302

1  Q. Did you understand it to be part of a
2     criminal investigation?
3  A. Yes.
4  Q. As opposed to an administrative
5     investigation; correct?
6  A. Yes.
7  Q. Were you issued your Miranda rights?
8  A. I was not.
9  Q. Did you consider yourself to be under oath?
10  A. Yes.
11  Q. Subject to penalty of perjury?
12  A. Yes.
13  Q. Do you understand there could be criminal
14     consequences for lying during the interview?
15  A. Yes.
16  Q. Did you, of course, understand there could be
17     job related consequences for lying?
18  A. Yes.
19  Q. Including termination?
20  A. That's correct.
21  Q. And you understood that you could face
22     criminal consequences for lying, as well?
23  A. Yes, ma'am.
24  Q. At the point of the interview 12:30, the
25     29th, what evidence, if any, had you reviewed

Page 303

1     in the case?
2  A. None.
3  Q. You hadn't reviewed your body camera footage?
4  A. No.
5  Q. And so you might know the answer to this, but
6     you hadn't reviewed any reports?
7  A. No.
8  Q. And had you talked to any officer
9     substantively about what happened at the
10     scene?
11  A. No, ma'am.
12  Q. Is it in keeping with WPD policy that
13     officers can see body camera footage of an
14     incident in which they're involved after they
15     have been interviewed?
16  A. I think so, but I'm not sure. This is the
17     first time I've ever been this involved in an
18     officer-involved shooting, so I'm really not
19     sure.
20  Q. And again, you did, in fact, see your body
21     camera footage a month after this interview?
22  A. Approximately a month.
23  Q. Was the internal investigation still ongoing
24     at that time?
25  A. I don't know.

Page 304

1  Q. Did you — had you received, at that point,
2     any indication that it was closed?
3  A. To this day, I haven't received that
4     notification.
5  Q. Had you — well, let me clarify something:
6     Is the WPD investigation separate from the
7     PSB investigation?
8  A. How do you mean?
9  Q. Is there a investigation conducted by WPD,
10     the homicide detectives in this case, that is
11     separate and apart from the Professional
12     Standards Bureau investigation?
13  A. That's my understanding of how it's done,
14     yes.
15  Q. There are two separate investigations?
16  A. The way I understand it, yes, ma'am.
17  Q. Okay. Did you ever receive any documentation
18     relating to the WPD investigation?
19  A. Other than just reviewing this transcript,
20     no.
21  Q. Okay. There was no file akin to the one we
22     marked as 57 for the PSB investigation?
23  A. If there was, I haven't seen it.
24  Q. Was the PSB investigation still ongoing at
25     the time you reviewed your body camera

Page 305

1     footage?
2  A. I don't know. I think so.
3  Q. Did you ever receive an indication from
4     anyone that that investigation had been
5     concluded?
6  A. Other than the — this right here that we've
7     already looked at, no.
8  Q. And that, you're pointing to Exhibit 57?
9  A. Yes, ma'am.
10  Q. And that states that — that seems to suggest
11     that the investigation was closed on July
12     19th, 2018; correct?
13  A. Yes.
14  Q. And that's when it was signed by the chief of
15     police?
16  A. Yes, ma'am.
17  Q. And the finding of that investigation was
18     exonerated; correct?
19  A. Yes, ma'am.
20  Q. And what does exonerated mean?
21  A. I couldn't tell you. You'd have to ask the
22     PSB guys.
23  Q. Do you have any indication as to what it
24     means?
25  A. To the best of my knowledge, it means that

77 (Pages 302 to 305)

Page 306

1    they did not find any policy or regulation
2    violations.
3    Q. Okay. Do you understand the difference
4    between exonerated and not sustained?
5    A. No.
6    Q. Okay. And you reviewed your body camera
7    footage prior to July 19th, 2018?
8    A. Yes.
9    Q. And you reviewed it sometime in February of
10   2018?
11   A. I believe so.
12   Q. Did you ever write any reports in this case?
13   A. No, ma'am, I did not.
14   Q. Did you ever write a use of force report?
15   A. No.
16   Q. Investigative report?
17   A. No.
18   Q. Were you ever asked to write a report?
19   A. No.
20   Q. Did you find it odd you were not asked to
21   write a report?
22   A. No.
23   Q. And why is that?
24   A. Because in keeping with department policies
25   and procedures, my criminal interview served

Page 307

1    as my report for the incident.
2    Q. Is that WPD policy?
3    A. Yes, ma'am.
4    Q. To your knowledge, did any of the officers
5    who were standing with you on the north
6    side — in the north side location, including
7    Powell, Fussell and Jonker, did they write
8    reports?
9    A. I don't know, ma'am.
10   Q. Did you ever request to review any reports
11   that were written about this incident?
12   A. No.
13   Q. Did you ever actually review any reports
14   about this incident?
15   A. Other than my own transcript, no.
16   Q. Did you take any notes about this incident at
17   any point in time?
18   A. No.
19   Q. Do you know if anyone who was on the scene
20   took any notes about this incident?
21   A. I'm not sure.
22   Q. All right. So if we could turn to what is
23   essentially Page 23, Wichita 2087. Just let
24   me know when you're there.
25   A. Okay.

Page 308

1    Q. Okay. And it starts with a "sure" at the
2    top?
3    A. Yes, ma'am.
4    Q. You see that?
5       And you see halfway down there is a
6    pause in conversation indicated in the
7    transcript?
8    A. Yes.
9    Q. And does this pause represent when you were
10   consulting with your attorney?
11   A. Yes.
12   Q. And did you ask, during the interview, about
13   halfway through, to consult with your
14   attorney?
15   A. I don't believe I asked. I believe my
16   attorney asked.
17   Q. I see. 'Cause A1 is your attorney in this
18   context, I believe?
19   A. Yes.
20   Q. And on Page 23, your attorney says "I'm sorry
21   to interrupt, but can we have a moment to
22   visit"; correct?
23   A. Yes.
24   Q. And at that time when he asked for a moment
25   to visit, you were being asked about

Page 309

1    Mr. Finch's movements from the time that he
2    was at the door until he entered the porch;
3    is that correct?
4       And feel free to look at the preceding
5    page if that helps you answer the question.
6    A. Yes.
7    Q. And that conversation with your attorney
8    during the interview was not recorded;
9    correct?
10   A. Correct.
11   Q. Was anyone else present during that
12   conversation?
13   A. No.
14   Q. And you're claiming privilege over that
15   conversation?
16   A. Yes.
17   Q. Did you tell Mr. Pigg about that
18   conversation?
19   A. I don't know.
20   Q. Did you tell him about the substance of that
21   conversation?
22   A. I'm not sure if we've talked about it or not.
23        MS. VAN BRUNT: Okay. I assume
24   you're claiming privilege over it.
25        MR. PIGG: All of our

78  (Pages 306 to 309)

Page 310

1    conversations are privileged.
2         MS. VAN BRUNT: Okay. With Jesse
3    Hoeme and you.
4         MR. PIGG: Hoeme just left at
5    that time.
6         MS. VAN BRUNT: Well, no.
7    BY MS. VAN BRUNT:
8    Q. It looks, from the record, that you actually
9       had a moment to visit during that time that
10      you consulted with your attorney; is that
11      correct?
12   A. Yes, I spoke with Mr. Hoeme in private.
13   Q. Okay. And you are claiming privilege over
14      that conversation?
15   A. Yes.
16   Q. How long was that conversation?
17   A. Two or three minutes maybe.
18   Q. All right. When did you find out that
19      Mr. Finch had died from his wounds?
20   A. I don't recall.
21   Q. Did you find out that night?
22   A. Yes.
23   Q. Before or after the interview?
24   A. I'm not sure, ma'am.
25   Q. You don't recall?

Page 311

1    A. No, I don't.
2    Q. Do you recall who told you?
3    A. No.
4    Q. What was your reaction when you did find out?
5    A. I don't remember.
6    Q. Do you recall feeling any mental distress?
7    A. Not distress, no.
8    Q. Do you recall feeling any emotion in
9       particular?
10   A. Sadness.
11   Q. Sadness for what reason?
12   A. Because a man lost his life in a tragic
13      incident.
14   Q. Did you feel regret?
15   A. No.
16   Q. And at any point did you have any kind of
17      emotional breakdown about this incident?
18   A. No.
19   Q. Any crying fit?
20   A. No.
21   Q. When did you find out that the call that led
22      to the police response to the Finch incident,
23      that it was a hoax?
24   A. I had an idea prior to my interview. And I
25      don't think I knew for certain until after my

Page 312

1    interview was concluded.
2    Q. You said you had an idea.
3        What did that idea stem from?
4    A. Just based on all the conflicting information
5       we started to receive after the shooting
6       incident had occurred.
7    Q. And that conflicting information was what you
8       received while you were still on the scene?
9    A. Yes, ma'am.
10   Q. And what information was that?
11   A. Information that the male caller was saying
12      that he was -- something like he was still
13      hiding in a closet or he was in the process
14      of pouring gasoline all over the house,
15      things that we knew to not be true because
16      officers were already in the house at that
17      point in time.
18   Q. And you were receiving information while you
19      were still on the scene about the fact that
20      officers had cleared the house and not found
21      what the caller seemed to be describing?
22   A. Correct.
23   Q. And then who told you definitively that it
24      was a hoax at the city building?
25   A. I don't remember, ma'am.

Page 313

1    Q. Sorry. Did you say when you found out.
2        Was it before or after the interview?
3    A. I believe I had a pretty good idea before my
4       interview, but I don't recall knowing for
5       certain until my interview was complete.
6    Q. Did you find out at that point that it was a
7       swatting call?
8    A. I don't recall, ma'am.
9    Q. You just knew it was a false call?
10   A. Yes.
11   Q. What was your reaction to finding that out?
12   A. Disappointed.
13   Q. And for what purpose?
14       In what manner were you disappointed?
15   A. I was disappointed because a false call led
16      to a man losing his life.
17   Q. Any other emotions?
18   A. Sadness.
19   Q. Any others?
20   A. No.
21   Q. Do you now, sitting here today, have any
22      additional information about Andrew Finch
23      that you did not have at the time of the
24      shooting?
25   A. As far as?

79 (Pages 310 to 313)

Page 314

1    Q. Any information at all about him.
2    A. Not really.
3    Q. Well, you now are aware of the fact that he
4       wasn't armed at the time; correct?
5    A. Yes.
6    Q. Are you aware of any actual threat that you
7       believe that Andrew Finch posed to you or the
8       other officers that night sitting here today?
9    A. I'm sorry. Could you ask that again.
10   Q. Sure. Sitting here today, are you aware of
11      any actual threat that Mr. Finch posed to you
12      or other officers that night?
13   A. No.
14   Q. Are you aware of any criminal activity
15      sitting here today that you believe that
16      Andrew Finch was engaged in at the time when
17      you shot him?
18   A. No.
19   Q. So you know now, of course, he did not have a
20      gun on him, correct, at the time he was shot?
21   A. Yes.
22   Q. You know that he had not held anyone hostage?
23   A. Correct.
24   Q. That he had not poured gasoline on the house?
25   A. Correct.

Page 315

1    Q. You now know that, in fact, he was an
2       innocent man?
3    A. Yes.
4    Q. Do you have anything that you would do over
5       again about that night if you could?
6          MR. PIGG: Object to form; calls
7       for —
8    A. No.
9          MR. PIGG: — speculation.
10   Q. Has any officer on the scene that night
11      expressed any regrets to you about how that
12      incident occurred?
13   A. No.
14   Q. Do you believe there should be any change to
15      WPD policy as a result of what happened?
16   A. No.
17   Q. Do you believe there should be any change to
18      WPD training?
19   A. I think we now have a completely new scenario
20      to add to training, yes.
21   Q. And what scenario is that?
22   A. A scenario of the swatting call.
23   Q. And you had not previously been trained on a
24      swatting call?
25   A. No, ma'am.

Page 316

1    Q. What exactly makes a swatting call different
2       than any other high stakes scenario for
3       purposes of training?
4          MR. PIGG: Object to form of the
5       question.
6    A. The most simplest answer to that is that a
7       swatting call is not real.
8    Q. Right. But you had been confronted by false
9       calls in the past; correct?
10   A. Correct.
11   Q. So what makes a swatting call different?
12   A. In my experience with one swatting call, it's
13      generally a higher level of priority type
14      call than other false calls that I,
15      personally, have responded to.
16   Q. And do you know if WPD now offers training on
17      response to swatting calls or potential
18      swatting calls?
19   A. I don't know, ma'am.
20   Q. In your personal opinion, what types of
21      training should be part of that particular
22      scenario training on swatting?
23          MR. PIGG: Objection; lack of
24      foundation, calls for speculation.
25   A. I would say there ought to be training

Page 317

1    scenarios that play out very similar to the
2    way this scenario did.
3    Q. I see. And in what way would that training
4       be different than the training on response to
5       a active shooter?
6          MR. PIGG: Same objection; lack
7       of foundation.
8    A. In an active shooter scenario, typically, you
9       can actually hear shots being fired upon the
10      first responding officer's arrival that would
11      add veracity to the claim of shots being
12      fired and there being an active shooter.
13   Q. I see. So swatting training would entail
14      training on the response where there are no
15      indications of an actual shooter when you
16      respond?
17   A. Correct.
18   Q. Would it be any different from training you
19      receive about barricaded gunmen?
20   A. Potentially.
21   Q. In what way?
22   A. That would be up to the people that provide
23      our training, ma'am.
24   Q. Would you expect it would include information
25      about how to verify information received by

80  (Pages 314 to 317)

Page 318

1    dispatch?
2    A. Partly.
3    Q. Do you receive training on that currently --
4    or prior to December 28th, 2017, did you
5    receive training on how to verify information
6    received by dispatch about a pending
7    incident?
8    A. Yes.
9    Q. Okay. And what did that training entail?
10   A. It entailed doing most of the same steps that
11   we did accomplish or would have accomplished,
12   given enough time that evening, but trying to
13   call the phone number, looking the phone
14   number up in our record system to see if we
15   can figure out who that phone number is
16   associated to, asking dispatch for any
17   information they had on previous calls made
18   at that residence, as well as verifying,
19   simply, that that address actually even
20   exists.
21   Q. What would additional training on those
22   procedures look like in a swatting incident?
23   A. I'm not sure, ma'am.
24   Q. Did anyone on the scene that night not act in
25   accordance with WPD policy in your opinion?

Page 319

1         MR. PIGG: Object to form; calls
2    for -- calls for speculation, insufficient
3    foundation.
4    BY MS. VAN BRUNT:
5    Q. Pardon?
6    A. I said not in my opinion, no.
7    Q. Do you believe everyone who you saw on the
8    scene that night acted as they should?
9         MR. PIGG: Same objection.
10   A. I believe so, as far as I'm aware.
11   Q. Did you have any subsequent interviews by any
12   WPD officers after this interview that we've
13   been talking about on the 20 -- early on the
14   29th?
15   A. Like me the subject of the interview?
16   Q. Right. Were you interviewed by any other
17   officers at any other time?
18   A. No, ma'am.
19   Q. Did you ever provide any followup information
20   to WPD following this interview?
21   A. No, ma'am, I did not.
22   Q. Did anything ever occur to you after this
23   interview about the incident that you thought
24   you should relay to WPD officers?
25   A. No, ma'am.

Page 320

1    Q. Were you ever polygraphed?
2    A. No, ma'am.
3    Q. Did you ever receive a psychiatric evaluation
4    as a result of this incident?
5    A. Other than the one I'm required to receive by
6    our policy, no.
7    Q. And when did you receive that?
8    A. I'm sorry. I guess it's not so much a
9    psychiatric evaluation as just a meeting with
10   a therapist or whoever that person was.
11   Q. I see. The counselor you talked about
12   before?
13   A. Yes, ma'am.
14   Q. Okay. What happened after this interview
15   concluded?
16   A. This interview?
17   Q. Yes Sorry. Let me be more clear for the
18   record.
19        What happened after the WPD interview
20   following the shooting concluded?
21   A. I believe I used the restroom and then when I
22   was allowed to go home.
23   Q. And what time was that?
24   A. I'm not a hundred percent sure.
25   Q. Was it before dawn?

Page 321

1    A. Yes.
2    Q. Were you slated to work the following day?
3    A. Yes.
4    Q. What day of the week did the shooting
5    incident occur on?
6    A. A Thursday night, I believe.
7    Q. Did you, in fact, work the following day?
8    A. No, ma'am.
9    Q. Why not?
10   A. I was on administrative leave per
11   departmental policy.
12   Q. For how long?
13   A. Until January 10th, I believe, or January
14   9th.
15   Q. And what was taking place during that time
16   that you were on leave?
17   A. Spending time at home. I also went and
18   completed my appointment with the counselor.
19   Went to the range and did my use of force
20   stuff that I'm required to do, and I think
21   that's about it.
22   Q. And I asked that badly. It's helpful
23   information, but what I was also wondering is
24   was there a reason why you were on
25   administrative duty until January 10th?

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105    WICHITA, KANSAS
316.267.8200                                                         67202

Page 322

1      Was there something going on at WPD
2  during that time that necessitated you being
3  on administrative leave?
4  A.  No.  That's just standard practice for an
5  officer that's been involved in a shooting.
6  Q.  They are expected to take off for a certain
7  amount of time?
8  A.  Yes, and it kind of depends.  I'd asked for
9  one or two extra days off because my wife had
10  wanted me to, but other than that, no, it's
11  standard for someone to go on administrative
12  leave following an officer-involved shooting.
13  Q.  And why did she want you to take extra days
14  off?
15  A.  Just to spend more time with me.
16  Q.  And when you said you went to the rifle
17  range, for what purpose did you go there?
18  A.  That's part of getting back to work.
19  Q.  You have to qualify again?
20  A.  Yes, ma'am.
21  Q.  Were you being paid fully following leave?
22  A.  Yes.
23  Q.  And when you went back in January, were you
24  then put on -- were you then put in the
25  position that you're on now?

Page 323

1  A.  Yes.
2  Q.  And you've been on that position ever since?
3  A.  Yes.
4  Q.  And what's the technical name of it again?
5  A.  Modified duty, I suppose.
6  Q.  And again, you're receiving full pay;
7  correct?
8  A.  Yes.
9  Q.  At some point, the Sedgwick County District
10  Attorney's Office conducted a criminal
11  investigation into this case; correct?
12  A.  Yes.
13  Q.  And were you interviewed as part of that
14  investigation?
15  A.  No.
16  Q.  You were never interviewed by a prosecutor or
17  an investigator with the prosecutor's office?
18  A.  No.
19  Q.  Did you ever meet with the DA, Mr. Bennett,
20  during the time that that criminal
21  investigation was ongoing?
22  A.  No.
23  Q.  Did your attorney meet with Mr. Bennett at
24  any point while that investigation was
25  ongoing, to your knowledge?

Page 324

1  A.  Not to my knowledge.
2  Q.  Did you stay in touch with your attorney
3  throughout that investigation?
4  A.  Yes, ma'am.
5  Q.  Did he keep you apprised of developments in
6  that -- strike that.
7      Were you kept apprised of developments
8  in the DA's investigation while it was
9  ongoing?
10  A.  No.
11  Q.  Did anyone from the DA's office ever call you
12  to tell you what was going on in the
13  investigation?
14  A.  No, ma'am.
15  Q.  How did you know that a criminal
16  investigation was taking place?
17  A.  'Cause that's what always happens.
18  Q.  You just assumed it was happening?
19  A.  Yes.
20  Q.  You didn't have any concrete facts to know it
21  was happening in your case?
22  A.  Other than it would be highly unusual for it
23  not to occur, no, I did not.
24  Q.  Did any of your supervising officers ever
25  mention that it was happening?

Page 325

1  A.  No.
2  Q.  Did you ever ask?
3  A.  No.
4  Q.  Were you curious?
5  A.  No.  I just -- like I said, I assumed that it
6  was happening because that's what always
7  happens.
8  Q.  Were you nervous about the outcome?
9  A.  No.
10  Q.  Why not?
11  A.  Because I wasn't.
12  Q.  You obviously could have faced some serious
13  prison time if you were convicted; correct?
14  A.  Sure.
15  Q.  But you weren't nervous?
16  A.  No.
17  Q.  Can you explain why?
18  A.  Yes.
19  Q.  Why?
20  A.  Because based off of our policies and
21  everything that I know about the law, as
22  tragic and unfortunate as this incident was,
23  I followed the law.
24  Q.  So the DA found that your -- that there was
25  not sufficient evidence to defeat a defense

82  (Pages 322 to 325)

Page 326

1    of self-defense in this case; correct?
2    A. Yes.
3            MR. PIGG: Object to form.
4    Q. And did you find that to be a correct
5    outcome?
6    A. Yes.
7    Q. Okay. And when did you find out the outcome
8    of the investigation?
9    A. Maybe two hours before he did his public
10   announcement.
11   Q. Okay. And who'd you find out from?
12   A. Marc Bennett.
13   Q. He called you?
14   A. I had a meeting with him at his office.
15   Q. Who else was present?
16   A. I believe Kelly Otis, the lead investigator
17   for the DA's office; and my captain.
18   Q. Who is your captain?
19   A. Brent Allred.
20   Q. And did you know what was going to happen at
21   that meeting prior to attending?
22   A. No.
23   Q. Were you summoned to it?
24   A. Yes.
25   Q. By whom?

Page 327

1    A. Captain Allred.
2    Q. Did you think it was possible that you could
3    receive bad news at that meeting?
4    A. Possible.
5    Q. Was your attorney present?
6    A. No.
7    Q. Did you want him to be present?
8    A. No.
9    Q. How come?
10   A. If it turned into any kind of interview
11   scenario for me, I would have advised them
12   that I would like to wait to be interviewed
13   until I had time to consult with my attorney.
14   Q. What did DA Bennett say to you at that
15   meeting?
16   A. He said that there was no evidence to support
17   charging me with a crime in the case and,
18   therefore, he was not going to file criminal
19   charges against me, and that in a reasonably
20   short period of time, he was going to make
21   that announcement publicly.
22   Q. Did he say there was no evidence to support
23   charging you or that they -- there was not
24   sufficient evidence to prove beyond a
25   reasonable doubt that you had committed that

Page 328

1    crime?
2    A. I don't remember his exact words, ma'am.
3    Q. Did Ms. Otis say anything during the meeting?
4    A. Mr. Otis did not.
5    Q. Oh, Mr. Otis. Apologies.
6            Did the captain say anything?
7    A. I don't think so.
8    Q. Did you say anything?
9    A. I don't believe so.
10   Q. Did you thank him?
11   A. Well, yes.
12   Q. And what did he say in response?
13   A. He said have a good day.
14   Q. Had you ever met DA Bennett prior to that
15   day?
16   A. I don't believe so.
17   Q. Had he ever conducted a training in which you
18   participated at WPD?
19   A. Maybe.
20   Q. All right. So I'll just ask as long as we're
21   doing it. Find it, one second. I'm going to
22   mark this as Exhibit 59.
23          (Rapp Exhibit No. 59 was marked for
24          identification.)
25   Q. I have put before you what is, again, looks

Page 329

1    like a PowerPoint. It's titled
2    Officer-Involved Use of Force. Below it,
3    Marc Bennett, District Attorney, 18th
4    Judicial District, Wichita, Kansas.
5    A. Uh-huh.
6    Q. Have you ever seen this document before?
7    A. Possibly.
8    Q. Looking through it, does it refresh your
9    recollection as to whether you attended a
10   training with DA Bennett?
11   A. Yes, I think, actually, I did.
12   Q. You did -- do you believe you attended this
13   training in particular?
14   A. I believe so.
15   Q. Okay. And in this training, DA Bennett
16   provided the -- among other things, the legal
17   principles and case law governing use of
18   force; correct?
19   A. Yes, ma'am.
20   Q. Is it here that you learned the objective
21   reasonableness standard that you cited
22   earlier?
23   A. No, I knew that prior to this training.
24   Q. Okay. But you did receive an affirmation of
25   that legal principle in this training?

83 (Pages 326 to 329)

Page 330

1  A. Yes.
2  Q. As well as the principles of self-defense
3     under Kansas Law?
4  A. Yes.
5  Q. And the use of force at arrest?
6  A. Yes.
7  Q. And various immunities, statutory immunities
8     in the context of use of force?
9  A. Yes.
10 Q. Okay. Did you think DA Bennett was a
11    effective trainer?
12 A. Oh, I suppose.
13 Q. And that was in -- do you recall what year
14    this training took place?
15 A. No, ma'am, I don't.
16 Q. Had you -- other than this training and the
17    meeting that you just described relating to
18    the criminal investigation in the Finch
19    shooting incident, had you met DA Bennett?
20 A. I think I had one meeting that he was present
21    for in reference to a child murder
22    investigation that was being worked by the
23    Wichita Police Department, and I was part of
24    that investigation. And Marc was present for
25    that meeting, but he and I did not have any

Page 331

1     interaction with each other. We were merely
2     in the same room for this meeting.
3  Q. Was he prosecuting the case?
4  A. I believe he was supervising the prosecution
5     of the case.
6  Q. All right. When was that meeting?
7  A. Probably March or April of this year.
8  Q. I see. Was it after the results came down
9     from the criminal investigation by the DA?
10 A. It may have been. It was either just prior
11    to or just after, ma'am. I really don't
12    remember when the meeting was.
13 Q. Were you a witness in that child murder case?
14 A. I was reviewing hours upon hours of
15    surveillance video in reference to that case.
16    I was not actually a witness.
17 Q. Did you testify in that case at any point in
18    time?
19 A. Actually, I'll be testifying in that case on
20    Friday this week.
21 Q. Okay. And so what was that meeting about at
22    that point in time?
23 A. The meeting was to let the two main
24    prosecutors for that case know the sheer
25    volume of evidence that we had and what we

Page 332

1     were seeing on all of this hours upon hours
2     upon hours of surveillance video.
3  Q. Were you a primary officer on the case?
4  A. I was one of the primary officers reviewing
5     the video.
6  Q. And did you ever review the report that DA
7     Bennett issued in relating to the Finch
8     shooting incident?
9  A. Yes, ma'am.
10        (Rapp Exhibit No. 60 was marked for
11    identification.)
12 Q. Mark it as Exhibit 60. All right.
13        Do you recognize the document I just
14    gave to you?
15 A. Yes, ma'am.
16 Q. And is it the report that the district
17    attorney released about the Finch shooting
18    incident?
19 A. Yes.
20 Q. And the conclusion of the criminal
21    investigation into that incident?
22 A. Yes, ma'am.
23 Q. And it's dated April 12th, 2018?
24 A. Yes.
25 Q. Well, first of all, does that refresh your

Page 333

1     recollection as to whether the meeting you
2     had about the child murders was before or
3     after the release of this document?
4  A. No, ma'am, it does not.
5  Q. And when did you first read this report?
6  A. On April 12th.
7  Q. Okay. So you read it as soon as it came out?
8  A. I read it after it was released to public.
9  Q. So it was after the meeting that you had?
10 A. Yes.
11 Q. And did you have -- well, did you find that
12    this report was factually accurate in its
13    summary of the evidence in the case?
14 A. Yes, I believe it to be accurate.
15 Q. Did you take any objection to any of its
16    findings?
17 A. No.
18 Q. And just to clarify for the record, if you go
19    to Page 12, stepping back a second, there are
20    no names used in this report; correct?
21 A. Yes.
22 Q. You are, in fact, never named in this
23    document --
24        REPORTER: I'm sorry. Repeat the
25    last part.

84 (Pages 330 to 333)

Page 334

1    Q. Never named in this document; correct?
2    A. I believe that's correct.
3    Q. Do you know why?
4    A. No.
5    Q. Was your name released ever to the public in
6       relation to this incident?
7    A. Yes.
8    Q. At what point in time?
9    A. When I testified in Tyler Barriss'
10      preliminary hearing.
11   Q. Okay. And prior to that time was it?
12   A. Yes.
13   Q. When?
14   A. Sometime in February.
15   Q. How?
16   A. An individual named Miko Hayes wrote multiple
17      news articles and made multiple social media
18      posts about me.
19   Q. And how did he find out you were the officer
20      involved?
21   A. I don't know.
22   Q. And is Miko Hayes somebody you're familiar
23      with?
24   A. No. Other than from this particular
25      incident, no, I was not familiar with him

Page 335

1    prior to that.
2    Q. Is he a civilian?
3    A. Yes.
4    Q. But this, obviously, does not name you so I'm
5       just going to confirm, on Page 12, it refers
6       to Wichita Police Department Officer No. 1.
7       Looking at that first paragraph, can you
8       confirm that you are Officer No. 1 for the
9       purposes of this report?
10   A. Yes.
11   Q. And the first paragraph also says: On the
12      night of the shooting, Officer No. 1 — he —
13      was riding in a two officer patrol unit with
14      Officer No. 2.
15         Does that suggest to you that Officer
16      No. 2 is Officer Powell?
17   A. Yes, ma'am.
18   Q. And one other question, if we go back to Page
19      10 it references Wichita Police
20      Department Sergeant No. 1?
21   A. Uh-huh.
22   Q. Based on that first paragraph and subsequent
23      information if you want to read it, do you
24      believe that to be Sergeant Jonker?
25   A. Yes.

Page 336

1    Q. And I'm not sure if you know, but on Page 12,
2       again, sorry, it refers to police department
3       Sergeant No. 2.
4          Do you know who that is?
5    A. Give me just one minute to read this.
6    Q. Of course.
7    A. And I will answer. No, I'm not sure who that
8       would be, ma'am.
9    Q. Okay. Is it possible that it's Sergeant
10      Beard?
11         MR. PIGG: Object to form.
12   A. That would be possible, yes.
13   Q. Since the shooting, have you faced any
14      work-related consequences as a result of the
15      shooting?
16   A. No.
17   Q. Have you faced any disciplinary action?
18   A. No.
19   Q. And you are aware that there was an
20      investigation conducted by the PSB; correct?
21   A. Yes.
22   Q. And how did you find out about that?
23   A. That's just standard practice.
24   Q. So again, you just assumed there would be
25      one?

Page 337

1    A. Yes, ma'am.
2    Q. No one ever told you definitively that there
3       was an investigation ongoing?
4    A. No.
5    Q. You never received information from Detective
6       Pichler that there was an investigation
7       ongoing?
8    A. No, ma'am.
9    Q. And that investigation was of an
10      administrative, not criminal nature; correct?
11   A. Correct.
12   Q. And what potential violations of WPD
13      regulations and policy were being
14      investigated to your knowledge?
15   A. I would assume the use of force policy, maybe
16      the rifle policy. Outside of that, I don't
17      know.
18   Q. Because you never received a formal
19      notification about the investigation?
20   A. Correct.
21   Q. Do you know what the status of the
22      investigation is now?
23   A. According to what you've shown me today, it
24      appears that it's over with.
25   Q. And you knew it was closed prior today — to

Page 338

1    today; correct?
2    A.  Yesterday when I saw the document, I knew,
3        yes.
4    Q.  Prior to yesterday, had you received any
5        notification that it was closed?
6    A.  I guess when I did go down to professional
7        standards to look at it, I did see.
8    Q.  And that was in July of this year?
9    A.  I think so.
10   Q.  And what were the circumstances that led you
11       to go to PSB in July?
12   A.  Someone had told me that they put together
13       entire binders on these.  I knew that would
14       be probably the best, most thorough bit of
15       information about the entire incident, and I
16       was curious to see it for myself.
17   Q.  Who told you about the binders?
18   A.  A detective.  I'm not sure who it was.
19   Q.  So you went in July.
20           What was the status of the
21       investigation at that point?
22   A.  I think it was done at that point, but I'm
23       not sure.
24   Q.  How come you didn't seek out the file prior
25       to July?

Page 339

1    A.  I don't know.
2    Q.  Was it just coincidence that you sought out
3        the file the same month that it was
4        concluded?
5    A.  Yes.
6    Q.  And no one told you that you were, in fact,
7        exonerated --
8    A.  No.
9    Q.  -- prior to you requesting to see the file?
10   A.  Correct.
11   Q.  Is that typical in your knowledge of WPD
12       policies and procedures?
13   A.  I don't know.
14   Q.  Had you ever worked with Joseph Pichler
15       before?
16   A.  No.
17   Q.  Have you ever been investigated by him
18       before?
19   A.  No.
20   Q.  Had you ever participated in an investigation
21       of officer excessive force before?
22   A.  No.
23   Q.  As a witness, for instance?
24   A.  Yes.
25   Q.  So you were a witness to an officer excessive

Page 340

1    force investigation?
2    A.  Yes.
3    Q.  And when was that?
4    A.  2011 or '12, I believe.
5    Q.  What were the circumstances of that
6        investigation?
7    A.  An individual we believed was armed with a
8        handgun would not give up his hands and had
9        them shoved in the front of his pants.  And
10       another officer -- as I was trying to
11       physically restrain that subject, another
12       officer used the butt end of a shotgun and
13       struck that individual in the head.
14   Q.  Which officer was that?
15   A.  Officer Schneider.
16   Q.  And you were interviewed as part of the PSB
17       investigation?
18   A.  Yes.
19   Q.  And you also wrote a report for WPD for that
20       investigation?
21   A.  Yes.
22   Q.  What was the outcome of the investigation?
23   A.  I don't know.
24   Q.  Was Officer Schneider disciplined?
25   A.  I don't know.

Page 341

1    Q.  Is he still on the force?
2    A.  Yes.
3    Q.  In what position?
4    A.  He's still a patrol officer, I believe.
5    Q.  Did -- what was the man who -- the civilian's
6        name who is the victim of the use of force?
7    A.  I have no idea.
8    Q.  Did he sustain any injuries?
9    A.  I believe he had a laceration to his head.
10   Q.  Do -- were you a witness to any other
11       incidents involving excessive force?
12   A.  No.
13   Q.  Did you ever see the subsequent file -- PSB
14       file in that case?
15   A.  On the one we just discussed?
16   Q.  Correct.
17   A.  No, ma'am.
18   Q.  Did you receive any awards or commendations
19       for your work on the Finch case?
20   A.  No.
21   Q.  Do you expect to?
22   A.  No.
23   Q.  Were you investigated at any point by the
24       Citizen Review Board in regards to this case,
25       this incident?

86  (Pages  338  to  341)

Page 342

1  A.  I don't know.
2  Q.  Have you ever appeared before the Citizen
3      Review Board before?
4  A.  No, ma'am.
5  Q.  Are you familiar with what it is?
6  A.  Yes.
7  Q.  Okay.  And what is it exactly?
8  A.  It's a group of citizens that have the
9      opportunity to review various uses of force.
10     I'm not sure how they pick which they will
11     review and which they won't review.  But they
12     review investigations and provide input to
13     Wichita Police Department command staff from
14     my understanding.
15 Q.  Do they -- do you know anything about their
16     policies and procedures?
17 A.  No, ma'am, I don't.
18 Q.  Do you know of anyone who has appeared before
19     them?
20 A.  No.
21 Q.  Or who has been interviewed by them?
22 A.  No.
23 Q.  Have you ever heard of the Citizen Review
24     Board reviewing an officer use of force since
25     you have been on the force?

Page 343

1  A.  No.
2  Q.  And you never received any kind of paperwork
3      from the board at any point about this
4      incident?
5  A.  No, ma'am.
6  Q.  Or about any other incident?
7  A.  No.
8  Q.  And you're, of course, familiar with the name
9      Tyler Barriss; correct?
10 A.  Yes, ma'am.
11 Q.  And who is he?
12 A.  He is the individual who made the 911 call or
13     the swatting call that led us to go to 1033
14     West McCormick.
15 Q.  And you testified in criminal proceedings
16     against him; correct?
17 A.  Yes, ma'am.
18 Q.  In a preliminary hearing on May 22nd, 2018?
19 A.  Yes, ma'am.
20 Q.  And prior to testifying, did you meet with DA
21     Marc Bennett?
22 A.  No.
23 Q.  Did you meet with any prosecutor?
24 A.  No.
25 Q.  And did you prepare in any way for that

Page 344

1      testimony?
2  A.  I reviewed my interview transcript from my
3      criminal interview.
4  Q.  Any other documents?
5  A.  No, ma'am.
6  Q.  Did you speak to any prosecutor prior to
7      testifying in that case?
8  A.  Not about that case, no.
9  Q.  So you just got on the stand cold?
10 A.  Yes.
11 Q.  They had no idea what you were going to say?
12 A.  Well, I'm sure they knew what I was going to
13     say.  They've reviewed my interview
14     transcript the same as I did.
15 Q.  All right.  But you had no communications
16     about your expected testimony in that case?
17 A.  No.  I had no planned st down preparatory
18     type meeting, no.
19 Q.  Did defense counsel for Mr. Barriss contact
20     you at all prior to the hearing?
21 A.  No, ma'am.
22 Q.  Was your testimony in that hearing completely
23     accurate and truthful?
24 A.  Yes.
25 Q.  Have you since seen a transcript of that

Page 345

1      hearing?
2  A.  Yes.
3  Q.  Did anything about that hearing or the
4      transcript strike you as inaccurate?
5  A.  No.
6  Q.  Is there anything that you do not stand by
7      now that is in that transcript?
8  A.  I'd have to read it again to be a hundred
9      percent certain, but I don't believe so.
10 Q.  Would you like to see a copy right now?
11 A.  Sure.
12         (Rapp Exhibit No. 61 was marked for
13         identification.)
14 Q.  All right.  This is going to be Exhibit 61.
15     Here you go.
16         What I'm handing out is a transcript
17     of -- I know I should have it here
18     somewhere -- Officer Rapp's testimony in the
19     preliminary hearing of State v. -- State of
20     Kansas v. Tyler Barriss held on May 22nd in
21     the 18th Judicial District of Kansas.
22         Is this the transcript that you
23     reviewed previously, sir?
24 A.  Yes, ma'am.
25 Q.  Okay.  And when you reviewed it -- sorry.

Page 346

1   **Strike that.**
2       **You reviewed it as recently as**
3   **yesterday; correct?**
4   A. Yes.
5   Q. **And when you reviewed it yesterday, nothing**
6   **struck you as inaccurate?**
7   A. In a brief flip through yesterday, no.
8   Q. **Okay. And nothing struck you as obviously**
9   **wrong?**
10  A. Correct.
11  Q. **I mean, there are no statements in here that**
12  **you would now take back upon further review?**
13  A. Well, that's why I'm trying to review this
14  right now, ma'am.
15  Q. **Sounds good. Take your time.**
16  A. I'm sorry. Your question was did I have
17  anything that I would change about this
18  transcript?
19  Q. **Correct.**
20  A. I would change the way that one of my
21  questions is interpreted based on the way it
22  was asked.
23  Q. **Can you point to that question, please?**
24  A. On Page 105, Line No. 6.
25  Q. **Okay.**

Page 347

1   A. Mr. Sylvester asked: "You had a clear view
2   of his hand when he's bringing it up, didn't
3   you?"
4       And I said: "Yes."
5       By clear view of his hand, I don't
6   mean I can clearly see his hand. I mean I
7   can clearly see his arm is coming up, not "I
8   can see his hand, I know it's empty."
9   Q. I see. How come you didn't make that
10  clarification at the time?
11  A. Because much like today's scenario, or
12  situation, there's a lot of stress, you're
13  answering a lot of questions, and it didn't
14  dawn on me that that had happened until today
15  when I answered basically the same question
16  the same way and thought, that's not a
17  hundred percent accurate.
18  Q. Getting to that point, you said you could see
19  his hand coming up at the time that you shot.
20      Was his hand fully up at 90 degrees
21  parallel to the ground?
22  A. From what I recall --
23  Q. Yes.
24  A. -- being in that moment --
25  Q. Yes.

Page 348

1   A. -- his arm was in the process of coming up as
2   I began pulling my trigger.
3   Q. So it wasn't fully raised at that point in
4   time?
5   A. Correct.
6   Q. Okay. And you state that you believed you
7   saw a firearm at that time.
8       Did you believe you saw specific
9   characteristics of that firearm?
10  A. No, ma'am.
11  Q. Do you believe you saw a specific color of a
12  barrel?
13  A. Dark.
14  Q. A dark barrel?
15  A. (Witness nods.)
16  Q. Do you believe you saw a specific color of a
17  handle?
18  A. No.
19  Q. And you mentioned that you turned on the
20  light of your rifle; correct?
21  A. Yes.
22  Q. And why did you do that?
23  A. To try to provide better lighting for the
24  porch area.
25  Q. Because it was dark?

Page 349

1   A. Yes.
2   Q. And did you have a night scope on the rifle?
3   A. We don't have those, ma'am.
4   Q. So there's no way to provide better vision
5   through the rifle scope at nighttime as
6   opposed to daytime?
7   A. Correct.
8   Q. Do you -- is there anything in your WPD
9   interview that you don't stand by now?
10  A. No.
11  Q. Everything's accurate?
12  A. Yeah.
13  Q. Do you consider Tyler Barriss responsible for
14  what happened to Andrew Finch?
15  A. Yes.
16  Q. Do you consider him to be fully responsible
17  to what -- for what happened to Andrew Finch?
18  A. No.
19  Q. Who else is responsible?
20  A. Andrew Finch.
21  Q. Andrew Finch is responsible?
22  A. Parts -- partially.
23  Q. And why is that?
24  A. Because he had every opportunity to be
25  compliant and not be shot.

88  (Pages 346 to 349)

Page 350

1    Q.  Anybody else responsible?
2    A.  Tyler Barriss.
3    Q.  So the only two people responsible for Andrew
4        Finch's death are Tyler Barriss and Andrew
5        Finch?
6    A.  That's my opinion.
7    Q.  You spoke earlier about the fact that you
8        know that people are sometimes noncompliant
9        when faced with a law enforcement response;
10       correct?
11   A.  Yes.
12   Q.  Are there occasions in their noncompliance
13       when they are not, in fact, engaged in
14       criminal activity or otherwise committing
15       misconduct?
16   A.  I'm sorry.  Can you ask that question again.
17   Q.  Are there occasions when people can be, in
18       your experience, noncompliant with officer
19       commands even when they are not engaged in
20       criminal misconduct or criminal activity?
21   A.  Yes.
22   Q.  And for what reasons are people in those
23       scenarios noncompliant, have you found, on
24       the job?
25   A.  In my experience?

Page 351

1    Q.  Correct.
2    A.  Because they don't like the police, they have
3        issues with authority.  Sometimes -- those
4        would probably be the two major ones.  They
5        don't like the police or they generally
6        disrespect authority figures.
7    Q.  Okay.  And we also discussed, possibly, if
8        they have mental health issues?
9    A.  Possibly, but most are still moderately
10       compliant.
11   Q.  Would you say that somebody who had a fear of
12       the police might not be compliant?
13   A.  No.  I've found them to, generally, be very
14       compliant.
15   Q.  Somebody who's maybe confused about the
16       police response, could you see a situation in
17       which they would be noncompliant?
18   A.  That would be possible.
19   Q.  I'm going to ask if you agree with certain
20       propositions, and you can just tell me yes or
21       no.
22           Do you agree with the proposition that
23       lethal force is the highest level of force an
24       officer can use?
25   A.  Yes.

Page 352

1    Q.  Would you agree that special rules apply in
2        the application of lethal force as opposed to
3        a regular use of force?
4    A.  I don't understand what you're asking.
5    Q.  Are there specific standards that govern the
6        use of lethal force?
7    A.  Yes.
8    Q.  And is it true that one of those standards is
9        that a situation must be life-threatening in
10       order for an officer to use lethal force?
11   A.  No.
12           MR. PIGG:  Object to form; that
13       misstates the law.
14   Q.  What's wrong about that statement?
15   A.  That limits it only to instances where it
16       absolutely is life-threatening, not the
17       perception of life-threatening.
18   Q.  Okay.  Do you believe it to be a subjective
19       perception of life-threatening or objective
20       perception of life-threatening?
21   A.  Objective.
22   Q.  Do you agree with the statement that lethal
23       force must be a last resort?
24   A.  Yes.
25   Q.  Do you agree that lethal force is likely to

Page 353

1        cause death or great bodily injury?
2    A.  Absolutely.
3    Q.  Do you agree that in responding to any
4        incident as a law enforcement officer with
5        the use of force, it's imperative that the
6        officer show respect for life?
7    A.  Yes.
8    Q.  Do you agree that to use lethal force, no
9        less lethal measures must be available?
10           MR. PIGG:  Object to form;
11       misstates the law.
12   Q.  Do you agree with this proposition or
13       disagree with the proposition that in order
14       to use less lethal force, all other less
15       lethal measures have been -- sorry.  Let's
16       strike that.
17           To use lethal force, there must be no
18       available less lethal measures available?
19           MR. PIGG:  Object to form of the
20       question; misstates the law.
21   A.  I'm sorry.  You got --
22   Q.  I'll try again.  In order to use lethal
23       force, do you -- sorry.
24           Do you agree with the proposition that
25       in order to use lethal force, no less lethal

89 (Pages 350 to 353)

Page 354

1  measures are -- must be -- let me just strike
2  that and get back to that 'cause I'm getting
3  tired.
4       Let's try this:  To use lethal force,
5  all other less lethal measures must have been
6  exhausted?
7            MR. PIGG:  Object to form; it's a
8  blatant misstatement of the law.
9  A.  I disagree with that.
10 Q.  You believe that you can still use lethal
11     force even if it is possible to use less
12     lethal force options at the time?
13 A.  I'm sorry.  When you phrased it that way --
14     well, that's really not a fair question.
15 Q.  How come?
16 A.  Because there's always a less lethal option
17     that would be potentially available, but
18     based on what you're facing, less lethal may
19     not be practical.
20 Q.  Practical, given what?
21 A.  Given if you believe you are or you are being
22     faced with lethal force.  It's like we
23     asked -- we talked earlier, you had asked
24     would I ever respond with less lethal force
25     to a lethal force threat, no.

Page 355

1  Q.  Do you believe -- do you agree with the
2      proposition that to use lethal force, an
3      officer should first issue a verbal warning,
4      when feasible, that deadly force is going to
5      be used?
6  A.  When it's feasible, yes.
7  Q.  And how do you define feasible?
8  A.  Feasible is available, possible.
9  Q.  Possible, given what?
10 A.  Given time, circumstances.
11 Q.  Do you believe that a subjective fear on the
12     part of an officer is insufficient to justify
13     the use of lethal force?
14            MR. PIGG:  Object to form.
15 A.  I'm sorry.  Can you ask that again.
16 Q.  Do you believe that a subjective fear by the
17     officer that -- is insufficient to justify
18     lethal force?
19            MR. PIGG:  Object to form.
20 A.  By subjective, you mean that officer's
21     opinion alone?
22 Q.  Correct.
23 A.  Okay.  Now please ask that question one more
24     time.
25 Q.  Do you believe -- do you stand by the -- do

Page 356

1  you agree with the proposition that
2  subjective fear is insufficient for using
3  lethal force?
4            MR. PIGG:  Object to form; it's
5  an insufficient hypothetical.
6  A.  Probably.
7  Q.  Would you agree that an overreaction -- well,
8  strike that.
9       Do you believe it would have been
10 possible for you to wait before shooting
11 Andrew Finch to see what he was going to do
12 with his hand?
13 A.  No.
14 Q.  Do you believe there was anytime that you
15  could have waited to give him a verbal
16  warning that lethal force was going to be
17  used?
18 A.  No.
19 Q.  And in fact, no verbal warning was used -- or
20  was issued before you fired your shot;
21  correct?
22 A.  No verbal warning that he would be shot was
23  issued.
24 Q.  And you stand by that action?
25 A.  Yes.

Page 357

1            MS. VAN BRUNT:  I am just going
2  to take a quick break to review notes and I
3  should be almost done.  We can go off the
4  record for a minute, please.
5            VIDEOGRAPHER:  Off the record at
6  6:25.
7       (A recess was taken from 6:25 p.m. to
8  6:34 p.m.)
9            VIDEOGRAPHER:  Back on the
10 record.  Current time is 6:34 p.m.
11           MS. VAN BRUNT:  All right.
12 Officer Rapp, I have no further questions.
13 And the only question, I guess, remaining for
14 you, unless, Counsel, do you have any
15 questions?
16           MR. PIGG:  I have just a few.
17           MS. VAN BRUNT:  Okay.  So turn it
18 over to your counsel.
19           CROSS-EXAMINATION
20 BY MR. PIGG:
21 Q.  Officer Rapp, at this location where you're
22  situated across the street from 1033
23  McCormick, I just want to paint that picture
24  a little bit more clearly.
25 A.  Okay.

90  (Pages 354 to 357)

Page 358

1  Q. You're by a couple of vehicles to provide
2     some cover; correct?
3  A. Yes, sir.
4  Q. And are you near the rear of those vehicles?
5  A. Yes, sir.
6  Q. Those vehicles are pulled in backwards toward
7     the building that's up against your back?
8  A. Yes, sir.
9  Q. Are you fairly close to the building?
10 A. Yes.
11 Q. And McCormick, is that a 2 or 4-lane street?
12 A. Four lanes.
13 Q. So Mr. -- when Mr. Finch comes out of the
14    front door of 1033 McCormick, he's all the
15    way across from pretty much the wall of that
16    building to the wall of the other building
17    across four lanes of travel?
18 A. Yes, sir.
19 Q. And it's dark at that time?
20 A. Yes.
21 Q. And you've testified that the photograph on
22    Page 16 of Exhibit 57 is fairly close to the
23    lighting circumstances?
24 A. Yes.
25 Q. When Mr. Finch made the movement that you

Page 359

1     interpreted as drawing a gun, and he -- he
2     put his hand back down so you couldn't see
3     his hand behind his right leg?
4  A. That's correct.
5  Q. The time that you were able to see his hand
6     at all, was that just when he raised the
7     hand?
8        MS. VAN BRUNT: Objection;
9  misstates former testimony.
10 A. I'm sorry. Can you rephrase that.
11 Q. From the time that Mr. Finch had made the
12    motion that you interpreted as drawing a gun?
13 A. Uh-huh.
14 Q. His hand was hidden from you until he raised
15    the hand?
16 A. Yes, sir.
17 Q. And when he raised the hand, did he do that
18    slowly?
19 A. No.
20 Q. How quickly did he do that?
21 A. It appeared to me that he would not have been
22    able to do it any faster than he did.
23 Q. And you had to make the decision of whether
24    he had a gun in his hand and whether you
25    needed to shoot to protect the other officers

Page 360

1     in the time that he raised the hand?
2        MS. VAN BRUNT: Objection;
3  leading.
4  A. Yes.
5  Q. Was -- was the length of time, it was a
6     fraction of a second?
7  A. Yes.
8  Q. How much time did you have to make that
9     decision?
10 A. Just fractions of a second.
11 Q. And you could see that he raised his arm
12    toward the other officers?
13 A. Yes.
14 Q. But you did not clearly see that he did not
15    have a gun in his hand?
16 A. That's correct.
17       MS. VAN BRUNT: Objection to
18 form.
19 BY MR. PIGG:
20 Q. Why did you not wait until longer?
21    Why did you shoot at that time?
22 A. 'Cause action is faster than reaction. And
23    in my experience not only firing firearms
24    myself at the range, but also in other use of
25    force training, in the time it takes for

Page 361

1     Mr. Finch or anyone to raise a firearm and
2     begin to fire and your brain to register he's
3     got a gun, he's firing, any individual would
4     be able to fire 3 to 5 rounds in that amount
5     of time, which would mean I would have
6     allowed him 3 to 5 bullets fired at officers
7     had I waited.
8        MR. PIGG: Officer Rapp, I don't
9  have any other questions at this time.
10       REDIRECT EXAMINATION
11 BY MS. VAN BRUNT:
12 Q. I just have one followup question, sorry, to
13    your answer you just gave.
14 A. Yes, ma'am.
15 Q. You said Mr. Finch could have given 3 to 5
16    rounds at officers had you waited?
17 A. Yes.
18 Q. But, of course, that's if he had a firearm;
19    correct?
20 A. Yes.
21 Q. Which he did not; correct?
22 A. Correct.
23       MS. VAN BRUNT: All right. No
24 further questions. Would you like to --
25       MR. PIGG: He'll read and sign.

91 (Pages 358 to 361)