# Exhibit D

```
 1              IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS
 2

 3

 4    LISA G. FINCH, Individually, as     )
      Co-Administrator of the Estate      )
 5    of Andrew Thomas Finch,             )
      deceased, and as Next Friend        )
 6    for her minor granddaughter,        )
      AF; DOMINICA C. FINCH, as           )
 7    Co-Administrator of the Estate      )
      of Andrew Thomas Finch,             )
 8    deceased; and ALI ABDELHADI,        )
                                          )
 9                    Plaintiffs,         )
                                          )
10                                        )
           vs.                            )Case No.
11                                        )18-CV-01018-JWB-KGS
                                          )
12    CITY OF WICHITA, KANSAS;            )
      JOHN DOE POLICE OFFICERS 1-10,      )
13                                        )
                      Defendants.         )
14                                        )

15

16                    D E P O S I T I O N

17

18         The videotape deposition of DUSTIN FUSSELL taken on

19    behalf of the Plaintiffs pursuant to the Federal Rules of

20    Civil Procedure before:

21               RICK J. FLORES, CSR
                 KELLEY REPORTING ASSOCIATES, LTD.
22               515 South Main, Suite 108
                 Wichita, Kansas  67202
23

24    a Certified Shorthand Reporter of Kansas, at 455 North

25    Main, 13th Floor, Wichita, Sedgwick County, Kansas, on

26    the 19th day of October, 2018, at 8:59 a.m.

27
```

Page 78

1  Q. Is there anything that you do differently in
2     responding to a call as a result of you being
3     involved in that swatting call back in the
4     northwest part of Wichita?
5  A. No. The number one thing is containment.
6     That's what our number one goal was. When we
7     got there, we could hear no active shooting.
8     We couldn't hear the disturbances or anything
9     from that residence at that point, so the
10    name of the game was containment at that
11    point. Contain the scene and then we would
12    start working up a plan on what we needed to
13    do to get those people out of that house.
14 Q. Let's turn now to the evening of December
15    28th of last year.
16    What do you recall about your shift
17    earlier that night?
18 A. I was on a DV report when the call came out.
19    I was up on 16-beat, which is sort of near
20    Second and Ridge. I was there with another
21    officer. She offered to take that report so
22    I can respond to the shooting call that came
23    out.
24    As I'm coming out of that apartment
25    complex, another officer, that's the beat

Page 79

1  officer I was talking about, officers cover
2  beats, I told that officer that was walking
3  up, hey, let's go to that shooting. This
4  officer's going to take the report so we can
5  respond to this shooting.
6     Me and her -- she had her own vehicle.
7  We went lights and sirens responding to this
8  incident. The call text that I was able to
9  look at at the computer at the time, I think,
10 it was like the first three or four lines of
11 the call text where he said he had just shot
12 his dad in the head and that he was holding
13 his mother and brother, I believe, at
14 gunpoint in the closet, and then like they --
15 the calling party disconnected.
16    So we're traveling. I get on Kellogg.
17 I head eastbound on Kellogg to this. While
18 en route, I can hear that other officers are
19 on scene. One of them's saying that they can
20 see some movement up on the second floor of
21 this building.
22    And then I hear Sergeant Jonker key
23 on, while I'm on Kellogg, saying hey, next
24 officers in, we need to start shutting down
25 McCormick at Seneca, which goes into the part

Page 80

1  of containment. We don't want cars driving
2  in between or in front of this residence.
3     So I'm at the point where I'm
4  coming -- I'm -- not Seneca -- yeah, Seneca
5  sorry, Seneca. So I go south down Seneca.
6  And I notice that nobody has blocked
7  McCormick yet. So I pull over on the east
8  side of Seneca at McCormick and I block the
9  eastbound lanes. The other officer comes in
10 and she blocks the westbound lanes, parks
11 pretty much right behind me.
12    Also note that at that point as
13 we're -- as I'm pulling up, he -- I know
14 Sergeant Jonker says hey, this house is right
15 pretty much diagonal to whoever's blocking
16 that road off. Hop out of your car real
17 quick and get to, like, a cover.
18    So I park. I hop out real quick. I
19 have my lights activated on my Tahoe. My
20 siren's not activated any longer. I think I
21 turn off my siren as I get onto Seneca from
22 Kellogg. I hop out. As I'm hopping out, I
23 see Sergeant Jonker, Officer Powell, and at
24 the time I believe it was Officer Rapp. They
25 were coming across the street from the south

Page 81

1  side of McCormick, and they were running to
2  the north side of McCormick on the east side
3  of Seneca.
4     So I -- it looked like they were going
5  to a certain spot, so I decided to follow
6  after them. We ran across the street. There
7  was like a business right there. And there's
8  a house just to the east of that.
9     Initially, I thought we actually went
10 to the driveway of that house, but after
11 reviewing my Axon, it looked like we were
12 just in that first business parking lot.
13 There was like a drive and some -- a couple
14 cars right there. That's sort of just to the
15 west of this residence.
16    So I look over. I see that Officer
17 Rapp has his patrol carbine out. He's
18 standing sort of in between these two cars.
19 He's pointing the rifle at the residence,
20 which would later turn out to be 1033 West
21 McCormick. Next to him, I believe it was
22 Officer Powell, then there was Sergeant
23 Jonker, and I was sort of standing behind to
24 the right of Sergeant Jonker. We stand
25 there. I didn't know that we were actually

21 (Pages 78 to 81)

Page 98

1  A. Did I see other officers at that time around
2     the area?
3  Q. Yes.
4  A. I saw officers to the east of the residence.
5     They looked fairly close. I want to say
6     there was like a patrol car pretty much
7     almost right there in that driveway if I
8     remember correctly.
9  Q. Can you place a circle there where you're
10    talking about.
11 A. (Witness complies.)
12 Q. And can you put -- let's put ESO for east
13    side officers there at that location.
14 A. Okay.
15 Q. Any other officers that you saw?
16 A. And then I saw another patrol car just
17    directly to the west of their residence in
18    this sort of little alleyway next to this
19    business.
20 Q. Can you draw a circle where you saw that
21    vehicle.
22 A. (Witness complies.)
23 Q. And let's put WSV for west side vehicle where
24    that vehicle was.
25 A. Okay. (Witness complies.)

Page 99

1  Q. And can you describe that vehicle for me?
2  A. I want to say it was a Crown Vic, but I'm not
3     a hundred percent.
4  Q. Was it -- what color was it?
5  A. The black and white Crown Vics. I'm pretty
6     sure it was a Crown Vic, though. And then
7     this one was a Tahoe.
8  Q. The one on the east side?
9  A. Uh-huh, it was a black Tahoe.
10 Q. Any other vehicles that you saw?
11 A. Officer Piper's vehicle that was right here.
12 Q. Why don't you draw that and put a P on that
13    for Piper.
14 A. Okay.
15 Q. And did you see Officer Piper get out of her
16    vehicle?
17 A. I didn't see what she was doing. I know she
18    was over there still near her vehicle.
19 Q. From when you had seen her earlier before you
20    started on route to this location, what was
21    Officer Piper wearing?
22 A. She was wearing what I'm wearing now. So I'm
23    pretty sure -- and she transitioned before I
24    did, so she was probably wearing the same
25    uniform that I'm wearing. And she doesn't

Page 100

1     wear exterior vests or anything like that.
2  Q. You said you could see officers on the east
3     side by where the vehicle was.
4         What were those officers wearing?
5  A. I'm pretty sure they were wearing the blacked
6     out. I think they were like SCAT officers,
7     as well. So they were wearing the black
8     hoodies and the black exterior vests.
9  Q. Is there anything on those uniforms or vests
10    that would identify them as police officers
11    other than the embroidered badge on the upper
12    left chest?
13 A. I think a lot of them have -- one of them was
14    a K-9 officer, I think, so usually they say
15    "Police K-9" on the back. The other
16    officers, I mean, like I didn't inspect their
17    backs so their -- this is sort of around the
18    time that policy has changed and they're
19    either -- I don't think they're really
20    allowing us to put police on our exterior
21    vests anymore 'cause it looks too tactical, I
22    think, or militaristic or something like
23    that. But I'm not entirely sure about that
24    'cause I don't wear exterior vests.
25 Q. You said you'd seen this, what you believed

Page 101

1     was probably a Crown Vic on the west side of
2     1033 McCormick.
3         Did you see any officers in or around
4     that vehicle?
5  A. Not that I recall, no.
6  Q. Other than Sergeant Jonker, Officer Rapp and
7     Powell and the officers that were on the east
8     side that you told me about, were there any
9     other officers that you remember seeing when
10    you first got out of your Tahoe?
11 A. No.
12 Q. And then did you decide to go to the north
13    side of McCormick following where you saw
14    Sergeant Jonker and the other officers going
15    on your own or were you asked to go there?
16 A. I made the decision to follow them on my own.
17 Q. And as you got out of your vehicle and made
18    the decision to go over there, did you hear
19    Sergeant Jonker issuing any instructions or
20    commands to the other officers?
21 A. I know he was -- he was on the radio. I
22    think at that point he was trying to obtain
23    more information from dispatch as far as what
24    the call text was.
25 Q. What makes you believe he was doing that?

Page 102

1  A. 'Cause he was asking dispatch, I think, for
2  updates. And where -- and I know he was
3  trying to figure out where the call was
4  coming in from and how dispatch was receiving
5  it.
6  Q. And could you hear the response?
7  A. They said something about the badge on the
8  floor, which is sort of like the city hall
9  security.
10 Q. Anything about that strike you as unusual?
11 A. Yeah, but we've gotten calls multiple
12 different ways before through dispatch. And,
13 I mean, we still got to take it what it is.
14 I mean, sometimes people don't call 911, you
15 know, and somehow we still get dispatched to
16 those.
17 Q. And I understand you may still respond to it.
18 A. Yeah.
19 Q. But what struck you as unusual about the
20 information that you received from
21 dispatch --
22    MR. PIGG: Object to form. He
23 didn't say --
24 Q. -- that the call came in to badge on the
25 floor?

Page 103

1     MR. PIGG: Object to form. That
2  misstates the testimony. There was no
3  testimony that was unusual.
4     MR. BAILEY: Counsel, if you'd
5  please just state that you object to the
6  form. If I need more information, I'll be
7  happy to ask you for it, but I don't want
8  your objection to inadvertently coach the
9  witness 'cause I'm sure neither of us want
10 that.
11 BY MR. BAILEY:
12 Q. I believe I asked you, but let's clarify it
13 again: When you heard that the call had come
14 in to badge on the floor, did anything about
15 that strike you as unusual?
16 A. Yeah.
17 Q. What struck you as unusual about that?
18 A. Well, 'cause, I mean, like dispatch does get
19 911 calls, but I didn't understand what the
20 badge on the floor was at that time.
21    Like as, for example, like a -- how
22 that person had a connection with dispatch.
23 And I was like, well, maybe they do have a
24 way of connecting with dispatch that way. I
25 was thinking, well, maybe they -- maybe they

Page 104

1  can contact dispatch that way, too, so, I
2  mean...
3  Q. Is it fair to say that most of the calls that
4  you respond to of this nature, the call had
5  come in directly to dispatch rather than
6  coming in to the badge on the floor?
7  A. Yeah, but sometimes they'll come in from
8  other dispatch agencies and stuff like that,
9  too, so -- but dispatch, ultimately, gets
10 that information at the end.
11 Q. So if I'm understanding you, it seemed
12 unusual to you that the badge on the floor
13 was involved in this, but you were giving
14 your attention to responding to the incident
15 and not necessarily trying to figure out why?
16 A. Yeah, 'cause, I mean, I was like, well, I can
17 probably -- probably ask the supervisor how
18 did the badge get this later on, you know.
19 So I didn't -- I was more focused on the
20 incident at that point.
21 Q. When Sergeant Jonker received the information
22 that this had come in to the badge on the
23 floor, did he say or do anything that
24 indicated how he was responding to that
25 information?

Page 105

1  A. No. I think he still treated it as it was,
2  at face value at this point.
3  Q. Did he say anything like that's unusual or
4  that's odd or that's confusing or --
5  A. No. Huh-uh.
6  Q. Did you hear him ask any questions of
7  dispatch as to why the call might have come
8  in to the badge on the floor?
9  A. No, not that I recall.
10 Q. Now, can you draw on Exhibit 67, put a circle
11 where the four of you, ultimately, ended up
12 on the north side of McCormick.
13 A. Okay. Can I add something on here, too?
14 Q. Please. What would you like to add?
15 A. So when I first -- and this might just be
16 'cause hindsight's always 20/20. I
17 originally reported that I thought we were in
18 this driveway right across the street from
19 the house. I only had the opportunity to
20 watch my Axon for the first time on
21 Wednesday. So it looked like, actually, when
22 we went across, we were actually in this one
23 sort of caddy-corner from here. So I want to
24 represent this correctly if that's okay.
25 Q. Yes. Draw where you know now, based upon

27 (Pages 102 to 105)

Page 122

1  Q. And no one introduced themselves or
2     identified themselves?
3  A. Not that I heard, no.
4  Q. At the time you saw the person step out on
5     the front porch, did you, in your mind, come
6     to any initial conclusions or thoughts as to
7     who this individual might be?
8  A. No, not at that point. I didn't have a
9     physical or anything. I think all we had was
10    the name Ryan, I believe, at that point.
11 Q. Did you hear anyone shout that name to the
12    person to see if they responded?
13 A. I didn't hear it, no.
14 Q. Did you have any preliminary conclusions as
15    to whether the person who was standing in
16    front of you was the person who had made the
17    call, person who was the shooter, person who
18    may have been a hostage, or a person who was
19    just some other occupant of the house?
20 A. No, not at that time.
21 Q. Did you have any information that would
22    enable you to make any of those kinds of even
23    tentative conclusions at that point?
24 A. Just that it was a male's name, I would say.
25 Q. Between the time you arrived on the scene and

Page 123

1     when this individual first stepped out on the
2     porch, had you heard any gunshots?
3  A. No.
4  Q. Any shouting or yelling from the inside of
5     the house?
6  A. No.
7  Q. Any cries of distress?
8  A. No.
9  Q. Any noise at all coming from the residence?
10 A. No.
11 Q. Did that strike you as consistent or
12    inconsistent with the report that you had
13    received about what was going on?
14 A. Well, things can calm down. So, I mean, like
15    it just depends on the situation, you know.
16    If he's saying that he's holding somebody
17    hostage, then yeah, there may not be a whole
18    lot of stuff going on right now.
19 Q. So the lack of noise didn't either confirm or
20    disprove what you believe you had been told
21    may be going on in the house?
22 A. Correct.
23 Q. Before this individual stepped out on the
24    front porch, are you aware of any attempts
25    that any of the officers there on the scene

Page 124

1     had made to try and communicate with the
2     individuals in the house?
3  A. No.
4  Q. Any communication that you'd heard of, you
5     know, "Wichita Police Department, come out
6     with your hands up" or anything like that?
7  A. No. No. We had just got on scene so I think
8     the call was still too fresh.
9  Q. Well, how long do you have to wait before you
10    make that?
11 A. Well, we want to set up the containment
12    first. There's no active shooting or
13    anything going on right at that point. So if
14    we're working a hostage scene at that point,
15    we're going to use time to our advantage
16    before we start calling people out. You
17    know, we want to sort of investigate, know
18    what else we're working with, you know.
19       Is there prior calls at this house,
20    you know, that kind of information. Do --
21    pull up a Google Maps of that, see what else
22    we're working with. There are a lot of
23    factors that are considered in there before,
24    you know, working to that point where,
25    actually, we're trying to make communication

Page 125

1     by phone, yes, that is one part of the steps.
2  Q. And in your experience, how long do those
3     steps take before you can start communicating
4     with the occupants of the house from the time
5     you arrive on the scene?
6  A. It just depends on the situation. So
7     sometimes we'll have to pull up our eJustice,
8     which is our record system on addresses,
9     names, houses and stuff like that. So it's
10    going to require an officer to have to do
11    that research to find out information and to
12    see hey, is this information current, are
13    these the people that we have currently
14    living here, you know. So they have to go
15    through all that information to get that
16    information to actually find those numbers.
17    Those numbers don't just magically, you know,
18    fall on our lap, unfortunately.
19 Q. How long does it take to do that search on
20    the justice system -- eJustice?
21 A. It can take 5 to 10 minutes because probably
22    during that time, too, you're also -- you can
23    also use those names that you pull up and
24    look at what those names have associated with
25    reports of that address. You know, is this

32 (Pages 122 to 125)

Page 130

1   (A recess was taken from 11:41 a.m. to
2   11:50 a.m.)
3       VIDEOGRAPHER: Back on the record
4   at 11:50.
5   BY MR. BAILEY:
6   Q.  Officer, you said that when the person
7       stepped out on the porch, you heard shouting
8       from the officers on the east side, you heard
9       shouting from someone, perhaps, Sergeant
10      Jonker on the north side.
11          Did you see movement by officers in
12      either location?
13  A.  Not that I recall, no.
14  Q.  If I understood your testimony, you saw the
15      person step out on the porch, you saw their
16      hands go up, and then your attention shifted
17      to the other windows in the house rather than
18      continuing to focus on the person who was
19      standing on the porch?
20  A.  Correct.
21  Q.  When was the next time your attention was
22      returned back to the person standing on the
23      porch?
24  A.  When I heard the shot fired.
25  Q.  So is it fair to say that you didn't see any

Page 131

1   activity, motion, body movement or body
2   language from this individual from the time
3   you saw him put his hands up until the time
4   you heard the shot?
5   A.  Out of the corner of my eye, peripheral, I
6       could see his arms lower, but they started to
7       make the direction down, but I was -- I
8       started focusing on the other windows at that
9       point.
10  Q.  During the time you saw the individual
11      standing on the front porch, whether it was
12      while your attention was focused on him or
13      whether it was things that you were seeing
14      out of the periphery of your vision, did you
15      see the individual do anything that you
16      believed showed a threat to any of the other
17      officers?
18  A.  No, because I didn't see him at that point.
19  Q.  Did you see that individual at any point have
20      the ability to deploy lethal force on anyone?
21  A.  I wasn't -- I wasn't watching him at that
22      point, so I don't know.
23  Q.  So is that a no?
24  A.  That's I don't know 'cause I didn't see him
25      make that -- I didn't see him make the

Page 132

1       motion.
2   Q.  Let me ask the question again 'cause what I'm
3       trying to ask is a question that I believe
4       can be either answered yes or no. So I'll
5       tell you that ahead of time and then let's
6       listen to the question and see if I can
7       actually do that.
8           Did you see the individual who was
9       standing on the porch at anytime appear to
10      have the ability to deliver lethal force?
11  A.  No.
12  Q.  Did you see, at anytime, the individual who
13      was standing on the porch have the
14      opportunity to deliver lethal force?
15  A.  No.
16  Q.  Did you see anytime the individual who was
17      standing on the porch that he placed any
18      other officers in jeopardy of delivering
19      lethal force?
20  A.  No.
21  Q.  What was your reaction when you heard the
22      gunshot?
23  A.  Startled.
24  Q.  Were you expecting the shot?
25  A.  No, 'cause I was looking at windows at that

Page 133

1       point.
2   Q.  Had you heard any of the officers say
3       anything about either motions that the person
4       was making or objects that the person might
5       have that the speaking officer believed posed
6       a threat?
7   A.  No, nobody said anything.
8   Q.  No one said anything like "I see a gun" or
9       "he's dropping his hands" or anything like
10      that?
11  A.  No, not that I heard, no.
12  Q.  What was the length of time that you recall
13      it took from the time the person stepped on
14      the porch until the time the shot was fired?
15  A.  Within 10 seconds.
16  Q.  You said you reviewed your body cam footage.
17          Did you note on the time display on
18      that the length of time that that took?
19  A.  No, not that I wrote down or anything.
20  Q.  Did you hear any of the officers on the east
21      side shout any type of information about this
22      person other than the commands that you said
23      you heard them hollering?
24  A.  No, not that I heard.
25  Q.  Nothing like "he's got a gun" or anything of

34 (Pages 130 to 133)