# Exhibit E

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS
 2

 3

 4   LISA G. FINCH, Individually, as      )
     Co-Administrator of the Estate       )
 5   of Andrew Thomas Finch,              )
     deceased, and as Next Friend         )
 6   for her minor granddaughter,         )
     AF; DOMINICA C. FINCH, as            )
 7   Co-Administrator of the Estate       )
     of Andrew Thomas Finch,              )
 8   deceased; and ALI ABDELHADI,         )
                                          )
 9                     Plaintiffs,        )
                                          )
10                                        )
        vs.                               )Case No.
11                                        )18-CV-01018-JWB-KGS
                                          )
12   CITY OF WICHITA, KANSAS;             )
     JOHN DOE POLICE OFFICERS 1-10,       )
13                                        )
                       Defendants.        )
14                                        )

15

16                 D E P O S I T I O N

17

18      The videotape deposition of DAVID HEADINGS taken on

19   behalf of the Plaintiffs pursuant to the Federal Rules of

20   Civil Procedure before:

21             RICK J. FLORES, CSR
               KELLEY REPORTING ASSOCIATES, LTD.
22             515 South Main, Suite 108
               Wichita, Kansas  67202
23

24   a Certified Shorthand Reporter of Kansas, at 455 North

25   Main, 13th Floor, Wichita, Sedgwick County, Kansas, on

26   the 28th day of November, 2018, at 9:00 a.m.

27
```

Page 2

```
 1              APPEARANCES
 2
 3   PLAINTIFFS:
       CONLEE SCHMIDT & EMERSON, LLP
 4     Mr. Rick E. Bailey
       Suite 300
 5     200 West Douglas
       Wichita, KS  67202
 6     (316) 264-3300
       Fax:  (316) 264-3423
 7     rbailey@fcse.net
 8
     DEFENDANTS:
 9     FISHER PATTERSON SAYLER & SMITH, LLP
       Mr. J. Steven Pigg
10     3550 S.W. 5th Street
       Topeka, KS  66606
11     (785) 232-7761
       Fax:  (785) 232-6604
12     spigg@fisherpatterson.com
13
     FOR THE WITNESS:
14     SEDGWICK COUNTY SHERIFF'S OFFICE
       Ms. Laura H. Oblinger
15     141 W. Elm
       Wichita, KS  67203
16     (316) 660-3900
       Fax:  (316) 660-3248
17     laura.oblinger@sedgwick.gov
18
     VIDEOGRAPHER:
19     ADVANCED DOCUMENT IMAGING
       Mr. Michael Miles
20     515 S. Main, Suite 108
       Wichita, KS  67202
21     (316) 267-9380
       Fax:  (316) 267-9382
22     video@kelleyreporting.com
23
24
25
26
27
```

Page 3

```
 1              INDEX
 2
 3
     DAVID HEADINGS
 4   Direct Examination by Mr. Bailey:      4
 5   Cross-Examination by Mr. Pigg:        73
 6   Redirect Examination by Mr. Bailey:   86
 7   Recross-Examination by Mr. Pigg:      89
 8
 9
10   Headings Exhibits
     No. 68 - Google Map Aerial View of 1033   25
11           W. McCormick w/Markings (1 pg)
12   No. 69 - Screen Shot from Officer Perry's 78
             Axon Showing Deputies Headings'
13           & Stephens-Clark's Perspective
             of Porch (1 pg)
14
15
16
17
18
19
20
21
22
23
24
25
26   SIGNATURE OF WITNESS                  92
27   CERTIFICATE                           93
```

Page 4

```
 1              VIDEOGRAPHER:  This begins the
 2      videotape deposition of David Headings.
 3      Today is November 28th, 2018, and the time
 4      is -- time is 9:00 a.m.
 5              Would the court reporter please swear
 6      in the witness.
 7                  DAVID HEADINGS
 8      having been first duly sworn on his oath to
 9      state the truth, the whole truth, and nothing
10      but the truth, testifies as follows:
11                  DIRECT EXAMINATION
12   BY MR. BAILEY:
13      Q.  Could you please state your name for the
14      record, please.
15      A.  David Headings.
16      Q.  Detective Headings, how are you currently
17      employed?
18      A.  I'm a deputy, actually, with the Sedgwick
19      County Sheriff's Office.
20      Q.  Have you ever had your deposition taken
21      before?
22      A.  Yes.
23      Q.  On how many occasions?
24      A.  I believe just once, and I don't even
25      remember what it was for, several years ago.
```

Page 5

```
 1      Q.  I'm sure you've had the opportunity to talk
 2      with your lawyer about what a deposition is,
 3      what you might expect here, but just to go
 4      over a few ground rules to make sure that you
 5      and I are on the same wavelength, I
 6      introduced myself to you before we started
 7      here.
 8              My name is Rick Bailey and I represent
 9      the Finch family in a lawsuit they've filed
10      against the City of Wichita and a couple of
11      individual officers arising out of the
12      shooting and death of their son Andrew Finch?
13      Do you understand that?
14      A.  Yes.
15      Q.  You understand that this deposition is my one
16      and only opportunity to ask you questions to
17      find out what knowledge you might have that's
18      relevant to the lawsuit that's been filed.
19      A.  Yes.
20      Q.  You understand you're under oath here today.
21      A.  Yes.
22      Q.  And that's the same oath you'd be under if
23      you were testifying live in front of a judge
24      and jury.
25      A.  Correct.
```

Page 10

1  Q. Were you given both of those transcripts or
2     just one?
3  A. I may have been given both, but I am not
4     sure. I can say I did not review them. I
5     got sick over the weekend, when I took
6     everything home and did not get to it.
7  Q. Other than being given a copy of the
8     transcript, did you have any other documents
9     that you were given during that meeting?
10 A. I was not given any that I recall. I did see
11    a few still photos.
12 Q. And what were the still photos of?
13 A. The photo was of my position east of the
14    house in question.
15 Q. And when you say the photo was of your
16    position, were you shown in the photo or was
17    it simply a photo of the area where you had
18    been?
19 A. I was shown. I believe it was a body camera
20    still photo or a snapshot. Just confirm that
21    was my location and we're all talking about
22    the same thing.
23 Q. Have you seen any of the body cam videos?
24 A. I seen a few second clip that was put on the
25    news, but that was it.

Page 11

1  Q. Nothing other than what was publicly
2     available?
3  A. Correct.
4  Q. So you had a copy of one or more of the
5     transcripts; you've looked at some still
6     photos.
7        Was there anything else that you
8     reviewed in preparation for your deposition
9     testimony here today?
10 A. No.
11 Q. Did you speak with anyone other than Mr. Pigg
12    or the county's attorney in preparation for
13    your deposition?
14 A. No.
15 Q. Did you tell anyone about your -- or talk to
16    anyone about the upcoming deposition other
17    than those two lawyers?
18 A. My wife and my supervisor knew I had a
19    deposition today, but no details.
20 Q. Anyone else?
21 A. I probably told some other coworkers I had a
22    deposition and wouldn't be here today.
23 Q. Anyone else?
24 A. No.
25 Q. What did Mr. Pigg tell you about your

Page 12

1     deposition?
2  A. Basically, what you went over so far. You're
3     required to tell the truth. It's a recorded
4     statement.
5  Q. And what else?
6  A. That's pretty much it.
7  Q. What was your position with the Sedgwick
8     County Sheriff's Office the day of the
9     shooting December 28th of 2017?
10 A. I was still assigned to the fugitive warrant
11    section and drug court, which is part of the
12    warrant section. I was also on the high risk
13    warrant entry team at the time.
14 Q. What is the high risk warrant entry team?
15 A. That team handles things that are more than
16    just a simple patrol response but not quite a
17    SWAT response. So they do a lot of the
18    search warrants or just any other high risk
19    call that comes out that just needs a little
20    more skill than a standard officer, but if it
21    was not a SWAT call I don't --
22 Q. Did you receive any particular training above
23    and beyond what every other deputy receives
24    in order to be on the high risk warrant entry
25    team?

Page 13

1  A. More so while on the team you just get a lot
2     more training more often, a lot more
3     familiarization.
4  Q. What type of training do you receive as a
5     part of that team?
6  A. A lot more firearms usage, nonlethal weapon
7     systems.
8  Q. Let's talk about the firearm usage training
9     that you've received as a part of that high
10    risk warrant entry team.
11       Can you tell me more detail what you
12    mean by training on firearm usage?
13 A. We -- in any terms you need to focus on
14    fundamentals more than anything. We did a
15    lot of extra fundamental shooting time. We
16    had -- I think it was every two weeks we had
17    training days and a lot of those would be
18    shooting days. There's a lot more exposure
19    to your firearms to stay familiar with them.
20       We did several different types of
21    drills and scenarios. A lot of our training
22    was practicing clearing buildings and rooms
23    safely as a team, working as a team.
24 Q. As a part of that training, did you receive
25    any additional drills or training on what

Page 22

1  reassess what we're dealing with. Situations
2  are fluid and dynamic.
3      Starting with a dispatch call, for
4  example, all you know is previous history, if
5  there is any, with the location or a subject
6  and what you're being told on the radio. So
7  you have, on the way there, your
8  cross-reference training experiences. Think
9  of anything as similar. A lot of people are
10 hopefully thinking about proper ways to
11 handle that type of a situation. Of course,
12 like I said, it's dynamic and you can't
13 really predict anything, but -- like if it's
14 domestic violence call I'm getting prepared
15 for some sort of domestic violence or -- in
16 that situation, there was dealing with guns
17 and possible death happening. So you get
18 control of your adrenaline, hopefully, and
19 start focusing on what you need to deal with
20 on the way there.
21 Q. Let's turn to that day.
22    What were you doing when you first
23    received a call notifying you about the
24    incident there on McCormick?
25 A. Myself and Deputy Stephens-Clark were

Page 23

1  conducting routine warrant sweeps that
2  evening. I was riding with him and --
3  Q. What do you -- what's a routine warrant
4    sweep?
5  A. We routinely pair up and just go out into the
6     community and look for people with arrest
7     warrants. We do the work beforehand and have
8     a stack of warrants or fugitives ready to go
9     and serve.
10 Q. Do you recall where you were when you
11    received the call?
12 A. I think I was about a few blocks away, maybe
13    3 to 5 blocks, rough guess. City blocks.
14 Q. And how did the call come to your attention?
15 A. I think there were tones on the radio -- I'm
16    not hundred percent sure -- that are normal
17    to get your attention for any kind of
18    priority call that there was -- I can't
19    remember specifically. I think it said
20    something along the lines of somebody had
21    shot their dad in the face and had other
22    family members hostage in the closet, which
23    would have been broadcast over multiple
24    channels and we would have to switch to the
25    channel that that was operating on.

Page 24

1  Q. And why did you choose to respond to this
2     call?
3  A. Both myself and Deputy Stephens-Clark were on
4     the entry team and we were very close. We
5     figured we'd be one of the first people
6     there, which we were.
7        And we had actually just gotten out of
8     the car or getting out of the car when that
9     happened to serve a warrant. We got back in
10    the car and head that way.
11 Q. How soon after the call went across do you
12    believe you first arrived on the scene?
13 A. Probably within a minute or two.
14 Q. And do sheriff's deputies like yourself, at
15    least, back in December of last year, wear
16    body cams?
17 A. Not that time.
18 Q. Have you since come to wear body cams?
19 A. We are implementing it now. I know some
20    people do. I may be incorrect, but I think
21    it would be K9s and one of the special units
22    that have had it for a while testing it and
23    seeing what would be best product for the
24    whole department to purchase.
25 Q. So it's in the process of being investigated

Page 25

1  and rolled out, but at that time you weren't
2  equipped with a body cam?
3  A. Correct.
4     (Headings Exhibit No. 68 was marked
5  for identification.)
6  Q. Detective, I'm going to hand you what I've
7     had marked as Exhibit 68, which is a Google
8     Map photograph of the area surrounding 1033
9     West McCormick here in Wichita.
10    Does that appear to be accurate?
11 A. Yes.
12 Q. Like for you to take a pen and draw for me
13    where you parked your vehicle when you first
14    arrived on the scene.
15 A. I do not believe I was driving, but the
16    vehicle was parked probably somewhere in this
17    area on Walnut Street south of McCormick.
18 Q. You've drawn a circle there?
19 A. Yes.
20 Q. Could you put a P in that circle for parked.
21 A. (Witness complies.)
22 Q. And then where did you proceed after you
23    arrived on the scene?
24 A. We exited the vehicle and went west towards
25    the 1033 West McCormick along the north side

Page 26

1  of the houses. We did not know exactly which
2  house it was. We were checking the addresses
3  on the way up to it.
4  Q. Were you walking on the sidewalk or were you
5  walking south of the sidewalk on the yard
6  between the sidewalk and the house?
7  A. I do not recall for sure. I believe it was
8  in the grass closer to the house so we were
9  not as exposed. Or there may have been a
10 combination of both.
11 Q. And where did you end up when you finally got
12 to the 1033 West McCormick?
13 A. We stopped short of the address to the east
14 near the northwest corner of the neighboring
15 house.
16    Would you want me to draw a circle
17 there, as well?
18 Q. Yes, please.
19 A. It's more of an oval. This is the main area
20 we occupied when we obtained our perimeter
21 position.
22 Q. When you arrived at that location, did you
23 meet up with any other law enforcement
24 officers?
25 A. As we were approaching, other law enforcement

Page 27

1  officers were showing up on scene. I know
2  officers were on the west side of the house.
3  I remember seeing them. And eventually some
4  came behind us and across the street to the
5  north.
6  Q. What were your responsibilities or duties
7  when you arrived on the scene?
8  A. We became part of the perimeter. So holding
9  security and observing what we could see
10 through any open windows, doors, et cetera.
11 Q. You said you became part of the perimeter.
12    Were you assigned that responsibility
13 by someone or did you simply do that because
14 you knew that's what needed to be done?
15 A. We just assumed that position. As the first
16 ones on the scene, we knew it needed to be
17 done. That's not something we could respond
18 to by ourselves.
19 Q. Was there anyone on the scene that was taking
20 charge and giving commands and handing out
21 assignments?
22 A. Wichita supervisors were arriving on scene
23 and took command on their call.
24 Q. And did you receive directions or
25 instructions or commands from that officer?

Page 28

1  A. I do not recall any guidance.
2  Q. When multiple law enforcement agencies are
3  responding to a situation like this, how does
4  the chain of command work?
5  A. Generally, a supervisor responsible for the
6  call would be from the bureau that the call
7  came from.
8     For example, I think this would have
9  been south bureau. One of their supervisors
10 have to acknowledge the call. And for this,
11 I would assume it'd be on their way. I don't
12 know their policies, but they would
13 automatically be in charge of that call.
14 Q. So when you arrived on the scene, who did you
15 understand was in charge of the scene?
16 A. Wichita Police Department.
17 Q. And who at the Wichita Police Department?
18 A. Nobody specific. I didn't know any names. I
19 just knew there was a supervisor monitoring
20 and taking control of it.
21 Q. And when you arrived at the location that
22 you've marked on Exhibit 68 with a circle,
23 where did you observe other officers?
24 A. I seen other officers on the northwest side
25 of the 1033 West McCormick. I seen some

Page 29

1  north -- I'm not exactly sure if it was
2  directly north across the street of
3  McCormick, but I seen a few officers over
4  there. I seen numerous officers blocking the
5  intersection.
6     I don't remember if it was myself or
7  Deputy Stephens-Clark had said to others to
8  move back 'cause we had a crossfire danger
9  that we did not want to happen if something
10 was to happen. And there was others coming
11 up behind us.
12    Like I say, I was paying attention to
13 the house and I'm not really sure what
14 everybody else was doing.
15 Q. Can you draw a circle where you saw officers
16 on the west side of 1033 McCormick.
17 A. (Witness complies.)
18 Q. Can you put a W by that so we'll know that's
19 for the west side.
20 A. (Witness complies.)
21 Q. And then you said you saw officers on the
22 north side.
23    Can you draw a circle with an N where
24 you saw those officers.
25 A. It's going to be an oval 'cause I'm not

### Page 34

1  location that you've marked as the circle on
2  Exhibit 68, you were helping set up part of
3  the perimeter and watching the house?
4  A. Correct.
5  Q. What were the other officers that were with
6  you doing?
7  A. Myself and Deputy Stephens-Clark were pretty
8  much doing the same thing: Holding position
9  there as other officers were still coming in
10 to make the perimeter on the house and
11 formulate a plan.
12 Q. Did the other officers that joined you at
13 that location meet up with you before the
14 shooting or after?
15 A. There was some before and I'm not sure. We
16 did see some movement in the house and I did
17 not really take my eyes off the house much.
18 Q. Do you know how many officers joined up with
19 you before the shooting at that location?
20 A. I remember at least two, but I'm not sure.
21 Q. And did you talk with those officers about
22 what was going on at any point prior to the
23 shooting?
24 A. I don't remember if I did say anything or if
25 it was Deputy Stephens-Clark, but it would

### Page 35

1  have been very minimal. I don't recall
2  anything specific.
3     I think one of us had said that they
4  could step back a little bit since we had
5  some better armor. And at some point I'd
6  actually ran back and grabbed a ballistic
7  shield from the vehicle and was using that
8  for additional cover, which would have been
9  more reason for them to back up.
10 Q. Did you recognize any of the officers that
11 met up with you?
12 A. I think Deputy Norton was there.
13 Q. Anyone else?
14 A. That's the only one I recall. I'm not very
15 good with names either.
16 Q. Did you recognize any of the officers that
17 were on the west side of 1033 McCormick?
18 A. Initially, no. I think Deputy Marsh,
19 actually, had made it to the west side at
20 some point, but I'm not sure when he got
21 there. I remember seeing him when they
22 finally did make entry.
23 Q. Again, before the shooting, when you were
24 still at the location you've circled there,
25 could you see the officers on the west side

### Page 36

1  clearly enough to be able to recognize or
2  identify them?
3  A. Yes. I wouldn't recognize them now, but I
4  could see -- I seen Deputy Marsh and I
5  recognized him from that position.
6  Q. What about the officers on the north area
7  that you've marked on Exhibit 68?
8  A. No. It was dark enough I couldn't make out
9  anything specific. I could tell it wasn't a
10 sheriff. At least not all of them.
11 Q. And how could you tell that?
12 A. Different uniforms.
13 Q. The officers that you saw on the west side of
14 1033 McCormick, how were they dressed?
15 A. I do not remember for sure. I want to say
16 they were in their tan uniforms. And at that
17 time of year, sheriff would have the very
18 bright Smurf blue color uniforms. Pretty
19 distinct difference.
20 Q. What about the officers on the north side
21 that you've marked, how do you recall them?
22 A. I don't recall really. There was also a lot
23 of flashing lights going on, too, which made
24 it difficult to see past the house.
25 Q. Where were the vehicles that had the lights

### Page 37

1  flashing on them?
2  A. Around the intersection blocking traffic. I
3  don't remember specifically, but I know that
4  they were blocking traffic so no innocent
5  bystanders would, hopefully, get involved.
6  Q. So when you say they were blocking traffic,
7  you mean back in the McCormick/Seneca
8  intersection west of 1033 McCormick?
9  A. Correct.
10 Q. And they had flashing lights that you were
11 looking towards as you're looking west
12 towards the house and then west towards where
13 the officers were?
14 A. Yes.
15 Q. Were there any vehicles -- any police
16 vehicles that were parked at that time in
17 front of the address of 1033 McCormick?
18 A. At the time of the shooting?
19 Q. Yes.
20 A. I'm not sure. I don't think there was
21 anything directly in front. I know one had
22 pulled in the driveway to the east where we
23 were at. I'm not sure how close to the west
24 any vehicles got.
25 Q. How much prior to the shooting did you arrive

10 (Pages 34 to 37)

Page 42

1  not sure if it was before or after.
2  Q. What view did you have of the front porch and
3     front door at 1033 McCormick, again, prior to
4     the shooting?
5  A. From the north face of the house, not the
6     porch, but the actual face of the house where
7     I would have seen both corners lined up, I
8     was a few feet north where I could see the
9     north side of the house and the door.
10    Probably somewhere in middle of where the
11    porch would have been directly to the east.
12 Q. Were there any officers that you could see
13    that were closer to the front porch and front
14    door of 1033 McCormick, closer than you were?
15 A. The officers on the west side were actually
16    right up against the house, at least, at some
17    point. They would have been closer. I'm not
18    sure if they were -- how far past the corner
19    they would have been to see anything.
20    Now at some points they were up
21    closer, but when he came out, my focus was
22    completely on him and his hands.
23 Q. Let's talk about when he came out.
24    When did you first notice that someone
25    was stepping out onto the front porch?

Page 43

1  A. When the door opened and he came out.
2  Q. And what did you see?
3  A. He came out on the north side of the house
4     onto the porch. Door would open to his left
5     or the west side. He came out walking
6     straight. And I believe multiple officers
7     would have said something along the lines
8     "show me your hands." He did appear startled
9     by the presence of numerous officers.
10 Q. Let me stop you there and let's get a little
11    more detail.
12    Describe the person that you saw step
13    out onto the front porch.
14 A. I think he would have been a white male
15    roughly a medium build, not super heavy. He
16    did not have long hair. I can't remember
17    specifically. I know he had a shirt and
18    pants on. I'm not even sure if he had shoes
19    on.
20 Q. Do you recall the color of his clothes?
21 A. Not right now, no.
22 Q. When he first stepped out, could you see his
23    hands?
24 A. Yes.
25 Q. Did you see anything in his hands?

Page 44

1  A. No.
2  Q. Could you see his body well enough to see if
3     he had anything protruding from a waistband?
4  A. I didn't see anything obviously sticking out.
5     I know I wasn't sure if he did have something
6     concealed, especially along his -- I seen his
7     right side, primarily. So anything from the
8     right side I couldn't see outside of.
9  Q. When he stepped out, did he say anything?
10 A. Not that I'm aware.
11 Q. Nothing that you heard anyway?
12 A. Correct.
13 Q. And you said he appeared startled.
14    What were you seeing that gave you the
15    impression that he was startled?
16 A. I -- what I perceived was he noticed there
17    was officers pretty much surrounding the
18    house. It didn't seem like he expected that
19    much presence.
20 Q. And what did he do or what was his facial
21    expression that gave you the impression that
22    this was something startling or unexpected?
23 A. Mainly just the stopping and looking around
24    briefly. 'Cause I know he'd got out and
25    would have seen the lights to his left and

Page 45

1     northwest and probably even down to the east
2     past us, but I'm not sure.
3  Q. And you said when he stepped out, officers
4     began hollering commands at him?
5  A. Yes.
6  Q. Did you?
7  A. Initially, I'm not sure. I probably would
8     have said some -- the same thing, "show me
9     your hands", and then I stopped 'cause I was
10    behind a shield and I knew I -- that's one
11    thing we talked about in training is one
12    person needs to assume the commands so it's
13    to eliminate any confusion.
14 Q. And at the time commands were first being
15    hollered, was there more than one officer
16    hollering commands at him?
17 A. Initially, yes.
18 Q. Were there officers in the location that
19    you've marked where you were that were
20    hollering commands?
21 A. I know Stephens -- I stopped 'cause I heard
22    Stephens-Clark -- Deputy Stephens-Clark
23    saying similar commands "show me your hands"
24    or -- I thought I heard something from the
25    north, but I didn't look to see what was

12 (Pages 42 to 45)

Page 46

1  going on. And from there I don't know if
2  anybody on the west side had said anything or
3  not.
4  Q. Could you hear specifically any of the
5  commands that were being hollered from the
6  north?
7  A. Yeah, something similar to "show me your
8  hands."
9  Q. Do you recall anyone hollering "crossfire" or
10  words to that effect?
11  A. Yes, but I'm not sure at what point in time,
12  if that was then. 'Cause I thought we'd
13  talked about it before to have those officers
14  or someone on the west side to move. It
15  might have been the patrol car at the
16  intersection to move back also. So at least
17  that would have been -- something to the
18  west, I know, was communicated that they
19  should move back. And that would have been
20  on the radio and recorded.
21  Q. Prior to this person stepping out on the
22  porch, had anyone been assigned the
23  responsibility of being the point of contact
24  or the person to communicate with the
25  occupants at 1033 McCormick?

Page 47

1  A. I'm not sure.
2  Q. If it was, you weren't aware of it?
3  A. Correct.
4  Q. And you said you probably hollered commands
5  initially, but then stopped.
6       Why was it, again, you stopped?
7  A. I had heard other people making commands and
8  I had -- I would have had the shield up in
9  front of me, which would have made anything I
10  was saying ineffective to continue.
11  Q. If I understood you, part of your training
12  was not to have a multitude of commands from
13  multiple different areas coming to a suspect
14  in a situation like this; is that fair?
15       MR. PIGG: Object to form;
16  leading.
17  BY MR. BAILEY:
18  Q. You can answer.
19  A. Through our entry team, it's something that
20  we had -- I think it was talked about
21  initially, and it was just something we
22  noticed through trial and error, especially
23  with training, is somebody has to assume the
24  commands and Deputy Stephens-Clark was
25  usually that person. He was kind of a team

Page 48

1  leader on the team, and one of the first ones
2  to go in. And something else we had talked
3  about as trial and error, also, is if you
4  have the shield, it makes it real hard to try
5  to project your voice past a barricade. And
6  sometimes you just -- it's the only thing you
7  can do, but you don't want to continue doing
8  it. It's something you want to try to fix.
9  Q. And have you also learned either through your
10  training or experience that when you have
11  multiple people hollering multiple commands
12  that that can increase the risk of confusion
13  with the suspect?
14       MR. PIGG: Leading; objection.
15  BY MR. BAILEY:
16  Q. You can answer.
17  A. Sure.
18  Q. Now when people were initially hollering --
19  officers hollering commands at this person
20  when they stepped out onto the front porch,
21  were they -- I don't know how else to
22  describe this -- hollering the same words at
23  the same time in unison or were they saying
24  things a little differently at little
25  different times?

Page 49

1       MR. PIGG: Object to form.
2  BY MR. BAILEY:
3  Q. You can answer.
4  A. I doubt it was the same words. Everything
5  that I heard from my position was similar.
6  It wasn't conflicting commands.
7  Q. Did you hear anyone holler a command to kneel
8  down or lay down?
9  A. I'm not sure. I don't think, initially, I
10  heard that. After some time elapsed, I don't
11  recall. It may have happened after the first
12  second.
13  Q. Do you recall hearing anyone yell a command
14  to step forward or step off the porch?
15  A. I remember something to that effect, but
16  nothing specific. I know we didn't want the
17  person to go back inside the house to an
18  unknown area.
19  Q. Do you recall anyone yelling commands to
20  "walk towards me" or words to that effect?
21  A. That sounds familiar, yes.
22  Q. Describe for me the movements that you saw
23  this person perform from the time they
24  stepped out until the time you saw the shot.
25  A. I remember he came out the front door. I

13 (Pages 46 to 49)

Page 50

1  don't remember if there would have been no
2  spring on the door, if it would have just
3  stayed open. I don't remember how that
4  occurred. I don't remember the door closing.
5  He -- I thought he had stepped forward at
6  least a halfway across the porch. And the
7  majority of his focus was north outside of a
8  few glances either way.
9       I remember he had put his hands up and
10 they'd slowly come back down, then "hands up"
11 were yelled again or something to that
12 effect. His hands went up and down numerous
13 times, and he slowly was stepping backwards
14 to go back inside the house, while still
15 facing north.
16 Q. And was that what he was doing when you heard
17    the shot?
18 A. At the time I heard the shot, he was reaching
19    behind his back and approaching the threshold
20    of the door. I'm not sure if he was reaching
21    for anything or what he was doing.
22    Basically, as his hand got to the -- near the
23    small of his back or near there, he had broke
24    the threshold of the door and I couldn't see
25    him -- or inside the threshold enough that I

Page 51

1  could not see what his hands were doing
2  anymore, and that would have been
3  simultaneously when the shot occurred.
4       When he was reaching there, I
5  perceived a potential threat to present
6  itself, but, like I said, he went out of
7  sight from my position and I couldn't tell
8  what he was doing.
9  Q. And when you say a potential threat, is that
10    because you hadn't seen a weapon yet, but you
11    thought a weapon could appear?
12 A. Correct. That'd be a normal place a handgun
13    could be placed in the small of the back.
14    And given the information earlier that
15    somebody had been shot, and I can't remember
16    if it was specifically said handgun or not,
17    but most likely in those situations, that's
18    what you would see.
19 Q. Was the motion that you saw him doing
20    reaching back behind his back consistent with
21    any nonthreatening activity?
22 A. Sure. I think I even mentioned in one of my
23    recording -- recorded statements previously,
24    he could have been -- I thought I said
25    something along like maybe even pushing his

Page 52

1  shirt in so maybe he had a shirt tucked in or
2  reaching back behind him and maybe his elbow
3  hit the door and pushed it that location.
4  I'm not sure. So there could have been other
5  possibilities, but given the call and what
6  was going on and him not listening to
7  commands, I was preparing myself in case a
8  threat presented itself.
9  Q. So if I'm understanding you, what you're
10    saying is that you saw him make some motions
11    that could have a threatening purpose or
12    could have nonthreatening purpose?
13 A. Correct.
14 Q. And your attention was focused -- was
15    heightened, if you will, to watch to see if a
16    threat actually occurred?
17 A. Correct.
18 Q. And at anytime did you see anything that
19    caused you to believe there was a threat
20    prior to the shot?
21 A. Other than what I've mentioned so far, no.
22 Q. You'd seen the potentially threatening
23    motion, but you hadn't seen anything that
24    actually presented a threat?
25 A. Correct.

Page 53

1  Q. At anytime prior to the shot, did you see
2     anything in his hand that you believed to be
3     a weapon?
4  A. No.
5  Q. Anytime prior to the shot, did you see
6     anything on his body that you believed to be
7     a weapon that he was reaching for?
8  A. No, I didn't see anything.
9  Q. At anytime prior to the shot, did you hear
10    any other officer say anything that indicated
11    that they had seen a weapon?
12 A. No.
13 Q. Did you know that a shot was going to take
14    place prior to the time it occurred?
15 A. No.
16 Q. What was your reaction to the shot?
17 A. I maintained my position and continued
18    watching. I did not -- well, when the shot
19    was fired, I remember seeing a spark at the
20    door. It was almost if it was kind of slow
21    motion, and I didn't think it actually had
22    hit the guy. He'd already moved back far
23    enough at the door I didn't see where he fell
24    or anything. I just continued making watch
25    'cause, like I said, I didn't know he was hit

Page 78

1  A. I'm trying to think of a way to articulate
2     it. What I remember was almost kind of a way
3     you would describe a -- something you'd see
4     in a horror movie. It was -- it wasn't a
5     fluid walk across. It was almost like a head
6     came this way and came in and out and maybe
7     peaked out the corner and disappeared.
8  Q. Do you have any estimate of the timeframe
9     from when you saw -- last saw any motion in
10    that window and the time Mr. Finch came out?
11 A. No. Just for tracking the time, at or very
12    close to that time it was communicated on the
13    radio that it was seen. That would be the
14    only way I could document a timestamp on when
15    it occurred.
16       (Headings Exhibit No. 69 was marked
17    for identification.)
18 Q. Deputy Headings, Exhibit 69 is what I would
19    call a screen shot from the body camera worn
20    by I believe it was deputy -- I mean, excuse
21    me, Officer Perry.
22       Do you see yourself in that
23    photograph?
24 A. Yes.
25 Q. And which one would you be?

Page 79

1  A. I am on the right side of the photograph.
2  Q. And you can see the shield or the back of the
3     shield in front of you?
4  A. Correct.
5  Q. And you can see part of the window that you
6     look through and part of it's covered by your
7     head?
8  A. Yes.
9  Q. Is that the position you were in at the time
10    Mr. Finch appeared at the front door?
11 A. That or very close to that.
12 Q. The officer that's next to you with the
13    helmet, who is that?
14 A. Deputy Stephens-Clark.
15 Q. Can you tell from that photograph whether you
16    have -- or whether there was any lighting
17    coming from officers on your side of the --
18    of the house?
19 A. Yes, it appears that there's at least one
20    weapon light coming from our position.
21 Q. Can you tell whose that is?
22 A. It appears Deputy Stephen-Clark has light
23    between his face and his weapon and also with
24    the illumination from the east side of the
25    residence.

Page 80

1  Q. As far as the lighting, is that a fair
2     representation of the lighting that you had
3     at the time Mr. Finch appeared at the front
4     door?
5  A. Yes.
6  Q. There's a light that's above your shield in
7     that photograph.
8        Can you tell what that is?
9  A. Looks like a street light.
10 Q. Over on the Seneca area?
11 A. From the intersection, yes. Actually looks
12    like there would be two of them probably from
13    the southeast and northwest corners.
14 Q. Okay. And you can see kind of the starry
15    light rays shining down in the photograph;
16    correct?
17 A. Yes.
18 Q. Excuse me. So from your angle -- let me ask
19    it this way: You weren't expecting Mr. Finch
20    to appear at the time he did, were you?
21 A. I was not expecting that at that moment.
22 Q. No law enforcement officer had called to the
23    house or requested anybody to come out at
24    that time, had they?
25 A. I don't recall that happening at that time.

Page 81

1  Q. When Mr. Finch appeared, officers started to
2     give commands to him to raise his hands?
3  A. Yes.
4  Q. And all the commands you heard were
5     consistent.
6        Although they might have been in
7     different words, but all would mean show your
8     hands or raise your hands?
9  A. Yes.
10 Q. Did you hear any inconsistent commands given
11    to Mr. Finch?
12 A. I don't recall any.
13 Q. And when Mr. Finch -- when those commands
14    were first given, he did raise his hands
15    initially, didn't he?
16 A. Yes.
17 Q. As if he had heard those commands?
18 A. Yes.
19 Q. But he did not continue to obey those
20    commands, did he?
21 A. No, he did not.
22 Q. And you saw him, then, move backwards into
23    the -- back into the house; correct?
24 A. Yes.
25 Q. And at the time he was doing that, you saw

21 (Pages 78 to 81)

### Page 82

1  his right hand go behind to the small of his
2  back?
3  A. Correct.
4  Q. A location where individuals sometimes wear
5  firearms?
6  A. Yes.
7  Q. But then you lost sight of him because you've
8  got a limited view from your angle toward the
9  porch; correct?
10 A. Right.
11 Q. So you didn't see what actions he took,
12 whether he raised his arms or took -- made
13 any other actions at that time?
14 A. That's correct. I did not see anything else.
15 Q. And in fact, he was far enough back that you
16 did not see him fall at the time he was shot?
17 A. Correct.
18 Q. And there was only one shot that you heard;
19 correct?
20 A. Correct.
21 Q. You were asked to speculate about a number of
22 reasons that somebody might not obey
23 commands.
24     In your experience, have you dealt
25 with people that have had gang involvement?

### Page 83

1  A. Yes.
2  Q. In your experience, do they tend to be
3  resistant to and not obey commands from law
4  enforcement?
5      MR. BAILEY: Object to the form
6  of the question.
7  A. Yes.
8  Q. And in your experience when you've dealt with
9  individuals that are law abiding, do they
10 generally adhere to commands that you give?
11     MR. BAILEY: Same objection.
12 A. Yes.
13 Q. I'm not sure I understand exactly what's on
14 the front of the shield.
15     You indicated that some of them are
16 different, but they'll have "sheriff" written
17 on the front in some way?
18 A. Correct.
19 Q. Are those in big block letters?
20 A. Yes.
21 Q. Are those letters reflective so that they
22 shine when there's a light on them?
23 A. I believe so.
24 Q. With the light from the gas station across
25 the street, would those letters on the front

### Page 84

1  of your shield have shined?
2  A. Yes. Just the light reflecting from our own
3  gun lights off the house should have been
4  enough to make it obvious.
5  Q. You indicated that some of the training when
6  you initially went to the academy was joint
7  between the sheriff's department and the
8  Wichita Police Department; correct?
9  A. Correct.
10 Q. The shooting range where you practice
11 shooting, is that a joint shooting range
12 between the sheriff's department and the
13 Wichita Police Department?
14 A. Yes and no. Typically -- well, there's two
15 shooting ranges there. There's a east and a
16 west one, and we generally stay separate
17 'cause we do have separate policies and
18 training standards. Practices.
19 Q. Are the teachers at the range the same?
20 A. Wichita has their own set. Sheriff has their
21 own set. And they do occasionally assist
22 each other.
23 Q. The second interview -- the second time you
24 were interviewed sometime after this
25 incident, do you recall if that was a KBI

### Page 85

1  special agent who interviewed you?
2  A. To my recollection, yes.
3  Q. If I understand then, at the time that
4  Mr. Finch came out, based on the nature of
5  the call, the information you had that there
6  had been a shooting inside the house and
7  people held hostage, and based upon the
8  motions that you saw him make while he was
9  visible to you, you were sufficiently
10 concerned that he presented a threat that you
11 moved your finger from just holding your gun
12 to actually being on the trigger?
13 A. Correct.
14 Q. But then he moved out of your sight and you
15 never saw, then, a movement that would cause
16 you to pull the trigger?
17 A. Correct. I'd also add that there is a
18 concern that there was alleged to be other
19 people inside that could be in danger, as
20 well.
21 Q. And you also were concerned with citizens or
22 civilians across the street and possibly
23 other officers that would have been in your
24 line of fire?
25 A. Right.