# Exhibit F

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF KANSAS
 2

 3

 4   LISA G. FINCH, Individually, as    )
     Co-Administrator of the Estate     )
 5   of Andrew Thomas Finch,            )
     deceased, and as Next Friend       )
 6   for her minor granddaughter,       )
     AF; DOMINICA C. FINCH, as          )
 7   Co-Administrator of the Estate     )
     of Andrew Thomas Finch,            )
 8   deceased; and ALI ABDELHADI,       )
                                        )
 9                     Plaintiffs,      )
                                        )
10                                      )
         vs.                            )Case No.
11                                      )18-CV-01018-JWB-KGS
                                        )
12   CITY OF WICHITA, KANSAS;           )
     JOHN DOE POLICE OFFICERS 1-10,     )
13                                      )
                       Defendants.      )
14                                      )

15

16                      D E P O S I T I O N

17

18       The videotape deposition of NOAH STEPHENS-CLARK

19   taken on behalf of the Plaintiffs pursuant to the Federal

20   Rules of Civil Procedure before:

21              RICK J. FLORES, CSR
                KELLEY REPORTING ASSOCIATES, LTD.
22              515 South Main, Suite 108
                Wichita, Kansas  67202
23

24   a Certified Shorthand Reporter of Kansas, at 455 North

25   Main, 13th Floor, Wichita, Sedgwick County, Kansas, on

26   the 28th day of November, 2018, at 11:19 a.m.

27
```

## Page 2

```
                    APPEARANCES
 1
 2
 3   PLAINTIFFS:
       CONLEE SCHMIDT & EMERSON, LLP
 4     Mr. Rick E. Bailey
       Suite 300
 5     200 West Douglas
       Wichita, KS 67202
 6     (316) 264-3300
       Fax: (316) 264-3423
 7     rbailey@fcse.net
 8
     DEFENDANTS:
 9     FISHER PATTERSON SAYLER & SMITH, LLP
       Mr. J. Steven Pigg
10     3550 S.W. 5th Street
       Topeka, KS 66606
11     (785) 232-7761
       Fax: (785) 232-6604
12     spigg@fisherpatterson.com
13
     FOR THE WITNESS:
14     SEDGWICK COUNTY SHERIFF'S OFFICE
       Ms. Laura H. Oblinger
15     141 W. Elm
       Wichita, KS 67203
16     (316) 660-3900
       Fax: (316) 660-3248
17     laura.oblinger@sedgwick.gov
18
     VIDEOGRAPHER:
19     ADVANCED DOCUMENT IMAGING
       Mr. Michael Miles
20     515 S. Main, Suite 105
       Wichita, KS 67202
21     (316) 267-9380
       Fax: (316) 267-9382
22     Video@kelleyreporting.com
23
24
25
26
27
```

## Page 3

```
 1                      INDEX
 2
 3
 4   NOAH STEPHENS-CLARK
     Direct Examination by Mr. Bailey:        4
 5
     Cross-Examination by Mr. Pigg:           52
 6
 7
 8
 9   Stephens-Clark Exhibits
     No. 70 - Google Map Aerial View of 1033  13
10       W. McCormick w/Markings (1 pg)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26   SIGNATURE OF WITNESS                     55
27   CERTIFICATE                              56
```

## Page 4

 1            VIDEOGRAPHER: This begins the
 2   videotape deposition of Noah Stephens-Clark.
 3   Today is November 28th, 2018, and the time is
 4   11:19 a.m.
 5            Would the court reporter please swear
 6   in the witness.
 7                NOAH STEPHENS-CLARK
 8   having been first duly sworn on his oath to
 9   state the truth, the whole truth, and nothing
10   but the truth, testifies as follows:
11                DIRECT EXAMINATION
12   BY MR. BAILEY:
13   Q.  Can you state your name for the record,
14       please.
15   A.  Noah Stephens-Clark.
16   Q.  And how are you currently employed?
17   A.  With Sedgwick County Sheriff's Office.
18   Q.  Have you ever had your deposition taken
19       before?
20   A.  I have not.
21   Q.  I know you've had the opportunity to meet
22       with your lawyer and talk about what's going
23       to be going on here today, but I'd like to
24       run over a few ground rules just to make sure
25       you and I are on the same page.

## Page 5

 1            My name is Rick Bailey. I represent
 2   the Finch family in a lawsuit that they've
 3   brought against the City of Wichita and a
 4   couple of individual officers arising out of
 5   the shooting of their son Andrew Finch last
 6   year.
 7            Do you understand that?
 8   A.  Yes.
 9   Q.  You understand that this deposition is my one
10       and only opportunity to ask you questions to
11       find out what knowledge and information you
12       might have that's relevant to that lawsuit.
13   A.  Yes.
14   Q.  Do you understand that?
15            Do you understand you're under oath
16       here today?
17   A.  Yes.
18   Q.  And it's the same oath you'd be under if you
19       were testifying live in front of the judge
20       and jury.
21   A.  Yes.
22   Q.  You understand that one of the purposes of
23       the deposition is that if at the time of
24       trial your testimony would differ from your
25       testimony here today, I could pull out the

## Page 6

1  deposition and point out those differences to
2  the judge and jury.
3  A. Yes.
4  Q. For that reason, it's real important to make
5  sure that we're understanding each other here
6  today.
7      So if at anytime I ask you a question
8  that you don't understand, maybe it's
9  longwinded or it's confusing, you lose your
10 train of thought in the middle of the
11 question, for whatever reason if you don't
12 understand my question, could you please stop
13 me and ask me to repeat it or rephrase it
14 until you're comfortable you understand what
15 I'm asking.
16 A. That'll work.
17 Q. A few other rules that will keep the court
18 reporter happy with both of us.
19     You've been doing a good job in
20 waiting until my question is finished before
21 you start your answer because it's difficult
22 for him to get both of us talking at the same
23 time.
24     So if you'll continue doing that, I'll
25 try and wait till your answer is finished

## Page 7

1  before I start my next question; all right?
2  A. Okay.
3  Q. You've also been doing a good job with
4  answering out loud with yes or no rather than
5  uh-huhs or huh-uhs.
6      Even though the deposition is
7  videotaped, it's important to answer yes or
8  no so that we can make sure the court
9  reporter gets your testimony down accurately;
10 all right?
11 A. Yes.
12 Q. And if you slip up anywhere along the way,
13 I'll just remind you that we need a yes or
14 no; all right?
15 A. Okay.
16 Q. I don't think we'll be long here today, but
17 if anytime you need to stop and take a break
18 for any reason, please let us know and we'll
19 do that; all right?
20 A. Okay.
21 Q. How long have you been with the Sedgwick
22 County?
23 A. 12 years.
24 Q. And walk me through your employment history
25 with them.

## Page 8

1  A. I started in the jail in 2006. I did two
2  years in there, and then 2008 I went to the
3  road.
4  Q. And in the 10 years since that time, have
5  your duties and responsibilities remained
6  about the same?
7  A. I did -- from '08 to September of 2015 I was
8  on second shift patrol. And then in
9  September of 2015 I moved to the fugitive
10 warrant section where I remain now.
11 Q. Where did you receive your training?
12 A. From the Wichita/Sedgwick County Law
13 Enforcement Training Center.
14 Q. And how long a training was that?
15 A. Six months.
16 Q. Was any of the training that you took joint
17 with the Wichita Police Department or were
18 you kept separate?
19 A. A little bit because our classes, the time
20 lines didn't match up. PD started prior to
21 ours, so we only had a few classes together
22 for my academy class.
23 Q. What did you do to prepare for your
24 deposition here today?
25 A. Reviewed my interview from the night of the

## Page 9

1  incident.
2  Q. Anything else?
3  A. Met with the lawyer prior.
4  Q. When did you meet with Mr. Pigg?
5  A. I can't recall the day. It was approximately
6  two weeks ago.
7  Q. How long did that meeting take?
8  A. 30, 45 minutes.
9  Q. Was there anyone else in the meeting with
10 you?
11 A. Deputy Headings.
12 Q. Anyone else?
13 A. No.
14 Q. Did you review any documents in the course of
15 that meeting?
16 A. Just the interviews that I had done.
17 Q. Were you given copies of the transcripts of
18 those interviews?
19 A. I was.
20 Q. Had you seen those transcripts prior to that
21 time?
22 A. I had not.
23 Q. Other than looking over those transcripts,
24 did you review any other documents in that
25 meeting with Mr. Pigg?

Page 10

1  A. No.
2  Q. Did you look at any videos or photographs
3     during that meeting?
4  A. No.
5  Q. Were you given any other documents by him to
6     review later?
7  A. No.
8  Q. What type of questions and things did you and
9     Mr. Pigg talk about?
10 A. Basically just how this proceedings was going
11    to happen.
12 Q. Did he ask you any questions about what had
13    transpired that night?
14 A. Yeah.
15 Q. What did -- what do you recall him asking you
16    about?
17 A. Just overview of what happened and then some
18    questions about the equipment I had and my
19    training.
20 Q. Other than the two interviews that you gave,
21    have you given any other statements or
22    interviews prior to today?
23 A. I have not.
24 Q. Did you ever prepare any written reports?
25 A. I did not.

Page 11

1  Q. Whether it was a formal report or whether it
2     was just notes to help refresh your
3     recollection, did you write anything down
4     after this incident to kind of help you keep
5     track or remember what had happened?
6  A. I did not.
7  Q. Have you seen any such documents that anybody
8     else may have prepared?
9  A. I haven't.
10 Q. What was your position with Sedgwick County
11    Sheriff's Office on December 28th of last
12    year?
13 A. Fugitive warrant unit.
14 Q. And tell me what that involves.
15 A. We get assigned and try to apprehend persons
16    with felony warrants. So we go look for them
17    and try to put them in jail.
18 Q. And what hours do you normally work?
19 A. Normal hours are 8:00 to 5:00.
20 Q. Were you working with a partner that evening?
21 A. I was.
22 Q. And who's that?
23 A. Deputy Headings.
24 Q. Is he normally your partner?
25 A. We don't have assigned partners. That night

Page 12

1     we were working an overtime assignment
2     looking for warrants and we squaded up that
3     night.
4  Q. Have you worked together with him in the
5     past?
6  A. I have.
7  Q. How did you become aware of the call that
8     evening?
9  A. It was broadcasted on an all channels over
10    our radios.
11 Q. And what information did you receive, at
12    least, initially?
13 A. The initial call was that it was a shots
14    fired call. That the suspect had -- I
15    believe the initial dispatch was that he had
16    shot his father, who was laying on the floor,
17    and that there might be two hostages.
18 Q. Any other information that you were given,
19    initially?
20 A. The location and what channel it was going to
21    operate on.
22 Q. And were you assigned to respond to the call
23    or did you choose to?
24 A. We chose to.
25 Q. And why was that?

Page 13

1  A. 'Cause we were a few blocks away.
2  Q. Were you driving that evening?
3  A. I was.
4  Q. And what kind of vehicle were you in that
5     evening?
6  A. A 2008 Chevy Impala.
7  Q. Is that a marked or unmarked vehicle?
8  A. Unmarked.
9  Q. And how were you dressed that evening?
10 A. Similar to this. I was wearing a jacket with
11    our department's patches on the side and the
12    basic same uniform.
13 Q. How long did it take you to get from where
14    you were when you heard the call to when you
15    first arrived on the scene?
16 A. Less than two minutes.
17    (Stephens-Clark Exhibit No. 70 was
18    marked for identification.)
19 Q. Let me hand you what I've had marked as
20    Deposition Exhibit 70. I'll tell you that's
21    a Google Map view of the area surrounding
22    1033 West McCormick.
23    Does that look accurate?
24 A. Yes, it does.
25 Q. Give you a pen. Could you show me where --

## Page 14

1  draw a circle on that Exhibit 70 where you
2  parked when you first arrived on the scene.
3  A. (Witness complies.)
4  Q. And could you put a P beside that for parked.
5  A. (Witness complies.)
6  Q. And you show you've drawn that circle on -- I
7  believe that's Maple?
8  A. It's Walnut.
9  Q. Walnut, excuse me. Walnut Street just south
10  of McCormick and east of the 1033 McCormick
11  address; is that correct?
12  A. Correct.
13  Q. And then how did you move from there to the
14  location of 1033?
15  A. Moved on foot from our position that we
16  parked along these yards to the target
17  residence.
18  Q. And when you say along these yards, were you
19  walking on the sidewalk or were you walking
20  in the yard between the sidewalk and the
21  houses?
22  A. If I recall, it was in the yards between the
23  sidewalk and the houses.
24  Q. Did you see any other officers from whatever
25  agency in that location or area at the time?

## Page 15

1  A. We were the first ones out, and as we were
2  making our approach, WPD officers arrived in
3  the alleyway adjacent to 1033 as we were
4  coming up.
5  Q. Where did you finally stop as you were
6  heading towards 1033?
7  A. On the northwest corner of this residence.
8  Q. And can you draw a circle there for us.
9  A. (Witness complies.)
10  Q. Now when you arrived there, were there any
11  other officers with you at that time?
12  A. Just Deputy Headings.
13  Q. Were there any other officers in the area
14  that you could see?
15  A. Initially, it was the ones that had parked in
16  the alleyway on the west side of 1033.
17  Q. Could you see any other officers?
18  A. At the very onset, no.
19  Q. What did you do when you reached the location
20  that you've marked with a circle there in the
21  house just to the east of 1033 McCormick?
22  A. I began scanning the area that I could see,
23  which was the north side of the residence and
24  the east side of the residence.
25      Also, the officers that were on the

## Page 16

1  west side in the alley, we'd established a
2  crossfire with them, so either via radio or I
3  yelled at them to move and relocate.
4  Q. How were you armed that night?
5  A. I had my M4 rifle.
6  Q. And so you yelled at the officers or
7  communicated by radio with the officers on
8  the west side to move.
9      Did you see where they moved to?
10  A. I knew that they didn't go north so they had
11  went south and west, but I didn't see.
12  Q. Did you see any other officers arrive at the
13  scene after that?
14  A. Yeah, there was a lot of officers arrived
15  around that time.
16  Q. And where did you see those other officers?
17  A. The main ones arrived and staged on the north
18  side of McCormick directly north of the
19  residence, maybe slightly to the west.
20  Q. Can you draw a circle there to show the area
21  where you saw those officers.
22  A. (Witness complies.)
23  Q. And can you put an N by that circle for the
24  north.
25  A. (Witness complies.)

## Page 17

1  Q. Did you see any other officers at another
2  location?
3  A. Officers then began blocking traffic on
4  Seneca and McCormick, as well as back here.
5  I didn't look behind me very much 'cause my
6  focus was the residence. And then we had
7  two -- at least two WPD officers arrive at
8  our location.
9  Q. When you were at that location which you've
10  indicated with a circle there at the house
11  east of 1033 McCormick, describe for us how
12  the officers were positioned, what order you
13  were in and where you were each standing.
14  A. I was closest to the residence that we were
15  standing next to, and then Deputy Headings
16  was off to my right. And then when the PD
17  officers arrived, they filled in behind us.
18  Q. Were they directly behind you, behind you and
19  off to the right, or now would you describe
20  their position?
21  A. I never really looked behind me. I just was
22  communicating through talking with them, so
23  all I know is that they were behind me.
24  Q. On the evening when this occurred, did you
25  have a body cam?

## Page 22

1  the lights on. And I turned my vehicle off
2  and secured it.
3  Q. How long would be your estimate did it take
4    you to get from where you parked the vehicle
5    until the spot on the corner of the house
6    east of 1033 McCormick?
7  A. It was less than a minute.
8  Q. Did you take any other gear with you other
9    than your rifle?
10 A. Yes, I donned my ballistic helmet.
11 Q. Did your partner take any gear with him?
12 A. Initially, no.
13 Q. At some point, he went back and got the
14    ballistic shield?
15 A. Correct.
16 Q. Had you gotten all the way to the location
17    that you've marked with a circle when he went
18    back to get that or were you still on --
19    walking on route to that when he turned
20    around and went back?
21 A. I believe it's after we got there and arrived
22    and I saw what the layout was, I told him to
23    go back and get the bunker.
24 Q. Anything transpire between the time he left
25    to get the bunker and when he returned?

## Page 23

1  A. No.
2  Q. And make sure I'm clear, term bunker and
3    ballistic shield are essentially the same
4    thing?
5  A. Correct.
6  Q. While you were on the location there at the
7    corner of the house east of 1033, did you see
8    any activity inside the house?
9  A. Yes.
10 Q. What did you see?
11 A. At some point after we were there, in the
12    second story window on the east side of the
13    residence, a male's head appeared in a window
14    for just a second or two and then
15    disappeared.
16 Q. And you could see it clearly enough to
17    identify it as a male?
18 A. Correct.
19 Q. Could you see anything about the age of the
20    individual?
21 A. Probably less than 35 or 30.
22 Q. Glasses or no glasses?
23 A. I recall no glasses.
24 Q. What about hair?
25 A. It was shaggy, brown hair best I can recall.

## Page 24

1  Q. What did you do in response to seeing this
2    individual up there?
3  A. By the time I was aware of it and trained my
4    weapon onto the window and activated my
5    weapon-mounted light, the person had
6    disappeared from the window, and I advised
7    the officers around me that I'd seen someone
8    in the window.
9  Q. You said you activated your rifle-mounted
10    light. Tell me about that light.
11 A. What would you like to know?
12 Q. Where is it and how does it work?
13 A. It's mounted on my front sight post and it's
14    operated by a pressure switch mounted on the
15    top part of the fore rail of my rifle.
16 Q. Did you turn that light on as soon as you
17    arrived on scene or did you first turn it on
18    when you saw this individual?
19 A. I turned it on at that instance when I saw
20    the individual. I didn't turn it on and
21    leave it on.
22 Q. So after the individual left, you turned your
23    light back off?
24 A. Correct.
25 Q. And why was that?

## Page 25

1  A. 'Cause if there was someone inside with a
2    gun, I didn't want them to know exactly where
3    I was with my light shining on the whole
4    time.
5  Q. So fair to say you were taking efforts to
6    remain as hidden as possible in the location
7    that you were at?
8  A. Correct.
9  Q. The officers that were at the north location
10    that you've indicated on Exhibit 70, how many
11    officers were there? Could you tell?
12 A. I have no idea.
13 Q. Did you recognize any of the officers there?
14 A. No, I never actually saw specific individuals
15    there.
16 Q. And why was that?
17 A. 'Cause again, my attention was focused to the
18    residence. And at times I did look around, I
19    saw that there was vehicles parked here and
20    officers staged at that area, but I never
21    recognized anybody.
22 Q. After you saw the individual upstairs,
23    trained your light on them, they disappeared,
24    you turned your light off?
25 A. Correct.

Page 26

1   Q. Is that correct?
2      Then what happened next after that?
3   A. Time passed. The sergeant on scene was
4      coordinating a plan to figure out what we
5      were going to do next. And at that point,
6      that's when Finch walked out on the front
7      porch.
8   Q. And the sergeant was Sergeant Jonker?
9   A. Correct.
10  Q. Have you worked with him on scene before?
11  A. I've been on calls with him, yes.
12  Q. Have you been on calls with him before where
13     he was the officer in charge of the scene?
14  A. I can't recall if he was the specific one in
15     command.
16  Q. Anytime that evening did you have direct
17     communications between you and Sergeant
18     Jonker about what you could do or should do
19     or would do?
20  A. No.
21  Q. How did you become aware that someone was
22     stepping out onto the front porch?
23  A. When he stepped out of the doorway.
24  Q. Did you see it before someone told you about
25     it or did someone say something and that

Page 27

1      brought your attention to it?
2   A. No, I saw it.
3   Q. And tell me what you saw.
4   A. I saw a white male wearing a gray or light
5      colored hoodie step out of – or jacket –
6      step out of the front door of the residence
7      and onto the porch.
8   Q. And how far out of the door did he step?
9   A. Two, three steps.
10  Q. Was he still within the swing of the screen
11     door on the outside?
12  A. He was.
13  Q. When he stepped out, did he say anything?
14  A. Not that I recall hearing.
15  Q. When he stepped out onto the front porch,
16     initially, did you have any belief as to who
17     this person was, whether he was the shooter,
18     a hostage, or some other occupant of the
19     house?
20  A. No, just that he was coming from the
21     residence. Possibility of all those.
22  Q. What did he do after he stepped out?
23  A. When he stepped out, I began giving him
24     verbal commands.
25  Q. And what verbal commands were you giving him?

Page 28

1   A. The first one I told him was to put his hands
2      up and that to step off the porch.
3   Q. Any other commands that you gave him?
4   A. It was just those repeated.
5   Q. Were others giving him commands, as well?
6   A. I could hear somebody to my right or to the
7      location from the north yelling, but I don't
8      know what commands they were giving.
9   Q. Was there anyone else in the group of
10     officers there on the east side where you
11     were that was yelling commands at this person
12     other than you?
13  A. Not that I recall.
14  Q. And if I understood you, you could hear
15     someone – some of the officers from the
16     north area yelling commands, but you couldn't
17     hear what they were saying?
18  A. Correct.
19  Q. What about officers on the west side, could
20     you hear any officers there yelling commands?
21  A. No.
22  Q. What did this person on the front porch do in
23     response to those commands?
24  A. To my commands to put his hands up,
25     initially, he put his hands up in the air,

Page 29

1      and then he lowered his hands and took a step
2      back. I again yelled at him to put his hands
3      up and step off the porch. He put his hands
4      back up, put his hands back down, took a step
5      backwards. I again yelled at him to put his
6      hands back up and step off the porch. He
7      brought his hands up higher but less high
8      this time and started to bring his hands back
9      down and stepped back into the doorway.
10  Q. When you were yelling commands, did you ever
11     identify yourself as a sheriff's deputy or
12     with law enforcement?
13  A. I did not.
14  Q. Did you hear anyone else?
15  A. No.
16  Q. Did this person on the porch ever turn and
17     look at you while you were yelling commands?
18  A. Yes, turned his head. Didn't turn his body.
19  Q. Which direction was his body facing?
20  A. North.
21  Q. So he turned his head to the -- to his right
22     in order to look towards you?
23  A. Correct.
24  Q. When he stepped out on the porch, could you
25     see his hands?

## Page 30

1  A. Yes.
2  Q. Did you see a weapon in his hands?
3  A. No.
4  Q. Did you see anything in either hand that
5  might have been mistaken by someone as a
6  weapon?
7  A. No.
8  Q. Could you see any weapon stuck in a waistband
9  or hanging out of a pocket?
10 A. No, his jacket was covering his waistband.
11 Q. Could you see any weapon sticking out of a
12 jacket pocket?
13 A. I could only see the right pocket and no.
14 Q. Did you see any bulges or lumps that you
15 believe could possibly be a weapon?
16 A. From what I saw of him, no, but again, he had
17 a jacket on covering his body.
18 Q. And I understand you only know what you saw,
19 but what you saw was nothing that either was
20 a weapon or that you could have mistaken for
21 a weapon; is that correct?
22      MR. PIGG: Object to form.
23 BY MR. BAILEY:
24 Q. You can answer.
25 A. I – correct.

## Page 31

1  Q. During the time he was on the porch, did this
2  individual ever speak to you?
3  A. No.
4  Q. Did you ever hear him speak to anyone?
5  A. No.
6  Q. Did you ever see his mouth moving, indicating
7  that he was speaking even though you couldn't
8  hear the words?
9  A. No.
10 Q. How long was he on the porch from the time he
11 first stepped out until the time the shot
12 occurred?
13 A. It was definitely less than a minute.
14 Q. What did you see Mr. Finch doing at the time
15 just before the shot occurred?
16 A. I didn't have a visual of Mr. Finch then. He
17 had backed into the threshold of the doorway,
18 and from my angle, I couldn't see any more of
19 him.
20 Q. During the time you could see him, did you
21 see anything which led you to believe that he
22 was a threat to yourself or other officers?
23 A. It was unknown at that time.
24 Q. At anytime from the time he stepped out onto
25 the porch until the shot occurred, did you

## Page 32

1  hear any other officers express anything that
2  they were seeing or hearing that indicated
3  that they saw or perceived a threat by
4  Mr. Finch?
5  A. No, I was yelling at the time that he was out
6  on the porch.
7  Q. How did you know that the shot had taken
8  place?
9  A. I heard the gunshot.
10 Q. At the time you heard the shot, had you seen
11 anything that led you to believe that the
12 application of lethal force was necessary?
13 A. From my perspective, no; but, again, I lost
14 visual of him as he went back into the
15 threshold.
16 Q. And again, I understand other officers are
17 going to have different perspectives. All my
18 questions are going to be directed to you and
19 your perspective.
20     You didn't see anything, if I'm
21 understanding you, from the time he stepped
22 out onto the porch until the time the shot
23 was fired that you perceived as a threat to
24 yourself or any other officer?
25 A. From what I could see, no.

## Page 33

1  Q. Were there any officers on the scene at the
2  time Mr. Finch was on the front porch that
3  were closer to Mr. Finch than you were?
4  A. Not that I know of.
5  Q. Did you see any indication of the shot other
6  than hearing it?
7  A. What do you mean?
8  Q. Did you see anything that demonstrated to you
9  that yes this person who had been standing in
10 the door had been shot?
11 A. I saw Finch – I didn't see him fall back,
12 but his feet came up into the air after the
13 shot, and I also saw sparks coming off the
14 screen door.
15 Q. What did you do next?
16 A. Held my position.
17 Q. Did you hear anyone on the radio say anything
18 about the shot being fired?
19 A. Yeah, someone came on the radio and said that
20 shots had been fired.
21 Q. Anyone say why shots had been fired?
22 A. No.
23 Q. Then what happened next?
24 A. Held our positions as a plan was formulated
25 for further action.

### Page 46

1  A. Only heard.
2  Q. And what have you heard, based on the reports
3     that you saw?
4  A. That he perceived that he had to take the
5     shot because of the call that we were
6     dispatched to and the situation, and that he
7     felt that the suspect going back in the
8     residence was a danger to either the people
9     that were still in the residence or to us.
10 Q. Based on your limited understanding, you
11    believe or understood that Officer Rapp ever
12    saw a weapon?
13 A. Not that I know of.
14 Q. Any point in time at the time Mr. Finch
15    stepped out on the front porch until he was
16    shot, have you reached a conclusion in your
17    mind whether this individual was the shooter,
18    a hostage, or some other third party?
19 A. I didn't think he was a hostage.
20 Q. Why was that?
21 A. 'Cause most hostages don't go back into the
22    building that they were being held hostage
23    in, and he was backing up into the residence
24    again. So that led me to believe that he was
25    either involved with it not as a hostage, or

### Page 47

1     as a third party in some respect.
2  Q. At the time the shot was fired, was Deputy
3     Headings on your right side or left side?
4  A. Right side.
5  Q. At any point in time prior to the shooting,
6     had you heard any other officers announce
7     themselves as sheriff deputies or Wichita
8     Police Department?
9  A. Not that I recall.
10 Q. Let's talk about your interview after the
11    incident.
12      How long after this incident were you
13    interviewed?
14 A. A few hours.
15 Q. And where was that?
16 A. In the Wichita Police Department
17    investigation section.
18 Q. And do you know the officer that interviewed
19    you?
20 A. It was a Detective Balthazar.
21 Q. Have you dealt with him before?
22 A. No.
23 Q. Was there anyone else in the room besides him
24    and you?
25 A. No.

### Page 48

1  Q. What did you understand was the purpose of
2     that interview?
3  A. To establish what I had seen and give my
4     account of the incident.
5  Q. At the time that interview took place, did
6     you understand that, in fact, the call that
7     was made about the residence there at 1033
8     McCormick was fabricated?
9  A. Yes.
10 Q. Did you understand that one of the purposes
11    of the investigation was to determine whether
12    the officer who fired that shot was justified
13    in doing so?
14 A. For what I was involved with, probably, yeah.
15 Q. When Mr. Finch stepped out onto the front
16    porch that evening, did you turn the light on
17    on your rifle?
18 A. I did.
19 Q. And how long did that remain on?
20 A. Until he backed into the threshold.
21 Q. Were there any other lights that you saw come
22    on to help illuminate the scene other than
23    your light?
24 A. Not that I recall.
25 Q. Was there a porch light on on that porch that

### Page 49

1     evening?
2  A. I don't believe there was.
3  Q. What about a yard light?
4  A. No.
5  Q. Were there any streetlights right out in
6     front of the house?
7  A. I don't know if it was in front of the house,
8     but in the area there were.
9  Q. There were lights coming from the businesses
10    there at the Seneca/McCormick intersection;
11    correct?
12 A. Correct.
13 Q. Any other lights along the street other than
14    those that you recall?
15 A. The red and blue lights coming off the police
16    vehicles that were blocking the intersection
17    at Seneca and McCormick.
18 Q. Any other lights?
19 A. Not that I can recall.
20 Q. Have you been involved in any other
21    officer-involved shootings other than this
22    one?
23 A. Prior to this?
24 Q. Before or after.
25 A. Yes.