# Exhibit G

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF KANSAS
 2

 3

 4   LISA G. FINCH, Individually, as   )
     Co-Administrator of the Estate    )
 5   of Andrew Thomas Finch,           )
     deceased, and as Next Friend      )
 6   for her minor granddaughter,      )
     AF; DOMINICA C. FINCH, as         )
 7   Co-Administrator of the Estate    )
     of Andrew Thomas Finch,           )
 8   deceased; and ALI ABDELHADI,      )
                                       )
 9                    Plaintiffs,      )
                                       )
10                                     )
         vs.                           )Case No.
11                                     )18-CV-01018-JWB-KGS
                                       )
12   CITY OF WICHITA, KANSAS;          )
     JOHN DOE POLICE OFFICERS 1-10,    )
13                                     )
                      Defendants.      )
14                                     )

15

16                  D E P O S I T I O N

17

18       The videotape deposition of KYLE PERRY taken on

19   behalf of the Plaintiffs pursuant to the Federal Rules of

20   Civil Procedure before:

21              RICK J. FLORES, CSR
                KELLEY REPORTING ASSOCIATES, LTD.
22              515 South Main, Suite 108
                Wichita, Kansas  67202
23

24   a Certified Shorthand Reporter of Kansas, at 455 North

25   Main, 13th Floor, Wichita, Sedgwick County, Kansas, on

26   the 28th day of November, 2018, at 1:13 p.m.

27
```

Page 2

1   APPEARANCES
2
3   PLAINTIFFS:
    CONLEE SCHMIDT & EMERSON, LLP
4   Mr. Rick E. Bailey
    Suite 300
5   200 West Douglas
    Wichita, KS 67202
6   (316) 264-3300
    Fax: (316) 264-3423
7   rbailey@fcse.net
8
    DEFENDANTS:
9   FISHER PATTERSON SAYLER & SMITH, LLP
    Mr. J. Steven Pigg
10  3550 S.W. 5th Street
    Topeka, KS 66606
11  (785) 232-7761
    Fax: (785) 232-6604
12  spigg@fisherpatterson.com
13
    VIDEOGRAPHER:
14  ADVANCED DOCUMENT IMAGING
    Mr. Michael Miles
15  515 S. Main, Suite 105
    Wichita, KS 67202
16  (316) 267-9380
    Fax: (316) 267-9382
17  video@kelleyreporting.com
18
19
20
21
22
23
24
25
26
27

Page 3

1   INDEX
2
3
    KYLE PERRY
4   Direct Examination by Mr. Bailey:        4
5   Cross-Examination by Mr. Pigg:          117
6   Redirect Examination by Mr. Bailey:     121
7
8
9
10
    Perry Exhibits
11  No. 71 - Google Map Aerial View of 1033   24
    W. McCormick w/Markings (1 pg)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26  SIGNATURE OF WITNESS                    130
27  CERTIFICATE                             131

Page 4

1            VIDEOGRAPHER: This begins the
2   videotape deposition of Kyle Perry. Today is
3   November 28th, 2018, and the time is 1:13
4   p.m.
5            Would the court reporter please swear
6   in the witness.
7                KYLE PERRY
8   having been first duly sworn on his oath to
9   state the truth, the whole truth, and nothing
10  but the truth, testifies as follows:
11              DIRECT EXAMINATION
12  BY MR. BAILEY:
13  Q.  Could you state your name for the record,
14      please.
15  A.  Kyle Perry.
16  Q.  And Mr. Perry, how are you currently
17      employed?
18  A.  By the City of Wichita as a police officer.
19  Q.  Have you ever had your deposition taken
20      before?
21  A.  I have not.
22  Q.  I know you've had the opportunity to meet
23      with Mr. Pigg to talk about what a deposition
24      is and what you can expect here today, but
25      I'd like to go through a few ground rules

Page 5

1       just to make sure that you and I are on the
2       same page.
3   A.  Okay.
4   Q.  My name's Rick Bailey and I represent the
5       family of Andrew Finch that have filed a
6       lawsuit against the City of Wichita and a
7       couple of individual officers arising out of
8       the shooting of Andrew Finch.
9           Do you understand that?
10  A.  I do.
11  Q.  Do you understand that this deposition is my
12      only opportunity to ask you questions to find
13      out what information you might have that's
14      relevant to the claims in that lawsuit?
15  A.  I do.
16  Q.  You understand you're under oath here today.
17  A.  Correct.
18  Q.  And it's the same oath you'd be under if we
19      were testifying live in front of the judge
20      and the jury.
21  A.  Correct.
22  Q.  You understand that one of the purposes of
23      this deposition is that at the time of trial
24      if your testimony would differ from your
25      testimony here today, I could pull out your

Page 22

1  Q. How are you graded on those -- your responses
2     to the simulation?
3  A. I passed.
4  Q. Is it a pass/fail or is there some other
5     grading system?
6  A. I believe it's a pass/fail.
7  Q. And what do you have to do in order to get a
8     fail?
9  A. I don't know. I haven't failed.
10 Q. Is there any record made, to your knowledge,
11    of how someone going through the academy
12    performs on each of these simulations?
13 A. I believe -- I don't know if it's broke down
14    at each simulation, but after -- after you go
15    through one simulation and you're finished,
16    members of the range staff are there with you
17    and they break it down piece by piece of the
18    situation and then you go on to the next one.
19    They clarify any questions, any things you
20    could have -- if there's anything you could
21    have done better, any suggestions they could
22    have asked. And then if it is a lethal type
23    situation, they're able to pull it back up
24    and show you your accuracy, discharge from
25    your firearm, and then they will discuss

Page 23

1     that.
2         I believe if they have any concerns,
3     they make notes and then that is discussed
4     elsewhere or taken out, but I believe after
5     each one, if you've passed, if they are
6     comfortable with you, if you're squared away
7     and you responded as necessary to the
8     situations, then I believe it is a pass/fail.
9  Q. Do you receive any written feedback?
10 A. No.
11 Q. It's all oral?
12 A. I believe so, yes.
13 Q. In these four or five simulations that you go
14    through, are all of those done at the same
15    time or is that spread out during the course
16    of your training?
17 A. It is all done at one time.
18 Q. Let's turn back now to December of last year
19    and specifically December 28th.
20         What were you doing when the call came
21    out about an incident at 1033 McCormick?
22 A. I was on patrol with my partner.
23 Q. And where was your -- where were you
24    patrolling?
25 A. In the south bureau.

Page 24

1  Q. And do you recall specifically where you were
2     when the call came in?
3  A. I don't remember exactly right now. It might
4     be in my transcripts if they asked that, but
5     I'm not for -- if you ask me right now what
6     intersection we were at, I can't tell you,
7     but I know I was in the south bureau.
8  Q. Do you recall about how far away from 1033
9     McCormick you were?
10 A. It'd be a few miles.
11 Q. And who was your -- your partner?
12 A. Ronen.
13 Q. And who was driving the vehicle?
14 A. I believe Ronen.
15 Q. And what kind of vehicle were you in that
16    night?
17 A. A marked Crown Vic.
18 Q. Is that marked or unmarked?
19 A. Marked.
20 Q. About how long did it take you to get from
21    wherever you were to the location there at
22    1033 McCormick?
23 A. A couple minutes.
24         (Perry Exhibit No. 71 was marked for
25    identification.)

Page 25

1  Q. I've handed you what I've had marked as
2     Deposition Exhibit 71, which is a Google Map
3     view of the area surrounding 1033 McCormick.
4     Does that look accurate?
5  A. It does.
6  Q. Like you to take a pen and indicate for me
7     where you parked -- or where, I guess,
8     Officer Ronen parked the vehicle that you
9     drove to the site that night.
10 A. How would you like me to mark it?
11 Q. Just mark it with a circle. And can you put
12    a P beside it for parked.
13 A. (Witness complies.)
14 Q. You've marked a spot south of McCormick on I
15    believe that's Walnut; is that correct?
16 A. That is correct.
17 Q. When you parked there, were there any other
18    law enforcement vehicles parked on that
19    street at the time?
20 A. A sheriff's department vehicle was parked
21    right in front of us.
22 Q. Mark that with a square or rectangle to show
23    where it was.
24 A. (Witness complies.)
25 Q. Had the sheriff's deputies left the vehicle

Page 26

1  or were they still in the vehicle at the time
2  you arrived?
3  A. They were gone, I believe.
4  Q. And did you see them where they were as you
5  drove up to park in that spot?
6  A. Their person?
7  Q. Their person, yes.
8  A. No.
9  Q. What did you do after you parked there?
10 A. We, I think, ran along the front of these
11 porches, utilizing them as best we could for
12 cover, and then met up with officers or
13 deputies that were one house to the east of
14 1033 West McCormick.
15 Q. So if I'm understanding you, you walked along
16 the porches of the houses that were on the
17 south side of McCormick between where you
18 parked and 1033 McCormick; is that correct?
19 A. Correct.
20 Q. How were you dressed that evening?
21 A. I was in a standard SCAT uniform, which is
22 black pants, a black shirt, and a black
23 exterior vest that states -- that says
24 "police" on the front and back.
25 Q. Do you recall what the weather was like that

Page 27

1  evening?
2  A. I believe it was cold, since it was December
3  28th, but I don't remember what the -- it
4  was -- it was not snowing and it wasn't
5  raining. I can clarify that.
6  Q. Do you have any additional gear you were
7  wearing because of the cold weather?
8  A. If it was cold enough, I would have had a
9  hoodie on underneath my vest, but it wouldn't
10 have changed the appearance of my uniform at
11 all because our hoodies, minus the hood,
12 match the uniform shirt.
13 Q. And what kind of indications are there on the
14 front of the vest to indicate that you're a
15 Wichita Police Department officer?
16 A. On that vest, it would have had a badge on
17 the shoulder, a -- our names, and the word
18 "police" on the front on separate sides. I
19 believe "police" was on the right, name was
20 on the left, but I don't have that vest
21 anymore. And then "police" in large, bold,
22 white letters on the back.
23 Q. And the "police" that's written on the front,
24 is that in roughly the same size letters as
25 your name on the other side?

Page 28

1  A. Yes, it is. It's the exact same size.
2  Q. Did you have any kind of a hat or a helmet on
3  that evening?
4  A. If it was cold enough, I would have had a
5  stocking cap on, but other than that, I did
6  not have any other gear other than like -- I
7  don't believe so, no.
8  Q. And does the stocking cap have any kind of an
9  indication to signify the police or Wichita
10 Police Department?
11 A. No.
12 Q. Kind of the standard, dark blue-black?
13 A. Black.
14 Q. How were you armed that night?
15 A. I was armed with a department-issue Glock 17,
16 9-millimeter handgun.
17 Q. Any other weapons you carried?
18 A. Nope.
19 Q. Any nonlethal weapons that you carried?
20 A. A Taser and a baton.
21 Q. And tell me about the Taser you carried.
22 A. It is an X2. I'm not an expert in Taser so I
23 can't get into specifics. But it's just a
24 standard department issued X2 Taser.
25 Q. And when you deploy that Taser, does it

Page 29

1  require actual close contact between you and
2  the suspect or is it one of the ones that
3  shoots wired prongs out?
4  A. It will shoot wired prongs up to a maximum of
5  25 feet.
6  Q. So you had your Glock 17, you had your Taser
7  X2, you had your baton.
8      Any other weapons whether lethal or
9  otherwise that you had on you that evening?
10 A. A pocketknife.
11 Q. I take it that's not something that's issued
12 by the police department, just something you
13 carry?
14 A. Yes, that is correct.
15 Q. I don't expect you've been trained to use a
16 pocketknife as a nonlethal weapon while at
17 the academy?
18 A. That is correct.
19 Q. So other than the Glock 17, the Taser X2, the
20 baton, and the pocketknife, any other weapons
21 whether lethal or nonlethal that you had
22 available to you that evening?
23 A. No.
24 Q. Are there any nonlethal weapons or other
25 lethal weapons that are carried in the

Page 30

1  vehicle that you were driving that evening?
2  A. No.
3  Q. Excuse me. I guess you were riding in the
4     evening.
5  A. Excuse me. There is a shotgun.
6  Q. Is that shotgun able to shoot beanbag or
7     nonlethal rounds?
8  A. No.
9  Q. And did either you or Officer Ronen carry the
10    shotgun with you to the location at 1033
11    McCormick?
12 A. We did not.
13 Q. Can you draw a circle there on Exhibit 71 to
14    show where you met up with the sheriff's
15    deputies when you finally got in the vicinity
16    of 1033 McCormick that evening.
17 A. Approximately right here (witness draws).
18 Q. And you've drawn a circle that's just on the
19    northwest corner of the house that's
20    immediately east of 1033 McCormick.
21 A. Correct.
22 Q. Is that correct?
23    Do you recall what the address of that
24    house is?
25 A. I do not.

Page 31

1  Q. I believe it's 1027, but I'm not positive of
2     that.
3     When you finally reached that location
4     there at the house just east of 1033
5     McCormick, did you see any other officers
6     other than the two sheriff's deputies that
7     you met up with?
8  A. Yes.
9  Q. And who did you see?
10 A. Exactly who I saw I cannot -- I've just -- I
11    saw officers in uniform.
12 Q. And let's talk about where those officers
13    were that you saw.
14    Were they all in one location or --
15 A. Would you like me to write it on Exhibit 71?
16 Q. Please do.
17 A. There were officers that we could see in this
18    parking lot right here. Do you want me --
19    how would you like me to mark this?
20 Q. Just an oval or a large square or something
21    to indicate the area where you saw them.
22 A. I believe there was some right here on the
23    street corner.
24 Q. And you're referring to the oval that you've
25    drawn on the southeast corner of the Seneca

Page 32

1     and McCormick intersection.
2         MR. PIGG: Southwest.
3  Q. Excuse me. No, southeast corner.
4  A. Be southeast.
5         MR. PIGG: You're right.
6  A. I saw officers pulling up and blocking
7     McCormick street in their patrol cars.
8  Q. Can you draw a square to show where you
9     were -- where you saw those vehicles.
10 A. Exactly I cannot for --
11 Q. And I understand this is just going off your
12    memory, but just draw a square that's big
13    enough for whatever precision you feel
14    comfortable with.
15 A. Approximately in this area right here
16    (witness draws). As we went north, I don't
17    know for sure how many cars were there. More
18    than 2, 3, 4, however many were needed. I
19    was not in charge of traffic at the time.
20    And then I saw officers running north of
21    McCormick and there were officers set up
22    approximately in this area, I'd say, in this
23    area of the circle. But that's not exact
24    because I didn't know exactly where they
25    were, but I saw them run to this area, and

Page 33

1     that'd be several officers.
2  Q. Sure. That circle that you've drawn to the
3     north of McCormick, can you put an N by that
4     to signify that that's where the north
5     officers were.
6  A. (Witness complies.)
7  Q. And the other circle that you've drawn on the
8     southeast corner of Seneca and McCormick,
9     could you put a W on that for the west most
10    officers?
11 A. And that's just the west most officers that I
12    could see.
13 Q. I understand.
14 A. Okay. (Witness complies.)
15 Q. Now when you arrived at the circle that
16    you've drawn there at the house just east of
17    1033 McCormick, what was your understanding
18    based on what information you'd been given as
19    to the situation you were responding to?
20 A. Excuse me. We were responding to a dispatch
21    call saying that an individual was calling
22    in, saying that he had just killed his father
23    and was holding his family at gunpoint.
24 Q. Were you given any other information at that
25    time about the situation or the people that

9 (Pages 30 to 33)

Page 38

1  A. No.
2  Q. And then if I'm understanding you, you
3     positioned yourself in back of and kind of
4     between those two officers?
5  A. Correct.
6  Q. And Officer Ronen was then to your right?
7  A. He was to my left.
8  Q. Excuse me, to your left. So he was closer to
9     the house than you were?
10 A. Correct.
11 Q. So if we're talking about proximity to the
12    house, going away from the house, was Officer
13    Ronen or Deputy Stephens-Clark closer to the
14    house?
15 A. Which house?
16 Q. The house just east of 1033 McCormick.
17 A. I can't speak for sure. I know Ronen was
18    beside me when we initially made contact with
19    them. And I know how we ended up was kind of
20    like a inverted triangle: Stephens-Clark
21    close approximate to my left within touch,
22    Deputy Headings directly to my right within
23    touch, and then me between them, and Officer
24    Ronen was somewhere back here, so I don't
25    know who was actually closer to the house,

Page 39

1     but we were all within -- at least those two
2     deputies and myself were all within touching
3     distance. We were very close together.
4  Q. As you approached 1033 McCormick, did you
5     receive any directions or commands as to what
6     you were to do from anyone?
7  A. No. We wanted to set up containment of the
8     situation as best we could. We knew the
9     house, and so we were coming in from the east
10    already so we would just take an eastern
11    perimeter position.
12       Once we were there, we communicated
13    where we were and that we had four, for lack
14    of better -- we'll just call them all
15    officers, two deputies, two officers. And
16    then we had a bunker. So we communicated to
17    Sergeant Jonker, who was the supervisor on
18    scene on the radio, that we would make --
19    that we would be a contact team if necessary.
20 Q. How did you become aware that Sergeant Jonker
21    was the person in charge on the scene?
22 A. He's my supervisor and I know his call number
23    and voice.
24 Q. Now did he direct you to set up the eastern
25    perimeter of the containment or was that

Page 40

1     something that you did on your own initiative
2     knowing or expecting that's what he would
3     want done?
4  A. Our own initiative.
5  Q. And were you the one that was in contact with
6     Sergeant Jonker or was it someone else in
7     this group of four that was in contact with
8     him?
9  A. I believe it was me.
10 Q. And did you volunteer or offer to be a
11    contact team or did he instruct you that that
12    was going to be your role?
13 A. We offered it.
14 Q. What is a contact team?
15 A. That would have been the team if there was --
16    if we were to make contact with an
17    individual, we would be the ones to initiate
18    the physical contact with him, her, whoever.
19    But if we were able to make a move on the
20    house or anybody that was out, that we would
21    move up as an element due to us having four
22    and having the bunker for protection that we
23    would make that move.
24 Q. At this point in time, had you had any
25    specific training or experience on being part

Page 41

1     of a contact team in a situation like this?
2  A. In this situation, no.
3  Q. How about just generally?
4  A. Generally, yes. Within our entry training,
5     we train, like within the active shooter, as
6     well, there's always a contact team that will
7     go directly to the threat.
8        Or, a contact team will also be a team
9     if we're doing like an officer down rescue,
10    there will be a team to go directly to that
11    officer if an officer's down, and that's
12    their only job is to rescue that officer and
13    handle anything they are presented and then
14    to get back out. So a contact team is just a
15    small group of officers, could be large, but
16    a group of officers that are all on the same
17    page with a specific task.
18 Q. When you made this offer to be a contact team
19    to Sergeant Jonker, did he respond?
20 A. I don't believe so.
21 Q. And how soon after your arrival there at the
22    corner of the house next to 1033 McCormick
23    did you make this offer to Sergeant Jonker of
24    being the contact team?
25 A. Once we realized that we had four of us and

Page 42

1  the bunker and then our geographical location
2  to where we are to the suspect residence, we
3  felt like we had the best -- we would have
4  had the best move safely. Officers from
5  across the street would not have cover.
6  Officers in the parking lot would not have
7  cover. We would be able to utilize a little
8  bit more cover if we were to make a move on
9  that house.
10 Q. So you get in location, you realize you have
11    four of us -- four of you, you realized you
12    had a bunker, you make the offer to Sergeant
13    Jonker to be the contact team.
14       What's the next thing that happens?
15 A. An individual walks out of the house.
16 Q. And how long had you been at that location
17    before the person walked out on the front
18    porch?
19 A. I said it in my other interviews, as well,
20    that I'm not for sure. It's hard to put a
21    time on those situations, but it was not very
22    long. It was a very short amount of time.
23       MR. PIGG: Rick, take a short
24    break?
25       MR. BAILEY: Yeah, that's fine.

Page 43

1       VIDEOGRAPHER: Off the record
2  2:04.
3       (A recess was taken from 2:04 p.m. to
4  2:12 p.m.)
5       VIDEOGRAPHER: Back on the record
6  at 2:12.
7  BY MR. BAILEY:
8  Q. So had you seen anything going on in the
9     house at 1033 McCormick from the time you
10    arrived on the scene until when you saw
11    someone step out on the front porch?
12 A. I did not.
13 Q. Describe for me the person who you saw step
14    out on the front porch.
15 A. A white male. I remember I couldn't -- and
16    this is going to be hard 'cause there was so
17    much I know now to what I knew then. I'd
18    have to refer to my exact transcript 'cause I
19    don't remember if I for sure could
20    distinguish what race he was, but a male step
21    out with dark colored clothing, a little bit
22    larger build, and that's all I could
23    distinguish.
24 Q. Were you close enough to be able to see his
25    face?

Page 44

1  A. I could not make out his face, no.
2  Q. So you couldn't tell whether he had facial
3     hair or not?
4  A. I could not.
5  Q. Could you see his hands when he stepped out?
6  A. When he first stepped out?
7  Q. Yes.
8  A. No.
9  Q. Later, while he was on the front porch, could
10    you see his hands?
11 A. Yes.
12 Q. How long after he stepped out onto the front
13    porch until when you were first able to see
14    his hands?
15 A. It's hard to -- I mean, it'd be seconds. I
16    mean, the whole situation probably only
17    lasted seconds so -- yeah, seconds.
18 Q. When you saw his hands, did you see anything
19    in his hands?
20 A. No.
21 Q. See any weapons?
22 A. No.
23 Q. Anything that may have looked like a weapon?
24 A. No.
25 Q. Were you able to see any weapon protruding

Page 45

1     from a pants pocket or a jacket pocket or
2     sticking out under a waistband?
3  A. I would not have even been -- I would not
4     have been able to see that, no.
5  Q. Why not?
6  A. Because it was so dark and his clothing and
7     my distance.
8  Q. Deputy Stephens-Clark and Deputy Heading
9     would have been a step or two closer to this
10    person than you were?
11 A. Correct.
12 Q. Was there anyone else -- any other officers
13    that were closer to the person on the porch
14    other than those two deputies?
15 A. To my knowledge, no.
16 Q. So to summarize, if I'm understanding your
17    testimony, you didn't see a weapon in either
18    hand, and you didn't see a weapon anywhere
19    else on his person, given the limitations of
20    the light and viewpoint that you had?
21 A. Correct.
22 Q. When he first stepped out onto the porch, did
23    you reach any opinions or assumptions in your
24    mind as to who this individual was?
25 A. In my mind, I believed we were -- we were

Page 46

1  going to be making contact with a suspect.
2  Q. Why?
3  A. Due to his mannerisms.
4  Q. What was it about his mannerisms?
5  A. If he would have been -- in my mind, I was
6     stating to myself if he is a victim or if he
7     is being held hostage, he's going to be
8     trying to distance himself from the house.
9         If he is the calling party, if he
10    is -- or a family member or victim, he's
11    going to be summoning us, trying to make
12    contact with us, or, again, just distancing
13    himself from the situation inside of the
14    house.
15 Q. Did the person that you saw step out onto the
16    front porch ever speak to you?
17 A. No.
18 Q. Did you see him ever speak to any officers?
19 A. No.
20 Q. Did you ever see his mouth move even though
21    you may not have been able to hear the words
22    that were being spoken?
23 A. I could not see that and did not hear
24    anything.
25 Q. And describe for me what you saw from the

Page 47

1  time the person stepped out onto the porch
2  until the time the shot rang out.
3  A. I'll probably have to demonstrate some of
4     this with my hands. I talk with my hands.
5  Q. No. Please do.
6  A. As the individual steps out of the house,
7     commands are initially -- are immediately
8     given from several angles. I can hear
9     preparatory commands as in like "police",
10    "show me your hands", "walk off the porch."
11    Several different commands were given.
12        As he walks out of the -- or walks out
13    of the door, the screen door stays open like
14    he's kind of blocking the screen door with
15    his foot, like kind of -- it's still ajar;
16    he's standing in the threshold of the screen
17    door. As commands are given "show me your
18    hands", "police", "step off the porch", all
19    those commands are given, he raises his hands
20    approximately to shoulder height or armpit
21    height. Not from his body, not out, not up,
22    just basically about like right here
23    (demonstrating) and just kind of scans around
24    and looks around and kind of just like kind
25    of takes all the whole situation in, what's

Page 48

1  going on, drops his hands. Commands are
2  given again, "show me your hands." He kind
3  of just like -- like almost like he was just
4  saying no, don't want to. And his hand comes
5  back -- comes down into like the front of his
6  like waistband area to like if you were going
7  to -- for us, if I was going to adjust my
8  belt, or if I had a weapon stored in the
9  front of my waistband, how I would grab that
10 weapon. Commands are given again, "show me
11 your hands."
12     At that point, he turns his body. And
13 I don't know -- due to it being so dark, I
14 don't know if he turned towards us looking to
15 the east or if he turned back and looking to
16 the west, but I see a hand come across his
17 body as if I was going to -- if a gun was on
18 my right hip, I was going to come out and
19 draw, or if a gun was on -- if he was turned
20 this way, a gun was on his other right hip --
21 or, I guess, if a gun was on his left hip, he
22 was going to come out with his right hand if
23 he was turning to the west. If he was going
24 to turn to the east, he would have came out
25 with his left hand across his body like this

Page 49

1  (witness demonstrates.)
2      At that point, in my mind, I believed
3  that he was drawing a weapon. Due to his
4  mannerisms, his actions, and then the way
5  that he blades his body would be similar to
6  the way I would if I was going to be drawing
7  a gun, the way I've been trained, if you
8  would draw a gun and come out and go back to
9  a threat, or how I've seen individuals draw
10 guns, that's what I believed was happening.
11 Q. I'd like to separate if I can -- have you
12    separate, if you can, what you saw and what
13    you believed was happening.
14        You've described that you saw an arm
15    going across the -- was it the front of his
16    body?
17 A. Well, if he was facing us, it would have
18    been, but if not, I just saw the motions of
19    coming across. So I couldn't see his exact
20    hands. It was too dark. He was just like in
21    the shadow. And so all I could see was the
22    motion. So if I'm facing you and it's dark,
23    you would just see like my elbow and my
24    shoulders dipping down, but if I was turned
25    away from you, you would just see the back of

13 (Pages 46 to 49)

### Page 50

1  my shoulder and that same view of my elbow
2  coming across my body the other way.
3  Q. So you saw a shoulder and an arm motion that
4  indicated to you that an arm was going across
5  the front of his body either facing you or
6  facing away from you?
7  A. Correct.
8  Q. But you couldn't see what the person was
9  reaching for, if anything?
10 A. Correct.
11 Q. You couldn't see the person's hand?
12 A. Correct.
13 Q. You made a comment in your earlier
14 description about he looked around with his
15 hands partially up, and then I think the
16 phrase you used was his hands started to
17 drop, there were more commands given, and he
18 was like no, I don't want to.
19    What were you seeing in his body
20 language that leads you to the assumption or
21 conclusion in your mind that that's what he
22 was thinking?
23 A. That he had no fear or obligation to do what
24 we said.
25 Q. And again, what were you seeing in his

### Page 51

1  behavior, what did you physically see him do
2  that leads you to the assumption that he had
3  no fear or inclination to obey the commands?
4  A. I've seen -- dealt with several situations.
5  I've given several commands to individuals at
6  gunpoint. I have given them not at gunpoint,
7  but just given them law enforcement commands
8  in a situation. Individuals that are going
9  to comply with your commands or that are in
10 fear or have a respect for law enforcement
11 raise their hands and it's very clear they
12 are up; they don't want anything to happen.
13 It's very clear what their actions are.
14    If they are going to run or if they're
15 going to fight, they are not going to comply
16 with your commands and they're either going
17 to -- they're either kind of -- they're --
18 they're -- for lack of better term, it's like
19 a stalling method.
20    If individuals are going to come out
21 and run, they're trying to gather their
22 thoughts what they're going to do. They're
23 overwhelmed with law enforcement contact.
24 They're like, okay, what's going on,
25 what's -- I'm going to run or I'm going to

### Page 52

1  fight or I'm formulating a plan, but they're
2  not up. Their hands don't come up above
3  their head. It's always where they can still
4  react if they need to where they can grab
5  something, grab something or run. They're
6  already in that motion. They're close --
7  they keep their hands close to their bodies.
8     So in seeing that on this situation,
9  that's what I'm thinking. This individual is
10 planning something; or, if he's not planning
11 something, he has actually no regard for the
12 law enforcement that is here and has no
13 regard or reason to obey us.
14    He -- I mean, I'm trying to put the
15 words to it. Like he, in his -- I'm trying
16 to put myself in his -- he has no reason to
17 obey us. That he's just I don't care is
18 the -- is the best way I can describe it.
19 That he just didn't -- had no care that we
20 were saying to show us his hands, or to step
21 off the porch or --
22 Q. You've said that a person may not respond to
23 commands because they're planning to run or
24 because they're planning to fight.
25    Are there any other reasons that

### Page 53

1  you've learned either in your experience or
2  your training why someone may not immediately
3  comply with commands given by law
4  enforcement?
5  A. They're deaf.
6  Q. Any other reasons?
7  A. Not that I can think of.
8  Q. What about mental impairment?
9     Have you ever been taught or trained
10 or had experience where a suspect has a
11 mental impairment that might inhibit their
12 ability to understand and respond to
13 commands?
14 A. In the academy we are taught to deal with
15 mental health first aid, things of that
16 nature, and we are given situations to talk
17 to individuals that are simulating mental
18 impairment, but that type of situation is in
19 a room like this, well lit, contact me to
20 you, and you're just trying to convince them
21 of what's going on, if they're suicidal or
22 whatever the situation, in a disturbance with
23 their family trying to just communicate with
24 them. I've never dealt with an individual
25 with mental impairment in a serious situation

### Page 58

1  BY MR. BAILEY:
2  Q. You can answer.
3  A. It's all dependent on the situation.
4  Q. Explain that to me.
5  A. State the question one more time.
6  Q. I asked you if the failure to comply with an
7     officer's law enforcement -- law enforcement
8     officer's commands was justification for the
9     use of lethal force.
10 A. If the situation were to arise of a situation
11    where lethal force could be taken, then yes,
12    such as a hostage situation; or, an
13    individual that is presenting a lethal threat
14    to somebody, law enforcement or myself or
15    somebody else and they don't comply, then,
16    ultimately, if that situation -- if the
17    factors all met, and this is all hypothetical
18    because we're not there and every situation
19    is different and fluid, so if that situation
20    could arise, then yes, there could be a
21    situation to where, yes, if someone does not
22    comply with law enforcement commands, lethal
23    force could be taken.
24 Q. If I'm understanding you, that situation
25    would require two things, the failure -- one,

### Page 59

1     the failure to comply with law enforcement
2     commands, and two, an imminent threat of
3     bodily harm to you or other individuals?
4  A. Correct.
5  Q. Did you ever see a weapon in this
6     individual's hands at anytime between the
7     time they stepped out on the porch till the
8     time they were shot dead?
9        MR. PIGG: Object to form of the
10    question.
11 BY MR. BAILEY:
12 Q. You can answer.
13 A. I did not see a weapon, but I believe he was
14    reaching for a weapon.
15 Q. And you were wrong; isn't that right?
16       MR. PIGG: Object to the form of
17    the question; it's argumentative.
18 A. At the time now, now I know all the facts, I
19    know that he was not reaching for a weapon,
20    but it does not change the indication of what
21    he was reaching for, or what I believed at
22    the time he was reaching for.
23 Q. You saw a motion consistent with someone
24    reaching for something; is that correct?
25 A. That is correct.

### Page 60

1  Q. You never saw a weapon; correct?
2  A. Correct.
3  Q. You never heard any other officer indicate
4     that they saw a weapon; correct?
5  A. Correct.
6  Q. And based upon that, you believe that the
7     person was reaching for a weapon?
8        MR. PIGG: Object to form of the
9     question.
10 BY MR. BAILEY:
11 Q. Correct? You can answer.
12 A. Correct. I believe he was reaching for a
13    weapon at that time in the moment of what was
14    going on, what I was seeing, I believe that
15    that individual was reaching for a weapon, or
16    indicating that he had a weapon.
17 Q. Do you believe, based upon what you saw from
18    your point of view, that the application of
19    lethal force was appropriate?
20       MR. PIGG: Object to form of the
21    question.
22 A. Yes.
23 Q. And that's based upon your assumption that
24    the person had a weapon; correct?
25 A. That is based on my training and experience

### Page 61

1     as a law enforcement officer, not of an
2     assumption in the moment of what I have been
3     trained and what I've seen in the past.
4  Q. Explain to me how your training and
5     experience as a law enforcement officer led
6     you to make the mistake to believe that this
7     unarmed man was armed.
8        MR. PIGG: Object to form of the
9     question.
10 BY MR. BAILEY:
11 Q. You can answer.
12 A. Because I also know if you're carrying a
13    weapon, the motion that you would have to do
14    to draw that weapon or indicate that you have
15    a weapon, because I also know there are
16    situations to where officers have been in
17    situations where a suspect has baited
18    officers into a suicide by cop, leading them
19    to believe that he had a weapon and then
20    making the overt movement indicating that he
21    was going to draw a weapon to harm them.
22 Q. Is that what you believe happened here?
23 A. Which part?
24 Q. Either part.
25 A. That he was reaching for a weapon, yes.

Page 62

1  Q. Now in coming to that conclusion or that
2     assumption, you assumed that the information
3     that was given to dispatch and forwarded to
4     you about the situation was truthful;
5     correct?
6  A. Correct.
7  Q. You assumed that that information was
8     accurate; correct?
9  A. Correct.
10 Q. You assumed that there actually had been a
11    shooting at 1033 McCormick prior to you
12    arriving?
13 A. For the fact of an assumption, I was not
14    assuming anything. I was acting on the facts
15    that I was giving over the radio. I have no
16    reason to believe what dispatch is saying. I
17    have no reason to question that -- in my job,
18    when they -- what they provide to us, we act
19    upon. So I was acting on the action of the
20    intelligence that I was giving, and at that
21    time, what they were providing to us,
22    everybody believed was the facts.
23 Q. And you assumed that the person stepping out
24    on the porch was the shooter?
25 A. I believed he was.

Page 63

1  Q. And that was based on the evidence that he
2     stepped out?
3          MR. PIGG: Object to form of the
4     question; misstates his prior testimony.
5  Q. What else was that assumption based upon?
6  A. What -- how I stated earlier how his actions
7     were, once he confronted us.
8  Q. You've said that you would expect if a person
9     was a hostage or some other family member in
10    the house that after they stepped out, they
11    would attempt to distance themselves from the
12    house; is that correct?
13 A. Correct.
14 Q. Why did you believe a shooter would step out
15    on the front porch to expose them self to all
16    these officers?
17 A. I can't speak on that, but I do know there's
18    instances within the Wichita Police that that
19    instance has happened before.
20 Q. If I'm understanding you, you also assumed
21    that the person stepping out on that front
22    porch was armed; correct?
23 A. As they stepped out?
24 Q. Yes.
25 A. I was not assuming anything at the time. I

Page 64

1     was -- after he made the motions, during the
2     motions of what he was making, I believed
3     that he was reaching for a weapon that he was
4     armed at that time. When a -- when he
5     stepped out of the situation, I was not
6     assuming. What I saw is what I saw, and I
7     did not see a weapon when he came out. I had
8     to take into consideration that he possibly
9     could be armed still, and then once he made
10    the motions, began making the motions, that's
11    when I believed in my mind that he was armed,
12    and that he was reaching for it.
13 Q. Do you believe that Wichita Police Department
14    policy allows an officer to apply lethal
15    force in that situation when a person is
16    making motions consistent with pulling a
17    weapon, but no weapon has been seen by
18    anyone?
19 A. Yes.
20 Q. Did this person who'd stepped out on the
21    porch make any kind of what you perceived to
22    be threatening gestures other than this
23    motion of reaching across their body?
24 A. I did not see any others, other than the
25    noncompliance.

Page 65

1  Q. And that is raising their hands, lowering
2     them, raising them and lowering them?
3  A. And the raising that you're doing is way
4     above his raising. As I stated before, they
5     never came above his armpit, never broke the
6     plane of his torso. Up, down, all the way to
7     his waistband, a little bit back up, and then
8     the reaching across his body.
9  Q. Where was this person standing on the porch
10    at the time they were shot?
11 A. In front of their front door.
12 Q. Were they outside the front door, standing
13    within the threshold, back inside the house,
14    where exactly?
15 A. There's two doors. So it would have been a
16    entry door and then a storm door. I don't
17    know what the main door was -- open, closed.
18    Don't know. Couldn't see. The glass door,
19    the storm door was opened, and it was being
20    held open by their body -- by the person's
21    body on the porch. So outside of the
22    threshold 'cause I was basically in line
23    perfectly parallel with the -- perfectly in
24    line with the threshold of the front door of
25    the main door. This person was out a couple

17 (Pages 62 to 65)

Page 66

1  steps from -- from the front door, but was
2  not far out enough for probably a standard
3  3-foot storm door to close behind them
4  because their body was blocking it.
5  Q. And which direction was this person facing at
6  the time they were shot?
7  A. I would have -- he would have been facing
8  east or west. So I don't know. It was too
9  dark for me to see which way he turned. So
10 the turn this way or the turn this way, and
11 then was still in that bladed position
12 squared up to me, who was directly east of
13 him, squared up, but bladed towards the other
14 officers.
15 Q. So he was -- if I'm understanding you, he was
16 either facing you or he had his back towards
17 you?
18 A. Correct.
19 Q. When you saw this reaching motion, were you
20 able to see where the arm and hand were or
21 were you simply seeing the movement of the
22 shoulder and body?
23 A. I was not able to see the actual hands, like
24 digits. But I was able to see like the arm
25 and going down, so yeah, what you're saying,

Page 67

1  the shoulder, the elbow, upper arm, parts of
2  lower arm coming in and dipping across.
3  Q. Did you take a shot that evening?
4  A. I did not.
5  Q. Why not?
6  A. Due to my position.
7  Q. Explain that to me.
8  A. Where I was, the house to the east, that
9  would have been a considerable distance.
10 Also, with a handgun to take, but the primary
11 reason I did not take it was because of these
12 officers behind him in his backdrop, and all
13 these citizens that were standing over here.
14 So if I were to take a shot, there was no way
15 I had a safe angle even after moving out a
16 couple feet, which we did, to move out and
17 try to put the house, part of the house
18 behind the suspect on the front porch, even
19 then, I was not comfortable taking that shot
20 due to striking officers or innocent
21 individuals that were behind the suspect.
22 Q. Was that the only reason you didn't take a
23 shot?
24 A. That is correct.
25 Q. Did any of the officers alongside you take a

Page 68

1  shot?
2  A. No.
3  Q. How did you become aware that the shot was
4  taken?
5  A. I heard it, and I also saw a spark on the
6  glass door like in front of the individual's
7  body.
8  Q. And then what happened?
9  A. The suspect fell inside of the house.
10 Q. And then what happened next?
11 A. It was communicated that shots were fired and
12 that the suspect was down by, I believe, the
13 officers to the north and Sergeant Jonker.
14 And then communication was given to what we
15 could see. They were asking us if they
16 could -- if we could see if the front door
17 was open or closed, if the individual had got
18 back in the house. But there was a foot and
19 a half, 2-foot lattice on the front porch
20 that was directly eye level with me, and I
21 could not see below that lattice, but I could
22 see that the door was just -- the storm door
23 was still slightly ajar.
24       And so it was communicated what
25 actions were going to be taken next. They

Page 69

1  were formulating a plan of how -- what the
2  next steps were.
3  Q. And who was formulating that plan?
4  A. Sergeant Jonker.
5  Q. Prior to the shooting, at anytime, did
6  Sergeant Jonker give you any directions or
7  commands as to what you were to do or not do?
8  A. Sorry. State that again.
9  Q. Prior to the shooting, had Sergeant Jonker
10 communicated to you any commands or
11 instructions as to what you were to do or not
12 do?
13 A. No.
14 Q. Sergeant Jonker giving you commands to issue
15 commands to this person or to anyone who
16 steps out onto the front porch?
17 A. No.
18 Q. Had he told you not to do that?
19 A. No.
20 Q. What was your next involvement in the
21 situation?
22 A. My next involvement was a patrol car, a K9
23 patrol car was pulled up in the driveway
24 separating the house that I was at and 1033
25 West McCormick. And I went to the back --

18 (Pages 66 to 69)

Page 86

1  A. Given what we had all been given, not
2     complying with commands, not being able to
3     see what they were doing with their hands to
4     what are they doing in the motions that I
5     saw, yes, I believed that this individual was
6     drawing a gun.
7  Q. Were there any nonthreatening or nonhostile
8     interpretations of those motions that you
9     considered?
10 A. Can you clarify.
11 Q. Were there any nonthreatening or nonhostile
12    interpretations of that body language that
13    you considered, such as is this person
14    reaching to shut the door behind them, or is
15    this person reaching to pull their pants up;
16    did you consider any of those possible
17    explanations for the body language that you
18    saw?
19 A. In my explanation to the first time in one of
20    my interviews of when he reached down like he
21    was doing it would be like he was -- you or I
22    were hitching up our pants or adjusting our
23    pants, for a motion to describe what I was
24    seeing.
25        If they were making those motions,

Page 87

1     could those motions be something else; yes,
2     but in my mind at the time, what we were
3     given and the motions that I saw is I believe
4     that the threat was a lethal threat.
5  Q. I understand that, and that's not my
6     question.
7         My question was did you consider in
8     your mind nonlethal or nonhostile motivations
9     by this person for the physical action that
10    you saw them taking?
11 A. I did. I -- when he was reaching, of course,
12    I was considering it myself what is he
13    reaching for. At first you have to ask
14    yourself: What is he possibly could be
15    reaching for? So all those things go through
16    your mind. Is he reaching for -- to adjust
17    his pants, is he reaching for the door, you
18    stated. Is he -- but why would you do
19    that -- in my mind, this is me thinking, why
20    would you do all that when you're giving
21    commands from law enforcement saying "show me
22    your hands", "don't reach", "don't drop your
23    hands", "come off the porch", why would you
24    not act accordingly.
25        So given that, not following commands,

Page 88

1     you're confronted with law enforcement,
2     actions are very clearly given to you what
3     you need to do, and at that point you need
4     to, I mean, comply with commands is a given.
5     That's what we expect as you're confronted
6     with law enforcement to comply. And if
7     you're not complying with me or complying
8     with the commands that are given to you, and
9     you're making those motions, I believe at
10    that point you are going to make -- you are
11    going to harm me or a coworker or someone
12    else out there is what I was believing in
13    going on.
14 Q. That's subjectively the thought process you
15    had?
16 A. Correct.
17 Q. And that's your subjective interpretation of
18    the physical action and behavior you saw this
19    person take?
20 A. Correct.
21 Q. I want to ask you some questions now about
22    your understanding of the Wichita Police
23    Department's policy on when lethal force can
24    be used. These questions are all about that.
25        Is it your understanding that lethal

Page 89

1     force is the highest level of force that an
2     officer can use?
3  A. Yes.
4  Q. Is it your understanding that special rules
5     apply to the use of lethal force by an
6     officer?
7  A. Yes.
8  Q. Is it your understanding that before an
9     officer can use lethal force, they must be
10    presented with a life-threatening threat?
11 A. That they must be confronted with it?
12 Q. Yes. Either threatening their own life or
13    the life of someone else.
14        MR. PIGG: Object to the form of
15    the question.
16 A. In fact, I could go much broader than what
17    you're asking. So if an officer perceives a
18    lethal threat, then they can take lethal
19    action. If that officer perceives a lethal
20    threat to somebody else, that officer can
21    take lethal force to save another person.
22 Q. And is it your understanding that that threat
23    to someone else must be immediate before
24    lethal force can be used?
25 A. That can be -- immediate could be a loose