# Exhibit H

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF KANSAS
 2

 3

 4   LISA G. FINCH, Individually, as     )
     Co-Administrator of the Estate      )
 5   of Andrew Thomas Finch,             )
     deceased, and as Next Friend        )
 6   for her minor granddaughter,        )
     AF; DOMINICA C. FINCH, as           )
 7   Co-Administrator of the Estate      )
     of Andrew Thomas Finch,             )
 8   deceased; and ALI ABDELHADI,        )
                                         )
 9                   Plaintiffs,         )
                                         )
10                                       )
          vs.                            )Case No.
11                                       )18-CV-01018-JWB-KGS
                                         )
12   CITY OF WICHITA, KANSAS;            )
     JOHN DOE POLICE OFFICERS 1-10,      )
13                                       )
                     Defendants.         )
14                                       )

15

16                      D E P O S I T I O N

17

18        The videotape deposition of CHRISTOPHER RONEN taken
19   on behalf of the Plaintiffs pursuant to the Federal Rules
20   of Civil Procedure before:
21             RICK J. FLORES, CSR
               KELLEY REPORTING ASSOCIATES, LTD.
22             515 South Main, Suite 108
               Wichita, Kansas  67202
23
24   a Certified Shorthand Reporter of Kansas, at 455 North
25   Main, 13th Floor, Wichita, Sedgwick County, Kansas, on
26   the 27th day of December, 2018, at 1:08 p.m.
27
```

Page 2

```
                    APPEARANCES

PLAINTIFFS:
    CONLEE SCHMIDT & EMERSON, LLP
    Mr. Rick E. Bailey
    Suite 300
    200 West Douglas
    Wichita, KS 67202
    (316) 264-3300
    Fax: (316) 264-3423
    rbailey@fcse.net

DEFENDANTS:
    FISHER PATTERSON SAYLER & SMITH, LLP
    Mr. J. Steven Pigg
    3550 S.W. 5th Street
    Topeka, KS 66606
    (785) 232-7761
    Fax: (785) 232-6604
    spigg@fisherpatterson.com

VIDEOGRAPHER:
    ADVANCED DOCUMENT IMAGING
    Mr. Michael Miles
    515 S. Main, Suite 108
    Wichita, KS 67202
    (316) 267-9380
    (316) 267-8200
    Video@kelleyreporting.com

Also present was Ms. Lisa Finch.
```

Page 3

                    INDEX

CHRISTOPHER RONEN
Direct Examination by Mr. Bailey:                4


Ronen Exhibits
No. 74 - Aerial Map of 1033 W. McCormick         18
         Area w/Markings (1 pg)










SIGNATURE OF WITNESS                            103
CERTIFICATE                                     104

Page 4

1    VIDEOGRAPHER: This begins the
2    videotape deposition of Christopher Ronen.
3    Today is December 27th, 2018, and the time is
4    1:08 p.m.
5        Will the court reporter please swear
6    in the witness.
7              CHRISTOPHER RONEN
8    having been first duly sworn on his oath to
9    state the truth, the whole truth, and nothing
10   but the truth, testifies as follows:
11             DIRECT EXAMINATION
12   BY MR. BAILEY:
13   Q. Could you state your name for the record,
14      please.
15   A. Christopher Ronen.
16   Q. And how are you currently employed?
17   A. City of Wichita as a police officer.
18   Q. Have you ever had your deposition taken
19      before?
20   A. I have not.
21   Q. I know you've had the opportunity to talk
22      with Mr. Pigg about what a deposition is and
23      what you might expect, but I'd like to go
24      through a few ground rules and issues just to
25      make sure that you and I are on the same page

Page 5

1       here today.
2           I introduced myself just a moment ago.
3       My name is Rick Bailey and I'm an attorney
4       for the Finch family, who's brought a lawsuit
5       against the City of Wichita and some
6       individual officers arising out of the
7       shooting of Andrew Finch.
8           Do you understand that?
9    A. I do.
10   Q. You understand that this deposition is my one
11      and only opportunity to ask you questions to
12      find out what information you might have
13      that's relevant to that lawsuit.
14   A. I do.
15   Q. You understand you're under oath here today.
16   A. Yes.
17   Q. And that's the same oath you'd be under if
18      you were testifying live in front of the
19      judge and jury.
20   A. Understood.
21   Q. Do you understand that one of the purposes of
22      this deposition is that if at the time of
23      trial your testimony would differ from your
24      testimony here today, I could pull out your
25      deposition and point out those differences to

### Page 14

| | |
|---|---|
| 1 | Q. Same general duties and responsibilities? |
| 2 | A. Yes. |
| 3 | Q. Were you assigned to a partner then? |
| 4 | A. I was not. |
| 5 | Q. About what year was that? |
| 6 | A. I went to south side in February of 2015. |
| 7 | Q. How long did you remain in that position? |
| 8 | A. Until December of 2016. |
| 9 | Q. And what was your assignment then? |
| 10 | A. I took a position as a -- as Patrol South |
| 11 | SCAT, which stands for Special Community |
| 12 | Action Team. |
| 13 | Q. And what were your duties and |
| 14 | responsibilities as Patrol South SCAT? |
| 15 | A. A strong majority of my day every day was |
| 16 | spent monitoring drug locations in south |
| 17 | Wichita and stopping drug offenders and |
| 18 | trying to build cases that eventually result |
| 19 | in arrests of drug dealers. |
| 20 | Q. Did you have a partner at that time? |
| 21 | A. I did. |
| 22 | Q. Who was that? |
| 23 | A. Kyle Perry. |
| 24 | Q. At some point, I understand that the SCAT |
| 25 | teams were dissolved; is that correct? |

### Page 15

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. When was that? |
| 3 | A. January 2018. |
| 4 | Q. So how did your assignment change? |
| 5 | A. I -- in January of 2018, I moved into the |
| 6 | violent crime response team. |
| 7 | Q. Did the violent crime response team exist |
| 8 | before January 2018? |
| 9 | A. No. |
| 10 | Q. What are your duties as a part of the violent |
| 11 | crime response team? |
| 12 | A. We kind of wear two hats. We respond to |
| 13 | shootings and gang related violent crimes, as |
| 14 | well as homicides. And when we -- there |
| 15 | isn't an active shooting or homicide |
| 16 | investigation, we do what I would call |
| 17 | proactive gang suppression. |
| 18 | Q. And what does that mean? |
| 19 | A. That means we have identified, through |
| 20 | intelligence gathering and through |
| 21 | interviews, a collection of 50 to 100 of |
| 22 | Wichita's most active gang members, whether |
| 23 | it be shooting people, robbing people, |
| 24 | selling drugs, selling guns, carrying guns, |
| 25 | and we try and proactively stop them and see |

### Page 16

| | |
|---|---|
| 1 | if they are possessing any of those things |
| 2 | and arrest them if they are. |
| 3 | Q. Since you were assigned to the violent crime |
| 4 | response team in January of 2018, do you have |
| 5 | a partner? |
| 6 | A. I do. |
| 7 | Q. And who is that? |
| 8 | A. Kyle Perry. |
| 9 | Q. So you and he have been partners ever since |
| 10 | December of 2016? |
| 11 | A. Yes. |
| 12 | Q. Let's turn now to December of 2017, |
| 13 | particularly, the day of the Finch shooting, |
| 14 | which was December 28th of that year. |
| 15 | What was your assignment that day? |
| 16 | A. Patrol South SCAT. |
| 17 | Q. And did you have any particular duties or |
| 18 | assignments that day? |
| 19 | A. I don't believe so. |
| 20 | Q. What were you doing at the time the call came |
| 21 | in? |
| 22 | A. If my memory serves me correctly, we were |
| 23 | parked south of Pawnee and Washington |
| 24 | watching a gang member's house. |
| 25 | Q. And how did the call come in? |

### Page 17

| | |
|---|---|
| 1 | A. The call came in as a shooter telling |
| 2 | dispatch that he had just killed his mother |
| 3 | and father. Or maybe it was just his father. |
| 4 | He had killed one of his parents. |
| 5 | Q. Was a location given? |
| 6 | A. Yes. |
| 7 | Q. And were you asked to respond to that call? |
| 8 | A. I was not asked. |
| 9 | Q. You chose to respond? |
| 10 | A. I chose, yes. |
| 11 | Q. Who was driving that day? |
| 12 | A. I think I was. |
| 13 | Q. Was it your decision to respond, kind of a |
| 14 | joint decision with you and Perry; how did |
| 15 | that work? |
| 16 | A. I think it was -- I think it was my decision. |
| 17 | He may have been looking through binoculars |
| 18 | at the house or something. And I do remember |
| 19 | looking at him and asking him, wow, did you |
| 20 | just hear that call? And I think he maybe |
| 21 | didn't quite hear it. And he goes, no, |
| 22 | what's going on? And I told him that there |
| 23 | was a crazy call that just came out on west |
| 24 | side that somebody called in and had just |
| 25 | shot -- said they shot their family and that |

KELLEY REPORTING ASSOCIATES, LTD   515 S. MAIN, STE 105   WICHITA, KANSAS
316.267.8200   67202

## Page 18

1  they were -- there were more family members
2  inside.
3   And then I think it was kind of what
4  you're alluding to. I was like, should we
5  go? And he -- then the consensus was, yeah,
6  let's go help. Then we started driving that
7  way red lights and siren.
8  Q. And what route did you take?
9  A. If my memory serves me correctly, we would
10  have went north on Washington and west on
11  Pawnee, north on McLean, and then west on
12  Lincoln, and then parked somewhere around
13  Walnut or Osage or one of those streets right
14  there to the east of Seneca, a block away or
15  so from the address that the dispatch had
16  provided.
17  Q. Were you familiar with that address?
18  A. No.
19  Q. Were you familiar with any occupants at that
20  address?
21  A. No.
22   (Ronen Exhibit No. 74 was marked for
23  identification.)
24  Q. Have you handed what I've marked as
25  Deposition Exhibit 74, which I'll tell you is

## Page 19

1  a Google Map view of the location surrounding
2  the intersection of Seneca and McCormick.
3   Does that appear to be correct?
4  A. Yes.
5  Q. Can you draw on that for us where it was that
6  you parked your vehicle when you arrived.
7  A. (Witness complies.)
8  Q. And you've drawn a box on Walnut just south
9  of the Walnut/McCormick intersection; is that
10  right?
11  A. Yes.
12  Q. What did you do after parking?
13  A. I got out of my car and I began walking close
14  to the houses through the yards towards the
15  location. And eventually I ended up in front
16  of this house -- or wait no, this is -- this
17  is the house where the incident occurred?
18  Q. Yes, 1033 McCormick.
19  A. All right. I eventually ended up around this
20  house in the front, on the front corner, on
21  this corner kind of -- but definitely in
22  front of this house. My position varied, I
23  think, throughout the -- leading up to the
24  incident.
25  Q. Can you draw a circle on that where you were

## Page 20

1  moving back and forth --
2  A. Sure.
3  Q. -- that location.
4  A. (Witness complies.)
5  Q. Now by the time you arrived at the location
6  and you'd parked your car on Walnut, had you
7  received any additional information about the
8  situation?
9  A. It's hard to remember. I can tell you this:
10  From when I had parked to when I had got to
11  the house, nothing had changed my mindset
12  based off of what the radio had provided that
13  there wasn't someone inside of that house
14  that had just killed their father and that
15  there weren't still innocent people, family
16  members inside. I do know that much.
17  Q. What type of vehicle were you driving that
18  evening?
19  A. I believe it was a Charger, a Dodge Charger.
20  Q. And was it marked or unmarked?
21  A. Marked.
22  Q. And how was it marked?
23  A. Red and blue lights on top and City of
24  Wichita Police on each front door.
25  Q. Did you turn your lights off at anytime prior

## Page 21

1  to parking it?
2  A. Yes. I don't have a -- like a vivid memory
3  of me doing this, but I know a hundred
4  percent sure that when I would have came down
5  McCormick, Lincoln turning into McCormick, I
6  would have turned all my lights and siren and
7  probably my headlights off, as well.
8  Q. And why would that be?
9  A. Because if this shooter were to be standing
10  on their porch or in their front yard or out
11  in the street, I would not want them to begin
12  shooting at me as I come into the area and
13  park out of sight. It's much more
14  advantageous tactically to approach on foot.
15  You have so many more options if someone were
16  to begin shooting at you, rather than being
17  essentially trapped and confined in your car
18  and having nowhere to go, if someone starts
19  shooting at you. That's why I would do that.
20  Q. Did you take any equipment with you when
21  you -- or weapons with you when you left the
22  vehicle?
23  A. No, nothing that isn't -- that was not
24  normally on my person.
25  Q. And how were you dressed that night?

Page 22

1  A. I was dressed in black boots, black pants, a
2     black shirt, and a black vest that said
3     police on the front and back.
4  Q. Is that similar to what you're wearing here
5     today?
6  A. Very similar. Almost identical. Just the
7     vest is a little bit different.
8  Q. And where would police have been written on
9     the front of that vest?
10 A. Police was on a -- a name tab about this big
11    in all bold white letters. It said police
12    and it was about right here.
13 Q. What about Officer Perry, how was he dressed
14    that evening?
15 A. Identical to me.
16 Q. Did either of you wear a hat?
17 A. Neither of us had a ball cap on. It's
18    possible that I was wearing a black stocking
19    cap, and possibly him, as well.
20 Q. And how were you armed that night?
21 A. I had one Glock 17 handgun, 9 millimeter,
22    with 18 rounds. And I had two additional
23    magazines with 17 in each magazine. And I
24    had a pocketknife probably and that was it.
25 Q. You don't carry a Taser?

Page 23

1  A. Oh, I did have a Taser. Yes, I did have a
2     Taser. I'm sorry. And a baton.
3  Q. Any other lethal or nonlethal weapons that
4     you had at your disposal that night?
5  A. Yes, I would have had my pepper spray with
6     me, as well. I think that covers it.
7  Q. Had Officer Perry done any kind of
8     investigation to try and learn more
9     information about the situation during the
10    drive from -- what was it -- Pawnee and
11    Washington till when you were parked there on
12    Walnut?
13 A. I don't think so. I think the most the --
14    what we did is switch our radio to the west
15    side channel from south side to ensure that
16    we were getting up to date information. That
17    would have been about all we would have done.
18 Q. When you first arrived on the scene, parked
19    your car at Walnut and started to walk west,
20    did you see any other officers?
21 A. Yes. Eventually, there was two Sedgwick
22    County sheriff's deputies that were either
23    already there or we almost came in together
24    simultaneously, those two and Perry and I.
25    And as far as where -- in my position, those

Page 24

1     are the only officers I saw as we came in.
2        Now upon being over there after
3     however long we were there, not very long,
4     you know, there was -- there ended up being a
5     lot of police cars blocking the intersection.
6     And then I couldn't necessarily see them, but
7     I heard them. There were police officers
8     right across the street from the house.
9  Q. Did you recognize any other officers on the
10    scene?
11 A. Not with my eyes. I could hear Sergeant
12    Jonker communicating and yelling things out
13    loud to people on scene. I heard his voice
14    coming from across the street.
15       There is one more officer that I just
16    remembered that I would recognize that showed
17    up later into the ordeal, and his name was
18    Moses, Officer Aaron Moses. He was an east
19    sider. But he was kind of back here maybe
20    more in this drive -- sorry -- yeah, back
21    here to the -- to the east of the house that
22    I was at so -- and if I remember correctly,
23    his -- he was not up with us four that I had
24    mentioned before.
25 Q. Now when you and the two sheriff's deputies

Page 25

1     walked from Walnut to the west towards the
2     house at 1033 McCormick, did you -- I'm
3     trying to get a picture how you walked.
4        Were you in a single file line?
5        Were you spread out?
6        Describe for us how that -- how that
7     went.
8  A. I don't remember. I want to tell you that we
9     would have walked in a straight line because
10    that would be the best practice. That would
11    be the best way to do it tactically, as well
12    as one of the Sedgwick County guys had a
13    shield. So there's no reason that we would
14    not have walked behind that shield. That
15    just -- I mean, common sense would say that
16    would be the best way to do that. I just
17    really -- I don't remember how we would have
18    walked. That's how I'd like to tell you we
19    did it 'cause that's the best way to do it,
20    but I don't remember.
21 Q. Did you have your Glock drawn at that time?
22 A. I don't remember.
23 Q. You've drawn on Exhibit 74 where you kind of
24    set up as you approach 1033 McCormick.
25 A. Uh-huh.

**Page 26**

Q. Did you decide to set up there because of instructions you were given by Sergeant Jonker or was that the decision of your group?

A. No one told us to go there. It was just -- I would call it fate that we ended up there because -- yeah, I really don't know why we ended up there. We were coming from the east to west, and that's the first street that we would have parked and, I mean, that's just -- that's just how it ended up. I don't remember any kind of conversation that was you shall go there and that shall be your position.

Q. Who was in charge of the scene at the time you arrived?

A. I don't know that there really was anyone in charge when we first arrived. That being said, there wasn't like -- there wasn't a huge lull. I wouldn't even call it minutes before Sergeant Jonker got there. I would call it 30 to 40 seconds where there was kind of a, okay, what's the game plan. We know we need to have this thing surrounded. We have that accomplished. And then Jonker was

**Page 27**

there. He was there quickly, and he started -- I don't -- I don't remember like any specific game plan, but I can tell you that there were instructions that were being given over the radio. He was communicating with dispatch. He was telling people where to block traffic, where to park cars as -- you know, my memory, I'm hearing him asking is the back covered, do we have plenty of people on the back, we have plenty of people on the front. You know, how does the east look, how does the west look. He was asking those kinds of questions.

So I would say he was in charge, even though there was never an overt -- you know, he never got on the radio and said, I'm in charge of this situation now. Everyone follow my orders and listen to what I'm doing so...

Q. Was Sergeant Jonker in place and giving those kinds of instructions prior to the time you arrived at the location where you've got the circle or was it after you arrived there?

A. I don't remember.

Q. So you arrive at that location where you've

**Page 28**

circled there at the house just to the east of 1033 McCormick. Tell me what you recall that happened next.

A. I recall standing kind of at the -- let's see, this would be the northwest corner and kind of having this type of a position: The sheriff guy with the shield, the sheriff guy with a rifle, and then me slightly behind and kind of in between with a pistol, and then Perry maybe kind of over here with his pistol out slightly behind, kind of this staggered two and two with still fields of fire. That's what I remember.

And then I remember a man coming out on the porch.

Q. Before we get to the man coming out on the porch, had you seen any movement inside the house at 1033 McCormick prior to that time?

A. I don't -- I don't think so.

Q. Had you heard any sound coming out of 1033 McCormick - gunshots, hollering, things crashing, any noise of that?

A. No.

Q. Had you seen anyone as you were walking from your car on Walnut up to your location there

**Page 29**

beside 1033 McCormick, seen anyone looking out of windows, sticking their head out of the front door, anything that gave you the impression that people were trying to investigate what the disturbance was?

A. No, nothing that you're describing was going on at that residence.

Q. And this time of evening it was dark?

A. Yes.

Q. Did you have a flashlight or any type of light that you were using to make your way from Walnut to the place next to 1033 McCormick?

A. No, I wouldn't have used my light.

Q. Why is that?

A. Much similar reasons that I provided you on why I would turn my red and blue lights off and my headlights off. If I were to come walking through these with a flashlight on or a gun light on and someone was standing out on the porch or on the roof or out of an upper level window, and they were wanting to do harm to police officers or innocents, and for them to see my light, I would just essentially be giving away my position, here

KELLEY REPORTING ASSOCIATES, LTD   515 S. MAIN, STE 105   WICHITA, KANSAS
316.267.8200   67202

Page 34

1  over there was to ensure that no one broke my
2  containment where I was.
3  Q. Did you and the two sheriff's deputies or
4  Officer Perry discuss, either as you were
5  walking up to that location, or once you
6  arrived there, who was going to do what and
7  how you were going to go about maintaining
8  this containment?
9  A. No.
10 Q. Was there any discussion about you watch
11 these windows, I'll watch those windows, or
12 anything of that nature?
13 A. Yes.
14 Q. Tell me about that.
15 A. I can't tell you specifically what window I
16 was watching, but I have vivid memories of us
17 discussing what we were covering because you
18 would not want four people watching the same
19 high window when there are other threat
20 areas, whether it be lower windows, the front
21 porch, the side door, the back corner. That
22 would just be irresponsible. Because you're
23 risking you, yourself or one of your people
24 standing close to you being shot or hurt from
25 a threat area that wasn't covered. So I

Page 35

1  cannot tell you what specifically I was
2  looking at or covering, but I can tell you
3  absolutely there was a discussion about what
4  each of us was looking at and covering.
5  Q. When you arrived there at the house just to
6  the east of 1033 McCormick, where did you see
7  other officers in that vicinity?
8  A. I can't say that I was seeing other officers
9  really at all. I was hearing the officers
10 across the street to the north. I could hear
11 them talking, communicating, yelling things.
12 And then I was seeing a lot of police cars
13 with red and blue lights on over here in the
14 intersection.
15 Q. Can you use that pen and draw where you saw
16 those officers -- or where you saw those
17 vehicles over in the intersection of
18 McCormick and Seneca.
19 A. Sure. (Witness complies.)
20 Q. Did you see any officers around those
21 vehicles?
22 A. I don't believe so.
23 Q. Did you see any officers to the west of the
24 1033 McCormick residence?
25 A. Not at this time. Later into the incident I

Page 36

1  did see -- I did see one guy, one officer.
2  Q. We'll get to that as we walk through this
3  chronologically. Try and keep us all from
4  getting confused.
5     So you've walked up with your three
6  other officers. You're at the location to
7  the east of 1033 McCormick. You've assigned
8  responsibility who's going to watch what
9  windows. You see the cars at the
10 intersection. You hear other officers on the
11 north side of McCormick.
12    What happens next?
13 A. Well, what happens next is a man is going to
14 come out of the front door of 1033 West
15 McCormick. And do you want me to keep going
16 or do you want to ask --
17 Q. No.
18 A. Keep going?
19 Q. Go ahead.
20 A. Okay. This man is going to come out of the
21 house and immediately there's going to be
22 loud shouting from all over the area of 1033
23 West McCormick about "police", "show me your
24 hands", "police", "show me your hands",
25 repeatedly. And this man is going to -- I

Page 37

1  don't know who he looks at first, but I
2  remember him kind of leaning forward and
3  looking across the street like squinting --
4  squinting, and then kind of looking over at
5  us, and then looking back and kind of putting
6  his hands up about this high (demonstrating).
7  Q. And let's stop there for a second.
8  A. Okay.
9  Q. When he first stepped out onto the porch, how
10 far from 1033 McCormick were you?
11 A. You know, on the map it looks like I'm just a
12 rock's throw away, but I would say when I
13 think about -- when I put myself there a year
14 ago or two years ago, whenever that was, and
15 I really think about it, it feels like I was
16 about 30 yards away.
17 Q. And the door that he walked out of, was it on
18 the west side of the residence, the east
19 side, or somewhere in the middle?
20 A. The door that he comes out of is facing
21 north, but it definitely favors to the west
22 over the east side of the residence of that
23 front porch.
24 Q. And did the door that he opened open towards
25 you or did it open away from you?

10 (Pages 34 to 37)

### Page 42

1  did any of those houses have porch lights or
2  yard lights that were on that evening?
3  A. I don't remember.
4  Q. Did anyone have a spotlight or searchlight or
5  flashlights that they were training on the
6  porch there at 1033 McCormick?
7  A. I don't remember.
8  Q. When this person stepped out onto the porch
9  there at 1033 McCormick, did they have a
10 flashlight or a lit cell phone or anything
11 like that in their hands with them?
12 A. Not that I saw.
13 Q. At anytime during this incident, did anyone
14 turn on any lights for the porch or the
15 interior of 1033 McCormick that would display
16 outside?
17 A. Not that I remember.
18 Q. When you first saw the individual step out
19 onto the porch, how would you describe them?
20 A. A physical description?
21 Q. Yes.
22 A. 5'10", 220, dark complected white male, not
23 like razored haircut, like not like razor
24 bald, but very short, buzzed haircut. My
25 memory tells me dark sweat pants or jeans and

### Page 43

1  a dark T-shirt.
2  Q. From your point of view, could you see his
3  facial expression?
4  A. Yes.
5  Q. And what was his facial expression when he
6  first stepped out?
7  A. The man was -- he seemed agitated or
8  frustrated.
9  Q. And what was there about his facial
10 expression that made you believe he was
11 agitated or frustrated?
12 A. It was -- his facial expression was, you
13 know, it's kind of -- I guess it's different
14 for me to explain this to you, but I would
15 describe his -- like his eyebrows coming down
16 and together and like almost a squinting of
17 the eyes and kind of maybe a clenched jaw as
18 he looked around. And he had -- there was
19 some body language, as well, that were with
20 his facial expressions that would lead me to
21 use the adjectives of agitated and
22 frustrated.
23 Q. What was his body language?
24 A. His body language was -- his hands -- so
25 earlier I mentioned that his hands when he

### Page 44

1  was being yelled at to put his hands up, his
2  hands were not up. They were not at his
3  sides. They were up, but they weren't up.
4  His hands were almost in a position where
5  when -- like if I were to go to you "what do
6  you want", that's how his hands were up. So
7  his hands were up, but his hands and his
8  facial expression was, "what do you guys
9  want, why are you here", to me. That's what
10 I saw.
11 Q. When you were gesturing with your hands, I
12 noticed you also gestured with your head
13 moving it forward.
14 A. Yeah.
15 Q. Did you see that motion or is that --
16 A. That is just my interpretation. I did not
17 see that. I can't say that I saw his head
18 come forward or his shoulders go back. I
19 just did that on my own. I don't remember
20 him doing that.
21 Q. Did he say anything?
22 A. Not that I remember.
23 Q. I believe you said there was loud shouting
24 from all over the place.
25       Were there officers in your group of

### Page 45

1  four that were shouting at him?
2  A. Yes.
3  Q. How many?
4  A. I can't tell you that. I don't know.
5  Q. Were you shouting?
6  A. I was not shouting.
7  Q. And you could hear shouting from other
8  officers, as well as those that were right
9  around you?
10 A. Yes, from across the street to the north. I
11 can't tell you who was shouting, but I can
12 tell you that there's a difference between
13 someone next to you or in front of you
14 shouting "police, show me your hands" and
15 someone that's 40 or 50 yards away from you
16 shouting "police, show me your hands." So
17 that's how I can confidently say of hearing
18 those two things.
19 Q. Did you hear anyone shouting "crossfire"?
20 A. I believe -- I don't -- I don't remember
21 hearing anyone discuss crossfire until after
22 I heard a shot.
23 Q. How long had you been on the scene when this
24 individual first stepped out onto the front
25 porch?

Page 46

1  A.  I will tell you that the night this happened,
2      I had interpreted us being there for around
3      10 minutes. But as the investigation
4      progressed that night, I learned that we were
5      there for a very short amount of time,
6      like -- my memory tells me we were only there
7      for like 2 or 3 minutes before the incident,
8      before the shot was fired.
9  Q.  And what information did you receive that
10     changed your mind about how long you were
11     there?
12 A.  I think that was just from detectives that
13     night. So I had been interviewed and then,
14     you know, no one talks to one another until
15     they're interviewed by detectives. And once
16     you're interviewed, you can get back together
17     with the people that you work with and start
18     discussing what happened out there, how long
19     do you think we were there. Well, I don't
20     know. How long were we there? Someone -- I
21     don't remember who -- must have gone and
22     asked, you know, or called dispatch, hey, how
23     long were we there on scene to when we called
24     shots fired. And eventually someone figured
25     out, wow, we were only there for 2 minutes.

Page 47

1      It felt like we were there forever.
2  Q.  So this was in discussions after your
3      interview up here on the sixth floor, but
4      still that same evening?
5  A.  Correct.
6  Q.  Who were you having those conversations with?
7  A.  I don't remember. I would say Officer Perry
8      'cause we had -- you know, we had been apart
9      for now several hours and getting back
10     together to now talk about what had actually
11     happened, since I hadn't had a chance to talk
12     to him since it all happened. But I can't
13     say that for sure. There was a lot of people
14     up there so it could have been really anyone.
15 Q.  And where did this conversation take place?
16 A.  I can't give you specifics. I don't
17     remember. Somewhere at the city building on
18     the sixth floor.
19 Q.  Was Officer Rapp one of the ones that was
20     involved in this conversation?
21 A.  No.
22 Q.  What about Officer Powell?
23 A.  No, I would not have sought out Powell or
24     really Rapp to discuss that with them. I
25     know both of them, but I wouldn't really call

Page 48

1      them my friends. We're just coworkers. So
2      that is not a conversation that I would go
3      after and just chat about that with them.
4  Q.  But there was more than just Officer Perry in
5      this conversation?
6  A.  I don't know. I don't -- I don't remember.
7  Q.  So this person steps out on the front porch,
8      there's loud shouting from all over, they
9      raise their hands up below their shoulders,
10     and then what happens?
11 A.  Well, their hands don't stay up very long, a
12     second or 2, 3 seconds. I don't -- it's hard
13     for me to describe the timeframe. In those
14     stressful things, time really kind of slows
15     down. But it -- my perception was his hands
16     stay up for a short amount of time before
17     they go back down.
18         And then I vividly remember the second
19     volley of yelling "police, show me your
20     hands", and people are now getting concerned.
21     It's a different kind of yelling. And the
22     best way I can explain that to you is when
23     you -- when you're dealing with someone
24     during a stressful situation and they do what
25     you tell them to do, it's almost a sense of

Page 49

1      relief, right. So as a police officer,
2      you're like, okay, this person is going to
3      listen to me. They're going to do as I want
4      them to. This is becoming a safer situation.
5          And I don't want to speak for everyone
6      else that was there, but I remember when he
7      put his hands down thinking -- I remember
8      being concerned, like this is not good. Why
9      is this person not listening to what we're
10     telling him. This is a very, very serious
11     situation. Why did he just put his hands
12     down.
13         And I'm telling you that I believe
14     other people were concerned, as well, because
15     of the way -- the new -- the new style of
16     yelling. This second volley of yelling
17     "police, show me your hands" was different
18     from the first. People were yelling louder,
19     quicker, almost more scared. That's why I
20     feel -- that's why I think I can say that
21     people were concerned like I was about this.
22     People were getting frightened, like why did
23     this guy -- why isn't he doing what we need
24     him to do.
25         So he puts his hands back down. And

Page 50

1  then people start yelling really loud again
2  "show me your hands, put your hands up, show
3  me your hands." And he raises them again.
4  He brings them back up again, and I can
5  remember being like, okay, whew, all right,
6  he's listening to us again, this is a good
7  thing.
8  Q. During all this, did you have your weapon
9     drawn?
10 A. Yes. The next thing that I remember is him
11    kind of turning towards us and his hands
12    going back down, and then a shot being fired.
13 Q. When his hands went down, can you describe
14    for me a little more clearly where they were
15    going at the time the shot was fired?
16 A. I did not see anything that specific. I can
17    tell you I saw his hands go back down as he
18    turned. I did not see him reach in a pocket.
19    I did not see him reach in his waistband. I
20    did not see anything like that. I saw him
21    turn and his hands go from here
22    (demonstrating) down as he turned.
23 Q. Did he turn towards you or away from you?
24 A. Well, as I'm describing it and thinking about
25    it now, I would say he turned towards me,

Page 51

1  towards where we were.
2  Q. Could you see where his eyes were tracking or
3     focusing when he turned his body towards you?
4  A. I couldn't see his eyes. His head was
5     point -- you know, towards our direction, but
6     I really have no idea where he was looking.
7  Q. Again, at this point in time, did he say
8     anything or could you see whether his mouth
9     was moving that he was attempting to say
10    anything?
11 A. No.
12 Q. Could you see well enough to determine
13    whether he had anything in his waistband or
14    the waist of his pants?
15 A. I would say it was too dark and his clothes
16    were too baggy for me to see something from
17    as far away as I was.
18 Q. Did you ever see anything in either of his
19    hands?
20 A. No.
21 Q. No weapon, no cell phone, nothing at all?
22 A. Nothing.
23 Q. Did he ever make any gestures which you
24    interpreted as threatening gestures?
25 A. Threatening, no.

Page 52

1  Q. Did he ever point at any of the officers that
2     were there?
3  A. No.
4  Q. Give anyone the finger?
5  A. No.
6  Q. Clench a fist and shake it at them?
7  A. No.
8  Q. Any gestures of any kind like that that were
9     threatening or intimidating?
10 A. He didn't do anything that was threatening.
11    The aforementioned body language I would call
12    concerning. I wouldn't say threatening.
13 Q. And in your mind, what's the difference
14    between those two?
15 A. Something threatening to me would seem
16    imminent like there is about to be -- or
17    something is going to happen like for sure.
18    If someone is threatening me, I need to act
19    on that. Something concerning is what I
20    would call the preparation for me getting
21    ready to act and do something. So as in a
22    sense, I am warming up for the threatening
23    behavior, getting ready to act. That's how I
24    would describe concerning.
25 Q. So the behavior you saw was the warming up,

Page 53

1  but you never saw anything that actually
2  developed into a threat?
3  A. Not for me personally, no.
4  Q. Now when he stepped out onto the porch, did
5     you, in your mind, come to any conclusions or
6     assumptions about who he was?
7  A. When he first came out on the porch, I had no
8     conclusions or assumptions about who he was.
9     When I saw the way he was looking around, the
10    look on his face, the way he was holding his
11    hands, dropping his hands, lifting his hands
12    back up and, ultimately, dropping and turning
13    his hands, I will tell you, and I remember
14    this, this is what I've said in all my
15    interviews, that made sense to me. And when
16    I say made sense, when I saw the way he
17    was -- he was acting and responding to our
18    commands, it made sense, the call that we had
19    received, and how he was acting that he was
20    the shooter. That's what I believed at that
21    time.
22 Q. And help me understand why.
23    MR. PIGG: Object to form.
24 Q. What was there about his behavior that made
25    you conclude that this must be the shooter?

Page 54

1  MR. PIGG: Object to form of the
2  question.
3  Q. You can answer.
4  A. Gosh, I guess it's kind of hard to explain.
5     I just will tell you this: I have been in a
6     lot of stressful, wild situations in the last
7     almost seven years, and there is an
8     extremely -- there couldn't be more of a
9     difference between the way innocent, scared
10    victims act and respond to police pointing
11    their guns at them and screaming at them to
12    do something, and the way that people who
13    have recently committed a crime act.
14 Q. Describe that difference for me.
15 A. Sure. So a good example would be -- let me
16    think of a good example.
17       When you're -- so after a high speed
18    vehicle pursuit, I've probably been in 40 or
19    50 high speed chases. There has been times,
20    several times, where there have been
21    passengers in a high speed vehicle pursuit
22    that wanted nothing to do with that high
23    speed pursuit. And when the pursuit comes to
24    an end, they get out of these vehicles after
25    we command them to do that, and we're

Page 55

1  screaming at them and sirens are going off
2  and pointing our guns at him, and their hands
3  could not be reached higher above their head.
4  Almost every time people are crying they're
5  so scared, and the driver, however, will
6  either run on foot, continue trying to run
7  with the gas pedal, or calmly and
8  nonchalantly step out of the driver seat
9  almost with a smile on their face and put
10 their hands up like, oh, darn, you got me,
11 I've been through this before. Or, they have
12 a look of, well, dang, my car wrecked out. I
13 guess you're going to get me this time. This
14 is just inconvenient for me.
15    And when I saw Mr. Finch's body
16 language and, obviously, it's hard for me to
17 describe what my brain was doing at that
18 night, but when I saw him come out on the
19 porch with a scowl on his face and ten police
20 officers screaming "put your hands up", "get
21 your hands up", "show me your hands", and he
22 put them about just 6 inches above waist
23 level, and then looked and like looked across
24 the street and kind of sized up those
25 officers, that's how I interpreted his look,

Page 56

1  that he was sizing them up, and looked over
2  at us and sized us up like hmm, there's only
3  four, hmm, there's only five, and put his
4  hands down, and that to me was a challenge
5  like let's see how serious they are. And
6  then he put his hands back up. And I guess
7  what I'm trying to say is when he was doing
8  that, I was really believing that he was just
9  testing our resolve. Like he -- so I was
10 viewing him as the shooter and I was
11 thinking, okay, this is a really, really
12 critical time right now 'cause three things
13 are going to happen: He's going to give up,
14 he's going to produce a weapon and shoot at
15 us and do a suicide by cop type of thing, or
16 he's going to run back in the house and kill
17 the innocent people.
18    And the whole reason that I perceived
19 that and was thinking in those three steps
20 were because of his body language. I just --
21 you know, I wish -- I wish over and over and
22 over and over again that he would have -- his
23 hands would have been reached to high heaven
24 and would have walked straight off the porch,
25 you know. 'Cause it just -- it would have --

Page 57

1  it would have made everything so crystal
2  clear, you know. It would have just made it
3  so clear. And unfortunately, things were so
4  unclear. And in my own brain and in that
5  moment, that is attributed to his body
6  language.
7  Q. Did you consider the possibility that he was
8     neither the shooter, nor one of the victims
9     who were being held hostage?
10 A. At that moment in time, no.
11 Q. Why not?
12 A. I guess I'm just -- you can't go in -- it's a
13    hard job, right. It's a hard police job
14    because you can't go to every call thinking
15    that it's false, even though a good portion
16    of everything we go to is a little bit of a
17    distortion of the truth.
18       But you're putting yourself in an
19    extreme risk if you walk into calls thinking
20    that they aren't legitimate. And,
21    unfortunately, the way that 911 is set up,
22    the public safety sector is just extremely
23    vulnerable to that. It could happen with a
24    building fire. It could happen with
25    anything. And I guess I'm just not willing

15 (Pages 54 to 57)

Page 98

1  would like to use -- just kind of just
2  feeling bad about the whole situation how it
3  all played out. Just misfortune that a man
4  had to lose his life over this -- all this,
5  yeah. And just random -- QuikTrip, gas
6  station, you know, especially right after it
7  happened. And I think that these people were
8  even pro police type of people just, you
9  know, wanting to -- just kind of like, man,
10 what happened, you know. That was just a
11 really unfortunate thing.
12 Q. Have any officers expressed regret to you?
13 A. I don't remember anyone specific, but I can't
14 say that I haven't had conversations with
15 police officers where we sat around and -- or
16 in passing were just like, man, what a -- you
17 know, what a just a terrible situation that
18 that was. And that was -- it's just so
19 unfortunate that it all had to go that way
20 and, you know, I don't know if anybody
21 ever -- I don't think anyone really has any
22 regret. I don't ever remember really anyone
23 saying, man, I really regret doing this or
24 doing that. Everyone is just like -- and me
25 included, just like, man, I wish that could

Page 99

1  have happened and went a lot better than it
2  did. That really was a terrible feeling and
3  situation to be in and -- I mean, obviously,
4  no one feels good about the way all that
5  happened.
6  Q. Is there anything that you believe you could
7  have done differently in this situation that
8  could have led to a different outcome?
9  A. Me specifically and what I did in this, no.
10 Q. What about any other officer?
11    MR. PIGG: Object to the form of
12 the question.
13 A. It's hard -- I mean, that's hard to say
14 because knowing what I know now, I mean, you
15 would -- obviously, no one could sit right
16 here in this chair with this camera and say
17 that, of course, Rapp wishes he wouldn't have
18 shot that man knowing what we know now.
19    But at the same time, at that moment
20 when I was one house to the east and a shot
21 rang out, it all made sense at that moment in
22 time, you know.
23    I thought for sure that the way he
24 turned and put his hands down and the
25 situation that we had all been told was

Page 100

1  happening inside that house that that shot
2  made perfect sense. It made perfect sense
3  so...
4  Q. What made perfect sense about it?
5     And I ask that because I thought I
6  understood you to say that you didn't see a
7  weapon or perceive a threat.
8     So from the fact that you didn't, what
9  makes sense about the shooting?
10 A. I didn't, but I thought he did. The way he
11 turned and his hands went down, and we
12 thought that we had -- we thought that -- I
13 thought he was the killer, and I thought
14 someone else had a view of, okay, here we go,
15 he's going to make his last stand and produce
16 his weapon. The way he turned and his hands
17 went down, I remember thinking here it goes,
18 here it is, this is where the gun comes out.
19 And then the shot rang out before the gun
20 ever came out.
21    And when I say it made sense, it made
22 sense. That's -- it made sense. The shot
23 being fired, what I was seeing, what I was
24 feeling, everything that had led up to that
25 moment, it made sense. The only thing that

Page 101

1  was missing was him pulling a gun out and me
2  seeing it. I just thought someone else from
3  a different angle had seen what I was about
4  to see before I saw it. That's what I'm
5  trying to say.
6  Q. Has anyone told you that they saw a gun?
7  A. No.
8     MR. BAILEY: I don't believe I
9  have any further questions. I'm sure your
10 counsel will have some questions for you.
11    MR. PIGG: He's wrong. I don't
12 have any questions for you at this time.
13    MR. BAILEY: Officer, you'll have
14 an opportunity, after the court reporter
15 types up all the notes here from this
16 computer gibberish that we don't read, to a
17 transcript like the ones that you've seen
18 before. You'll have the opportunity to read
19 through that, make any changes that you feel
20 need to be made, then have that signed and
21 notarized and return it. And you'll have 30
22 days to do so.
23    THE WITNESS: Okay.
24    MR. BAILEY: If you have any
25 questions about that process, I'm sure your

26 (Pages 98 to 101)