# Exhibit M

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF KANSAS
 2
 3
    LISA G. FINCH, Individually, as    )
 4  Co-Administrator of the Estate     )
    of Andrew Thomas Finch,            )
 5  deceased, and as Next Friend       )
    for her minor granddaughter,       )
 6  AF; DOMINICA C. FINCH, as          )
    Co-Administrator of the Estate     )
 7  of Andrew Thomas Finch,            )
    deceased; and ALI ABDELHADI,       )
 8                                     )
                      Plaintiffs,      )
 9                                     )
                                       )
10        vs.                          ) Case No.
                                       ) 18-CV-01018-JWB-KGS
11                                     )
    CITY OF WICHITA, KANSAS;           )
12  WICHITA POLICE OFFICER JUSTIN      )
    RAPP; SGT. BENJAMIN JONKER;        )
13  JOHN DOE POLICE OFFICERS 1-8,      )
                                       )
14                    Defendants.      )
                                       )
15
16
17                 D E P O S I T I O N
18       The videotape deposition of ROBERT KING JACOBS taken
19  on behalf of the Plaintiffs pursuant to the Federal Rules
20  of Civil Procedure before:
21            RICK J. FLORES, CSR
              KELLEY REPORTING ASSOCIATES, LTD.
22            515 South Main, Suite 108
              Wichita, Kansas  67202
23
24  a Certified Shorthand Reporter of Kansas, at 1620
25  Southwest Tyler, Topeka, Shawnee County, Kansas, on the
26  27th day of August, 2019, at 10:18 a.m.
27
```

## Page 26

1  prior to our current Policy No. 57, this
2  probably did take precedence over Policy 57
3  as to how we operated with officer-involved
4  shootings. I would say that today, Policy 57
5  is the -- is the overarching policy.
6      MS. VAN BRUNT: Okay. So why
7  don't we just mark that for the record.
8  Rick, do you mind marking Policy 57 as the
9  next exhibit.
10     (Jacobs Exhibit No. 139 was marked for
11  identification.)
12 BY MS. VAN BRUNT:
13 Q. All right. And this is the policy that you
14    referred to earlier, sir?
15 A. Yes, ma'am.
16 Q. All right. Is it your position that Policy
17    57 has replaced Policy 21 as the guiding set
18    of policies in investigations into officer
19    use of deadly force?
20 A. I believe so. One of the biggest changes
21    there is that if you read Policy 21, for us
22    to investigate a public official, it requires
23    a letter to be sent to the KBI for review.
24     In an officer-involved shooting
25    investigation or an officer use of deadly

## Page 27

1  force investigation, that letter, because of
2  exigency of the case, that letter is not
3  typically needed. A phone call, typically,
4  will suffice.
5  Q. I see. Any other differences that you notice
6     offhand looking at the two policies?
7  A. No, ma'am.
8  Q. All right. Focusing specifically on Wichita,
9     as a matter of policy, what entity is
10    responsible for the criminal investigation of
11    officer-involved shootings?
12 A. I would say that it's a combination in
13    Wichita of both the Kansas Bureau of
14    Investigation, and depending on which agency
15    it is, if it's Wichita Police Department,
16    they typically participate; if it's Sedgwick
17    County Sheriff's Office, they typically
18    participate. But we participate in those, as
19    well.
20 Q. So are you saying it's shared responsibility?
21 A. Yes, ma'am.
22 Q. I'd like to explore that a little more.
23    Could you explain what the division of
24    responsibility looks like in a case involving
25    the WPD, Wichita Police Department, between

## Page 28

1  WPD and KBI.
2  A. Our standard practice would be that if we are
3     requested to come to assist Wichita Police
4     Department with a use of deadly force,
5     depending on the number of witnesses and
6     tasks that are going to be needed to be
7     accomplished, that will kind of, I guess,
8     direct how many resources we send, how many
9     personnel we send, how much.
10       So we will typically arrive.
11    Sometimes we go to the scene of the incident
12    itself first and kind of see what occurred
13    and kind of get a layout in our own minds so
14    that when we're doing interviews later, we
15    have an idea. And then we will travel to the
16    sixth floor of the city building, which is
17    where many of the personnel are brought. And
18    we will conduct interviews alongside Wichita
19    Police Department personnel, specifically,
20    the homicide detectives and -- I shouldn't
21    just say homicide -- detectives. And we will
22    sit in and review those -- or not review
23    them. We will participate in those
24    interviews, as well.
25 Q. Anything else you'd like to add about the

## Page 29

1  division of responsibility?
2  A. No, there's typically -- sometimes there's a
3     supervisor there from the KBI who is managing
4     resources from the KBI, as well as
5     supervision from Wichita Police Department,
6     they are typically always there. But whether
7     we have management there or not just varies
8     on the need.
9  Q. And who, to your knowledge, generally
10    provides the supervision from the WPD
11    standpoint?
12 A. It can vary. In the past, the chief of
13    police has been there. Sometimes you have a
14    captain over investigations who's there. And
15    then, typically, there's always the
16    lieutenant over homicide or the acting
17    lieutenant over homicide who's there.
18 Q. Okay. You mentioned that the entities that
19    the KBI shares responsibility with in Wichita
20    include WPD or the Sedgwick County Sheriff's
21    Office depending on the incident.
22      Does it also share responsibility with
23    the district attorney's office?
24 A. The district attorney's office is
25    typically -- or a representative -- is

### Page 54

1  have done this here because I see an evidence
2  marker or whatever it may be. So we
3  sterilize the scene. There's nothing to lead
4  them one way or the other into what occurred.
5  Q. Fair to say that walk-throughs are not common
6  occurrences as part of the KBI investigation?
7  A. I wouldn't say it's not common. More along
8  the lines it's situational. You don't
9  necessarily have to do it on every one
10  depending on whether it's necessary at the
11  time.
12  Q. When it's necessary -- sorry to cut you off.
13  I was just going to ask: When is it
14  necessary?
15  A. Again, it's incident dependent. If you have
16  an officer that was injured and was in the
17  hospital for a prolonged period and they may
18  not have -- they may not recall a lot
19  regarding the incident or whatever, if we
20  think it will be beneficial to them, we can
21  conduct that.
22      The one other time that I had it occur
23  was there was a -- there was a difference in
24  what the officer's memory was and what the
25  findings were evidentiary wise from the

### Page 55

1  pathologist, and so we conducted a
2  walk-through three or four months later and
3  asked the officer if -- what he recalled
4  occurring, and that shed some light as to why
5  there was a discrepancy there, and it
6  actually made much more sense once that
7  walk-through occurred.
8  Q. So it's one way to address potential
9  evidentiary discrepancies in a case?
10  A. It's possible to do that.
11  Q. Does the KBI, as a matter of policy, write
12  reports about walk-throughs?
13  A. Yes, we -- yes, it is our practice now to do
14  that.
15  Q. Now 4.4 in Policy 57 discusses upon the
16  conclusion of the criminal investigation what
17  should happen.
18      Do you see where I am?
19  A. Yes, ma'am.
20  Q. All right. Specifically, it says that the
21  case agent will review the findings of the
22  investigation with the regional SAC.
23      Now whose findings are being referred
24  to there: The KBI's or the local law
25  enforcement agency's?

### Page 56

1  A. Depending on the situation, it can be one or
2  both.
3  Q. If it's speaking just about Wichita, what
4  findings are typically reviewed?
5  A. When a -- in Wichita, it is a collective
6  review of the incident with not only the
7  Wichita Police Department, but the KBI and
8  then the district attorney. They do what's
9  called a felony review to determine the
10  actions of the officer, whether they were
11  legally justified. And then that -- that
12  meeting can then be reported to the -- or
13  typically is then reported to the SAC as to
14  how that went.
15  Q. As part of that collective review, are
16  investigative documents shared with the DA?
17  A. Yes, ma'am.
18  Q. And those documents might include a crime
19  scene analysis?
20  A. Yes, ma'am.
21  Q. And witness statements?
22  A. Yes, ma'am, video, audio, all sorts --
23  anything that's necessary.
24  Q. In Wichita, is that evidence reported by WPD
25  or the KBI or both?

### Page 57

1  A. That evidence is typically prepared by the
2  Wichita Police Department and reported to the
3  district attorney in a meeting with the KBI
4  and the district attorney. So it's a review
5  with several people in the room.
6  Q. But the documents that are being reviewed are
7  authored by WPD officers; correct?
8  A. Yes, ma'am, most of the time, yes.
9  Q. Does KBI issue its own investigative reports
10  in an officer-involved shooting as a general
11  matter?
12  A. In Wichita?
13  Q. Just generally speaking, first.
14  A. If we believe that a crime has occurred, we
15  will -- and we make it to the point where we
16  want -- we believe that that needs to occur,
17  we will write an affidavit in support of
18  that, and we will submit that to the district
19  attorney or the county attorney, yes.
20  Q. What are the specific findings that the KBI
21  can make as a matter of policy in a criminal
22  investigation of officer-involved shootings?
23  A. We don't determine legality of the shooting.
24  That's the district attorney or the county
25  attorney. We will either believe that

Page 70

1   As part of investigations involving
2   Wichita's police department officer-involved
3   shootings, do KBI officers generally have a
4   role in securing the scene?
5   A. In Wichita, no, we do not.
6   Q. Okay. What about analyzing physical evidence
7   at the scene, for instance, firearm casing?
8   A. Typically not. We have done that on
9   occasion, but for the majority of the times,
10   no, we do not have -- that's not one of our
11   roles.
12   Q. What about locating and securing ammunition
13   and cartridges used by the suspect?
14   A. No, that is not our role.
15   Q. What about trying to recreate the scene?
16   A. Are you referring to a walk-through?
17   Q. I'm referencing, in particular -- give me one
18   second.
19      Yeah, I guess that is what I'm
20   referring to. And you said already
21   walk-throughs are not very common; correct?
22   A. They're not. In the situations that we've
23   done walk-throughs, it was a -- it was both
24   KBI and Wichita Police Department and
25   actually the district attorney's office that

Page 71

1   was involved in it.
2   Q. Okay. What about collecting information
3   about the subject, usually, civilian subject
4   from anyone at the scene, is that a task that
5   KBI generally performs in Wichita?
6   A. Not typically, no.
7   Q. Okay. Is it fair to say that these are
8   activities performed by WPD investigators?
9   A. Yes, ma'am.
10   Q. All right. Is it fair to say that it is --
11   in KBI investigation, KBI regularly relies on
12   the physical investigation conducted by WPD
13   investigators?
14   A. Yes, yes, ma'am.
15   Q. Do KBI officers in Wichita cases generally
16   identify witnesses who should be interviewed?
17   A. No, ma'am, we do not.
18   Q. That's, again, more the role of WPD officers?
19   A. Typically. By the time we get there,
20   oftentimes, the witnesses, the involved
21   parties are all already identified and have
22   been brought to one location where they can
23   all be interviewed.
24   Q. Okay. In Wichita, do KBI officers generally
25   have a role in conducting witness interviews?

Page 72

1   A. Occasionally.
2   Q. Would you say it's more common for WPD
3   officers to conduct the interviews of
4   witnesses?
5   A. Yes, ma'am.
6   Q. And is that also true of interviews of
7   involved officers?
8   A. No, ma'am. I mean, Wichita PD does conduct
9   those, but we are -- we participate in those
10   interviews, as well.
11   Q. Okay. Who, typically, leads those interviews
12   of involved officers?
13   A. The majority of the time, I would say Wichita
14   Police Department leads it.
15   Q. All right. And when you say that KBI
16   officers participate, what does that
17   participation entail?
18   A. We are typically in the room. We are
19   listening to the interview. And we often do
20   interject questions that either have not been
21   asked by the Wichita Police Department
22   detective or may answer questions of the
23   involved officer. But we typically have some
24   amount of input in that interview. It may
25   not be the lead, but we do have some input.

Page 73

1   Q. Do you work with WPD to develop questions to
2   be asked in the interview or does WPD do
3   that?
4   A. That's a tough question because I think that
5   there is a standard practice when it comes to
6   officer-involved shooting investigations.
7   There's a particular type of questioning
8   called the cognitive interview that you want
9   to use with officers that are involved in
10   those critical incidents. So I've never seen
11   a situation where officers have developed
12   questions ahead of time, whether that's KBI
13   or it's Wichita Police Department. They do
14   the same type of interview that we would do.
15   Q. So as a matter of practice, KBI officers
16   don't meet with the WPD officer conducting
17   the interview beforehand to discuss the
18   questions that will be asked?
19   A. No, ma'am, we don't.
20   Q. Would it surprise you to review a transcript
21   of an interview of an involved officer
22   involving WPD and KBI in which the KBI
23   officer who sat in on the interview did not
24   ask any questions?
25      Would you find that surprising?