# Exhibit N

```
                                                              Page 1
 1             IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF KANSAS
 2

 3

 4   LISA G. FINCH, Individually, as    )
     Co-Administrator of the Estate     )
 5   of Andrew Thomas Finch,            )
     deceased, and as Next Friend       )
 6   for her minor granddaughter,       )
     AF; DOMINICA C. FINCH, as          )
 7   Co-Administrator of the Estate     )
     of Andrew Thomas Finch,            )
 8   deceased; and ALI ABDELHADI,       )
                                        )
 9                    Plaintiffs,       )
                                        )
10        vs.                           )Case No.
                                        )18-CV-01018-JWB-KGS
11   CITY OF WICHITA, KANSAS;           )
     JOHN DOE POLICE OFFICERS 1-10,     )
12                                      )
                      Defendants.       )
13                                      )

14

15                    D E P O S I T I O N

16

17       The videotape deposition of MARC BENNETT taken on

18   behalf of the Plaintiffs pursuant to the Federal Rules of

19   Civil Procedure before:

20             RICK J. FLORES, CSR
               KELLEY REPORTING ASSOCIATES, LTD.
21             515 South Main, Suite 108
               Wichita, Kansas  67202
22

23   a Certified Shorthand Reporter of Kansas, at 525 North

24   Main, 2nd Floor, Wichita, Sedgwick County, Kansas, on the

25   12th day of June, 2019, at 9:21 a.m.

26

27
```

## Page 10

1   advice to them. I don't provide any
2   oversight. We interact with them, but no
3   oversight.
4   Q. You don't provide legal advice.
5       Do you provide training to the Wichita
6   Police Department?
7   A. We do.
8   Q. Do you personally provide training?
9   A. I have. Probably last time I did a specific
10  training would have been -- I'd have to
11  check, but '17, maybe '18, 2018.
12  Q. Do your employees provide training to the
13  Wichita Police Department?
14  A. From time to time, yes.
15  Q. How does that training come about?
16  A. The most common is with respect to new
17  detectives that'd make detective. Here's how
18  we have cases presented to us. This is how
19  an affidavit -- you need to have an
20  affidavit. You need to have your discovery
21  brought -- excuse me -- put together when you
22  bring a case over for charging. Has to do --
23  the most common training we do is in that
24  respect: How to bring a case over here, what
25  we expect, what kind of preparation you need

## Page 11

1   to bring to bear when you bring a case to the
2   office, that sort of thing. That's a fairly
3   routine training that takes place.
4       We have -- we'll do search and seizure
5   training from time to time. Those are the
6   main things, most -- most routine, excuse me.
7   Q. Does your office have any specific
8   responsibilities incident to occasions where
9   a Wichita police officer may have seriously
10  injured or killed someone?
11  A. We review those cases, yes, ma'am.
12  Q. And when you say review those cases, what
13  does that mean?
14  A. When the case is investigated -- two
15  different things: The first thing is when
16  those incidents take place, if someone is
17  seriously injured or killed, I, typically,
18  get a phone call. And if I'm in the area, I
19  will respond -- if it's Wichita, I'll
20  respond, typically, to the scene. And then
21  I'll go to what's called the sixth floor,
22  which is investigative section of the Wichita
23  Police Department and I, typically, will sit
24  there and watch and be aware of all of the
25  investigation as it's taking place.

## Page 12

1       In this day and age, AXON cameras, as
2   they are brought in and downloaded, I'll
3   watch those in realtime. Each interview I'll
4   be in the room and able to watch in realtime.
5   So that's -- I'm there to observe.
6       And then when the investigation is
7   complete, the case is brought to me, I
8   usually have -- we do what we call a felony
9   review. We do that in all homicides and all
10  serious matters. And we will have,
11  typically, myself, my chief attorney from the
12  charging division; I have three attorneys who
13  charge cases, who do all the charging. We
14  rarely do -- I say rarely. In fact, I can
15  think of one or two times in my career here
16  where we've used a grand jury, but I was
17  about to say, we rarely use grand juries. We
18  charge on complaint. But we'll review cases
19  for charging determinations and then,
20  ultimately, make a charging determination as
21  to whether or not to charge the felony
22  whether it's an officer or, for that matter,
23  any felony.
24  Q. You testified that when there is an incident
25  where a police officer either kills or

## Page 13

1   seriously injures someone, it's possible you
2   respond to the scene.
3       Do I have that right?
4   A. Correct.
5   Q. Do you respond to the scene if there's an
6   incident where a civilian has seriously
7   injured or killed another civilian?
8   A. Sometimes, yes, ma'am.
9   Q. Do you make it your practice to respond to
10  the scene for every incident where a police
11  officer has either killed or seriously
12  injured someone?
13  A. If -- if practical, yes. There was a -- give
14  you an example: Last month there was an
15  officer-involved shooting. It was out of
16  doors where it took place. Frankly, it was
17  pouring rain. And I got an update from law
18  enforcement at the time and drove by, but did
19  not get out at the scene. I went straight to
20  the sixth floor. It was -- standing outside
21  in the rain wasn't going to offer me much
22  insight.
23      But most of the time, yes, ma'am, I
24  will go to the scene, at least, stand at the
25  perimeter, get an idea of where things are

Page 18

1  Q. And I believe your testimony was that you
2     review every incident where an officer has
3     either killed someone or seriously injured
4     someone; is that right?
5  A. Correct.
6  Q. What is the nature of that review?
7  A. Depends on the circumstance to some extent,
8     but if it's a fatality, at some point, when
9     the investigation is complete, and by that I
10    mean toxicology's back, the autopsy is
11    complete, ballistics are done, any sort of
12    forensic analysis that needed to be done is
13    complete; then the law enforcement agency
14    will contact me, come over and present the
15    case to me in that sort of felony review
16    setting, typically, again, with a charging --
17    the chief of the charging unit, one or two
18    deputies, and myself. We'll ask questions,
19    make sure that we are satisfied that the
20    investigation is complete. And then they
21    will submit all of the documents, all the
22    discovery to the office, and then I will,
23    typically, personally, review the case file,
24    and as I'm going through it, make the
25    charging determination.

Page 19

1  Q. So to be clear: The nature of your review is
2     focused on whether the officers' actions or
3     inactions rose to the level of criminal
4     liability?
5  A. That's solely my purview is to determine
6     whether or not I can prove a crime was
7     committed, yes or no.
8  Q. So you are not looking at any violations of
9     Wichita PD policies?
10 A. No, ma'am.
11 Q. You are not making any kind of inquiry to
12    determine whether Wichita Police Department
13    officers acted in conformity with any of the
14    training that they may have received?
15 A. No, ma'am.
16 Q. Okay. Are any inquiries related to Wichita
17    Police Department policy, practice or
18    training, are they relevant to your inquiry
19    about charging crimes?
20 A. If somebody -- I can't say the answer would
21    be no always. If someone was completely
22    acting in violation of policy, driving 150
23    miles an hour down the road to a scene, that
24    might speak to whether or not their behavior
25    was reasonable depending on the

Page 20

1     circumstances, but in terms of if they
2     violated policy, that then means they
3     committed a crime, or if they did not violate
4     policy, that means they did not commit a
5     crime, no.
6        I'm not sure I'm being very clear
7     there, but it's -- I can't say it's
8     irrelevant, but it is certainly not
9     dispositive.
10 Q. Understood. Understood. And just so that
11    we've got a clear record here: The focus of
12    your inquiry is solely on a charging
13    decision; is that right?
14 A. Yes, ma'am.
15 Q. If you are reviewing a file and you note a
16    policy violation that doesn't rise to the
17    level of a crime but is still a policy
18    violation, what would you do in that
19    circumstance?
20 A. Contact the -- at least contact the captain
21    of the bureau where the officer or detective
22    worked, meaning today, currently, Captain
23    Allred is the captain of person crimes, for
24    instance; Clay Germany is the captain of
25    property crimes. So I would notify, at

Page 21

1     least, one of them.
2        If it was something in the field, an
3     officer in the field did something, I'd
4     probably go straight to one of the deputy
5     chiefs and let them know that I saw what
6     appears to be a policy violation. The idea
7     being it is -- you know, it's their call, but
8     I would expect them to conduct a IA, an
9     internal affairs investigation to determine
10    whether or not somebody had violated their
11    policy. Might be relevant -- unrelated to a
12    particular case. It might be relevant,
13    though, to other matters in terms of that
14    officer's future behavior.
15 Q. How frequently have you done that?
16    How frequently have you reached out to
17    a captain in relation to potential policy
18    violations?
19 A. Couple times a year probably.
20 Q. And do you keep any record of those?
21 A. I do -- I'm on the back side of it. We have
22    a policy -- a policy. We have a practice in
23    Sedgwick County where I meet monthly with the
24    U.S. attorney, myself and one of the
25    prosecutors from the Wichita Municipal Court.

6 (Pages 18 to 21)

Page 58

1  was the movement of the hands. It was also,
2  though, the swatting call itself which set --
3  which provided information, later learned to
4  be false, but information that the officers
5  all relied upon in the moment. All of that
6  context is what I analyzed the case within.
7  Q. What about the fact that at the time the
8      officers engaged with Mr. Finch, they didn't
9      know who he was. They didn't have a physical
10     description of the person -- of the alleged
11     gunman and Mr. Finch could have been one of
12     the people who was being held hostage.
13         Did that possibility influence your
14     analysis here at all?
15            MR. PIGG: Object to form.
16 A. Got an objection to form.
17     The -- you've asked several questions
18     there. So the fact that the officers didn't
19     know who he was, did that -- I can't remember
20     exactly how you asked it, but was that
21     something I considered. It's something I
22     considered. The fact that he could have been
23     one of the hostages, I considered that. I
24     would say there was no evidence to suggest
25     that a grown -- or that an adult male was one

Page 59

1  of the -- one of the hostages. A younger
2  sibling was -- and a mother were the two
3  other people listed or referenced by the
4  swatter, the caller, but yeah, I considered
5  all of those things.
6  Q. And in your consideration of all those
7      things, you still came to the conclusion that
8      charges were not appropriate here?
9  A. I came to the conclusion that I could not,
10     under Kansas Law, establish that Officer Rapp
11     was not engaging in self-defense or defense
12     of a third party as it was more specifically.
13 Q. In arriving at that determination, you made
14     no analysis of whether Officer Rapp or any
15     other officer at the scene acted in
16     conformity with Wichita Police Department
17     policy; is that right?
18 A. The policy was not a part of my analysis. I
19     was relying upon state law and guidance from
20     the Supreme Court with respect to case law.
21 Q. In arriving at your analysis, you made no
22     conclusions involving whether Officer Rapp or
23     any other officer at the scene acted in
24     conformity with their training; is that
25     right?

Page 60

1  A. Correct. Again, I already stated what I
2     relied upon. And if --
3  Q. Officer Rapp --
4  A. I'm sorry.
5  Q. Please go ahead.
6  A. I'm going to say, an officer could act in
7     conformity with his training and in
8     conformity with policy and potentially still
9     have violated the law or not acted in
10    conformity with his or her policy and
11    training and still not have been -- there
12    still may not have been a reason to -- or
13    basis to file charges. That's -- that's the
14    analysis that I go through.
15 Q. I'm trying to establish for the record that
16    your decision to not file charges is not --
17    is not the decision about whether or not this
18    shooting was done in compliance with Wichita
19    Police Department policy?
20 A. That is accurate. I did not weigh in on that
21    and I'm not weighing in on that today.
22 Q. And your decision to not file charges is not
23    a decision about whether this shooting
24    happened in compliance with the training that
25    Wichita Police Department officers receive?

Page 61

1  A. Correct. I make no commentary on that.
2  Q. Officer Rapp was an important witness for you
3     in the criminal case against Barriss, the
4     individual who called in the swat call; is
5     that right?
6  A. Ultimately, he was at the preliminary
7     hearing.
8  Q. And prior to the preliminary hearing, you had
9     a conversation with Officer Rapp where you
10    told him that charges were not going to be
11    fired -- filed; is that right?
12 A. I spoke to Officer Rapp twice before the
13    preliminary hearing. The first time was the
14    time I met him. I'd never -- I didn't know
15    who he was before that. I'd never met him,
16    I'll say that. And I believe it was the day
17    of the press release where I said -- told
18    him, so you know, I'm not going to be filing
19    charges. I did -- I'm not going to get back
20    to the slide, but the slide you saw earlier
21    on the presentation I made during the
22    mandatories cited Rule 3.6 and just -- and I
23    told him I would -- you're not my employee, I
24    can't tell you what to do, but I'd appreciate
25    it if you not make any public commentary