# Exhibit O

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS
 2

 3
     LISA G. FINCH, Individually, as     )
 4   Co-Administrator of the Estate      )
     of Andrew Thomas Finch,             )
 5   deceased, and as Next Friend        )
     for her minor granddaughter,        )
 6   AF; DOMINICA C. FINCH, as           )
     Co-Administrator of the Estate      )
 7   of Andrew Thomas Finch,             )
     deceased; and ALI ABDELHADI,        )
 8                                       )
                         Plaintiffs,     )
 9                                       )
          vs.                            )Case No.
10                                       )18-CV-01018-JWB-KGS
     CITY OF WICHITA, KANSAS;            )
11   JOHN DOE POLICE OFFICERS 1-10,      )
                                         )
12                       Defendants.     )
                                         )
13

14

15            DEPOSITION DEEMED CONFIDENTIAL

16              SUBJECT TO PROTECTIVE ORDER

17

18                    D E P O S I T I O N

19      The videotape deposition of LIEUTENANT BLAKE MUMMA

20   taken on behalf of the Plaintiff pursuant to the Federal

21   Rules of Civil Procedure before:

22            RICK J. FLORES, CSR
              KELLEY REPORTING ASSOCIATES, LTD.
23            515 South Main, Suite 108
              Wichita, Kansas  67202
24

25   a Certified Shorthand Reporter of Kansas, at 455 North

26   Main, 13th Floor, Wichita, Sedgwick County, Kansas, on

27   the 18th day of April, 2019, at 10:31 a.m.
```

Page 6

1  DIRECT EXAMINATION
2  BY MS. BEDI:
3  Q. Good morning again, Lieutenant Mumma.
4  A. Morning.
5  Q. As I -- I introduced myself off the record,
6     but my name is Sheila Bedi, and I represent
7     the plaintiff in this matter and I'll be
8     taking your deposition today.
9  A. Yes, ma'am.
10 Q. Have you ever given a deposition before?
11 A. I have.
12 Q. So you understand the ground rules here; is
13    that right?
14 A. I do.
15 Q. You understand that you're under oath today?
16 A. Yes, ma'am.
17 Q. And you know that we are making a record of
18    our exchange. I'll be asking the questions,
19    you'll be giving the answers, the court
20    reporter will be taking down our exchange.
21    So it's important that your answers are
22    verbal.
23 A. Yes, ma'am.
24 Q. You have a right to a clear question. If you
25    don't understand any of my questions, please

Page 7

1     let me know, and I will do my best to
2     reframe. If you answer my question, I'm
3     going to assume that you understand it.
4     Does that make sense?
5  A. Yes, ma'am, it does.
6  Q. What did you do to prepare for today's
7     deposition?
8  A. Mostly, I just reviewed documents, internal
9     policies. I looked at some of the
10    statistical information that was coming out
11    of our IAPro computer. That is the computer
12    that we track internal -- internal discipline
13    and complaints.
14 Q. Who is your employer?
15 A. I work for the Wichita Police Department, so
16    essentially my employer is the City of
17    Wichita.
18 Q. And what is your position at the -- at the
19    police department?
20 A. My current position is I am the lieutenant
21    who oversees the Professional Standards
22    Bureau.
23 Q. What is the Professional Standards Bureau?
24 A. Well, it used to be known as the Internal
25    Affairs Division. Over the years we've seen

Page 8

1     some name changes. So we handle internal and
2     external complaints of officer conduct. So
3     we look at officer conduct or performance,
4     how it applies to our rules and regulations,
5     our policies and our procedures and our
6     standard operating policies.
7  Q. And specifically what are your
8     responsibilities as the individual who
9     oversees the PSB?
10 A. I oversee four detectives that conduct
11    internal investigations.
12 Q. And other than the four detectives, are there
13    any other people who work in the PSB?
14 A. There is. We have one administrative clerk.
15    She handles the front desk, answering the
16    phone, first contact with people through the
17    door, but she also -- she also handles
18    maintaining our Blue Team entries. Those are
19    computer entries that come in from the field
20    and then go into the -- in IAPro database
21    system. It's -- essentially, it's a wing of
22    IAPro.
23 Q. And the Blue Team data, that's part of the
24    Early Intervention System; is that correct?
25 A. It is. Blue Team is -- basically it's a

Page 9

1     system -- it is a database so that the
2     officers can enter their data and it can be
3     collected by IAPro.
4         In addition to Ms. Bean, Kelly Bean,
5     our administrative assistant, I have two --
6     currently, I have two temporary
7     investigators. These are people that are on
8     light duty, and they come in usually to help
9     us with some of our investigations and to
10    handle some of the paperwork. They are only
11    temporary.
12 Q. All right. So I am going to mark the
13    deposition notice as Exhibit 75.
14    (Mumma Exhibit No. 75 was marked for
15    identification.)
16 Q. Lieutenant Mumma, have you seen this
17    deposition notice?
18 A. Yes, ma'am, I have.
19 Q. Let's look to where it says the number 1,
20    paragraph number 1.
21 A. Uh-huh.
22 Q. And it asks that the City designate an
23    individual who is prepared to testify to the
24    system of accountability that was in
25    operation in the period between 2007 and

Page 30

1  investigation is closed?
2  A. PSB, by organization, is under the direct
3     supervision of the chief of police. So the
4     chief of police, ultimately, has the decision
5     to make those things.
6        For instance, if a investigator saw
7     what they believed to be an internal
8     investigation that had a policy or regulation
9     violation, he would bring it to the attention
10    of the bureau supervisor; that would be me in
11    these circumstances, and I would bring it to
12    the chief of police with a request to
13    continue further investigation.
14 Q. How long have you served as the bureau
15    supervisor?
16 A. I have only been the bureau supervisor since
17    October of 2018.
18 Q. How long have you worked in PS -- PSB?
19 A. I previously worked in PSB from 2002 to 2007.
20    And then I returned as the supervisor in
21    2018.
22 Q. And I'm looking for just a rough estimate
23    here.
24        During your tenure either as
25    supervisor or as, I assume, as a detective in

Page 31

1  PSB?
2  A. Yes, ma'am.
3  Q. How frequently did an administrative
4     investigation occur after a closed criminal
5     investigation?
6  A. That's a very broad scope because we do other
7     investigations of incidents that are criminal
8     investigations, as well.
9  Q. Let me -- let me cabin it by asking you to
10    respond to that same question in the context
11    of shootings.
12        MR. PIGG: Are you asking before
13    2013, which is the scope of the --
14 A. Right. Before 2013, as a detective, I
15    couldn't tell you how often that occurred. I
16    wouldn't have that number. And I'm not sure
17    that I have that number since 20 -- I'm not
18    sure that I have that number since 2013
19    either.
20 Q. Does PSB have any written policies or
21    directives for individuals who are reviewing
22    criminal investigations that would help a
23    detective identify when an administrative
24    investigation should be opened?
25 A. PSB has a standard operating procedure. I

Page 32

1     don't think that we have anything pertaining
2     specifically to when we would conduct a
3     internal investigation of that -- of a
4     shooting. I think mostly we're governed by
5     Policy 901, the administrative internal
6     investigations.
7        And as in -- as in any internal
8     investigation, we make an application of what
9     we know to be the facts against our policies
10    and our regulations. So I don't know that
11    there's a distinction between a shooting and
12    other investigations. They're done very
13    similar. We take the facts and we apply them
14    to our policies and our regulations.
15 Q. So there's a difference, though, and correct
16    me if I'm wrong here: My understanding is is
17    that in non-shooting cases --
18 A. Uh-huh.
19 Q. -- that PSB does its own investigations; is
20    that correct?
21 A. That's correct.
22 Q. And that in shooting cases, the
23    administrative investigation begins with a
24    review of a criminal investigation that is
25    already completed; is that right?

Page 33

1  A. Right, but I think that we're limiting this
2     to just shootings. There are other criminal
3     investigations that occur within the police
4     department that are not just shootings. And
5     then we take those for review and determine
6     whether we think that there is a policy or
7     regulation violation, as well.
8        So do you understand what I'm saying?
9     I know -- you were to ask me about
10    shootings. Yes, we review all those
11    shootings to see if there's a policy or
12    regulation, but there are other -- they're
13    not -- shootings are not just the only thing
14    that are investigated criminally. Other acts
15    by officers can be investigated criminally,
16    and they would go to PSB for review, as well.
17 Q. And those -- those other acts like, for
18    example, an excessive use of force?
19 A. It could be any criminal conduct by any
20    officer. The scope is the, you know, state
21    statutes and federal laws.
22 Q. And by policy, the criminal investigation
23    must be completed first before there can be
24    an administrative investigation; is that
25    correct?

### Page 34

1  A. Yes, ma'am.
2  Q. Do you know why that is?
3  A. The criminal investigation can involve --
4     again, it can be conducted by the Kansas
5     Bureau of Investigations. Investigation
6     could occur by the district attorney
7     investigators. Chief could dedicate an
8     outside agency to investigate that.
9     Sometimes federal agencies come in and say
10    that they want to review or investigate
11    instances.
12        So to begin an internal investigation
13    and try to make a conclusion whether this
14    person violated our policies and procedures
15    would be inappropriate because we might find
16    exculpatory information that might apply
17    toward our investigation. So we do our
18    internal investigation last.
19 Q. So you have absolutely no authority as the
20    head of PSB to run a concurrent
21    administrative investigation; is that right?
22 A. Yes, ma'am.
23 Q. And that's by -- that's by WPD policy?
24 A. Yes, ma'am.
25 Q. If we can look at the last page of 904.

### Page 35

1  A. Yes, ma'am.
2  Q. If we can go to 904.20.
3  A. Yes, ma'am.
4  Q. It says that "at the direction of the chief
5     of police or duty chief, personnel from the
6     Professional Standards Bureau will conduct an
7     administrative investigation."
8        Did I read that accurately?
9  A. Yes, ma'am, you did.
10 Q. And does this provision mean that PSB can
11    only conduct investigations at the discretion
12    of the chief?
13 A. Or the duty chief, yes, ma'am.
14 Q. Or the duty chief; is that correct?
15 A. Yes, ma'am.
16 Q. So PSB has no independent authority to
17    conduct investigations; is that right?
18 A. That is correct.
19 Q. And so if the chief of police does not order
20    an administrative investigation or if the
21    duty chief does not order an independent
22    investigation, an independent
23    investigation -- I'm sorry -- an
24    administrative investigation does not occur?
25 A. Yes, ma'am.

### Page 36

1  Q. Is that right?
2  A. Yes, ma'am.
3  Q. Generally speaking, under what circumstances
4     will an administrative investigation be
5     ordered?
6  A. Administrative investigations are initiated
7     from really all levels of the police
8     department. Probably the vast majority of
9     them are initiated at the street level. They
10    are initiated by usually street supervisors
11    who receive information that conduct was in
12    violation of policy and procedure.
13        So the other investigations that are
14    initiated may be investigations that come
15    either to the street level supervisors or to
16    PSB themselves through external sources.
17        Any citizen or complainant that walks
18    into a substation or contacts a supervisor or
19    comes to the PSB bureau fills out a complaint
20    form. They can also do it online. They can
21    send online complaints to me for review.
22    They can do it by telephone. We receive
23    letters from people that are incarcerated in
24    the jail. Sometimes we receive letters from
25    people out in the community or at the

### Page 37

1     community at large, abroad. And those are
2     the bases from which we look at those
3     independent situations and make a
4     determination whether we should conduct an
5     internal investigation.
6  Q. What role does the chief of police have in
7     determining whether or not, under the
8     circumstances you just described, an
9     administrative investigation moves forward?
10 A. He is the individual that says yes we're
11    going to move forward with an investigation
12    based on the information that you have.
13 Q. So the chief of police has the authority to
14    say this is not something we need to
15    investigate because the complaint on its face
16    does not look credible; is that fair?
17 A. Yes, ma'am.
18 Q. All right. Is it fair to say that your
19    detectives in PSB have specialized knowledge
20    in investigating policy violations as opposed
21    to criminal violations?
22 A. Yes, I think that's fair to say that.
23 Q. And is it fair to say that the detectives in
24    PSB have a specialized knowledge in policy
25    violations that you would not necessarily

## Page 38

1  expect, let's say, a homicide detective to
2  have?
3  A. Yes, I think they're more experienced in
4     investigating policies than, say, your
5     average homicide investigator, yes, ma'am.
6  Q. It's a -- and would you agree that the
7     investigation of a -- that a criminal
8     investigation, you are looking at a violation
9     of state and federal criminal law; is that
10    right?
11 A. Yes, ma'am.
12 Q. And that for an investigation of WPD policy,
13    you're looking at the violation of very
14    specific detailed policies and regulations;
15    is that right?
16 A. Yes, ma'am.
17 Q. There's some overlap, but not always overlap?
18 A. That is correct.
19 Q. And one could -- an officer could violate
20    policy but not have committed a crime?
21 A. Yes, ma'am.
22 Q. And I imagine that happens quite frequently
23    where officers violate policy, but haven't
24    done anything that rises to the level of a
25    criminal violation.

## Page 39

1  Is that a fair statement?
2  A. Yes, ma'am, I think that's fair.
3  Q. So I'm going to now mark Policy 901. And
4     this will be 80.
5     (Mumma Exhibit No. 80 was marked for
6     identification.)
7  Q. One more question about -- actually, let's
8     focus on this.
9  A. Okay.
10 Q. So you're familiar with this policy, with
11    Policy 901; is that right?
12 A. Yes, ma'am.
13 Q. And could you describe just generally
14    speaking what this policy -- what this policy
15    is.
16 A. This policy pertains to our conducting of
17    administrative internal investigations as
18    opposed to criminal investigations. The
19    investigation of officers who have violated
20    our policies and our regulations.
21 Q. And so these are the policies that kind of
22    set forth the charge, the purpose of PSB; is
23    that right?
24 A. Yes, ma'am.
25 Q. And these are the types of incidents that PSB

## Page 40

1  is required to investigate; is that correct?
2  A. Yes, ma'am.
3  Q. Under 901.02, it states here that -- that PSB
4     must investigate all incidents involving the
5     discharge of a firearm.
6  A. That is correct.
7  Q. Is that accurate?
8     So there's no discretion there; is
9     that correct?
10 A. That is correct.
11 Q. So is it sufficient and in compliance with
12    this policy for a PSB detective to review a
13    criminal investigation and make a
14    determination based on that criminal
15    investigation that all policies were complied
16    with?
17 A. I think that I would agree with that except
18    for the portion that says determination.
19    What would happen is that the
20    detective would review that. And in our
21    current state, he would then prepare a --
22    what they refer to as an after action report
23    saying I've reviewed this, here are some
24    areas that we should look at or talk about;
25    or, I didn't find any areas of concerns.

## Page 41

1  And then along with that after action
2  report would be the entirety of that criminal
3  investigation or review. The persons that
4  make the determination whether a policy was
5  actually violated or not is the command
6  staff, the chief being in charge of the
7  command staff themselves.
8  Q. So the PSB detective makes a recommendation
9     about whether there should be a finding that
10    a policy was violated; is that right?
11 A. Right, he would identify areas of concern
12    based on our policies and our regulations.
13 Q. Could a PSB detective, based solely on the
14    report from the criminal investigation, read
15    through the criminal investigation and
16    determine no policies were violated?
17 A. It's possible.
18 Q. Make that recommendation that no policies
19    were violated?
20 A. He could say -- I think the only part that I
21    would have -- I would have contention with in
22    your statement is he would not make that
23    conclusion. He would say, here are areas of
24    concern; or, if he saw no areas of concern,
25    he would say, I see no areas of concern, and

Page 42

1  then he would present all investigative
2  material over to the command staff. He would
3  not make a finding. PSB investigators do not
4  make findings or determinations. That is up
5  to the command staff to make that
6  determination.
7  Q. Okay. So a PSB detective could review a
8     criminal investigation and make a
9     recommendation based on that criminal
10    investigation that there were no areas of
11    concern and then forward that criminal
12    investigation to the command staff without
13    conducting any additional investigation?
14 A. That is true.
15 Q. And that is up to the discretion of the
16    individual PSB detective; is that right?
17 A. No. The PSB detective would prepare that
18    document. That document would then be
19    reviewed by the supervisor over PSB, and then
20    it would be passed on to the command staff
21    members each for review of that information,
22    and then finally the chief himself.
23 Q. So reviewing the criminal investigation, just
24    merely reviewing the criminal investigation,
25    that would be sufficient to comport with

Page 43

1     901.02, which requires administrative
2     investigations after a firearm discharge?
3  A. Yes, ma'am.
4  Q. Why isn't there a requirement that there be
5     an entirely separate administrative
6     investigation, along with the criminal
7     investigation, given the differences that
8     we've just discussed in the types of
9     investigations?
10 A. Again, there's always a possibility that
11    additional investigation can occur. But
12    since witnesses have now been -- in our day
13    of age of technology have been interviewed by
14    the criminal investigator sometimes more than
15    one time in recorded interviews, which are
16    then saved and availed to the administrative
17    internal investigator, along with the AXON
18    and information, sometimes it's just not
19    necessary. Those questions have been
20    answered.
21       If the district attorney did an
22    internal -- or did a criminal investigation,
23    documents can be provided by them. So the
24    internal investigators, they have access to
25    all of this information. There may just not

Page 44

1  be questions pertaining to whether a policy
2  or a violation was committed, and so we do
3  not redo all of that information again. We
4  simply review the information that is there
5  that has been presented to us.
6  Q. You also said that the way PSB operates now,
7     officers who are detectives who are reviewing
8     the criminal investigation will do an after
9     action report.
10       Do I have that right?
11 A. That's correct.
12 Q. And it sounds like the way you describe the
13    after action report is that it is a
14    summary -- it's an analysis of what happened
15    of the incident and whether or not there were
16    any policy violations.
17       Is that an accurate --
18 A. Right, it is a -- yes, it is a summary, but
19    more specifically it is a look at that
20    incident through the lens of whether it
21    complied with our policies and our
22    regulations. It's not concerned with
23    anything else like the scope of that on the
24    criminal side. Although those documents
25    become -- from the criminal investigation

Page 45

1  become a permanent part of that after action,
2  that internal investigation, as well.
3  Q. And for how long have PSB detectives been
4     required to produce these after action
5     reports?
6  A. I could not tell you that. I don't know how
7     long that's been going on. I cannot -- I
8     cannot answer that question. I'm sorry.
9  Q. When you took over PSB in October -- October
10    2018?
11 A. Yes, ma'am.
12 Q. Is that right?
13 A. Uh-huh.
14 Q. Were the after action reports required?
15 A. They were.
16 Q. And then when you were working in PSB in 2002
17    to 2007, were the after action reports
18    required?
19 A. We were writing a summary report. I don't
20    think that they were calling it after action
21    reports. Because our computer and tracking
22    systems have quite frankly become much more
23    advanced.
24 Q. So let's go to 901.03.
25 A. Okay.

12 (Pages 42 to 45)

Page 90

1  that the information that's being input is
2  accurate?
3  A. The information that does after -- the
4  information, after it's been entered into and
5  reviewed in Blue Team, is then reviewed one
6  last time by the administrative assistant as
7  she moves it from Blue Team over into IAPro.
8  And her review of it is basically to make
9  sure that all the boxes were completed, all
10 the necessary information was inputted. It's
11 not a review of policy or regulation.
12 Q. Are you aware of any process where, for
13 example, there is an audit to ensure that all
14 reported uses of force are included in Blue
15 Team?
16 A. Other than the reviews by the supervisors
17 that are managing those incidents on scene,
18 I'm not aware of any other review.
19 Q. So the only review that you are aware of is
20 done by an individual officer's -- is done by
21 someone in the individual officer's chain of
22 command?
23 A. Yes, ma'am.
24 Q. Is that right?
25    And the information that is input into

Page 91

1  Blue Team by either the officer or someone in
2  his or her chain of command, that's input
3  manually; is that right?
4  A. It is.
5  Q. Can you describe the process for inputting,
6  let's say, use of force?
7  A. The officer would open up, on his computer,
8  either in his vehicle or at a desk terminal,
9  he would open up Blue Team. He would then --
10 Blue Team is assigned -- each officer has
11 their own individual password and access to
12 it. He would then open up, accordingly. We
13 have -- it has fields of choices. If he's
14 inputting a use of force, he would pick the
15 use of force field.
16    It would then require that he check
17 all the boxes and put the information --
18 either type it in, link it to a WPD case
19 number if there was one, or an external case
20 number if there was one, and then forwarding
21 it to the supervisor, his sergeant, street
22 supervisor.
23 Q. I'm now going to mark Policy 913 as 82.
24    (Mumma Exhibit No. 82 was marked for
25 identification.)

Page 92

1  Q. Lieutenant, was Policy 913 one of the
2  policies that you reviewed for today's
3  deposition?
4  A. It was, ma'am.
5  Q. So let's focus on -- and this is is a policy
6  that sets forth the requirements for
7  reporting and investigating force; is that
8  accurate?
9  A. That is correct, ma'am.
10 Q. Let's look at Page 5 of this policy and focus
11 on what is characterized as Type 3 uses of
12 force.
13 A. Uh-huh.
14 Q. Which is any force resulting in death or a
15 firearm discharge; is that -- is that right?
16 A. Yes, ma'am.
17 Q. So let's then turn to Page 10, paragraph 4.
18 And this section of the policy talks about
19 the -- what needs to happen after a Type 3
20 use of force; is that accurate?
21 A. Yes, ma'am.
22 Q. And under paragraph (b) under (b)4, it states
23 that after a Type 3 use of force, dispatch
24 will immediately notify the chief of police
25 or his or her designee, and the chief of

Page 93

1  police will initiate a professional
2  standards -- a professional standards
3  investigation to determine whether the
4  officers followed department policy.
5     Do you see that?
6  A. I do see that.
7  Q. I read that accurately?
8  A. Uh-huh.
9  Q. So this policy states that a professional
10 standards investigation is mandatory.
11    Would you agree?
12 A. I think that that policy says that the chief
13 of police will initiate an investigation into
14 it. I also think that there is other policy
15 that indicates that the chief of police makes
16 the decision on all internal investigations.
17 Q. Well, you -- that's sort of my question.
18 That's what I'm confused by.
19    So this policy seems to say there must
20 be an administrative investigation every time
21 there is a Type 3 use of force.
22 A. Uh-huh.
23 Q. Is that your understanding of the way the
24 Wichita Police Department operates?
25 A. I believe -- it is my understanding that we

### Page 94

1  do do an administrative investigation or
2  review of all Type 3 types of forces. I
3  think that this term investigation gets -- it
4  gets put into these policies without a clear
5  definition of what investigation actually
6  means.
7  Q. So in reality and in terms of the way PSB
8  operates, there is a review, an
9  administrative review of each Type 3 use of
10 force, but not necessarily an independent
11 administrative investigation; is that
12 accurate?
13 A. I think that -- I think that there can be an
14 administrative review or there can be a
15 investigation involving notification, Garrity
16 interviews, and I think that the chief of
17 police makes that determination.
18 Q. So it's fair to say that there is not a
19 separate administrative investigation every
20 time there is a Type 3 use of force?
21     MR. PIGG: Object to the form of
22 the question.
23 BY MS. BEDI:
24 Q. Do you understand my question?
25 A. I don't understand it.

### Page 95

1  Q. I'm just trying to confirm that after every
2  time there's a Type 3 use of force --
3  A. Right.
4  Q. -- there is not a separate administrative
5  investigation.
6      MR. PIGG: Object to the form of
7  the question. And the problem is the
8  investigation and he's defined it a couple of
9  ways.
10 BY MS. BEDI:
11 Q. Okay. Well, let's get our definitions
12 straight here.
13 A. Okay.
14 Q. When I say a separate administrative
15 investigation, I'm talking about an
16 investigation. I'm talking about a Garrity
17 investigation where you've got a PSB
18 detective who's conducting interviews, who's
19 analyzing evidence, who is sitting down with
20 the officer, with the witnesses and
21 conducting a separate administrative
22 investigative file.
23 A. Okay.
24 Q. Is that a fair definition of an
25 administrative investigation?

### Page 96

1  A. I think that's a fair -- a fair definition of
2  one of the types of investigations that we
3  do.
4  Q. And then it's my understanding, based on your
5  previous testimony, that there is another
6  type of review that PSB detectives can do --
7  A. Uh-huh.
8  Q. -- when there's a Type 3 use of force.
9     And that is a review of the
10 investigation that occurred -- a review of
11 the criminal investigation that occurred; is
12 that accurate?
13 A. Yes, ma'am.
14 Q. Okay. So operating on those -- on those
15 definitions, it is true that after a Type 3
16 use of force, there is not always an
17 administrative investigation?
18 A. As you defined in the first -- in the first
19 sense, an administrative investigation may be
20 a review because a review can be -- I know
21 that you set down and you clearly defined --
22 you said where you sat down with the officer
23 and you talk with the officer and things like
24 that. An administrative review could be a
25 review of all of the information in the file:

### Page 97

1  Looking at all of the videos, listening to
2  all the reports, reading all the transcripts.
3  It could be going back and speaking with
4  immediate supervisors about that incident
5  that's not Garrity protected saying "I just
6  want to verify that you were on scene; yes, I
7  was", things of that nature that don't fall
8  under the first definition that you had. So
9  an administrative review could be involved.
10 It could take a variety of different levels
11 other than just reading the reports
12 themselves so...
13 Q. Is there any written policy that sets out an
14 administrative review -- sets out the
15 requirements of an administrative review?
16 A. Not that I'm aware of.
17 Q. Would you agree that an administrative review
18 or an administrative investigation must
19 determine whether every relevant provision of
20 Wichita Police Department policy was complied
21 with?
22 A. Yeah, I think -- I think that's true.
23 Q. A PS -- does a PSB detective have the
24 discretion to say there were five policies
25 that were operational here; I'm only going to

Page 98

1  look into one of them?
2  A. No, I think that -- I think that the review
3  or the investigation is always an
4  investigation of an incident to see if all
5  WPD policies and regulations were conformed
6  with, as well as the city also has a
7  guideline of policies, as well, and there may
8  also be SOPs for those particular entities,
9  those bureaus, or those specialty units that
10 may also apply.
11 Q. Can you give me an example of where the
12 city's policies might apply?
13 A. I don't think that they would apply as much
14 toward like a -- we've talked extensively
15 about officer-involved shootings as much as
16 it might apply toward how we handle an
17 officer that's on FMLA or something like
18 that. But the city does have a defined set
19 of policies that we are -- that we work or
20 function under, as well.
21 Q. If look back at Policy 913 under paragraph
22 (c), it states: "The investigation shall be
23 conducted consistent with the approved
24 officer individual shooting OIS policy."
25    And it's my interpretation that the

Page 99

1  investigation referred to in paragraph (c) is
2  the professional standards investigation
3  discussed in paragraph (b).
4     Would you agree?
5  A. See, I think individual shooting
6  officer-involved shooting policy is much more
7  a reference toward officer-involved incident
8  policies and not this internal policy.
9  Investigation shall be conducted consistent
10 with the approved officer individual
11 shooting, officer-involved shooting policy.
12 Q. That was going to be my next question. Let's
13 clarify the record first.
14    The investigation being referred to
15 here is the administrative investigation that
16 the Professional Standards Bureau conducts;
17 is that right?
18 A. Uh-huh. That's correct.
19 Q. What does -- so then what does paragraph (c)
20 mean?
21 A. It means that we're going to follow the
22 guidelines also that are set out in a
23 officer-involved shooting incident, any
24 policies that are relevant to that. And I
25 think this is maybe a reference to the fact

Page 100

1  that we are going to conduct our internal
2  investigations after the criminal
3  investigations are completed, that officer
4  involved incident, that officer-involved
5  shooting.
6  Q. And what policy number is the
7  officer-involved shooting policy, if you
8  know?
9  A. It's the 904 member involved incidents.
10 Q. So it's the member involved incidents policy,
11 that's your understanding of the policy
12 that's being incorporated by reference here?
13 A. I think that it is, yes.
14 Q. And you think -- it's your understanding that
15 specifically what's being referenced here is
16 904.01 that states: "The Wichita Police
17 Department will initiate a criminal
18 investigation whenever an officer is involved
19 in an action that either could have resulted
20 in serious injury or death or did result in
21 serious injury or death."
22    Is that accurate?
23 A. Yes, ma'am.
24 Q. And I assume your interpretation of this
25 policy provision is also that provision

Page 101

1  904.19 of this policy which states "criminal
2  investigations will take precedence over
3  administrative internal investigations" is
4  also being incorporated by reference here?
5  A. Yes, ma'am.
6  Q. So it's fair to say your interpretation of
7  this provision is that PSB will essentially
8  stand down from the administrative
9  investigation until the criminal
10 investigation is completed; is that accurate?
11 A. Yeah. Stand down, again, sometimes PSB may
12 monitor information coming in from the
13 criminal investigation. I referenced the
14 fact that as a supervisor, I might watch
15 those criminal investigative interviews, as
16 well, but we would not initiate an internal
17 investigation. We would not notify the
18 officer. We would not start interviewing
19 witnesses independently until the completion
20 of that criminal investigation.
21 Q. I think -- let's go to Regulation 4.1. And
22 we'll mark this as 83.
23    (Mumma Exhibit No. 83 was marked for
24 identification.)
25 A. Thank you, ma'am. Is this the one that we

Page 142

1  believe that a policy applies to that
2  investigation, each investigation on its own
3  merit, then they can ask for those policies
4  to be applied and a review to be made of
5  them.
6  Q. And just speaking generally, if an
7  investigator and/or command staff believes
8  that a policy reasonably could apply, that
9  policy's going to be listed in the report,
10 speaking generally?
11 A. Reasonably, okay, I'm afraid of speaking out
12 of sort 'cause you're saying a policy could
13 reasonably apply. Again, was there
14 reasonable belief that that policy was
15 violated, then it would be applied and looked
16 at. If the policy wasn't violated, then they
17 wouldn't take the policy and look at it and
18 say, I'm going to put it in here. But I
19 believe that when the investigator looks at
20 this, he's thinking about all policies that
21 apply toward that investigation, and he's
22 saying did we adhere to this or did we not.
23 These things are, again, applicable policies.
24 He's saying hey, we were investigating this
25 because we reasonably believed that there

Page 143

1  could be a violation of this.
2      Do you understand what I'm saying?
3  Q. I do. I do. All right. Let's go to 10650.
4  A. Yes, ma'am.
5  Q. And here there's a list of both evidence and
6  criminal investigators who were involved in
7  this matter.
8      Do you see that?
9  A. Yes, ma'am.
10 Q. And there -- here there are a number of
11 investigators from both the Wichita Police
12 Department homicide, gang unit, KBI, as well
13 as the district attorney's office; is that
14 right?
15 A. Yes, ma'am.
16 Q. And there's no PSB staff listed here; is that
17 correct?
18 A. Right, 'cause this says criminal
19 investigators.
20 Q. And so because it says criminal
21 investigation, as we talked about previously,
22 the criminal investigation proceeded here,
23 and then PSB did a review; is that accurate?
24 A. In this situation, I don't know if this is
25 just a review or if they -- actually, PSB

Page 144

1  came back and investigated. Okay. It looks
2  like, based on what Detective Kevin Real's
3  front page, he's saying that he did just a
4  review of this. Okay.
5  Q. So there was no separate --
6  A. I didn't know that. And I apologize. I
7  didn't see the front page. We didn't look at
8  it, I don't recall. If we did, I apologize.
9  So yeah, there's no PSB investigators
10 involved in this because he's talking about
11 the criminal investigators.
12 Q. And so -- and so here there was no separate
13 administrative investigation; there was a
14 review of the criminal investigation.
15     Is that your -- is that right?
16 A. That is correct.
17 Q. So let's go to 01719.
18 A. 01 --
19 Q. 010719.
20 A. I've got you. Thank you. Yes, ma'am.
21 Q. So here we've got a section of the report
22 that says Findings of Fact and
23 Policy/Regulation Classification.
24 A. Yes, ma'am.
25 Q. Generally speaking, who would author this

Page 145

1  section of the report?
2  A. Okay. So this was authored clearly by this
3  investigator Kevin D. Real. And this is a
4  investigation from 2014, I believe, or 2013.
5  2015. The incident itself occurred in 2014.
6  So PSB made a change in how we conduct our
7  investigations.
8      Previously, the investigator would
9  cite a finding of fact. And that was -- it
10 is my belief that when the current Chief
11 Gordon Ramsay came to the Wichita Police
12 Department, sometime after that, he made a
13 change and said, "I don't want my PSB
14 investigators drawing conclusions. That
15 should be done by the administrative staff."
16 This investigation precedes that change.
17 Q. So at this point in time, under PSB,
18 detectives who were reviewing criminal
19 investigations were actually making
20 conclusions?
21 A. Yes, ma'am.
22 Q. Is that right?
23 A. Yes, ma'am.
24 Q. But that is no longer the case?
25 A. That is correct.