# Exhibit R

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA G. FINCH, Individually, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased, and as Next Friend )
for her minor granddaughter, )
AF; DOMINICA C. FINCH, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased; and ALI ABDELHADI, )
 )
           Plaintiffs, )
 )
    vs. )Case No.
 )18-CV-01018-JWB-KGS
 )
CITY OF WICHITA, KANSAS; )
JOHN DOE POLICE OFFICERS 1-10, )
 )
           Defendants. )
 )

DEPOSITION

The videotape deposition of CHIEF GORDON RAMSAY taken on behalf of the Plaintiffs pursuant to the Federal Rules of Civil Procedure before:

          RICK J. FLORES, CSR
          KELLEY REPORTING ASSOCIATES, LTD.
          515 South Main, Suite 108
          Wichita, Kansas  67202

a Certified Shorthand Reporter of Kansas, at 455 North Main, 13th Floor, Wichita, Sedgwick County, Kansas, on the 24th day of May, 2019, at 8:14 a.m.

Page 62

1  initiated, I'm notified. We take care to
2  ensure that all supervisors and leadership is
3  notified when an investigation is initiated.
4  Q. All right. Let's go to Page 72. And I want
5     to focus now on the timing of administrative
6     investigations and criminal investigations.
7     And you understand what I mean when I
8     use those two terms; is that right?
9  A. Correct.
10 Q. What's the distinction between an
11    administrative investigation and a criminal
12    investigation?
13 A. Well, criminal is looking at solely the
14    aspect of criminal behavior. The internal is
15    looking at internal -- well, it can look at
16    criminal, as well; it does, but, primarily,
17    policy violations. Was it within policy,
18    practice standards of the department.
19 Q. And do you have a -- have you provided PSB
20    with a mandate about when a administrative
21    investigation should occur incident to a
22    criminal investigation?
23 A. Yes.
24 Q. And what is that mandate?
25 A. The mandate is is that I don't want them

Page 63

1  getting involved in a criminal investigation.
2  So generally they are standing by while a
3  criminal investigation is occurring as to not
4  potentially mix the two up.
5  Q. So the mandate is -- and let's talk
6     specifically about officer-involved
7     shootings.
8  A. Sure.
9  Q. That there will be a criminal investigation
10    of an officer-involved shooting.
11    Once that criminal investigation ends,
12    then the administrative investigation can
13    begin.
14 A. Yes.
15 Q. Is that right?
16 A. Yes. They can gather some -- if some facts
17    come across, but I don't want them actively
18    doing the admin while a criminal's going on.
19 Q. And why is that?
20 A. Well, I don't ever want to taint a criminal
21    investigation. And I know you're probably
22    well aware of the issues that can occur when
23    police taint a criminal with a
24    administrative, right. We don't want to do
25    anything to potentially lose any criminal

Page 64

1  charges because of actions by our
2  professional standards group, ever.
3  Q. So it's your belief that holding back on the
4     administrative investigation and prioritizing
5     the criminal investigation ensures the
6     integrity of the criminal investigation?
7  A. That's the idea, yes.
8  Q. Are you concerned that waiting for the
9     criminal investigation to be completed prior
10    to beginning the administrative
11    investigation, that that will then prolong
12    the amount of time that any discipline, if
13    needed, would be implemented?
14 A. So on an old officer-involved shooting,
15    generally, those are expedited criminally.
16    Generally, those don't take too long. We
17    will often have some insight as to whether or
18    not, initially, within -- fairly quickly if
19    there's questions about it or not.
20    So even though we may not have all the
21    facts -- that's the wrong thing to say. Even
22    if we don't have all the -- one hundred
23    percent of the information, generally, we
24    have an idea if this is a -- this is a
25    shooting that we need to be concerned about

Page 65

1  or if there was some -- something more
2  serious to it.
3  Q. Let's look at the -- we're on Page 72.
4  A. Yep.
5  Q. Let's look at the last paragraph, and this
6     is -- this is the section dealing with
7     internal investigations.
8     During this time of interim
9     leadership, internal policy changes
10    concerning the initiation of internal
11    investigations continue. Initially, on
12    July 8th, 2014, Chief Williams authorized
13    professional standards to begin its
14    investigation of officer-involved incidents
15    starting at the time of the incident.
16 A. Uh-huh.
17 Q. He also directed that his internal
18    investigations be kept separate from the
19    internal investigation. Draft language to
20    update departmental procedures to allow these
21    investigations to proceed simultaneously has
22    been developed and shared with the law
23    department and the FOP.
24 A. Uh-huh.
25 Q. It sounds like your approach differs from

17 (Pages 62 to 65)

### Page 66

1  what's in here.
2  A. A little bit. So they still come in on
3  officer-involved shootings. For instance,
4  one of my concerns was is that they were
5  going up to where the individuals were
6  being -- the witnesses and officers involved
7  were being interviewed. They were going up
8  and mingling with the criminal investigators.
9  I don't want that. They should not be
10 mingling with the criminal investigators.
11 They shouldn't even be seen up there when
12 those criminal investigations are going on.
13 So they still come in, as I said, and will
14 gather some facts, but as far as interviews
15 and getting involved in the investigation,
16 absolutely not. They can gather information,
17 but they're not -- they're not getting
18 involved in, like I said, going up to that
19 floor and mingling with the investigators.
20 Q. Why is it a problem for the PSB detectives to
21 be around when there -- during the criminal
22 investigation?
23 A. Well, my concern is that it could be
24 perceived as interfering -- not
25 interfering -- what's the right word --

### Page 67

1  intermingling the two cases. For me, you get
2  one bite at the apple on a criminal case, and
3  we don't want to do anything to taint the
4  criminal case with concerns over the
5  administrative investigation.
6  Q. So you would have a concern with the PSB
7  detective observing a interview that's
8  happened with an officer who was involved in
9  a shooting?
10 A. In the room on the floor where these things
11 are taking place, I do not want that. I
12 don't mind them watching it later or watching
13 it from their office, but I don't want them
14 involved with the criminal at all.
15 Q. And that's because your priority is
16 maintaining the integrity of the criminal
17 investigation?
18 A. Yes.
19 Q. So it sounds like what you're proposing is
20 quite different than what's contained in this
21 report that talks about the administrative
22 investigation beginning right at the time of
23 the incident, but being kept separate from
24 the criminal investigation?
25 A. You know, I would say that it's kind of

### Page 68

1  semantics, right. So I don't want them
2  interviewing, doing any of that, but yeah,
3  they're going to -- they're going to still
4  gather some information, but they're not
5  going to be -- they're going to be kept very
6  separate from that.
7  Q. They're going to gather information, but be
8  kept separate from the investigation?
9  A. The criminal, yes.
10 Q. I thought -- and I promise you I'm just
11 trying to get clarity on this. I'm not
12 trying to trip you up.
13 A. Yeah.
14 Q. I thought your previous testimony was that
15 your mandate is criminal investigation begins
16 and ends, then the administrative
17 investigation begins.
18     Do I have that right?
19 A. So they're gathering information. They're
20 not working full time on it. They're
21 gathering things as they come along.
22 Q. So is it fair to say that the
23 administrative -- that during the pendency of
24 a criminal investigation, the administrative
25 investigator may open a file and put

### Page 69

1  information in the file as it comes in, but
2  they're not actively involved in
3  investigating the matter?
4  A. I would say that's more along the lines what
5  I'm talking about, yes.
6  Q. Okay.
7  A. Yeah.
8  Q. And that your expectation would be as soon as
9  the criminal investigation closes, then the
10 administrative investigation proceeds with
11 full force?
12 A. Yeah, so you go from a walk to a full out
13 run, essentially, yeah.
14 Q. Okay. Let's look at the recommendations on
15 Page 73.
16 A. Okay.
17 Q. The first one: Review the effectiveness of
18 the department's discipline code and penalty
19 matrix relative to the desired corrective and
20 developmental outcomes to facilitate employee
21 success.
22     Is that a recommendation you
23 implemented?
24 A. Yes. Well, there isn't really a
25 recommendation. It's review it. One of the

Page 82

1  entity that conducts these investigations.
2  A. Uh-huh.
3  Q. Is that right?
4     And it states that the chief of police
5  or the duty chief may contact an outside law
6  enforcement agency and request that they
7  conduct or assist in the criminal
8  investigation.
9  A. Uh-huh.
10 Q. Is that something that you do as chief of
11    police?
12 A. We utilize the sheriff's department. Like I
13    said, we have an MOU with them that we've put
14    in place after this for criminal
15    investigations.
16 Q. And so the sheriff's department is involved
17    in criminal investigations, but that does not
18    include officer-involved shootings; is that
19    right?
20 A. That is correct.
21 Q. And why is that?
22    Why are officer-involved shootings
23    excluded from the MOU with the sheriff's
24    department?
25 A. They don't have the resources.

Page 83

1  Q. So what types of incidents are the sheriff's
2     department investigating?
3  A. Well, since we've put that in, it's been
4     primarily misdemeanors and some minor
5     felonies.
6  Q. If the sheriff's department had the
7     resources, would you have it investigate
8     officer-involved shootings?
9  A. I think it would be -- I would prefer KBI.
10    The sheriff is a former -- you know, we want
11    to keep these things clear. I would love to
12    have the KBI do it. One, they investigate
13    shootings all the time. They have the
14    expertise. Officer-involved shootings and
15    homicide investigations are complex and it's
16    not something you can just have any
17    investigator investigate if you want quality
18    work.
19 Q. So ideally, you'd have KBI take over the
20    investigations of all officer-involved
21    shootings?
22 A. If that was an option, that would be my
23    choice.
24 Q. Why isn't that an option?
25 A. When I talked to the director about it, he

Page 84

1  talked about staff resources, not enough
2  staffing.
3  Q. You had a conversation with the director of
4     the KBI about taking over all
5     officer-involved shootings?
6  A. When I first arrived, yes.
7  Q. And why did you have that conversation?
8  A. I just think it would be -- I'd prefer it.
9     Just like with criminal investigations going
10    to the sheriff's department, I can't be
11    accused of covering things up, you know,
12    making mistakes. I think it's a best
13    practice to have another agency investigate
14    your shootings.
15 Q. Did you have concerns that there could be
16    some perception issues about having Wichita
17    Police Department homicide detectives
18    investigate other officers inside the
19    department?
20 A. I think there could be some -- I think there
21    is some perception issues with that.
22 Q. And what are those perception issues?
23 A. Well, people are concerned. The same reason
24    why we did the criminal is that, you know,
25    that police are not doing -- not being

Page 85

1  objective because it's people they work with.
2  Q. Have you reviewed any criminal investigations
3     of officer-involved shootings where you had
4     concerns that the homicide detectives were
5     not objective?
6  A. No.
7  Q. If you had reviewed any -- any criminal
8     reports from officer-involved shootings that
9     suggested to you an officer was not
10    objective, what would you do?
11       MR. PIGG: Object to form.
12 BY MS. BEDI:
13 Q. Do you understand my question?
14 A. Would you say it one more time, please.
15       MS. BEDI: Would you mind reading
16    it back.
17       (The requested portion of the record
18    was read by the reporter, as follows:
19    Question: "If you had reviewed any criminal
20    reports from officer-involved shootings that
21    suggested to you an officer was not
22    objective, what would you do?")
23 A. I'd investigate further.
24 BY MS. BEDI:
25 Q. And how would you investigate further?

22 (Pages 82 to 85)

Page 86

1  A. I'd seek more information to see if my
2     concern was valid or not.
3  Q. So the way policy and procedure stands right
4     now, there is no requirement that an external
5     agency conduct an investigation into an
6     officer-involved shooting; is that right?
7  A. That is correct. I would be remiss to say
8     that I don't have any concerns with us doing
9     it. It is the perception issue.
10 Q. And you would agree that it's best practice
11    to have an external agency conduct reviews
12    into officer-involved shootings?
13 A. I would agree with that.
14 Q. And best practice just isn't happening in the
15    Wichita Police Department right now.
16    You would agree?
17 A. We have -- we don't have that option, right.
18    If the state would fund KBI, I would do it in
19    a heartbeat, but we don't -- we don't have
20    another option.
21 Q. We've talked about the fact that incident to
22    officer-involved shootings, there are two
23    types of investigation: There's a criminal
24    investigation and then an administrative
25    investigation.

Page 87

1          In your judgment, what are the
2     components of an administrative
3     investigation?
4  A. So I'm not quite sure. You want me to go
5     through the -- when you say components, like,
6     what do you mean?
7  Q. What are the steps that you would expect a
8     PSB detective to take after an
9     officer-involved shooting?
10 A. Well, gather -- gather information, gather
11    evidence, gather statements, review findings,
12    everything associated with the case that they
13    could get their hands on.
14 Q. Given that at the time a PSB detective
15    receives the go ahead to be able to begin his
16    full investigation the criminal investigation
17    will have already occurred, would you expect
18    the PSB detective to, for example,
19    re-interview the officer who was involved in
20    the shooting?
21 A. Maybe.
22 Q. But that would not be a requirement?
23 A. No.
24 Q. Would you expect the PSB detective to go out
25    and to interview or re-interview any

Page 88

1     witnesses that were already spoken to by the
2     homicide detectives?
3  A. Maybe.
4  Q. It would not be a requirement in your mind?
5  A. No.
6  Q. Would you expect the PSB detectives to do any
7     independent analysis of any evidence that was
8     found at the scene?
9  A. Say the first part again.
10 Q. Would you expect the PSB detectives to
11    conduct any independent analysis of any
12    evidence that was found at the scene?
13 A. Potentially.
14 Q. Would you -- is -- would you -- do you
15    require PSB detectives to do an independent
16    analysis of evidence that is found at the
17    scene?
18 A. No. Well, they review everything. So, you
19    know, the idea of that investigation is for
20    them to review all the facts and an analysis,
21    I guess, would be a part of reviewing the
22    facts.
23 Q. I'm not a law enforcement officer so I'm
24    going to screw this up, but it's my
25    understanding that in these investigations

Page 89

1     there are things like ballistics testing that
2     need to happen; is that right?
3  A. Yeah.
4  Q. Do I have the term right?
5  A. Uh-huh.
6  Q. You'd expect that kind of ballistics testing
7     to happen after any shooting; is that right?
8  A. Yeah.
9  Q. Would you expect a PSB detective to redo any
10    ballistics testing that was done by the
11    homicide detectives to ensure its
12    credibility?
13 A. Not unless there was some extenuating
14    circumstance.
15 Q. So generally speaking, your expectation would
16    be that the PSB detectives would rely on the
17    investigation that was performed by the
18    homicide detective?
19 A. Yes, generally.
20 Q. Is it fair to say that it would be sufficient
21    for an administrative investigation to
22    consist of reviewing all of the materials
23    that were generated through the homicide
24    investigation?
25 A. Could you repeat the first part again.