# Exhibit S

Page 1

1

2                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS
3

4
    LISA J. FINCH, et al,              )
5                                      )
                                       )
6                    Plaintiffs,       )
                                       )
7                                      )
        vs.                            )Case No.
8                                      )18-cv-1018-JWB-ADM
                                       )
9   CITY OF WICHITA, KANSAS, et al,    )
                                       )
10                                     )
                     Defendants.       )
11                                     )

12

13

14                    D E P O S I T I O N

15        The VIDEOTAPE deposition of KEVIN REAL taken on

16   behalf of the Plaintiffs pursuant to the Federal Rules of

17   Civil Procedure before:

18                    DARLENE K. KELLEY, CSR
                      KELLEY REPORTING ASSOCIATES, LTD.
19                    Suite 108, 515 South Main Street
                      Wichita, KS    67202
20

21   a Certified Shorthand Reporter of Kansas, at 455 N. Main,

22   13th Floor, Wichita, Sedgwick County, Kansas, on

23   Thursday, May 23, 2019, at 2:30 p.m.

24

25

26

27

Page 10

1  And then I want to say November of '16 was
2  when I left Professional Standards.
3  Q.  And how does a detective become a PSB
4  detective?
5  A.  When I went, they -- there was an opening
6  there.  Brian Hightower was a sergeant, he
7  got -- or he was a detective, got promoted to
8  sergeant so there was a vacancy so they put
9  it on the inner watch, basically said any
10  detective interested in transferring to
11  Professional Standards, put your letter in.
12  So I put in a letter of interest.
13  And then myself and I don't know, two
14  or three other people had an oral board
15  interview for it.
16  Q.  Why did you make the decision to apply to
17  PSB?
18  A.  I was ready for a change.  I had been in
19  narcotics for eight years.  And the captain
20  over PSB at the time was somebody that I
21  wanted to work directly under.
22  Q.  Why did you want to work directly under him?
23  A.  Because he's -- he's just a very thorough
24  investigator and I wanted to learn under him.
25  Q.  And who is this person?

Page 11

1  A.  John Speer.
2  Q.  And did you learn under him?
3  A.  I did.
4  Q.  What did you learn?
5  A.  Just by watching him do interviews, how
6  methodical he is in the way he interviews
7  people.
8  Q.  We talked a little bit about this before, but
9  can you describe the training you received
10  specific to your duties as a PSB detective?
11  A.  The Kansas Law Enforcement Training Center
12  put on a -- it was at the time a two or
13  three-day course.  I attended that.  It was
14  put on by Tim Brant with the Derby Police
15  Department.  I don't recall his position at
16  the time, but I think he was a captain.
17  I went to an Internal Affairs
18  training.  I think it was a three-day
19  training in California.  I think that was in
20  2011 or '12, probably '12.
21  Q.  What topics were covered in the internal
22  affairs training?
23  A.  Case law, union, basically interaction with
24  police unions because it, you know, involves
25  internal investigations.  A lot of it focuses

Page 12

1  on like compelled statements versus criminal
2  investigation where you wouldn't have to give
3  a statement.
4  Q.  What are the differences between a criminal
5  investigation and an administrative
6  investigation?
7  A.  Primarily the administrative investigation
8  you can compel a statement or an interview of
9  an employee, whereas a criminal you cannot.
10  Q.  Let's talk specific to officer-involved
11  shootings.  Can you describe generally the
12  steps you would take as a PSB detective after
13  being assigned to review and/or investigate
14  an officer-involved shooting?
15  A.  When I was there, Captain Speer routinely had
16  whoever was available from Professional
17  Standards respond.  He would generally have
18  somebody respond to the actual crime scene or
19  the scene where it occurred.  He would have
20  somebody respond to the hospital if anyone
21  was at the hospital.
22  And then ultimately we would all go up
23  to the 6th Floor which is where our
24  investigation section is.  And we would view
25  interviews of witnesses and/or officers.

Page 13

1  That's what happens from the start.
2  Generally when we do the internal, we
3  get transcripts, reports, evidence,
4  photographs.  Anything that's involved in the
5  criminal, we review that.  If we have any
6  clarifying questions, then we will send out
7  notices for the officers, have them come in
8  so we can ask them questions.
9  If there's questions that we want to
10  ask witnesses, like civilian witnesses, we
11  will contact them.  Obviously we can't compel
12  them, but we'll ask them if they're willing
13  to give an interview.
14  Basically we summarize the criminal
15  investigation and then summarize anything
16  that we did as follow-up, submit our report
17  to -- at the time it went to our lieutenant
18  and then it would go to the captain and then
19  from the captain directly to the chief.
20  Q.  So to clarify, the PSB detective is not
21  required to do any independent investigation
22  if in his or her judgment none is needed; is
23  that accurate?
24  A.  If he or she believes that the criminal
25  investigation covered everything and they

4  (Pages 10 to 13)

Page 14

1    don't up with any questions whatsoever, then
2    that could be a possibility.
3    Q.  How many officer-involved shootings have you
4    been responsible for investigating or
5    reviewing?
6    A.  This one right here.
7    Q.  One?
8    A.  Yes, ma'am.
9    Q.  And did you review your report about the
10   Stacy Richard's shooting in advance of
11   today's deposition?
12   A.  I did.  Let me take that back.  There was
13   another one where an officer, he says he was
14   shooting at someone but there was no one
15   there, so I investigated that but it was a
16   hoax.  It was -- when you say
17   officer-involved shooting, I think of an
18   officer shooting at someone else, but there
19   was no one there.  So I investigated that one
20   as well.
21   Q.  In either of the two officer-involved
22   shootings that you investigated, did you
23   conduct any independent investigation other
24   than that which was done by the criminal
25   investigators?

Page 15

1    A.  In both, yes.
2    Q.  In both, you did, you did additional
3    investigation?
4    A.  Yes, ma'am.
5    Q.  And how did you come to decide to do that
6    additional investigation?
7    A.  Just in reviewing both of those cases I had
8    questions of my own that I thought needed to
9    be answered.
10   Q.  You've got a binder of exhibits, if you could
11   flip to Tab 85.  This was previously marked
12   as Exhibit 85.  This is the Stacy Richard's
13   investigation.
14              MR. PIGG:  I don't have the Bates
15        stamped version, so if can you would give the
16        page number, I would appreciate it.
17              MS. BEDI:  I will do my best, so
18        remind me if I don't.
19   BY MS. BEDI:
20   Q.  If we go to the second page of the
21   investigation, that is your name on there; is
22   that right?
23   A.  Yes, ma'am.
24   Q.  And that indicates that you were responsible
25   for conducting the administrative review of

Page 16

1    the Stacy Richard's shooting death; is that
2    right?
3    A.  Well, just my name on this just signifies
4    that I'm the one that wrote this report.
5    Q.  Okay.  And in writing this report you are
6    responsible for compiling the evidence and
7    making a recommendation about the
8    administrative review of the shooting; is
9    that right?
10   A.  Yes, ma'am, yes, ma'am.
11   Q.  Can you describe the steps you took relative
12   to this investigation?
13   A.  Yes, ma'am.  I recall making the scene on
14   Graber the day of this shooting.  I remember
15   watching officer-interview video, but I mean
16   it's been so long ago I can't remember if it
17   was the day of the shooting or if it was just
18   during my investigation.
19              But basically I reviewed all of the
20   criminal investigative reports and anything
21   that would have been in Laserfiche, which I
22   mean all evidence receipts and anything else
23   that's not in our main computer system which
24   is called eJustice.
25              So I went through everything.  If I

Page 17

1    had anything that I thought needed to be
2    clarified, I sent out witness notification
3    letters to officers and I conducted follow-up
4    interviews with them.
5    Q.  And do you know what follow-up interviews you
6    conducted?
7    A.  I interviewed four officers that were
8    directly involved in the shooting, which
9    Officer Phillips, Officer Arterburn,
10   Officer Mackey and Officer Stevens.  I
11   interviewed Sergeant Kelly O'Brien,
12   Officer Ed Johnson and Officer Noll, I think
13   were the ones I did.
14   Q.  And why did you conduct those interviews?
15   A.  I guess to get things clear in my mind that I
16   thought weren't clear from reading the
17   reports.
18   Q.  You had additional questions you wanted to
19   ask that were not asked by the criminal
20   investigators?
21   A.  Correct.
22   Q.  Is that a fair statement?
23             Would it be fair to summarize this
24   incident as follows:  Dispatch receives a
25   call that there is a suicidal man with a gun

5  (Pages 14 to 17)