## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LISA G. FINCH et al.                                )
                Plaintiff(s)       )
    vs.                                           )      Case No. 18-cv-1018-JWB-ADM
                            )
CITY OF WICHITA, KANSAS et al.     )
              Defendant(s).     )

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On December 28, 2017, 28-year-old Finch was shot and killed on his front porch by Wichita Police Department (WPD) Officer Rapp during a response to a prank call. Finch was unarmed, which Rapp could clearly see. Other officers did not perceive Finch as a threat. When he fired, Rapp did not know who Finch was—suspect or victim. Rapp's conduct was objectively unreasonable. *Walker v. City of Orem*, 451 F.3d 1139, 1159-60 (citing *Graham v. Connor*, 490 U.S. 386, 399 (1989)). Rapp shares culpability with his supervisor, WPD Sergeant Jonker, who set in motion and directed the events leading to Finch's death. Neither Rapp nor Jonker is entitled to qualified immunity for violating this clearly established principle: officers may not use lethal force on an unarmed person who poses no threat. *McCoy v. Meyers*, 887 F.3d 1034, 1052 (10th Cir. 2018)

The City of Wichita is also legally responsible for Finch's death. It turned a blind eye to the use of excessive lethal force by its officers, and failed to hold them accountable when they unlawfully shot those WPD is sworn to protect. The City's deliberate indifference led officers to believe they could violate the rights of civilians, including Finch, with impunity—and they did so.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' FACTS

Plaintiffs admit the following from Defendants' Statement of Facts ("DSOF"): Paragraphs 1-3, 5, 7-10, 12, 14-27, 30, 32-35, 37-38, 40, 55, 68-69, 71-72, 75, 78, 82, 87-88, and 99. Plaintiffs dispute the remaining paragraphs in this response ("Resp. DSOF"), as follows:

4.  Deny. As calls can be "false," officers respond to calls based on information also learned from on-scene investigation. **Ex. 1 at 120:23-121:19**; **Ex. 2 at 66:22-71:4**; **Ex. 3 at 125:8-126:24**.

6.  Deny. Rapp did not testify that contact was to be made only after the perimeter was in place. **Ex. 3 at 158:6-18**. Fussell's and Jonker's testimony addressed what *should* happen at a high-stakes incident, not what actually happened. **Resp. DSOF ¶¶ 70, 79.**

11.  Deny to the extent "west of the house" is misleading. Officers did not observe officers directly west of the house, but farther from the scene. **Ex. 4 at 37:6-14; Ex. 5 at 31:12-33:12.**

13.  Admit that Jonker was in command of the onsite response. Deny that Jonker "took charge of the scene." *See* **PSOF ¶¶ 103-105; 111-116; Resp. DSOF ¶¶ 70, 79.**

28.  Admit but incomplete. *See* **Resp. DSOF ¶ 11.**

29.  Admit but incomplete. Jonker did not respond to Perry's statement. **Ex. 5 at 41:18-20.**

31.  Deny that a perimeter or plan was actually in place. **Ex. 2 at 111:8-112:4, 128:17-129:10; Resp. DSOF ¶ 70**. Admit the rest.

36.  Admit but incomplete. Jonker also yelled "walk this way." **Ex. 2 at 143:25-144:7**. There were multiple people yelling commands from different directions. *Id.,* **142:13-143:11; Resp DSOF ¶ 39.**

39.  Deny. The officers were yelling different commands. **Ex. 4 at 48:18-49:6**; **Ex. 6 (starting at 1:30)**; **Ex. 7 (starting at 5:35)**. Some shouted "raise your hands"; others shouted "walk this way" (**Ex. 2 at 143:25-144:7**) and "step off the porch" (**Ex. 8 at 27:25-28:4**). Stephens-Clark could not understand the commands being given by northside officers. **Ex. 8 at 28:5-8**. Headings initially began hollering commands but stopped because he was trained that one person needs to issue commands to eliminate confusion. **Ex. 4 at 45:3-13**; *see also* **Ex. 3 at 223:16-224:11**.

41.  Deny. Finch complied by raising his hands, briefly lowering them to pull up his pants. **PSOF ¶ 102**. Finch was startled by the commands. *Id.,* **¶ 103;** *see* **Resp. DSOF ¶¶ 36, 39.**

42.  Deny. **Resp. DSOF ¶ 41**. Finch's hands were not down as Rapp could see them at the time he fired. **PSOF ¶ 107**. Jonker also saw Finch raise his hands. **Ex. 2 at 145:24-148:14**. Finch was facing Rapp when he was shot. **PSOF ¶ 110; DSOF ¶ 53**; **Ex. 2 at 162:21-163:2; Ex. 4 at 29:16-20**.

43.  Admit Ronen so testified but deny its veracity. Finch appeared startled. **PSOF ¶ 102**. Ronen is also unreliable. He spoke to Perry the night of the shooting to "discuss[] what happened." **Ex. 9 at 46:9-47:18**. He "debriefed" a week after the shooting with Jonker, Perry and Rapp, where "everybody [got] back on the same page about what they saw and what happened." **Ex. 5 at 15:15-20:11**; *see* **Ex. 9 at 82:7-83:2; Ex. 10 at 90:18-93:9**. Rapp, Ronen and Perry are on "the same team." **Ex. 5 at 110:2-20**. Perry and Ronen have been partners since 2016. **Ex. 9 at 16:3-11**.

44.  Admit Ronen so testified; deny the shot "made sense." Finch had no weapon. **PSOF ¶¶ 106-107; Resp. DSOF ¶¶ 41-42, 50.** Other officers did not believe Finch was a threat. **PSOF ¶ 108**.

45.  Admit Stephens-Clark so testified but incomplete. While he may not have seen Finch's hands, other officers who could did not think Finch was a threat. **Resp. DSOF ¶ 42.** Stephens-Clark did not hear officers claim Finch was a threat. **Ex. 8 at 31:24-32:6**.

46.  Admit Stephens-Clark so testified but incomplete. *See* **Resp. DSOF ¶ 80**.

47.  Admit that Perry so testified but deny as to the veracity of what he said he observed. Finch had no weapon. **Resp. DSOF ¶ 44**. Perry's testimony is not credible. *Id*., ¶ **43**.

48.  Admit that Perry so testified but deny that Finch was a "lethal threat." **Resp. DSOF ¶ 44; Ex. 12 at 9-10**. There was also no risk of crossfire. **Resp. DSOF ¶ 11; Ex. 9 at 45:19-22**.

49.  Admit as to Headings' testimony but incomplete. *See* **Resp. DSOF ¶¶ 41-42, 45, 50**.

50.  Admit Headings could not see Finch's hands, but incomplete. Headings believed Finch's conduct was consistent with nonthreatening activity, *e.g.*, tucking in his shirt or bumping his arm on the door; he did not perceive a weapon or actual threat before the shot. **Ex. 4 at 51:19-53:15**.

51.  Admit as to Headings' testimony but incomplete. **Resp. DSOF ¶ 50**.

52. Admit as to Headings' testimony but deny as to why Headings did not fire. **Resp. DSOF ¶ 50**.

53. Deny Rapp could see Finch's eyes. **Ex. 3 at 213:6-7, 226:12-227:4, 243:2-6**. Admit the rest.

54. Admit to "less than one second"; deny the rest. **Resp. DSOF ¶¶ 41-44, 50; PSOF ¶¶ 106-107**.

56. Deny because it implies Finch was an objective threat. He was not. **Resp. DSOF ¶¶ 42, 54.**

57. Admit Rapp had a clear view of Finch's hand but deny that Rapp's perception was reasonable. He did not see a gun. **Ex. 13 at 102:8-9; 103:18-19, 105:6-8; Ex. 2 at 149:2-10; Resp. DSOF ¶ 54**.

58. Deny. **Resp. DSOF ¶¶ 54, 57**. No eastside officers saw a gun. **PSOF ¶ 108**.

59. Admit Rapp did not know if Finch was a suspect and that he shot after 10 seconds. Deny the rest. **Resp. DSOF ¶¶ 46, 54, 57**.

60. Admit as to the reason Rapp fired. Deny it was objectively reasonable. **Resp. DSOF ¶¶ 54, 57**.

61. Deny. Rapp never voiced this rationale, **Ex. 3 at 248: 1-5**, including to detectives who interviewed him post-shooting, *id.*, 247:5-18, to prosecutors, *id.* at 247:19-22, or in the *Barriss* hearing. **Ex. 13 at 85:3-5**. Finch presented no such threat. **Resp. DSOF ¶¶ 54, 57; PSOF ¶ 108.**

62. Admit Rapp did not wait or provide a verbal warning. Deny that conduct was reasonable. Rapp could clearly see Finch's hands and he saw no gun. **Resp. DSOF ¶¶ 54, 57; Ex. 12 at 9-10**.

63. Deny. No decision was necessary. **Resp. DSOF ¶ 62**.

64. Deny, as it implies Finch was an actual threat. He was not. **Resp. DSOF ¶ 62.**

65. Deny. Rapp clearly saw that Finch did not have a gun in his hand. **Resp. DSOF ¶ 62**.

66. Deny. Powell saw Finch reach back and touch the doorknob. **Ex. 14 at 18:3-18**. He did not believe Finch was armed or a threat. **PSOF ¶ 108**.

67. Deny because it wrongly implies a risk of crossfire. *See* **Resp. DSOF ¶ 48**. Admit the rest.

70. Deny. Jonker failed to direct the scene before Finch appeared, **PSOF ¶¶ 103-104, 111-116**, despite there being time to do so, **Ex. 15 (0:00-4:56)** (highlighting time before shot)**; DSOF ¶ 71**. Jonker did not establish a contact team, even after Perry suggested he and the eastside officers be

4

given that responsibility. **Ex. 5 at 39:16-19, 41:18-20**. Jonker did not give officers instructions about what to do if anyone left the house. **Ex. 2 at 94:17-19, 104:5-18, 109:17-19, 127:23-128:2**. He did not determine what less-lethal weapons were available. **Id., 149:22-150:7; Resp. DSOF ¶ 79**.

73.   Deny as to the reason Jonker did not request SWAT. That decision was intentional, **Ex. 2 at 117:23-118:5**, in violation of policy, **PSOF ¶ 113**. Deny also that the duty chief made the "decision" as to SWAT; the unit responds based on a supervisor's request. **Ex. 18 at 52:5-9; 81:12-19**.

74.   Admit as to testimony but incomplete. *See* **PSOF ¶ 112.**

76.   Deny to the extent it implies those steps occurred in this case; they did not. **Resp. DSOF ¶¶ 31, 70, 79**. Deny also that those steps are sequential; forming a perimeter and contact team are done simultaneously. **Ex. 1 at 25:15-20**. Also deny SWAT would only establish long cover. It would "first and foremost" gather intelligence and then utilize a sniper with a sighting system to allow the officer(s) to see into the building. *Id*. **at 33:2-34:16**. Admit as to Rapp's deployment.

77.   Admit but his testimony is incomplete. DeFoe further stated that a suspect should not be allowed back in only "if you reasonably believe that is [the] suspect" as opposed to a victim or third party. **Ex. 1 at 77:3-19**. That assessment is based on the supervisor's "commands, [suspect's] ability to respond to commands, reasonable amount of time to comply, [and] best information at the time." *Id*. **at 77:25-78:5; Resp. DSOF ¶ 59**.

79.   Deny. DeFoe criticizes Jonker for failing to: provide direction to the officers on staging, use of less-lethal force and how to respond if someone appeared from the house; set up a contact team; and ensure officers did not issue simultaneous commands. **Ex. 1 at 68:21-72:14; Resp. DSOF ¶ 70**. Deny also because Defoe criticized other cases, **Ex. 1 at 295:14-21**, including ▮▮▮▮▮ *id*. **at 276:4-277:2**, and ▮▮▮▮ *id*. **at 280:22-281:5**; **Ex. 19 at 10**, on similar grounds.

80.   Deny. Fussell thought there was insufficient information to determine who Finch was. **Ex. 11 at 122:14-24.** Jonker and Rapp did not know if Finch was a hostage. **Ex. 1 at 161:2-17; Ex. 3 at**

**216:20-217:8**. Stephens-Clark thought Finch may have been a third party. **Ex. 8 at 46:14-47:1**. Deny that Finch "match[ed] the description" of a suspect; there was no description. **DSOF ¶ 33**.

81.  Deny. KBI has no substantive role in investigating officer shootings. **PSOF ¶ 126**

83.  Deny to the extent it implies Bennett conducts an independent investigation. He relies on the WPD criminal investigation for his charging decisions. **Ex. 23 at 26:16-25**. His evaluation is also perfunctory—he never charges involved officers for criminal violations. **PSOF ¶ 138**.

84.  Deny. Bennett concluded that he could not establish *beyond a reasonable doubt* that Rapp was not engaged in self-defense under Kansas law. **Ex. 23 at 78:10-17;** *see also* **Resp. DSOF ¶ 83**.

85.   Deny. WPD criminal investigations are flawed. **PSOF ¶¶ 128, 131, 135**. Bennett does not substantively evaluate officer shootings. **Resp. DSOF ¶ 83**. He does not assess if officers obeyed use-of-force policy, which has a reasonableness standard. **Ex. 23 at 26:16-25, 78:10-17**; **Ex. 24.**

86.  Deny as it wrongly implies PSB is a functioning oversight system. *See* **PSOF ¶¶** 125-138, 142.

89.  Deny that policy prohibits simultaneous investigations. **Ex. 25 at D**. It is Ramsay who prohibits PSB from reviewing shootings during a criminal investigation. **Ex. 22 at 63:5-18; 74:17-76:14**. This violates best practices, as Ramsay knew but disregarded. *Id*. **at 74:17-76:14; Ex. 26 at "H."**

90.   Deny Ramsay "would investigate further." The chief has historically overlooked flawed investigations and violations of both law and policy committed during officer-involved shootings. **PSOF ¶¶ 123, 124, 127-137**; **Resp. DSOF ¶ 89.** Admit the rest.

91.  Deny. PSB does not conduct a separate investigation; it only reviews the criminal investigations conducted by WPD, which are flawed and do not address policies. **PSOF ¶¶ 125, 127; Resp. DSOF ¶ 85**. That undermines officer accountability. **PSOF ¶¶ 142; Ex. 1 at 201:8-25; 203:10-204:11**.

92.  Deny as PSB conducts no investigation and it fails to assess all relevant policies. **Resp. DSOF ¶ 91; PSOF ¶¶ 120-121, 123, 125, 130**.

93.  Admit Rapp was aware there was superficially an investigative and criminal process for shootings, but deny he thought WPD would impose discipline. WPD fails to discipline officers for policy and criminal violations, which Rapp knew. **PSOF ¶¶ 139-140.** DA Bennett never pressed charges against an officer for a shooting before the Finch shootings. ***Id.*,** ¶ **138**.

94.  Deny as to what Rapp understood. ***See* Resp. DSOF ¶ 93**.

95.  Admit Jonker was aware there was superficially an investigative and criminal process for shootings, but deny he understood WPD would impose discipline. WPD fails to discipline officers for policy and criminal violations, which Jonker knew. **PSOF ¶ 141**. DA Bennett never pressed charges against an officer for a shooting prior to the Finch shootings. ***Id.*,** ¶ **138**.

96.  Deny as to Jonker's perception. ***See* Resp. DSOF ¶ 95**.

97.  Admit to the testimony but incomplete. Each WPD shooting DeFoe analyzed was "reviewed" by PSB, not "investigated," which is part of DeFoe's critique. **Ex. 1 at 198:16-199:3; Ex. 19 at 3-5**. He also criticized the lack of officer discipline. **Ex. 19 at 9-10**. Robust PSB investigations would have prevented Finch's shooting. **Ex. 1 at 283:20-284:25; PSOF ¶ 140**. Deny also that there is no standard requiring independent oversight. Ramsay admitted it was best practice to have external review of officer shootings but that WPD had not adopted that practice. **Ex. 22 at 86:3-20**.

98.  Deny the discipline was substantive. In ███████ the supervising officer received a one-day suspension, and the shooting officer received a written reprimand, unrelated to his use of force. **PSOF ¶ 124(1).** The officer in ███████ received a one-day suspension. ***Id.*,** ¶ **124(3)**.

## **PLAINTIFFS' MATERIAL FACTS THAT PRECLUDE JUDGMENT ("PSOF")**

### **Shooting Death of Andrew Finch**

100.    The Finch call was a typical "high-risk" incident to which Rapp and Jonker regularly responded. **Ex. 2 at 40:3-10**, **65:8-66:21**, **72:15-73:2**; **Ex. 3 at 113:17-23, 114:7-115:10, 117:5-13, 128:5-14**. Officers could "assume" from the 911 call that the suspect had "a mental health problem."

**Ex. 2 at 79:18-20**.

101.      Jonker did not hear screaming, gunshots or cries of distress from the house. **Ex. 2 at 130:1-13.** He did not ask dispatch if gunshots were reported. *Id*. **at 130:23-131:2.**

102.      After stepping on the porch and hearing shouting, Finch put his hands up, dropping them only to pull up his pants. **Ex. 11 at 82: 19-24; Ex. 5 at 46:25-49:10; Ex. 27 at Wichita 001657**. Finch was startled by the officers. **Ex. 4 at 43:2-9, 44:13-45:2; Ex. 14 at 18:9-18.**

103.      No officers on the scene identified themselves as police. **Ex. 2 at 143:2-5.** The officers were not recognizable as police; they were dressed in black vests, shirts, and pants with identification obstructed. **Ex. 11 at 95:25-96:18; Ex. 3 at 37:20-38:7; Ex. 12 at 7**. Jonker did not identify himself as WPD to Finch when Finch stepped on the porch. **Ex. 2 at 128: 17-25, 143:2-5.**

104.      Jonker failed to issue or order announcements alerting the occupants that WPD had surrounded the house and instructing how to end the incident. **Ex. 2 at 128:10-20**. Rapp did not instruct Finch as what he should do once he stepped on the porch. **Ex. 3 at 218:18-19; 228:8-10**.

105.      Neither Jonker nor Rapp gave Finch a warning that deadly force would be used, **Ex. 2 at 145: 15-19**, in violation of WPD policy, **Ex. 24 at 4.104(A)**.

106.      Finch was unarmed. **Ex. 3 at 236:6-10.** He was not holding anything in his hands, including any item that could be mistaken as a weapon. **Ex. 2 at 149:2-7**; **Ex. 14 at 22:1-11**; **Ex. 5 at 57:4-60:5; Ex. 11 at 133: 2-11, 20-134:2**; **Ex. 4 at 53:1-12**; **Ex. 8 at 29:24-30:7**; **Ex. 9 at 51:18-22.** No weapon was found on or near his body or in the house. **Ex. 27 at Wichita 001689.**

107.      Rapp was could clearly see Finch's hands when he fired his weapon; he never saw Finch holding a weapon or anything that looked like a weapon. **Ex. 3 at 236:20-237:10; Ex. 13 at 102:8-10.** Rapp was the only officer to use a weapon. **Ex. 2 at 163:22-24** Rapp could not see officers on the east side of the house. **Ex. 3 at 151:25-152:4.**

108.      Finch made no threatening movements toward any officer and he never made

threatening statements. **Ex. 9 at 51:23-52:10**; **Ex. 2 at 201:19-202:9**; **Ex. 11 at 133:2-11**. Other officers on the scene, including on the east side, did not perceive Finch to be armed or a threat. **Ex. 14 at 27:4-7** ("**Q.** [B]ut you didn't perceive [Finch] to be a threat to any of the officers who were on the scene, correct? **A.** Not from what I saw, no."); **Ex. 11 at 132:8-20**; **Ex. 8 at 31:24-33:4**.

109.     Officers were surprised at the shot. **Ex. 11 at 132:21-133:7; Ex. 2 at 151:20-21**.

110.     Finch was shot in the chest, and the bullet did not follow an acute angle. **Ex. 28 at 025848-49**. Finch was not turning toward the door when he was shot; he remained on the porch, with his body facing north toward Rapp. **Ex. 8 at 29:16-20: Ex. 2 at 162:13-23**.

111.     Jonker did not finalize a tactical plan; provide non-lethal force options; utilize de-escalation tactics, including by slowing down the pace of the incident and prohibiting aggressive tactics; designate a single contact officer to communicate with anyone who came outside; or ensure that officers did not issue conflicting verbal commands. **Ex. 2 at 104:24-105:16, 112:5-114:10, 128:7-20, 129:11-21**, **144:8-145:10, 150:5-19**; **Resp. DSOF ¶ 79; Ex. 12 at 6-9**. Jonker was trained to do these things as a matter of policy. **Ex. 2 at 29:6-31:3; 31:13-18, 33:20-34:15, 37:18-38:24, 126:19-4, 145:20-23;** *see also* **Ex. 22 at 120:13-17** (in a hostage situation, best practice is having a single person communicate with the suspect); ***id*. at 198:9-21** (policy requires de-escalation).

112.     Contrary to WPD protocol and his training, Jonker did not conduct a preliminary investigation about the incident, including by learning Finch's identity. **Ex. 16 at 602.02E; Ex. 2 at 80:24-25, 161:2-17;** *see also* **Ex. 1 at 77:3-79:4**.

113.     Contrary to protocol and his training, Jonker did not initiate negotiations during the incident. **Ex. 16 at 602.05; Ex. 2 at 126:7-127:22**. Contrary to protocol and his training, he did not request SWAT for what he believed was a barricaded gunman and hostage incident. **Ex. 2 at 47:19-20, 72:11-24, 115:24-116:3, 126:7-13**. WPD policy requires that SWAT be called out in such situations. **Ex. 16 at 602.143**; **Ex. 17 at Wichita 15421-15423**. SWAT has specially trained

negotiators. **Ex. 16 at 602.09, 602.11**.

114.    According to SWAT officer Schepis, calling out SWAT would have slowed down the WPD response to the incident. **Ex. 10 at 30:11-12, 58:3-59:24, 88:2-19**.

115.    Contrary to his protocol and training, Jonker failed to request WPD's Crisis Intervention Team (CIT). **Ex. 2 at 31:9-18, 55:22-56:18, 57:10-58:6**. On-scene supervisors are responsible for requesting CIT assistance**. Ex. 29 at 519.02**. CIT is specially trained to defuse emergency situations, including mental health crises. **Ex. 29**.

116.    Jonker did not tell Rapp or other officers what to do if someone exited the house. **Ex. 2 at 104:5-8, 139:5-8, 152:9-20.**

117.    Ronen and Perry, on the east side of the house, failed to activate their body cameras during the shooting, in violation of WPD policy. **Ex. 5 at 71:23-72:22; Ex. 9 at 64:20-65:7; Ex. 54**. They were not disciplined. **Ex. 5 at 73:5-13; Ex. 9 at 66:9-12**.

118.    Jonker supervised the clearing of the Finch residence after the shooting. **Ex. 2 at 169:7-170:16.** He knew Finch was "seriously hurt" and needed medical attention. ***Id.* at 170:17-171:5; Ex. 30 at 50:20-52:23**. Jonker did not provide, or order any other officer to provide, emergency medical treatment to Finch. **Ex. 2 at 176:23-177:3; Ex. 9 at 64:1-1; Ex. 10 at 125:19-126:19**. Two EMS units reported to the scene eight minutes before Finch was shot. **Ex. 31 at Wichita 010465.** At Jonker's command, WPD officers waited over 15 minutes after the shooting to provide medical care. **Ex. 27 at Wichita 010449-50**; **Ex. 7 at 5:30-22:00.** Jonker stopped another officer from taking Finch out of the house, ordering to "just push past him." **Ex. 6 (11:00-11:26).**

119.    Finch was declared dead over 30 minutes after being shot. **Ex. 27 at Wichita 010450**.

120.    Rapp was exonerated by PSB for the Finch shooting based on a rationale he never provided. **Ex. 32 at Wichita 011390, 011410**; **Resp. DSOF ¶ 61**. Rapp was never interviewed by PSB. **Ex. 3 at 247:23-25**. The Chief and command channel officers signed off on the exoneration

in July 2018. **Ex. 32 at Wichita 011390**. The DA found the "shooting should not have happened," but there was "insufficient evidence to overcome self-defense immunity" beyond a reasonable doubt. **Ex. 31 at Finch 000351**. Jonker was never investigated for his conduct. **Ex. 32 at Wichita 11390, 11396; Ex. 19 at 4, 10**. PSB did not examine relevant policies implicated by the incident, like the SWAT and hostage policies. **Ex. 19 at 4, 10**. WPD classified the Finch shooting incident as a "justifiable homicide" on January 29, 2018. **Ex. 27 at Wichita 001576.**

**City of Wichita's Policies, Practices, and Customs**

*WPD Use of Lethal Force*

121.    WPD policies mandate that officers engage in de-escalation prior to using lethal force to determine whether the objective can be accomplished "without the use of a weapon." **Ex. 24 at 4.101(b), 4.106**. Under WPD policy, "the primary concern in any hostage (or) barricaded suspect…situation is containment….The longer the (WPD) has to negotiate, the better chances of a successful resolution of the incident." **Ex. 16 at 602.05.**

122.    Between 2012 and early 2018, WPD officers used lethal force at least 23 times, including in 13 instances where officers killed civilians.[1] **Ex. 33 at 15:1-18; Ex. 55.** With few exceptions, PSB executed "a review of the criminal investigation [that] included no independent interviews by the PSB Detective[]." **Ex. 33 at 155:25-156:11; Ex. 19 at 3-5, 7-8.**

---

[1] After several meet and confer conferences with Defendants, Plaintiffs were only able to obtain internal WPD documents relating to WPD shooting investigations from the five years prior to the Finch shooting (2013-2018). The narratives here thus do not include shootings close in time to the Finch incident but prior to 2013 or after early 2018. *See, e.g.*, *Herington v. City of Wichita*, No. 6:14-cv-01094-JTM, 2017 WL 76930, at *11 (D. Kan. Jan. 9, 2017) (sufficient evidence for jury to find that WPD officer was unreasonable in shooting and killing Troy Lanning six times from 15 feet away where bag Lanning held did not contain a gun ); *Jackson v. City of Wichita, Kansas*, No. 13-1376-KHV, 2017 WL 106838, at *11-12 (D. Kan. Jan. 11, 2017) (genuine issue of fact as to whether WPD officers lacked probable cause to believe Karen Jackson posed a threat of serious harm when they shot and killed her); *Estate of Smart v. City of Wichita*, No. 14-2111-JPO, 2018 WL 3744063, at *8 (D. Kan. Aug. 7, 2018) (on appeal) (finding "genuine issue of fact" as to whether WPD officers violated Smart's constitutional rights when they killed him); *Dixon v. City of Wichita, Kan.*, No. 13–1033–RDR, 2013 WL 2422741 (D. Kan. Jun. 3, 2013) (Plaintiff's excessive force claim against WPD officers who shot and killed Dixon survives motion to dismiss).

123.     WPD shootings that resulted in no discipline or findings of policy violations include:

(1) ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Policy violations and unlawful practices include failure to de-

escalate, precipitous use of force, and failure to call specialized units (CIT). *See id.* **at 010767.**

(2) ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Policy violations and unlawful practices also

include failure to de-escalate, precipitous use of force, failure to issue verbal commands, and

failure to call specialized units (SWAT/CIT). **Ex. 36 at 39:7-11, 69:19-73:8; Ex. 19 at 11.**

(3) ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████. Policy violations and unlawful practices also

include failing to examine the actions of all involved officers and policies. **Ex. 19 at 4**.

(4) ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████. Policy violations and unlawful practices also

include failure to de-escalate and failure to plan and communicate effectively. **Ex. 19 at 10-11**.

(5) ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████ PSB relied on Force

Science training to find the shooting reasonable. **Ex. 41 at 78:5-79:5**.

(6) ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████ Policy violations and unlawful practices also include misuse of a rifle (the

officer unreasonably used her rifle as a flashlight, **Ex. 42 at 010937**), precipitous use of force,

and failure to de-escalate. **Ex. 36 at 106:12-112:2; Ex. 19 at 9-11**.

(7) ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ PSB did not reconcile eyewitness accounts that differed from the officers' statements. *Id*. **at 60:8-61:11**. Policy violations and unlawful practices include that the officer failed to de-escalate, and in fact affirmatively escalated, the incident. **Ex. 19 at 11-12**.

(8) █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████ PSB relied on Force Science to find the shooting justified. *Id*. **at 66:16–67:1**. Policy violations and unlawful practices include failure to plan and communicate effectively. **Ex. 44 at Wichita 011137-42**.

(9) █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████ PSB also did not address inconsistencies in the officer's account of the incident. **Ex. 41 at 21:18-22:13, 46:24-48:7**. ██████████████████

███████████████████████████████████████████

██████████ . Policy violations and unlawful practices also include failure to de-escalate, failure to issue warnings, and precipitous use of force. *Id*. **at 11; Ex. 41 at 23:5-15**.

(10) ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

[REDACTED] Policy violations include failure to call specialized teams (CIT/SWAT), and failure to establish a point person for negotiations. ***Id*. at 011324-28**.

(11) [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]. Policy violations include failure to engage in specialized units and failure to plan and communicate effectively. ***Id.***

124.    Three other WPD shootings resulted in minimal discipline:

1) [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Policy violations and unlawful practices also include failure to request a specialized unit (CIT/SWAT), failure to effectively communicate and plan, failure to make announcements, precipitous use of force, failure to de-escalate/retreat. ***Id*. at 010669-700, 010689; Ex. 49 at 31:5-32:4, 42:21-47:18, 68:3-75:21**. **Ex. 19 at 10-11, 12**. PSB cited two officers for policy violations, but the discipline was minimal—a one-day suspension and a written reprimand unrelated to the use of force. **Ex. 19 at 10-11; Ex. 48 at Wichita 010731**.

2) [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] PSB found the use of force was unreasonable and the officer involved was disciplined and criminally

prosecuted. **Ex. 21 at 26:12-31:22**. But PSB made no findings regarding the officer's failure to follow WPD policy regarding interacting with people with mental illness. ***Id*. at 33:3-35:20.**

3) ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████ PSB admitted the officer used unnecessary lethal force twice during this encounter. **Ex. 41 at 99:1-11.** PSB found that the initial use of force ████████████████ was reasonable, even though this action was precipitous and escalated this encounter in violation of WPD policy. **Ex. 19 at 12; Ex. 41 at 109:14-18**. The involved officer was suspended for one day. **Ex. 52.**

***WPD System of Accountability/Discipline***

125.    No independent entity investigates WPD officer uses of force. **Ex. 19 at 7-8; Ex. 22 at 11:16-14:10, 210:1-211:11**, **213:1-10**. **PSOF ¶ 126**. WPD Professional Standards Bureau (PSB) is responsible for conducting administrative investigations into officers' uses of lethal force. **Ex. 25.** WPD homicide detectives conduct criminal investigations of officers' uses of lethal force. **Ex. 53 at 9:20-10:9.** Criminal investigations do not examine policy violations. **Ex. 33 at 29:4-16**. Criminal investigators lack "specialized knowledge" for investigating policy violations. ***Id*. at 37:23-38:5**.

126.    KBI's involvement in Wichita police shootings "is limited, to say the least." **Ex. 20 at 128:16-18.** KBI agents rely on the physical evidence gathered by WPD, rarely interview witnesses, and do not review interview transcripts for discrepancies. ***Id*. at 69:22–75:15; *see also* Ex. 21 at 22:17-23:10**. KBI does not provide the Chief with any report. **Ex. 22 at 13:23-14:10**. KBI has no role in assessing violations of WPD policies. **Ex. 20 at 88:17-89:23**.

127.    PSB does not investigate shootings, but instead reviews the criminal investigations. **Ex. 33 at 28:13-21**; **Ex. 19 at 3-5; Ex. 22 at 136:5-14, Ex. 53 at 8:16-25; Ex. 39 at 24:11-18, 51:13-18**; **Ex. 36 at 49:10-21, 115:24-116:6**.

128.     PSB does not determine whether the criminal investigations are completed in accordance with WPD policy. **Ex. 33 at 117:18-118:8** ("we're not investigating the investigators").

129.     PSB operates entirely at the direction and command of Chief Ramsay. **Ex. 22 at 61:17-22**; **Ex. 33 at 29:24-30:5, 35:4-25; Ex. 25 at 901.5(D(2)), 901.11**. Ramsay requires that PSB detectives wait until criminal investigations are completed to begin their review but does not require that PSB detectives conduct an independent investigation into possible policy violations. **Ex. 22 at 88:14-22, 91:24-92:16; Ex. 33 at 28:13-21, 42:7-43:3, 101:6-11**. There is no written policy on the requirements for administrative review. **Ex. 33 at 97:13-16.**

130.     PSB as a matter of practice does not examine whether all of the officers at the scene complied with all relevant WPD policies. **Ex. 33 at 118:9-122:2; Ex. 19 at 4.** A PSB review that failed to analyze all relevant WPD policies would be incomplete. **Ex. 33 at 102:4-104:19.**

131.     WPD officers who conduct criminal investigations of officer-involved shootings use leading questions during interviews with involved officers, suggesting to the officer that the use of force was justified. **Ex. 19 at 7-8**. PSB has no objection to this. **Ex. 41 at 36:17-42:2, 80:13-85:6**

132.     PSB officers may not issue ultimate findings of policy violations or discipline; that is for command channel and the chief. **Ex. 33 at 41:8-42:6, 63:25-64:14, 103:19-104:8.** There is no policy on command channel review of administrative investigations. *Id.* **at 75:13-21**. The review occurs in private "meetings" of command staff, of which there are no records. *Id.* **at 76:5-18, 112:2-20**. There is no system for tracking concerns PSB identifies in shootings. *Id.* **at 128:9-14.**

133.     Ramsay requested that KBI investigate each WPD use of lethal force, but KBI declined for lack of resources. **Ex. 20 at 79:13-81:12; Ex. 22 at 83:6-84:6.** Ramsay took no further action after the refusal, **Ex. 22 at 13:9-22, 33:16-34:11**, and the policy remains unchanged. **Ex. 25**.

134.     Knowing Force Science is not a reputable methodology; **Ex. 22 at 22:4-23:3;** *see* **Pls.' Mem. in Support of Mot. to Exclude Borden (Dkt. No. 161)**, Ramsay allows PSB

investigators to rely on it when evaluating (and justifying) WPD deadly force. **Ex. 22 at 23:8-24**.

135.    Ramsay has "no concerns" with detectives using leading questions. *Id*. **at 85:2-6**.

136.    No officer was terminated for violating WPD use of force policy before the Finch shooting. On the rare occasion PSB finds policy violations, the discipline imposed (if any) is minor; command channel and the chief approved each shooting. **Ex. 32 at Wichita 010427, 010457-58; Ex. 34 at Wichita 010767-69; Ex. 35 at Wichita 010838-45; Ex. 51 at Wichita 011212-17 and Ex. 52; Ex. 42 at Wichita 010968-76; Ex. 40 at Wichita 011048-56; Ex. 43 at Wichita 011103-07; Ex. 44 at Wichita 011173-75; Ex. 45 at Wichita 011253-57; Ex. 38 at Wichita 011306; Ex. 46 at Wichita 011349; Ex. 37 at Wichita 011352, 011386;** *see also* **Resp. DSOF ¶ 98**.

137.    As a matter of practice, WPD officers "are not disciplined, counseled, or retrained despite clear policy violations" in connection with officer-involved shootings. **Ex. 19 at 9-10**.

138.    The DA recalls only one WPD officer facing criminal prosecution related to the use of lethal force; that prosecution occurred after the Finch shooting. **Ex. 23 at 29:3-30:16**.

139.    Rapp knew of five police shootings in the past five years; he was present for two. **Ex. 3 at 96:1-11**. One was the shooting death of Marquez Smart by WPD Officers Chaffee and Froese, where both Jonker and Rapp were at the scene. *Id*. **at 96:14-98:10; Ex. 2 at 223:14-224:3**. Smart resulted in a lawsuit as he was unarmed and shot in the back. *Smart*, **2018 WL 3744063**. Rapp knew there was no finding of a policy violation and that the officers are still on the force. **Ex. 3 at 98:14-100:23**. Rapp also witnessed a shooting of a civilian by Officers Dunkel and Schmeidler. **Ex. 3 at 99:12-100:2.** There was no finding of a policy violation and the officers are still on the force. *Id*. **at 100:2-15**. Rapp was not interviewed in either case. *Id*. **at 101:2-8**.

140.    Rapp also knows of three other shootings in the past five years. **Ex. 3 at 101:21-25**. Involved officers Batiste, Wisely, Kurtz, and Seacrist are still on the force. *Id*. **at 102:1-105:16**.

141.    Jonker previously served as a detective investigating other WPD officer-involved

shootings, including the Smart case, **Ex. 2 at 223:4-18; 224:20-225:5**, and another involving WPD Lieutenant Ojile and Officer Hill, *id***. at 224:20-225:8.** He did not conduct an investigation into the involved officers' actions in Smart. *Id***. at 224:5-19.** He knows the officers involved in the Smart case are still on the force. *Id***. at 224:1-10**. Ojile was in charge of the WPD homicide detectives investigating the Finch incident, **Ex. 27 at 1679-1683**, which Jonker knew, **Ex. 2 at 184:15-22**.

142.      "[I]f the Wichita Police Department and if the Chief of Police and Professional Standards Bureau Detectives had identified the [] patterns of deficiencies in the use of force, systemic changes could have been made that could have prevented the Finch incident from unfolding as it did." **Ex. 19 at 13**.

<u>**STATEMENT OF ISSUES**</u>

Summary judgment is inappropriate. Rapp was objectively unreasonable in shooting Finch; Jonker set in motion and directed the events that led to Finch's unlawful death; and the City had a custom of unlawful force and failures of accountability that caused the constitutional violations.

<u>**ARGUMENT AND AUTHORITIES**</u>

**I.      SUMMARY JUDGMENT ON FOURTH AMENDMENT CLAIMS INVOLVING DISPUTED ISSUES OF FACT IS DISFAVORED.**

Summary judgment is appropriate only when the moving party establishes that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157 (1970). The evidence must be viewed in the light most favorable to the opposing party, and "genuine disputes" may not be resolved "in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). The standard is decisive here, where the reasonableness of the defendants' actions and the related qualified immunity question of whether those actions violated

clearly established law turn on numerous disputed questions of fact. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002) (summary judgment is inappropriate in an excessive force case "based on qualified immunity or otherwise" if "the moving party has not quieted all disputed issues of material fact"); *see also Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001) ("qualified immunity defense [is] of less value when raised in defense of an excessive force claim.").

## II.  DEFENDANTS' CONDUCT WAS OBJECTIVELY UNREASONABLE AND VIOLATED CLEARLY-ESTABLISHED FOURTH AMENDMENT LAW.

Defendants violated clearly-established law: "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). The Tenth Circuit has repeatedly affirmed that principle. *See Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) (no need for "identical facts" to establish "it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public or the suspect himself."); *McCoy*, 887 F.3d at 1052 ("the Fourth Amendment prohibits the use of force without legitimate justification, as when a subject poses no threat"); *Estate of Booker v. Gomez*, 745 F.3d 405, 428 (10th Cir. 2014) ("[T]here undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect…who already has been subdued and does not present a danger….") (citation omitted).[2]

### A.  Rapp Violated the Fourth Amendment by Shooting an Unarmed and Innocent Man.

In assessing the reasonableness of deadly force, courts consider the severity of the crime, the potential threat posed by the suspect, and the suspect's attempts to resist arrest. *Graham*, 490 U.S. at 396. The second factor is the "most important" in the analysis. *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017) (deadly force is justified "if the officer had 'probable cause to believe there

---

[2] While *Booker* concerned a Fourteenth Amendment claim, "'a finding of excessive force under the Fourth Amendment is highly relevant to the relationship between the amount of force used and the need presented in the first part of an excessive force inquiry under the Fourteenth Amendment.'" *McCoy*, 887 F.3d at 1053 n. 25 (citation omitted).

was a threat of serious physical harm to themselves or to others.'") (citation omitted). Tenth Circuit courts examine four components in evaluating the threat: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Pauly*, 874 F.3d at 1216 (citing *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)).

Finch cannot describe how events unfolded the last minutes of his life. *See Pauly*, 874 F.3d at 1218 (urging caution in lethal force cases to "ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify.") (citation omitted). But abundant evidence confirms that Rapp violated *Graham* when he shot a visibly unarmed Finch with his sniper rifle—over 40 yards, less than 10 seconds after Finch entered his porch, and without issuing a warning or discovering who Finch was. PSOF ¶¶ 105, 112; *Zuchel v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989) (no summary judgment where record suggested officer shot victim who he mistakenly believed was armed from 10 to 12 feet away, without warning, and victim was not charging at officer); *Walker*, 451 F.3d 1139 (*see* II(B)), *Casey v. Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (officer liable under *Graham* where she tasered victim shortly after arriving on scene, and gave victim "no opportunity to comply with her wishes").

On the first *Graham* prong, while Rapp may have believed he was responding to a violent incident, whether his conduct was lawful depends on the threat he confronted "at the exact moment of the threat of force." *Medina*, 252 F.3d at 1132; *see Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666 (10th Cir. 2010) ("It is not objectively reasonable to ignore specific facts as they develop…in favor of prior general information about a suspect."). The record, under the second and third *Graham* prongs, underscores the unconstitutionality of Rapp's conduct at that moment in time. *Finch had no weapon on or near him when he was shot*; he had nothing in his hands or pockets; no

weapon was later discovered in the house. PSOF ¶ 106. A reasonable juror could find that Rapp saw Finch's hands at the time of the shooting, and that he did not observe a gun (or any item that could be mistaken as such). *Id*, ¶ 107. WPD had no record of responding to the Finch house, and there was no sign of a gunman at the scene. *Id*, ¶ 101; DSOF ¶ 12. Finch did not evade arrest. PSOF ¶ 110. Rapp lacked probable cause to believe Finch was a serious physical threat. *Pauly*, 874 F.3d at 1216.

*Larsen* compels the same conclusion. *First*, officers did command Finch to drop a weapon because he had no weapon and the officers never saw one. PSOF ¶ 108; *Larsen*, 511 F.3d at 1260. Rapp and Jonker failed to announce themselves as police, and the officers' clothing did not show their affiliation. PSOF ¶¶ 103-104; *see Zia Trust Co. ex rel Causey v. Montoya*, 597 F.3d 1150, 1154-55 (10th Cir. 2010) (denying summary judgment in part because officer failed to identify himself before shooting man suspected of violence); *Pauly*, 874 F.3d at 1219 (reasonable juror could find police provided inadequate identification by yelling out "State Police" only one time). Finch was "startled" by what he confronted—a cadre of unknown black-clothed figures, shouting conflicting commands. PSOF ¶ 102; Resp. DSOF ¶¶ 36, 39. Exacerbating the risk of harm, Rapp failed to warn Finch he intended to use deadly force. *Id*., ¶ 105; c*f. Garner*, 471 U.S. at 11-12; *Casey*, 509 F.3d at 1285 ("The absence of any warning…makes the circumstances of this case especially troubling."). This is particularly egregious as officers had reason to believe the suspect was mentally ill, PSOF ¶ 100, and they failed to employ crisis management. *Id*., ¶¶ 111, 113, 115.

*Second*, a reasonable juror could find Finch made no "hostile motions" toward officers or anyone else. *Larsen*, 511 F.3d at 1260. Rapp states Finch made a gun-drawing motion suggestive of a threat to the eastside officers. Def. Mem. at 22. Rapp's description of Finch's movements is undermined by other officers. PSOF ¶ 108.[3] *Cf. Buck v. City of Albuquerque*, 549 F.3d 1269, 1287

---

[3] The officers who partly support Rapp's story are biased. Resp. DSOF ¶ 43. A jury must assess their credibility. *Tolan*, 572 U.S. at 660 ("witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases" and it is "for that reason that genuine disputes are generally resolved by juries"). *cf. United States v. Baldridge*,

(10th Cir. 2008) ("A court assesses the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene….") (quoting *Graham*, 490 U.S. at 388). Those beside Rapp on the north side—Powell and Fussell—and those closest to Finch, on the east side—Headings and Stephens-Clark—did not believe Finch was a threat. PSOF ¶ 108; Resp. DSOF ¶ 50.[4] *Third*, the distance separating Rapp and Finch was vast. *Larsen*, 511 F.3d at 1260. Rapp was over 40 yards away. DSOF ¶ 25; *see Stewart v. City of Prairie Village*, 904 F. Supp. 2d 1143, 1154 (D. Kan. 2012) ("[E]vidence that the gun was fired at a distance…minimizes the reasonableness of the use of deadly force."). And Rapp could not even see the eastside officers to assess whether they were in danger. PSOF ¶ 107; *cf. Orsak v. Metro. Airport Com'n Airport Police Dept.*, 675 F. Supp. 2d 944, 955 (D. Minn. 2009) (no reasonable conduct where suspect was only "theoretical threat to officer safety"). *Fourth*, for these reasons, Finch did not "manifest" an intent to harm. *Larsen*, 511 F.3d at 1260.

Even if Rapp's assessment of the threat was "mistaken" rather than malicious, Def. Mem. at 20, he is not insulated from liability as his belief was objectively unreasonable. *Cf. King v. Hill*, No. 14-cv-5073, 615 Fed. App. 470, 478 (10th Cir. 2015) (summary judgment improper in shooting case where there was conflicting testimony about whether suspect was armed, regardless of whether officer's assessment about the threat "was mistaken…rather than deliberately malicious"); *see also Lopez v. New Mexico*, No. 2:15-CV-00889, 2017 WL 3412106, at *12 (D.N.M. Mar. 13, 2017) (In shooting case, "jury could view the evidence in Plaintiffs' favor and determine that…any mistake [the defendant] made in believing he was not tasering [the victim] was not reasonable"); *Tolan*, 4572 U.S. at 659 ("A jury could have well concluded that a reasonable officer would have heard Tolan's words not as a threat," but as a plea to the officer); *Henry v. Purnell*, 652 F.3d 524, 535 (4th Cir. 2011) (officer can commit constitutionally unreasonable seizure because of an unreasonable factual

---

559 F.3d 1126, 1135 (10th Cir. 2009) ("It is permissible impeachment to expose a witness's bias….").
[4] Powell's bodycam does not "corroborate[] the officers' perception that Finch lowered his hand towards his waist and then began to raise it." Def. Mem. at 20. Powell, who wore the camera, did not think Finch was a threat. PSOF ¶ 108.

mistake). The cases Defendants cite (Def. Mem at 20-21) do not suggest otherwise. In *Blossom v. Yarbrough*, 429 F.3d 963 (10th Cir. 2005), the victim reached toward the deputy's gun at the time he was shot. *Id*. at 968. The officer in *Billingsley v. Omaha*, 277 F.3d 990 (9th Cir. 2002) could not see the suspect's "hand and [] shoulder movement" when he fired. *Id*. at 995. Neither applies, where inferences drawn in Plaintiffs' favor indicate that Rapp never saw a gun and Rapp could see Finch's empty hands when he fired. PSOF ¶ 107. Defendants' other out-of-circuit cases (Def. Mem. at 21-22) are also off-point. Each involved suspects who, unlike Finch, engaged in observable criminal activity and threatening conduct, with obscured hand movements.[5]

Defendants also argue that even if the shooting was unreasonable to protect officers, it was justified to prevent Finch from entering the house where there were ostensibly hostages. Def. Mem. at 22-23. Leaving aside that this *post hoc* rationale was not Rapp's motivation in firing, Resp. DSOF ¶ 61, it does not pass muster on the facts. *Cf. Cole v. Carson*, 935 F.3d 444, 455-56 (5th Cir. 2019) ("[I]t is beyond our jurisdiction to consider the officers' set of facts, a narrative evolving over time. '[I]f an excessive force claim turns on which of two conflicting stories best captures what happened on the street," the caselaw "will not permit summary judgment in favor of the defendant official. ... [A] trial must be had.'") (citing *Saucier v. Katz*, 533 U.S. 194, 216 (2001) (Ginsburg, J. concurring)).

Finch was shot in the chest. The bullet traveled to his back and did not follow an acute angle, suggesting Finch was facing Rapp when he was shot. PSOF ¶ 110. *See Walker*, 451 F.3d at 1160, (bullet path showed plaintiff was not threatening officer at time he was shot); *Cole*, 935 F.3d at 454

---

[5] In *Loch v. City of Litchfield*, 837 F. Supp. 2d 1032 (D. Minn. 2011), the Court found for the officer because he saw "something black" on the suspect's hip and saw the suspect move his right arm toward his hip, heard the suspect use the word "kill," and saw the suspect turn sideways so that the officer could not see his arm. *Id*. at 1037. In *Wyche v. City of Franklinton*, 837 F. Supp. 137 (E.D.N.C. 1993), the suspect was walking in public covered in blood, after shouting deadly threats at and chasing the officer before lunging at him. *Id*. at 139-40. In *Thompson v. Hubbard*, 257 F. 3d 896 (8th Cir. 2001), the suspect's hands were obscured and he was fleeing when he was shot. *Id*. at 898. The same was true in *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991), in which the victim repeatedly defied the officer's orders by reaching below his sight line, after engaging in a high speed chase and throwing stolen objects from the car. *Id*. at 500-501.

(dispute over whether suspect "was aware of the officers, whether and how he turned and aimed his gun, and whether [the officer] warned [the suspect]" precluded qualified immunity in shooting case). Other officers agree Finch was *not* turning. PSOF ¶ 110. The "hostage" justification is further eviscerated by Rapp's failure to conduct a cursory inquiry into Finch's identity. Officers at the scene knew one physical detail about the suspect: he was male. DSOF ¶ 33. They did not know his age, race, size, or features. Yet, Rapp did not try to learn whether Finch was suspect or hostage. He made no announcements and gave no warning. Under these circumstances, no reasonable officer would believe "shoot-to-kill" justified. *See Harte v. Bd. of Comm'rs of Ct. of Johnson*, 864 F.3d 1154, 1192 (10th Cir. 2017) ("Had the deputies done some homework, they would have learned that no one in the Harte family posed any risk of violence….Considering the lack of danger the Hartes posed…their tactics were unreasonably extreme.") (citing *Graham*, 490 U.S. at 396); *Sevier v. City of Lawrence*, 60 F.3d 695, 701 n. 10 (10th Cir. 1995) ("[T]he record reveals some evidence upon which a jury could conclude that Defendants acted recklessly by confronting Gregory…without gathering more information….").

For all these reasons, Plaintiffs are entitled to a jury trial on whether Rapp is liable.

## B. Rapp is Not Entitled to Qualified Immunity for Shooting an Unarmed Man.

Nor is Rapp entitled to qualified immunity, even assuming the defense has a legitimate place in our jurisprudence.[6] Viewing the record in Plaintiffs' favor, Rapp's conduct violated clearly established law, defined by Supreme Court and Tenth Circuit decisions, and the authority of other

---

[6] There is a "growing, cross-ideological chorus of jurists and scholars" recognizing that qualified immunity has no basis in the text of § 1983 or the common law. *Zadeh v. Robinson*, 902 F.3d 483, 498 (5th Cir. 2018) (Willet, J. concurring); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring) (courts applying the doctrine are not "engaged in 'interpret[ing] the intent of Congress in enacting'" § 1983 and further "the sort of 'freewheeling policy choice[s]'" that is antithetical to the judicial role.). Courts should be cautious before curbing an individual's right to a jury of her peers. *See Manzanares v. Roosevelt Cty. Adult Detention Ctr.*, 331 F. Supp. 3d 1260, 1294 n. 10 (D.N.M. 2018) ("[I]n a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable….").

courts. *McCoy*, 887 F.3d at 1052; *Nosewicz v. Janosko*, No. 18-1139, 2018 WL 5617756, at *8 (10th Cir. Oct. 30, 2018) (denying qualified immunity where on plaintiff's record the defendant's "use of force was gratuitous"); *see generally Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018).

The defendants complain (Def. Mem. at 23) that no cases prohibited Rapp's specific wrongdoing. But the more "egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004); *see Weigel*, 544 F.3d at 1154. In any event, this suit *does* share "salient factual components" with other Tenth Circuit cases. *McCowan v. Morales*, __ F.3d __, 2019 WL 7206045, at *7 (10th Cir. Dec. 27, 2019). It is particularly analogous to *Walker v. City of Orem*, where the Court held that on plaintiffs' facts, officers "acted precipitously" in shooting victim believed to be violent (1) in front of his house (2), where he had made no violent threats (3), was not advancing on anyone at the time he was shot (4), was over 28 feet away from the officer (5), and where he was fired upon 12 seconds after leaving his car (6), before officers gave a warning they intended to use lethal force (7). *Id*. at 1157-60. Strikingly, the Court dismissed the defendants' claims that the victim took a "pistol shooting stance" when they fired (8), *id*. at 1158; competing inferences suggested he was clearly not holding a gun (9). *Id*. at 1160. The Tenth Circuit held similarly in *Zia*, 597 F.3d 1150, denying qualified immunity for an officer who shot a mentally ill man (1) suspected of violence (2) and being armed (3), where the record, read "in the light favorable to plaintiffs," showed the officer shot the victim from 15 feet away (4), after approaching him with his gun drawn (5) and failing to identify himself (6), but without knowing who the man was (7) or what his role was in the alleged incident (8). *Id*. at 1153, 55. *See also Zuchel*, 890 F.2d at 275.

Also on point is *King v. Hill*, 615 Fed. App. 470, in which the Court denied summary judgment for an officer who responded to a domestic call and shot a man standing in the doorway of his own home, where the "evidence and reasonable inferences…would establish that… [the

victim] was unarmed at the time of [the] shooting; both of his hands were visible; [and] he could not have been holding a long gun." *Id.* at 475. The Court rejected qualified immunity based on *Walker*, *Zia*, and *Zuchel*: "the law was clearly established that an officer could not shoot an unarmed man who did not pose any actual threat to the officer or to others." *Id.* at 479. On these principles, Rapp's conduct was also unconstitutional in every other Circuit. *See Halley*, 902 F.3d at 1149.[7]

The defendants' claim of "mistake" (Def. Mem. at 17) cannot resuscitate their baseless immunity defense. *See Tolan*, 572 U.S. at 656-57 (reversing qualified immunity at summary judgment, urging courts to "take care not to define a case's 'context' in a manner that imports genuinely disputed factual proposition"); *Lopez*, 2017 WL 3412106, at *12 (fact dispute about reasonableness of officers' mistaken use of force precluded qualified immunity). In December 2017, it was clearly established that even where an officer believes that he *may* encounter an armed suspect, deadly force is not justified where the officer does not actually confront a serious threat. *See Carr v. Castle*, 337 F.3d 1221, 1226-27 (10th Cir. 2003) (affirming denial of qualified immunity where record showed victim "no longer posed a threat of serious physical harm" at the time of the use of force); *Zia*, 597 F.3d at 1153-55 (qualified immunity inappropriate where officers at scene

---

[7] *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 23 (1st Cir. 2005) (officer violated Fourth Amendment by firing "extraordinarily quickly" and without "adequate warning" at armed man whose gun was "pointed downwards"); *Davis v. Little*, 851 F.2d 605, 607 (2d Cir. 1988) (officer force excessive against person who "was unarmed" and "made no threat [toward] them or on any third party"); *Lamont v. New Jersey*, 637 F.3d 177, 184-85 (3d Cir. 2011) (no qualified immunity where officers fired on weaponless suspect whose hands were visible after suspect "yanked his right hand out of his waistband"); *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277-78 (5th Cir. 2015) (reversing qualified immunity as it was clearly established that officer cannot use deadly force against person who poses no immediate threat; *Cole*, 935 F.3d at 453-54 (denying qualified immunity for officers who opened fire without warning); *Keeton Geiger v. Sloan*, 780 Fed. App. 150, 154 (5th Cir. 2019) (no qualified immunity where parties' stories "diverge[d]" on "whether [the officer] saw a gun."); *Bouggess v. Mattingly*, 482 F.3d 886, 894-95 (6th Cir. 2007) (disputed facts precluded summary judgment, as "[e]ven a split-second decision, if sufficiently wrong, may not be protected by qualified immunity."); *Strand v. Minchuk*, 910 F.3d 909, 916 (7th Cir. 2018) ("The Fourth Amendment does not sanction an officer—without a word of warning—shooting an unarmed offender who is not fleeing, actively resisting, or posing an immediate threat to the officer or the public"); *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) (no qualified immunity where suspect did not pose a serious threat where he held pistol over his head and there was no warning); *Foster v. City of Indio*, 908 F.3d 1204, 1211-13 (9th Cir. 2018) (affirming denial of qualified immunity where fact issues remained as to whether suspect had gun); *Clawson v. Rigney*, 777 Fed. App. 381, 385 (11th Cir. 2019) (denying qualified immunity because of "disputed facts about whether [the victim] posed an immediate threat.").

involving potential firearm shot victim who did not manifest an intent to harm); *McCoy*, 887 F.3d at 1052-53 (denying summary judgment where on non-movant's facts, officers used clearly-established excessive force on armed suspect believed to be holding hostages, after he was subdued).

In sum, the qualified immunity defense cannot bar trial in this case.

### C. Jonker Has Fourth Amendment Supervisory Liability and is Not Immune.

Finch's death would not have occurred had Jonker properly supervised the scene. Supervisory liability attaches where an "'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise[.]'" *Fogarty v. Gallagos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (citation omitted). The Tenth Circuit has a three-prong test: "(1) personal involvement; (2) causation, and (3) state of mind." *Booker*, 745 F.3d at 435. To satisfy the first, the supervisor must have "'actively participated or acquiesced in the constitutional violation.'" *Holland v. Harrington*, 268 F.3d 1179, 1187 (10th Cir. 2001). The causation requirement is similar. *See Booker*, 745 F.3d at 435 (defendant must have set "'in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'") (citation omitted). On the third prong, Fourth Amendment supervisory actions are analyzed under the objective reasonableness standard. *See Webb v. Thompson*, 643 Fed. App. 718, 724-25 (10th Cir. 2016).

Plaintiffs meet their burden as to Jonker. The undisputed commander of the scene, he directly participated in and exercised control over the law enforcement response. *See Booker*, 745 F.3d at 435 (while "direct participation" is unnecessary for supervisory liability "surely it is sufficient."). Contrary to the defense claim (Def. Mem. at 24), Jonker did direct the use of force by ordering Rapp to target Finch with a sniper rifle, without determining whether there was an actual threat warranting

28

deadly force.[8] *See Fogarty*, 523 F.3d at 1163-64 (captain who oversaw police response to protest was liable where he "planned the [police] response to the protest, ordered certain arrests, and controlled the deployment of chemical munitions and less lethal projectiles[.]"). Jonker also failed to mitigate the risk of deadly force—which he could have done if he gathered information, made announcements, called in specialized teams, prevented conflicting commands, and appointed a contact person. PSOF ¶ ¶ 111-116; *Hastings v. Barnes*, 252 Fed. App. 197, 203 (10th Cir. 2007); *Sevier*, 60 F.3d at 701 n. 10. Jonker was well-trained on WPD policies that mandated he take these steps; he intentionally disregarded his training. *Id*. *Weigel*, 544 F.3d at 1155 ("reasonableness of an officer's actions…assessed in light of the officer's training"); *accord*, *Booker*, 745 F.3d at 425.

Thus, Jonker's deliberate omissions set in motion the events by which Finch was gunned down, in violation of the Fourth Amendment. *See Poolaw v. Marcantal*, 565 F.3d 721, 733 (10th Cir. 2009) (Plaintiffs "must show that [the defendants] set in motion a series of events they knew or reasonably should have known would result in the search of the Poolaws' property and the seizure of [the plaintiffs]. Given that [one defendant] ordered the search and [another defendant] swore out the affidavit, it strains credulity that they would not have known these clearly intentional acts would lead directly to the search….[V]iewing the record…in the light most favorable to the [plaintiffs]… a reasonable jury could find [the defendants] knew or reasonably should have known the [plaintiffs] would be seized…."). Indeed, on these same facts, Jonker is liable not just as a supervisor, but also for precipitating the use of force. *Sevier*, 60 F.3d at 699 (Whether officers were reasonable "depends on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to

---

[8] *Chamberlain*, 986 F. Supp. 2d 363 (S.D.N.Y. 2013), Def. Mem. at 25, is off-point. Those officers had first-hand knowledge that the suspect was armed; the suspect confirmed it and officers saw the weapon. *Id*. at 384-85. The officers talked to the suspect for "more than an hour," to try to resolve the incident peacefully before tasering the suspect. *Id*. at 376-78. The officers utilized the very tactics Jonker should have used before directing lethal force. Resp. DSOF ¶ 76.

use such force."); *Hastings*, 252 Fed. App. at 203 (no summary judgment where officer confronted mentally ill, armed man by cornering him and issuing loud commands). Given the incident's timing, Jonker's conduct was "immediately connected" to the shot. *Allen*, 119 F.3d at 841 ("entire incident lasted 90 seconds, so officers' preceding actions were "included in the reasonableness inquiry.").

The defense presents a host of factual arguments about why Jonker's tactical failures did not cause Finch's death. Def. Mem. at 24-25. These are disputed. Honing in on just one omission, the defense argues SWAT could not have been mobilized in time to respond. *Id*. at 25.[9] The rejoinder is multipart: had Jonker investigated the scene, SWAT would have been unnecessary; had he slowed down the response (using a single contact to communicate with Finch), SWAT would have had time to respond; had Jonker called SWAT en route to the scene, it could have arrived in time. Calling SWAT also slows the incident. PSOF ¶ 114. This is for the jury to resolve. *Tolan*, 572 U.S. at 657.

Defendants also erroneously state that deliberate indifference is required for supervisory liability. Def. Mem. at 25. Courts facing such claims under the Fourth Amendment "do not consider an actor's state of mind." *Webb*, 643 Fed. App. at 725 (citing *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010) (intent depends on "the constitutional provision at issue")); *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) ("[T]here's no special rule of liability for supervisors. The test for them is the same as the test for everyone else."). *Serna* (Def. Mem. at 25), in contrast, had an Eighth Amendment supervisory claim with a higher *mens rea* requirement. 455 F.3d at 1152.

Even if there was an intent requirement, a reasonable jury could conclude that Jonker had the requisite *mens rea*. Despite having participated in incidents involving barricaded gunman and hostages during his career, Jonker intentionally violated the WPD training on protocols governing such scenarios. PSOF ¶¶ 100, 111-116; *see Booker*, 745 F.3d at 427 (jury could find intent in

---

[9] Defendants tacitly admit that Jonker was in a position to call SWAT, but chose not to. Def. Mem. at 25. That decision highlights his supervisory role. *See Fogarty*, 523 F.3d at 1163-64 (supervisor's claims "may bolster his assertions that he used only reasonable force but they also established his detailed involvement" in the police response leading to force).

excessive force case where "Deputy Grimes' actions conflicted with Denver Sheriff Department policy and training."); *United States v. Rodella*, No. CR 14-2783, 2014 WL 6634391, at *14 (D.N.M. Nov. 20, 2014) ("If it is shown that Rodella received training on how to properly perform a high-speed pursuit and…that Rodella disregarded this training, then this information is relevant to whether Rodella willfully violated Tafoya's constitutional rights."); *Bevan v. Valencia*, No. 15-0073, 2018 WL 4208065, at *5 (D.N.M. Sept. 4, 2018) ("Whether any of the County Individuals were aware of applicable SOPs…and…violated those SOPs…[is] relevant to whether [they] acted with deliberate indifference..."). Jonker's post-shooting conduct underscores his bad intent. He refused to provide Finch medical care, callously ordering his subordinates to "push past him." PSOF ¶ 118. Finch bled out for 15 minutes until he was pulled from the house and handed to waiting paramedics. *Id*. This manifests an intentional disregard for Finch's rights. *Cf. Booker*, 745 F.3d at 436 (intent satisfied where supervisor exhibited "excessive zeal" in using taser longer than recommended time).

Finally, Jonker is not entitled to qualified immunity because his omissions violated clearly established law. *See Stewart*, 904 F. Supp. 2d at 1156 (Officers "unreasonably escalated the situation, neglected to use a negotiator or other individual trained in talking to mentally ill people, and aggressively precipitated the use of deadly force…The conduct…was clearly established as unconstitutional…."); *Booker*, 745 F.3d at 435-36 (no qualified immunity where jury could find sergeant "actively participated in—and failed to intervene and prevent—the use of excessive force"); *Fogarty*, 523 F.3d at 1164 (denial of qualified immunity for supervisor who "set in motion a series of acts by others" that violated constitutional rights).

## III.   THE CITY OF WICHITA IS LIABLE FOR ITS POLICIES AND PRACTICES.

The City is liable for "persistent and widespread" practices that were the moving force behind the misconduct that caused Finch's death. *Monell v. Dep't of Soc. Srvcs*, 436 U.S. 658, 691 (1978); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) ("well-

settled custom or practice" supports municipal liability where it is "closely related to the violation of the plaintiff's federally protected right," so it is the "moving force" behind the violation). WPD officers (1) systemically utilized excessive lethal force and violated WPD training, and (2) were not disciplined under WPD's flawed accountability system. The City had notice that these practices would result in constitutional violations, yet it intentionally disregarded the risk. *See Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1999) (deliberate indifference lies "'when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm.'"); *Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 759 (10th Cir. 2014) (municipal "liability by inaction" if entity ignored obvious need for intervention to prevent constitutional violation). Finch's death was the tragic result. The *Monell* claims should proceed to trial.[10]

## A. A Trial is Necessary on City's Widespread Practice of Excessive Lethal Force

Wichita is responsible for its officers' "widespread" practice of using excessive deadly force. The record establishes custom, causation and state of mind. *Schneider*, 717 F.3d at 779. *First*, the City had at least 23 officer-involved shootings between 2012 and early 2018, before the Finch shooting, in which the involved officers violated the rights of civilians— because either the force was unreasonable at the moment it was used, *Larsen*, 511 F.3d at 1260, or officers recklessly precipitated the use of force, *Sevier*, 60 F.3d at 699; PSOF ¶¶ 122-124. These incidents create a dispute as to municipal "custom" under *Monell*.[11] *See Abila v. Funk*, No. CIV 14–1002, 2016 WL 9021834, at *17 (D.N.M. Dec. 14, 2016) ( "policy, practice or custom is a question of fact for the

---

[10] Even if Rapp and Jonker have qualified immunity, the *Monell* claims survive as there is a factual dispute as to whether they violated the Constitution. *See Myers v. Okl. Cty. Bd. of Cty. Comm'rs*, 151 F.3d at 1313, 1317 (10th Cir. 1998).

[11] Defendants' do not address the shooting incidents that underlie Plaintiffs' claim. Even if they had, given the record, whether the shootings constitute an unlawful pattern is for a jury to decide. *See Torres v. City of Albuquerque ex rel. Albuquerque Police Dept.*, No. Civ-12-1048, 2015 WL 13662387, at *9 (D.N.M. Apr. 22, 2015); *cf. Perea v. City of Albuquerque*, No. CIV 13-263, 2014 WL 12621250, at *8 (D.N.M. 2014) (whether City had proper notice of tortious conduct where Plaintiffs put forth evidence of instances of excessive force is "ripe for a jury to determine.").

jury") (citing cases); *see also Torres*, 2015 WL 13662387, at *4, *9 (denying summary judgment because 43 shootings by Albuquerque police resulting in 21 deaths in six-year period could show municipal practice of police violence)[12]; *Beck v. City of Pittsburgh*, 89 F.3d 966, 972-76 (3d Cir. 1996) (series of unsustained complaints against officer in five-year period, combined with other failures of police oversight, sufficient to allow a reasonable jury to find city-wide custom of condoning excessive force); *Fiacco v. City of Rensselaer, NY*, 783 F.2d 319, 326, 329-31 (2d Cir. 1986) (*Monell* claim question for jury where civilian complaints and police chief testimony suggested City was "knowingly and deliberately indifferent to the possibility that its police officers were wont to use excessive force" by failing to adequately investigate such claims); *Moore v. City of Ferguson, MO*, 213 F. Supp. 3d 1138, 1147 (E.D. Mo. 2016) (five incidents of excessive taser use before individual incident sufficient to establish pattern); *Brown v. City of Margate*, 842 F. Supp. 515, 517-18 (S.D. Fla. 1993), *aff'd*, 56 F.3d 1390 (11th Cir. 1995) (three past incidents of excessive force combined with inadequate investigation of citizen complaints sufficient to support *Monell*).

*Second*, a reasonable jury could find causation. Each of the prior shootings constituted "tortious conduct," *Barney*, 143 F.3d at 1307, in which officers engaged in patterns of behavior "closely related" to the violation of Finch's rights, *Schneider*, 717 F.3d at 770. As the administrative records of each shooting, testimony of PSB officers and WPD command staff, and Plaintiffs' expert opinion make clear, involved officers not only violated the law but also WPD policy and training in specific ways, including by: recklessly (and unlawfully) using firearms to endanger civilians (*e.g.*, ████████████████████████████████████████████); precipitously shooting at civilians (*e.g.*, ████████████████████████████████████); failing to de-escalate

---

[12] *Torres* is particularly relevant as the record included testimony from experts and city officials suggesting the City's investigatory procedures were deficient. *See Garcia v. City of Newark*, No. 08-1725, 2011 WL 689616, at *4 (D.N.J. Feb. 16, 2011) (instances of force combined with expert testimony sufficient to defeat summary judgment). This case presents even stronger evidence of liability, as Plaintiffs' expert identified patterns of misconduct in each of the prior shootings that match the misconduct at the Finch scene.

situations, particularly involving likely mental health crises (*e.g.*, ██████████████████████████████ ██████████████████████); failing to plan and communicate during a police response, leading to use of deadly use of force (*e.g.*, ██████████████████████), and failing to call in specialized units (██████████████████████████████). Yet, none of the officers faced criminal charges or punishment, which the Defendants knew. *See* III(B), *infra*.

For that reason and others, a reasonable jury could find "the practice of condoning violence was well-established," such that WPD's culture of acquiescence "was the moving force behind the Defendant Officers' actions[.]" *Torres*, 2015 WL 13662387, at *9 (causation met based on investigative documents and expert evidence showing officers were not prosecuted or disciplined for shooting civilians, which defendants knew); *see also Ortega v. City and County of Denver*, 944 F. Supp. 2d 1033, 1041 (D. Colo. 2013) ("reasonable juror could find that Denver has a custom of tacitly approving of, or at the very least of acquiescing to, a pattern of conduct within the Department whereby police officers routinely fail to report…uses of force."); *Beck*, 89 F.3d at 976 (reasonable juror could infer City "knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers."). It could similarly determine that due to the City's deliberate failure to intervene, Defendants' misconduct at the Finch scene (which mirrored the misconduct committed in the prior shootings) was predictable. That is, "if the Wichita Police Department and if the Chief of Police and Professional Standards Bureau Detectives had identified the [] patterns of deficiencies in the use of force, systemic changes could have been made that could have prevented the Finch incident from unfolding as it did." PSOF ¶ 142; *see Layton v. Bd. of Cty. Comm'rs of Okl. Cty.*, 512 Fed. App. 861, 872 (10th Cir. 2013) ( "sufficient evidence to demonstrate a 'direct causal link' between the County's (in)action and the deprivation of [plaintiff's] constitutional rights" where "prompt intervention would have prevented [plaintiff's] death") (citation omitted).

*Third*, Plaintiffs' record supports the requisite intent. *Cf. Cruz v. City of Laramie*, 239 F.3d 1183, 1191 (10th Cir. 2001) (on showing of "deliberate indifference" by municipality, existence of "material issues of fact preclude[s] summary judgment."). The City was on "notice" that its officers were engaged in a pattern of misconduct. *Barney*, 143 F.3d at 1307. Each shooting was reviewed (but not investigated, *see* III(B), *infra*) by PSB, before being signed off on by the Chief. *See Shannon v. Koehler*, 673 F. Supp. 2d 758, 802 (N.D. Iowa 2009) (deliberate indifference where chief was "clearly put on notice of the complaints due to his role in the complaint procedure."). The Chief had concerns about the adequacy of WPD's internal investigations—he attempted to engage KBI to conduct them, but the agency declined. PSOF ¶ 133. Despite knowing the accountability system was deficient, the Chief did nothing to ameliorate it, *id.*, and civilians continued to be harmed. Such deliberate disregard, at the highest command, establishes intent. *See Schneider*, 717 F.3d at 771; *Torres*, 2015 WL 13662387, at * 9 (knowledge by police department of high rate of police shootings and deaths sufficient to establish intent); *Ortega*, 944 F. Supp. 2d at 1041 (evidence that police chief and internal affairs officers were "not concerned" by failures in police reporting of misconduct sufficient to establish deliberate indifference).

**B. A Trial is Also Necessary on Plaintiffs' Municipal Failure of Accountability Claim**

A reasonable juror could also find the City liable for repeatedly failing to hold officers accountable, "encourag[ing] unconstitutional misconduct[]" that led to the violations here. *Estate of Holmes by and through Couser v. Somers*, 387 F. Supp. 3d 1233, 1263 (D. Kan. 2019) (upholding failure to discipline claim based on prior excessive force complaints); *Cardova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("A failure to investigate or reprimand might also cause a future violation by sending a message to officers that such behavior is tolerated."). Had WPD used "proper investigative and police disciplining procedures," officers, including Defendants, "would not have pursued a settled practice of applying excessive force[.]" *Beck*, 89 F.3d at 972; PSOF ¶ 142.

Defendants dispute Plaintiffs' showing of causation, arguing WPD performs both a criminal and administrative investigation of each officer-involved shooting. Def. Mem. at 28. But the record shows WPD's system of oversight lacks any "teeth," and "the mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens." *Beck*, 89 F.3d at 974.

On the policy side, PSB fails to conduct independent administrative investigations of officer-involved shootings. As a matter of custom, PSB does not: interview involved officers and witnesses to shootings; resolve discrepancies in evidence, including competing witness statements; analyze whether all officers complied with relevant WPD policies, particularly non-use-of-force policies; or examine whether officer conduct increased the likelihood that deadly force would be used. PSOF ¶¶ 122-124, 127-128, 130, 132. Instead, PSB determinations rely on the findings of the criminal investigation previously conducted by WPD detectives. *Id.*, ¶ 127. But those criminal investigations never address policy violations. *Id.*, ¶ 125. Accordingly, PSB rarely identifies officer deviations from policy. *Id.*, ¶¶ 123-124, 136. PSB officers are also prohibited from making recommendations on policy changes or officer discipline stemming from their reviews. *Id*, ¶ 132. In the rare instance where a PSB investigator submitted an "area of concern" in a shooting, it was not tracked, recorded or pursued by WPD command staff. *Id*, ¶¶ 123(3), 132.

On the criminal side, the homicide investigations on which PSB "reviews" rely are themselves deeply flawed. Detectives conduct biased interviews with involved officers, employing leading questions designed to clear officers of misconduct. *Id*, ¶ 131. And these investigations never result in charges. *Id.*, ¶¶ 136, 138. DA Bennett has never pursued a criminal case against an officer before the Finch shooting, *id.*, ¶ 136, despite the many WPD shootings over the past five years that violated the law, *see* III(A), *supra*. PSB officers do not assess whether criminal investigators comply with WPD investigative policy, *id*, ¶ 128, insulating such investigations from evaluation.

Contrary to Defendants' assertion (Def. Mem. at 28), no outside law enforcement agency, including KBI, has any substantive role in investigating WPD. PSOF ¶ 126. The Chief has full control over WPD shooting investigations, so the whitewashing of officer misconduct occurs at his direction. Despite WPD's persistent pattern of violence, he does not analyze the sufficiency of PSB reviews, mandate that PSB officers actually investigate the underlying incident, or ensure that PSB list, analyze, and report on all policies implicated in a case. *Id.*, ¶¶ 129-130, 135-137. Under his authority, administrative oversight culminates in a backroom meeting, to which no PSB officer is privy. *Id.*, ¶ 132. In these meetings, the Chief and staff "sign off" on PSB reports, without real review. *Id.*, ¶¶ 123-124, 136.[13] No policy guides the command channel process. *Id.*, ¶ 132. No paperwork details the command channel review or tracks PSB outcomes. *Id. Cf. Parrish v. Luckie*, 963 F.2d 201, 205 (8th Cir. 1992) (municipal liability where chief "did not review use-of-force files that were not forwarded to him and his Department kept no log on the history of force used by particular officers."). Because of this broken apparatus, officers are never held accountable for excessive deadly force.[14] PSOF ¶¶ 136, 138, 142.

The Finch shooting emblemizes WPD's faulty system of accountability. PSB did not independently investigate the case. PSOF ¶ 120. Despite Jonker's myriad policy violations, *see* II(C), PSB did not assess his conduct. *Id*. To ensure Rapp's exoneration, PSB adopted a rationale for the shooting that contradicted the one Rapp himself provided. *Id*. In any event, the outcome of the case was predetermined, labeled a "justifiable" homicide by WPD before the criminal investigation was completed, or the DA had announced his findings. *Id*. While the defense dismisses the relevance of the Finch investigation (Def. Mem. at 29, "an investigation that occurs after the

---

[13] Defendants cite to DeFoe's testimony on the command review, Def. Mem. at 28, is misleading. DeFoe criticized WPD for its lack of officer discipline. Resp. DSOF ¶ 97.
[14] Defendants claim that certain officers in shooting cases have been disciplined. Def. Mem. at 28. That discipline was so minor as to be virtually meaningless. Resp. DSOF ¶ 98.

shooting, cannot cause the shooting"), that contention misses the mark. Plaintiffs' claim derives from the incidents before Finch's death, but how WPD handled the Finch case sheds light on the accountability system writ large. *Cordova*, 569 F.3d at 1194 ("A subsequent cover-up might provide circumstantial evidence that the city viewed the policy as a policy in name only and routinely encouraged contrary behavior."); *see also Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed….").

The defense also wrongly asserts that a "pattern" of misconduct for *Monell* purposes must be unconstitutional. Def. Mem. at 28. Not so. Municipal claims regularly arise out of practices that are not themselves unlawful, for instance, in the context of failure to train or supervise, where the policy causes the violation of constitutional rights. *See Schneider*, 717 F.3d at 770.

The record also suggests officers "were aware of" the deficiencies in force investigations. Def. Mem. at 29. Rapp and Jonker knew officers engaged in excessive shootings; that those officers were subject to "investigations"; and they remained "on the job" with no status change. PSOF ¶¶ 139-141; *see Cardova*, 569 F.3d at 1194; *Parrish*, 963 F.2d at 205 ("overwhelming evidence to support the jury's finding that…police officers operated in a system where reports of physical or sexual assaults by officers were discouraged, ignored, or covered up…. officers operating under this system recognized they could act with impunity….") (citing *Brandon v. Holt*, 469 U.S. 467 (1985)). The culture of impunity is strengthened by the DA's refusal to charge officers for homicides. *Id*., ¶ 138. Contrary to Defendants' claims (Def. Mem. at 29), officers faced no risk of prosecution.

In all, the facts establish a triable *Monell* claim, bolstered by the numerous decisions of courts upholding similar claims. *See Torres*, 2015 WL 13662387, at *9; *Ortega*, 944 F. Supp. 2d at 1041; *Beck*, 89 F.3d at 974 ("Protection of citizens' rights and liberties depends upon the substance of the [City's] investigatory procedures. Whether those procedures had substance was for the jury's consideration."); *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) ("Evidence that a police

department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force….") (citing *Vann v. City of New York*, 72 F.3d 1040, 1050 (2d Cir. 1995); *Adams v. City of Atlantic City*, 294 F. Supp. 3d 283, 300-304 (D.N.J. 2018) (denying summary judgment based on city's failure to investigate and discipline officers accused of excessive force in making arrests); *Price v. Sery*, 513 F.3d 962, 971-73 (9th Cir. 2008) (fact issues existed as to whether city had custom of excessive lethal force based on failure to discipline); *Noble v. City of Camden*, 112 F. Supp. 3d 208, 222-23 (D.N.J. 2015) (sufficient *Monell* evidence based on backlog of police complaints that "were flawed and poorly investigated, as demonstrated in part by the low number of disciplinary actions."); *Day v. Jackson Twp.*, No. 10-4011, 2013 WL 394151, at *11 (D.N.J. Jan. 30, 2013) (denying summary judgment where record showed that in five year period, police department investigated fifteen excessive force complaints, and none resulted in disciplinary action, so that department's "lackadaisical internal affairs investigations related to excessive force, may have led to [Day's] injuries at the hands of the Officer Defendants.").

## **CONCLUSION**

Plaintiffs respectfully request the Court deny Defendants' motion in its entirety.

Respectfully submitted,

/s /Rick E. Bailey
Rick E. Bailey, KS # 11583
200 W. Douglas, Ste. 300
Wichita, Kansas 67202
(316) 264-3300

Andrew M. Stroth (Pro Hac Vice)
Carlton Odim (Pro Hac Vice)
Action Injury Law Group, LLC
191 North Wacker Drive, Ste 2300
Chicago, IL 60606
(312) 771-2444

Alexa Van Brunt (Pro Hac Vice)
Sheila A. Bedi (Pro Hac Vice)
MacArthur Justice Center
Northwestern Pritzker School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-1336
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on January 14, 2020, a true and correct copy of the above **Plaintiffs' Response to Defendants' Motion for Summary Judgment** and exhibits were filed with the Clerk of the District Court by using the CM/ECF system which will send a notice of electronic filing to counsel for Defendant City of Wichita at:

/s /Rick E. Bailey