# EXHIBIT 1

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

SCOTT A. DEFOE									June 24, 2019

```
                                                              Page 1
 1        IN THE DISTRICT COURT OF THE UNITED STATES
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   LISA G. FINCH,                 )
     Individually, as               )
 4   Co-Administrator, of the       )
     Estate of ANDREW THOMAS        )
 5   FINCH, deceased, ADELINA       )
     FINCH, DOMINICA C. FINCH,      )
 6   as Co-Administrator of the     )
     Estate of ANDREW THOMAS        )
 7   FINCH, Deceased; and ALI       )
     ABDELHADI,                     )
 8                                  )
                    Plaintiffs,     )
 9                                  )
               -vs-                 ) No. 18-CV-01018
10                                  ) JWB-KGS
     CITY OF WICHITA, KANSAS;       )
11   WICHITA POLICE OFFICER         )
     JUSTIN RAPP; SGT. BENJAMIN     )
12   JONKER; JOHN DOE POLICE        )
     OFFICERS 1-8,                  )
13                                  )
                    Defendants.     )
14

15          Deposition of SCOTT A. DeFOE, taken before

16   NANCY DECOLA EATINGER, C.S.R., and Notary Public,

17   pursuant to the Federal Rules of Civil Procedure for

18   the United States Courts pertaining to the taking of

19   depositions for the purpose of discovery, at Suite

20   2300, 191 North Wacker Drive, Chicago, Illinois,

21   commencing at 9:00 o'clock a.m., taken on

22   June 24, 2019.

23

24

25
```

Page 22

 1  with SWAT.
 2          But SWAT is always subservient to the
 3  incident commander on a number of things. They won't
 4  dictate how you tactically perform or what you put in
 5  place, but other than just giving you the approval
 6  maybe to deploy a chemical agent, whatever it may be,
 7  so they're kind of the sounding board or the
 8  approving authority for some of the things that you
 9  do to follow up.
10     Q   So if I'm following you then, the incident
11  commander is a situation that modifies, it's
12  essentially the initial officer on the scene, and
13  then if he's not the ranking officer, then as
14  officers with more rank arrive, they become and take
15  over as incident commander?
16     A   That's correct. And they may not. If the
17  officer is doing a good job or the detective, he may
18  maintain his position unless it's beyond his
19  capabilities where you're dealing with incident
20  command systems that are being put in place. Now you
21  want someone at the command level to make some of
22  these decisions because you're dealing with
23  deployment, time, overtime, resources, so beyond the
24  typical pay grade of a detective or a sergeant.
25     Q   Now, at LAPD, after the initial alert is

Page 23

 1  given but there's not an actual call out, who makes
 2  the decision then whether to actually call SWAT to
 3  the scene?
 4     A   It could be anyone. It could be the first
 5  responder knowing that. Once again, that's why in
 6  SWAT, I was one of the training sergeants that would
 7  train all sergeants on a monthly basis. This is what
 8  our criteria is.
 9          We've got a structure, you've got someone
10  who is armed, presumed to be armed, position of
11  advantage. That's something that SWAT is going to
12  handle based on our criteria.
13          So sergeants are pretty good at knowing what
14  will meet our criteria. The first thing we're going
15  to ask typically is have you contained the location
16  and have you tried to call that person out. That's
17  typically the criteria --
18     Q   Okay.
19     A   -- while we're responding because, you know,
20  plenty of times I'm -- I would be in route to a call,
21  and the question would be to the sergeant at the
22  scene have you tried to call him or her out of the
23  residence. No, stand by. He's coming out, he's in
24  custody. Then we cancel the SWAT call-up.
25          So typically it's the refusal to submit to

Page 24

 1  arrest is kind of the catchall for the SWAT call-up
 2  unless there's no contact at all. They maybe
 3  bullhorned it, used a PA, person didn't come out, and
 4  we'll assume that's a refusal because of the
 5  non-compliance.
 6     Q   So the incident commander on the scene
 7  initially is going to set up a perimeter to contain
 8  the situation?
 9     A   We're taught that you're -- other than if
10  it's something where you need to direct a contact
11  team, like an active shooter where there's an
12  immediate defensive life situation, you want to
13  contain that person to establish some type of in or
14  an out of containment if resources allow, as
15  resources come up, but in a case where you may have
16  someone who is barricaded in the house, potentially
17  armed, you're going to want to establish containment,
18  but you're more importantly going to want to
19  establish we call it Emergency Assault Team, and
20  that's really if the behavior continues with the
21  shots fired that you're going to need to make entry
22  into that structure to stop the behavior if you hear
23  shots being fired, and that's kind of what the theory
24  is, you know, post Columbine. We're not going to sit
25  and wait for SWAT, if there's an active shooter

Page 25

 1  situation, we're going to need to take some proactive
 2  response to that.
 3     Q   So if the incident commander arrives and
 4  hears shots, there's active shooting going on or
 5  appears to be, then they would attempt immediate
 6  entry?
 7     A   Unless it's a lone gunman. Then you've got
 8  somebody who maybe just fired off rounds in the house
 9  or is maybe suicidal, but if you have either declared
10  hostages or you have undeclared hostages where you
11  don't know if there's someone else in the house,
12  typically we're not going to wait until people get
13  there from everywhere, we're going to take some type
14  of proactive action.
15     Q   And if you arrive and that's not occurring,
16  that's a static situation without active shooting,
17  you set up a perimeter and start to develop a contact
18  team in the event that it is necessary to go in
19  because shooting starts?
20     A   That's exactly right.
21     Q   And the incident commander will be assessing
22  those situations, and then if it remains static
23  generally would attempt to contact the suspect
24  inside?
25     A   Sure. Once it's contained, they'll either

Page 30

 1  command post is where you can effectively manage the
 2  incident but not within line of sight from where the
 3  structure would be or structures.  That's typically
 4  the proximity, so a couple blocks away is the typical
 5  distance to a command post.
 6      Q   And once at that location what happens?  You
 7  said you might change clothes.  Has that happened
 8  there or somewhere else?
 9      A   It depends.  I mean, depending on the nature
10  of the call, if it's an active shooter, I may throw
11  on a tac vest, a helmet, grab a rifle and then go
12  down range regardless of what I'm wearing.  It could
13  be shorts, it could be fatigues, whatever the uniform
14  of the day is.
15          But it just depends on the circumstances.  I
16  mean, if it's contained we're going to slow things
17  down, and then we're going to get dressed
18  appropriately, and then we're going to go ahead and
19  assume the containment of the location from those
20  officers.
21          We're going to obviously automatically have
22  an Emergency Assault Team get down range, put eyes on
23  what would be the best breach point, the easiest way
24  to get into that structure, which obviously with
25  explosive breach capabilities and manual breach

Page 31

 1  capabilities to be able to enter that area and
 2  possibly multiple areas depending on the venue.
 3          And then slowly we will remove the patrol
 4  from containment and augment that with SWAT personnel
 5  as they arrive as well as equipment.
 6          So we'll have officers pick up the heavy
 7  vehicles.  As a sergeant I'll direct people to do
 8  that.  Typically that's already scripted out for the
 9  day, so if I know -- I wouldn't be doing it, but if
10  an officer had to pick up the BEAR, they know there's
11  a SWAT call-up, no one is wondering who is picking up
12  the ballistic vehicles, Officer Smith is going to get
13  that vehicle.
14          And you also know what your assignment is
15  going to be.  I got to know who the snipers will be
16  on that team, who your Emergency Assault Team is
17  going to be, who your negotiators are going to be.
18  As I mentioned, they're inclusive as part of the SWAT
19  team.  That's kind of already scripted out so we know
20  our roles.
21          That will probably change, but at least on
22  the initial part we know where we're going.
23      Q   And if it is a static situation, no active
24  gunshots being fired, once you're at the rallying
25  point, do you wait until the entire SWAT team is

Page 32

 1  assembled before actually replacing the regular
 2  street patrol officers that have established the
 3  initial perimeter?
 4      A   As a supervisor, I'm going to want to -- if
 5  it's a barricaded subject with -- that you may have
 6  hostages involved, I'm going to get a team, an
 7  Emergency Assault Team, a supervisor plus a minimum
 8  of four to five officers down range right away to get
 9  eyes on -- and part of that is for the intelligence
10  component to be able to know what I'm looking at at
11  the time.
12          And then as officers arrive, we don't wait
13  for everyone to show up.  As they'll arrive, the
14  tactic supervisor, which I may be, and the SWAT -- at
15  LAPD SWAT, you have a tactic supervisor who is in
16  charge of the overall tactical plan.
17          You have an emergency assault supervisor who
18  will be with the Emergency Assault Team in the event
19  there's a breach to go into the residence.
20          Then you have a negotiation supervisor who
21  will deal with the intelligence gathering, working
22  with detectives, seeing if we're going to try to get
23  negotiation component up, and then you have the SWAT
24  lieutenant who is kind of the intermediary between
25  you and the incident commander.  That's typically how

Page 33

 1  the process works.
 2      Q   And typically as a part of the SWAT
 3  establishing a perimeter once it took over, would it
 4  have a long cover with a rifle?
 5      A   Sure.  If you can get high-ground capability
 6  at any point, that's always recommended you do that
 7  for the intelligence gathering first and foremost and
 8  obviously with the -- you know, you want that
 9  long-range capability, .223 round, .308 round,
10  whatever something is going to be able to -- someone
11  is going to be able to get eyes into a structure by
12  use of a weapon system that will have a sighting
13  system on it, a Neotec ACOG, something like that
14  where you can see into that structure.
15      Q   Explain that a little more.  You said see
16  into that structure?
17      A   Well, sure.  The sniper component, the number
18  one thing a sniper does is provide intelligence to
19  the tactic supervisor, and they do that typically
20  hopefully from an elevated position if you can get
21  that, and you're doing that to try to get -- if you
22  see movement inside the residence, what are you
23  seeing, and so they're a kind of good set of eyes to
24  try to get as much intel as they can from their best
25  position.

Page 34

So typically you're going to want a sniper component to cover all four sides of the residence if possible depending on where the openings are.

Q   So you typically have more than one sniper?

A   Sure.  It'll depend on, for instance, if you look at a residence and side one is one, two is on the left side, three to the rear, and on the right side of the house is side four, is the typical numbering system.

If you don't have windows on either side two and three, there's no reason to have a sniper component, but typically front and back of the house, and then if you can get someone in position safely that can see on the side of the house if there are openings, that would be important.  That's what the optimal is.

Q   But when you were saying see inside the house, you weren't talking about some type of infrared heat detection or some other device, you're just talking about what you could see through windows, for example?

A   Yeah, through windows, just movement from an elevated position.

Q   Okay.  I wasn't familiar with some of the terms you used.

Page 35

That was not some kind of equipment that allows visual or other views of what's going on inside the house other than windows?

A   That equipment exists, but for the primary typical SWAT barricaded subject incident, you're looking at getting eyes, and that eyes could be through an optic, it could be through the system on the rifle whatever rifle you're deploying at the time, so it just depends.  It might be my eyes just looking through a window.

Q   You mentioned a .233 rifle.

That's the same type of rifle that Officer Rapp had?

A   Yeah, an M4, .223 is the round capability. It's the same, it's the same.

Q   So if I'm following you, best-case scenario in LA with a full-time SWAT would be 20 to 30 minutes for SWAT to arrive from the time called out?

A   I think that's a good general -- I think that's generally what the optimal is by the time you get everyone there to be able to start changing out positions.

Hopefully sooner, but typically with traffic it could be longer than that if it's off hours, of course by the time you get the call, get the car and

Page 36

then drive to wherever that may be.

Q   Okay.  In this Finch situation, officers are dispatched to a call that is reported to be a man has shot his father and is holding his mother and brother hostage at gunpoint.

A   Yes.

Q   You would agree that presents a situation of significant danger to the occupants of the house and to the police officers when they respond?

A   I do.

Q   Sergeant Jonker, do you know how long it was after he arrived before the shot was fired?

A   Probably about five minutes.  My understanding based on my review that officers arrived at around 18:23 hours, and the shots were fired at 18:28 hours.  I don't know -- so sometime between 18:23 and 18:28.

Q   18:23 was the first officer, it's not necessarily Officer Jonker?

A   That's correct.

Q   Did you review Officer Jonker's Axon video?

A   I did.

Q   If you watch it, I think it shows that the shot occurs a minute and 55 seconds after the video starts?

Page 37

A   Okay.

Q   Do you recall anything that would be inconsistent with that?

A   I think that I believe it was Powell stated that he was standing around for about one to two minutes before being deployed upon getting there, so that seems about right by the time they worked their way over to the north side of the street.

Q   And Powell and Rapp arrived before Jonker?

A   That's correct.

Q   And if you watch Powell's video, you can see when Jonker first arrives or when he first appears in the video, and he asks for Rapp to go with him across the street because he has a rifle?

A   That's correct.

Q   That was an appropriate decision?

A   I don't believe it was appropriate for Jonker to go across the street.  I believe it was appropriate for him to deploy Rapp across the street with the rifle.

Q   Why would it not be appropriate for Jonker to go across the street?

A   Because he's the only supervisor at the scene at the time, and my concern is not going to be as a sergeant to be on a containment position, nor am I

Page 66

1  investigations to see if they were boilerplate
2  language to see if a particular sergeant investigated
3  a certain way, and so we would pull all the use of
4  force investigations, for instance, from a respective
5  division, look for anomalies, look for boilerplate
6  language to make sure that the investigation was done
7  appropriately and thoroughly, and that was for both
8  use of force and Internal Affairs investigations.
9       Q   Maybe I'm confused.
10          So you were looking at officers who were
11 believed to have committed criminal conduct off duty?
12      A   No, this is on-duty behavior, and what we did
13 as part of the Corruption Task Force is we not only
14 looked at the rampart area, but we looked at all of
15 the other divisions throughout the City in making
16 sure that, you know, use of force is being reported
17 appropriately, that this type of what they considered
18 was possible wide-spread corruption through the
19 department, but after the result of the
20 investigation, which I helped write the document, was
21 that it was localized.
22          There was some missteps along the way, but
23 nothing that would be considered corruption, and that
24 corruption was germane only to Rampart Division.
25      Q   But none of those involved officer-involved

Page 67

1  shootings?
2       A   No.  That was not within our scope.  That's
3  robbery, Homicide Division, Force Investigation
4  Division and obviously at the time Internal Affairs.
5  They run through investigations concurrently.
6       Q   So you've never investigated an officer's use
7  of lethal force?
8       A   That is correct.
9       Q   And your time in PSB or IA was temporary on
10 loan if I'm following you?
11      A   It was temporary on loan, and after that I
12 was, right after my loan I was promoted to a vice
13 sergeant, so I left my six-month loan.  I was offered
14 a full-time position there, but I opted to go work a
15 vice position instead.
16      Q   How many officers in the LAPD?
17      A   At the time when I was there, at the time I
18 left, probably about 9300.  I think there were
19 several hundred, I think about 300 or so sergeants
20 and detectives in Internal Affairs, 3 to 400.
21      Q   After Officer Rapp and Sergeant Jonker had
22 arrived while they were still at the back of the
23 Breakfast Club next door to 1033 West McCormick.
24 Officers observed a figure, a silhouette in a window
25 going up and down that was perceived perhaps to be

Page 68

1  somebody giving CPR.  Do you recall that?
2       A   Officer Rapp testified to that.
3       Q   I'm sorry, officer who?
4       A   Rapp testified to that, excuse me.
5       Q   Would that information be consistent with
6  there having been an injury inside the house?
7       A   Possibly.
8       Q   Consistent with possibly a shooting inside
9  the house?
10      A   Possibly.
11      Q   Are you asserting that Officer -- Sergeant
12 Jonker violated WPD Policy 602 in any way?
13      A   What's the policy?
14      Q   That's the barricaded suspect policy?
15          (Whereupon, Exhibit 64 was previously marked
16           for identification.)
17      MR. PIGG:  Q   I'll show you what's previously
18 marked as Exhibit 64, Policy 602.
19      A   Yes, got it.  Yes under D, 602.02, Subsection
20 D.
21      Q   You're contending that he violated 602.02
22 Capital D to assess the need to respond?
23      A   Yes.  He testified that it wasn't his
24 responsibility to do that.
25      Q   Any other aspects of 602 that you contend

Page 69

1  were violated by Sergeant Jonker?
2       A   Well, I don't believe he stabilized the
3  situation by isolating based on my review of all the
4  facts in this case, that he never other than
5  deploying Officer Rapp on the north side, he didn't
6  give anyone any direction as to what they were going
7  to do there, so part of that was responsible to
8  stabilize the situation by isolating and containing
9  the suspect.
10          There was no direction or supervision or
11 oversight commanding control at the time based on the
12 testimony I've read in this case.
13      Q   You can see from Sergeant Jonker's video that
14 it is visibly apparent that officers are situated on
15 the east side of the porch?
16      A   Yes.
17      Q   And he had just walked by officers that were
18 on the west side of the porch, correct?
19      A   Yes.
20      Q   And he had knowledge that there were officers
21 in the back including an officer with a rifle?
22      A   One, yes.
23      Q   So that would cover all sides of the
24 residence, correct?
25      A   It would, yes.

SCOTT A. DEFOE                                                                                   June 24, 2019

Page 70
1  Q  And your complaint is that he hadn't gathered
2  those people together to give them instructions on
3  what to do?
4  A  I'm not complaining about anything.  My
5  criticism would be that he did not manage, supervise
6  or control the event based on the officers' testimony
7  that none of them heard any direction regarding the
8  less lethal force options, regarding cover and
9  control, regarding contact officers, regarding
10 emergency assault, regarding potential, you know,
11 what are we going to do if someone appears, if we
12 hear gunshots being fired.  None of that was put out
13 over the radio.
14        No one needs to be huddled, no one needs to
15 be taken off of their containment positions, but
16 putting forth a plan by obtaining a tactical
17 frequency and letting the officers know if we hear
18 gunshots, this is the team designated to go in, this
19 is the direction they're going to go, this is how
20 we're going to try to get in the location, do we even
21 have breach tools to be able to get into the
22 location, that being a hook, a Ram, that being is
23 there a need for some other type of breaching, a tool
24 or mechanism to be able to get entrance into the
25 structure, are we going to simultaneously breach two

Page 71
1  openings in case we're defeated at one of the
2  openings, how are we going to gain access into the
3  residence.
4        None of that was put out as a sergeant,
5  which would be typical and consistent with what he
6  should have done at the time in my opinion.
7        He just basically saw people in positions
8  and assumed they knew what to do, and as supervisor,
9  you don't make those assumptions, you provide
10 direction to those people.
11       And even he stated in his deposition, once
12 you get to the north side position, he doesn't recall
13 issuing any commands to any officers at the scene.
14       He also stated that he did not tell Officer
15 Rapp what to do if someone came to the porch prior to
16 the shooting and did not tell officers what to do.
17       So based on his own testimony, he didn't
18 give any direction at all to the people who were
19 present.
20  Q  Any other instructions you criticize Sergeant
21 Jonker for not giving prior, in the two minutes prior
22 to Mr. Finch coming to the door?
23  A  There was no command and control by Sergeant
24 Jonker.  I think the situation could have ended much
25 differently had he done what he was paid to do and

Page 72
1  taken a command responsibility and put these officers
2  in a position where they could have been successful
3  and deployed the necessary less lethal force
4  considerations letting people know who is going to
5  cover, who is going to contact, ensuring that
6  officers don't issue simultaneous commands.
7        There's a number of things that he should
8  have done based on his own testimony and the
9  officers' testimony.  He didn't do any of that the
10 entire time other than take himself out of the
11 equation by putting himself on the north side of the
12 property and then taking out his pistol and issuing
13 verbal commands to someone, which is not his role as
14 the only supervisor present at the scene.
15  Q  You complained -- excuse me, you don't like
16 that.  You criticized Sergeant Jonker for not giving
17 commands on what to do if they needed to breach the
18 house.
19       It never came to pass that they needed to
20 breach the house, did it?
21  A  There was no plans at all.  And according to
22 every officer that testified in this case, they did
23 not receive any information from Sergeant Jonker as
24 to what the plans were going to be because if the
25 officers would have ran into the residence and God

Page 73
1  forbid one of the officers would have been killed, I
2  would hope that the investigation and oversight would
3  look at the fact who formulated the plan for the
4  officers to make entry, and the response in this case
5  would be no one.  Why not?  Officers just responded
6  from different agencies and responded and made entry
7  into a residence, and someone would have been -- an
8  officer would have been killed or injured, I would
9  hope in the review process if it was done correctly
10 that they would find that there was a lack of command
11 and control at this situation.
12 MR. PIGG:  Move to strike the response as
13 completely non-responsive.
14       Read back the question, please.
15 MR. ODIM:  I'll object to that.  It's completely
16 responsive.
17       (Record read.)
18 THE WITNESS:  As I mentioned, there was no
19 information provided to any of the officers at scene
20 regarding potentially breaching the residence, what
21 to do if shots are fired.
22       That's the first thing that should have been
23 put out over the air once you've establish your
24 Emergency Assault Team, and that's what we're going
25 to do in the event we hear shots fired, where are we

SCOTT A. DEFOE                                                              June 24, 2019

Page 74
1  going to make entry from because what you don't want
2  to happen is if shots are fired and now an officer on
3  rear containment decides he's going to make entry, an
4  officer in the front containment decides they're
5  going to make entry.  Now you've got a blue-on-blue
6  situation, which has happened unfortunately many
7  times in law enforcement in this country where you
8  have officers shooting one another.
9       That's why we specifically say if there are
10 shots fired we're going to make entry, we'll breach
11 through side one, opening one, whatever the opening
12 may have been, or we're going to make entry.  These
13 are the officers, everyone else hold your position,
14 is what should have went out initially while he's
15 setting containment once that Emergency Assault Team,
16 which would have been the officers that were
17 positioned east of the door, would have been
18 responsible for.
19     MR. PIGG:  Move to strike the answer as
20 completely non-responsive.
21          Read back the question, please.
22     MR. ODIM:  I object.  The answer is completely
23 responsive.
24          (Record read.)
25     THE WITNESS:  I don't understand that question.

Page 75
1    MR. PIGG:  Q   What do you not understand about
2  that question?
3    A   Never came to pass, no.  The answer is no,
4  they didn't breach the house because Mr. Finch came
5  out of the house and was subsequently shot on the
6  porch, so no, they didn't breach and go in until
7  obviously after to clear the occupants out of the
8  house, but there was never a breach into the
9  residence because Mr. Finch came out on the porch, if
10 that's what the question was.
11   Q   Well, there was never a shot, an active shot
12 heard while the officers were there that created a
13 need for them to breach the house?
14   A   Sir, respectively, the plan comes long before
15 the shot occurs.  The plan comes --
16   Q   That wasn't my question.
17   A   Well, that's what my response was.  The plan
18 comes before the shots are fired.  Putting out the
19 plan in the event the shot is fired is that's how the
20 team will know to respond based on the plan.  We
21 don't wait for the shot to be fired, then formulate
22 the plan.
23     MR. PIGG:  Again, move to strike as
24 non-responsive.
25     MR. ODIM:  Again, you're trying to put words in

Page 76
1  his mouth, and you don't accept what he -- what his
2  response is.  It is completely responsive, so I
3  object to striking it.
4      MR. PIGG:  Read back that last question one time,
5  please.
6            (From the record above, the reporter read
7             the following:
8             "Q   Well, there was never a shot, an
9             active shot heard while the officers were
10            there that created a need for them to
11            breach the house?"
12     THE WITNESS:  Correct, they never breached the
13 house.
14     MR. PIGG:  Q   And until after the shot of
15 Mr. Finch, there was no need to breach the house?
16   A   Yeah, not until after, that is correct.
17   Q   And in fact, to breach the house prior to
18 then would have been countered to good practice
19 because you don't want to create a situation, you
20 want to stabilize it and keep the status quo?
21   A   Unless you knew at the time that you had
22 people that are in peril, then even without shots
23 being fired, if you had information that someone was
24 dying inside or was injured or even without shots
25 fired, the decision may be at that time to make entry

Page 77
1  to -- you know, as a contact team to rescue people or
2  stop behavior inside the residence.
3    Q   And if officers were present under the
4  perception that hostages had been held at gunpoint
5  and are still in the residence and an individual has
6  already been murdered by the suspect and a person
7  comes to the door that is perceived to be the
8  suspect, you wouldn't let that person back in the
9  house with the hostages, would you?
10   A   Try not to, no.
11   Q   Because that would create an imminent risk of
12 injury and death to those hostages?
13   A   Possibly if you reasonably believe that that
14 is the person that is your suspect.  If you believe
15 it's the brother of the person being held or a
16 potential hostage themselves, then yes, you would
17 not, but if you reasonably believe that's the
18 suspect, you do not want to allow that suspect back
19 into the residence.
20   Q   And an officer who observed a male come to
21 the porch and then try to go back in the house, you
22 wouldn't perceive -- that officer would reasonably
23 perceive that individual to be the suspect and not
24 the hostage?
25   A   I don't know.  It just depends on the

Page 78
1  officer, but you would hope that if the hostage would
2  -- once again, it all goes back to commands, ability
3  to respond to commands, reasonable amount of time to
4  comply, best information at the time, so it's
5  depending on the totality of the circumstances.
6      Q    We're talking about a reasonable officer, a
7  reasonable officer that perceives a person that is
8  consistent with the description of the suspect, who
9  comes to the porch, disregards commands and then is
10 reentering the house, a reasonable officer would not
11 perceive that individual to be the hostage?
12     A    Well, I don't know if there was a suspect
13 description put out in this case.
14     Q    A male?
15     A    Right, but there's also a male being held
16 hostage as well.  There's also the concern that is
17 this a legitimate call.  There's also a concern that
18 -- there's a number of other things that would come
19 into play that you don't -- could not with a hundred
20 percent certainty know if a person comes out and it's
21 a male that it's your suspect.
22          It could be the neighbor, it could be --
23 once again, it could be a location where there's not
24 actually been a crime that occurred like in this
25 case, it could be the brother who is being allegedly

Page 79
1  held hostage.  It could be a number of people that
2  could have came to that door, and you need to
3  consider that if someone does come to the door at
4  that time.
5      Q    And my question was if the individual who
6  comes to the door who matches the description even
7  though it's a limited description that he's a male
8  and that individual disregards police orders and
9  tries to go back in the house, a reasonable officer
10 would not perceive that individual to be a hostage?
11     A    Possibly, yes.
12     Q    And on the other side, a reasonable officer
13 would consider that individual to be the suspect?
14     A    Possibly.
15     Q    And you've reviewed the transcripts of the
16 interviews of all of the officers that were there,
17 and they all perceived this individual, Mr. Finch, to
18 be the suspect, isn't that correct?
19     A    That's what they testified to, yes.
20     Q    And you understand that in Wichita there is
21 not a full-time, always-on-duty SWAT team?
22     A    I'm aware of that, yes.
23     Q    And do you have anything to disagree with the
24 testimony that it would take a minimum of 45 minutes
25 for a SWAT to deploy to the location after being

Page 80
1  called out?
2      A    I do not.
3      Q    Sergeant Jonker testified that he was
4  assessing the situation to report to the watch
5  commander who ultimately would make a decision
6  whether SWAT would be called out.  Do you recall
7  that?
8      A    Yes.
9      Q    And as I understand it, that's consistent
10 with the LAPD practice as well, the incident
11 commander would assess the situation after he's there
12 and then report to the watch commander who would make
13 the decision whether to call SWAT?
14     A    That's consistent on most occasions, yes.
15     Q    From your review of the video about 12 times,
16 what did you see Mr. Finch do?
17     A    He appeared to be -- after he came out of the
18 residence?
19     Q    Yes.
20     A    He appeared to be complying with the
21 officers' commands by putting his hands up.  He
22 appeared -- once again, it's hard to make a
23 perception based on video what he was feeling.
24 Obviously I can't do that.
25     Q    I'm just asking for what you saw on the

Page 81
1  video.
2      A    Okay.  That he put his hands up.  His hands
3  came down a little bit, and then the -- shortly after
4  that the shot occurred.
5      Q    Did you see the movement of the shoulder dip?
6      A    No, I didn't.
7      Q    Did you see the hand, the right hand go out
8  of view?
9      A    I don't recall.
10     Q    Did you see the arm come back up?
11     A    I just saw some slight movement at the front
12 of his torso, is all I saw.
13     Q    Slight movement of his arms, arm or arms in
14 front of his torso?
15     A    Right, his arms.
16     Q    Did you see his change of where he was
17 looking to look to the officers to the east?
18     A    No, I didn't notice that.
19     Q    Do you agree that if a suspect had a gun and
20 raised it toward officers to the east, that would
21 present an imminent threat of serious injury or death
22 to those officers?
23     A    Yes.
24     Q    And that would justify the use of lethal
25 force?

Page 118

1  someone has raised a gun toward another officer to
2  have a discussion about it?
3     A   If the perception is real and it's
4  objectively reasonable, then no, I expect them to
5  take proper action to stop that imminent threat, but
6  I don't believe it applies to the facts in this case.
7     Q   Overreaction is excessive force is another
8  bullet point.
9         That's because he made the decision to shoot
10 rather than not shoot?
11    A   Yes.
12    Q   Anything else?
13    A   No, sir.
14    Q   The bottom paragraph you have, the
15 ratification of use of deadly force and Officer
16 Justin Rapp's conduct prior to use of deadly force in
17 this manner can be seen as endorsing and perpetuating
18 inadequate training and failure to enforce written
19 policies, et cetera.
20        First, what conduct of Officer Rapp prior to
21 the use of deadly force are you referencing?
22    A   Ultimately just -- well, the prior would be
23 up to and including the use of deadly force.  There's
24 nothing that he did -- I don't think there's anything
25 that Officer Rapp did prior to the use of lethal

Page 119

1  force that was inappropriate other than -- I thought
2  him taking that position was appropriate on the north
3  side, I think being directed by the supervisor there
4  was an appropriate tactic to get into that position,
5  so ultimately my opinion is just at the time of the
6  use of force but not prior to.
7         The prior to deals with my opinions, and I
8  should have clarified that better in my report, as it
9  relates to Sergeant Jonker's actions.
10    Q   So if I'm following you, your only criticism
11 of Officer Rapp is his perception of the need to pull
12 the trigger?
13    A   I'm not -- I don't make a credibility
14 determination, so I have nothing to do with his
15 perception.  I'm critical of the actual use of force.
16    Q   The decision to pull the trigger?
17    A   Yes.
18    Q   And that's the only thing you're criticizing
19 regarding Officer Rapp?
20    A   Yes.
21    Q   On the next page you say you base your review
22 on Officer Rapp stating he had not been trained on a
23 SWATing call.
24        How does that play into your opinion?
25    A   I think that's important.  I mean, I don't

Page 120

1  think the SWATing call or the SWATing phenomenon
2  is -- as I mentioned earlier, officers have been
3  responding to calls that have been bogus for decades
4  or as long as law enforcement has been in existence,
5  so the term of SWATing became kind of topical in
6  2008, 2009 is when the concept really came into
7  fruition, and a lot of that had to do with a lot of
8  celebrities that were targeted and things such as
9  that, so officers now are trained, and the FBI put a
10 term on it I think in 2013 where they actually called
11 it -- the FBI really put a term on it in 2008, it
12 became a term actually in about 2013 for law
13 enforcement, and with that officers now need to
14 recognize that these type of events, especially with
15 the videos and things such as that, which seems like
16 it generates these type of calls for some odd reason,
17 that officers need to be trained that this may be a
18 bogus call, this may be not what you think it is, so
19 we need to slow down and take other precautions if
20 possible, and he stated he was never trained on
21 anything relating to SWATing.  So that's my
22 criticism.
23    Q   You would agree that an officer has to
24 consider the information provided by dispatch as
25 accurate when he goes to a call?

Page 121

1     A   With the caveat that there are times that
2  calls for whatever reason are false and they're bogus
3  and can't take because they're getting the best
4  information, and sometimes that information there's
5  maybe a gap in translating that information or
6  getting it to the officers.  That happens on
7  occasion.
8         Or the call could be, just like in this case
9  just outright bogus, and they wouldn't know that, but
10 with that being able to go there and then slow things
11 down to see, properly contain, as I mentioned, see if
12 we have a legitimate call here, and that's where we
13 get there.
14        We request additional information from
15 dispatch, we slow things down, we contain, put people
16 in position to be able to be the eyes for us, that
17 being a container position, such as sniper component,
18 and see if we have any legitimate call here or, in
19 fact, in this case that it's bogus.
20    Q   When, in fact, here that's what they were
21 doing, they were setting up a perimeter and had taken
22 no action to accelerate the call?
23    A   They didn't do anything to accelerate the
24 call, but what they did do is they didn't do anything
25 preceding the use of force, which goes back into my

Page 158
1  different Jack Ryan.  Let's take a few minutes.
2         (Brief recess taken.)
3         (Whereupon, Exhibit 131 was marked for
4         identification.)
5     MR. PIGG:  Q   Exhibit 131, that's your fee
6  schedule?
7     A   It is, but for the hourly for this case it
8  was 2019, so I think I sent them the 2018 rates,
9  which is 325 an hour.  This reflects 350 an hour.
10    Q   So which rate applies to this case?
11    A   425 for depositions.  For hourly it's 325,
12 not 350.
13    Q   And 100 for travel time?
14    A   Yes.
15    Q   Have you been asked to prepare a supplemental
16 report?
17    A   As of now, no.  My understanding there's been
18 a motion for me to do that, is what my understanding
19 is.
20    MR. PIGG:  I don't have any other questions at
21 this time.
22    MR. ODIM:  A few questions.
23              EXAMINATION
24              By Mr. Odim:
25    Q   Mr. DeFoe, do you recall what was said, if

Page 159
1  anything, by the officers on the scene as soon as
2  Mr. Finch, as soon as he walked out of the front door
3  of the house?
4     A   I don't believe there was anything said.
5     Q   Was there any identification by the officers
6  of who they were, where they were from?
7     A   Well, other than, other than put your hands
8  up and walk towards me.
9         Are you speaking to was the word "police"
10 identified.
11    Q   Police or traditional identification that one
12 would expect from law enforcement?
13    A   No, other than the commands I mentioned
14 earlier from the officers.  That would be to put your
15 hands up and walk towards me is what I recall from
16 the testimony.
17    Q   All right.  Do you understand or have any
18 facts that allow you to say what directions the
19 various commands were coming from that were made
20 towards Mr. Finch?
21    A   No.  My understanding from the testimony they
22 were multiple commands coming from multiple officers.
23    Q   And multiple directions, east, west, north?
24    A   I don't know.
25    Q   Okay.  You mentioned there being a difference

Page 160
1  between a criminal investigation and an
2  administrative investigation.
3         What is the difference?
4     A   Just a criminal investigation is looking to
5  see if there were violations of any laws.  Primarily
6  that's the focus, and like in this case or even like
7  for a district attorney's office may be looking at,
8  DA investigators may be looking at if the officer's
9  actions rose to the level of a crime.
10        But the difference of the administrative
11 investigation is that you're looking, you are looking
12 if things come out during your investigation that
13 would be criminal in nature, you would obviously
14 reveal those, but you're also looking at any policy
15 and training issues that the officer may have
16 violated or officers may have violated and any
17 potential training, recommendations that may come out
18 of the investigation for the future.
19    Q   Is that best practices for timing of
20 conducting criminal investigations on an
21 administrative investigation?
22    MR. PIGG:  Object to form, lack of foundation.
23    THE WITNESS:  As long as you're not waiting to
24 the end.  You want obviously witnesses to be
25 available, evidence to be available for people not

Page 161
1  waiting because this may take a year or so to do a
2  criminal investigation.
3         In addition to that, if it goes beyond, like
4  at the LAPD, if you go beyond a year at the time of
5  the incident, even if there were policy violations,
6  you cannot find that person -- you can find them
7  guilty, but you can't impose any type of
8  administrative penalty because it's beyond the
9  statute date, which is a year once the incident
10 occurs.
11        So the reason for that is you want to make
12 sure you're conducting the administrative
13 investigation concurrently.  You're going to allow
14 the criminal, as I mentioned earlier, to run its
15 course, and once it runs its course, obviously you're
16 going to go ahead and complete your administrative
17 investigation, which typically goes through the Use
18 of Force Review Board.
19        That investigation gets discussed and to see
20 if there were policy violations and then looking at
21 the force.  Everything from the planning,
22 communication, tactics, less lethal force options and
23 ultimately that choice of use of force is examined by
24 a Board and determined if there should be any
25 recommendations for training or any type of policy

Page 198

 1  believe that should have been explored by PSB as well
 2  regarding the poor tactics that were displayed by
 3  Officer Bautista preceding the shooting.
 4     Q   That would not involve any additional
 5  investigation, would it?
 6     A   It could, sure, as to -- the investigation,
 7  specifically tactics of reaching into that vehicle.
 8  Because the result of the investigation, there was no
 9  training that was imposed on Bautista.  So either that
10  which was not a violation of training obviously, there
11  was no specific policy as to best practices or tactics
12  related to reaching into cars and putting yourself in
13  such a poor position, and now ultimately you have to use
14  your firearm to stop the threat.
15     Q   Any others?
16     A   Detective Harty did not do any independent
17  investigation separate from the criminal investigation
18  in the Marcus Mitchell matter.  Once again, that being
19  using your firearm to strike the side of the window, and
20  then using force, that being lethal force after, and
21  specifically shooting into a moving vehicle.
22         I did not read anywhere that there was any
23  questions that were asked regarding policy and
24  procedures regarding shooting into or from a moving
25  vehicle.  And that was not asked during the criminal

Page 199

 1  investigation.  And Detective Harty never did any
 2  independent investigation regarding the tactics of
 3  shooting into or from a moving vehicle.
 4     Q   And that officer was disciplined as a result of
 5  his shooting into the vehicle?
 6     A   Yes.  He was disciplined for that.  But
 7  specifically it's not just the result that he was
 8  disciplined as he should have been, it's developing best
 9  practices and training so officers don't do this in the
10  future.  We know that shooting into or from moving
11  vehicles is a significant concern for law enforcement,
12  as well as for citizens, because typically the results
13  are catastrophic.  You typically don't stop the car.
14         Typically there's a potential for uninvolved or
15  unintended victims to be shot.  And then the aftermath
16  of the vehicle that operates on its own after an
17  individual has been shot has had traumatic consequences
18  in many matters, many of which I've been retained on
19  throughout the United States.
20     Q   You don't know what training was provided after
21  the Mitchell incident, do you?
22     A   I don't know.  It wasn't noted in the
23  investigation that I received if there was in fact any
24  training provided to both Bautista, or officers in
25  general, not just Bautista.  Because the best part about

Page 200

 1  conducting, looking at policies and procedures is
 2  develop best practices, and then provide training to
 3  those officers to ensure that hey, we could probably do
 4  things differently, or what's safer for officers.
 5         We don't reach into cars because there's a
 6  chance the person may drive off with you reaching into
 7  the car, and then ultimately you may have to shoot the
 8  person, or you could have been killed or dragged to your
 9  death, which could have happened to that officer.
10  Fortunately, that did not happen.
11     Q   All you have reviewed is the PSB reports, so
12  you do not know what occurred as a result of any further
13  training provided by administration of the WPD following
14  this review, do you?
15         MR. STROTH:  Objection; calls again for
16  speculation.
17         THE WITNESS:  I don't know if there was any
18  training.  I just know that there was not any
19  independent investigation separate from the criminal
20  investigation.  And I don't know if during the criminal
21  investigation -- I do know the fact that those areas
22  were not explored.  If there was follow-up training to
23  the officers, and not just the officers that are
24  involved, but if there were policies that were crafted
25  or reinforced or training was conducted, I think that

Page 201

 1  would be a good thing.  I don't know if it happened or
 2  not.
 3     Q   There was no vehicle involved in the Finch
 4  incident, was there?
 5     A   No, there was not.
 6     Q   Any others where you claim there should have
 7  been some additional investigation?
 8     A   On the Villa matter, I don't know if I
 9  mentioned this, on page 29 of his deposition, which was
10  confounding to me, he stated that Detective Harty stated
11  that he does not believe that he had an obligation to
12  ask officer -- excuse me, Sergeant Ryan if he could have
13  done anything other than lethal force at that moment.
14         So there wasn't -- part of the administrative
15  review should be, if you're looking at policies,
16  procedures, tactics, best practices, everything from
17  communication, planning, considerations of less lethal
18  force options, warnings, all those things should be
19  explored by detectives on the administrative side to see
20  if, though criminally it may have not met a threshold of
21  a criminal violation based on the district attorney
22  Bennett's review -- B-e-n-n-e-t-t, I believe, Marc,
23  M-a-r-c -- but there wasn't any -- he didn't even ask
24  the question, was there something you could have done
25  different, looking back at this incident.  He didn't



Page 202

1 feel that he had an obligation. If he's conducting the
2 administrative investigation, if it's not him, I don't
3 understand who would that -- that would be.
4   Q   And Mr. Villa was a fellow who had just been
5 involved in a burglary and an incident with someone at a
6 gas station, there was a car chase, and he then got into
7 the vehicle of two elderly people in the front seat with
8 a gun; correct?
9   A   Well, he was never -- the facts leading up to
10 the point with a gun is correct, but my understanding is
11 that he was not armed, and never pointed or displayed a
12 weapon. I believe that Sergeant Pearce testified that
13 he believed he had a gun, but there was no gun found
14 inside of the vehicle when he was shot.
15   Q   Any others?
16   A   I think that is it for now. Some other
17 information may jog my memory as we go through, but --
18 can I take a two-minute break to use the restroom?
19        MR. PIGG: Sure.
20        THE WITNESS: Thank you.
21        (Recess, 9:48 to 9:51)
22 BY MR. PIGG:
23   Q   Of the 18,000 or so law enforcement agencies in
24 the nation, how many do separate administrative
25 investigations as opposed to administrative reviews of

Page 203

1 an officer-involved shooting?
2   A   I have no idea.
3   Q   That's not the prevalent practice, is it?
4   A   I don't know.
5   Q   You cited no standard that applies to whether
6 you do a separate redundant administrative
7 investigation, did you?
8   A   I didn't apply a standard, no. I don't believe
9 I used the word redundant either.
10   Q   You didn't, but an investigation by the -- the
11 administrative side would be reviewing essentially the
12 same facts that are being reviewed by the criminal
13 investigation?
14   A   No, because the -- for instance in this matter,
15 and the other matters I previously mentioned, they're
16 not asking specific questions regarding policy and
17 procedures, tactics, communication and planning, things
18 such as that. In the Finch matter, we know they didn't
19 look at any other officers on the scene, to include
20 Sergeant Jonker.
21       So other than what they're looking for in way
22 of a -- for a filing potentially, or see if it met
23 the -- as DA Bennett stated, that the focus of his
24 inquiry is solely on a charging decision, and that
25 there's no comments on training he states on pages 60

Page 204

1 and 61 of his deposition.
2       So if the focus from the criminal aspect is
3 solely on did the officer violate a law, or laws, and
4 not on everything leading up to the shooting, as I
5 earlier mentioned, then it is not redundant. In fact,
6 that's where the gaps exist to ensure that best
7 practices are used in the future, and that any
8 corrective action that may be necessary as a result of
9 things that transpired in an individual incident, such
10 as planning, tactics, communication, warnings, things
11 such as that.
12   Q   The information provided from the witnesses is
13 going to be the same in a criminal investigation as in
14 an administrative investigation; isn't it?
15   A   It depends. If the witnesses are officers, no,
16 because if they're not asked specifically what did you
17 do when you got there, or was there any planning that
18 came from the supervisor in charge, was there any
19 discussion as to what your specific role was going to
20 be.
21       Once again, if witnesses aren't asked
22 specifically what the officer's actions were, maybe
23 preceding a shooting, such as did he leave a position of
24 cover and walk into an open air environment. What did
25 he do, looking at it from a tactical standpoint, not

Page 205

1 solely from did the officer commit a crime.
2       I think if there are gaps or the Homicide
3 detectives are not asking questions that encompass all
4 of those other factors, that needs to be followed up
5 with -- by the PSB detectives to ensure that the other
6 areas are covered as well, not just the -- from the
7 criminal liability aspect of it.
8   Q   When the officers in the criminal investigation
9 have asked questions that ascertain exactly what all
10 those officers did, that's going to cover what their
11 testimony would be, isn't it?
12   A   It could, unless based on new information is
13 revealed or the reviewer is looking at it from a
14 different -- through a different lens than maybe that
15 specific investigator or investigators failed to ask,
16 and it just may have been an oversight.
17       I think if you're looking at all facets of
18 preceding the use of force, as I mentioned, and
19 ultimately then the use of force, and then even after
20 what transpired as relates to the use of force, I think
21 those are all important. If the detectives asked all
22 those pointed questions and received answers, there may
23 not be a necessity to conduct additional interviews.
24 Just depends on what they ascertain from their initial
25 investigation or interviews.



Page 274

 1  house and you're having guns pointed at you.  You don't
 2  know what you've done wrong because you haven't
 3  committed a crime.  And now you're trying to probably
 4  process what's going on and trying to comply.  And then
 5  once again, ultimately you're shot.
 6      Q   We don't know whether Mr. Finch had committed a
 7  crime recently or not, do we?
 8      A   I know that we know that he didn't shoot his
 9  dad and threaten to light his house on fire.
10      Q   That wasn't the question.  We don't know that
11  he didn't commit some crime?
12      A   I'm not trying to be --
13          MR. STROTH:  What's the question?  I didn't
14  even hear the question.
15  BY MR. PIGG:
16      Q   We don't know that Mr. Finch had not committed
17  some crime that he had in his mind at the time he exits
18  the door?
19          MR. STROTH:  Objection; form.
20          THE WITNESS:  I have no idea what he did.  We
21  know he did not commit the crime that he was accused
22  of, or not that he was accused of.  The reason for the
23  response by law enforcement on that day.
24  BY MR. PIGG:
25      Q   We do know that he had a significant history of

Page 275

 1  which he had been arrested on multiple occasions and was
 2  familiar with being arrested.
 3          MR. STROTH:  Objection; form.
 4          THE WITNESS:  I mentioned earlier in my other
 5  deposition I've never seen his criminal history to know
 6  what his prior arrests or convictions were, so I don't
 7  know.
 8  BY MR. PIGG:
 9      Q   I thought you were critical of his -- of the
10  information being included in the PSB report.
11      A   My criticism came from civilian witnesses that
12  were -- that information was put in.  That's what we
13  spoke about, civilian witnesses.  And I was even
14  critical of having officers' information in there as
15  well.
16      Q   I think you were critical of Detective Pichler
17  accepting officers' statements.  What statements did
18  Detective Pichler accept that were wrong or not reviewed
19  by reviewing video?
20      A   Well, there was no questions as relates to --
21  there was no questions as relates to pre-shooting
22  tactics.
23      Q   Were there any inaccurate statements of any
24  witness, any law enforcement witness that were accepted
25  by Detective Pichler in his report?

Page 276

 1      A   Inaccurate, no, because once again he didn't
 2  interview the officers.  He took the information
 3  directly from the Homicide interviews.
 4      Q   If I understand your criticism of Richards,
 5  it's you think the discipline should have been more
 6  significant than it was?  That Sergeant O'Brien and
 7  Sergeant Mackey were disciplined for lack of judgment
 8  and planning.
 9      A   Once again, if it's -- a written reprimand and
10  one-day suspension is solely for the incident without
11  any future training or learning, then it's for nothing
12  because it doesn't prevent future incidents from
13  occurring.  That's what the objective should be with
14  training.  It's not solely for that specific officer or
15  supervisor in this case and officer, it's so that these
16  type of events don't occur in the future.
17          That you don't enter residences when people are
18  armed and by themselves.  You don't when people are
19  mentally ill or experiencing a mental crisis.  You don't
20  do that because officers get killed that way, or lethal
21  force is used that doesn't need to be used potentially.
22          So once again, unless the information can be
23  disseminated for the best practices for all officers,
24  it's really of no value if someone gets a written
25  reprimand or not.  It may change that person or modify

Page 277

 1  that person's behavior, but it does nothing to prevent
 2  future incidents from other officers.
 3      Q   You're criticizing that Officer Thompson was
 4  not asked why she did not transition to a taser, and
 5  we've already discussed that?
 6      A   Yes, sir.
 7      Q   Anything additional you have about that?
 8      A   Just on the question of her perception, her
 9  taser.  Taser International would go out of business if
10  they had a 50 percent success rate on their product.
11  The fact that she believes that it's not a viable less
12  than lethal force option because it doesn't work 50
13  percent of the time is either based on lack of training,
14  or that could have been her experience, not to minimize
15  her experience, but the reasons as to why would be
16  critical for future.
17          Is it probe placement, you did not achieve
18  neuromuscular incapacitation due to distance, was it
19  clothing, was it a number of factors.  So that may
20  require additional training so she doesn't consider
21  resorting to lethal force or not using a less lethal
22  force option because her opinion is that it's an
23  ineffective tool.
24      Q   That's not the reason she didn't use a less
25  lethal force option, it was because she perceived him to



Page 278
1  be reaching for a knife to go after the guy who was
2  tasing him; correct?
3     A   That's what she testified to, but she also
4  testified that she didn't believe that -- she believed
5  it only had a 50 percent success rate.
6     Q   Do you have any statistics that are reliable on
7  what the success rate is with a taser?
8     A   I don't at this time.
9     Q   Have you seen a video of the guy attacking the
10 two sheriffs deputies with a knife that is tased twice
11 and it's ineffective, and an officer has to shoot him?
12    A   Which video are you referring to?
13    Q   I don't know if you have it.  It's an earlier
14 shooting.
15    A   No.  Once again, I'm not opining that at times
16 the taser is not effective and that officers need to use
17 lethal force stop someone's violent attack.  But I also
18 know from my training and experience that the taser is
19 effective.  My experience has been 90 percent of the
20 time that it's effective.  If deployed properly, with
21 proper distance, proper probe placement, and all those
22 other factors I previously mentioned, that it's quite
23 effective.  When it's not effective, it's typically
24 based either on distance, clothing, or probe placement.
25    Q   Under the topic of escalating, you address the

Page 279
1  Richards situation.  But the officers weren't
2  disciplined in that case; correct?
3     A   Yes, they were disciplined.
4     Q   Then you address Garner, and we've already
5  talked about that, your criticism of his reaching in the
6  car?
7     A   Yes.
8     Q   In Mitchell, you nitpick that there was no
9  review of pointing the gun, though he was disciplined
10 for use of the gun to hit the car and firing at the car?
11    A   Yes.  And I wasn't nitpicking, counsel.  I was
12 just opining.
13    Q   Somebody will decide if you were or not.
14        Then in failure -- so your answer is yes, but
15 you don't call it nitpicking?
16    A   That's correct.
17    Q   Then the references to Finch are all things
18 we've already gone over; correct?
19    A   Yes.
20    Q   In Perry, everything did happen all at once,
21 didn't it?
22    A   Let me refer to Perry real quick.
23    Q   That's where he's going back in the house with
24 a gun and the dog is released to stop him.  He shoots
25 the dog, points at the officers, and is shot.

Page 280
1     A   Yes.  I was primarily talking about that the
2  information regarding the woman who was Meyer was not
3  there at the time.  That's what I'm talking about,
4  information gathering.  I'm not talking specifically
5  about the use of force, right.  Once the -- I don't have
6  any criticisms of the lethal use of force in that case,
7  just the fact that there was no one else in the trailer.
8  So obviously the officers need to defend themselves.
9  And I thought the use of lethal force was appropriate in
10 that case.  It's just the information regarding not
11 having any other victims inside of the trailer at the
12 time.
13    Q   It would be appropriate to release a dog to
14 prevent somebody with a gun going back in where they
15 could barricade themselves, irrespective of whether
16 there was anybody inside?
17    A   I think it's a good tool.  I think some K9
18 officers, with someone who's armed, would be very
19 reluctant to do that, for just the very thing that
20 occurred, that's officer's dog -- you don't want your
21 dog to be killed.
22        The guy barricades himself in there, he's
23 static, alone by himself.  Then you can go back to
24 conventional barricaded tactics, such as use of chemical
25 deployment, crisis negotiation, all of that, rather than

Page 281
1  use that dog as a sacrifice.  If you know that that
2  person is not -- if there's no one else inside of that
3  trailer, I don't think it was a prudent decision to send
4  the dog, if you reasonably believe there's no one else
5  in the trailer, knowing that the person is armed.
6     Q   And I just couldn't hear part of your answer,
7  whether you said it was or was not prudent to send the
8  dog.
9     A   Once again, I think it's the handler's decision
10 based on the fact that this person is armed.  I think
11 it's one of those ones that even as a K9 supervisor, I
12 would let that handler make that decision because the
13 likelihood of that dog being killed is great, and I
14 wouldn't want to make -- I think that's -- if the guy
15 went back into the residence and he barricaded himself
16 alone, you could transition to conventional SWAT tactics
17 without having that dog be killed, I think might be the
18 best -- but if you believe there's someone else in the
19 trailer, I think sending the dog was an appropriate use.
20    Q   If a guy gets back inside with a gun, you don't
21 know what's going to happen, whether he's by himself or
22 not?
23    A   Right.  If he's by himself or not.  If you know
24 he's by himself, once again, you question the fact of
25 sending the dog.  If you don't know, then the use of the



Page 282

1  dog I think is a reasonable tool, knowing though there's
2  a likelihood that your dog is going to be either killed
3  or injured.
4      Q   Explain your opinion regarding the system to
5  track areas of concern.
6      A   Are we on page 12?
7      Q   I don't have the page marked.
8      A   I have it.  It's page 12 of 16, second
9  paragraph from the bottom.  This primarily deals with
10 what I've already testified to regarding the policy and
11 practice leading up to officer-involved shootings.  And
12 then the -- in addition to the officers inputting their
13 own force and information into the system without a
14 supervisor auditing or overseeing it.
15     Q   Anything else?
16     A   No.
17     Q   And your reference to Detective Amy including
18 the areas of concern, and the fact that no one followed
19 up with him, that doesn't mean that command staff didn't
20 consider that, does it?
21     A   I have no idea.  They may have.
22     Q   And you don't know if command staff considered
23 Detective Pichler's areas that he addressed or not?
24     A   I don't know.
25     Q   The magnification of the rifle, light on the

Page 283

1  rifle, possibly having one dedicated dispatcher on the
2  call.
3      A   Give me one second, please.  What Chief Ramsay
4  stated in his deposition, at the time of his depo,
5  rifles do not have magnification.  None of the
6  recommendations that were included in the report were
7  fully implemented is what he stated on pages 132 to 134.
8      Q   That doesn't mean they weren't considered, does
9  it?
10     A   No, they may have been considered.  They just
11 have not been put in place since the report was
12 completed, up to the day of his deposition, which was
13 on -- I don't have the date.  In May, I believe.
14     Q   And the dispatch is a sheriff's operation,
15 isn't it?
16     A   Yes.
17     Q   He wasn't asked if he had consulted with the
18 sheriff about that?
19     A   Not in his deposition, no.
20     Q   Your last paragraph before, just discussing
21 your qualifications, it relates to an opinion that if
22 the department had identified the above patterns of
23 deficiencies in use of force, systemic changes could
24 have been made that could have prevented the Finch
25 incident from unfolding as it did.

Page 284

1      Q   What specifically are you referring to?
2      A   I've already testified to it.  Primarily
3  looking directly at conducting independent interviews by
4  PSB to explore all potential violations of policy, and
5  even not violations of policy, but best practices as
6  relates to communication, planning, tactics, and less
7  than lethal force options prior to the use of lethal
8  force.
9      Q   What is the basis for any opinion that any
10 change would have, quote, prevented the Finch incident
11 from unfolding as it did?
12     A   Just based on, I believe based on Sergeant --
13 specifically Sergeant Jonker's actions or inactions on
14 the day of the Finch incident as relates to command and
15 control, his understanding of what the policy is, his
16 command and control of the officers that he was the sole
17 supervisor of at the time, at the scene is what that
18 paragraph particularly addresses.
19     Q   I want to know specifically, not just the
20 general conclusory command and control deficiencies.
21         What did he do or not do that you suggest might
22 have been modified if there had been any changes in the
23 system prior to that time?
24     A   As I mentioned, I believe he -- I can once
25 again read deposition cites.  I know you don't want me

Page 285

1  to do that.  He at no time communicated any formal plan
2  to any of the officers at scene.  He at no time
3  established any command and control.  At no time did he
4  take control as the single point of contact.  Did not
5  distinguish as to what would transpire if there were
6  shots fired as relates to emergency assault.  Did not
7  discuss any of his plans that he had in his head at the
8  time with any of the officers at scene.
9          Did not do anything other than deploy Powell
10 himself and Rapp on the north side of the residence, 112
11 feet away from where Mr. Finch was shot.  And did not do
12 anything leading up to this event that I believe could
13 have prevented this event, based on his lack of command
14 and control.
15         And now once again, I also hold Officer Rapp
16 responsible for obviously firing a round that I believe
17 was not in immediate defense of life based on his, and
18 other officers' testimony that there was no gun, there
19 was no object resembling a gun.  Officer Rapp did not
20 believe he was attempting to re-enter the residence, the
21 Finch residence.
22         There's no information about Mr. Finch or
23 anyone else inside going to light the house on fire.
24 That information was never disseminated to the officers.
25 All of those things I previously testified to in my last



Page 294

1    A  Sure.  If you see an object that you reasonably
2  believe that there's a gun and it's being pointed at
3  officers, yes, that would be appropriate use of force.
4    Q  I've got one case right now where the beanbags
5  bounce right off the guy.  Have you seen that, with no
6  effect?
7    A  That has happened.  I think it's infrequent.
8  It depends.  A Super-Sock round is a pretty effective
9  round.  It's traveling about 270 feet per second.  It's
10 a well-designed round.  I think there are some people
11 that are impervious to pain.  There are people that, you
12 know, taking bath salts and synthetic drugs and all
13 those other things that can withstand some of the force
14 associated with those munitions.
15        Lower extremities, knees, legs, even bigger
16 people that are resistant, they'll typically tend to
17 buckle them and put them down.
18   Q  What did you refer to, a Sock round?
19   A  Yeah, the Super-Sock round.  That's basically
20 what the beanbag round is now.  The beanbag rounds were
21 changed to the Super-Sock round because they were
22 breaking open, and there was issues with potentially eye
23 injuries and other things.  Most law enforcement
24 transitioned to the Super-Sock round probably ten years
25 ago or so.  It's the same design.  The holding device,

Page 295

1  the actual beanbag is much stronger, the Super-Sock,
2  than it was in the past.  Trying to negate or mitigate
3  eye injuries and other things.
4        MR. PIGG:  Let's take five.  I'm going to
5  review my notes.  We're close, if not done.
6        MR. STROTH:  Okay, great.
7        (Recess, 12:37 to 12:41)
8  BY MR. PIGG:
9    Q  Mr. DeFoe, of the cases you reviewed, none of
10 them involved the situation like the Finch situation
11 with a barricaded hostage suspect, did it?
12   A  No, it did not.  It was quite unique to any of
13 the other cases.
14   Q  And none of those cases involved the same
15 criticisms that you have about officer, or Sergeant
16 Jonker's performance; correct?
17   A  No.  I mean, we've talked about other cases
18 like the Richards case and others that I have different
19 criticisms on.  But as relates to command and control of
20 a scene similar to the Finch matter, this one was
21 unique.
22   Q  Have I covered all of the supplemental opinions
23 in your deposition today?
24   A  You have, sir, yes.
25   Q  Do you have anything else to add?

Page 296

1    A  At this time, I do not, sir.
2        MR. PIGG:  I don't have any other questions at
3  this time.
4        MR. STROTH:  The plaintiff does haven't any
5  questions.  Thank you.
6        MR. PIGG:  I assume you want to read and sign,
7  Mr. DeFoe?
8        THE WITNESS:  I would like to, yes.
9        MR. PIGG:  Okay.  We are done.  Off the record.
10       (Deposition concluded at 12:42 p.m.)
11              * * *

Page 297

```
 1                REPORTER'S CERTIFICATION.
 2
 3     I, Liz Zehner, Certified Shorthand Reporter, in and
 4  for the State of California, do hereby certify:
 5
 6     That the forgoing witness was by me duly sworn;
 7  that the deposition was then taken before me at the time
 8  and place herein set forth; that the testimony and
 9  proceedings were reported stenographically by me and
10  later transcribed into typewriting under my direction;
11  that the foregoing is a true record of the testimony and
12  proceedings taken at that time.
13
14     IN WITNESS WHEREOF, I have subscribed my name this
15  23rd day of August, 2019.
16
17
18                       Liz Zehner
19
20              _____
                    Liz Zehner, CSR No. 8425
```

