# EXHIBIT 2

**Lisa G. Finch, et al. vs. City of Wichita, Kansas**

**Case No. 18-cv-1018-JWB-ADM**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


LISA G. FINCH, Individually, as    )
Co-Administrator of the Estate     )
of Andrew Thomas Finch,            )
deceased, and as Next Friend       )
for her minor granddaughter,       )
AF; DOMINICA C. FINCH, as          )
Co-Administrator of the Estate     )
of Andrew Thomas Finch,            )
deceased; and ALI ABDELHADI,       )
                                   )
                Plaintiffs,        )
                                   )
       vs.                         )Case No.
                                   )18-CV-01018-JWB-KGS
CITY OF WICHITA, KANSAS;           )
JOHN DOE POLICE OFFICERS 1-10,     )
                                   )
                Defendants.        )
                                   )


D E P O S I T I O N


       The videotape deposition of SERGEANT BENJAMIN JONKER

taken on behalf of the Plaintiffs pursuant to the Federal

Rules of Civil Procedure before:

                RICK J. FLORES, CSR
                KELLEY REPORTING ASSOCIATES, LTD.
                515 South Main, Suite 108
                Wichita, Kansas  67202

a Certified Shorthand Reporter of Kansas, at 455 North

Main, 13th Floor, Wichita, Sedgwick County, Kansas, on

the 18th day of October, 2018, at 9:02 a.m.

## Page 10

1    Q.   Thank you.  Are you still working with WPD
2         currently?
3    A.   Yes, ma'am.
4    Q.   Are you on active duty?
5    A.   Yes, ma'am.
6    Q.   And full pay?
7    A.   Yes, ma'am.
8    Q.   And what was your position the morning of the
9         Finch shooting incident on December 28th,
10        2017?
11   A.   I was the Patrol South Special Community
12        Action Team supervisor, and also a K-9
13        supervisor, and also a K-9 handler.
14   Q.   What is the -- did you say Special Community
15        Action Team?
16   A.   Yes, ma'am.
17   Q.   What does that entail?
18   A.   It's no longer, but the focus of the SCAT
19        team was street level narcotics and gang.
20   Q.   All right.  And what is your current
21        position?
22   A.   So we revamped the SCAT team and they called
23        it the CRT team or Community Response Team.
24        So I'm the patrol south supervisor for that
25        and still the K-9 supervisor.

## Page 11

1    Q.   Did you graduate from high school?
2    A.   Yes.
3    Q.   In Wichita?
4    A.   Yes, ma'am.
5    Q.   And did you go to college?
6    A.   Yes, ma'am.
7    Q.   Where did you go?
8    A.   Wichita State.
9    Q.   Did you receive a degree?
10   A.   Yes.
11   Q.   What was your degree in?
12   A.   Bachelor's degree in criminal justice.
13   Q.   Did you receive any other formal education?
14   A.   No.
15   Q.   Have you served in the military?
16   A.   No, ma'am.
17   Q.   When did you join Wichita Police Department?
18   A.   December 26 of 2000.
19   Q.   Did you have any other jobs, prior to joining
20        WPD, after leaving college?
21   A.   No.  I graduated, actually, probably -- while
22        I was on the department.
23   Q.   I see.  So did you have any previous jobs
24        prior to -- while you were in college?
25   A.   I've had previous jobs, yes.

## Page 12

1    Q.   Okay.  Can you just go through a short list
2         of those?
3    A.   Target, Ace Hardware, Cintas Uniform and then
4         the police department -- or J.C. Penneys and
5         then the police department.
6    Q.   Okay.  And why did you want to become a
7         police officer?
8    A.   I enjoy that work.  It's exciting work.
9    Q.   Okay.  Is there a particular area of policing
10        in which you saw yourself when you joined?
11   A.   I did not foresee myself being a K-9 officer,
12        but that's -- I really enjoy that now.
13   Q.   And what does a K-9 officer duties entail?
14   A.   We have dual purpose dogs in Wichita, meaning
15        that they do patrol work and narcotic work.
16        So we do a lot of training and just respond
17        to calls for service for police dogs, whether
18        that be patrol or for narcotic sniffs.
19   Q.   Why were -- well, there were dogs present on
20        the scene of the Finch shooting incident --
21   A.   Yes, ma'am.
22   Q.   And why was that?
23   A.   Well, the way that they -- I mean, we operate
24        as a team.  And they typically respond to
25        violent crimes or calls such as that.

## Page 13

1         They're not 911 driven.  So they're available
2         for calls like that so they typically will
3         respond just to assist whether the dog be
4         needed or not.
5    Q.   And what was your intention in terms of using
6         the dogs the night of the Finch shooting
7         incident?
8         What was their purpose?
9    A.   I hadn't asked for any of them to respond to
10        begin with.  When they were there,
11        originally, Officer Gumm was on the rear of
12        the residence, so he potentially -- he didn't
13        have his dog out, but had it been needed, we
14        could have used it for somebody fleeing out
15        of the house or -- and then at that point, I
16        mean, I didn't request the dog.  I had my
17        dog, but I left him in the car.  So just
18        'cause we show up on the scene doesn't
19        necessarily mean we're going to use the dog.
20   Q.   So they're just with you at all times?
21   A.   Correct.
22   Q.   Officer Gunn -- Gumm is also a K-9 officer?
23   A.   Yes, ma'am.
24   Q.   Are you his supervising officer?
25   A.   Yes, ma'am.

## Page 26

1    Q.    It's your responsibility to make the initial

2          request; is that fair to say?

3    A.    As a supervisor on scene, yes.

4    Q.    On December 28th, 2017, what shift were you

5          working?

6    A.    Well, it's -- we work a third shift, sort of

7          hybrid third shift.

8    Q.    And what are the times?

9    A.    I come in at 1630.

10   Q.    Okay.  Till?

11   A.    0200.  2:00 o'clock in the morning.

12   Q.    And what days of the week?

13   A.    I work that shift on Thursday, Fridays and

14         Saturdays, and then Wednesdays I work during

15         the day for dog training.

16   Q.    Do you know what day of the week December

17         28th was?

18   A.    I believe it was a Thursday.

19   Q.    And did you have a regular partner at that

20         time?

21   A.    My dog.

22   Q.    Okay.  So no one rode in your car with you

23         regularly?

24   A.    No.

25   Q.    Did you wear a uniform as a K-9 officer?

## Page 27

1    A.    Yes, ma'am.

2    Q.    And is it the uniform you're wearing today?

3    A.    It -- very similar.  The external vest, I

4          think I had a hoodie on that night, but

5          that's -- it's a similar uniform.

6    Q.    And you had a hoodie because it was winter?

7    A.    Yes, it was cold.

8    Q.    And it was cold that night?

9          Sorry.  Can you answer?

10   A.    Yes.

11   Q.    Were you wearing multiple layers that night?

12   A.    I believe so, yes.

13   Q.    What color's the hoodie?

14   A.    Black.

15   Q.    Did you have the hood up that night?

16   A.    I don't recall.

17   Q.    And you can still see your badge if you're

18         wearing the hoodie?

19   A.    Yes.

20   Q.    And it's the badge you can see on the video

21         on your left side breast?

22   A.    Yes, and I also have a badge on my -- on my

23         duty belt.

24   Q.    And were you driving a WPD-issued car?

25   A.    Yes.

## Page 28

1    Q.    Is it marked?

2    A.    It is not marked.

3    Q.    What is it?  What kind of car is it?

4    A.    It's a black Dodge Charger.

5    Q.    Okay.  And did you drive it to the scene that

6          night?

7    A.    Yes, ma'am.

8    Q.    Did anyone drive with you?

9    A.    No.

10   Q.    So you went to the academy, of course;

11         correct?

12   A.    Yes, ma'am.

13   Q.    And what -- for how long?

14   A.    Good question.  Seems like forever.

15   Q.    Just estimate, that's fine.

16   A.    I can't even -- it's like a 6-month academy.

17   Q.    Okay.  Did you receive training on use of

18         force at the academy?

19   A.    Yes.

20   Q.    And specifically when use of force was

21         allowable for law enforcement officers?

22   A.    Yes.

23   Q.    Sorry.  Is that a yes in there?

24   A.    Yes.

25   Q.    And when use of force was not allowable;

## Page 29

1          correct?

2    A.    Yes.

3    Q.    Meaning when it became excessive?

4    A.    I mean, they discussed excessive force in the

5          academy, yes.

6    Q.    Okay.  And did you receive training on lethal

7          use of force?

8    A.    Yes.

9    Q.    Did you receive training on less lethal use

10         of force options?

11   A.    What's your definition of less lethal?

12   Q.    For instance, weapons or any type of force

13         that can be employed in lieu of using deadly

14         force.

15   A.    When I went to the academy, we didn't have

16         beanbag shotguns if that's what you're

17         talking -- we didn't have Tasers so we have

18         batons and whatnot that, I guess, if you want

19         to consider that less lethal, then yes, we'd

20         receive training on that.

21   Q.    Okay.  So at the academy, you received

22         training on things like batons or OC spray?

23   A.    Uh-huh.

24   Q.    And currently officers on WPD have access to

25         beanbag shotguns; is that correct?

8 (Pages 26 to 29)

Page 30

```
 1   A.   Specific officers do, yes.
 2   Q.   Do you?
 3   A.   I am trained on them.  I do not carry one.
 4   Q.   Okay.  And what is a beanbag shotgun?
 5   A.   I mean, I don't know the specifics.
 6   Q.   Just a general description.
 7   A.   It's a -- it's a -- I mean, it's a shotgun
 8        that's -- ours are painted orange or it's
 9        orange plastic, and rather than shooting out
10        pellets like a normal shotgun would, this has
11        a shell that shoots a beanbag.
12   Q.   And in your career have you ever carried a
13        beanbag shotgun on you?
14   A.   I've never -- I've used one.  I've never -- I
15        never carried -- I've never been assigned
16        one.
17   Q.   Okay.  So when you used it, how is it that
18        you had it on you if it wasn't assigned to
19        you?
20   A.   I took it from another supervisor.
21   Q.   I see.  And do you carry a Taser currently?
22   A.   I do not.
23   Q.   Do most WPD officers, to your knowledge?
24   A.   All WPD officers are required to carry Tasers
25        other than supervisors.
```

Page 31

```
 1   Q.   I see.  You've been trained on how to use a
 2        Taser?
 3   A.   Yes.
 4   Q.   When you were in the academy, did you receive
 5        training on crisis management?
 6   A.   I don't -- I mean, I'm certain that we did.
 7        I don't know what the title of the class
 8        would have been.
 9   Q.   Did you receive any training on responding to
10        incidents involving people with mental health
11        issues?
12   A.   Yes.
13   Q.   Okay.  And did you receive training on how to
14        use deescalation tactics?
15   A.   Again, I'm sure that we did.  I don't know
16        what the title of the course was.  I don't
17        know if that was a coined phrase at that
18        point.
19   Q.   Did you receive training on responding to --
20        I'll use this term and then ask you about
21        it -- high stake scenarios?
22   A.   I guess I will ask your definition of high
23        stake scenario.
24   Q.   I'll ask your definition.
25             Is that a phrase you use in the scope
```

Page 32

```
 1        of your employment?
 2   A.   No.
 3   Q.   How would you characterize various incidents
 4        that involved, for instance, armed gunmen?
 5   A.   How would I describe it?
 6   Q.   Yes.
 7   A.   An armed gunman call, I guess.  I don't --
 8   Q.   Is there any classification for calls that
 9        rise to a certain level of severity or
10        violence?
11   A.   What do you mean by classification?
12   Q.   Like this is --
13   A.   Like what we call or --
14   Q.   Correct.
15   A.   I mean, I guess dispatch calls them -- I
16        mean, they have priority 1 calls.
17   Q.   Okay.
18   A.   And, I mean, I -- you know, burglary in
19        progress, a shooting, stuff like that, I
20        think.  But, I mean, we don't -- a hot call,
21        I guess.  I don't know what -- we don't call
22        them anything really.
23   Q.   Okay.  And you have received in-service
24        training over the years, as well; correct?
25   A.   Yes.
```

Page 33

```
 1   Q.   And how frequently or how many hours a year
 2        do you have to take an in-service training?
 3   A.   We take 40 hours a year.
 4   Q.   Okay.
 5   A.   I'm sorry.  We have to have 40 hours of
 6        in-service training.  We have mandatory
 7        in-service training through the department
 8        that we go through twice a year.
 9   Q.   And as a sergeant, is your -- are your
10        training requirements any different from
11        regular officers?
12   A.   No.  I still am mandated by the state to get
13        the 40 hours.  I -- we go through supervisor
14        retreats sometimes.
15   Q.   And have any of your in-service trainings
16        involved use of force training?
17   A.   Yes.
18   Q.   Would you say a fair number of them?
19   A.   Oh, yeah, frequently.
20   Q.   And does that include training on lethal use
21        of force?
22   A.   Like firearm training?
23   Q.   Any kind of training related to lethal --
24        less lethal force tactics, techniques,
25        responses.
```

9 (Pages 30 to 33)

Page 34

1    A.    Every -- I mean, we -- so once a year we'll
2          qualify with the beanbag shotgun and the 40
3          millimeter grenade shotgun thing, foam round.
4          So, I mean, each time at in-service training
5          we'll qualify with our handgun, shotgun, and
6          then the less lethal as supervisors and, I
7          guess, any officer that's assigned or has
8          been to the training for the less lethal.
9          And I say less lethal, the beanbag shotgun,
10         the foam launcher also.
11   Q.    And is that just a weapon that shoots foam
12         balls?
13   A.    Essentially.
14   Q.    Okay.  Are you certified to carry that?
15   A.    I'm certified to use it, yes.
16   Q.    Are many WPD officers or just a select few?
17   A.    Supervisors and I'm fairly certain that
18         they've gone through and trained select
19         officers on the beanbag.  I'm not a hundred
20         percent sure about the foam launcher.
21   Q.    Okay.  And do those certifications just teach
22         you how to use those weapons or when to use
23         those weapons?
24   A.    Both.
25   Q.    Okay.  And so about -- do you learn threat

Page 35

1          assessment in those certification trainings?
2    A.    Not for that, no.
3    Q.    Do you receive any training in in-service on
4          threat assessment?
5    A.    Again, I'm sure that we have.  I can't recall
6          specifically.
7    Q.    Okay.  Have you received training on a use of
8          force continuum?
9    A.    Yes.
10   Q.    And what is a continuum?
11   A.    The use of force continuum?
12   Q.    Correct.
13   A.    It's basically you start off at one level and
14         it just -- and works its way up.
15   Q.    Is it fair to say, then, that you're trained
16         to use the level of force that is appropriate
17         in response to the resistance that you're
18         encountering?
19   A.    That's what the force -- the use of force
20         continuum was.  I can't think of the name of
21         what the -- I don't believe that's what we
22         use now.  They've flipped the name to -- but
23         I'm not a hundred percent sure.
24   Q.    Do those principles that you learned as part
25         of the use of force continuum training still

Page 36

1          apply in your work on WPD?
2    A.    Essentially.  It's not -- the threat
3          assessment -- I forget what they changed the
4          name to.  And to go back to -- what was
5          your -- when you asked to step it up or
6          appropriate amount of force, what was your
7          question?
8    Q.    I was just trying to clarify what the
9          continuum was.  I think I said something like
10         to use the level of force appropriate based
11         on -- the appropriate level of force based on
12         the level of resistance being encountered.
13         Is that a summary of the continuum
14         with which you agree or disagree?
15   A.    I would agree that that was what the use
16         of -- I mean, they -- I guess I'll just say I
17         don't know.
18   Q.    Okay.  Well, would you say that principle
19         still applies in your work?
20   A.    To an extent, yes.
21   Q.    And to what extent does it not apply?
22   A.    I mean, the use of force -- I guess the way
23         that you're describing it is, I mean, we
24         don't necessarily have to go from -- we don't
25         have to go through that whole continuum with

Page 37

1          a guy standing with a gun.  We can -- you
2          know, we can bypass some of the things in the
3          continuum.  So I would say that the way that
4          you were describing it is we don't --
5          there's, you know, your verbal -- or your
6          uniform presence, your verbal, your soft
7          empty hand, your hard empty hands, your
8          impact weapons.  So we don't -- just
9          because -- we don't have to follow that
10         entire thing up.
11   Q.    Okay.  So if I hear what you're saying, it's
12         that you do not have to exhaust less lethal
13         options if you are facing a person who is
14         armed?
15   A.    We don't have to go through every level of
16         that depending on where the suspect's at in
17         that level, yes.
18   Q.    Okay.  And in-service training, have you
19         received training on deescalation tactics?
20   A.    Yes.
21   Q.    What are some deescalation tactics that you
22         have been trained upon off the top of your
23         head?
24   A.    Talking, you know, not cornering somebody,
25         trying to talk in a calm manner, getting on a

## Page 38

1    first name basis with somebody, not having a

2    whole bunch of people around.

3    Q.    Would you agree one key deescalation

4    technique is to take time as a tactic to slow

5    down the pace of an incident?

6    A.    Yes.

7    Q.    And to give the suspect time to respond to

8    commands?

9    A.    Yes.

10   Q.    And possibly to engage in continual

11   conversation to keep the suspect calm?

12   A.    Can be, yes.

13   Q.    And even acknowledging a suspect's possible

14   confusion or mistrust of law enforcement?

15   A.    I don't recall that specifically.

16   Q.    Have you ever used that technique on the job?

17   A.    To what?

18   Q.    Have you ever used that particular technique

19   on the job to defuse a situation?

20   A.    Which technique?

21   Q.    Speaking to a suspect by acknowledging his

22   possible mistrust of law enforcement or

23   confusion concerning the situation.

24   A.    I'm certain that I have.

25   Q.    Okay.  Would you agree these techniques we've

## Page 39

1    just discussed are important to use in a

2    scenario presenting a risk of possible injury

3    or death?

4          MR. PIGG:  Object to form; it's

5    insufficient hypothetical, calls for

6    speculation.

7    A.    I think that -- can you rephrase the

8    question.

9    Q.    Sure.  Do you think it's important to use

10   deescalation techniques in a scenario in

11   which a civilian -- I'll rephrase -- is

12   armed?

13         MR. PIGG:  Same objection.

14   A.    I think that law enforcement is very fluid,

15   and if you have the time, then certainly.  A

16   lot of times there's not the time to do that.

17   Q.    Okay.  If you can, you should?

18         MR. PIGG:  Same objection.

19   A.    If you are able or if it's -- I guess if you

20   have -- if you have the time, time is

21   always -- I mean, if you can talk to somebody

22   if they're going to listen, then yes.

23   Q.    And the value of using these techniques is to

24   ensure a positive outcome; correct?

25   A.    Correct.

## Page 40

1    Q.    Meaning an outcome where no one was harmed?

2    A.    Correct.

3    Q.    Do you recall an incident in September 2013

4    in which you responded to a call of a

5    suicidal individual who was threatening to

6    shoot himself?

7    A.    I probably responded to a hundred of them.

8    Q.    So that's kind of a typical scenario to which

9    you responded in the course of your career?

10   A.    I've been on lots of them, yes.

11   Q.    I will try to refresh your recollection.  All

12   right.

13         (Jonker Exhibit No. 62 was marked for

14   identification.)

15   Q.    So I am going to mark a performance appraisal

16   for Benjamin Jonker as Exhibit 62.  It was

17   produced as Wichita 3352 to 3379.

18         And you don't have to look through

19   this full document 'cause I'm going to direct

20   you to bates number 3366 in the bottom

21   right-hand corner.  All right.

22         And specifically, the bottom box, it's

23   the assessment of judgment, and it looks to

24   me like the assessor gave an example of your

25   ability to make sound decisions in the face

## Page 41

1    of crisis by citing to an event that took

2    place on September 2013.

3          Do you see where I'm looking?

4    A.    Yes.

5    Q.    Okay.  And feel free to read that.

6          Does that -- and once you do, does

7    that refresh your recollection as to the

8    incident to which I'm referring?

9    A.    I don't recall that -- that incident.

10   Q.    It doesn't refresh your recollection?

11   A.    No.

12   Q.    Okay.  Is it fair to say that that

13   description, though, is accurate in terms of

14   how you would respond as normal practice to

15   such an event?

16         MR. PIGG:  Object to form; it's

17   an insufficient hypothetical.

18   A.    I guess I would need more information to

19   answer that question.

20   Q.    We'll ask some specific questions.

21         According to this assessment, you

22   responded to a person who was suicidal and

23   armed; correct?

24   A.    Okay.

25   Q.    And in the report, it states that you

## Page 42

```
1          coordinated a perimeter?
2     A.   Okay.
3     Q.   Have you, in the past, in your job
4          coordinated perimeters?
5     A.   Many.
6     Q.   And what is the purpose of a perimeter?
7     A.   Containment.
8     Q.   And how does one set up a perimeter?
9     A.   Rephrase the question, I guess.
10    Q.   What's the process of setting up a perimeter?
11    A.   The easy way to answer -- I mean, the -- I
12         guess, the -- you go over here, you go over
13         here.  I mean, we want to contain all sides.
14         So on the radio, verbally, I guess.
15    Q.   So you assign officers to all sides of the
16         scene to contain the suspect?
17    A.   Not necessarily.  We want to -- I mean, the
18         purpose of a perimeter is to be able to have
19         eyes on all sides of the scene.
20    Q.   Okay.  And one of the reasons for that is to
21         keep civilians safe, correct, who are in the
22         area?
23    A.   Yes.
24    Q.   And to keep law enforcement safe?
25    A.   Correct.
```

## Page 43

```
1     Q.   Okay.  And is it typical for you to create a
2          perimeter when faced with a person who is
3          suicidal as in this incident that's relayed
4          in your assessment?
5     A.   What was your question?
6     Q.   Would you typically set up a perimeter if you
7          had a armed suicidal person to whom you were
8          responding?
9     A.   It just depends.
10    Q.   On what?
11    A.   On the location, I mean, on a lot of things.
12    Q.   Okay.  And this report says that you got in
13         contact with the suspect.
14              Is that a typical response that you
15         would use?
16    A.   I honestly have zero recollection of this
17         specific.  If you have --
18    Q.   And I understand.  I'm just asking,
19         generally, if the tactics relayed here are
20         tactics you would use in the course of your
21         work as an officer.
22    A.   If -- are you -- as an officer responding to
23         an armed suicidal person --
24    Q.   Correct.
25    A.   -- you would want to contain that person, try
```

## Page 44

```
1          to, where they're not going to be out walking
2          around with a handgun.  And obviously you're
3          going to want to try and make contact with
4          them.
5     Q.   For what purpose?
6     A.   'Cause if you didn't make contact with them,
7          you can't do anything.
8     Q.   Okay.  And you'd try to engage --
9     A.   You could try and deescalate or try and
10         disarm, take them into custody, whatever.  At
11         some point you have to make contact with
12         them.
13    Q.   Got it.  And would the goal of using those
14         tactics be to disarm him without anyone
15         getting hurt?
16    A.   Correct.
17    Q.   All right.  We'll put that away.  Thank you.
18              Did you receive training in in-service
19         sessions on active shooters?
20    A.   Yes.
21    Q.   And do you recall any of what you learned in
22         those sessions?
23    A.   I mean, specific -- yes.
24    Q.   And what do you recall?
25    A.   Just how to respond to active shooting
```

## Page 45

```
1          situations, you know, making contact teams.
2          We learned different movements to go through
3          on active shooting situations.
4     Q.   When you say teams, do you mean contact
5          teams?
6     A.   Yes.
7     Q.   And what is a contact team?
8     A.   I guess I'll give a scenario.
9     Q.   Okay.
10    A.   If you had a school shooting -- well, that's
11         not a good scenario.  Let's say that your
12         first arriving officers on scenes would be
13         your contact team.  So our policy, if you
14         have a -- say that you had three patrol
15         officers and a SWAT guy that showed up on
16         scene, your SWAT guy's going to be the team
17         leader because he's been through much more
18         advanced training on active shooting
19         situations.  So your contact team is
20         basically just that:  Your team that's going
21         to go in and make contact with your active
22         shooter.
23    Q.   Okay.  And what will they do in the process
24         of making contact with the shooter?
25              Or what techniques are they expected
```

## Page 46

1      to employ?

2  A.  That's a hypothetical question.  I don't --

3      it would depend on the situation, I guess.

4  Q.  What are you trained to do in terms of

5      formulating a contact team?

6  A.  More specifically.

7  Q.  Well, you said you have in-service training

8      on responding to active shooter situations;

9      correct?

10  A.  Uh-huh.

11  Q.  And part of that training involves contact

12      teams.

13          And what specifically are you trained

14      to do in terms of being a member of a contact

15      team?

16  A.  Find the guy that's shooting.

17  Q.  Okay.  And say what to him?

18  A.  That's a hypothetical.  I mean, I don't -- I

19      don't remember specifically what they were --

20      what they taught us to say to the guy.  I

21      mean, if you have a guy actively shooting,

22      I'm assuming that you're going to shoot back,

23      but that's -- it's a -- it's a -- it'd just

24      depend on what happens at that -- on each

25      specific scenario.

## Page 47

1  Q.  But the role of the contact team is not to

2      shoot back; is that correct?

3  A.  It just depends on what happens when you get

4      there.

5  Q.  But you would agree that one of the primary

6      objectives of the contact team is to make

7      contact, verbal contact with the potential

8      shooter?

9  A.  Potentially, yes.

10  Q.  And potentially to disarm the shooter, if

11      possible?

12  A.  Potentially, yes.

13  Q.  So you have an outcome that doesn't involve

14      in anybody getting shot?

15  A.  That also could be a potential outcome.

16  Q.  Okay.  Did you receive any training on

17      hostage rescue?

18  A.  Not that I recall.

19  Q.  All right.  Did you take any SWAT training?

20  A.  I've trained with SWAT, yes.

21  Q.  Okay.  So you don't have to be a member of

22      SWAT to receive SWAT training?

23  A.  Well, we deploy the dogs with SWAT

24      occasionally.

25  Q.  Okay.  And in that SWAT training, what topics

## Page 48

1      did you cover?

2  A.  I mean, the SWAT training that we do is just

3      entries.

4  Q.  Entries into buildings?

5  A.  Houses, buildings, yes.

6  Q.  In what scenarios?

7  A.  There's a -- we try to cover every scenario.

8      I mean, there's tons of scenarios that we'll

9      try and set up.

10          The thing with dog training is that we

11      try to expose the dogs to anything that we

12      could possibly think of that we would ever

13      deploy the dogs with so it's not the first

14      time that they see it when they're out on the

15      street.

16  Q.  Okay.  So would that include training on

17      entering houses involving an armed shooter?

18  A.  That's typically not something that we would

19      deploy the dog on.

20  Q.  Okay.  Why not?

21  A.  'Cause I like my dog.  You know, we typically

22      aren't going to deploy a dog into something

23      where it's a suicide mission, I guess, for

24      the dog.

25  Q.  Okay.  So your training in SWAT is limited to

## Page 49

1      the occasions in which a dog would be used in

2      a SWAT incident?

3  A.  Correct.

4  Q.  Do you agree that WPD officers should use

5      less lethal weapons when appropriate as a

6      means of overcoming a subject's resistance?

7  A.  If -- ask the question again.

8  Q.  Do you agree with the principle that WPD

9      officers should use less lethal weapons, when

10      appropriate, as a means of overcoming

11      resistance?

12  A.  Yes.

13  Q.  And do you agree with the statement that WPD

14      officers should use only amount of force --

15      only the amount of force necessary to

16      overcome a subject's resistance?

17  A.  One more time.

18  Q.  Do you agree with the principle that WPD

19      officers should use only the amount of force

20      necessary to overcome a suspect or subject's

21      resistance?

22  A.  I guess rephrase that for me.  Is that -- I

23      mean, is that out of policy or is that a --

24      the --

25  Q.  It's a statement.  I'm just asking you to

Page 54

```
 1        ignite.
 2    Q.  Okay.  So at some point, you issued a shot
 3        from your beanbag shotgun; correct?
 4    A.  Two.
 5    Q.  And what was the reason for doing so?
 6    A.  Trying to safely take him into custody.
 7    Q.  All right.  And beanbag shotgun, as we
 8        discussed, is a less lethal weapon option?
 9    A.  Correct.
10    Q.  And you hit him in the bicep area and
11        abdomen.  Does that ring a bell?
12    A.  Yeah, I believe the first shot hit him in the
13        bicept and then he still had -- he threw
14        down -- my second shot was right there in
15        the side.
16    Q.  And did you issue a second shot because he
17        was still resisting?
18    A.  Because the first shot was -- I mean, it
19        didn't get the desired result.
20    Q.  Meaning what?
21    A.  That he complied.
22    Q.  I see.  So after you shoot the second shot,
23        were you able to take him into custody?
24    A.  Yeah, it distracted him.  He still didn't
25        comply, but we basically rushed him and took
```

Page 55

```
 1        him into custody.
 2    Q.  Okay.  And there are no fatalities in that
 3        incident?
 4    A.  No.
 5    Q.  Did you think the officers on the scene did a
 6        good job of defusing the situation?
 7    A.  I thought he did.  I mean, I had some
 8        criticism as far as the way that the -- I
 9        mean, the officer got too close, I thought,
10        to a chain link fence giving him his own
11        personal cell phone.  I had some criticisms
12        about it, but I thought the officer did a
13        good job of continuing to talk to him.
14    Q.  Why shouldn't he have given him his own cell
15        phone?
16    A.  I don't think he should have allowed him to
17        call anybody first off, but that wasn't my
18        call.  Secondly, he -- I mean, he was way too
19        close with a guy with several knives.
20    Q.  Were the knives recovered after the incident?
21    A.  I believe so.
22    Q.  Have you received CIT training?
23    A.  Yes.
24    Q.  Did you --
25    A.  I'm not a CR -- or CIT officer.  I went
```

Page 56

```
 1        through like a basic class, I guess.
 2    Q.  Okay.  And what did you learn in that class,
 3        in general terms?
 4    A.  I don't specifically remember that specific
 5        class.
 6    Q.  Did you learn how to respond to scenes
 7        involving a potential mental health crisis?
 8    A.  Yes.
 9    Q.  And did it involve deescalation techniques of
10        the kind that we discussed earlier?
11    A.  Yes.
12    Q.  All right.  And how many officers, to your
13        knowledge, are CIT certified on the force?
14    A.  I have no idea.
15    Q.  Was anyone at the Finch shooting incident CIT
16        certified?
17    A.  I didn't know at the time.  I learned through
18        a meeting that there were.
19    Q.  And who do you now know to be CIT certified
20        who was at the scene?
21    A.  Is that something I can --
22    Q.  I'm just asking, generally, your knowledge,
23        not as to how you came to have that knowledge
24        or the process by which you came to have that
25        knowledge.
```

Page 57

```
 1            MR. PIGG:  You can tell her if
 2        you know that somebody was there even if you
 3        learned it in our meeting.
 4    A.  Just during our meeting, I learned that
 5        Officer, I think, Powell and Fussell both
 6        were.
 7    Q.  Okay.  And they were near you at the time of
 8        the shooting; correct?
 9    A.  Correct.
10    Q.  Are you familiar with the CIT policy -- WPD
11        CIT policy?
12    A.  I have a working knowledge of that policy,
13        yes.
14    Q.  Okay.  And would you agree one of the
15        provisions states that when officers
16        recognize they are potentially dealing with a
17        mental health abuse -- or substance abuse
18        emergency, officers should consider applying
19        certain deescalation techniques?
20            Would you agree with that -- that
21        proposal?
22    A.  Yes.
23    Q.  Okay.  And you received training on that
24        policy?
25    A.  Yes.
```

15 (Pages 54 to 57)

## Page 58

1  Q.  All right.  If you are a supervisor in charge
2      of a crime scene that involves a potential
3      mental health crisis or a suspect with a
4      mental health issue, are you expected to call
5      in CIT certified officers to the scene?
6  A.  **We have the ability to do that, yes.**
7  Q.  Is it mandated practice that you do so?
8  A.  **No.**
9  Q.  Is it good practice, in your opinion?
10 A.  **To --**
11 Q.  To call in CIT officers if you think you're
12     responding to a scene involving a mental --
13 A.  **Yeah.**
14 Q.  -- health crisis?  And is that
15     particularly -- strike that.
16         Is that because CIT officers have
17     particular training in how to deal with such
18     situations?
19 A.  **Correct.**
20 Q.  All right.  And at the time of the Finch
21     shooting, you were certified to use several
22     different weapons; correct?
23 A.  **Yes, ma'am.**
24 Q.  Including a handgun?
25 A.  **Yes.**

## Page 59

1  Q.  What type of handgun?
2  A.  **A Glock.**
3  Q.  And did you have that on you at the time of
4      the shooting?
5  A.  **Yes.**
6  Q.  And any other weapons on you at the time of
7      the shooting?
8  A.  **Baton.**
9  Q.  Okay.  Any others?
10 A.  **Had access to a dog.**
11 Q.  All right.  Did you have a beanbag shotgun on
12     you?
13 A.  **No.**
14 Q.  One of the foam --
15 A.  **No.**
16 Q.  -- shotguns?  Do you know if anybody at the
17     scene had access to those types of weapons at
18     the scene?
19 A.  **When I -- when I first got there, I assumed**
20     **that nobody else had access to that because I**
21     **was the only supervisor on the scene.  And I**
22     **believe at that time, it was just supervisors**
23     **that had access to that.  So at the -- just**
24     **in the minutes that this transpired when I**
25     **was the only supervisor on the scene, I**

## Page 60

1      **didn't believe that we had access to that.**
2  Q.  Is it your understanding now that
3      non-supervisors have access to those weapons,
4      as well?
5  A.  **Now, yes.**
6  Q.  Okay.  And was that true in December 28th,
7      2017?
8  A.  **I don't recall.  I don't recall when we made**
9      **that switch.**
10 Q.  Okay.  And how come you didn't have those
11     weapons on you at the time?
12 A.  **I don't have them assigned to me because I**
13     **have a lot of other equipment that I carry in**
14     **my patrol car.**
15 Q.  Okay.  Which -- do you know which sergeants
16     do have those assigned to them?
17 A.  **I do not.  They're --**
18 Q.  Sorry.  Go ahead.
19 A.  **They're assigned to specific cars, so I**
20     **couldn't tell you which ones had them in**
21     **there.**
22 Q.  Do you know which cars are assigned to them?
23 A.  **No.**
24 Q.  Have you ever fired a weapon in the course of
25     your work, WPD?

## Page 61

1  A.  **In training.**
2  Q.  What about in response to an actual scenario?
3  A.  **My handgun?**
4  Q.  Yes.
5  A.  **No.**
6  Q.  Have you ever fired a -- any other kind of
7      weapon?
8  A.  **Lethal weapon?**
9  Q.  Sorry.  Yeah, let me rephrase.  Any other
10     lethal weapon?
11 A.  **No.**
12 Q.  Have you ever been at the scene of an
13     incident in which another officer in your
14     presence fired a lethal weapon?
15 A.  **No.**
16 Q.  Is this the, the Finch shooting incident, the
17     one and only incident in which you were on
18     the scene of an officer firing a lethal
19     weapon?
20 A.  **At the time that he fired it?**
21 Q.  Correct.
22 A.  **Yes.**
23 Q.  Have you subsequently been at a scene
24     involving --
25 A.  **Yes.**

16 (Pages 58 to 61)

Page 62

```
1    Q.   -- a officer-involved shooting?
2    A.   Yes.
3    Q.   And when did that occur?
4    A.   When -- in March of 2017, I guess, when we
5         lost -- or '16, when we lost our police K-9,
6         I responded to that scene from home.  I was
7         off duty.  Our dog got shot and the suspect
8         was shot also.  So I responded to that scene.
9    Q.   And what were the circumstances surrounding
10        that incident?
11   A.   It was a domestic violence call.  The suspect
12        came out.  We -- the officers deployed the
13        dog.  And when the suspect tried to retreat
14        back into his house, the dog engaged the guy
15        and when the dog was engaged on his porch, he
16        had brought a handgun up, ultimately,
17        shooting the dog.
18   Q.   What was the suspect's name?
19   A.   I don't recall.
20   Q.   Was he killed?
21   A.   Yes.
22   Q.   And you said you thought March 2017, which
23        would have been after the Finch incident; is
24        that --
25   A.   '16, sorry.
```

Page 63

```
1    Q.   So it was actually prior to the Finch
2         incident?
3    A.   Yes.
4    Q.   All right.  You were not the shooter?
5    A.   Huh?
6    Q.   You were not the shooter?
7    A.   No.
8    Q.   Who was the officer that shot the gun?
9    A.   Schepis.
10   Q.   Jamie Schepis?
11   A.   Yes.
12   Q.   Were you involved in any subsequent
13        investigation to that shooting?
14   A.   What do you mean?
15   Q.   Were you interviewed by WPD officers?
16   A.   No.
17   Q.   Were you interviewed by anyone with the
18        Professional Standards Bureau?
19   A.   No.
20   Q.   Do you recall if there -- did you ever find
21        out if there was an investigation into the
22        shooting?
23   A.   I'm certain that there was an investigation.
24   Q.   Do you know the outcome of that
25        investigation?
```

Page 64

```
1    A.   To my knowledge, that hasn't been ruled on by
2         the district attorney's office yet.
3    Q.   Has it been ruled on by WPD?
4    A.   They typically will wait.  I don't know
5         specifics.  They typically would wait until
6         that ruling, I'm assuming.
7    Q.   Wait until the ruling from the DA?
8    A.   Yes.
9    Q.   Is Officer Schepis still on the force?
10   A.   Yes.
11   Q.   Is he still on active duty?
12   A.   Yes.
13   Q.   And he's on SWAT; correct?
14   A.   Yes.
15   Q.   Okay.  Prior to the Finch shooting incident,
16        had you responded to scenes involving armed
17        shooters?
18   A.   Yes.
19   Q.   And had you ever responded to scenes
20        involving possible hostages?
21   A.   Yes.
22   Q.   Had you responded to scenes involving
23        barricaded gunmen?
24   A.   Yes.
25   Q.   And what does that mean exactly, a barricaded
```

Page 65

```
1         gunman?
2    A.   I guess an easy example would be somebody
3         that knows that we're out there or -- and
4         pushes a couch in front of his front door.
5         Somebody that's barricaded that's going to
6         prevent -- that's refusing to come out, I
7         guess, would be an easy answer to that.
8    Q.   And I assume I know the answer to this, given
9         our prior discussion, but have you responded
10        to scenarios involving armed persons with
11        potential mental health issues?
12   A.   Yes.
13   Q.   Okay.  And would you say it was not unusual
14        to respond to these kinds of incidents, these
15        kinds of -- well, let me strike that.
16             How usual was it for you to respond to
17        active shooter incidents?
18   A.   How usual?
19   Q.   Yeah.  Never happens, once in awhile, pretty
20        typical?
21   A.   It happens.  I guess that's the easiest --
22        I've been out on them.  They happen.
23   Q.   Do you know how many, over the course of your
24        career, you've responded to?
25   A.   A lot.
```

17 (Pages 62 to 65)

Page 66

```
 1    Q.   More than 10?
 2    A.   Of armed --
 3    Q.   -- shooters.
 4    A.   Like actively shooting?
 5    Q.   Correct, or you receive a report that the
 6         person had shot.
 7    A.   Yeah, I mean, would a shooting call count as
 8         that?
 9    Q.   Yeah.
10    A.   Yeah, hundreds.
11    Q.   Okay.  Pretty typical?
12    A.   Yes.
13    Q.   How typical are barricaded gunman calls?
14    A.   Less typical.  I mean, I've responded to
15         them.
16    Q.   Do you know how many, about?
17    A.   I couldn't tell you.
18    Q.   Less than 10, more than 10?
19    A.   I would say more than 10.
20    Q.   Do any stand out for you?
21    A.   No.
22    Q.   Have you ever responded to a false call?
23    A.   Yes.
24    Q.   And what is a false call?
25    A.   My definition of what a false call is?
```

Page 67

```
 1    Q.   Sure.
 2    A.   Somebody calls 911 and basically says
 3         something to elicit a police or fire, medical
 4         response that's not truthful.
 5    Q.   Would you say such calls are pretty typical
 6         on the job?
 7    A.   I wouldn't say they were typical.  They
 8         happen.
 9    Q.   How many, over the course of your career,
10         would you estimate?
11    A.   I couldn't tell you.
12    Q.   Again, more than 10?
13    A.   More than 10.
14    Q.   More than 20?
15    A.   Probably more than 20.
16    Q.   All right.  Is it fair to say that you
17         frequently respond to crime scenes based on
18         information you receive from dispatch?
19    A.   That we respond to crime scenes based off of
20         what dispatch gives us?
21    Q.   Yep.
22    A.   Very frequently.
23    Q.   Okay.  That's the norm, in fact?
24    A.   Correct.
25    Q.   And you would agree, I assume, based on your
```

Page 68

```
 1         prior statement that the information received
 2         from dispatch is not always correct?
 3    A.   Correct.
 4    Q.   And especially when the person who is, in
 5         fact, reporting a crime gives dispatch
 6         incorrect information?
 7    A.   Correct.
 8    Q.   Okay.  Do you receive training on any methods
 9         law enforcement officers can use to verify
10         the accuracy of a emergency call?
11    A.   Formal training?
12    Q.   Any kind of training.
13    A.   Yes.
14    Q.   And what kind of training did you receive?
15    A.   I would say most of it would be on-the-job
16         training.
17    Q.   Okay.
18    A.   Being able to look stuff up on your computer,
19         checking with dispatch to find out if we've
20         had prior calls there and whatnot.
21    Q.   Okay.  And what kind of info would you be
22         looking up on the computer?
23    A.   People, addresses, calls.
24    Q.   Okay.  So you'd look to see if police had
25         previously responded to the supposed suspect
```

Page 69

```
 1         location?
 2    A.   More or less, yes.
 3    Q.   And what would be the importance of doing
 4         that?
 5    A.   To find out if we've been there before?
 6    Q.   Right.  Why would that be important?
 7    A.   I mean, in my computer you could pull up if
 8         we've been out on false calls there or if
 9         there's somebody that is classified as a
10         mental is living at that address and is
11         somebody that frequently calls in all the
12         time.
13    Q.   Okay.  What's a mental?
14    A.   The -- somebody that has been classified
15         through our system as a -- somebody with
16         mental issues.
17    Q.   And is it fair to say you would also look to
18         see if there were legitimate police responses
19         to that house?
20    A.   Yes.
21    Q.   Because that would tend --
22    A.   Domestic violence or --
23    Q.   Right, because that would tend to confirm the
24         accuracy of the call?
25    A.   Correct.
```

18 (Pages 66 to 69)

Page 70

1  Q.  Would you try to ascertain demographic detail
2      about the suspect from dispatch, like the
3      person's age, sex, race, physical
4      description?
5  A.  From our dispatcher?
6  Q.  Correct.
7  A.  On -- what scenario are we on now?
8  Q.  Just in any scenario which you're responding
9      to a 91 call involving an identified suspect,
10     would you attempt to know who you were
11     responding to by asking identifying details
12     from dispatch?
13 A.  Dispatch would typically give us that
14     information.
15 Q.  And if they didn't, would you ask?
16 A.  Possibly.
17 Q.  And what would be the importance of asking?
18 A.  To find out who you're going to deal with.
19 Q.  Okay.  Would you say it'd also be important
20     to then confirm the details you received
21     based on what you saw at the scene?
22 A.  What do you mean by that?
23 Q.  Well, if dispatch said you were dealing with
24     a 6-foot-4, white, 40-year-old man; you came
25     to the scene and all you saw was a

Page 71

1      18-year-old African American teenager, that
2      would cause you to suspect that perhaps there
3      were some discrepancies in the call?
4  A.  Yes.
5  Q.  Okay.  And you're familiar with the term
6      swatting?
7  A.  Yes.
8  Q.  Were you familiar with it on December 28th?
9  A.  Yes.
10 Q.  And how had you heard the term?
11 A.  I remember being asked this in my interview.
12     And when I think of swatting, I think of like
13     Los Angeles PD, you know, and people calling
14     911 on actors or sports figures, somebody
15     famous.
16 Q.  Right.
17 A.  And having -- you know, saying something in
18     order to elicit a large response from the
19     police.
20 Q.  So you knew it was a phenomenon; correct?
21 A.  Correct.
22 Q.  Had you ever heard of it being used against
23     non-celebrities?
24 A.  You know, I don't recall if I had or not.
25 Q.  Okay.  Do you agree sitting here now that the

Page 72

1      call that stimulated the police response to
2      McCormick on December 28th, 2017, was likely
3      a swatting call?
4  A.  Absolutely.
5  Q.  All right.  And I'm going to refer to 1033
6      West McCormick going forward.
7          Would you agree that's the location at
8      which the Finch shooting --
9  A.  Yes.
10 Q.  -- incident occurred?
11         At the time you responded to the call
12     that night, before any shots were fired, did
13     you believe it to be a swatting call?
14 A.  No.
15 Q.  Okay.  And is it fair to say, when you
16     responded to the scene, you believed you were
17     dealing with a barricaded shooter scenario?
18 A.  Yes.
19 Q.  An active shooter scenario, perhaps?
20 A.  I wouldn't say active.  Your first --
21 Q.  Barricaded gunman?
22 A.  Yes.
23 Q.  And a hostage scenario; correct?
24 A.  Correct.
25 Q.  All right.  And you had, as we discussed

Page 73

1      earlier, responded to such cases before?
2  A.  Correct.
3  Q.  Now the evening of December 28th, when did
4      you start your shift?
5  A.  I believe probably around 4:30.
6  Q.  Okay.  And you didn't have assigned partner;
7      right?
8  A.  My dog.
9  Q.  Okay.  And what were your assigned duties
10     that night, as you understood them?
11 A.  As a CR -- or a SCAT supervisor and the K-9
12     supervisor.
13 Q.  And did you do anything on the job prior to
14     going to 1033 West McCormick?
15 A.  Yes.
16 Q.  What did you do?
17 A.  We had a meeting at a citizen's house with
18     all of our dogs.
19 Q.  All right.  For what purpose?
20 A.  Just 'cause she likes the dogs.
21 Q.  Did you do anything else that night prior to
22     going?
23 A.  No.
24 Q.  Did you make any arrests?
25 A.  No.

19 (Pages 70 to 73)

## Page 78

1  Q.  What information did you have?

2  A.  I asked dispatch if we had had any calls from

3      that address or from the phone number in the

4      past.

5  Q.  And when did you ask dispatch that?

6  A.  While I was driving to there.  Shortly after

7      they'd broadcast the call.

8  Q.  Okay.  And what did dispatch tell you?

9  A.  That there had been a call of a stroke.

10 Q.  Okay.  Just a medical call?

11 A.  Correct.

12 Q.  No law enforcement response?

13 A.  Not that they ever told me.

14 Q.  Did you find out at that time that you

15     responded to the scene -- or the initial

16     information you received, rather, that it was

17     coming via the badge on the floor?

18 A.  No.

19 Q.  Did you ever find that out that night?

20 A.  Yes.

21 Q.  And when did you find that out?

22 A.  Well after the shooting, after we'd cleared

23     the -- most of the residence.

24 Q.  Did anything about the initial information

25     you received via simulcast strike you as

## Page 79

1      suspect or unusual?

2  A.  No.  It's an unusual call.

3  Q.  In what sense?

4  A.  I mean, it's not every day that we go to a

5      call where somebody says that they shot their

6      dad and they're holding their mom and

7      siblings hostage.  I mean, it's a very high

8      priority call.

9  Q.  Right.  Was there anything about that call

10     that suggested to you you might be dealing

11     with a mental health issue?

12 A.  No.

13 Q.  Did anything about the circumstances of the

14     call suggest that the person who was holding

15     their family hostage and who had shot a

16     member of their family might have a mental

17     health problem?

18 A.  No, but one could assume that if you shoot

19     your dad and are holding two people hostage

20     that you may have a mental health problem.

21 Q.  So was it in your mind that mental health

22     issues may be involved as you responded?

23 A.  Not really.

24 Q.  Did you ever learn the name Andrew Finch

25     prior to the shooting?

## Page 80

1  A.  No.

2  Q.  When did you first find out that name?

3  A.  I don't recall.  I mean, I don't even

4      remember, during my interview, if I knew his

5      name.

6  Q.  You know it today, of course; right?

7  A.  Yes.

8  Q.  Are you familiar with the name outside this

9      case?

10 A.  No.

11 Q.  Had you ever come across Mr. Finch before?

12 A.  Not that I recall.

13 Q.  After hearing the call, you drove to the

14     scene; correct?

15 A.  Correct.

16 Q.  And what route did you take?

17 A.  West on Kellogg and I got off on Seneca and

18     then I went south -- I think in my tape -- my

19     transcript, it says north, but I went south

20     on Seneca from Kellogg to McCormick

21     basically.

22 Q.  Then were you talking to dispatch during this

23     drive?

24 A.  The only thing I said to dispatch was I asked

25     them what the call history was.

## Page 81

1  Q.  Did it strike you as unusual that such a high

2      priority incident would be happening at a

3      residence with no history of law enforcement

4      response?

5  A.  No.  Can you rephrase that -- or ask that

6      question again.

7  Q.  Sure.  You learned that there wasn't a

8      history of law enforcement responding to that

9      house?

10 A.  Uh-huh.

11 Q.  Did it then strike you as, perhaps, unusual

12     that such a high priority incident was, thus,

13     taking place there?

14 A.  No, just the opposite, actually.  What would

15     make me believe that maybe this isn't a real

16     call would be if there was 40 calls from a

17     guy that reports, you know -- constantly

18     calls 911 and because he is mentally ill

19     or -- that's what would -- that's what I'm

20     looking for when I'm asking that, you know,

21     is this a guy that calls 911 and reports off

22     the wall things all the time, which is not

23     what we had in this situation.

24 Q.  Right.  You also didn't have a history of

25     violent acts at that house; correct?

21 (Pages 78 to 81)

Page 94

1    you parked?
2    A.   Not very at all.
3    Q.   Meaning less than two minutes?
4    A.   Yes.
5    Q.   All right.  Did you give Officer Rapp any
6         orders at that location?
7    A.   Yes.
8    Q.   What did you say?
9    A.   I had pointed at Officer Rapp, and I didn't
10        know at the time, but I believe it's Officer
11        Powell to follow me around to the front of
12        the house.
13   Q.   So Officer Powell was also at that location?
14   A.   I believe so, yes.
15   Q.   Because he came with Rapp?
16   A.   Yes.
17   Q.   Okay.  Did you give Officer Gumm any
18        commands?
19   A.   No.
20   Q.   Do you know, did Officer Gumm, to your
21        knowledge, know what to do while he was at
22        that location?
23   A.   Yes.
24   Q.   How do you know?
25   A.   'Cause I've worked with him for a long time.

Page 95

1    Q.   What was he doing at that location?
2    A.   He was basically covering off the back of the
3         residence.
4    Q.   Okay.  But you never said "cover back the
5         residence"?
6    A.   Not that I recall.
7    Q.   You just assumed he'd do so.
8    A.   Correct.
9    Q.   And what kind of weapon did he have?
10   A.   A handgun.
11   Q.   Was it out?
12   A.   I believe so.  I don't -- specifically, I
13        don't recall, but I believe so.
14   Q.   And why did you choose to move to the north
15        side of McCormick?
16   A.   Because this did not look like an egress or
17        ingress point.
18   Q.   Sorry.  This being the back of the 1033 West
19        McCormick?
20   A.   Yes.  The rear where officers were at did not
21        appear to be utilized for moving in and out,
22        and I wanted to get a better view of the
23        front of the residence.
24   Q.   Okay.  And why did you take Powell and Rapp
25        with you?

Page 96

1    A.   Because I wanted officers on the front of the
2         residence.
3    Q.   Okay.  More than one?
4    A.   Correct.
5    Q.   Any specific reason why you chose those
6         officers?
7    A.   There was absolutely zero reason why I chose
8         Powell other than he was standing right next
9         to me.  And the reason that I chose Rapp was
10        because he was the only one out there with a
11        rifle.
12   Q.   Okay.  And you knew he had a rifle on him?
13   A.   Correct.
14   Q.   How did you know that?
15   A.   He had it up and out and trained on the back
16        of the house.
17   Q.   Okay.  Did you have prior knowledge that he
18        was rifle certified?
19   A.   Yes.
20   Q.   How did you have that knowledge?
21   A.   I just did.  He was one of my employees.
22   Q.   Okay.  Had you worked for him -- with him for
23        some time?
24   A.   Yes.
25   Q.   How many months or years?

Page 97

1    A.   I think he was -- I was trying to think of
2         this last night.  Maybe a year and a half.
3    Q.   Okay.  And he was your subordinate officer
4         during that time?
5    A.   Correct.
6    Q.   Did you find him to be a good officer?
7    A.   Yes.
8    Q.   Honest?
9    A.   Yes.
10   Q.   Trustworthy?
11   A.   Yes.
12   Q.   Do you think he was reliable with a weapon?
13   A.   Yes.
14   Q.   Had you ever seen him engaged in any
15        excessive use of force while on the job?
16   A.   Absolutely not.
17   Q.   Any improper conduct whatsoever while on the
18        job?
19   A.   No.
20   Q.   Could you mark the location on the map and
21        call it location 2 where you went on the
22        north side of McCormick, please.
23   A.   (Witness complies.)  In general, it was I
24        believe right up -- I can't tell because of
25        the trees.

25 (Pages 94 to 97)

Page 102

1    A.   'Cause he had the rifle.
2    Q.   All right.  And did he comply with that
3         command?
4    A.   Yes.
5    Q.   So when you arrived at location 2, did he, in
6         fact, raise his rifle and provide cover?
7    A.   His -- I saw his -- I mean, he was -- he had
8         his rifle pointed at the front of 1033 West
9         McCormick.
10   Q.   Okay.  And did you give him particular
11        instructions as to how to provide cover?
12   A.   No.
13   Q.   And do you -- what did you understand his
14        duties to be?
15   A.   To provide a long angle cover on 1033 West
16        McCormick.
17   Q.   And what does that mean?
18   A.   Over watch.  I mean, he's got the best
19        picture of the -- of the front of the
20        residence.
21   Q.   And what were his job duties in that
22        position?
23   A.   I just thought I answered that.
24   Q.   In specifics, what was he expected to do
25        while providing cover?

Page 103

1    A.   Provide cover.
2    Q.   What does that mean?
3         Pretend I have no knowledge of law
4         enforcement.
5         What does it mean to provide cover?
6    A.   I mean, he would be the one that if somebody
7         popped out onto the porch, he would let us
8         know that.  You know, he could verbalize
9         that.  He's watching that.  He has the best
10        angle to see what's going on from across the
11        street.  There are officers to the east.
12        He's the cover officer.
13   Q.   So you say he had the best angle.
14        Is that because he was facing the
15        entryway head on?
16   A.   I mean, he had the unobstructed view from
17        across the street, yes.
18   Q.   Okay.  How many feet away from the house were
19        you at that point?
20   A.   I don't know.
21   Q.   Can you guess?
22             MR. PIGG:  Object to form; calls
23        for speculation.
24   A.   40 to 50 yards.
25   Q.   Okay.  And at the time you got to location 2,

Page 104

1         had you given any instructions to Powell?
2    A.   No.
3    Q.   To Fussell?
4    A.   Not that I recall.
5    Q.   Had you issued any other instructions to
6         other specific officers beyond telling Rapp
7         to provide cover?
8    A.   No.  I had -- I had -- I was going through a
9         million things in my head on what needed to
10        be done.  And there was -- so when I first
11        got over there, I'm just taking an overview
12        of what we have.  I had -- I remember in my
13        interview, I was unsure if I verbalized it
14        over the radio or if that's what I was
15        thinking in my head at the time for my -- the
16        cover -- or the takedown team, but I don't
17        recall specifically ordering any commands at
18        that point.
19   Q.   Okay.  So it's still your statement that
20        you're not sure whether you relayed a plan to
21        anyone over the radio once you were at
22        location 2?
23   A.   Correct.
24   Q.   Did you intend to relay a plan at some point?
25   A.   Certainly, yes.

Page 105

1    Q.   And what was that plan going to be?
2    A.   So we have the cover over here so we have the
3         eyes on it.  I had looked up.  You could see
4         on the house to the east, there were a couple
5         of sheriff's deputies and at least two SCAT
6         guys and that, ultimately, would have been
7         my -- the -- we call it QRF or a takedown
8         team.  So my -- what I would have verbalized
9         over the radio would be that we would give
10        commands from across the street so basically
11        he wouldn't know -- or whoever came out of
12        the house wouldn't know that these people
13        were even there.  And that they would,
14        ultimately, be the ones -- we would give
15        commands out across, and then they would take
16        him into custody in that front yard.
17   Q.   Okay.  So I'll break this down a little bit.
18        You said you saw some east side
19        officers; correct?
20   A.   No, I saw officers on the east of the house.
21   Q.   Okay.  Sorry.  You saw officers on the east
22        of the house, and that included two sheriff's
23        deputies?
24   A.   There were some sheriff's deputies over
25        there.  I don't recall specifically how many.

27  (Pages 102 to 105)

## Page 106

1  Q.  And why did sheriff's deputies respond to the
2      scene?
3  A.  It's a shooting call.
4  Q.  So that's just what they do?
5  A.  And their squad room is right down the
6      street.
7  Q.  Okay.  So you weren't surprised they were
8      there?
9  A.  No.
10 Q.  And did you see WPD officers?
11 A.  Yes.
12 Q.  And officers you found out later to be Ronen
13     and Perry?
14 A.  Correct.
15 Q.  Any other officers you now knew to have been
16     there?
17 A.  Not -- no, not specifically.
18 Q.  Could you mark on the map where the officers
19     on the east side of the house were located.
20 A.  As location 3?
21 Q.  Sure.  Well, actually, let's call it just ES
22     for east side as best you can.
23 A.  (Witness complies.)
24 Q.  Mind if I take a look?
25 A.  Yeah, it's hard.  So they were basically

## Page 107

1      right up alongside of the house.
2  Q.  Okay.  And they were alongside the house to
3      the east of 1033 with the blue roof on the
4      Google map?
5  A.  Yes.
6  Q.  Were they kind of in the front walk area?
7  A.  They were up against the house, yes.
8  Q.  Okay.  Were they taking cover behind
9      anything?
10 A.  I mean, I don't recall if they had a bunker
11     or not.  The house, I guess, would be cover.
12 Q.  Were they armed, to your knowledge?
13 A.  Yeah, they're police officers, yes.
14 Q.  Okay.  Had they drawn their weapons at that
15     point?
16 A.  I don't know.
17 Q.  Could you see them from your point of view
18     at -- sorry.
19         Could you see them from where you were
20     standing in location number 2?
21 A.  Yes.
22 Q.  Could you see all four officers clearly?
23 A.  I don't recall how many officers specifically
24     were there, but I could -- I could see the
25     officers -- I couldn't tell who they were,

## Page 108

1      but I could see them, yes.
2  Q.  Okay.  And at that point could you describe
3      who you were standing next to?
4  A.  Rapp.
5  Q.  And were you on the end and Rapp was next to
6      you?
7          I guess could you describe the order.
8          There were four officers over there;
9      correct?
10 A.  Uh-huh.
11 Q.  And who was standing where?
12 A.  I have no idea where the other two officers
13     were standing at.  They were behind me and to
14     my right, to the best of my knowledge.  They
15     were not to my left.  Rapp was immediately to
16     my left.  There was a pickup truck, a dark
17     colored car, and we were -- we were behind
18     the dark colored car at the trunk area, I
19     believe.  I believe it was backed in, so we
20     were -- Rapp and I were behind that -- that
21     vehicle.
22 Q.  And that vehicle provided cover for you two?
23 A.  Yes.
24 Q.  And were you close enough to touch his
25     shoulder?

## Page 109

1  A.  I would have been, yes.
2  Q.  Were you both standing?
3  A.  I was standing.  I don't remember if Rapp
4      maybe had been -- I don't recall.  He might
5      have been hunkered down looking through --
6      through the scope on his rifle.  Or -- I
7      don't remember if he was in the position with
8      his rifle pointed that direction hunkered
9      down or if he was standing, but I was
10     standing.
11 Q.  Did he have his rifle raised the entire time
12     you were at location 2?
13 A.  Pardon me?
14 Q.  Did Rapp have his rifle raised the entire
15     time you were at location 2?
16 A.  I believe so.  Hold on, sorry.
17 Q.  Problem.  Did you issue any commands to the
18     officers east of 1033?
19 A.  No.
20 Q.  Were there officers on the west side of 1033,
21     as well?
22 A.  Ultimately, yes.
23 Q.  Prior to the shooting?
24 A.  I didn't see them -- well, yes.
25 Q.  How did you know they were there?

28  (Pages 106 to 109)

Page 110

```
 1    A.    Out of my peripheral vision, I saw them
 2          moving milliseconds prior to the shooting.
 3    Q.    Do you know how many officers there were?
 4    A.    I remember two.
 5    Q.    And who were they?
 6    A.    What?  Pardon me?
 7    Q.    Which officers?
 8    A.    I have no idea.
 9    Q.    Were there other officers located in another
10          location we haven't discussed prior to the
11          shooting?
12    A.    I'm certain that there were.
13    Q.    Do you know where?
14    A.    Well, I knew that I would have officers
15          blocking the street down here.  I did not --
16    Q.    Sorry.  For the record, down where?
17    A.    East of our location, somewhere blocking
18          westbound traffic on McCormick.
19    Q.    Okay.
20    A.    I knew -- the problem that you run into on
21          scenes like this is people come from
22          everywhere.  Officers come from everywhere.
23          So I don't know -- those are the officers
24          that I knew at the time -- specifically at
25          the time of the shooting.
```

Page 111

```
 1    Q.    Because those are the officers that you could
 2          see clearly?
 3    A.    Correct.  And I knew that Gumm -- at least
 4          Gumm and -- was on the back of the house.
 5    Q.    And by that point had you issued any commands
 6          to Gumm?
 7    A.    No.
 8    Q.    Did you set up a perimeter?
 9    A.    That's what we were in the process of -- I
10          mean, we had just gotten across the street,
11          and that's what I was looking at right there.
12    Q.    Okay.  Was the perimeter in place at the time
13          of the shooting?
14    A.    I think I had -- I think there was a decent
15          perimeter at the time of the shooting.
16    Q.    Okay.  What was missing, in your view, from
17          the perimeter?
18    A.    Like I said, I thought we had a decent -- I
19          mean, a -- if you -- if I had all the time in
20          the world to set something up, I would have
21          liked to have had a less lethal shotgun with
22          this QRF team to the east of the house.  I
23          would have probably liked to have had a dog
24          on the front of the house somewhere.  And
25          this is just the very beginning of setting
```

Page 112

```
 1          up.  It happened so quick that this was the
 2          very beginning stages of just making sure
 3          that we had a decent perimeter to start
 4          moving forward.
 5    Q.    Okay.  So you intended to have the east
 6          officers be the QRF team?
 7    A.    Correct.
 8    Q.    QRF is -- is that quick reaction force?
 9    A.    Correct.
10    Q.    And what does a QRF do?
11    A.    They're the ones who are going to go hands on
12          with a potential bad guy.
13    Q.    Okay.  Would they be the primary points of
14          contact with the suspect?
15    A.    No.
16    Q.    Who is the primary point of contact with the
17          suspect -- or who was the primary point of
18          contact with the suspect in the Finch
19          shooting incident?
20    A.    Well, I would hope that that was going to be
21          me.
22    Q.    Okay.  You intended yourself to be that
23          contact person?
24    A.    At the time, yes.  I'll rephrase that.  When
25          he came out on the porch, I wanted to be at
```

Page 113

```
 1          that point because I hadn't assigned anyone
 2          else to do that.
 3    Q.    Okay.  Did you radio to other officers that
 4          you were the primary point?
 5    A.    No.
 6    Q.    Did you intend to do so eventually?
 7    A.    Yes.
 8    Q.    And did you radio --
 9    A.    Let me rephrase that.
10    Q.    Sure.
11    A.    I would have -- I would have assigned
12          somebody with me to have been the primary
13          point of contact over the radio if I had
14          time.
15    Q.    Okay.  And the job of the primary contact
16          point people would have been to actually
17          communicate with the suspect?
18    A.    Attempt to, correct.
19    Q.    And issue commands?
20    A.    Correct.
21    Q.    And warnings?
22    A.    Correct.
23    Q.    So the QRF was not in charge of actually
24          communicating with the suspect?
25    A.    In this instance?
```

29 (Pages 110 to 113)

## Page 114

1   Q.   In your plan of how the QRF would respond to
2        the scene, they would not be the people
3        communicating with the suspect?
4   A.   Correct, at first.
5   Q.   Okay.  But you did not relay to the east side
6        officers that they were to be the QRF team?
7   A.   And you're saying east side officers and
8        you're referring to the officers east of the
9        house.
10  Q.   Correct.  Sorry.
11  A.   Okay.  'Cause we call them west side
12       officers, south side officers, north side
13       officers 'cause there's different bureaus.
14  Q.   I see, yeah.  Can we just use east side in
15       this context for their physical location?
16  A.   Yes.
17  Q.   So did you relate to the east side officers
18       that they were to be the QRF team?
19  A.   No, and I -- no.
20  Q.   Is that because everything happened so fast?
21  A.   That and they -- there's a lot of things in
22       law enforcement with experience that you just
23       don't have to relay.  Like they were set up
24       for that.  You know, they were staged right
25       there.  And it was clear in my mind that

## Page 115

1        that's -- I mean, they were there already.
2        By the time I got around there, I saw them
3        right there, and bam, that's my QRF right
4        there.
5   Q.   And that's because they were closest to the
6        entryway?
7   A.   They are closest to the entryway.  They are
8        concealed in point from view of the
9        front of the house, yes.
10  Q.   How far away were they in yards or feet,
11       would you guess?
12  A.   I don't -- I mean, I guess it's hard to let
13       the picture speak for itself, but --
14  Q.   Yeah.
15  A.   I mean, it's next door.  I don't -- I
16       wouldn't feel comfortable guessing on yards
17       or feet.
18  Q.   Closer than you were?
19  A.   Much.
20  Q.   Okay.  And did they have a good line of
21       sight, in your opinion, to the porch?
22  A.   I couldn't tell the angle from where I was
23       at.
24  Q.   At any point while you were on McCormick --
25       well, while you were on the scene at all but

## Page 116

1        prior to the shooting, did you call to
2        request a SWAT unit to respond?
3   A.   No.
4   Q.   And why not?
5   A.   That is certainly something that could have
6        happened, but like I said before, this was --
7        this happened so fast that I was just -- just
8        getting across the street and trying to get
9        the resources that I had in place.  So, I
10       mean, before I'm requesting a SWAT unit, I
11       want to make sure that I have a decent
12       perimeter set up around the residence.
13  Q.   Okay.  And that hadn't been completed yet?
14  A.   Ultimately, there was a pretty decent
15       perimeter, but, I mean, that -- that was --
16       that was step one.
17  Q.   Okay.  If you had had more time, would you
18       have called SWAT?
19            MR. PIGG:  Objection; calls for
20       speculation.
21  A.   I -- potentially, I guess, would be a good
22       answer.  I mean, I would go through a lot of
23       other things to make that determination.
24  Q.   Like what?
25  A.   I would want to look up criminal history.  I

## Page 117

1        would want to make sure that my perimeter
2        was, in fact, set up.  I would have the QRF
3        team -- 'cause SWAT doesn't respond
4        immediately.  It takes -- I can tell you many
5        a times that we have called SWAT on a
6        situation and it's over by the time the SWAT
7        team gets there.  Somebody finally comes out
8        or -- so I would have set up, made sure that
9        the QRF knew that they were the QRF and that
10       we would be giving commands.  I would want
11       to -- when we make that call, we immediately
12       start getting phone calls from people that
13       have no idea what's going on.  So I like to
14       have a good idea about what's going on.  So
15       we would have tried to do some history on the
16       house, history on the people in the house.
17  Q.   And that would have been through dispatch?
18  A.   Or having somebody on scene look up in the
19       computer to see if they can pull that address
20       up.  So I just don't show up to a scene and
21       say start SWAT.  There's -- I want to have my
22       ducks in a row before I make that call.
23  Q.   So you wanted more recognizance before you
24       called SWAT in?
25  A.   Correct.

Page 118

1    Q.  And just the nature of the call you're
2        responding to is not sufficient, in your
3        view, to justify calling SWAT?
4    A.  **Just specifically off being told something by**
5        **dispatch is not enough for me to start SWAT.**
6    Q.  Okay.  And I don't know if I had you do it,
7        but would you mind marking where the west
8        side officers were, meaning the officers that
9        were west of 1033 McCormick prior to the
10       shooting.
11   A.  **Like milliseconds prior to the shooting,**
12       **'cause I don't recall seeing them other than**
13       **in my peripheral and that was right --**
14   Q.  Sure, so I guess your best estimate would
15       be --
16   A.  **So how do you want me to mark that?**
17   Q.  Just with a star and WS, please.
18   A.  **(Witness complies.)**
19   Q.  And it looks like you're marking near the
20       corner of Seneca and McCormick.
21   A.  **It's actually on the corner of the building,**
22       **but yes, on the corner of the breakfast club**
23       **area.**
24   Q.  Okay.  And what was your understanding as to
25       their distance from the entryway at 1033?

Page 119

1    A.  **The west side officers?**
2    Q.  Yeah.
3    A.  **The only thing that I saw that those --  I**
4       **didn't need officers over there.  What I**
5       **assumed in my head was that these officers**
6       **were people who just showed up and they're**
7       **coming around the corner.  So I had just**
8       **caught a glimpse of -- out of my peripheral**
9       **vision that these -- that potentially I am**
10      **going to -- and this is as soon as I saw this**
11      **after Mr. Finch came out onto the porch that**
12      **there was officers there.  And I thought we**
13      **have some -- potentially that there's a**
14      **crossfire problem with the east side officers**
15      **and the west side officers.**
16   Q.  Okay.  So to be clear, the west side officers
17       weren't on the corner of Seneca and West
18       McCormick so much as right at the corner of
19       the breakfast club building?
20   A.  **In my recollection, that's where the west**
21      **side officers were at was closer -- like**
22      **there's a sidewalk that goes by there and**
23      **that's just -- I don't know.  That's just how**
24      **I recall seeing it.  It was so fast that**
25      **that's where I remember seeing them at.**

Page 120

1    Q.  And at the time of the shooting, you said
2        officers were still basically in front of
3        that blue roofed house?
4    A.  **Correct.**
5    Q.  Okay.  You said you worried about crossfire.
6        What did you worry about in
7        particular?
8    A.  **We always -- if you have two crossfire --**
9       **if -- say somebody comes out of the house and**
10      **one of the east side officers or the west**
11      **side officers had to shoot at something that**
12      **was right in between both of them, there's a**
13      **potential that they would be shooting at**
14      **officers.**
15   Q.  And you intended the east side officers to be
16       the first line of defense in this case,
17       correct, as members of a QRF?
18   A.  **No.**
19   Q.  No.  You intended them to be the first people
20       to have physical contact with the suspect?
21   A.  **Correct.**
22   Q.  Okay.  Did you ever issue a command to the
23       west side officers to ceasefire because east
24       side officers would be handling the first
25       contact with the suspect?

Page 121

1    A.  **It was over by the time that I even realized**
2       **that west side -- that those guys were there**
3       **on that west side.**
4    Q.  Got it.  Prior to the shot, did you -- while
5        you were still on the scene, did you speak to
6        dispatch about any further information about
7        the incident?
8    A.  **I was in contact with dispatch on the**
9       **scene -- I guess restate your question,**
10      **please.**
11   Q.  Did -- you were in contact with dispatch
12       while you were on the scene; correct?
13   A.  **Correct.**
14   Q.  Did they provide you any substantive
15       information about the incident while you were
16       on the scene that you did not have already?
17   A.  **Prior to or after the shooting?**
18   Q.  Prior to the shooting.
19   A.  **I do not believe so.**
20   Q.  Okay.  Did you ask them to track down any
21       information that you might have wanted about
22       the incident?
23   A.  **Prior to the shooting?**
24   Q.  Correct.
25   A.  **No.**

31 (Pages 118 to 121)

Page 126

1      that policy while I read it out loud?
2   A.   Sure.
3   Q.   Okay.  Let me make sure I have it in here.
4        Okay.
5        (Jonker Exhibit No. 64 was marked for
6        identification.)
7   Q.   All right.  So I am -- trying to find a good
8        place for this -- going to mark this as
9        Exhibit 64.  It's the WPD Policy 602
10       governing Barricaded Suspects, Sniper and
11       Hostage Situations, SWAT Procedures.
12            Are you familiar with this policy?
13  A.   Yes.
14  Q.   All right.  So I was just going to direct
15       your attention to 602.05 in general
16       principles.  I'm going to read it and then
17       just ask you a question.
18  A.   Okay.
19  Q.   "The primary initial concern in any hostage,
20       barricaded suspect, or sniper situation is
21       containment.  If at all possible, do not
22       force the suspect into a do-or-die situation.
23       The longer the department has to negotiate,
24       the better the chances of a successful
25       resolution of the incident."

Page 127

1        Do you agree with this principle?
2   A.   Yes.
3   Q.   Have you been trained on this principle?
4   A.   Yes.
5   Q.   Do you think it was a problem that there were
6        no negotiations conducted during the Finch
7        incident?
8        MR. PIGG:  Object to form of the
9        question.
10  A.   No.
11  Q.   And why not?
12  A.   We didn't have time.
13  Q.   If you had time, you would have; is that
14       correct?
15  A.   If circumstances didn't play out as they did,
16       that would have definitely been the
17       appropriate way to go would be to try and
18       communicate.
19  Q.   And to, in particular, try to get the suspect
20       to come into custody without incident;
21       correct?
22  A.   Correct.
23  Q.   All right.  Just to circle around, once you
24       got to the north side position, or location
25       number 2, did you issue any commands to any

Page 128

1        officers at the scene at all?
2   A.   Not that I recall.
3   Q.   Did you talk to Rapp about what he should do
4        as the long cover if someone came onto the
5        porch prior to the shooting?
6   A.   No.
7   Q.   Did you talk to any officers about what they
8        should do?
9   A.   No.
10  Q.   Did you give any instructions to the people
11       in 1033 West McCormick prior to the shooting
12       over a PA system?
13  A.   No.
14  Q.   Did you issue any instructions without a PA
15       system, like over a bullhorn, for instance?
16  A.   No.
17  Q.   Did anyone at the scene, prior to the
18       shooting, announce to the people inside that
19       police had surrounded the house?
20  A.   No, but I'd like to clarify.
21  Q.   Sure.
22  A.   Prior to doing anything like that, I would
23       want to have a perimeter established and make
24       sure that we knew what was going to happen
25       when people started coming out of the house.

Page 129

1   Q.   Okay.  And if I'm understanding you
2        correctly, the perimeter was not sufficiently
3        established to make announcements to the
4        residents inside?
5   A.   We're not going to -- I was just in the
6        process of making sure that that was in
7        place.
8   Q.   Just in the process of making sure it was in
9        place when Mr. Finch entered the porch?
10  A.   Correct.
11  Q.   Okay.  So is it fair to say that at the point
12       in time when Mr. Finch entered the porch, you
13       were still setting up the response to the
14       incident?
15  A.   Definitely.
16  Q.   And you were still formulating a plan about
17       how to respond to the incident?
18  A.   Definitely.
19  Q.   And you were still deciding who was going to
20       do what?
21  A.   Correct.
22  Q.   Okay.  Would you agree that the shot was
23       fired pretty quickly after you moved to
24       location number 2?
25  A.   Yes.

33 (Pages 126 to 129)

## Page 130

1   Q.   Okay.  At anytime before the shooting, did
2        you hear any gunshots from inside the house?
3   A.   No.
4   Q.   Any screaming?
5   A.   No.
6   Q.   Any cries of distress?
7   A.   No.
8   Q.   At anytime before the shooting, were you made
9        aware of any reports from neighbors that they
10       had heard shots?
11  A.   No.
12  Q.   Did that concern you at all?
13  A.   No.
14  Q.   And why is that?
15  A.   Experience.
16  Q.   What do you mean by that?
17  A.   A lot of times you won't hear that.  I mean,
18       if the shooting's already done, you wouldn't
19       hear that.  If everyone inside the house is
20       dead, you wouldn't hear screams coming from
21       inside.  It's not -- it's not not typical for
22       people not to hear things.
23  Q.   Did you ask dispatch if they had received any
24       emergency calls from neighbors?
25  A.   Not at that time, no.

## Page 131

1   Q.   Did you ever?
2   A.   No.
3   Q.   All right.  So I'm going to show you a
4        previously marked exhibit.
5   A.   You want this one back?
6   Q.   Sure.  We're just going to collect these and
7        keep them here.  All right.  I just have to
8        find it.  One second.  I'm looking for the
9        PS -- nope.  Okay.
10            I am going to show you Exhibit 57,
11       previously marked yesterday.  It's titled
12       Administrative Investigative Review.  It's
13       what I understand to be the PSB file in this
14       case.
15  A.   Okay.
16  Q.   Take a look at it and then I'm going to
17       direct you to, in particular, Page 16.
18            First of all, have you ever seen this
19       document before?
20  A.   I have not.
21  Q.   You have not?
22  A.   I have not.
23  Q.   This is the first time?
24  A.   Correct.
25  Q.   Okay.  Do you have any reason to take issue

## Page 132

1        with my representation that it is a document
2        created by the Professional Standards Bureau
3        in relation to the Finch shooting incident?
4   A.   No.
5   Q.   Okay.  If you could go to Page 16 of the
6        document.  And you should see two pictures
7        there.  And in particular, looks like screen
8        shots from Officer Powell's Axon video
9        camera; correct?
10  A.   That is what that is labeled.  I -- I would
11       almost think that that looks more like my
12       angle on -- from my camera, but I'm not sure.
13       That's -- that's -- that's the view that I
14       remember having.
15  Q.   Okay.  So I don't know if that's what I was
16       going to ask.  Is picture number 1, the top
17       one, is that an accurate representation of
18       the vantage that you had just prior to the
19       shooting of 1033?
20  A.   That is what the scene looked like.  This is
21       a pretty blurry picture.
22  Q.   Okay.  Is that picture an accurate
23       description of the light that was available
24       at the time?
25  A.   Well, so -- I mean the top picture?

## Page 133

1   Q.   Correct.
2   A.   Prior to the shooting?
3   Q.   Correct, just prior to the shooting.
4   A.   Prior to Mr. Finch coming outside, that is
5        about the light.
6   Q.   Okay.  Once he was on the front porch, was
7        there more light on the porch?
8   A.   Yes.
9   Q.   Stemming from what?
10  A.   I had my weapon-mounted light on, activated,
11       and I believe that Officer Rapp had his light
12       on also on his firearm.
13  Q.   Do you believe the light on your handgun was
14       able to reach the porch?
15  A.   It lightened it up.  I don't -- it wasn't a
16       direct light, but it -- I mean, it -- there
17       was light on the porch.
18  Q.   Is it your understanding that Officer Rapp's
19       light provided additional lighting source on
20       the porch?
21  A.   I remember when -- I remember that it got a
22       lot brighter that wasn't from mine.  And I
23       don't remember if that was from a flashlight
24       or from the -- his rifle light, but it was --
25       something lit the porch up significantly

34 (Pages 130 to 133)

Page 138

1  Q.  And is that based on your memory of that
2      night?
3  A.  Yes.
4  Q.  Okay.  And what was his physical appearance
5      when he stepped on the porch?
6  A.  What do you mean by his physical appearance?
7  Q.  What did he look like?
8  A.  Just standing there with -- I believe he had
9      a gray sweatshirt on, blue jeans and was
10     standing on the porch.
11 Q.  Could you tell his race at the time?
12 A.  White male.
13 Q.  Could you tell his hair color?
14 A.  Dark.
15 Q.  The hairstyle?
16 A.  No.
17 Q.  Could you see any facial hair?
18 A.  You know, at this point, no.  I recall when I
19     gave my interview, I thought maybe he had a
20     goatee, but I don't recall at this point.
21 Q.  Could you see from your vantage location to
22     a -- any facial expressions on his face?
23 A.  Not that I recall.
24 Q.  Could you see the direction in which he was
25     looking?

Page 139

1  A.  Towards us, yes.
2  Q.  And that's because that's the way his head
3      was facing?
4  A.  Coming out the door, yes.
5  Q.  At the time he came out, did you radio any
6      instructions to officers about what to do,
7      given that he was now on the porch?
8  A.  No.  As a matter of fact, one of the
9      officers, and I believe that it was Officer
10     Rapp but I'm not a hundred percent sure is
11     the one who said that he's coming out.  And
12     just as that was going on, some officer had
13     keyed up and asked for me on the radio and
14     said that it was in reference to that case.
15     So I had my radio depressed as they're saying
16     "he's coming out."  So I acknowledge this
17     officer and I actually say "he's coming out"
18     or "the door's opening", I forget
19     specifically what I said, but I relayed that
20     over the radio system.
21 Q.  Do you know which officer was on the radio?
22 A.  It was -- I don't -- I don't believe it was
23     an officer on the scene.  I want to say it
24     was a community policing officer from north
25     side, but I don't recall his name.

Page 140

1  Q.  And why was he radioing you?
2  A.  Have no idea.  No idea.  I did not -- once he
3      said that, I had never gotten a hold of him
4      after the -- after the fact.  I don't know if
5      investigators did or if he relayed his -- I
6      didn't talk to anyone after the shooting
7      so. . .
8  Q.  Did he say he had information about the
9      incident?
10 A.  I think he said it was pertaining to the call
11     that I was on.
12 Q.  Okay.  But you have no idea what that
13     information was?
14 A.  No.
15 Q.  Did you shut down radio communications with
16     him after that?
17 A.  Immediately after that was when the shooting
18     occurred.
19 Q.  Okay.  So when you said to that community
20     policing officer "he's coming out" --
21 A.  It wasn't specifically directed towards him.
22     I was keying the radio up to find out what he
23     wanted.  And then that was when he came out,
24     and I had just said that so everybody knew
25     that he was coming out.

Page 141

1  Q.  Did you see him come out or were you relaying
2      what Rapp was telling you?
3  A.  I recall him being standing on the porch.
4      I -- I mean, at the -- we're talking
5      milliseconds that we're discussing so. . .
6  Q.  Right.
7  A.  I don't recall if -- if I looked up and saw
8      him as I'm talking on the radio or if I'm
9      just relaying what Rapp's saying.  I mean, I
10     don't recall that timeframe.
11 Q.  Okay.  Did you hear other officers at that
12     point radioing about him coming out on the
13     porch?
14 A.  No.
15 Q.  Did Rapp say anything to you other than "he's
16     coming out"?
17 A.  No.
18 Q.  Did Powell or Fussell say anything?
19 A.  To me?
20 Q.  Well, just out loud in your presence.
21 A.  A lot of people started saying "let me see
22     your hands."
23 Q.  Okay.  When you say a lot of people, do you
24     mean -- well, first of all, did you issue any
25     commands to him?

36 (Pages 138 to 141)

Page 142

1    A.  I did.
2    Q.  What did you say?
3    A.  I said -- at the beginning, I think I said
4        "let me see your hands" or "put your hands
5        up."  Specifically, I don't recall.  But
6        there were people from across the street.
7        Specifically if it was to the east I'm not
8        sure, I'm assuming, and then some of the
9        officers behind me were also yelling
10       commands.
11    Q.  Powell or Fussell or both?
12    A.  Or Rapp, I'm not sure.
13    Q.  Were west side officers issuing commands?
14    A.  I don't -- I don't know.
15    Q.  Could they have been?
16    A.  Certainly, yes.  There was -- there was
17        multiple people yelling.
18    Q.  And were they all yelling the same thing?
19        Different commands?
20    A.  They were all yelling "let me see your hands"
21        or "show me your hands" or "put your hands
22        up."
23    Q.  Okay.
24    A.  Clear -- clear -- I mean, it was clear that
25        they were yelling to put your hands up or to

Page 143

1        let me see your hands.
2    Q.  Did anybody announce themselves as WPD at
3        that time?
4    A.  Not that I recall.  Not that I recall
5        hearing.
6    Q.  Would that have been proper procedure to do
7        that?
8    A.  Probably.
9    Q.  And it's fair to say, then, the commands were
10       coming from different directions; correct?
11    A.  As I recall, yes.
12    Q.  And is it also fair to say that the commands
13       were being screamed at Mr. Finch?
14    A.  I don't recall them being -- I mean, I don't
15       recall there being like out of control
16       screams.  I just remember hearing very loud
17       commands.
18    Q.  Okay.  Would it be fair to say that everyone
19       started screaming at him the moment he came
20       on the porch?
21    A.  No.
22    Q.  Were any of the commands conflicting in any
23       way?
24    A.  Not that I recall.
25    Q.  Did you issue a command at some point telling

Page 144

1        him to walk forward?
2    A.  Walk this way.
3    Q.  Walk this way being what way?
4    A.  Towards me.
5    Q.  Did you indicate in what direction he was
6        supposed to move?
7    A.  Walk this way, towards my voice.
8    Q.  Right.  And you were issuing that command at
9        the same time all the east -- the east side
10       officers were issuing their commands and Rapp
11       was issuing his command; correct?
12    A.  I -- with the plan that I had in my head, I
13       didn't want him to know that these officers
14       to the east were even there.  So I vividly
15       remember wanting to yell louder so he would
16       pay attention to me and walk this way, walk
17       this way.  I believe I was the only person
18       saying "walk this way."  Everyone else had
19       said "put your hands up" or something to that
20       effect to do with your hands.  I wanted him
21       to come off of the porch and come towards me.
22       So I remember in my head, I got to be louder
23       than these guys so he is focusing on me and
24       not figuring about this.  'Cause we're still
25       operating off of the basis that somebody had

Page 145

1        shot his dad.  I mean, at this point this
2        is -- we have absolutely zero information
3        that this is a -- a bad call.
4    Q.  And you wanted to be the point person;
5        correct?
6    A.  Absolutely.
7    Q.  And did you ever tell, via radio, the east
8        side officers that you were to be the point
9        person; they should stop yelling?
10    A.  We did not have time for that, no.
11    Q.  Would you have done so if you had more time?
12    A.  Had kept coming out and -- and -- I would
13       have hoped that I would have said that on the
14       radio, yes.
15    Q.  Okay.  Did anyone, yourself included, give
16       Mr. Finch a warning, meaning a warning as to
17       what would happen if he did not comply with
18       commands?
19    A.  Not that I heard.
20    Q.  Is it in accordance with WPD policy for
21       multiple officers to issue commands at the
22       same time?
23    A.  No.
24    Q.  All right.  And what was Finch's response to
25       the commands that were issued?

37 (Pages 142 to 145)

Page 146

1   A.   Again, I would -- when he first came out, I
2        recall his hands being down, and then -- and
3        then I remember his hand coming back up.  So
4        we're talking -- I mean, you'd have to break
5        it down by milliseconds on the way that this
6        is processing through my head.
7             As his hand starts to come back up, it
8        was not -- his hands were not up in the air
9        like this.  His hands were -- I just remember
10       them on its way back up from being down here,
11       and that's when, in my peripheral, I see
12       these other officers.  This is when I see the
13       west side officers coming.  So I'm glancing
14       off over there, and that's when I hear the --
15       the shot.
16  Q.   I'm going to ask you to do something I asked
17       Officer Rapp to do yesterday just because we
18       have a video camera and it's hard to describe
19       movements in verbal form.
20            Would you mind demonstrating what you
21       saw Mr. Finch doing in response to the
22       commands while standing, please.
23  A.   Yeah.  This reach?
24  Q.   Yeah, should be.
25  A.   When -- so when we say he's coming out as

Page 147

1        everyone's yelling "let me see your hands",
2        and I remember his hands being down.
3   Q.   Correct.
4   A.   I remember his hands starting to come back
5        up.  And they were about -- right about here
6        (demonstrating) is when I see the -- at some
7        point when -- his hands were never up like
8        this, like you would expect, but I do
9        remember his hands coming back up, and that's
10       when I turn my attention over to these
11       officers that are on that side.  So after --
12       after the shot went off is when I refocused
13       my attention back on him.
14  Q.   So you saw his hands come partway up and then
15       fall back down.  Is that accurate?
16  A.   You mean from the beginning?
17  Q.   At any point in that instance when he came
18       onto the porch until the shot was fired.
19  A.   I remember his hands being down, and then his
20       hand coming back -- his right hand
21       specifically coming back up partway.  And at
22       this point, without reviewing my report, I
23       wouldn't -- I mean, I -- vividly, I don't
24       remember it like I did that day, that time.
25  Q.   Okay.  Do you believe his hands fell at some

Page 148

1        point near his waist or are you not sure
2        about that?
3   A.   Oh, no, his hand was down by his waist when
4        I -- at the very beginning.
5   Q.   Okay.  And at some point, they may or may not
6        have come back up.
7             You're not a hundred percent sure?
8   A.   Based off of commands is when I saw it
9        starting to come back up, and that's when I
10       changed my focus to the other officers.
11  Q.   Okay.  So he was starting to comply with
12       commands at the time you changed your focus?
13  A.   His hand were coming back up, and in my head,
14       that was what was happening.
15  Q.   Okay.  And is it fair to say you did not see
16       him do anything else after that because your
17       focus changed to the west side officers?
18  A.   My focus -- yes, that's when I saw the
19       officers coming from the -- or I saw the
20       officers at that point, and I started to
21       worry about the crossfire.
22  Q.   And just prior to changing your focus to the
23       west side, when you did see Mr. Finch's hands
24       start to come back up, could you see his
25       hands clearly?

Page 149

1   A.   I -- I don't -- I don't recall.
2   Q.   Did you see a weapon in his hands?
3   A.   No.
4   Q.   Do you believe you would have seen one had he
5        had one?
6   A.   I think that I probably would have, but that
7        was -- I did not.
8   Q.   At any point while Mr. Finch was on the
9        porch, did you see him holding a weapon?
10  A.   No.
11  Q.   At any point while he was on the porch, did
12       you believe you saw him holding a weapon?
13  A.   No.
14  Q.   Did any of the officers standing by you in
15       location to say out loud or to you "that man
16       has a weapon"?
17  A.   No.  Visibly, is that what you mean?
18  Q.   Well, I mean did they say "he has a weapon"?
19  A.   No.
20  Q.   Did they say "I believe he has a weapon"?
21  A.   No.
22  Q.   Were the officers located on the east side
23       within shooting distance of the porch using a
24       handgun based on your experience?
25  A.   Shooting distance?

38  (Pages 146 to 149)

Page 150

1    Q.   Correct.
2    A.   That house is within shooting distance based
3         off of my experience.  I don't know what type
4         of angle they had at that time.
5    Q.   Okay.  Do you know if any of them had on them
6         the less lethal weapons we discussed?
7    A.   I don't know.
8    Q.   Beanbag shotgun, for instance?
9    A.   I would -- an experienced answer would be
10        that the WPD officers didn't.  I didn't know
11        what the sheriff's department had.
12   Q.   Got it.  In an ideal world, would you have
13        wanted those officers who were to be your QRF
14        team to have had such weapons on them?
15   A.   I would have eventually had somebody with a
16        beanbag shotgun on that QRF.
17   Q.   And in particular, somebody who was close
18        enough to shoot it; right?
19   A.   Correct.
20   Q.   What's the range of a beanbag shotgun?
21   A.   I believe it will go up to 60 feet, but I'm
22        not a hundred percent sure.  I'd have to
23        review policy.
24   Q.   Okay.  And they were -- you said officers
25        were probably within 60 feet of the porch?

Page 151

1    A.   Oh, yeah.
2    Q.   How much time passed between when Finch
3         stepped on the porch and when you heard the
4         rifle shot?
5    A.   Seconds.
6    Q.   Less than 10?
7    A.   To my recollection, yes.
8    Q.   Did you physically see Officer Rapp shoot his
9         gun -- or his rifle, rather?
10   A.   What do you mean by that?
11   Q.   Did you see him pull the trigger?
12   A.   No.
13   Q.   Did you see the shot fire out of --
14   A.   I saw, through my peripheral, the muzzle
15        flash.
16   Q.   And you heard it, of course?
17   A.   Oh, yeah.
18   Q.   It was very loud?
19   A.   Very.
20   Q.   Is it fair to say that it surprised you?
21   A.   It absolutely surprised me.
22   Q.   Did it shock you?
23   A.   It didn't shock me.  It was -- it was
24        startling.
25   Q.   Okay.  Is that because you absolutely weren't

Page 152

1         expecting it to be fired?
2    A.   I could tell you that I was going to fire my
3         handgun in here, and it would still make
4         you -- I mean, it would -- it would startle
5         you just 'cause it's so loud.
6    Q.   Well, were you expecting that shot to be
7         fired?
8    A.   No.
9    Q.   Just to be clear:  Had you given, at anytime,
10        any instructions to any officer about when to
11        shoot Mr. Finch prior to the shot going off?
12   A.   No.
13   Q.   Did you give any instructions to Officer Rapp
14        about when to shoot?
15   A.   No.
16   Q.   Had you given any instructions to any officer
17        on the scene about what to do about the
18        suspect who was on the porch prior to the
19        shot being fired?
20   A.   No.
21   Q.   Should the east side officers have known that
22        they should not issue commands to that
23        suspect on the porch without your say so?
24   A.   Not necessarily.  I will say through
25        experience that I think adrenaline and it

Page 153

1         just happens on a lot of calls where unless
2         it's specifically said, that people will
3         just -- because it's just out of nature you
4         want to try and resolve it.  So and, you
5         know, we're told -- taught from the academy
6         that we want to give good verbal commands.
7         So I think when a situation arises, unless
8         you are specifically -- even when people are
9         specifically told "I will give commands",
10        it's hard for people to not sometimes.
11   Q.   Okay.  And no one in this case was given a
12        command --
13   A.   No.
14   Q.   -- not to issue --
15   A.   No.
16   Q.   -- a command?
17   A.   I didn't have a chance to give that yet.
18   Q.   All right.  Is it your belief that Mr. Finch
19        was not complying with police orders at the
20        time he was shot?
21   A.   He was not doing what he was told to when he
22        was shot.
23   Q.   And what's that statement based on?
24   A.   Put your hands up.  Walk this way.
25   Q.   Okay.  It's because he didn't have his hands

39 (Pages 150 to 153)

Page 158

1  A.  The way that I recalled it, yes.
2  Q.  At the time he shot -- Rapp shot his rifle,
3      were you in fear for your life?
4  A.  No.
5  Q.  Did you fear for the lives of other officers
6      at the scene?
7  A.  I always do, yes.
8  Q.  In that particular situation?
9  A.  Again, I mean, are we -- the call itself or
10     at that specific time?
11 Q.  At the point in time when you heard the shot
12     being fired, did you fear -- did you have an
13     immediate fear for the lives of officers at
14     the scene?
15 A.  Yeah.
16 Q.  Which officers?
17 A.  Everybody on the scene.
18 Q.  The west side officers?
19 A.  At the west side officers for the crossfire,
20     the east side officers who were close, I
21     mean, as a supervisor, I'm worried about, I
22     mean, all the officers who are out there.
23 Q.  Did you have a particularized fear about
24     somebody, some officer being shot or killed
25     as a result of Finch's actions at the time

Page 159

1      the shot was fired?
2  A.  I wasn't looking at him at the time the shots
3      were -- I mean, again, we're -- such a small
4      timeframe.  I -- the answer to the question
5      that I -- I mean, at the exact time that the
6      shot was fired, that's not what my focus was
7      on.  So the answer would be no, because I
8      didn't see whatever Rapp had seen.
9  Q.  Did you talk to Officer Rapp in the immediate
10     aftermath of the shooting?
11 A.  No.  I had a -- I did ask him something on
12     the radio as we had moved up, but I had not
13     had a conversation with him.
14 Q.  Did you give him any orders right after the
15     shooting?
16 A.  I guess you could call it that.  I asked him
17     if he still -- as we were moving up to move
18     up to the house, I asked him if he still had
19     the windows covered.
20 Q.  So you essentially asked him to retain cover
21     of the house?
22 A.  Correct.
23 Q.  At the moment that Mr. Finch opened the
24     screen door, did you believe he was the
25     shooter described by dispatch?

Page 160

1  A.  I didn't know.
2  Q.  He could have been a hostage, could have been
3      a shooter, didn't know?
4  A.  Yeah, I did not know.
5  Q.  At that exact point in time, did you have any
6      reason to believe he was more likely to be
7      the shooter than the hostage?
8  A.  I did, because, I mean, I don't know -- I
9      don't know what was going through my head,
10     but, I mean, I assumed that that was probably
11     the guy that we were looking for just because
12     he says that his mom and his brother or
13     sister, which, I assume, were younger were
14     the ones in the closet, and this was not a
15     young child or -- so just that's what was
16     going through my head that he most likely was
17     probably the person that we were there
18     looking for.
19 Q.  Did dispatch say the brother was younger?
20 A.  No.
21 Q.  That was just an assumption you made?
22 A.  That was just an assumption that I made.
23 Q.  At the time that Rapp shot his gun, did you
24     have any reason to believe that Mr. Finch was
25     the shooter rather than a hostage?

Page 161

1  A.  Can you ask that question again.
2  Q.  Sure.  At the time Rapp shot his rifle, did
3      you have any reason to believe that Finch was
4      the shooter rather than a hostage?
5  A.  At the time that he shot his gun, I assumed
6      that it was for a reason.  So I'm not sure --
7      I didn't know who he was at the time.  I
8      think dispatch asked me if it was the
9      suspect, and I think I told dispatch "I don't
10     know", because we don't.  I mean, there could
11     be five shooters inside the house.  You just
12     don't know.  So I didn't want to give out
13     false information.  I didn't want to give out
14     a sense of that, hey, we're done, he's down
15     at the front, we're done and let people's
16     guard go down at all.  So I guess I don't
17     know.
18 Q.  You said something along the lines of you
19     thought that Finch had good reason to shoot
20     his rifle or something like that, is that
21     fair, just now?
22 A.  Rapp?
23 Q.  Sorry.  Rapp, yes.
24 A.  No.  I said I would assume that he would,
25     yes.

41 (Pages 158 to 161)

Page 162

1    Q.    Okay.  And what is that assumption based on?

2    A.    **That he's a police officer.  I mean, that**

3          **he's not going around randomly shooting**

4          **people.  You know, that he had saw something**

5          **that caused him to fire his rifle.**

6    Q.    Okay.  You assume he made the right call

7          'cause he's a police officer?

8    A.    **I assume that he saw something that caused**

9          **him to fire it.**

10   Q.    And that assumption is based on the fact that

11         he's a trained police officer?

12   A.    **That goes into it, yeah.**

13   Q.    Is it possible, based on what you observed

14         that night, that at the time he was shot,

15         Mr. Finch was trying to go back into the

16         house?

17                 MR. PIGG:  Object to form; calls

18         for speculation.

19   A.    **I never got that -- I never got that feeling.**

20   Q.    Why is that?

21   A.    **It's a feeling.  I don't know.  Nothing that**

22         **he did made me believe that he was going back**

23         **inside the house.**

24   Q.    Nothing he did made you believe he was

25         turning to go back inside the house at the

Page 163

1          time he was shot?

2    A.    **Not -- not -- not in my observations, no.**

3    Q.    Would you agree that when faced with police

4          commands, not everyone reacts the same way?

5    A.    **Yes.**

6    Q.    And some people are immediately compliant;

7          correct?

8    A.    **Correct.**

9    Q.    And some people are certainly not; right?

10   A.    **Correct.**

11   Q.    And would you agree, in your experience, that

12         some people are not compliant even when they

13         have not engaged in criminal activity?

14   A.    **Yes.**

15   Q.    And that could be through -- because of a

16         distrust of law enforcement, for instance?

17   A.    **True.**

18   Q.    Hostility to law enforcement?

19   A.    **(Witness nods.)**

20   Q.    Maybe mental health issues?

21   A.    **Yes.**

22   Q.    Did anyone else on the scene shoot a firearm

23         that night other than Officer Rapp?

24   A.    **At that scene, no.**

25   Q.    Did any of the officers on the east side ever

Page 164

1          shoot a weapon, to your knowledge?

2    A.    **No.**

3    Q.    At the time the shot was fired, I assume you

4          were not looking at the east side officers;

5          right?

6    A.    **No.**

7    Q.    And so you didn't see their facial

8          expressions?

9    A.    **(Witness nods.)**

10   Q.    Sorry.  Do you mind verbalizing?

11   A.    **No.  Sorry.**

12   Q.    And you didn't see which way they were

13         standing?

14   A.    **No.**

15   Q.    Or their posture?

16   A.    **No.**

17   Q.    Would it have been reasonable, in your

18         opinion, to order the east side officers to

19         use less lethal force options on Mr. Finch

20         given the way he was reacting to police

21         orders?

22   A.    **That is a possibility.  I mean, had things**

23         **played out differently, that is a**

24         **possibility.**

25   Q.    Did you, at the time of the shooting, believe

Page 165

1          that -- or understand it to be possible that

2          gasoline had been poured on the house?

3    A.    **I'm sorry.  Can you repeat the question.**

4    Q.    Sure.  Did you hear from dispatch prior to

5          coming to the scene, or at the scene, that

6          gasoline may have been poured on the house?

7    A.    **Well after the shooting we had learned that**

8          **information.**

9    Q.    Okay.  That wasn't information you had prior

10         to the shooting?

11   A.    **No.**

12   Q.    All right.  So you said several times after

13         the shooting you moved up; correct?

14   A.    **Yes.**

15   Q.    And could you mark on the map where you moved

16         to after the shooting.

17   A.    **Ultimately, to the house.**

18   Q.    All right.  First, though, you went in the

19         direction of where a Tahoe was; is that

20         right?

21   A.    **I had a Tahoe come to us, yes.**

22   Q.    And you made that order after the shooting?

23   A.    **Correct.**

24   Q.    Could you mark where the Tahoe driven by

25         Sergeant Stevens was located, and just put

42  (Pages 162 to 165)

Page 166

1      Tahoe.
2  A.   When he first came? I mean, so I think he
3       came from this way, but, I mean, I --
4  Q.   Did he stop the car at some point?
5  A.   Yes.
6  Q.   At your direction?
7  A.   Well, yes, I mean, and I believe that was
8       right about here. He stops it right here and
9       that's where everybody -- everybody -- the
10      team that I was going to move up with comes
11      right here.
12 Q.   And that's the stack of officers you referred
13      to previously?
14 A.   Yes.
15 Q.   Could you just write Tahoe there, please.
16 A.   (Witness complies.)
17 Q.   And it looks like they were in the middle of
18      the street on McCormick?
19 A.   Ish, yeah.
20 Q.   Okay. Did you, at some point, turn off your
21      body camera during the incident?
22 A.   No.
23 Q.   For a short period of time?
24 A.   No.
25 Q.   Okay. I was going to ask you.

Page 167

1  A.   At the very end of the -- I mean, at the very
2       end, I mean -- so are you talking about why
3       there's two videos?
4  Q.   No. I am referring to something and I'm
5       happy to mark this as an exhibit, but during
6       your Wichita police interview, you say
7       that -- okay.
8            So you turned it -- you never turned
9       it off prior to clearing the house; is that
10      accurate?
11 A.   I was done with what I was doing on the scene
12      when I turned my camera off.
13 Q.   Okay. At some point did you turn your camera
14      off in order to have a conversation with
15      other supervisors?
16 A.   That's what I turned it off permanently, and
17      then I got into my car and drove to the city
18      building.
19 Q.   Okay. And how come you didn't keep it on
20      during that conversation?
21 A.   I don't recall. That's pretty normal. That
22      was the end of my -- with my -- I mean, I
23      think I told -- I don't even remember. There
24      was a group of supervisors, and I told them
25      that Rapp needed to go up stairs, that he

Page 168

1       was the shooter. And then I think I was
2       going over who else was -- who else I knew
3       directly needed to go upstairs that who would
4       have potentially been witnesses, the officers
5       that were with me, 'cause I didn't know who
6       they were at the time, other than Rapp. So I
7       had asked for those guys all to meet over
8       here in this little parking area or whatever
9       that is.
10 Q.   In front of the breakfast club?
11 A.   Yeah, but, I mean, their parking lot is back
12      here. It's an open area. That's where we --
13      that's where we were at. This is well after,
14      after we'd cleared the house. So -- and
15      that's when I -- I had turned it off when I
16      went out there to tell them that stuff and
17      then I got in my car and drove to the city
18      building.
19 Q.   Okay. So you collected all potential
20      witnesses to the incident after clearing the
21      house?
22 A.   I made sure that the supervisors who were out
23      there who were going to be taking over knew
24      that those guys needed to go upstairs.
25 Q.   And who were the supervisors who took over?

Page 169

1  A.   Well, I'll tell you the supervisors there. I
2       don't know -- Lieutenant Bruno was there, and
3       he was the -- he was the highest ranking at
4       the time on the scene. Bill Stevens,
5       Sergeant Beard, or Lieutenant Beard now, I
6       don't remember who else. There were several.
7  Q.   And at some point after the shot, you
8       actually went into the house; correct?
9  A.   Yes.
10 Q.   Did you make a plan about how to clear the
11      house with the stack of officers at the
12      Tahoe?
13 A.   I wouldn't say that's what we did. I mean,
14      we -- we had a plan that we were going in to
15      clear the house. We didn't make a plan on
16      how to do that.
17 Q.   What did you discuss at the Tahoe with those
18      officers?
19 A.   Well, originally, what my plan to do because
20      we couldn't see Mr. Finch and I didn't know
21      if he was armed or not. My plan was to use a
22      dog to go in there and we could safely pull
23      him out to us to get him medical attention or
24      to make sure that he wasn't armed. And as
25      the plan unfolded, that became less of an

## Page 170

```
 1        option because the door wasn't open enough.
 2        His leg was sort of caught on the inside of
 3        the door so. . .
 4   Q.   How would a dog have brought him out?
 5   A.   That's something that we trained for.  We
 6        call it an officer down drill.  We basically
 7        give the dog an override command where he's
 8        just going to go up and bite the first thing
 9        that he sees, and then we have him on a
10        50-foot leash.  So the dog would go in and
11        grab a hold, and then we would pull back from
12        safety so we're not exposing anybody --
13        exposing anybody.
14   Q.   Okay.  So that was your plan, but it didn't
15        work out that way?
16   A.   Correct.
17   Q.   At the time you were at the Tahoe, did you
18        have any knowledge as to what Mr. Finch's
19        medical condition was?
20   A.   Are you talking about from back when we were
21        back behind the Tahoe back here?
22   Q.   Yes.
23   A.   No.
24   Q.   Did you believe he needed medical attention?
25   A.   Oh, yeah.
```

## Page 171

```
 1   Q.   Did you believe he could be seriously hurt?
 2   A.   Yes, I knew he was seriously hurt.
 3   Q.   Did you intend to secure medical attention
 4        for him?
 5   A.   I -- yes.
 6   Q.   At that point in time at the Tahoe or still
 7        while you were at location 2, did you order
 8        medical attention for him?
 9   A.   I -- at that point, I was still operating
10        that this was a good call.  And I asked
11        dispatch as -- and this is very quickly after
12        the shooting.  I asked dispatch to start a
13        second EMS unit because I was still operating
14        under the assumption that we needed another
15        EMS unit for the father that was upstairs.
16   Q.   Was there an ambulance at the scene at that
17        point in time already?
18   A.   I don't recall seeing an ambulance, but I
19        know that when dispatch puts out a shooting,
20        that ambulance and fire are dispatched.  So,
21        typically, on shooting calls, they are staged
22        in an area.  When we secure the scene,
23        they'll move in.
24   Q.   When is the first time you recall seeing an
25        ambulance on the scene?
```

## Page 172

```
 1   A.   I don't recall seeing an ambulance on the
 2        scene.  By the time that I -- I was still
 3        inside the house when I believe they had
 4        taken Mr. Finch.
 5   Q.   Did a EMT ever enter the house?
 6   A.   No.
 7   Q.   Were they allowed to do so?
 8   A.   No.  The body, at that point, had been moved
 9        from the house.
10   Q.   Had it not been moved, could EMT have
11        responded to the house to provide medical
12        attention to Mr. Finch?
13   A.   What was your question again?
14   Q.   Well, could EMT have entered the house to
15        provide lifesaving medical attention to
16        Mr. Finch?
17   A.   When?
18   Q.   Right after the shooting.
19   A.   We would not have allowed that.  It would not
20        have been safe at that point.
21   Q.   And why is that?
22   A.   Well, that's -- well, because we don't
23        potentially know what else is going on inside
24        the house.  Until we clear that residence,
25        that was the purpose of wanting to have the
```

## Page 173

```
 1        dog, bring him out, and then we could safely
 2        move him away.
 3   Q.   And you did eventually enter the house;
 4        correct?
 5   A.   Correct.
 6   Q.   How long after the shot?
 7   A.   Again, time, it's a complete guess, maybe
 8        five minutes.
 9   Q.   Okay.  Could it have been as many as 10?
10   A.   From the time of the shot?
11   Q.   Correct.
12   A.   It could potentially be that high, yes.
13   Q.   Who else entered the house with you?
14   A.   A lot of people.
15   Q.   And were they all entering the house on your
16        orders?
17   A.   Yes.
18   Q.   You were still in charge of the scene?
19   A.   Well, I mean, tactically, I was the one
20        running the show.  Lieutenant Bruno was there
21        at that point, so, I mean, technically, he's
22        in charge.
23   Q.   But you had the most knowledge about what had
24        happened at the scene at that point in time?
25   A.   Well, to my knowledge, yes.
```

Page 174

1    Q.    Were you the first person in the house?
2    A.    No.
3    Q.    Who was the first person in?
4    A.    I have no idea.
5    Q.    What did you see as you first entered the
6          house?
7    A.    Well, when I -- when I -- prior to entering
8          the house, when we were stacked up getting
9          ready to go in, I noticed that it,
10         tactically, was a very poor situation by the
11         way that there were several doorways and
12         stairs immediately inside the door.
13   Q.    Okay.  Did you see anyone as you entered the
14         house?
15   A.    Mr. Finch.
16   Q.    Where was he?
17   A.    Laying right there in the foyer area of the
18         entranceway.
19   Q.    Okay.  What was his condition at that time?
20   A.    I believed that he was deceased.
21   Q.    Did you check his vitals?
22   A.    I did not.  If we back up for just a second.
23   Q.    Uh-huh.
24   A.    When we were -- when we had pushed up to the
25         actual doorway, when I realized that the dog

Page 175

1          was not going to be a viable option,
2          Lieutenant Bruno had moved around and was
3          holding the screen door open.  And Sergeant
4          Beard was in the stack.  And we had come up
5          with a plan that Sergeant Beard was going to
6          reach in and try and grab him and drag him
7          out, but, again, at this point I'm still
8          operating under the assumption that
9          there's -- we don't know -- it's an unknown
10         inside the house.  So I'd seen that
11         Mr. Finch's foot appeared to have been -- you
12         couldn't just pull and drag because it was
13         going to -- his foot was going to catch up on
14         the -- on the doorway.  So the plan was that
15         Sergeant Beard was going to go grab him, and
16         at that point Lieutenant Bruno said that he
17         was not breathing.  And I remember shining my
18         flashlight handgun at his chest to see if he
19         was breathing.  I did not see anything.
20         That's when we made the determination that we
21         would push through with our team and that
22         eventually other people would -- once we had
23         secured that area that other people could
24         pull him out.
25   Q.    Okay.  So once you saw that he did not appear

Page 176

1          to be breathing, you pushed through into the
2          house?
3    A.    Correct.
4    Q.    And you left him on the floor?
5    A.    Correct.
6    Q.    And you did not, to be clear, touch him to
7          see if he was still breathing?
8    A.    I did not.
9    Q.    You just shone the flashlight on his chest to
10         see if it was moving up and down?
11   A.    Me, personally, yes.
12   Q.    Did anyone, at that point, perform emergency
13         CPR?
14   A.    Not that I saw.
15   Q.    Did you command anybody to do so?
16   A.    No.
17   Q.    Did Lieutenant Bruno?
18   A.    I do not know.
19   Q.    Did Sergeant Beard, in your presence?
20   A.    Nobody in my presence -- nobody in my
21         presence, nor did I see anybody doing any
22         lifesaving measures in my presence.
23   Q.    And why did you not order lifesaving measures
24         at that point in time?
25   A.    Well, because I was focused on clearing the

Page 177

1          rest of the house, and then that was going to
2          be what the other officers were going to do
3          was take him out of the house.
4    Q.    Did you order anyone to take him out of the
5          house?
6    A.    By the time that we got to that where it was
7          secure, I was told that it had already been
8          done.
9    Q.    Okay.  So at the time you entered the house,
10         you gave no orders to somebody else --
11   A.    No.
12   Q.    -- get this guy out of here; get him to the
13         EMT?
14   A.    That was the plan for probably several
15         minutes was what the plan was to get him out.
16         And then when we got up to there and saw that
17         he was not breathing is when we went in and
18         cleared it.  So that was the purpose of
19         wanting to use the dog so we could safely
20         pull him out.  And then when Lieutenant Bruno
21         said that he wasn't breathing is when we
22         determined just that we would just push
23         through, secure that area and then get him
24         out.
25   Q.    Would you say there was less urgency to get

Page 182

1    scratch that.  Somebody said that there was
2    somebody that led me to believe it was
3    somebody younger upstairs.  So I remember
4    asking what their name was and then relaying
5    that to Sergeant Stevens, who was sitting in
6    the Tahoe, and he gave announcements over the
7    PA system for them to come outside.  And
8    then --
9    Q.   Sorry.  Just to cut you off there, sorry.
10        Was -- were the other residents out at
11        that point by the time the announcement was
12        made to the residents?
13   A.   There were people out of the residence, yes.
14   Q.   Had they come out in response to
15        announcements by WPD?
16   A.   No, we had not made announcements yet.
17   Q.   When the announcement was made, what was the
18        content of that announcement?
19   A.   I don't specifically remember the call -- the
20        person's name who they told us.  It's -- but
21        Sergeant Stevens said "hey, it's the Wichita
22        police, you need to come out", something to
23        that effect.
24   Q.   Were the residents who had come out prior to
25        that, were they dressed?

Page 183

1    A.   I don't recall seeing anybody naked running
2         down.  I didn't -- I just caught a glimpse
3         'cause I'm standing way back here and they
4         were coming out the east door running in a
5         northeasterly direction towards the other
6         officers that were over on -- where that QRF
7         was at.
8    Q.   Were they wearing coats, to your knowledge?
9    A.   I don't have any idea.
10   Q.   Did you order them to be detained?
11   A.   No.
12   Q.   Did anybody detain them, to your knowledge?
13   A.   I'm assuming so, but I do not know.
14   Q.   Based on whose orders?
15   A.   Based off of practice.  I mean, just -- until
16        we figure out what's going on, everybody out
17        of that house would be detained.
18   Q.   And would detaining entail handcuffs?
19   A.   It could.  I don't know.
20   Q.   And what's the purpose of detaining possible
21        hostages in a case like this?
22   A.   'Cause we don't know what's going on at that
23        point.
24   Q.   And how long were the residents outside prior
25        to being -- strike that.

Page 184

1         They were eventually, the residents,
2         taken into police custody, correct, to your
3         knowledge?
4    A.   I don't believe so.
5    Q.   Do you have any knowledge as to whether they
6         were interviewed by WPD that night?
7    A.   After the fact, I know that they were
8         interviewed.
9    Q.   Do you know whether they were taken to the
10        city building that night?
11   A.   I believe that they were.
12   Q.   Do you know how long they were outside on the
13        scene prior to being taken to that building?
14   A.   I have no idea.
15   Q.   Do you know who would have that information?
16   A.   Who would have that information?
17   Q.   Correct.
18   A.   Addie Perkins, Lieutenant Ojile, anyone from
19        the homicide section.
20   Q.   Those were the officers who investigated the
21        case?
22   A.   Correct.
23   Q.   Do you know what officer was tasked with
24        staying by them during that time?
25   A.   No.  I -- I recall asking for Sergeant Beard

Page 185

1    to go over there and handle that situation.
2    Q.   Do you know if he did?
3    A.   He walked off that direction.
4    Q.   What was his -- what was -- or what is --
5         strike that.
6         What was his position on December
7         28th?
8         Which unit was he with?
9    A.   He was part of the -- trying to think back on
10        when we switched.  We'll just say the gang
11        unit.  He was the supervisor of the gang
12        unit.
13   Q.   What about Lieutenant Bruno, what unit was he
14        attached to?
15   A.   I believe he was a second shift lieutenant in
16        Patrol West Bureau.
17   Q.   Was he your direct supervisor?
18   A.   No.
19   Q.   Who was yours during this incident?
20   A.   Kennedy, and he had shown up on scene a
21        little bit -- but this is a west side call.
22        I mean, it's -- it's -- there's no reason
23        for -- other than it was a officer-involved
24        shooting -- for Kennedy to show up.  And I
25        don't think he was there other than -- I

Page 198

1   A.   No.

2   Q.   Had you looked at your body camera footage?

3   A.   No.

4   Q.   By the way, what happened to your body camera

5        footage?

6   A.   When I was sitting in the lieutenant's

7        office, somebody, and I don't know who, came

8        in and took my -- the camera and, I'm

9        assuming, downloaded it.

10  Q.   Okay.  Who was that somebody?

11  A.   I don't know.

12  Q.   You never saw it being downloaded.

13       You just assume it was?

14  A.   Yeah.  I mean, they come and take it and

15       that's pretty typical, also.  And they have a

16       bank up there that they'll download everybody

17       who was involved in a incident and download

18       it.

19  Q.   Okay.

20  A.   We don't have to label it or anything on that

21       time.

22  Q.   Did you ever request to view your footage?

23  A.   I did.

24  Q.   When?

25  A.   At the conclusion of my interview.

Page 199

1   Q.   And did you, in fact, then view it?

2   A.   Part of it.

3   Q.   What part?

4   A.   Just right up till after the shooting.

5   Q.   Why did you ask to see it?

6   A.   I just wanted to go through what I thought

7        I'd seen in my head.

8   Q.   For what purpose?

9   A.   Just to make sure that my -- what I had told

10       everybody was accurate.

11  Q.   And was it?

12  A.   From my recollection, yeah.

13  Q.   Did you get a chance to review the transcript

14       of your interview?

15  A.   Not officially.  I have read it several

16       times, yes.

17  Q.   Including yesterday?

18  A.   Last night, yes.

19  Q.   Have you ever found any problems with what is

20       included in that transcript?

21  A.   The only error that I had seen in there was I

22       think I said when I got off of Kellogg I went

23       north, and I actually went south on Seneca.

24  Q.   Stand by everything else in there?

25  A.   Yeah, I mean, at the time that was what I

Page 200

1        remembered.

2   Q.   Did you ever write a report in the case?

3   A.   No.

4   Q.   Ever take any notes about the case?

5   A.   No.

6   Q.   Did you find out, eventually, Mr. Finch died

7        from his wounds?

8   A.   Yes.

9   Q.   And when did you find out?

10  A.   I don't recall.  I'm sure up on the sixth

11       floor just outside -- I don't know.

12  Q.   And what did you feel upon hearing that?

13  A.   What do you mean?

14  Q.   What was your emotional reaction upon hearing

15       he had died?

16  A.   It sucks.  I mean, it was horrible.

17  Q.   And why is it horrible?

18  A.   'Cause anytime anybody dies, it's not a good

19       thing.

20  Q.   Do you think it was particularly horrible

21       because it was an officer-involved shooting?

22  A.   I don't -- I think anytime anybody is killed

23       is a pretty bad deal.

24  Q.   Sitting here today, are you aware of any

25       criminal activity that Andrew Finch was

Page 201

1        engaged in before he was shot?

2   A.   Sitting here today?

3   Q.   Correct.

4        MR. PIGG:  Are you asking about

5        right at the time or about his history?

6   BY MS. VAN BRUNT:

7   Q.   Sorry.  I'm not asking about his history.

8        I'm asking about at the time he was shot.

9   A.   No.  Well, okay.  Reask your question,

10       please.

11  Q.   At the time he was -- are you aware, sitting

12       here today, of any criminal activity that

13       Andrew Finch was engaged in at the time he

14       was shot?

15  A.   Can I ask a -- I mean, are you -- what we

16       thought he was engaged in?

17  Q.   No.  I'm asking your knowledge now.

18  A.   No.

19  Q.   Again, sitting here today, are you aware of

20       any actual threat that Andrew Finch posed to

21       you or to any other officer at the scene at

22       the time he was shot?

23  A.   Knowing what I know now --

24  Q.   Yes.

25  A.   -- no.

51 (Pages 198 to 201)

Page 202

1    Q.    And you know now that Andrew Finch had not
2          shot anyone that night; right?
3               You know he did not have a gun on him?
4    A.    Correct.
5    Q.    You know he was not holding anyone hostage;
6          correct?
7    A.    Correct.
8    Q.    You knew -- you know now he was not -- he had
9          not poured gasoline on the house?
10   A.    Correct.
11   Q.    Do you have any regrets about what happened
12         to Andrew Finch that night?
13   A.    Do I have any regrets about what happened to
14         him?
15   Q.    Yes.
16   A.    Yeah, somebody was killed.
17   Q.    Is there anything you, personally, would do
18         over again if you could?
19   A.    I don't -- I can't think of having time to
20         redo anything.  The only thing I -- if I had
21         time, I would have, obviously, liked to have
22         verbalized who -- that one of us would be
23         giving commands, but there was no time for
24         any of that.
25   Q.    Is there anything you'd have asked one of

Page 203

1          your officers to do differently?
2    A.    No.
3    Q.    Do you believe everyone at the scene acted in
4          accordance with WPD policy that night?
5    A.    Yes.
6    Q.    Do you think there should be any changes to
7          policy as a result of what happened that
8          night?
9    A.    I don't -- I think we could certainly train
10         for other situations, but I don't think that
11         anything was -- I think it's a -- I don't
12         think that we had time to do anything
13         different than what we did.
14   Q.    Do you believe everyone acted on the scene
15         that night as they should?
16   A.    Yes.
17   Q.    In accordance with policy?
18   A.    Yes.
19   Q.    I found a notice we have to do a tape change
20         so we're going to take one last short break,
21         please.
22   A.    Outstanding.
23               VIDEOGRAPHER:  Going off the
24         record 12:34.
25               (A recess was taken from 12:34 p.m. to

Page 204

1          12:45 p.m.)
2               VIDEOGRAPHER:  Back on the
3          record.  It's 12:45 p.m.
4    BY MS. VAN BRUNT:
5    Q.    Okay.  When we stopped, I think, you were
6          saying that perhaps there should be
7          additional training in WPD as a result of
8          this incident.
9               Did I get that right?
10              MR. PIGG:  Object to form.
11   A.    I don't -- I think I -- you -- I think the
12         question was -- I don't recall what the
13         question was.
14   Q.    The question I asked was do you believe there
15         should be any changes to WPD policy as a
16         result of the incident that night?
17   A.    No.
18   Q.    Do you believe there should be any changes to
19         WPD training as a result of what happened
20         that night?
21   A.    I think that you can never have enough
22         training.
23   Q.    What additional training, in particular, do
24         you think there should be?
25   A.    I think you can -- I mean, swatting.

Page 205

1    Q.    Training on swatting?
2    A.    Sure.
3    Q.    What would that entail?
4    A.    I don't know.
5    Q.    Well, you were on the scene.
6               What additional training would have
7          assisted that incident to happen in a better
8          way?
9               MR. PIGG:  Object to form of the
10         question; it's argumentative.
11   A.    Like I said before, I don't -- I wouldn't
12         have changed anything.  With the lack of time
13         that we had, I thought -- I, although it was
14         never enacted, had a good plan, but like you
15         can never not train enough.  And I don't know
16         what training -- I mean, it might -- I mean,
17         even just going through training talking
18         about it would certainly probably wouldn't
19         have changed the outcome of this, but any
20         training that you go to is beneficial.
21   Q.    Do you think any officer conduct, if it had
22         been changed, could have changed the outcome
23         in this case?
24   A.    Officer?
25   Q.    Yes.

52  (Pages 202 to 205)

Page 222

1    Q.   And what was the old one called?
2    A.   City Manager's Review Board, I think.
3    Q.   Did you ever appear before them?
4    A.   No.
5    Q.   Did you ever find out any information about
6         cases they were investigating?
7    A.   No.
8    Q.   Do you know if they ever investigated any
9         officer-involved shootings?
10   A.   I have no idea.
11   Q.   Or officer uses of excessive force?
12   A.   I don't -- I don't know.
13   Q.   Do you know the outcome of any Professional
14        Standards Bureau investigation related to the
15        Finch incident?
16   A.   Not officially.
17   Q.   Unofficially?
18   A.   That everything was found to be within
19        policy.
20   Q.   Do you think that's the correct outcome?
21   A.   Yes.
22   Q.   And did you receive any awards or
23        commendations for your work on this case?
24   A.   No.
25   Q.   And have you previously responded to a scene,

Page 223

1         other than this case, involving an
2         officer-involved shooting?
3    A.   What was the question?
4    Q.   Have you ever been on the scene of an
5         officer-involved shooting other than the
6         Finch incident?
7    A.   At the time of the shooting?
8    Q.   At anytime.
9    A.   Yes.
10   Q.   And how many?
11   A.   We discussed the one.
12   Q.   Right, the one where the dog was shot.
13        Any others?
14   A.   I was a detective and went out on an
15        officer-involved shooting from -- I forget
16        what the street was.  It was a robbery, a
17        residential robbery, and I went out there and
18        helped locate shell casings.
19   Q.   When was that?
20   A.   I don't know.  I was also a detective during
21        the time when we had the Old Town shooting,
22        and I went out and assisted with that.
23   Q.   Which Old Town shooting?
24   A.   The Smart, I think, is his last name.
25   Q.   Marquez Smart?

Page 224

1    A.   I believe so.
2    Q.   You were on the scene then?
3    A.   I was, as a detective.
4    Q.   You investigated afterwards?
5    A.   I didn't -- I wasn't the investigator.  I
6         assisted in the investigation.
7    Q.   Did you see the shooting itself?
8    A.   No.
9    Q.   Do you know the officers involved in that?
10   A.   Froese and Chaffee, who's now with the ATF.
11   Q.   Did you conduct any investigation into their
12        actions?
13   A.   No.
14   Q.   Were you part -- were you a witness to any
15        investigation into their actions?
16   A.   What do you mean by that?
17   Q.   Were you interviewed as a possible witness to
18        the incident?
19   A.   No.
20   Q.   Any other officer-involved shootings?
21   A.   Yeah.  I was a -- not that come to the top of
22        my head.  When I was a detective, I mean, we
23        would be up on the sixth floor and help out
24        with -- I think I did an interview on -- I
25        assisted in an interview when Ojile and Hill

Page 225

1         had gotten involved in an officer-involved
2         shooting and I assisted.  I interviewed a
3         helicopter pilot.
4    Q.   Do you recall who was shot?
5    A.   No.
6    Q.   What year was that?
7    A.   I don't recall.  It was between 2010 and
8         2013.
9    Q.   The day before the Finch incident, were you
10        involved in an incident involving a theft?
11   A.   Yes.
12   Q.   And did John Groh, one of your K-9 officers,
13        fire shots?
14   A.   No.
15   Q.   Were shots fired in that case?
16   A.   Not by -- not by John Groh.
17   Q.   Who -- can you tell me the circumstances of
18        that incident?
19   A.   I don't -- I mean, I can give you generics.
20        They -- we were dog training.  And they got a
21        call of a officer in trouble out with shots
22        fired.  And we were all fairly close.  So we
23        switched over, and as we switched over at
24        Central and 235, the -- one of the patrol
25        west first shift officers was screaming on

57 (Pages 222 to 225)