# EXHIBIT 3

**Lisa G. Finch, et al. vs. City of Wichita, Kansas**

**Case No. 18-cv-1018-JWB-ADM**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


LISA G. FINCH, Individually, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased, and as Next Friend )
for her minor granddaughter, )
AF; DOMINICA C. FINCH, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased; and ALI ABDELHADI, )
)
              Plaintiffs, )
)
)
    vs. )Case No.
)18-CV-01018-JWB-KGS
)
CITY OF WICHITA, KANSAS; )
JOHN DOE POLICE OFFICERS 1-10, )
)
            Defendants. )
)


D E P O S I T I O N


    The videotape deposition of JUSTIN RAPP taken on
behalf of the Plaintiffs pursuant to the Federal Rules of
Civil Procedure before:

                RICK J. FLORES, CSR
                KELLEY REPORTING ASSOCIATES, LTD.
                515 South Main, Suite 108
                Wichita, Kansas 67202

a Certified Shorthand Reporter of Kansas, at 515 South
Main, Suite 108, Wichita, Sedgwick County, Kansas, on the
17th day of October, 2018, at 12:04 p.m.

## Page 34

1   Q.   You ever ask?

2   A.   No.

3   Q.   Do you intend to apply again in the future to

4        be one?

5   A.   I'm not sure at this point.

6   Q.   Why did you want to be a SWAT officer back

7        when you did apply a year ago?

8   A.   I believed that based on my training

9        experiences within the department that I

10       could be a valued member of that team.

11  Q.   Was there something in particular about SWAT

12       that appealed to you?

13            Are there specific duties and

14       responsibilities?

15  A.   Not particularly.  I have several friends

16       that are a part of that team, and so it was

17       just something that I could do that would

18       allow me more time with several of my

19       friends.

20  Q.   And Officer Schepis is one of those; correct?

21  A.   Yes, ma'am.

22  Q.   What other officers do you consider your

23       friends on the SWAT team?

24  A.   Officer Thatcher, Officer Benjamin Reed,

25       officer -- or excuse me -- Sergeant Clay

## Page 35

1        Schuler, Detective Keith Cox.

2   Q.   Going to December 28th, 2017, what shift were

3        you working that day?

4   A.   I was on third shift.

5   Q.   Is that a typical shift?

6   A.   Yes, ma'am.

7   Q.   And what are the times of that shift?

8   A.   Starts at 5:00 p.m. and it ends at 3:00 a.m.

9   Q.   What days of the week?

10  A.   I worked Wednesday through Saturday.

11  Q.   So Officer Powell was obviously a new partner

12       at the time --

13  A.   Correct.

14  Q.   -- of the incident?

15            Was it your job to provide on-the-job

16       training for Officer Powell?

17  A.   In the context of working drug complaints and

18       things like that, yes.  Officer Powell had

19       already completed field training program.  He

20       was not a new officer by any means, but his

21       job duties were set to change, and so I was

22       trying to -- or I was assigned to teach him

23       kind of the drug investigation side of

24       things.

25  Q.   How were his duties set to change?

## Page 36

1   A.   With the reorganization that eliminated SCAT,

2        he was going to be one of the Patrol West

3        Community Response Team members which

4        operates similar to a SCAT team, but it's not

5        called SCAT anymore.

6   Q.   On the prior occasions you had been partnered

7        with Powell, had you also done on-the-job

8        training with him?

9   A.   As it relates to the drug investigations,

10       yes.

11  Q.   While you were at SCAT south or west, did you

12       train any other officers?

13  A.   Not at patrol south 'cause I was new myself

14       to SCAT at that point.  Patrol west I trained

15       Officer Cale Carson and Officer Traci

16       Guplaun.

17  Q.   By that time were you considered an

18       experienced SCAT officer?

19  A.   Yes, ma'am.

20  Q.   And who tasked you with training Officer

21       Powell?

22  A.   One of the supervisors at patrol west.  I

23       don't remember if it was the sergeant or the

24       lieutenant, but it would have been a

25       supervisor.

## Page 37

1   Q.   Who was your sergeant?

2   A.   At that point in time, it was Sergeant Bill

3        Stevens.

4   Q.   And Sergeant Stevens was your sergeant at the

5        time of the Finch shooting incident?

6   A.   Yes, ma'am.

7   Q.   And who was your lieutenant at that time?

8   A.   I believe Lieutenant Casey Slaughter.

9   Q.   Did you regularly report to anyone else?

10  A.   No, ma'am.

11  Q.   Did you wear a uniform as a member of SCAT?

12  A.   Yes, ma'am.

13  Q.   And what did that uniform look like?

14  A.   It's black in color.  Kind of depends on the

15       time of the year what -- if you're wearing a

16       long sleeved collared shirt, a short sleeve

17       collared shirt or in the wintertime we also

18       had a black hooded sweatshirt as part of our

19       uniform that could be worn.

20  Q.   What were you wearing the night of December

21       28th?

22  A.   The hooded sweatshirt, as well as black 511

23       pants, which is just a brand of cargo pants,

24       and my black boots.

25  Q.   Did you have your hood up during the

10  (Pages 34 to 37)

## Page 38

1    incident?

2    A.    I don't believe that I did.

3    Q.    And does it show some kind of official emblem

4    on the sweatshirt?

5    A.    Yes, ma'am.

6    Q.    And where is that emblem located?

7    A.    On the left chest.

8    Q.    Okay.  And did you have a badge on that

9    night?

10   A.    It's actually an embroidered badge on the

11   sweatshirt itself.

12   Q.    I see.  And were you driving a WPD-issued car

13   that night?

14   A.    I was not.

15   Q.    Was Officer Powell driving --

16   A.    Yes.

17   Q.    -- the car?  And is it a marked car?

18   A.    Yes.

19   Q.    Like a -- what are the Wichita Police

20   Department car colors?

21   A.    Kind of depends.  But the vehicle that we

22   were in would have been black, kind of an off

23   white, maybe a little bit of yellow in the

24   decal or graphics on the side of the car.

25   Q.    Did Officer Powell regularly drive?

## Page 39

1    A.    We kind of took turns depending on the day.

2    Q.    And why was he driving that night?

3    A.    Just his day to drive.

4    Q.    And what was the weather like on December

5    28th, 2017?

6    A.    Cold.

7    Q.    Do you remember the temperature,

8    approximately?

9    A.    No, I don't.

10   Q.    Would you say it was colder than usual for a

11   Wichita December?

12   A.    Not really.

13   Q.    Just cold because it was winter?

14   A.    Yes, ma'am.

15   Q.    Was it clear outside?

16   A.    To the best of my recollection, yes.

17   Q.    Wasn't snowing?

18   A.    No.

19   Q.    Let's go back to the academy.

20         You said it was six months long, is

21   that correct, academy training?

22   A.    Ballpark, yes.

23   Q.    Okay.  And you said it was mostly classroom

24   training?

25   A.    Primarily, yes.

## Page 40

1    Q.    And do any topics of that training stand out

2    for you now?

3    A.    Not particularly.

4    Q.    Do you have any recollection of the training

5    that you received during the academy --

6    A.    Yes.

7    Q.    -- sitting here today?

8          Okay.  And what do you recollect?

9          What topics in particular?

10         MR. PIGG:  Object to form; it's

11   broad.

12   BY MS. VAN BRUNT:

13   Q.    Can you -- I should mention, so your

14   attorney, obviously, has the right to make

15   objections throughout this process to

16   maintain a record.

17         Unless it's a privilege objection, we

18   still -- I still ask that you answer after

19   your attorney has the -- makes a record of

20   the objection.  Make sense?

21   A.    Yes, ma'am.

22   Q.    Okay.  So I'll try to rephrase that.

23         Do you recall, sitting here today, any

24   topics on which you were trained while in the

25   academy for six months?

## Page 41

1    A.    Yes, ma'am.

2    Q.    And what topics were those?

3    A.    We were trained in domestic violence.  We

4    were trained in homicide.  We were trained in

5    robberies.  We were trained in how to fill

6    out departmental paperwork.  We were trained

7    in use of force.  We were trained in

8    emergency vehicle operations.  We were

9    trained in different weapon systems at the

10   range.  We were trained -- I'm sorry.  I'm

11   trying to think.  Trained in an awful lot of

12   things.  That'd be probably the bulk or

13   what's sticking out to me at the moment.

14   Q.    Which weapon systems did you receive training

15   on?

16   A.    In the academy, it was handgun, shotgun and

17   Taser, I believe.

18   Q.    Not on rifles?

19   A.    Not in the academy, no.

20   Q.    And what's the range of a WPD-issued handgun?

21         MR. PIGG:  Object to form of the

22   question.

23   BY MS. VAN BRUNT:

24   Q.    Is that not a comprehensible question?

25         I see you looking at me.

Page 94

1    completely different ball games.
2    Q.   Are they?  How so?
3    A.   The army has its own set of what they call
4         rules of engagement that's at times similar
5         to police, but at other times completely
6         different than policing.
7    Q.   So are there any points in time when you
8         follow army rules of engagement on the job --
9    A.   No.
10   Q.   -- with WPD?  You follow WPD rules of
11        engagement?
12   A.   Yes.
13   Q.   And WPD policy?
14   A.   Yes.
15   Q.   And WPD training?
16   A.   Yes.
17   Q.   Have you ever had a complaint filed against
18        you stemming from conduct committed in the
19        scope of employment with PD?
20   A.   I believe that I have.
21   Q.   Do you recall any of those instances sitting
22        here today?
23   A.   I had one complaint of racial profiling that
24        the individual declined to speak to a
25        supervisor about at that moment in time.  I

Page 95

1    don't know if he ever followed up at a later
2    date.
3    Q.   Was there an investigation of that instant --
4         incident?
5    A.   No, because that individual, when I told him
6         that I had called for my supervisor and my
7         supervisor would respond for him to speak
8         with him, he declined to stick around long
9         enough for my supervisor to respond.
10   Q.   Okay.  So obviously no discipline followed
11        from that incident?
12   A.   Correct.
13   Q.   Any other complaints you can recall?
14   A.   I've received a notification that earlier
15        this year, a citizen was upset that her case
16        was not being prosecuted and had named me as
17        one of the people that she was frustrated
18        with, but I don't know what the status of
19        that is.
20   Q.   Any others?
21   A.   Not that I can think of off the top of my
22        head.
23   Q.   Received any complaints stemming from use of
24        force on the job?
25   A.   Not that I'm aware of.

Page 96

1    Q.   Are you aware of any other police-involved
2         shootings at WPD within the past five years?
3    A.   Yes.
4    Q.   And how many can you recall sitting here
5         today?
6    A.   Probably five or so.
7    Q.   Were you personally involved in any of those?
8    A.   To what extent?
9    Q.   Were you on the scene or a witness to any of
10        those incidents?
11   A.   I was present for two.
12   Q.   Were you a shooter in any of those incidents?
13   A.   No, ma'am.
14   Q.   For the two in which you were present, can
15        you tell me -- well, let's start with one.
16             What was the date or approximate date
17        of one of those shootings?
18   A.   I believe it was 2014, maybe 2015.  Took
19        place in Old Town.
20   Q.   Is this while you were south SCAT?
21   A.   No, actually I was still in patrol.  So it
22        would have actually been earlier, maybe 2013.
23   Q.   And what were the circumstances of that
24        incident?
25   A.   An individual at club closing time had pulled

Page 97

1    a gun and begun firing into the crowd and was
2    subsequently shot by other officers.
3    Q.   And you were one of the officers who
4         responded to the scene?
5    A.   Yes.
6    Q.   Do you know the name of the person who was
7         shot?
8    A.   Marquez Smart.
9    Q.   And was that person killed?
10   A.   Yes.
11   Q.   Do you know who the shooting officer was?
12   A.   Yes.
13   Q.   And what's his name?
14   A.   Officer Chaffee and Officer Froese.
15   Q.   Where were you in relation to the shooting
16        officers that night?
17   A.   To the best of my knowledge, they were at the
18        northeast corner of one of the parking
19        garages down in the downtown area, and I was
20        on the southwest corner.  I had arrived there
21        to address a completely separate thing, and
22        upon my arrival, the shooting incident
23        unfolded.
24   Q.   What role did you play in that incident?
25   A.   I actually contacted a female who had been

25 (Pages 94 to 97)

## Page 98

1  shot as a result of the overall shooting that
2  occurred and stayed with her until she made
3  it to the hospital and attempted to interview
4  her.
5  Q.  Who shot her?
6  A.  I believe that the investigation determined
7  that Mr. Smart had shot her.
8  Q.  Did you provide cover in that incident for
9  the other officers who were there?
10  A.  No, ma'am.
11  Q.  So there was a subsequent investigation;
12  correct?
13  A.  Yes.
14  Q.  Do you -- were you interviewed in that
15  investigation?
16  A.  No.
17  Q.  Do you know the outcome of the investigation?
18  A.  As far as?
19  Q.  Were the officers found liable for violating
20  any policy?
21  A.  I don't believe so.
22  Q.  Was any discipline meted out to the officers
23  as a result of that investigation?
24  A.  I do not know.
25  Q.  Do you know if -- you said Chaffee and

## Page 99

1  Froese?
2  A.  Froese.
3  Q.  Froese.  Are they still on the force?
4  A.  Officer Froese is.  Officer Chaffee is not.
5  Q.  What were the circumstances of Officer
6  Chaffee leaving?
7  A.  He now works for a federal agency.
8  Q.  Were there any other civilian deaths other
9  than Marquez Smart stemming from that
10  incident?
11  A.  I don't believe so.
12  Q.  What was the other incident you witnessed?
13  A.  I believe it was in 2012.  And I was present.
14  I did not witness a shooting after a
15  residential robbery had occurred.  Multiple
16  suspects fled out the back door of the
17  residence while armed and were confronted by
18  officers in the backyard.
19  Q.  Where were you located?
20  A.  I was on the front side of the house behind a
21  vehicle in the street.
22  Q.  So you heard the shots but didn't see them?
23  A.  Correct.
24  Q.  And which officers shot in that case?
25  A.  I believe that was Officer Dunkel and Officer

## Page 100

1  Schmeidler.
2  Q.  Was there a subsequent investigation?
3  A.  Yes, ma'am.
4  Q.  Were you interviewed?
5  A.  Yes.
6  Q.  And what was the outcome of that
7  investigation?
8  Was there any finding of a violation
9  of policy by the shooting officers?
10  A.  I don't believe so.
11  Q.  Was any discipline assigned to the shooting
12  officers?
13  A.  I don't know.
14  Q.  Are they still on the force?
15  A.  Yes.
16  Q.  And were both the investigations we just
17  talked about for the 2013 and 2012 incidents
18  conducted by PSB, the Professional Standards
19  Bureau?
20  A.  Yes.
21  Q.  Were there any other investigations conducted
22  to your knowledge?
23  A.  Not to my knowledge, no.
24  Q.  Was there any investigation conducted by a
25  civilian review authority?

## Page 101

1  A.  I don't know.
2  Q.  Were you ever interviewed by one for either
3  incident?
4  A.  No.
5  Q.  You only witnessed the 2013 incident;
6  correct?
7  A.  I didn't even really witness it.  I was just
8  present for it.
9  Q.  Did you see the shot fired in 2013?
10  A.  No, ma'am.
11  Q.  Is that because you didn't have a vantage
12  point at which to see it?
13  A.  Correct.
14  Q.  Do you know why you weren't interviewed in
15  that case?
16  A.  Probably because I was with Ms. Hamilton the
17  entire time and had no firsthand knowledge of
18  what had transpired other than I heard
19  multiple gunshots and did not know who had
20  fired them.
21  Q.  You said there were three other shootings
22  that you were aware of within the past five
23  years but at which you were not present;
24  correct?
25  A.  Correct.

## Page 102

1    Q.   And what were those?

2    A.   One was on West Douglas.  And I honestly

3         don't know the name of the individual

4         involved in that one.

5    Q.   Do you recall the year?

6    A.   Not specifically.  Maybe 2015.

7    Q.   Do you recall the officers involved?

8    A.   I believe it was Officer Batiste and Officer

9         Wisely, I believe.

10   Q.   I got a notice that we need to change the

11        tape so we are going to take a short break,

12        restroom and anything else anybody needs.

13   A.   Sure.

14             VIDEOGRAPHER:  Going off the

15        record for now at 1:47.

16             (A recess was taken from 1:47 p.m. to

17        2:00 p.m.)

18             VIDEOGRAPHER:  Back on the

19        record.  It's currently 2:00 p.m.

20   BY MS. VAN BRUNT:

21   Q.   Okay.  When we left off to change the tape,

22        we were discussing an incident on West

23        Douglas around 2015 in which there was a

24        police-involved shooting involving Officers

25        Batiste and Wisely; is that correct?

## Page 103

1    A.   Yes.

2    Q.   And you were not present at that scene;

3         correct?

4    A.   That's correct.

5    Q.   How did you find out about it?

6    A.   Saw early morning news reports and then spoke

7         with other officers who were present.

8    Q.   And what were the circumstances of that

9         incident?

10   A.   To the best of my recollection, it was an

11        individual who had actually fired upon

12        officers and officers had to engage that

13        individual back with returning gunfire, and I

14        believe he was killed as a result.

15   Q.   And you don't know his name?

16   A.   No, ma'am.

17   Q.   Do you know if he had mental health issues or

18        was a drug user?

19   A.   I'm not sure.

20   Q.   Do you know if there was a subsequent

21        investigation by PSB?

22   A.   I'm sure that there probably was.

23   Q.   And why do you say that?

24   A.   Because they investigate every time we have

25        an officer-involved shooting.

## Page 104

1    Q.   Do you know the outcome?

2    A.   No, ma'am.

3    Q.   Are Batiste and Wisely still on the force?

4    A.   Yes.

5    Q.   Do you know if they got disciplined?

6    A.   I don't know.

7    Q.   And what was the next incident at which you

8         were not a witness?

9    A.   I think 2012 or '13 officers responded to an

10        armed robbery at Dollar General down at the

11        intersection of Pawnee and Meridian.  DeJuan

12        Colbert was armed with a knife and was killed

13        by officers.

14   Q.   Which officers?

15   A.   Officer Kurtz, Officer Seacrist, and I think

16        there was a third officer there, but I don't

17        recall that officer's name.

18   Q.   Was there an investigation of that shooting?

19   A.   Yes, ma'am.

20   Q.   And do you know the outcome of the

21        investigation?

22   A.   I do not.

23   Q.   Were any of the officers disciplined?

24   A.   I do not know.

25   Q.   Are the three officers you mentioned still on

## Page 105

1    the force?

2    A.   The two that I named, yes.  I honestly

3         couldn't tell you who the third officer was

4         so I don't know.

5    Q.   Do you know the circumstances that led to the

6         shooting?

7    A.   It was an armed robbery at the Dollar General

8         is really all I could tell you.

9    Q.   And how did you find out about that incident?

10   A.   I saw it on the news.

11   Q.   Did you talk about it with colleagues?

12   A.   I'm sure that I did.

13   Q.   And the fifth incident?

14   A.   I'm not sure there is a fifth.  I was just

15        estimating earlier when I answered your

16        question.

17   Q.   Do any others come to mind, any other

18        police-involved shootings come to mind since

19        you have been on the WPD force?

20   A.   No, not offhand.

21   Q.   We talked earlier about recertifications that

22        you go through for Tasers and for firearms;

23        correct?

24   A.   Yes.

25   Q.   And just to clarify, that recertification

27 (Pages 102 to 105)

## Page 110

1  Q.  Okay.  And how did you come to be on the
2      show?
3  A.  I was selected by the department.
4  Q.  And was there an application process?
5  A.  No, ma'am.  I was just told that a film crew
6      was going to ride with me and my partner.
7  Q.  Who told you you were selected?
8  A.  Former Deputy Chief John Spear.
9  Q.  So it was a higher command decision to have
10     Cops involved in WPD activities?
11 A.  Yes, ma'am.
12 Q.  And why did you agree to be on it?
13 A.  Because I was told that that's what was going
14     to happen, so I said okay.
15 Q.  Did you have any objections to being on it?
16 A.  No.
17 Q.  And when did the filming take place?
18 A.  I believe it was kind of late summer into the
19     winter of 2014.
20 Q.  Was this while you were a patrol officer?
21 A.  No, ma'am.  I was assigned to the Patrol
22     South SCAT team at that time.
23 Q.  And how did the show choose what to film, to
24     your knowledge?
25 A.  I don't know.

## Page 111

1  Q.  Did they just have the camera on you the
2      entire time you were on duty?
3  A.  Yes, ma'am.
4  Q.  Okay.  Were there any issues related to
5      privacy for those civilians who were caught
6      on film that had to be addressed in the
7      course of filming?
8  A.  You mean as far as people that appeared in
9      the episodes who were not police personnel?
10 Q.  That's correct.
11 A.  They all -- to my knowledge, they all signed
12     waivers provided to them by the film crews.
13 Q.  And did the producers of Cops tell you what
14     to do while you were on the job?
15 A.  No.
16 Q.  Did you select the incidents for inclusion in
17     the show or did they?
18 A.  They did.
19 Q.  Do you have any knowledge as to how they
20     selected the segments?
21 A.  No.
22 Q.  Did you receive any response from the
23     community after you were on Cops in the form
24     of e-mails, letters, calls?
25 A.  I don't think so.  I've had various people,

## Page 112

1      when I'm out and about, recognize me from
2      being on that show.  I don't recall any phone
3      calls or e-mails or letters.
4  Q.  Did you receive any recognition by WPD for
5      participating?
6  A.  I think I got like a certificate of
7      appreciation or something.
8  Q.  Were any other officers with WPD filmed?
9  A.  Yes.
10 Q.  Do you know who they are?
11 A.  I Officer Spaulding, Officer Boatright,
12     Officer McKenna, officer -- I'm trying to
13     think of his name.  I can see his face.  I
14     want to say Tapia, Officer Goebel, and that's
15     it that I can think of off the top of my
16     head.
17 Q.  Do you have any knowledge as to how the
18     selection process occurred?
19 A.  No, ma'am.
20 Q.  Any knowledge as to why you were selected?
21 A.  No, ma'am.
22 Q.  Prior to the Finch shooting incident, had you
23     ever fired a weapon in the course of your
24     employment?
25 A.  No.

## Page 113

1  Q.  December 28th was the first time?
2  A.  Yes.
3  Q.  Had you ever fired a Taser?
4  A.  Yes.
5  Q.  Had you ever fired OC spray?
6  A.  Yes.
7  Q.  And had you ever fired any nonlethal weapon
8      that we didn't mention?
9  A.  No.  I'm not trained on any of the other
10     nonlethal weapons.
11 Q.  Okay.  Prior to the Finch shooting incident,
12     had you been involved in any incident that
13     involved hostage taking?
14 A.  No.
15 Q.  Okay.  What about active shooter scenarios?
16 A.  No.
17 Q.  What about -- well, let's start with this:
18     Would it be fair to say that the Finch
19     shooting incident, based on your
20     understanding at the time you heard about the
21     incident on dispatch, constituted a
22     barricaded gunman situation?
23 A.  It could fall into that category, yes.
24 Q.  Okay.  And what does that category entail, to
25     your knowledge?

29 (Pages 110 to 113)

## Page 114

1  A.  The barricaded gunman category?

2  Q.  Yes.

3  A.  Be someone who may or may not have committed

4     a crime, but is in possession of a firearm

5     and could possibly barricade them self inside

6     a house.

7  Q.  Had you ever responded to an incident prior

8     to December 28th, 2017, involving a

9     barricaded gunman?

10 A.  Yes.  And actually we had -- I'm sorry, I

11    forgot.  You asked about previous hostage

12    type calls.

13 Q.  Yeah.

14 A.  There was one maybe back in 2012.  A man

15    with -- a reported man with a hostage in a

16    detached garage.

17 Q.  Did you respond to that scene?

18 A.  Yes, ma'am.

19 Q.  And you were on patrol then?

20 A.  Yes.

21 Q.  And was the man armed?

22 A.  I believe he had quite a few knives.  I don't

23    believe that there was a firearm involved.

24 Q.  Who was his hostage?

25 A.  A female.  I don't remember what their

## Page 115

1     relationship was.

2  Q.  Can you describe the circumstances of your

3     response to that incident?

4  A.  As I recall it, we were in the process of

5     kind of setting up a perimeter around that

6     detached garage structure when the man exited

7     the garage and was able to -- he obeyed

8     verbal commands and was able to be

9     successfully detained while we investigated

10    the incident.

11 Q.  What's a perimeter?

12 A.  A perimeter would be kind of a -- it's not

13    always a circle, but if you were to set up

14    kind of a boundary of sorts around an area,

15    we would refer to that as a perimeter.

16 Q.  And what's your understanding as to the

17    purpose of setting up a perimeter?

18 A.  It's, typically, in order to contain a

19    subject to a particular area so that if they

20    are able to flee their immediate area, they

21    are still contained within our law

22    enforcement perimeter.

23 Q.  So also another purpose being to protect

24    nearby civilians?

25 A.  Yes.

## Page 116

1  Q.  And also law enforcement?

2  A.  Yes.

3  Q.  And is perimeter making a skill you were

4     trained on as a WPD officer?

5  A.  It'd be more something that's covered in the

6     field training program as we're responding to

7     various incidents.

8  Q.  Do you know if that's specialized training

9     that SWAT officers receive?

10 A.  I don't believe so, but I could be wrong.

11 Q.  Do you recall the man's name in 2012?

12 A.  No, ma'am, I don't.

13 Q.  But he responded to verbal commands?

14 A.  That's correct.

15 Q.  And so there was no lethal force used in that

16    incident?

17 A.  Yes.

18 Q.  And he was apprehended?

19 A.  Yes.

20 Q.  Peacefully?

21 A.  Yes.

22 Q.  And did you consider that a barricaded gunman

23    situation?

24 A.  Yes.

25 Q.  He didn't have a gun, though?

## Page 117

1  A.  Not that I remember.

2  Q.  Other than that incident, have you responded

3     to any scenes involving barricaded gunmen?

4  A.  Not that come to mind, no.

5  Q.  Have you responded to any scenes involving

6     armed persons with potential mental health

7     issues?

8  A.  Yes.

9  Q.  And how many would you say over the course of

10    your career?

11 A.  15, 20, maybe more.

12 Q.  Common enough situation?

13 A.  Yes.

14 Q.  And in those incidents, did you respond

15    knowing that the person was in mental health

16    crisis?

17 A.  Sometimes, not always.

18 Q.  And on occasions in which you did not know

19    they had a mental health crisis, is it fair

20    to say that you identified it as a mental

21    health crisis once you got to the scene?

22 A.  Yes.

23 Q.  How did you do that?

24 A.  It just kind of depends on a case by case

25    basis.  Sometimes there would be yelling and

30 (Pages 114 to 117)

Page 122

1     A.    Not a mental health issue, no.
2     Q.    Okay.  Was there a time then you responded to
3           somebody who was armed with a fireman --
4           firearm who was not in mental health crisis?
5     A.    Yes.
6     Q.    And what -- how many incidents?
7     A.    Quite a few.
8     Q.    How many over the course of your career would
9           you say?
10    A.    Maybe 20 or more.
11    Q.    Did you use force in any of those incidents?
12    A.    It depends on your definition of use of
13          force.  We consider -- on the Wichita Police
14          Department, we consider me drawing and
15          pointing my firearm at someone, without
16          firing a round, to be a use of force, so yes,
17          in that -- to that regard, yes.
18    Q.    How many occasions did you -- of that 20-plus
19          incidents did you draw and point your
20          firearm?
21    A.    All of them.
22    Q.    But you never shot?
23    A.    Correct.
24    Q.    Did you ever use some of the less lethal
25          options that we discussed earlier - Taser, OC

Page 123

1           spray?
2     A.    No.
3     Q.    And you never shot a firearm?
4     A.    Correct.
5     Q.    Did any of them result in harm to the
6           suspect?
7     A.    If they did, it was minor harm towards the
8           end.
9     Q.    In the apprehension process?
10    A.    Yes.
11    Q.    Have any of those incidents resulted in a PSB
12          investigation?
13    A.    I don't know.
14    Q.    You don't recall ever being interviewed in
15          connection to one?
16    A.    No.
17    Q.    And you've never received discipline for one?
18    A.    No.
19    Q.    Have you ever responded to a false call in
20          the line of duty?
21    A.    Yes.
22    Q.    What do you understand a false call to be?
23    A.    A call where the information provided by the
24          calling party turns out to be not true.
25    Q.    And how typical is that in your line of work?

Page 124

1     A.    Not very.
2     Q.    But it's happened to you before?
3     A.    Yes.
4     Q.    How many times over the course of your
5           career?
6     A.    Oh, maybe 10 or 15.
7     Q.    And do you recall the types of incidents in
8           those 10 or 15 calls?
9     A.    I think a couple have been like domestic
10          violence or just a general type of
11          disturbance, and that would probably be it.
12          Something along the lines of general
13          disturbance, a fight going on somewhere and
14          we're never able to find any indication that
15          a fight occurred by looking for evidence or
16          speaking with other people in the area.
17    Q.    Is it fair to say that both in your job as
18          patrol and then in SCAT, you would respond to
19          crime scenes based on information received
20          from dispatch?
21    A.    Yes.
22    Q.    Okay.  And you'd agree, based on what we just
23          discussed, that some of the times the
24          information received from dispatch is not
25          correct?

Page 125

1     A.    Correct.
2     Q.    And that's because the person providing the
3           information to dispatch, the civilian, is
4           providing false information?
5     A.    Yes.
6                 MR. PIGG:  Object to form.
7     BY MS. VAN BRUNT:
8     Q.    Okay.  Do you use any law enforcement
9           techniques to root out false calls when
10          you're responding?
11    A.    Yes.
12    Q.    And what would those be?
13    A.    I'm sorry.  By when responding, do you mean
14          while on the way or upon arriving?
15    Q.    Well, let's start with on the way, what would
16          you do?
17    A.    On the way, one of the things that you could
18          do would be to try to search a phone number
19          or find out history at that location to see
20          if there's prior history that does match.
21    Q.    And how do you find out a history of a
22          particular location?
23    A.    Typically just asking dispatch or there may
24          be officers who work the area of that call
25          that might be familiar with that location.

32  (Pages 122 to 125)

## Page 126

```
 1    Q.   So you would reach out to them?
 2    A.   Or, ideally, they would just pipe up and
 3         provide the information.
 4    Q.   Okay.  Is that because when a dispatch call
 5         goes out, it goes out to all the radios?
 6    A.   The way we do our radio system, it's north,
 7         south, east and west.
 8    Q.   Okay.
 9    A.   Just matches with our four patrol bureaus.
10         So if a call occurs in a particular patrol
11         bureau, it will go out on the radio as
12         everybody in that bureau that's on that radio
13         channel would hear it.  Certain types of
14         calls are broadcast citywide.  Just kind of
15         depends on the severity of the call.
16    Q.   Are more severe incidents broadcast citywide?
17    A.   Yes.
18    Q.   And then how -- what would you do to root out
19         a false call once you got to the scene?
20    A.   Attempt to make contact with the people at
21         that location, speak with neighbors, do those
22         kinds of things and determine whether or not
23         the information provided through dispatch was
24         valid.
25    Q.   Are you familiar with the term swatting?
```

## Page 127

```
 1    A.   Well, I am now.
 2    Q.   Okay.  And prior to December 28th, 2017, were
 3         you familiar with it?
 4    A.   Not really, no.
 5    Q.   Have -- other than the Finch swatting
 6         incident, have you ever been involved in a
 7         potential swatting incident?
 8    A.   I don't believe so.
 9    Q.   Have you ever heard about it on the media?
10    A.   Since then, yes.
11    Q.   But prior to December 28th?
12    A.   I don't believe so.
13    Q.   Okay.  Would you agree that the call relaying
14         a threat from 1033 West McCormick on December
15         28th, 2017, was likely a swatting call?
16    A.   Can you clarify that.
17    Q.   Do you believe that the call to dispatch that
18         resulted in your response to the Finch
19         residence was a swatting call?
20              MR. PIGG:  Based on --
21    A.   Now or then?
22    Q.   Right now.
23    A.   Right now?
24    Q.   Based on your information right now.
25    A.   Yes, I do believe now that it -- that it was.
```

## Page 128

```
 1    Q.   And at anytime prior to the shooting, did you
 2         suspect you were responding to a swatting
 3         call?
 4    A.   No.
 5    Q.   Would you say you believed you were dealing,
 6         instead, with a hostage scenario?
 7    A.   I believed that was likely, yes.
 8    Q.   An armed shooter scenario?
 9    A.   Yes.
10    Q.   A barricaded gunman scenario?
11    A.   Possibly.
12    Q.   You call it a high risk scenario in your
13         police experience?
14    A.   Yes.
15    Q.   Okay.  Now turning to the evening of
16         December 28th, 2017, what shift were you
17         working?
18    A.   Third shift.
19    Q.   And remind me the hours.
20    A.   5:00 p.m. to 3:00 a.m.
21    Q.   And you started at 5:00 that night?
22    A.   Yes, ma'am.
23    Q.   What were your assigned duties that night?
24    A.   We were going to assist with 911 calls in the
25         Patrol West Bureau because staffing levels
```

## Page 129

```
 1         were pretty low.  And then we were going to
 2         go down to -- I think it was St. Francis
 3         hospital -- might have been Wesley -- to act
 4         as a guard for an individual that was in
 5         custody down there.
 6    Q.   Did you actually respond to any 911 calls?
 7    A.   Yes.
 8    Q.   Any high risk situations that night prior to
 9         the Finch shooting incident?
10    A.   No.
11    Q.   Did you make any arrests?
12    A.   No.
13    Q.   Did you stop anyone?
14    A.   I don't remember.
15    Q.   Were you partnered with Powell throughout the
16         evening?
17    A.   Yes.
18    Q.   So your assigned duties that night were not
19         typical of your SCAT duties?
20    A.   Correct.
21    Q.   Was it an issue of holiday coverage?
22    A.   That's what I remember.
23    Q.   And at some point in time that night, you
24         learned about an incident taking place at
25         1033 West McCormick; correct?
```

KELLEY REPORTING ASSOCIATES, LTD 515 S. MAIN, STE 105          WICHITA, KANSAS
316.267.8200                                                          67202

## Page 150

1    Q.    Okay.  Do you ever communicate with the
2          person in the second floor window?
3    A.    **I did not, no.**
4    Q.    Did Officer Gunn, to your knowledge?
5    A.    **I don't know.**
6    Q.    Did anyone suggest getting in touch or in
7          communication with that person in the second
8          floor window?
9    A.    **Not to my knowledge.**
10   Q.    You never heard Sergeant Jonker attempt to
11         make contact with that person in your
12         presence?
13   A.    **I did not hear him, no.**
14   Q.    Okay.  You also said there was a sheriff's
15         deputy at location number 1?
16   A.    **Yes, ma'am.**
17   Q.    What was that officer doing?
18   A.    **I just remember seeing them there.  I don't**
19         **remember any specific actions they were**
20         **taking.**
21   Q.    And then Sergeant Jonker, of course, and what
22         was Sergeant Jonker doing when you arrived?
23   A.    **He was trying to make sure that we had a good**
24         **perimeter set all the way around this**
25         **location.**

## Page 151

1    Q.    And how do you know that's what he was trying
2          to do?
3    A.    **'Cause I heard him talking about it over the**
4          **radio.**
5    Q.    What was he saying?
6    A.    **I couldn't quote him.  I just know he was in**
7          **the -- in the -- in the process of trying to**
8          **make sure that we had a good perimeter set up**
9          **around the house.**
10   Q.    Was he talking to various officers?
11   A.    **He was talking on the radio.**
12   Q.    And what was the gist of what he was saying?
13   A.    **That he was trying to make sure we had a good**
14         **perimeter set up around the location.**
15   Q.    And what does a good perimeter look like to
16         your understanding?
17   A.    **A good perimeter would have multiple officers**
18         **on the north, south, east and west sides of**
19         **the location.**
20   Q.    When you stepped out of your vehicle at
21         location 1, was the perimeter complete?
22   A.    **No.**
23   Q.    And what sides of the perimeter were missing?
24   A.    **I believe the north side.**
25   Q.    And there was somebody -- there were officers

## Page 152

1          on the east side?
2    A.    **Yes.**
3    Q.    But you couldn't see them?
4    A.    **No, because I was on the southwest corner of**
5          **the residence.**
6    Q.    Okay.  So how did you know there were
7          officers there?
8    A.    **Because I believe that's what I heard.**
9    Q.    Heard from whom?
10   A.    **From Sergeant Jonker and the radio traffic**
11         **that was being discussed.**
12   Q.    Okay.  And there were sergeants -- there were
13         officers, to your knowledge, on the west side
14         of the house?
15   A.    **Yes.**
16   Q.    And how do you know that?
17   A.    **I saw them.**
18   Q.    Okay.  So you saw them when you were in
19         location number 1?
20   A.    **No, not until I was moving to my location**
21         **across the street on the north side of**
22         **McCormick.**
23   Q.    Okay.  So let's stick with location number 1,
24         could you see west side officers?
25   A.    **No.**

## Page 153

1    Q.    Did you believe them to be there?
2    A.    **Yes.**
3    Q.    Based on what?
4    A.    **Based on radio traffic.**
5    Q.    And at location number 1, you could also not
6          see east side officers; correct?
7    A.    **That is correct.**
8    Q.    But you believed them to be there?
9    A.    **Yes.**
10   Q.    Based on radio traffic?
11   A.    **Yes.**
12   Q.    Was anyone behind the building 1033 West
13         McCormick?
14   A.    **No.  Where we were at location 1 served as a**
15         **good enough vantage point for the south side**
16         **of 1033 West McCormick.**
17   Q.    Okay.  Did Officer Gunn have assigned duties,
18         to your knowledge, at location 1?
19   A.    **I don't believe so.**
20   Q.    Did he indicate to you what he thought he was
21         supposed to be doing?
22   A.    **No.**
23   Q.    Did anyone in your vicinity seem confused as
24         to what was happening at the time?
25   A.    **No.**

39  (Pages 150 to 153)

Page 158

1    in place at that point in time that you moved
2    to the north side, to your knowledge?
3         MR. PIGG:  Could you repeat that.
4    I didn't understand it.
5    BY MS. VAN BRUNT:
6    Q.   Was there a planned police response to the
7    incident in place at the time that you moved
8    to the north side of the street?
9    A.   Yes.
10   Q.   And what was that?
11   A.   We were going to set up a perimeter around
12   the location.
13   Q.   And beyond setting up a perimeter, was there
14   a planned law enforcement response in place?
15   A.   I believe so.
16   Q.   And what was it?
17   A.   To attempt to make contact with anyone inside
18   the residence of 1033 West McCormick.
19   Q.   And what makes you say that?
20   A.   That would be what we would do in a situation
21   like this would be to try to make contact
22   with any occupant of that structure to
23   determine, you know, who is hurt, how many
24   people are hurt and investigate the incident.
25   Q.   Did you actually receive instructions from

Page 159

1    Jonker to attempt to make contact with
2    somebody in the house?
3    A.   Not me personally, no.
4    Q.   Did you hear him issuing such instructions
5    over the radio?
6    A.   I think at some point, I couldn't tell you
7    what point, had asked dispatch about
8    calling -- calling back the calling party and
9    had checked on are there -- were there
10   previous calls at that location.
11   Q.   Do you believe that happened prior to the
12   shooting?
13   A.   I believe so, but I'm not a hundred percent
14   sure.
15   Q.   Do you know what dispatch's response was?
16   A.   Dispatch said that they were not able to call
17   the person back.  And I don't recall on the
18   location history.
19   Q.   Did that -- did you hear that response
20   personally from dispatch?
21   A.   I believe so.
22   Q.   Did that raise any alarm bells in your mind
23   that they couldn't reach the caller?
24   A.   No.
25   Q.   Why is that?

Page 160

1    A.   Because it's not uncommon in a situation like
2    this for people to not answer their phones
3    when they're disconnected for whatever
4    reason.
5    Q.   Did you hear Jonker assign any officers over
6    the radio to be a contact person to the
7    person in the house?
8    A.   Not that I recall.
9    Q.   Did you receive instructions from Jonker as
10   to what to do if someone came to the door of
11   the house once you were at the north side
12   location?
13   A.   No.
14   Q.   You had a gun on your person this entire
15   time; correct?
16   A.   Yes.
17   Q.   You actually had a rifle and a handgun;
18   correct?
19   A.   Yes, ma'am.
20   Q.   And at what point did you take that rifle out
21   of your car?
22   A.   Immediately upon arriving to the address at
23   location 1.
24   Q.   Why did you do that?
25   A.   Because I believed that there was a high

Page 161

1    probability of an armed encounter with
2    someone at this location.
3    Q.   And why did you believe that?
4    A.   Based on the call information I was provided
5    by Sedgwick County 911.
6    Q.   Was your firearm in your holster?
7    A.   Yes.
8    Q.   Once you moved to the north side, the second
9    location, can you describe where you were
10   standing?
11   A.   I was standing at the rear driver corner of a
12   small dark colored car.
13   Q.   Whose car was it?
14   A.   I don't have any idea.
15   Q.   It was parked there?
16   A.   Yes, ma'am.
17   Q.   And so you were behind the car?
18   A.   Yes.
19   Q.   Was that providing cover for you?
20   A.   For the most part, yes.
21   Q.   And who else was present at that exact
22   location?
23   A.   Officer Powell, Sergeant Jonker and Officer
24   Fussell.
25   Q.   Where did Fussell come from?

41 (Pages 158 to 161)

Page 210

1          could have done?
2     A.   Yes.
3     Q.   And were you aware of a phone number for the
4          house at the time you were at location 2?
5               Had you heard that over dispatch?
6     A.   No, ma'am.
7     Q.   And you've mentioned, you know, what you
8          would do if there was a SWAT response, as
9          well; correct?
10    A.   Yes.
11    Q.   And did you expect, at some point, there
12         would be a SWAT response to that house?
13    A.   It just depended on how -- which one of the,
14         you know, unimaginable scenarios as far as
15         number go played out.
16    Q.   But that was certainly one of the scenarios
17         you did imagine?
18    A.   Yes, ma'am.
19    Q.   Of course, it would have been appropriate in
20         that context to have SWAT respond?
21    A.   Depending on how the events unfolded, yes.
22    Q.   Now could you describe Finch's entrance onto
23         the porch, the physical entrance onto the
24         porch?
25    A.   Sure.  He put -- opened the main door of the

Page 211

1          residence, pushed the screen door open with
2          his left hand and stepped out onto the porch.
3     Q.   What direction did the main door open on or
4          open towards?
5     A.   I believe the main door swung -- if you're
6          standing outside going inside, I believe it
7          swung in and to the right.
8     Q.   It swung into the house towards the right?
9     A.   Yes.
10    Q.   And what was that door made of?
11    A.   I don't know.
12    Q.   And then you said there was a screen door?
13    A.   Yes.
14    Q.   And how did that screen door open?
15    A.   It opened -- if you -- again, if you were
16         standing on the porch, you would reach to the
17         left side of the door and pull it out and
18         open to the right.
19    Q.   Okay.  So the screen door swung out?
20    A.   Yes.
21    Q.   And where were the door's -- the screen
22         door's hinges?
23    A.   Looking at the door, on the right-hand side
24         of the door.
25    Q.   Okay.  Did -- when Mr. Finch entered the

Page 212

1          porch, did the main door remain open?
2     A.   As far as I know, yes.
3     Q.   Did the screen door remain open?
4     A.   Yes.
5     Q.   Did he prop it?
6     A.   It looked like it could have been leaning on
7          his left shoulder.
8     Q.   I see.  So he still had contact with the door
9          when he entered the porch?
10    A.   That's the way it looked, yes.
11    Q.   Okay.  Such that he was supporting it with
12         his left shoulder?
13    A.   Possibly, yes.
14    Q.   Okay.  At any point in time, did the screen
15         door slam shut while he was still on the
16         porch?
17    A.   No, I don't believe so.
18    Q.   Okay.  Can you describe Andrew Finch's
19         physical appearance at the time he came out
20         on the porch?
21    A.   He appeared to be approximately 6-foot tall,
22         about 210 to maybe 220 pounds wearing kind of
23         a dark colored or grayish sweatshirt.
24    Q.   Could you see his race?
25    A.   I'm sorry?

Page 213

1     Q.   Could you see what race he was?
2     A.   Oh, I could tell that he was either a white
3          or Hispanic male.
4     Q.   Could you see whether he had any facial hair?
5     A.   No, I could not.
6     Q.   Could you see any -- his facial expressions?
7     A.   No.
8     Q.   You weren't close enough for that purpose?
9     A.   Correct.
10    Q.   Could you see what color his hair was?
11    A.   No, ma'am.
12    Q.   Could you see the styling of his hair?
13    A.   No.
14    Q.   How long it was?
15    A.   No.
16    Q.   Could you see what shoes he was wearing?
17    A.   No.
18    Q.   Could you see what pants he was wearing?
19    A.   No.
20    Q.   Did you have any information from dispatch at
21         the time at which Mr. Finch appeared on the
22         porch with which you could compare the
23         information you received from dispatch to
24         Mr. Finch?
25              Does that make sense?

54  (Pages 210 to 213)

Page 214

```
 1   A.   No.
 2   Q.   Okay.  Let me restate it.
 3            At the time that Mr. Finch entered the
 4        porch, had you received any information from
 5        dispatch as to the suspected shooter's
 6        physical appearance with which you could use
 7        to compare that description to Mr. Finch?
 8   A.   Other than it being a male caller, no.
 9   Q.   Okay.  Did you hear anyone on the radio ever
10        request a description of the suspected
11        shooter while you were at the scene prior to
12        the shooting?
13   A.   I don't recall.
14   Q.   Did you ever hear Jonker request it?
15   A.   No, I don't think so.
16   Q.   As Mr. Finch came out, did you say anything?
17   A.   Yes.
18   Q.   And what did you say?
19   A.   I said someone's at the -- something to the
20        effect of "someone's at the door" or
21        "someone's coming outside."
22   Q.   Did you say that into the radio?
23   A.   No, I did not.
24   Q.   You just said that out loud?
25   A.   Yes.
```

Page 215

```
 1   Q.   Did Officer Powell say anything, to your
 2        knowledge?
 3   A.   I don't know.  He may have relayed my radio
 4        traffic.
 5   Q.   What does that mean relayed your radio
 6        traffic?
 7   A.   When you're operating the rifle or even a
 8        shotgun in the same or a different scenario,
 9        those weapon systems require both of your
10        hands so you're not able to really utilize
11        your radio; therefore, when I saw movement at
12        the front door, I notified the officers close
13        to me, Powell and Jonker, verbally, so that
14        they either, A, were aware themselves, or B,
15        could put that information out to other
16        officers via the radio.
17   Q.   So they were acting essentially as your voice
18        to relay any potential threats?
19   A.   Yes.
20   Q.   Did they understand that to be their
21        responsibility?
22   A.   I don't know.
23   Q.   Did you ask them to do so?
24   A.   I did not.
25   Q.   Did Officer Powell say anything to you at the
```

Page 216

```
 1        moment that Mr. Finch came out the door?
 2   A.   I don't think so.
 3   Q.   You don't recall?  He could have?
 4   A.   I don't recall.  He might have.
 5   Q.   What about Officer Fussell, did you see --
 6        hear him say anything?
 7   A.   No, I did not.
 8   Q.   Definitively you did not?
 9   A.   Correct.
10   Q.   And Sergeant Jonker, did you hear him say
11        anything?
12   A.   Not that I recall.
13   Q.   Did anybody respond to your statement
14        "somebody's coming out"?
15   A.   I don't believe so.
16   Q.   Did you hear anything over the radio at the
17        time he entered the porch?
18   A.   No, because I began yelling at him, giving
19        him a verbal command.
20   Q.   And what command did you give him?
21   A.   I would have to listen to my video to give
22        you an exact quote, but something to the
23        effect of "get your hands up" or "show me
24        your hands."
25   Q.   And why did you relay that command in
```

Page 217

```
 1        particular?
 2   A.   Because we were responding to a shooting.  We
 3        believe that the suspect is a male.  And we
 4        don't know his status at this point in time,
 5        and so one of the things that we would do is
 6        order him to show his hands so we can either
 7        confirm or eliminate him as a suspect in the
 8        incident.
 9   Q.   Is that training you receive to issue those
10        types of commands in a suspected shooter
11        case?
12   A.   We'd give those commands anytime we feel that
13        they're necessary, but yes.
14   Q.   And you said by relaying that command you
15        could confirm whether or not the person was a
16        suspected shooter?
17   A.   It would go to the decisionmaking process of
18        they're involved or they're not involved.
19   Q.   And how so?
20   A.   A compliant person typically is going to --
21        as long as he was compliant with verbal
22        commands, he'd be given the opportunity to
23        come out and be briefly detained and speak
24        with us.
25   Q.   I see.  And if he was not compliant?
```

55 (Pages 214 to 217)

## Page 218

1  A.  Then we'd have to address the issue of the
2      noncompliance in one way or another.
3  Q.  How many times did you issue that command?
4  A.  Personally, once.
5  Q.  And did Officer Powell issue any commands?
6  A.  I don't know.
7  Q.  Did Officer Fussell?
8  A.  I don't know.
9  Q.  Did Sergeant Jonker?
10  A.  Yes.
11  Q.  How many commands did he issue?
12  A.  I believe Sergeant Jonker issued one or two,
13      and the officers to the east issued
14      additional commands, as well.
15  Q.  What command did Sergeant Jonker issue?
16  A.  I couldn't tell you.  I just know I heard him
17      yelling.
18  Q.  Did you tell Andrew Finch where he should go?
19  A.  Personally, no, I did not.
20  Q.  Did Sergeant Jonker?
21  A.  Maybe.
22  Q.  And you said the officers on the east side
23      issued commands?
24  A.  Yes, ma'am.
25  Q.  What commands did they issue?

## Page 219

1  A.  I know they yelled "get your hands up" or
2      "show us your hands", something to that
3      effect, similar to what I had yelled.
4  Q.  And were all the officers on the east side
5      yelling commands?
6  A.  I don't know.
7  Q.  And that's because you couldn't actually see
8      them; correct?
9  A.  Correct.
10  Q.  You just heard what was coming in on -- over
11      the radio?
12  A.  Actually, not -- not over the radio.  Because
13      we were a good distance apart, but they were
14      yelling loud enough that even though I was
15      all the way across the street, I could hear
16      them yelling.
17  Q.  Were they all issuing the same command?
18  A.  It sounded to me that they were.
19  Q.  In unison?
20  A.  Pretty close.
21  Q.  And how many officers were over there, you
22      think?
23  A.  I don't know, ma'am.
24  Q.  But more than three?
25  A.  I believe so.

## Page 220

1  Q.  And officers on the west side, were they
2      issuing commands?
3  A.  I don't know.
4  Q.  Did you ever hear any commands being issued
5      from that side?
6  A.  No, ma'am, I didn't.
7  Q.  Could have been; you don't know?
8  A.  Correct.
9  Q.  Were any officers on the south side issuing
10      commands?
11  A.  Probably not.
12  Q.  And that's because they didn't have a view of
13      the porch?
14  A.  That would be my assumption, yes.
15  Q.  Were any other commands coming from any other
16      direction other than what we've already
17      discussed?
18  A.  Not to my knowledge.
19  Q.  Were any of the commands conflicting in any
20      way?
21  A.  Not that I remember hearing, no.
22  Q.  Did the east side officers tell Andrew Finch
23      to walk a certain way?
24  A.  I don't think so.
25  Q.  What was the manner in which officers were

## Page 221

1      issuing the commands?
2  A.  Can you describe -- or sorry -- can you
3      clarify that question.
4  Q.  Sure.  Were they yelling, shouting,
5      whispering?
6  A.  Yelling.
7  Q.  Okay.  Would you describe it as screaming?
8  A.  No.
9  Q.  Just yelling?
10  A.  Yes.
11  Q.  Do you think they were polite commands?
12  A.  To what extent?
13  Q.  Well, were they directive?
14  A.  Like telling him what to do?
15  Q.  Correct.
16  A.  Yes.
17  Q.  Was there urgency to them?
18  A.  Yes.
19  Q.  Did anyone in the time that Finch was on the
20      porch, prior to you issuing the shot, give a
21      warning as opposed to a command?
22  A.  A warning as to?
23  Q.  As to what would happen if he did not comply
24      with the commands.
25  A.  Not to my knowledge.

56 (Pages 218 to 221)

## Page 222

```
 1    Q.   Would that have been practice to do so?
 2    A.   No.
 3    Q.   Why is that?
 4    A.   Because it wasn't practical in that
 5         circumstance in that point in time.
 6    Q.   Did anyone say that you were the police?
 7    A.   I don't know.
 8    Q.   Did anyone say that you were armed?
 9    A.   No.
10    Q.   Did anyone say that he must put his hands up
11         or he would be shot?
12    A.   I don't believe so.
13    Q.   Okay.  At the time you had your rifle raised,
14         was the badge on your hoodie still visible?
15    A.   Yes.
16    Q.   Okay.  So you -- if you could, could you
17         describe the manner in which your rifle was
18         raised at that point?
19    A.   At this point, it would be right here placed
20         into my right shoulder, and my hands would be
21         basically like this (demonstrating).
22    Q.   Would you be facing forward?
23    A.   Yes.
24    Q.   So you're facing with your left arm and where
25         is your badge at this point?
```

## Page 223

```
 1    A.   Right here, right where this one is
 2         (demonstrating).
 3    Q.   And your left arm is not covering it?
 4    A.   It shouldn't be.
 5    Q.   Would it have been visible to Andrew Finch
 6         120 feet away?
 7    A.   I don't know.
 8    Q.   Is it in accordance with WPD policy for
 9         multiple officers to give multiple commands
10         during a high stakes scenario?
11              MR. PIGG:  Object to form; lack
12         of foundation.
13    A.   It's -- I don't know that it's within policy,
14         but it wouldn't be without -- or outside of
15         policy either.
16    Q.   So whoever is on the scene, it's proper for
17         them to issue whatever commands they want at
18         that time?
19    A.   It would be best to have a limited number of
20         officers or a single officer issuing verbal
21         commands.
22    Q.   And why is that?
23              Sorry if I cut you off.
24    A.   No, you're fine.  Because sometimes, no
25         matter how clear commands are, whether
```

## Page 224

```
 1         they're conflicting with each other or not,
 2         they can be confusing at times.
 3    Q.   And would you say that'd be particularly true
 4         if they're coming from multiple directions?
 5    A.   Sure.
 6    Q.   And if they were coming from multiple
 7         different people?
 8    A.   Sure.
 9    Q.   And if they were perhaps relaying slightly
10         different information?
11    A.   Yes.
12    Q.   And should -- would it have been appropriate
13         in the circumstances presented in this case
14         for there to have been one contact person who
15         was in charge of communicating with
16         Mr. Finch?
17    A.   If things had gone perfectly, yes, that would
18         have happened.
19    Q.   And the purpose of that would have been to
20         have one line of communication such as to cut
21         down on the risk of confusion that you just
22         discussed?
23    A.   Correct.
24    Q.   And to make sure that there were clear
25         communications to Mr. Finch about what he
```

## Page 225

```
 1         should be doing?
 2    A.   Correct.
 3    Q.   And the possible consequences if he didn't
 4         comply?
 5    A.   Yes.
 6    Q.   What was Mr. Finch's response to the commands
 7         that were being issued by the officers on the
 8         scene?
 9    A.   He initially complied with the commands, put
10         his -- both hands up to approximately his ear
11         level.  And just as quickly as he complied,
12         he dropped both of his hands back to his
13         waist level.
14    Q.   Could you show me for the video what that
15         action looked like to you.
16    A.   Him raising his arms?
17    Q.   And then dropping them, please.
18    A.   Sure.  He put his arms up to approximately
19         here (demonstrating), and then immediately
20         put both hands back down to his waistband.
21    Q.   Okay.  And -- I'm sorry.
22    A.   Or waist level.
23    Q.   Do you mind standing up just so we can see
24         your waist 'cause I think it's -- all right.
25              Do you mind repeating that action.
```

57 (Pages 222 to 225)

Page 226

```
 1   A.   No.  Arms up to about here (demonstrating),
 2        and then immediately back down like this.
 3   Q.   So they were below his waist level then?
 4   A.   Generally, his waist level, however far down
 5        his arms reached.
 6   Q.   So he let his arms go slack; is that correct?
 7   A.   Yes.
 8   Q.   Okay.  You can sit down again.
 9             And how much time passed over the
10        course of him making that motion?
11   A.   Less than one second.
12   Q.   All right.  And where was he facing while he
13        made that motion?
14   A.   He was facing kind of north-northeast.
15   Q.   So in between you and the east side officers?
16   A.   Yes.
17   Q.   Could you see what he was looking at?
18   A.   He appeared to be focused more towards the
19        east side officers.  I'm not positive that he
20        knew where I was.
21   Q.   Okay.  You couldn't see his eyes, though;
22        right?
23   A.   Correct.
24   Q.   You were just saying that based on the
25        direction of his head?
```

Page 227

```
 1   A.   The direction his body was kind of oriented.
 2   Q.   Okay.  But you couldn't see what he was
 3        looking at?
 4   A.   That's correct.
 5   Q.   And in that one and a half seconds or so in
 6        which that happened, is that -- did I get
 7        that right?
 8   A.   Probably even less.
 9   Q.   Okay.  In the less than second -- one second
10        in which that happened, did any thoughts
11        cross your mind?
12   A.   I initially thought, okay, he's not being
13        compliant.
14   Q.   And why did you think that?
15   A.   Because he briefly complied and then put his
16        hands back down.
17   Q.   Okay.  And what happened next?
18   A.   Then officers to the east began yelling at
19        him again.  I'm not sure exactly what they
20        were yelling at that point in time, but they
21        were giving him additional verbal commands.
22        And that would be -- that's it for right now.
23   Q.   You don't recall what those commands were?
24   A.   No, ma'am, I don't.
25   Q.   At the moment you were there, you heard them?
```

Page 228

```
 1   A.   Yes.
 2   Q.   You just aren't recalling now what they are?
 3   A.   I don't know exactly what the wording they
 4        were using was.
 5   Q.   You mean you don't recall it or you never
 6        knew?
 7   A.   No, I don't recall it.
 8   Q.   Okay.  Did you issue any other commands at
 9        that point?
10   A.   I did not.
11   Q.   Did Officer Powell?
12   A.   I don't believe so.
13   Q.   Did Officer Fussell?
14   A.   I don't think so.
15   Q.   Did officer -- or Sergeant Jonker?
16   A.   I don't think so.
17   Q.   Okay.  So there's basically no command being
18        issued from the north side at the time he
19        dropped his hands?
20   A.   Correct.
21   Q.   Okay.  What happened after he dropped his
22        hands and the east side officers reissued
23        commands?
24   A.   Then he grabbed the right side of his hoodie
25        or sweatshirt, whatever he was wearing,
```

Page 229

```
 1        lifted it up, made a motion like he was
 2        drawing a firearm and dipped his shoulder
 3        forward just as I demonstrated for you
 4        earlier when you asked me to demonstrate
 5        drawing a firearm, and then he put his hand straight
 6        back down kind of on the back half of his
 7        right thigh.
 8   Q.   Could you demonstrate that motion standing up
 9        again, please.
10   A.   Sure.  Pulled his sweatshirt up and kind of
11        out away from his body (demonstrating),
12        appeared to grab at something here on his
13        waistband, his arm came up, shoulder rolled
14        forward, and then he put his hand back down
15        here kind of hidden from my view where I was
16        north across the street from him.
17   Q.   Okay.  And at the time, at the beginning, you
18        said he pulled up his hoodie, where was the
19        end of his hoodie hanging?
20   A.   Somewhere in the ballpark of where his hands
21        were hanging.
22   Q.   Okay.  So below the waist?
23   A.   I believe so, yes.
24   Q.   Somewhere below hip level?
25   A.   That's the way it appeared to me.
```

58 (Pages 226 to 229)

Page 234

1  Q.  All right.  And then at some point, you said,
2      he turned, after dropping his hand, after
3      this motion you just described, he turned
4      towards the east side officers?
5  A.  Yes.
6  Q.  Did he turn completely east?
7  A.  Not completely.
8  Q.  So he wasn't just in profile to you?
9      What was your viewpoint of him at that
10     point?
11 A.  Almost -- if I could orient myself to you to
12     show you.
13 Q.  Sure.
14 A.  Almost like this (demonstrating).
15 Q.  Okay.  You could see his chest?
16 A.  Yes.
17 Q.  You could see his left hand?
18 A.  Yes.
19 Q.  You could see a profile of his face?
20 A.  Yes.
21 Q.  And his neck?
22 A.  Yes.
23 Q.  And his ear?
24 A.  Yes.
25 Q.  What direction was his -- what direction was

Page 235

1      he -- his face facing?
2  A.  To the -- the same direction as his body, to
3      the east.
4  Q.  So fully to the east side at this point?
5  A.  Again, not quite fully, but generally more
6      east than not.
7  Q.  Okay.  And at that point, what was he doing
8      with his hands?
9  A.  His left hand was not doing anything, and his
10     right hand had started to come up pointing in
11     the direction of the officers.
12 Q.  And if you could stand up to demonstrate that
13     action, please.
14 A.  Yes.  Again, orienting myself to you --
15 Q.  Yes.
16 A.  -- as you are me.
17 Q.  Yep.
18 A.  Generally, like this and arm comes up
19     (demonstrating).
20 Q.  Okay.  Straight up?
21 A.  Yes.
22 Q.  His arm was straight?
23 A.  Like that (demonstrating).
24 Q.  Okay.  And at that point, could you clearly
25     see his hand?

Page 236

1  A.  Well, I could see his hand, yes.
2  Q.  You said that with some hesitation.
3      Could you see the entirety of his
4      right hand as it was lifting up?
5  A.  Yes.
6  Q.  Okay.  Now you know at this point in time, I
7      mean today, sitting here today, that Andrew
8      Finch did not have a weapon on him on that
9      porch; correct?
10 A.  That's correct.
11 Q.  All right.  So knowing that and sitting here
12     today, you are also saying that you had a
13     clear view of his hand at the time it was
14     raised?
15 A.  Yes.
16 Q.  So does not that mean that you clearly saw he
17     did not have a gun at that point?
18 A.  It means that I believed at that point in
19     time that he had a gun in his hand.
20 Q.  Okay.  You believed he had a gun in his hand,
21     and you also say you could clearly see his
22     hand; correct?
23 A.  Yes.
24 Q.  So that belief was mistaken; correct?
25 A.  That's correct.

Page 237

1  Q.  At any point during the interaction with
2      Finch on the porch, did you actually see him
3      holding a weapon?
4  A.  I now know that I did not.
5  Q.  At that point in time, did you see him with a
6      weapon?
7  A.  I believed that I did.
8  Q.  But did you is my question?
9          MR. PIGG:  Object to form.
10 A.  In hindsight, I did not.
11 Q.  All right.  But at the point in time when you
12     saw him on the porch, did you see him with a
13     weapon?
14         MR. PIGG:  Object to form; it's
15     asked and answered.
16         REPORTER:  I'm sorry.  I didn't
17     get an answer.
18 Q.  Do you mind saying that again.
19 A.  I believed that I did.
20 Q.  All right.  At the time he was lifting his
21     arm, were any of the officers that were
22     standing near you, namely, Powell, Jonker and
23     Fussell, saying, in your presence, anything
24     about Finch having a weapon?
25 A.  I don't think so.

60  (Pages 234 to 237)

Page 242

1   A.   The chest.
2   Q.   And why was that?
3   A.   Because that's what we're trained to do.
4   Q.   You were trained to shoot to kill?
5   A.   We're trained to shoot for the largest
6        portion of the body.
7   Q.   And why is that?
8   A.   Because in law enforcement shootings or any
9        kind of shooting whether it's law enforcement
10       or not, it's a stressful event and you
11       don't -- you're far less likely to hit a
12       shoulder or a knee or a toe than you are the
13       largest portion of a body.
14  Q.   At the time you fired your rifle, which
15       direction was Mr. Finch facing?
16  A.   Kind of north-northeast.
17  Q.   Had he brought his arm up all the way to that
18       90-degree position we discussed at that point
19       in time?
20  A.   I don't believe so.  I believe it was in the
21       process of being raised.
22  Q.   So he wasn't facing head-on to you, so where
23       in his chest did you aim?
24  A.   I was aimed at chest level, which, after he
25       turned, would have been approximately here

Page 243

1        (indicating).
2   Q.   At that point that you fired, could you see
3        Mr. Finch's face?
4   A.   The side of it.
5   Q.   And could you see his expression?
6   A.   No.
7   Q.   When you fired, did the bullet hit Mr. Finch
8        directly?
9   A.   I believe it hit the screen door first.
10  Q.   Okay.  And then it ricocheted off?
11  A.   I believe it went through, but I could be
12       mistaken.
13  Q.   So it hit the screen door and then hit
14       Mr. Finch?
15  A.   Yes.
16  Q.   What happened to Mr. Finch's body after the
17       shot was fired?
18  A.   He fell backwards and into the entryway of
19       the residence.
20  Q.   So the screen door was still open at the time
21       you fired; correct?
22  A.   Yes.
23  Q.   Was he holding it with his shoulder still?
24  A.   Yes, I believe so.
25  Q.   So he fell inside the door frame at the time

Page 244

1        of the shot?
2   A.   He fell back into the residence from my
3        understanding and from what I saw.
4   Q.   And what happened to the screen door?
5   A.   I believe it closed.
6   Q.   Behind him?
7   A.   Yes.
8   Q.   Did you see anyone else near his body right
9        after the shooting?
10  A.   Shortly after, there was a female.  I don't
11       know who she was, fairly tall and thin, and
12       she was standing over him.
13  Q.   When you say shortly after, how many minutes
14       or seconds?
15  A.   A handful of seconds.  I didn't time that on
16       the video.  I know that she was brought to my
17       attention by Officer Powell.
18  Q.   Do you believe that your line of sight that
19       night when you fired was just as good as the
20       line of sight of the east side officers you
21       believed to be in the location you've
22       previously indicated?
23  A.   Yes.
24  Q.   Despite the fact that you were much further
25       away than they were?

Page 245

1   A.   Yes.
2   Q.   And why is that?
3   A.   Because I had just as good of a line of
4        sight.
5   Q.   Do you think it was appropriate for you to be
6        the one providing cover when you were much
7        further away than other officers?
8   A.   Yes.
9   Q.   And why is that?
10  A.   Because the rifle is designed to be used from
11       a distance.
12  Q.   Can you tell me why you fired your rifle that
13       night?
14  A.   Because I believed Andrew Finch presented a
15       lethal threat to officers on the east side of
16       the residence.
17  Q.   Did you have a subjective fear of their --
18       for their life?
19  A.   Yes.
20  Q.   Did you have a subjective fear for your life?
21  A.   No.
22  Q.   What about for the officers -- subjective
23       fear of the law officers who -- the lives of
24       the officers who were standing near you?
25  A.   No.

62  (Pages 242 to 245)

Page 246

1   Q.   What about a subjective fear for the officers
2        on the west side?
3   A.   No.
4   Q.   Was there any other reason why you fired your
5        weapon that night other than the one you just
6        articulated?
7   A.   No.
8   Q.   So to be clear:  The reason you fired was
9        because of the subjective fear of Mr. Finch
10       shooting at the east side officers?
11            MR. PIGG:  Object to form of the
12       question; misstates his testimony.  It's not
13       complete.
14  A.   Can you ask your question again.  I'm sorry.
15  Q.   So the reason you shot your rifle that
16       night -- the one and only reason you shot
17       your rifle that night was because of the
18       subjective fear that you had for the lives of
19       the officers on the east side of that house
20       that night?
21            MR. PIGG:  Same objection.
22  A.   I fired my rifle that night because I was
23       operating with the information that was given
24       to me by dispatch that, unfortunately, it
25       turns out, was false.  That information,

Page 247

1        coupled with Mr. Finch's actions on the porch
2        led me to believe that he was a lethal threat
3        to the officers to the east, and I feared for
4        their safety, so I fired at him.
5   Q.   Did you believe he was a lethal threat to
6        anyone else at the time you fired, other than
7        the east side officers?
8   A.   He could potentially be a lethal threat to
9        the hostages we believed were inside at that
10       point in time.
11  Q.   Okay.  Did you articulate that to any of the
12       officers who interviewed you after the
13       shooting?
14  A.   Did I articulate what, ma'am?
15  Q.   That you feared that he could be a threat to
16       the people inside the house at the time that
17       you shot him.
18  A.   No, I did not.
19  Q.   Did you articulate that to any prosecutors
20       who spoke to you about the incident following
21       the shooting?
22  A.   No, I don't believe so.
23  Q.   Did you articulate that to PSB when they
24       investigated the shooting?
25  A.   I've never spoken to PSB about my shooting.

Page 248

1   Q.   Okay.  Have you ever articulated that reason
2        for the shooting prior to today?
3   A.   I'm not sure.
4   Q.   You have no recollection of doing so?
5   A.   No.
6   Q.   Did you at anytime that night consider using
7        a less lethal weapon on Mr. Finch?
8   A.   Me personally, no.
9   Q.   Did you consider asking Sergeant Jonker to
10       have an officer who was closer to him do so?
11  A.   No, we didn't have time for that.
12  Q.   Why do you say that?
13  A.   Because at the point that Mr. Finch appeared,
14       we didn't have time to communicate about who
15       was going to do what, whether we were going
16       to try a less lethal, and there just simply
17       wasn't enough time.
18  Q.   And to be clear:  There had been no such
19       communication about what to do with a
20       possible suspect entering the porch prior to
21       him entering the porch?
22  A.   That's correct.
23  Q.   Do you have any knowledge as to what weapons
24       the east side officers had on them at the
25       time of the shooting?

Page 249

1   A.   I would surmise that they all had handguns at
2        a minimum, but other than those, I don't
3        know.
4   Q.   You don't know whether they had other less
5        lethal options on them, as well?
6   A.   They may have had Tasers, but that would have
7        been it.
8   Q.   At the moment that Mr. Finch opened the door
9        and then the screen door, did you believe
10       that he was the shooter described by
11       dispatch?
12  A.   There was no real description other than a
13       male subject, and I was not sure who he was
14       when he first stepped onto the porch.
15  Q.   Okay.  Did you have any reason at that exact
16       point in time, meaning when he opened the
17       door to enter the porch, to believe that he
18       was the shooter?
19  A.   I believed it possible.
20  Q.   Based on what?
21  A.   Just simply that we knew the male -- male
22       caller was a male.
23  Q.   You knew the caller was a male and that
24       Mr. Finch was a male --
25  A.   Yes.

63 (Pages 246 to 249)