# EXHIBIT 4

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

```
                                                    1              I N D E X
        IN THE UNITED STATES DISTRICT COURT         2
              FOR THE DISTRICT OF KANSAS            3
                                                       DAVID HEADINGS
   LISA G. FINCH, Individually, as   )              4  Direct Examination by Mr. Bailey:      4
   Co-Administrator of the Estate    )              5  Cross-Examination by Mr. Pigg:        73
   of Andrew Thomas Finch,           )              6  Redirect Examination by Mr. Bailey:   86
   deceased, and as Next Friend      )              7  Recross-Examination by Mr. Pigg:      89
   for her minor granddaughter,      )              8
   AF; DOMINICA C. FINCH, as         )              9
   Co-Administrator of the Estate    )             10  Headings Exhibits
   of Andrew Thomas Finch,           )                 No. 68 - Google Map Aerial View of 1033   25
   deceased; and ALI ABDELHADI,      )             11       W. McCormick w/Markings (1 pg)
                                     )             12  No. 69 - Screen Shot from Officer Perry's 78
              Plaintiffs,            )                      Axon Showing Deputies Headings'
                                     )             13      & Stephens-Clark's Perspective
       vs.              )Case No.                           of Porch (1 pg)
                        )18-CV-01018-JWB-KGS       14
                                     )             15
   CITY OF WICHITA, KANSAS;          )             16
   JOHN DOE POLICE OFFICERS 1-10,    )             17
                                     )             18
              Defendants.            )             19
                                     )             20
                                                    21
              D E P O S I T I O N                   22
                                                    23
      The videotape deposition of DAVID HEADINGS    24
   taken on behalf of the Plaintiffs pursuant       25
   to the Federal Rules of Civil Procedure          26  SIGNATURE OF WITNESS                    92
   before:                                          27  CERTIFICATE                             93
         RICK J. FLORES, CSR
         KELLEY REPORTING ASSOCIATES, LTD.
         515 South Main, Suite 108
         Wichita, Kansas  67202

   a Certified Shorthand Reporter of Kansas, at
   455 North Main, 13th Floor, Wichita, Sedgwick
   County, Kansas, on the 28th day of November,
   2018, at 9:00 a.m.
                                                    1
```

---

```
 1           A P P E A R A N C E S
 2
 3   PLAINTIFFS:
        CONLEE SCHMIDT & EMERSON, LLP
 4      Mr. Rick E. Bailey
        Suite 300
 5      200 West Douglas
        Wichita, KS  67202
 6      (316) 264-3300
        Fax:  (316) 264-3423
 7      rbailey@fcse.net
 8
     DEFENDANTS:
 9      FISHER PATTERSON SAYLER & SMITH, LLP
        Mr. J. Steven Pigg
10      3550 S.W. 5th Street
        Topeka, KS  66606
11      (785) 232-7761
        Fax:  (785) 232-6604
12      spigg@fisherpatterson.com
13
     FOR THE WITNESS:
14      SEDGWICK COUNTY SHERIFF'S OFFICE
        Ms. Laura H. Oblinger
15      141 W. Elm
        Wichita, KS  67203
16      (316) 660-3900
        Fax:  (316) 660-3248
17      laura.oblinger@sedgwick.gov
18
     VIDEOGRAPHER:
19      ADVANCED DOCUMENT IMAGING
        Mr. Michael Miles
20      515 S. Main, Suite 108
        Wichita, KS  67202
21      (316) 267-9380
        Fax:  (316) 267-9382
22      video@kelleyreporting.com
```

---

 1           VIDEOGRAPHER:  This begins the
 2   videotape deposition of David Headings.
 3   Today is November 28th, 2018, and the time
 4   is -- time is 9:00 a.m.
 5           Would the court reporter please swear
 6   in the witness.
 7           DAVID HEADINGS
 8   having been first duly sworn on his oath to
 9   state the truth, the whole truth, and nothing
10   but the truth, testifies as follows:
11           DIRECT EXAMINATION
12   BY MR. BAILEY:
13   **Q.  Could you please state your name for the record, please.**
15   A.  David Headings.
16   **Q.  Detective Headings, how are you currently employed?**
18   A.  I'm a deputy, actually, with the Sedgwick
19   County Sheriff's Office.
20   **Q.  Have you ever had your deposition taken before?**
22   A.  Yes.
23   **Q.  On how many occasions?**
24   A.  I believe just once, and I don't even
25   remember what it was for, several years ago.

**Page 29**

1  north -- I'm not exactly sure if it was
2  directly north across the street of
3  McCormick, but I seen a few officers over
4  there. I seen numerous officers blocking the
5  intersection.
6      I don't remember if it was myself or
7  Deputy Stephens-Clark had said to others to
8  move back 'cause we had a crossfire danger
9  that we did not want to happen if something
10 was to happen. And there was others coming
11 up behind us.
12     Like I say, I was paying attention to
13 the house and I'm not really sure what
14 everybody else was doing.
15 Q. Can you draw a circle where you saw officers
16    on the west side of 1033 McCormick.
17 A. (Witness complies.)
18 Q. Can you put a W by that so we'll know that's
19    for the west side.
20 A. (Witness complies.)
21 Q. And then you said you saw officers on the
22    north side.
23     Can you draw a circle with an N where
24    you saw those officers.
25 A. It's going to be an oval 'cause I'm not

**Page 30**

1  exactly sure where, but somewhere in the
2  oval, and I put a N which is hard to see.
3      Also, later, at some point, a Wichita
4  marked vehicle pulled in the driveway in
5  front of our position, which we used for
6  cover and concealment.
7  Q. When you first were approaching the location
8     of 1033 McCormick, did anything seem unusual
9     to you about the situation?
10 A. As we discussed earlier, I could use this as
11    an example why you cannot assume anything.
12    With multiple shots and what sounded like
13    would have been maybe some sort of chaos
14    going on or yelling, it was quiet, which I
15    did not initially expect.
16     I was hoping to have some sign from
17    one of the houses we were walking past as
18    somebody was awake and doing something
19    unusual.
20 Q. So if I'm understanding you, you didn't hear
21    any raised voices or hollering or noise
22    coming from any of these houses?
23 A. Correct.
24 Q. Did you hear any sounds of gunshots?
25 A. No, not at that point.

**Page 31**

1  Q. Did you see anyone other than the police
2     officers out on the street as if they were
3     investigating what was going on?
4  A. No. The only other people would have been at
5     the gas station on the southwest corner of
6     the intersection of Seneca and McCormick,
7     where there would have been vehicles and
8     patrons going in and out.
9  Q. As you walked past the houses between where
10    your vehicle was parked and 1033 McCormick,
11    did you notice any of the neighbors or
12    occupants in those houses looking out their
13    windows or coming to the doors to try and
14    figure out what was going on?
15 A. No, I don't recall seeing anybody.
16 Q. Did that strike you as unusual?
17 A. Not really. If there was gunshots, maybe the
18    closest neighbors might have heard it. I
19    know inside of a house, it can be difficult
20    to hear something. I was hoping to see
21    something to kind of clue us into what we
22    were looking for on the way up there that was
23    not completely surprised.
24 Q. By the time you arrived at the location that
25    you've marked with a circle on Exhibit 68,

**Page 32**

1  had you been given any additional information
2  about what was the subject of this call?
3  A. More -- more specific information was still
4     coming in on the radio. I can't think of
5     anything specific other than maybe some
6     elaboration of what I'd already mentioned:
7     Sounded like the caller had shot, I think,
8     the dad maybe or stepdad or something in the
9     head and had people hostage. I don't know if
10    it was like a sister or a mom or something in
11    the closet.
12 Q. Do you have any information at that time
13    about how many people were involved in this
14    situation that was going on at 1033?
15 A. I only recall maybe the four that I'd
16    mentioned and I'm not hundred percent sure.
17 Q. Were you given descriptions of any of those
18    individuals?
19 A. I don't recall.
20 Q. And by description, I mean anything that
21    might help identify a description of
22    clothing.
23     Do you recall whether you were given
24    that?
25 A. Only thing I can recall is just pronouns that

KELLEY REPORTING ASSOCIATES, LTD   515 S. MAIN, STE 105   WICHITA, KANSAS
316.267.8200   67202

```
 1      flashing on them?
 2   A. Around the intersection blocking traffic. I
 3      don't remember specifically, but I know that
 4      they were blocking traffic so no innocent
 5      bystanders would, hopefully, get involved.
 6   Q. So when you say they were blocking traffic,
 7      you mean back in the McCormick/Seneca
 8      intersection west of 1033 McCormick?
 9   A. Correct.
10   Q. And they had flashing lights that you were
11      looking towards as you're looking west
12      towards the house and then west towards where
13      the officers were?
14   A. Yes.
15   Q. Were there any vehicles -- any police
16      vehicles that were parked at that time in
17      front of the address of 1033 McCormick?
18   A. At the time of the shooting?
19   Q. Yes.
20   A. I'm not sure. I don't think there was
21      anything directly in front. I know one had
22      pulled in the driveway to the east where we
23      were at. I'm not sure how close to the west
24      any vehicles got.
25   Q. How much prior to the shooting did you arrive
```
37

```
 1      at the location that you've marked there on
 2      Exhibit 68?
 3   A. I'm not sure of the timeframe. I know it was
 4      quite awhile.
 5   Q. How were you armed that night?
 6   A. I think, initially, I had my rifle. I can't
 7      remember for sure. And once I got the
 8      shield, I was using my handgun.
 9   Q. And what handgun did you have that night?
10   A. Issued Glock 17 handgun, 9 millimeter.
11   Q. How far were you from the front porch of 1033
12      McCormick?
13   A. Just an estimate from distant memory, maybe
14      20 yards.
15   Q. What's the effective range of your Glock 17?
16   A. I was going to say, that depends on who's
17      holding it but --
18   Q. When you're holding it.
19   A. Anything over 10 yards and you add adrenaline
20      gets a greater chance of missing. 15 yards
21      even more, 25 yards even more. I can say at
22      100 yards I have hit a 12-inch circle more
23      than 50 percent of the time. But in that
24      situation, that would have been a shot that
25      would require a lot of focus.
```
38

```
 1   Q. But would it be fair to say that the front
 2      porch area was either at the edge or beyond
 3      the effective range of your -- of your weapon
 4      that day?
 5   A. I would say it was at the edge.
 6   Q. At anytime prior to the shooting occurring,
 7      prior to Andrew Finch stepping out on the
 8      porch, did you see anything going on in the
 9      house at all?
10   A. In one of the upper windows, I remember
11      seeing somebody making passes past the
12      window. And one of the times it was kind of
13      an awkward pass across the window. It'd be
14      hard to describe.
15   Q. Was the window open or closed?
16   A. The window itself was closed if I remember
17      correctly. And the -- I don't remember
18      seeing any blinds or curtains.
19   Q. What could you see of the person that was
20      walking in front of that window?
21   A. I couldn't tell who it was. Didn't seem to
22      be a large person. I couldn't make out who
23      it was, whether it was male or female with
24      short hair as I don't remember seeing a
25      silhouette of hair. Did not seem to be a
```
39

```
 1      large person.
 2   Q. What did you do in response to seeing this
 3      person?
 4   A. One of us, me or Deputy Stephens-Clark had --
 5      I think it was him -- mentioned that there
 6      was motion in the window, upper bedroom
 7      window -- or not bedroom, but upper window on
 8      the east side. And that would have been put
 9      on the radio for other officers to know what
10      was going on and what we could see.
11   Q. Between the time you arrived at the location
12      that you've marked with the circle there next
13      to 1033 McCormick and the time when Andrew
14      Finch stepped out onto the porch, did you
15      receive any other information either directly
16      or indirectly about the situation that you
17      were facing?
18   A. Not anything specifically. There might have
19      been some more details that -- I remember my
20      understanding was it was still ongoing with
21      the same information that we started with.
22   Q. Now where were you standing in relation to
23      the other officers that were there at your
24      location?
25         MR. PIGG: At what time?
```
40

**Page 41**

BY MR. BAILEY:
Q. At the time prior to the shooting.
A. I was still somewhere in the area of the circle. The Wichita -- I want to say it was an SUV had pulled into the driveway facing south. And I took a closer position towards the front of the vehicle where I could still see the house. I still had my shield and Deputy Stephens-Clark was to the south of me, maybe slightly back to use some of my shield or my armor as some cover, and he had his rifle reaching out past me.
Q. Now did that vehicle that you've talked about that came in and provided cover, did that move into place before the shooting or after the shooting?
A. I think it was before.
Q. I'm asking that because I've watched some of the body cam video of the two police officers --
A. Actually, sorry.
Q. Yeah, go ahead.
A. It might not have been before 'cause we were still there for quite awhile providing security for the clearing of the house. I'm

**Page 42**

not sure if it was before or after.
Q. What view did you have of the front porch and front door at 1033 McCormick, again, prior to the shooting?
A. From the north face of the house, not the porch, but the actual face of the house where I would have seen both corners lined up, I was a few feet north where I could see the north side of the house and the door. Probably somewhere in middle of where the porch would have been directly to the east.
Q. Were there any officers that you could see that were closer to the front porch and front door of 1033 McCormick, closer than you were?
A. The officers on the west side were actually right up against the house, at least, at some point. They would have been closer. I'm not sure if they were -- how far past the corner they would have been to see anything. Now at some points they were up closer, but when he came out, my focus was completely on him and his hands.
Q. Let's talk about when he came out. When did you first notice that someone was stepping out onto the front porch?

**Page 43**

A. When the door opened and he came out.
Q. And what did you see?
A. He came out on the north side of the house onto the porch. Door would open to his left or the west side. He came out walking straight. And I believe multiple officers would have said something along the lines "show me your hands." He did appear startled by the presence of numerous officers.
Q. Let me stop you there and let's get a little more detail.
    Describe the person that you saw step out onto the front porch.
A. I think he would have been a white male roughly a medium build, not super heavy. He did not have long hair. I can't remember specifically. I know he had a shirt and pants on. I'm not even sure if he had shoes on.
Q. Do you recall the color of his clothes?
A. Not right now, no.
Q. When he first stepped out, could you see his hands?
A. Yes.
Q. Did you see anything in his hands?

**Page 44**

A. No.
Q. Could you see his body well enough to see if he had anything protruding from a waistband?
A. I didn't see anything obviously sticking out. I know I wasn't sure if he did have something concealed, especially along his -- I seen his right side, primarily. So anything from the right side I couldn't see outside of.
Q. When he stepped out, did he say anything?
A. Not that I'm aware.
Q. Nothing that you heard anyway?
A. Correct.
Q. And you said he appeared startled. What were you seeing that gave you the impression that he was startled?
A. I -- what I perceived was he noticed there was officers pretty much surrounding the house. It didn't seem like he expected that much presence.
Q. And what did he do or what was his facial expression that gave you the impression that this was something startling or unexpected?
A. Mainly just the stopping and looking around briefly. 'Cause I know he'd got out and would have seen the lights to his left and

KELLEY REPORTING ASSOCIATES, LTD   515 S. MAIN, STE 105
316.267.8200
WICHITA, KANSAS
67202

**Page 45**

1  northwest and probably even down to the east
2  past us, but I'm not sure.
3  Q. And you said when he stepped out, officers
4  began hollering commands at him?
5  A. Yes.
6  Q. Did you?
7  A. Initially, I'm not sure. I probably would
8  have said some -- the same thing, "show me
9  your hands", and then I stopped 'cause I was
10 behind a shield and I knew I -- that's one
11 thing we talked about in training is one
12 person needs to assume the commands so it's
13 to eliminate any confusion.
14 Q. And at the time commands were first being
15 hollered, was there more than one officer
16 hollering commands at him?
17 A. Initially, yes.
18 Q. Were there officers in the location that
19 you've marked where you were that were
20 hollering commands?
21 A. I know Stephens -- I stopped 'cause I heard
22 Stephens-Clark -- Deputy Stephens-Clark
23 saying similar commands "show me your hands"
24 or -- I thought I heard something from the
25 north, but I didn't look to see what was

**Page 46**

1  going on. And from there I don't know if
2  anybody on the west side had said anything or
3  not.
4  Q. Could you hear specifically any of the
5  commands that were being hollered from the
6  north?
7  A. Yeah, something similar to "show me your
8  hands."
9  Q. Do you recall anyone hollering "crossfire" or
10 words to that effect?
11 A. Yes, but I'm not sure at what point in time,
12 if that was then. 'Cause I thought we'd
13 talked about it before to have those officers
14 or someone on the west side to move. It
15 might have been the patrol car at the
16 intersection to move back also. So at least
17 that would have been -- something to the
18 west, I know, was communicated that they
19 should move back. And that would have been
20 on the radio and recorded.
21 Q. Prior to this person stepping out on the
22 porch, had anyone been assigned the
23 responsibility of being the point of contact
24 or the person to communicate with the
25 occupants at 1033 McCormick?

**Page 47**

1  A. I'm not sure.
2  Q. If it was, you weren't aware of it?
3  A. Correct.
4  Q. And you said you probably hollered commands
5  initially, but then stopped.
6     Why was it, again, you stopped?
7  A. I had heard other people making commands and
8  I had -- I would have had the shield up in
9  front of me, which would have made anything I
10 was saying ineffective to continue.
11 Q. If I understood you, part of your training
12 was not to have a multitude of commands from
13 multiple different areas coming to a suspect
14 in a situation like this; is that fair?
15    MR. PIGG: Object to form;
16 leading.
17 BY MR. BAILEY:
18 Q. You can answer.
19 A. Through our entry team, it's something that
20 we had -- I think it was talked about
21 initially, and it was just something we
22 noticed through trial and error, especially
23 with training, is somebody has to assume the
24 commands and Deputy Stephens-Clark was
25 usually that person. He was kind of a team

**Page 48**

1  leader on the team, and one of the first ones
2  to go in. And something else we had talked
3  about as trial and error, also, is if you
4  have the shield, it makes it real hard to try
5  to project your voice past a barricade. And
6  sometimes you just -- it's the only thing you
7  can do, but you don't want to continue doing
8  it. It's something you want to try to fix.
9  Q. And have you also learned either through your
10 training or experience that when you have
11 multiple people hollering multiple commands
12 that that can increase the risk of confusion
13 with the suspect?
14    MR. PIGG: Leading; objection.
15 BY MR. BAILEY:
16 Q. You can answer.
17 A. Sure.
18 Q. Now when people were initially hollering --
19 officers hollering commands at this person
20 when they stepped out onto the front porch,
21 were they -- I don't know how else to
22 describe this -- hollering the same words at
23 the same time in unison or were they saying
24 things a little differently at little
25 different times?

**Page 49**

MR. PIGG: Object to form.
BY MR. BAILEY:
Q. You can answer.
A. I doubt it was the same words. Everything that I heard from my position was similar. It wasn't conflicting commands.
Q. Did you hear anyone holler a command to kneel down or lay down?
A. I'm not sure. I don't think, initially, I heard that. After some time elapsed, I don't recall. It may have happened after the first second.
Q. Do you recall hearing anyone yell a command to step forward or step off the porch?
A. I remember something to that effect, but nothing specific. I know we didn't want the person to go back inside the house to an unknown area.
Q. Do you recall anyone yelling commands to "walk towards me" or words to that effect?
A. That sounds familiar, yes.
Q. Describe for me the movements that you saw this person perform from the time they stepped out until the time you saw the shot.
A. I remember he came out the front door. I

**Page 50**

don't remember if there would have been no spring on the door, if it would have just stayed open. I don't remember how that occurred. I don't remember the door closing. He -- I thought he had stepped forward at least a halfway across the porch. And the majority of his focus was north outside of a few glances either way.
    I remember he had put his hands up and they'd slowly come back down, then "hands up" were yelled again or something to that effect. His hands went up and down numerous times, and he slowly was stepping backwards to go back inside the house, while still facing north.
Q. And was that what he was doing when you heard the shot?
A. At the time I heard the shot, he was reaching behind his back and approaching the threshold of the door. I'm not sure if he was reaching for anything or what he was doing. Basically, as his hand got to the -- near the small of his back or near there, he had broke the threshold of the door and I couldn't see him -- or inside the threshold enough that I

**Page 51**

could not see what his hands were doing anymore, and that would have been simultaneously when the shot occurred.
    When he was reaching there, I perceived a potential threat to present itself, but, like I said, he went out of sight from my position and I couldn't tell what he was doing.
Q. And when you say a potential threat, is that because you hadn't seen a weapon yet, but you thought a weapon could appear?
A. Correct. That'd be a normal place a handgun could be placed in the small of the back. And given the information earlier that somebody had been shot, and I can't remember if it was specifically said handgun or not, but most likely in those situations, that's what you would see.
Q. Was the motion that you saw him doing reaching back behind his back consistent with any nonthreatening activity?
A. Sure. I think I even mentioned in one of my recording -- recorded statements previously, he could have been -- I thought I said something along like maybe even pushing his

**Page 52**

shirt in so maybe he had a shirt tucked in or reaching back behind him and maybe his elbow hit the door and pushed it that location. I'm not sure. So there could have been other possibilities, but given the call and what was going on and him not listening to commands, I was preparing myself in case a threat presented itself.
Q. So if I'm understanding you, what you're saying is that you saw him make some motions that could have a threatening purpose or could have nonthreatening purpose?
A. Correct.
Q. And your attention was focused -- was heightened, if you will, to watch to see if a threat actually occurred?
A. Correct.
Q. And at anytime did you see anything that caused you to believe there was a threat prior to the shot?
A. Other than what I've mentioned so far, no.
Q. You'd seen the potentially threatening motion, but you hadn't seen anything that actually presented a threat?
A. Correct.

```
 1   Q.  At anytime prior to the shot, did you see
 2       anything in his hand that you believed to be
 3       a weapon?
 4   A.  No.
 5   Q.  Anytime prior to the shot, did you see
 6       anything on his body that you believed to be
 7       a weapon that he was reaching for?
 8   A.  No, I didn't see anything.
 9   Q.  At anytime prior to the shot, did you hear
10       any other officer say anything that indicated
11       that they had seen a weapon?
12   A.  No.
13   Q.  Did you know that a shot was going to take
14       place prior to the time it occurred?
15   A.  No.
16   Q.  What was your reaction to the shot?
17   A.  I maintained my position and continued
18       watching.  I did not -- well, when the shot
19       was fired, I remember seeing a spark at the
20       door.  It was almost if it was kind of slow
21       motion, and I didn't think it actually had
22       hit the guy.  He'd already moved back far
23       enough at the door I didn't see where he fell
24       or anything.  I just continued making watch
25       'cause, like I said, I didn't know he was hit
```
53

```
 1       or I didn't know what was going to happen.
 2   Q.  Was it clear to you when you heard the shot
 3       that the shot was coming from someone outside
 4       1033 McCormick?
 5   A.  Yes.
 6   Q.  Did anyone indicate to you by radio or
 7       otherwise who had taken the shot?
 8   A.  I don't remember if it was on the radio.  I
 9       was -- being that it was outside and it was
10       close, and I'm familiar with a 5.56 or .223
11       bullet sound, and I knew it was from
12       somewhere across the street.
13   Q.  Now how were you standing at this time?
14       Were you standing or kneeled down,
15       crouched down?
16   A.  I don't remember for sure.  I know I went
17       back and forth between all three.  I stood
18       stationary.  I'd taken a knee there.  I know
19       at some point I even turned the shield upside
20       down so the least cover was covering my feet
21       and the wider base was up higher to give
22       more -- it'd also put the weight of the
23       ballistic shield on the ground not to wear my
24       arm out anymore.  I think at some point I
25       even went and stood using the engine block
```
54

```
 1       for more cover over the top of the car.  So
 2       there was some transition.
 3   Q.  At the time he stepped out on the porch, were
 4       you looking at him through the ballistic
 5       shield or around it or did you have it raised
 6       up at all?
 7   A.  Actually, I remember now, I think when he
 8       first came out, I might have still been what
 9       we call inverted with the shield upside down.
10       And when he came up, I think I would have
11       came back the normal carry where I could look
12       through the shield and would have brought my
13       handgun in front, which is usually kind of
14       sideways just so you can actually get the gun
15       there where you need to be where I could
16       focus through the sights.
17   Q.  Did you fire a shot anytime that night?
18   A.  No.
19   Q.  Why not?
20   A.  Numerous reasons.  There was -- well, from
21       the position he was, I knew there was a store
22       on the other side.  I was worried about any
23       collateral damage or officers I knew were on
24       the other side.  And I didn't see the threat
25       present itself.  I know I did -- I
```
55

```
 1       traditionally keep my finger straight and off
 2       the trigger until there's enough threat that
 3       you transition to the trigger.  When his hand
 4       starting going back, I did transition to the
 5       trigger, but I didn't see the next step to
 6       pull the trigger, once he disappeared inside
 7       the door.
 8   Q.  How long had transpired from the time Andrew
 9       Finch stepped out onto the front porch until
10       the time the shot occurred?
11   A.  I'm not sure.
12   Q.  I'll tell you I've looked at some of the body
13       cams, and it appears that that period of time
14       was somewhere around 4 to 6 seconds.
15       Does that sound accurate?
16           MR. PIGG:  Object to form; it's
17       leading.
18   BY MR. BAILEY:
19   Q.  You can answer.
20           MR. PIGG:  Also misstates the
21       evidence.
22   A.  I'm not sure.  With the adrenaline, the way
23       you perceive time tends to slow down.  I
24       would have -- it seemed like it was longer,
25       but that could be accurate.
```
56