# EXHIBIT 5

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA G. FINCH, Individually, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased, and as Next Friend )
for her minor granddaughter, )
AF; DOMINICA C. FINCH, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased; and ALI ABDELHADI, )
                                )
           Plaintiffs,          )
                                )
    vs.                         ) Case No.
                                ) 18-CV-01018-JWB-KGS
CITY OF WICHITA, KANSAS;        )
JOHN DOE POLICE OFFICERS 1-10,  )
                                )
           Defendants.          )

D E P O S I T I O N

The videotape deposition of KYLE PERRY taken on behalf of the Plaintiffs pursuant to the Federal Rules of Civil Procedure before:
        RICK J. FLORES, CSR
        KELLEY REPORTING ASSOCIATES, LTD.
        515 South Main, Suite 108
        Wichita, Kansas 67202

a Certified Shorthand Reporter of Kansas, at 455 North Main, 13th Floor, Wichita, Sedgwick County, Kansas, on the 28th day of November, 2018, at 1:13 p.m.

**Page 2**

A P P E A R A N C E S

PLAINTIFFS:
    CONLEE SCHMIDT & EMERSON, LLP
    Mr. Rick E. Bailey
    Suite 300
    200 West Douglas
    Wichita, KS 67202
    (316) 264-3300
    Fax: (316) 264-3423
    rbailey@fcse.net

DEFENDANTS:
    FISHER PATTERSON SAYLER & SMITH, LLP
    Mr. J. Steven Pigg
    3550 S.W. 5th Street
    Topeka, KS 66606
    (785) 232-7761
    Fax: (785) 232-6604
    spigg@fisherpatterson.com

VIDEOGRAPHER:
    ADVANCED DOCUMENT IMAGING
    Mr. Michael Miles
    515 S. Main, Suite 105
    Wichita, KS 67202
    (316) 267-9380
    Fax: (316) 267-9382
    video@kelleyreporting.com

**Page 3**

I N D E X

KYLE PERRY
Direct Examination by Mr. Bailey:        4
Cross-Examination by Mr. Pigg:         117
Redirect Examination by Mr. Bailey:    121

Perry Exhibits
No. 71 - Google Map Aerial View of 1033    24
    W. McCormick w/Markings (1 pg)

SIGNATURE OF WITNESS                   130
CERTIFICATE                            131

**Page 4**

            VIDEOGRAPHER:  This begins the videotape deposition of Kyle Perry.  Today is November 28th, 2018, and the time is 1:13 p.m.
            Would the court reporter please swear in the witness.
                    KYLE PERRY
having been first duly sworn on his oath to state the truth, the whole truth, and nothing but the truth, testifies as follows:
            DIRECT EXAMINATION
BY MR. BAILEY:
    Q.  Could you state your name for the record, please.
    A.  Kyle Perry.
    Q.  And Mr. Perry, how are you currently employed?
    A.  By the City of Wichita as a police officer.
    Q.  Have you ever had your deposition taken before?
    A.  I have not.
    Q.  I know you've had the opportunity to meet with Mr. Pigg to talk about what a deposition is and what you can expect here today, but I'd like to go through a few ground rules

```
 1      commands; less lethals, you know, Tasers,
 2      joint locks, hand/defensive tactics type
 3      stuff, less lethal with the Taser, the baton,
 4      K9s, and then all the way up till lethal
 5      force.
 6   Q. Based on your understanding of the City of
 7      Wichita's policies and procedures, is the use
 8      of lethal force authorized if a suspect
 9      simply refuses to comply with commands given?
10   A. No.
11   Q. What did you do to prepare for your
12      deposition here today?
13   A. I read back over my -- my transcripts.
14   Q. And I assume you met with Mr. Pigg?
15   A. Yes.
16   Q. When was that?
17   A. Two weeks ago, approximately, three weeks.
18   Q. And how long did you meet with him?
19   A. About approximately two hours.
20   Q. Who else was in the room with you?
21   A. Officer Schepis and Officer Ronen.
22   Q. Anyone else?
23   A. I don't believe so, no.
24   Q. Other than reviewing your transcripts of the
25      interviews that you gave, had you reviewed
                                                    13
```

```
 1      any other documents in preparation for your
 2      deposition?
 3   A. No.
 4   Q. Have you reviewed any of the body cam videos?
 5   A. Since this incident or --
 6   Q. Yes.
 7   A. -- since I met with Mr. Pigg, no.
 8   Q. And let me break that down 'cause the
 9      question may not have been clear.
10          First, let me ask, in your meeting
11      with Mr. Pigg, did you review any body cam
12      videos?
13   A. I did.
14   Q. And which body cam videos did you review?
15   A. Mine.
16   Q. Any others?
17   A. Officer Ronen's was playing, but I did not
18      watch it directly, myself, watch his video.
19   Q. Any others?
20   A. No.
21   Q. Other than the meeting that you had with
22      Mr. Pigg where you reviewed yours and some of
23      Officer Ronen's, have you reviewed any of the
24      body cams of officers that were present on
25      the scene there at the Finch shooting?
                                                    14
```

```
 1   A. I have seen what we released to the media.
 2   Q. Anything in addition to that?
 3   A. No.
 4   Q. Other than the conversation with Mr. Pigg and
 5      the other officers that were there, have you
 6      had conversations with anyone else since the
 7      incident about the incident?
 8   A. Probably my wife.  Other than that, no.  The
 9      officer -- I guess, yes, the officers on
10      scene where it was at, the debrief of the
11      situation which I was present for.
12   Q. Was that when you were interviewed for the
13      first time?
14   A. No.
15   Q. Okay.  Tell me about the debrief you're
16      talking about.
17   A. This would be the Critical Incident Stress
18      Management Team within the department holds a
19      debrief of the situation after a volatile
20      officer-involved serious situation.
21   Q. How long after the shooting was that?
22   A. Approximately a week, maybe.
23   Q. And where was that held?
24   A. It's a church on West 21st Street.  I can't
25      think of the exact -- Golden Harvest Church
                                                    15
```

```
 1      maybe, but the church at 21st and Tyler.
 2   Q. And who all was present during that debrief?
 3   A. It would have been Officer Ronen, myself,
 4      Officer Rapp, his wife, and then the
 5      dispatcher, and then a few other, I mean,
 6      odds and end department members were there,
 7      supervisors and such, but I can't remember
 8      exactly who was all there other than those
 9      people that I've named.
10   Q. And who led this debrief?
11   A. That would have been -- Sergeant Yarberry led
12      it and then also the EMPAC coordinator.
13   Q. I'm sorry.  Was that EMPAT?
14   A. EMPAC:  E-M-P-A-C.
15   Q. And what does E-M-P-A-C stand for?
16   A. I don't know exactly what it stands for,
17      hence, calling it just by the acronym.  But
18      it's a service officer -- offered to officers
19      after a situation so for counseling and
20      psychologists, and we have to go see them
21      after you've been involved in a
22      officer-involved shooting to get released
23      back to work.  That's counseling provided by
24      the department for other issues, as well.
25   Q. And the counseling that's required before you
                                                    16
```

**Page 17**

1  can go back to work, is that what this
2  debrief is or is that something --
3  A. That's separate, yeah.
4  Q. How long did this debrief last?
5  A. I don't know for sure. I couldn't clarify
6     for exact time. I mean, I'd say like it's
7     for an hour.
8  Q. And was it just that one occasion or did you
9     have followup meetings?
10 A. Just one.
11 Q. Were there any materials or PowerPoints or
12    anything like that that were used as part of
13    this?
14 A. No.
15 Q. So what went on at this debrief?
16        MR. PIGG: This is a privileged
17    communication between counselors and patients
18    so the details of what went on are
19    privileged.
20        MR. BAILEY: Okay. I'm not going
21    to agree with that, but I understand you'll
22    direct him not to answer any questions about
23    the details.
24        MR. PIGG: Correct.
25 BY MR. BAILEY:

**Page 18**

1  Q. You said Sergeant Yarberry was the one who
2     led this meeting?
3  A. I believe he was the coordinator. I don't
4     know, technically, that he led it, but he is
5     the coordinator of those -- of the Critical
6     Incident Stress Management Team.
7  Q. And who was there from EMPAC?
8  A. A counselor. I don't know anyone in
9     particular. I don't know all their names.
10 Q. Was it more than one person?
11 A. I believe it was just one.
12 Q. And was this person a man or a woman?
13 A. I don't remember which one it was.
14 Q. Do you know what this person's educational
15    background or training was?
16 A. No.
17 Q. Was your attendance at this debrief required
18    as one of the steps necessary for you to be
19    able to go back to work?
20 A. No.
21 Q. Was your attendance at this debrief mandatory
22    or voluntary?
23 A. Voluntary.
24 Q. And how were you communicated -- or how were
25    you told about the fact that this debrief

**Page 19**

1  would take place?
2  A. I don't remember for sure.
3  Q. Was this something you had asked for it?
4     Was it something that someone came to
5     you and told you about?
6  A. It was just communicated about that it was
7     going to be offered. I don't remember --
8     it's not something I sought out.
9  Q. Do you remember how you found out about this?
10    Was that by an e-mail or somebody
11    coming to you and telling you personally
12    about it or a flier?
13 A. If it was -- I believe -- I honestly do not
14    know for sure how. I mean, I don't remember
15    for sure how, so I can't answer how it was
16    communicated about.
17 Q. And if I understand you, there was Officer
18    Ronen, Officer Rapp, yourself, Officer Rapp's
19    wife, a dispatcher, Sergeant Yarberry, the
20    person from EMPAC.
21       Anyone else that you have a specific
22    recollection of attending?
23 A. No.
24 Q. Is that kind of the list of who all was there
25    or are there -- were there other people that

**Page 20**

1  you just don't -- can't place right now?
2  A. There were others.
3  Q. About how large was this group?
4  A. Approximately 10 to 12.
5  Q. And what did you understand was the purpose
6     of this debrief?
7  A. It is a service offered to where officers can
8     speak about the incident and get everybody
9     back on the same page about what they saw and
10    what happened, how they're feeling and just
11    for us just to talk.
12 Q. Is this something that's somehow coordinated
13    or connected with the union or is it
14    separate?
15 A. I believe it is separate.
16 Q. Is this something that the Wichita Police
17    Department as an organization offers you or
18    is this set up somehow separately from that?
19 A. I believe it's through EMPAC, which is a
20    service offered through the department. So I
21    believe they coordinate it and communicate to
22    the department that it's going to be offered.
23    But for sure who's in charge, who foots the
24    bill, who pays for it, who coordinates it,
25    that's above my head and I don't know.

```
 1     require actual close contact between you and
 2     the suspect or is it one of the ones that
 3     shoots wired prongs out?
 4  A. It will shoot wired prongs up to a maximum of
 5     25 feet.
 6  Q. So you had your Glock 17, you had your Taser
 7     X2, you had your baton.
 8         Any other weapons whether lethal or
 9     otherwise that you had on you that evening?
10  A. A pocketknife.
11  Q. I take it that's not something that's issued
12     by the police department, just something you
13     carry?
14  A. Yes, that is correct.
15  Q. I don't expect you've been trained to use a
16     pocketknife as a nonlethal weapon while at
17     the academy?
18  A. That is correct.
19  Q. So other than the Glock 17, the Taser X2, the
20     baton, and the pocketknife, any other weapons
21     whether lethal or nonlethal that you had
22     available to you that evening?
23  A. No.
24  Q. Are there any nonlethal weapons or other
25     lethal weapons that are carried in the
                                                29
```

```
 1     vehicle that you were driving that evening?
 2  A. No.
 3  Q. Excuse me. I guess you were riding in the
 4     evening.
 5  A. Excuse me. There is a shotgun.
 6  Q. Is that shotgun able to shoot beanbag or
 7     nonlethal rounds?
 8  A. No.
 9  Q. And did either you or Officer Ronen carry the
10     shotgun with you to the location at 1033
11     McCormick?
12  A. We did not.
13  Q. Can you draw a circle there on Exhibit 71 to
14     show where you met up with the sheriff's
15     deputies when you finally got in the vicinity
16     of 1033 McCormick that evening.
17  A. Approximately right here (witness draws).
18  Q. And you've drawn a circle that's just on the
19     northwest corner of the house that's
20     immediately east of 1033 McCormick.
21  A. Correct.
22  Q. Is that correct?
23         Do you recall what the address of that
24     house is?
25  A. I do not.
                                                30
```

```
 1  Q. I believe it's 1027, but I'm not positive of
 2     that.
 3         When you finally reached that location
 4     there at the house just east of 1033
 5     McCormick, did you see any other officers
 6     other than the two sheriff's deputies that
 7     you met up with?
 8  A. Yes.
 9  Q. And who did you see?
10  A. Exactly who I saw I cannot -- I've just -- I
11     saw officers in uniform.
12  Q. And let's talk about where those officers
13     were that you saw.
14         Were they all in one location or --
15  A. Would you like me to write it on Exhibit 71?
16  Q. Please do.
17  A. There were officers that we could see in this
18     parking lot right here. Do you want me --
19     how would you like me to mark this?
20  Q. Just an oval or a large square or something
21     to indicate the area where you saw them.
22  A. I believe there was some right here on the
23     street corner.
24  Q. And you're referring to the oval that you've
25     drawn on the southeast corner of the Seneca
                                                31
```

```
 1     and McCormick intersection.
 2         MR. PIGG: Southwest.
 3  Q. Excuse me. No, southeast corner.
 4  A. Be southeast.
 5         MR. PIGG: You're right.
 6  A. I saw officers pulling up and blocking
 7     McCormick street in their patrol cars.
 8  Q. Can you draw a square to show where you
 9     were -- where you saw those vehicles.
10  A. Exactly I cannot for --
11  Q. And I understand this is just going off your
12     memory, but just draw a square that's big
13     enough for whatever precision you feel
14     comfortable with.
15  A. Approximately in this area right here
16     (witness draws). As we went north, I don't
17     know for sure how many cars were there. More
18     than 2, 3, 4, however many were needed. I
19     was not in charge of traffic at the time.
20     And then I saw officers running north of
21     McCormick and there were officers set up
22     approximately in this area, I'd say, in this
23     area of the circle. But that's not exact
24     because I didn't know exactly where they
25     were, but I saw them run to this area, and
                                                32
```

Page 33:

```
 1       that'd be several officers.
 2   Q.  Sure.  That circle that you've drawn to the
 3       north of McCormick, can you put an N by that
 4       to signify that that's where the north
 5       officers were.
 6   A.  (Witness complies.)
 7   Q.  And the other circle that you've drawn on the
 8       southeast corner of Seneca and McCormick,
 9       could you put a W on that for the west most
10       officers?
11   A.  And that's just the west most officers that I
12       could see.
13   Q.  I understand.
14   A.  Okay.  (Witness complies.)
15   Q.  Now when you arrived at the circle that
16       you've drawn there at the house just east of
17       1033 McCormick, what was your understanding
18       based on what information you'd been given as
19       to the situation you were responding to?
20   A.  Excuse me.  We were responding to a dispatch
21       call saying that an individual was calling
22       in, saying that he had just killed his father
23       and was holding his family at gunpoint.
24   Q.  Were you given any other information at that
25       time about the situation or the people that
```

Page 34:

```
 1       were participating in that situation?
 2   A.  No, just the address.
 3   Q.  Did you have any kind of a description of the
 4       person who was supposedly the shooter?
 5   A.  I do not recall that, no.
 6   Q.  Anything about their size or weight, race,
 7       age, any kind of information like that?
 8   A.  Not that I recall.
 9   Q.  During the time that you were running from
10       where you parked -- where the car was parked
11       by your partner to the house next door to
12       1033 McCormick, did you hear any gunshots or
13       sounds of any kind coming from 1033
14       McCormick?
15   A.  No.
16   Q.  Did you see any -- anyone other than police
17       officers out on the street in that area?
18   A.  No.
19   Q.  See anyone looking out the windows trying to
20       figure out what all the commotion was about?
21   A.  No.  There was -- within this area, no, but
22       there was a large -- there was people --
23       several people in the parking lot of the
24       Johnson's General Store.
25   Q.  And that's on the Johnson's General Store
```

Page 35:

```
 1       that's on the southwest corner of McCormick
 2       and Seneca?
 3   A.  Correct.
 4   Q.  Other than those individuals, did you see
 5       anyone in the neighborhood of 1033 McCormick
 6       that was looking out their window or coming
 7       outside the house?
 8   A.  No, but I was not specifically looking for
 9       any either.
10   Q.  Once you arrived at the house just to the
11       east of 1033 McCormick, again, did you hear
12       any gunshots coming out of the house?
13   A.  No.
14   Q.  Did you hear any raised voices or shouting?
15   A.  No.
16   Q.  Did you see any signs of commotion, hear any
17       breaking glass or breaking furniture or
18       anything like that?
19   A.  No.
20   Q.  Is there anything that you could see or hear
21       that suggested to you that there was some
22       type of a disturbance going on in 1033?
23   A.  No.
24   Q.  Did any other officer tell you after you
25       arrived on the scene that they had heard
```

Page 36:

```
 1       gunshots there at the house?
 2   A.  No.
 3   Q.  That they'd heard raised voices?
 4   A.  No.
 5   Q.  That they'd heard any sounds of a commotion
 6       or disturbance going on in that house?
 7   A.  No.
 8   Q.  Did you see any signs of a disturbance in any
 9       of the windows at 1033 McCormick?
10   A.  No.
11   Q.  Now if I understand your testimony, there
12       were four officers in this group there at the
13       house east of 1033 McCormick.
14           There was yourself, Officer Ronen and
15       two sheriff's deputies; is that correct?
16   A.  That is correct.
17   Q.  Any other officers that arrived anytime prior
18       to the shooting?
19   A.  I cannot -- I do know officers or deputies
20       ended up behind us at some point, but I don't
21       know -- they weren't communicated.  I was
22       fixed on forward.  I did not pay attention to
23       who was all arriving behind us, but I know
24       after the fact that there were officers there
25       behind us that once we moved, I saw them that
```

**Page 37**

1 they were behind us, but I was not looking
2 behind us at that point.
3 Q. But as to who they were or where they were or
4 when they arrived, you don't know?
5 A. Correct.
6 Q. As to the four officers that you were aware
7 of at that location, how did you position
8 yourselves?
9 A. It would have been Deputy Stephens-Clark,
10 Deputy Headings with a ballistic bunker, and
11 then I was fixated in between them, and then
12 Officer Ronen was to my left.
13 Q. So I want to make sure I'm understanding your
14 description there.
15 Deputy Stephens-Clark would have been
16 nearest to the house there that's to the east
17 of 1033 McCormick?
18 A. Correct.
19 Q. And to his right was Deputy Headings?
20 A. Correct.
21 Q. Had you known either of those officers prior
22 to this?
23 A. No.
24 Q. Ever responded to a call that you're aware of
25 where they were there, as well?

**Page 38**

1 A. No.
2 Q. And then if I'm understanding you, you
3 positioned yourself in back of and kind of
4 between those two officers?
5 A. Correct.
6 Q. And Officer Ronen was then to your right?
7 A. He was to my left.
8 Q. Excuse me, to your left. So he was closer to
9 the house than you were?
10 A. Correct.
11 Q. So if we're talking about proximity to the
12 house, going away from the house, was Officer
13 Ronen or Deputy Stephens-Clark closer to the
14 house?
15 A. Which house?
16 Q. The house just east of 1033 McCormick.
17 A. I can't speak for sure. I know Ronen was
18 beside me when we initially made contact with
19 them. And I know how we ended up was kind of
20 like a inverted triangle: Stephens-Clark
21 close approximate to my left within touch,
22 Deputy Headings directly to my right within
23 touch, and then me between them, and Officer
24 Ronen was somewhere back here, so I don't
25 know who was actually closer to the house,

**Page 39**

1 but we were all within -- at least those two
2 deputies and myself were all within touching
3 distance. We were very close together.
4 Q. As you approached 1033 McCormick, did you
5 receive any directions or commands as to what
6 you were to do from anyone?
7 A. No. We wanted to set up containment of the
8 situation as best we could. We knew the
9 house, and so we were coming in from the east
10 already so we would just take an eastern
11 perimeter position.
12 Once we were there, we communicated
13 where we were and that we had four, for lack
14 of better -- we'll just call them all
15 officers, two deputies, two officers. And
16 then we had a bunker. So we communicated to
17 Sergeant Jonker, who was the supervisor on
18 scene on the radio, that we would make --
19 that we would be a contact team if necessary.
20 Q. How did you become aware that Sergeant Jonker
21 was the person in charge on the scene?
22 A. He's my supervisor and I know his call number
23 and voice.
24 Q. Now did he direct you to set up the eastern
25 perimeter of the containment or was that

**Page 40**

1 something that you did on your own initiative
2 knowing or expecting that's what he would
3 want done?
4 A. Our own initiative.
5 Q. And were you the one that was in contact with
6 Sergeant Jonker or was it someone else in
7 this group of four that was in contact with
8 him?
9 A. I believe it was me.
10 Q. And did you volunteer or offer to be a
11 contact team or did he instruct you that that
12 was going to be your role?
13 A. We offered it.
14 Q. What is a contact team?
15 A. That would have been the team if there was --
16 if we were to make contact with an
17 individual, we would be the ones to initiate
18 the physical contact with him, her, whoever.
19 But if we were able to make a move on the
20 house or anybody that was out, that we would
21 move up as an element due to us having four
22 and having the bunker for protection that we
23 would make that move.
24 Q. At this point in time, had you had any
25 specific training or experience on being part

**Page 41**

    of a contact team in a situation like this?
A. In this situation, no.
Q. How about just generally?
A. Generally, yes. Within our entry training, we train, like within the active shooter, as well, there's always a contact team that will go directly to the threat.
    Or, a contact team will also be a team if we're doing like an officer down rescue, there will be a team to go directly to that officer if an officer's down, and that's their only job is to rescue that officer and handle anything they are presented and then to get back out. So a contact team is just a small group of officers, could be large, but a group of officers that are all on the same page with a specific task.
Q. When you made this offer to be a contact team to Sergeant Jonker, did he respond?
A. I don't believe so.
Q. And how soon after your arrival there at the corner of the house next to 1033 McCormick did you make this offer to Sergeant Jonker of being the contact team?
A. Once we realized that we had four of us and

**Page 42**

the bunker and then our geographical location to where we are to the suspect residence, we felt like we had the best -- we would have had the best move safely. Officers from across the street would not have cover. Officers in the parking lot would not have cover. We would be able to utilize a little bit more cover if we were to make a move on that house.
Q. So you get in location, you realize you have four of us -- four of you, you realized you had a bunker, you make the offer to Sergeant Jonker to be the contact team.
    What's the next thing that happens?
A. An individual walks out of the house.
Q. And how long had you been at that location before the person walked out on the front porch?
A. I said it in my other interviews, as well, that I'm not for sure. It's hard to put a time on those situations, but it was not very long. It was a very short amount of time.
    MR. PIGG: Rick, take a short break?
    MR. BAILEY: Yeah, that's fine.

**Page 43**

    VIDEOGRAPHER: Off the record 2:04.
    (A recess was taken from 2:04 p.m. to 2:12 p.m.)
    VIDEOGRAPHER: Back on the record at 2:12.
BY MR. BAILEY:
Q. So had you seen anything going on in the house at 1033 McCormick from the time you arrived on the scene until when you saw someone step out on the front porch?
A. I did not.
Q. Describe for me the person who you saw step out on the front porch.
A. A white male. I remember I couldn't -- and this is going to be hard 'cause there was so much I know now to what I knew then. I'd have to refer to my exact transcript 'cause I don't remember if I for sure could distinguish what race he was, but a male step out with dark colored clothing, a little bit larger build, and that's all I could distinguish.
Q. Were you close enough to be able to see his face?

**Page 44**

A. I could not make out his face, no.
Q. So you couldn't tell whether he had facial hair or not?
A. I could not.
Q. Could you see his hands when he stepped out?
A. When he first stepped out?
Q. Yes.
A. No.
Q. Later, while he was on the front porch, could you see his hands?
A. Yes.
Q. How long after he stepped out onto the front porch until when you were first able to see his hands?
A. It's hard to -- I mean, it'd be seconds. I mean, the whole situation probably only lasted seconds so -- yeah, seconds.
Q. When you saw his hands, did you see anything in his hands?
A. No.
Q. See any weapons?
A. No.
Q. Anything that may have looked like a weapon?
A. No.
Q. Were you able to see any weapon protruding

```
 1      from a pants pocket or a jacket pocket or
 2      sticking out under a waistband?
 3   A. I would not have even been -- I would not
 4      have been able to see that, no.
 5   Q. Why not?
 6   A. Because it was so dark and his clothing and
 7      my distance.
 8   Q. Deputy Stephens-Clark and Deputy Heading
 9      would have been a step or two closer to this
10      person than you were?
11   A. Correct.
12   Q. Was there anyone else -- any other officers
13      that were closer to the person on the porch
14      other than those two deputies?
15   A. To my knowledge, no.
16   Q. So to summarize, if I'm understanding your
17      testimony, you didn't see a weapon in either
18      hand, and you didn't see a weapon anywhere
19      else on his person, given the limitations of
20      the light and viewpoint that you had?
21   A. Correct.
22   Q. When he first stepped out onto the porch, did
23      you reach any opinions or assumptions in your
24      mind as to who this individual was?
25   A. In my mind, I believed we were -- we were
```
45

```
 1      going to be making contact with a suspect.
 2   Q. Why?
 3   A. Due to his mannerisms.
 4   Q. What was it about his mannerisms?
 5   A. If he would have been -- in my mind, I was
 6      stating to myself if he is a victim or if he
 7      is being held hostage, he's going to be
 8      trying to distance himself from the house.
 9          If he is the calling party, if he
10      is -- or a family member or victim, he's
11      going to be summoning us, trying to make
12      contact with us, or, again, just distancing
13      himself from the situation inside of the
14      house.
15   Q. Did the person that you saw step out onto the
16      front porch ever speak to you?
17   A. No.
18   Q. Did you see him ever speak to any officers?
19   A. No.
20   Q. Did you ever see his mouth move even though
21      you may not have been able to hear the words
22      that were being spoken?
23   A. I could not see that and did not hear
24      anything.
25   Q. And describe for me what you saw from the
```
46

```
 1      time the person stepped out onto the porch
 2      until the time the shot rang out.
 3   A. I'll probably have to demonstrate some of
 4      this with my hands. I talk with my hands.
 5   Q. No. Please do.
 6   A. As the individual steps out of the house,
 7      commands are initially -- are immediately
 8      given from several angles. I can hear
 9      preparatory commands as in like "police",
10      "show me your hands", "walk off the porch."
11      Several different commands were given.
12          As he walks out of the -- or walks out
13      of the door, the screen door stays open like
14      he's kind of blocking the screen door with
15      his foot, like kind of -- it's still ajar;
16      he's standing in the threshold of the screen
17      door. As commands are given "show me your
18      hands", "police", "step off the porch", all
19      those commands are given, he raises his hands
20      approximately to shoulder height or armpit
21      height. Not from his body, not out, not up,
22      just basically about like right here
23      (demonstrating) and just kind of scans around
24      and looks around and kind of just like kind
25      of takes all the whole situation in, what's
```
47

```
 1      going on, drops his hands. Commands are
 2      given again, "show me your hands." He kind
 3      of just like -- like almost like he was just
 4      saying no, don't want to. And his hand comes
 5      back -- comes down into like the front of his
 6      like waistband area to like if you were going
 7      to -- for us, if I was going to adjust my
 8      belt, or if I had a weapon stored in the
 9      front of my waistband, how I would grab that
10      weapon. Commands are given again, "show me
11      your hands."
12          At that point, he turns his body. And
13      I don't know -- due to it being so dark, I
14      don't know if he turned towards us looking to
15      the east or if he turned back and looking to
16      the west, but I see a hand come across his
17      body as if I was going to -- if a gun was on
18      my right hip, I was going to come out and
19      draw, or if a gun was on -- if he was turned
20      this way, a gun was on his other right hip --
21      or, I guess, if a gun was on his left hip, he
22      was going to come out with his right hand if
23      he was turning to the west. If he was going
24      to turn to the east, he would have came out
25      with his left hand across his body like this
```
48

### Page 49

1       (witness demonstrates.)
2           At that point, in my mind, I believed
3       that he was drawing a weapon. Due to his
4       mannerisms, his actions, and then the way
5       that he blades his body would be similar to
6       the way I would if I was going to be drawing
7       a gun, the way I've been trained, if you
8       would draw a gun and come out and go back to
9       a threat, or how I've seen individuals draw
10      guns, that's what I believed was happening.
11  Q.  I'd like to separate if I can -- have you
12      separate, if you can, what you saw and what
13      you believed was happening.
14          You've described that you saw an arm
15      going across the -- was it the front of his
16      body?
17  A.  Well, if he was facing us, it would have
18      been, but if not, I just saw the motions of
19      coming across. So I couldn't see his exact
20      hands. It was too dark. He was just like in
21      the shadow. And so all I could see was the
22      motion. So if I'm facing you and it's dark,
23      you would just see like my elbow and my
24      shoulders dipping down, but if I was turned
25      away from you, you would just see the back of

### Page 50

1       my shoulder and that same view of my elbow
2       coming across my body the other way.
3   Q.  So you saw a shoulder and an arm motion that
4       indicated to you that an arm was going across
5       the front of his body either facing you or
6       facing away from you?
7   A.  Correct.
8   Q.  But you couldn't see what the person was
9       reaching for, if anything?
10  A.  Correct.
11  Q.  You couldn't see the person's hand?
12  A.  Correct.
13  Q.  You made a comment in your earlier
14      description about he looked around with his
15      hands partially up, and then I think the
16      phrase you used was his hands started to
17      drop, there were more commands given, and he
18      was like no, I don't want to.
19          What were you seeing in his body
20      language that leads you to the assumption or
21      conclusion in your mind that that's what he
22      was thinking?
23  A.  That he had no fear or obligation to do what
24      we said.
25  Q.  And again, what were you seeing in his

### Page 51

1       behavior, what did you physically see him do
2       that leads you to the assumption that he had
3       no fear or inclination to obey the commands?
4   A.  I've seen -- dealt with several situations.
5       I've given several commands to individuals at
6       gunpoint. I have given them not at gunpoint,
7       but just given them law enforcement commands
8       in a situation. Individuals that are going
9       to comply with your commands or that are in
10      fear or have a respect for law enforcement
11      raise their hands and it's very clear they
12      are up; they don't want anything to happen.
13      It's very clear what their actions are.
14          If they are going to run or if they're
15      going to fight, they are not going to comply
16      with your commands and they're either going
17      to -- they're either kind of -- they're --
18      they're -- for lack of better term, it's like
19      a stalling method.
20          If individuals are going to come out
21      and run, they're trying to gather their
22      thoughts what they're going to do. They're
23      overwhelmed with law enforcement contact.
24      They're like, okay, what's going on,
25      what's -- I'm going to run or I'm going to

### Page 52

1       fight or I'm formulating a plan, but they're
2       not up. Their hands don't come up above
3       their head. It's always where they can still
4       react if they need to where they can grab
5       something, grab something or run. They're
6       already in that motion. They're close --
7       they keep their hands close to their bodies.
8           So in seeing that on this situation,
9       that's what I'm thinking. This individual is
10      planning something; or, if he's not planning
11      something, he has actually no regard for the
12      law enforcement that is here and has no
13      regard or reason to obey us.
14          He -- I mean, I'm trying to put the
15      words to it. Like he, in his -- I'm trying
16      to put myself in his -- he has no reason to
17      obey us. That he's just I don't care is
18      the -- is the best way I can describe it.
19      That he just didn't -- had no care that we
20      were saying to show us his hands, or to step
21      off the porch or --
22  Q.  You've said that a person may not respond to
23      commands because they're planning to run or
24      because they're planning to fight.
25          Are there any other reasons that

```
 1       come up other than perhaps here?")
 2            MR. PIGG: He needs to know what
 3       that situation is -- what he's referring to.
 4            (The requested portion of the record
 5       was read by the reporter, as follows:
 6       Question: "What about a person who cannot
 7       hear or understand the commands that they're
 8       being given?
 9       Answer: I've never encountered a situation
10       to where they weren't able to understand us.
11       Question: At least other than this one.")
12            MR. PIGG: Object to the form of
13       the question; assumes facts not in evidence.
14  BY MR. BAILEY:
15  Q.   You can answer.
16  A.   I can't speak on perhaps, because I believe
17       everybody that I've dealt with from my
18       experience, I've never encountered anybody
19       that hasn't been able to do this, so I have
20       no reason to believe why people would not
21       comply.
22  Q.   Is failure to comply with a law enforcement
23       officer's commands justification for the use
24       of lethal force?
25            MR. PIGG: Asked and answered.
                                                   57
```

```
 1  BY MR. BAILEY:
 2  Q.   You can answer.
 3  A.   It's all dependent on the situation.
 4  Q.   Explain that to me.
 5  A.   State the question one more time.
 6  Q.   I asked you if the failure to comply with an
 7       officer's law enforcement -- law enforcement
 8       officer's commands was justification for the
 9       use of lethal force.
10  A.   If the situation were to arise of a situation
11       where lethal force could be taken, then yes,
12       such as a hostage situation; or, an
13       individual that is presenting a lethal threat
14       to somebody, law enforcement or myself or
15       somebody else and they don't comply, then,
16       ultimately, if that situation -- if the
17       factors all met, and this is all hypothetical
18       because we're not there and every situation
19       is different and fluid, so if that situation
20       could arise, then yes, there could be a
21       situation to where, yes, if someone does not
22       comply with law enforcement commands, lethal
23       force could be taken.
24  Q.   If I'm understanding you, that situation
25       would require two things, the failure -- one,
                                                   58
```

```
 1       the failure to comply with law enforcement
 2       commands, and two, an imminent threat of
 3       bodily harm to you or other individuals?
 4  A.   Correct.
 5  Q.   Did you ever see a weapon in this
 6       individual's hands at anytime between the
 7       time they stepped out on the porch till the
 8       time they were shot dead?
 9            MR. PIGG: Object to form of the
10       question.
11  BY MR. BAILEY:
12  Q.   You can answer.
13  A.   I did not see a weapon, but I believe he was
14       reaching for a weapon.
15  Q.   And you were wrong; isn't that right?
16            MR. PIGG: Object to the form of
17       the question; it's argumentative.
18  A.   At the time now, now I know all the facts, I
19       know that he was not reaching for a weapon,
20       but it does not change the indication of what
21       he was reaching for, or what I believed at
22       the time he was reaching for.
23  Q.   You saw a motion consistent with someone
24       reaching for something; is that correct?
25  A.   That is correct.
                                                   59
```

```
 1  Q.   You never saw a weapon; correct?
 2  A.   Correct.
 3  Q.   You never heard any other officer indicate
 4       that they saw a weapon; correct?
 5  A.   Correct.
 6  Q.   And based upon that, you believe that the
 7       person was reaching for a weapon?
 8            MR. PIGG: Object to form of the
 9       question.
10  BY MR. BAILEY:
11  Q.   Correct? You can answer.
12  A.   Correct. I believe he was reaching for a
13       weapon at that time in the moment of what was
14       going on, what I was seeing, I believe that
15       that individual was reaching for a weapon, or
16       indicating that he had a weapon.
17  Q.   Do you believe, based upon what you saw from
18       your point of view, that the application of
19       lethal force was appropriate?
20            MR. PIGG: Object to form of the
21       question.
22  A.   Yes.
23  Q.   And that's based upon your assumption that
24       the person had a weapon; correct?
25  A.   That is based on my training and experience
                                                   60
```

```
 1      were formulating a plan of how -- what the
 2      next steps were.
 3   Q. And who was formulating that plan?
 4   A. Sergeant Jonker.
 5   Q. Prior to the shooting, at anytime, did
 6      Sergeant Jonker give you any directions or
 7      commands as to what you were to do or not do?
 8   A. Sorry.  State that again.
 9   Q. Prior to the shooting, had Sergeant Jonker
10      communicated to you any commands or
11      instructions as to what you were to do or not
12      do?
13   A. No.
14   Q. Sergeant Jonker giving you commands to issue
15      commands to this person or to anyone who
16      steps out onto the front porch?
17   A. No.
18   Q. Had he told you not to do that?
19   A. No.
20   Q. What was your next involvement in the
21      situation?
22   A. My next involvement was a patrol car, a K9
23      patrol car was pulled up in the driveway
24      separating the house that I was at and 1033
25      West McCormick.  And I went to the back --
```
69

```
 1      sorry.
 2           My next involvement was I saw
 3      individuals on the -- or on the east side of
 4      the house open the door, and it was
 5      communicated by the deputies that were with
 6      us that they would handle that situation --
 7      that they would handle the individuals that
 8      were in the house, and they were giving
 9      commands to them.  And I moved to the back of
10      the Tahoe that was parked in the driveway,
11      and I held a cover position for the top --
12      the second story windows, to cover officers
13      as the officers were going to move up or to
14      cover our position and just provide another
15      position of cover from behind the Tahoe
16      looking up at the upstairs windows.
17   Q. Did you ever enter the house?
18   A. I did not.
19   Q. Were you ever told either before the shooting
20      or after the shooting that the person who
21      made the phone call saying that they had shot
22      their father and were holding other family
23      members hostage had said they were in a
24      one-story house?
25   A. I was not aware of it.
```
70

```
 1   Q. This house, obviously, was not a one-story
 2      house; correct?
 3   A. That is correct.
 4   Q. Had you been given that information, would
 5      that have affected your response in any way?
 6   A. My personal response?
 7   Q. Yes.
 8   A. No.
 9   Q. How long did you remain on scene?
10   A. Not long.  After the house was cleared, yeah,
11      as soon as the house was cleared and we
12      realized that what had -- not even know what
13      had happened.  Once the house was cleared,
14      a -- everybody that was directly involved in
15      the situation that was in the close perimeter
16      of the house was instructed to go to the
17      sixth floor, and so I rode with another
18      officer to the sixth floor.
19   Q. From the time you left the scene until the
20      time you were interviewed, did you talk with
21      any other officers?
22   A. No.
23   Q. Now you didn't turn your body cam on until
24      after the shooting had occurred; is that
25      right?
```
71

```
 1   A. That is correct.
 2   Q. Why?
 3   A. When we got out of the car, we were running
 4      up; I believed I had activated it at that
 5      time.  You have to hit it twice.  I --
 6      apparently, my camera did not activate for
 7      whatever reason.  I didn't hit it twice, I
 8      didn't get it -- didn't turn on,
 9      malfunctioned or whatever, but I do
10      specifically remember turning my camera on or
11      believing I was turning my camera on.  Dealt
12      with the situation.  After the shooting
13      happened, it was -- things had calmed back
14      down, I looked down and I saw that my camera
15      was blinking green, that it was not on, and I
16      activated it at that time.
17   Q. What does Wichita Police Department policy
18      say about when you are to activate your body
19      cam?
20   A. There are several different situations of why
21      or when an officer will or will not activate
22      their camera.
23           For this situation, I believed that it
24      would best suit me that it would be
25      activated.  That's why, when I got out of the
```
72

**Page 73**

1  car, and was running up to the situation that
2  I activated it.
3  Q. Or thought you activated it?
4  A. Or thought I activated it.
5  Q. Have you received any discipline of any kind
6     as a result of your failure to activate the
7     body cam before the shooting?
8  A. No.
9  Q. Do you know of any officer that has ever
10    received discipline from the Wichita Police
11    Department because of a failure to activate
12    their body cam when required?
13 A. Not that I'm aware of.
14 Q. And you know that Officer Ronen also did not
15    activate his body cam until after the
16    shooting; is that correct?
17 A. I am -- I have been made aware of that, yes.
18 Q. So we don't have the view from your body cam
19    from your point of view of the individual
20    stepping out onto the front porch, making
21    whatever motions they made, and then being
22    shot and falling back into the house;
23    correct?
24 A. Is that -- are you stating that or are you
25    asking me a question?

**Page 74**

1  Q. I'm asking you: We don't have any view from
2     the perspective where you were, either of
3     your body cam, Officer Ronen's body cam, or
4     any other body cam that show that particular
5     point of view of the shooting?
6  A. I am aware that mine and Officer Ronen's did
7     not show it.
8  Q. Do you know whether the sheriff's deputies
9     that were there were equipped with body cams
10    at that time?
11 A. They were not.
12 Q. Are you aware of any body cams of any
13    officers other than the ones across the
14    street to the north that can show us the
15    actual event of the shooting?
16 A. I am not aware of any.
17 Q. Has anyone ever spoken to you about your
18    failure to activate the body cam before the
19    shooting?
20 A. That night it was just asked of me why -- why
21    isn't your camera -- like why didn't you have
22    your camera on earlier, and I stated exactly
23    what I just said to you, and that's all that
24    was said.
25 Q. And other than that, there hasn't been any

**Page 75**

1     other discussion about that?
2  A. No.
3  Q. Prior to this incident December 28th of last
4     year, had you ever been to this house at 1033
5     McCormick?
6  A. I had not.
7  Q. Did you know Andrew Finch?
8  A. I did not.
9  Q. Since the time of the shooting, have you
10    learned any information about Andrew Finch?
11 A. Not that I can recall, no, of actionable like
12    stuff that's just for sure about him, no.
13 Q. What kind of non-actionable rumors or
14    innuendos have you heard?
15 A. Just that he is -- had contact with the
16    police before.
17 Q. Do you know any details about what contact he
18    supposedly had?
19 A. I just know that he's been -- I had heard
20    that he has been arrested relating in
21    narcotic related offenses.
22 Q. Anything else?
23 A. No.
24 Q. You weren't aware of any of that at the time
25    of the shooting?

**Page 76**

1  A. That is correct.
2  Q. Would your general knowledge that he's had
3     some contact with the police and may have
4     been arrested on some drug charges have
5     changed or impacted your actions that night
6     in any way?
7  A. No.
8  Q. Have you had any type of training while you
9     were in the academy or since then on what are
10    referred to as deescalation techniques?
11 A. In the academy, yes.
12 Q. Tell me about that.
13 A. I think it's all given in the standard -- I
14    think at the time it was called like Verbal
15    Judo is the class that is taught. And it's
16    just speaking to an individual. No matter
17    what the individual, the situation is at
18    hand, speaking at them and using words and
19    methods to figure out what you can to gain
20    compliance with an individual.
21 Q. Did they talk in any of that training about
22    how to use time as a tactic to kind of slow
23    down the pace of an incident to achieve
24    better compliance?
25 A. Yes.

```
 1    A.  I believe -- I mean, I don't remember reading
 2        it, but I'm sure it was put on the Interwatch
 3        so officers, you know, across the city would
 4        get it the next shift about what had
 5        happened, what had occurred and situations of
 6        that, but I don't know of anything more than
 7        that.
 8    Q.  And you're referring to this as the
 9        Interwatch.
10            Is that some kind of electronic
11        communication or is that something written?
12    A.  It is electronic.
13    Q.  And how is that distributed?
14            Is it through e-mail or some internal
15        system?
16    A.  It's on the police portal.
17    Q.  So prior to this situation at McCormick, you
18        weren't aware of any other swatting incident
19        that had occurred in the City of Wichita?
20    A.  No.
21    Q.  Since the shooting on McCormick, have you had
22        any conversations with Justin Rapp?
23    A.  At that -- direct conversations me and him,
24        yes.  About this specific incident directly
25        between him and I, no.  But I have spoke to
```
                                                                    109

```
 1        him.
 2    Q.  Tell me about the conversations you've had
 3        with him.
 4    A.  Well, we are on the same team now so I've
 5        discussed what we are -- what is going on,
 6        what is -- what's he doing, where he plans on
 7        eating that night, what car he's going to
 8        drive.  I would consider that a conversation.
 9            I've asked him how things are going
10        with -- at home when he was on light duty or
11        administrative duty.  Just asked him how
12        things were going just to update him to make
13        sure he was doing okay.  But other than that,
14        there hasn't been any conversations other
15        than related to non -- non-related to this
16        incident at work situations.
17    Q.  And you said you're on the same team.
18            Help me understand what that means.
19    A.  Officer Rapp is a part of the violent crime
20        community response team that I'm on.
21    Q.  And help me understand how that team is
22        organized, how many people are on it, and who
23        reports to who.
24    A.  There's 16 people.  Ten work at night.  Six
25        work during the day.  There's three
```
                                                                    110

```
 1        supervisors.
 2    Q.  Who are the supervisors?
 3    A.  Sergeant Bartell and Sergeant Hardy would be
 4        over Rapp.  They're on the night team.
 5    Q.  Are you on the night team, as well?
 6    A.  I am.
 7    Q.  Do you and Officer Rapp report to the same
 8        supervisor?
 9    A.  I don't believe so.  I think he reports to
10        Sergeant Hardy.  They're -- it's very -- it's
11        a team.  I mean, they're all connected, but
12        then each supervisor has a group of officers.
13        And I know -- the only thing I know for sure
14        of is Sergeant Bartell supervises Officer
15        Ronen and officer -- and myself.  That's the
16        only two that I know for sure.  I don't
17        really pay attention to who else is what boss
18        because we report to both of them, but I
19        don't know which one is his direct, like,
20        administrative supervisor.
21    Q.  And physically, where does that team meet?
22    A.  On the sixth floor of police investigations.
23    Q.  And do you have an office or a cubicle or a
24        desk?  How does that work?
25    A.  We have a office, the gang office on the
```
                                                                    111

```
 1        sixth floor, and then our sergeants also have
 2        their own separate offices.
 3            But we meet in a squad room around a
 4        table, a room identical to this, at the
 5        beginning of a shift.  And then we all kind
 6        of go to our separate work stations.  The
 7        office that we're in that I work out of only
 8        has four computers so not everybody can fit
 9        in there.  So they go through random work
10        stations.
11            And Officer Rapp is not in the office.
12        He's not assigned to the computer that I'm
13        in, the office that I'm in.
14    Q.  The night of the shooting on McCormick, you
15        told me that you thought you turned your
16        camera on.  After the shooting, you look down
17        and you realize it's not on and you turned it
18        back on.
19            When did you make the decision to turn
20        your camera off?
21    A.  I do not know.  I don't remember.
22    Q.  And what happened to your body cam after the
23        incident?
24    A.  I believe detectives collected it once we got
25        to the sixth floor.
```
                                                                    112