# EXHIBIT 8

**Lisa G. Finch, et al. vs. City of Wichita, Kansas**

**Case No. 18-cv-1018-JWB-ADM**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA G. FINCH, Individually, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased, and as Next Friend for her minor granddaughter, AF; DOMINICA C. FINCH, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased; and ALI ABDELHADI,

Plaintiffs,

vs. Case No. 18-CV-01018-JWB-KGS

CITY OF WICHITA, KANSAS; JOHN DOE POLICE OFFICERS 1-10,

Defendants.

D E P O S I T I O N

The videotape deposition of NOAH STEPHENS-CLARK taken on behalf of the Plaintiffs pursuant to the Federal Rules of Civil Procedure before:
RICK J. FLORES, CSR
KELLEY REPORTING ASSOCIATES, LTD.
515 South Main, Suite 108
Wichita, Kansas 67202

a Certified Shorthand Reporter of Kansas, at 455 North Main, 13th Floor, Wichita, Sedgwick County, Kansas, on the 28th day of November, 2018, at 11:19 a.m.

A P P E A R A N C E S

PLAINTIFFS:
CONLEE SCHMIDT & EMERSON, LLP
Mr. Rick E. Bailey
Suite 300
200 West Douglas
Wichita, KS 67202
(316) 264-3300
Fax: (316) 264-3423
rbailey@fcse.net

DEFENDANTS:
FISHER PATTERSON SAYLER & SMITH, LLP
Mr. J. Steven Pigg
3550 S.W. 5th Street
Topeka, KS 66606
(785) 232-7761
Fax: (785) 232-6604
spigg@fisherpatterson.com

FOR THE WITNESS:
SEDGWICK COUNTY SHERIFF'S OFFICE
Ms. Laura H. Oblinger
141 W. Elm
Wichita, KS 67203
(316) 660-3900
Fax: (316) 660-3248
laura.oblinger@sedgwick.gov

VIDEOGRAPHER:
ADVANCED DOCUMENT IMAGING
Mr. Michael Miles
515 S. Main, Suite 105
Wichita, KS 67202
(316) 267-9380
Fax: (316) 267-9382
Video@kelleyreporting.com

I N D E X

NOAH STEPHENS-CLARK
Direct Examination by Mr. Bailey: 4

Cross-Examination by Mr. Pigg: 52

Stephens-Clark Exhibits
No. 70 - Google Map Aerial View of 1033 W. McCormick w/Markings (1 pg) 13

SIGNATURE OF WITNESS 55
CERTIFICATE 56

VIDEOGRAPHER: This begins the videotape deposition of Noah Stephens-Clark. Today is November 28th, 2018, and the time is 11:19 a.m.

Would the court reporter please swear in the witness.

NOAH STEPHENS-CLARK
having been first duly sworn on his oath to state the truth, the whole truth, and nothing but the truth, testifies as follows:

DIRECT EXAMINATION

BY MR. BAILEY:

**Q. Can you state your name for the record, please.**
A. Noah Stephens-Clark.
**Q. And how are you currently employed?**
A. With Sedgwick County Sheriff's Office.
**Q. Have you ever had your deposition taken before?**
A. I have not.
**Q. I know you've had the opportunity to meet with your lawyer and talk about what's going to be going on here today, but I'd like to run over a few ground rules just to make sure you and I are on the same page.**

A. 'Cause if there was someone inside with a gun, I didn't want them to know exactly where I was with my light shining on the whole time.
**Q. So fair to say you were taking efforts to remain as hidden as possible in the location that you were at?**
A. Correct.
**Q. The officers that were at the north location that you've indicated on Exhibit 70, how many officers were there? Could you tell?**
A. I have no idea.
**Q. Did you recognize any of the officers there?**
A. No, I never actually saw specific individuals there.
**Q. And why was that?**
A. 'Cause again, my attention was focused to the residence. And at times I did look around, I saw that there was vehicles parked here and officers staged at that area, but I never recognized anybody.
**Q. After you saw the individual upstairs, trained your light on them, they disappeared, you turned your light off?**
A. Correct.

**Q. Is that correct?**
**Then what happened next after that?**
A. Time passed. The sergeant on scene was coordinating a plan to figure out what we were going to do next. And at that point, that's when Finch walked out on the front porch.
**Q. And the sergeant was Sergeant Jonker?**
A. Correct.
**Q. Have you worked with him on scene before?**
A. I've been on calls with him, yes.
**Q. Have you been on calls with him before where he was the officer in charge of the scene?**
A. I can't recall if he was the specific one in command.
**Q. Anytime that evening did you have direct communications between you and Sergeant Jonker about what you could do or should do or would do?**
A. No.
**Q. How did you become aware that someone was stepping out onto the front porch?**
A. When he stepped out of the doorway.
**Q. Did you see it before someone told you about it or did someone say something and that brought your attention to it?**

A. No, I saw it.
**Q. And tell me what you saw.**
A. I saw a white male wearing a gray or light colored hoodie step out of -- or jacket -- step out of the front door of the residence and onto the porch.
**Q. And how far out of the door did he step?**
A. Two, three steps.
**Q. Was he still within the swing of the screen door on the outside?**
A. He was.
**Q. When he stepped out, did he say anything?**
A. Not that I recall hearing.
**Q. When he stepped out onto the front porch, initially, did you have any belief as to who this person was, whether he was the shooter, a hostage, or some other occupant of the house?**
A. No, just that he was coming from the residence. Possibility of all those.
**Q. What did he do after he stepped out?**
A. When he stepped out, I began giving him verbal commands.
**Q. And what verbal commands were you giving him?**

A. The first one I told him was to put his hands up and that to step off the porch.
**Q. Any other commands that you gave him?**
A. It was just those repeated.
**Q. Were others giving him commands, as well?**
A. I could hear somebody to my right or to the location from the north yelling, but I don't know what commands they were giving.
**Q. Was there anyone else in the group of officers there on the east side where you were that was yelling commands at this person other than you?**
A. Not that I recall.
**Q. And if I understood you, you could hear someone -- some of the officers from the north area yelling commands, but you couldn't hear what they were saying?**
A. Correct.
**Q. What about officers on the west side, could you hear any officers there yelling commands?**
A. No.
**Q. What did this person on the front porch do in response to those commands?**
A. To my commands to put his hands up, initially, he put his hands up in the air,

and then he lowered his hands and took a step back. I again yelled at him to put his hands up and step off the porch. He put his hands back up, put his hands back down, took a step backwards. I again yelled at him to put his hands back up and step off the porch. He brought his hands up higher but less high this time and started to bring his hands back down and stepped back into the doorway.

**Q. When you were yelling commands, did you ever identify yourself as a sheriff's deputy or with law enforcement?**

A. I did not.

**Q. Did you hear anyone else?**

A. No.

**Q. Did this person on the porch ever turn and look at you while you were yelling commands?**

A. Yes, turned his head. Didn't turn his body.

**Q. Which direction was his body facing?**

A. North.

**Q. So he turned his head to the -- to his right in order to look towards you?**

A. Correct.

**Q. When he stepped out on the porch, could you see his hands?**

A. Yes.

**Q. Did you see a weapon in his hands?**

A. No.

**Q. Did you see anything in either hand that might have been mistaken by someone as a weapon?**

A. No.

**Q. Could you see any weapon stuck in a waistband or hanging out of a pocket?**

A. No, his jacket was covering his waistband.

**Q. Could you see any weapon sticking out of a jacket pocket?**

A. I could only see the right pocket and no.

**Q. Did you see any bulges or lumps that you believe could possibly be a weapon?**

A. From what I saw of him, no, but again, he had a jacket on covering his body.

**Q. And I understand you only know what you saw, but what you saw was nothing that either was a weapon or that you could have mistaken for a weapon; is that correct?**

MR. PIGG: Object to form.

BY MR. BAILEY:

**Q. You can answer.**

A. I -- correct.

**Q. During the time he was on the porch, did this individual ever speak to you?**

A. No.

**Q. Did you ever hear him speak to anyone?**

A. No.

**Q. Did you ever see his mouth moving, indicating that he was speaking even though you couldn't hear the words?**

A. No.

**Q. How long was he on the porch from the time he first stepped out until the time the shot occurred?**

A. It was definitely less than a minute.

**Q. What did you see Mr. Finch doing at the time just before the shot occurred?**

A. I didn't have a visual of Mr. Finch then. He had backed into the threshold of the doorway, and from my angle, I couldn't see any more of him.

**Q. During the time you could see him, did you see anything which led you to believe that he was a threat to yourself or other officers?**

A. It was unknown at that time.

**Q. At anytime from the time he stepped out onto the porch until the shot occurred, did you**

**hear any other officers express anything that they were seeing or hearing that indicated that they saw or perceived a threat by Mr. Finch?**

A. No, I was yelling at the time that he was out on the porch.

**Q. How did you know that the shot had taken place?**

A. I heard the gunshot.

**Q. At the time you heard the shot, had you seen anything that led you to believe that the application of lethal force was necessary?**

A. From my perspective, no; but, again, I lost visual of him as he went back into the threshold.

**Q. And again, I understand other officers are going to have different perspectives. All my questions are going to be directed to you and your perspective.**

**You didn't see anything, if I'm understanding you, from the time he stepped out onto the porch until the time the shot was fired that you perceived as a threat to yourself or any other officer?**

A. From what I could see, no.

**Q. Were there any officers on the scene at the time Mr. Finch was on the front porch that were closer to Mr. Finch than you were?**
A. Not that I know of.
**Q. Did you see any indication of the shot other than hearing it?**
A. What do you mean?
**Q. Did you see anything that demonstrated to you that yes this person who had been standing in the door had been shot?**
A. I saw Finch -- I didn't see him fall back, but his feet came up into the air after the shot, and I also saw sparks coming off the screen door.
**Q. What did you do next?**
A. Held my position.
**Q. Did you hear anyone on the radio say anything about the shot being fired?**
A. Yeah, someone came on the radio and said that shots had been fired.
**Q. Anyone say why shots had been fired?**
A. No.
**Q. Then what happened next?**
A. Held our positions as a plan was formulated for further action.

**Q. Who was formulating the plan?**
A. Sergeant Jonker was the one I could hear on the radio, whose voice stuck out.
**Q. And what plan was formulated?**
A. To be honest, I don't recall, initially, what it was. I know at some point a WPD Tahoe pulled into the driveway of 1033. And then we moved from our position of the residence to the east to that, and that's when it was relayed to us that officers were going to go up to the porch and either try to retrieve Finch or what they, ultimately, did was make entry.
**Q. Did you ever make entry in the house?**
A. I did not.
**Q. At some point, people came out of the house on the east side door?**
A. Correct.
**Q. When was that?**
A. After the shot, after Finch was shot.
**Q. Did you have any dealings with those people that came out?**
A. I did.
**Q. Tell me about that.**
A. After the shot, it was a short time after that that the east door opened up. Again, from my position at the residence to the east, I had the best vantage point. Began giving them verbal commands to put their hands up and to exit. The first one was a female, a white female. She complied and started to walk out slowly. Behind her was a white male. He also complied. Put his hands up and began to walk out, when I called them out, all the way to our position where they were taken into custody.

**Q. Anyone else other than those two that came out of the house?**
A. From that doorway at that time, no.
**Q. At any later time?**
A. After the element that went inside to clear the residence, they located another male inside.
**Q. Did you ever observe a young woman, a young girl teenage age, step out of the house?**
A. I don't recall.
**Q. What happened to the white female, white male that you saw step out?**
**Who took custody of them?**
A. The white male I called over to our position, and he was taken into custody by a PD officer, I believe. And the white female I called to myself, I handcuffed her, and then passed her off to a WPD officer; I don't know who.

**Q. And after those two were passed off to WPD officers, what did you do next?**
A. I resumed my covering of the east and north side of the residence until the time that the Tahoe arrived in the driveway.
**Q. And then if I'm understanding you, you moved behind the Tahoe to use as cover while you continued to watch the east and north sides?**
A. Correct.
**Q. And how long did that last?**
A. My being at the Tahoe?
**Q. Yes.**
A. I was there till the conclusion of the incident.
**Q. After you dealt with the white female and the white male that came out, resumed your observation of the front and east sides, that, essentially, if I'm understanding you, was the last activity that you had that evening?**

**Q. Any kind of conversation whether one on one or otherwise?**
A. What do you mean?
**Q. You said not a one on one conversation, which suggests to me that there was something other than a one on one conversation so that's what I'm trying to find out.**
A. The news reports and stuff of the following proceedings and Officer Rapp's testimony.
**Q. Are you familiar with Officer Rapp's testimony?**
A. No, just the broad outline of it.
**Q. You ever talked with him since this incident?**
A. Yes.
**Q. Tell me about that.**
A. It was when we were looking for a missing juvenile and we were searching a large park area, and it was just conversation about that situation.
**Q. Any conversation with him about this incident?**
A. No.
**Q. Have you read a transcript of his testimony or only heard what came across the news reports?**

A. Only heard.
**Q. And what have you heard, based on the reports that you saw?**
A. That he perceived that he had to take the shot because of the call that we were dispatched to and the situation, and that he felt that the suspect going back in the residence was a danger to either the people that were still in the residence or to us.
**Q. Based on your limited understanding, you believe or understood that Officer Rapp ever saw a weapon?**
A. Not that I know of.
**Q. Any point in time at the time Mr. Finch stepped out on the front porch until he was shot, have you reached a conclusion in your mind whether this individual was the shooter, a hostage, or some other third party?**
A. I didn't think he was a hostage.
**Q. Why was that?**
A. 'Cause most hostages don't go back into the building that they were being held hostage in, and he was backing up into the residence again. So that led me to believe that he was either involved with it not as a hostage, or

as a third party in some respect.
**Q. At the time the shot was fired, was Deputy Headings on your right side or left side?**
A. Right side.
**Q. At any point in time prior to the shooting, had you heard any other officers announce themselves as sheriff deputies or Wichita Police Department?**
A. Not that I recall.
**Q. Let's talk about your interview after the incident.**
**How long after this incident were you interviewed?**
A. A few hours.
**Q. And where was that?**
A. In the Wichita Police Department investigation section.
**Q. And do you know the officer that interviewed you?**
A. It was a Detective Balthazar.
**Q. Have you dealt with him before?**
A. No.
**Q. Was there anyone else in the room besides him and you?**
A. No.

**Q. What did you understand was the purpose of that interview?**
A. To establish what I had seen and give my account of the incident.
**Q. At the time that interview took place, did you understand that, in fact, the call that was made about the residence there at 1033 McCormick was fabricated?**
A. Yes.
**Q. Did you understand that one of the purposes of the investigation was to determine whether the officer who fired that shot was justified in doing so?**
A. For what I was involved with, probably, yeah.
**Q. When Mr. Finch stepped out onto the front porch that evening, did you turn the light on on your rifle?**
A. I did.
**Q. And how long did that remain on?**
A. Until he backed into the threshold.
**Q. Were there any other lights that you saw come on to help illuminate the scene other than your light?**
A. Not that I recall.
**Q. Was there a porch light on on that porch that**