# EXHIBIT 9

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

```
         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF KANSAS

 LISA G. FINCH, Individually, as   )
 Co-Administrator of the Estate    )
 of Andrew Thomas Finch,           )
 deceased, and as Next Friend      )
 for her minor granddaughter,      )
 AF; DOMINICA C. FINCH, as         )
 Co-Administrator of the Estate    )
 of Andrew Thomas Finch,           )
 deceased; and ALI ABDELHADI,      )
                                   )
         Plaintiffs,               )
                                   )
     vs.                )Case No.
                        )18-CV-01018-JWB-KGS
                                   )
 CITY OF WICHITA, KANSAS;          )
 JOHN DOE POLICE OFFICERS 1-10,    )
                                   )
         Defendants.   )
                        )

              D E P O S I T I O N

    The videotape deposition of CHRISTOPHER RONEN taken
 on behalf of the Plaintiffs pursuant to the Federal Rules
 of Civil Procedure before:
         RICK J. FLORES, CSR
         KELLEY REPORTING ASSOCIATES, LTD.
         515 South Main, Suite 108
         Wichita, Kansas  67202

 a Certified Shorthand Reporter of Kansas, at 455 North
 Main, 13th Floor, Wichita, Sedgwick County, Kansas, on
 the 27th day of December, 2018, at 1:08 p.m.
```

Page 1

---

```
         A P P E A R A N C E S

PLAINTIFFS:
    CONLEE SCHMIDT & EMERSON, LLP
    Mr. Rick E. Bailey
    Suite 300
    200 West Douglas
    Wichita, KS  67202
    (316) 264-3300
    Fax:  (316) 264-3423
    rbailey@fcse.net

DEFENDANTS:
    FISHER PATTERSON SAYLER & SMITH, LLP
    Mr. J. Steven Pigg
    3550 S.W. 5th Street
    Topeka, KS  66606
    (785) 232-7761
    Fax:  (785) 232-6604
    spigg@fisherpatterson.com

VIDEOGRAPHER:
    ADVANCED DOCUMENT IMAGING
    Mr. Michael Miles
    515 S. Main, Suite 108
    Wichita, KS  67202
    (316) 267-9380
    (316) 267-8200
    Video@kelleyreporting.com

Also present was Ms. Lisa Finch.
```

Page 2

---

```
                    I N D E X

CHRISTOPHER RONEN
Direct Examination by Mr. Bailey:           4


Ronen Exhibits
No. 74 - Aerial Map of 1033 W. McCormick    18
         Area w/Markings (1 pg)











SIGNATURE OF WITNESS                        103
CERTIFICATE                                 104
```

Page 3

---

```
            VIDEOGRAPHER:  This begins the
    videotape deposition of Christopher Ronen.
    Today is December 27th, 2018, and the time is
    1:08 p.m.
            Will the court reporter please swear
    in the witness.
            CHRISTOPHER RONEN
having been first duly sworn on his oath to
state the truth, the whole truth, and nothing
but the truth, testifies as follows:
            DIRECT EXAMINATION
BY MR. BAILEY:
    Q.  Could you state your name for the record,
    please.
    A.  Christopher Ronen.
    Q.  And how are you currently employed?
    A.  City of Wichita as a police officer.
    Q.  Have you ever had your deposition taken
    before?
    A.  I have not.
    Q.  I know you've had the opportunity to talk
    with Mr. Pigg about what a deposition is and
    what you might expect, but I'd like to go
    through a few ground rules and issues just to
    make sure that you and I are on the same page
```

Page 4

Page 13

1    first?
2    A.  I was not. I was by myself. Well, I'm
3        sorry. So right out of the academy you go
4        into a 12-week field training program where I
5        cycled through three or four different senior
6        officers that trained me how to do the job in
7        the field, and then I went into patrol west
8        fourth watch by myself.
9    Q.  What officers did you work with during that
10       12-week field training?
11   A.  I worked with an officer who's still employed
12       by the city named Nick Halls. I worked for
13       an officer that is actually now deceased; his
14       name was Robert Golding. And then I worked
15       with another officer who's still on the
16       department named Eric Little.
17   Q.  So 12 weeks, three officers, it sounds like
18       you spent about four weeks with each one?
19   A.  Yeah, that's accurate.
20   Q.  How long were you on fourth watch?
21   A.  I was on fourth watch west for about two and
22       a half years.
23   Q.  And when you left fourth watch west, what did
24       you then -- what was your next assignment?
25   A.  I went to fourth watch south.

Page 14

1    Q.  Same general duties and responsibilities?
2    A.  Yes.
3    Q.  Were you assigned to a partner then?
4    A.  I was not.
5    Q.  About what year was that?
6    A.  I went to south side in February of 2015.
7    Q.  How long did you remain in that position?
8    A.  Until December of 2016.
9    Q.  And what was your assignment then?
10   A.  I took a position as a -- as Patrol South
11       SCAT, which stands for Special Community
12       Action Team.
13   Q.  And what were your duties and
14       responsibilities as Patrol South SCAT?
15   A.  A strong majority of my day every day was
16       spent monitoring drug locations in south
17       Wichita and stopping drug offenders and
18       trying to build cases that eventually result
19       in arrests of drug dealers.
20   Q.  Did you have a partner at that time?
21   A.  I did.
22   Q.  Who was that?
23   A.  Kyle Perry.
24   Q.  At some point, I understand that the SCAT
25       teams were dissolved; is that correct?

Page 15

1    A.  Yes.
2    Q.  When was that?
3    A.  January 2018.
4    Q.  So how did your assignment change?
5    A.  I -- in January of 2018, I moved into the
6        violent crime response team.
7    Q.  Did the violent crime response team exist
8        before January 2018?
9    A.  No.
10   Q.  What are your duties as a part of the violent
11       crime response team?
12   A.  We kind of wear two hats. We respond to
13       shootings and gang related violent crimes, as
14       well as homicides. And when we -- there
15       isn't an active shooting or homicide
16       investigation, we do what I would call
17       proactive gang suppression.
18   Q.  And what does that mean?
19   A.  That means we have identified, through
20       intelligence gathering and through
21       interviews, a collection of 50 to 100 of
22       Wichita's most active gang members, whether
23       it be shooting people, robbing people,
24       selling drugs, selling guns, carrying guns,
25       and we try and proactively stop them and see

Page 16

1        if they are possessing any of those things
2        and arrest them if they are.
3    Q.  Since you were assigned to the violent crime
4        response team in January of 2018, do you have
5        a partner?
6    A.  I do.
7    Q.  And who is that?
8    A.  Kyle Perry.
9    Q.  So you and he have been partners ever since
10       December of 2016?
11   A.  Yes.
12   Q.  Let's turn now to December of 2017,
13       particularly, the day of the Finch shooting,
14       which was December 28th of that year.
15           What was your assignment that day?
16   A.  Patrol South SCAT.
17   Q.  And did you have any particular duties or
18       assignments that day?
19   A.  I don't believe so.
20   Q.  What were you doing at the time the call came
21       in?
22   A.  If my memory serves me correctly, we were
23       parked south of Pawnee and Washington
24       watching a gang member's house.
25   Q.  And how did the call come in?

```
 1      four that were shouting at him?
 2   A. Yes.
 3   Q. How many?
 4   A. I can't tell you that. I don't know.
 5   Q. Were you shouting?
 6   A. I was not shouting.
 7   Q. And you could hear shouting from other
 8      officers, as well as those that were right
 9      around you?
10   A. Yes, from across the street to the north. I
11      can't tell you who was shouting, but I can
12      tell you that there's a difference between
13      someone next to you or in front of you
14      shouting "police, show me your hands" and
15      someone that's 40 or 50 yards away from you
16      shouting "police, show me your hands." So
17      that's how I can confidently say of hearing
18      those two things.
19   Q. Did you hear anyone shouting "crossfire"?
20   A. I believe -- I don't -- I don't remember
21      hearing anyone discuss crossfire until after
22      I heard a shot.
23   Q. How long had you been on the scene when this
24      individual first stepped out onto the front
25      porch?
```
45

```
 1   A. I will tell you that the night this happened,
 2      I had interpreted us being there for around
 3      10 minutes. But as the investigation
 4      progressed that night, I learned that we were
 5      there for a very short amount of time,
 6      like -- my memory tells me we were only there
 7      for like 2 or 3 minutes before the incident,
 8      before the shot was fired.
 9   Q. And what information did you receive that
10      changed your mind about how long you were
11      there?
12   A. I think that was just from detectives that
13      night. So I had been interviewed and then,
14      you know, no one talks to one another until
15      they're interviewed by detectives. And once
16      you're interviewed, you can get back together
17      with the people that you work with and start
18      discussing what happened out there, how long
19      do you think we were there. Well, I don't
20      know. How long were we there? Someone -- I
21      don't remember who -- must have gone and
22      asked, you know, or called dispatch, hey, how
23      long were we there on scene to when we called
24      shots fired. And eventually someone figured
25      out, wow, we were only there for 2 minutes.
```
46

```
 1      It felt like we were there forever.
 2   Q. So this was in discussions after your
 3      interview up here on the sixth floor, but
 4      still that same evening?
 5   A. Correct.
 6   Q. Who were you having those conversations with?
 7   A. I don't remember. I would say Officer Perry
 8      'cause we had -- you know, we had been apart
 9      for now several hours and getting back
10      together to now talk about what had actually
11      happened, since I hadn't had a chance to talk
12      to him since it all happened. But I can't
13      say that for sure. There was a lot of people
14      up there so it could have been really anyone.
15   Q. And where did this conversation take place?
16   A. I can't give you specifics. I don't
17      remember. Somewhere at the city building on
18      the sixth floor.
19   Q. Was Officer Rapp one of the ones that was
20      involved in this conversation?
21   A. No.
22   Q. What about Officer Powell?
23   A. No, I would not have sought out Powell or
24      really Rapp to discuss that with them. I
25      know both of them, but I wouldn't really call
```
47

```
 1      them my friends. We're just coworkers. So
 2      that is not a conversation that I would go
 3      after and just chat about that with them.
 4   Q. But there was more than just Officer Perry in
 5      this conversation?
 6   A. I don't know. I don't -- I don't remember.
 7   Q. So this person steps out on the front porch,
 8      there's loud shouting from all over, they
 9      raise their hands up below their shoulders,
10      and then what happens?
11   A. Well, their hands don't stay up very long, a
12      second or 2, 3 seconds. I don't -- it's hard
13      for me to describe the timeframe. In those
14      stressful things, time really kind of slows
15      down. But it -- my perception was his hands
16      stay up for a short amount of time before
17      they go back down.
18          And then I vividly remember the second
19      volley of yelling "police, show me your
20      hands", and people are now getting concerned.
21      It's a different kind of yelling. And the
22      best way I can explain that to you is when
23      you -- when you're dealing with someone
24      during a stressful situation and they do what
25      you tell them to do, it's almost a sense of
```
48

```
 1      relief, right.  So as a police officer,
 2      you're like, okay, this person is going to
 3      listen to me.  They're going to do as I want
 4      them to.  This is becoming a safer situation.
 5          And I don't want to speak for everyone
 6      else that was there, but I remember when he
 7      put his hands down thinking -- I remember
 8      being concerned, like this is not good.  Why
 9      is this person not listening to what we're
10      telling him.  This is a very, very serious
11      situation.  Why did he just put his hands
12      down.
13          And I'm telling you that I believe
14      other people were concerned, as well, because
15      of the way -- the new -- the new style of
16      yelling.  This second volley of yelling
17      "police, show me your hands" was different
18      from the first.  People were yelling louder,
19      quicker, almost more scared.  That's why I
20      feel -- that's why I think I can say that
21      people were concerned like I was about this.
22      People were getting frightened, like why did
23      this guy -- why isn't he doing what we need
24      him to do.
25          So he puts his hands back down.  And
                                                    49

 1      then people start yelling really loud again
 2      "show me your hands, put your hands up, show
 3      me your hands."  And he raises them again.
 4      He brings them back up again, and I can
 5      remember being like, okay, whew, all right,
 6      he's listening to us again, this is a good
 7      thing.
 8  Q.  During all this, did you have your weapon
 9      drawn?
10  A.  Yes.  The next thing that I remember is him
11      kind of turning towards us and his hands
12      going back down, and then a shot being fired.
13  Q.  When his hands went down, can you describe
14      for me a little more clearly where they were
15      going at the time the shot was fired?
16  A.  I did not see anything that specific.  I can
17      tell you I saw his hands go back down as he
18      turned.  I did not see him reach in a pocket.
19      I did not see him reach in his waistband.  I
20      did not see anything like that.  I saw him
21      turn and his hands go from here
22      (demonstrating) down as he turned.
23  Q.  Did he turn towards you or away from you?
24  A.  Well, as I'm describing it and thinking about
25      it now, I would say he turned towards me,
                                                    50

 1      towards where we were.
 2  Q.  Could you see where his eyes were tracking or
 3      focusing when he turned his body towards you?
 4  A.  I couldn't see his eyes.  His head was
 5      point -- you know, towards our direction, but
 6      I really have no idea where he was looking.
 7  Q.  Again, at this point in time, did he say
 8      anything or could you see whether his mouth
 9      was moving that he was attempting to say
10      anything?
11  A.  No.
12  Q.  Could you see well enough to determine
13      whether he had anything in his waistband or
14      the waist of his pants?
15  A.  I would say it was too dark and his clothes
16      were too baggy for me to see something from
17      as far away as I was.
18  Q.  Did you ever see anything in either of his
19      hands?
20  A.  No.
21  Q.  No weapon, no cell phone, nothing at all?
22  A.  Nothing.
23  Q.  Did he ever make any gestures which you
24      interpreted as threatening gestures?
25  A.  Threatening, no.
                                                    51

 1  Q.  Did he ever point at any of the officers that
 2      were there?
 3  A.  No.
 4  Q.  Give anyone the finger?
 5  A.  No.
 6  Q.  Clench a fist and shake it at them?
 7  A.  No.
 8  Q.  Any gestures of any kind like that that were
 9      threatening or intimidating?
10  A.  He didn't do anything that was threatening.
11      The aforementioned body language I would call
12      concerning.  I wouldn't say threatening.
13  Q.  And in your mind, what's the difference
14      between those two?
15  A.  Something threatening to me would seem
16      imminent like there is about to be -- or
17      something is going to happen like for sure.
18      If someone is threatening me, I need to act
19      on that.  Something concerning is what I
20      would call the preparation for me getting
21      ready to act and do something.  So as in a
22      sense, I am warming up for the threatening
23      behavior, getting ready to act.  That's how I
24      would describe concerning.
25  Q.  So the behavior you saw was the warming up,
                                                    52
```

**Page 61**

one -- none of the officers had been shot.

There was some talk about getting, you know, some EMS personnel ready to go to assist this person.

And then there was a huge plan that was getting started and devised about sending a dog, a K9 -- a K9 -- a police dog to go and latch onto the person that was laying on the front porch's clothing, and then dragging them away from the danger area of the residence or the front door, just getting them out of that area. So there was several minutes of getting set up for that operation until, eventually, whoever -- I don't remember who -- someone deemed that that was not going to work because of a door, the storm door or something was in the way.

But I eventually -- during that plan, I take a new position at the foot of the eastern drive of 1033 right at McCormick and the private drive behind a police Tahoe, where I begin watching a high window over the front porch after the shot has fired.

Q. Let me stop you there and ask a question.
A. Uh-huh.

**Page 62**

Q. If the person who had stepped out on the front porch was, indeed, the shooter and they had been shot, why were all these precautions needed to get the other innocent victims out of the house?
A. You know, that's kind of just a hard thing -- I guess that's hard to explain for -- that's just the way it has always been done, as far as tactically speaking, which I know seems silly. And before I was a police officer, I probably would have had the same question: What's the danger? Why is there anymore concern, right?

But everything in this job when you're trying to do things safe and tactically speaking, I've noticed, is to slow things down.

So I can't speak for Sergeant Jonker, but I can't say that I disagree either with the way things were -- why we wouldn't just go rush up on the porch, because there could have been another, which -- and I know that to someone who isn't a police officer or a military person, it sounds crazy that, well, there can't be another shooter in the house.

**Page 63**

You're just -- you could what-if this to death, but I will tell you that every police officer that I have ever come into contact always says where there's one, there's two. And that is just in the spirit of being extremely thorough, cautious and safe.

So the example would be you find something illegal on someone; well, your search isn't done 'cause there could be more illegal things that could harm you. And when there's -- and we're trained for -- from day one, you know, even -- where there's one, there's two; where there's one gun, there's two; where there's one robber, there's two robbers; where there's one gunman, there's two gunmen. And that's the only way I can really describe that to you.

And in the spirit of being completely sure that there isn't a second gunman, that is why you just don't run up on the porch and drag them off yourself and go just walking into the house as if everything is now solved and done and okay and cleaned up, because it just isn't that clear in that -- at that moment in time.

**Page 64**

Q. Did you sense any urgency in the discussions that you heard in trying to get to the person who had been shot to administer aid to them?
        MR. PIGG: Object to form of the question.
Q. You can answer.
A. I can't say that I had a real sense of urgency, you know. I didn't -- you know, I understand that that's -- I sense the danger of that question, I'll be honest, but I can't say that I remember anything just super urgent sticking out in my mind that we had to give aid to that victim.
Q. How long was it before someone actually entered the residence after the shooting?
A. I would approximate somewhere 3 to 5 minutes.
Q. Did you ever enter the house?
A. No.
Q. When did you notice that your body cam was not on that night?
A. I can't remember exactly when I noticed that, but I will say that I thought even that night that I got it on in time to catch the shooting on the 30 second playback. I know

```
 1    now that that didn't happen, but I remember
 2    shortly after the shot being fired
 3    thinking -- or checking to see if my camera
 4    was on, realizing it wasn't, and turning it
 5    on.  And I thought that I would be within
 6    that 30 second lookback, and now I know that
 7    I was not.
 8  Q. Do you recall attempting to turn on your body
 9    cam at anytime prior to that look, after the
10    shot, that you made?
11  A. I have no conscious thought of trying to turn
12    it on.  But that being said, I also have no
13    conscious thought of, you know, purposefully
14    not turning it on.
15       If you're -- I suspect that you would
16    be looking for explanation on why it wasn't
17    on, and to be completely honest, I don't have
18    a great explanation.  The best explanation
19    that I can provide to someone who has never
20    done police work or been into a high
21    stressful situation where you're thinking
22    that there is a murderer and an active --
23    active killer barricaded in a home or in a
24    home where more people are going to get
25    killed or police are going to get shot at or
```

65

```
 1    something extremely stressful, where your
 2    safety and your partner's safety are -- and
 3    innocent victims' safety are to the utmost
 4    concern, I'll be honest, the camera just was
 5    kind of low on my list of priorities.  And
 6    that's the best explanation I can give.
 7    There was no mal intent keeping it off.  I
 8    just forgot.
 9  Q. Have you received any kind of discipline or
10    reprimand for your failure to get the body
11    cam on prior to the shooting?
12  A. I have been served no official discipline.
13  Q. How about unofficial?
14  A. I was spoken with by Sergeant Jonker that
15    night about how displeased the investigators
16    were that my camera was not on.  And I
17    suspect that that was noted in my file, but I
18    don't know for sure.
19  Q. Have you come to learn that Officer Perry
20    also did not turn his body cam on until after
21    the shooting?
22  A. I have learned that.
23  Q. How did you learn that?
24  A. When we had our meeting with Mr. Pigg.
25  Q. At anytime have you looked at any of the body
```

66

```
 1    cams that showed the actual shooting?
 2  A. Only what the news had.  I saw what the
 3    police department released to the news.  And
 4    I didn't see that in a police department type
 5    of role.  I just saw that watching the news.
 6  Q. How long were you there on the scene after
 7    the shooting?
 8  A. Not very long.  I would say that after the
 9    shot had been fired and the officers had went
10    in and went inside the residence and cleared
11    around, that I was there no longer than 15 or
12    20 minutes before a different officer besides
13    Perry drove me to investigation section to be
14    interviewed.
15  Q. Were you involved in removing Andrew Finch
16    from the residence?
17  A. No.
18  Q. Involved in giving him any aid or assistance
19    afterwards?
20  A. No.
21  Q. Were you able to see any of the aid that was
22    or wasn't given to him afterwards?
23  A. The last memory I have of Mr. Finch is two or
24    three officers carrying him off the porch and
25    carrying him either straight off the porch --
```

67

```
 1    straight off the porch to the north like into
 2    McCormick or carrying him off the porch and
 3    then going to the west.  I don't remember
 4    where the ambulance was.  That's the last
 5    memory I have of Mr. Finch.
 6  Q. When did you first learn that this had been a
 7    swatting incident?
 8  A. After the shot had been fired, I still
 9    believed wholeheartedly that it was a murder.
10    That that man had murdered his family or a
11    member of his family.
12       As the team of officers went inside of
13    the residence and began clearing, I remember
14    being extremely concerned for their safety
15    because I truly believed that they were going
16    to engage in a shootout inside the house with
17    the man who was now back on the phone stating
18    that he was holding his family at gunpoint in
19    the closet upstairs, and then also that he
20    was going to set the house on fire.  And I
21    don't remember -- I'll be honest, I don't
22    remember what I was thinking about Mr. Finch
23    at that time.  I was thinking -- I don't
24    know.  I didn't have thoughts about him at
25    that time.  Obviously, somewhere in my brain
```

68

**Page 81**

    He's a K9 deputy. And then there were
several out of jurisdiction Sumner County
deputies -- I don't know their names -- that
were involved in that, as well.
Q. You've told me about three.
   Any other officer-involved shootings?
A. I think that's it.
Q. Have you ever had a complaint made against
   you concerning your use of force?
A. No.
Q. Have you ever made a complaint against
   another officer because of that officer's use
   of force?
A. No.
Q. What's your understanding of the procedure to
   do so?
A. Well, I can't say that I'm aware of the
   formal procedure, but I do know that we have
   a duty to intervene and a duty to tell a
   supervisor, someone above us. So I would --
   I would go to my direct supervisor if I saw
   something extremely concerning.
       Or, even before that, you know, I
   would intervene and tell someone to stop
   doing something just as it was happening

**Page 82**

   'cause I know that criminally and civilly
   that me, myself, as a person, if I saw -- was
   witnessing another police officer doing
   something excessive and way out of line that
   I -- that, you know, I can't just stand there
   and allow it -- let it happen so. . .
Q. And I understand you were involved in a
   debrief session after the Finch shooting with
   Officer Rapp and his wife, Officer Perry, and
   perhaps some others.
       Do you recall how long after the
   shooting that was?
A. Yeah, I would guess 4 to 7 days.
Q. And do you recall where that was?
A. Uh-huh.
Q. Where?
A. That was at a church near 21st and Tyler on
   the west side of town.
Q. You recall, other than the people that I
   listed, any of the other people who attended
   that?
A. Yeah, I think Sergeant Jonker and another
   police officer by the name of Skyler
   Boatright were there. And I think Officer
   Schepis was there, as well.

**Page 83**

Q. And how long did that session last?
A. No longer than two hours.
Q. Other than that debrief, have you had
   conversations with any other officers who
   were involved in the Finch shooting about the
   Finch shooting?
       And I'll exclude Officer Perry 'cause
   you've told me conversations with him.
A. I've -- I have not spoken with anybody,
   really, about the shooting since it happened.
   I have spoken with Rapp a fair amount of
   times about his work situation.
       And I don't know how familiar you are
   with it, but, essentially, he just -- he
   wasn't allowed to go back to work for a long
   time. And he, after the dismantling of SCAT,
   ended up on the same team as me, this violent
   crime team. So I was seeing him a lot at
   work. So, you know, occasionally I would ask
   him hey, what's the word? When are you
   coming back to the street? That's like slang
   term for police officers, when are you going
   to be back in a patrol vehicle riding around
   doing things that we do.
       And, you know, he would explain his

**Page 84**

   situation to me, basically, that he didn't
   know when he was going to be back on the
   street. He had been given several different
   timelines that the timelines come to head,
   and then he's extended further out by the
   command staff of this police department.
       And other general conversations, you
   know, how his wife was doing. And there were
   some things that he went through with some
   citizens in this community where, you know,
   they were talking about messing with his
   house and things like that and -- so, but no,
   nothing specific like about the shooting with
   anyone, really, since it happened or since
   that debrief.
Q. What did he tell you about why he believed he
   was not being put back to work on the street?
A. He told me that the command staff was not
   allowing him back on the street because they
   were concerned about his safety.
       So he would further elaborate and say
   that the citizens in the community that were
   really upset with him, once they believed or
   found out that he was the one who had shot
   Mr. Finch, the command staff was concerned