# EXHIBIT 10

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

```
                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS

   LISA G. FINCH, Individually, as   )
   Co-Administrator of the Estate    )
   of Andrew Thomas Finch,           )
   deceased, and as Next Friend      )
   for her minor granddaughter,      )
   AF; DOMINICA C. FINCH, as         )
   Co-Administrator of the Estate    )
   of Andrew Thomas Finch,           )
   deceased; and ALI ABDELHADI,      )
                                     )
             Plaintiffs,             )
                                     )
                                     )
        vs.           )Case No.
                      )18-CV-01018-JWB-KGS
                                     )
   CITY OF WICHITA, KANSAS;          )
   JOHN DOE POLICE OFFICERS 1-10,    )
                                     )
             Defendants.             )

                      D E P O S I T I O N

     The videotape deposition of JAMIE SCHEPIS taken on
behalf of the Plaintiffs pursuant to the Federal Rules of
Civil Procedure before:
          RICK J. FLORES, CSR
          KELLEY REPORTING ASSOCIATES, LTD.
          515 South Main, Suite 108
          Wichita, Kansas  67202

a Certified Shorthand Reporter of Kansas, at 455 North
Main, 13th Floor, Wichita, Sedgwick County, Kansas, on
the 27th day of December, 2018, at 9:03 a.m.
```

                        Page 1

```
                    A P P E A R A N C E S

PLAINTIFFS:
     CONLEE SCHMIDT & EMERSON, LLP
     Mr. Rick E. Bailey
     Suite 300
     200 West Douglas
     Wichita, KS  67202
     (316) 264-3300
     Fax:  (316) 264-3423
     rbailey@fcse.net

DEFENDANTS:
     FISHER PATTERSON SAYLER & SMITH, LLP
     Mr. J. Steven Pigg
     3550 S.W. 5th Street
     Topeka, KS  66606
     (785) 232-7761
     Fax:  (785) 232-6604
     spigg@fisherpatterson.com

VIDEOGRAPHER:
     Advanced Document Imaging
     Mr. Michael Miles
     515 S. Main, Suite 105
     Wichita, KS  67202
     (316) 267-9380
     (316) 267-8200
     video@kelleyreporting.com

Also present was Ms. Lisa Finch.
```

                        Page 2

```
                         I N D E X

JAMIE SCHEPIS
Direct Examination by Mr. Bailey:          4
Cross-Examination by Mr. Pigg:           130


Schepis Exhibits
No. 72 - WPD SWAT Standard Operating      55
         Procedures (30 pgs)

No. 73 - Aerial Map of 1033 W. McCormick  63
         Area w/Markings (1 pg)
```

SIGNATURE OF WITNESS                      133
CERTIFICATE                               134

                        Page 3

         VIDEOGRAPHER:  This begins the
   videotape deposition of Jamie Schepis.  Today
   is December 27th, 2018, and the time is 9:03
   a.m.
         Will the court reporter please swear
   in the witness.
              JAMIE SCHEPIS
   having been first duly sworn on his oath to
   state the truth, the whole truth, and nothing
   but the truth, testifies as follows:
              DIRECT EXAMINATION
   BY MR. BAILEY:
   Q.  Can you state your name for the record,
       please.
   A.  Jamie Schepis.
   Q.  And how are you currently employed?
   A.  With the Wichita Police Department.
   Q.  Have you ever had your deposition taken
       before?
   A.  Not like this.
   Q.  I'm sure you've had the opportunity to talk
       with your lawyer about what a deposition is
       and what you might expect here today, but I'd
       like to go over a few things just to make
       sure that you and I are on the same page here

                        Page 4

1  which would help us decide.
2  Q.  And again, while you were on the SCAT team
3  planning search warrant execution, who on the
4  team was responsible for making the decision
5  about which philosophy you would use?
6  A.  A lot of time it was intelligence based on
7  what we knew from the residence, the layouts.
8  I was -- eventually got on the -- on the SWAT
9  team in 2014.
10     So, of course, everything goes up the
11  chain of command as far as how you want to do
12  things, but it was a lot of time more of a
13  roundtable type decisionmaking process for
14  everywhere from the entry, how we were going
15  to approach the residence and what manner we
16  were going to approach.  If we were going to
17  get in -- have people load in vehicles and
18  get out in the front with lights and sirens
19  on and do it that manner; or, we were going
20  to park down the street and walk in on foot
21  to be more stealthy.  All that stuff was
22  essentially laid out and, of course, went
23  through my immediate supervisor and then up
24  the chain to a lieutenant who reviewed
25  everything.  But a lot of times it was more

29

1  of a roundtable.  We'd just kind of get
2  together and feel what we thought was the
3  best.
4     Ultimately, Sergeant Jonker would have
5  the final say, but having had experience
6  late -- from at least the later -- latter two
7  years of being with Sergeant Jonker, my
8  experience in SWAT a lot of times, I mean, I
9  would bring ideas to the table that he -- a
10  lot of times he didn't object to.
11 Q.  You joined SWAT, you said, in 2014?
12 A.  Correct.
13 Q.  What was the process for joining SWAT?
14 A.  We had what we call hell days.
15 Q.  And what are hell days?
16 A.  Essentially -- well, I went through three of
17  them.  So essentially they are just long,
18  many hour days that are filled with
19  evaluation -- I would say processes of
20  evaluation.  Those processes of evaluation
21  are physical type things from pushing tires
22  up and down hills to shooting drills, scored
23  and graded shooting drills, to scenario-based
24  Simunition type grading process, and then
25  ended with a oral interview, which would be

30

1  probably a week or two after the initial hell
2  day.
3  Q.  Had you applied for SWAT more than once
4  before you were finally accepted?
5  A.  Yes.  I was accepted on my third try, or
6  attempt, whatever you would like to call it.
7  Q.  And why were you interested in joining SWAT?
8  A.  I'd had experience and had a -- was, I
9  guess -- in the Marine Corps, I was initially
10  sent after another hell day, they call it,
11  indoctrination into special forces with recon
12  right out of school of infantry, but ended up
13  not continuing the process of that for -- I
14  didn't like water, and a lot of the training
15  was water-based cold in Coronado, so I knew
16  that wasn't for me.  So going to what we call
17  the fleet Marine Corps, I got paired up in a
18  platoon that was called a direct action
19  platoon and we were corps'd with fifth --
20  fifth force recon.  There we learned -- I
21  learned and had a lot of training on close
22  quarter combat, learning philosophy and
23  tactics for fighting in structures.  And I
24  call it kind of high speed low drag type
25  of -- type of stuff.  And I've always -- from

31

1  day one, I knew I wanted to be a SWAT officer
2  on the department so I just --
3  Q.  What about that kind of activity appeals to
4  you?
5  A.  I think there needs to be people that are
6  competent, people that are -- can do that
7  type of job.  I think that I am.  I think I
8  keep myself in physical shape.  My weapon
9  skills, I can shoot well.  And I think that
10  once I retire, I would like maybe -- you
11  know, I would want somebody that had the
12  skills that I had to protect me, you know,
13  those crucial times so. . .
14 Q.  Other than being in good physical shape and
15  having good weapon skills, are there other
16  traits or abilities or attributes that you
17  think are important for a SWAT officer?
18 A.  Absolutely.  I mean, communication is
19  definitely -- definitely something you got to
20  be -- if you're going to do that, you got to
21  be able to teach your knowledge.  'Cause
22  there's no difference from a SWAT guy than a
23  normal guy, in my opinion, or gal.  We have a
24  SWAT gal.
25     But the only thing is is we hone and

32

```
 1    provide a highly trained and skilled tactical
 2    team as a resource for the Wichita Police
 3    Department in the handling of critical
 4    incidents."
 5         Is that your understanding as to the
 6    purpose of the SWAT team?
 7  A. Yes, sir.
 8  Q. I'd like you to turn next to Page 18. And in
 9    the middle of the page it has a section
10    marked definitions.
11         Do you see that section?
12  A. Yes, sir.
13  Q. And the first one is a barricaded incident.
14    Can you read that into the record, please.
15  A. In situations specific in place and time in
16    which a person, or persons, who is armed or
17    believed to be armed resists being taken into
18    custody.
19  Q. And how about hostage incident, can you read
20    the definition of that, please.
21  A. A situation in which a person, or persons,
22    holds another person, persons, against his or
23    her will by force, threat or violence and law
24    enforcement officers present at the scene are
25    attempting to obtain the release of the
                                                57
```

```
 1    person, or persons, quote-unquote, hostages
 2    being held at that location.
 3  Q. Like to turn now to the Finch shooting.
 4         What were your normal duties and
 5    responsibilities that day outside of SWAT?
 6  A. I was a SCAT officer.
 7  Q. And did you have any particular assignment?
 8  A. That particular night, no. I was trying to
 9    get caught up on some cases. And I was
10    actually -- I believe I had finished up some
11    reports from the night before, the shift
12    before. And then, also, I know when the
13    radio traffic kind of came out, I was on a
14    tape report on Dictaphone. So I was kind of
15    catching a little bit of it, but I was more
16    zoned into talking to my report.
17         Someone from the substation came
18    running into the front office and said, hey,
19    you probably better listen to this call. I
20    don't know who that was.
21  Q. So where were you at this time?
22  A. I was at patrol south at the very front where
23    it was -- 'cause it was past the hours of
24    where a secretary or we call it the BOF, the
25    badge on the floor, sits. So it's more --
                                                58
```

```
 1    there's peace and quiet up there and I was
 2    calling in my -- some taped reports from the
 3    previous nights.
 4  Q. And where is that substation located?
 5  A. Pawnee and Broadway. I think it's 211 East
 6    Pawnee.
 7  Q. And how, again, did you become aware of the
 8    call?
 9  A. I know I heard -- remember hearing tones,
10    which, when I say tones, certain type of
11    offenses, part 1 offenses are toned out, and
12    I believe it was a shooting tone, initially.
13    Definitely something I knew was -- perked my
14    ears up while I was talking, and then saying
15    maybe there was a hostage situation going on
16    or someone being held in a closet. So I was
17    trying to get my tape finished as fast as I
18    could so I could really listen to it and pay
19    attention, but I didn't get a chance. And
20    somebody came running up saying, hey, you
21    better listen to this. And my partner at the
22    time, which was Officer Boatright, was like,
23    we better go. So I hung up the phone and we
24    left.
25  Q. You said your partner was Officer Boatright?
                                                59
```

```
 1  A. Correct.
 2  Q. Is he also a member of the SWAT team?
 3  A. No, sir.
 4  Q. So what happened next?
 5  A. Ran to our vehicles. I still had not loaded
 6    my rifle and my gear up for the nightshift
 7    into my patrol car. So we did that as fast
 8    as we could while listening to the
 9    information. And then we tried -- there was
10    so much radio traffic, we didn't want to get
11    on the radio to have them repeat the address.
12    So I think I flipped to another station -- or
13    channel -- and asked them. And then I know I
14    tried to get on the computer 'cause I wanted
15    to read what was being said 'cause I knew me
16    and my partner had both missed some stuff.
17    So as we knew the general location, we were
18    heading that way. I was -- actually, I
19    believe I was driving. So my partner was on
20    there trying to get the information so we
21    could actually see what dispatch was typing
22    'cause it was kind of a confusing call, I
23    remember, right off the get go.
24         But it didn't help that I was also
25    doing other things and wasn't like in my
                                                60
```

1   A.  In accordance with the Wichita Police
2       Department Policy and Procedure manual, the
3       SWAT unit will be called out on all incidents
4       where it is believed that the hostage --
5       hostages -- sorry -- believed that hostages
6       have been taken.
7   Q.  Now was SWAT ever called out on this
8       incident?
9   A.  No, sir.
10  Q.  Even though you're a SWAT officer, were you
11      responding as a part of SWAT or were you
12      responding as part of your other Wichita
13      Police Department responsibilities?
14  A.  I was responding as a SCAT officer.
15  Q.  Did you believe, when you were responding,
16      that the training and experience and
17      expertise that you had developed as a part of
18      SWAT would be helpful in managing this
19      situation?
20  A.  To an extent, yes.
21  Q.  Did you ever reach an opinion as to whether
22      you believed SWAT should have been called
23      out?
24  A.  Absolutely.
25  Q.  And what was that?

85

1   A.  That the situation evolved way too rapidly
2       for that to occur.
3   Q.  And why do you say that?
4   A.  There was -- everything that was going on and
5       information coming was still so fresh and new
6       that we really weren't sure what we had.  We
7       knew we had an individual that was -- had
8       been shot, laying in a doorway.  We had
9       information that there was other stuff going
10      on, also, inside of the residence with
11      potential hostage, hostages.  We know we need
12      to render aid to the person in the doorway.
13      We know we potentially need to act on hostage
14      situation.  So there was too many
15      uncertainties for SWAT to have been called at
16      that particular time, in my opinion.
17  Q.  So in your opinion, those uncertainties all
18      need to be resolved before a decision can be
19      made to call SWAT?
20  A.  Not all resolved, but I would say more
21      clarity could have come to several of those
22      open ended before SWAT should have been
23      called.  We're dealing with exigents on this,
24      in my opinion.  And because of that exigents,
25      I think that the calling of SWAT would have

86

1       done nothing.  Would have taken us 45 minutes
2       to an hour to have responded, set up and done
3       anything.  The time of night, time of day, I
4       think, it, technically, probably would have
5       potentially slowed down this particular
6       process on this particular incident.
7   Q.  So in your opinion, calling out SWAT that
8       evening would have resulted in SWAT taking
9       45 minutes to an hour to respond and get set
10      up and be ready to deal with the situation?
11  A.  In any situation it takes 45 minutes to an
12      hour for SWAT to respond and get set up.
13  Q.  So the answer to my question is yes, it would
14      have taken 45 minutes to an hour for SWAT to
15      respond to this incident?
16  A.  Yes, roughly, give or take.
17  Q.  Because of that long delay from the time SWAT
18      is called out until they can get set up and
19      ready to respond, why wouldn't you call them
20      earlier rather than later?
21  A.  Like I said, there was still active things
22      going on that supervisors, people that
23      would -- that had the authority to do that
24      were dealing with.  This situation evolved
25      way too fast for that to have happened, in my

87

1       opinion.
2   Q.  And in your opinion, from what you said, SWAT
3       being called out would have slowed this
4       incident down, the response to the incident?
5   A.  Just the response, yes, sir.
6   Q.  Looking back now with 20/20 hindsight, would
7       slowing the response to this incident down
8       have altered the outcome of Andrew Finch
9       being shot dead?
10          MR. PIGG:  Object to form of the
11      question.
12  BY MR. BAILEY:
13  Q.  You can answer.
14  A.  I think there were several different things
15      that could have been done that could have
16      altered so just to pick one, potentially,
17      that could have been one.  In my opinion,
18      there were several other things that could
19      have altered.
20  Q.  Let's talk about each of those.
21  A.  Okay.
22  Q.  One would be SWAT being called out to slow
23      down the response to this.
24          What other things could have done --
25      been done that might have changed the

88

KELLEY REPORTING ASSOCIATES, LTD   515 S. MAIN, STE 105                    WICHITA, KANSAS
                                   316.267.8200                                67202

**Page 89**

outcome?

MR. PIGG: Object to form.

A. I think, potentially, verified, done more verification on where calls were coming from, but I don't know how all that works. I just know that phone calls were being transferred in from the city hall security. I do know that we -- Sergeant Jonker, specifically, remember hearing him trying to clarify this type of stuff and seeing where phones were being pinged or what towers they were coming -- specifically, I don't remember what. I just know that we were trying to clarify 'cause things were not making sense, both outside, and then especially once we got inside.

And if we look at hindsight, you follow directions, police. And I have never, never been a part of any situation where someone followed directions and they were punched, they were kicked, they were slammed, they were shot, never, in my career. I have never seen it. You see it on TV all the time. I have never seen that.

Q. And you didn't see it here because you didn't

**Page 90**

see anything that occurred prior to the shooting?

A. Correct.

Q. So you don't know --

A. We're hindsighting.

Q. Yeah.

A. Hindsight.

Q. And what hindsight do you have as to what occurred that led up to and caused the shooting?

MR. PIGG: Object to the form of the question.

BY MR. BAILEY:

Q. You can answer.

A. There's been all sorts of media coverage. There's been all sorts of things written as far as news articles written.

Can we talk about the briefing?

MR. PIGG: No. You're talking about the counseling?

A. Uh-huh.

MR. PIGG: No.

BY MR. BAILEY:

Q. You're referring to the briefing that occurred a week or two after the shooting?

**Page 91**

A. Roughly, yes.

Q. And again, I know your attorney has objected in the past and will continue to object to me learning about what went on in that briefing, but who attended that briefing that you're talking about?

And yes, you're allowed to answer that question.

A. All right.

MR. PIGG: Yes.

A. I recall myself, Officer Perry, Officer Ronen, Rapp, Rapp's wife, and, I guess, psychologist people or medical people associated with it. I think there was a member of the CISM team, as well, maybe two, actually, and I don't recall exactly which one. It was either Brunsching, Sergeant Brunsching or -- I can't remember his name, a different supervisor. And then I know there was two dispatchers, at least one or two dispatchers, and the -- one of our -- what do you call them -- clergy, one of our Wichita police -- I can't remember. Someone that represents as far as for being with the clergy so. . .

**Page 92**

Q. And how did you receive notice of this debriefing?

A. They're common and I think -- I don't know if I was on a e-mail or if I heard about it through Officer Perry and Ronen. I really don't recall. I just knew there was going to be a briefing.

Q. And was attendance at this briefing mandatory or voluntary?

A. It was voluntary.

Q. And why did you choose to go?

A. Just to be for -- be support since two of my other team members were involved, Officer Perry and Officer Ronen, and then dealing as I've known Rapp for a while. Just I really had no -- nothing to add. I didn't even speak at all. Just -- just to be there for support. 'Cause it was a very bad, difficult situation.

Q. Other than what you learned during that debriefing that we're not allowed to talk about, did you get information from any other source about what exactly transpired that led up to the shooting of Andrew Finch?

A. No, sir, other than what was briefed by our

```
 1       department that was put out on the news.
 2   Q.  And tell me, what do you recall about that?
 3   A.  Facts being wrong.
 4   Q.  What facts?
 5   A.  The facts on times and statements at certain
 6       times is one of the things I recall.  That
 7       the debriefing was actually -- created more
 8       issues than clarity for not only myself, but,
 9       I think, for others.
10   Q.  At some point in time, did you learn that
11       this had been what's been referred to as a
12       swatting incident?
13   A.  Yes, sir.
14   Q.  Had you heard that term before this incident?
15   A.  I had not.
16   Q.  Had you heard, prior to this incident, of
17       false calls being made to police in order to
18       generate a response?
19   A.  Yes, just false police report.
20   Q.  Had you heard of an incident in the year to
21       18 months prior to this incident that
22       occurred in west Wichita where a false call
23       was made that an individual had been shot and
24       others were taken hostage that later turned
25       out to be completely false?
                                                    93

 1   A.  I heard about that only after knowing about
 2       the swatting, learning what a swatting
 3       incident was.  So both incidents of what
 4       swatting is and then the west Wichita
 5       incident I learned following the Finch
 6       incident.
 7   Q.  So that wasn't something that you were
 8       officially notified about prior to the Finch
 9       incident?
10   A.  Correct.
11            MR. BAILEY:  Let's take a 5 or
12       10-minute break here.  They need to change
13       tapes.
14            VIDEOGRAPHER:  Off the record
15       11:14.
16            (A recess was taken from 11:14 a.m. to
17       11:22 a.m.)
18            VIDEOGRAPHER:  Back on the record
19       11:22.
20   BY MR. BAILEY:
21   Q.  Officer, have you been faced with a situation
22       when you have had to fire your weapon during
23       the course of your duties as a police
24       department officer?
25   A.  If I can, I'd like to not answer that
                                                    94

 1       question off of Fifth Amendment.
 2   Q.  Have you ever had any criminal charges filed
 3       against you?
 4   A.  Yes.
 5   Q.  When?
 6   A.  I don't know what year, but I was 15, 16
 7       years old.
 8   Q.  What charges were filed?
 9   A.  I don't know the exact terminology, but it
10       was just possession of a weapon as a juvenile
11       under so many lengths inches or -- I don't
12       know details.  It was long ago and I've never
13       looked into it.  Sometime in college, I
14       believe, after the Marine Corps, I went and
15       got it expunged.  That's really the only
16       thing I've dealt with since it happened.
17   Q.  Have you ever had any complaints made against
18       you while you've been in the police
19       department alleging that you used excessive
20       force?
21   A.  I don't believe so, no, sir.
22   Q.  Have you ever --
23   A.  I don't -- I don't -- I don't recall.  I
24       don't -- I don't believe so.  If there has,
25       there's never been any that I've been
                                                    95

 1       investigated on, like a formal investigation
 2       that I recall.
 3   Q.  Have you ever made a complaint against
 4       another officer that you believe used
 5       excessive force?
 6   A.  No, sir.
 7   Q.  What do you understand the responsibilities
 8       of an officer to report a fellow officer's
 9       use of force if they believe it's excessive?
10   A.  I believe you would have obligation to do it
11       ethically and legally and by policy, so
12       absolutely.  I don't have -- I would not have
13       a problem doing it whatsoever on any
14       violation, whether use of force or anything
15       else, and have had to do so in the past.
16   Q.  How many times have you had to use a firearm
17       during the course of your employment with the
18       police department?
19            MR. PIGG:  Object to form.  You
20       mean shoot one?
21            MR. BAILEY:  Yes.
22            MR. PIGG:  What do you mean by
23       use?
24            MR. BAILEY:  Yes.
25   BY MR. BAILEY:
                                                    96
```

### Page 125

```
 1      hostage HRT situation, and things were going
 2      through my head and how I'm going to do that,
 3      you know, while going up the stairs or if I
 4      encountered them at the stairs or once I got
 5      past the stairs. So my brain was just
 6      processing how I was going to do it.
 7   Q. How long would you estimate it took from the
 8      time you first arrived on the scene until the
 9      time you and others entered the front of the
10      residence?
11   A. I think 8 to 10 minutes. Longer than I
12      wanted, just because I knew we were going to
13      need to render aid, but at the same time for
14      safety and trying to figure out everything,
15      looking back, if we can look at hindsight, I
16      think now it was reasonable. Maybe even --
17      other than knowing we needed to render aid,
18      you know, I think it was fairly reasonable.
19   Q. I wanted to clarify something I wasn't sure
20      of: When you first went in the house, did
21      you render any aid to Andrew Finch?
22   A. No.
23   Q. Did you see any of the others render aid to
24      Andrew Finch?
25   A. They were behind me, sir. I think they were
```

### Page 126

```
 1      just trying to get him out. That's what I'm
 2      assuming, trying to get him out of that area
 3      'cause we had what's essentially a beachhead
 4      or a -- we call it a limited penetration,
 5      but, essentially, we're just using our body
 6      armor and ourselves to block angles and
 7      letting the other people behind us deal with
 8      getting them out. So we're basically being
 9      body shields for any potential other danger
10      was what I perceived I was doing and what I
11      was trying to do.
12   Q. Do you know how long it took from the time
13      you entered the residence until Andrew Finch
14      was carried out?
15   A. I do not. It was all behind me, sir. I can
16      say that once we went through and cleared the
17      bottom main floor and basement was probably
18      five minutes, and he was out by then, but I
19      don't know.
20   Q. And prior to this incident, did you know
21      Andrew Finch?
22   A. No. I remember an incident that he was
23      involved with now that I wasn't -- I was not
24      involved with. I remember hearing it on the
25      radio, which was by Officer McKenna, and I
```

### Page 127

```
 1      was involved in that. But prior to that, I
 2      did not recognize him. I had no -- no known
 3      history of him at all whatsoever.
 4   Q. And what was the incident that you're now
 5      remembering that you were involved in?
 6   A. Was an incident that -- this is post --
 7      realized that he was involved after this, but
 8      was an incident involving a car chase where
 9      he ended up in a pool in a backyard.
10   Q. That wasn't something you recalled prior to
11      this incident; it's been afterwards?
12   A. Yes, sir.
13   Q. Any other information that you've since
14      learned about Andrew Finch since the
15      shooting?
16   A. Yes.
17   Q. Tell me about that.
18   A. I do know, I believe he's been arrested 16,
19      17 times in 10 years. I think he's done
20      prison time twice. Was on community
21      corrections at the time of the incident. And
22      this is not fact, I've heard that he had
23      actually seen his ISO earlier that day and
24      had completed a urinalysis test earlier the
25      day of the incident.
```

### Page 128

```
 1   Q. And where did you get any of this
 2      information, the information he'd been
 3      arrested 16 times?
 4   A. And that's roughly. Preparing for this, just
 5      to know his criminal background, amount of
 6      police contacts he had, just looking through
 7      the mug -- all the mug booking photos. Now
 8      that's just our jurisdiction. I have no idea
 9      what -- outside of other jurisdictions. I
10      don't have access to their mugs.
11   Q. So is that something you did in preparation
12      for your deposition?
13   A. Yes, sir.
14   Q. I'm asking that because you didn't mention
15      anything about looking through mugshots or
16      doing that kind of research.
17           What other research did you do into
18      Andrew Finch in preparation for your
19      deposition?
20   A. I looked him up on the Kansas Department of
21      Corrections website to see what his
22      convictions were.
23   Q. And what convictions did you see?
24   A. I don't recall. I think evade, elude. I
25      believe -- I don't know specifically, but I
```