# EXHIBIT 11

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA G. FINCH, Individually, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased, and as Next Friend )
for her minor granddaughter, )
AF; DOMINICA C. FINCH, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased; and ALI ABDELHADI, )
                                )
            Plaintiffs,         )
                                )
                                )
        vs.                     )Case No.
                                )18-CV-01018-JWB-KGS
                                )
CITY OF WICHITA, KANSAS;        )
JOHN DOE POLICE OFFICERS 1-10,  )
                                )
            Defendants.         )
                                )

D E P O S I T I O N

The videotape deposition of DUSTIN FUSSELL taken on behalf of the Plaintiffs pursuant to the Federal Rules of Civil Procedure before:

        RICK J. FLORES, CSR
        KELLEY REPORTING ASSOCIATES, LTD.
        515 South Main, Suite 108
        Wichita, Kansas 67202

a Certified Shorthand Reporter of Kansas, at 455 North Main, 13th Floor, Wichita, Sedgwick County, Kansas, on the 19th day of October, 2018, at 8:59 a.m.

Page 82

```
 1    going to stop at this location.  I didn't
 2    know what their original plan was.  I didn't
 3    know if we were going to do -- if he --
 4    Sergeant Jonker was going to direct me to do
 5    containment or move over that way or that way
 6    or what we had at that point.  So when they
 7    stopped there, I was waiting pretty much for
 8    instruction.  I was watching the house.
 9         At that point, one of them -- I don't
10    know who it was -- said hey, the door's
11    opening.  So I didn't see the person
12    originally come out.  When I heard them say
13    the door's opening, I looked over Sergeant
14    Jonker's, like, left shoulder, and I could
15    see a subject had come out, like a white
16    male.  He was a little bit larger, 6-foot,
17    like 240.  He had a gray pullover hoodie on
18    and, I think, blue jeans.
19         And I heard somebody -- there were
20    several officers out there already.  I heard
21    one officer yell at him to show me your
22    hands, show me your hands.  At that point, I
23    transitioned over to the right of Sergeant
24    Jonker.  I could see that his hands were up,
25    and so I knew at that point Officer Rapp,
```

Page 83

```
 1    just from working with people that have used
 2    rifles in the past, that they're cover
 3    officers, they're usually going to focus on
 4    the person that they had visual on.  So I
 5    started to look around at the windows looking
 6    for exterior threats.
 7         Out of the corner of my eye, I could
 8    see his hands, this individual's hands start
 9    to lower.  And then I'm looking at those
10    windows, I'm seeing officers on the east and
11    west side of this house.  I'm worried about a
12    crossfire situation.  And at that moment I do
13    hear a shot ring out to the left of me.  It
14    sounded like it came from the patrol rifle.
15    And I knew that Officer Rapp was the only one
16    that had the rifle out.
17         I remember really focusing on the male
18    at that point when I hear the shot ring out.
19    It looks like he grabs himself in the chest
20    area, he falls backwards across the threshold
21    of the entryway of the door, and he falls
22    down.  You can only see his legs at that
23    point from my point of view.  So I train on
24    that, thinking that there was maybe a
25    confrontation at that point, maybe something
```

Page 84

```
 1    happened, and watching him.  While we're
 2    watching him, decision's made now that we're
 3    going to maybe try to start working our way
 4    up to the house.
 5         I believe that Sergeant Stevens had
 6    his patrol Tahoe.  And he came in from -- off
 7    of Seneca and came in and sort of paralleled
 8    the house so we can use the vehicle as cover
 9    on the driver side.
10         I remember stacking up with Sergeant
11    Jonker, and he was starting to sort of give
12    commands.  It sounds like there was talks
13    about he was going to maybe try to use his
14    K-9 to pull the subject out of the house.
15    And there's discussions on how we were going
16    to work that further.  And I know during that
17    time, there was a male and a female, I
18    believe, that came out on the east side of
19    the residence.  There was like an east door.
20    Saw those two come out.  While we're talking
21    with them, a third person ends up coming out
22    like a minute or two later.  So I saw a total
23    of three people.
24         So I'm standing there.  There was
25    other officers coming up stacking, which
```

Page 85

```
 1    means they're like lining up behind me.  And
 2    then we start proceeding forward in this
 3    Tahoe.  He parks the Tahoe.  We try to do a
 4    callout on -- Sergeant Stevens does a callout
 5    on the intercom system yelling out the
 6    address, telling them:  Residents, if there's
 7    anybody else in there, they need to come out
 8    with their hands up.  He does that, I want to
 9    say, probably four times.  And nobody else
10    comes out.
11         At that point, we start going up
12    'cause we have a bunker now; it's that big
13    shield.  There's an officer with a bunker.
14    We start progressing slowly up these stairs.
15    During that time, I'm like probably like
16    fourth or fifth one at that point.  When we
17    make it up to the stairs, I see somebody pull
18    off the screen door.  They have to pull it
19    off.  I can still see the subject.  I can
20    still see his legs.  They don't appear to be
21    moving.  We make it up to the front.  I hear
22    an officer up front of me says "it doesn't
23    look like he's breathing."  And they start
24    progressing into the house.  Start yelling
25    out "police", calling out, asking for anybody
```

22 (Pages 82 to 85)

## Page 94

1    first started to respond to the call and when
2    you arrived on the scene?
3  A. I'm sure he did get on the radio, but that's
4    what I picked up from it, from those.
5  Q. You don't recall any other commands that he
6    may have given?
7  A. No, not specifically.
8       MR. BAILEY: Let's have this
9    marked.
10      (Fussell Exhibit No. 67 was marked for
11   identification.)
12 BY MR. BAILEY:
13 Q. Officer Fussell, I'm going to hand you what's
14   been marked as Deposition Exhibit 67, which
15   is a Google Maps depiction of the area.
16      Do you see 1033 West McCormick Street?
17 A. I do.
18 Q. And while this picture shows it during the
19   day rather than evening, does this seem to
20   fairly depict the layout of at least where
21   the buildings and houses, streets and
22   sidewalks were at the time you responded?
23 A. Yes, it does.
24 Q. Can you draw on there for us where you parked
25   your black Tahoe when you arrived on scene.

## Page 95

1  A. Yeah. How would you like me to mark it, with
2    like an X or --
3  Q. Why don't you draw a box that kind of
4    shows --
5  A. Okay.
6  Q. -- depicts which way your vehicle was facing
7    and -- recognizing that it won't be to scale.
8  A. (Witness complies.) And the box with an
9    arrow pointing to the south.
10 Q. And can you put a number 1 beside that so
11   we'll know that's the first place that you
12   were when you arrived.
13 A. Okay.
14 Q. I believe you said as you got out of your
15   car, you saw Sergeant Jonker, sergeant -- or
16   Officer Powell and Officer Rapp crossing from
17   the south side of the street, McCormick, to
18   the north side?
19 A. Yes.
20 Q. Is that correct?
21 A. Yeah, that's what I believed, initially.
22 Q. And can you draw an arrow there showing us
23   where you saw them coming from and going to.
24 A. (Witness complies.)
25 Q. And how were they dressed at the time?

## Page 96

1  A. Rapp would probably have been in his SCAT
2    uniform, which is -- and during that time
3    they wore hoodies and then he has an exterior
4    black vest. He has a black hoodie on, black
5    cargo pants.
6       Officer Powell, I think he has -- he's
7    wearing -- he was wearing the older uniform.
8    So I think he had on the green PDUs with an
9    exterior green vest and the tan cargo pants.
10   And Jonker is going to be similar to Officer
11   Rapp 'cause he's a K-9 officer so he has the
12   black hoodie, black exterior vest, black
13   cargo pants.
14 Q. What insignia or words appear on the black
15   hoodies or black cargo vests that Sergeant
16   Jonker and Officer Rapp were wearing?
17 A. So the black hoodies are underneath the
18   tactical vest. And so the tactical vest will
19   probably have the badge on the front of it.
20   On the back, it will say "police". And then
21   they'll either have their badge either on the
22   front or it would have been on their belts.
23      And then Officer Powell, his is sort
24   of similar, it's just different colors. The
25   green, and then on the front of that one it's

## Page 97

1    the -- has sort of a black top, green base.
2    It has a patch of the police on here. And
3    I'm not sure if he has one that says "police"
4    on the back.
5  Q. Were there any kind of distinctive hats that
6    any of them had on that would indicate they
7    were police officers?
8  A. It's possible because it was the 28th of
9    December, but nothing that I remember.
10 Q. Do you remember anything other than black or
11   dark blue stocking caps?
12 A. Well, one of the issue stocking caps to us is
13   just a plain black stocking cap. It doesn't
14   have any insignia on it. I have a newer
15   stocking cap that does say WPD on it. But I
16   think I just had a plain black stocking cap
17   on that day.
18 Q. And if I understand your testimony earlier,
19   you were wearing that night much what --
20   similar to what you're wearing here today?
21 A. Yep. Yep.
22 Q. Did you see any other officers on the scene
23   at that point in time when you're still at
24   your Tahoe before you crossed over to the
25   north side of McCormick?

Page 122

1  Q.  And no one introduced themselves or
2      identified themselves?
3  A.  Not that I heard, no.
4  Q.  At the time you saw the person step out on
5      the front porch, did you, in your mind, come
6      to any initial conclusions or thoughts as to
7      who this individual might be?
8  A.  No, not at that point. I didn't have a
9      physical or anything. I think all we had was
10     the name Ryan, I believe, at that point.
11 Q.  Did you hear anyone shout that name to the
12     person to see if they responded?
13 A.  I didn't hear it, no.
14 Q.  Did you have any preliminary conclusions as
15     to whether the person who was standing in
16     front of you was the person who had made the
17     call, person who was the shooter, person who
18     may have been a hostage, or a person who was
19     just some other occupant of the house?
20 A.  No, not at that time.
21 Q.  Did you have any information that would
22     enable you to make any of those kinds of even
23     tentative conclusions at that point?
24 A.  Just that it was a male's name, I would say.
25 Q.  Between the time you arrived on the scene and

Page 123

1      when this individual first stepped out on the
2      porch, had you heard any gunshots?
3  A.  No.
4  Q.  Any shouting or yelling from the inside of
5      the house?
6  A.  No.
7  Q.  Any cries of distress?
8  A.  No.
9  Q.  Any noise at all coming from the residence?
10 A.  No.
11 Q.  Did that strike you as consistent or
12     inconsistent with the report that you had
13     received about what was going on?
14 A.  Well, things can calm down. So, I mean, like
15     it just depends on the situation, you know.
16     If he's saying that he's holding somebody
17     hostage, then yeah, there may not be a whole
18     lot of stuff going on right now.
19 Q.  So the lack of noise didn't either confirm or
20     disprove what you believe you had been told
21     may be going on in the house?
22 A.  Correct.
23 Q.  Before this individual stepped out on the
24     front porch, are you aware of any attempts
25     that any of the officers there on the scene

Page 124

1      had made to try and communicate with the
2      individuals in the house?
3  A.  No.
4  Q.  Any communication that you'd heard of, you
5      know, "Wichita Police Department, come out
6      with your hands up" or anything like that?
7  A.  No. No. We had just got on scene so I think
8      the call was still too fresh.
9  Q.  Well, how long do you have to wait before you
10     make that?
11 A.  Well, we want to set up the containment
12     first. There's no active shooting or
13     anything going on right at that point. So if
14     we're working a hostage scene at that point,
15     we're going to use time to our advantage
16     before we start calling people out. You
17     know, we want to sort of investigate, know
18     what else we're working with, you know.
19         Is there prior calls at this house,
20     you know, that kind of information. Do --
21     pull up a Google Maps of that, see what else
22     we're working with. There are a lot of
23     factors that are considered in there before,
24     you know, working to that point where,
25     actually, we're trying to make communication

Page 125

1      by phone, yes, that is one part of the steps.
2  Q.  And in your experience, how long do those
3      steps take before you can start communicating
4      with the occupants of the house from the time
5      you arrive on the scene?
6  A.  It just depends on the situation. So
7      sometimes we'll have to pull up our eJustice,
8      which is our record system on addresses,
9      names, houses and stuff like that. So it's
10     going to require an officer to have to do
11     that research to find out information and to
12     see hey, is this information current, are
13     these the people that we have currently
14     living here, you know. So they have to go
15     through all that information to get that
16     information to actually find those numbers.
17     Those numbers don't just magically, you know,
18     fall on our lap, unfortunately.
19 Q.  How long does it take to do that search on
20     the justice system -- eJustice?
21 A.  It can take 5 to 10 minutes because probably
22     during that time, too, you're also -- you can
23     also use those names that you pull up and
24     look at what those names have associated with
25     reports of that address. You know, is this

Page 130

1   (A recess was taken from 11:41 a.m. to
2   11:50 a.m.)
3   VIDEOGRAPHER: Back on the record
4   at 11:50.
5   BY MR. BAILEY:
6   Q.  Officer, you said that when the person
7       stepped out on the porch, you heard shouting
8       from the officers on the east side, you heard
9       shouting from someone, perhaps, Sergeant
10      Jonker on the north side.
11          Did you see movement by officers in
12      either location?
13  A.  Not that I recall, no.
14  Q.  If I understood your testimony, you saw the
15      person step out on the porch, you saw their
16      hands go up, and then your attention shifted
17      to the other windows in the house rather than
18      continuing to focus on the person who was
19      standing on the porch?
20  A.  Correct.
21  Q.  When was the next time your attention was
22      returned back to the person standing on the
23      porch?
24  A.  When I heard the shot fired.
25  Q.  So is it fair to say that you didn't see any

Page 131

1       activity, motion, body movement or body
2       language from this individual from the time
3       you saw him put his hands up until the time
4       you heard the shot?
5   A.  Out of the corner of my eye, peripheral, I
6       could see his arms lower, but they started to
7       make the direction down, but I was -- I
8       started focusing on the other windows at that
9       point.
10  Q.  During the time you saw the individual
11      standing on the front porch, whether it was
12      while your attention was focused on him or
13      whether it was things that you were seeing
14      out of the periphery of your vision, did you
15      see the individual do anything that you
16      believed showed a threat to any of the other
17      officers?
18  A.  No, because I didn't see him at that point.
19  Q.  Did you see that individual at any point have
20      the ability to deploy lethal force on anyone?
21  A.  I wasn't -- I wasn't watching him at that
22      point, so I don't know.
23  Q.  So is that a no?
24  A.  That's I don't know 'cause I didn't see him
25      make that -- I didn't see him make the

Page 132

1       motion.
2   Q.  Let me ask the question again 'cause what I'm
3       trying to ask is a question that I believe
4       can be either answered yes or no.  So I'll
5       tell you that ahead of time and then let's
6       listen to the question and see if I can
7       actually do that.
8           Did you see the individual who was
9       standing on the porch at anytime appear to
10      have the ability to deliver lethal force?
11  A.  No.
12  Q.  Did you see, at anytime, the individual who
13      was standing on the porch have the
14      opportunity to deliver lethal force?
15  A.  No.
16  Q.  Did you see anytime the individual who was
17      standing on the porch that he placed any
18      other officers in jeopardy of delivering
19      lethal force?
20  A.  No.
21  Q.  What was your reaction when you heard the
22      gunshot?
23  A.  Startled.
24  Q.  Were you expecting the shot?
25  A.  No, 'cause I was looking at windows at that

Page 133

1       point.
2   Q.  Had you heard any of the officers say
3       anything about either motions that the person
4       was making or objects that the person might
5       have that the speaking officer believed posed
6       a threat?
7   A.  No, nobody said anything.
8   Q.  No one said anything like "I see a gun" or
9       "he's dropping his hands" or anything like
10      that?
11  A.  No, not that I heard, no.
12  Q.  What was the length of time that you recall
13      it took from the time the person stepped on
14      the porch until the time the shot was fired?
15  A.  Within 10 seconds.
16  Q.  You said you reviewed your body cam footage.
17          Did you note on the time display on
18      that the length of time that that took?
19  A.  No, not that I wrote down or anything.
20  Q.  Did you hear any of the officers on the east
21      side shout any type of information about this
22      person other than the commands that you said
23      you heard them hollering?
24  A.  No, not that I heard.
25  Q.  Nothing like "he's got a gun" or anything of

34 (Pages 130 to 133)

Page 134

```
 1       that nature?
 2   A.  No.
 3   Q.  After the shot was fired, did you hear any of
 4       the officers saying anything?
 5   A.  No.
 6   Q.  What happened next?
 7   A.  I know Sergeant Jonker started getting in
 8       contact, I think, with Sergeant Stevens that
 9       was coming up in his patrol Tahoe.  And we
10       started orchestrating the team to go up to
11       make contact at the front door.
12   Q.  And there was a period of time, as I
13       understand it, where you and Sergeant Jonker
14       and Rapp and Powell and perhaps some other
15       officers were standing near Sergeant Stevens'
16       vehicle?
17   A.  Rapp stayed.  He stayed over there.  He still
18       watched the house.  He was still covering
19       down the house.  But Powell, I believe, came
20       over with me and Sergeant Jonker.
21   Q.  You don't remember Rapp coming over with you
22       for a period of time?
23   A.  Not that I recall, no.
24   Q.  Do you remember hearing Rapp say anything
25       after the shooting until the time you left
```

Page 135

```
 1       the scene?
 2   A.  No.
 3   Q.  Do you ever recall hearing him say that he
 4       saw the person on the porch "reach for
 5       something"?
 6   A.  Not to me, no.
 7   Q.  Did you hear him say those words to anyone
 8       else that you might have overheard?
 9   A.  No, not that I recall.
10   Q.  Now you said, if I understand your testimony,
11       that the group got behind Sergeant Stevens'
12       vehicle keeping it between you and 1033
13       McCormick; is that right?
14   A.  Yes.
15   Q.  And at some point in that process, Sergeant
16       Stevens got on a loudspeaker and was issuing
17       commands to the occupants of the house?
18   A.  Yes.
19   Q.  And at that point in time, he identified
20       himself as Wichita Police Department; is that
21       right?
22   A.  Yes.
23   Q.  Prior to that time, no one had made any such
24       announcement; correct?
25   A.  Not that I recall, no.
```

Page 136

```
 1   Q.  And at that point in time, he was directing
 2       the people in the house to come out with
 3       their hands up?
 4   A.  Yes.
 5   Q.  And prior to that time, no one had made a
 6       similar command to anyone in the house?
 7   A.  No.
 8   Q.  Anytime between the person stepping out on
 9       the porch and the shot being fired, did
10       anyone issue any warnings to this individual
11       as to what might happen if he did not comply
12       with their commands?
13   A.  No.
14   Q.  Is that the preferred practice before
15       deploying lethal force?
16   A.  In our policy, it's recommended that we give
17       a warning first, but they understand in
18       certain situations that's not available.
19   Q.  Would it have been possible for one of the
20       officers on the east side to yell "put your
21       hands up or we'll shoot"?
22           MR. PIGG:  Object to form.
23   BY MR. BAILEY:
24   Q.  Was there sufficient time for that command to
25       be issued?
```

Page 137

```
 1           MR. PIGG:  Same objection.
 2   Q.  You can answer.
 3   A.  I think they were busy about yelling the
 4       commands for him to put his hands up first.
 5   Q.  And again, that's not my question.
 6   A.  And it was -- but within seconds so, I mean,
 7       in those situations if you have more time,
 8       yeah, those warnings can be issued at that
 9       point.
10   Q.  But if I understand it from what you saw, you
11       don't know what happened that caused Officer
12       Rapp to fire the shot that killed Andrew
13       Finch?
14   A.  I do not know.
15   Q.  And if I understand it from your testimony,
16       you don't know why additional time couldn't
17       have been given to issue warnings or take
18       other steps to try and defuse the situation
19       before killing Andrew Finch?
20           MR. PIGG:  Object to the form of
21       the question.
22   Q.  You can answer.
23   A.  No.
24   Q.  Is the failure to comply with commands that a
25       police officer gives to an individual
```

35 (Pages 134 to 137)