# EXHIBIT 12

**Lisa G. Finch, et al. vs. City of Wichita, Kansas**

**Case No. 18-cv-1018-JWB-ADM**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

## On-Scene Consulting

March 4, 2019

Mr. Andrew M. Stroth, Esq.
Action Injury Law Group, LLC
191 North Wacker Drive
Suite 2300
Chicago, IL 60611

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**LISA G. FINCH, Individually, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased, and as Next Friend of her minor granddaughter, AF; DOMINICA C. FINCH, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased; and ALI ABDELHADI, Plaintiffs,**

**vs.**

**CITY OF WICHITA, KANSAS; JOHN DOE POLICE OFFICERS 1-10, Defendants. Case No. 18-CV-01018-JWB-KGS.**

Dear Mr. Stroth,

Thank you for retaining me to analyze and render opinions regarding the December 28, 2017, shooting death of Mr. Andrew Finch at 1033 W. McCormick, Wichita, Kansas 62713, by Wichita Police Department Police Officer Justin Rapp, No. 2350. Pursuant to Rule 26 requirements, I have studied reports, photographs, Body Worn Camera Videos, Wichita Police Department Documents, Transcriptions of Digitally Recorded Depositions and Interviews, and other material provided to me thus far regarding this case.

Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions.  It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

## On-Scene Consulting

**List Materials Reviewed:**  See Attached Document.

**Summary**

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive.

**Brief Overview of the Events that Transpired and Commentary:**

On the evening December 28, 2017, 28-year-old Mr. Andrew Thomas Finch was shot on the front porch of his residence at 1033 W. McCormick, Wichita, Kansas 62713, by Wichita Police Department Police Officer Justin Rapp, No. 2350 who responded to the residence in response to a "swatting call."

Wichita Police Department Police Officers and Sedgwick County Sheriff's Office deputies responded to Andrew Finch's residence on a false report of a crime at the residence. Wichita Police Department Sergeant Benjamin Jonker was the Officer-in-Charge of the scene at the time of the shooting. In particular, Wichita Police Department Emergency Services relayed a message from a California man later identified as Tyler Barriss, who told the dispatchers he had shot his father, was holding his other family members hostage at gunpoint, and had poured gasoline all over the house. This call was a hoax. Mr. Barriss is a hacker who has engaged in multiple "swatting" incidents nationwide. Swatting involves placing a false emergency call in order to elicit an armed law enforcement response to a target's residence, usually as an act of revenge. Mr. Barriss had pled guilty on federal charges for the Finch shooting incident.

It is clear from the record developed thus far when Defendants and Wichita Police Department Police Officers first responded to the Finch residence, they were unaware that they were responding to a "swatting call." The officers believed that they were responding to a possible incident involving a shooting and hostage taking incident with a barricaded gunman.

"Swatting is the harassment tactic of deceiving an emergency service (via such means as hoaxing an emergency services dispatcher) into sending a police and emergency services response team to another's person's address. This is triggered by the false report of a serious law enforcement emergency, such as a bomb threat, murder, hostage situation, or other alleged incident."

Officer Justin Rapp and Officer Matthew Powell were riding as a two-officer car assigned to Patrol West SCAT. Officer Powell and Officer Rapp responded lights and siren to the shooting call. Approximately 30 to 45 seconds prior to their arrival, other officers arrived on scene. Officer Rapp and Powell parked their police vehicle by other officers on the southwest corner of Mary's Supper Club which is the first structure west of Mary's Supper Club which is the first structure west of 1033 W. McCormick.

On-Scene Consulting

Sergeant Jonker contacted Officer Rapp and instructed Officer Rapp to follow him (Jonker) to the north side of McCormick across the street to set up a perimeter. Officer Powell went across the street with Sergeant Jonker and Officer Rapp. Officer Rapp took a position behind the rear driver's side of a small four door car parked in the parking lot across from 1033 W. McCormick. This position gave Officer Rapp a direct view of the front door of 1033 W. McCormick. Officer Rapp assumed the role of the cover officer, due to having his assigned WPD rifle.

As Sergeant Jonker attempted to set a perimeter, Officer Rapp had his rifle pointed at the front door of the residence looking through the red dot optic, when a male figure appeared in the doorway of 1033 W. McCormick. Mr. Finch, who was in his living room went onto his front porch to investigate the commotion. Mr. Finch, who was unarmed, opened the door and stepped out just past the threshold of the door onto the front porch. Officer Rapp knew Officers were positioned to the northeast of the residence and heard officers giving the male verbal commands.

Officer Justin Rapp fired one round from his Colt M4 Model LE6940 rifle from an estimated distance of approximately 122 feet striking Mr. Andrew Finch and causing him to immediately fall to the ground. EMS 28 transported Mr. Andrew Finch to St. Francis Hospital where he was pronounced deceased at 1903 hours. There were no weapons found at the scene or anywhere inside of Mr. Finch's residence.

On December 29, 2017, an autopsy was performed on the body of Mr. Andrew Finch at the Sedgwick County Regional Forensic Center. A gunshot wound to the trunk was found to be the cause of death. The bullet entered through the anterior chest through the sternum, heart, aorta, and middle lobe to the right lung.

 **Opinions:**

Note: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues. Rather, my opinions involve the consistency of the officers' actions with standard police practices.

1. It is my opinion that a reasonable Wichita Police Department Dispatcher (s) acting consistent with standard police practices would have requested Wichita Police Department Special Weapons and Tactics (SWAT) to respond to the incident immediately based on the initial comments of the call that Wichita Police Department Dispatch received. Based on my review of the reported facts in this matter, the calling party stated that he shot his dad in the head, his dad was not breathing, and the calling party was holding his mother and brother at gunpoint inside the house. In addition, the calling party stated that the incident was due to his parents arguing and he did not mean to shoot his dad and lastly that he was going to kill himself and light the house on fire.

# On-Scene Consulting

It is my opinion based on my review of the facts in this matter, Wichita Police Department Dispatch failed to contact Wichita Police Department Special Weapons immediately upon receiving the call from Mr. Tyler Barriss.  I base my opinion on Wichita Police Department Special Weapons and Tactics (S.W.A.T.), Standard Operating Procedure Mission Statement: "Recognizing that the presence of a highly trained, highly skilled police tactical unit has been shown to substantially reduce the risk of injury or loss of life to citizens, police officers and suspects; and recognizing that a well-managed "team" response to critical incidents usually results in successful resolution of critical incidents, it is the intent of the Wichita Police Department S.W.A.T. Unit to provide highly trained and skilled tactical team as a resource for the Wichita Police Department in handling of critical incidents."

In addition. it is my opinion that this incident involved both a possible Barricaded Suspect and a Hostage(s) Incident.  According to Wichita Police Department Special Weapons and Tactics (S.W.A.T.), Standard Operating Procedure, a BARRICADED INCIDENT is defined as a situation specific in place and time in which a person(s) who is armed or believed to be armed resists being taken into custody.  According to Wichita Police Department Special Weapons and Tactics (S.W.A.T.), Standard Operating Procedure, a HOSTAGE INCIDENT is defined as a situation in which a person (s) holds another person(s) against his/her will by force, threat or violence and law enforcement officers present at the scene are attempting to obtain the release of the person(s) (hostages) being held at that location.

According to the National Tactical Officers Association (NTOA), a "Hostage" is defined as a person held by force of fear by a hostage taker as security that specified terms, or an ultimatum will be met.  In addition, the NTOA defines a "Hostage Rescue" as a deployment of a tactical team in defense of life and to save and rescue hostages (Tactical Response and Operations Standard for Law Enforcement Agencies, National Tactical Officers Association, Published 2008/2011/2015).

In addition, it is my opinion based on the review of the facts in this matter, the Wichita Police Department Special Weapons and Tactics Team (S.W.A.T), was never requested to respond to the scene at 1033 W. McCormick, Wichita, Kansas 62713.

Lastly, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents. I addition, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents, as well as being personally involved in the use of lethal and less than lethal force incidents.

2.  It is my opinion that Wichita Police Department Sergeant Benjamin Jonker failed to take Command and Control of the scene.  It is my opinion that a reasonable Wichita Police Department Sergeant acting consistent with standard police practices would have

## On-Scene Consulting

requested Wichita Police Department Special Weapons and Tactics (SWAT) to respond to the incident immediately based on the initial comments of the call that Wichita Police Department Dispatch received.  Based on my review of the reported facts in this matter, the calling party stated that he shot his dad in the head, his dad was not breathing, and the calling party was holding his mother and brother at gunpoint inside the house.  In addition, the calling party stated that the incident was due to his parents arguing and he did not mean to shoot his dad and lastly that he was going to kill himself and light the house on fire.

It is my opinion based on my review of the facts in this matter, Wichita Police Department Sergeant Benjamin Jonker failed to contact Wichita Police Department Special Weapons immediately upon receiving the call from Mr. Tyler Barriss.  I base my opinion on Wichita Police Department Special Weapons and Tactics (S.W.A.T.), Standard Operating Procedure Mission Statement: "Recognizing that the presence of a highly trained, highly skilled police tactical unit has been shown to substantially reduce the risk of injury or loss of life to citizens, police officers and suspects; and recognizing that a well-managed "team" response to critical incidents usually results in successful resolution of critical incidents, it is the intent of the Wichita Police Department S.W.A.T. Unit to provide highly trained and skilled tactical team as a resource for the Wichita Police Department in handling of critical incidents."

In addition. it is my opinion that this incident involved both a Barricaded Suspect and a Hostage(s) Incident.  According to Wichita Police Department Special Weapons and Tactics (S.W.A.T.), Standard Operating Procedure, a BARRICADED INCIDENT is defined as a situation specific in place and time in which a person(s) who is armed or believed to be armed resists being taken into custody.  According to Wichita Police Department Special Weapons and Tactics (S.W.A.T.), Standard Operating Procedure, a HOSTAGE INCIDENT is defined as a situation in which a person (s) holds another person(s) against his/her will by force, threat or violence and law enforcement officers present at the scene are attempting to obtain the release of the person(s) (hostages) being held at that location.

According to the National Tactical Officers Association (NTOA), a "Hostage" is defined as a person held by force of fear by a hostage taker as security that specified terms, or an ultimatum will be met.  In addition, the NTOA defines a "Hostage Rescue" as a deployment of a tactical team in defense of life and to save and rescue hostages (Tactical Response and Operations Standard for Law Enforcement Agencies, National Tactical Officers Association, Published 2008/2011/2015).

In addition, it is my opinion based on the review of the facts in this matter, the Wichita Police Department Special Weapons and Tactics Team (S.W.A.T), was never requested to respond to the scene at 1033 W. McCormick, Wichita, Kansas 62713.

In addition, I base my opinion on the following facts and testimony:

## On-Scene Consulting

- Sergeant Benjamin Jonker testified that he never requested a SWAT unit to respond to the scene, (<u>Deposition Transcript of Benjamin Jonker, Page 115:24-116</u>).
- Sergeant Benjamin Jonker testified as a supervisor or commanding officer on a scene involving a potential barricaded suspect or gunman, it is not his duty to call in SWAT, (<u>Deposition Transcript of Benjamin Jonker, Page 115:24:23-25:2</u>).
- Sergeant Benjamin Jonker testified that he was the only supervisor on the scene at the Finch residence prior to the shooting, (<u>Deposition Transcript of Benjamin Jonker, Page 85:1-12</u>).

Lastly, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents. I addition, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents, as well as being personally involved in the use of lethal and less than lethal force incidents.

3. It is my opinion that Wichita Police Department Sergeant Benjamin Jonker failed to take Command and Control of the scene. It is my opinion that Sergeant Benjamin Jonker failed to formulate an effective and safe tactical plan that included the designation of <u>Cover and Contact Officers</u> to ensure that Wichita Police Department Police Officers did not issue conflicting verbal commands in the event that they made contact with individuals at (inside/outside) of the residence.

**<u>Inadequate Communication:</u>**
- Not establishing roles, (<u>cover, contact, etc</u>.).
- Failure to work with other officers as a team.
- Failure to notify dispatch of actions.

The element of officer safety refers to the practical application of tactically sound procedures to perform law enforcement activities in a safe and effective manner to include the utilization of available resources.

In addition, it is my opinion that Sergeant Benjamin Jonker failed to formulate a tactical plan that should have outlined Less than Lethal Force options such as the X-26 Electronic Control Device (ECD) Taser with an effective range of 21-25 feet, Oleoresin Capsicum spray, 40mm, baton or the deployment of the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round. The Drag Stabilized 12-Gauge Round is a translucent 12 Gauge shell loaded with a 40-Gram tear shaped bag made from a cotton and ballistic material blend and filled with #9 shot. The design utilizes four stabilizing tails and smokeless powder as the propellant. The round has a velocity of 270 feet per second (FPS) with a maximum effective range of 75 feet.

On-Scene Consulting

**Plan of Action:**
- Officers should discuss safety factors as well as possible plans for taking actions in situations involving fleeing subjects.
- Plans may include coordination of who will transmit radio traffic.
- Appropriate use of escalation of force.

**Inappropriate Attitude:**
- Careless or complacent.
- Overconfident.
- Too aggressive.

**Poor or No Planning:**
- Rushing into the situation without any plan of action.
- Failure to establish plan of action prior to engaging the suspect.
- Not considering alternative actions.

Officers are trained to work together and function as a team. In order to ensure officer safety and to ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another. Appropriate communication involves advising the primary officer of any critical occurrences or safety issues.

Based on my review of the facts in this matter, upon stepping onto the porch of his residence, Mr. Andrew Finch was startled and attempted to re-enter his residence. In addition, based on my review of the facts in this matter, Sergeant Benjamin Jonker failed to formulate a plan prior to engaging Mr. Andrew Finch to include the designation of less than lethal force options by officers assigned to designated positions. It is my opinion, based on Sergeant Benjamin Jonker's careless and complacent attitude, Wichita Police Department Police Officers began issuing confusing and conflicting verbal commands on all sides such as, "put your hands up," "raise your hands," "walk towards me," and other conflicting commands. In addition, based on my review of the facts in this matter, none of the officers identified themselves as police officers. It is my opinion that Sergeant Benjamin Jonker should have designated a single Contact Officer that if in fact anyone came out of the residence that designated officer would utilize a hand-held bullhorn or the Public Address (PA) system on the police vehicle and advise the individual(s) that they were the Wichita Police Department and direct them as necessary.

In addition, it is my opinion that Mr. Andrew Finch may not have been able to recognize that the individuals outside of his residence who were screaming simultaneous conflicting commands were police officers. Based on my review of the facts in this matter, most of the officers were dressed in all black vests, black shirts, black pants, small name tags and the word "police" in small letter on either the front of their uniforms or on their belts which may have been obstructed based on them being in either a Weaver or Isosceles Shooting Stance and pointing their firearms in the direction of Mr. Andrew Finch.

# On-Scene Consulting

In addition, based on my review of the facts of this matter, Sergeant Benjamin Jonker failed to issue directions or instructions to officers on the scene.  In addition, Sergeant Benjamin Jonker and any other Wichita Police Department Police Officer failed to identify themselves as law enforcement officers and utilize defusing and de-escalation techniques when Mr. Andrew Finch stepped onto the porch.

In addition, I base my opinion on the following facts and testimony:

- According to Officer Matthew Powell, he described that Mr. Finch was "startled" by the police response, which caused him to try to retreat in the house, (Deposition Transcript of Matthew Powell, Page 18:9-23).
- Sergeant Benjamin Jonker testified that he was the only supervisor on the scene at the Finch residence prior to the shooting, (Deposition Transcript of Benjamin Jonker, Page 85:1-12).
- According to Sergeant Benjamin Jonker, there were "a lot" and "multiple" people yelling commands from all directions, including from the eastside, and that he (Jonker) was yelling, "walk this way," while other officers issued different commands and ideally he would have liked to be the only one issuing commands, (Deposition Transcript of Benjamin Jonker, Page 141:20-145:12).
- According to Sergeant Benjamin Jonker, no one announced themselves as Wichita Police Department at the time Mr. Andrew Finch entered the porch until the time that he was shot, (Deposition Transcript of Benjamin Jonker, Page 143:2-5).
- According to Police Officer Dustin Fussell, he described Sergeant Jonker and Officer Rapp as wearing Wichita Police Department uniform, including black hoodies, black cargo vests with a name badge on the vest or belt, and black stocking caps without lettering, (Deposition Transcript of Dustin Fussell, Page 95:-96).
- According to Officer Justin Rapp, on the night of the shooting he was wearing a "hooded sweatshirt, as well as black 511 pants and black boots and the police emblem was on his left chest, (Deposition Transcript of Justin Rapp, Page 39:23-142:7, 155:17-21, 207:9-18)."
- According to Sergeant Benjamin Jonker, he described the plan that he had in his head at the time Mr. Finch was shot, but admitted he had no time to put the plan in action, (Deposition Transcript of Benjamin Jonker, Page 129:11-121, 144:12-145:10).
- According to Officer Justin Rapp, at the time that Mr. Andrew Finch came on the porch, no one had received any communication from Sergeant Jonker about what to do if a possible suspect exited the house, (Deposition Transcript of Justin Rapp, Page 248:18-22).
- According to Lisa G. Finch, the responding officers never said, "This is the Sheriff's Department, this is Wichita Police Department, never once announced themselves, (Deposition Transcript of Lisa G. Finch, Page 60:23-61:1).

## On-Scene Consulting

- According to Officer Justin Rapp, he did not consider using a less lethal weapon on Mr. Finch, (Deposition Transcript of Justin Rapp, Page 248:6-11).
- According to Sergeant Benjamin Jonker, he did not issue plans to the officers positioned on the east side of 1033 W. McCormick Avenue, (Deposition Transcript of Benjamin Jonker, Page 108).
- According to Sergeant Benjamin Jonker, he did not issue any commands to Officer Gumm who was positioned on the back of the house, (Deposition Transcript of Benjamin Jonker, Page 111).
- According to Sergeant Benjamin Jonker, he never broadcasted over the radio that he was going to be the primary point of contact, (Deposition Transcript of Benjamin Jonker, Page 112).
- According to Sergeant Benjamin Jonker, once he got to the north side position (Location No. 2), he does not recall issuing any commands to any officers at the scene, (Deposition Transcript of Benjamin Jonker, Pages 127-128).
- According to Sergeant Benjamin Jonker, he did not tell Officer Rapp what to do if someone came to the porch prior to the shooting and did not tell the officers what to do, (Deposition Transcript of Benjamin Jonker, Page 128).
- According to Officer Matthew Powell, Sergeant Jonker did not give him any instructions before the shooting, (Deposition of Matthew Powell, Page 21).
- According to Officer Matthew Powell, he does not recall a plan being said to him, (Deposition of Matthew Powell, Page 24).
- According to Officer Matthew Powell, he was on-scene for 1-2 minutes when Sergeant Jonker told him to go to the north side, (Deposition of Matthew Powell, Page 35).
- According to Officer Justin Rapp, prior to the shooting, no one made any announcements to the people inside of 1033 McCormick over the PA system, (Deposition Transcript of Justin Rapp, Page 173).
- According to Officer Justin Rapp, he never heard anyone to include Sergeant Jonker request a description of the suspected shooter while he was at scene prior to the shooting, (Deposition Transcript of Justin Rapp, Page 214).
- According to Officer Justin Rapp, he agrees that the purpose to have one officer issue verbal commands to cut down the risk of confusion, (Deposition Transcript of Justin Rapp, Page 224).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

Lastly, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents.

## On-Scene Consulting

I addition, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents, as well as being personally involved in the use of lethal and less than lethal force incidents.

4.  It is my opinion that a reasonable officer acting consistent with standard police practices would not have considered Mr. Andrew Finch a lethal threat to law enforcement officers and or the community.  The basis in determining whether force is "unreasonable" shall be consistent with the Supreme Court decision of <u>Graham v. Connor, 490 U.S. 386 (1989)</u>. When an officer uses deadly force in self-defense, standard police practices and most agencies polices dictate that the officer must be facing what is reasonably believed to be an imminent or immediate threat of death or serious bodily injury.

Based on my review of the facts in this matter, Mr. Andrew Finch had no firearm or weapon on his person or inside of his residence at the time of the shooting.  Mr. Finch had not committed a crime and was not engaging in criminal activity when he was killed by Officer Justin Rapp.  Based on my review of the facts in this matter, Officer Justin Rapp testified that at the time of the shooting he could clearly see Mr. Finch's hands and he (Officer Rapp) never saw Mr. Finch holding a weapon or anything that looked like a weapon, (<u>Deposition Transcript of Justin Rapp, Page 236;20-237:6</u>). In addition, according to Officer Justin Rapp, he admitted that it was "possible" that when he fired his weapon, Mr. Finch was merely turning to go back into his own home because he was frightened by the police response, (<u>Deposition Transcript of Justin Rapp, Page 252:22-253:4</u>).

In addition, it is my opinion that Officer Justin Rapp violated <u>Wichita Police Department Policy Manual, Regulation 4.0-Weapons/Use of Force Requirements, Issued 1-28-2013, 21-5227. Law Enforcement Officer Making Arrest-(a)</u> A law enforcement officer, or any person whom such officer has summoned or directed to assist in making a lawful arrest, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest.  Such officer is justified in the use of any force which such officer reasonably believes to be necessary to effect the arrest and the use of any force which such officer believes to be necessary to defend the officer's self or another from bodily harm while making the arrest.  However, such officer is justified in using deadly force only when such officer reasonably believes that such force is necessary to prevent the death or great bodily harm to such officer or another person, or when such officer reasonably believes that such force is necessary to prevent the arrest from being defeated by resistance or escape and such officer has probable cause to believe that the person to be arrested has committed or attempted to commit a felony involving death or great bodily harm or is attempting to escape by the use of a deadly weapon, or otherwise indicates that such person will endanger human life or inflict great bodily harm unless arrested without delay.

In addition, the ratification of the use of deadly force and Officer Justin Rapp's conduct prior to the use of deadly force in this matter can be seen as endorsing and perpetuating

inadequate training and failure to enforce written policies and established standards regarding the Use of Deadly Force.

Lastly, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents. I addition, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents, as well as being personally involved in the use of lethal and less than lethal force incidents.

5.  It is my opinion that a reasonable officer acting consistent with standard police practices would have given a verbal warning to Mr. Andrew Finch that he was going to fire his service weapon.  The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force when feasible…"*

It is my opinion that Police Officer Justin Rapp should have given a verbal warning to Mr. Andrew Finch and a reasonable opportunity to comply with the verbal command prior to firing his service weapon.  In addition, I base my opinion on Wichita Police Department Policy Manual, Regulation 4.0-Weapons/Use of Force Requirements, issued 1-28-2013, 21-5227.DISCHARGING A FIREARM/USE OF LETHAL FORCE:   Discharging of firearm/use of lethal force is allowed Pursuant to K.S.A. 21-5227.
A.  ***When practical, a verbal warning for the suspect to submit to the member shall be given prior to the use of lethal force in any situation unless doing so would increase the danger to members or others.***

In addition, I base my opinion on the following facts and testimony:
- According to Benjamin Jonker, neither he or any other officer gave Mr. Andrew Finch a warning that deadly force would be used and that he would be shot if he did not comply with their commands, (Deposition Transcript of Benjamin Jonker, Page 145:15-19).
- According to Benjamin Jonker, he does not believe that law enforcement officers should issue a verbal warning when feasible that deadly force will be used, (Deposition Transcript of Benjamin Jonker, Pages 229-230).
- According to Matthew Powell, he did not hear Officer Rapp give Mr. Finch any commands before he shot him, (Deposition of Matthew Powell, Page 89).

Lastly, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents. I addition, I base my opinion on my twenty-eight- year law enforcement career where as

## On-Scene Consulting

a Supervisor, I have investigated over 100 Use of Force Incidents, as well as being personally involved in the use of lethal and less than lethal force incidents.

6.  <u>It is my opinion that Wichita Police Department Police Officer Justin Rapp's Use of Deadly Force in this matter was excessive and unreasonable based on the following below facts and testimony</u>:

- Mr. Finch's actions never rose to the level of "life threatening," which corresponds under standards and training with the use of deadly force.
- According to Officer Justin Rapp, there was just a few seconds that passed between when Mr. Finch entered the porch until when Officer Rapp fired his weapon, (<u>Deposition Transcript of Justin Rapp, Page 240:8-15</u>).
- There is no dispute that Mr. Andrew Finch was unarmed at the time of the shooting.
- There was no weapon found anywhere inside of his residence.
- Based on my review of the Axon Video (<u>Bates 2793</u>) in this matter, Mr. Finch was not holding anything that might have been mistaken as a weapon.
- According to Officer Justin Rapp and other Wichita Police Officers at scene, Mr. Andrew Finch never made any threatening movements or threatening statements, (<u>Deposition Transcript of Benjamin Jonker, Page 201:19-202:9</u>), (<u>Deposition Transcript of Matthew Powell, Page 27:4-7</u>).
- ***According to Officer Justin Rapp, he never saw Mr. Finch holding a weapon or anything that looked like a weapon***, (<u>Deposition Transcript of Justin Rapp, Page 236:20-237:6</u>).
- None of the Wichita Police Department Officers who were positioned physically much closer to Mr. Andrew Finch than Officer Justin Rapp, fired their weapons at Mr. Andrew Finch when he came out on the porch of his residence.
- According to Sergeant Benjamin he did not see a weapon in Mr. Finch's hands and that he "probably would have" had Mr. Finch been armed, (<u>Deposition Transcript of Benjamin Jonker, Page 149:2-7</u>).
- According to Officer Matthew Powell, he "did not see any kind of weapon" in Finch's hand, (<u>Deposition Transcript of Matthew Powell, Page 22:1-11</u>).
- According to Officer Dustin Fussell, he stated that nobody said in his presence or on the radio that Mr. Andrew Finch had a gun or indicated in any way that he was armed, (<u>Deposition Transcript of Dustin Fussell, Page 133:2-11, 20-134:2</u>).
- According to Officers Fussell and Powell, who were standing next to Sergeant Jonker and Officer Rapp when Officer Rapp fired his weapon, did not perceive Mr. Finch pose a threat/jeopardy to any of the officers on the scene, (<u>Deposition Transcript of Matthew Powell, Page 27:4-7</u>), (<u>Deposition Transcript of Dustin Fussell, Page 132:8-20</u>).
- According to Benjamin Jonker, the gunshot absolutely surprised him, (<u>Deposition Transcript of Benjamin Jonker, Page 151:20-21</u>).

# On-Scene Consulting

- According to Sergeant Benjamin Jonker, he did not, and the officers did not have information that gasoline may have been poured on the house, (Deposition Transcript of Benjamin Jonker, Page 165).
- According to Matthew Powell, he did not know what the background of Mr. Finch, so he did not want to take the risk of harming someone else if it had to happen that we did shoot, (Deposition of Matthew Powell, Page 23).
- According to Matthew Powell, from the time that he laid eyes on Mr. Finch until he was shot, Mr. Finch did not threaten him, (Deposition of Matthew Powell, Page 26).
- According to Matthew Powell, he believes that if you are able to use a lesser form of force, then they are to use that lesser form, (Deposition of Matthew Powell, Page 61).

In addition, based on my review of **ALL** the Body Worn Camera (BWC) videos I have reviewed in this matter, **NONE** of the videos depicted that Mr. Andrew Finch was holding a weapon or an object that the officers on scene, to include Officer Justin Rapp, would reasonably believe was a weapon or object prior to the fatal shooting.

## Considerations Regarding the Use of Deadly Force

The use of deadly force is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by *the reverence for human life* and, used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation on which deadly force rests.  Deadly force is always the last resort used in the direst of circumstances.  The authority to use deadly force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained that the use of force must meet an "*Objectively Reasonable*" standard. *"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner."

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.*  Therefore, it is important to emphasize that peace officers do with the utmost care and restraint, *not confer* "*police powers*" *on themselves.*

On-Scene Consulting

7. It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident. It is also my opinion that there was a failure to train or a departure of from Use of Force and Use of Deadly Force Training. It is my expert opinion that a similarly trained Wichita Police Department Police Officer would not have considered Mr. Andrew Finch to be a lethal threat in this set of facts. As such, Officer Justin Rapp's actions constituted unreasonable, excessive, and deadly force, which did not comply with established training and standards.

In addition, <u>I base my opinion that the use of deadly force was unreasonable and excessive based on the following factors:</u>

- Highest level of force an Officer can use.
- This was not an immediate Defense of Life situation.
- Must be a last resort before using lethal force.
- Must be the direst of circumstances.
- Deadly force is likely to cause great bodily injury or death.
- Must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- Subjective Fear is insufficient.
- Over reaction is excessive force.

Lastly, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents. I addition, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents, as well as being personally involved in the use of lethal and less than lethal force incidents.

8. It is my opinion that the Wichita Police Department should have determined through their review process that the use of deadly force by Wichita Police Department Police Officer Justin Rapp was unreasonable and that Sergeant Benjamin Jonker failed to effectively take command and control of the scene prior to the fatal shooting of Mr. Andrew Finch.

In addition, the ratification of the use of deadly force and Officer Justin Rapp's conduct prior to the use of deadly force in this matter can be seen as endorsing and perpetuating inadequate training and failure to enforce written policies and established standards regarding the Use of Deadly Force.

On-Scene Consulting

In addition, I base my review on the below facts and testimony:

- According to Benjamin Jonker, he did not receive any disciplinary action as a result of the shooting, (Deposition Transcript of Benjamin Jonker, Page 221).
- According to Officer Justin Rapp, he had not been trained on a "swatting" call, (Deposition Transcript of Justin Rapp, Page 315).
- According to Officer Justin Rapp, he has not faced any disciplinary action as a result of the shooting, (Deposition Transcript of Justin Rapp, Page 336).

9. It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident. In addition, it is my opinion based on a review of the below listed incidents that the Wichita Police Department failed to provide training to their officers involved in the Andrew Finch matter as well as the below listed incidents on the following subject matters and by doing so can be seen as endorsing and perpetuating inadequate training and failure to enforce written policies and established standards regarding the Use of Deadly Force: Proper Response and Interaction with the Mentally Ill, Vehicle Deployment Tactics, Working as a Team, Use of Available Cover and Concealment, Contact and Cover Officers, Verbal Strategies, Active Listening Skills, Crisis Intervention Training, Defusing and De-Escalation Techniques, Requesting Additional/Follow-Up Information, Less than Lethal Force Options (ASP Baton, Bean-Bag Shotgun, 40mm Less Lethal Launcher, Oleoresin Capsicum Spray, Taser Electronic Control Device, Tactical Retreat, Tactical Re-Deployment, Strikes, Kicks, Ground Fighting, K9, Weapon Retention Techniques, Team-Take Down/Swarm Techniques and Control Holds, and other Reasonable Use of Force options when an individual fails to follow verbal commands.

In addition to the documents related to the shooting death of Andrew Finch, I reviewed the investigative files of six other officer involved shooting incidents, each of which occurred within years of Mr. Finch's shooting. Based on the information provided in those files that I have received thus far, it is my opinion that the Wichita Police Department operates with a policy and practice of 1) failing to supervise and/or adequately plan law enforcement operations; 3) failing to adequately train officers regarding less lethal and lethal force; and 2) failing to discipline and/or hold accountable officers who violate policy. These failures are demonstrated by the following instances:

**Shooting of Stacy Richards: (14-PSB-0386, (Bates No. 10645-10738/10739-10742)**. On February 25, 2014 Wichita Police Department Police Officers entered the home of a man they knew to be armed and suicidal. The records available to me reflect that the officers failed to effectively plan, failed to consider that Mr. Richards was mentally ill and or experiencing a mental crisis, failed to gather relevant information and failed to request the Crisis Intervention Team, Special Weapons and Tactics (SWAT) and Hostage/Crisis Negotiators to respond. Even

On-Scene Consulting

though Mr. Richards was only a danger to self, multiple officers fired their service weapons ultimately wounding Mr. Richards. The sergeant at the scene was given a one-day suspension because of his actions and inactions related to this incident. Based on my review of the records in this matter, no other officers were subject to discipline.

**Shooting of Jeffrey Smith: (15-PSB-1272, (Bates No. 11007-11056).** On May 4, 2015, Wichita Police Department Police Officers were in pursuit of a stolen car. After locating the car in alley, the car accelerated in reverse towards the officer and the officer fired towards the driver. Two other officers also fired into the car even though they were not in the path of the vehicle. This incident demonstrates the lack of poor planning, communication, and tactics.  Based on my review of the records in this matter, no officers were subject to discipline.

**Negligent Discharge of a Firearm/Shooting at a Moving Vehicle (Marcus Mitchell): (16-PSB-2228, (Bates No. 11183-11217/DA 112-18-11226)**.  On August 12, 2016, a Wichita Police Department Police Officer conducted a traffic stop. The officer issued verbal commands to the driver of the vehicle to stop and when the vehicle failed to stop, the officer struck the vehicle's window with his handgun causing a negligent discharge of his handgun. The officer then fired his handgun at the vehicle as the vehicle was moving away from him. The investigation determined that the officer used unreasonable lethal force and failed to follow policy. It is unknown what, if any, discipline the officer received. Wichita Police Department appears to have a policy that permits officers to shoot at moving vehicles.  The PSB review says: "Officer Jameson's decision to hit the window is problematic for a number of reasons…Officer Jameson said he though about firing his handgun as the car was coming towards him, however, he changed his mind and decided to hit the window.  It was only at this point, when he was in front of the car, that lethal force *could*  have been justified.  However, Officer Jameson appeared to be somewhat off centered from the car and his actions show he was able to move out of the way.  Officer Jameson waited until he was at the rear third of the vehicle to intentionally fire his gun towards a car driving away from him."

**Shooting Death of Troy Lanning:** On March 21, 2012, Wichita Police Department Police Officer (s) engaged in a high-speed pursuit of vehicle that was a different make and model than one sought in relation to a suspected shooting. The vehicle stopped and Mr. Troy Lanning fled on foot carrying a black bag. Mr. Lanning ran through a residential area and refused the officer's commands to stop. The Wichita Police Department Police Officer Williamson shot Mr. Lanning six times while he was approximately 15 feet away. The Wichita Police Department Police Officer Williamson

On-Scene Consulting

claimed he believed Mr. Lanning's bag contained a gun. After Mr. Lanning was shot, it was discovered that the bag contained computer-related accessories and no gun. Wichita Police Department Police Officer Williamson was not disciplined for his role in this shooting. The federal court found sufficient evidence from which a jury could reasonably find that Wichita Police Department Police Officer Williamson used excessive force. (but dismissed based on Qualified Immunity). After Mr. Lanning's death, in September 2012, Wichita Police Department Police Officer Williamson was terminated from the Wichita Police Department because he had engaged in misconduct including giving false information, criminal discharge of a firearm and falsely reporting a crime in relation to another shooting incident.

**Shooting Death of Nicholas Garner:** On August 22, 2015, Wichita Police Department Police Officer Bautista conducted a vehicle stop for a vehicle with an equipment violation (broken tail light). The driver, (Nicholas Garner) stopped the vehicle at a gas station. Wichita Police Department Police Officer Bautista approached the vehicle and spoke with Mr. Garner for several minutes regarding items that Officer Bautista could see inside of the vehicle. Mr. Garner allegedly became agitated and began waving his arms around. Officer Bautista reached inside of the Mr. Garner's vehicle to try to hold Mr. Garner's arms and "calm him down," at which point Mr. Garner began to drive away. Mr. Garner drove his vehicle in circles around the parking lot of the gas station and the neighboring Sam's Club and out onto the street, with Officer Bautista hanging onto the wheel and door of the car. When Mr. Garner eventually drove out to a main road, Officer Bautista shot and killed Mr. Garner. It is my opinion that Officer Bautista demonstrated poor pre-shooting tactics by reaching into a vehicle and not moving away from the vehicle as the vehicle started to move. In addition, Officer Bautista failed to request and or wait until backup arrive once Mr. Garner allegedly became agitated.

**Shooting Death of John Paul Quintero:** On January 3, 2015, Wichita Police Department Police Officers Hall and Thompson were dispatched to the scene of a disturbance, reported on several 911 calls, that was taking place in a car parked in the driveway of a residence. The 911 calls reported that the man involved in the disturbance had a knife. The officers arrived to find two men seated in a car. The officers ordered the men out of the car and they complied. John Paul Quintero then became agitated during continuing conversations with the officers. Officer Thompson told Mr. Quintero to put his hands on the vehicle, which he did, but then took them off and turned around towards Officer Hall who tasered him. Officer Thompson reports that Mr. Quintero did not seem affected by the Taser, but instead crouched and "reached towards his waistband," at which point Officer Thompson shot and killed him. Mr. John Paul Quintero was unarmed.

On-Scene Consulting

**My Qualifications for Reviewing this Case:**

My opinions are based on my education, training and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds.  I received the Purple Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basis Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended mandated Basic Supervisor School.  In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include: Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle

## On-Scene Consulting

Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group.  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives.  As a Unit, we prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section.  I investigated personnel complaints that were too large in scope for a geographical Division.  At the conclusion of my loan, I was selected to Management Services Division, Special Projects, and Office of the Chief of Police.  I completed numerous in-depth staff projects for review by the Chief of Police.  In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice.  I directly supervised ten undercover officers and four uniformed officers.  I provided all facets of training to the officers assigned to Vice at that time to include: Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer.  I conducted audits, personnel investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force.  I conducted Use of Force audits on Specialized Units in Central and South Bureaus.  I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1.  I directly supervised (18) K9 Handlers.  Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units.  I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant

## On-Scene Consulting

services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer.  In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School.   While at K9, I investigated and completed K9 contacts, personnel complaints, Use of Force Investigations.  In addition, I directed and was directly involved in Use of Force incidents.  I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers.  I conducted and facilitated all facets of SWAT training to include: Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis.  In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting).  I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing).  I was the Supervisor-in-Charge of the Crisis Negotiation Team.  I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified CNT School, and suicide prevention training.  I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Training.  In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counter-Terrorism following the terrorist attack in November 2008. I taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical Police Officers.  Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career.  During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart and the Police Star.  In addition, from June of 2010 through March 2016, I maintained a status of Level 1 Reserve Police Officer with the Los Angeles Police Department.

## On-Scene Consulting

Attached are my curriculum vitae, listing of testimony and fee schedule.

_____
Scott A. DeFoe