# EXHIBIT 19

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

# On-Scene Consulting

July 28, 2019

Mr. Andrew M. Stroth, Esq.
Action Injury Law Group, LLC
191 North Wacker Drive
Suite 2300
Chicago, IL 60611

<u>**Federal Rules of Civil Procedure 26 (a) (2) (B) Supplemental Report**</u>

**LISA G. FINCH, Individually, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased, and as Next Friend of her minor granddaughter, AF; DOMINICA C. FINCH, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased; and ALI ABDELHADI, Plaintiffs,**

**vs.**

**CITY OF WICHITA, KANSAS; JOHN DOE POLICE OFFICERS 1-10, Defendants. Case No. 18-CV-01018-JWB-KGS.**

Dear Mr. Stroth,

Thank you for retaining me to analyze and render supplemental opinions regarding the December 28, 2017, shooting death of Mr. Andrew Finch at 1033 W. McCormick, Wichita, Kansas 62713, by Wichita Police Department Police Officer Justin Rapp, No. 2350. Pursuant to Rule 26 requirements, and since the submission of my Rule 26 Report on March 4, 2019, I have studied additional Wichita Police Department Documents, Transcriptions of Digitally Recorded Depositions and other material provided to me thus far regarding this case.

Please be advised that if additional documents related to this matter are provided, it may be necessary to write an additional supplemental report in order to refine or express additional opinions. It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

On-Scene Consulting

**Additional Materials Reviewed:**

1. Deposition Transcript and Exhibits of Lieutenant Blake Mumma taken on April 18, 2019.

2. Deposition Transcript and Exhibit of Michael Amy taken on June 11, 2019.

3. Deposition Transcript and Exhibits of Marc Bennett taken on June 12, 2019.

4. Deposition Transcript and Exhibit of Lance Oldridge taken on May 29, 2019.

5. Rough Deposition Transcript of Francois Do taken on June 11, 2019.

6. Deposition Transcript and Exhibits of Daniel Harty taken on May 23, 2019.

7. Wichita Police Department After-Action Report, WPD Case 17C088615, PSB 17PSB-3347, (Wichita 007910-7916).

8. Deposition Transcript and Exhibit of Joseph Shawn Pichler taken on June 12, 2019.

9. Deposition Transcript of Kevin Real taken on May 23, 2019.

10. Deposition Transcript and Exhibits of Chief Gordon Ramsay taken May 24, 2019.

**Opinions:**

Note: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues. Rather, my opinions involve the consistency of the officers' actions with standard police practices.

**Opinion Number 1: It is my opinion that the Wichita Police Department lacks a Functional, Effective System of Internal Accountability.**

My opinion is based on admissions by Wichita Police Department witnesses in this case as well as the Professional Standards Bureau (PSB) investigations of other lethal shooting incidents by Wichita Police Department Police Officers between 2014 and 2017. The evidence that supports my opinions are detailed below.

# On-Scene Consulting

A. **<u>In most cases the Wichita Police Department (WPD) fails to conduct an administrative investigation of officers who use lethal force to include officers that use excessive or and or unjustified lethal force</u>**.

Professional Standards Bureau (PSB) investigations are far more akin to "reviews" than "investigations." In most cases, PSB Detectives rely only on the evidence and findings of the criminal investigation conducted by prosecutors and Wichita Police Department (WPD) Homicide Detectives, despite the fact that the scope of the criminal investigations explicitly do not concern WPD policy violations and or training issues and Homicide Detectives are not trained on how to conduct policy investigations.

In his deposition, District Attorney Marc Bennett admitted that the sole focus of the criminal review is whether or not he can prove beyond a reasonable doubt that a crime has been committed. He is not looking at violations of WPD policy or training, (Deposition Transcript of Marc Bennett).

Nonetheless, according to Lieutenant Mumma, an administrative investigation begins with a "review" of the criminal investigation. Even for discharges of a firearm, which WPD policy dictates *must* be investigated, a review of the criminal investigation is sufficient to satisfy this requirement, (Deposition Transcript of Lieutenant Blake Mumma).

Additional investigations, including interviews of the officers at issue, are only sometimes authorized at the discretion of the chief of police, (Deposition Transcript of Lieutenant Blake Mumma). Chief Ramsay testified that PSB officers are not required to re-interview involved officers or witnesses nor to conduct an independent analysis of evidence at the scene, (Deposition Transcript of Chief Gordon Ramsay). This is the case despite Detective Harty's admission that "the crime investigators are looking at different facts than what I am. They're seeking different information than what I might need," (Deposition Transcript of Daniel Harty).

The PSB officers also do not take steps to resolve discrepancies within a criminal investigation, including those that arise from competing witness statements. If the command channel meets to discuss discrepancies, there is no written documentation of such meetings and no written analysis describing the discrepancies coming out of such meetings.

- Detective Oldridge testified that "I wouldn't say you have to reconcile the differences...you take all the information and you try to paint a picture of what actually happened," (Deposition Transcript of Lance Oldridge).
- Regarding the officer shooting of John Paul Quintero, Chief Ramsay stated that he had some concerns about the fact that the officer's statements differed from that of a witness, but that he reconciled these discrepancies "at a meeting," (Deposition Transcript of Chief Gordon Ramsay).

## On-Scene Consulting

- Although many detectives include a "discrepancies" section in their reports, these sections omit critical information. Detective Oldridge describes the discrepancies section as "this is just kind of me picking things out," (Deposition Transcript of Lance Oldridge).

PSB Detectives also fail to evaluate the totality of the circumstances in a shooting incident, including whether all of the officers (including supervisors) at the scene complied with all relevant WPD policies. In particular, PSB Detectives do not assess whether supervisors complied with policies in commanding the scene and their subordinate officers, undermining supervisory accountability. Lt. Mumma testified that in the Finch case, for example, he would not expect PSB Detectives to examine the actions of *all* WPD personnel at the scene, (Deposition Transcript of Lieutenant Blake Mumma). Similarly, in the Ortiz case, Detective Amy's review focused exclusively on the officer who fired his weapon: although he states that "my primary focus was on Officer Reid, but I've reviewed the incident itself," (Deposition Transcript of Michael Amy), his report does not discuss the actions of any officers other than Officer Reid.

PSB Detectives also do not determine whether officers complied with non-use of force policies that may have ultimately affected the officer's use of lethal force—and in some instances negated the need for force (e.g., SWAT procedures, hostage policies, mental health policies). Although Lt. Mumma testified that they "look at all policies" in the investigation, he admits that they do not "list all policies" in the report itself, (Deposition Transcript of Lieutenant Blake Mumma).

- No PSB report that I reviewed thus far makes a determination as to whether non-compliance with WPD policy created or heightened the risk that an officer would use force.
- Detective Pichler testified that his review of the Finch shooting focused only the Use of Force Regulation 4 and Critical Stress Debriefing Policy 204, not the SWAT policy or the policy for dealing with people with mental illness which were relevant to this case. Pichler did not analyze the situation for compliance with the hostage policy, despite the fact that the 911 call indicated that it was clearly a hostage situation, (Deposition Transcript of Joseph Pichler).
- Detective Do testified that his review of the Perry shooting did not focus on Policy 519 (CIT policy) or Policy 602 (SWAT policy) even though they were responding to a 911 call about a reportedly suicidal person, (Deposition Transcript of Francois Do.). Similarly, although the Ortiz shooting was a hostage situation, Detective Amy did not list Policy 602 or Policy 519 in his review, (Deposition Transcript of Michael Amy).

The following PSB reports constituted essentially a review of the criminal investigation but included no independent interviews by the PSB Detectives: Finch, Perry, Smith, Mitchell, Terrazas, Zehring, Holden, Reed, Garner, Randolph, Quintero, Ortiz.

Finally, as Lt. Mumma and Chief Ramsay testified, there is no policy on conflicts of interest within PSB, and thus no safeguards to ensure unbiased internal investigations, (Deposition Transcript of Lieutenant Blake Mumma).  WPD Policy 901.05(B) explicitly authorizes the investigation of an officer by his direct supervisor.

> **B. The Wichita Police Department (WPD) does not have any policies as to how Professional Standards Bureau Detectives should conduct and report on administrative investigations and what evidence they should consider in those investigations. Furthermore, the Wichita Police Department lacks any policies or template as to how command channel review officers should assess Professional Standards Bureau investigations, make evidentiary findings, and assign discipline.**

There is no uniform training for PSB Detectives charged with examining the compliance of officers with use of force policy. Detective Oldridge testified that PSB Detectives learn "as they go" from supervisors, even though there are significant differences between administrative investigations and the criminal investigations that consume most of the officer's time before they become PSB Detectives, (Deposition Transcript of Lance Oldridge). PSB Detectives conduct these investigations without guidance. For instance, PSB places unwarranted weight on criminal histories of civilian witnesses, but frequently fail to conduct interviews with officers that focus on their compliance with WPD policies.

- In his Deposition, Lt. Mumma admitted that researching civilian witnesses' criminal histories is a standard part of the PSB investigation, even where they have no significance to the offense at issue, (Deposition Transcript of Lieutenant Blake Mumma). Detective Harty also stated that he included the suspect's criminal history "for our command staff to have an understanding of who [the officer] was dealing with."

There is no requirement that PSB Detectives list, analyze, or report on all relevant policies implicated by a specific incident. Lt. Mumma testified that "we look at all policies when we're doing these investigations. We just don't list all policies," (Deposition Transcript of Lieutenant Blake Mumma). There is no requirement that Detectives write up whether or not they reviewed a policy, or whether a policy was relevant to an officer's actions during a specific incident, (Deposition Transcript of Lieutenant Blake Mumma). Chief Ramsay confirmed that "just because [a policy] is not listed here doesn't mean that it wasn't considered or thought about," (Deposition Transcript of Chief Gordon Ramsay).

Furthermore, WPD lacks any policies or template as to how command channel review officers should assess PSB investigations, make evidentiary findings, and assign discipline, (Deposition Transcript of Lieutenant Blake Mumma).  Detective Oldridge testified that there is no requirement that the command channel reviewers make a record of their review of the report or explain why they concurred with the investigation's result,

# On-Scene Consulting

(Deposition Transcript of Lance Oldridge). The review supposedly consists of an oral discussion of supervisory staff, but Lt. Mumma testified that there is no record of the meetings in which the command staff discuss administrative investigations and their findings, (Deposition Transcript of Lieutenant Blake Mumma). Detective Oldridge stated that he might discuss his concerns about an incident with his supervisor without including it in his report. He said there would "probably not" be a written record of any such discussion, (Deposition Transcript of Lance Oldridge). The Chief of Police has final sign-off on all disciplinary decisions.

The Chief and Deputy Chief are exclusively responsible for initiating investigations, and the Chief is solely in charge of internal discipline.

- Detective Amy testified that his role as a PSB detective is to summarize, and not to make any recommendations, (Deposition Transcript of Michael Amy).

- Detective Real testified that he does not make training recommendations or any other intervention short of a policy violation. Detective Real stated that he is not aware of whether or not he even has the authority to make such recommendations, (Deposition Transcript of Kevin Real).
- Detective Pichler testified that he does not make any official recommendations or findings because "the Chief is the ultimate decision maker," (Deposition of Joseph Pichler).
- Lt. Mumma testified that pursuant to Wichita Police Department Policy 904.20, PSB can only investigate at the discretion of the Chief or Deputy Chief, (Deposition Transcript of Lieutenant Blake Mumma), even if the incident involves an officer-involved shooting (which are required to be investigated under WPD Policy). Chief Ramsay confirmed that the PSB cannot act independently of the Chief in conducting investigations, (Deposition of Chief Gordon Ramsay).
- The Fraternal Order of Police agreement prevents investigators from recommending discipline even though they are the officers with the most knowledge about the case and subsequent investigation, (Deposition Transcript of Lieutenant Blake Mumma). Lt. Mumma testified that only the command staff and Chief of Police can make recommendations about officer discipline, (Deposition Transcript of Lieutenant Blake Mumma).

PSB Detectives may identify areas of concern but cannot render any recommendations as to how the Department should address those concerns systemically to improve officer function and protect community safety.

### C. The Wichita Police Department (WPD) does not conduct parallel administrative and criminal investigations involving potential officer misconduct.

Lt. Mumma testified that PSB investigators have no authority to run an administrative investigation concurrently with a criminal investigation, regardless of the nature of the conduct at stake, (Deposition Transcript of Lieutenant Blake Mumma). Typically, the case has to have been presented to the DA's office before the commencement of an administrative investigation, (Deposition Transcript of Michael Amy). Chief Ramsay testified that right after a shooting, PSB detectives should not interview involved officers or engage with any crime scene evidence in order to allow the criminal investigation to take precedence, (Deposition Transcript of Chief Gordon Ramsay). The inevitable time delay that results from waiting to conduct a PSB investigation until the criminal investigation is complete, potentially risks undermining the availability of evidence (e.g., memories of witness's fade), and delaying corrective action and discipline. It also undermines public trust and confidence in the Department's ability to act efficiently and fairly in the face of potential police misconduct to include excessive force.

### D. There is no independent oversight of either administrative or criminal investigations within Wichita Police Department.

Because there is no independent oversight of WPD internal investigations, PSB relies on criminal investigations that don't address potential policy violations or investigative error which may undermine accountability.  The Kansas Bureau of Investigation (KBI) is involved in the criminal investigation of officer-involved shootings, which gives the appearance of independence, but in practice KBI merely supports the investigation with WPD Homicide Detectives taking the lead. *See* Finch PSB Report at 5. Detective Amy testified that KBI ultimately just "comes in and does follow along with the investigation, [and] sits in on interviews," (Deposition Transcript of Michael Amy). KBI does not produce any documentation of their findings in these investigations, (Deposition Transcript of Chief Gordon Ramsay). This is because their role in the investigation is to support WPD and is not truly independent.

Although PSB often relies completely on the criminal investigation of an officer-involved shooting for their own review of that incident, Lieutenant Mumma testified that PSB does not determine whether policy was followed by the homicide detectives conducting the investigation, stating that "we're not investigating the investigators," (Deposition Transcript of Lieutenant Blake Mumma). This results in PSB conducting investigations that rely on potentially flawed or biased criminal investigations.

## On-Scene Consulting

PSB Detectives rely on the records from criminal investigations, even where the Homicide/Criminal Detective was asking leading questions or telling the officer what he needed to know in order to determine that the use of force was justified.

- In Do's deposition, he stated that "if an officer is talking...and he's basically describing the elements of self-defense, but he hasn't quite flat out said so...and [the investigator asks] this looks like what you're telling me is that you did it in self-defense; is that correct? I don't have a problem with that," (Deposition Transcript of Francois Do).
- In Harty's deposition, when asked if he was concerned that the criminal detective was feeding the officer under investigation the proper answers to questions, Harty stated that he wasn't concerned "because again I think he was just trying to let Officer Pierce make sense of what he was going through or experiencing," (Deposition Transcript of Daniel Harty).
- Harty also testified that if he "saw something [in the criminal investigation] that was definitely done incorrectly or misconduct, yes, I would hold that out in my report," but it does not raise any red flags for him that the criminal detective was essentially catering the interview style and time to what would be better for the officer and "trying to make Sergeant Ryan feel more comfortable," (Deposition Transcript of Daniel Harty).

With regard to oversight of administrative investigations, Chief Ramsay testified that he does not believe in external oversight, stating that you can't have a "group managing the police department," (Deposition Transcript of Chief Gordon Ramsay). It is clear from Chief Ramsay's Deposition that he does not review the sufficiency of the administrative investigations. In response to a question about whether PSB detectives are allowed to attribute unarticulated motives to officers who engage in the use of lethal force, he stated that "they could. I don't have a big issue with that. Like I said, I don't agree with why that's in there, but I'm not going to have them change his report." Ramsay also stated that he was making no efforts to increase external oversight of the department because "what we have is working."

While the City Manager has the power to oversee administrative investigations, they have never done so since Ramsay was hired as Chief. The WPD has a Civilian Review Board, but that Board lacks any oversight authority. The Civilian Review Board allows for opportunities for the community to engage with the police department and voice concerns, but there is no oversight mechanism that grants the Board the power to independently investigate complaints against an officer. The Civilian Review Board also does not have the authority to demand that WPD conduct an internal investigation. No independent agency outside of the FBI, District Attorney, KBI, and U.S. Attorney's Office has complete access to WPD's records, (Deposition Transcript of Lieutenant Blake Mumma).

On-Scene Consulting

### E. The Wichita Police Department does not have an auditing process for the Early Intervention System, which is based on information manually inputted by the officer or his supervisor.

The Wichita Police Department has an Early Intervention System which gives PSB alerts when an officer accumulates a certain amount of complaints, uses of force, or firearm discharges. However, Lieutenant Mumma testified that this information is generally inputted manually into the system by the officers themselves or their supervisor, (Deposition Transcript of Lieutenant Blake Mumma).

Furthermore, once the information is entered into the system, there is no procedure in place to audit the information to ensure its accuracy. The failure to audit this system undermines the ability of the Department to identify "problem officers" or officers that need additional training or create a risk management issue for the Department.

**Opinion Number 2:   It is my opinion based on my review of prior incidents involving the Wichita Police Department, there are times that Wichita Police Department Officers are not disciplined, counseled, or re-trained despite clear policy violations.**

During the Garner incident, Officer Bautista reached into Mr. Garner's vehicle to attempt to control his arms during a routine traffic stop. PSB Report, Garner Incident (Bates 011060). Despite the fact that Detective Harty acknowledged that Officer Bautista shouldn't have done that in hindsight and that there is nothing in Wichita Police Department training that instructs officers to reach into vehicles during traffic stops, Officer Bautista was not disciplined or retrained as a result of this incident, (Deposition Transcript of Daniel Harty).

After shooting Icarus Randolph, a Wichita Police Department Police Officer pointed his gun at Randolph's unarmed grandmother when she approached her grandson lying on the ground. PSB Report, Randolph Incident (Bates 010818). Detective Oldridge acknowledged that this was a use of force, but there was no investigation into it and the officer was not disciplined, (Deposition Transcript of Lance Oldridge).

During the Villa incident, Officer Ryan used his car to bump Villa's Buick as Villa was exiting the vehicle. Despite the fact that Wichita Police Department Policy 605 states that "no officer should intentionally make vehicle-to-vehicle contact without the controlling supervisor's permission," Officer Ryan was not disciplined. PSB Report, Villa Incident (Bates 011255).

In the Quintero shooting, Officer Thompson used her rifle's weapon-mounted flashlight to look inside a vehicle before she knew who was inside the vehicle. There was no

## On-Scene Consulting

investigation into this use of force and Officer Thompson was not disciplined, (Deposition Transcript of Lance Oldridge).

Despite the fact that the 911 call in the Finch incident portrayed the incident as a hostage and/or barricaded subject incident, no SWAT callout was made. The Wichita Police Department SWAT Standard Operating Procedures dictate that "the S.W.A.T. Unit will be called out on all incidents of barricaded suspects" and that "the S.W.A.T. Unit will be called out on all incidents where it is believed that hostages have been taken," (SWAT Standard Operating Procedures, Pages 18-19). Nonetheless, Sgt. Jonker, the supervising officer at the scene, was neither investigated nor disciplined for his failure to call SWAT during the incident.

In the Perry shooting, Officer Gumm justified deploying the police canine out of concern that Mr. Perry could barricade himself in his trailer with another female, PSB Report, Perry Incident (Bates 11294). At that point, however, Ms. Meyer was already with other WPD officers, who could have communicated to Officer Gumm that there was no second female in the trailer. None of the officers at the scene were disciplined for this failure of communication, tactics or planning.

**Opinion 3:  It is my opinion that the Wichita Police Department fails to ensure that Officers effectively plan, communicate and or de-escalate.  In addition, it is my opinion that the Wichita Police Department fails to take corrective action when Officers fail to effectively plan, communicate and or de-escalate**.

Each of the below lethal force incidents involve identifiable patterns of failures to effectively plan, communicate and de-escalate that were never addressed by PSB Detectives or during the Wichita Police Department to include the final review and approval by the Chief of Police.  In addition, it is my opinion that the failure to take corrective action to include training and or discipline ultimately ratified and endorsed future behavior of failing to effectively plan, communicate and de-escalate before during and after incidents.

Failure to communicate

- Detective Pichler testified that he did not conduct a specific review to determine whether the officers' planning and communication in the Finch shooting conformed with professionally accepted standards. In addition, other than reviewing the officer reports, Pichler did nothing to confirm that the officers gave Mr. Finch clear and consistent commands. Pichler confirmed that he merely "accepted the officers' story as the truth." In addition, Pichler made no investigation into the fact that no WPD officers announced themselves on the scene when they arrived, (Deposition Transcript of Joseph Pichler).
- Detective Real testified that the officers responding in the Richards shooting failed to conduct a thorough investigation, which would have included asking pertinent questions and gathering facts, before entering the home where Richards was unarmed and suicidal. Detective Real himself stated that he would not have

- entered the home because Mr. Richards was alone and only a threat to himself, (Deposition Transcript of Kevin Real).  Instead, because of their failure to communicate on the scene, the officers did enter the home and wasted valuable time clearing it while their training indicated to them that they should back out of the home. Although two officers were cited for policy violations for this failure to communicate, the written reprimand and one-day suspension issued is inconsequential when juxtaposed against the harm caused by their actions and will do little to address this misconduct.
- In the Reed investigation, Detective Do did not have any conversations with the officer who shot Reed to determine whether he identified himself as a police officer while giving Reed verbal commands, (Deposition Transcript of Francois Do).
- In the Perry shooting, a witness told officers on the scene that there was no one inside the house, however this information was not communicated to all officers on the scene, which resulted in Officer Gumm releasing his dog to prevent Perry from entering his house, (See PSB Report, Perry Incident (Bates 11294, Page 8).

Failure to De-Escalate

- In his testimony on the Randolph shooting, Detective Oldridge stated that determining whether a WPD officer should have given Randolph a verbal command before resorting to force was not an important part of the investigation. When asked if it was his job to determine whether an officer had enough time to deescalate and/or give verbal commands, Oldridge responded "no, I would say it is not, because it is not a requirement," (Deposition Transcript of Lance Oldridge).
- In his testimony on the Villa shooting, Detective Harty stated that he "just didn't feel it was necessary" to make any inquiry into whether or not it would have been practical for Sergeant Ryan to give a verbal warning before using lethal force, (Deposition Transcript of Daniel Harty).
- In his testimony on the Quintero shooting, Detective Oldridge stated that he did not ask Officer Thompson for more information about why she didn't transition from her patrol rifle to a Taser because he "didn't feel it was relevant to the investigation," (Deposition Transcript of Lance Oldridge).

Affirmatively Escalating

- In the Richards shooting discussed above, the officers escalated the situation by entering the home of Mr. Richards, who was alone and not a threat to anyone but himself.
- In his investigation of the Garner shooting, Detective Harty did not include any specific determination in his report that the first use of force (reaching into the car and holding down Garner's hands) was justified.  Harty testified that "I probably did not specifically write that, but I did not conclude and document that it was

- unjustified." Harty also stated that he did not explicitly analyze the appropriateness of that use of force, (Deposition Transcript of Daniel Harty).
- In his investigation of the Mitchell shooting, Detective Harty did not include any specific determination about the officer's initial use of force (pointing his gun at both Marcus and Darius Mitchell). When asked about whether he should have included a discussion of that in his report, he testified that "I think it's safe to say that I find that to be within policy because I did not notate that it was an issue," (Deposition Transcript of Daniel Harty).

Failure to Plan

- As previously discussed, Pichler's testimony discussing the Finch shooting indicates that he did not conduct an investigation into whether the officers' failure to establish a plan to communicate with the alleged suspect inside the house conformed with professionally accepted standards.
- While testifying about the Perry shooting, Detective Do stated that in a "fluid situation," there is not necessarily a requirement of information gathering and planning prior to taking action because "everything is actually happening all at once," (Deposition Transcript of Francois Do).
- In Real's testimony regarding the Richards shooting, Real stated that he didn't know why the officers on scene didn't call SWAT, and that he didn't know whether or not SWAT should have been called, (Deposition Transcript of Kevin Real).

The Wichita Police Department fails to track and record "areas of concern" within Wichita Police Department operations, policy and practice that are identified by PSB investigations into potential officer misconduct, (Deposition Transcript of Lieutenant Blake Mumma).  WPD lacks any kind of centralized system in which to identify problematic policies and practices or track its efforts to address them.  Consequently, systemic problems identified in internal investigations, including use of force investigations, may never be ameliorated, undermining accountability and putting civilians at greater risk in interactions with officers.

- Detective Amy included significant areas of concern in one of his reviews but reported that no one from the Department ever followed up with him about his concerns, nor did anyone inform him of policies that changed as a result of including these areas of concern, (Deposition Transcript of Francois Do).
- Pichler testified that no changes to WPD policy or training have been made based on the areas of concern that he outlined in his report of the Finch shooting, and no one from command staff has followed up with him to discuss his recommendations, (Deposition Transcript of Joseph Pichler).

On-Scene Consulting

It is my opinion that if the Wichita Police Department and if the Chief of Police and Professional Standards Bureau Detectives had identified the above patterns of deficiencies in the use of force, systemic changes could have been made that could have prevented the Finch incident from unfolding as it did.

**<u>My Qualifications for Reviewing this Case:</u>**

My opinions are based on my education, training and experience. Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811. Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader. Upon my graduation from the LAPD Academy, I was assigned to 77th Division. In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail). I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds. I received the Purple Heart in 2010. Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division. I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basis Detective School. Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division. Prior to my assignment, I attended mandated Basic Supervisor School. In conjunction with

# On-Scene Consulting

Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include: Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group.  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives.  As a Unit, we prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section.  I investigated personnel complaints that were too large in scope for a geographical Division.  At the conclusion of my loan, I was selected to Management Services Division, Special Projects, and Office of the Chief of Police.  I completed numerous in-depth staff projects for review by the Chief of Police.  In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice.  I directly supervised ten undercover officers and four uniformed officers.  I provided all facets of training to the officers assigned to Vice at that time to include: Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer.  I conducted audits, personnel investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force.  I conducted Use of Force audits on Specialized Units in Central and South Bureaus.  I reported directly to the Office of the Chief of Police.

# On-Scene Consulting

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School. While at K9, I investigated and completed K9 contacts, personnel complaints, Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers. I conducted and facilitated all facets of SWAT training to include: Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team. I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Training. In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counter-Terrorism following the terrorist attack in November 2008. I taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart and the Police Star. In addition, from June of 2010 through March 2016, I maintained a status of Level 1 Reserve Police Officer with the Los Angeles Police Department.

On-Scene Consulting

Attached are my curriculum vitae, listing of testimony and fee schedule.

_____
Scott A. DeFoe