# EXHIBIT 20

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA G. FINCH, Individually, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased, and as Next Friend )
for her minor granddaughter, )
AF; DOMINICA C. FINCH, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased; and ALI ABDELHADI, )
 )
            Plaintiffs, )
 )
 )
  vs.               )Case No.
 )18-CV-01018-JWB-KGS
 )
CITY OF WICHITA, KANSAS; )
WICHITA POLICE OFFICER JUSTIN )
RAPP; SGT. BENJAMIN JONKER; )
JOHN DOE POLICE OFFICERS 1-8, )
 )
            Defendants. )
 )

D E P O S I T I O N

The videotape deposition of ROBERT KING JACOBS taken on behalf of the Plaintiffs pursuant to the Federal Rules of Civil Procedure before:
    RICK J. FLORES, CSR
    KELLEY REPORTING ASSOCIATES, LTD.
    515 South Main, Suite 108
    Wichita, Kansas 67202

a Certified Shorthand Reporter of Kansas, at 1620 Southwest Tyler, Topeka, Shawnee County, Kansas, on the 27th day of August, 2019, at 10:18 a.m.

## Page 2

A P P E A R A N C E S

PLAINTIFFS:
    (VIA VIDEOCONFERENCE)
    MACARTHUR JUSTICE CENTER
    Ms. Alexa Van Brunt
    Northwestern Pritzker School of Law
    375 East Chicago Avenue - 8th Floor
    Chicago, IL 60611
    (312) 503-1336
    a-vanbrunt@law.northwestern.edu
    Mr. Luke Fernbach

DEFENDANTS:
    FISHER PATTERSON SAYLER & SMITH, LLP
    Mr. J. Steven Pigg
    3550 S.W. 5th Street
    Topeka, KS 66606
    (785) 232-7761
    Fax: (785) 232-6604
    spigg@fisherpatterson.com

FOR THE WITNESS:
    KANSAS BUREAU OF INVESTIGATION
    ASSISTANT ATTORNEY GENERAL
    Ms. Laura M. Graham
    1620 SW Tyler
    Topeka, KS 66612-1837
    (785) 296-8207
    Fax: (785) 296-0915
    laura.graham@kbi.state.ks.us

VIDEOGRAPHER:
    ADVANCED DOCUMENT IMAGING
    Mr. Michael Miles
    515 S. Main, Suite 108
    Wichita, KS 67202
    (316) 267-8200
    Fax: (316) 267-9382
    video@kelleyreporting.com

## Page 3

I N D E X

ROBERT KING JACOBS
Direct Examination by Ms. Van Brunt:    4
Cross-Examination by Mr. Pigg:    105
Redirect Examination by Ms. Van Brunt:    124
Recross-Examination by Mr. Pigg:    131

Jacobs Exhibits
No. 137 - Subpoena to Testify at Deposition    10
        (4 pgs)

No. 138 - KBI Policy 21 - Investigations    25
        Involving Public Officials (2 pgs)

No. 139 - KBI Policy 57 - Investigations    26
        Regarding Use of Deadly Force
        (5 pgs)

No. 140 - KBI Report Index - Rapp/Barriss    89
        (1 pg)

No. 141 - Transcript of Jacobs' Followup    119
        Interview of Officer Ronen (15 pgs)

No. 142 - Transcript of Jacobs' Followup    119
        Interview of Officer Perry (12 pgs)

No. 143 - Transcript of Jacobs' Followup    119
        Interview of Officer Headings
        (10 pgs)

SIGNATURE OF WITNESS    134
CERTIFICATE    135

## Page 4

    VIDEOGRAPHER: This begins the videotape deposition of Robert Jacobs. Today is August 27th, 2019, and the time is 10:18 a.m.

    Will the court reporter please swear in the witness.

    ROBERT KING JACOBS
having been first duly sworn on his oath to state the truth, the whole truth, and nothing but the truth, testifies as follows:

    DIRECT EXAMINATION
BY MS. VAN BRUNT:

Q. Thank you. Sir, could you please state your full name and title for the record.

A. My full name is Robert King Jacobs. I am an assistant special agent in charge at the Kansas Bureau of Investigation.

Q. Thank you. And have you ever given a deposition before?

A. One time.

Q. One time. And what kind of matter was that?

A. It was on an officer-involved shooting case several years ago.

Q. I see. And what was your involvement in that case?

```
 1      the evidence and determine a legal outcome?
 2   A. Correct.
 3   Q. Is the perception of other officers at the
 4      scene just as critical as the perception of
 5      the involved officer in making the
 6      determination of probable cause?
 7           MR. PIGG: Object to form; it's
 8      an insufficient hypothetical.
 9   A. That's a tough one to answer. I really don't
10      know. I think each individual officer may
11      have their own opinion as to whether or not
12      they want to weigh one witness' account more
13      importantly than another one. I think in a
14      ideal situation, you should -- you should
15      look at all evidence equally.
16   Q. You would agree in a multi-officer incident,
17      meaning more than one officer responded to a
18      scene, that the interviews of all the
19      officers should be taken into account when
20      determining whether there's probable cause?
21   A. Yes, ma'am.
22   Q. So now I just want to back up and go through
23      some specific tasks related to KBI
24      investigations focusing specifically on
25      Wichita and not KBI, generally.
                                                    69
```

```
 1      As part of investigations involving
 2      Wichita's police department officer-involved
 3      shootings, do KBI officers generally have a
 4      role in securing the scene?
 5   A. In Wichita, no, we do not.
 6   Q. Okay. What about analyzing physical evidence
 7      at the scene, for instance, firearm casing?
 8   A. Typically not. We have done that on
 9      occasion, but for the majority of the times,
10      no, we do not have -- that's not one of our
11      roles.
12   Q. What about locating and securing ammunition
13      and cartridges used by the suspect?
14   A. No, that is not our role.
15   Q. What about trying to recreate the scene?
16   A. Are you referring to a walk-through?
17   Q. I'm referencing, in particular -- give me one
18      second.
19           Yeah, I guess that is what I'm
20      referring to. And you said already
21      walk-throughs are not very common; correct?
22   A. They're not. In the situations that we've
23      done walk-throughs, it was a -- it was both
24      KBI and Wichita Police Department and
25      actually the district attorney's office that
                                                    70
```

```
 1      was involved in it.
 2   Q. Okay. What about collecting information
 3      about the subject, usually, civilian subject
 4      from anyone at the scene, is that a task that
 5      KBI generally performs in Wichita?
 6   A. Not typically, no.
 7   Q. Okay. Is it fair to say that these are
 8      activities performed by WPD investigators?
 9   A. Yes, ma'am.
10   Q. All right. Is it fair to say that it is --
11      in KBI investigation, KBI regularly relies on
12      the physical investigation conducted by WPD
13      investigators?
14   A. Yes, yes, ma'am.
15   Q. Do KBI officers in Wichita cases generally
16      identify witnesses who should be interviewed?
17   A. No, ma'am, we do not.
18   Q. That's, again, more the role of WPD officers?
19   A. Typically. By the time we get there,
20      oftentimes, the witnesses, the involved
21      parties are all already identified and have
22      been brought to one location where they can
23      all be interviewed.
24   Q. Okay. In Wichita, do KBI officers generally
25      have a role in conducting witness interviews?
                                                    71
```

```
 1   A. Occasionally.
 2   Q. Would you say it's more common for WPD
 3      officers to conduct the interviews of
 4      witnesses?
 5   A. Yes, ma'am.
 6   Q. And is that also true of interviews of
 7      involved officers?
 8   A. No, ma'am. I mean, Wichita PD does conduct
 9      those, but we are -- we participate in those
10      interviews, as well.
11   Q. Okay. Who, typically, leads those interviews
12      of involved officers?
13   A. The majority of the time, I would say Wichita
14      Police Department leads it.
15   Q. All right. And when you say that KBI
16      officers participate, what does that
17      participation entail?
18   A. We are typically in the room. We are
19      listening to the interview. And we often do
20      interject questions that either have not been
21      asked by the Wichita Police Department
22      detective or may answer questions of the
23      involved officer. But we typically have some
24      amount of input in that interview. It may
25      not be the lead, but we do have some input.
                                                    72
```

**Page 73**

1  Q. Do you work with WPD to develop questions to
2     be asked in the interview or does WPD do
3     that?
4  A. That's a tough question because I think that
5     there is a standard practice when it comes to
6     officer-involved shooting investigations.
7     There's a particular type of questioning
8     called the cognitive interview that you want
9     to use with officers that are involved in
10    those critical incidents. So I've never seen
11    a situation where officers have developed
12    questions ahead of time, whether that's KBI
13    or it's Wichita Police Department. They do
14    the same type of interview that we would do.
15 Q. So as a matter of practice, KBI officers
16    don't meet with the WPD officer conducting
17    the interview beforehand to discuss the
18    questions that will be asked?
19 A. No, ma'am, we don't.
20 Q. Would it surprise you to review a transcript
21    of an interview of an involved officer
22    involving WPD and KBI in which the KBI
23    officer who sat in on the interview did not
24    ask any questions?
25        Would you find that surprising?

**Page 74**

1  A. No, no. It depends on the questions being
2     asked and the level of experience from the
3     officer who was leading the interview. The
4     agent who sat in on that interview may not
5     have -- may not have believed that any
6     further questions were necessary. I don't
7     know -- it wouldn't surprise me, but I have
8     never personally been in an interview where I
9     did not ask usually, at least, one question.
10 Q. But it also wouldn't surprise you to have the
11    WPD interviewer do the bulk of the
12    questioning?
13 A. No, that would not surprise me.
14 Q. Does KBI author its own reports about witness
15    interviews in which it participates?
16 A. I think that varies from person to person.
17    Typically, we do author some type of a report
18    saying that we were -- we were present. The
19    extent of that report may vary from agent to
20    agent. But in my experience, I typically
21    will author some type of report saying I
22    participated.
23 Q. Is it fair to say, though, in Wichita, KBI
24    leaves it up to WPD to create the transcript
25    of the interview in which WPD participated or

**Page 75**

1     led the interview?
2  A. That is correct, yes.
3  Q. Does the KBI officer working on an
4     investigation involving Wichita analyze
5     interview transcripts for evidentiary
6     discrepancies?
7  A. Can you repeat that again.
8  Q. Sure. Is it typical practice for a KBI
9     officer working on a Wichita case involving
10    Wichita PD to analyze interview transcripts
11    involving witnesses for evidentiary
12    discrepancies?
13        MR. PIGG: Object to form.
14 A. No, I would not say that's a typical activity
15    of a KBI agent.
16 Q. What about investigating -- strike that.
17        What about reviewing evidentiary
18    discrepancies more generally in a case, is
19    that a task of a KBI agent in a Wichita case?
20        MR. PIGG: Object to form; it's
21    vague.
22 A. I think that with -- a case agent involved in
23    a case would work in tandem with the Wichita
24    Police Department lead detective, and if
25    there are discrepancies in the case, then

**Page 76**

1     they would work to determine why that is.
2     And it's, again, sort of a cooperative
3     effort.
4  Q. Would KBI report on those discrepancies
5     anywhere?
6  A. Honestly, I do not know if that's been done.
7  Q. Have you ever seen a report that involves
8     that kind of analysis of evidentiary
9     discrepancies in a KBI investigation?
10 A. Possibly once, but that would be it.
11 Q. Was that in a Wichita case?
12 A. Yes, ma'am. It was the one where we did the
13    walk-through. I think we did a report
14    regarding the fact that we did a walk-through
15    four months later because of the
16    discrepancies in the evidence and the
17    statements.
18 Q. In WPD investigations, does the KBI, as a
19    matter of practice, communicate with WPD
20    officers throughout the investigation?
21 A. Yes, ma'am.
22 Q. Okay. And that would be with the WPD
23    detectives conducting the criminal
24    investigation?
25 A. Yes, ma'am.

**Page 77**

Q. What about with the chain of command at WPD, do KBI officers regularly communicate with those individuals?
A. Not typically. We -- whoever's the case agent for the KBI will typically communicate directly with the case detective for the Wichita Police Department, and unless there's a need, will not go up the chain of command at Wichita Police Department.
Q. Does KBI communicate with the chief of WPD for any purpose relating to officer-involved shootings with any regularity?
A. In passing we see him occasionally when we're there to conduct or be part of an investigation. We've had one meeting that I know of relating to officer-involved shootings with the chief of police, but beyond that, no.
Q. And was that meeting related to a specific case?
A. No, ma'am.
Q. So it's just about officer-involved shootings generally?
A. Yes, ma'am.
Q. And was that with Chief Ramsay?

**Page 78**

A. Yes, ma'am.
Q. Do you recall when that occurred?
A. It was shortly after he became the chief of police. And when I say shortly, I would say six -- approximately six months after he became the chief of police.
Q. And what was discussed at the meeting?
A. The role of the KBI in working officer-involved shootings with Wichita Police Department.
Q. And what specifically about the role of KBI was discussed?
A. I think it was -- we met with Chief Ramsay to discuss what our current role was and whether that was his request in the future, what his -- I don't want to say desire -- that's a bad word, but what he wished our role to be or what he envisioned our role to be. And so we discussed the different parameters of officer-involved shootings and how we could assist.
Q. What did he say to you about how he envisioned the role of KBI in officer-involved shootings in Wichita?
A. I don't think that there was anything

**Page 79**

definitive that resulted from the meeting. No set changes or anything came from it. I think his initial reaction was he wanted some pretty drastic changes and then realized that that may not be realistic, and so -- as far as logistically. And so -- so there was no real definitive answers that came out of the meeting.
Q. Did he want KBI to be more involved in officer-involved shooting investigations than it currently was?
A. I honestly don't know what he thought.
Q. Well, when you say drastic changes, what do you mean by that?
A. I think Chief Ramsay, initially, when we approached him, said, well, I want KBI to work the entire thing, just like they did -- just like the -- where he came from, that's -- that was the role that they had. However, I think when we started talking about the logistics of that occurring, he realized that there might be some hurdles to that. And so in my opinion, he backed away from that position and we never really changed our role since then.

**Page 80**

Q. And were some of those -- are some of those hurdles resource related for KBI?
A. Yes.
Q. Meaning the agency does not have the resources to conduct independent investigation of an officer-involved shooting in Wichita on its own?
A. I don't know if I would say that it doesn't have the ability to do that. I think timeliness was an issue as far as getting resources to Wichita and the amount of time it would take to conduct that investigation.
Q. That was a prohibitive factor?
A. In my opinion, I think that's what -- that was a concern of his.
Q. And you discussed that with Chief Ramsay?
A. We discussed the logistical issues of having to send several resources from all over the state there. He never -- I don't recall him ever formally saying, oh, well, we can't do that because of that, but I just -- that was all information that we passed on to him during that meeting.
Q. Did he say why he wanted -- sorry. Were you finished?

**Page 81**

1  A. Yes.
2  Q. Sorry about that. It's the delay.
3     Did he say why he wanted KBI to take
4     over the investigations of officer-involved
5     shootings in Wichita?
6  A. He did not. As I said, it was the way that
7     where he came from being a chief previously,
8     or his role, it was in another state, and I
9     think he was referring back to the model that
10    they used there. And he said, well, it
11    worked there, and so that's the way I want it
12    here.
13 Q. Okay. Again, referring just to WPD, in the
14    event of an officer-involved shooting, does
15    KBI communicate with the district attorney's
16    office throughout the investigation?
17 A. Yes, ma'am.
18 Q. And in what manner does that communication
19    occur?
20 A. Well, as mentioned previously, the district
21    attorney's office typically has personnel
22    present when we're doing -- conducting
23    interviews. They're not in the rooms doing
24    the interviews. They're sitting in another
25    room. So there's communication back and

**Page 82**

1  forth with them during that time. We do a
2  felony review with them and we're present for
3  that, typically. And then on occasion the
4  district attorney will request that either
5  the officer or sometimes the individual who
6  was -- who had force used against them, he
7  will have their families come up and will
8  talk to them before releasing that statement
9  about his decision. And we will -- we have
10 been asked in the past to sit in on that
11 meeting with the families or the officer
12 involved and be present when he is -- when
13 the district attorney is giving information
14 about his decision to them.
15 Q. So other than the felony review, would you
16    say most of the communications with the DA
17    occur on an informal basis?
18 A. Yes, ma'am.
19 Q. Okay. They're not memorialized in a report,
20    for instance?
21 A. That is correct.
22 Q. And the only written communication that the
23    KBI does with the Sedgwick County DA is
24    either this affidavit that we talked about
25    earlier or a written statement about why

**Page 83**

1     there's no probable cause; is that correct?
2  A. Well, I don't --
3     MR. PIGG: Object to form.
4  A. Sorry. I don't -- as said earlier, we have
5     never had to do that or haven't done that. I
6     shouldn't say had to do that. We've never
7     done that in the past. So I can't say that
8     that is the only thing that we do with the
9     DA. We've never written that affidavit or --
10    and I honestly don't know if we've done
11    prosecution summaries for the DA in addition
12    to the felony review and all of the discovery
13    that they get from Wichita Police Department.
14 Q. Okay. So in W -- in Wichita, it is common
15    that the KBI would not issue its own
16    independent report directed to the DA in
17    officer-involved shooting investigations?
18 A. That is correct.
19 Q. All right. Have you personally ever seen a
20    report concerning a criminal investigation
21    into an officer-involved shooting issued by
22    WPD?
23    And by report, I mean a concluding
24    report as to whether or not there is criminal
25    liability in the case.

**Page 84**

1  A. I don't know if -- I don't believe I've ever
2     seen a written report. That is covered,
3     typically, during the felony review, and we
4     will sit there and we will talk about
5     probable cause or facts of the case during
6     the felony review. We will then discuss the
7     statute that the actions fall under. And so
8     all of that is discussed. I've not actually
9     physically seen a report, though.
10 Q. And the officer involved in the shooting is
11    not present at that meeting, that felony
12    review meeting; correct?
13 A. Correct.
14 Q. Does KBI have any -- communicating -- of
15    WPD --
16    REPORTER: I'm sorry. Start
17    over. You're breaking up a little bit. I'm
18    sorry.
19 Q. No problem. Does KBI have any role in
20    communicating the decision of whether to
21    press charges to the involved officer in a
22    Wichita case?
23 A. Whether to press charges against the officer?
24 Q. Right. Does KBI have any role in
25    communicating that decision to the involved

**Page 85**

1  officer in a Wichita case?
2  A. No, ma'am.
3  Q. Whose job is that, do you know?
4  A. I actually do not know.
5  Q. Does KBI, as a matter of practice, review the
6     findings of the Wichita PD in criminal
7     investigations of officer-involved shootings?
8         MR. PIGG: Object to form;
9     assumes facts not in evidence.
10 A. I would say that we -- we're present during
11    the felony review, which is the conclusion of
12    the investigation and the presentation of
13    that to the district attorney and we actively
14    participate in that. So the review of that
15    is done during that felony review.
16 Q. Does KBI ever perform audits of WPD criminal
17    investigations of officer-involved shootings?
18 A. You'll have to define an audit, please.
19 Q. Does KBI conduct a review of how the
20    investigation itself was handled by WPD
21    officers?
22 A. I do not believe so, no.
23 Q. Has W -- strike that.
24        Has KBI ever addressed any problems in
25    fact finding by WPD officers investigating

**Page 86**

1  officer-involved shootings?
2  A. Not that I'm aware of.
3  Q. Has a KBI officer involved in an
4     officer-involved shooting in Wichita ever
5     requested that the WPD officers go back and
6     reinvestigate a part of the case?
7  A. Has KBI requested that?
8  Q. Correct.
9  A. I don't believe that KBI's ever requested
10    that the Wichita Police Department go back
11    and reinvestigate or redo part of an
12    investigation involving a use of force.
13    There have been times that KBI has
14    participated in going back and doing
15    additional work on a case, but they were --
16    they were part of that.
17 Q. So in those instances, was that work redone
18    at KBI's behest?
19 A. No, ma'am.
20 Q. All right. Does KBI -- now we're talking,
21    generally speaking, statewide.
22        Does KBI ever audit local law
23    enforcement's accountability system?
24        Is that part of KBI's mandate?
25 A. No, ma'am, I don't believe so.

**Page 87**

1  Q. All right. So fair to say, then, KBI has
2     never done an audit of Wichita PD's internal
3     accountability system?
4  A. No, ma'am, we do not.
5  Q. All right. And I take it KBI never, as a
6     matter of policy or practice, reviews the
7     findings of a prosecutor in an
8     officer-involved shooting?
9  A. What do you mean by review? I'm sorry.
10 Q. Yeah, bad question. Before -- let's focus
11    specifically on Wichita.
12        Wichita -- or the Sedgwick County DA
13    issues its findings publicly in an
14    officer-involved shooting; correct?
15 A. Correct.
16 Q. And we have already discussed that that
17    document generally serves as the closing
18    document for KBI in its own investigation;
19    correct?
20 A. When the individual is deceased.
21 Q. Right, when the individual is deceased.
22        Has KBI ever seen that report before
23    it's released publicly?
24 A. Maybe once or twice, but typically not.
25 Q. Okay. Has KBI -- well, strike that.

**Page 88**

1         So, typically, your first --
2     typically, KBI determines -- strike all
3     those.
4         Typically, KBI learns whether the DA
5     is going to press charges at that felony
6     review meeting. Is that fair to say?
7  A. That is, yes.
8  Q. Does KBI typically -- well, never mind.
9     Let's just leave it there.
10        Turning to a bit of a different issue,
11    would you agree that an administrative
12    investigation in a police department is not
13    the same as a criminal investigation when it
14    comes to an officer-involved shooting?
15        MR. PIGG: Object to foundation.
16 A. Yes, I would agree to that.
17 Q. And KBI, to be clear, is only involved in
18    criminal investigations of officer-involved
19    shootings; right?
20 A. Correct.
21 Q. KBI, as a matter of policy, does not conduct
22    administrative investigations into officers
23    who fire their weapons in the course of duty?
24 A. To clarify: Outside of the KBI, we do not do
25    administrative investigations. If an agent

**Page 89**

1  within the KBI fires their weapon, then we
2  would do an administrative investigation, as
3  well.
4  Q. I gotcha'. Okay.
5      So just to clarify terms, you'll agree
6  a criminal investigation, the purpose of that
7  is to determine whether any criminal laws
8  have been violated; correct?
9  A. Correct.
10 Q. Whereas, an administrative investigation, the
11 purpose of that is to determine whether an
12 officer has violated a law enforcement
13 agency's internal policies and procedures;
14 correct?
15     MR. PIGG: Object to form; it's
16 leading.
17 A. That is my understanding, yes.
18 Q. All right. And so KBI, as a general matter,
19 does not conduct administrative
20 investigations into other law -- into
21 officers' conduct at other law enforcement
22 agencies outside KBI?
23 A. Yes, ma'am, correct.
24 Q. And focusing specifically on Wichita, KBI has
25 no role in conducting administrative

**Page 90**

1  investigations into officer conduct?
2  A. No -- yes, ma'am, you're correct.
3  Q. Okay. Sounds good. And was KBI involved in
4  the investigation of the Andrew Finch
5  shooting on December 28th, 2017, by a WPD
6  officer?
7  A. My understanding is yes we were.
8  Q. All right. Did KBI have any role in the
9  administrative investigation of the Finch
10 shooting?
11     MR. PIGG: Object to form.
12 A. I do not believe so.
13 Q. And again, that would not be KBI policy to
14 conduct such an investigation; correct?
15 A. Not our policy or our role.
16     MS. VAN BRUNT: Okay. I just
17 want to look over an index that we have that
18 was received in response to subpoena.
19     Rick, do you mind marking the report
20 index.
21     (Jacobs Exhibit No. 140 was marked for
22 identification.)
23 BY MS. VAN BRUNT:
24 Q. Have you ever seen this before, sir?
25 A. No, ma'am, I have not.

**Page 91**

1  Q. Just as a general matter, have you seen a
2  report index like this?
3  A. Yes, ma'am.
4  Q. So this is a typical document that is created
5  by KBI in an investigation of an
6  officer-involved shooting?
7  A. Yes, ma'am.
8  Q. And is it -- is the index an index of all the
9  documents that are created by KBI in such an
10 investigation?
11 A. Yes, ma'am. It's an index of our reports in
12 the investigation. Some of that may be
13 receipt of supporting documents. For
14 example, there are several in here, but -- so
15 it can either be reports that we generate
16 or -- well, they're all reports that we
17 generate, but they could include outside
18 sources, if that makes sense.
19 Q. Okay. And does a report index generally
20 represent the entirety of KBI files in a
21 certain matter?
22 A. If the index is generated at the end of the
23 case, yes, it should have all of the reports
24 in there.
25 Q. Okay. And is this generally -- is the report

**Page 92**

1  index generally the cover sheet to the file,
2  the KBI file?
3      Is it kept somewhere separately?
4  A. It's -- the report index, my understanding is
5  is that it is disseminated with the reports
6  to whoever you're disseminating it to,
7  whether it's the prosecutor or the chief of
8  police or whoever it may be going to. So
9  this -- this sheet goes with the bulk of the
10 reports, the reports that are listed there.
11 Q. Okay. And as a general matter, does that
12 report get disseminated both to the local law
13 enforcement agency and the local prosecutor?
14 A. So how our policy and what's called a
15 division advisory bulletin works, in a use of
16 force situation with an officer involved, the
17 reports are all disseminated to the
18 prosecutor, to the district attorney, county
19 attorney. The reports can then also be
20 disseminated to the chief of police or the
21 head of that agency where the officer was
22 employed and to be used for an administrative
23 investigation; however, that cannot be --
24 that cannot occur until after the prosecutor
25 has made a decision one way or the other as

**Page 125**

Q. Has KBI, to your knowledge, ever found probable cause in an officer-involved shooting where a district attorney eventually failed to press charges?
A. I believe so. I could not say with 100 percent certainty. I do know of a situation that we had a review of a case that we recommended charges and that no charges were filed, but I don't know -- I didn't know the specifics of whether or not we wrote the affidavit and we did everything else that we had spoken about earlier.
Q. Relatedly, has KBI ever found there was no probable cause in a case where the district attorney or prosecutor did eventually press charges?
A. Not that I'm aware of.
Q. I think at some point you were asked about -- it was a little hard to hear -- but whether KBI, as a matter of practice, would intervene if an agent was sitting in an interview and the interviewing officer was doing something improper.
     Did I hear that correctly?
A. You did.

**Page 126**

Q. Okay. Do you know what I mean if I say (transmission interruption) for purposes of interviewing what a leading question is?
     REPORTER: You have to repeat that. Something broke up.
Q. Do you know what a leading question is?
A. I do.
Q. All right. And is that fair to say that it is a type of question that suggests a specific answer?
A. Yes, ma'am.
     MR. PIGG: Objection; that was a leading question.
BY MS. VAN BRUNT:
Q. Would you agree that leading questions are generally improper in investigative interviews?
     MR. PIGG: Object to form.
A. Yes, ma'am. I agree that they are improper.
Q. Okay. For instance, in an officer-involved shooting, it would be improper for the questioner to pose a question that suggested why a shooting might be justified; correct?
     MR. PIGG: Object to form.
A. That is correct. I mean, that's one of the

**Page 127**

reasons we use the cognitive approach and let them narrate it to avoid those types of questions.
Q. Okay. If KBI -- if a KBI agent who was sitting in on an interview of an officer-involved shooting case saw that the questioner was using leading questions, what is a KBI officer expected to do in that event?
A. I can't speculate as to what another agent would do, to be honest with you. I know what I would do. I don't know if there is any sort of policy regarding that from a KBI standard or view. I'm not aware --
Q. What would you do? Sorry.
A. I would probably stop the interview and discuss that with the other interviewer outside of the presence of the person that we're interviewing and warn them about -- I'm sorry.
Q. Sorry. Keep going.
A. I would warn them about the -- the problems associated with asking leading questions.
Q. Do you have -- have you ever done that?
A. I honestly don't -- I'm sure I've done it

**Page 128**

once or twice, but I honestly don't recall off the top of my head.
Q. Do you recall whether those were Wichita cases?
A. No.
Q. At the very beginning of the deposition, I asked you to summarize what you discussed with Mr. Pigg prior to the deposition starting, and I think you said something like we discussed Wichita Police Department procedures, and you said that there were some procedures, I believe, that could be improved upon.
     Did I have that right?
A. You did.
Q. And what procedures are you referring to?
A. As we mentioned, our role in Wichita is limited, to say the least. So I advised Mr. Pigg that I think that there were certain roles that the KBI could accomplish that would benefit the overall investigative experience, appearance, however you want to look at it, the investigation, one of those being the use of our crime scene team, and so that they're not handling evidence themselves