# EXHIBIT 21

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

```
           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF KANSAS


  LISA G. FINCH, Individually, as   )
  Co-Administrator of the Estate    )
  of Andrew Thomas Finch,           )
  deceased, and as Next Friend      )
  for her minor granddaughter,      )
  AF; DOMINICA C. FINCH, as         )
  Co-Administrator of the Estate    )
  of Andrew Thomas Finch,           )
  deceased; and ALI ABDELHADI,      )
                                    )
            Plaintiffs,   )
                                    )
      vs.            )Case No.
                     )18-CV-01018-JWB-KGS
  CITY OF WICHITA, KANSAS;          )
  JOHN DOE POLICE OFFICERS 1-10,    )
                                    )
            Defendants.  )
                                    )

               D E P O S I T I O N

     The videotape deposition of MICHAEL AMY taken on
  behalf of the Plaintiffs pursuant to the Federal Rules of
  Civil Procedure before:
           RICK J. FLORES, CSR
           KELLEY REPORTING ASSOCIATES, LTD.
           515 South Main, Suite 108
           Wichita, Kansas  67202

  a Certified Shorthand Reporter of Kansas, at 455 North
  Main, 9th Floor, Wichita, Sedgwick County, Kansas, on the
  11th day of June, 2019, at 11:45 a.m.
```

                                                    1

```
1              A P P E A R A N C E S
2
3  PLAINTIFFS:
      (VIA VIDEOCONFERENCE)
4     MACARTHUR JUSTICE CENTER
      Ms. Sheila Bedi
5     Northwestern Pritzker School of Law
      375 E. Chicago Ave., 8th Floor
6     Chicago, IL 60611
      (312) 771-2444
7     Fax:  (312) 641-6866
      sheila.bedi@law.northwestern.edu
8
      CONLEE SCHMIDT & EMERSON, LLP
9     Mr. Rick E. Bailey
      Suite 300
10    200 West Douglas
      Wichita, KS  67202
11    (316) 264-3300
      Fax:  (316) 264-3423
12    rbailey@fcse.net
13
   DEFENDANTS:
14    FISHER PATTERSON SAYLER & SMITH, LLP
      Mr. J. Steven Pigg
15    3550 S.W. 5th Street
      375 East Chicago Avenue - 8th Floor
16    Topeka, KS  66606
      (785) 232-7761
17    Fax:  (785) 232-6604
      spigg@fisherpatterson.com
18
19 VIDEOGRAPHER:
      Advanced Document Imaging
20    Mr. Michael Miles
      515 S. Main, Suite 108
21    Wichita, KS  67202
      (316) 267-9380
22    Fax:  (316) 267-8200
      video@kelleyreporting.com
23
24
25
26
27
```

                                                    2

```
1                  I N D E X
2
3
4  MICHAEL AMY
   Direct Examination by Ms. Bedi:            4
5
   Cross-Examination by Mr. Pigg:             61
6
   Redirect Examination by Ms. Bedi:          62
7
   Recross Examination by Mr. Pigg:           63
8
9
10
   Amy Exhibits
11 No. 108 - PSB Administrative Internal      25
             Investigation 17PSB-3349
12           Re:  Betts Incident (50 pgs)
13
14
15
16
17
18
19
20
21
22
23
24
25
26 SIGNATURE OF WITNESS                       64
27 CERTIFICATE                                65
```

                                                    3

```
1              VIDEOGRAPHER:  This begins the
2     videotape deposition of Michael Amy.  Today
3     is June 11th, 2019, and the time is 11:45
4     a.m.
5         Will the court reporter please swear
6     in the witness.
7              MICHAEL AMY
8  having been first duly sworn on his oath to
9  state the truth, the whole truth, and nothing
10 but the truth, testifies as follows:
11             DIRECT EXAMINATION
12 BY MS. BEDI:
13    Q.  Good morning, Detective Amy.
14    A.  Good morning, ma'am.
15    Q.  Do I have that correct?  Is it Detective Amy?
16    A.  That is correct.
17    Q.  Have you ever given a deposition before?
18    A.  Approximately 20 years ago.
19    Q.  Well, we'll refresh some of the ground rules
20    of a deposition for you.
21        You understand that you are under
22    oath; is that right?
23    A.  Correct.
24    Q.  And you know that I will be asking the
25    questions, you'll be giving the answers, the
```

                                                    4

```
 1       law enforcement agencies have taken full
 2       responsibility for conducting a criminal
 3       investigation of a department member?
 4    A. Yes.
 5    Q. Under what circumstances?
 6    A. If the officer -- in my experience, if the
 7       officer's been accused of a crime.
 8    Q. And are you aware of any circumstances where
 9       an officer has been accused of a crime?
10    A. Yes.
11    Q. And describe those circumstances.
12    A. You talking about a specific case or --
13    Q. Yes, a specific case.
14    A. I have one that's actually sitting on hold
15       where an officer's been involved in a serious
16       injury collision.  It was investigated by --
17       actually, that one was in partnership with
18       the Kansas Highway Patrol.  It has since been
19       charged in the Sedgwick County District
20       Court.
21    Q. What is that officer's name?
22    A. Samuel Dugo.
23    Q. Are you aware of any officer-involved
24       shootings where an outside law enforcement
25       entity has taken sole responsibility for
                                              21
```

```
 1       investigation?
 2    A. I'm not sure sole responsibility.  I know who
 3       the lead is on them, but I'm not sure sole
 4       responsibility would be the word I'd use.
 5    Q. What's the word you would use to characterize
 6       the nature of the involvement of any outside
 7       law enforcement entity into reviews of
 8       officer-involved shooting -- I'm sorry --
 9       into investigations of officer-involved
10       shooting?
11    A. There's actually several.  Your lead agency
12       is the Kansas Bureau of Investigation.  They
13       also work in partnership with Wichita police
14       homicide unit.  You have the Sedgwick County
15       District Attorney's Office and their
16       investigators, as well.
17    Q. What is your understanding of the
18       responsibility of the KBI as a lead agency in
19       matters related to officer-involved
20       shootings?
21    A. To oversee the investigation.
22    Q. And what does that entail?
23       What does overseeing an investigation
24       entail?
25    A. The best way I understand it is from my work
                                              22
```

```
 1       with KHP in my prior unit.  Serious injury
 2       collisions or them would also involve an
 3       outside agent, which would be Kansas Highway
 4       Patrol.  They did the scene work.  They -- in
 5       my case, this is the only one I've worked so
 6       I'm not as familiar with us, other than KBI
 7       comes in and does -- follows along with the
 8       investigation, sits in on interviews.  Their
 9       role outside of that would be better asked of
10       homicide than it would be of me.
11    Q. Let's go to 904.12 on the second page of the
12       policy.
13    A. I'm there now.
14    Q. And it states that members directly involved
15       in police action resulting in serious injury
16       or death will be notified that this is a
17       criminal investigation, not an administrative
18       one.
19         Did I read that accurately?
20    A. You did.
21    Q. What is the difference between a criminal
22       investigation and an administrative
23       investigation?
24    A. In a criminal investigation, they're
25       investigating whether or not a crime has been
                                              23
```

```
 1       committed.
 2         In an administrative investigation,
 3       we're looking into whether our policies were
 4       followed or not.
 5    Q. Relative to an officer-involved shooting,
 6       what are the steps of an administrative
 7       investigation?
 8    A. I can't say all the time, but for the most
 9       part, it's not all the time, but like in the
10       particular one I did, you may respond to the
11       scene and watch.  You'll get a briefing of
12       what actually occurred, but we don't ask any
13       questions.  We'll just watch.  After that,
14       the criminal investigation is worked.  Once
15       it's presented to the DA's office, the --
16       whoever the investigator is that has the case
17       file will turn the case file over to a member
18       of PSB for review.
19    Q. And then the PSB detective will review the
20       file by reading the investigations; is that
21       right?
22    A. Yes.
23    Q. And reading the interviews; is that right?
24    A. Yes.
25    Q. And what other steps will the PSB detective
                                              24
```

```
 1       take once the file is turned over to him from
 2       the homicide?
 3   A.  You try to look at AXON video if there's any,
 4       or any surveillance footage that was
 5       provided.  You'll look at interviews,
 6       photographs, what's included in the file
 7       normally.
 8   Q.  Is there any requirement that a PSB detective
 9       conduct his or her own independent interviews
10       with involved officers in order to complete
11       an administrative investigation?
12   A.  Not to my knowledge.
13   Q.  Let's now go to what was previously marked as
14       Exhibit 111.  111.
15   A.  We have to change books.  Hold on just a
16       moment.
17               MR. BAILEY:  It may not be tabbed
18       in the back.
19   A.  All I have is 107.
20               MR. BAILEY:  107.  I don't think
21       we have a 111.  What is that?
22               MS. BEDI:  This is -- this is the
23       Aliana Orme investigation.  It's bates 11616.
24               (Off-the-record discussion.)
25               (Amy Exhibit No. 108 was marked for
                                                    25
```

```
 1       identification.)
 2               MR. PIGG:  We need to break to go
 3       to the restroom.
 4               MS. BEDI:  Sure.
 5               VIDEOGRAPHER:  Off the record
 6       12:17.
 7               (A recess was taken from 12:17 p.m. to
 8       12:24 p.m.)
 9               VIDEOGRAPHER:  Back on the record
10       at 12:24.
11   BY MS. BEDI:
12   Q.  All right.  Detective Amy, you have in front
13       of you what was marked as Exhibit 108, which
14       is the PSB review of a shooting of Aliana
15       Orme; is that right?
16   A.  Correct.
17   Q.  And your name is on the first page of that
18       exhibit; is that correct?
19   A.  It is.
20   Q.  Did you conduct a review of this
21       officer-involved shooting?
22   A.  I did.
23   Q.  What steps did you take relative to your
24       review here?
25   A.  I reviewed the case file on this one, as
                                                    26
```

```
 1       well, videos, things of that nature.
 2       Initially, we were going to -- I was told to
 3       do a review, so I began the review process.
 4       Then there was a meeting, and they did --
 5       staff determined that they wanted a internal
 6       investigation.  I interviewed two witnesses,
 7       which would be, I believe, Officer Corlis and
 8       Sergeant Crouch.  There was discussion on
 9       interviewing Officer Betts, which I argued
10       against and, ultimately, we did not.  There
11       was a criminal investigation going on.  It
12       would not have been appropriate to interview
13       the focus during the active criminal
14       investigation and the subsequent charging.
15   Q.  Was Officer Betts charged in this incident?
16   A.  Yes, he was.
17   Q.  What was he charged with?
18   A.  It'd be -- I think I remember, but it'd be
19       more speculation if I answer.
20   Q.  Okay.  Just based on the best of your
21       recollection.
22   A.  I believe it was agg battery.
23   Q.  And do you know if Officer Betts is still
24       employed by the Wichita Police Department?
25   A.  No, ma'am.  My understanding was he was a
                                                    27
```

```
 1       probationary employee and they terminated his
 2       employment.
 3   Q.  And if I understand your testimony correctly,
 4       you argued against interviewing Officer Betts
 5       because the criminal investigation was
 6       ongoing; is that right?
 7   A.  Yeah, there was -- I can't remember if he had
 8       been charged at that point or not, but yes, I
 9       did argue against it because of the in
10       criminal -- I'm sorry -- because of the
11       criminal investigation.
12   Q.  Would you believe that this would be a fair
13       characterization of this incident:  That
14       Officer Betts discharged his firearm while he
15       was attempting to shoot a dog that he claimed
16       was attacking him.  That bullet fragments
17       from the shot struck a 9-year-old child and
18       that he fired two shots while four children
19       were present?
20   A.  That sounds accurate.
21   Q.  Is there anything about that that you would
22       change based on your review?
23   A.  When you ask me what I would change, what do
24       you mean?
25   Q.  Is there anything about what I just read to
                                                    28
```

**Page 29**

```
 1        you that you would change, that you think was
 2        an inaccurate statement of what happened
 3        here?
 4   A.   I haven't reviewed this in awhile so, like,
 5        when you say the number of shots fired, it
 6        sounds accurate, but without reading through
 7        this report again, do you understand what I'm
 8        saying?  I haven't read this report in a
 9        while.
10   Q.   I understand.
11   A.   It sounds accurate.
12   Q.   Based on the best of your -- based on the
13        best of your recollection, that sounds like
14        an accurate description?
15   A.   Yes.
16   Q.   Okay.  All right.  Let's go to Page 14 of the
17        report.
18            You authored this report; is that
19        correct?
20   A.   I did.
21   Q.   And the summary here is where you're
22        describing what you see on the body cam
23        footage; is that right?
24   A.   Yes.
25   Q.   I am going to read the two paragraphs in the
```

**Page 30**

```
 1        middle of the page.
 2            The dog continued to charge at Officer
 3        Betts as Officer Betts retreated towards the
 4        southwest corner of the living room.  Officer
 5        Betts fired two shots at the dog with his
 6        city issued Glock 17 9 millimeter handgun.
 7        Aliana was still seated in front of the couch
 8        in the living room facing south with her
 9        knees pulled up to her chest.  The dog was in
10        front of Aliana when the shots were fired.
11        Betts missed the dog striking the floor with
12        both shots.  The dog retreated down the
13        hallway and Aliana immediately rose to her
14        feet and began to scream.  Aliana ran towards
15        the hallway holding her right eye.
16            Did I read that accurately?
17   A.   Yes.
18   Q.   And that is what you observed when you were
19        watching the video cam footage; is that
20        right?
21   A.   Yes.
22   Q.   Based on your experience, does the shooting
23        here comport with WPD policy?
24   A.   When you say comport, do you mean agree?
25   Q.   Yes.
```

**Page 31**

```
 1   A.   No, I would believe this to be outside of
 2        policy.
 3   Q.   In what way was this -- was this shooting
 4        outside of policy?
 5   A.   You had four children present in the room,
 6        the ages you've already mentioned.
 7        Basically, when you looked at how the shots
 8        were fired, it placed those four children in
 9        danger.
10   Q.   What should an officer have done in this
11        circumstance?
12   A.   I could make suggestions.  There are several
13        different things he could have attempted, but
14        firing his weapon would be one that I would
15        say he should not have done.
16   Q.   What are the suggestions that you would make?
17   A.   Try your pepper spray, kick the dog.  You
18        have a baton.  I believe -- I'd have to go
19        back and review, but I believe he also had a
20        Taser on him, as well.  Any of those steps or
21        even physically fight the dog would have been
22        a much better alternative.
23   Q.   Let's go to Page 11 of this report.
24            Here is, again, a summary that was
25        written by you; is that right?
```

**Page 32**

```
 1   A.   Yes.
 2   Q.   And in the middle of the page, it states the
 3        origin of the call.  The reason why the
 4        police were at this residence was in response
 5        to one of the residents threatening to kill
 6        himself and scaring some of the other people
 7        in the residence.
 8            Is that accurate?
 9   A.   Yes.
10   Q.   Did you evaluate whether the officers acted
11        in conformity with any policies governing the
12        interactions of people that deal with mental
13        illness when making your review of this case?
14   A.   I don't know that I reviewed specifically,
15        but I knew that they had acted upon it.  If I
16        remember correctly, again, I haven't read
17        this in awhile, I thought that the male was
18        taken for evaluation later on that evening.
19        Mental health evaluation.
20   Q.   So if we look at -- I'm sorry.
21   A.   That's okay.
22   Q.   If you look at Page 10 of the report, there's
23        the -- you cite the policy and regulation
24        investigation; is that right?
25   A.   I did.
```

**Page 33**

1   Q.  And there the --
2   A.  My fault.  That's the regulation.
3   Q.  And the policy and regulation that is cited
4       here is about use of force.
5            There's nothing cited here about
6       interacting with people who live with mental
7       illness; is that right?
8   A.  That's correct.
9   Q.  So is it fair to say your review of this
10      incident focused solely on Officer Betts'
11      decision to discharge his firearm?
12  A.  Yes.
13  Q.  You did not conduct any review of the
14      officers' decision to enter the home once
15      they had made contact with the individual who
16      had threatened suicide; is that right?
17  A.  It was discussed in the interviews with, I
18      believe, Officer Corlis and Sergeant Crouch.
19  Q.  Did you make any conclusions about whether
20      the officers' decision to enter the home was
21      done in compliance with policy?
22  A.  This is an incomplete investigation.  I don't
23      believe I concluded on that area.
24  Q.  That was going to be one of my questions
25      later on.

**Page 34**

1       Did you issue any findings here?
2   A.  Not that I recall.  They terminated the focus
3       officer before he was interviewed.
4   Q.  So that means you did not come to any
5       conclusions with regards to this
6       investigation; is that right?
7   A.  Not that I'm seeing in the report in front of
8       me.
9   Q.  If we look at Page 37 of the report, here is
10      a summary that you completed of an interview
11      between Officer Betts and Detective Chisholm;
12      is that right?
13  A.  Yes.
14  Q.  And here in the middle of the page there is
15      an exchange between Detective Chisholm and
16      Officer Betts where Detective Chisholm asked
17      him:  Why'd you have your firearm out?
18           Officer Betts answers:  Based on the
19      fact that I know there's a gun in the house.
20      I'm not sure who else is in the house.  Maybe
21      another person who could be hostile to us.
22           Did I read that accurately?
23  A.  You did.
24  Q.  Did you conduct any review of Officer Betts'
25      decision to enter the house with his gun

**Page 35**

1       drawn?
2   A.  I know it was something I was going to cover
3       in his interview.  And I know I asked -- I'm
4       pretty confident I asked relevant questions
5       to Officer Corlis about that, about the
6       decision of why Betts had his gun out, but I
7       didn't specifically get to ask Betts why he
8       had it out.
9   Q.  Based on your understanding of the relevant
10      facts of this matter, was Betts' decision to
11      enter the home with his gun drawn, was that
12      done in compliance with Wichita Police
13      Department policy?
14  A.  I know what Officer Corlis told me during his
15      interview.  For me to weigh in on whether he
16      complied policy, a lot of that would be to
17      what his thought process was when he entered
18      that -- in that residence, and I didn't
19      really get the time to interview him to
20      really dig into that.
21  Q.  So based on what you know at the time, you
22      don't -- based on what you know as you sit
23      here today, you don't feel like you're in a
24      position where you can make the call about
25      whether entering the home with a gun drawn

**Page 36**

1       was in violation of policy; is that fair?
2   A.  That would be fair.  I know what Officer
3       Corlis told me, but I would have liked to
4       have conducted my own interview to figure
5       that for myself.
6   Q.  What is it that you recall that Officer
7       Corlis said to you?
8   A.  Officer Corlis did not have his gun drawn
9       when he entered the residence.  Best I can
10      remember from memory, I asked him why.  I
11      want to say he said something to the effect
12      he didn't think it was necessary.  But that's
13      not exact by any means.
14  Q.  So does the fact that Officer Corlis -- does
15      the fact that Officer Corlis did not think it
16      was necessary to draw his gun, does that lead
17      you to a conclusion that it was unreasonable
18      for Officer Betts to draw his gun?
19  A.  I don't think you can be that conclusory with
20      just one statement from one party involved.
21      I would have liked to have had an interview
22      with Betts.
23  Q.  Understood.  In reviewing this incident, did
24      you have any concern about the role in the
25      other officers who were responding and the

```
 1        investigation?  Or this review, excuse me.
 2   A.   I reviewed the case file that was turned over
 3        toward me -- or to me.
 4   Q.   Did you make any recommendations related to
 5        this incident?
 6   A.   Based on my own opinion and analysis, I made
 7        a suggestion at the end, yes.
 8   Q.   And those are your areas of concern; is that
 9        right?
10   A.   Yes.
11   Q.   We'll talk about those in a moment.
12             Look at the front page of the exhibit.
13             This is the chain of command that you
14        mentioned earlier; is that right?
15   A.   Yes.
16   Q.   And does this indicate to you that the
17        officer who was involved in this shooting was
18        exonerated?
19   A.   Yes.
20   Q.   Are you aware if the district attorney made a
21        ruling on this case?
22   A.   I believe he did.
23   Q.   And what do you believe the ruling was?
24   A.   I believe it was no charges would be filed.
25        I'd have to -- it's on the back page of his
                                                              45

 1        document.  I've seen it.  I just don't have
 2        it in front of me.
 3   Q.   All right.  So if we look at Page 3 of the
 4        report, here you list the policies and
 5        regulations that your review focused on; is
 6        that correct?
 7   A.   Yes.
 8   Q.   And so here you did not include anything
 9        about -- about SWAT; is that right?
10   A.   No, I did not list Policy 602.
11   Q.   And you did not include anything about --
12        about interacting with people who live with
13        mental health issues; is that right?
14   A.   Are you referring to a specific policy?
15   Q.   I am referring to a specific policy.  I know
16        that there is a policy that the Wichita
17        Police Department has.  It is Policy 519,
18        Mentally Ill Person/Crisis Intervention Team.
19   A.   No, I did not --
20   Q.   You do not refer --
21   A.   No, I did not.
22   Q.   -- to that policy?
23   A.   No, ma'am.
24   Q.   For the record, the policy on mentally ill
25        persons is Exhibit 55.
                                                              46

 1   Q.   So describe the steps you took related
 2        to your review of this incident.
 3   A.   The same as before:  Photographs, videos,
 4        transcripts, the dispatch call to 911.
 5        That's what I can remember without having the
 6        file in front of me.
 7   Q.   Let's look at Page 14 of the report.
 8             I'm going to read the third paragraph:
 9        At approximately 0715 hours, Laura called
10        Sedgwick County 911.  My brother is on drugs
11        and he has a knife and he's trying to kill my
12        sister-in-law.  Please get someone -- please
13        get someone to get here right away, please,
14        please.  Laura pleaded with 911 to send
15        police and provided Jose's name and a
16        physical description.  The four kids inside
17        the residence, Abrian, Mariana, Mariela and
18        Yulisa were brought outside the residence
19        through the back door.  Rodrigo and Manuel
20        again exited the residence while Natividad
21        took the children to her residence at 1304
22        North Wellington.
23             Did I read that accurately?
24   A.   Yes.
25   Q.   Based on this description, is this an
                                                              47

 1        incident when officers should have been
 2        planning either for SWAT and/or for
 3        interacting with somebody who lived with
 4        mental illness?
 5   A.   They should have been preparing to assess and
 6        handle a dangerous situation is what they
 7        should have been preparing to do.
 8   Q.   But specifically should they have been
 9        operationalizing the SWAT policy, Policy 602,
10        and the policy for dealing with people who
11        live with mental illness?
12   A.   Based on the 911 call itself?
13   Q.   Based on the information they had from
14        dispatch, yes.
15   A.   No, I don't believe so.  They needed to
16        assess.
17   Q.   And what are the steps of assessing a
18        situation such as the one that I just read
19        into the record?
20   A.   Officers go to the scene.  They form a
21        perimeter.  They try to interview witnesses
22        or people that can provide information.  They
23        try to get additional information about the
24        house, who's inside.  There were a lot of
25        things that needed to be discovered.
                                                              48
```

```
 1    launcher being loaded.  It wasn't visually
 2    verified by a second officer, but,
 3    ultimately, it was not utilized.  It was
 4    resecured.  But still, there needs to be a
 5    reminder that we have to visually verify that
 6    to make sure that we're putting the proper
 7    round inside it.
 8  Q.  And here in your areas of concern, you also
 9    make a number of recommendations about the
10    SWAT notification process; is that right?
11  A.  Yes.
12  Q.  And on Page 36, the first recommendation is
13    that the time delay for paging SWAT was
14    delayed by 15 minutes in this case.  And you
15    state that you reviewed two other SWAT
16    callouts to evaluate from the time -- the
17    time from the request for SWAT and the noted
18    SWAT notification time by dispatch.
19        Did I read that accurately?
20  A.  Yes.
21  Q.  Why was this an area of concern?
22  A.  It was -- it was my analysis of 602.  I look
23    at it as it was my suggestion, my opinion on
24    a way to -- that we may be able to possibly
25    consider to improve.
                                              53
```

```
 1  Q.  Did anybody ask you to do this type of
 2    analysis?
 3  A.  No.
 4  Q.  Are you aware of any actions that were taken
 5    as a result of your analysis?
 6  A.  Only one.
 7  Q.  And what is that?
 8  A.  And I just became aware yesterday.  There is
 9    a -- it would appear that there's a guide to
10    show -- I don't know how to describe it, like
11    the SWAT callout process.  Am I making sense?
12  Q.  Sorry.  I'm not following.
13  A.  I thought so.  Not a matrix, but like a
14    guideline, steps to follow for the SWAT
15    callout process, somebody had one of those
16    yesterday.  That is the first I'd ever seen
17    of it.
18  Q.  Do you know how recent -- recently the guides
19    for the SWAT callout process was developed?
20  A.  No, ma'am, I cannot answer that.
21  Q.  But that's not something you had ever seen
22    since yesterday?
23  A.  I saw it for the first time yesterday.
24  Q.  Your second bullet point was that the process
25    for notifying SWAT is complex, time consuming
                                              54
```

```
 1    and lacks efficiency.  Several -- several
 2    layers of notifications are required to be
 3    made prior to the SWAT team being paged.
 4        Did I read that accurately?
 5  A.  You did.
 6  Q.  And why did you include this finding in your
 7    areas of concern?
 8  A.  Observations I made watching the video.
 9  Q.  Are you aware of any changes that have been
10    made as a result of this observation?
11  A.  No.
12  Q.  Have you made any inquiries to determine if
13    any actions have been taken as a result of
14    your observation here?
15  A.  No, ma'am.  That consideration would be well
16    above where I'm at.
17  Q.  Has anybody above where you're at come and
18    talked to you about this observation and
19    asked for your ideas about how to implement
20    any changes here?
21  A.  Not that I can recall, no.
22  Q.  Your third bullet was on scene officers have
23    limited options when dealing with barricaded
24    subjects or hostage situation.  These
25    incidents have the potential to rapidly
                                              55
```

```
 1    evolve and exceed the abilities, training and
 2    equipment available to patrol officers.
 3        Did I read that accurately?
 4  A.  You did.
 5  Q.  Are you aware of any changes that have been
 6    made as a result of the observation you made
 7    here?
 8  A.  I haven't inquired and I'm not aware of
 9    anything at this point.
10  Q.  Has anybody above your chain of command come
11    and talked to you about this observation and
12    asked you for any input about changes that
13    could be made to ensure that officers have
14    adequate training, abilities and equipment to
15    respond to barricaded subjects or hostage
16    situations?
17        MR. PIGG:  Object to form.
18  BY MS. BEDI:
19  Q.  You can answer.
20  A.  Okay.  I'm sorry.
21        MR. PIGG:  Yeah.  Go ahead and
22    answer.
23  A.  I apologize.  Not that I can recall.
24  Q.  Is it possible that somebody in your chain of
25    command came to you and asked you about what
                                              56
```

Pages 53 to 56

**Page 57**

kind of training or equipment officers needed to deal with barricaded subjects and hostage -- hostage situations and you just don't remember?

A. I wouldn't -- I mean, anything's possible, but I don't -- I don't know that I even -- you asking that that I'd be the proper person to ask that of.

Q. Well, that's what I'm asking, right. I'm asking if anybody came and asked -- you wrote this; correct?

A. Yes.

Q. This is your observations?

A. Yes. Absolutely.

Q. And my question is and did anybody in your chain of command come and say to you: We appreciate this observation. Based on your observation, what do you think we should do to address the training and equipment deficiencies that you observed? Did anybody come and have that conversation with you?

MR. PIGG: Object to form of the question.

A. Not that I remember.

**Page 58**

Q. The next bullet talks about lieutenant -- and help me with his name. I don't want to butcher it.

A. Kochenderfer.

Q. Okay. Lieutenant Kochenderfer and the fact that he is one of the last commanders to be notified when a request for SWAT has been made, yet he's got this invaluable training and experience on these incidents. Is that a fair characterization of the next bullet?

A. It is.

Q. And you also recommend that he should be -- that the SWAT commander should be the first point of contact when there is a decision made to activate SWAT; is that right?

A. I said it should be considered, I did.

Q. Are you aware of any changes were made -- if any changes have been made to a policy or procedure as a result of this observation?

A. Not that I'm aware of, but I'm not involved in that process of the SWAT callout, so not that I've seen and I haven't reviewed another one.

Q. And has anybody in the chain of command

**Page 59**

spoken to you specifically about this recommendation?

A. Not that I remember.

Q. Your third -- I'm sorry, not your third, but your next observation focuses on other demands that are made on the on scene supervisor, and the fact that the on scene supervisor is inundated with phone calls once a request for SWAT has been -- has been made. And your recommendation is that those need to be limited so that the supervisor can focus on managing the scene and ensuring the safety of both the officers and the community members. Is that a fair characterization of your next observation?

A. That was my opinion.

Q. Are you aware of any changes that have been made to policy or practice or training as a result of this observation?

A. Not that I remember.

Q. Has anybody in your chain of command come in and spoken to you about this observation?

A. Not that I remember.

Q. And your last observation here is that watch

**Page 60**

commanders and supervisors should have training on the guidelines and requirements for SWAT activation. And you make a recommendation here that there should be a matrix or a guide to assist with the decisionmaking process and the requirements to request SWAT notification.

A. Yes.

Q. And I believe your testimony was that you saw, for the first time yesterday, a matrix that was in response -- that could be in response to this recommendation; is that fair?

A. It could be. It looked like some type of guide to me, yes.

Q. And did anybody in your chain of command come and speak to you specifically about this recommendation?

A. Not that I remember.

MS. BEDI: Give us just one second.

(Off-the-record discussion.)

MS. BEDI: Okay. I've got -- I've got nothing further.