# EXHIBIT 22

**Lisa G. Finch, et al. vs. City of Wichita, Kansas**

**Case No. 18-cv-1018-JWB-ADM**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**



**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA G. FINCH, Individually, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased, and as Next Friend )
for her minor granddaughter, )
AF; DOMINICA C. FINCH, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased; and ALI ABDELHADI, )
Plaintiffs, )
)
vs. )Case No.
)18-CV-01018-JWB-KGS
CITY OF WICHITA, KANSAS; )
JOHN DOE POLICE OFFICERS 1-10, )
)
Defendants. )
)

D E P O S I T I O N

The videotape deposition of CHIEF GORDON RAMSAY
taken on behalf of the Plaintiffs pursuant to the Federal
Rules of Civil Procedure before:
RICK J. FLORES, CSR
KELLEY REPORTING ASSOCIATES, LTD.
515 South Main, Suite 108
Wichita, Kansas 67202

a Certified Shorthand Reporter of Kansas, at 455 North
Main, 13th Floor, Wichita, Sedgwick County, Kansas, on
the 24th day of May, 2019, at 8:14 a.m.

**Page 2**

A P P E A R A N C E S

PLAINTIFFS:
MACARTHUR JUSTICE CENTER
Ms. Sheila Bedi
Northwestern Pritzker School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 771-2444
Fax: (312) 641-6866
sheila.bedi@law.northwestern.edu
CONLEE SCHMIDT & EMERSON, LLP
Mr. Rick E. Bailey
Suite 300
200 West Douglas
Wichita, KS 67202
(316) 264-3300
Fax: (316) 264-3423
rbailey@fcse.net

DEFENDANTS:
FISHER PATTERSON SAYLER & SMITH, LLP
Mr. J. Steven Pigg
3550 S.W. 5th Street
Topeka, KS 66606
(785) 232-7761
Fax: (785) 232-6604
spigg@fisherpatterson.com

VIDEOGRAPHER:
Advanced Document Imaging
Mr. Michael Miles
515 S. Main, Suite 108
Wichita, KS 67202
(316) 267-9380
Fax: (316) 267-8200
Video@kelleyreporting.com

**Page 3**

I N D E X

CHIEF GORDON RAMSAY
Direct Examination by Ms. Bedi: 4

Ramsay Exhibits
No. 106 - WSU Wichita Police Department     14
Organizational Assessment
February 2015 (222 pgs)
(Reporter Note:  There was also an
Ex. 106 previously marked.)

No. 107 - Wichita Eagle Article 1-3-18     137
Quoting Chief Ramsay Re:  Swatting
Incident (2 pgs)

SIGNATURE OF WITNESS     214
CERTIFICATE     215

**Page 4**

VIDEOGRAPHER:  This begins the
videotape deposition of Gordon Ramsay.  Today
is May 24th, 2019, and the time is 8:14 a.m.
Will the court reporter please swear
in the witness.
CHIEF GORDON RAMSAY
having been first duly sworn on his oath to
state the truth, the whole truth, and nothing
but the truth, testifies as follows:
DIRECT EXAMINATION
BY MS. BEDI:
Q.  Good morning again, Chief Ramsay.
A.  Good morning.
Q.  I introduced myself off the record, but my
name is Sheila Bedi and I represent the
plaintiff in this matter.
Have you ever given a deposition
before?
A.  Yes.
Q.  So you understand the ground rules we're
working with here today.
A.  Yes.
Q.  You understand that you're under oath.
A.  Yes.
Q.  And that I will be asking the questions,

Pages 1 to 4

1  Q.  As an experienced law enforcement
2      professional, what are -- what do you believe
3      the priorities are when it comes to an
4      accountability system for police officers?
5  A.  Well, one is community trust, internal
6      mechanisms, trust from elected officials.
7  Q.  Let's talk about internal mechanisms.
8          What kind of internal mechanisms do
9      you believe are critical to a functioning
10     accountability system for police officers?
11 A.  Well, I believe that use of force is,
12     obviously, the -- one of the most visible.
13     That would be one.  All the way down to
14     ensuring that there is tracking on whether
15     reports are turned in or not, that there is
16     mechanisms to catch issues, to flag issues.
17     That's a big, big question.
18 Q.  It's a big question, yeah.  Intentionally,
19     it's a big question.
20         Are there such mechanisms in play in
21     the Wichita Police Department?
22 A.  Yes.
23 Q.  And are there any mechanisms that you put in
24     place as when you became chief?
25 A.  Yes.

9

1      police department, so we meet regularly with
2      them.  We have liaisons that discuss issues
3      and concerns when there's potential crimes
4      against all the communities that may be
5      biased.  We meet and talk about it and ensure
6      people are aware and ensure that they're okay
7      with the direction that we're going and
8      answer questions as we can.
9          We -- citizen oversight is important
10     to me and we created a Civilian Review Board.
11     We meet regularly with the community.  We
12     just had a community engagement panel where
13     we talk about issues and concerns that they
14     have on crime and police.  Many -- I could go
15     on and on.
16 Q.  Does the Civilian Review Board have the
17     ability to independently investigate
18     complaints of police misconduct?
19 A.  No.
20 Q.  Does -- is there any entity independent from
21     the Wichita Police Department that has the
22     ability to investigate complaints of police
23     misconduct?
24 A.  Depends if it's criminal or not.
25 Q.  Let's assume that there is a complaint that

11

1  Q.  And describe those mechanisms.
2  A.  Well, there's a number of them.  One, we have
3      reached out to various communities,
4      particularly, our communities of color.  We
5      created, in our African American community, a
6      group of pastors that assists us and guides
7      us on various community issues that are
8      particular to the African American community.
9      They come on calls with us when we have
10     sensitive issues.  They help liaison with the
11     community with us.  They advise me on
12     different issues.  We have officers that also
13     are specifically liaisoning with the African
14     American community, same with the Hispanic
15     and Latino community.  We have officers
16     assigned that liaison with them, as well as a
17     Hispanic Advisory Board where we meet
18     regularly and talk about policies and
19     opportunities to interact, talk about issues
20     such as immigration and our policies and how
21     they impact the Hispanic and Latino
22     community.
23         We created a group with the LBGTQ
24     community after discovering that they had
25     some concerns about relationships with the

10

1      is not criminal.
2  A.  Okay.
3  Q.  Is there an independent entity that can
4      conduct investigations?
5  A.  Yes, there is.
6  Q.  And what is that entity?
7  A.  It would be like the city attorney's office
8      could through the city manager or by --
9      otherwise, it would be internal.
10 Q.  And if there is a complaint that could be
11     criminal against a police officer, is there
12     an independent entity that conducts an
13     investigation?
14 A.  Yes.
15 Q.  And what is that entity?
16 A.  Generally, we have a -- in order to increase
17     the transparency, I entered an MOU with the
18     sheriff's department in 2017, I believe, for
19     them to investigate any criminal misconduct
20     against an officer.
21         So if we have a criminal complaint
22     against an officer, a concern that there may
23     be criminal charges, we immediately request
24     the sheriff's office to investigate.
25 Q.  Does the sheriff's office investigate all

12

Pages 9 to 12

1     instances of officer-involved shootings?
2     A.  No.
3     Q.  What entity is responsible for investigating
4         officer-involved shootings?
5     A.  Us and the KBI.
6     Q.  And the KBI is the Kansas Bureau of
7         Investigations?
8     A.  Yes.
9     Q.  And which law enforcement entity leads an
10        investigation in the event of an
11        officer-involved shooting?
12    A.  Well, I will tell you I would prefer that KBI
13        did everything.  When I arrived here, I had
14        spoken with the director about that; however,
15        they don't have the resources to totally do
16        everything.  They only have, unfortunately, a
17        few agents assigned here, so they are very
18        limited in what they can do.  So they act as
19        more of an auditor position or a oversight
20        position on ours and they shadow our
21        investigators and detectives and oversee the
22        investigation.
23    Q.  Do the KBI officers produce any written
24        document as a result of their audit of the
25        officer-involved shooting investigations

13

1     conducted by the Wichita Police Department?
2     A.  They do produce some documents.  I -- so the
3         criminal documents, generally, because
4         they're books like this, unless there's
5         concerns, that's the only time I hear from
6         them through their director.
7     Q.  So you don't regularly receive some kind of
8         report from the KBI about how an
9         officer-involved shooting went down?
10    A.  That is correct.
11        MS. BEDI:  All right.  I am going
12    to mark this as, I believe, 106.
13        (Ramsay Exhibit No. 106 was marked for
14    identification.)
15    BY MS. BEDI:
16    Q.  Chief Ramsay, are you familiar with Exhibit
17        106?
18    A.  Yes.
19    Q.  What is this document?
20    A.  This was an assessment that was done by
21        Wichita State University on the Wichita
22        Police Department.
23    Q.  And this assessment was done prior to coming
24        on as chief; is that right?
25    A.  Yes.

14

1     Q.  And has this assessment informed your
2         priorities as chief in any way?
3     A.  Yes.
4     Q.  In what way?
5     A.  It has been a -- I've used it as a guide to
6         focus on priorities.
7     Q.  And what priorities, in particular, were
8         informed by this document?
9     A.  One of the largest was the community
10        relations portion, building relationships
11        with our community, the body camera portion,
12        racial profiling portion, the -- they called
13        it a advisory and review board, but,
14        essentially, our Civilian Review Board.  The
15        use of force, community policing, all the
16        critical issues that they identified that I
17        mentioned most of them just now.
18    Q.  Let's go to xi in the introduction of this
19        document.
20    A.  How far down is that?
21    Q.  It's 5 or 6 pages in.
22    A.  Okay.
23    Q.  So this -- and I'll point you to the last
24        paragraph on this page which is a conclusion
25        to the executive summary and it states that

15

1     the organizational assessment provides a
2     blueprint for the next chief of police.
3         Is that how you've used this document?
4     A.  Yeah.
5     Q.  Yeah?
6     A.  Yes.
7     Q.  You would describe it as a -- as a blueprint?
8     A.  I would say it definitely helped guide my
9         priorities.
10    Q.  Is it a document that you currently refer to?
11    A.  Not so much because a lot of the issues in
12        here have been now it's on autopilot.  Like I
13        mentioned, the community groups that we work
14        with, the Civilian Review Board, a lot of
15        the -- most, if not all, the issues we have
16        addressed.
17    Q.  As you sit here today, are there any issues
18        in this report that you feel like you have
19        not addressed?
20    A.  I'd have to reread it to ensure I was
21        accurate, but I can tell you that we have
22        addressed the majority of them.
23    Q.  All right.
24    A.  If not all of them.
25    Q.  Let's go to Page 7 of the report.

16

1      A.  Yeah, all police officers go through that
2          training.  It's mandatory.  We call it
3          mandatory in-service.  It's not an option.
4      Q.  And have you made any changes to the training
5          that happens at the academy?
6      A.  A little more, yeah.  We do more on
7          communication, focus on deescalation at the
8          training academy, yes.
9      Q.  Does the training academy also use the
10         scenario-based training?
11     A.  Yes.
12     Q.  And does it also focus on critical --
13         critical thinking training?
14     A.  Yes.
15     Q.  Are you familiar with a training module
16         called Force Science?
17     A.  Yes, a little bit.
18     Q.  Have you ever had Force Science training?
19     A.  No.
20     Q.  Have you ever sent any of your officers to
21         Force Science training?
22     A.  Yes.
23     Q.  And what informed your decision to send your
24         officers to Force Science?
25     A.  One, I always want to learn more about it.

                                                    21

1      It -- in some cases, it can provide an
2          explanation on use of force incidents for
3          understanding what occurred.
4      Q.  In your judgment, is Force Science a
5          reputable source for training about use of
6          force?
7      A.  I -- I think some things there are.
8      Q.  Do you think some things there are not?
9      A.  I don't have -- I don't know enough about it.
10         I mean, there's some things I've heard where
11         I agree with, and there's some things that I
12         don't agree with.
13     Q.  What don't you agree with?
14     A.  Boy, that's specific.  Sometimes the time
15         delays sometimes I question.  Don't totally
16         agree with the time delays.
17     Q.  When you say time delays, what do you mean?
18     A.  You know, one of the focuses is on the
19         reaction time.  And some of the reaction time
20         things I've heard I am not totally onboard
21         with that.
22     Q.  But despite not being totally onboard with
23         the analysis that Force Science has done
24         about officer reaction times, you still send
25         your officers to Force Science training; is

                                                    22

1          that right?
2      A.  Yeah, because I think there's some very
3          valuable parts to it.
4      Q.  What are the parts that you find valuable?
5      A.  I think the analyzing of critical incidents
6          and I think the time studies are fascinating
7          and, in some cases, worthwhile.
8      Q.  Do you have any concerns about any of -- any
9          PSB detectives relying on the Force Science
10         training in analyzing officer-involved
11         shootings?
12     A.  I don't have concerns about them using it.  I
13         try to be very objective when I look at those
14         things and take into my -- my concerns and my
15         objectivity and apply my experience and my
16         beliefs and my feelings on the issue versus
17         just relying on Force Science.
18     Q.  So generally speaking, if a PSB detective
19         told you or if it became clear in a PSB
20         detective's report that he relied on Force
21         Science training in exonerating an officer
22         for a shooting, would that raise any red
23         flags for you?
24     A.  I wouldn't say red flags.  I would
25         definitely -- you know, as with all the

                                                    23

1          findings that PS provides -- PSB provides, I
2          take the time to objectively review them, and
3          I don't rely on experts or training.  I
4          review all of it and see if it's consistent
5          with what my philosophy is and what my
6          beliefs are as the police chief.
7      Q.  So it's not like you get a PSB report that
8          cited Force Science, you wouldn't say to the
9          officer:  This is junk science, you know, go
10         back and redo it.
11     A.  I would not say that.
12     Q.  And you also wouldn't say, oh, well, Force
13         Science says it's okay, so I'm going to sign
14         off on it.
15     A.  That is correct.
16     Q.  Is that right?
17         So you would take the officer's
18         analysis that includes Force Science and you
19         would look at it independently.
20         Is that your position?
21     A.  That's correct.
22     Q.  Okay.  All right.  And to be clear, your
23         officers are attending Force Science
24         currently?
25     A.  We don't have a lot.  I mean, we've sent -- I

                                                    24

                                              Pages 21 to 24

**Page 25**

don't know how many. I think maybe I've sent one that I can think of off the top of my head. Maybe, maybe one or two more, but I can't say for sure. I'd have to look at the records.

Q. And what informs your decision to send officers to Force Science?

A. Well, I mean, the training is valuable in the analysis of critical incidents. You know, I mean, we all go to training where we agree with some things and we don't agree with things. So I would put this with like any other training: You take the good parts and leave the parts you don't necessarily like. But I think, you know, I want to maintain that we are always looking at every possible angle and different considerations. And it's a very complex issue and I think the -- any training is valuable.

Q. Have you ever said to any of your officers who have been trained by Force Science, hey, I've got questions about this response time analysis and I think we should take that with a grain of salt?

A. I think there's some people know that I am

**Page 26**

not -- that I am very objective on issues they bring up related to any -- whether it's Force Science or any other perceived expert training in this issue.

Q. But have you ever said to any officers who have been trained by Force Science: I've got some questions about Force Science's conclusions about officer response time?

A. Maybe not in those words, but I have mentioned I have -- I want to look closely at these things and, yeah, there's several officers that know I am not going to just buy into Force Science.

Q. And what are the names of those officers?

A. Well, it was when I first got here. When I first arrived, it would have been -- in professional standards, it might have been Rusty Leeds, who was a captain at the time. Might have been Randy Reynolds, who was a lieutenant at the time, or Paul Duff, who was a lieutenant, or Captain Nolte who was in there for a while. I can't say for sure who it was I discussed it with, but I know I've had those conversations with some people.

Q. And did you have those conversations incident

**Page 27**

to a specific police shooting?

A. More on we discuss national incidents and, you know, I mean, there's no shortage of national policing incidents with shootings. And we frequently have debates on, you know, what'd you think of this case. So yeah, there's many, many discussion times where we've had that.

Q. Let's go back to the report.

A. Sure.

Q. Under training on this list of weaknesses of the department is communication.

A. Uh-huh.

Q. And it states that internal and external groups identified communication as an area for improvement. Specific themes included proactive communication on department policies and procedures, updates on internal activities and transparency on significant events.

Have you made any changes to address this analysis of the department's weakness?

A. Yes.

Q. And what are those changes?

A. A few of them are is we immediately provide

**Page 28**

information on shootings when they occur to the public. We have a portal that's part of an open data portal where we provide use of force information.

I -- when I speak to community groups, we often talk about the number of complaints and what we're doing and my philosophies on investigations.

The -- again, the Civilian Review Board is one way and our partnership with the other community groups and communities of color. Oftentimes, when we do have an incident that impacts a certain community, particularly, those that have had historical distrust, I will reach out to them and give them some insight as to what happened and share information with them.

Q. You mentioned your philosophy on investigations.

A. Uh-huh.

Q. What is -- excuse me.

What is your philosophy on investigations?

A. Can you narrow that a little bit.

Q. Well, I assume when you said your philosophy

1   review -- now that we have a Civilian Review
2   Board, we are reviewing cases with them.  So
3   they have oversight.  They can choose cases
4   to see or not see.
5   **Q.  Can you describe the powers of the Civilian**
6   **Review Board?**
7   A.  Yeah, they are an advisory group.  You know,
8   there's many different types of Civilian
9   Review Boards.  And I have extensive
10  experience with them.  I started one in my
11  old city, as well.  And there is no one size
12  fits all, for many reasons.  You have to
13  consider state law, contracts, as well as
14  what fits in a community, what works for a
15  community.
16  **Q.  Given your experience with them, I'm sure**
17  **you're aware of the fact that there are some**
18  **models of civilian oversight that provide the**
19  **oversight entity with the ability to**
20  **independently investigate instances of police**
21  **misconduct?**
22  A.  Yes.
23  **Q.  That's not the model here; is that right?**
24  A.  That is correct.
25  **Q.  And why is that?**

33

1   Why isn't that the model here?
2   A.  One is that my personal philosophy where
3   there is a -- I feel that there's a chief
4   that is responsible for discipline and
5   oversight of the department and, ultimately,
6   you can't have -- I don't believe you can
7   have a group managing a police department.
8   You need to have one person that manages it.
9   And if the chief isn't going in the direction
10  that the community or the elected officials
11  want, then you get a new chief.
12  **Q.  So you believe that external oversight**
13  **provided by -- by some sort of civilian board**
14  **could get in the way of police department**
15  **operations.**
16  **Is that a fair statement?**
17  A.  No, I would disagree.  If I could elaborate.
18  **Q.  Yes, please.**
19  A.  So I am happy to have people look at our -- a
20  group of citizens that have some
21  understanding of police procedures to review
22  our stuff.  I am proud of the work that we do
23  on our investigations and our internal
24  investigations, and I welcome the people to
25  look at it and, as I've said, to pull it

34

1   apart and pick and prod and ask questions.
2   And boy, if there's anything we can do
3   better, I want to know and I want people to
4   suggest it.  So I welcome scrutiny of our
5   cases.
6   **Q.  It sounds like what you're articulating is an**
7   **important philosophy about transparency.**
8   **Would you agree?**
9   A.  Yes.
10  **Q.  But it's not about independence, the**
11  **independence of investigations.**
12  **Would you agree?**
13  A.  I'm not sure I understand.
14  **Q.  Well, I'm sure you're aware that two of the**
15  **fundamental principles of police oversight**
16  **are independence and transparency, and**
17  **independence is frequently thought to include**
18  **having investigations that happen external to**
19  **the policing agency that's being**
20  **investigated.**
21  A.  So I think that's kind of a subjective
22  statement.  I would not have any problem with
23  an external group doing our investigations.
24  Matter of fact, you know, I'm aware of other
25  police departments that have a group outside

35

1   of the PD that investigate the complaints.  I
2   wouldn't have any issues on that.
3   **Q.  But currently right now the detectives of the**
4   **PSB investigate complaints?**
5   A.  Correct.
6   **Q.  Is that right?**
7   A.  Yeah.
8   **Q.  Are you making any efforts to have a group**
9   **external to the Wichita Police Department**
10  **investigate complaints?**
11  A.  No, I'm not.
12  **Q.  Why not?**
13  A.  Because I believe what we have is working.
14  **Q.  Okay.**
15  A.  Yeah.
16  **Q.  Let's go to Page 8 of the report.**
17  A.  Okay.
18  **Q.  And let's focus halfway down the page on**
19  **discipline and internal affairs.  I'm going**
20  **to read that for the record.**
21  **Comments were made from internal**
22  **stakeholders on the inconsistency and**
23  **expediency of discipline.  External**
24  **participants expressed frustration on the**
25  **transparency and expedience of the**

36

KELLEY REPORTING ASSOCIATES, LTD   515 S. MAIN, STE 105          WICHITA, KANSAS
316.267.8200                                     67202

1  the policy, actually, maybe even recommends
2  low level discipline to be handled in the
3  field.  That's been a policy that's been out
4  there for -- before this.
5  Q.  And what do you consider low level
6  discipline?
7  A.  A rudeness complaint, a driving complaint, a
8  fail to followup complaint.  We classify
9  complaints through a letter.  Minor
10  complaints are A, B's, maybe C's.  D, E and
11  F's are more serious.  And the policy gives
12  that latitude for those minor cases to be
13  pushed to the field.  And I believe it says
14  those serious cases will be investigated by
15  PSB with an option for me to decide where
16  they go.
17  Q.  And you have authority over whether PSB can
18  conduct an investigation; is that right?
19  A.  That is correct.
20  Q.  And PSB cannot act independently without your
21  authority; is that correct?
22  A.  Yeah.  I mean, they are given a lot of
23  latitude.  I don't -- I can't -- I don't have
24  the time to get involved in everything they
25  do, but when there is an investigation that's

61

1  initiated, I'm notified.  We take care to
2  ensure that all supervisors and leadership is
3  notified when an investigation is initiated.
4  Q.  All right.  Let's go to Page 72.  And I want
5  to focus now on the timing of administrative
6  investigations and criminal investigations.
7  And you understand what I mean when I
8  use those two terms; is that right?
9  A.  Correct.
10  Q.  What's the distinction between an
11  administrative investigation and a criminal
12  investigation?
13  A.  Well, criminal is looking at solely the
14  aspect of criminal behavior.  The internal is
15  looking at internal -- well, it can look at
16  criminal, as well; it does, but, primarily,
17  policy violations.  Was it within policy,
18  practice standards of the department.
19  Q.  And do you have a -- have you provided PSB
20  with a mandate about when a administrative
21  investigation should occur incident to a
22  criminal investigation?
23  A.  Yes.
24  Q.  And what is that mandate?
25  A.  The mandate is is that I don't want them

62

1  getting involved in a criminal investigation.
2  So generally they are standing by while a
3  criminal investigation is occurring as to not
4  potentially mix the two up.
5  Q.  So the mandate is -- and let's talk
6  specifically about officer-involved
7  shootings.
8  A.  Sure.
9  Q.  That there will be a criminal investigation
10  of an officer-involved shooting.
11  Once that criminal investigation ends,
12  then the administrative investigation can
13  begin.
14  A.  Yes.
15  Q.  Is that right?
16  A.  Yes.  They can gather some -- if some facts
17  come across, but I don't want them actively
18  doing the admin while a criminal's going on.
19  Q.  And why is that?
20  A.  Well, I don't ever want to taint a criminal
21  investigation.  And I know you're probably
22  well aware of the issues that can occur when
23  police taint a criminal with a
24  administrative, right.  We don't want to do
25  anything to potentially lose any criminal

63

1  charges because of actions by our
2  professional standards group, ever.
3  Q.  So it's your belief that holding back on the
4  administrative investigation and prioritizing
5  the criminal investigation ensures the
6  integrity of the criminal investigation?
7  A.  That's the idea, yes.
8  Q.  Are you concerned that waiting for the
9  criminal investigation to be completed prior
10  to beginning the administrative
11  investigation, that that will then prolong
12  the amount of time that any discipline, if
13  needed, would be implemented?
14  A.  So on an old officer-involved shooting,
15  generally, those are expedited criminally.
16  Generally, those don't take too long.  We
17  will often have some insight as to whether or
18  not, initially, within -- fairly quickly if
19  there's questions about it or not.
20  So even though we may not have all the
21  facts -- that's the wrong thing to say.  Even
22  if we don't have all the -- one hundred
23  percent of the information, generally, we
24  have an idea if this is a -- this is a
25  shooting that we need to be concerned about

64

Pages 61 to 64

1  concerning officer-involved incidents can
2  proceed simultaneously as criminal cases.
3  A.  Yeah.
4  Q.  And I believe that that directly contradicts
5  what we previously established.
6       Would you agree?
7  A.  Pretty much.  So there's also different
8  severities.  So take that racial profiling
9  complaint story I gave you where the -- it
10  had been a year and a half.  So they were not
11  starting those investigations until the
12  ticket was resolved in court.  So it took a
13  year and however many months to resolve that
14  ticket and they weren't starting those
15  investigations.  So for minor complaints, say
16  racial profiling or a rudeness complaint,
17  they weren't starting those until those
18  tickets were resolved in court.  I -- to me,
19  that's different than, say, an
20  officer-involved shooting.
21       So go forward on your investigations
22  on those where there's minor tickets that may
23  be involved 'cause we're not going to wait a
24  year and a half to resolve this versus the
25  going forward on a more serious criminal

73

1  investigation.
2  Q.  And if it's a more serious criminal
3  investigation, your view is that PSB needs to
4  stand down and collect evidence, but the
5  investigation does not proceed until the
6  termination of the criminal investigation?
7  A.  Be very careful.  And I think what happens
8  here is this all got mixed up into that --
9  they don't identify are we talking about a
10  minor racial profiling or a rudeness
11  complaint, or are we talking about a serious
12  potential felony criminal charge.
13  Q.  Okay.  Let's look Attachment H, which is in
14  the back.  It's one of the last attachments.
15  And this is a memo from attorney Eric Daigle.
16  A.  Okay.
17  Q.  And I'm just going to summarize a piece of
18  it.  The new procedures change the timing of
19  the investigation so that the administrative
20  investigation will now coincide with any
21  criminal investigation.  This change will
22  provide better information for the defense of
23  any civil claims and will allow discipline to
24  occur, if appropriate, immediately following
25  the incident.

74

1       And again, it's my understanding that
2  this was a recommendation that you considered
3  and, particularly, with regard to
4  officer-involved shootings, determined that
5  you did not want to implement.
6       Is that fair to say?
7  A.  I understand what you're getting at.  So if
8  there is -- oftentimes in these
9  officer-involved shootings, we know within a
10  reasonable amount of time whether or not it
11  meets the criminal threshold or policy
12  violation.  So I would say to an extent we do
13  this, maybe not full bore on felony
14  investigations as they're -- as he's saying.
15  I think it's troublesome to ever taint a
16  criminal investigation with an admin.  We do
17  not want to lose a potential criminal charge
18  against an officer because of a mistake of
19  PSB.
20       And one of the things that was
21  happening was they were going upstairs and
22  interacting with the criminal investigators.
23  And I believe that could be, potentially,
24  problematic for us if there was ever a
25  criminal charge.  So I don't want those guys

75

1  getting involved with it.  They can still
2  watch them on -- from their office and gather
3  information, but I don't want them getting
4  involved with the criminal investigation.
5  That's what I think was happening is they --
6  the pendulum swung a little too far, and they
7  were getting too engaged with the criminal
8  investigation.  That made me uncomfortable.
9  Q.  And so that's why you, then, develop the
10  mandate that the criminal investigation
11  begins and ends and then the administrative
12  investigation proceeds with full force; is
13  that right?
14  A.  A little bit, yeah.  So they can still gather
15  their information.  And I don't know if I'm
16  articulating it right 'cause a lot of it's --
17  you know, some cases they may start gathering
18  more information earlier.  But I guess the
19  one thing that I just wanted to make clear is
20  that when I got here, there was too much
21  cross-contamination of the criminal and the
22  internal.  And as the chief, I don't ever
23  want to be accused of a practice that -- that
24  we couldn't get criminal charges on because a
25  statement was thrown out because PSB

76

**Page 81**

resulted in or could have resulted in serious injury or death, including critical or fatal traffic accidents, the Wichita Police Department will initiate a criminal investigation.

And that was already the policy of the department when you took over; is that right?

A. I believe that's what they were doing, yes.

Q. And it's a policy that you wanted to -- you wanted to continue that policy once you took over?

A. Yes.

Q. And why is that?

Why did you want to ensure that there was a criminal investigation after there was an incident where somebody either was seriously injured or killed or could have been seriously injured or killed?

A. I think it's along the same lines of what we've been talking about. One is transparency of it and two is, you know, best practices and procedures. If there's a potential that there was criminal action involved, that needs to take priority.

Q. And the next paragraph has to do with the

**Page 82**

entity that conducts these investigations.

A. Uh-huh.

Q. Is that right?

And it states that the chief of police or the duty chief may contact an outside law enforcement agency and request that they conduct or assist in the criminal investigation.

A. Uh-huh.

Q. Is that something that you do as chief of police?

A. We utilize the sheriff's department. Like I said, we have an MOU with them that we've put in place after this for criminal investigations.

Q. And so the sheriff's department is involved in criminal investigations, but that does not include officer-involved shootings; is that right?

A. That is correct.

Q. And why is that?

Why are officer-involved shootings excluded from the MOU with the sheriff's department?

A. They don't have the resources.

**Page 83**

Q. So what types of incidents are the sheriff's department investigating?

A. Well, since we've put that in, it's been primarily misdemeanors and some minor felonies.

Q. If the sheriff's department had the resources, would you have it investigate officer-involved shootings?

A. I think it would be -- I would prefer KBI. The sheriff is a former -- you know, we want to keep these things clear. I would love to have the KBI do it. One, they investigate shootings all the time. They have the expertise. Officer-involved shootings and homicide investigations are complex and it's not something you can just have any investigator investigate if you want quality work.

Q. So ideally, you'd have KBI take over the investigations of all officer-involved shootings?

A. If that was an option, that would be my choice.

Q. Why isn't that an option?

A. When I talked to the director about it, he

**Page 84**

talked about staff resources, not enough staffing.

Q. You had a conversation with the director of the KBI about taking over all officer-involved shootings?

A. When I first arrived, yes.

Q. And why did you have that conversation?

A. I just think it would be -- I'd prefer it. Just like with criminal investigations going to the sheriff's department, I can't be accused of covering things up, you know, making mistakes. I think it's a best practice to have another agency investigate your shootings.

Q. Did you have concerns that there could be some perception issues about having Wichita Police Department homicide detectives investigate other officers inside the department?

A. I think there could be some -- I think there is some perception issues with that.

Q. And what are those perception issues?

A. Well, people are concerned. The same reason why we did the criminal is that, you know, that police are not doing -- not being

objective because it's people they work with.

**Q.  Have you reviewed any criminal investigations**
**of officer-involved shootings where you had**
**concerns that the homicide detectives were**
**not objective?**

A.  No.

**Q.  If you had reviewed any -- any criminal**
**reports from officer-involved shootings that**
**suggested to you an officer was not**
**objective, what would you do?**

MR. PIGG:  Object to form.

BY MS. BEDI:

**Q.  Do you understand my question?**

A.  Would you say it one more time, please.

MS. BEDI:  Would you mind reading
it back.

(The requested portion of the record
was read by the reporter, as follows:
Question:  "If you had reviewed any criminal
reports from officer-involved shootings that
suggested to you an officer was not
objective, what would you do?")

A.  I'd investigate further.

BY MS. BEDI:

**Q.  And how would you investigate further?**

85

A.  I'd seek more information to see if my
concern was valid or not.

**Q.  So the way policy and procedure stands right**
**now, there is no requirement that an external**
**agency conduct an investigation into an**
**officer-involved shooting; is that right?**

A.  That is correct.  I would be remiss to say
that I don't have any concerns with us doing
it.  It is the perception issue.

**Q.  And you would agree that it's best practice**
**to have an external agency conduct reviews**
**into officer-involved shootings?**

A.  I would agree with that.

**Q.  And best practice just isn't happening in the**
**Wichita Police Department right now.**
**You would agree?**

A.  We have -- we don't have that option, right.
If the state would fund KBI, I would do it in
a heartbeat, but we don't -- we don't have
another option.

**Q.  We've talked about the fact that incident to**
**officer-involved shootings, there are two**
**types of investigation:  There's a criminal**
**investigation and then an administrative**
**investigation.**

86

**In your judgment, what are the**
**components of an administrative**
**investigation?**

A.  So I'm not quite sure.  You want me to go
through the -- when you say components, like,
what do you mean?

**Q.  What are the steps that you would expect a**
**PSB detective to take after an**
**officer-involved shooting?**

A.  Well, gather -- gather information, gather
evidence, gather statements, review findings,
everything associated with the case that they
could get their hands on.

**Q.  Given that at the time a PSB detective**
**receives the go ahead to be able to begin his**
**full investigation the criminal investigation**
**will have already occurred, would you expect**
**the PSB detective to, for example,**
**re-interview the officer who was involved in**
**the shooting?**

A.  Maybe.

**Q.  But that would not be a requirement?**

A.  No.

**Q.  Would you expect the PSB detective to go out**
**and to interview or re-interview any**

87

witnesses that were already spoken to by the
homicide detectives?

A.  Maybe.

**Q.  It would not be a requirement in your mind?**

A.  No.

**Q.  Would you expect the PSB detectives to do any**
**independent analysis of any evidence that was**
**found at the scene?**

A.  Say the first part again.

**Q.  Would you expect the PSB detectives to**
**conduct any independent analysis of any**
**evidence that was found at the scene?**

A.  Potentially.

**Q.  Would you -- is -- would you -- do you**
**require PSB detectives to do an independent**
**analysis of evidence that is found at the**
**scene?**

A.  No.  Well, they review everything.  So, you
know, the idea of that investigation is for
them to review all the facts and an analysis,
I guess, would be a part of reviewing the
facts.

**Q.  I'm not a law enforcement officer so I'm**
**going to screw this up, but it's my**
**understanding that in these investigations**

88

1    there are things like ballistics testing that
2    need to happen; is that right?
3    A.  Yeah.
4    Q.  Do I have the term right?
5    A.  Uh-huh.
6    Q.  You'd expect that kind of ballistics testing
7    to happen after any shooting; is that right?
8    A.  Yeah.
9    Q.  Would you expect a PSB detective to redo any
10    ballistics testing that was done by the
11    homicide detectives to ensure its
12    credibility?
13    A.  Not unless there was some extenuating
14    circumstance.
15    Q.  So generally speaking, your expectation would
16    be that the PSB detectives would rely on the
17    investigation that was performed by the
18    homicide detective?
19    A.  Yes, generally.
20    Q.  Is it fair to say that it would be sufficient
21    for an administrative investigation to
22    consist of reviewing all of the materials
23    that were generated through the homicide
24    investigation?
25    A.  Could you repeat the first part again.

89

1    Q.  Sure.  Is it sufficient for an administrative
2    investigation to consist solely of a review
3    of all of the information that was generated
4    during the criminal investigation?
5    A.  Depends.
6    Q.  Depends on what?
7    A.  So there are some policy considerations that
8    criminal investigations don't take into
9    consideration.
10    Q.  What are those policy considerations?
11    A.  Well, were -- were policies followed.  Those
12    aren't generally included in criminal
13    investigations.
14    Q.  So for example, you would not expect a
15    homicide detective to ask or interview an
16    officer about whether or not that officer
17    gave verbal commands prior to using lethal
18    force; is that right?
19    A.  I think any good criminal investigator would
20    have that in there.
21    Q.  Let's assume that in a specific shooting, a
22    homicide detective failed to ask that
23    question.  It just wasn't clear from the
24    record whether the officer either gave verbal
25    commands prior to using lethal force or made

90

1    any efforts to deescalate prior to using
2    lethal force.
3        Under those circumstances, would your
4    expectation be that the PSB detective would
5    conduct an independent interview?
6        MR. PIGG:  Object to form.
7    A.  Depends on the case.  So if it's a -- if it's
8    an ambush, you don't have time or if
9    someone's shooting at you, you don't have
10    time to make those statements.  So if an
11    officer's driving down the street and someone
12    starts shooting at him, I doubt there that
13    anybody would ask "did you shout at the guy
14    put your hands up" or "drop the gun" as
15    you're driving down the street.  So it
16    depends on the case.
17    Q.  Would you expect a PSB review to include some
18    sort of evaluation of whether the officer
19    used or could have used either verbal
20    commands or deescalation techniques?
21        MR. PIGG:  Object to form.
22    A.  If there was that -- if the opportunity
23    existed, yes.
24    Q.  Well, in the example you just gave of the --
25    of the ambush, would you expect that the PSB

91

1    detective's report would say because this was
2    an ambush, there clearly was no time for the
3    officer to either use deescalation techniques
4    or to engage in verbal commands?
5        MR. PIGG:  Object to form.
6    A.  I wouldn't expect that.
7    Q.  You wouldn't expect that?
8    A.  No.
9    Q.  Why not?
10    A.  'Cause there are certain just basic
11    assumptions in the -- in the incident where
12    you're driving down the road and your windows
13    are up and the person's at the end of the
14    block that there's just an assumption that an
15    officer's not going to say "put your hands
16    up."
17    Q.  Let's talk through another hypothetical.
18        Let's assume that there is a shooting
19    that happens incident to a traffic stop, and
20    there is a individual who officers allege is
21    noncompliant, that officers perceive the
22    individual to be threatening and they shoot
23    and kill the individual.
24        Under that factual scenario, would you
25    expect there to be an analysis of whether the

92

Pages 89 to 92

1   A.  Yes.
2   Q.  And the name of one officer is listed here,
3      and that is Officer Justin Rapp; is that
4      correct?
5   A.  Yes.
6   Q.  That suggests that no other officers were
7      investigated by PSB for their role in this
8      shooting; is that correct?
9   A.  Correct.
10   Q.  The only officer who was investigated was
11      Officer Rapp?
12   A.  Correct.
13   Q.  There was no investigation -- no PSB
14      investigation into the actions of Sergeant
15      Jonker; is that right?
16   A.  He wasn't the -- the subject of this was the
17      firing of the weapon, but Jonker's actions
18      were reviewed and he was interviewed.
19   Q.  Jonker was not the subject of any specific
20      investigation; is that correct?
21   A.  I would say the fact they interviewed him, I
22      mean, you are -- you're part of an
23      investigation, but he was not -- how did you
24      frame it again?  I'm sorry.
25   Q.  He was not the subject of an investigation.

117

1   A.  No.
2   Q.  Are you familiar with Sergeant Jonker's
3      actions at the scene of the Finch matter?
4   A.  Pretty much, yes.
5   Q.  What's your understanding of what Jonker did?
6   A.  Overall, he was trying to contain the scene,
7      secure the perimeter.
8   Q.  Do you have any concerns about Sergeant
9      Jonker's communication or lack thereof
10      communication in relation to the Finch
11      matter?
12   A.  No.
13   Q.  Are you aware of how Sergeant Jonker
14      communicated to others during the Finch
15      incident?
16   A.  Somewhat, yes.
17   Q.  What's your understanding of the way in which
18      he communicated?
19   A.  He was setting up the perimeter, directing
20      officers where to -- where to go.
21   Q.  And his actions, as you reviewed them in this
22      report, raise no concerns for you?
23   A.  No.
24   Q.  Let's go to Page 14 of the report.  I'm going
25      to read this paragraph.  It is the last full

118

1      paragraph on the page.
2         Several other officers were on the
3      scene of the shooting.  All described Finch
4      as putting his hands up and then dropping
5      them back down.  Officers described Finch's
6      actions as reaching for the door to moving
7      his hands around.  Finch did not comply with
8      any of the officers' orders to put his hands
9      up, show his hands, or walk towards the
10      officers who were giving verbal commands.
11      From all accounts, Finch was not cooperative
12      and did not follow the officers' orders.
13      Finch was believed to have been the suspect
14      who had shot his father in the head and was
15      holding his mother and sibling hostage.
16         So this is a summary of the statements
17      provided by other officers who were at the
18      scene.
19         Is that accurate?
20   A.  I would say that's a summary of some of the
21      officers, yes.
22   Q.  And it describes the officers providing
23      orders which are numerous orders to Finch,
24      including put his hands up, show his hands,
25      walk towards the officers; is that right?

119

1   A.  Yes.
2   Q.  Do you have any concerns that the officers
3      who were shouting out these commands were,
4      perhaps, not coordinated or may have been
5      shouting out commands that were confusing
6      Andy Finch?
7   A.  I think one of the issues was that they
8      were -- they were all still setting up on
9      scene.  They didn't expect that he was going
10      to come out.  They were trying to get to
11      positions and his appearance was highly
12      unexpected.
13   Q.  In a hostage situation doesn't best practice
14      and/or policy require one officer to be
15      designated as the person who would make
16      contact and communicate with the suspect?
17   A.  In perfect conditions, yes.
18   Q.  And prior to setting up the perimeter,
19      shouldn't your officers have identified who
20      that point of contact should have been?
21   A.  I think it happened too quickly.
22   Q.  You don't think they had enough time to
23      identify the person who would be engaging
24      with the suspect?
25   A.  I don't think they were to that point yet.

120

Pages 117 to 120

1      they have implemented that recommendation?
2    A.  No, I haven't.
3    Q.  The other recommendation -- one of the other
4        recommendations included here has to do with
5        flashlights on rifles.
6            Are you familiar with that
7        recommendation?
8    A.  I am.
9    Q.  Have you taken any action to implement that
10       recommendation?
11   A.  Very similar to the sights is resource
12       allocation and training.
13   Q.  So you've not been able to take any action on
14       that recommendation because of resource
15       allocation --
16   A.  To say we haven't taken any action is not
17       accurate on either of those.  It is -- it
18       takes funding, it takes training and to train
19       people, and you just can't do it at the drop
20       of a hat.  It's not like -- it's a working
21       office of six people, but yeah, we have been
22       working toward it and I'm not so sold on the
23       flashlight portion.  We're still talking
24       about that and discussing that.
25   Q.  Are you sold on the rifle magnification

133

1        portion of it?
2    A.  I think it's a good idea, yes, yeah.
3    Q.  And are you -- do you believe that the
4        recommendation that one dispatch -- that one
5        person should handle a dispatch call that's a
6        high priority?
7    A.  I don't know how feasible it is for them to
8        do.  It sounds good in practice, but in
9        reality, I don't know if it's the way they
10       operate over there, if that's feasible.
11       Because they can't be talking on the phone at
12       the same time and providing information.
13       It's -- it sounds great to a
14       non-practitioner, but not feasible probably
15       in reality, unless they're sitting right next
16       to each other.
17   Q.  So it's fair to say that -- and this is not
18       me being critical, but that given the issues
19       with funding and resource allocation, none of
20       the recommendations that were included in
21       this report have been fully implemented at
22       this time?
23   A.  I think that's a harsh statement that leaves
24       out some details, but I'll leave it at that.
25   Q.  But is it true?

134

1    A.  No, because we have been working on it.
2        Trying to find funding and plan training is
3        not -- that doesn't mean we're not doing
4        anything.
5    Q.  And I apologize.  That's not what I'm trying
6        to suggest.
7    A.  Okay.
8    Q.  What I'm just trying to understand is if the
9        recommendations in this report have been
10       implemented.
11   A.  Implementation, no, but we are working toward
12       that.
13   Q.  Okay.  Understood.  I'm just trying to
14       understand if they've been fully implemented.
15   A.  We're on the same page.
16   Q.  Now that we've talked through this report,
17       does that refresh your recollection at all
18       about how long it took you to review this
19       matter?
20   A.  No.
21   Q.  Did you have any meetings with any of the
22       individuals who were involved in either the
23       homicide investigation or the PSB review of
24       this matter?
25   A.  Well, afterward, I was updated by

135

1        supervision.  Maybe I talked to the
2        detectives, the criminal detectives.  I asked
3        for a lot of information and sought a lot of
4        information.
5    Q.  Would you agree with me that a fair
6        characterization of PSB's involvement in this
7        matter is that the PSB detective gathered all
8        of the information that was generated through
9        the criminal investigation, analyzed it, and
10       produced a summary report?
11   A.  I'd agree with -- yeah, for the most part.
12       There's some things that, you know, they did
13       their own review, as well, but they used a
14       lot of existing information.
15   Q.  The PSB detective here did not conduct any
16       independent interviews; is that right?
17   A.  I'd have to review, but I don't believe so.
18   Q.  And the PSB detective who conducted this
19       review did not conduct any independent
20       evidence testing; is that right?
21   A.  I believe so, correct.
22   Q.  And the PSB detective did not do any -- any
23       re-creations of the scene; is that right?
24   A.  No, I -- someone did.  I can't remember who
25       did the re-creations, if it was our -- they

136

1    know I've sent e-mails out to staff on that
2    so. . .
3    Q.  And would your e-mails say things like slow
4        things down, don't create a crisis?
5    A.  Similar to that, yeah.  Those are words I use
6        frequently, yeah.
7    Q.  And who do those e-mails go to?
8    A.  Command staff.  It could be supervisors.  It
9        might have been department wide e-mails.
10   Q.  Would you expect your PSB detectives to be
11       evaluating incidents to ensure that people
12       are, in fact, slowing things down and not
13       creating a crisis?
14   A.  Yeah, I'd want to know that.
15   Q.  And do you feel like those requirements,
16       excuse me, are implicit in WPD policies?
17   A.  Do you mean the investigation or the actions?
18   Q.  I mean -- I mean the actions.  That implicit
19       in WPD policies as they currently exist is a
20       requirement that whenever possible, officers
21       slow things down and they don't take any
22       action that would induce a crisis.
23   A.  Deescalate.  I'm trying to remember where
24       we're at with our policies, what I've updated
25       and not.  I'd have to review which ones I've

197

1        Officer Mackey said Stacy did not look
2    like a person who was going to deescalate,
3    put down the weapon and give up.  Officer
4    Mackey advised that he saw -- that the look
5    he saw from Stacy told him it was getting
6    ready to turn into a lethal encounter.
7        As you sit here today, does that
8    summary of Stacy, Mr. Richards, the victim of
9    the shooting's demeanor, does that raise any
10   red flags for you?
11   A.  Does his demeanor raise any red flags?
12   Q.  Did the summary of the description of his
13       demeanor as someone who does not look like he
14       was going to deescalate, does that raise any
15       concerns for you?
16   A.  It would cause pause.  I'd want some more
17       information.
18   Q.  Ultimately, in this incident, there were two
19       officers that were found -- that were
20       sustained for policy violations of failing to
21       perform an adequate investigation because the
22       officers did not get enough information from
23       Michlle about who was in the house and about
24       what exactly the threat was.
25   A.  Okay.

199

1    implemented, if we've gotten those done or
2    not.
3    Q.  But it would be your -- sorry.  Go ahead.
4    A.  So their -- policies are always in process.
5        I can't remember where we're at with the --
6        with our -- I'd have to look at the use of
7        force policies to see if those words are in
8        there.
9    Q.  Is there a revision of the policy that's in
10       the works that would make the requirement to
11       slow things down and not create a crisis
12       explicit?
13   A.  It's hard to put into policy, right.  So
14       oftentimes we don't determine the speed of
15       which things go, unfortunately.  So I do like
16       policies that recognize the sanctity of life,
17       that recognize the importance of
18       deescalation.  I believe it says, in our
19       policy, deescalate when possible.  So I
20       believe that's -- that word is in there, even
21       in the old policy.
22   Q.  Let's go to Page 16 of the report.  And
23       this is the last sentence in the second full
24       paragraph and it is a summary of Officer
25       Mackey's response to this incident.

198

1    Q.  Are you aware of how those officers were
2        disciplined?
3    A.  No.
4    Q.  One officer got a written reprimand.  The
5        other officer got a day suspension and a
6        written reprimand.
7    A.  Okay.
8    Q.  Does that sound like sufficient discipline
9        based on your, understandably, limited
10       understanding of the facts here?
11   A.  I'd like to answer that.  I just would need
12       more -- I'd need to know more.
13   Q.  How important is it that when officers are at
14       the scene, they do an adequate investigation
15       before engaging tactically?
16   A.  With an armed person?
17   Q.  Well, when they're responding to a scene, how
18       important is that component of police
19       interaction?
20          MR. PIGG:  Object to form.
21   A.  I'd say it depends on the type of call.
22   Q.  In a call such as this when you're responding
23       to somebody who has been identified as
24       suicidal and armed, how important is it to
25       gather facts at the scene before engaging?

200

Pages 197 to 200

1    Q. Do you trust them?
2    A. I like some of the things. I don't like
3    others.
4    Q. So here are the characteristics as
5    articulated by NACOLE -- NACOLE.
6    That effective oversight will have
7    independence. An oversight body must be
8    separate from all other groups in order to
9    garner trust by being unbiased.
10    Would you agree that that is an
11    important component of effective oversight?
12    A. I think that's subjective. I think it's --
13    may work in some cities, not necessary in
14    others.
15    Q. With the exception of the Civilian Review
16    Board, is there any entity that has
17    independent oversight on a regular basis of
18    the Wichita Police Department?
19    A. Independent: Do you mean outside of the city
20    or within the city framework?
21    Q. I mean outside of the police department.
22    A. Yeah. So I say our city counselors. I say
23    our mayor, the city manager, the assistant
24    manager. Obviously, your KBI has authority,
25    FBI, district attorney.

209

1    Q. Is there any entity that has the authority to
2    conduct investigations of the Wichita Police
3    Department in relation to violations of
4    policy and practice, not law, without you
5    giving it the authority to do so?
6    A. The city manager would.
7    Q. And does the city manager conduct such
8    investigations?
9    A. Yeah, he has.
10    Q. Does the city manager conduct investigations
11    of individual officer's compliance with
12    policy and procedure?
13    A. Not while I've been here.
14    Q. Are you aware of any circumstances under
15    which the city manager conducted such
16    investigations?
17    A. No.
18    Q. So there is no independent entity that has
19    the authority to conduct independent
20    investigations of officers' compliance
21    with -- with policy?
22    MR. PIGG: Object to form.
23    A. Well, the manager could -- could order that.
24    Q. You're not aware of the manager ever doing
25    that?

210

1    A. He's -- he's ordered investigations.
2    Q. Has he ordered investigations of the actions
3    of individual officers in relation to their
4    interaction with -- with civilians?
5    A. No, it's been more internal.
6    Q. Is there any civilian oversight entity that
7    has complete and unfettered access to WPD
8    records?
9    A. No.
10    Q. Do you think there should be?
11    A. No.
12    Q. Why not?
13    A. As I've said before, one is we've moved in a
14    direction of creating more transparency with
15    the Civilian Review Board. They get to see a
16    significant amount of our -- they can see
17    whatever case they'd like. Pretty much the
18    only thing they can't see is the officer's
19    name, which was a -- in order to get this
20    done, a negotiation with the FOP. And then
21    we don't show victims' names, witnesses'
22    names to them either for -- state law somehow
23    worked into it.
24    Q. When was the Civilian Review Board
25    established?

211

1    A. I think the council voted on it the end of
2    '17.
3    Q. And when was it up and running?
4    A. Early '18, but we had been working on it
5    since I arrived in 2016, putting together the
6    framework. Again, as I said, every one --
7    every Civilian Review Board is -- you got to
8    do what works in your community, what works
9    best for your community.
10    Q. So prior to -- and the Civilian Review Board
11    was operational in 2018; is that right?
12    A. Yes.
13    Q. Prior to 2018, there was no such apparatus
14    for the Wichita Police Department; is that
15    right?
16    A. Yeah, there was what they call the managers
17    review board that was -- I'd heard a lot of
18    frustrations about it and that it was kind
19    of -- worked sometimes, didn't work others,
20    but that was a source of people to -- for
21    people to make complaints or appeal
22    complaints to. But it was pretty much
23    defunct when I got here.
24    Q. And the Civilian Review Board was a reform
25    that you brought to Wichita because of your

212

Pages 209 to 212

previous experience with civilian oversight?

A.  And I also felt it would be beneficial here.

Q.  **But the Civilian Review Board does not have the authority on its own to demand an investigation?**

A.  Correct.

Q.  **And the Civilian Review Board does not have the ability to conduct its own independent investigations; is that right?**

A.  Correct.

MR. PIGG:  I think we're out of time.

MS. BEDI:  Yeah, we're out of time.  Okay.  I think that's a good place for us to end.

THE WITNESS:  Okay.

VIDEOGRAPHER:  Off the record at 12:53.

(Deposition concluded at 12:53 p.m.)

\* \* \*

213

---

I have read or have had read to me the foregoing testimony recorded on pages 4 to 213, inclusive, and the same is true and correct to my knowledge and belief.


CHIEF GORDON RAMSAY          (Date)



STATE OF          )
                  ) ss:
          COUNTY)
Subscribed and sworn to before me, the undersigned authority, this, the     day of
          ,     .


Notary Public


(Commission Expires)




FINCH v. CITY OF WICHITA

214

---

CERTIFICATE

STATE OF KANSAS)
               ) ss:
SEDGWICK COUNTY)

I, RICK J. FLORES, a Certified Shorthand Reporter for the State of Kansas, do hereby certify that the within-named witness was by me first duly sworn to testify the truth, that the testimony given in response to the questions propounded, as herein set forth, was first taken in machine shorthand and reduced to writing with computer-aided transcription, and is a true and correct record of the testimony given by the witness.  I certify that review of the testimony was requested by the witness or the parties.  If any changes are made by the deponent during the time period allowed, they will be appended to the transcript.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

WITNESS my hand and official seal at Wichita, Sedgwick County, Kansas, this     day of
          ,     .



RICK J. FLORES, CSR
KELLEY REPORTING ASSOCIATES, LTD.
515 South Main, Suite 108
Wichita, KS   67202
(800) 654-8684

215

---