# EXHIBIT 23

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA G. FINCH, Individually, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased, and as Next Friend )
for her minor granddaughter, )
AF; DOMINICA C. FINCH, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased; and ALI ABDELHADI, )
                                )
         Plaintiffs, )
                                )
   vs.            )Case No.
                  )18-CV-01018-JWB-KGS
CITY OF WICHITA, KANSAS; )
JOHN DOE POLICE OFFICERS 1-10, )
                                )
         Defendants. )
                                )

D E P O S I T I O N

   The videotape deposition of MARC BENNETT taken on behalf of the Plaintiffs pursuant to the Federal Rules of Civil Procedure before:
      RICK J. FLORES, CSR
      KELLEY REPORTING ASSOCIATES, LTD.
      515 South Main, Suite 108
      Wichita, Kansas  67202

a Certified Shorthand Reporter of Kansas, at 525 North Main, 2nd Floor, Wichita, Sedgwick County, Kansas, on the 12th day of June, 2019, at 9:21 a.m.

## Page 2

A P P E A R A N C E S

PLAINTIFFS:
   (VIA VIDEOCONFERENCE)
   MACARTHUR JUSTICE CENTER
   Ms. Sheila Bedi
   Northwestern Pritzker School of Law
   375 E. Chicago Ave., 8th Floor
   Chicago, IL  60611
   (312) 771-2444
   Fax:  (312) 641-6866
   sheila.bedi@law.northwestern.edu

   CONLEE SCHMIDT & EMERSON, LLP
   Mr. Rick E. Bailey
   Suite 300
   200 West Douglas
   Wichita, KS  67202
   (316) 264-3300
   Fax:  (316) 264-3423
   rbailey@fcse.net

DEFENDANTS:
   FISHER PATTERSON SAYLER & SMITH, LLP
   Mr. J. Steven Pigg
   3550 S.W. 5th Street
   375 East Chicago Avenue - 8th Floor
   Topeka, KS  66606
   (785) 232-7761
   Fax:  (785) 232-6604
   spigg@fisherpatterson.com

FOR THE WITNESS:
   OFFICE OF THE DISTRICT ATTORNEY
   EIGHTEENTH JUDICIAL DISTRICT
   Ms. Ann E. Swegle
   535 N. Main
   Wichita, KS  67203-3747
   (316) 660-3613
   Fax:  (316) 383-7266
   aswegle@sedgwick.gov

VIDEOGRAPHER:
   Advanced Document Imaging
   Mr. Michael Miles
   515 S. Main, Suite 108
   Wichita, KS  67202
   (316) 267-9380
   Fax:  (316) 267-8200
   video@kelleyreporting.com

## Page 3

I N D E X

MARC BENNETT
Direct Examination by Mr. Bedi:          4
Cross-Examination by Mr. Pigg:          71
Redirect Examination by Ms. Bedi:       80
Recross-Examination by Mr. Pigg:        83

Bennett Exhibits
No. 111 - Bennett's Review of Quintero    66
         Matter 4-7-16 (30 pgs)
No. 112 - Bennett's Review of Garner      68
         Matter 3-31-17 (17 pgs)
No. 113 - Bennett's review of the Randolph 69
         Matter 6-12-15 (13 pgs)

SIGNATURE OF WITNESS                    85
CERTIFICATE                             86

## Page 4

       VIDEOGRAPHER:  This begins the videotape deposition of Marc Bennett.  Today is June 12th, 2019, and the time is 9:21 a.m.
       Will the court reporter please swear in the witness.
       MARC BENNETT
having been first duly sworn on his oath to state the truth, the whole truth, and nothing but the truth, testifies as follows:
       DIRECT EXAMINATION
BY MS. BEDI:
   Q.  Good morning, again, Mr. Bennett.  My name is Sheila Bedi and I am one of the attorneys who represents the plaintiff in this matter.
       Have you ever given a deposition before?
   A.  Yes.
   Q.  So you're generally familiar with the rules of a deposition.
       You understand that you are under oath this morning; is that right?
   A.  I do.
   Q.  And are you represented by counsel today?
   A.  I've got Ann Swegle with me.  She's one of my deputies in the office, attorney for the

**Page 25**

1  it's capable of. I can tell you that I can
2  put a list together, yes.
3  Q. How did your office come to have the
4  responsibility to review each incident where
5  an officer either seriously injures or kills
6  someone?
7  A. By virtue of the fact that the state statute
8  controls felonies. So if someone is
9  seriously injured or killed, there's no
10 municipal ordinance that would cover that.
11 There are federal crimes, you know, certainly
12 1983 or Civil Rights violation, things like
13 that that the federal prosecutor's office
14 would have the purview over, but the office
15 of the district attorney in Kansas reviews
16 all felonies and is solely responsible for
17 that by state law. So by operation of state
18 law, if a felony's going to be reviewed, it's
19 going to be done by the elected county or
20 district attorney, depending on the
21 jurisdiction.
22 Q. And was your office reviewing police-related
23 fatalities or serious injuries at the time
24 you were elected?
25 A. Yes.

**Page 26**

1  Q. Has that review completed by your office been
2  the practice there for as long as you can
3  recall?
4  A. Just to clarify: That we review
5  officer-involved incidents that lead to death
6  or serious injury whether it's WPD, sheriff's
7  department or any other agency, are you
8  asking is it always been the practice in my
9  experience that this office reviews those?
10 Q. Yes, that's exactly what I'm asking.
11 A. Yes, ma'am, it's always been my experience.
12 And I'll add, it's been my experience that
13 that's the practice in most jurisdictions
14 across the state. Or at least the larger
15 jurisdiction.
16 Q. And you would describe the role that your
17 office has in officer-involved serious
18 injuries or deaths as a -- as a review; is
19 that right?
20 A. Yes, we review the investigation.
21 Q. And you review the investigation that is
22 completed by the Wichita Police Department if
23 we are talking about a Wichita police
24 officer-involved shooting or serious injury?
25 A. Yes, ma'am.

**Page 27**

1  Q. Is that right?
2  A. Yes, ma'am.
3  Q. Are there any differences in reviewing a
4  felony that may have been committed by a
5  civilian as opposed to a felony that may have
6  potentially been committed by a police
7  officer?
8  A. Not -- a felony committed by a civilian. I
9  don't do a felony review of forgeries or of
10 lower level felonies of -- frankly, I don't
11 do one of all rapes and things like that. We
12 have charging attorneys who review 90 percent
13 of the felonies that come through the office
14 and make a charging decision in the moment.
15 They're given that -- that authority to do
16 that.
17    With respect to homicides or something
18 that's more complex, say a human trafficking
19 case with complex issues, you know, we -- all
20 homicides; but then in addition to that,
21 cases with certain complexities, then we do a
22 formal felony review, again, it's our term,
23 but it just means the officers come into the
24 room, we -- they present what they found. We
25 ask questions. We make sure we understand

**Page 28**

1  what they -- what their investigation showed.
2  So in that respect, an officer-involved
3  fatality, an officer who took some action
4  that led to the death of another human being,
5  that is treated the same as every other
6  homicide case.
7  Q. So every homicide case -- every potential
8  homicide case goes through the felony review
9  process that you just described?
10 A. Yes, ma'am.
11 Q. Have you -- has your office ever filed
12 charges against a police -- a Wichita police
13 officer?
14 A. Many times.
15 Q. How frequently?
16 A. Frequency would be -- it's hard for me to
17 say. I'll say that I asked, I think,
18 since -- I asked one of our IT people to go
19 back and check. You can pull information,
20 obviously, from our RMS. I asked someone to
21 check how many times we charged a law
22 enforcement officer with any crime, and I
23 want to say the number was over 40, and I
24 want to say that was since 2011 maybe, so
25 even a little bit before I took over. But

```
 1       everything from domestic violence to DUI to
 2       aggravated battery, across the board.
 3   Q.  Has your office ever prosecuted a Wichita
 4       Police Department officer for his role in an
 5       officer-involved shooting?
 6   A.  I'm currently in --
 7   Q.  And let me -- I apologize.
 8           Let me clarify:  Has your office ever
 9       prosecuted an on duty Wichita Police
10       Department officer for his role in an
11       officer-involved shooting?
12   A.  I have such case pending right now.
13   Q.  And what case is that?
14   A.  Officer's name was Dexter Betts:  B-E-T-T-S.
15   Q.  And the -- Mr. Betts, that was a case where
16       Mr. Betts shot a -- at a dog that he alleged
17       was attacking him when children were present;
18       is that right?
19   A.  Correct, and struck a child.
20   Q.  Other than the case concerning Mr. Betts, are
21       there any other incidents where you have
22       prosecuted an on duty Wichita Police
23       Department officer for his role, his or her
24       role in a officer-involved shooting?
25   A.  I've been in the office since '97.  I don't
                                                    29
 1       recall -- I know I have not, other than
 2       Mr. Betts in a shooting case.  We've got
 3       another officer charged currently with an on
 4       duty aggravated battery, but it has to do
 5       with a car.
 6           During my tenure, so since January of
 7       '13, I've not charged another officer with an
 8       on duty shooting incident.  I don't recall
 9       another under my predecessor, but I couldn't
10       say dispositively, but I don't have -- I
11       don't remember one.
12   Q.  So as far as your memory serves, Officer
13       Betts is the only officer you can recall who
14       has been prosecuted for an on duty
15       officer-involved shooting?
16   A.  On duty shooting, that's correct.
17   Q.  Are you familiar with the Civilian Review
18       Board?
19   A.  I'm aware that one exists.
20   Q.  Have you ever been requested to provide
21       information to the Civilian Review Board?
22   A.  If we're talking specifically the Wichita
23       Police Department or the City of Wichita
24       Civilian Review Board, not to my knowledge.
25   Q.  Okay.  Let's go to -- you should have a
                                                    30
 1       binder of exhibits that's in front of you and
 2       it will be in front of you in a moment.
 3           And if we could go to what was
 4       previously marked as Exhibit 59.
 5   A.  I'm sorry.  You said 59?
 6   Q.  Yes.
 7   A.  Yes, ma'am.
 8   Q.  Okay.  And this is a PowerPoint presentation
 9       that has your name on it; is that right?
10   A.  Correct.
11   Q.  Okay.  And this is a training that you
12       provided to the Wichita Police Department; is
13       that correct?
14   A.  Correct.
15   Q.  Do you know when you provided this training?
16   A.  It's during their mandatories, they call it,
17       where every officer is required to go through
18       it.  I remember it was every day for 26 or
19       '7 days.  I can find out, but my memory is
20       either '17 -- either 2017 or 2018.
21   Q.  Since 2017 or 2018, have you provided this
22       training?
23   A.  Not to the Wichita Police Department, no,
24       ma'am.
25   Q.  And did you -- did you develop these
                                                    31
 1       PowerPoint slides?
 2   A.  Yes, ma'am.
 3   Q.  And you did that -- you developed them
 4       yourself?
 5   A.  Yes, ma'am.
 6   Q.  What were the main takeaways that you wanted
 7       the Wichita Police Department officers to
 8       receive from your training?
 9   A.  What the law was with respect to use -- not
10       so much use of force, but with respect to --
11       let's see here, self-defense and immunity and
12       how cases are assessed in my office.
13   Q.  And specifically were you attempting to
14       educate the officers about how cases where
15       officers were involved in either a fatality
16       or a serious injury would be reviewed by your
17       office?
18   A.  Correct.
19   Q.  So that officers would know under what
20       circumstances they could face some sort of
21       criminal liability for their actions or
22       inactions; is that right?
23   A.  To understand how that assessment is made by
24       my office, yes, ma'am.
25   Q.  So if we could go to the slide, it is the --
                                                    32
```

**Page 77**

pendency of the Barriss case at state court, we had a substantial change in state law with respect to prior criminal history, a case called Whitridge (ph) which radically reduced the amount of time -- the penalty that Mr. Barriss faced. And so that was a significant contributing factor in my decision, but I agreed that I would dismiss if he pled, and so that's what happened. And he was sentenced earlier this spring to, I believe, 20 years by -- in federal penitentiary by Judge Melgren.

Q. In evaluating the shooting in this case involving Mr. Finch, you looked at the totality of the circumstances presented to Officer Rapp?
A. Yes, sir.
Q. You reviewed the AXON video that was available?
A. Yes, sir.
Q. Did you find that that video was consistent with Mr. Rapp's perceptions?
A. That the physical descriptions that he gave of Mr. Finch's movement I saw reflected as best as I could tell on that quality of AXON

**Page 78**

from a distance of, you know, 122 feet.
     Now to clarify: It wasn't his AXON. When he had his eye on the optic, his AXON essentially pointed at the ground, but the sergeant standing next to him I believe it was -- or excuse me -- the officer standing next to him, his AXON, from a distance of less than 2 feet, was what I was looking at, but they were, yes, generally consistent.

Q. And you relied on the fact that Officer Rapp reasonably perceived that he was confronting a situation with an armed suspect who had just shot somebody?
A. Again, to be clear, my assessment is can I prove beyond a reasonable doubt that what he did was unreasonable, and I concluded that I could not.
Q. Was that one of the factors that you considered that Mr. Rapp reasonably perceived that he was confronted with a suspect who was armed and who had just committed a shooting of another person?
A. That was the context in which Officer Rapp made his determination.
     (Cell phone rings.)

**Page 79**

Q. Sorry about that.
     And he was confronted with a person who came out and disregarded clear and consistent orders to raise his hands, show his hands?
A. Officer Rapp --
     MS. BEDI: Objection to form. Objection as to form and also misstates the evidence.
A. Officer Rapp's description of the individual coming outside and his lack of conformity to the verbal commands he was given was part of what Officer Rapp -- which led Officer Rapp to believe this would be the suspect that they were there to respond to.
Q. And that's also what the other officers had perceived is that he had disregarded their commands?
A. That he was not in compliance with those commands, yes, sir.
Q. But they also knew that he heard them and recognized them because he initially raised his hands, then lowered them?
A. They all -- I won't say every officer 'cause the ones to the west, I'd have to review

**Page 80**

their -- their statements again, but every officer or deputy, I should say, to the east and to the north who had a full view of Mr. Finch, did describe him raising his hands, initially, putting them down, and then bringing them back up.

Q. And the officers to the west, their view is somewhat obscured by the screen door that's standing partially open?
A. Yeah, and by the -- by his movement, Mr. Finch's movement, both as he stepped out and stepped back into the threshold of the -- of the door. They were almost -- what would that be -- due west, as opposed to the officers who were more on the east side, excuse me, were more east and a little bit -- a little bit to the north, so they were able to look at an angle back toward Mr. Finch and had less of an obstructed view.
     MR. PIGG: I don't have any -- excuse me. I don't have any other questions. Thank you.
     REDIRECT EXAMINATION
BY MS. BEDI:
Q. Mr. Bennett, just a -- just a few followup.