# EXHIBIT 26

**Lisa G. Finch, et al. vs. City of Wichita, Kansas**

**Case No. 18-cv-1018-JWB-ADM**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

# WICHITA POLICE DEPARTMENT
## Organizational Assessment

February 2015

*Prepared by*
## Wichita State University
## Hugo Wall School of Public Affairs
## Center for Urban Studies

*Faculty Advisors and Investigators*
**Dr. Michael L. Birzer**
Director of Wichita State University School of Community Affairs
Professor of Criminal Justice

**Dr. Andra J. Bannister**
Director of Wichita State University Regional Community Policing Training Institute
Professor of Criminal Justice

*Project Coordinator*
**Misty Bruckner**
Director of Center for Urban Studies

*Project Assistant*
**Stephanie Knebel**
Project Associate

*Graduate Assistants*
**John Emerson**
**Alex Hendee**
**Mitch Kolf**



WICHITA STATE
UNIVERSITY
*Hugo Wall School
of Public Affairs*
Center for Urban Studies



Ramsay
EXHIBIT NO. 106
DATE 5-24-19
*Kelley, York & Associates*

## DISCLAIMER

The study was conducted by the Center for Urban Studies (CUS) at Wichita State University (WSU) Hugo Wall School of Public Affairs in collaboration with the direction and research of Dr. Michael L. Birzer, Director, WSU School of Community Affairs and Professor of Criminal Justice and Dr. Andra J. Bannister, Director of WSU Regional Community Policing Training Institute and Professor of Criminal Justice.

The Center for Urban Studies is an independent research body not affiliated with the City of Wichita. This report was prepared by the research team. It represents the findings, views, opinions and conclusions of the research team only and the report does not express the official nor unofficial policy of WSU or Hugo Wall School of Public Affairs. Information for this report was supplied by the City of Wichita and additional sources. The accuracy of findings for the report is dependent upon these sources.

## ACKNOWLEDGEMENTS

The Hugo Wall School of Public Affairs would like to thank the staff of the City of Wichita, especially representatives of the Wichita Police Department, for their time and information and recognizes their commitment of public service to the citizens in Wichita. In addition, the CUS would like to thank the many community partners and citizens who shared time and information to contribute to the project. Specifically, the CUS would like to acknowledge the following people for their contributions to the report:

**CITY OF WICHITA**
**Police Department**
Interim Chief Nelson Mosley
Deputy Chief Hassan Ramzah
Deputy Chief John Speer
Interim Deputy Chief Gavin Seiler
Captain Russell Leeds
Captain Troy Livingston
Captain Brent Allred
Captain Doug Nolte
Officer Katherine Inkelaar
Officer Mike Lieber
DeAnn Mull, Senior Administrative Assistant

**Budget**
Mark Manning, Budget Director
Trinh Bui, Senior Budget Analyst
Elizabeth Goltry, Budget Analyst

**Administration**
Robert Layton, City Manager
Sharon Dickgraff, Interim City Attorney
Denise Peters, Project Manager

# HUGO WALL SCHOOL
## *of* PUBLIC AFFAIRS

## TABLE *of* CONTENTS

**Executive Summary** ................................................................ **i-xi**

**Introduction** ................................................................ *Pages* **001-003**
    Background
    Purpose
    Process
    Best Practice Research

**Stakeholder Engagement** ................................................ *Pages* **004-006**
    Protocol
    External Stakeholders
    Internal Focus Groups

**Common Themes** ................................................................ *Pages* **006-009**
    Strengths and Weaknesses
    Tangible Improvements Needed

**Critical Issues** ................................................................ *Pages* **010-042**
    Community Relations
    Community Policing
    Body Cameras
    Racial Profiling
    Reflection of the Community
    Advisory and Review Board
    External Communication
    Use of Force

**Administrative Issues** ................................................ *Pages* **043-087**
    Mission, Leadership and Resource Alignment
    Non-Emergency Calls and Priorities
    Committee Structure
    Leadership Transition
    Organizational Structure
    Traffic Unit
    Accident Impact
    Commissioned and Non-Commissioned Personnel
    Timely Decision Making
    Employee Morale
    Workload
    Budget
    Discipline
    Intelligence-Led Policing
    Recruitment

# HUGO WALL SCHOOL
# *of* PUBLIC AFFAIRS

**TABLE *of* CONTENTS** (continued)

Promotional Process
Training
Internal Communications
Inter-Agency Relations
Brady-Giglio Impact

**Hiring the Next Chief of Police** ................................................ *Pages* **088-092**
Qualities
Selection Process
Semi-Finalists
Finalists
Naming New Chief

# HUGO WALL SCHOOL
## *of* PUBLIC AFFAIRS

## EXECUTIVE SUMMARY

### WICHITA POLICE DEPARTMENT ORGANIZATIONAL ASSESSMENT

Recent national events and local actions have heightened awareness of the critical relationship among law enforcement, residents and ultimately local government and public service professionals. Due to the volume of public interactions, number of employees, and critical functions that public safety represents, a police department is a fundamental representation of local government to its citizenry. Creating a high performing police department is critical to the officers, organization, and most importantly the City of Wichita. This organizational assessment for the City of Wichita is an attempt to identify critical issues and provide recommendations to assist the department in preparing for the hiring of a new chief of police. In addition to this assessment, much more scrutiny and deliberation must take place to address long-term systemic issues and community expectations.

Wichita State University Hugo Wall School of Public Affairs (HWS), including faculty from the Department of Criminal Justice, was requested to assist with the project. The purpose of this consultation was to conduct an organizational assessment to provide a blueprint for the Wichita Police Department (WPD) and the hiring of the next chief of police. The WSU team was tasked to:

1. Provide research of best practices on specific topics (Racial Profiling and Community Policing);

2. Engage internal and external stakeholders to identify assets, issues of concern and ideas on the future direction of the WPD;

3. Review critical information that includes current WPD demographics, planning documents, recent reports, and identified policies and procedures to ascertain strengths and opportunities for improvement; and

4. Provide recommendations for the selection process for the next chief of police and direction of the WPD.

# HUGO WALL SCHOOL
## *of* PUBLIC AFFAIRS

## STAKEHOLDER ENGAGEMENT

The purpose of collecting qualitative information from internal (195 employees, nearly 25% of the department) and external stakeholders (22 meetings) was:

1. To identify strengths and assets of the department,
2. To identify priority issues for the department; and
3. To identify issues where internal and external stakeholders view the department differently.

Both internal and external stakeholders were asked the same ten questions as the foundation for the conversation. Strengths for the department included: quality personnel, community policing philosophy, specialty units and relations with other law enforcement agencies. Areas for improvement included: training, communication, and implementation or deployment of community policing officers. The most important tangible improvements identified for the next two years were: training, technology, recruitment, and communication.

## COMMUNITY RELATIONS ISSUES

Improving community relations was identified as an issue by WPD leadership and community organizations. While there were many comments about positive relations with the community, there are specific areas for improvement. Finding opportunities to build relations, create understanding between community members and WPD about police activities, and provide for more open communication are paramount for the future success of the department. Primary recommendations include:

### 1. *Community Policing and Race*

- Hire a forward thinking visionary chief of police who is deeply committed to the Community Policing Philosophy, not just verbally but also as a proven practitioner.

# HUGO WALL SCHOOL
## *of* PUBLIC AFFAIRS

- Continue to engage officers and community members on expectations and the evolution of holistic community policing.
- Ensure the Community Policing Philosophy is embraced by the entire Department; not only a stand-alone unit. A separate unit cannot achieve the full purpose, more importantly, it fails to truly engage all officers completely in building relationships and trust.
- Develop a transition and implementation plan to expand the community policing strategy prior to the hiring of the next chief of police by creating a Transition Team comprised of WPD staff and community members. This team should begin discussions to change from the current Community Policing strategy of having a beat coordinator for every beat to a more comprehensive approach, while still maintaining the need for officers in target areas and a liaison for organizations throughout the community.
- Re-engage other city departments in the Community Policing philosophy. All City departments within the city structure should be educated, actively engaged and supportive of neighborhood activities.

### 2. Body Cameras

- Continue with implementation and communicate progress regularly to the community.

### 3. Citizens with Mental Health Issues

- Develop an implementation plan for all officers to attend a Mental Health First Aid course and expand training opportunities.
- Seek advice about current topics and trends from mental health organizations in the community to be proactive in addressing mental health issues.

### 4. Racial Profiling Training

- Make racial profiling, or fair and impartial police training, and cultural diversity/sensitivity training as hands-on as possible. Engage police officers in active role-playing and problem-solving learning exercises.

iii

# HUGO WALL SCHOOL
## *of* PUBLIC AFFAIRS

- Invite members from minority communities to the police training environment to participate in diversity/sensitivity training sessions.

### 5. Racial Profiling Policy

- Insert a specific link to racial and other biased based policing policies on the WPD website. This will document WPD's policy against racial and other biased based policing and will provide a transparent process for all citizens to easily review the stated policy.

### 6. The Pretext Stop

- Because citizens are largely unaware of the legalities of the pretext stop, it would be beneficial for WPD, as much as possible, to educate the community during forums on racial profiling.
- Implement proposed policy to increase documentation and improve communication to citizens and the department on pretext stops.

### 7. Demographic and Workforce Comparison

- Lack of departmental diversity is not unique to the WPD; law enforcement agencies across the country are challenged by this issue.  Developing targeted recruitment and retention plans, mentoring and support systems will be critical for future success.

### 8. Wichita Police Department Community Advisory Board

- Establish a new Community Advisory Board for the purpose of working with the police department and to improve relations between WPD and the community.  This new advisory board would provide community perspective on important policy, programs and priorities of the department.
- A standing committee of this advisory board would serve as the City Manager Review Board (CMRB).  This committee would review cases on police conduct and administrative issues that are appealed by citizens.  The District Attorney will continue to be responsible for all criminal investigations.

# HUGO WALL SCHOOL
## *of* PUBLIC AFFAIRS

- The CMRB will review cases appealed by a citizen if the citizen disagrees with the findings of Professional Standards.
- In a significant change, the CMRB will also hear direct appeals from citizens for review of officer conduct or the CMRB may make a direct request. The first step will be for the CMRB to determine if the incident has already been reviewed by Professional Standards, and if so, determine the outcome. If the incident has NOT been reviewed by Professional Standards, the case will be sent to Professional Standards for investigation.
- For cases appealed to the CMRB, the board will review the report and findings from Professional Standards. Another significant change will be for the CMRB to have discussions with Professional standards and the chief of police to create understanding, improve process and address policy issues regarding the case. Additionally, the CMRB would also have the ability to request additional investigation or clarification, which is currently not an available option.
- If the CMRB supports the findings of Professional Standards, the case is complete. If the CMRB does NOT agree with the findings of Professional Standards, the CMRB may appeal to the City Manager.

## 9. *External Communication*

- Review website options to improve access to information.
- Standardize approach on significant issues to ensure transparency and consistency of process.
- Create a proactive educational campaign to inform the public on police practices and procedures.
- Evaluate the structure of the communication staff. Provide resources for an additional noncommissioned position to assist with public information and volunteer support.

# Hugo Wall School of Public Affairs

### 10. Communication with Racial Minority Citizens

- Schedule regular community meetings with all minority communities to discuss racial profiling and other issues impacting minority communities.

### 11. Volunteers

- Use of volunteers is particularly crucial in an environment challenged with financial hardships. Thinking of creating ways that volunteers can be utilized and thinking beyond the way law enforcement has used them in the past would prove to be most beneficial.

### 12. Use of Force and Community Incidents

- Create a proactive information campaign on the use of force, and the related police policies and procedures.
- Develop standard procedures to follow after an incident occurs to inform the public, neighborhood and media.
- Continue to improve internal practices, policies and trainings regarding the use of force.

## ADMINISTRATIVE ISSUES

Numerous internal, or administrative issues, were identified during focus groups with police department employees. These issues reflect significant opportunities for the WPD to improve internal operations and thus the morale of the department.

### 1. Response Time

- Further investigate the significant changes in the types of calls.
- Inventory and prioritize special assignments.
- Ensure resources are available to the next chief of police to create a strategic work plan for the department.

# HUGO WALL SCHOOL
## *of* PUBLIC AFFAIRS

### 2. Committee Structure

- Identify and communicate standing committees, membership, purpose and annual work plan.
- Create task forces, as needed, for specific issues with clearly defined goals, deliverable timeframes, membership and responsible leaders.

### 3. Leadership Transition

- Communicate outcomes of the organizational assessment and transition plan to the department, law enforcement partners and community to ensure transparency of the process.
- Establish a leadership and management development program to support the current department leadership and prepare for the next generation.
- Hire a chief of police that values professional and personal development with a proven record of growing capacity within the department.

### 4. Organizational Structure

- Complete a staffing analysis with the primary purpose of ensuring that an appropriate allocation and deployment of officers is meeting current service demands.

### 5. Traffic Unit

- Evaluate the impact of reinstating the traffic unit or developing alternatives to address officer time on traffic accidents and decreasing accidents.

### 6. Relationship between Commissioned and Non-Commissioned Personnel

- Provide opportunities for commissioned and non-commissioned supervisors to interact on an informal level to build trust and communication across the department.

# Hugo Wall School
## *of* Public Affairs

- Provide opportunities for field officers to tour non-commissioned service areas so they know what day-to-day operations entail and can therefore provide better service to citizens.

### 7. Workload

- Analyze data from the Officer Daily Activity Reports (ODAR) to determine what deployment changes can be made and drill deeper with officers on time consuming activities.
- Complete a workload assessment, or time study, to create more understanding on what changes can be made for the best use of officer time.

### 8. Discipline

- Provide clarification, training and set forth expectations on what types of infractions should be handled by frontline supervisors and what cases need to be sent to Professional Standards.
- Create understanding of different generational expectations in the workforce.
- Annually distribute information, both internally and externally, about the number of cases, length of investigations and findings.

### 9. Intelligence-Led Policing

- Determine the role of the analysts and if analysts should continue to support a primary patrol bureau or be assigned to work with key functions such as field, investigations, or administration.
- Analyze the value for all analysts to be located at City Hall to create a cohesive Crime Analysis Section. Purchase new analytic software with input not only from WPD, but also from the Sedgwick County Sheriff's Office and the Sedgwick County Association of Police Chiefs as a way to begin to look at crime analysis on a county-wide perspective.

# Hugo Wall School *of* Public Affairs

### 10. *Recruitment*

- Conduct focus groups with recent applicants about the recruitment process and front-line supervisors to identify strengths and weaknesses of the current process and identify motivation for applying.
- Conduct a process review with a group of current and former WPD training staff, Fraternal Order of Police (FOP) representatives, and human resources staff to determine opportunities for improvement.
- Develop a marketing plan and material for internal employees and external recruits.

### 11. *Promotional Process*

- Review written tests and ensure alignment with skill set needed.
- Assess timeframe and process improvements.
- Continue to work proactively with the City's Human Resources and Budget Departments as well as the Position Review Committee to decrease the length of time a position is unfilled.

### 12. *Training*

- Identify external resources that can be used for training at minimal or reduced costs. Examples of resources include: The Institute for Intergovernmental Research, Federal Law Enforcement Training, local universities, and shared resources with other agencies.
- Develop continuous supervisor and leadership training and explore co-sponsorship with other regional law enforcement agencies.
- Evaluate the benefit of hiring a non-commissioned staff person with expertise in training and development to provide consistency for the department through leadership changes with emphasis on adult learning.

## HUGO WALL SCHOOL
## *of* PUBLIC AFFAIRS

### 13. Internal Communications

- As previously recommended, hire a noncommissioned employee with a communication background to assist the commissioned leadership.  The communication specialist can also provide media training and coaching to assist the department with routine activities and messaging for high-profile activities.
- Create a bi-monthly update to employees to include information from Command Staff meetings, highlights from special projects, policy changes, special recognitions and other important information.

### 14. Inter-Agency Relations

- Develop priorities, work plan and timeframe to investigate and report potential cooperative efforts between WPD and Sedgwick County Sheriff's Office prior to the hiring of the next chief of police.  Initial cooperative ventures could include:
  - Co-locate Narcotics
  - Co-locate Property and Evidence
  - Co-locate Records Section
  - Share the cost of a polygrapher
  - Joint technology purchases
  - Regional training for leadership and management

### 15. Brady-Giglio Impact

- Through periodic meetings between the City and District Attorneys, continue to monitor the national understanding of court interpretations.
- Initiate a "fit for duty" screening for current officers who have been determined by the District Attorney to have negative credibility.
- Once complete, and in communication with the FOP, finalize the status of officers who have not passed the "fit for duty" screening.

x

# HUGO WALL SCHOOL
## *of* PUBLIC AFFAIRS

## HIRING THE NEXT CHIEF OF POLICE

Responses from all focus groups and one-on-one interviews about the qualities of the next chief of police were fairly consistent.  Based on community feedback and information presented in *"Selecting a Police Chief:  A Handbook for Local Government"* publication from the International City/County Management Association (ICMA), a selection process for the City of Wichita was prepared.  Key recommendations include:

1.  Engage a firm that specializes in hiring police chiefs.

2.  Establish a Community Advisory Search Committee as a way to ensure an open and transparent process and ensure broad community participation.

3.  Provide a forum for department employees and community members to meet the finalists and provide input to the City Manager.

4. Structure interviews to involve representatives from community  groups, department heads, representatives from non-commissioned employees, FOP leadership and command staff.

5. Schedule a community forum to provide an opportunity for greater community  input.

## CONCLUSION

This organizational assessment for the Wichita Police Department provides a blue print for the next Chief of Police.  With a department of this size and complexity, there are always challenges and areas for improvement.  Most importantly for the WPD, there are incredible future opportunities due to the committed personnel of the department, support of the City Manager and City Council, and support of the Wichita community.  Establishing the priorities and the transition plan will be the next step in this endeavor as the search and hiring of the new chief of police proceeds through 2015.

## INTRODUCTION

Recent national events and local actions have heightened awareness of the critical relationship among law enforcement, residents and local government and public service professionals. With issues and tragedies that create strong reactions, tension and division, local government is challenged to find common ground instead of polarizing responses.

A police department is often a fundamental representation of local government to its citizenry due to the volume of public interactions, number of employees, and critical functions that public safety represents. Ensuring this relationship is productive and successful is vital to the image of the local government.

In addition, public safety represents a significant financial investment of local government resources. Determining the appropriate level of resources, deployment of resources, and return on investment is a continuous challenge. The challenge becomes more difficult in a large organization with many technical units, special assignments, traditions, information brokers and perceived lack of agility. More so, the demands of public safety at the local level continue to increase with cybercrimes, technology expectations, terrorist threats, and socio-economic challenges. Coupling that with the current environment of public service, it creates a daunting road to navigate.

With this significant impact, creating a high-performing police department is critical to the officers, organization, local government, and most importantly the community. This organizational assessment for the Wichita Police Department is an attempt to highlight critical issues that need to be addressed to move the department forward. This three month endeavor is only a preliminary investigation and provides for a general course of action. Much more scrutiny and deliberation must take place to address long-term internal systemic issues and community expectations.

### Background

In response to the City of Wichita's request for services, the Hugo Wall School (HWS) proposed to assist the City of Wichita Police Department (WPD) with an organizational assessment in preparation for hiring the next chief of police. The HWS, in partnership with the Wichita State University (WSU) Department of Criminal Justice, provided neutral research, facilitation and process development to assist in the assessment.

The organizational assessment was designed to assist the City of Wichita with an accurate, fair and impartial evaluation to provide a clear representation of the current environment and to assist with the next era of the WPD.

## Purpose

The purpose of the consultation was to conduct a thorough organizational assessment to provide a blueprint for the WPD and the hiring of the next chief of police. The WSU team provided external independent assistance for the WPD to achieve that goal. The evaluation process follows best practices in industry standards, engages internal and external stakeholders, identifies assets to build on, as well as issues to be addressed, and provides ideas for the future direction of the WPD.

## Process

In order to conduct a successful organizational assessment, the WSU team was tasked to:

- Provide research of best practices on specific topics (community policy and racial profiling) and compare to current standards of the WPD.
- Engage internal stakeholders to identify assets, issues of concern and ideas on the future direction of the WPD.
- Review critical documents to include current WPD demographics, planning documents, recent reports, or identified policies and procedures to identify strengths and opportunities for improvement.
- Provide recommendations for the selection process for the next chief of police and direction of the WPD.

The WSU team met regularly with the City Manager, WPD leadership and others to ensure critical review and direction of the process.

## **BEST PRACTICE RESEARCH**

The WSU team, led by faculty members Dr. Michael L. Birzer, Director, WSU School of Community Affairs and Professor of Criminal Justice, and Dr. Andra J. Bannister, Director of WSU Regional Community Policing Training Institute and Professor of Criminal Justice, created an overview of best practice research on critical issues for the WPD. This research was used to assess the current practices of the WPD and provide recommendations; research will also provide direction and support for future development of the department. This research is integral to establishing the foundation for recommendations in the report.  Attachments of supporting documents are provided at the end of the report.

## STAKEHOLDER ENGAGEMENT

Paramount to any organizational assessment is collecting qualitative information from internal and external stakeholders. Information was collected through informed interviews and focus groups of internal and external stakeholders. The purpose of the engagement was threefold: 1) To identify strengths and assets of the department; 2) To identify priority issues for the department; and 3) To identify issues where internal and external stakeholders view the department differently.

### Protocol

To initiate stakeholder engagement, interviews were conducted with key individuals within the department and with community partners. These informed interviews helped define the questions and processes for the internal and external focus groups. WPD, city management, and Fraternal Order of Police leadership provided input on identifying key stakeholder groups. Standardized questions were used for each stakeholder session to identify strengths and weaknesses of the department, WPD leadership, community relations and recommendations for the selection of the next chief of police.

*(See Attachment A)*

### External Stakeholders

Law enforcement partners, community groups and special interest organizations with an important connection to the WPD were invited by the HWS to participate in focus groups. In addition, the HWS conducted focus groups by request and led a modified community discussion on December 10, 2014. Participants included:

- Sedgwick County District Attorney
- Sedgwick County Sheriff's Office
- City of Wichita Department Directors
- External Law Enforcement Agencies
- USD 259
- City of Wichita Law Department
- Service Employees International Union
- Justice Keepers

- Wichita Crime Commission
- Speak Out Kansas
- Racial Profiling Task Force
- Neighborhood associations
- Sunflower Community Action
- College Hill United Methodist Church
- Black Chamber of Commerce
- Sedgwick County Association of Police Chiefs
- At-large community meetings
- Ministerial League of Wichita
- Nonprofit and partner organizations
- Hispanic community
- Fraternal Order of Police
- State and Federal law enforcement agencies

**Internal Focus Groups**

The primary goal in creating internal focus groups was to provide as many employees as possible with the opportunity to provide input. WPD provided a list of employees by rank (officer, sergeants, etc.), assignment (security, animal control, etc.), and shift. The HWS then alphabetized the lists. To meet the target focus group size of fifteen (15), the HWS selected a random sample and provided a recommended list of participants to the WPD for review to ensure gender and racial diversity. Two make-up sessions were scheduled.

A total of 275 (36%) employees from across the department were invited to participate in an internal focus group. Employees not invited to participate in a focus group were encouraged to share concerns with a co-worker or meet with their union representative. In the end, 195 employees (nearly 25%) from across the department attended a focus group.

*Chart 1:* **Internal Focus Groups**

| GROUPS | # INVITED | # ATTENDED | % ATTENDED |
|---|---|---|---|
| Animal Control | 21 | 13 | 62 |
| Captains | 10 | 7 | 70 |
| Civilians | 48 | 36 | 75 |
| Detectives | 31 | 24 | 77 |
| Lieutenants | 30 | 10 | 33 |
| Officers | 103 | 57 | 55 |
| Security | 8 | 8 | 100 |
| Sergeants | 24 | 19 | 79 |
| Make-Up Meetings | NA | 21 | NA |

Notes from all meetings were collected, assembled, reviewed and analyzed. No names or correlation to specific focus group session or meetings were documented. Analysis of the qualitative information was to attempt to quantify the themes of comments by coding and attributing comments to common themes.

## COMMON THEMES

There were several common themes from the stakeholder sessions that are identified in the following information. As much as possible, quantitative information has been provided on the number of times the issue was discussed in the groups.

### 1. Strengths of the Department

- *Quality Staff:* Both employees and external law enforcement identified a high percentage of high quality staff that were dedicated to the profession and service to the community.
- *Community Policing:* External focus groups viewed the community policing philosophy and officers as a strength of the department. *(14 specific mentions)*
- *Specialty Units:* Specialty units and special programs were identified as a strength. The Homeless Task Force, Homicide and the Crisis Intervention Team were mentioned.

## 2. Weaknesses of the Department

- *Training:* Training facilities, opportunities and quality were mentioned as areas of improvement primarily by internal groups, but also by external stakeholders especially involving racial profiling and community relations. *(36 specific mentions)*

- *Communication:* Internal and external groups identified communication as an area for improvement. Specific themes included: proactive communication on department policies and procedures; updates on internal activities; and transparency on significant events. *(22 specific mentions)*

- *Recruitment:* Internal candidates expressed frustration with the recruitment process, but there was no consensus on the direction. Some felt it was too hard for recruits to be accepted, some indicated the quality of recruits had lessened and some were more concerned about the actual process. External focus addressed the lack of diversity in recruits. *(20 specific mentions)*

- *Technology/IT:* The need for improved technology, especially in software for reports, connectivity with other law enforcement agencies, crime analysis, and equipment were discussed. *(20 specific mentions)*

## 3. Strengths of WPD Leadership

- *Partnerships with External Law Enforcement:* Other law enforcement agency representatives stated there has been a historically positive relationship with the WPD. Praise was given for the willingness to work together, creation of special task teams, and the overall professionalism of the department.

- *Transition Leadership Team:* The interim leadership team received support for addressing delays in decision making, including promotions. The team also received support for providing direction on issues that had stagnated. Participants indicated the hiring of the next chief provides a new opportunity.

- *Community Policing:* External participants indicated that the WPD leadership was supportive of community policing. Although changes and improvements are needed, there was a leadership commitment to the philosophy.

## 4. Weaknesses of WPD Leadership

A challenge with identify the weakness of the WPD leadership is to clarify which comments were directed toward previous administration and which were are more systemic and inherited by the interim team.  More systemic issues indicated were:

- *Communication:*  Both internal and external stakeholders expressed a desire for more communication and information from WPD, including a more proactive approach on police policies and practices.  In addition, comments from all on the need to improve communication with minority communities. *(20 specific comments)*
- *Training:*  Stakeholders felt this needs to be a priority moving forward for the leadership team. Both internal and external stakeholders indicated there is work to be done on officer training. *(18 specific comments)*
- *Discipline and Internal Affairs:*  Comments were made from internal stakeholders on the inconsistencies and expediency of discipline.  External participants expressed frustration on the transparency and expedience of the disciplinary process.  *(18 specific comments)*

## 5. Strengths of Community Relations and Engagement

- *Community Policing:*  Similar to the previous reasoning provided, community policing was discussed as a positive of the department in building relations. *(14 specific comments)*
- *Special Programs:*  Programs that proactively address problems, such as School Resource Officers (SROs), Homeless Task Force, training for mental health, were discussed as positive approaches for law enforcement.

## 6. Weaknesses of Community Relations and Engagement

- *Communication:*  Once more, the need for more communication was identified.  The request from both internal and external groups for more proactive and timely information was discussed.  *(30 specific comments)*
- *Community Policing:*  While some felt that community policing was a strength of the department, many, especially internally, indicated a desire for change.  Deployment and implementation was the focus of the concern, not a commitment to the philosophy of community policing.  *(15 specific comments)*

*(Questions 7 and 8 are included in the final section on "Hiring the Next Chief of Police.")*

## 9. Tangible Improvements Needed In Next Two Years

Participants were asked to identify the priorities for tangible improvements needed in the next two years.  Explanation for the issue has been previously indicated, but the following are the top items:

- Training
- Technology
- Recruitment
- Communication

Information from the focus groups was used to identify and prioritize issues for the department. The information also served as an impetus for further research and verification of the perceptions.

## CRITICAL ISSUES

As part of the organizational assessment, the HWS was charged with review of the following issues:

- Current operational policies and procedures
- Community and employee relations
- Organizational structure
- Safety and training programs
- Community policing model
- Use of technology
- Communication and engagement activities
- Interagency relations

The report reflects the critical issues identified during stakeholder interviews and incorporates the specific topics in the framework of the assessment. Critical issues are divided between community relations and administrative, or internal, issues. As much as possible, data was collected on the issues identified by the stakeholders to provide factual content to perspectives.  The purpose for this research is to identify gaps or accuracy between opinions and documented information.

## COMMUNITY RELATIONS ISSUES

Improving community relations was identified as an issue by WPD leadership and community organizations. While there were many comments about positive relations with the community, there are specific areas for improvement. Community policing was identified as a positive relationship builder by many  external focus groups, but both internal and external stakeholders identified a need for improvement. For the past 20 years, the WPD has implemented community policing with relatively little change.  While there is support for the philosophy and purpose of community policing, internal and external stakeholders indicated a need for changes to ensure relevancy and best practices for today. School partnerships, business community relations, neighborhood associations and internal departments provided examples of many successful joint efforts, communication and support from the WPD.

In contrast, there was a different perception with regard to relations with some in the African American community. Concerns of racial profiling , police harassment and unfair treatment were

expressed in meetings with groups involved with the African American community. In addition, there are more improvements that can be made to build relations in the Hispanic community and with other special populations and immigrant groups. While these are issues identified by people in communities of colors, it would be over simplistic and inaccurate to identify these as a "black issue" or "brown issue" or even socio-economic differences. The importance of police relations with minority groups and perceptions of police tactics and citizen interactions were expressed by Caucasian stakeholders of different backgrounds, external law enforcement representatives and by internal leadership.

Finding opportunities to build relations, create understanding between community members and the police department on police activities, and provide for more open communication are paramount for the future success of the department. Developing positive personal relationship skills, applying de-escalation techniques, and participating in activities and events to build relationships are foundational elements for officers to have success with the community. In addition, while issues of concern with specific officer behavior were certainly highlighted in conversations with African American stakeholders, there was concern expressed by all races. More so, there was consistent feedback that these issues of concerns were probably not with the majority of the officers, but rather a small percentage of officers. Similarly, there are some citizens that expressed extreme distrust of WPD, the majority did not represent that view. The following sections were identified as important issues for improving relationships with the community.

## Community Policing

Community Policing is a valuable asset for law enforcement agencies and the communities they serve, if implemented correctly and consistently. While not a cure-all of a community's troubles, a vast amount of literature and evidence certainly supports its value and worth. The relationship between law enforcement and community varies significantly around the nation. A fairly consistent finding is that incorporating a Community Policing Philosophy, which is rooted in partnerships, has proven to be successful even in areas challenged with significant levels of violent crimes. For example, Chief Scott Johnson, Police Chief of Camden, New Jersey, spoke eloquently on "Face the Nation" recently about his Agency's ability to have a significant impact on the violence that has plagued their community for years. He stressed the need for "human contact" in order to impact and

chip away at neighborhoods deemed to be some of the most dangerous in the United States.

A few other key points that Chief Johnson states provide some helpful insights. While he doesn't use the phrase "community policing," he infers it when he goes on to discuss the strategies being utilized. Officers going door-to-door throughout the day to make direct contact with citizens to ask what they need and about their concerns rather than only showing up during a crisis, exemplifies one important aspect. This supports his position that his officers are "guardians, not warriors" and that trust building through interaction is evidence that they are "building community first and enforcement comes second." Lastly, he goes on to state that policing with the consent of the community they serve enables his department to function both efficiently and effectively.

A thoughtful piece by renowned expert, Dr. David Carter, from Michigan State University tackles the issue of how to make a successful change to community policing. Clearly, as is evidenced in the majority of the literature, a committed leader with a vision for change and transformation needs to be at the helm of the department . While there is no doubt that continuing  with the status quo is easy and usually doesn't require much creative thought, change is always difficult and more likely than not will be met with a significant amount of resistance, regardless of the community .

Dr. Carter goes on to talk about the need for the department's  leaders  to be open and flexible to changes  they will need to make, not only mentally, but fiscally as well. Reallocation of resources, personnel, training programs, and whatever other moves prove necessary to facilitate the transition must be met with an open mind.

One of the major components of community policing is input. While this is most often interpreted as meaning solely community input, this is not the only type of input. In fact, as Dr. Carter points out, officers, regardless of rank, should have input into how expanding community policing unfolds. This can be a very uncomfortable position for both officer and administrator alike, especially in a particularly large and complex department; however, it is a necessary step.

Taking chances, taking risks and trying out new ideas and programs are part of the process common to the true holistic implementation of community policing in practice. The question then becomes, are these new strategies actually effective. While human nature seemingly wants immediate results, time and most likely continual iterations, will be the true test of the long-term success or failure of

such initiatives.  Seeking support from officers, city management , and community is crucial to this transformation, as well. Clear and transparent communication is critical. Communication allows for everyone to truly understand what is occurring and why as well as to educate everyone on the process.  Dr. Carter states that support should be sought prior to the implementation of a new program, especially one of this magnitude. Also, he is quick to note that one-way communication is not effective. All community interest groups  should be able to provide candid feedback on an on-going basis. This will help significantly with buy-in from all interested and affected parties. With that being said, it is also important to recognize that not everyone will be on board with the transformation. Unfortunately, those individuals often find themselves left behind.

A couple of additional noteworthy points mentioned by Dr. Carter are as follows:  Significant change is sometimes met with political opposition and challenge. This is not in any way meant to discourage or derail the implementation process, just as a precautionary note. And second, one of the greatest concerns for law enforcement officers in the field is that  traditional performance evaluations still often used in many law enforcement departments  do not reflect an officer's level of productivity, especially when it relates directly to proactive or prevention-oriented policing, i.e. community policing. *(See Attachment B for additional information on best practices in community policing.)*

Lastly, it is important that community policing is viewed and understood as being a win-win for everyone. Smarter, better policing is the ultimate goal where everyone wins. Safer communities lead to increased satisfaction on both parts. Crime reduction, mitigation, intervention that results from a good, strong relationship with the community at-large should be the focus when "selling" the community policing philosophy. Also, quality of life issues are very important to citizens as are perceptions.

## Community Policing and Race

Community based policing strategies are an undercurrent to much of this assessment report. Expanding the community policing philosophy seems to be the most appropriate way  to improve communication and relations with racial minority citizens, something that minority citizens participating in stakeholder meetings expressed. Community policing may also improve on-going dialogue on racial profiling. The idea is that community policing strategies will improve the ability of

the police and community to come together to discuss problems more frequently and with renewed focus because they will have more direct contact with each other. Community policing is said to improve police-community relations in the following areas:

- Closer relations with minority groups, where the need is greatest for police understanding and involvement.
- More effective and more open communication between the police and the community.
- Increased citizen involvement in crime prevention and addressing social problems as a means of reducing crime.
- Improved understanding between the police and the community, with both gaining recognition of each other's problems.
- Creation of awareness among police-community relations problems, and encouragement of officers to help solve them.
- Direction of an all-department effort toward improving relations with the total community, whether these involve crime prevention, public relations or neighborhood problem solving.

### *Recommendations*

- Hire a forward-thinking visionary police chief who is deeply committed to the Community Policing Philosophy, not just verbally but as a practitioner.
- Continue to engage officers and community members on expectations and evolution of holistic community policing.
- Keep ongoing communication and education active throughout the transforming process and beyond.
- Clearly define how community policing is a win-win for everyone, both internally and externally.
- Connect Intelligence-Led Policing, Predictive Policing, and other useful technology tools in the name of Community Policing.
- Create partnerships that involve other entities in addition to the residential community. For example, inter-agency partnerships, partnerships with local businesses, and other regional city and county entities are particularly advantageous when trying to problem solve on city-wide issues. Several businesses already have field workers in the community, such as the electric

company, cable companies and construction companies.  Team with businesses to create an ongoing communication process to identify and report any community concerns.

- Ensure the Community Policing Philosophy is embraced by the entire Department.  Having a stand-alone unit has created a division within the department and in some situations, resentment regarding workload. More importantly, it fails to truly engage all officers completely in building relationships and trust.

- Experiment with implementation options. Many ideas are failures the first time around. WPD should not get discouraged but should rather invest the time and patience into either revising a strategy or trying something completely different.

- Look to "Best Practices" from  other agencies around the United States. Recognize that agencies and communities are unique. Just because something works well in one community doesn't mean it will be successful in another.

- Understand and support that despite the phrase "community policing" which some critics interpret as "soft", this philosophy is anything but. Traditional crime solving, reactive policing, making arrests, etc. is not meant to be replaced, only supported.

- Commit to implementing this philosophy throughout the entire department, while simultaneously developing a staffing plan that is more agile for deployment. Move away from designated beat coordinators to a smaller group of officers with a targeted approach based on need and crime trends. However, the department must ensure a connection to all neighborhood and business associations.

- Develop a transition and implementation plan prior to the hiring of the next chief of police by creating a Transition Team comprised of WPD staff and community members to change from a beat coordinator for every beat to a more comprehensive approach, while still maintaining the need for officers in target areas and a liaison for organizations throughout the community.

- Re-engage other city departments in the community policing philosophy.  All departments within the City should be actively engaged and supportive of neighborhood activities.  Improve communication within the organization on important issues.  Develop partnerships for a team approach to crime issues through code enforcement, housing and neighborhood development.

- Increase training on the philosophy and implementation opportunities for all officers to improve

integration. Ensure performance evaluations and promotions support and reflect the community policing philosophy. Confirm WPD leadership commitment to community policing for all officers. Develop systems that create accountability and recognition for supervisors that support community policing activities.

## BODY CAMERAS

The implementation of body cameras has been a significant issue for the WPD in recent history.  At a public meeting in August, "No Ferguson Here," the City committed to having every officer equipped with a body camera.  Wichita will be one of the first cities of its size to require every officer to wear a body camera; only Ft. Worth, Texas, Albuquerque, New Mexico and San Diego, California are comparable cities that have completed this objective. To accomplish this, the City will purchase 450 cameras, in addition to the 60 cameras already deployed in the field. In 2015, this purchase will be made by grounding the air unit, but federal grant funding may potentially be available with recent comments from the White House. WPD anticipates full implementation of the cameras by December 31, 2015, at a cost of approximately $1.5 million for the cameras, new staff, maintenance, and data storage.   The City provided the public with research, funding options and an implementation plan. *(See Attachment C)*

Aside from the financial investment, there are several other considerations for camera deployment. The WPD developed the following implementation plan:

### *Body Camera Implementation Plan and Timeline*

*Phase 1:*  **Research and Planning**

> *Target Date for Completion: February 28, 2015*

- Research body camera and data storage vendor options
- Identify a funding source from within the current operating budget
- Develop relevant operational and technology policies
- Consult with the IT department to equip WPD facilities with the capacity to upload data

*Phase 2:* ***Purchasing***

> *Target Date for Completion: June 30, 2015*

- Contract with a vendor to supply the body cameras
- Contract with a vendor to store data
- Hire support clerks to maintain the cameras and manage their data
- Receive the body cameras from the vendor

Phase 3: **Training and Preparation**

Target Date for Completion: October 31, 2015

- Train officers to properly operate cameras according to equipment specifications and WPD policies
- Train support clerks to provide technical support and maintain equipment and resulting data
- Prepare substations to store cameras and upload data

Phase 4: **Deployment**

Target Date for Completion: December 31, 2015

- Disseminate information to the community about the body cameras' features and policies
- Develop a phased bureau-by-bureau rollout
- Rollout to SWAT team and specialty bureaus

Due to recent high profile national events, numerous other communities are also investigating the use of body cameras. Coupled with potential for federal funding, there could be more demand than supply, which could delay implementation. The Fraternal Order of Police, the union that represents WPD officers, detectives, and sergeants, supports the implementation of body cameras for officers in the field to protect both the officers and the public from inappropriate conduct.

**Recommendation**

- Continue with implementation of the plan and communicate progress regularly with community.

## CITIZENS WITH MENTAL HEALTH ISSUES

Since 2012, all police recruits have received a four-hour crisis intervention training (CIT) to learn how to safely interact with citizens who may suffer from mental illness or have other mental health

concerns. Although this training is limited, it is at least a start to having the entire department understand very complex mental health issues. Recruits also receive training in crisis management, behavior management, and learn how to safely interact with special populations, veterans, and people with Post-Traumatic Stress Disorder. These trainings expose recruits to a variety of incidents to which they could respond that require specialized knowledge and training. Again, it is important to remember the vast amount of knowledge recruits are expected to absorb and this provides only an overview for sensitivity to the issues.

Once recruits graduate, they become eligible to attend more comprehensive CIT courses. Each year, the Sedgwick County CIT Council hosts a 40-hour basic course with 10-15 spots reserved for WPD. The CIT Council also hosts an 8-hour advanced training course that previously trained officers can attend based on availability. The basic course curriculum has remained consistent to provide officers with the foundational information needed to make appropriate decisions in the field, while the advanced curriculum is regularly updated to cover current issues and trends.

Currently, 89 of the 617 officers (14.4%) and supervisors are trained in crisis intervention. The WPD has been approved to send 20 officers to CIT training in June 2015. More so, in 2015, four officers will be attending a weeklong training, Mental Health First Aid Instructor Course offered by The Kansas Law Enforcement Training Center (KLETC), to learn how to become trainers to provide additional resources to the department. The department is also procuring additional equipment for non-lethal options while dealing with people with mental illness. An initial purchase of shotguns that shoot bean bags are being made, including instruction on use. The KLETC and equipment purchases are an estimated $15,000-$20,000 investment for the department to assist with situations with people with mental health issues.

When WPD is dispatched to a call involving a person who may be suffering from mental health issues, a crisis intervention officer may also be dispatched, if available. Because trained officers hold the same responsibilities as any other field officer, they may not be able to respond immediately. If a crisis intervention officer is dispatched, this trained officer is better equipped to evaluate the situation and determine the best course of action to handle a person with mental health issues and their family members. This officer has training to support communication strategies, conflict

de-escalation tactics, and determine if there is a need to bring in other mental health professionals.

To improve service delivery to mental health consumers and their families, WPD has committed, in partnership with the Sedgwick County CIT Council and COMCARE of Sedgwick County, to provide every officer with Mental Health First Aid training.  WPD has  also committed to continue to encourage and support police personnel to successfully complete the 40-hour Basic CIT course and/or the Advanced course.

### *Recommendations*

- Develop an implementation plan for all officers to attend a Mental Health First Aid course.
- Continue to work with COMCARE to expand training opportunities by offering the class more than once a year.
- Seek advice about current topics and trends from community mental health organizations to be proactive in addressing mental health issues.
- Review deployment of CIT officers and develop information to identify officer availability per bureau and shift.
- Identify any significant gaps or vulnerabilities for why a CIT officer is not readily available.
- Work to define specific targets for the number of trained officers per bureau and shift to be available for calls.
- Until a higher percentage of officers are trained, it will be difficult to ensure officers are available to respond to calls due to current beat and shift assignments, call loads and special duties.

## RACIAL PROFILING

*Perceptions and Realities:* Similar to many cities across the United States, Wichita is not immune to the perception among its minority citizenry that the police profile them based soley on their race. Subsequent to a town hall community meeting held in Wichita ("No Ferguson Here"), it was apparent that there was a fair amount of distrust between the WPD and some in the minority community.  Some of this distrust is the result of several highly publicized local officer involved shootings, while other forms of distrust centered on performance of general  patrol tactics, perceived by the minority community to be racial profiling and unfair treatment.

National surveys have consistently revealed that minority citizens are much more likely to believe that the police engage in racial profiling when compared to white citizens. Three studies commissioned by the City of Wichita over the past fifteen years found that minorities are overrepresented in vehicle stops and citations (see Withrow, 2000, Withrow 2004, Birzer and Beeson, 2014). *(See Attachment D)* It is important to note that while minorities in these studies were overrepresented in stops and citations, in reality, it could not be shown that the WPD engages in racial profiling because it does not assess the intent or motivation of the officer.

In 2010, a research project commissioned by the Kansas Department of Transportation (KDOT) and the Governor's Task Force on Racial Profiling examined the perceptions of racial profiling among Wichita's racial minority citizens (see Birzer, 2010, 2013). Minority citizens from Wichita were included as part of a larger study across Kansas. As the WPD considers ways to enhance policing services and improve relations with the minority community, the results of this research is germane in order to further understand the perceptions and experiences of citizens who believe they have been racially profiled.

Six themes emerged from the research pertaining to minority citizens' perceptions of racial profiling. These themes along with a brief description are presented below in order for the police department to better understand the perceptions of racial profiling among Wichita's minority citizenry.

## Theme 1:  Emotional/Affective

Citizens spoke about the many emotions they experienced as a result of being stopped by the police for what they believed to be based solely on their race. For many citizens, the stops resulted in what they describe as "long-term emotional distress". The participants spoke of the embarrassment of being stopped by the police. In some cases they were made to stand along the road while their cars were being searched which resulted in a great deal of humiliation for participants. Participants felt a sense of embarrassment because they wholeheartedly believe that the sole reason for their stop and detention was for driving while Black or Brown.

## Theme 2:  Symbolic Vehicle

In this theme participants described how they believed the police hold stereotypical beliefs about the type of vehicle that minority citizens drive. For example, citizens revealed that if you are, for

example, Black, and driving an expensive car, that will attract police suspicion because of the stereotypical belief by police that the vehicle is too expensive for a minority citizen to drive. Citizens highlighted the fact that the make and model along with the appearance of the car they happen to drive will attract police attention. They believe this is because it is perceived by the police as the type of car that a minority would drive. Participants believe that the police construct the "minority symbolic vehicle" based on stereotyping. The "minority symbolic vehicle" includes a constellation of customization and apparel such as wheel rims, nice or custom paint job, car that sits low to the ground, window tint, and gold around the tag, tag film covers, and the like.

### Theme 3: Nature of the Violation

Citizens believed that the police routinely use what they describe as "petty" and "minor" traffic violations as a pre-text to stop them. Forty percent of the stops were for what citizens described as being suspicious, or just checking the driver out, or for tinted windows. While another 15% report being stopped for a cracked taillight or a defective brake light. Of the 91 stop incidents studied, 59 (65%) of the stops resulted in no traffic citation being issued. Thirty-five (35%) of the stops, resulted in a traffic citation or an equipment fix-it ticket being issued. For citizens, this reinforced the racialized aspect of being stopped.

### Theme 4: Officer Demeanor

This theme revealed that when minority citizens are stopped by the police, the officer would often "talk down to them." Citizens revealed they were "treated like criminals" during their contacts with the police. They suggested that if the police were polite and would communicate better with them during the stop it would minimize many negative perceptions.

According to citizens participating in the study, police officers often delayed advising them why they were being stopped. They reported that they had to inquire of the officer several times as to why they were being stopped before they were finally given a reason by the officer. Citizens found this delay especially frustrating. Participants described the officers' demeanor during a stop as accusatory, demeaning, impersonal, and often hesitant to give an immediate reason for the stop.

### Theme 5: Normative Experience

Many minority citizens have accepted racial profiling as what they described as a "normal" part of

life. There was  a pervasive feeling among the study's participants that the chances of being stopped by police authorities simply because of their race or ethnicity was  very real.  While this feeling was widespread among all participants  it was especially prevalent among Black male participants. Black male participants seemed to be much more troubled by their experiences of being stopped by the police and they were much more structural in telling their stories.

### Theme 6: Race and Place

Citizens believed that there was  a greater likelihood of being stopped in some geographical areas of the community. For example, they believed they were  more likely to be stopped in predominately white and affluent neighborhoods. Many reported that they avoided driving through some affluent white neighborhoods for fear of attracting police suspicion.  Participants believe that there is a perception among the police that if a minority citizen is driving through an affluent predominately white neighborhood that they are out of place.  Furthermore, participants felt that there was a greater chance of them being stopped in economically disadvantaged areas including areas targeted by the police for increased enforcement activities.

### Global Conclusions

- There were no contextual differences in the way in which Black and Hispanic citizens experienced what they believed to be racial profiling.  The ethnic and racial minority groups represented in the study experienced what they believe to be racial profiling in much the same way.  The only minor difference was  in the case of Black males.

- Black males were much more structural in telling their stories, and they appeared to be the most impacted in terms of the emotional toll. While this impact is shared by Hispanic participants, it was  much more pervasive among Black males.

- There was  a belief among minority citizens that police authorities use pre-textual traffic violations to stop them because of their race. Participants  described these pre-textual traffic violations as being very minor.  There was general agreement that these same traffic violations aren't enforced to the same extent among White drivers.

- As a result of being stopped for what they believed to be racial profiling, many participants spoke of altering their driving routine. They spoke of avoiding areas where there is a greater chance of

seeing police. Several participants revealed that they alter their schedules and allow for additional
time when driving through certain neighborhoods due to the possibility of being stopped.

- Many participants revealed that they, or others they know, purposefully drive bland looking cars
in order to avoid attracting police attention.

- For a great many participants, the emotional toll was great and lasted for long periods of time.
The emotional toll often culminated in a distrust of the police and/or reinforced previously held
suspicions and mistrust.

- Participants believe that the manner in which a police officer communicated with them during a
stop could go a long way. Many participants revealed that when they were  stopped for what they
believed to be racial profiling, they were often talked down to. Participants describe the
experience as demeaning, embarrassing, and accusatory.

- In many cases minority participants  said they were not issued a ticket or warning after being
stopped  for what they described as a minor traffic violation.  This reinforced to them that the
stop was because of their race.

- Citizens interviewed for this study believe that being stopped by the police is a normative
experience. This is often described as routine and expected, a normative culture of sorts among
racial minority citizens. The normative culture dictates to avoid the police, and if stopped, "don't
give them a reason to make your situation worse." What is perhaps most striking is that many
participants spoke of being taught as youth, as well as teaching their own children about what to
do if stopped by the police.

## Racial Profiling Training

There were a number of implications from this data that center on police training. The first
overarching training topic is continued racial profiling training, or fair and impartial policing training,
and cultural diversity awareness training throughout the department. It is recommended that racial
profiling training within the WPD be continually re-emphasized as part of the annual required racial
profiling training and is included in  WPD policy (Policy 903) related to racial profiling and bias based
policing as well as Kansas Statutes (KSA 22-4606) that addresses racial profiling and biased based
policing.

## Recommendations

- Make racial profiling training, or fair and impartial police training, and cultural diversity and sensitivity training as hands-on as possible. Engage police officers in active role-playing and problem-centered learning exercises. This  may include scenarios where, for example, racial minority citizens allege the police department engages in racial profiling. Police officers would then work in small learning groups to tailor strategies to address the allegations.
- Invite members of the minority community  to the police training environment to participate in the  profiling and cultural diversity/sensitivity training sessions.
- Incorporate the themes found in the "Perceptions of Racial Profiling" study into racial profiling training just as the  KLETC  has.  Police officers may benefit from knowing how minority citizens describe and perceive what they believe to be racial profiling.

## Mutual Respect

An important objective of both racial profiling training and cultural diversity training is to provide police officers with information on the issue of mutual respect. The Department of Justice - Office of Community Oriented Policing Services produced a best practices training curriculum for police officers on this topic. They suggest that an important aspect  of this training is to increase police officers' awareness of respectful police behavior. By doing so, their ability to work toward better community relationships will be strengthened.  They suggest that interim performance objectives of this training should be to:

- Recognize that all citizens are influenced by experiences and that treating people with dignity and respect is the foundation of good communication.
- Recognize that police officers' actions and demeanor shape the image of their agencies and of law enforcement in general.
- Recognize that good law enforcement practices involve investigating patterns of criminal behavior and the use of race as a reason to stop someone is illegal.
- Recognize that gaining community support and acceptance requires mutual trust and respect between citizens and the police.
- Recognize that establishing positive community partnerships is an effective use of police authority.

## Motorist Contacts

Research has shown that it is critical that that both WPD recruit and in-service trainings emphasize and re-emphasize the importance of acting as a professional as possible during violator contacts, especially with minority citizens.  The perceptions that residents have of police conduct during stops might be considered just as important as the actual objective reality of the stop. The traffic stop is, in many cases, the only contact a resident might have with the police.  The manner in which the police officer communicates can leave lasting impressions.

In many cases, residents reported that the police officer "beat around the bush" or was ambiguous about the reason for the stop. It may be beneficial for police officers upon initial contact with a violator of any race or ethnicity to properly identify himself and then give the reason for the stop. This may result in a more positive outcome for both the police and the resident.  WPD Policy 409.06 provides guidelines for officers to follow during traffic stops. This specific policy is sound and meets best practices. Thus, officers should periodically be reminded during training of the importance of the motorist contact and Policy 409.06.

It is important to point out that research has consistently shown that racial minority citizens are much more likely to suspect that a police stop was racially motivated if they were treated with hostility, discourtesy, and not informed of the reason for the stop.  Moreover, contacts with the police tend to have stronger and longer-lasting effects on the views of racial minorities when compared to Whites. Racial minority citizens are more likely than whites citizens to leave an encounter upset or angry.

## Racial Profiling Policy

Best practices recommend that police agencies have a policy in place to address racial profiling. Policy should be tailored within the scope of state and local legislation.  The Police Executive Research Forum recommends a policy that:

1. Emphasizes arrests, traffic stops, investigative detentions, searches, and property seizures be based on reasonable suspicion or probable cause.

2. Restricts officers' ability to use race or ethnicity in establishing reasonable suspicion or probable cause to those situations in which trustworthy, locally relevant information links

a person or persons of a specific race or ethnicity to a particular unlawful incident.

3. Applies the above restrictions to requests for consent searches and even those consensual encounters that do not amount to legal detentions.

4. Articulates the use of race and ethnicity be in accordance with the equal protection clause of the Fourteenth Amendment.

5. Includes provisions related to officer behavior during encounters that can serve to prevent perceptions of racially biased policing.

After a careful review of WPD Policy 903 that addresses racial and other biased based policing, it appears that the department meets best practices. The policy provides a comprehensive definition of racially biased policing, and it is strongly embodied within the Fourth Amendment (search and seizure) and the Fourteenth Amendment (equal protection).

### *Recommendation*

• A specific link to the racial and other biased-based policing policy on the WPD website is recommended. This will document WPD's policy and stance against racial and other biased based policing and allow citizens to easily review this stated policy. Posting policies on public websites is increasingly being done in agencies across the country as well as in Kansas. For example, see the websites of the Garden City and Topeka Police Departments.

### The Pretext Stop

The pretext stop is a significant problem for those alleging racial profiling. In interviews with racial minority citizens, they were unaware that the police can legally use a pretext as a reason to stop them even though that was not the motivating reason for the stop. Pretext stops are used as an investigatory tool for law enforcement. Their validity and constitutionality have been upheld by the Supreme Court *(Whren v. U.S., U.S. Supreme Court 1996)*. By definition, a pretext stop is when an officer has reasonable suspicion but not probable cause to stop a car. A clear and articulable identification of a violation of some sort, usually traffic or equipment, provides a legal reason to stop that particular vehicle.

The pretext stop also makes it more difficult for police leadership to identify officers who may be

using race as the sole factor to stop citizens, unless of course he or she admits it.  Virtually any motorist can be stopped for any reason, and it is recognized that an officer engaging in racial profiling can hide behind the pretext stop.  That is, the officer can say, "I did not stop the car because the driver was Black, I stopped the car because the driver committed a traffic violation."

### Recommendations

- Because citizens are largely unaware of the legality of the pretext stop, it may be beneficial for the police department as much as possible to educate them during community forums on racial profiling.
- Because police officers often use their discretion when deciding to use a pretext stop, which is used regularly in high crime areas in inner-city neighborhoods, the logic goes that it is possible that racial minority citizens who reside in these areas will receive a disproportionate number of traffic tickets for minor types of offenses. Therefore it is important that policy and training reinforce that objective and circumstantial evidence during each stop and encounter will be the standard for administrative review.
- WPD is modifying Policy 409 - Vehicle / Pedestrian Stops and Regulation 5.8 - Reporting Requirements, requiring that officer shall prepare an Incident Report documenting the facts and details of pedestrian and vehicle stops which fall within the definition of "pretext stops" or "investigative stops."
- Additionally, officers shall, when requesting consent to search or conducting consent searches, prepare and submit the Wichita Police Department Waiver to Search Form 322-106 even if the person gives verbal consent and declines to sign the form.  The officer will draw a case number, prepare an Incident Report documenting the facts and details of the consent search, and submit the Waiver to Search Form.
- These requirements will align Policy 409 and Regulation 5.8, with definitions in Policy 903 - Racial and Other Biased Based Policing.  The employee will be required to deliver reports for pretext stops, investigative stops and searches to their supervisor for review and approval by the end of their tour of duty.
- Supervisor responsibility will be stated in Policy 409 requiring that the supervisor review the incident for proper application of contemporary search and seizure legal standards, and proper

detail in the incident report and / or supplemental report for the incident.

• In order to accommodate a periodic random audit by Professional Standards, the Investigations Division or the Chief's designee, WPD will establish a means by which to classify or flag these cases in the Records Management System for later retrieval and audit.

• An important piece will be initial training for officers and supervisors on current case law standards for search and seizure and the stricter Department policy and regulation requirements on reporting pretext and investigative stops and searches.

## Reflection of the Community

In community discussions, the concern that WPD does not reflect the diversity of the community was expressed.  The following is a current overview of the department's race, ethnicity and gender comparison with the community:

*Chart 2:* **WPD Race Comparison with Community**

| Race Comparison (as of December 1, 2014) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | American Indian/ Alaska Native | Asian | Black/ African American | Native Hawaiian/ Other Pacific Native | White | Other | Total |
| **WPD\*** | 7 | 24 | 71 | 0 | 695 | 0 | 797 |
| **WPD (percentage)** | 0.9% | 3% | 9% | 0% | 87% | 0.0% | 100% |
| **Wichita\*\*** | 4,560 | 18,466 | 43,807 | 336 | 275,080 | 40,119 | 382,368 |
| **Wichita (percentage)** | 1.2% | 4.8% | 11.5% | 0.1% | 71.9% | 10.5% | 100% |

*\*For Wichita Police Department: Asian and Native Hawaiian / Other Pacific Native totaled together and are represented in "Asian" column for purposes of reporting.*

*\*\* Wichita 2010 Census.*

*Chart 3:* **WPD Hispanic Demographics in Comparison with Community**

| Ethnicity Comparison (as of December 1, 2014) | | | |
|---|---|---|---|
| | **Non-Hispanic** | **Hispanic** | **Total** |
| **WPD** | 737 | 60 | 797 |
| **WPD (percentage)** | 92.5% | 7.5% | 100% |
| **Wichita*** | 193,845 | 188,523 | 382,368 |
| **Wichita (percentage)** | 50.7% | 49.3% | 100% |
| *Wichita 2010 Census* | | | |

*Chart 4:* **WPD Gender Demographics in Comparison with Community**

| Gender Comparison (as of December 1, 2014) | | | |
|---|---|---|---|
| | **Female** | **Male** | **Total** |
| **WPD** | 195 | 602 | 797 |
| **WPD (percentage)** | 24.5% | 75.5% | 100% |
| **Wichita** | 193,845 | 188,523 | 382,368 |
| **Wichita (percentage)** | 50.7% | 49.3% | 100% |
| *Wichita 2010 Census* | | | |

WPD is not unique in the challenge of recruiting and retaining a diverse workforce reflective of the community. In comparison of current WPD demographics to 2010 Census, the African American population in Wichita represent 11.5 percent, and 9 percent of the workforce. The Asian population represents 4.8 percent of Wichita's population, and 3.0 percent of the WPD workforce. More than one race and other categories create the "other category," which may not be accurately captured for comparison with the WPD reporting.

Wichita has a Hispanic population that is 15.1 percent of the total population, but the WPD has a Hispanic representation of 7.5 percent. Hispanics have a higher percentage of the population in

younger generations, which may not be reflected yet in the workforce pool. There still remains a need to increase recruitment for Hispanic officers. Women are also disproportionately represented on the department. Once more, this is not unique to the WPD, but is a national issue. Increased recruitment and retention efforts will be an ongoing challenge.

**Demographic and Workforce Comparison**

The City of Wichita Human Resources Department compared the WPD's demographics with the available Wichita workforce demographics, which is another consideration impacting the department in recruitment of under-represented populations. Human Resources uses Utilization Analysis to compare the City of Wichita workforce with the available labor force. All job titles and classifications are coded according to the eight EEO categories for local government Jobs; Officials/Administrators, Professionals, Technicians, Protective Service, Paraprofessionals, Clerical Workers, Skilled Craft Workers and Service Maintenance Workers. When hired, city employees self-identify the racial/ethnic group they belong to and can choose one of the following; White, Black, Hispanic, Asian, Native Hawaiian/Other Pacific Islanders, American Indian/Alaskan Native or two or more of any race.

The actual race and gender codes are put into a spreadsheet and then Human Resources compares Census data to determine the appropriate percentages of the available labor force (16 years and older). Percentages of the labor force are subtracted from the actual percentages and if a negative sum is the result, then that indicates "underutilization." Underutilization of more than 20% can be evidence of discriminatory actions once this rate exceeds 10% underutilization, then Human Resources becomes pro-active in targeted recruitment. Currently, there are no areas of under-utilization exceeding 20% in any area of city employment. However, disparity exists with regard to gender. *(See Attachment E)*

*Recommendation*

- The need and lack of diversity is not unique to the WPD; law enforcement agencies across the country are challenged by the issue. Developing a targeted recruitment plan, retention plan, mentoring and support systems for under-represented populations on the force will be critical for future success.

## WICHITA POLICE DEPARTMENT COMMUNITY ADVISORY BOARD

Closely connected to improving relations with the community and especially the minority communities that may feel disenfranchised, the Community Advisory Board/City Manager Review Board should be completely restructured and repurposed to better create opportunities to improve understanding, relationships, trust and performance between the WPD and the community.  In 2005, the WPD created the Citizens Racial Profiling Board to address biased based policing for the department. The City Manager's Review Board was re-established in 2010 to further enhance the level of trust between the WPD and the community. Members were appointed by the City Manager with input from the Mayor and City Council. Membership was intended to be representative of the community with at least one member from each Council District.

To meet the requirements of the State of Kansas legislation passed in 2011 to address racial profiling and biased-based policing, the Wichita City Council at its June 12, 2012 meeting approved the creation of a Community Advisory Board by using the existing City Manager's Review Board. Two of the stated purposes of this board are to: 1) review the results of completed WPD investigations of citizen complaints; and 2) conduct appeal hearings for citizens who disagree with the findings of WPD investigations.

The City Manager Review Board has not been active, creating frustration from groups in the community and within WPD. In addition, there is a Racial Profiling Board that is frustrated by their perception of a lack of commitment to improving biased policing; however, there is frustration from the police department on what they perceive as unfounded accusations.

Based on stakeholder focus groups and previous research, many minority citizens believe if racial profiling or other complaints are made to the police, little will be done. In the previous mentioned study, one African American participant referring to allegations of racial profiling stated, "The police will cover things like this up."  Many minority citizens believe it will do little good to file a formal complaint with police authorities.

In order to change this belief, the WPD should establish a new Police Department Community Advisory Board for the purpose of creating continuous dialogue between community representatives and the WPD.  The primary purpose of this advisory board would be to improve relations between

WPD and the community and be available to provide community perspective on important policy, programs and priorities of the department.  In addition, a subset of the advisory should review the completed investigation concerning racial profiling or other professional misconduct through a revised City Manager Review Board.

The U.S. Department of Justice strongly encourages law enforcement agencies to consider forming citizens review boards. It is best to form the citizens review board as a proactive measure as opposed to the result of a police incident that draws large public disfavor (e.g., the latest incident in Ferguson, Missouri). A community advisory board will go a long way in sending a positive message to the Wichita community.

Rather than creating a standalone board solely to investigate only issues of concern, it is recommended that the WPD be proactive in building community relations by creating the previously mentioned Community Advisory Board to be expansive in scope and purpose that would also include a subcommittee for a City Manager Review Board.

Details regarding the re-defined advisory board include:

- The purpose of the Community Advisory Board will be to serve as an advisory board for the police department on critical community and department issues.
- The Board will meet bi-monthly to review recommended policies, programs, organizational changes, implementation of police procedures (case examples), review citizen initiated Professional Standard cases (not only those appealed), and other important topics.
- An appointed standing subcommittee will serve as the City Manager Review Board (CMRB) to review completed investigations that are appealed by citizens.  A new function of the CMRB will be to receive direct requests from citizens for investigations regarding police conduct. In addition, the CMRB may also request a special review of a situation or incident.
- The advisory board should consist of 15-20 members.  A significant change will be for the members to be nominated from community organizations and open to the general public for application.  Consideration should be given for standing appointments for specific community organizations concerned with police and community relations.  Again, this change is to build relationships, understand perspectives, and create a continuous improvement process for the

WPD. Final appointments should be made by the City Manager with input from the Mayor and the City Council. The chair of the committee should be familiar with public safety and actively involved in the community.

- The members of the Community Advisory Board must reflect the diversity in Wichita, including ethnicity, race, gender, religion, sexual orientation, socio-economic, people with disabilities, age, and geographic. To be a board member, a citizen should meet the following qualifications:

  <u>Minimum Qualifications:</u>

  - Must be at least 18 years of age
  - Rules and regulations established in Sec. 2.04.070 and Sec. 2.12.010 of City of Wichita Municipal Code include:
    - Resident of the City of Wichita, or the owner of a business physically situated in the City of Wichita (A resident of Sedgwick County may be appointed if he/she has unique qualifications to serve.)
    - Not employed by the City of Wichita
    - No member of the immediate family of any member of the city council

  <u>Additionally:</u>

  - U.S. Citizen
  - No pending criminal charges
  - Not on probation or parole for certain misdemeanors or any felony conviction
  - Not on any sex offender registry in any jurisdiction
  - Not a party to any pending litigation against the City of Wichita
  - Not an elected public office holder, or a candidate for elected public office
  - Not a present or former Wichita Police Department officer, or immediate family member of any Wichita Police Department member
  - Must successfully complete a background check
  - Must not be in arrears in the payment of taxes or any other liability to the City

- To improve significantly from the current process, board members should anticipate a minimum of 30 hours of training prior to service on the board, with ongoing training and updates as part of their appointment.  For members serving on the CMRB subcommittee, additional training will be required.
- As part of the overall review to take place 18 months after the hiring of the new chief of police, the Community Advisory Board will also be reviewed to ensure it continues to be a functioning board for the community.

### *City Manager Review Board Research*

The most accepted approaches to review boards are that citizens on the review panel should represent diversity in terms of race and socio-economic status. The review board should not be primarily made up of only high profile citizens.  This is a criticism of many minority citizens.  That is, that often panels and committees are not inclusive of "everyday citizens from the neighborhood." Across the country, the protocol for selecting citizens to serve on the review panel is somewhat nuanced.

An important consideration regarding civilian participation is defining how much authority the board will be granted.  That is, will they be granted investigative authority, or will they simply be a review body? This question should be answered in a manner that best meets the need of the WPD and the Wichita community. A review panel that is granted some reasonable investigative authority is generally viewed by the community as credible because it provides for oversight from beginning to end. On the other hand, the risk of having a board restricted to only review may be looked upon with disfavor by members of the community.

Some citizen review panels are independent of the law enforcement agency while others work directly with the police agency.  Some review panels are made up entirely of civilians while others have a mix of police personnel and civilians. What follows is a brief description of the various types of citizen review panels that have been suggested by the Department of Justice. Because citizen review boards are often resented among police personnel, and have the potential to impact police morale, the idea of the proposed City Manager Advisory Board is to be proactive in working with WPD, not just reactive to when there is a problem.  The CMRB as part of the Advisory Board, then

serves to address specific issues of concern, but again will have a broader understanding of WPD issues.

## National Models

**1. Review Board/Commission:** Citizens constitute the totality of the membership of the board. With staff assistance, an investigation is made of the complaint of police misconduct and findings are forwarded to the law enforcement executive officer. It is an external investigation of each complaint independent of the police department.

**2. Police Investigate/Citizen Review Monitoring:** Police officers investigate all allegations of police misconduct and forward their investigation to a citizen's oversight board. Citizens' members review the investigation, and indicate their position regarding the internal affairs/professional standards findings, and recommended disciplinary action. If it's a question of policy or standard operating procedure, the police department's policy and procedures may be monitored. In most instances the recommendations are advisory in nature, and the police chief can approve or reject the findings. Depending upon the amount of cases, there may be a need to determine specific types of cases (use of force, weapon discharge, etc.) for automatic review.

**3. Police Investigate/Citizens Handle Appeals:** Police officers investigate charges of police misconduct. An unsatisfied complainant may appeal the finding to a board composed of citizens, and after review citizens send their own findings to the police chief or other designee. This board is more reactive and not necessarily proactive.

**4. Independent Police Auditor/Ombudsman:** The auditor investigates the process by which the internal affairs/professional standards unit accepts and investigates complaints. If the investigation is inadequate the auditor may ask for further investigation. The auditor submits reports to the political or other appointing body (such as the city manager), the police agency, and citizens. The auditor can conduct an independent investigation of citizen complaints and review police policies and procedures or initiate general investigations. *(See Attachment F for more examples of review boards.)*

## City Manager Review Board (CMRB) Wichita Model

There is a need to create a model that is right for Wichita. The following is an outline for a new model and process:

- The CMRB will review cases concerning professional and administrative conduct (not criminal activities) appealed by a citizen if the citizen disagrees with findings of Professional Standards.

- The CMRB will also hear direct requests from citizens to review officer conduct; or the CMRB may request review of a specific incident. This is a change from the current CMRB process. This change is recommended to address concerns from citizens heard during stakeholder interview of citizens not wanting to go directly to WPD regarding the alleged incident. After hearing from citizens, the next step is to determine if the incident has already been investigated by WPD. If the incident has **NOT** been reviewed by WPD, the case will be sent to Professional Standards for investigation. Again, this change is recommended to create another option for citizens to have their concerns heard by fellow citizens and the CMRB has the added responsibility to request an investigation.

- Another significant change will be that the CMRB can make a direct request to the WPD for review of an existing investigation, or to start a new investigation regarding officer conduct. This responsibility might be used in a high profile situation where the CMRB wants to ensure the public interest was addressed.

- Once the initial investigation is complete, the CMBR will review the report and findings with Professional Standards. The CMRB will then have the opportunity to ask questions of Professional Standards to further understand the issues and findings. The board may also ask for further investigation. The added value these process changes make is to have actual dialogue between the community and the WPD and to ensure a more thorough investigation. The intent is to create understanding and clarity for all parties involved in the issue.

- After the discussion, if the CMRB supports the findings of Professional Standards, the case is closed.

- If the CMRB does **NOT** agree with the findings of Professional Standards, or has further questions, the CMRB may request that Professional Standards do additional investigation, including contacting other witnesses, asking additional questions, or gathering additional data.

Once more, this opportunity does not exist now and will result in a more thorough investigation.

- After further investigation by WPD, any additional information will be shared with the CMRB and the chief of police; at this time the chief of police will have the opportunity to adjust or confirm the previous disciplinary decision.  The case will again be presented and discussed by the CMRB and the board will have the opportunity to meet with the chief of police to review the new information and any changes to the disciplinary action.  Again, this significant change in the process creates the opportunity for understanding, process improvement and clarification of policy.
- If the CMRB, upon meeting with the chief of police, now supports the findings of WPD, the case is closed.
- If the CMRB, upon meeting with the chief of police, does **NOT** support the findings of Professional Standards, the case and all findings are given to the City Manager for a final decision.

*(See Attachment G: Flow Chart of Process)*

The City, by its Home Rule Authority, could authorize the board to issue subpoenas. However, a number of procedural issues exist regarding enforcement or compliance with subpoenas issued by an administrative agency, such as the CMRB.  The Supreme Court of the United States has held that law enforcement officers and other public employees have the right to be free from compulsory self-incrimination. Because of this, an officer and other public employees could not be compelled to testify, even if subpoenaed by the Advisory Board.  These issues, as well as sanctions for not appearing for a subpoena, must be addressed by a court. The Board would not be authorized to hold a witness in contempt. Based on Kansas case law, it does not appear that municipal court would have the authority to hold a person in contempt under these circumstances.   While the board could issue subpoenas, the process to gain compliance would be a lengthy one in order to actually be allowed and impactful.  For those reasons, the recommendation is move forward with administrative changes to the Citizen Advisory Board and CMRB.  As stated previously, a review of the board will be made in 18 months.

## External Communication

There was agreement with internal and external focus groups on the need for more transparency on significant issues and a proactive approach for education on police practices and procedures. The fatal officer involved shooting in October 2014 was cited in interviews and focus groups as an improvement in transparency.

Social media was considered a successful effort by both internal and external representatives, but a need to improve the ability to better navigate on the website was also mentioned.  The structure and resources for communication staff was also expressed as an issue.

### Recommendations

- Review options to improve access to website information. WPD is dependent upon the City of Wichita IT infrastructure, so coordination and support for improvement is needed.
- Standardize approach on significant issues (officer involved shooting, use of force) to ensure transparency and process consistency.  Communicate the process and change in procedures to the community in advance of any incident.
- Create a proactive educational campaign to inform the community about police practices and procedures.
- Evaluate structure of communication staff and number of other direct personnel reports, such as warrants reporting to the lieutenant in charge of communications.
- Provide resources for additional public information and volunteer support.  Hire a noncommissioned communication professional to work for the commissioned leadership to assist with daily, routine communication; advise on high profile issues; create a monthly external communication report; develop proactive information campaign and assist with volunteer programs. Estimated budget implications: $70,000 for salary and benefits.

## Communication with Racial Minority Citizens

Many racial minority citizens in Wichita believe that the WPD avoids communicating with them, and when they do, the dialogue is often skewed to the police position. Open and regular communication can dispel rumors and resolve potential misunderstandings.  The necessity for translators or bilingual officers is great, especially for the Hispanic, Vietnamese, and Laotian communities.

*Recommendations*

WPD would benefit by holding regular or semi-regularly scheduled community meetings with all minority communities to discuss racial profiling and other issues impacting the minority community. In order to avoid complaining sessions, the community meetings should not be held only when hot button issues have caused the community to get riled up. Traditional and more progressive dialogue forums include:

- Sessions with the police chief advisory boards (either one board with members from several minority communities, or several boards, one for each community.)
- Chaplain or faith programs involving minority clergy.
- Radio and TV shows with calls.
- Beat meetings that are integral to joint community problem solving.
- Facilitated discussions (with a neutral, third-party moderator), which increase police and resident accountability for following up on agreed upon actions.
- Study circles, which are structured to include three steps: 1) organization of the community; 2) identification of areas of mutual police-citizen concern; and 3) agreement and action taken by both the police and minority groups.

## Volunteers

Lastly, internal focus groups identified the loss of volunteers or the demise of volunteer programs as a missed opportunity to build relations with the community. The economic downturn over the last several years has had a crippling effect on many law enforcement agencies nationwide. While some resorted to layoffs of personnel, freezing positions left vacant by attrition, other departments have been able to envision and implement creative strategies to minimize such devastating outcomes.

The use of volunteers has been one particularly effective strategy utilized by some of the most resilient departments. Incorporating volunteers into what has always been deemed traditional police roles has proven particularly successful and cost effective. Following a particularly vigorous background check and, in some agencies attending an academy, volunteers are being used to field phone calls, work accident scenes, help with crowd control, write tickets, provide eyes and ears for law enforcement while driving around in designated beat areas, etc. Volunteers are also being tasked

with data entry, working in the crime analysis unit, updating sex registrants via DOJ, registering and updating arson and drug offender information, assisting animal control officers by transporting strays to shelters, tracking maintenance on police vehicles, and trained to operate the mobile command post.

Another strategy that has been used in the law enforcement field is hiring retired officer's part time to work in specialty areas, such as cold case units. While the retirees are paid a small salary consistent with part time wages, the Agency does not pay benefits. This is a win-win for both parties since the retiree has some income coming in and the Agency has a subject matter expert to work specific types of cases.

Other types of volunteerism come in the form of private business/industry. Individuals who own companies are typically more than willing to provide assistance to law enforcement when called upon. So, the dedication of both time and resources proves beneficial.

While the vast majority of volunteers who dedicate their time/and or services to law enforcement and other city/county agencies receive no financial incentive, one agency in California has thought of a creative way to reward these individuals. Once a particular volunteer has completed as specifiedT number of service hours, he/she is given monetary credits on their water and sewer bill. If the volunteer is neither a resident in the City proper or isn't responsible for water and sewer (i.e. a tenant in an apartment complex) he/she will be given a gift card to a local merchant for a reward for their service. Clearly, none of the volunteers give of their time for something in return. Their only hope is that they can assist when and where needed to support law enforcement in helping to ensure a safe community in which they reside.

## *Recommendations*

- The use of volunteers is particularly crucial in an environment challenged with financial hardships. Thinking of creative ways that volunteers can be utilized and thinking beyond the way law enforcement has used them in the past will prove to be most beneficial. While the previous examples may not work under current local or state law, the point of the research is to inspire departmental staff and other decision makers to consider different approaches.

- Reach out to retirees, college students, community members via social media and at public meetings, when deemed appropriate.
- Identify businesses/contacts that help with such things as heavy equipment (for community projects), office space, etc. Also, reach out to local software companies to help develop and financially support law enforcement specific programs/projects.  Reach out to large companies to help support local initiatives. Look to private companies for grant opportunities.
- Evaluate current assignments of department personnel to determine where volunteers might assist and prioritize projects.

## Use of Force and Community Incident

The WPD has been working with an external consultant for improvements to use of force incidents. In January of 2013, the City of Wichita contracted with Attorney Eric Daigle, of Daigle Law Group, to complete a comprehensive review of the Wichita Police Department's policies, practices, training, and reporting of use of force incidents. Mr. Daigle is recognized in the field of law enforcement operations and management.  He provides police practices consultation to law enforcement agencies across the country in the area of operational liability, with an emphasis on policies, operations, and investigations.  Mr. Daigle has provided an update on his activities with the WPD. *(See Attachment H)*

Because of concerns over use of force, the WPD may benefit from taking proactive strategies in the event an incident occurs that results in the death or serious injury of a citizen at the hands of a police officer, especially in areas of the community where relations are strained. The Los Angeles and Philadelphia Police Departments, in the years following the Rodney King incident, implemented proactive strategies in the event of a police shooting or other critical encounter between the police and citizens in minority neighborhoods.

For example, shortly after the Los Angeles riots in the 1990s, a Philadelphia police officer shot and killed a minority suspect and the shooting was met with much suspicion on the part of the minority community and tensions were high. A special team of officers (Civil Affairs Team) was sent into the neighborhood where the incident occurred and began knocking on doors and explaining to residents what had happened and what was being done by the police department.

This was done in conjunction with the police commissioner meeting and briefing minority community leaders and citizen advisory councils. In essence, they engaged in dialogue with the affected community before rumors spread and before the news media began to report on the shooting. There is much evidence to suggest that approaches such as these are effective.

The Philadelphia police commissioner at the time (Willie L. Williams) reported that this simple action on the part of the police left residents with the impression that the police were responsible and fair minded. A similar approach was used by the LAPD following the shooting of an 18 year old gang member in an area where the department was experiencing strained relations.

### *Recommendations*

- Create a proactive information campaign on use of force, police policy and procedures.  Share information through the media, website, community forums, neighborhood meetings, and schools.
- Develop standard procedures to follow after an incident occurs to inform the public, specific neighborhood and media communications.
- Continue to improve internal practices, policies and trainings regarding the use of force.

## ADMINISTRATIVE ISSUES

Numerous internal, or administrative issues, were identified during internal focus groups. These issues reflect significant opportunities for the WPD to improve internal operations and thus the morale of the department.

### Mission, Leadership and Resource Alignment

The current mission statement of the WPD is:

> "To provide professional and ethical public safety services in partnership with citizens to identify, prevent and solve the problems of crime, fear of crime, social disorder and neighborhood decay, thereby improving the quality of life in our community."

During the more than 50 focus groups and stakeholder interviews, several issues were identified concerning the mission, leadership and resource alignment for the WPD. Clear direction, support and resources are the foundation of any organization. With the upcoming transition of leadership for the department, there is an opportunity to evaluate opportunities to clarify the mission, leadership expectation and ensure priorities of limited resources. There were several themes identified in the qualitative resource process that were then compared to quantitative data.

### Nonemergency Calls and Priorities

Nonemergency calls were often cited as a frustration for field service officers in trying to balance responsiveness with effective use of their time. Numerous anecdotes were provided to illustrate the issues from citizen calls about tall grass, to child custody issues, to basic requests for information. Another concern the officers expressed was frustration with priorities. Officers often shared stories of "layering on" activities or projects, making it difficult to define priorities. Call tracking from 2009 through November 2014 by the WPD is represented in Chart 5. And indicates interesting patterns that the WPD should evaluate to understand its impact on the department.

Pr

*Chart 5:* **Call Load**

| PRIORITY/TYPE | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Percentage Change |
|---|---|---|---|---|---|---|---|
| E:  Priority "E" calls are those calls where a life-threatening situation exists or a serious felony crime is in progress. | 3,692 | 3,526 | 3,733 | 4,127 | 4,626 | 4,437 | 17% |
| Priority 1: Priority "1" calls are urgent calls. These are calls where a serious crime has just occurred or is imminent, bodily injury has just occurred or is imminent, or another agency requires immediate police assistance. | 17,968 | 17,520 | 17,326 | 17,820 | 18,225 | 19,566 | 8% |
| Priority 2:  Priority "2" calls are those calls requiring prompt dispatch. These are calls where a crime has occurred of a nonlife threatening nature and immediate response is not necessary to arrest the offender. | 170,488 | 163,377 | 155,256 | 152,574 | 147,441 | 146,185 | -17% |
| Priority 3:  Priority "3" calls are non-emergency, nuisance, or report calls that do not require an immediate response. Additionally, it includes assist a citizen type situations when an officer responds to talk to a citizen or assist them in a small matter that is not necessarily a police matter. | 68,443 | 65,173 | 62,729 | 61,016 | 61,912 | 60,631 | -13% |
| Priority 4:  Case Desk – This civilian section of the Department records criminal cases from both police officers and citizens. Case desk takes the reports directly over the phone so it must not require the presence of an officer (i.e. no offender to arrest, no evidence to collect, no need to prevent a crime from occurring or the crime has not just occurred). | 11,374 | 10,090 | 9,316 | 9,105 | 7,748 | 6,878 | -65% |
| Priority 5:  Special Assignments (SA) is used when officers are working on something outside of regular patrol (i.e. DUI check lane, some kind of project typically). | 3,219 | 4,525 | 5,777 | 7,129 | 8,699 | 12,102 | 73% |
| Others | 0 | 1 | 0 | 0 | 0 | 7 | |
| TOTALS | 275,184 | 264,212 | 254,137 | 251,771 | 248,651 | 249,806 | -10% |

### *Overall Dispatched Call Load*

The number of total dispatched calls has decreased by ten percent in the last five years, even with a slight upturn in 2014.

*Graph A:* **Total Call Load**



Priority E Calls are calls are those calls where a life-threatening situation exists or a serious felony crime is in progress. These calls represent the top priority offenses. Priority calls have increased by 17 percent in the last five years.

*Graph B:*  **Priority E Calls**



Priority 1 calls are urgent calls. These are calls where a serious crime has just occurred. Priority 1 calls have also increased in the past five years, by 8% from 2009 through November 2014.

*Graph C:*  **Priority 1 Calls**



Priority 2 Calls are those calls requiring prompt dispatch. These are calls where a crime has occurred of a nonlife threatening nature and immediate response is not necessary to arrest the offender. Priority 2 calls have decreased by 17 percent in the time period.

*Graph D:* **Priority 2 Calls**



Priority 3 calls are non-emergency, nuisance, or report calls that do not require immediate response. They also include situations when an officer responds to speak with or assist a citizen in a small matter that is not necessarily a police issue. This category has decreased by 13 percent during this time span.

*Graph E:* **Priority 3 Calls**



Priority 4 Calls are Case Desk – This civilian section of the department records criminal cases from both police officers and citizens. Case desk takes the reports directly over the phone so these calls must not require the presence of an officer (i.e. no offender to arrest, no evidence to collect, no need to prevent a crime from occurring or the crime has not just occurred). These calls have had a 65 percent decrease from 2009 to November 2014.

*Graph F:* **Priority 4 Calls**



Priority 5 Calls are Special Assignments (SA) when officers are working on something outside of regular patrol (i.e. DUI check lane). There has been a 73 percent increase of SA calls from 2009 to November 2014.

*Graph G:* **Priority 5 Calls**



The difference in calls does not provide the full story, but certainly raises more questions. At least the initial review seems to support the idea that officers are being pulled off of more regular assignments to respond to calls to work on special assignments. A 65 percent increase is a significant difference. Special assignments are a strategy for utilizing existing resources to address evolving crime problems identified by analysis of crime data and intelligence information. Special assignments are also used to staff and manage special projects and unexpected events. Special assignments have been the means by which Intelligence-Led Policing tactics have been employed to address specific issues across the four patrol bureaus.

This strategy is best described in *Intelligence-Led Policing: The New Intelligence Architecture*[1] as "Strategic targeting and prioritization are other critical roles of intelligence. Law Enforcement agencies with tight budgets and personnel reductions or shortages must use their available resources carefully, targeting individuals, locations, and operations that promise the greatest results and the best chances for success. Case or lead overloads can reduce investigators' efficiency unless they know how to identify the most fruitful leads. Intelligence enables officers to work more efficiently."

These types of special assignments have had positive results.  For example, a special assignment was used for a larceny and theft problem in the West Patrol Bureau, dramatically decreasing the crime level.  A similar assignment crossed Bureau lines to target prolific catalytic converter thieves using a search warrant authorized GPS tracking unit which led to the arrest and prosecution of three individuals.  Another in northeast Wichita resulted in the arrest of two individuals responsible for a series of armed robberies. Special assignments are often proactive.  The challenge is balancing targeted, proactive projects with the need for officers to be available on the street to react to crimes. A common practice in agencies using crime analysis and intelligence-led policing is to deviate from "traditional" staffing practices, [i.e. one officer on each beat, day in and day out, regardless of increases, decreases or trends in crime rates] and shift resources based on trends, hot spots, and predictive analytics.

With the significant increase in documented special assignments there seems to be a need for additional research into the allocation and utilization of field personnel, and available alternatives. More so, there were several comments about the many different types of special assignments, including some that may be tracking off-duty officers.

Another important area to investigate is the dramatic decline in Priority 4 Calls to the Case Desk.  The bottom line is the need to determine what is causing this change or the impact on the deployment of resources.

[1]Bureau of Justice Administration, *Intelligence-Led Policing: The New Intelligence Architecture,* (Washington, D.C., 2005).

**Response Time**

Another piece of information to consider in regard to call loads and staffing deployment is response times. The International City/County Management Association (ICMA) collects performance measurement information from across the United States to establish benchmarks. As can be documented, in the following chart, response times from dispatch to arrival for Priority I calls have increased by 20% or a full minute.

*Chart 6:* **Response Time (In Minutes) to Top Priority Calls: Dispatch to Arrival**

| Benchmark | | 2008 Actual | 2009 Actual | 2010 Actual | 2011 Actual | 2012 Actual | 2013 Actual |
|---|---|---|---|---|---|---|---|
| ICMA | 4.95 | 4.94 | 5.08 | 5.20 | 5.37 | 5.88 | 5.93 |

The change in call loads also provides insight to the need for the department to define priorities. Citizen expectations of the WPD are to respond to emergency calls and to protect life and property. While this type of work is often reactionary, it is the bedrock of public safety and must remain the top priority, including how resources are deployed to support that priority.

In contrast, preventive public safety measures are proactive and often favorable with the community. Special task forces, such as the Homeless Task Force, crime prevention activities, safety check and others can, and do, address public safety concerns. The challenge for the department is to ensure basic public safety needs, such as responses to calls in the fields are addressed, while still balancing the benefits of proactive law enforcement practices.

*311 or Call Center*

Many communities across the country have implemented a non-emergency, centralized call center. The City of Wichita implemented a call center with the baseline for the 311 Call Center functionality established in January of 2011. The core function was, and still is, the Water Utility Customer Service. The dial 'wichita' (942-4482) number has been published in the phone book since 2012. The 311 call center receives 311 calls, however, the vast majority of calls are still water related.

Regarding the handling of police non-emergency calls, the Call Center does not anticipate rolling sub-station numbers into the Call Center in the near term. Recent environmental scans in terms of

call volume and call handling have indicated there is currently enough capacity to handle non-emergency calls at the Police sub-stations.

## *Recommendations*

- Investigate further the significant changes in the types of calls. Determine what is causing the drop in Priority 4 and the increases in special assignment calls.  Evaluate if this accurately reflects the priorities of the department.

- Inventory and prioritize special assignments. Ensuring appropriate resources for high priority calls is the primary responsibility of the department. Eliminating or postponing proactive assignments, despite their popularity and effectiveness, may be a difficult choice until additional resources are available.

- Ensure resources are available to the next chief to create a strategic work plan for the department.  The strategic plan should be clearly defined with priorities, deliverables and timeframes and not simply a laundry list of items.

- Engage Emergency Dispatch to determine any changes, or opportunities for improvement for routing of calls to WPD, including Case Desk, Call Center or other departments.

- Examine capacity and opportunities to collaborate more with the Call Center. With the infrastructure and improvement plan in development, the recommendation would be the following:

  ◦ Conduct internal meetings with WPD and Call Center leadership about changes, capabilities and determine implementation plan.

  ◦ Provide external information to community partners, citizens and media through a marketing plan.

  ◦ Although the department is in a time of transition there are some clear priorities defined during the organizational assessment that should move forward during the hiring process of the next chief.

## COMMITTEE STRUCTURE

A common concern in the internal focus groups and stakeholder interviews was the historic ineffectiveness of internal committees. Frustration with the number and productivity of committees was often expressed by officers that creating a committee was often used to delay decisions or address an issue. For people serving on committees, frustration was expressed that committee recommendations were often ignored or returned to the committee for continued work, which was interpreted by members that their opinion was not valued.

The following are the only standing committees:

- Kansas Criminal Justice Information System
- Public Safety Work Group – this may also be called the Public Safety Working Committee
- EJIS Steering Committee
- SCAT Committee
- Reserve Police Committee Uniform Committee
- Accident Review Board
- Awards Committee

### *Recommendations*

During the interim leadership, changes to committees have already started to occur with a return to standing committees. There is great value in creating short-term "tasks forces" to seek input form members to address specific, time-specific issues. The following recommendations would continue the improvements for committee use:

- Identify and communicate standing committees, membership, purpose and annual work plan.
- Create task forces, as needed, for specific issues with clearly defined goals, deliverable timeframes, membership and responsible leaders.
- Communicate quarterly to all staff work and deliverables of committees and taskforces.

## LEADERSHIP TRANSITION

Mainly due to retirements, there has been significant attrition in leadership.  The chart provides an overview of the tenure in leadership positions.

*Chart 7:* **Time in Current Rank**

| Year promoted to current rank | Years of Service in current rank | Captain | Detective | Lieutenant | Sergeant |
|---|---|---|---|---|---|
| 1979 | 35 | | 1 | | |
| 1990 | 24 | | 1 | 1 | |
| 1991 | 23 | | 3 | | |
| 1994 | 20 | | 2 | | |
| 1995 | 19 | | 3 | 1 | |
| 1996 | 18 | | 2 | 1 | 1 |
| 1997 | 17 | | 9 | | 5 |
| 1998 | 16 | | 4 | 1 | 1 |
| 1999 | 15 | | 7 | 1 | 3 |
| 2000 | 14 | | 4 | 3 | 3 |
| 2001 | 13 | | 4 | | 3 |
| 2002 | 12 | | 3 | 1 | 1 |
| 2003 | 11 | | 1 | | |
| 2004 | 10 | | 1 | 4 | 3 |
| 2005 | 9 | | 6 | 2 | 2 |
| 2006 | 8 | 1 | 1 | | 1 |
| 2007 | 7 | | 2 | | |
| 2008 | 6 | | 2 | 3 | 3 |
| 2009 | 5 | | 4 | 2 | 3 |
| 2010 | 4 | 3 | 7 | 2 | 5 |
| 2011 | 3 | | 6 | | 3 |
| 2012 | 2 | | 3 | | 1 |
| 2013 | 1 | | 3 | | 4 |
| 2014 | 0 | 7 | 20 | 11 | 15 |
| Total # of Positions | | 11 | 99 | 33 | 57 |
| # Promoted in Past Five Years | | 10 | 39 | 13 | 28 |
| Percentage Promoted in Past Five Years | | 91% | 39% | 39% | 49% |

As the chart indicates, significant percentages of leadership have been promoted in the past five years. For leadership positions, 91 percent of captains; 39 percent of lieutenants; 49 percent of

sergeants and 39 percent of detectives, all have less than five years in their current positions. Couple that with all of the three deputy chiefs being promoted within the last five years, and it is a very new leadership team. Even though officers in those positions have years of experience within the department, the tenure in their current positions is not long.  Any department experiencing that significant amount of leadership change will have growing pains. The next chief must be prepared to develop all leadership levels.  Considering national employment trends due to the retirement of Baby Boomers, the WPD may learn from other organizations with leadership changes.

As with any lasting leadership, the long-tenure of the previous chief has had a significant impact on the culture and perceived leadership style of the department. Efforts to re-establish, develop and expand relationships among WPD leadership and internal staff, community partners, and law enforcement agencies are paramount for the success of the organization. While there were many positive examples of leadership, two recurring themes for leadership included a lack of timely decision-making and a punitive culture.

### Recommendations

With any leadership transition, there is an opportunity for an organization to recreate and chart a new era.  Initial efforts should include:

- Communicate outcomes of the organizational assessment and transition plan to the department, partners and community to ensure transparency. Continue to provide strong leadership during the time of transition.
- Establish a leadership and management development program to support the current department leadership and prepare for the next generation.  Research examples from other departments, including successful succession planning.
- Recognize examples of outstanding leadership within the department and communicate the information.  Create a culture of learning and development for the department and recognize differences in learning and leadership expectations of the next generation of leaders.
- Hire a chief that values professional development and personal development with a proven record of growing capacity within the organization.

## ORGANIZATIONAL STRUCTURE

Beginning September 2010 and continuing through 2014, the WPD implemented a new organizational structure for the department.  The impetus of this change was a request to find permanent savings in the department's operating budget to address City financial shortfalls.  In addition, there was a request from the City Manager for all city departments to examine opportunities to decrease the number of higher level management positions and reallocate resources.  The intent was to create a less "top heavy" organization and direct more resources to services.  A summary of these changes is as follows:

*Chart 8:*  **Restructuring Implications for Commissioned**

| COMMISSIONED POSITIONS | | | |
|---|---|---|---|
| **Position** | **Prior to Restructuring** | **After Restructuring** | **Net** |
| Chief | 1 | 0 | 1 |
| Dep. Chief | 3 | 0 | 3 |
| Captain | 13 | -2 | 11 |
| Lieutenant | 37 | -6 | 31 |
| Sergeant | 57 | 5 | 62 |
| Detective | 102 | 1 | 103 |
| Officer | 438 | 0 | 438 |
| Totals | 651 | -2 | 649 |

*Chart 9:* **Restructuring Changes for Non-Commissioned**

| NON-COMISSIONED POSITIONS | | | |
|---|---|---|---|
| **Position** | **Prior to Restructuring** | **After Restructuring** | **Net** |
| Service Officer -1 | 8 | -1 | 7 |
| Station Clerk-710 | 2 | -1 | 1 |
| CSC-II 619 (BOF) | 4 | -3 | 1 |
| CSC-II (Alarm) | 0 | 1 | 1 |
| CSC-I 617 (Training) | 1 | -1 | 0 |
| CSI Supervisors | 2 | -2 | 0 |
| C-43 (Reclassified to 623) | 1 | -1 | 0 |
| A.C. Supervisor-623 (See Above) | 1 | 1 | 2 |
| All other | 184 | 0 | 184 |
| Totals | 203 | -7 | 196 |

*Chart 10:* **Total Impact of Restructuring**

| | **Prior to Restructuring** | **After Restructuring** | **Net** |
|---|---|---|---|
| Total Impact | 854 | -9 | 845 |

The impact of this four-year process is now being fully realized at the operational level. Increases in individual job duties and workloads were common themes at internal focus group meetings. Most employees seemed to understand why reductions were needed and believed these changes could have been absorbed in the short-term, but increased demands have also impacted performance. Most employees believe they are not able to perform their job at full capacity. Without objective information, it is difficult to determine the full value of concerns expressed.

The size and type of a police department and the types of services it provides are a reflection of the character and demands of a community. The continuous challenge for a department is to determine the appropriate allocation and deployment of officers to meet changing demands. The last comprehensive staffing study of the WPD was completed in 1985.

There are several primary approaches to a staffing analysis: crime trends, per-capita, minimum-manning levels, authorized budget levels, and workload-based. The HWS recommends an analysis based on workload as supported by the ICMA Center for Public Safety Management. This analysis relies on actual levels of demand for services and matches that demand with the supply of police resources. This approach would examine 911 calls for service and then modeling these calls to understand supply and demand. While this approach requires complex data analysis, it offers the most accurate and reliable predictor of police staffing levels.

### Recommendation

- Complete a staffing analysis with the primary purpose to ensure that an appropriate allocation and deployment of officers is meeting current service demands. Estimated financial impact: $25,000-$85,000.

## TRAFFIC UNIT

Internal focus groups also voiced concern about the elimination of the traffic unit in the early 2000's. Motorcycles were abandoned as an enforcement strategy in 2001 and the Traffic Bureau was dissolved with enforcement integrated into the Patrol Section. These changes involved re-assigning traffic safety officer duties to patrol officers. Another strategic shift occurred in 2012 with the implementation of e-Citation software to automate citation issuances. This strategy was expected to increase citations and reduce the error rate on citations, allowing officers to be more efficient by using computer equipment. Instead, the number of citations decreased annually from a high in 1987 of approximately 122,000 citations to a consistent decline from 2007-2013 (80,000 to 68,000).

The civilian Traffic Bureau specialized in working all traffic accidents (diverting traffic, writing reports, cleaning up, writing tickets, and enforcing DUI laws). Internal focus groups voiced concerns about:

- The time it takes to clear accidents; an accident is put in the same 911 queue as all other calls such as a purse snatching, burglary, welfare check, etc.
- Patrol officers are not as agile or quick to respond as a dedicated traffic unit because they need to finish an incident before responding.
- The quality in how the accident is handled; the traffic unit brought expertise and training to handle traffic control during incident management to ensure quick and safe clearance.
- The increase or stagnation of accidents, injuries from accidents or accidents resulting in death.
- The decrease in the number of traffic warning and tickets issued.
- The decrease in annual revenue.

## ACCIDENT IMPACT

Reports found on *www.WICHway.org* provided data about the average time it took to clear crashes from highways. This site is maintained by the Kansas Department of Transportation. Please note that US-54 is patrolled by WPD while the Kansas Highway Patrol patrols all other highways in Wichita. While there is month-to-month variation, the average length of time to clear injury/fatality accidents from US-54 between May and October 2014 was nearly 1.5 hours.

From the Kansas Department of Transportation, Traffic Facts Book, the following comparative information is provided on accidents, death and injuries:

*Graph H:* **Traffic Accidents**



Wichita is consistently almost double the amount of accidents compared to other communities in Kansas, which is anticipated due to the population size.

*Graph I:* **Traffic Deaths**



When deaths and injuries are analyzed per population, Wichita is trending upward. With the exception of Kansas City, Kansas, Wichita is the highest per population in deaths and the highest in injury per population, with the exception of one year.

*Graph J:* **Traffic Injuries**



All of the major measurements (total, death and injury) all indicate that comparatively Wichita is not performing as well as other communities.

Source: *Court Revenues and Traffic Citations* (City of Wichita Finance Department, November 2013)

*Recommendation*

- Evaluate internally the impact of reinstating the traffic unit or developing alternatives to address officer time on traffic accidents and decreasing accidents.

## RELATIONSHIP BETWEEN COMMISSIONED AND NON-COMMISSIONED PERSONNEL

Researchers and practitioners in law enforcement indicated cultivating effective relationships among commissioned and non-commissioned employees is often a challenge. Different work cultures, background, priorities and real or perceived class system in the workplace often create contention. WPD non-commissioned employees include:  Records, Security, Property & Evidence, and Animal Control.   Based on information gathered from internal focus group discussions, there is a level of frustration from non-commissioned employees and a desire for effective communication with WPD Command Staff.

*Recommendations*

- Provide opportunities for commissioned and non-commissioned supervisors to inter-act on an informal level to build trust and communication across the department
- Provide opportunities for field officers to tour these service areas so they know what these day-to-day operations entail and can therefore provide better service to citizens.

## TIMELY DECISION MAKING

Numerous times, internal focus groups lamented the lack of timely decision making and the impact it had on the entire organization on promotions, developing new policy and procedures, and implementing committee recommendations. Interim administration has done an admirable job to ensure decisions are timely and it is important for the new Chief to understand this dynamic and be prepared to: 1) continue acting in a timely fashion; and 2) be able to communicate to the department

the status of pending critical decisions. Changing culture is difficult but with the support and assistance of the entire command staff, raising the expectation of supervisors to make timely decisions can be accomplished.


## EMPLOYEE MORALE

The majority of employees indicated favorability toward police work and believe in the mission of the police department but a majority felt as though their day-to-day efforts in taking on added responsibilities were not recognized by upper management. Information gathered from internal focus groups was consistent about the reasons for low employee morale including: the lack of priorities or continually being asked to do more, lack of communication, lack of good training opportunities, lack of departmental leadership and sense that they worked in a punitive environment.


## WORKLOAD

A recent WPD internal report on workload created in 2014 indicates the officers' perceptions of an increased workload is accurate. The Officers Daily Activity Report (ODAR) Summary data represents an average work day for each year for any given officer. A high and low threshold has been created using a standard deviation calculation. Any total outside the low or high range indicates a significant variance from the average range.

*Chart 11:* **ODAR Report**

| Average Work Day for Officers (January-May) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Activity Type** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **AVG** | **STD** | **LOW** | **HIGH** |
| Calls Dispatched | 5.56 | 5.57 | 4.89 | 4.34 | 4.34 | 6.85 | 8.26 | 6.94 | 5.84 | 1.40 | 4.45 | 7.24 |
| Investigatory Traffic Stop | 1.27 | 1.11 | 1.18 | 1.02 | 1.07 | 1.37 | 2.21 | 2.04 | 1.41 | 0.46 | 0.95 | 1.87 |
| Reports Preliminary | 1.30 | 1.40 | 1.25 | 1.12 | 1.15 | 1.62 | 1.43 | 1.20 | 1.31 | 0.17 | 1.14 | 1.48 |
| Moving Tickets | 1.27 | 1.10 | 1.22 | 1.09 | 1.10 | 1.37 | 0.98 | 0.98 | 1.14 | 0.14 | 1.00 | 1.28 |

Data from the above table (source: *WPD Crime Analysis*) indicates a 37 percent increase in the number of calls dispatched per officer from 2011 to 2012 and a 47 percent increase from 2011 to 2013. Traffic stops increased, while preliminary reports and moving tickets decreased. However, the ODAR does not establish a true picture of the workload or "typical day" for an officer with how their time is used. There are several example of how work environment changes have impacted how officers use their time. The following provide some changes to officers work requirements:

- Rather than taking photos at a crime scene and submitting a roll of film to the photo lab, officers now manage the images themselves, case by case, by connecting the camera to the mobile computer terminal (MCT), uploading the images, labelling the folder and submitting into a digital folder on the secure portal.
- Rather than preparing a handwritten ODAR, dropping it in a mail tray, the officers generate digital ODARs on the MCT, verify and clean up automated entries and electronically submit the document for digital upload with an automated PDF saving to a backed up network file at the end of their shift.
- Rather than hand writing a report, officers now populate forms and type narratives on laptops and PC's. Many have been trained to input their reports directly into EJustice Solutions (EJS), relieving the volume of work for a reduced Records work force.
- Officers log into Blue Team and input data on Use of Force, Vehicle Pursuits, and Firearms Discharges for Early Intervention System documentation and Professional Standards records keeping, rather than using paper forms. These Blue Team entries are in addition to the Kansas Standard Offense Report and Kansas Standard Arrest Report, evidence receipts, and other mandatory reporting documents that officers prepare (mostly electronically) for the incident.
- Officers with AXON body cameras are required to properly label and classify each video they record.

Additional information from the WPD also reflects an increase in overtime. The following chart reflects the total number of regular overtime hours each year between the months of January and May. These numbers do not include any overtime from court, call outs, or special assignments. It represents the number of hours after a regular shift that officers are working, which indicates an increase.

*Chart 12:* **Overtime Report**

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Total hours | 10,796 | 12,626 | 10,509 | 13,301 | 15,202 | 11,504 | 12,778 |

Source: *WPD Crime Analysis*

**Recommendations**

Changes to improve employee morale will be an ongoing effort.  Many of the specific issues mentioned by employees, such as communication, training and staffing resources are being addressed as issues in the organizational assessment.   While there are definitely some short-term improvements, a long-term commitment to systemic change is needed.  Specific recommendations include:

- Analyze ODAR data to determine what immediate deployment issues can be made and drill deeper with officers to better understand their time consuming activities.
- Commit to a staffing study, as previously recommended, to evaluate proper deployment of resources for the department, including noncommissioned support.
- Complete a workload assessment, or time study, to create a clearer understanding of what changes can be made for best use of officer time.
- Communicate to officers the trends and current actions that are occurring to address the issue and recommendations for the future.

## BUDGET

In the internal focus groups, several comments were made about the change in the departmental budget.  The perception was the department had experienced significant financial cuts.  In review of budget information, this perception is not supported in actual dollars.

In looking at actual expenditures from 2008-2013, the police department increased spending in each of the five (5) budget categories. The department is on track to increase spending in 2014 through 2015.  Department spending as a percentage of the general fund increased each year from 2008-2013 with only a slight decrease in 2014-2015.   There is a notable decrease in the amount of

grant funds realized by WPD beginning in 2014 which can be attributable to the decreasing number of federal dollars available for use by local governments.

*Chart 13A:* **Police Department General Fund Expenditures**

| | 2008 Actual | 2009 Actual | 2010 Actual | 2011 Actual | 2012 Actual | 2013 Actual | 2014 Revised | 2015 Adopted |
|---|---|---|---|---|---|---|---|---|
| Salaries and Benefits | 60,375,553 | 61,478,281 | 63,469,567 | 66,658,996 | 66,777,808 | 67,938,500 | 69,570,501 | 70,474,155 |
| Contractuals | 6,725,820 | 6,773,518 | 5,911,730 | 6,409,874 | 6,885,629 | 6,966,206 | 7,342,738 | 7,572,995 |
| Commodities | 835,992 | 768,404 | 1,887,415 | 2,429,842 | 2,368,828 | 2,472,290 | 2,626,506 | 2,558,006 |
| Capital Outlay | - | - | - | - | - | - | - | - |
| Other | 54,194 | 72,408 | 17,580 | 16,355 | 43,449 | 61,555 | 153,182 | 153,379 |
| Grant Funds | 228,799 | 266,793 | 347,755 | 828,419 | 896,246 | 798,551 | 357,141 | 216,827 |
| TOTAL expenditures | 68,220,358 | 69,359,404 | 71,634,047 | 74,686,648 | 75,179,468 | 76,640,000 | 79,335,786 | 80,541,708 |

*Chart 13B:* **City of Wichita General Fund Expenditures**

| 2008 Actual | 2009 Actual | 2010 Actual | 2011 Actual | 2012 Actual | 2013 Actual | 2014 Revised | 2015 Adopted |
|---|---|---|---|---|---|---|---|
| 198,259,703 | 198,595,309 | 201,277,252 | 208,626,198 | 206,494,173 | 205,866,360 | 213,360,497 | 218,172,209 |

*Chart 13C:* **Police Department as a Percentage of the General Fund**

| 2008 Actual | 2009 Actual | 2010 Actual | 2011 Actual | 2012 Actual | 2013 Actual | 2014 Revised | 2015 Adopted |
|---|---|---|---|---|---|---|---|
| 34.41% | 34.92% | 35.59% | 35.80% | 36.41% | 37.23% | 37.18% | 36.92% |

## DISCIPLINE - INCONSISTENCY AND TIMELINESS

A majority of the internal focus groups indicated frustration with not only the number of cases investigated through Professional Standards, but also the length of time these investigations took. Officers expressed frustration that discipline that historically had been handled at the field level was now being sent through Professional Standards.

In the past, there was more discretion for supervisors to handle discipline in an informal manner, which may or may not have been documented in an employee's working or permanent file. All *documented* corrective action, formal and informal, can impact an employee's lateral and upward mobility within the Department. Historically, WPD formal discipline levels were actually harsher than the current discipline matrix. Performance appraisals and formal discipline both factor into scoring

for specialty positions. Performance appraisals factor into scoring for promotions. Employees are resistant to discipline entries in their files for these reasons, and often for other personal reasons.

Due to FOP concerns of supervisor inconsistencies in the handling and documentation of corrective actions and discipline, there is probably not as much latitude in the current law enforcement environment for WPD frontline supervisors to employ his/her own opinion when managing basic discipline issues. Union contract language formalizes all discipline (corrective action), both minor and major (verbal counseling through dismissal). The result has been closer oversight by Command Staff to create consistency across shifts, sections, bureaus, and divisions. There is a clear perception that discipline practices which evolved over several years have resulted in a more punitive environment rather than a balanced environment utilizing more learning and development. The Department's Disciplinary Code/ Penalty table in Regulation 2.0 was revised in 1992 to reduce discipline levels for "B", "C", and "D" violations from the harsher levels dating back to 1981. Regulation 2.0 was revised again in 2001 to reduce the progressive level of discipline for "A" violations. All other levels of discipline have remained unchanged since at least 1996.

### Comparison with Other Communities

Based on data from the 2013 Benchmark City Survey (designed in 1997 by a core group of police chiefs from around the country to establish measurement tools to help ensure departments were providing the best service possible within their respective communities), it appears that WPD investigates more total complaints than expected for a community of its size. However, there are several factors that could impact this comparison, including: how complaints are received; promotion or information available to officers; and internal policies and procedures. The research is an indicator and should not be seen as conclusive.

*Chart 13D:* **Internal Complaints Comparison**

|  | 2013 Population | Citizen/External Complaints | Internal Complaints | Total | Complaints per 10,000 population |
|---|---|---|---|---|---|
| Wichita, KS | 385,577 | 100 | 111 | 211 | 5.472 |
| Henderson, NV | 278,047 | 65 | 33 | 98 | 3.524 |
| Lincoln, NE | 265,404 | 5 | 1 | 6 | 0.226 |
| Plano, TX | 264,910 | 82 | 19 | 101 | 3.812 |
| Chula Vista, CA | 249,382 | 17 | 20 | 37 | 1.483 |
| Garland, TX | 233,564 | 7 | 22 | 29 | 1.241 |

Information provided by WPD Professional Standards *(See Attachment I)* indicates that from 2009-2013 the number of internal complaints has actually decreased (161 to 111). Additional conversations with the department would be needed to better understand the difference in perception and the actual reported numbers.

*Graph K:* **Total Internal Complaints**



Total Internal Complaints

## Results of Complaints

When Professional Standards investigates a case, there are five types of findings, which are:

- **Unfounded**: Allegation[s] is [are] false or not factual; or
- **Exonerated**: Incident occurred, but was lawful and proper; or
- **Not-Sustained**: Insufficient evidence exists to either prove or disprove the allegation; or
- **Sustained**: Allegation is supported by sufficient evidence to justify a reasonable conclusion of guilt.

The following information provides a breakdown of findings by Professional Standards.   The vast majority of the internal complaints are sustained by the unit.

*Graph L:*  **Internal Complaint Results**



*Graph M:* **Types of Internal Complaints Sustained**



Professional Standards also classifies the severity of the violations (Directive) and tracks that information. The "A" violations are considered lesser offenses, while the "F" violations are considered more serious. Severity of disciplinary actions coincide with the severity of the conduct offense.

*Graph N:* **Internal Allegation Counts by Directive Type**



## External Complaints

Professional Standards is also responsible for investigation of external complaints from citizens. The number is lower than internal complaints and findings are different.

*Graph O:* **External Complaints**



*Graph P:* **External Complaint Results**



*Chart 14:* **Type of Cases Sustained**

**External Complaints Sustained**

| Classification | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Excessive Force | 0 | 1 | 3 | 2 | 3 |
| Improper Conduct | 10 | 12 | 19 | 9 | 15 |
| Procedural Violation | 4 | 3 | 9 | 4 | 7 |
| Unnecessary Force | 0 | 0 | 0 | 1 | 3 |
| Other | 0 | 0 | 1 | 2 | 4 |
| Total Sustained | 14 | 16 | 32 | 18 | 32 |

The Professional Standards report also examined the average time to "investigate" internal and external allegations of misconduct. "Investigate means from assignment to a PSB investigator or other Division/Bureau supervisor until closure with a staff approved disposition. There are investigations which extend beyond the estimated maximum because of per incident variables."

- **A violations**: 3 – 6 weeks; average = 4.5 weeks (1.13 months)
- **B violations**: 3 – 8 weeks; average = 5.5 weeks (1.40 months)
- **C violations**: 4 – 10 weeks; average = 7 weeks (1.75 months)
- **D violations**: 6 – 12 weeks; average = 9 weeks (2.25 months)
- **E violations**: 8 – 16 weeks; average = 12 weeks (3 months)
- **F violations**: 12 – 36 weeks; average = 24 weeks (6 months)

One of the concerns raised in the focus groups was the timeliness of decisions following the conclusion of the investigation and the more significant the violation, the longer it took to investigate. While this is substantiated with the data, the significance of the allegation also often creates complexity of the investigation.

During this time of interim leadership, internal policy changes concerning the initiation of internal investigations continue. Initially, on July 8, 2014, Chief Williams authorized Professional Standards to begin its investigation of Officer Involved Incidents starting at the time of the incident.  He also

directed that this internal investigation be kept separate from the criminal investigation. Draft language to update departmental procedures to allow the these investigations to proceed simultaneously has been developed and shared with the Law Department and the FOP. The final product has yet to be vetted a final time by the Law Department; and changes will need to be published. Although new language has not yet been finalized, Professional Standards already started investigating and documenting Officer Involved Incidents in this manner which occurred in 2014. A secondary part of these types of investigations is completed by a tactical review group; the operational protocols for this review are still in development.

## Recommendations

- Review the effectiveness of the Department's discipline code and penalty matrix relative to desired corrective and developmental outcomes to facilitate employee success.
- Review training resources and the Department's realistic capacity to provide effective remedial and developmental training in a timely manner as part of the corrective/discipline matrix.
- Provide clarification, training, and set forth expectations for frontline supervisors on the consistent management of coaching, counseling, and discipline incidents.
- Revise policy and department SOP to more clearly delineate the types and levels of investigations managed by PSB, and those managed by shift, Section, and Bureau supervisors.
- Create understanding of different generational expectations in the workforce.
- Continue implementation of the bifurcated investigation approach and conduct research on any best practices to address significant violations and to expedite the process.
- Continue to amend departmental procedures so that internal investigations concerning Officer Involved Incidents can proceed simultaneously as criminal cases.
- Distribute information annually on number of cases, time of investigation and findings, both internally and externally.

## INTELLIGENCE-LED POLICING

Intelligence-Led Policing is a policing model built around the assessment and management of risk. Crime analysis is a law enforcement function that involves a systematic review of information for identifying and analyzing patters and trends in crime and disorder.  Analysts guide operations, rather than operations guiding intelligence. Intelligence-led policing builds on earlier models of best practices in law enforcement, such as community policing, and problem-oriented policing. Intelligence-led policing should be incorporated and used as a resource for the department.

Internal focus groups voiced their frustration with the way Intelligence-Led Policing had been deployed through the organization stating that it was "ineffective" and "incomplete."  Further discussion revealed that analysts are deployed throughout the department with one analyst stationed at each of the four substations to provide crime information about that specific bureau to the captain and officers stationed only at that substation.  Because the analysts work is driven by individual requests for information there may not a thorough understanding of what information is possible to produce.

Additionally, while there are four crime analysts in the department, there are only two licenses to access the GIS software and only two licenses to access the report writing software; both of these licenses are assigned to Support Services in City Hall.  All requests for maps are funneled through these two individuals.

Additional concerns from analysts revealed that while they may have the title of "analyst" they also serve as patrol officers leading to lack of complete commitment to the role from leadership. Analysts serve as a combination of statistician, researcher, criminologist, and planners for the police department.

### *Recommendations*

- Analyze the value for all analysts to be located at City Hall to create a cohesive Crime Analysis Section as part of Information Services.
- Purchase enough licenses for each analysts to have access to GIS and report writing software so they can perform their primary job functions.

- Commit to purchasing, implementation and training process for BAIR Analytics, an analytical software that specializes in the processing and analysis of crime data for law enforcement agencies. Raids Online is the public facing portion of the software that would make the same crime data utilized by the WPD available to the public. The cost to purchase this software has been estimated at $90,000 by the WPD.
- Determine the role of the analysts.  Should analysts continue to support a primary patrol bureau or should they be assigned to work with key functions:  field, investigations, or administration?
- Evaluate the need for new analytic software with input not only from WPD, but also from the Sedgwick County Sheriff's Department and the Sedgwick County Police Chiefs Association as a way to begin to look at crime analysis on a county-wide perspective.
- Provide opportunities for analysts to share current projects throughout the department (Leadership, Shift Change, Academy, continuing education) in order to educate everyone about what reports and information are possible to produce.

The International Association of Crime Analysts (IACA) website at *www.iaca.net* can serve as a resource for the WPD as they re-initiate the role of crime analysts in the department.

## RECRUITMENT

Recruitment for law enforcement is a growing challenge that is not unique for the WPD.  According to a July 10, 2014 ABC News broadcast by Oliver Yates Libaw, the number of applicants is down more than 90 percent in some cities.  "Police Departments in Los Angeles, New York, and Chicago are all working harder at recruitment and drawing fewer applicants.  But it is the same story in smaller cities such as Leesburg, Virginia where the number of applicants has dropped 90 percent over the past five years, and Reno, Nevada which reports a decline of 50 percent since 1997.  A decade ago there were 3,000 applications for 10 openings with the Seattle police; now there are 1,000 for 70 positions – a drop of more than 90 percent.  In Springfield, Mississippi, only 75 people applied for the police academy, but four years ago they had 300."

The difficulty of filling officer positions was also the focus of an article in the December 2014 "Police Chief" publication, which estimated that more than 80 percent of the nation's 17,000 law

enforcement agencies, large and small, have police officer positions they cannot fill. The California Chiefs of Police Association consistently ranked recruitment and selection among the top issues facing law enforcement in the next five years, regardless of agency size.

Using limited resources in a strategic effort to attract and retain officers is critical for the sustainability of the department. The WPD has also been hindered with the financial impacts of the past five years by only having one recruit class per year, instead of two, which had been the historical norm. Starting in 2015, there will once again be two recruit classes.

Statistics from the WPD indicate a decline in available candidates for the department. The following are the numbers for applicants that completed the city test, aptitude test and the First Contact Booklet. The change represents a 55 percent decrease for the preliminary screening of applicants from 2011-2014.

*Graph Q:*  **Changes in Police Recruit Applications**



With the national spotlight on many contentious law enforcement incidents, such as Ferguson, Missouri, the scrutiny of public safety officials has increased.   Several comments were made in internal focus groups about recruitment.  Opinions varied on whether the recruitment process was too lenient or restrictive, but there was an overall sentiment of concern.   There were also several comments made from current officers on whether they would have made it through today's recruitment activities; and concern about recommending others to apply for the department.

The recruitment process is and should be a significant undertaking for any applicant. The steps for applicants include:

- All applications are completed online. Candidates will be asked to fill out additional paperwork as the application process continues. (The application is 56 pages.)
- The written aptitude is a 100-question examination. The applicant will have one hour and forty-five minutes to complete the examination.
- The First Contact Interview with a member of the Pre-Employment Section. The applicant will complete the interview packet then it will be reviewed by the applicant and a member of the Pre-Employment Section.
- The physical agility test includes: suspect chase and the body drag.
- A background investigation will be completed.
- Passing an Oral Board Interview.
- Successful completion of all steps will place the applicant on the eligibility list.
- Completing a polygraph examination that is administered by a State Certified Examiner. The examination will confirm information noted on the applicant's first contact packet.
- Successfully passing the Command Staff Interview. This interview panel consists of a Lieutenant, Captain, Deputy Chief, and Chief of Police.
- If nominated by the Chief of Police for a position as Police Recruit Officer, additional testing will follow, including:
  - Psychological Examination. Applicants will be evaluated by a licensed psychologist.
  - Physical examination. Applicants will complete a medical examination administered by a licensed physician.
  - Cooper's Run. (1.5 mile run in 14 minutes or less).
- Upon successful completion of all steps, appointment to the Wichita Sedgwick County Law Enforcement Training Center is made by the Chief of Police.

## *Recommendations*

Resources for improving recruitment provide for a long-term return on investment. Additional funding should be provided to develop a recruitment plan and specify needed resources for the department. Financial estimate: $20,000-$30,000

- Conduct focus groups with recent applicants on the recruitment process and front-line supervisors to identify strengths and weaknesses, and to identify motivation for applying.
- Conduct a process review with an internal group of current and former WPD training staff, FOP representatives, and human resources staff to determine opportunities for improvement.
- Conduct analysis of impact of current marketing efforts.
- Identify target markets for recruitment, including addressing diversity trends. Develop a marketing plan and material for internal employees and for external recruits.

## PROMOTIONAL PROCESS

Similar to the recruitment process, the promotional process is another area for review and improvement that was often mentioned in internal focus groups.  The written test was the item most frequently mentioned as the source of frustration. The promotion process includes:

- The Training Academy is responsible for the development and administration of the all promotional tests (detective, sergeant and lieutenant and captains).
- The Academy has two personnel that are primarily responsible for developing and administering all promotional processes (the In-Service Training Sergeant and Recruit Academy Lieutenant). However, if they are taking one of the promotional tests, they cannot be involved in that specific process.  In 2014, there were 159 detectives, 13 sergeants and 17 lieutenants participating in the promotional process.
- The Academy prepares the promotional study packet by gathering standard documents such as Policy and Procedures, FOP Contract, SEIU Contract, and case law as well as information presented at annual mandatory training.  These documents are assembled and CD's created.
- Promotional scores include:  the last two performance evaluations, seniority, written tests and oral board scores.

### Selection Process

Detective candidates for promotion can be selected from those ranking in the top fifteen percent (15%), or a minimum of five candidates, whichever is greater. In the event there are less than five eligible candidates on the promotion list, all will be considered for promotion.

For the sergeant and lieutenant lists, only detectives/sergeants ranking in the top twenty percent (20%), or a minimum of three candidates, whichever is greater, will be considered for promotion. In the event there are less than three eligible candidates on the promotion list, all will be considered for promotion.

Candidates are allowed to rise to the eligibility range as candidates are promoted. If a candidate is passed over for promotion, the City shall inform the employee in writing, and in person, of the specific reasons for that decision, within thirty (30) days. The City will also give specific items for suggestion that the employee can work on to improve his/her opportunity for promotion.

### Staff Role

Training Academy staff:

- Develop the oral board questions.
- Contact individuals to sit on the oral board.
- Develop the written test.
- Administer the written test.
- Score the exams.

### Recommendations

Promotions are the opportunity to expand the capacity of the department and are a critical component for a successful future. Ensuring the best promotional process and use of resources is an important investment for the department. An estimated investment of $30,000-$50,000 is worthwhile for the impact of successful promotion. Recommendations include:

- Review written test and ensure alignment with skill set needed.
- Evaluate opportunities for professional assistance for written test development.
- Assess timeframe and process improvements.
- Create an internal review of the current assessment center process to identify improvement opportunities.
- Evaluate improvements to increase transparency of promotion decisions by WPD leadership.
- Identify resources for candidates to improve skills for future promotions.

- Continue to work proactively with the City's Human Resources and Budget Departments and the Position Review Committee to decrease the length of time a position is unfilled.

## TRAINING

Training was a consistent issue for opportunities for improvement from staff and from external law enforcement partners. Several issues were identified, including the lack of pertinent and relevant topics and the need for better presentation skills. Specific areas mentioned, include:

- **Insufficient facilities**
  - The City of Wichita and Sedgwick County have been in discussion for several years on building a new training facility. The current location is outdated and has numerous infrastructure issues.
- **Opportunity for more joint training with regional law enforcement**
  - WPD is not alone in the need for more training opportunities and it provides an opportunity to partner with other regional law enforcement professionals.
- *Lack of supervisory and leadership professional development*
  - With the change of workforce in the WPD and a high percentage of people in new leadership positions, the department needs to invest in supervisory and leadership development. There were numerous examples of officers new in management positions and unprepared for the role. The department should be proactive in development of this resource.
- **Improvement for mandatory training**
  - Mandatory training is always a challenge, so finding creative, hands-on, interactive, and cutting-edge training is important to keep interest of the participants.

### Recommendations

Resources for improving training provide for a long-term return on investment.  The following provide for initial recommendations:

- Determine course of action on training facility in early 2015.

- Identify external resources that be used for training at no or reduced costs. Examples of resources:
  - The Institute for Intergovernmental Research
  - Federal Law Enforcement Training Center
  - Local universities
  - Shared resources with other agencies
- Develop continuous supervisor and leadership training and explore co-sponsorship with other regional law enforcement.
- Conduct internal focus groups specific to training and solicit external information.
- Research best practices from other law enforcement, such as:
  - Tulsa
  - Charlotte-Mecklenburg
- Assess mandatory training with consideration of performance evaluation issues, community relations, management input, adult learning styles and consideration of past evaluation information.
- Develop a training curriculum for non-commissioned staff.
- Hire a non-commissioned staff person with expertise in training and development to provide consistency for the department through leadership changes and focus on adult learning. Estimated cost: $85,000

## **EQUIPMENT**

Equipment was an area of review requested for the organizational assessment. While the topic of equipment came up in several internal focus group discussions, overall there was not enough substance to rise to the level of a top priority. Some officers reported that equipment was not purchased or distributed in a timely fashion, while others were concerned about fit and quality. There were also several comments about the age of the cars and mileage on the cars. However, the diversity of comments do not create any clear direction or define a significant equipment issue.

## INTERNAL COMMUNICATIONS

All internal focus groups discussed the need for more communication from command staff regarding department issues. Communication among numerous shifts, locations and specialized units is always a challenge for any department, but due to the constant demands and nature of the work, police have even greater issues. The request from employees regarding information were wide-ranging and included: more transparency on current issues, key budget expenditures, challenges being faced in each bureau, changes in personnel assignments, and "good news" promotion.

Another communication issues is there was a level of frustration of job expectations from shift supervisors from the same section. Some of this variation can be attributed to a lack of supervisory training, but some is also due to the lack of written protocols and procedures for basic and re-occurring tasks. Ensuring consistent information for employees is important for understanding, productivity and job satisfaction.

Communication is hard in any organization, but it is especially hard for large organizations. Improving communication will need to be a sustained effort but one with large payback over time.

### *Recommendations*

- As indicated under external communication, hire a noncommissioned employee with a communication background to assist the commissioned leadership.
- For internal communications improvements: create a bi-monthly update to employees to include information from Command Staff meetings, highlights from special projects, policy changes, special recognitions and other important information. The communication specialist can also provide media training and coaching to assist the department with routine activities, but also assisting with messaging for high-profile activities.
- Develop or review standard operating procedures among bureaus and shifts, and provide written updates as appropriate.

## INTER-AGENCY RELATIONS

Interviews with other law enforcement agencies, indicated an overall and historically positive relations with WPD. Public safety officials indicated the WPD is a professional organization with a reputation for expertise in special areas; homicide, intelligence and other special units were specifically mentioned. Special taskforce spanning jurisdictions and inter-governmental members were considered to be highly effective in the past.

Law enforcement agency stakeholders indicated opportunities for collaboration in technology, intelligence information, special task forces and training. Specific collaborative efforts were identified by WPD and the Sedgwick County Sheriff's Office. Finally, during the interim and with the selection of the new chief, it is imperative for WPD to continue to participate in regional organizations, meetings and community efforts with other law enforcement agencies.

### *Recommendations*

- Conduct focus groups discussions with regional law enforcement agencies to identify improvements and opportunities for collaboration regarding specific criminal activities. Regional law enforcement gave examples of previous joint efforts that had been highly successful.
- Develop priorities, work plan and timeframe to investigate and report potential cooperative efforts between the WPD and the Sedgwick County Sheriff's Office prior to the hiring of the next Chief of Police. Initial ideas include:
  - Co-locate Narcotics: There is a memorandum of understanding in progress to co-locate WPD and Sheriff's Office Narcotics to improve communication, share equipment and review intelligence information.
  - Co-locate WPD and Sheriff's Office Property and Evidence: The value of improving customer service to the public was the impetus for this idea. Citizens often are unaware if their property has been recovered by the City or the County, which creates confusion on where they need to go to claim it. In addition, current resources allow for Property and Evidence to be open to the public from 8:00 a.m. to 5:00 p.m. By co-locating there is a potential to extend hours of operation and provide better service to the public. The initial

estimate for renovating WPD's current location is $3 million, but that does *not* include information from the Sheriff's Office, which would be the next step.

○ Co-locate Records Section: Operations could also be improved by space sharing of records operations between the City and County. While the units would retain autonomy, cross-access to records could be possible. The benefits once again would be improved service to citizens and others in public safety needing access to records. More so, improvements for record management and sharing might also be improved through co-locating. The initial step would be to create a committee to investigate and fully evaluate the idea.

○ Shared polygrapher: Both the WPD and Sheriff's Office are interested in a joint polygrapher position to use primarily for recruitment, but also investigative services. While the administrative functions of the position (reporting structure, human resource issues, etc.) would need to be defined, there is an opportunity for both units to benefit, and for a shared use of tax dollars. Estimate for the position is $87,000, to be divided.

○ Technology: There are many opportunities to consider for joint purchase and coordination of technology that would benefit the public and those in public safety. A joint task force should be appointed to identify opportunities for collaboration. Technology is and will continue to be a significant investment for both departments, and opportunities to share and collaborate could improve service and provide for efficient use of tax dollars.

○ Regional Training for Leadership and Management: With the current and anticipated changes in leadership, there is a need to explore a joint training program for public safety leadership and management. By coming together with other law enforcement agencies, the opportunity to share resources, build relationships and learn from other agencies is created.

## BRADY-GIGLIO IMPACT

Since 1963, a series of U.S. Supreme Court decisions has clarified that in criminal cases prosecutors must disclose to the defense evidence favorable to the defendant.  This includes information that may be used to impeach (*definition*: to discredit the testimony of a witness by proving that he/she has not told the truth or has been inconsistent by introducing contrary evidence, including statements made outside of the courtroom in depositions or in statements of the witness heard by another) the credibility of government witnesses, including law enforcement officers. Police officers are in a unique position because they testify under oath as a job requirement and many testify frequently. A law enforcement official's word and the complete validity of that word is the fundamental expectation of service.

In *Brady v. Maryland* (1963) the U.S. Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." In the Brady decision, two men were tried for a murder that occurred during a robbery.  One of the defendants, Brady, admitted that he had taken part in the robbery but claimed that the other defendant committed the killing.  The Court found that the prosecution should have disclosed to Brady's attorney the co-defendant's statements confessing to the killing.

In *Giglio v. United States* (1972) the Court extended the obligation to share exculpatory information with the defendant to include information concerning the credibility of government witnesses. Giglio was convicted of forgery primarily on the testimony of on unindicted co-conspirator.  At trial, the co-conspirator testified that he had not received any promises of leniency in exchange for his testimony against Giglio, when in fact the prosecutor who presented the case to the grand jury had promised not to prosecute him in exchange for testifying.  The Court was unimpressed with the trial prosecutor's claims that he knew nothing of the deal. "When the reliability of a given witness may be determinative of guilt or innocence," the Court wrote, "nondisclosure of evidence affecting the credibility falls within this general rule."

In *United States v. Agurs* (1976) the Court expanded the *Giglio* case by recognizing a duty for a prosecutor to disclose exculpatory information even in the absence of a specific request for it from the defense.

Most recently, the Court's decision in *Kyles v. Whitley* (1995) imposed on the prosecutor an affirmative "duty to learn of any favorable evidence known to the others acting on the government's behalf, including the police," and a resulting duty to disclose that evidence to the defense.  In this case, the defendant was convicted of first-degree murder but was given a new trial after it was discovered that the prosecutor had not divulged exculpatory evidence, even though the prosecutor was unaware of the evidence, which was in police files.  The Court stated that even if a prosecutor isn't aware of the exculpatory evidence, "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it."

The bottom line is that these Supreme Court decisions create a rule that require prosecutors to learn of and disclose to the defense information that could be used to discredit law enforcement witnesses in a case.  Prosecutors are essentially held responsible for knowing what the police know and must rely on law enforcement agencies to inform them of witness credibility problems. Beginning in 2011 WPD changed its hiring policy so that applicants with any crimes, convictions, or dishonesty would not be considered for hire by the department.  In August 2014 District Attorney Marc Bennett, as the prosecutor for the 18th Judicial District, released his Brady-Giglio policy. The major problem for law enforcement officers in Wichita and across the county has been that once a negative credibility determination against them has been sustained, it tends to impact careers. If an officer is intended to be a primary or solo witness in a pending criminal case, a prosecutor may decline to take the case forward because of his negative credibility. Additionally, a prosecutor may choose to decline to take any future criminal cases involving this officer forward where he/she is the primary or sole witness.

The impact of this ruling here in Wichita, just as in other communities throughout the nation, will evolve as the law enforcement and legal communities work to understand the full influence of these court cases.

## *Recommendations*

- Through periodic meetings with City and District Attorneys, continue to monitor the national understanding of court interpretations.
- Initiate a "fit for duty" screening for current officers who have been determined by the District Attorney to have a negative credibility.
- Once the screening is complete, and in communication with the FOP, finalize the status of officers who have not passed the "fit for duty" screening.

## HIRING THE NEXT CHIEF OF POLICE

### Recommendations for Qualities for the Next Chief of Police

Responses from all focus groups and one-on-one interviews about the required qualities of the police chief were fairly consistent.  The most frequent responses included:

- Excellent communication skills to reach internal and external constituents
- Ability to stand up for the mission and priorities of the department
- Proven leader in a metro environment
- Ethical and professional conduct beyond reproach
- Ability to create on-going healthy relationships with the entire community, other law enforcement agencies and community partners
- An innovator – willingness to try something new
- Timely decision maker

### Selection Process

While the question of whether to hire internally or externally was not on the list of discussion points for focus groups, nearly every group had an opinion:

- Internal candidates know the department and all of its issues; current employees have done a good job and are already well respected; the position is too important to spend more time and energy recruiting if an outside person does not work.
- External candidates would provide an opportunity to bring in new ideas; somebody that can see things differently can better implement new and creative solutions.

### *Recommendations*

Based on community feedback and *"Selecting a Police Chief:  A Handbook for Local Government" gtp,* International City/County Management Association (ICMA)'s  the recommendations are:

- Engage a firm that specializes in hiring police chiefs.  This firm should have proven experience in advertising and finding appropriate candidates, conducting assessment centers that would led by current and retired chiefs or deputy chiefs as part of the assessment, and leading communities through the hiring process.  The firm should have experience in extensive vetting of candidates, including onsite visits.

- Review the job description and salary requirements.  Several groups stated that an increased salary would allow the City to attract the best candidates.
- Develop a process that is open and transparent and that includes community participation. Establishing a Community Advisory Search Committee would be one way to ensure broad community participation. This committee would:
  - Be comprised of 10-12 members; representative of business, neighborhood and minority communities. Selection would be made by the city manager and the committee would be chaired by the city manager.
  - Be assisted by City Human Resources staff and the selected external search firm.
  - Provide feedback on the job description and the community profile, review applications, narrow applicants to ten semi-finalists and five finalists, and participate in the community meetings.
  - Sign confidentiality agreements that extend past the completion of the hiring process to ensure the integrity of the entire process.
  - Be expected to attend scheduled meetings with the potential of serving for 6-8 months. Finally, the committee would attend the announcement of the new Chief to the community.

## Selecting Semi-Finalists

- Based on national information, the City could receive form 75-125 applications from across the country.  The objective of the initial evaluation for the Community Advisory Search Committee would be to determine which applicants meet minimum qualifications, have experience in policing operations and administration, and have demonstrated accomplishments, initiatives, and skills.  The Committee would work with the external search firm in this process and provide review and feedback to the firm.
- The committee would narrow the applicants to ten semi-finalists for review and approval by the City Manager.
- These ten semi-finalists would then be asked to complete a personality profile to ensure there is a fit with City Manager and department expectations, as well as respond to written questions concerning various topics specific to the WPD.   Another option would be for a preliminary Skype or phone interview.

- After reviewing responses, the Community Advisory Search Committee would narrow the list to approximately five finalists for review and approval by the City Manager. These five finalists would be invited for on-site interviews.

## Finalists

- Both internal and external focus groups expressed the need to have department employees and community members meet the finalists and provide input to the City Manager.
- Structured interviews with feedback cards would be scheduled involving representatives from external groups such as:
  - Racial Profiling Task Force
  - Ministerial League of Wichita
  - Hispanic community
  - Sedgwick County Chief's Association
  - Neighborhood associations
  - Business community
  - Other law enforcement agencies
- Structured interviews with feedback cards would be held internally with:
  - City Department Directors
  - Representatives from all commissioned levels and FOP leadership
  - Command Staff
  - Representatives from non-commissioned employees
- A tour of Wichita should be scheduled with finalists with the driver/navigator tasked with providing feedback to the City Manager
- Finally, a community meeting should be held to provide an opportunity to include even more community input:
  - When entering, each resident should receive an evaluation card and a pen.  Evaluation cards would have critical questions and a place to write impressions of each candidate.
  - Residents would have time to meet each candidate, ask questions and mark impressions.
  - Evaluation cards would be collected and read by the Community Advisory Search Committee and the City Manager.

**New Chief**

After reviewing all of the information, it is the responsibility of the City Manager to name the new police chief. Prior to this announcement, reference checks and background investigations should be conducted to ensure work experience, personal life, education, and financial history are reviewed in depth.

**Summary**

The organizational assessment for the Wichita Police Department provides a blueprint for the next chief of police.  With an organization of this size and complexity, there are always many challenges and areas for improvement.  More importantly for the WPD there are incredible opportunities due to the committed personnel of the department, support of the City of Wichita and the Wichita community.  Establishing the priorities and the transition plan will be the next step in this endeavor as the search and transition to the next chief of police begins.

**Attachment A**

## Questions for WPD Assessment

1.  What do you consider the strengths of the WPD?

2.  What do you think are areas of improvement for the WPD?

3.  For leadership for the WPD, what do you think has gone well?

4.  For leadership for the WPD, what do you think needs to be improved?

5.  What do you think are the strengths of the WPD in working with the community?

6.  What do you think needs to be improved by the WPD in working with the community?

7.  As you think about the next Chief of Police, what qualities should this person exhibit?

8.  Any other advice for the city manager for the Chief of Police search?

9.  In the next two years, what tangible improvements that are within the control of the WPD, would you identify as the priorities for the department?

10. Any last comments?

10.20.2014

**Attachment B**

**Best Practices in Law Enforcement**

**Dr. Andra Bannister, Professor of Criminal Justice and Director of Regional Community Policing Training Institute**

As law enforcement is faced with a number of challenges, many of which involve public image, ethics and integrity issues, doing more with less, etc., it has become incumbent upon agencies and the cities in which they reside to provide new and improved strategies to combat such ills. Learning from past and other's mistakes and missteps has provided the impetus to propel a number of agencies forward and facing challenges in a positive, rather than negative way.

While clearly, this has not been an easy road for some, the underlying facilitator of such gains is rooted in enthusiastic, creative leadership that is not afraid to take risks and/or make significant changes in agencies steeped in very traditional cultures. While, it is true that human nature oftentimes hinders the change process due to a comfort level with familiarity and predictability, this mentality has not proven to be the most advantageous avenue for many. In fact, it has stagnated.

With that being said, some law enforcement agencies around the Country have leapt ahead, and have made inroads deemed, as some point, extremely difficult to overcome and, in some cases, insurmountable. Looking at Best Practices provides a roadmap to other agencies willing to assess their current state and open to looking towards a more positive, well-positioned future. Utilizing and borrowing ideas from such agencies and others makes sense, when and where deemed appropriate to one's own needs. This is not to say that everything discussed below should be adopted, but rather the ideas tried, tested, and vetted by these agencies have very practical applications, are actively being utilized in the field on a daily basis, with positive outcomes, results, a support. Additionally, the Best Practices identified in this document have been both vetted and recognized as being the National Standards for law enforcement Nationwide by the Federal Government.

**Community Policing:**
One of the founders of the current rendition of community policing, the Late Dr. Bob Trojanowicz, was quick to point out that the term is often met with skepticism and angst from law enforcement personnel. In fact, he went so far as to recommend that another term be used, so as to psychologically receive more buy-in from agencies Nationwide. However, he never wavered on the importance of the philosophy of community policing. In fact, ahead of his time, and to some, viewed as a futurist in the policing arena, Dr. Trojanowicz understood and embraced the power of the relationship between law enforcement and community.

In its purest form, community policing focuses on a full agency approach, where each and every officer, supervisor, administrator, etc. is a cog in the wheel. The community represents both a full partner and recipient of such an approach. In fact, it is clear that law enforcement receives numerous benefits as well. Mutual understanding, respect, and input are all underlying components of this Philosophy.

1

**Attachment B**

While seemingly an easy sell, this has not necessarily been the case for all law enforcement agencies. In fact, agencies that continually fall back on their "professional era" culture oftentimes are unable or unwilling to take the next steps towards embracing this philosophy. Some find reaching out the community as being more of pandering than partnership building. Although many concerns are certainly legitimate, a failure to try to understand and recognize the overwhelming benefits of community policing has oftentimes resulted in less than positive outcomes for an agency. This is not to imply that community policing is the answer to all challenges facing law enforcement today, but that it can certainly help to mitigate many and/or completely resolve others.

Failure to understand the depth and breadth of community policing has led to number of misunderstandings in the implementation of the community policing principles. As implied earlier, the community policing philosophy, if practiced as intended, should be pervasive throughout the entire agency. Stand-alone community policing units do not truly prove beneficial, both internally and externally. An unintended consequence of these units is that, oftentimes, an animosity develops between traditional units and community policing units. Resentment leveled at either side only hurts morale and creates a culture of unnecessary competition.

Oftentimes, community policing training in the field is met with the need to detail specific application of the principles discussed. Unlike many programs utilized in law enforcement, the community policing philosophy is just that, a philosophy. It is not a particular pre-scribed, pre-packaged tactic, often the end result of traditional in-service training programs. The fact that is an abstract concept versus an absolute, concrete practice has created a level of frustration for both line-level officers and administrators, alike. The common question asked in many community policing training programs is how can, should, etc. our agency implement community policing. While the answer intuitively might seem simple and straightforward, this is not the case. In fact, agencies who have legitimately committed to the community policing philosophy as their next step, in many cases, initially find themselves trying to identify very specific practices, with little thought to fit to their agency or external demographics. Looking at Best Practices can aid with decisions on how to best move forward.

Complaints from line-level officers and supervisors whose agencies have focused on community policing as their overall philosophy, have some genuine concerns when it comes to the evaluation process. While, not all crime can possibly be prevented, research confirms that proactive policing combats and helps to mitigate the commission of some potential criminal acts. And, the community policing philosophy, when translated in practice consistent with its core principles, results in both criminal apprehension and crime prevention/reduction. However, these successes, especially the ones pertaining to crime prevention and reduction, are not reflected during the evaluation process. For example, fewer arrests should not be automatically misconstrued as meaning failure to preform prescribed duties. Rather, such objective measure might merely indicate a rather successful individual.

Other agencies simply do not understand the role of community and/or other partnerships as they pertain to law enforcement. While community policing emphases community input

2

**Attachment B**

and partnerships as being vital to any law enforcement organization and community as a whole, this does not imply that the Community dictates and controls police operations, at any level. However, this is sometimes the perception, however incorrect.

Lastly, the community policing philosophy is, in some agencies, defined very narrowly and rigidly. Rather than interpreting this Philosophy broadly and recognizing that it includes a variety of partnerships, both public and private, these agencies only view it as tapping into some neighborhoods, with limited input.

Additionally, the prevalence of rigidity also hinders the understanding that the community policing philosophy and its tenets should be weaved through most law enforcement issues, regardless of what they are. For example, following the 9/11 terrorist attacks on the United States, at the International Chiefs of Police Meeting (a very prominent organization in the world of law enforcement), a meeting of some of the top law enforcement leaders in the world reneged on their commitment to community inclusion in the law enforcement arena. Rather than recognizing the need to reach out to communities nationwide like never before to help identify and locate would-be terrorists, there was a clamming up by many law enforcement personnel who felt a complete betrayal of their trust. While understanding that 9/11 impacted many facets of society, the eventuality and understanding that community policing was clearly the victor in what is needed finally rose to the surface again, fortunately.

Addressing the concerns and criticisms of community policing is needed to help understand how it truly impacts and effects society, while dispelling some of the common myths and misgivings. With that being said, a number of outstanding programs and practices have come to the forefront, which illustrate the significant benefits affiliated with the implementation of the community policing philosophy. While the particular programs identified below are not intended to be an exhaustive review of all successful programs nationwide, they have received a number accolades from the law enforcement field and exemplify and underscore the value and benefits of a well thought out, creative community policing program.

### Lincoln, NE

The Lincoln, Nebraska Police Department adopted community policing and problem-oriented policing early on. The officers are cross-trained to participate in a number of roles and community-related projects, there is no stand-alone unit. Project development and critical    thinking begins in the academy and continues through field training.

The Lincoln Police Department has a number of successful programs which highlight their commitment to the community policing philosophy. These programs epitomize the strong focus of this Agency, reflecting a culture of partnership and integration.

The **Stronger, Safer Neighborhoods Program** represents one such program. It focuses on very fragile neighborhoods. The strength is that there is a well-entrenched, community-wide, program-oriented policing initiative coupled with a large partner organization. The goals are to provide safety and security, to improve

3

**Attachment B**

the physical environment (directly in line with the **Broken Windows Theory** (George Kelling), and to have community engagement. This program has resulted in a great deal of success.

The **Community-Focused Mapping Program** focuses on highly transient areas (94% rentals), where large numbers of calls for service (violence, disturbances), originate. Developing and cultivating partnerships with apartment owners/managers is the goal, with the end result being reducing criminal activity in these locations. Relying on one of the very basic tenants of community policing, partnerships, officers on these beats, with the support of the police department and City,    engaged in a number of strategies, ranging from a positive first contact to having to take more punitive measures with resistant parties.

All landlords/ managers in these targeted areas where invited to attend meetings to share and discuss concerns. These meetings allow for open, interactive, two-way communication between the both parties (law enforcement and property owners/ managers). Resource information and referrals were provided to interested parties. Those that failed to show any real interest in working to better their properties by cleaning up and/or evicting trouble tenants were sent a letter citing violations, and stressing accountability.

The results of this program have been highly successful. There has been a strong impact on transient communities once deemed hopeless by many. Additionally, by starting out in a positive, rather than negative, punitive manner, a mutual respect was developed from both sides of the issue.

Providing a number of avenues for community engagement is also a very prominent program for the Lincoln Police Department. Access to crime mapping for the public to view provides a way for citizens to directly become engaged in current trends/problems affecting their neighborhoods and City, overall. In most communities, schools are neutral places where most citizens feel a level of comfort and ownership. Providing a venue of this caliber for community-wide functions has proven to another success story for this police department and City at large.

**Self-Selected POP Projects** leads to officer buy-in. Lincoln Police Department Officers are tasking with identifying the needs of his/her particular area. He/she is then responsible for focusing attention and resources on this (these) particular issue(s). The length and duration of each project is determined by what is necessary. While some projects may last only a short time until a respectable resolution is achieved, others have become permanent approaches utilized by other patrol divisions (i.e. the residential burglary approach and responses to party disturbances). The success rates of these projects are tied directly to the fact that officers have ownership in their assigned areas and the problems present. Additionally, officers have a great deal of latitude and support from their supervisors to develop and design creative approaches to reach their intended goals of crime prevention, interruption, and mitigation.

4

**Attachment B**

Yet another successful initiative by Lincoln, **The Problem Resolution Team (PRT),** focuses on quality of life issues, as well as threats to health, safety, and welfare. It is comprised of a number of City Agencies, all of which have committed fully to this program. In addition, other keys to successful implementation have been 1) a top priority for the Mayor, 2) it is co-chaired with the Police and the City Council, 3) the Police Leadership set the tone to take seriously, early on in the process, 4) all City Departments are committed to the success of the program, 5) there are a manageable number of cases, and lastly, 6) data and information resources are available in a support capacity.

Targeted areas of the **PRT** are characterized as having chronic problems, repeated calls for service, especially those that are particularly troublesome, and beyond the capacity/authority of a single agency. This team functions on a number of levels. First, it is responsible for identifying problem properties/areas and for gathering and sharing the necessary and relevant information. The SARA problem-solving model is utilized heavily to achieve this goal. The results are then evaluated and a determination is made as to what the next steps should be to counter the problems. Going beyond traditional police protocol, citizens are kept informed throughout the process and then appropriate policy changes are initiated.

**Colorado Springs, Colorado:**
**Demographics:**

Colorado Springs consists of an area of approximately 200 square miles with a mixed topography. The Police Department currently has a total of 600 officers, a number that varies with attrition and budgetary constraints. It is divided into two main bureaus and a total of four patrol subdivisions. As with most cities, Colorado Springs has neighborhoods that span the SES continuum. Crime is mostly limited to property crimes such as burglaries and car thefts. Other crimes include some gang activity, human trafficking, and drug crimes. Interestingly enough, compared to other cities of comparable size, the murder rate is relatively low.

**Community Policing Philosophy:**
According to the Chief, the two overarching main goals of leadership of this program are: 1) setting the tone for organizational change, and 2) being a change agent. Additionally, the three goals that define this agency are 1) **responsiveness** - being receptive and kind to citizens and their needs, treating people with respect, viewing the community as customers who deserve to be encouraged through a "can do" attitude when it comes to problem solving, and not focusing on how quickly officers respond, but what happens when they get there (focus on good interaction with the community), 2) **excellence** - being responsible and accountable for decision making, identifying and implementing the best practices, and having the highest level of professional standards, 3) **humility** - that members of the police department are "approachable, respectful, and compassionate". Applying and adhering to these goals have proven to be particularly valuable in dealing with the Community, City

5

**Attachment B**

and County departments and agencies, as well as with outside agencies, mainly other departments around the Country.

The Colorado Springs Model for Effective Patrol Services also exemplifies the community policing philosophy. It is broken down into four sections, each consisting of a strong community oriented partnership/relationship. Proactively solving problems focuses on being prevention oriented by utilizing resources to address hot spots, crime trends, and the causes of crime.

The second section captures community policing through an emphasis on excellence in customer service. Recognizing the importance of outstanding service to the Community through reduction in actual crime as well as reducing the fear of crime is of paramount importance. Assistance by way of not only response but referrals, as well, strengthens the bond between the police department and their citizens.

The third section emphasizes the need to respond to calls in a timelier manner. While the current response time is still not quite what the police department is hoping for, they are determined to make every effort to reach a pre-determined target of eight minutes for emergency calls.

Lastly, a quality thorough investigation helps the community build trust in the police department. Showing citizens that their particular case or complaint is taken seriously is an excellent tool to establish a strong, supportive community.

**Community Groups**
In ensuring effective communication and timely resolutions to problems, quarterly community meetings are held with the Chief. In total, there are currently four standing groups that represent a majority of the citizenry, in one way or another. There is a faith-based group, a community advisory group made up of a variety of special interests, a very vocal and active group called the Southern Colorado Ministry Group, and lastly, a group representing the deaf and hard of hearing. It is important to note that in addition to having quarterly meetings housed at the Police Department, the Chief and some of his command staff also engage the community groups through on-site visits.

**Community Service Officers (CSOs):**
Community service officers are civilian officers tasked with lesser calls. They are paid and work on either a full or a part-time basis. Many are retired law enforcement officers, while others are in the cadet program, or former interns. Approximately, twenty-five percent started out as volunteers.

The CSO program was developed in response to the negative reception of the alternative police response. The main goal of this program was to revert back to the face-to-face contact the Community demanded. Applauded by the greater Colorado Springs Community, another advantage was to increase law enforcement related

**Attachment B**

presence on the streets without the added cost.  In fact, six police officer positions were converted to CSO positions.

There is a three-tiered response approach for CSOs.  First, they are integrated with the patrol unit.  Second, they are involved in problem-solving strategies, and third, they are an auxiliary force.  Utilizing CSOs in situations where a second uniformed patrol officer is not absolutely needed, has proven extremely beneficial.  Also, the role for CSOs continues to expand as the police department begins to transition and train them for other roles such as assisting in specialty units.

**Neighborhood Initiatives:**
**Southeast Part of Town:**  The southeast part of town was plagued with a number of issues, some gang and violence related, others quality of life issues.  The area consists of a lower SES where multifamily homes are the norm and a number of military families reside. In order to combat these issues and number of strategies were implemented.

Holding neighborhood meetings for community members, addressing quality of life issues, surveying residents, taking the time and making the effort to build rapport, and providing training to managers and owners of housing units were all instrumental in making some positive changes.  Additionally, to address the crime issues, directed activity patrols were created to focus efforts on enforcement.  Once hotspots were identified, these patrols were sent to provide high visibility of the police in these particular areas.

**Downtown Colorado Springs:**  The downtown area of Colorado Springs was an area facing a number of challenges. During the daytime, problems with drug sales/ use, homeless panhandling, and quality of life issues were the norm.  The nighttime introduced other issues.  Problems with bars, assaults, noise, and military personnel engaging in unprofessional and/or criminal behaviors became quite abundant and troublesome.

In response to these concerns, the Colorado Springs Police Department engaged in a number of strategies to help mitigate and work to counteract such problems.  The Downtown Area Response Team, or DART, made use of targeted patrols, while interactions with citizens and bar owners/ managers proved useful in developing rapport, trust, and cooperation.

Focusing on issues related to military personnel included some creative problem solving.  The Armed Forces Disciplinary Control Board, a partnership between the police department and military was formed to address issues pertaining specifically to these individuals. Identification of locations such as bars and/or housing areas deemed to be trouble spots is the focus.  Once on this list, target locations are off-limits to military personnel.  Bankruptcy is often the end result for businesses that fail to comply and end up on this list.

**Attachment B**

**<u>Westside Colorado Springs:</u>**
An area known as "no man's land", Westside Colorado Springs was a section of town viewing as being infamous in police circles. Due to a variety of crime problems and quality of life issues, such as homelessness and panhandling, it was not a pleasant place to live, work, let alone, visit. Rather than just dismiss this location as being hopeless, the Colorado Springs Police Department made a significant move in conjunction with very organized residents and businesses to clean it up.

The Avenue Task Force represents a strong alliance in this part of town. It consists of a citizen-led group, three law enforcement agencies (this is a multijurisdictional area of town), elected officials, neighborhood groups, and business groups. This Partnership has done an outstanding job to, in essence, "take back the neighborhood" and regain what was lost over the years.

**<u>Other Community Programs:</u>**
**<u>The Homeless Outreach Team:</u>**
Outside the realm of normal, everyday police work, the Colorado Springs Police Department was dealing with a particularly troublesome issue, that of homeless. Not only was blight a factor, but a number of crimes, including violent crimes were on the uptick as the homeless began to set up tents. These tent cities were oftentimes located in or near parks and recreational areas that, prior to this point, were enjoyed by the Community.

In attempt to address the issue, the police department was met with significant opposition from the ACLU. In fact, a threat by the ACLU to sue the police department led to a "hands off" approach when it came to the homeless. This approach led to a downward spiral whereby the greater Colorado Springs Community was outraged that the police were doing "nothing" while these tents cities continued to expand exponentially. In contrast, advocates were applauding the ACLU for threatening to take legal action against the police department's "heavy handed" approach to the homeless population.

While appearing to be a no-win situation, the police department opted for a new strategy. Understanding that they had to be careful how they proceeded so as not to raise the ire of the ACLU or advocates, they resorted to community policing, something in which they were well versed.

Knowing full well that the homeless, in general, were not particularly fond of the police, the police department devised a plan to conduct surveys wearing plain clothes. As an incentive, they offered all participants a pair of socks, something coveted by many homeless folks. Also, the department identified the leader of the main group of the homeless and was able to make inroads with him.

The solution to the problem, which initially seemed hopeless, turned out to be one heavily rooted in the community policing philosophy. By developing relationships and building partnerships with not just the homeless themselves, but those who

**Attachment B**

could help them through social services, as well, the department was able to de-escalate a very difficult situation. In the end, the results were impressive by any standard. A number of homicides were solved, the crime rate was reduced, the internal crimes committed within these makeshift camps began to decline, and there was a 68% reduction in the call load to the police due to these programs that target the homeless situation.

**Disaster Preparedness:**
After the Waldo Canyon Wildfire, it became clear that the City of Colorado Springs was vulnerable to some extremely dangerous natural disasters. Out of this disaster, which led to horrible floods, deaths, and a number of damaged and destroyed properties, the police department was forced to think about how best to go about being proactive, lest another disaster of this magnitude were to occur again. Prior to this point, there was little community outreach, poor attendance by citizens at evacuation drills, and bottom line, little interest in this topic.

Following this disaster, things changed. There was an emphasis on community partnerships and collaborative efforts in these areas. Also, a number of public meetings were called and there was a focus on the development of an emergency plan. Partnerships also were formed with other agencies, such as the fire department, the Fire Marshall, the Office of Emergency Management, and city communications (911).

**Arlington, Texas:**
**Demographics:**
Arlington is part of the Dallas-Fort Worth Metroplex. In Arlington alone, the population is approximately 365,438 spread out over 99.69 miles. In addition to this fixed population, a large transient population flows in and out of Arlington due to two large sports arenas, one home to the Dallas Cowboys Football Club and the other to the Texas Rangers Baseball Club.

**Community Policing Philosophy:**
The Arlington Police Department clearly exemplifies and embraces the community policing philosophy in a number of ways. Despite some agencies that merely articulate their commitment to community policing, Arlington incorporates these principles on a daily basis. Transparency is a major component of this agency. They understand the importance that relationship building and trust with the community is often based on this concept. In fact, the Arlington Police Department has a media relations department consisting of a number of individuals, both commissioned and civilian, committed to ensuring that information is flowing from the department to community through a number of venues, in some cases as an incident is occurring. Internal police reporting by a former news reporter, currently an employee of the department, is done daily and results in a direct line to the local media outlets.

Reaching out and engaging the community, including formerly disenfranchised populations and those previously outside the typical contacts, is a primary goal of the Arlington Police Department. This became evident early on in the site visit. For

**Attachment B**

example, a monthly newsletter called "On Call" is widely distributed throughout the community via both paper and electronic means.  It provides and update on current events impacting the Police Department and the Community.  Other strategies utilized to engage and support the Community by the Arlington Police Department are discussed in the subsections below.

**Community Programs:**
Clergy as Volunteers:  Building partnerships with a variety of segments of the population is central to the departments' strategy of community policing.  One of the programs highlighted during our visit involved members of the local clergy volunteering their time and resources to reach out to youth in a number of ways to help combat hunger and crime.  Many of these programs were in a direct response to the number of disturbance calls received by police involving youth congregating after school.

Disturbances such as assaults, loitering and other negative behaviors became the norm at one particular location.  An intervention strategy by the clergy involved the creation of afterschool rec programs where basketball, tutoring, and food/snacks were made available to any kid who chose to come.  Such programs almost immediately impacted the previously documented problems and significantly reduced the call load to law enforcement, consuming much less time and resources needed for much more serious and dangerous situations.

Additionally, volunteer clergy also walk their neighborhoods assessing the needs of their particular community members.  Situations involving youth who are in violent and dangerous situations or those that simply are not receiving the basics such as food become the target of their efforts.

The Arlington Police Department has taken extra steps to ensure that members of the clergy that volunteer are well trained and prepared to serve the needs of their constituents.  Training programs are provided which help foster relationships built on trust and respect with the PD.  Additionally, clergy gain a much better and deeper understanding of their communities and the work of the police within them.

**Richland, Washington:**
**Demographics:**
Richland is part of an area known as the tri-cities.  In total, the population in the tri-county area is approximately 280,000 with Richland having a population of 50,000 spread out over 42 square miles. District One is geographically cut-off from the rest of the city.

It is a highly educated community with a significant number of PhDs who work in various high tech companies (e.g. Pacific Northwest Laboratories and a number of health care providers).  There have been a total of three murders this year and most crime is limited to car prowls in unlocked vehicles, homes and garages.

**Philosophy:**

**Attachment B**

Chief Skinner is a big supporter of the community policing philosophy which is pervasive throughout the organization. Richland utilizes geo-based policing and creates an environment whereby accountability to the organization, the community and to each other is at the forefront. Officers have close connections to their communities and are assigned to a minimum of six months in a particular district. With that being said, officers are required to rotate to other districts, ensuring that they become familiar with the entire community, not just a particular segment.

The number of neighborhood watch programs has blossomed from nine to 35 over the last two years. This is unlike many other communities where neighborhood watch programs ebb and flow with the latest crime wave. According to Chief Skinner, the reason that there is such a significant success rate is due to the collaborative relationships other neighborhoods have witnessed with the police. The police department is highly involved with their neighborhoods, offering a multitude of resources, including presentations by community policing officers and district officers, and ongoing two-way "positive messaging". Additionally, according to the Chief, the Richland Police Department is heavily invested in having an emotional connection to the community they serve.

Another interesting and unusual approach is that there is confluence between officers regarding reports, issues, etc. Rather than having to wait until officers return to duty following days off, it is a matter of "passing the torch" to the officer on-duty so as to reduce unnecessary delays in case management.

Chief Skinner views the Richland Police Department not as a public agency that is typically viewed as being burdened by an inflexible bureaucracy, but rather follows a business plan whereby consumer and brand loyalty are at the forefront, with the main focus being customer satisfaction. This is very much a private sector approach effectively applied to a public entity.

Lastly regarding philosophy, the Richland Police Department is not a heavy-handed agency. Rather, all members of the agency are taught that soft skills are just as valuable as hard skills. Excellent and consistent communication is vital, something that is emphasized    continually with community engagement and contacts. According to Chief Skinner, his agency takes a more "holistic" approach to law enforcement than is typically seen.

**<u>Collaborative Partnerships:</u>**
The police department is highly effective in creating, nurturing, and sustaining partnerships. These partnerships go far beyond what most agencies would deem a partnership. In many cases, agencies regard a sponsorship as a partnership, when in fact this is not a partnership in the truest sense of the word. In fact, the department recognizes that partnerships oftentimes involve creativity, but always should involve a two-way relationship, whereby each entity has something to offer and something to gain. The question being, "How do we accomplish our goals and help them meet their goals?"

11

**Attachment B**

Community, school, library and local business partnerships represent just the tip of the iceberg for Richland PD. In addition, there is a very strong relationship between other law enforcement entities in the region. Chiefs and Sheriffs meet every week and participate in a variety of teams /task forces. Territoriality is not an issue allowing outside agencies to provide assistance when needed, anytime, anywhere. In fact, according to Chief Skinner, this is the first region to share all of its crime data in the area, a very unique approach. It constitutes a true regional approach where information sharing mutually benefits the entire tri-city area.

Along these same lines, although each agency has one crime analyst each, analysts meet regularly to discuss the information and intelligence they have gathered over a particular period of time. This approach to resource sharing allows all agencies involved to police smarter and more effectively.

**Clearwater, Florida:**
**Demographics:**
The Clearwater Police Department is responsible for policing 26 square miles and a population that swells from approximately 110,000 residents to 150,000 residents during the tourism season. The geographic layout of this City is unique, for it has traditional neighborhoods, an island-type neighborhood, and a large, well- visited beach area. The permanent resident population is comprised of a number of diverse cultures and ethnicities.

Operating with a $38 million budget and approximately 325 officers, the Clearwater Police Department is broken down into three districts, reflecting the neighborhoods mentioned above. Like many other communities, Clearwater has problems with gangs, drugs, robberies, prostitution, and burglary. However, unlike many communities, it also deals with nuisance calls, underage drinking, and other calls common to spring break hot spots.

The department is no stranger to economic hardships. In fact, it has faced a number of challenges in light of the economic downturn, resulting the downsizing of personnel by approximately 30 officers. Facing such challenges has only reinforced the need to enhance, re-focus, and re-commit to an already active and well-entrenched community policing philosophy.

**Community Policing Philosophy:**
The Clearwater Police Department is clearly an advocate for the community policing philosophy. Their commitment to these principles spans at least twenty-five years, surpassing many agencies around the Nation. It is reflected in their daily relationships with their communities, neighborhoods, and the people they serve, regardless of whether they are residents or just visitors to their community.

With the economic downturn of the 2010, a variety of the challenges arose. One of the most significant was that of losing personnel to attrition and the inability to replace them due to a shrinking budget. Unlike many agencies, whose first response often is to reign in community policing programs since they are costly and labor

**Attachment B**

intensive, the reaction of the Clearwater Police Department was just the opposite. In fact, these circumstances only increased the commitment of the department, whose values and mission were already steeped deeply in community policing.  No longer was it solely the responsibility of certain officers to foster these connections and relationships, but now the expectation that all officers, regardless of assignment (except for a few for obvious reasons), were mandated to engage in community policing.

Having the foresight to recognize the value of the police-community relationship has served the department well.  The following programs are just some examples of how the police department actively engages the community around the City on an on-going, daily basis.  The techniques utilized are varied, for their aim/goal is to reach all members of the community.  This illustrates the department's recognition that "one size does not fit all".

**Clearwater Neighborhood Enhancement Team (CNET):**  A collaborative effort between a number of agencies (fire, code enforcement, waste, etc.), and the police in tackling long-term, quality of life problems has been a particularly effective community policing program.  By showing a firm commitment to providing a targeted, comprehensive approach to large scale issues that are plaguing certain parts of neighborhoods, the CNET has resulted in large-scale community satisfaction.

**Park, Walk, and Talk (PWT):**  The Park, Walk, and Talk Program, developed by the Clearwater Police Department, mandates all officers to participate at least once a week. Consistent with the community policing philosophy, this program provides daily interaction with citizens in an attempt to get to know everyone in the Community.  The four main tenants of the PWT Program are as follows: 1) to increase the feeling of security and reduce the fear of crime, 2) to familiarize citizens with officers in a positive setting, 3) learn about crimes and suspicious activity while educating the community, and 4) provides support for criminal investigations.

**Operation Graduate:**  This particular program developed by the police department targets kids who have been identified by schools, teachers, the courts and parents as heading down the wrong path for a variety of reasons.  The ultimate goal is to give the kids direction, guidance, and support in an attempt to encourage them to make positive choices.  Oftentimes, these troubled youth have done so poorly in school that they are not able to move with their peers to the next grade level.  As a result, they are often left behind feeling embarrassed, humiliated and ashamed to attend school with younger kids. To counteract this problem, Operation Graduate provides tuition free college classes over the summer that these youth can attend in an attempt to get them the necessary credit hours to rejoin their classmates at the start of the next school year.  Funded with asset forfeiture funds, this program has a success rate of approximately 95%, meaning that a significant portion of these youth go on to lead success, productive lives.

**Attachment B**

**Clearwater for Youth Program:** Recognizing that youth congregating after school in-between sports seasons with nothing to do and nowhere to go led to a number of complaints and problems, the Clearwater Police Department devised a plan to implement after school recreation programs. Such programs immediately led to a decrease in call load which was directly linked this particular issue.

**Tips 411/Citizen Observer:** The Clearwater Police Department developed the Tips 411/Citizen Observer program as a mechanism to receive tips about suspicious activity from community members. It represents a viable alternative to the traditional crime stoppers in that it utilizes current technology, texting, to immediately receive tips. This enables the department to respond if necessary or, at the very least, to gather information that can be crucial to identifying that a crime is or was committed and any other relevant information. The tipster is able to remain anonymous and, if agrees, can be contacted at a later time by the police for additional information.

**Community Liaison and Anti-Crime Teams:** Each of the three districts of the Clearwater Police Department has both a community liaison and anti-crime team. The teams work collaboratively and in unison to identify and focus on particular problems, crimes, and issues that are prevalent in a particular district. The Community Liaison Team functions in a very typical community policing manner, by utilizing the SARA model, attending community meetings, and working collaboratively with a number of relevant agencies. The Anti-Crime Team is best characterized as being the enforcement branch of the Liaison Team in that it responds to serious crime issues in a predictive manner utilizing a variety of non-traditional methodologies.

**Charlotte/Mecklenburg, North Carolina:**
**Demographics:**
The Charlotte/Mecklenburg area comprises 500 square mile and has a population of around 900,000. Approximately 120,000 commuters travel into this area each day for work or school. Over the last five years, Part I crimes have decreased from 52,000 to 32,000. Much of this is attributed to community support for law enforcement coupled with the advanced technology utilized by this agency.

**The Police Department**
This department is a consolidated agency, consisting of both the City and County, although there are a few small towns that have their own police force. There are a total of four service areas broken down into thirteen divisions. Each service area has a Captain and three Lieutenants are assigned to each division. Resources are pushed directly into each patrol division, making each somewhat autonomous. Additionally, every division has its own analyst who actively monitors social media accounts and sends all analysis and pertinent information out to each officer on their individual dashboard.

**Attachment B**

**Community Policing Philosophy:**
The Charlotte/Mecklenburg Police Department has a long history of community policing. Early on they recognized that community is a basic component of policing and that trust and support from citizens is crucial. The implementation of new programs and/or strategies is much more likely to be successful, without much or any pushback. The Chief and his command staff clearly understand that the public will fight any and all new programs if they do not trust the police. Also, they are confident that the ACLU will not come in if the department has community support for their initiatives.

The department recognizes the need to put a face to the agency. Rather than some abstract organization, the public needs to see and know who represents the PD. This has been a very powerful and successful strategy. Not only is the Chief highly visible in the Community, but his Command Staff recognizes the relationship between visibility, accountability, and trust.

**Crime Stoppers:**
Albeit a program utilized by a number of LE agencies around the Country, the Crime Stoppers program in the Charlotte/Mecklenburg area has been very successful. In fact, the vast majority of homicides over the last year were solved due to Crime Stoppers. What is unique to the Program at the Charlotte/Mecklenburg Police Department is that the reward money will be increased in certain cases and that the head of Crime Stoppers meets personally with witnesses to once again increase visibility, accountability, and trust.

Last year alone, Crime Stoppers had generated over 2,500 tips, whereas in previous years tips ranged from 700 to 1,000 per year. However, such successes did not come without hard work and a commitment from the department. As is the case with most programs, it was first necessary to sell the program to the Community. The department went to the media to get the word out and visited with the Community to put a face on the program. Driving a Crime Stoppers car in parades, at professional sporting events, as well as partnering with Adams Outdoor Billboard Company to put up a number of Crime Stoppers Billboards, went far to publicize the program.

**Partnerships:**
The Charlotte/Mecklenburg department has developed and nurtured partnerships with the business community, as well. As noted previously, partnering with Adams Billboard Company provided a significant boost to the visibility of the Crime Stoppers Program. Additionally, recognizing the benefits of having video footage of local businesses, especially those that either have been victimized or are susceptible to victimization, led the department to tap into City resources to offer matching funds for the installation of cameras by businesses. Being able to stream video via these cameras and others that had previously been installed directly to the department has significantly increased the solvability of a number of crimes.

**Attachment B**

Another interesting partnership was developed in conjunction with the hotel/motel business. The Nuisance Enforcement Strategy Team (NEST), comprised of the police department, fire department, code enforcement, economic development, zoning, housing, health department, etc. had identified a number of problem locations where prostitution and/or drug dealing were becoming the norm. The Team reached out to the owners of these businesses to let them know that what was going on was not going to be tolerated. While most owners immediately understood and complied with the police, a few others did not. For those that were uncooperative, rather than putting an injunction on property, the police instead put on specific sanctions. The most notable was not allowing individuals from local zip codes to rent rooms anymore. The goal was to combat illegal activities, which has worked out very well.

**Beaumont, California:**
**Demographics:**
Beaumont, California is a bedroom community that comprises approximately 30 square miles and a population of 39, 776. It is a City that has experienced a significant growth in the resident population over the last couple of decades. The median family income is $79,800, significantly above the National Average. Crime, including Part One Index Offenses, is relatively low, despite the overall growth in the population.

**The Police Department:**
Beaumont currently has 44 sworn officers and a number of support staff. Due to the economic downturn, the number of sworn officers reflects a steady decrease despite the significant population growth. While there have been no furloughs or layoffs for current officers, attrition is the result of retirements and/or officers leaving to take jobs in larger, more professionally diverse law enforcement agencies.

Despite the continued downsizing of the number of sworn officers, statistics reflect a fairly consistent decrease in the number of Part 1, Index Offenses from one year to the next. While a curious and unusual finding, the police credit this to the increased use and reliance on the department's one crime analyst as well as to the partnerships the department has created and fostered with other City agencies, the Community, private businesses/corporations, private service organizations and schools. Additionally, the use of volunteers has also enabled the department to focus on police calls and not extraneous activities that, in the past, would unnecessarily tie up police resources. A number of programs, some adopted from other agencies, and some unique to Beaumont, have been utilized extensively and successfully.

**The Community Policing Philosophy:**
The Beaumont Police Department clearly subscribes to the community policing philosophy in a very natural, genuine, and humbling manner. The mission of the department is to "exceed expectations in everything we do". During the site visit, it became clear that the Beaumont Police Department is very committed to its

**Attachment B**

partnerships, those ranging from public-private partnerships to community and government partnerships.  Additionally, it also appears that these partnerships, unlike those of many other law enforcement agencies, have been developed and nurtured in a rather healthy, welcoming setting In fact, it appears that partnerships, many varied, are steeped in the culture of the City of Beaumont.

## Volunteers:

The City of Beaumont boasts a number of volunteers, some of which assist with law enforcement, others supporting a wide spectrum of other city and government entities.  The overarching program for volunteering in Beaumont is defined by the acronym VIBA, which stands for **Volunteers in Beaumont is Excellent**.  What makes this program so unique is, in addition to the number of volunteers, there is an incentive program for those who participate.  Volunteer hours per individual are submitted by each entity on a weekly basis to a central repository.  Once a particular volunteer has completed a specified number of service hours, he or she is given monetary credits on their water and sewer bill.  If the volunteer is not a resident in the City or is not responsible for water and sewer (i.e., a tenant in an apartment complex), he/she will be given a gift card to a local merchant as a reward for their service.

## Social Media:

The Community Oriented and Problem Solving Team (COPPS) of the police department has its own Facebook page which "has over 600 friends and belongs to multiple community groups".  Additionally, the City has a Facebook Page and utilizes Twitter.

Beaumont has also been very successful in joining Facebook pages that are developed by individual neighborhoods.  This has been a real plus for the police department since they are able to gain some insight into what is going on in a particular neighborhood. The police can immediately respond if there is a concern or complaint, even if it involves issues related to too much or unusual law enforcement activity.

## Partnerships:
**Open Forums:**  The police department works extremely well with the City Government and other City Agencies to address the needs and/or concerns of the citizens of Beaumont.  A program called the **Beaumont Community Awareness Team,** or BECAT, provides an open forum where citizens can ask questions or voice concerns to members that represent a number of agencies, including the PD.

Piggybacking on this forum is yet another program that enables citizens to have a user-friendly way to communicate with the correct department, including, but not limited to the police department.  **Ask Beaumont** is a program developed through the City Webpage.  Once logged on, the citizen can submit a concern and/or request and it will be immediately sent to the correct city department.  Feedback will be given in a timely manner.

17

## Attachment B

**Businesses:** The Beaumont Police Department has a division that acts as a liaison with the business community. Their efforts have resulted in a number of important contacts, which have gone beyond just increasing the relationship between the department and business community. In fact, it has established programs that have linked owners of hotels to homeless families, enabling the struggling family to receive shelter for a number of nights.

The development of public-private partnerships has also made for a safer community. For example, a strong and ongoing partnership with the local Walmart exemplifies these successes. Whereby, Black Fridays (the biggest shopping day of the year) in most communities is cause for alarm due to the chaotic and sometimes violent behavior of the patrons, this is not the case in Beaumont. Rather, to head off any problems, the Beaumont Police Department always has extra police on the scene to provide a visible police presence, discouraging potential offenders. This has led to an outstanding outcome, no trouble and no police reports even being written. This is clearly advantageous for the police and Walmart, who is not charged for the increased police presence and benefits tremendously by the absence of would be troublemakers.

More traditional programs, such as **CPTED** (Crime Prevention Through Environmental Design), also prove very beneficial. Officers provide a free service to business owners looking to protect their businesses from would-be-thieves or other criminals. Of course, in return, the police benefit due to a lower call load and fewer police reports.

The bank deposit/escort program is another unique program of the Beaumont police. Business owners who request an escort when going to the bank to deposit the day's earnings will find that the department is more than happy to assist.

**Community/Residential Programs:**
The relationship between the Beaumont Police Department, the City, and the Community is one of an enviable nature. A plethora of programs and events illustrates that the City as a whole is deeply committed to creating a supportive and stable lifestyle for its residents.

**The Beaumont Cares program** encompasses the basic tenants of traditional neighborhood watch programs. Citizens are encouraged to report anything suspicious in their communities.

**"If I were a Thief"** is a program that is utilized by the police and its volunteers to warn citizens that their vehicle is a target for a theft due. Informational leaflets are left on the vehicle to educate the owner of ways to secure their valuables.

Beaumont participates in the **National Night Out Program**. Citizens are strongly encouraged to come out alongside their police and take a stand for

**Attachment B**

safety and security in their neighborhoods.  This program clearly supports the nurturing of relations between the police and members of the community.

Another program instituted by the police targets drivers who may have had too much to drink.  Partnering with the local tow companies, drivers are able to get a ride home and have their car towed home, as well.   Unlike many other programs which have limited appeal to drunk drivers since they need their car at home for the next day, incorporating the "towing the car home" aspect is more likely to elicit a positive outcome.

Yet another program gives citizens a place to dispose of unwanted drugs, the City of Beaumont has been able to cut down on the drugs on the streets, "prevent overdoses and accidental poisonings, and avoid environmental contamination".

**The Crime Free Multi-Housing Program** focuses on building strong relationships between residents, owners, and the police department to develop a safe and crime-free environment.

**Youth Programs:**
Although the Beaumont Police Department does not have SROs in the schools, they have an excellent relationship with the staff and children, nevertheless. The police play a critical role in the safety and security of the schools by building relationships and fostering trust. While some students come from dysfunctional families, where crime and illicit activities are prevalent, officers want them to know the police as being their friends and advocates.  This is accomplished through a number of programs coupled with face-to-face contact.

**Operation Safe Passage** is a program that reminds and reinforces the need for parents and other citizens to slow down in school zones. It ensures the safety of students by having officers in marked patrol units sit in front of the schools for the first few weeks of the school year to provide a friendly reminder to all traffic passing through the area.

**The Parent Program** focuses on ways to assist parents who are having a difficult time with their children.  Affected parents are taught skills which are aimed at developing strong family relationships, decreasing drug use, and increasing self- esteem.

**The Family Safety Fair** is yet another venue where citizens have an opportunity to interact with and get to know their law enforcement officers.  A number of demonstrations are put on by the police allowing citizens to better understand their roles and responsibilities.

**Story Time Café** gives officers an opportunity to develop positive relationships with the youngest of Beaumont's citizenry.  Reading books to the children shows them early on that the police are their friends.

19

**Attachment B**

**Adopt-a-Cop** provides for a highly interactive experience for children with their local police officers. Additionally, students in fourth and fifth grade with perfect attendance are rewarded with a trip to a local baseball game.

**Special Events:**
In addition to all of the programs aforementioned, the Beaumont Police Department also has a highly visible presence in activities run by the City. There are a number of seasonal events which provide numerous opportunities for citizens to get to know their city officials and staff in an informal, relaxed setting.

**Ice Cream Socials** provide an opportunity for citizens to come out and interact with the police, in addition to other city departments. These events are held in both the summer and winter.

A special program targets underprivileged children in Beaumont. **Shop With a Hero** enables 20 less fortunate children to go on a shopping spree with an officer from the Beaumont Police Department. Each child receives a meal and gift card, allowing them to pick out gifts for themselves and family members. Donations for this program come from officers and staff from the PD.

**Operation Santa** is another event whereby police and firefighters accompany Santa around the Community.

And, lastly, **Trunk or Treat**, is a Halloween event where donated candy is distributed in a safe environment, eliminating the need for children to go door to door.

**Norwalk, Iowa:**
**Demographics:**
Norwalk, Iowa is a small bedroom community located west of Des Moines. The population is approximately 10,000, and growing. The crime rate is very low and is limited to mostly domestic violence, burglaries, criminal mischief, and some small gang issues, spillover from Des Moines.

The police department is made up of 15 sworn officers (13 full-time, 2 part-time) and a COPS Office grant funded part-time SRO position.

**Community Policing Philosophy:**
The department is steeped in a very strong belief in partnerships built on honesty, trust, reliability, and mutual benefit. Regular meetings are held with local government, schools, and the police. Additionally, the former police chief currently serves as the head of the Chamber of Commerce. His role bridges the department with local community issues including developing commercial businesses, helping with bond issues to support technological advancements, and working diligently with the community in a number of capacities.

**Attachment B**

Relationship building from the standpoint of the police has translated into a number of very effective programs.  The department has a strong partnership with the local school districts.  Officers are involved in teaching classes at school, in capacities other than the typical law enforcement educational awareness programs, like DARE. In fact, they actually teach both government and health classes. Additionally, officers are involved with conflict resolution.

The current and former Chiefs recognize that, in their own words, 95% of their success rate   is attributed to building and nurturing relationships, both with their agencies and externally.  Rather than solely focusing on outcomes, as many agencies have a tendency to do, the Norwalk, Iowa Police Department recognizes that it is the process that is "more important than outcomes".

# Attachment C

## POLICE BODY WORN CAMERAS (BWCs)

CITY OF WICHITA

### Background, Issues and Funding Options

The Wichita Police Department (WPD) plans to outfit all patrol officers with a body worn camera (BWC) by December 31, 2015.  The BWC can enhance transparency and accountability, both by police officers and citizens.  In addition, BWCs can reduce use of force incidents, complaints of officer misconduct, and liability claims.  BWC footage may also be a useful tool in collecting video evidence at crime scenes.  However, the use of BWCs creates challenges.  There are privacy issues for both officers and citizens.  In addition, managing the video produced by BWCs can be a significant logistical and financial challenge.

This report reviews recent law enforcement trends regarding BWCs.  Issues are examined, specifically from three cities that have piloted and evaluated BWC programs (Rialto, CA; Mesa, AZ; and Phoenix, AZ).  Expected outcomes from a BWC strategy (as related to the City of Wichita) are discussed, as are the costs and potential financing options for BWC implementation by the WPD.  Finally, the report concludes with potential implementation issues for the WPD, as well as funding recommendations for an expanded BWC program.

What is a BWC? -  A police body worn camera (BWC) is a device that is worn on the body and records interactions between police and the public to increase officer and citizen accountability.[1]  Multiple varieties of devices are available on the market, including those that are clipped on clothing, an ear piece, or glasses.  Although significant, upfront costs tend to be a smaller barrier to establishing a BWC program.  A much more significant financial consideration for any BWC program is the recurring costs to maintain and re-



place BWC equipment and (most significantly) the cost to store, access and manage the enormous amount of video that will be generated.

BWC Issues and Trends in Law Enforcement -  Other law enforcement agencies already use BWC systems and have pilot programs to review their merits.[2,3]  Since 2012, three cities (Rialto, CA; Mesa, AZ; and Phoenix, AZ) have piloted BWCs and have conducted studies on the effectiveness of the BWC strategy.  In 2013, Federal Judge Shira Scheindlin recommended the use of BWCs in her ruling that declared New York's stop-and-frisk policy unconstitutional.[4]  However, groups such as the American Civil Liberties Union have begun voicing privacy concerns related to BWCs.[5]

| Other Cities with BWC Systems |
| --- |
| Mesa, AZ |
| Phoenix, AZ |
| Rialto, CA |
| Albuquerque, NM |
| San Diego, CA |
| New York, NY |
| Washington, D.C. |



## Attachment C

# POLICE BODY WORN CAMERAS (BWCs)

Background, Issues and Funding Options

More recently, two cities (San Diego, CA and Albuquerque, NM) began steps toward full implementation of BWCs.  On June 10, 2014, the San Diego City Council approved a contract with TASER International, Inc., for the purchase of up to 1,000 BWCs, as well as related accessories and ongoing program support. The total cost of the multi-year contract was $3,937,247.[6,7]

Albuquerque, as part of a settlement agreement with the U.S. Department of Justice (DOJ), is now required to outfit all officers with a BWC.  The settlement was approved by the Albuquerque City Council on November 6, 2014.[8]  Previously, the Albuquerque Police Department had piloted BWCs.

BWC Issues and Studies  -  The number of empirical studies on the impact of BWCs is somewhat limited. A US Department of Justice (DOJ) report entitled "Police Officer Body Worn Cameras – Assessing the Evidence" identified three studies in the US as of September 2013.  These include studies by Rialto, CA; Mesa, AZ; and Phoenix, AZ.  The DOJ report identified "perceived benefits" and "perceived concerns."  The perceived benefits include enhanced transparency, and improved behavior by both citizens and officers. Perceived concerns include privacy issues (for both officers and citizens), significant investments in policy development and training, and the substantial commitment of resources and logistics.  The DOJ report did not offer empirical findings, but noted BWCs "hold great promise as a training tool," while stating that independent research on BWCs is "urgently needed."  The report recommended that departments interested in BWC technology should "proceed cautiously."[9,10]

In 2013, the City of Rialto, CA conducted a randomized study that found BWCs reduced citizen complaints and use of force events by 59% and 87.5%, respectively.[11]  This was one of the first empirical studies documenting the benefits of BWCs.  However, the Rialto study is complicated by two factors.  The Rialto Police Department is relatively small (111 officers) and the department had a significant number of pre-existing "issues," including a very high per capita number of officer misconduct complaints.[12]

The City of Mesa, AZ conducted a study of 50 BWCs from October 1, 2012 to September 30, 2013.  Most of the study focused on the challenges and importance of properly cataloguing and storing videos for efficient retrieval.  The study found a 40% decrease in complaints and a 75% decrease in use of force complaints, although the sample size was again very small.[13]

Phoenix, Arizona piloted BWCs to enhance transparency with the community and determine the value of BWCs in clearing crimes, primarily domestic violence.  The Phoenix pilot program is probably the best documented pilot in the US, although Phoenix's results are still not definitive.  The Phoenix Police Department (PPD) partnered with Dr. Charles Katz, of Arizona State University, to study the impact of BWCs. The PPD spent one year developing a scope of services before completing an initial order of 56 cameras. Phoenix project managers recommended that an implementation be done "very deliberately," and the input from and impact on various stakeholders, including officers, the public, and other criminal justice agencies, be carefully considered.  The BWCs in Phoenix were found to have a "civilizing" effect on citizens once they were aware they were being recorded.  Citizen complaints decreased 44%.[14]  However, the department also found data storage and retrieval requirements to be "manpower intensive."  The



# Attachment C

# POLICE BODY WORN CAMERAS (BWCs)

Background, Issues and Funding Options

PPD is also studying the value of BWCs in enhancing domestic violence prosecution as a result of additional video evidence.[15]

Expected Outcomes and Performance Measures - There are numerous performance measures that should be directly impacted if a BWC system is procured and fully implemented. For example, data should point to a reduction in workers' compensation and public liability claims, use of force incidences, and citizen complaints. At the same time, BWCs could produce increased crime clearance rates. Three measures that are tracked as part of the City of Wichita's Performance Management System are reviewed below.

*General Liability Claims per Capita*: The Budget Office tracks the total number of claims per capita; there could be a sub-measure for Police Department claims per capita. For total claims, the lowest year in the dataset is 2012 (197 total claims), and the highest year is 2009 (398 claims).

*Use of Force Incidents*: This measure is tracked by the WPD, although it has not been included in the City's Performance Measure reports.

*Number of External Citizen Complaints*: In 2013, there were 102 external complaints. The lowest year in the dataset is 2006 (43 complaints) and the highest year was 2012 (123 complaints).

Citizen Survey - The National Citizen Survey, sponsored by the International City/County Management Association in cooperation with National Research Center, Inc., serves as an extension of Wichita's Performance Management System. Hundreds of local communities participate in the survey process, which provides feedback on perceptions about government rather than actual performance. The City of Wichita uses such feedback to enhance community engagement efforts and better educate the public. Optimally, perceptions will mirror actual performance trends through successful community engagement. An expanded BWC strategy could improve results in several measures including the ones below.

*Police Services - Percent Rated "Excellent" or "Good"*: Officer interaction comprises part of the rating. Other factors also influence the rating. This question was asked in 2006 (66%), 2010 (74%), and 2012 (67%). In each year, the City of Wichita was similar to the benchmark.

*Overall Impression of Most Recent Contact with WPD - Percent Rated "Excellent" or "Good"*: This is the Citizen Survey rating that would be most directly impacted by deployment of BWCs. This question has only been asked on one previous survey (in 2012) and the outcome was similar to the benchmark at 69%.

Implementation Issues - There are many specification issues to consider when purchasing a new BWC system, including: battery life; video quality; recording limits; night recording; camera focal width; audio recording; camera placement; and radio integration capability. In addition, many operational issues must



# Attachment C                    POLICE BODY WORN CAMERAS (BWCs)

| Background, Issues and Funding Options |
| --- |

be resolved, most likely through the use of revised policies and procedures. Issues could include: when BWCs should be turned on; what operating policies and procedures will be needed; and what training (initial and recurring) should be provided.[16] There are legal issues to consider, including how long to retain videos, and when to release videos and under what circumstances. In addition, storage and retrieval of videos can be a laborious task. The estimated additional staffing (two positions) is based on a staff estimate and may need to be reviewed as a BWC program is fully implemented.

| Considerations in BWC Procurement and Implementation |
| --- |
| Initial Cost |
| Ongoing Operating Cost |
| Performance Outcomes |
| Policies and Procedures |
| Privacy Issues |
| Training Requirements |

Presently, there are no uniform best practices that govern BWC usage. Privacy considerations, data retention and public disclosure policies, and social impacts and expectations should all be considered when implementing a BWC program. BWC usage in policing is a relatively recent phenomena, and a deliberate and methodical implementation is essential to the successful deployment of BWC equipment.

Costs and Options to Finance a BWC System for the WPD  -  The unit cost of a BWC can appear relatively small. However, total implementation costs can be significant. Even more challenging would be the ongoing costs, including operating costs for data storage and retrieval, as well as future planned replacement costs. Initial outlay for an additional 444 BWCs is estimated at $927,200. The operating and replacement costs over a ten-year life cycle are estimated at $6,440,585.

  Initial Capital Outlay  -  There are three basic costs to implement a BWC program: the camera and equipment; the docking stations; and the IT costs, including hardware and infrastructure to communicate with each Patrol substation. The latest cost estimate for each camera is $1,300.[17] Outfitting all patrol officers would require 444 cameras at an estimated cost of $577,200. In addition, 74 docking stations would be needed, at a total estimated cost of $148,000. An estimated $25,000 in IT equipment and $177,000 for connectivity infrastructure would also be required. This would fund fiber-optic connections between Police substations and City Hall.

| BWC Estimated Implementation Costs | |
| --- | --- |
| Camera | $600 |
| Mounting Kit and Accessories | 200 |
| Extended Warranty | 300 |
| In-Car Video Viewers | 200 |
| Total Camera Unit Cost | $1,300 |
| Total Costs for 444 Cameras | $577,200 |
| | |
| Docking Stations | $1,500 |
| Extended Warranty | 500 |
| Total Docking Station Unit Cost | $2,000 |
| Total Costs for 74 Docks | $148,000 |
| IT Equip & Connectivity Costs | $202,000 |
| **Total Initial Capital Outlay** | **$927,200** |

  Operating Costs  -  Multiple ongoing operating costs would also be required to utilize BWCs. Annual data storage and software licensing costs would be incurred. These annual costs are estimated at $150 and $300 per BWC, respectively. With 504 cameras (60 currently operated and an additional 444), the annual cost would be $226,800. In addition, managing the high volume of stored video evidence would require increased and dedicated staffing. Presently, two Clerk II positions are projected to be required, but staffing demands may



**Attachment C**

# POLICE BODY WORN CAMERAS (BWCs)

Background, Issues and Funding Options

vary either upward or downward depending on actual experience. The estimated cost of these two positions in year one is $108,312, with annual increases in subsequent years based on wage and benefit cost changes. Finally, an annual allowance of $15,000 is estimated for replacement parts and batteries. Ongoing annual operating costs are estimated at $350,112 in year 1. Costs would be expected to rise in future years as wage and licensing fees increase.

| BWC Estimated Annual Operating Costs | |
|---|---|
| Data Storage Cost | $150 |
| Software Licensing Cost | 300 |
| | $450 |
| Data and License Costs 504 BWC | $226,800 |
| | |
| Additional Police Dept Staffing (2 positions) | $108,312 |
| Misc repairs, replacement, etc. | $15,000 |
| Total Annual Operating Costs | $350,112 |

 Replacement Costs - BWCs are typically covered by an initial three-year warranty, which limits replacement costs in early years. However, after the warranty period expires, system replacement costs must be programmed to replace damaged, destroyed, lost, or obsolete BWC devices. Assuming unit costs of $1,300 per camera, a total of $655,200 would be required, based on 504 cameras.

Based on initial assumptions and assuming moderate inflation rates, the cost of a ten-year BWC system is estimated at $6,440,585. This includes $2,548,723 in capital outlay and $3,891,862 in operating costs.[18]

Selected Options to Fund a New BWC System - There are a variety of opportunities to finance both the capital and ongoing operating costs of a new BWC system. Options include various grant opportunities, narcotics seizure funds, capital improvement program (CIP) resources, and reallocation within the WPD budget or broader General Fund budget. All options will require a prioritization process, and there are no simple financing solutions. Funding the initial cost could include some form of grant funding, narcotics seizure funding, CIP resources, or a reallocation within the General Fund. Operating cost options would be more challenging, and would require either additional General Fund resources or a reallocation of current expenditures within the General Fund.

| Potential BWC Financing Alternatives |
|---|
| Grant Opportunities |
| Narcotics Seizure Funds |
| CIP Resources |
| Reallocation of WPD Budget |
| Reallocation of GF Budget |

Initial Outlay Options

*Grants*: The Edward Byrne Justice Assistance Grant (JAG) Program and Community Oriented Policing Services Making Officer Redeployment Effective (COPS MORE) are examples of grants that may allow for allocation of monies to obtain BWCs and related equipment. The Wichita City Council approved $177,076 in JAG assistance for general police equipment (including funding for Tasers, BWCs, and other equipment purchases and repairs) on June 3, 2014.[19] JAG resources typically provide around $180,000 annually, and the WPD expects to receive annual JAG awards in the future.

*Narcotics Seizure Funds*: The WPD has a sizable balance in the Narcotics Seizure Fund. However, the use of these funds is restricted.[20] The City is not allowed to use anticipated future forfeiture revenues when



**Attachment C**

# POLICE BODY WORN CAMERAS (BWCs)

Background, Issues and Funding Options

developing the budget. Any budgeted spending must be financed by cash currently on hand. Annually, approximately $360,000 is typically used for eligible investigations operating expenditures. The current balance of the Narcotics Seizure fund is $1.5 million.

_CIP Resources_: CIP resources could be used to finance a BWC system purchase. For example, $4 million was included in the 2011-2020 Adopted CIP to finance mobile radio purchases.[21] It is important to note that BWCs would most likely be purchased using Debt Service Fund cash rather than issuing bonds.

_General Fund_: The General Fund could be used to finance the initial capital outlay. This would either require a reallocation of currently budgeted items, or the use of General Fund reserves. As a one-time cost, the use of reserves would be structurally acceptable. However, maintaining and enhancing the General Fund reserve level has also been an important policy issue in recent years.

_Stabilization Reserve Fund_: The City maintains a Stabilization Reserve account within the General Fund. There is currently a cash balance of slightly more than $1 million. This one-time source of funding could be used to fund the initial outlay costs.

### Operating Cost Options

The City of Wichita operating budget allocates resources to produce meaningful outcomes in four strategic priority areas: ensure physical safety; protect property; protect public infrastructure assets; and create a growing community. For the WPD, ensuring physical safety and protecting property are probably the most important strategic priority areas. To the extent an expanded BWC program supports these strategic priority areas better than alternative services and programs, existing General Fund resources might be reprioritized to fund the increased operating costs.

_Air Section_: The WPD's Air Patrol Section is supported through the City of Wichita's General Fund budget. The Air Section is very useful in providing backup to ground officers and in conducting searches and surveillance. A total of 200 flight hours annually are budgeted. This Section includes a Police Officer and a Helicopter Mechanic. A third position (Police Lieutenant) supports the Air Section periodically (as a pilot) but is attached to the Special Investigations Bureau, and is

| Estimated Ten-Year Air Section Costs | |
|---|---|
| Helicopter Repl. | $2,000,000 |
| Operating Costs | 3,789,339 |
| | $5,789,339 |

not included in the Air Section operating costs in this report. The 2015 budget for this Section is $345,891. The current helicopter will need to be replaced within the next ten years at an estimated cost of $2 million. The ten-year cost of the Air Section, including capital costs, is estimated at $5,789,339.

If an expanded BWC program supports the strategic priorities of ensuring physical safety and protecting property to a greater extent than the Air Section, then resources might be repurposed from the Air Section to support the BWC program. This would provide $3.8 million over the next ten years to fund operating costs, and eliminate the need to identify $2 million for a future helicopter replacement. In addition, approximately $250,000 from contingency reserves and $800,000 in estimated proceeds from a sale of the helicopter could be applied to cover any initial and future capital outlay costs for BWCs.



**Attachment C**

# POLICE BODY WORN CAMERAS (BWCS)

| Background, Issues and Funding Options |

_Other Police Strategies:_   At least two other Police strategies have been reviewed in recent years.  The 2015 Adopted Budget includes $425,251 in the General Fund to finance eight School Resource Officers. These officers are funded equally by the City and USD 259.  The officers provide outcomes of mentoring youth, serving as a positive role model for adolescents, and investigating and preventing crime in USD 259 locations (primarily high schools).  This program was restructured in 2011 and has been reviewed several times.  It is highly leveraged (the City only funds 50% of the costs) and it provides outcomes in sync with protecting property and life in Wichita.  However, the outcomes are less empirical and more anecdotal. The Police Mounted Unit has also been discussed in the past.  It is an effective strategy for crowd control and crime prevention, but it is a tactic used infrequently.  The total cost of the Mounted Unit on an annual basis is around $53,000.

_Other General Fund Services or Additional General Fund Resources:_   A new BWC program could be funded with a mill levy increase of approximately 0.20 mills, or with the reallocation of approximately $640,000 annually from other current General Fund services.

_Fee to Offset Video Retrieval Costs_:  A fee may be warranted to partially offset the costs associated with reproduction of BWC videos.  Fees are presently charged for background checks and access to accident reports and other police reports.  These fees partially offset the cost of providing these services. Currently, a fee of $25 is charged for the production of police videos and total revenues are minimal. However, with an expanded BWC program, fee revenue could provide a small amount to fractionally offset operating costs.  Revenue is difficult to estimate; however, assuming an increased demand for videos based on the enormous amount of videos that would be created, a fee could generate an estimated $57,152 annually.

Recommendations for Funding an Expanded BWC Program  -  Funding an expanded BWC program presents two separate issues:  financing the initial implementation and life cycle replacement costs (estimated at $2,548,723 over the next ten years); and funding the projected annual operating costs (estimated at $3,891,862 over the next ten years).   Matching one-time funding sources for the periodic capital outlay is less difficult than identifying recurring resources to fund operating costs.  Finally, future costs (continued replacement costs as well as staffing costs once full implementation is achieved) are speculative, and funding recommendations should be considered conceptual.  A combination of grant and seizure funds are recommended for initial implementation, with other balances and video fees reserved for future replacements.  For operating costs, the Air Section budget is recommended to be reallocated to fund BWC operating costs.

As mentioned above, to fund the initial implementation costs estimated at $927,203, a combination of grant and Narcotics Seizure Fund resources could be used.  The 2015 JAG grant could provide $100,000 and $827,203 could be utilized from existing Narcotics Seizure Fund cash.  Assuming the Air Section is disbanded, the current balance in the Helicopter Maintenance Account (estimated at $250,000) and any residual value from the sale of the current MD 500E helicopter (estimated at $800,000) could be reserved for future replacement costs.  Finally, any video fees (estimated at $57,152 annually) could be reserved to fund future replacement costs.



**Attachment C**

# POLICE BODY WORN CAMERAS (BWCs)

Background, Issues and Funding Options

Recommendation for Funding Ongoing Operating Costs - There are two primary options to finance the ongoing costs of a new BWC program: 1) reprioritize spending within the WPD budget; or 2) reprioritize spending within the General Fund. Given past policy direction, increasing the mill levy to fund a BWC program is not recommended. If disbanded, the Air Section could provide $3.8 million over ten years to pay for operating expenditures. On an annual basis, the projected Air Section operating costs match very closely with projected BWC operating costs. Over the 10-year life cycle, Air Section costs would be approximately $102,523 less than required. However, phasing the initial implementation of the additional 444 cameras in 2015 (which is recommended operationally) would reduce the 10-year operating costs to within the amount available from disbanding the Air Section.

| Recommended Ten Year Financing Plan | | | | |
|---|---|---|---|---|
| BWC Program Cost | Cost Amount | Source of Financing | Financing Amount | Financing Surplus/(Deficit) |
| **Capital Outlay** | **$2,548,723** | **Capital Financing** | **$2,548,723** | $0 |
| - Initial Implementation | $927,200 | Grants/ Narc. Seizure | $927,203 | 0 |
| | | - JAG Resources | $100,000 | |
| | | - Narcotics Seizure | $827,203 | |
| - Continual Replacement | $1,621,523 | Helicopter sale, Fees | $1,621,520 | 0 |
| | | - Maintenance Fund | $250,000 | |
| | | - Sale of Helicopter | $800,000 | |
| | | - Video Fee | $571,520 | |
| **Operating Costs** | **$3,891,862** | **Operations Financing** | **$3,891,862** | $0 |
| | | - Air Section Operations | $3,789,339 | |
| | | - Savings from Phased Implementation | $102,523 | |
| **Total** | **$6,440,585** | | **$6,440,585** | |

 **Attachment C**

# POLICE BODY WORN CAMERAS (BWCs)

| Background, Issues and Funding Options |

**Footnotes**

1. On November 1, 2011, the Wichita City Council authorized the purchase of 20 BWCs through the combination of an American Reinvestment and Recovery Act Justice Assistance Grant and the WPD's General Fund budget. The total estimated cost for the 20 BWCs, associated accessories, one year of video storage and retrieval support, and a three-year warranty was $125,000. Today, the City of Wichita operates and maintains 60 cameras as part of an ongoing pilot project. The existing cameras would not preclude a switch to a new BWC system if all patrol officers are to be outfitted with BWCs, assuming a new system would better meet the needs of the WPD.

2. Pearce, Matt, LA Times Reporter. 2014. Growing use of Police Body Cameras Raises Privacy Concerns. Page 1.

3. For more regarding Washington, D.C. and police BWCs, see: Washington, D.C. Police Complaint Board. 2014. Enhancing Police Accountability Through an Effective On-Body Camera Program for MPD Officers. http://policecomplaints.dc.gov/sites/default/files/dc/sites/office%20of%20police%20complaints/publication/attachments/Final%20policy%20rec%20body%20camera.pdf. Page 1-12.

4. David Floyd, Lalit Clarkson, et al. v. The City of New York.  Case 1:08-cv-010134.  United States District Court Southern District of New York.  http://www.nytimes.com/interactive/2013/08/12/nyregion/stop-and-frisk-decision.html.

5. Ramirez, Eugene P. of Manning & Kass, Ellrod, Ramirez, Trester LLP. A Report on Body Worn Cameras. http://www.parsac.org/parsac-www/pdf/Bulletins/14-005_Report_BODY_WORN_CAMERAS.pdf. Page 1-23.

6. City of San Diego, CA. 2014. Resolution R-2014-712. http://www.sandiego.gov/city-clerk/pdf/officialdocs/legisdocs/140610tuesdaydock.pdf. Page 21-22.

7. City of San Diego, CA. 2014. Item-101, June 10, 2014 Council Docket. http://dockets.sandiego.gov/sirepub/cache/2/plz3vobt2zoq05tpuv2mbdue/6782061110201408083535361.PDF. Page 1-5.

8. City of Albuquerque, NM. 2014. EC-14-194. https://cabq.legistar.com/LegislationDetail.aspx?ID=1989477&GUID=5E86A4AD-BD0C-46DB-9FB9-7E04DB573EF0. Page 1.

9. White, Michael D., Ph.D., Consultant for U.S. DOJ Office of Justice Programs. 2014. Police Officer Body-Worn Cameras: Assessing the Evidence. https://ojpdiagnosticcenter.org/sites/default/files/spotlight/download/Police%20Officer%20Body-Worn%20Cameras.pdf. Page 6-9.

10. Michael D. White, Ph.D. shares findings in common with numerous other research reports on the matter of police BWCs. In particular, the U.S. DOJ has sponsored numerous research reports on the matter. For another report on BWCs, see also: U.S. DOJ Community Oriented Policing Services. 2012.



**Attachment C**

# POLICE BODY WORN CAMERAS (BWCs)

Background, Issues and Funding Options

Implementing a Body-Worn Camera Program: Recommendations and Lessons Learned. http://www.justice.gov/iso/opa/resources/472014912134715246869.pdf. Page 1-77.

11. "Self-awareness to Being Watched and Socially-Desirable Behavior: A Field Experiment on the Effect of Body-Worn Cameras on Police Use-of-Force" is a 14 page study summarizing the effect of body cameras. The study was conducted by the Rialto, CA Police Department in 2012 and 2013.

12. Cato Institute: National Police Misconduct Reporting Project 2010. http:\www.policemisconduct.net\statistics\2010-annual-report\.

13. Mesa, AZ Police Department. 2013. End of Program Evaluation/Recommendations On-Officer Body Camera System. http://issuu.com/leerankin6/docs/final_axon_flex_evaluation_12-3-13-. Page 1-16.

14. Interview with Dr. Charles Katz on 20 August 2014. http://www.msnbc.com/the-last-word-with-lawrence-odonnell/watch/-video-changes-everything--320356931874.

15. The Arizona State University School of Criminology and Criminal Justice maintains a webpage for the PPD BWC Projects at the following address: http://ccj.asu.edu/news-events/news/spi-phoenix-police-department-body-worn-camera-project. The site includes interviews with Commander Michael Kurtenback, PPD, and Dr. Charles Katz, Arizona State University.

16. US DOJ Office of Justice Programs, National Institute of Justice. 2012. A Primer on Body-Worn Cameras for Law Enforcement. https://www.justnet.org/pdf/00-Body-Worn-Cameras-508.pdf. Page 5-10.

17. Cost estimates in this report are based on informal inquires and experience gained through the BWC pilot project. The estimates are not meant to infer precision, but rather potential magnitudes.



**Attachment C**

# POLICE BODY WORN CAMERAS (BWCs)

Background, Issues and Funding Options

18. Below is a more detailed ten-year cost estimate for a new BWC system as developed by City staff.

| Ten-Year Estimated Cost of a BWC System | | | | | | |
|---|---|---|---|---|---|---|
| Year | Cameras | Licensing | Staffing | Misc | Subtotal: Operating Costs | Total Costs |
| Year 1 | **$927,200** | $226,800 | $108,312 | $15,000 | **$350,112** | **$1,277,312** |
| Year 2 | | $226,800 | $111,561 | $15,375 | **$353,736** | **$353,736** |
| Year 3 | | $226,800 | $113,795 | $15,759 | **$356,354** | **$356,354** |
| Year 4 | **$780,745** | $250,345 | $116,640 | $16,153 | **$383,138** | **$1,163,883** |
| Year 5 | | $250,345 | $119,556 | $16,557 | **$386,458** | **$386,458** |
| Year 6 | | $250,345 | $122,545 | $16,971 | **$389,861** | **$389,861** |
| Year 7 | **$840,778** | $269,594 | $125,609 | $17,395 | **$412,598** | **$1,253,376** |
| Year 8 | | $269,594 | $128,749 | $17,830 | **$416,173** | **$416,173** |
| Year 9 | | $269,594 | $131,968 | $18,276 | **$419,838** | **$419,838** |
| Year 10 | | $269,594 | $135,267 | $18,733 | **$423,594** | **$423,594** |
| Total | **$2,548,723** | $2,509,811 | $1,214,002 | $168,049 | **$3,891,862** | **$6,440,585** |

19. See Agenda Item No. II-14 from the June 3, 2014 Wichita City Council Meeting at http://wichitaks.granicus.com/MetaViewer.php?view_id=2&clip_id=2640&meta_id=136248.

20. Generally, Seizure Funds must be used in accordance with the U.S. DOJ's "Guide to Equitable Sharing for State and Local Law Enforcement Agencies," which can be found at http://www.justice.gov/usao/ri/projects/esguidelines.pdf. Pages 16-19 outline permissible uses as well as non-permissible uses. Generally, seizure funds cannot supplant current local resources, cannot fund ongoing staff, and should be used only on law enforcement related costs, including equipment, facilities, training, and grant matches. Anticipated seizure revenues also cannot be utilized.

21. For more on the mobile radio project, see http://wichitaks.granicus.com/MetaViewer.php?view_id=2&clip_id=1549&meta_id=95755.

**Attachment D**

# THE PHENOMENOLOGY OF RACIAL PROFILING IN KANSAS

# TECHNICAL REPORT

**Prepared by:**

**Michael L. Birzer**
**School of Community Affairs**
**Wichita State University**

**Prepared for:**
**The Kansas Governor's Task Force on Racial Profiling**

**December 23, 2010**

**Attachment D**

## TABLE OF CONTENTS

**SECTION**                                                      **PAGE**

List of Tables
List of Figures
Acknowledgments
Executive Summary

**INTRODUCTION**                                                    1
    The stories they told                                      1
        South central Kansas                                   1
        Northeast Kansas                                      3
    Purpose of study                                           6
    Organization of report                                     7

**SECTION ONE – A REVIEW OF THE LITERATURE**                        9
    Profiling across the country                               9
    Kansas studies                                            11
    Existing data collection                                  13
    Qualitative data                                          14

**SECTION TWO – METHODOLOGY**                                      16
    Participant selection                                     16
        Criterion sampling                                   17
        Advertising                                          17
        Participant screening                                17
        Snowball sampling                                    18
    Participants and Setting                                  18
    Treatment of data                                        20
    Trustworthiness (validity) of data                       22
        Member checks                                        22
        Triangulation                                        23
        Thick rich descriptions                              23

**SECTION THREE – RESULTS**                                        24
    Theme 1: Emotional/Affective                             25
    Theme 2: Symbolic vehicle                                34
    Theme 3: Nature of the violation                         38
    Theme 4: Officer demeanor                                43
    Theme 5: Normative experiences                           47
    Theme 6: Race and place                                  48
    Weaker emerging theme                                    52
        Feeling compelled                                    53
    Unifying experience                                      53

**Attachment D**

**TABLE OF CONTENTS**
**Continued**

**SECTION FOUR – CONCLUSIONS**                     55
   Global conclusions                              56
   Implications for practice                       57
   Emerging questions and future research          58

**REFERENCES**                                     59

**CASES CITED**                                    61

**Attachment D**

**LIST OF TABLES**

**TABLE**                                                                 **PAGE**

Table 1:  Interviews and focus groups – African American participants        19

Table 2:  Interviews and focus groups – Hispanic participants                19

Table 3:  Interview – Asian participant                                      19

Table 4:  Participant representation by city                                 20

Table 5:  Common themes and their associated meanings                        25

Table 6:  Stop and citation information as reported by participants           40

Table 7:  Search details                                                     53

Table 8:  Unifying experience of perceived racial profiling                  54

**Attachment D**

## LIST OF FIGURES

| FIGURE | PAGE |
|---|---|
| Figure 1:  Participant selection protocol | 16 |
| Figure 2:  Race and place model as constructed by participants | 52 |

**Attachment D**

## ACKNOWLEDGMENTS

First of all, my sincere thank you to the Kansas Department of Transportation and the Governor's Task Force on Racial Profiling for funding this research. The State of Kansas is to be commended for their ongoing efforts to investigate the troublesome and complex dynamics of racial profiling.

I am most appreciative of the many community leaders who graciously assisted me in identifying key contacts for this research. While it is not possible to thank everyone, I am particularly grateful to Ford County Sheriff, Dean Bush, and Marilyn Treto, Dodge City resident and Human Resources Director for National Beef. They both opened the door to numerous contacts in Western Kansas.

In the Wichita area, a special thank you to James Barfield, Dra Aguilar, Juanita Blackmon – Justice Keepers, Trina Beasley, and Sergio Martinez who were all crucial in providing key contacts for this research. I would also like to thank Mario Quiroz, owner of Frida's Mexican Grill in Wichita, for hosting a focus group at his restaurant.

I am grateful to Bobby Wilkerson of the Topeka Human Rights Commission, and Bill Beachy of the Topeka Center for Peace and Justice. They were most helpful with suggestions for contacts in northeastern Kansas. I would also like to acknowledge Dr. Nathaniel Terrell of Emporia State University. He was instrumental in passing along several key contacts from the Emporia area. I extend special thanks to Demario Smith and Kristen Brewer of Newton who hosted a focus group in their wonderful home.

Last but not least, to the 87 minority citizens who participated in this study, I extend my sincerest gratitude. Thank you for the many hours of interviews, focus groups, electronic chats and phone conversations. I was your student for 17 months and I am deeply indebted to you. Thank you for helping me to understand.

Michael L. Birzer
Wichita, Kansas

**Attachment D**

## EXECUTIVE SUMMARY

The purpose of this study is to describe minority citizens' experiences with perceived racial profiling in 16 communities across the State of Kansas. The study employs a qualitative phenomenological research method. Qualitative phenomenological research is the study of lived experience. The aim of this study is not to confirm or disconfirm that racially profiling is or is not occurring. Rather, this study describes and puts into context how minority citizens' experience what they believe is racial profiling. The data consists of in-depth interviews, focus groups, written documents, telephone conversations, email communiqués, and electronic blog dialogue with carefully selected minority citizens.

In this study, 87 minority citizens who believe they were racially profiled by police authorities while driving in their automobiles were interviewed. Of these, the researcher conducted in-depth interviews with 65 participants (39 Black, 25 Hispanic, and 1 Asian) who describe a total of 91 stop incidents by the police for what they believed to be racial profiling. An additional 22 citizens (14 Black, 8 Hispanic) participated in four focus group sessions regarding their experiences with racial profiling in Kansas.

Of the 91 stops studied, 77 involve stops by local police department officers, 5 by county sheriff's deputies, and 9 by highway patrol authorities. All officers in these stops were reported as White with the exception of three who were Black. Furthermore, all officers were male, with the exception of one White female police officer.

The police requested consent to search participants' vehicles in 28 (31%) stops. Of these, 24 (86%) citizens gave police consent to search, and four refused to allow police to search. There was no evidence found in these 24 searches. In addition to these 28 requests to search, 12 searches were conducted by police incidental to an arrest. In three of these searches the police found small amounts of marijuana.

This study identified six dominant themes.

**Theme 1: Emotional/Affective**
Participants describe the emotions they experience as a result of being stopped by police authorities for what they believe to be based solely on their race. For many participants, the stops result in long term emotional distress. The participants spoke of the embarrassment of being stopped by the police. In some cases participants stood along the road while their cars were being searched by police resulting in a great deal of humiliation. Participants feel a sense of humiliation because they wholeheartedly believe the sole reason for their stop and detention was for driving while Black or Brown.

**Theme 2: Symbolic Vehicle**
In this theme participants describe how they believe police authorities hold stereotypical views about the type of vehicle that minority citizens drive. For example, participants say that if you are, for example, Black, and drive an expensive car, this will attract police suspicion because of the stereotypical views held by the police that the vehicle is too expensive for a minority citizen to drive.

**Attachment D**

Participants highlight that the make and model, along with the appearance of their vehicles, will attract police attention because it is perceived as a symbolic vehicle. Participants believe the police construct the "symbolic vehicle" based on stereotyping. The "symbolic vehicle" would include a number of factors, e.g., customization and apparel such as wheel rims, custom paint job, car that sits low to the ground (low rider), window tint, gold around the tag, tag film covers, and the like.

**Theme 3:  Nature of the Violation**

The data reveal that participants believe the police routinely use "petty" and "minor" traffic violations as a pre-text to stop them. Thirty-six (40%) of the stops were for what participants describe as being suspicious, just checking the driver out, or for tinted windows. Fourteen (15%) of the stops were for what participants describe as a cracked taillight or a defective brake light. Of the 91 stop incidents studied, 59 (65%) resulted in no traffic citation being issued. In 32 (35%) of the stops, a traffic citation or an equipment fix-it ticket was issued.

**Theme 4:  Officer Demeanor**

The police often "talk down" to participants. Participants reveal that during the stop the police treat them like criminals. Participants suggest that if the police are polite and communicate better with minority citizens, it will help to minimize negative perceptions of the police.

Participants reveal that it is common for police officers to delay advising them of the reason for the stop. Participants generally have to inquire several times of officers' why they are being stopped before being given a reason. Participants find this especially frustrating. Participants describe the officers' demeanor during a stop as accusatory, demeaning, impersonal, and often hesitant to give an immediate reason for the stop.

**Theme 5:  Normative Experience**

Many minority citizens accept racial profiling as a "normal" part of their lives. There is a pervasive feeling among participants that the chances of being stopped by police authorities simply because of their race or ethnicity is very real. While this feeling is widespread among all participants in this study, it was especially prevalent among Black male participants. Black male participants seemed to be much more troubled by their experiences.

**Theme 6:  Race and Place**

Participants believe there is a greater likelihood of being stopped in certain geographical areas. This theme is binary in nature. First, participants believe they are more likely to be stopped in predominately White and affluent neighborhoods. Many go out of their way and consciously avoid driving through some affluent White neighborhoods for fear of attracting police suspicion. Participants believe there is a perception among the police that if a minority citizen is driving through an affluent, predominately White Neighborhood, they are out of place. Second, participants feel a greater chance of being stopped in some economically disadvantaged neighborhoods including areas targeted by the police such as weed and seed areas.

**Unifying Experience**

The essential, invariant structure is the one unifying meaning of all the descriptions provided by the participants. The unifying experience of perceived racial profiling was derived

**Attachment D**

at by synthesizing the clusters of themes and their associated meanings, and then developing the overall description.

**Unifying Experience of Perceived Racial Profiling**

Incidents which participants believe they were racially profiled by police authorities often began with a heightened awareness of the police car presence. The police follow participants for great distances before stopping them. This results in increased anxiety on the part of participants. Participants were humiliated, helpless, embarrassed and frustrated, and the encounter with the police often left them angry and emotionally drained. In some cases the emotional affect lasts for a considerable time after the stop. Minority citizens believe the type of car they drive will result in increased police suspicion. For example, driving a customized car (rims, window tint, low rider, and/or flashy paint), or simply driving an expensive car such as a Mercedes, BMW or Lexus is perceived to attract greater police suspicion. Participants perceive that the police form a stereotype of the symbolic minority vehicle and use the traffic infraction as a pretext to stop them. The stop is most often described as a minor traffic infraction. During the stop participants say the police are demeaning and accusatory, asking many questions such as do you have any weapons or drugs on you? Where are you coming from? And where are you going? In many cases, the police do not give participants an immediate reason of why they are being stopped. Many ethnic and racial minorities learn not only through their own but others' experiences that their chances of being stopped by the police are greater when compared to White citizens. There is a normative expectation of being stopped. It is similar to a routine, always watchful for a police car and always mindful of the possibility of being stopped. Participants become conditioned to tolerate it and are reluctant to show emotion, or even to inquire about the reason for the stop because they do not want to make the situation worse. When police ask for consent to search participants' automobiles, many consent because they feel compelled, and if they refuse to consent to the search, it may make their situation worse.

**Conclusions**

- What is striking in this study is the dominant themes are the same regardless of the geographical area in Kansas. It did not matter where in Kansas that the participants experience what they believe to be racial profiling, they all had the same contextual experiences.

- This study illuminates stories of perceived racial profiling primarily from Black and Hispanic Citizens. There was one Asian male participant. When the data were analyzed paying specific attention to race and ethnicity, there were no contextual differences. The ethnic and minority groups represented in this study experience what they believe to be racial profiling in much the same way. The only minor difference is the case with Black males.

- Black males were much more structural in telling their stories, and they appear to be the most affected in terms of the emotional toll. While this is shared by Hispanic participants, it is much more pervasive among Black males.

**Attachment D**

- There is a belief among participants that police authorities often use traffic violations as a pre-text to stop them. Participants describe these pre-textual traffic violations as minor. There is agreement among participants that these same traffic violations are not enforced to the same extent among White drivers.

- Many participants alter their driving routine. Participants avoid areas where there is a greater chance of seeing police. Many participants alter their schedules and allow for additional time when they drive through some neighborhoods because of the possibility of being stopped by police.

- Participants point out that they themselves, or others they know, purposively drive bland looking cars in order to avoid attracting police attention.

- For a great many participants the emotional toll of being stopped by police for what they believe to be racial profiling is profound and lasts for long periods of time. The emotional toll culminates in a distrust of the police and/or reinforces previously held suspicions.

- Participants reveal when they are stopped for what they believe to be racial profiling they are often talked down to by the police. They describe the experience as demeaning, embarrassing, and accusatory. In many cases, the police do not give participants an immediate reason of why they are being stopped and participants have to ask several times.

- The potential of being stopped by the police has become a normative experience for participants. Participants describe this as routine. The data confirm a normative culture of sorts among minority citizens. The normative culture dictates to avoid the police, and if stopped, "don't give them a reason to make your situation worse."

**Attachment D**

# INTRODUCTION

**The Stories They Told**[1]

### *South Central Kansas*

Early one September morning, Richard, a Black male business owner in his 60s and lifelong resident of Wichita, was steering his newer model Mercedes Benz toward the train station in Newton, Kansas. His 88 year old mother and his sister had an early Amtrak to catch. Newton is a small Kansas community with a population of just over 18,000 citizens. Newton is home to the Amtrak rail which serves a good portion of Kansas. Despite the 3:00 a.m. time, the interior of the Mercedes was full of conversation. Richard's mother, sister and brother-in-law, all African Americans, were passengers in the car. Richard first saw the police car as he was turning onto the main street to drive the few remaining blocks to the train station. Richard recalls, "We made eye contact with each other as I turned the corner." It wasn't long that Richard noticed that the police car had turned around and was now following him. He remained aware of the following police car as he continued to travel toward the train station. Richard said, "I really didn't think too much about it at first but the longer he followed the more I thought that he was looking for a reason to stop me." After Richard pulled into the train station, parked, and began to off load his mother's and sister's luggage from the trunk, he noticed that the police car had pulled into a parking lot across the street and seemed to be watching him. Even though he had done nothing wrong, Richard worried that he may get stopped.

After seeing his mother and sister off safely, Richard along with his brother-in-law climbed back into the Mercedes to make the drive back home to Wichita. As he pulled the car back onto the road he noticed that the police car had pulled out of the parking lot and was again

---

[1] In order to preserve anonymity, participants were assigned pseudonyms. Furthermore, the names of law enforcement agencies and locations across Kansas are used sparingly to ensure anonymity of participants.

**Attachment D**

following him.  *What is going on?* he wondered.  Richard recalls paying close attention to his

driving as to not provoke the officer.  Richard's fear was soon realized.  Suddenly he saw the

illumination of red flashing lights in his rearview mirror.  Richard immediately eased the

Mercedes to the far right of the street and stopped.  A few seconds later two police officers were

at his windows, one on the passenger's side and one on the driver's side.

   "Can I see your driver's license?"  The officer at the driver's window said.

   "Why am I being stopped, officer?"  Richard said.

   "You are being stopped because you ran that stop sign back there," the officer said.

   "How am I going to run a stop sign when I knew you were following me?"  Richard said.

   "Do you have any drugs or weapons on you?"  The officer said.

Richard was outraged at the officer's question and yelled,

   "No I don't have any drugs or weapons on me."

   Richard wondered out loud if the officer asked every motorist if they have drugs or

weapons on them.  Richard said that one of the officers replied "that's a routine question, we ask

everyone that."

   The officer shined his flashlight illuminating the interior of the Mercedes.  Richard said

the officers then went back to the police car.  A few minutes passed and Richard noticed that two

more police cars pulled up.  The officers met behind Richard's Mercedes, he could hear them

talking.  *What's going on!* Richard thought.  Richard was detained for what he said was about 45

minutes.  He received a ticket for running the stop sign, and without further explanation was

released.  Richard told me, "I firmly believe I was stopped for being a Black man and driving an

expensive car at 3:00 a.m."  As an African American male, Richard was well aware that driving

an expensive car was enough to arouse police suspicion.  He said, "This is well known in the

**Attachment D**

African American community."  Richard said, "I know they made up the stop sign charge to have a reason to stop me hoping they would find something illegal.  They realized after they stopped me that they made a mistake and stopped a law abiding citizen."

The stop bothered Richard tremendously.  The next day, Richard drove back to Newton and filed a complaint with the chief of police.  To Richard's surprise, the chief furnished him with a copy of the police radio transmission of the stop.  What Richard heard in the transmission confirmed his belief that he had been racially profiled.  As Richard listened to the taped police transmission he hears one officer say to another, "I have a drug dealer that's just entered town." Another officer is heard saying, "Is that the one with deep tinted windows."  The radio transmission continues with an officer saying, "We have to stop that car."  Richard told me his windows had only factory tint and were legal.  He said the chief of police inspected the windows the day after the stop and concluded they were legal."  According to Richard, the officers in question were not disciplined and he ultimately ended up paying the traffic ticket.

### *Northeast Kansas*

Many miles to the northeast of Newton, Kansas, another citizen believed he was profiled because of his ethnicity.  It all began one late Saturday afternoon in April of 2001 when David, a 54 year old Hispanic male who holds a Ph.D. and works in the educational field began the 250 mile drive from Manhattan, Kansas to his home in western Kansas.  David recalled that it was a beautiful spring afternoon in northeastern Kansas as he drove out of Manhattan.  He was exhausted after spending the day sitting in class at Kansas State University where at the time he was studying for a doctorate.  In the passenger seat of his 1997 Chevy van sat his 17 year old son who he brought along for the company.  David was lost in conversation with his son when without warning he was alerted to red lights flashing in his rearview mirror.  David recalls that

3

**Attachment D**

the location must have been about 10 maybe 20 miles west of Manhattan on I-70.  He remembers

thinking to himself "*what have I done?*"  He pulled over to the shoulder of the highway and,

seconds later, a Kansas State Trooper appeared at the driver's side window.

"Can I see your license and proof of insurance?" the trooper said.

"Why am I being stopped?"  David said.

"You were going 10 miles over the speed limit."  The trooper said.

"I don't know if I was speeding, I was having a conversation with my son?" David said.

David gave the trooper his driver's license and proof of insurance.  David said what

happened next caught him completely off-guard.  The trooper asked him and his son to get out of

the van.  They complied at once with the trooper's request.  David remembers that the trooper

had his hand on his sidearm and was very unfriendly in his tone of voice.  The trooper directed

them to stand on the shoulder of the highway.  David recalled that the trooper walked around the

van glancing through the windows and then said, "Do you mind if I search your van?"  David

still not sure what was going on complied with the trooper's request and said, "You're welcome

to search but you're not going to find anything."  The trooper asked David to open the rear and

side doors and then began to search through the van.  David said the trooper never told him what

he was searching for.  David recalled that the trooper was not very friendly and didn't seem

interested in anything he (David) had to say.  After about 20 minutes the trooper gave him a

speeding ticket and said, "*You are free to go*."  David recalled:

> The whole thing was very demeaning because he had his hand on his gun, he was
> walking up to me and you know this man was making me feel guilty.  He made us get
> out, he checked the van, and he investigated everything.  I mean we were sitting by the
> highway and all that, and he reviewed us for everything even though we didn't do
> anything.  All we were doing around 4:00 o'clock in the afternoon - we were coming
> back from Manhattan after a daylong class.  I told him I was just coming back from class
> at K-state but he did not seem too interested in hearing what I had to say.  He just kept his

4

**Attachment D**

hand on his gun as he searched through the van.  He really made us feel like we were guilty of something.  It was very demeaning for me.  It made me very angry.

David is convinced that he was profiled because he is Hispanic.  He said the trooper probably thought he would find drugs or guns.

Richard's and David's stories are merely two of many this report illuminates, stories of minority citizens who believe they were racially profiled.  The researcher made great effort to carefully select the participants utilized in this study.  It is through carefully crafted interviews and focus groups, telephone conversations, written documents provided by participants, and electronic blogs and email communiqués that the researcher was able to construct the stories of participants who believe they were racially profiled by police authorities across the state of Kansas.  Each story was carefully studied and analyzed.

Racial profiling is generally defined as any police activity that relies on race, ethnicity, or national origin as the sole criteria for police scrutiny.  Kansas State Statute 22-4206 defines racial profiling as:

> The practice of a law enforcement officer or agency relying, as the sole factor, on race, ethnicity, national origin, gender or religious dress in selecting which individuals to subject to routine investigatory activities, or in deciding upon the scope and substance of law enforcement activity following the initial routine investigatory activity.  Racial profiling does not include reliance on such criteria in combination with other identifying factors when the law enforcement officer or agency is seeking to apprehend a specific suspect whose race, ethnicity, national origin, gender or religious dress is part of the description of the suspect.

Studies indicate that minority communities are less likely to hold favorable attitudes toward the police because of the perception of racial profiling (Harris, 2005; Russell, 1998).  One recent study found that 80 percent of Black citizens believed that racial profiling was pervasive in their own city and an alarming 90 percent believed that racial profiling was widespread in the United States.  Similarly, the same study found that 59 percent of Hispanic citizens believed that

**Attachment D**

racial profiling was pervasive in their city and 77 percent believed it was widespread across the United States. Only one-third of White citizens believed that racial profiling was pervasive in their city (Weitzer & Tuch, 2005).

What further exacerbates the allegations of racial profiling is police authorities themselves, for the most part, deny that they engage in racially biased police tactics. So this presents an irony of sorts. On the one hand a vast literature points out that many minority citizens say racial profiling occurs frequently in their communities, while on the other hand police authorities themselves deny these allegations.

One poignant problem that is not solved in the current studies giving attention to racial profiling is the lack of qualitative investigations that construct racial profiling from the worldview of the minority citizenry. Because research has shown a significant amount of minority citizens think that racial profiling occurs regularly in their communities, it is critical that researchers construct racial profiling from the lens of the minority community in an attempt to better understand this troubling phenomenon. The current study attempts to accomplish this goal.

**Purpose of Study**

The overall purpose of this study is to describe minority citizens' experiences with perceived racial profiling in selected communities across the State of Kansas. Specifically, data were collected in consideration of the following questions:

1. How do minority citizens experience what they believe to be racial profiling?

2. What are the common themes among minority citizens regarding their experiences with what they believe to be racial profiling?

3. What meanings do minority citizens ascribe to their experiences with what they believe to be racial profiling?

6

**Attachment D**

4. What is the unifying description of perceived racial profiling as experienced by minority citizens?

This study employs a qualitative phenomenological research method. The data consists of in-depth interviews, focus groups, written documents, telephone conversations, email communiqués, and electronic blog dialogue with carefully selected minority citizens who believe they have been racially profiled by police authorities. The aim of this study is not to confirm or disconfirm that racially profiling is or is not occurring. Rather, this study describes and puts into context how minority citizens' experience what they believe is racial profiling. Many studies simply report anecdotal accounts of perceived racial profiling without subjecting the data to systematic qualitative analysis in order to discern what the data in fact means. If researchers can construct in a scientifically defensible manner how minority citizens experience what they believe to be racial profiling, police authorities may be in a better position to craft effective solutions through policy and training mandates, as well as through community education strategies.

**Organization of Report**

This report is divided into four sections. Section one provides a brief summary of the literature giving attention to racial profiling. Section one also discusses the existing data collection methods (primarily police stop data) and discusses shortcomings of these methods in constructing a holistic portrait of racial profiling from minority citizenry perspective.

In section two the researcher describes the research methodology used in the study. This discussion includes how participants were selected, the nature of the data, the specific analysis strategy used, and the strategy the researcher employed to establish the validity of the data.

Section three presents the results. This section is rich with descriptions of how minority citizens across the State of Kansas experienced what they believe to be racial profiling by police

**Attachment D**

authorities.  Moreover, this section discusses the dominant themes and their associated meanings that emerged from the data, and presents the unifying description of racial profiling as experienced by minority citizens.

The final section, section four, discusses the conclusions as well as the implications that the research presents for fundamental policy giving attention to racial profiling.  This section provides a sketch of new guiding questions fleshed out from this research and how they might be best answered.

**Attachment D**

## SECTION ONE

### A REVIEW OF THE LITERATURE

The purpose of this section is three-fold. First, to discuss the studies that have found a disproportionality of minority motorists stopped by police authorities across the United States. Second, to review the predominate methods used to investigate racial profiling. Lastly, this section sheds light on why qualitative research designs such as the one used in this study are sorely needed in order to more fully understand this phenomenon.

**Profiling Across the Country**

For some time anecdotal reports suggest that many in the minority community believe that the police routinely stop and search them because of the color of their skin (Harris, 2002; Birzer & Smith-Mahdi, 2006). Such reports were often dismissed as isolated experiences of angry, overly sensitive, or disgruntled minority citizens. Recent national opinion polls found that a significant number of American citizens feel racial profiling is prevalent in our society. For example, a 2004 Gallup poll of citizens found a substantial proportion of Americans believe racial profiling is widespread. Fifty-three percent of those polled think the practice of stopping motorists because of their race or ethnicity is widespread (Carlton, 2004).

Several studies found that minority citizens are subjected to traffic stops and searches at disproportional rates. Antonovics and Knight (2004) reviewed vehicle search data from the Boston Police Department and found that more than 43 percent of all searches were of Black motorists even though they represented only 33 percent of the cars that were stopped by the police. One study in Ohio found that Black citizens were twice more likely to be stopped by the police than non-Blacks (Harris, 1999). In San Diego, Black and Hispanic drivers were found to be overrepresented in vehicle stops (Cordner, Williams, & Velasco, 2002).

**Attachment D**

Studies in Maryland found that 70 percent of the drivers stopped on Interstate 95 were African Americans, while according to an American Civil Liberties survey, only 17.5 percent of the traffic and speeders on that road were Black (Cole, 1999). Similarly, studies in New Jersey found that the state police routinely stopped a disproportionate amount of Black drivers. For example, the *State v. Pedro Soto* (1996) case involved consolidated motions to suppress evidence under the equal protection and due process clauses of the Fourteenth Amendment. Seventeen defendants of African ancestry claimed that their arrests on the New Jersey Turnpike between 1988 and 1991 resulted from discriminatory enforcement of the traffic laws by the New Jersey State Police.

In the New Jersey case researchers employed a windshield survey. This entailed stationing observers by the side of the road in randomly selected periods of seventy-five minutes from 8:00 a.m. to 8:00 p.m. with the objective to count the number of cars and the race of the occupants. It was determined by the windshield survey that out of 40,000 New Jersey turnpike drivers that were observed, 13.5 percent were Black motorists. A violator survey was also employed. The violator survey was conducted over ten sessions in four days between exits one and three on the New Jersey Turnpike. Researchers traveled with the cruise control calibrated and set at fifty-five miles per hour (five miles per hour over the legal speed limit). Researchers observed and recorded the number of vehicles that passed them, the number of vehicles they passed, the race of the driver, and whether the driver was speeding. Fifteen percent of the violators were Black; however, they made up more than 46 percent of the drivers stopped by the New Jersey State Police, a disparity of more than three to one. The Court found the defendants to have established a prima facie case of selective enforcement. The Courts finding resulted in suppression of all contraband and evidence seized.

10

## Attachment D

In *Fuchilla v. Layman* (1988) the Court found that in the New Jersey State Police agency, profiling drivers based on the color of their skin was tolerated and in some ways encouraged at the highest levels of the state police. Subsequently, in 2005 the State of New Jersey passed legislation to prohibit racial profiling and required every police officer within its borders to undergo intensive instruction on profiling and protecting citizens' rights. Moreover, the New Jersey legislature passed legislation which made racial profiling a criminal offense.

Disparate police stops were also discovered in Florida. On a stretch of Interstate 95 in Florida, known for being a drug trafficking route, Blacks and Latinos comprised only 5 percent of drivers, but accounted for 70 percent of those stopped by members of the highway patrol. Only nine drivers out of the 1,100 stopped during the study, were ticketed for a violation, let alone arrested for possession of illegal contraband (Wise, 2005).

**Kansas Studies**

According to the Kansas Attorney's General Office, in 2009 there were 64 *citizen initiated reports* of racial profiling across Kansas (this does not include officer initiated reports). Of these reports, 54 were unfounded, 5 cases are currently ongoing or pending, 3 cases were resolved, and there was no investigation in 2 cases. These two cases were subsequently closed.

In 2002, the Wichita Police Department released the results of the Wichita Stop Study. The police department commissioned a professor from Wichita State University (Dr. Brian Withrow) to analyze police stop data. The purpose the study was to describe the routine enforcement and/or public service activities of the Wichita Police Department. Stop data was collected by the police department from January 2001 through July 2001. In all, data from 37,454 police stops were analyzed.

11

**Attachment D**

The Wichita Stop Study concluded that Black citizens were stopped at disproportionally higher rates than White, Asian, Native American, and Hispanic citizens in Wichita. Moreover, Black and Hispanic citizens were searched and arrested at disproportionally higher rates than they were represented in the community. Using powerful multivariate statistical analyses, Dr. Withrow concluded that citizens stopped during the nighttime hours at the police officer's discretion and in the company of other citizens, were more likely to be Black. However, it's important to point out that a determination could not be made in regards to how much, if any, of the disparities were based on racial or ethnic prejudice.

In 2004, the Wichita Police Department commissioned Professor Withrow to replicate the 2001 study. Data in the follow-up study included 25,418 police/citizens contacts. Again, similar to the 2001 study, Professor Withrow found that Black citizens were stopped at a higher proportion than they were represented in the population (18.6 percent to 11.4 percent). No other racial or ethnic group was similarly overrepresented. However, the number of Black citizens stopped by Wichita Police Officers had actually decreased from 20.7 percent in 2001 to 18.6 percent in 2004. According to Withrow's report this was in part attributed to the Wichita Police Department's effective administrative responses to racial profiling.

In 2003, the Police Foundation was awarded a grant by the by the State of Kansas to study racial profiling within the state's geographical borders. The purpose of the Police Foundation's study was to determine whether law enforcement agencies in the State of Kansas engage in racial profiling (Police Foundation, 2003). The police foundation's study represents a multijurisdictional assessment of racial profiling which examined ten different law enforcement agencies throughout Kansas. This study went a step further when compared to other studies, the researchers made comparisons between data collected from traffic stops and the appropriate

12

**Attachment D**

benchmark of the motoring population in various locations.  In short, the study included ten

agencies (Maysville, Osage County, Park City, Emporia, Hutchinson, Olathe, Kansas City,

Kansas Highway Patrol, Overland Park, and Wichita).  Three of the ten agencies were later

omitted from the study due to a lack of appropriate data.  According to the report, "the findings

from the remaining seven jurisdictions provided ample evidence of the patterns of profiling in

the State of Kansas" (Police Foundation, 2003, p. 2).  The report went on to note that several

agencies had or were in the process of taking proactive steps to collect data and address

disproportionate stop patterns.

**Existing Data Collection**

In response to allegations of racial profiling, many jurisdictions have begun to track

information about those who are stopped, searched, ticketed, and/or arrested by police

authorities.  The logic behind the collection of police stop data is to provide tangible numbers

that will enable police and community leaders to better understand their policing activities.  With

this understanding, it is thought that police agencies will be able to examine and revamp policing

strategies based on effectiveness, reconfigure deployment of police resources, and/or take other

necessary measures.  Data collection includes not only the collection of the police stop numbers,

but also an objective analysis of the data, which is often done through a partnership between the

police department and outside experts.

Data collection has the potential to allow researchers and police authorities to gauge the

proportionality of traffic stops based on racial factors.  However, it is important to note there are

some inherent shortcomings to the collection of police stop data.

- Simply collecting stop data alone may do little to assist law enforcement agencies in
  answering questions about its practices.  For example, collecting police stop data
  primarily serves to document whether minority citizens are disproportionally stopped
  which doesn't conclusively prove that the agency engages in racially biased practices.

13

**Attachment D**

- The law enforcement agency must arrange for the analysis and interpretation of what the data means. The analysis process may lead to more questions than answers which can be frustrating for both the police and the community.

- One other potential problem is if law enforcement officers believe they are being monitored, they may disengage from police activity. In other words officers would selectively reduce their traffic stops in order to avoid any behavior which might be perceived as racially biased and this may impact public safety.

- Data collection also possess and array of fiscal dilemmas for the law enforcement agency which center on up-front costs for establishing a data collection system, as well as ongoing costs for data entry and analysis.

- One other potential shortcoming is data collection systems rely on police officers themselves to accurately report the data from their stops.

While the collection of police stop data is important in order to provide insight into stop disparities in regards to race and ethnicity, there are often too many complex variables to make a prima facie case of racial profiling solely based on these data, thus, other data collection strategies should be considered. Precise benchmarking must be carefully designed similar to the Police Foundation's study discussed above in order to make sense of the data.

**Qualitative Data**

One problem with the existing investigations of racial profiling is that they fail to capture how perceived racial profiling is experienced by the citizenry. It is increasingly recognized that researchers must move beyond simply the collection and analysis of police stop data to include other methodological strategies. Consequently, there is an increasing recognition of the importance of qualitative research methods in the investigation of racial profiling (Engel, Klahm, & Tillyer, 2010; Glover, 2009; Gumbhir, 2007).

Qualitative research methods seek to explore and understand a phenomenon, and to make sense of a person's or group's reality or perceptions of an issue. It attempts to discover and understand why people feel a certain way about an issue or phenomenon. Qualitative research is

14

**Attachment D**

concerned with the process of how something occurs and not just merely the outcome. An important objective of qualitative research is to gain an understanding of how people make sense of their lives, experiences, and their realties. This may include directly asking questions of persons who have experienced a phenomenon, or it may involve the researcher committing lengthy time in the field observing social behavior or in some cases actually participating in the phenomenon.

In qualitative research the results are trends, patterns or themes described in words. A qualitative research strategy is used in this study with the objective to understand racial profiling from the perspectives of those citizens who say they have experienced it. It goes beyond the simple reporting of anecdotal accounts of racial profiling by analyzing the data in a logical and systematic manner, and concludes with dominant patterns and themes.

15

**Attachment D**

<u>**SECTION TWO**</u>

**METHODOLOGY**

This study employed a qualitative phenomenological method.  Qualitative phenomenological research is the study of lived experience and attempts to gain a deeper understanding of the nature and meaning of our experiences (Van Manen, 1990).  A phenomenological strategy was selected for this study in order to capture the essence of how minority citizens interpret, process, and experience racial profiling.  Phenomenological studies are useful when the researcher is interested in discerning the lived experiences and perceptions of a phenomenon among a specific person or group (Creswell, 2007).  Based on in-depth interviews and other data sources, the objective is to identify what is perceived to be the central underlying meaning of the descriptions provided by the participants.  In other words, the aim is to describe as accurately as possible the phenomenon, reframing from any pre-given framework, but remaining true to the facts.

**Participant Selection**

Figure 1:  Participant Selection Protocol



**Attachment D**

### *Criterion Sampling*

In selecting participants for this study, the researcher employed two types of sampling strategies. The first sampling strategy used was the criterion. Criterion sampling works well when the individuals that are studied represent people who have experienced the phenomenon (Creswell, 2007). Specifically, the requirements were:

- Participants be a member of a racial or ethnic minority group - 18 years of age or older
- Participants experienced what they believed to be racial profiling by police authorities while driving in Kansas preferably within the past five years (in some cases the five year time limit was waived due to the rich context a participant's story).

### *Advertising*

Participants were solicited using electronic advertisements, Facebook, electronic blogs, newspaper advertisements (specifically, newspaper publications that have a minority readership, e.g., the Community Voice, The Kansas City Call, etc.). To assist in soliciting participants, the researcher employed the assistance of countless community leaders, law enforcement leaders, NAACP, the Topeka Human Rights Commission, the Kansas Human Rights Commission, Topeka Center for Peace and Justice, The Sunflower Action League and several other organizations. Additionally, the researcher made use of several graduate assistants and students at Wichita State University to help get the word out about the study.

### *Participant Screening*

When a potential participant contacted the researcher, a basic phone screening was conducted to ensure that she/he fit the criteria for the study. The researcher was meticulous to screen out persons who were involved in criminal activity at the time of their perceived racial profiling, as well as those persons who in the judgment of the researcher, merely had an "axe to grind" with police authorities. For example, on one occasion the researcher received a telephone

**Attachment D**

call from a citizen who said that he had been racially profiled by the police. Upon further screening it was discovered that the person had been involved in a hit and run accident and was subsequently arrested. The researcher did not use data from this interview screening. On many occasions potential participants contacted the researcher to simply complain about how they were treated by the police in various situations. After concluding they did not fit the criteria for the study, these persons were advised that they should contact the internal investigation unit or the law enforcement executive in the specific jurisdiction.

### *Snowball Sampling*

The research also employed a snowball sampling strategy. This is a sampling technique where the researcher asked the participants interviewed to identify others that might be willing to participate in the study. For example, after a participant was interviewed, the researcher inquired of them if they knew of other potential participants who believe they have been racially profiled and may agree to an interview. About 57 participants were identified using a snowball sampling strategy and the other 30 participants contacted the researcher as the result of seeing an advertisement or hearing about the study.

## Participants and Setting

There were a total of 87 citizens that participated in this study. Sixty-five (65) citizens were interviewed about their experiences with perceived racial profiling and 22 citizens were divided up and participated in four separate focus group sessions. Focus groups were used for two primary reasons: (1) to promote self-disclosure and dialogue among participants regarding racial profiling; and (2), to discuss themes and their associated meanings that were fleshed out of individual interviews with participants.

18

## Attachment D

Recall that 65 participants agreed to in-depth interviews regarding their experiences with perceived racial profiling by police authorizes. Each interview ranged from 20 minutes to 2 hours in length. Each focus group lasted 90 minutes. Many participants were interviewed on multiple occasions over several months. Of the 65 participants interviewed, 39 were Black (27 males and 12 females), 25 were Hispanic (15 males and 10 females), and one participant was an Asian male. Of the 23 participants who were selected to participate in focus group sessions, 14 were Black (9 males and 5 females), and 8 were Hispanic (4 males and 4 females). Collectively, the average age of participants was 38, and their ages ranged from 18 to 68.

Table 1:  Interviews and Focus Groups – African American Participants

| Participant Race/Ethnicity | Interviewed | Focus Group | Total |
|---|---|---|---|
| African American Male | 27 | 9 | 36 |
| African American Female | 12 | 5 | 17 |
| **Total** | 39 | 14 | 53 |

Table 2:  Interviews and Focus Groups – Hispanic Participants

| Participant Race/Ethnicity | Interviewed | Focus Group | Total |
|---|---|---|---|
| Hispanic Male | 15 | 4 | 19 |
| Hispanic Female | 10 | 4 | 14 |
| **Total** | 25 | 8 | 33 |

Table 3:  Interviews and Focus Groups – Asian Participant

| Participant Race/Ethnicity | Interviewed | Focus Group | Total |
|---|---|---|---|
| Asian Male | 1 | 0 | 1 |
| **Total** | 1 | 0 | 1 |

**Attachment D**

The participants represented a large cross section of occupations. For example, a parole officer, a corrections officer, a high-ranking school administrator, several teachers, numerous business owners, a retired corporate executive, college students, several ministers, numerous laborers, youth and substance abuse counselors, one security guard, one banking employee, several health professionals, social workers, several unemployed citizens and the like were interviewed. Data were collected over a 17 month period from August 2009 through December 2010. As table 4 depicts, participants were interviewed regarding their experiences with what they believe to be racial profiling from 16 communities across Kansas.

Table 4:
Participant Representation by City

| City | Location Reference |
|------|--------------------|
| Dodge City | 154 miles west of Wichita |
| Emporia | 88 miles east of Wichita |
| Florence | 29 miles northwest of Newton |
| Great Bend | 118 miles northwest of Wichita |
| Hesston | 48 miles north of Wichita |
| Kansas City | 62 miles east of Topeka |
| Leawood | 5 miles east of Overland Park |
| Liberal | 83 miles southwest of Dodge City |
| Maize | 14 miles northwest of Wichita |
| Manhattan | 58 miles northwest of Topeka |
| Mulvane | 17 miles south of Wichita |
| Newton | 27 miles north of Wichita |
| Overland Park | 13 miles south and west of Kansas City, KS. |
| Spearville | 17 miles northeast of Dodge City |
| Topeka | 59 miles east of Emporia |
| Wichita | 30 miles north of Oklahoma state line (I-35) |

**Treatment of Data**

Qualitative phenomenological methods recognize and seek to describe the intrinsic relation of the person to the subject matter. The data analysis technique used in this study was adapted and modified from the one discussed in Moustakas (1994). A qualitative data analysis

20

**Attachment D**

program (NVivo version 8) was used to assist the researcher in organizing, sorting and analyzing

the data.  The raw data in this study included transcriptions from interviews and focus groups,

audio recordings of interviews and focus groups, interview memos and analytical memos

prepared by the researcher after each interview and focus group, electronic dialogue with

participants, written records provided by participants' (e.g., copies of official complaints that

were filed with organizations such as the Kansas Human Rights Commission, and the Topeka

Human Rights Commission).  Data analysis was carried out using a six step process as follows:



**Step 1:** Once data collection was completed, the transcripts, interview memos and all other written material were read in order to first ensure that they contained adequate data to be useful in the analysis.

**Step 2:** The data were then examined and relevant information separated from irrelevant information.  All relevant information was broken into small segments of significant statements that each reflected a single, specific thought.

**Step 3:** The significant statements were then carefully re-read and overlapping and repetitive statements were eliminated.

**Step 4:** The segments were then grouped into meanings that depict what participants described as racial profiling.

**Step 5:** Clusters of themes were organized from the formulated meanings.  Specifically, the data were examined and the various ways considered in which racial profiling was experienced by participants, and these were clustered into themes.  The objective in this stage of the analysis was to allow for the emergence of themes common to all the participants descriptions.

**Step 6:** In the final step of the analysis, the clusters of themes were used to develop an overall description.  The overall description is referred to as the essential, invariant structure.  The essential, invariant structure describes the one unifying meaning of all the descriptions provided by the participants.

## Attachment D

**Trustworthiness (Validity) of Data**

One of the central concerns in any qualitative study centers on did the researcher get it right. In other words, can the data be trusted and confirmed? In order to establish the trustworthiness of the data, I used member checks, triangulation, and rich, thick description. Trustworthiness was also supported by my overall responsibility to analyze the data, identify significant statements, form common themes, and to construct an overall experience.

### *Member Checks.*

Member checks is a strategy which the researcher solicits the participants' view of the data in order to verify the study's findings. Member checks were initiated early and often in this study, and were ongoing until the study was completed. Specifically, participants were furnished with a copy of the themes, significant statements, associated meanings, unifying description, conclusions of the study, and were asked to analyze and provide feedback. Many participants revealed that they had not really thought about their experience using the same terminology used by the researcher, but their experiences were accurately described. For example, one participant wrote to me in an email communiqué verbatim: "Thanks Professor Birzer, you really named this right. I started to cry just reading it, as if it was my own reaction. This is absolutely on the point." Several participants suggested additional themes that should be investigated and provided comments to enhance the accuracy of the study. The majority of their suggestions were incorporated into the final report. I also furnished a copy of excerpts from interview transcripts and memos that are integrated into this report, and asked participants to verify their accuracy. In the end, the findings were validated and endorsed by participants.

## Attachment D

### *Triangulation*

Triangulation strategies typically make use of multiple data sources, and/or investigators to provide collaborating evidence. When using triangulation, "researchers search for convergence among multiple or different sources of information to form themes or categories in a study" (Creswell & Miller, 2000, p. 126). Multiple data sources were used including in-depth interviews, focus groups, written documents, email communication, and electronic blogs.

#### *Rich, Thick Descriptions.*

The researcher used rich, thick descriptions provided by the participants to illustrate how they experienced and ascribed meaning to perceived racial profiling. This is the process where participants described their experiences in-depth. These descriptions were taken verbatim from the participants and were used to support thematic categories.

**Attachment D**

## SECTION THREE

### RESULTS

After interviewing and conducting focus groups with the 87 participants, the researcher reached data saturation and stopped collecting data.  Data saturation is the point in the research when the additional collected data becomes redundant.  The researcher recognized the data to be complete and fairly well integrated.  Furthermore, the research questions appeared to be addressed.

After the transcripts, memos, and other documentation were carefully read and recorded, 370 significant statements which described participants experiences with racial profiling were extracted from the raw data.  From these 370 significant statements, 257 were taken out because they were repetitive and/or overlapping.  This left 113 significant statements that were coded for use in the analysis.  These 113 significant statements were subsequently clustered to form six dominant thematic categories.  These six themes reveal a great deal about how participants experience what they believe to be racially profiling.  I have extracted the richest statements and narratives from the transcripts and interview memos in order to illuminate, support, and give meaning to these themes.  Table 5 depicts the six dominant themes and their associated formulated meanings.

24

## Attachment D

Table 5:
Common Themes with their Associated Meanings

| Common Themes | Associated Formulated Meanings |
|---|---|
| Emotional/Affective | Embarrassment<br>Heightened alertness upon seeing police<br>Increased anxiety<br>Anticipation of being stopped<br>Frustration<br>Anger<br>Fear<br>Helplessness<br>Lasting emotional trauma |
| Symbolic Vehicle | Driving an expensive car<br>Customized apparel<br>(rims, paint, window tint)<br>Driving older model car with customized<br>apparel referred to as a "Hoopty") |
| Nature of the violation | Perceived minor traffic violation<br>Pretextual stop |
| Officer Demeanor | Ambiguous about why being stopped<br>Accusatory<br>Demeaning<br>Impersonal |
| Normative Experience | Accustomed to being stopped<br>A part of life in minority community<br>Routine |
| Race and Place | Driving in affluent White neighborhoods<br>Driving in police targeted areas<br>Driving in economically disadvantaged areas |

## Theme 1: Emotional/Affective

In this theme, participants reveal much about their emotional experiences as a result of being stopped by the police for what they believe to be based solely on their race. For many, these emotions had a lasting impact. Some participants began to sob as they struggled to tell

25

**Attachment D**

their stories.  This theme carried with it several associated meanings to include, embarrassment, heightened alertness upon seeing police, increased anxiety, anticipation of being stopped, frustration, anger, a sense of helplessness, and lasting emotional trauma.

The participants spoke of the embarrassment of being stopped by the police.  They told stories of being made to stand alongside of the street while their vehicles were being searched. They spoke of the humiliation of having other motorists staring as they drove past.  Finally, participants felt a sense of embarrassment because they firmly believed that they did not do anything wrong, and that the sole reason they were stopped was for driving while Black or Brown.  This seemed to be exacerbated by the reason for the stop (e.g., cracked windshield, fail to use turn signal within 100 feet of an intersection, cracked brake light, tinted windows, etc.). There was a pervasive feeling among participants that the police use, for example, a pretext such as a cracked windshield as a reason to stop them, when the real underlying motive may be that they suspect other criminality which according to participants is perpetuated by race, appearance, type of car, and/or geographical area.  In order to cope, many participants said they purposively avoid driving in areas where there is a high probability that the police will be present.

Listen to how some of the participants describe the feeling of embarrassment and humiliation when stopped by the police.  The following descriptions were taken verbatim from the taped transcripts, interview memos, and written reports furnished to me by the participants.

Sharla, a Black female in her early 40s with a graduate degree and employed as a parole officer, recalls one memorable encounter that she and her family had with the police.  Sharla and her family were stopped one summer morning at about 12:30a.m.  They had been playing cards at a friend's home and as they were driving back to their home they were stopped by the police. During the encounter, she questions the treatment her family received by the police.  Sharla's

26

**Attachment D**

husband was driving a 1987 Cadillac which he takes great pride in keeping the car in pristine condition. Sharla was sitting in the front passenger seat, and two of their friends along with their toddler grandson were sitting in the backseat. All were Black with the exception of the grandson who Sharla described as bi-racial. Listen to Sharla tell the story.

> My husband was driving and we noticed the police were following us for a long time. The police officer signaled his red lights and we heard the siren and we pulled over. He walked up to the car and asked for my husband's driver's license. My husband gave him the license. He [the officer] then asked where we were headed to. My husband said, well why do you need to know, why did you pull me over? Then the officer said do you have your registration? So my husband pulls it out and gives it to him. My husband asked the officer again why we were being stopped. And then my husband asked, "What did I do wrong?" The officer was like just stay right here, as if we were going to go somewhere. So he goes back to his car and he never told us what he stopped us for. Finally he walked back to our car and we noticed two other police cars drive up and I was like what the hell, what's going on? So he comes back to the car. Now I begin to question him and was asking like what is the problem? He says well your car is reported stolen. We were like what! What are you talking about! So then he tells us we need to get out of the car, first he tells my husband to step out of the car. So my husband steps out of the car and he [the police officer] says well I'm going to have everybody step out of the car.

> By this time there were five other police cars that had driven up, so there were a total of like seven police officers. So he asks my husband to step back, does his procedure and asks him if he can search the vehicle. I started talking then and said no, why do you need to search our vehicle? If it was reported stolen why are you searching the vehicle? And I want to know who made the report? So then he says, well ma'am, I'm not addressing you and you need to be quiet. I said No, I will not be quiet. This car is registered to us - you see who it is registered to, my husband. The owner is driving the car so how can it be stolen. The officer got really upset with me because I was arguing with him and asking him questions. He said that I was being argumentative and that if I did not shut up he was going to put me in the back of the police car. So now my husband is angry because he [the officer] just threatened to put me in the police car for trying to find out what's going on. My husband started yelling that you just pulled us over because we are Black. After several more minutes it was over, all of sudden the officer said we could get back in our car and were free to leave. We did not even get an apology. As we were walking back to our car one of the officers said, I suppose you are one of the ones that are going to say we racially profiled you too. We just got back in the car and got out of there.

> My husband drove right down to the substation to file a complaint. He told the supervisor that we don't appreciate this and my family was embarrassed, all these people were watching us and they just randomly picked us. My husband told the police

**Attachment D**

supervisor at the substation that he wanted to see the stolen car report.  They never did produce the report.

Sharla describes how embarrassing it was for her as a parole officer to be standing along-side of the road while police officers searched the car.  Sharla said, "There were cars driving by and slowing down to get a look."  She said, "We were all standing out on the side of the street at 12:30 a.m."  Sharla attributes it all to being Black and driving a nice looking car at 12:30 a.m.  A few days after the interview I received a follow-up email communication from Sharla.  She wrote that she forgot to mention that after the stop, "they did not receive a ticket."  She also related that "they [the police] never knew I was a parole officer until they asked for my driver's license and saw my badge."  Sharla writes verbatim in her email,

> They [the police] wanted to know what the badge was for and I told them I was a parole officer.  One of the officers must have recognized me and he told me that he asked me to issue a warrant over the phone a while back and he told the officer - the one that had stopped us, that that he remembered me from the parole office.

DeMarcus, a Black male in his late 20s, employed as a youth care worker, who is college educated with a master's degree, describes the embarrassment he felt when he and his wife and their small child were stopped while driving on a highway a mile or two north of Liberal, Kansas.  DeMarcus began the interview by telling me that even though he has never been in trouble or arrested, being stopped by the police is just "part of his world," he said, "I have just gotten used to it."

DeMarcus had flown into the Liberal airport from Albuquerque, New Mexico where he had been visiting family.  His wife (who is White) and their bi-racial daughter picked him up at the airport.  As they left the City of Liberal and began driving to their home located in central Kansas, they were stopped by a Kansas State Trooper.  DeMarcus describes the incident.

> We were on the highway just outside of Liberal, Kansas, we on our way home.  I saw the police car pass us going the opposite direction.  I noticed that he immediately made a U-

28

**Attachment D**

turn and started to follow us. He really followed us for a while, maybe a mile or two, and then stopped us. He was a young White trooper. He told me the reason he was stopping me was because I was following a semi-truck too close. I thought to myself what! He asked for my driver's license - and then with no explanation he asked me and my wife to get out the car. He separated us at opposite ends of the car. He started going back and forth between us asking us questions. It seemed like he was purposively trying to mix up our stories. He kept asking where we were coming from and where we were going and this and that. He kept asking the same questions over and over. My daughter was still in the back seat and she was scared.

After a while he asked me if he could search my car. I told him well you're not going to find anything in the car except my bag of clothing. He then said, where did you guys say you were coming from again, did you say you were from Texas? I was like no! I told you Albuquerque, and he was like are you sure you didn't say Texas. I said no I didn't tell you Texas. So he kept trying to use that line over and over again and he had us out there for a good 45 minutes. My wife started getting irritated. She told him this is against the law - you can't do this. He didn't say anything. Yeah, he searched and the first thing he went for was my bag. I have a big Nike duffle bag, big duffle bag for school and you know he's digging through clothes and shoes. You know he searched the car, let us go, and no ticket, not nothing…Even though you're like I don't want him to search my car because you're not going to find nothing…This whole thing made me feel bad, I was upset, it was just, you know, really embarrassing. I have learned not to argue with them [police] when I get stopped. If you do they make it hard on you. There is just not a dammed thing you can do about it.

DeMarcus believes the reason he was stopped was because the officer saw a Black male and White female driving along the highway and probably thought that they were drug smugglers. DeMarcus concluded that the trooper kept trying to trip them up on their story by saying, "are you sure you didn't say you were from Texas." DeMarcus is convinced that his race prompted the suspiciousness on the part of the trooper coupled with the fact that he was just leaving a rural and predominantly White community. DeMarcus said the officer used the pretext of following the semi-truck too close as the reason to stop him even though, according to DeMarcus "he [trooper] could probably care less about that charge." I asked DeMarcus about his seemingly without hesitation giving the trooper consent to search his car. DeMarcus replied, "Yeah, I found that by telling them no, it creates more of a headache. They get upset and they try to hold you longer. So it's kind of like something you just want to get it done and over with."

29

**Attachment D**

It is striking that DeMarcus justifies giving the trooper consent to search his car "to get it over and done with." This seems to portray a routine and seemingly normative response to law enforcement's request to search. This normative response was so compelling in this study that it became a dominant theme and will be discussed in detail later in this report.

DeMarcus explains, "it was embarrassing to be stopped like this and standing along the highway with my wife and little girl while he searched our car and asking if I had any guns or drugs in the car."

Jada, a Hispanic woman in her early 30s described it this way:

I was embarrassed that someone who knows me would drive by and see me standing along the street with the police searching my car. You know there must have been 4 or 5 police cars. You know that you haven't done anything and it hurt so badly and you can't do anything about it. You know what, this all boils down to being a Latina driving a customized car in America. You learn to expect this.

David, a 29 year old Hispanic manufacturing worker further illuminates this theme by explaining the embarrassment he felt when stopped by two police officers for a cracked taillight.

They kept asking me what gang I was in. I told him I have never been in a gang. They kept on asking me back to back questions. I was embarrassed because it was in the parking lot of where I work and all my friends were watching.

Of the many minority citizens that shared their stories with me, perhaps the following excerpt from the interview of Tony, a 60 year Black male who retired several years ago from a professional corporate management job, most effectively illustrates the "emotional/affective" theme. Tony seemed to struggle to tell me his story. He stopped several times during the interview to in order to regain his composure. It was clear to me after spending a considerable amount of time talking with Tony that his experience affected him deeply and emotionally. Although Tony's experience occurred about one year prior to the time I interviewed him, the

**Attachment D**

emotional scars from the incident remain fresh. He is convinced that authorities would have

handled the situation differently with a White person.

According to Tony, he was stopped by authorities because he looked suspicious. He was

not charged with a crime nor was he issued a citation. Tony does not live in Kansas but

frequently visits his elderly mother in who resides in Wichita. It was during one of these visits

when he says he was profiled because he is Black. Speaking in a measured tone, Tony recalls

the incident which sheds light on the embarrassment and humiliation he felt. As you will see

from the following excerpt, he specifically uses the words, embarrassment and humiliation to

describe how he felt.

> I have never been so embarrassed in my life. This was humiliating. I am 60 years old
> retired from middle management and this happened to me. I have never been stopped in
> my life until this incident. I drove to [location purposively taken out] to purchase a
> newspaper and a cup of coffee to start my day. Over the past year I have done this many
> times, it is part of my routine. I drove on this day only because I had a lot of running
> around to do during the day. I usually walk for daily exercise…Basically they
> approached me and asked what business I had there…I informed them that I was merely
> having my morning coffee and reading the newspaper…All of a sudden with no warning
> or provocation, the officer abruptly told me to stand up and put my hands behind my
> back. At this point I was just incredulous and couldn't believe what was happening. I
> was horrified and embarrassed because it was totally public humiliation being marched
> out of a public venue for no apparent reason and treated like a common criminal in view
> of others. I stood up and turned around complying totally with his unwarranted demands.
> At this point, I just couldn't believe what was happening to me. It was like I was having
> an out of body experience. In 60 years, I've never managed to get myself handcuffed.
> I've never been arrested. I've always been the consummate and quintessential lawful
> citizen. It was very degrading with the unwarranted abrupt treatment of being bullied and
> having my rights to public accommodations violated…As I was being led out, I remarked
> to the officer [name purposively taken out] that if I was of a different color, I am sure this
> matter would have been handled differently. He accused me of playing the race card…I
> complained about how embarrassed I was about being led out of a public place in
> handcuffs for no reason or cause. He [the officer] didn't seem to be too empathetic.

Tony was checked for warrants and was released without as much as a ticket. Tony said

the incident bothered him tremendously. Tony was a polished and articulate man. He very much

looked and exhibited the mannerisms of a corporate executive.

**Attachment D**

Many participants describe feeling increased anxiety while driving and seeing the presence of a police car. For example, one participant remarked, "I started driving really conscientiously when I saw the police car." Another participant, Javier, a Latino from Dodge City in his early 20s described it this way, "I noticed the officer pull a U-turn and start to follow me. When I first saw him I really got nervous and in the back of my mind I knew he was going to start following me."

Certainly, many drivers may experience increased anxiety regardless of race upon seeing a police car, but these data seem to suggest it has more significance for minority citizens. It appears to be even more profound for African American participants.

Participants reveal a defensive and cautious attitude upon seeing a police car. Participants were always alerted to the police presence and they would peer in their rearview mirror watching to see if the police car was going to start following them. Because research has pointed out that minority citizens often hold deeper suspicions of the police when compared to White citizens, this may in part explain the increased anxiety (Birzer, 2008; Birzer, & Smith-Mahdi, 2006; MacDonald, & Stokes, 2006; Parker, Onyekwuluje, & Murty, 1995).

Rodney, a college educated African American male in his late 20s provides further context to what many minority citizens experience while driving.

> For many of us, especially African American males we laugh and joke about it, but this is a serious matter. Whenever I drive past the police, I find myself getting nervous even though I've done nothing wrong. We get a scary feeling when driving past the police, even when we've done nothing wrong. There's something about driving past the police that makes you scared and it turns you into the perfect driver. Whenever I'm driving and I spot the police, I'm aware of where they're at. I'm constantly checking my mirrors to keep an eye on them. A lot of my Hispanic friends said that they too find themselves with the scary feeling whenever law enforcement presence is around. A lot of times, because we constantly check our mirror it makes us look suspicious and gives them a reason to pull us over. A lot of African American males tend to keep conversations to a minimum with law enforcement once they've been pulled over. The thinking behind this is if I'm quiet, I'll get off with a warning" and "if I express my emotions, I'm being

32

**Attachment D**

defiant." So for us, the anticipation of being stopped is very real. It's almost like you get accustomed to being pulled over, but no matter how many times you've been stopped the scary feeling inside of you still is there each and every time.

The sense of anxiety that participants described while driving and spotting a police car, led to the "anticipation of being stopped." There is a sub-conscious feeling among participants that they could be stopped. Rita, a Hispanic woman in her late 20s describes the anticipation of being stopped this way: "As I was driving, I saw the police officer sitting in the parking lot and I was mindful of his next potential move." One participant said this:

I saw him [the police officer] sitting in the parking lot and he starred at me as I drove by. I knew there was a good chance he would start following me. I was about maybe a block away and I saw him pull out and come in my direction. He followed me for about two more blocks and I remember thinking, OK he is going to stop me any minute. That's just a fact when you are Black and driving late at night.

Participants racially constructed the anticipation of being stopped. In other words, they believe that because they are members of a racial or ethnic group, they are more likely to get stopped by the police, thus they are at a heightened state of alert upon seeing a police car. One participant, Charles, a Black man in his 40s provided context for the racialization. During the interview with Charles, he described a past experience while driving in affluent and predominantly White neighborhoods.

If I notice an officer pass me going the opposite direction, I automatically look in my rearview mirror. I have had things happen like this in the past. This one time I saw an officer and I really got nervous and in the back of my mind I knew he was going to start following me, and he pulled a U-turn and did. You know I am a Black man driving in this area and you see a police car, what do you think is going to happen.

Participants often describe feeling frustrated and angry when stopped by the police for what they believe to be racial profiling. The frustration and anger is usually controlled by the participants because they know if they openly exhibit emotion, it will make matters worse.

## Attachment D

Many participants described a sense of helplessness, or as one participant put it, "there is not a damn thing I can do about it." One participant said,

> They [the police] always ask if they can search my car, they let me know that I have a choice. So I let them search because I know I had nothing to hide. I knew if said no, he would have called more officers and it would have been worse. You know there is nothing you can do, and you better not say anything or they will make it tough on you.

### Theme 2: Symbolic Vehicle

Participants describe the frustration and anger of being stopped for what they say is for stereotyping because of their race coupled with in some cases the type of car they drive. This was the case with Ana, a 34 year old college educated Hispanic female and former correctional officer now employed as an advocate for crime victims. Ana describes the anger and frustration she felt and how she questioned the officer's motive.

> I was driving a 1985 Cutlass Supreme low rider. It had gold plates. My family is in the business of customizing cars. My brother borrowed my car that day because he had a job out of town and my car got better gas mileage. My son had a doctor's appointment and I had to get him there. I asked my brother if I could use his car because my son needed medicine. He said, no sweat, take my Cutlass, we just painted it, but it's ready. My brother said to take his wife's tag and put it on the car. That tag had not been registered because they were restoring the car and they hadn't used it in forever.

Ana recalls that this was a onetime thing and that she just wanted "to get from point A to point B and back with no problems." She continues her story.

> The car had very expensive rims and sits low to the ground...I saw the sheriff's car traveling in front of me. I was behind him a little ways. I made a turn onto [location purposively taken out] and noticed that the sheriff's car made a U-turn and got behind me and started following me. Now I am a very good driver and I was thinking to myself that this can't be happening. I know from my friends that they will stop you if you're driving a low rider because they think you are just gang banging Mexicans. He followed me for a while, maybe a mile or so and then stopped me. By this time I was pretty upset about what was happening...When he came up to the car I told him you better have a good reason to stop me. He told me he was randomly running tags and that he ran my tag and it was not assigned to the vehicle. I remember thinking he is stopping me because I'm driving a low rider which they associate with Mexican gang members. I got upset and yelled at him. I was yelling that this is not a serious thing and why did you turn around and follow me in the first place. He told me to get out of the car because I was being

34

**Attachment D**

verbally aggressive. I kept on questioning him about why he turned around and started to follow me. He then grabbed me and forcibly pulled me from my car and handcuffed me. I remember that he searched me in front of his video camera. He searched my car and impounded it and he refused to let my brother pick it up. I think that he was maxing out his authority because I was so angry and not very cooperative with him. I asked if I could pull it into a parking lot and he said no. I know my actions might have made this worse, but I watched the whole thing play out and I knew what was going on. He turned around to follow me just because I am Hispanic driving a low rider. I was embarrassed that someone I know would see me standing alongside of the road in handcuffs. I lived in the area where I was stopped.

Ana believes she was profiled because of her Hispanic ethnicity coupled with the fact she was driving a customized Cutlass Supreme low rider. She said, "We were traveling westbound and there is no way he could get behind me unless he intentionally braked to do so. That's why I feel I was profiled."

In the symbolic vehicle theme, participants describe how they believe police authorities hold stereotypical beliefs about the type of vehicle that minority citizens drive as well as the appearance of their vehicles. For example, participants believe if you are, for example, Black, and driving an expensive car, this will attract increased police suspicion because of the belief that the vehicle is too expensive for a Black citizen to drive. One participant said, "They stopped me because I was Black and driving a nice car. They probably think I am not supposed to drive a nice car. If I was driving my Kia I would have never been stopped." Another participant, Michael, a Black male in his early 30s, is convinced he was stopped in a small central Kansas town by police and peppered with interrogating questions for simply being Black, and driving a newer model Mercedes. In another interview, Rick, a 28 year old Black male said, "You know, it was just the type of car I was driving." During the interview with Rick, it was revealed he was driving a 1995 Chevy caprice with customized rims and tinted windows. Another participant, Angela, who is a Black female in her early 50s, talked about being stopped by police authorities for driving a nice car.

35

**Attachment D**

...It's like they think you are not supposed to driving this nice car. It's like we are still in slavery. They never issue me a ticket so I think it had to be because I was Black and driving that nice Jaguar. You know the thing is that I never got a ticket. They would just check me out and let me go.

In a follow-up phone interview with Angela, she reported being stopped on many occasions while driving in her Jaguar. She reiterated that she not once received a traffic citation. In her own words:

They never issued me a traffic ticket so I think it had to be because of my race driving that car. If you are Black and driving a nice car you are going to get stopped by the police. I can tell you I drove a Kia for years and never got stopped. When I purchased the Jaguar, I swear to you I was stopped three times within a few weeks.

Participants highlight that the make and model along with the appearance of their car will attract police attention because it is perceived as the type of car a minority would drive. There is a belief that the police construct the "symbolic vehicle" based on stereotypes. According to participants, the "symbolic vehicle" would include customized apparel such as wheel rims, nice paint job, sits low to the ground (low rider), window tint, gold around the tag, etc. Participants believe the police associate certain cars with Black and Hispanic drivers. Cheryl, a Black female in her early 30s and employed as a beautician explains:

I drive a 1999 Cadillac with lavender paint. I got stopped and he never gave me a reason why he was stopping me. I had my sister in the car. He asked to search my car and I said no. I was not given a ticket and after I refused to let him search he let me go. I think the reason I was stopped was because I was driving a 1999 Cadillac with lavender paint and tinted windows. This is the kind of car they associate with a minority driver and that will get you stopped. It's almost like if you are a Black person you aren't supposed to be driving that nice of a car.

One other participant describes being stopped by the police because of the association of his ethnicity and the type of car he drives. As Albeto, a Hispanic male in his early 20s who works in the construction industry explains, he is stopped frequently because he believes police authorities associate the appearance of his car with criminality (gangs and drugs). Albeto

36

**Attachment D**

reveals, "I was driving a customized Cutlass Supreme. I think the officer was just sizing me up because I was driving this car, it sits low and they think these cars are associated with Mexican gangs." Another Black male participant describes his experience.

> I remember another time a police officer stopped me. I was walking into my apartment in Hesston. I think he must have been following me. He called me and said he heard that my license was suspended. My license was not suspended. I heard from a friend who knows some police officers in Hesston that they will stop you if you are Black and driving a car that fits what they call a drug dealers car. Maybe it's the rims, tinted windows or something like that. Even when I had the tinted windows on my car, I always drove with my windows down to avoid getting stopped. I had tint but you could still see through my windows.

An interview with Melvin, a Black man in his early 20s reveals it wasn't necessarily a customized car that resulted in him being stopped, but rather for driving an expensive car. Melvin was stopped for a turn signal violation. Here is how Melvin describes it:

> When the police officer walked toward my 2005 Cadillac CTS, he says is this your car? The officer didn't ask for my driver's license, instead he wanted my insurance. I think the reason for this is because he thought a young African American male can't drive a nice car. After he looked at my insurance, he then asked me for my driver's license. I thought it was fishy but being an African American sometimes you have to bite your tongue when it comes to certain situations.

Perhaps the story that most effectively illustrates the symbolic vehicle theme was one shared by Darryl, a 62 year old Black male who is employed as a custodian in Topeka. This story is especially salient because the officer interjects the symbolic gesture of race and ethnicity along with the symbolic vehicle into the context of the stop. Listen to how Darryl describes it verbatim.

> I was driving my Ford F-50 two-toned extended cab pick-up truck. I noticed the police officer driving in the opposite direction. As we passed each other, I noticed he looked directly at me and seemed to be surprised. It was kind of strange. I just had a feeling I would be stopped. I watched in my rear-view mirror and sure enough, he did a U-turn and turned on the red lights. I immediately pulled over and stopped…There were two White police officers in the police car. They approached on each side of the truck. He asked for my driver's license. I asked him why I was being stopped and he said for having tinted covers over my headlights. Now listen, you know this was at ten o'clock in

## Attachment D

the morning…I received a ticket for driving with covers over my headlights. I didn't realize this was even a violation because they're sold in just about every automotive store. As he was giving me the ticket he kind of looked my truck up and down and said your truck kind of looks like the kind of truck a Mexican would drive.

**Theme 3: Nature of the Violation**

Another dominant theme fleshed out of this study is one the researcher named "Nature of the Violation." In this theme, participants deconstructed the pre-textual basis of their being stopped by police authorities. In other words, participants revealed that the police routinely use, in their words, "petty" or "minor" traffic violations to stop and "harass them" because of their race.

The United States Supreme Court decided that pre-textual stops by police authorities are legally permissible. The Supreme Court in the 1996 decision *Whren v. United States* decided that the police can stop motorists and search their vehicles if probable cause exists that the occupants are, for example, trafficking illegal drugs or weapons. Under the Whren decision, police can stop motorists for a traffic violation even though the traffic violation may not be the underlying motive for the stop. Regardless of the legality of this police practice, participants feel that they are routinely stopped for "minor traffic offenses" and that the police often use these minor traffic offenses as a reason to profile them.

Participants reveal that in many of the stops by the police experienced over their lifetimes, often concluded without a traffic citation being issued. The irony here is many citizens may view this as a desirable outcome, but to minority citizens this seems to reinforce the racialized aspect of being stopped. The absence of a traffic citation seems to signal to minority citizens that their suspicions of a racially motivated stop are supported. Professor Karen Glover (2009) made note of this in her research on racial profiling. According to Professor Glover

**Attachment D**

(2009, p. 97), "The traffic stop, innocuous as it appears to some and especially when no citation is issued, is a micro-level occurrence that demonstrates the state's reach on a macro-level."

One Black male participant named Arnold is in his late 40s. Arnold is employed as a minister in Kansas City Missouri. He describes being stopped on at least six different occasions in a short period of time while driving through the eastern Kansas communities of Leawood and Overland Park. Arnold says he was not stopped for a traffic violation, but rather he was stopped, and just "checked out," in what he describes as "routine practice." Arnold travels from the Kansas City Missouri area to Overland Park frequently to pick up a White co-worker. Listen to how he describes his experiences.

> When they stopped me it wasn't even for a traffic violation, at least they never told me I violated any law, they just said they were checking me out. I never got a ticket. It was a routine. They would always ask where I was headed and where I was coming from. They asked for my license and proof of insurance. Sometimes they would ask if they could search my car. A couple of times I would get out, they would have me stand at the back of the car and they would search my car and have me open up the trunk… The older I get the more I just learn that it is easier just to let them do their thing so I can get on my way.

In 60 (65%) stops reported by participants, traffic citations were not issued. While on the other hand, in 32 (35%) stops resulted in a traffic citation or a fix-it ticket being issued. In 30 (35%) stops were for what participants described as "being suspicious" and/or for "tinted windows." See table 6 as follows.

Case 6:18-cv-01018-JWB   Document 174-23   Filed 01/14/20   Page 191 of 224

**Attachment D**

Table 6:
Stop and Citation Information as Reported by Participants

| Reported Reason for Stop | Number of Reports | Citation Issued: Yes | No |
|---|---|---|---|
| Suspicious | 15 | 3 | 12 |
| Tinted windows | 15 | 5 | 10 |
| Brake light out | 9 | 4 | 5 |
| Just checking you out | 6 | 0 | 6 |
| Cracked taillight | 5 | 1 | 4 |
| Driving in known drug area | 4 | 1 | 3 |
| Making a wide turn | 4 | 2 | 2 |
| Speeding | 4 | 2 | 2 |
| Tag not assigned to vehicle | 4 | 3 | 1 |
| Fail to use turn signal | 3 | 1 | 2 |
| Fail to stop at stop sign | 3 | 3 | |
| Expired tag | 2 | 2 | |
| Cracked windshield | 2 | 2 | |
| Check out tag | 2 | | 2 |
| Illegal lane change | 2 | 2 | |
| Defective Headlight | 2 | | 2 |
| Report of stolen vehicle | 1 | | 1 |
| Fit description of stolen vehicle | 1 | | 1 |
| Following too close | 1 | | 1 |
| Suspended driver's license (cleared at scene) | 1 | | 1 |
| Tinted covers on headlight | 1 | 1 | |
| Defective windshield wiper | 1 | | 1 |
| Fail to yield to emergency vehicle | 1 | | 1 |
| Inattentive driving | 1 | | 1 |
| Fail to signal 100 feet when making turn | 1 | | 1 |
| Fail to signal when pulling away from curb | 1 | | 1 |
| **Total** | **92** | **32** | **60** |

**Note: Citation category inclusive of written warnings and equipment fix-it tickets**

While in the final stages of preparing this report, DeMarcus, a 29 year old Black male participant who previously interviewed on several occasions called to report that he believed that he was racially profiled on December 2, 2010.  DeMarcus was interviewed the following day. The interview is highlighted here because it adds additional clarity and context to the "Nature of the Stop" theme.

**Attachment D**

DeMarcus was driving his nine year old daughter to school just before 9:00 a.m. in Newton. He was driving a 2001 model midnight blue Chevrolet Monte Carlo. He described the car as having tinted windows and customized chrome rims. DeMarcus saw the highway patrol car traveling in the same direction about 50 or so yards in front of him. For DeMarcus, what happened next reinforced that he was singled out and profiled based on his race. Listen to DeMarcus describe the stop:

> I was turning out of the parking lot and I saw the highway patrol car pass me. As soon as he passed I pulled out onto the road. He was in front of me about 50 yards. He then pulled over to the side of the road and waited for me to pass him. I went by him and then he pulled out and started to follow me. I thought to myself, what now. He followed me for a while. I think he was probably checking out my tags. Then he stopped me. I pulled over. I saw him walking up kind of cautiously to the passenger's side of the car and then he changes directions at the last minute and walks over to the driver's side of the car. He bent over to look into my car and I saw his hand on his gun. I remember thinking this is the same trooper that stopped me a few months back about tinted windows on my Caprice.

> Do you know why I pulled you over? the trooper said.

> No I Don't, DeMarcus said.

> Have you had your window tint checked out lately, the trooper said.

> No I haven't, DeMarcus said.

> That's why I am stopping you to check out your tinted windows, they look kind of dark, the trooper said.

> I will need to see you driver's license and proof of insurance. If you have your registration let me see that too, the trooper said.

> *DeMarcus hands the requested documents over to the trooper.*

> Just sit tight and let me check them out, the trooper said.

> How long will this take, I am taking my daughter to school and I don't want her to be late, DeMarcus said.

> I will get you out of here as soon as possible, the trooper said.

41

**Attachment D**

The trooper leaned over once more and peered into the car. After a few seconds he walked back to his patrol car and returned with the tint meter. DeMarcus continues,

> He told me my tint was too dark and he started to walk back to his patrol car. I said again that I was taking my daughter to school and did not want her to be late. He said I'll get you out of here as soon as possible. He went back to his car and he was back there for a while, he took his time. My daughter was 30 minutes late to school. He gave me a ticket for the window tint and told me that if I did not take care of it my license would be suspended. My thing is if he is going to pull me over for tint, then you have to stop and pull everyone over. I was so mad. I dropped my daughter off at school and went home and just sat there. I was really bothered by this. I called down to the courthouse and talked with someone in the traffic office. I asked her if she could tell me how many people this trooper has stopped for tinted windows. She told me she could not release that information but she could tell me that in the county [which has a population of about 33,675] there were 24 tickets issued for window tint so far this year.

As DeMarcus reflects back on the experience, he seems to have much emotion bottled up inside. He describes vividly as a youth growing up in Arizona, and seeing his mother stopped and her car searched because according to DeMarcus, she was simply Black and driving through an affluent White neighborhood. He recalls his mother being interrogated by the police about what she was doing in the area and then released without so much of a warning. DeMarcus recalls standing out alongside the road with his brothers and sisters as the police searched his mother's car.

DeMarcus told me his White friends who drive cars with tinted windows in the same community where he resides are never stopped by the police. He believes they are given a pass because they are White. He firmly believes that the police are attracted to the appearance of certain cars because they are associated with minority drivers. After the association is made, the police follow until the driver has committed a traffic violation. Recall that according to the participants, the police stop them based on a pre-text which they say is usually a minor traffic infraction.

**Attachment D**

Perhaps the irony of DeMarcus' story is something he said during the interview, "I tried to control my anger when he stopped me because I did not want my daughter to have a bad impression of the police." This is striking in light of his experiences with what he believes to be racial profiling, and along with seeing his mother stopped and searched during his youth. In spite of these experiences he finds it necessary to protect his daughter from negative views of the police.

**Theme 4:  Officer Demeanor**

In this theme participants reveal during their contacts with police authorities, the police would often "talk down to them." Participants spoke of being "treated like a criminal." Listen to how Peter, a Hispanic male in his middle 30s, and a former United States Army Demolition Expert who holds a master's degree, describes his experience. As a preface to Peter's story, he was traveling in Wichita on a major throughway at about 5:00 p.m. His children, both Hispanic, were in the backseat. He was driving a black 1998 Dodge Neon with tinted rear windows. The car also had a clear plastic film cover over the license plate. The officer stopped Peter for the tinted windows.

Peter was in a hurry when he left his residence because he had to pick his wife up from work. In his haste of getting his children out the door and into the car, Peter left his driver's license at home. During the stop, the officer confirmed that Peter had a valid driver's license. Here is how Peter describes his experience.

> I didn't feel like I was doing anything wrong and I really think this was a racially motivated stop. He [the officer] acted superior, talking down to me and his voice, his words, the way he talked and acted was aggressive. He treated me like I was inferior...I thought the way he treated me was awful and if they are getting away with this with me, what else are they getting away with?

**Attachment D**

As Peter continues to tell his story the emotionally laden context of the stop is revealed.  I
sensed that this incident was emotionally charged for Peter.  He continues:

> My kids were frightened and they thought something was going to happen to me.  You
> know, he didn't have to talk to me like that in front of my kids.  They were afraid and
> saw law enforcement as bad people because of this situation.  I mean, I was angry, but I
> didn't want my kids to see me that way, they [police] are not all bad, even if I think this
> one was wrong.

Peter believes his incident was racially motivated.  For Peter, this was reinforced by the
police officer's comments about what Peter believes his Hispanic heritage.  Peter explains further
in the following passage.

> When he [police officer] came back up to the car, he said that he wasn't going to give me
> a ticket for the tint being too dark, but instead he was going to give me a ticket for you
> know those plastic film covers you can get to put over your license plate.  He was still
> asking about my driver's license.  I think I asked him why he still thought I didn't have a
> driver license even after he confirmed it in the computer.  He told me that usually when
> he pulls people over like me they usually don't have a driver's license, or it's suspended
> and they start coming up with excuses as to why they don't have a license on them.

After the officer used the term "people like me," Peter recognizes that he may have just been
profiled because of his Hispanic heritage.  Peter is upset and questions the officer regarding the
statement.  He continues:

> I said, wait a minute!  People like me!  I asked him what he meant by people like me?  He
> seemed surprised that I was questioning him, and then he really tried to explain himself.
> I think he knew I caught him.  I really believe that he didn't think I was going to
> challenge him on that statement.  He really started to change his tune after that.

Peter was greatly bothered by this stop.  He believes the officer was pushing his weight
around.  Peter has never been in trouble with the police and spent many years in the military.
After his discharge from the military, he enrolled in college and earned a master's degree.  Peter
said, "The officer kept repeating to me that not having your driver's license on your person is an
"arrestable offense."  I asked Peter to explain why he felt that this incident was racial profiling.
Peter believes that when the officer used the term "people like me," that the officer was making

44

**Attachment D**

an association to undocumented Mexicans living in the United States. He said that the officer knew he got caught and did not expect me to challenge him. Peter believes that the officer used the threats of arrest to make it seem like he (the officer) was doing Peter a favor or cutting him a break. The motive, Peter believes, is so that he (Peter) would not make an issue out of the racialized remark. Peter said what really surprised him about this incident was that the officer was Black.

The following narrative describes Teresa's experience of being stopped by police authorities one evening for looking suspicious.

> I was driving home from the gym and was just exiting off [street name omitted]. I saw him following me in my rearview mirror. He followed me for a short distance and then stopped me. Right away he started to treat me like a criminal. I asked him why he stopped me and all he kept asking was if I know this person and do I know that person. He looked at my gym bag on the floor board and said what do you have there? He picked it up and started to search it. I was very angry at this point and I asked him, just what is your problem with me and I asked him again why he was stopping me. He did not say anything. He just continued to look through my bag and in my car without my permission. He finally said I am stopping you because you look suspicious. Now let me tell you, I drive a 2001 Mitsubishi Diamante, it is not suspicious. The only thing I can think of is that I am Hispanic and was wearing a hoodie because I just left the gym. He was probably thinking gang member.

William, an African American male in his middle 20s describes his experience with a police officer. William said the officer had a demeaning attitude toward him. William was stopped for tinted windows. He says it was really because he was Black. William questions if the incident would have been handled differently if he was White.

> The officer was not polite to me at all. Maybe if my tattoos were showing this would give him a reason to fear me or question his safety around me, but they weren't because I was fully covered…. He said I don't look like the picture on my driver's license and that I memorized my driver's license…I was speechless, I couldn't believe this was happening, he wouldn't stop harassing me, no matter what I said, he kept being an asshole to me. Then he tried to make me think he was doing me a favor, yeah, cutting me a break or something because he said he could have cited me for having too dark of tint on my windows.

**Attachment D**

William continues the interview and begins to talk about the way the police talk to minority citizens.

> When they do stop us they should know that the worse thing they can do when stopping a Black person is talking down to them. They disrespect us. They shouldn't talk down to us. Just treat us like human beings.

Stacie, a Black female in her early 30s complains about the manner in which police talk to minority citizens. "It's like when they stop a person of color they are automatically suspicious and always begin the contact with little demeaning remarks." She believes this is a fairly common experience among minorities. Stacie illustrates one such incident where the police officer talked to her in a very demeaning manner. She thought the officer was very inappropriate. Here is how she describes it:

> I had just dropped off a friend at his house and was driving home when I noticed a police car start to follow me. I keep my eye on the rearview mirror and he kept following me. This went on for about three blocks and then he stopped me. He said he was stopping me for a cracked windshield. I couldn't believe it. I can tell you it was a tiny crack on the passenger's side of my car. I am not even sure how he noticed this…The only reason he stopped me is because he was driving around in a bad neighborhood looking for someone to stop. I was a lone Black female driving in the area so I was stopped. He was very rude from the start and told me to shut the fuck up when I started asking questions about why he stopped me. He really talked down to me.

During one focus group session with a group of African Americans the discussion was centered on officer demeanor theme. One male participant in his middle 20s suggested if the police were polite and improved their communication skills when dealing with minority citizens it would minimize many negative perceptions of the police. He said, "It's all in the way they talk to us." This participant admits he has a past arrest history along with several what he referred to as "run-ins with the police." He said the officer's communication during the initial contact can go a long way. The participant suggested in some of his encounters the officer's demeanor

**Attachment D**

escalated his reaction which in some cases resulted in him arguing with and challenging the police. Here are a few remarks taken verbatim from another focus group participant.

> In the academy, if they were to train them to be polite and then take action, it would kill a lot of problems. None of them know how to communicate. They don't even talk to us right. You are automatically a threat to them. I think a lot of Black men get offended because they [the police] make them feel like less than a man, especially in front of other people. If you run from them you get a case, if you say something smart to them, you get a case. You can't talk smart to them or question or challenge them about anything. There is nothing you can do. If you try to, it makes the situation worse.

**Theme 5: Normative Experiences**

Many participants accept racial profiling a normative part of their lives. The data reveal a pervasive feeling that the chances of being stopped by police authorities for the most minor traffic infraction is very real for minority citizens. While this feeling was widespread among all participants in this study, it was especially prevalent among Black male participants. For example, during one focus group session with eight African-Americans (6 males and 2 females), one participant, a Black male in his early 60s, when asked about what he things of when he hears the term racial profiling replied, "I think about Black men." Another participant underscored this sentiment and said, "I've really gotten used to being stopped, it's just a part of life for a Black man." Another participant replied, "Getting stopped by the police is a reality in our neighborhood. White communities don't understand because they don't face this like we do. It's a matter of fact to us." Recall Arnold, the African American minister who shared the many incidents of being stopped in eastern Kansas. Arnold said, "It's just a routine fact of life, at first I really had a lot of rage built up inside, but as I have matured in life, I learn to accept it as the norm."

Perhaps the most revealing statement that underscored the normative experience is the one volunteered by Cory, a Black male participant in his late 20s. Here is what Cory said:

**Attachment D**

> It's almost like we are in slavery. Every time we are driving around we got to watch out because we might get stopped. You know I have become so used to the possibility of being stopped it's like an everyday thing. You get used to it after a while. When I see a police officer, I automatically begin to think that I may be stopped. It is always there in the back of your mind, it's automatic, you just think about it when you see the police car.

Cory's narrative is troubling. Here we have an African American male in his late 20s, a productive citizen raising a family, equating the experience of potentially being stopped by police authorities to slavery. He captures how a great many minority citizens feel. Participants constructed an almost normative expectation of being stopped by the police. The "normative experience" theme was strong throughout this study and was often intertwined with the other themes.

Several participants actually use the "norm" to describe being stopped. For example, during an interview of one Black male participant, he used the word "norm" on two occasions, in a matter of fact style. Notice how in that last sentence of his narrative, he suggests a we against them attitude:

> Too many Black males in a car will strike up suspicion. That's the norm. My friends refuse to let other Black people pile up in a car or they will get stopped. That's the norm. It's just not worth the hassle. Why take a chance and give them a reason.

**Theme 6: Race and Place**

The "race and place" theme centers on participants belief that there is a greater likelihood being stopped in certain geographical areas of the communities in which they reside. This theme is binary in nature. First, there is a sense among participants that they are more likely to be stopped in what they described as predominately white and affluent neighborhoods. Second, participants described an increased chance of being stopped in economically disadvantaged areas including areas targeted by the police.

**Attachment D**

Participants describe how they consciously avoid driving through some affluent White neighborhoods for fear that they will attract police attention. This theme was discussed during one focus group. One Black male focus group participant who is employed as a house painter recalls driving through an affluent, predominately White neighborhood in south central Kansas and being followed for several blocks by the police. He believes it was simply because he was Black and "out of place." The participant explained he had a paint job that he was finishing in the neighborhood. This participant routinely makes it a habit of not driving through some neighborhoods in order to avoid police scrutiny, even if it means driving several blocks out of his way. Many participants in this study described altering their routes in order to avoid police attention.

As shown in the following interview with Tina, a 36 year old Black female employed as a school paraprofessional, race and place is very real.

> I was trying to find my friend's house. My friend is White and lives in a White area of town. It's a pretty nice area. I'm driving around this neighborhood in broad daylight and I see in my rearview window this police car following me. I thought to myself, here we go again. My 11 year old sister is in the car with me. I was driving a big yellow 2000 Buick. I know it stands out. I kept driving thinking he would get off of me but after a couple of blocks he stopped me. He told me he was stopping me for a cracked windshield. The crack was only about two inches and was on the passenger's side. He asked for my driver's license and proof of insurance. What really surprised me is when he asked if I had any drugs or weapons in the car. I said no I don't. He was like looking at my driver's license. I had my 11 year sister in the car and he is asking this. He used the windshield as an excuse to stop me. I'm pretty sure he stopped me because he saw this Black woman driving a yellow Buick around in this this White neighborhood. I got a warning for the cracked windshield and he told me I could go.

Tina questions how the police officer could notice the small crack in the windshield. She believes "that he must have really been searching for something to stop her for." For Tina, this racialized the stop. In other words, the pretext of using the cracked windshield as a reason to stop her racialized the stop. Tina believes that there is a perception among the police that if a

**Attachment D**

Black person is driving through an affluent and White neighborhood, that they must be up to something criminal.

The race and place theme not only reveals a heightened awareness among participants of being stopped in predominately White affluent neighborhoods, but also neighborhoods disproportionally impacted by crime including those that are economically disadvantaged. Participants discuss being stopped by police authorities for driving, for example, in lower income areas, many of which have high crime rates. In an interview with Betty, a 49 year old African American minister, who is proud of the fact that she has her own church, recalled being stopped by the police while driving through, what she described as a "rough part of the community." Here is how Betty describes it:

> It was about 7:00 or 8:00 one night in 2007. I was driving home when I saw a police car in my rearview mirror following me. I think that they followed me for a couple of blocks. You know they were probably calling in my tag. I was driving a 2000 Nissan Pathfinder and there was nothing special about the pathfinder. The windows were slightly tinted. After a couple of blocks, sure enough, they stopped me. There were two officers in the car. They were walking up on both sides of my pathfinder. When they came up to the window, I said, I know why you are stopping me but there is nobody in here but me and Jesus. One officer said can I see your driver's license. And then I asked him, why are you stopping me? He said, ma'am just give me your driver's license. I pulled my driver's license out and said, I know why you are stopping me, you thought you had a car full of gang bangers, but you had no idea you were stopping a 49 year old minister. I told him that I just left work and that I had to work late that night. Then the officer who was standing on the passenger's side of the car must have recognized me as being a minister and called me by name. I said, yep that's' me but I know you guys do this all of the time. Yep, I could tell that he had egg all over his face. Then the other officer said that my tag light was out. I know that this was a bogus stop and that's the best they could come up with. When it was all said and done they gave me a fix-it ticket and told me when I get it fixed to have a police officer sign off on it.

Betty believes that the officers made the up the tag light infraction because they know that many young Black citizens are unlikely to file a complaint. Betty indicated she was driving in a rough area of the community and the police have knowledge that most people they stop in these neighborhoods are poor and can't fight back. Betty continues with her story:

**Attachment D**

The next day I stopped in the quick trip to get something to drink and I see the same two officers that stopped me the night before. I went up to the officers and said hey, do you remember me? You gave me a bogus ticket last night. You said my tag light was out and it works just fine. I asked him if he wanted to sign the bogus ticket…I told him I want you to go out there and write off on this ticket because I did not have a defective tag light. I saw that the officer who knew me looked a little embarrassed. Then the other officer said I don't know what you are talking about and then he says you better watch the way you are talking to us.

Betty said the officer went outside and checked the tag light which was working properly, and signed off on the ticket. Betty remembers asking the officer after he signed the ticket, "How many times do you all do that each night?" Betty believes that the officers thought they were stopping a young African American male. She told me, "I know if it would have been a Black male and he had friends in that car they would have been all over them." Betty said she ministers to many young Black males in the community and she hears the same thing over and over about the police stopping them for bogus reasons. Betty continues:

You know they [police] might get lucky every now and then, and find someone with an old ticket they didn't or couldn't afford to pay and then they get to take them to jail. It happens all of the time.

For Betty, what was particularly striking is the officer that recognized her as being a minister apologized to her. Betty continues, "The officer that knew who I was, got me to the side at the Quick Trip and said, pastor I am sorry, I was riding with him and that was him." For Betty this apology reinforced her suspicions of the police.

Betty also seems to try to understand the police perspective. She told me, "I can see both sides here. To the police, you have this young Black male driving around in this car, with expensive rims that probably cost five or six thousand dollars, and he doesn't have a job." Betty is quick to point out that she still believes this is not a reason to stop young Black males.

51

**Attachment D**

Figure 2:
Race and Place Model as constructed by Participants



**Weaker Emerging Theme**

This research identifies one weak but nevertheless important theme which I named,

"being compelled." This theme is included because it is beneficial in contextually understanding

the way minority citizenry experience what they believe to be racial profiling.

## Attachment D

### *Feeling Compelled*

If the police requested to search participants' automobile, they would most likely consent because if they didn't, the police would make it worse for them.  Participants believe if they did not consent to the search that they would be accused of hiding something which would lead to a lengthier detention time.

Of the 92 stops studied, in 36 (39%), the police conducted a search of the participants' automobiles.  There were four citizens that did not allow the police to search their vehicles. Table 7 provides information regarding the 36 searches.

Table 7:
Search Details (N=91 Stops)

| Type of Search | Number | Number of Searches Where Evidence Found |
|---|---|---|
| Gave police consent to search | 24 (67%) | 0 |
| Search incidental to arrest (Consent was not asked) | 12 (33%) | 3[+] |
| Total Searches | 36 (40%) | 3 |

**[+]in 3 searches small amounts of marijuana were seized**

## Unifying Experience

The essential, invariant structure is the one unifying meaning of all the descriptions provided by the participants.  The unifying experience was constructed by taking the clusters of themes, and then developing the overall description.  During validation procedures using member checks, the essential, invariant structure was adjusted and perfected numerous times as a result of feedback provided by participants.  Table 8 depicts the essential, invariant structure describing the one unifying meaning of all the descriptions.

53

**Attachment D**

Table 8
Unifying Experience of Perceived Racial Profiling Experiences

Incidents which participants believe they were racially profiled by police authorities often began with a heightened awareness of the police car presence. The police follow participants for great distances before stopping them. This results in increased anxiety on the part of participants. Participants were humiliated, helpless, embarrassed and frustrated, and the encounter with the police often left them angry and emotionally drained. In some cases the emotional affect lasts for a considerable time after the stop. Minority citizens believe the type of car they drive will result in increased police suspicion. For example, driving a customized car (rims, tint, low rider, and/or flashy paint), or simply driving an expensive car such as a Mercedes, BMW or Lexus is perceived to attract greater police suspicion. Participants perceive that the police form a stereotype of the symbolic minority vehicle and use the traffic infraction as a pretext to stop them. The stop is most often described as a minor traffic infraction. During the stop participants say the police are demeaning and accusatory, asking many questions such as do you have any weapons or drugs on you? Where are you coming from? And where are you going? In many cases, the police do not give participants an immediate reason for why they are being stopped. Many ethnic and racial minorities learn not only through their own but others' experiences that their chances of being stopped by the police are greater when compared to White citizens. There is a normative expectation of being stopped. It is similar to a routine, always watchful for a police car and always mindful of the possibility of being stopped. Participants become conditioned to tolerate it and are reluctant to show emotion, or even to inquire about the reason for the stop because they do not want to make the situation worse. When police ask for consent to search participants' automobiles, many consent because they feel compelled, and if they refuse to consent to the search, it may make their situation worse.

**Attachment D**

## SECTION FOUR

## CONCLUSIONS

This study is one of the first qualitative phenomenological studies to deeply explore how minority citizens experience racial profiling. Prior studies have primarily been quantitative in nature which examine police stop data and then make hypothetical statements about racial profiling. Other studies have reported primarily anecdotal reports from minority citizens often without subjecting the data to rigorous qualitative analysis. The methodology used in this study aimed to "explore and search for the essential, invariant structure (essence) or the central underlying meaning of the experiences that contain both the outward appearance and inward consciousness based on the memories, images and meaning" (Moustakas, 1994, p.52) of citizens who believe they have been racially profiled. This method explored and elucidated the hidden and complex facets of racial profiling.

In all, 87 participants were carefully selected to participate in this study. Of these, 65 participants agreed to in-depth interviews and described 91 police stops that they believed were racial profiling. The remaining 22 participants were divided up and participated in four separate focus groups. Participants described perceived racial profiling incidents in 16 communities across the State of Kansas.

There were six dominant themes identified in this study (emotional/affective, symbolic vehicle, nature of the violation, officer demeanor, normative experience, and race and place). These themes provide significant insight into how minority citizens experience what they believe to be racial profiling. In this section, I will first discuss the global conclusions gleaned from the study. This section concludes with a discussion of emerging questions and future research that emerged from this study.

**Attachment D**

There is still a general belief among many in the minority community that they are subjected to racial profiling in many aspects of their lives. Racial profiling is manifested oftentimes in the reason given for the stop (what is perceived to be minor infractions) along with the type of car, and in many cases, the geographical area. This appears to go beyond socio economic class. For example, I interviewed persons from what would be classified as the lower socioeconomic class, to persons that were upper-middle class. Moreover, the majority of participants in this study were employed in responsible positions.

Many minority participants discussed the emotional impact of being stopped for what they believe was because of their race. The emotional impact was exacerbated during the context of the stop. For example, the demeanor of the law enforcement official was called into question. This seems to have great significance. As one participant explained to me during validity checks of the data:

> Imagine for a moment from my point of view, you think that you have done nothing wrong and you are stopped for a turn signal violation, cracked brake light or some other minor traffic charge. Imagine that the officer's tone during the stop becomes accusatory and interrogative. Maybe he questions how I can afford a car like this, and then the officer says that he can't even afford a car like this. This is how you know it's not about some little brake light or cracked windshield or film cover on your tag. It's about you being a Black man. That's what it's really about.

**Global Conclusions**

- What is striking in this study is the dominant themes are the same regardless of the geographical area in Kansas. It did not matter where in Kansas that the participants experience what they believe to be racial profiling, they all had similar contextual experiences.

- This study illuminates stories of perceived racial profiling primarily from Black and Hispanic Citizens. There was one Asian male participant. When the data were analyzed paying specific attention to race and ethnicity, there were no contextual differences. The ethnic and minority groups represented in this study experience what they believe to be racial profiling in much the same way. The only minor difference is the case with Black males.

56

**Attachment D**

- Black males were much more structural in telling their stories, and they appear to be the most affected in terms of the emotional toll. While this is shared by Hispanic participants, it is much more pervasive among Black males.

- There is a belief among participants that police authorities often use traffic violations as a pre-text to stop them. Participants describe these pre-textual traffic violations as minor. There is agreement among participants that these same traffic violations are not enforced to the same extent among White drivers.

- Many participants alter their driving routine. Participants avoid areas where there is a greater chance of seeing police. Many participants alter their schedules and allow for additional time when they drive through some neighborhoods because of the possibility of being stopped by police.

- Participants point out that they themselves, or others they know, purposively drive bland looking cars in order to avoid attracting police attention.

- For a great many participants the emotional toll of being stopped by police for what they believe to be racial profiling is profound and lasts for long periods of time. The emotional toll culminates in a distrust of the police and/or reinforces previously held suspicions.

- Participants reveal when they are stopped for what they believe to be racial profiling they are often talked down to by the police. They describe the experience as demeaning, embarrassing, and accusatory. In many cases, the police do not give participants an immediate reason of why they are being stopped and participants have to ask several times.

- The potential of being stopped by the police has become a normative experience for participants. Participants describe this as routine. The data confirm a normative culture of sorts among minority citizens. The normative culture dictates to avoid the police, and if stopped, "don't give them a reason to make your situation worse."

**Implications for Practice**

- Use the data in this report as a venue to enhance existing or new training programs that focus on cultural sensitivity and racial profiling.

- Reinforce the importance of police officers to inform the motoring public of the reason they are being stopped when initial contact is made.

- Increase ride-along programs specifically for minority communities. This may foster increased understanding between the police and the minority citizenry.

- Use a constellation of police stop data along with qualitative methods such as the one used in this study to shape training curriculum and policy decisions.

**Attachment D**

- Enhance cultural diversity/sensitivity training focusing specifically on cultural differences.

- Build coalitions and community boards that address racial profiling.  It is recommended that board membership should largely be made up of citizens whose voices are typically absent from the policy decision making process.

- Directly involve members of the minority community in police training regarding racial profiling and cultural differences.

**Emerging Questions and Future Research**

This study raised three additional questions that should be addressed in order to enhance our understanding of racial profiling in the State of Kansas.

1. What is the police worldview regarding racial profiling?

2. Do White drivers have the same contextual experiences when stopped by police authorities?

3. What are the perceptions of individual officers as it relates to the initial vehicle observation coupled with the decision to stop, and as it relates to establishing the pre-textual basis for the stop?  Understanding police decision making as it pertains to pre-textual stops is critical in order fully understand the dynamics of perceived racial profiling and disparities in police stops.

These questions should be addressed using qualitative research methods including phenomenological strategies that make use of in-depth interviews, and ethnographic strategies that make use field observations.

**Attachment D**

## REFERENCES

Antonovics, K.L., & Knight, B.G. (2004).  *A new look at racial profiling: Evidence from the Boston Police Department*. Cambridge, MA:  National Bureau of Economic Research.

Birzer, M.L. (2008).  What makes a good police officer:  Phenomenological reflections from the African-American community.  *Police Practice and Research: An International Journal, 9*(3), 199-212.

Birzer, M.L., & Smith-Mahdi, J. (2006).  The phenomenology of discrimination experienced among African-Americans.  *Journal of Black Studies, 10*(2), 22-37.

Carlson, D.K. (2004, July 20).  *Racial profiling is seen as wide spread, particularly among young  Black men*. Retrieved October 22, 2010 at http://www.gallup.com/poll/12406/racial-profiling-seen-pervasive-unjust.aspx

Cordner, G., Williams, B., & Velasco (2002).  *Vehicle stops in San Diego:  Executive report*.  Retrieved January 10, 2006, from http://www.sandiego.gov/police/pdf/stoprpt.pdf

Cole, D. (1999).  *No equal justice:  Race and class in the American criminal justice system*.  New York:  The New Press.

Creswell, J.W., & Miller, D.L. (2000).  Determining validity in qualitative inquiry.  *Theory into practice, 39*, 124-130.

Creswell, J.W. (2007).  *Qualitative inquiry and research design:  Choosing among five approaches*.  Thousand Oaks, CA:  Sage.

Engel, R.S., Klahm C.F., & Tillyer, R. (2010).  Citizens' demeanor, race, and traffic stops.  In S.K. Rice, & M.D. White, (Eds.), *Race, ethnicity, and policing* (pp. 281-282.)

Glover, K.S. (2009).  *Racial profiling: Research, racism, and resistance*.  Lanham, MD:  Rowman and Littlefield Publishers, Inc.

Gumbhir, V.K. (2007).  *But is it racial profiling: Policing, pretext stops, and the color of suspicion*.  New York:  LFB Scholarly Publishing LLC.

Harris, D. (1997).  Driving while Black and all other traffic offences:  The supreme court and pretextual traffic stops.  *Journal of Criminal Law and Criminology, 87*, 544-582.

Harris, D.A. (1999).  The stories, the statistics, and the law:  Why driving while Black matters.  *Minnesota Law Review, 84*, 265-326.

Harris, D.A. (2002).  *Profiles in injustice:  Why racial profiling cannot work*.  New York:  The New Press.

## Attachment D

Moustakas, C. (1994).  *Phenomenological Research Methods*.  Thousand Oaks:  Sage.

Parker, K.D., Onekwuluje, A.B., & Murty, K.S. (1995).  African-Americans' attitudes toward the police: A multivariate analysis. *Journal of Black Studies, 25*(3), 396-409.

Police Foundation (2003).  *A multijurisdictional assessment of traffic enforcement and data collection in Kansas.*  Washington, DC:  Police Foundation.

Russell, K.K. (1998).  *The color of crime: Racial hoaxes, White fear, Black protectionism and police harassment and other macroaggressions.*  New York: New York University Press.

Weitzer, R, & Tuch, S.A. (2004).  Reforming the police: Racial differences in public support for change.  *Criminology* 42(2), 391-417.

Weitzer, R., & Tuch, S.A. (2005).  Racially biased policing: Determinants of citizen perceptions. *Social Forces, 83*, 1009-1030.

Wise, T. (2005).  Racial profiling and its apologists.  In J.L. Victor & J. Naughton (Eds.), *Annual editions, criminal justice* (pp. 100-103).  Dubuque, IA: McGraw-Hill/Dushkin.

Withrow, B.L. (2002).  *The Wichita stop study.*  Unpublished manuscript, Midwest Criminal Justice Institute, Wichita State University, Wichita, Kansas.

Withrow, B.L. (2005).  *The Wichita stop study 2004 follow-up analysis.*  Unpublished manuscript.  Midwest Criminal Justice Institute, Wichita State University, Wichita, Kansas.

**Attachment D**

## CASES CITED

*Fuchilla v. :Layman, 537 A.2d 652, 654, , cert denied, 488 US 826 (1988).*

*State v. Pedro Soto,* 324 N.J. Super. 66; 734 A.2d 350 (1996).

*Whren v. United States,* 517 U.S. 806 (1996).

Attachment E

# Attachment E

| | MALE WHITE | BLACK | HISP | NHOPI | NAT AM | ASIAN | TWO+ | NOTC | UNKWN | MALE TOTAL | FEMALE WHITE | BLACK | HISP | NHOPI | NAT AM | ASIAN | TWO+ | NOTC | UNKWN | FEMALE TOTAL | M/F TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **POLICE DEPARTMENT** | | | | | | | | | | | | | | | | | | | | | |
| 1 OFFICIALS/ADMINISTRATORS | 2 | 2 | | | | | | | | 4 | | | | | | | | | | 0 | 4 |
| | 50.0 | 50.0 | 0.0 | 0.0 | 0.0 | | | | | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | | | | |
| COMMUNITY LABOR STATS | 54.0 | 2.8 | 2.0 | 1.0 | 0.1 | | | | | | 32.5 | 3.2 | 1.3 | 0.8 | 0.5 | | | | | | |
| UTILIZATION | -4.0 | 47.2 | -2.0 | -1.0 | -0.1 | | | | | | -32.5 | -3.2 | -1.3 | -0.8 | -0.5 | | | | | | |
| 2 PROFESSIONALS | 3 | | | | | | | | | 3 | 8 | 1 | 1 | | | 1 | | 1 | | 12 | 15 |
| | 20.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | | | | 53.3 | 6.6 | 6.6 | 0.0 | 0.0 | 6.6 | | 6.6 | | | |
| COMMUNITY LABOR STATS | 42.5 | 2.4 | 1.4 | 2.1 | 0.4 | | | | | | 42.9 | 3.1 | 1.8 | 1.1 | 0.5 | 1.1 | | | | | |
| UTILIZATION | -22.5 | -2.4 | -1.4 | -2.1 | -0.4 | | | | | | 10.4 | 3.5 | 4.8 | -1.1 | -0.5 | 5.5 | | | | | |
| 3 TECHNICIANS | | | | | | | | | | | 1 | | | | | | | | | 1 | 1 |
| | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | | | | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | | | | |
| COMMUNITY LABOR STATS | 31.9 | 3.4 | 2.2 | 2.9 | 0.5 | | | | | | 46.6 | 6.4 | 2.1 | 1.8 | 0.0 | | | | | | |
| UTILIZATION | -31.9 | -3.4 | -2.2 | -2.9 | -0.5 | | | | | | 53.4 | -6.4 | -2.1 | -1.8 | 0.0 | | | | | | |
| 4 PROTECTIVE SERVICE | 445 | 42 | 40 | | 4 | 18 | | 2 | | 551 | 74 | 8 | 8 | | | 1 | | | | 91 | 642 |
| | 69.3 | 6.5 | 6.2 | 0.0 | 0.6 | 2.8 | | 0.3 | | | 11.5 | 1.2 | 1.2 | 0.0 | 0.0 | 0.2 | | | | | |
| COMMUNITY LABOR STATS | 61.9 | 9.5 | 6.3 | 2.0 | 0.2 | 2.0 | | | | | 15.2 | 3.2 | 0.2 | 0.0 | 0.0 | 0.0 | | | | | |
| UTILIZATION | 7.4 | -3.0 | -0.1 | -2.0 | 0.4 | 0.8 | | | | | -3.7 | -2.0 | 1.0 | 0.0 | 0.0 | 0.2 | | | | | |
| 5 PARA-PROFESSIONALS | | | | | | | | | | | 1 | | | | | | | | | 1 | 1 |
| | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | | | | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | | | | |
| COMMUNITY LABOR STATS | 4.9 | 1.2 | 0.0 | 0.2 | 0.1 | | | | | | 73.4 | 14.6 | 3.8 | 0.8 | 0.9 | | | | | | |
| UTILIZATION | -4.9 | -1.2 | 0.0 | -0.2 | -0.1 | | | | | | 26.6 | -14.6 | -3.8 | -0.8 | -0.9 | | | | | | |
| 6 OFFICE/CLERICAL | 5 | 2 | | | | | | | | 7 | 59 | 11 | 5 | | | | | 3 | | 78 | 85 |
| | 5.9 | 2.4 | 0.0 | 0.0 | 0.0 | | | | | | 69.4 | 12.9 | 5.9 | 0.0 | 3.5 | | | | | | |
| COMMUNITY LABOR STATS | 25.9 | 3.0 | 1.7 | 0.8 | 0.3 | | | | | | 53.8 | 6.9 | 4.2 | 0.9 | 0.6 | | | | | | |
| UTILIZATION | -20.0 | -0.7 | -1.7 | -0.8 | -0.3 | | | | | | 15.6 | 6.0 | 1.7 | -0.9 | 2.9 | | | | | | |
| 7 SKILLED CRAFT | 1 | | | | | 1 | | | | 2 | | | | | | | | | | 0 | 2 |
| | 50.0 | 0.0 | 0.0 | 0.0 | 0.0 | 50.0 | | | | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | | | | |
| COMMUNITY LABOR STATS | 65.3 | 6.3 | 9.8 | 3.3 | 1.0 | 3.3 | | | | | 8.2 | 1.4 | 1.2 | 1.2 | 0.2 | | | | | | |
| UTILIZATION | -15.3 | -6.3 | -9.8 | -3.3 | -1.0 | 46.7 | | | | | -8.2 | -1.4 | -1.2 | -1.2 | -0.2 | | | | | | |
| 8 SERVICE/MAINTENANCE | 7 | 3 | 2 | | | | | | | 12 | 4 | 1 | 1 | | | | | | | 6 | 18 |
| | 38.9 | 16.7 | 11.1 | 0.0 | 0.0 | | | | | | 22.2 | 5.6 | 5.6 | 0.0 | 0.0 | | | | | | |
| COMMUNITY LABOR STATS | 37.1 | 7.5 | 9.1 | 2.6 | 0.9 | | | | | | 25.5 | 6.4 | 5.1 | 2.5 | 0.5 | | | | | | |
| UTILIZATION | 1.8 | 9.2 | 2.0 | -2.6 | -0.9 | | | | | | -3.3 | -0.8 | 0.5 | -2.5 | -0.5 | | | | | | |
| * TOTAL DEPT PO | 463 | 49 | 42 | | 4 | 19 | | 2 | | 579 | 147 | 21 | 15 | | | 3 | 2 | 1 | | 189 | 768 |

**ATTACHMENT F**

**Civilian Review Boards**
**Prepared by Mitch Kolf, Graduate Assistant**
**Hugo Wall School**

Across the nation many cities have taken steps to increase the transparency of their police departments. Many have done this by instituting civilian review boards to serve as oversight of investigations relating to police misconduct. These boards typically review cases relating to excessive force, firearm use, and racial profiling. After they have reviewed the investigation they usually make suggestions to the police chief on discipline or make a determination on whether the action taken by the officer was appropriate. Some civilian review boards have more power than others, each civilian review board and the actions and processes they take are unique to their individual community.

St. Paul, Minnesota has an active and well-structured civilian review board. It is made up of 5 citizens and 2 officers. For a citizen to be on the review board they must be a resident of St. Paul, graduate from the civilian police academy, be appointed by the mayor, and approved by council. The board reviews investigations related to excessive force, firearm usage, discrimination, and poor public relations. They then make a recommendation on action to the police chief, who reserves final authority on all discipline decisions. The board strives to find a balance between holding police officers accountable and allowing them to use their best judgment to enforce the law. The major purpose of the board is to build trust between the citizens and the department. They strive to do this by issuing an annual report and employing a full-time civilian coordinator who assists citizens with filing complaints and who serves as a staff person to the review board.

Portland, Oregon has a citizen review committee that is located in the City Auditor's Office under the Independent Police Review division. The Independent Review division employs a director and complaint investigators who are dedicated to addressing citizen concerns. When a complaint is filed it is assigned to a complaint investigator who interviews the citizen, officer, and witnesses, and reviews police reports and any video evidence. Once the information has been gathered the director will decide either to refer the case to internal affairs, dismiss it, bring in a mediator, or start an independent investigation. The citizen

1

**ATTACHMENT F**

review committee consists of 9 members who are appointed by city council and serve three year terms. The committee members must be residents or business owners in Portland, have no conflicts of interest with the department, and be able to commit 5-7 hours every week. The review committee has its own webpage where citizens can file complaints, read reports, file commendations, check on the status of complaints, view a map showing where complaints are filed, learn about the review process, and get meeting information. The citizen review committee has four major functions: 1) they need to be aware of the concerns citizens have with the police; 2) they help the Independent Police Review director form policy; 3) advise the Independent Police Review Director and Internal Affairs on complaints; and 4) hear appeals from complainants and report on findings.

Columbia, Missouri has a citizen's police review board that is made up of 8 members who serve 3 year terms and 1 member of the commission of human rights. Members must be residents, be registered to vote, can't be a city employee, elected official or candidate for office, or have any pending litigation with the city. The major responsibilities of Columbia's board are: to review the chief's disciplinary decisions on police misconduct, host public meetings, host educational events for the public, review police policies and training, and submit an annual report to council summarizing their work. The city website provides information about the board and the ordinances that established it and describe its duties.

Iowa City, Iowa has a citizen police review board made up of 5 members who are appointed by the city council. The board also has its own legal counsel. The review board reviews the reports prepared over alleged police misconduct, and makes recommendations to the police chief. They have limited administrative review power and no power at all to enforce police discipline. They also hold a forum every year for citizens to express their concerns over the police department. The board receives complaints about the department and holds the chief responsible for completing an investigation within 90 days. The board then receives a report from the chief and can either request additional investigation or make a determination on whether the complaint was "sustained" or "not sustained". They also prepare an annual report.

**ATTACHMENT F**

<u>Pittsburg, Pennsylvania</u> has a citizen police review board.  This is actually an independent organization with an executive director and board appointed by city council.  The board investigates misconduct complaints, helps citizens file complaints, and makes recommendations on appropriate actions for the complaints.  They also serve as a conduit to improve police relations with the community, and therefore hold open meetings to get citizen input on the police department.  The board has its own website where it posts news, reports, video of meetings, and their budget.

The <u>National Association for Civilian Oversight of Law Enforcement (NACOLE)</u> provides support for individuals and agencies trying to establish civilian oversight of law enforcement.  Their mission is to assist with the establishment, development, and provide technical assistance for civilian oversight boards of law enforcement.   They want to encourage high ethical standards in law enforcement and enhance police and civilian relationships.  NACOLE has many resources and best practices of civilian oversight boards on their website. They have identified 3 general models of civilian oversight boards.

The first model is the investigative model.  In this model the board is authorized to conduct investigations of complaints and make recommendations to administration over discipline or policy.   They usually have full-time staff to assist the board with conducting and independent investigation.

The second model is the monitoring model.  This model is authorized to review internal affairs investigations of complaints against officers.   They make a determination on whether the investigation was adequate and may make policy recommendations based on their reviews. They sometimes have staff that assist them with the monitoring process.

The third oversight model is an independent auditor.  This model does not contain a board, but instead employs a full-time independent investigator who can conduct investigations at will within the department.  They also monitor and evaluate internal affairs investigations.

**ATTACHMENT F**

**Works Cited**

Citizen Police Review Board Pittsburgh. (n.d.). *Citizen Police Review Board Pittsburg.* Retrieved December 10, 2014, from CPRB: http://cprbpgh.org/

City of Columbia. (n.d.). *Citizens Police Review Board.* Retrieved December 10, 2014, from www.gocolumbiamo.com: http://www.gocolumbiamo.com/Council/Commissions/description.php?bcid=14

City of Portland Auditor's Office. (n.d.). *Independent Police Review.* Retrieved December 10, 2014, from Auditor's Office: http://www.portlandonline.com/auditor/index.cfm?c=26646

City of Portland Oregon. (n.d.). *Independent Police Review - Citizen Review Committee.* Retrieved December 10, 2014, from www.portlandoregon.gov: https://www.portlandoregon.gov/oni/article/82181

City of St. Paul. (n.d.). *Civilian Review Board.* Retrieved December 10, 2014, from www.stpaul.gov: http://www.stpaul.gov/index.aspx?NID=2061

City of St. Paul. (n.d.). *Function of the Commission.* Retrieved December 10, 2014, from www.stpaul.gov: http://www.stpaul.gov/index.aspx?NID=2298

City of St. Paul. (n.d.). *Police Civilian Review Commission.* Retrieved December 10, 2014, from www.stpaul.gov: http://www.stpaul.gov/index.aspx?NID=587

The National Association for Civilian Oversight of Law Enforcement . (n.d.). *Mission.* Retrieved December 11, 2014, from NACOLE: https://nacole.org/about-us/mission/

The National Association for Civilian Oversight of Law Enforcement. (n.d.). *Models of Civilian Oversight in the United States: Similarities, Differences, Expectations and Resources.* Retrieved December 11, 2014, from NACOLE: https://nacole.org/resources/models-of-civilian-oversight-in-the-united-states-similarities-differences-expectations-and-resources/

Attachment G



## Attachment H

In January of 2013, the City Attorney's Office contracted with Attorney Eric Daigle, of Daigle Law Group, to complete a comprehensive review of the Wichita Police Department's policies, practices, training, and reporting of use of force incidents. Attorney Daigle is a recognized expert in the field of law enforcement operations and management. He provides police practices consultation to law enforcement agencies across the country in the area of operational liability, with an emphasis on policies, operations, and investigations. He focuses on police best practices, specifically in the areas of policy development, training, investigation, and operations.

The Wichita City Police Department has made a commitment to constitutional policing and promoting respectful and effective police practices. They believe that proper policy, procedure, training, and operations in law enforcement are paramount to the realization of transparent and constitutional policing. As such, Mr. Daigle was asked to complete an analysis of the department's critical incident policies, bias based policing, and a proposed shooting review board policy.

Over the next year Attorney Daigle reviewed department policies, use of force reports, internal affairs investigations, and officer involved shooting investigations. Based on this review, Attorney Daigle provided WPD with detailed recommendations and suggested areas in need of improvement and attention by the department. Specifically, Attorney Daigle recommended that WPD review and revise existing WPD policies to provide clearer, more defined policies that better meet the standards of common police practices. He also worked with the WPD to update and revise training of WPD officers regarding the appropriate constitutional limitations for use of force. It was also determined that the department needed to improve training and increased involvement of front line supervisors regarding use of force incidents, particularly reporting and investigation of the incidents. Finally, Attorney Daigle determined that there was a need to improve the process of reporting and evaluating use of force incidents by officers.

Since the completion of Mr. Daigle's report, and based on his recommendations, the following tasks have been undertaken by the WPD and the Wichita Law Department.

### A. Policy Revisions

Utilizing the expertise of Attorney Daigle, the WPD command staff of analysed multiple high liability and high frequency policies. WPD was dedicated to conducting a complete analysis of these policies, and worked to develop sound policies based on the principles of proper legal and law enforcement standards. WPD understands that department policies and procedures reflect and express the Department's core values and priorities, and provide clear direction to ensure that officers lawfully, effectively, and ethically carry out their law enforcement responsibilities.

With the input of WPD command staff, Attorney Daigle drafted revised comprehensive policies regarding use of force. These policies have not yet been published. The new policies include:

1. Use of Force;
2. Reporting and Investigating Use of Force;

**Attachment H**

3. Use of Firearms;
4. Use of Impact Weapons;
5. Use of Patrol Rifles;
6. Use of Chemical Agents;
7. Use of Electronic Weapons; and
8. Officer Involved Shootings.
9. Crowd Control
10. SWAT procedures
11. Administrative Investigation of Deadly Force Incidents (modification to existing policy)

Additionally, at the request of the City Manager and Council, Mr. Daigle has also completed a review of the Department's vehicle pursuit policy. A number of changes were recommended. These changes will be reviewed and implemented following the completion of the use of force reporting policy changes.

**B. Training**

Attorney Daigle's analysis of the department identified a need to conduct training for the WPD command staff and all front line supervisors (captains, lieutenants, and sergeants), which the department readily accepted. The training focused on teaching the supervisors the full extent of their responsibilities pursuant to the revised policies; including the requirement that each officer or employee report violations of policy; that supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel will be held accountable for policy and procedure violations. The training clarified that the WPD shall ensure that supervisors have the knowledge, skills, and ability to provide close and effective supervision to each officer under the supervisor's direct command; provide officers with the direction and guidance necessary to improve and develop as police officers; and to identify, correct, and prevent officer misconduct.

The training was successful and the supervisors were receptive to the message. Attorney Daigle also conducted use of force training to the recruit class in July of this year. Once the use of force policies are completed, additional use of force training will be scheduled for all officers. The goal is to have the policies in place and re-training occur during the Department's fall mandatory training schedule.

**C. Reporting Use of Force**

Following a review of WPD's use of force reporting practices, Attorney Daigle provided recommendations for specific modifications to enhance the reporting of use of force incidents by WPD officers. As a result of his recommendations, a Reporting and Investigating Force policy was developed. The underlying purpose of the policy is to provide officers and supervisors with comprehensive guidelines for reporting, investigating, and reviewing use of force incidents. The fundamental purpose of revising this process is to protect both officers and citizens, while demonstrating that the department and its officers are committed to documenting and

**Attachment H**

investigating use of force incidents.  The Department recognizes that accurate and timely reporting of reportable use of force is essential for monitoring and training development.

Furthermore, proper use of force reporting establishes a foundation for the justification of the officers' use of force and provides the department with timely information concerning use of force incidents, including any concerns that may arise or need to be addressed.  In addition, Attorney Daigle encourages WPD to track its use of force through an early intervention system, which is essentially a risk management system, . Proper tracking of use of force incidents is a key performance indicator that is used to identify at-risk officers, and correct problematic behaviors.

The need for supervisory review of use of force policies was reiterated at the supervisors' training, which Attorney Daigle conducted in April.  Additionally, Chief Deputy City Attorney, Sharon Dickgrafe, discussed the importance of thorough reporting, and the need to review all reports submitted regarding these incidents, during civil liability training, which occurred during the spring mandatory training. Every WPD officer and civilian staff was required to attend the training.

Based on Attorney Daigle's recommendation, the timing of the Professional Standards Bureau investigation of officer involved shooting use of force incidents has been changed. Historically, use of force incidents involving officer-involved shootings were not investigated until the case had been cleared by the District Attorney.  As a result, the investigation for other use of force cases was delayed until all criminal charges were resolved. The new procedures have changed the timing of the investigations so that administrative investigations will now coincide with any criminal investigation. This change will provide better information for the defense of any civil claims, and will allow discipline to occur, if appropriate, immediately following the  incident.

Attorney Daigle also recommended specific improvements in the actual use of force reporting forms. These changes in the format of reports will be reviewed and implemented with all other policy changes.

Conclusion:

WPD staff and the Law Department are continuing to work with Attorney Daigle to revise and implement  his recommendations. A positive working relationship has been developed and WPD staff looks forward to final implementation of the recommended changes.  We anticipate that in the near future the department will move to begin publishing and training the department members on the new training.

**Attachment 11**

**Evaluation of the article "Biomechanics of lethal force encounters—officer movements" by W. Lewinski published in** *The Police Marksman* **magazine (2002).**

**This article contains the statement:** "Until we understand and measure the variety of biomechanical motions that officers perform in lethal force encounters, it's difficult to isolate the more complex and profound psychological dynamics, such as perception and judgment time" (middle of second paragraph).

The statement above assumes that processing related to perception and judgment do not occur during biomechanical motions—that is, they can be separated in time from these biomechanical motions. However, it is general knowledge in the perception/attention literature that these processes occur in parallel, they are not discrete processes that can be separated. This is an example where the goal of the research is based on flawed assumptions and reflects a lack of understanding human information processing.

**The article also contains the statement:** "However, the reaction times, sight times, and movement times need to be studied, because often they are the only things officers do in shooting situations. Sometimes they form the components of more complicated motions and need to be fractioned out if we are to more fully understand the more complex motions. For instance "lag time" is comprised of a variety of things including movement time."

It is not clear here why fractioning out these action plans needs to be done to understand the "more complex motions"—which by the way, is never defined. According to the literature on action planning (e.g., Rosenbaum, 1980; 1984; Jeanerod, 1997) actions are hierarchically structured and initiating the component of the action at the top of the hierarchy typically leads to execution of the actions that follow that structured in the action plan. Also, action components that occur late in the action plan affect how actions are executed early in the action plan—suggesting that actions plans consist of integrated as opposed to separable components. In other words, once you decide to act, the action plan as a whole is carried out—it is not carried out in a piecemeal fashion. Again, it is difficult to parse actions into separate components because these components are not discrete—they are activated in a continuous fashion. That is, as you are executing one component of the action plan you are preparing for the next action component. Also, overlap can occur between two different action plans—planning to shoot someone in the right leg and then planning to shoot someone in the left leg. While executing the action to shoot the right-leg, preparing to execute the action in the left is beginning to occur.

**The article further states that:** "The primary purpose of this study is to measure the time it takes to do certain motions. This is not the definitive study of the movements and times of officers lethal force encounters. However, it is very comprehensive. While the complete research design and a full analysis will not be presented here, it is important to know that a variety of measurements were taken on 68 officers from different sections of the Los Angeles Police Department" (top of third paragraph).

The statement above that "this is a very comprehensive study" cannot be evaluated because the research design and analyses are not available—However, the way in which this sentence is written

misleads the reader in believing it is comprehensive because measurements were taken from 68 LAPD officers. The intentional or unintentional, misleading statements that occur in Lewinski's research are also present in statements made by Lewinski in his declaration (See section 3 of this declaration). That is, the convoluted way in which ideas are described can give the false impression that the ideas are logically connected.

**The article further states** at the end of paragraph three and beginning of paragraph four: "… components of the movements officers perform in shooting situations or they directly replicated these movements. For instance, the officers performed movements that **allowed me to separate reaction time, movement time, and sighting time.**"

**There are several problems with the logic of the statements that these different mental and motor processes can be separated out in time when recording only reaction time.** First, based on the perception-action literature, one's reaction time to "shoot" would include movement time and sighting time. Second, there is no research or logic laid out to suggest that the movements the officers performed should allow Mr. Lewinski to separate "reaction time, movement time, and sighting time". How did these movements "allow" him to separate reaction time? Third, the connection between the following two statements does not make sense: Mr. Lewinski states that officers made movements typical to that in shooting situations, and then says, "for instance" they performed actions consistent with shooting situations. Fourth, there is no mention as to how he was able to separate out reaction time, movement time, and sighting time—no mention of methodology or special measures that might allow one to do so. He describes using a PACT timer from the onset of the stimulus to the time of pulling the trigger, and that is all. As mentioned earlier, there are no behavioral measures that can separate cognitive processes from time to respond. In some studies, one can separate information such as stimulus evaluation time from onset of motor processing in the brain—but this requires psychophysiogical measures (EEG measures sensitive to evoked response, electrical potentials measured over different areas of the scalp—reflecting onset of activity in different brain areas corresponding to stimulus evaluation and motor processing). The psychophysiological measures clearly show an overlap in activating motor and other perceptual/cognitive processes. Finally, again, the idea that motor components can be analyzed separately to figure out the overall time dedicated to each process when these actions are carried out together is flawed. Time is actually saved when carrying out these actions together, because the process of one component of the action can begin before the next is completed. In the perception-action literature it is well known that information is processed in a continuous fashion, and not in a discrete fashion. Lewinski is using what is called "subtraction logic" which assumes that processes are discrete—one process finishes before another can begin. Under this faulty assumption, one assumes that by subtracting out the time it takes to execute one action, you can figure out the time it takes to do others. This idea, originally promoted by Donder's (1968-1969) has been shown to be incorrect (e.g., see McClelland, 1979).

**One other comment of importance to this study.** While time to execute each of the components identified by Mr. Lewinski (moving, sighting, pulling the trigger) cannot be accurately obtained (particularly using behavioral measures), the relative time to do one action or all of these actions in combination can be measured—that is, claims can be made in terms of which combinations may take

Attachment 11, p. 2

more or less time to execute (e.g., sighting + pull trigger vs. just pull trigger with no sighting).  However, that is not the purpose of the study described in the paper.  The primary purpose of this study is to measure the time it takes to execute different activities.  This study not only makes claims based on unreliable data, but the data reported are not directly linked to the purpose of the study.  In fact, the results highlighted by Lewinski in this paper, do not address the purpose described in the paper, and do not contribute to the overall goal of separating out motor processes from perceptual/cognitive processes – he focuses on data that does not address the purpose.  The failure to link data to the relevant question proposed would be sufficient for rejection in a peer-reviewed journal.  It also shows that the data used to support his original premise is invalid, and hence is unreliable.

In summary, this study is invalid and unreliable.  In my opinion, this study questions the ability of Mr. Lewinski to apply relevant and reliable data to answer a question or support an argument.  **That is, if one cannot report relevant and reliable data to answer a question posed in one's own research study, how can one trust that this person can apply relevant and reliable data to support conclusions he has drawn from the current case.  The loose connections between data and one's premise can lead to misleading, inaccurate, and unreliable statements/conclusions.**