# EXHIBIT 31

**Lisa G. Finch, et al. vs. City of Wichita, Kansas**

**Case No. 18-cv-1018-JWB-ADM**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**



*District Attorney Marc Bennett*
*18th Judicial District of Kansas*

## For Immediate Release
### April 12, 2018

District Attorney Marc Bennett has completed the review of the use of deadly force that resulted in the death of Andrew Finch, a 28 year old white male. The incident occurred on December 28th, 2017, at 1033 West McCormick in Wichita, Sedgwick County, Kansas.

## SCOPE OF REPORT

This report details the findings and conclusions limited specifically to criminal liability of the Wichita Police Department officer who fatally shot Andrew Finch.

The Office of the District Attorney has no administrative or civil authority regarding use of force investigations. Therefore, this report does not address any administrative review that may be conducted by the Wichita Police Department, provide any assessment of policy considerations, or address questions of possible civil actions where a lesser burden of proof would apply.

Questions as to whether the use of force in any particular case could have been avoided or de-escalated if the officer(s) or citizen(s) had behaved differently in the moments leading up to the fatal use-of- force are not properly addressed in a criminal investigation.

The sole question addressed by the District Attorney is whether sufficient evidence exists to establish beyond a reasonable doubt that a violation of the criminal laws of the state of Kansas occurred in this instance.



Rapp
EXHIBIT NO. 60
DATE 10-17-18
*Kelley, York & Associates*

FINCH 000310

# TIMELINE

According to phone records of the Wichita city building, on Thursday, December 28th 2017, at 18:10 hrs (6:10 p.m.), the "badge on the floor," (hereinafter "BOF") the "service officer" who answers the phone after 5 p.m. Monday through Friday at the Wichita city building, received a phone call from a male caller. The caller ID call was received from what appeared to be a local number, (316) 435-8355. The call to the BOF was not recorded. The BOF believed the caller said words to the effect, that his mother had struck his father with a gun.

The BOF attempted to transfer the caller to 911. Over the next several minutes, the caller called the BOF back two more times, complaining each time that the call had been dropped when transferred to 911. Whether the call was dropped or the caller hung up, is not clear. Each time, the BOF tried to transfer the caller to 911.

Finally, at 18:17 (6:17 p.m.), the caller identified himself as "Brian" and provided the number from which he had called. The BOF called 911 and relayed the caller's name and told the 911 call taker that "Brian" said his mother had struck his father with a gun.

## I. 6:18 p.m. 911 call

Records provided by Sedgwick County Emergency services reflect that the 911 call taker made contact with the male caller for the first time at 18:18 hrs (6:18p.m.). The conversation that ensued between the male caller and the call taker (CT), was recorded. The CT is an employee of Sedgwick County Emergency Communications who takes calls from the public, enters details into the CAD. CAD is the "computer aided dispatch" system, some of which is accessible by law enforcement officers in their respective patrol cars via their MCT, "mobile communication terminal," also referred to as MDT, "mobile dispatch terminal." The CT relays the information received from the calling party to dispatchers by typing the information. The dispatcher in turn verbally communicates the information to law enforcement officers by way of their radios.

During the call taken by the 911 CT at 18:18:58 hrs (6:18:58 p.m.), the following conversation took place between the call taker (CT) and male caller (caller):

        CT:      *"Nine, one, one."*
        Caller:   *"Hello?"*

FINCH 000311

CT:       "*Nine, one, one, what's the location of the emergency?*"
Caller:   "Um, *I'm at one, zero, thirty three west McCormick Street. I just shot my dad in the head. 'Cause. He was arguing with my mom and it was getting way out of the control*";
CT:       "*And, what is that location one more time? Can you hear me?*"
Caller:   "*Hello, can you hear me?*"
CT:       "*Yes. Sorry, you're cutting out.*"
Caller:   "*Hello?*"
CT:       "*What was that location one more time? Can you hear me?*"
Caller:   "*Yeah.*"
CT:       "*OK, I can hear you now. What was that location one more time?*"
Caller:   "*(inaudible) West McCormick.*"
CT:       "*One, zero, three, three?*"
Caller:   "*Yeah.*"

Note: At approximately 18:19 hrs (6:19 p.m.) officers were notified by dispatch using "alert tones," which are audible tones that alert officers in the field that a shooting has occurred. The dispatcher then initially said over the radio, "*have a shooting at 1033 West McCormick. 1033 West McCormick.*" Approximately twenty seconds later, the dispatcher relayed that it was "*self-inflicted.*" Forty two seconds after the initial tones, the dispatcher corrected himself over the air and said he had now "*read the call and that's not correct*" and clarified to officers in the field that the calling party said he "*did shoot his dad in the head, he is not breathing. He's also indicating that his mom and brother are in the house and he has them at gunpoint.*"

CT:       "*Is that a house?*"
Caller:   "*Yeah, it's a house. My mom and my brother are really scared right now, so I'm just pointing a gun at them and holding them in the closet right now.*"

Note: At 18:19:46 hrs (6:19 p.m.), the following was added to the written CAD, "*cp* [calling party] *is holding his mom and brother at gunpoint in the closet.*" One minute and 36 seconds after the initial alert tones, a sergeant (identified below as "WPD Sgt. #1") asked dispatch over the radio "*you have any call history with that phone number or address?*" The dispatcher immediately replied, "*I'm looking now. The only thing I've got in there previously is back in August on a stroke.*"

CT:       "*And what's your name? What's your name, hon?*"
Caller:   Ryan."
CT:       "*Ryan? Ok, Ryan, can you still hear me?*"
Caller:   "*Yeah.*"
CT:       "*Your mother and your brother are in the closet? Ryan, can you go somewhere where I can hear you better?*"
Caller:   "*I can hear you. I just, I just, I have really bad anxiety right now 'cause uh, of what I did.*"

FINCH 000312

| | |
|---|---|
| CT: | *"Ok. Well, that's Ok, Ryan. I am just having a hard time hearing you.  Now who's in the closet?"* |
| Caller: | *"My mom and my little brother uh, I'm holding them in the closet right now, making sure they don't get hurt and they don't go anywhere"* |
| CT: | *"Ok, your mom and your little brother?"* |
| Caller: | *"[voice cuts out] I don't want to get in trouble.  I didn't really mean to kill my dad."* |
| CT: | *"I understand.  Is your, can you see your dad right now?"* |
| Caller: | *"Yeah, he's on the floor dead, and he's not breathing and it's, I'm starting to think about. . ."* |
| CT: | *"Ok, tell me what happened, Ryan."* |
| Caller: | *" . . . like, lighting the house on fire and then just committing suicide."* |

Note: the printed CAD report shows that the statement, *"lighting the house on fire and killing himself,"* was entered into CAD by the call taker at 18:23:01 hrs (6:23 p.m.).  The call taker typed the statements which would then have been available to officers at the scene by way of the MCT in their patrol cars, but that information—*"lighting the house on fire and killing himself"* – was **not** relayed over the air to officers by dispatch.  Officers would only have been aware of those details if they read the call on their MCT before exiting their respective cars.

| | |
|---|---|
| CT: | *"Ryan, I'm right here with you, you don't need to do that."* |
| Caller: | "Huh? [Or possibly "Hello?"] |
| CT: | *"Tell me what happened? He was arguing with your mom, you were protecting her?"* |
| Caller: | *"Hello?"* |
| CT: | *"Ryan? Can you hear me?"* |
| Caller: | *"Can you hear me?"* |
| CT: | *"I can barely hear you, Ryan.  Can you go . . ."* |
| Caller: | *"I, I* [inaudible]" |
| CT: | *"Go ahead, I can hear you."* |
| Caller: | *"Huh?"* |
| CT: | *"Tell me what happened.  So, he was arguing with your mom?"* |
| Caller: | *"Yeah."* |
| CT: | *"I can barely hear you Ryan.  Can you go like in the living room, so I can hear you better?"* |
| Caller: | *"Ok."* |
| CT: | *"You were protecting your mom?"* |
| | End of call. |

The call lasted 3 minutes and forty seconds, meaning it ended at approximately 18:21:34 hrs (6:21:34 p.m.) given that the call was entered into CAD as received at 18:18:54.

At approximately 18:22 hrs, three minutes and thirty seconds after the initial alert tones (which began at 18:19 hrs), the dispatcher verbally advised over the radio, *" . . . indicated Ryan is going to be your suspect.  Ryan said he didn't mean to shoot him.  That he was arguing with his mom and it got out of hand.  They hung up on us.  I no longer have contact.  We are unable to call back."*

FINCH 000313

At 18:24 hrs (6:24 p.m.), one of the officers already at the scene stated over the radio that he witnessed movement on a second floor window. Again, at 18:25 hrs (6:25 p.m.) an officer noted on the radio that he saw movement in a window on the second floor.

At 18:26:30 hrs (6:26:30 p.m.), approximately seven minutes and 30 seconds after the alert tones, WPD Sgt. #1 asked the dispatcher over the radio, "*have you attempted to call back*?" The dispatcher replies, "*I don't have a phone number to call back, sir.*"

At 18:26:50 hrs (6:26:50 p.m.), seven minutes and 50 seconds after alert tones, the dispatcher added, "*previous call came from a caregiver so it's not going to help us.*" It appeared the dispatcher's reference to the "caregiver" from the "previous call" was a reference to the 911 call from August of 2017 regarding someone having a stroke.

According to CAD, at 18:28:24 hrs (6:28 p.m.) a sergeant with the Wichita Police Department (identified below as "WPD Sgt. #1") stated over the radio, "*we got the front door open.*" At timestamp 18:28:40 hrs (6:28:40 p.m.) in CAD, WPD Sgt #1 notified dispatch there were "*shots fired*" and "*one down*" at the front of the house. Note the timestamp in CAD reflects when information is typed. The recording of the radio traffic reflects that 10 seconds after WPD Sgt. #1 first announced over radio traffic that the front door was opening, WPD Sgt. #1 then stated over the air, "*shots fired, one down.*" The dispatcher responded, "*. . . shot's fired. One down. Confirming, it's the suspect*?" Sgt. #1 responds, "*don't know.*"

## II. 6:38 p.m. 911 call

At 18:38 hrs (6:38 p.m), approximately ten (10) minutes after the shooting, the BOF transferred a call to 911 from what appeared to be the original male caller. The 911 call taker was not able to get a verbal response from the caller. The CT hung up and, because the BOF had provided the calling party's number— (316) 435-8355—to the dispatcher this time, the 911 CT was able to call the calling party back at 18:40 hrs (6:40 p.m.), and make contact approximately twelve (12) minutes after the shooting.

The following conversation then took place between the CT and the caller:

      Caller:   "*Hello.*"

FINCH 000314

CT:     *"This is 911 what's going on?  Hello?"*
Caller:    *"Yeah."*
CT:     *"This is 911 what's going on?"*
Caller: *"Um I recently got disconnected.  I had told you guys everything that happened uh the argument with my mom and dad."*
CT:     *"Okay what's your address?  Hello?"*
Caller:    *"Yeah um its 1033 West McCormick street."*
CT:     *"Okay tell me exactly what happened."*
Caller:    *"They were arguing and I shot him in the head and he's not breathing anymore."*
CT:     *"Okay so what's going on right now?  Brian, are you there?"*
Caller:    *"Yeah."*
CT:     *"Okay do you have any weapons on you?"*
Caller:    *"Yeah, I do."*
CT:     *"What kind of weapons do you have?"*
Caller:    *"Um a handgun."*
CT:     *"What kind of handgun is it?"*
Caller:    *"I don't know, it's my dad's."*
CT:     *"What color is it?"*
Caller:    *"It's black."*
CT:     *"Where exactly are you at in the house?"*
Caller:    *"Um, by the closet."*
CT:     *"Okay what closet?"*
Caller:    *"My mom's."*
CT:     *"Where's that at in the house?"*
Caller:    *"Uh in her room.   Which is where she's at and my little brother."*
CT:     *"You have a little brother?"*
Caller:    *"Yeah."*
CT:     *"What's your brother's name?"*
Caller:    *"Alex.  I was on the phone with you guys earlier um telling you guys about it I just, I got disconnected."*
Ct:     *"Okay well we're 'gonna try to get you some help um, where exactly in the house like is this a one story or two story house?"*
Caller:    *"It's one story."*
CT:     *"Okay is it towards the front of the house, the back of the house?  Is it towards the front of the house, the back of the house?"*
Caller:    *"Um well like its, its like towards the back I guess.  I'm just pointing the gun at them making sure they stay in the closet.  My mom and my little brother."*
CT:     *"Okay is there any way you can put the gun up?"*
Caller:    *"No are you guys sending someone over here cause then I'm definitely not 'gonna put it away."*
CT:     *"Okay I'm just 'gonna go ahead and stay on the phone with you okay?"*
Caller:    *"That's fine. Until they get here or?"*
CT:     *"As long as you need me to okay?"*
Caller:    *"Yeah I'm thinking about um cause I already poured gasoline all over the house I might just set it on fire."*
CT:     *"Okay well we don't need to do that okay?"*
Caller:    *"In a little bit I might."*
CT:     *"Why would you do that?"*

FINCH 000315

Caller: *"Do you have my address correct?"*
CT:     *"Can you verify it for me again?"*
Caller: *"Um its 1033 West McCormick street um my zip code is 67213."*
CT:     *"Okay.   So which way does your house face like does your front door face north, south, east, west?"*
Caller: *"Uh no, it's just facing the street.   My dad isn't breathing its kind of giving me anxiety making me like paranoid.  Hello?"*
CT:     *"I'm still here.  I'm still here okay?"*
Caller: *"Yeah me too."*
CT:     *"Okay are you white, black, Asian, Hispanic?  Are you there?"*
Caller: *"Yeah."*
CT:     *"Are you white, black, Asian, Hispanic?"*
Caller: *"Is, is, it was an accident so."*
CT:     *"Okay that's fine.   I'm just trying to see who's, who okay.  Is your name Brian or Ryan?"*
Caller: *"Ryan."*
Q:      *"Ryan, R-A, R-Y-A-N?"*
Caller: *"Yeah."*
CT:    *"Okay and what's your last name Ryan?  What's your last name?  Are you there? Ryan are you still there can you hear me?   Hello?  Are you there, talk to me. Ryan.  Hello?   Ryan are you there?   Can you hear me?  Talk to me Ryan. Ryan are you there?   Hello? Can you hear me?  Hello. Ryan, are you there? Hello?*

Mr. Finch was subsequently removed by law enforcement officers from the porch, west to Seneca Street where EMS had been "staged" initially in anticipation of providing medical attention for the "father" allegedly shot according to the original call. EMS had been dispatched with the original dispatch at 18:19 hrs (6:19 p.m.).  CAD recorded that at 18:20:45 the first EMS unit reported at the scene and at 18:24:35, a second EMS unit reported at the scene. Mr. Finch was transported by ambulance to the hospital and was later pronounced dead at 19:03 hrs (7:03 p.m.).

## REVIEW OF THE INVESTIGATION

The officer who fired the shot that caused the death of Andrew Finch was transported to the Wichita City Building where he submitted to a voluntary, recorded interview by a detective with the Wichita Police Department and an agent with the Kansas Bureau of Investigations.  Crime Scene Investigators from the Wichita Police Department processed the scene at 1033 West McCormick.

The body of Andrew Finch was ultimately transported to the Sedgwick County Regional Forensic Science Center for autopsy.  Bullet fragments were recovered from the body of Mr. Finch and the

FINCH 000316

single cartridge casing was collected at the scene.

After the shooting, multiple law enforcement officers who had been present on the exterior, to the north, east and west of 1033 West McCormick at the time of the shooting also submitted to voluntary, recorded interviews. The four civilians inside the residence at the time of the shooting were transported to the city building where they were each interviewed that night. At the request of the Office of the District Attorney, the Wichita Police Department officers and Sedgwick County Sheriff's deputies who had been staged on the north and east sides of 1033 West McCormick the night of the shooting were subsequently re-interviewed by a KBI agent and an investigator with the Office of the District Attorney during the first week of March of 2018.

Video taken by body camera was collected from officers with the Wichita Police Department. Deputies with the Sedgwick County Sheriff's Department do not typically wear body cameras and none of the deputies on scene this night were equipped with body cameras. Transcripts of interviews, reports of officers and detectives involved in the investigation, reports detailing the collection of evidence at the scene, all physical evidence recovered, the results of the forensic testing and the autopsy report were all reviewed.

FINCH 000317

## WITNESS STATEMENTS

### Law Enforcement Witnesses

**Badge on the Floor (B.O.F.)** – A noncommissioned employee of the Wichita Police Department is routinely assigned to answer the phone at the city building during off hours. Known as the "badge on the floor" (hereinafter, B.O.F.), the B.O.F. was interviewed and provided the following:

According to phone records of the Wichita city building, on Thursday, December 28th 2017, 18:10 hrs (6:10 p.m.), the BOF received a phone call from (316) 435-8355. The BOF described the caller as male. The male caller asked, *"Can you hear me now"* in what the BOF described as a low voice. When the BOF acknowledged he could hear the caller, the caller added, *"my mother hit my father in the head with a loaded gun."* The call lasted ten (10) seconds. The BOF then attempted to transfer the call to 911.

At 18:15 hours (6:15 pm), the same number came through to the BOF. The caller asked if police were on the way and said his call to 911 had been dropped. The call lasted sixteen (16) seconds. The BOF again attempted to transfer the call to 911.

At 18:17 hours (6:17 pm), the same number came through to the same BOF and the caller again said the call had been dropped when he was previously transferred to 911. The call lasted twenty eight (28) seconds. The BOF again attempted to transfer the call to 911.

Eighteen minutes later, at 18:35 hours (6:35 pm), the same number came through to the BOF and again the caller said the call had been dropped when he was transferred to 911. The BOF asked the caller his name, and was told "Brian." The BOF asked the caller to confirm the number he was calling from, which the caller did. The BOF attempted the fourth transfer of the call to dispatch. The BOF then called the patrol west CT at 911 and advised he had a caller named Brian who was reporting his mother had hit his father in the head with a loaded gun. He provided the number and the CT said they would call Brian back at that number.

At 18:36 hrs (6:36 p.m.), the caller who referred to himself as "Brian" called the BOF. The BOF noted the caller was *"talking loud and irritated."* The BOF told him to hang up as 911 was trying to

FINCH 000318

call him back

**Wichita Police Department Sergeant #1.**  The sergeant is a 17 year veteran of the Wichita Police Department, was the first commanding officer on scene. He was interviewed the night of the incident.

He was driving westbound on Kellogg near Woodlawn when he heard the dispatch relay that a caller said he had shot his "*dad and that he had his, I believe it was his mom and sister at gunpoint in a closet.*" He asked dispatch on the west channel if there had been prior calls to that address or from that phone number.  Dispatch responded that the number had made a recent call related to medical call. When Sgt. #1 arrived, he heard two sheriff's deputies had checked out on scene and saw other officers were arriving.

When Sgt. #1 arrived, he saw lights on in upstairs windows and heard officers on the radio describing movement in the upstairs windows. He directed officers to cover the north side of 1033 McCormick, and to block the street. He saw one officer with a rifle, WPD Officer #1, who had initially placed himself on the west side of the house. Sgt. #1 directed Officer #1 to move to the front of the house because he wanted "*a rifle for long cover.*"

Sgt. #1 went with WPD Officer #1 and two additional WPD officers to 1038 West McCormick, the north side of McCormick street across from 1033 West McCormick. From that position, Sgt. #1 saw a line of officers staged on the north side of 1027 West McCormick, the residence directly to the east of 1033 McCormick.  Sgt. #1 was getting the perimeter established and preparing to use a P.A. to "*call . . . out*" the suspect.

He heard someone yell, "*he's coming out*" and saw a male standing in the doorway.  Officers began yelling "*let me see your hands,*" and "*come out here.*"  Thinking it would be better for the male to focus away from the officers staged to the east, Sgt. #1 began "*screaming louder for this guy to, to walk towards me.*" Sgt. #1 pulled his handgun as soon as the man stepped into the doorway, then recognized that he was too far to "*be taking a shot from that distance*" with the handgun.

With respect to the male, Sgt. #1 saw "*his hand like start to come down to his right side.*" Sgt. #1 never saw the male with "*his hands up.*" Sgt. #1 stated instead that the male's hands appeared to be

FINCH 000319

"*out in front of him.*" Then his "*right hand came down.*" He added later, "*his right hand came down a little bit to his side and that's when everyone screamed louder.*" Sgt. #1 "*glanced*" away to where other officers were staged when he heard the "*crack*" of the rifle from WPD Officer #1, who was standing next to him.

Because officers lost sight of Mr. Finch after the shooting, Sgt. #1 considered having a K-9 placed on a long leash to pull the male, later identified as Andrew Finch, away from the porch. A Lieutenant arrived and the decision was made that officers would go onto the porch and remove Mr. Finch to EMS, which had been requested to "stage" at the nearby Phillips station. As this was accomplished, officers entered and began to clear the residence. After the first floor was cleared, dispatch advised that the caller was back on the phone saying he was upstairs hiding with a handgun and had poured gasoline in the house. Sgt. #1 specifically remembered telling dispatch, "*I don't smell gasoline.*" Note, as referenced above, the caller's second contact with 911 began at 18:40 hrs (6:40 p.m.).

The first time the sergeant realized something was "*off*" concerning the call was after the shooting when he asked dispatch where the "*ping*" from the caller's phone was coming from, and dispatch responded, the call had not come in directly through 911, but rather had been "*it's coming from a cell phone and I'm getting some conflicting information. It may have been transferred through and I don't have a cell phone number, I don't have any way to ping it. I think I understand that now.*" The dispatcher then added, "*we do have a live person on the phone, was transferred from downtown.*"

Sgt. #1 was subsequently interviewed by an investigator with the Office of the District Attorney in March of 2018. Sgt. #1 confirmed that he focused on the officers approaching from the side of the house, because he was concerned about the risk of cross-fire between officers on either side of 1033 West McCormick. He gave verbal commands for Mr. Finch to "*walk this way,*" to get him out away from the house where he could be taken into custody by officers nearer the house. As he looked to the officers at the west, he heard the shot. Sgt. #1 said he did not shoot because he had a handgun and felt he was at a distance across the street and that was "*a 50 yard shot that I'm not comfortable making.*"

Sgt. #'s axon body camera was activated at the time of the shooting.

FINCH 000320

**Wichita Police Department Sergeant #2,** heard the dispatch at 18:18 hrs (6:18 p.m.) regarding a possible shooting at 1033 West McCormick. Prior to his arrival at the scene, Sgt. #2 heard dispatch report *"shots fired."* He arrived and immediately joined the *"stack"* of officers preparing to approach the porch. He was not aware at that time whether law enforcement had fired the shot.

Sgt. #2 approached the front porch and saw the person later identified as Andrew Finch lying on the porch. Sgt. #2 heard another law enforcement officer verbalize that Mr. Finch appeared to be deceased. Sgt. #2 proceeded with a team of officers into the residence and cleared the first floor. After clearing the first floor, a white male, later identified as M.J., came down the stairs. M.J. was taken into custody and removed by other officers.

As *"officers were preparing to proceed up the staircase,"* Sgt. #2 recalled dispatcher provided additional information that (in the words of Sgt. #2) *"the suspect was still upstairs and that he had hostages hiding in the closet"* and that he *"was preparing to pour gasoline all over the area and was going to be prepared to set everything on fire."* Officers then cleared the residence and did not locate anyone additional persons. Sgt. #2 wrote, "[i]*t was at this point that we believed this was possibly some type of fake call.*"

Sgt. #2 did not witness the shooting. He was not interviewed but generated a typed report detailing his involvement.

**Wichita Police Department Officer #1.** The officer who fired his department-issued rifle, killing Andrew Finch, is a seven year veteran of the Wichita Police Department. On the night of the shooting, he was riding in a two officer patrol unit with Officer #2.

Officer #1 told investigators that while on the west side of Wichita, he and Officer #2 heard dispatch relay that a caller was reporting he had shot his father and was holding his younger sibling and mother at gunpoint in a closet. The location of the call was 1033 West McCormick.

Officer #1 and Officer #2 responded to the scene. Other officers had already checked out on scene. They parked behind the former restaurant due west of the residence. When he exited the patrol vehicle, Officer #1 obtained his department-issued rifle, "[k]*nowing that given what's being reported*

FINCH 000321

*of the homicide happened, people are being held at gunpoint. Um, we may be just setting up a perimeter for SWAT if, if you know all of the, depending on how things go.*" Officer #1 had been certified to use the rifle for three years.

Officer #9 directed Officer #1's attention to a window in the second story of the west side of 1033 West McCormick. The silhouette of a person was visible. The person appeared to be bending at the waist and moving up and down. Officer #9 verbalized that it looked as though someone was conducting CPR. Officer #1 later explained that he "agree[d]" that it did look as though someone was actively performing CPR.

Officer #1 was then instructed by Sgt. #1 to accompany him (Sgt. #1) to the north of 1033 West McCormick. Officer #1 and Officer #2 then followed Sgt. #1 north of the residence, across McCormick Street to the driveway of 1038 West McCormick.

Officer #1 took a position behind a car in the driveway of 1038 West McCormick to cover officers who were setting up a perimeter around 1033 West McCormick.

Officer #1 saw a silhouette behind the screen door (north facing) of 1033 West McCormick. The front door opened to the west and a white male, later identified as Andrew Finch, appeared in the doorway. Officer #1 confirmed he was looking through the "*optic lens,*" a non-magnifying rifle optic, when he saw Mr. Finch open the door.

Officer #1 heard other officers east of 1033 West McCormick yelling the command, "*show us your hands.*" In response, Mr. Finch turned his head to the right, and "*throws his hands up very quickly*" to about ear-level—"*and almost as soon as he puts his hands up, he brings them back down.*" The officer then sees Mr. Finch reach back with his right hand and lift "*the side of his sweatshirt or jacket or whatever it is that he's wearing, actually lifts the side.*" Officer #1 said the garment then "*comes back down.*" Officer #1 believed this was a "*gun drawing motion.*" Mr. Finch then "*dips his shoulder before he comes back up and puts his right hand down at his side.*" The officers to the east "*are still yelling at him.*" Officer #1 then sees Mr. Finch look back at the officers to the east and "*take a drop step back and to his right as he starts to bring his hand up and um I at that point I believe he has a firearm in his hand.*" The officer again stated Mr. Finch was "*squaring his body*" toward the officers

FINCH 000322

to the east, "*at the same time that his hand starts to come up and that when I'm like okay he's, he's 'gonna fire at officers. I believe that I see a, a gun in his hand and as the, that's being raised at the officers and at that point that's when I decide to protect those officers and their lives and safety, I fire one round at this individual.*"

Officer #1 stated that he believed Mr. Finch would shoot the officers to the east. He stated, "*we've got the reported homicide, people being held at gunpoint and this man's confronted by police on the porch. He's gone through the entire scenario of drawing his firearm, lifting up his shirt, just like you or I would if we're in plain clothes. Shoulder dips, arm comes back up, does this, take his drop step and start to bring up his hand.*" Officer #1 stated, "*I believe he's got a firearm in his hand and is going to fire on those officers and I fired a single round at that male.*"

Officer #1's axon body camera was activated at the time of the shooting.

**Wichita Police Department Officer #2.** Officer #2, a five and ½ year veteran of the Wichita Police Department, was riding with Officer #1 near Kellogg and Ridge when the dispatch came out involving a disturbance with a gun.

Officer #2 described dispatch stating that the calling party had shot his father and was holding his brother and mother at gunpoint in a closet. Officer #2 drove. He said his partner, WPD Officer #1 would have been reading the CAD printout by way of the MCT in the patrol vehicle and may have verbally relayed some of what came across CAD.

The two officers arrived and parked southwest of 1033 West McCormick. His partner, Officer #1, was the only officer on scene that he saw with a rifle, so they went from the west side of the residence across McCormick to the north directly facing the front door of 1033 West McCormick. Officer #2, Officer #1 and Sgt. #1 were all then standing north of McCormick street.

"[M]*aybe 3, 3, 4 minutes,*" after they were in place, a white male appeared in the doorway. Officer #2 did not recall any new information being relayed over the radio during those minutes.

When the man appeared in the door way, "*just immediately outside the threshold,*" Officer #2 "*had*

FINCH 000323

*complete view of him.*" The man seemed "*startled by our presence*" and made a "*sudden movement,*" or a jerking movement after the verbal commands from officers. Officer #2 heard officers to the east of the white male. Officer #2 thought the man was trying to get back into the house and "*made a big effort to try and get back in that house. I could see him struggling with the door knob*" with his right hand.

Officer #2 heard a single shot and saw the white male, subsequently identified as Andrew Finch, fall. He later saw a female approach the front door from the interior of the residence. Officer #2 went towards the house and shone a flashlight. He could see the female standing near or possibly over Mr. Finch. It appeared the female then exited the residence out an east door.

After the shooting, Officer #2 described hearing "*mixed . . . information.*" At various times after the shooting, he heard radio traffic that a 16 year old was in the house, but later heard the 16 year old was not. He heard radio traffic that the mother was upstairs but the officers who went in to clear the house could find no one on the second floor.

Officer #2 was subsequently interviewed by an investigator with the Office of the District Attorney in March of 2018. Officer #2 said that he did not fire because he did not see a firearm in Mr. Finch's hands. When Mr. Finch reached behind himself, Officer #2 interpreted Mr. Finch's movement as an attempt to retreat back into the house.

Officer #2's axon body camera was activated at the time of the shooting

**Wichita Police Department Officer #3.** The officer is a four and one half year veteran of the Wichita Police Department. He was working surveillance near Pawnee and Washington with Officer #4 when "*tones*" came across the radio indicating a shooting. The dispatch relayed that the calling party stated "*his dad's been shot and he's holding . . . the rest of his family at gunpoint.*"

Officer #3 arrived at the scene and when it was clear that officers had "*all sides covered*" he stationed at the northwest corner of 1027 West McCormick, which is the house directly east of 1033 West McCormick on the same side of the street.

FINCH 000324

A Sheriff's Deputy standing west of him brought a bunker (shield).  Officer #3 heard radio traffic from officers on the scene that they were seeing movement from upstairs windows.  He heard an officer say words to the effect, "*we got movement*."  Officer #3 then saw a white male, later identified as Mr. Finch, step out of the north facing door.  He heard officers begin to yell commands to the man. Officer #3 did not remember yelling commands himself but did remember yelling the word "*crossfire*," as a warning to other officers because he was concerned about the risk of cross fire between officers staged both east and west of the front porch of 1033 West McCormick.

Officer #3 stated, "*at this point I mean I believe we're contacting a suspect who had just admitted to a shooting, I believe shooting his dad and holding his family at gunpoint.*"  The officer moved to the right (north) a "*little.*"  He described Mr. Finch raising his hands just above shoulder-height, before "*dropping them back.*"  When the officers yelled commands such as "*show us your hands,*" and "*raise your hands,*" Mr. Finch would respond by raising his hands back up.

After raising his hands, Mr. Finch then reached down towards what the officer believed to be his (Mr. Finch's) waistband.  He said Mr. Finch appeared to be "*scanning*" or "*gazing around*" at the officers but did not "*look like he was being compliant at all.  He wasn't locked in on any commands and he wasn't, . . . wasn't acting very quickly to the commands.*"

Mr. Finch then dropped his hands "*to his waistband.*"  The officer thought "*if he has a gun, he's going for his gun because of the movements that he's making with his hands.*"  Mr. Finch reached back to his right toward the house, "*blading*" himself toward the house, "*like he's either 'gonna draw and take fire or if he's just 'gonna draw and just you know keep going.*"  The officer then heard a single shot and saw the "*spark*" of the bullet striking the edge of the storm door.

Officer #3 then provided cover outside the residence while other officers entered and cleared the residence.

Officer #3 was subsequently interviewed by an investigator with the Kansas Bureau of Investigation in March of 2018.  Officer #3 stated, that he arrived and staged at the corner of the house directly east of 1033 West McCormick with Officer #4 and staged behind the Sheriff's Deputies already there.  He said the group of officers and deputies he was with communicated to Sgt. #1 – who had moved with

Officer #1 and Officer #2 to the North side of McCormick – that they would be the *"arrest team, a contact team."* Other officers were communicating by radio what their relative positions were around the house, when he saw Mr. Finch come to the front (North) door. Officer #3 heard *"heated"* commands from the deputies directly in front of him and the officers to the north, across McCormick. Officer #3 again provided detail concerning Mr. Finch's multiple hand movements. Officer #3 said he looked to the west and saw officers as well as what appear to be civilians at the convenience store at the North West corner of Seneca and McCormick and realized he had *"terrible background."* Worried about the risk of cross fire, he began to move to his right (north) *"so I can put the house, the corner of the house as his background, for my backdrop, for if I have to take a shot."* As he began to move, he heard a single shot. He clarified that he did not shoot due to the poor backdrop and his fear of crossfire with the officers and civilians to the west.

Officer #3's axon body camera was not activated at the time of the shooting. The officer activated the device moments after the shooting. No audio is captured in the first 30 seconds when body cameras are activated.

**Wichita Police Department Officer #4.** The officer, a five and ½ year veteran the department, was on surveillance near Washington and Pawnee with Officer #3 when he heard "tones" indicating a shooting call. Dispatch then said they had a *"young man on the phone that was stating that he just shot his father in the head. And that he was holding his mother and siblings at gunpoint."* He later added that dispatch said the caller *"accidentally"* shot his father and was holding his mother and sibling hostage. When he heard this, Officer #4 said he thought, *"why would you be holding your family at gunpoint if you accidentally shot your father. It didn't add up to me."*

Officer #4 and #3 responded to the scene, parked and took up positions on the northwest corner of 1027 West McCormick, which is the house directly east of 1033 West McCormick on the same side of the street.

He and Officer #3 were stacked or staged behind three Sheriff's Deputies (Deputies #1, #2 & #3), the first of whom (Deputy #1) had a shield.

The five officers agreed to each cover different *"areas of responsibility"* at 1033 West McCormick.

FINCH 000326

One sheriff's deputy had a rifle and covered the porch, while he and officer # 3 covered upstairs windows.

A male later identified as Mr. Finch, came out of the north door onto the porch, "*just barely*" out of the house before officers began giving verbal commands. Because the Sheriff's deputies in front of Officer #4 were already giving verbal commands to "*show me your hands, show me your hands, lift your hands up*" Officer #4 did not offer any commands of his own.

Officer #4 could see Mr. Finch's "*body language*" and facial expression which he described as "*like he was just not interested in dealing with the police on this day or this night.*" The officer said Mr. Finch put his hands up before he reached down with both hands "*and actually pulled up his pant[s] and I can remember thinking that's not a good idea. . . don't be lifting, tugging at your waistband.*" The officer said Mr. Finch never spoke. Officer #4 said Mr. Finch then turned "*back towards the house and one of his hands, I believe it was his . . . right*" went back down "*towards his pants, so he turns, he's 'gonna turn towards us.*" Officer #4 thought, "*given the circumstances of this call and him not listening to us, I remember thinking okay this is 'gonna be the guy. This is 'gonna be the one who just shot the dad.*" He went on to say that he thought, "*this is 'gonna be what this guy wants. He's 'gonna want the police to shoot him. This is where he's 'gonna pull out his gun and get shot.*" Officer #4 thought "*he was 'gonna pull a gun out.*" He heard a single gunshot and saw Mr. Finch fall.

Officer #4 saw residents of 1033 W. McCormick coming out a side door facing east shortly after the shooting. The people inside were contacted by officers. The residents were not able to say whether or not a boy and woman might still be upstairs. After officers went in to clear the house, dispatch said over the radio that a caller still inside saying he was hiding in a closet with a gun and intended to light the house on fire. The entry team finally announced they were confident they had cleared the house and the caller was not there.

Officer #4 was subsequently interviewed by an investigator with the Office of the District Attorney in March of 2018. Officer #4 said that when he and Officer #3 arrived, he placed himself at the north west corner of 1027 West McCormick, directly east of 1033 West McCormick. He estimated this put him 35 to 40 yards from the front (north) door of 1033 West McCormick (note, subsequent examination by crime scene investigators estimated the distance from Mr. Finch to officers located

FINCH 000327

east, at 47 feet). Officer #4 reiterated his impression that he believed Mr. Finch was the calling party and that when Mr. Finch reached "*towards his waistband*," that he was "'*gonna pull out a gun.*" Officer #4 stated he did not fire because the sheriff's deputy with a rifle was closer to 1033 West McCormick and "*it was his shot to take.*" He also added that he did not see a weapon in Mr. Finch's hand and that was "*why I didn't shoot.*"

Officer #4's axon body camera was not activated at the time of the shooting. The officer activated the device moments after the shooting. No audio is captured in the first 30 seconds when body cameras are activated.

**Wichita Police Department Officer #5.** The officer, a four year veteran of the department, was near Harry and McLean with Officer #6 when the dispatch came out. They parked at the closed restaurant directly west of 1033 W. McCormick.

Sgt #1 was on scene and had taken command, was monitoring radio traffic and putting out information. Officer #5 took cover at the closed business west of the residence and monitored the west side of the house. He saw "*a male come out um the screen door.*" Officers started giving commands to the man, later identified as Andrew Finch. Officer #5 said the man's hands were down, "*I couldn't tell you if that was the suspect of the alleged shooting or if it was someone coming out asking for help.*" When asked if he saw Mr. Finch make any movements, he responded, "*not that I can see, no.*" He later described seeing the "*screen door hit the porch and almost looked like it was almost 'gonna shut back on him.*"

Officer #5 drew his weapon but was concerned about cross fire with the officers to the east, "*so I lowered mine.*" A single shot was then fired.

Officer #5's axon body camera was activated at the time of the shooting

**Wichita Police Department Officer #6.** The officer had been with the department nearly one year. He and Officer #5 were riding together that night. They heard the dispatch of a shooting on the west side. He switched over to CAD (computer assisted dispatch) and read that the shooting was on 13 beat. The CAD text indicated that "*the suspect was holding a brother and mom hostage and that a, or*

FINCH 000328

*at gunpoint and that dad had been shot. So, at that point it sounded like it was either an active shooter or some kind of firearm was involved.*" They responded to the scene and parked in the alley directly west of the residence.

Other officers began to arrive and set up a perimeter around the house. He saw the silhouette of a person walking through a second story window. He saw Sgt. #1 and two other officers he did not know take positions across McCormick Street to the North.

From his position west of 1033 West McCormick, Officer #6 saw the front door to the residence open and saw someone exit. He drew his pistol and began to yell the command, "*show me your hands*" or "*hands.*" The man, later identified as Andrew Finch, "*had his hands up at first. And then he started moving his hands.*" Officer #6 heard a single gunshot from officers. He had his gun drawn but did not shoot because he was aware of a risk of crossfire with the officers to the east.

After the shot, he and other officers staged immediately to the west then entered the residence to clear 1033 West McCormick.   Officer #6 assisted in clearing the residence.

Officer #6's axon body cameras was activated at the time of the shooting

**Wichita Police Department Officer #7**.  The officer, a nearly six year veteran of the department, was working a DV call on the west side when he heard the call.  A shooting call was dispatched, so another officer took the DV call and Officer #7 responded to the shooting call on McCormick.

As he arrived he heard Sgt. #1 calling for help to shut down McCormick Street. So, when he arrived, Officer #7 parked his Tahoe blocking the eastbound lanes of McCormick.  He saw WPD Sgt. #1, Officer #2 and Officer #3 "*crossing McCormick to the north.*"  He secured his vehicle and followed them to the north of McCormick Street.

While in route in his patrol car, he had reviewed the "*call text*" from the MCT and began sharing that information with the officers he accompanied north of McCormick.  The information he had was that the calling party "*had just shot his dad in the head. And uh, dispatch continued on stating that he had his mother and I believe his brother a hostage in a closet and was holding them at gunpoint. And they*

FINCH 000329

*also made a statement that he was wanting to kill himself or something like that.*"

Officer #7 was focused on the upstairs windows of 1033 West McCormick when he heard officers yell "*show me your hands.*" He could see a white male, later identified as Andrew Finch, "*stepping out of the threshold.*" The officer continued to look for additional movement from other windows. He added that he was concerned for the risk of crossfire between officers to the east and west of 1033 West McCormick. From his peripheral vision, he saw Mr. Finch's "*hands come down briefly.*" He said Mr. Finch's hands were at or near head height. He added that he did not see where his hands went but that he did "*remember [seeing] his hands coming down.*" The officer then focused again on the upstairs windows when he heard a single shot.

Other residents of the house later began to exit the east side of door. WPD Sgt. #1 and another Sgt. that arrived after the shooting ordered officers to move up to remove Mr. Finch to another location for medical assistance and to clear the residence. Officer #7 assisted in carrying Mr. Finch to a location away from the house. He patted Mr. Finch down and found only a wallet. Mr. Finch was not armed. Officer #7 then assisted in the "*secondary*" search of 1033 West McCormick, when officers checked the residence a second time to ensure it was clear, "*because we still believed that there was probably somebody still shot inside.*"

Officer #7's axon body camera was activated at the time of the shooting

**Wichita Police Department Officer #8**. The Officer, a five and ½ year veteran of the department, heard the dispatch and responded to 1033 West McCormick and took up a position south and west of the residence. He had not reported to the north of the building at the time of the shooting.

He saw movement in the upstairs windows. He heard "*yelling and it sounded like it was coming from officers.*" He specifically heard the command, "*show me your hands.*" It sounded like the commands were coming from north of the house. He heard one gunshot.

He heard WPD Sgt. #1 then used a PA to direct people out of the house. Officer #8 was part of the entry team that cleared the residence including the attic.

FINCH 000330

**Wichita Police Department Officer #9.** The officer heard the dispatch at 18:18hrs (6:18 p.m.) of a shooting that had occurred at 1033 West McCormick. The calling party told 911 he had shot his father in the head and that was still in the house with his mother and brother. In route to the call, updated information provided by dispatch was that the caller was *"holding his mother and brother at gun point in a closet in the house."*

Officer #9 arrived at 18:23 hrs (6:23p.m.) and parked near the former restaurant west of 1033 West McCormick. As other officers arrived, dispatch verified that they had lost contact with the caller. Officer #9 saw the shadow of what appeared to be a person in the upstairs window, *"bending over at the waist and . . . going up and down rhythmically. Due to the nature of the call and the information we had at that point, I believed it possible that I was seeing someone doing chest compressions or CPR inside the residence."*

Another officer arrived on the scene and Officer #9 began to relay what information was available. While providing the update, Officer #9 heard a single shot. Due to the echo from the surrounding buildings, Officer #9 thought the shot had been fired from the south. He later witnessed other officers carrying what was subsequently determined to be Andrew Finch to EMS for medical intervention.

Officer #9 did not witness the shooting. He was not interviewed but generated a typed report detailing what he saw and heard.

**Wichita Police Department Officer #10.** The officer heard a dispatch at 1818 hrs (6:18 pm) regarding a calling party who *"stated he had shot his dad in the head and was holding his mother and brother at gun point in the closet."*

Officer #10 arrived at approximately 1823 hrs (6:23 p.m.) and parked at 1023 West McCormick, two houses east of 1033 West McCormick. He saw officers to his west (one house east of 1033 West McCormick) *"attempting to secure a perimeter."* While still standing at 1023 West McCormick, he "observed a silhouette of a person open the outside screen door of 1033 West McCormick and step out onto the front porch of the residence with the screen door open." He *"could not tell if this person was male or female and could only observe that they appeared to be of a larger build wearing a*

*hooded top.*" Officer #10 heard other officers making verbal commands to "*show us your hands.*"
Then, "[a]*fter several commands from officers, it appeared the individual turned or was moving back
towards the threshold of the door when I heard a gunshot that sounded as if it were coming from the
northwest of the residence.*"

Officer #10 was not interviewed but generated a typed report detailing what he saw and heard.

**Sedgwick County Sheriff's Deputy #1.**  The deputy, in his seventh year with the department, was
on patrol that night with deputy #2 attempting to serve warrants when they heard the dispatch.  He
recalled hearing that it sounded like an "execution" had taken place at 1033 West McCormick.  He
and the sheriff's deputy he was with responded to the scene and parked east and approached on foot
on the south side of McCormick. Walking from that position toward the suspect house, the deputy saw
lights on upstairs and other officers who had arrived and taken positions at the northwest corner of the
house.  Law enforcement vehicles were visible where they were parked west of the house.

Deputy #1 and Deputy #2 then went to the northwest corner of 1027 West McCormick, the house
directly east of 1033 McCormick.  As other officers arrived, he went back to his patrol vehicle and
retrieved a "*ballistic shield,*" also referred to as a "bunker."  He saw movement in an east facing,
upstairs window.  Officers were still "*setting up the perimeter*" when he saw a male exit the home
onto the north front porch.

Deputy #1 described a WPD SUV parked between the two houses, 1033 West McCormick and 1027
West McCormick. The SUV had been parked facing south.  The deputy initially said he was standing
near the driver's side front tire of the SUV when the male stepped onto the porch.  The next day,
Deputy #1 re-contacted the detective who conducted his interview and clarified that, after thinking
about it over night, he had not moved from 1027 West McCormick to the area next to the WPD SUV
until after the shot was fired.

Deputy #1 remembered yelling, "*put your hands up,*" or "*show us your hands*" and heard other
officers give similar commands.  The male put his hands "*up in front of him*" and then "*slowly backed
up and reached back with his right hand behind his back as he's backing up.*" Deputy #1 described
this reaching motion as the male reaching behind his own back.  The deputy could not see what "*he*

FINCH 000332

*was reaching for*" because the man was "*moving back into the doorjam.*"  As the man's "*hand went down behind his back,*" Deputy #1 heard the shot.  He did not see the man's hands come "*back up.*"

Deputy #1 maintained his position after the shot was fired.  Over the radio, he heard officers arrange to have EMS ready at the intersection of Seneca and McCormick.  The male, later identified as Andrew Finch, was subsequently moved to that location.

Deputy #1 later saw civilians exit the residence of 1033 West McCormick from a door on the east side of the house.  He spoke to a younger female and directed her back away from the house.

Deputy #1 was subsequently interviewed by an investigator with the Office of the District Attorney in March of 2018.  Deputy #1 again stated he was positioned with a bunker the night of the incident. After Mr. Finch came to the door, and officers began yelling commands, he described Mr. Finch raising his "*hands up and down a few times,*" and that his "*right hand went behind the small of his back.*"  Deputy #1 could not see what Mr. Finch was doing "*exactly, whether he was tucking his shirt in or pulling his pants up,*" or whether his "*elbow hit the door,*" but then Mr. Finch "*recessed into the threshold where I lost visual.*"  Deputy #1 did not know "*what happened from there.*"  He never saw Mr. Finch raise his arm from the small of his back before moving back into the threshold.

**Sedgwick County Sheriff's Deputy #2**.  The deputy, an eleven year veteran of the Sedgwick County Sheriff's Department, was working that evening with Deputy #1.  They heard the call come out regarding 1033 West McCormick and responded.  The calling party reported he had shot his father, and had his "*mother and brother at gunpoint.*"  En route to the scene, he thought he heard the dispatcher issue the code for a "*barricaded subject.*"  He and Deputy #1 parked east of the house and approached on foot on the south side of McCormick.

When they arrived, they moved with WPD officers to the northwest corner of 1027 West McCormick, the house directly east of 1033 West McCormick.  Deputy #2 retrieved his duty rifle, and took the lead position closest to the house.  He heard WPD Sgt. #1 on the radio "*formulating a plan what we were going to do.*"  He saw a white male with dark hair look out an east facing window for "*just a second.*"

FINCH 000333

"*A short time later*," he saw a white male, later identified as Andrew Finch, exit the north facing door of the residence. Deputy #2 saw Mr. Finch's right hand was empty and did not recall seeing anything in his left hand. The deputy yelled for Mr. Finch to raise his hands and walk slowly off the porch. The deputy heard other officers yelling commands as well. Mr. Finch did "*initially raise his hands when he first looked at me*." Deputy #2 said Mr. Finch's "*expression was that of surprise*." Deputy #2 said Mr. Finch put "*his hands up and then he lowered them and he kind of brought 'em back up again and lowered them. And then he started to backtrack into the residence into the door that he had came* [sic] *out of. So, well he was, he was kind of slow but he was backing back in, then I was losing visual of him due to my angle*." The deputy could only see "*a third*" of Mr. Finch. He heard a single gunshot and saw sparks.

After the shot was fired, a period of time passed and people from inside 1033 West McCormick began to exit the residence through a door on the east side of the house. Deputy #2 and other law enforcement officers directed the civilians out of the house.

Deputy #2 was subsequently interviewed by an investigator with the Office of the District Attorney in March of 2018. Deputy #2 said that as he was making verbal commands to Mr. Finch, he saw Mr. Finch "*had retreated into the uh, threshold of the door. I lost visual of everything at that point*."

**Sedgwick County Sheriff's Deputy #3**. Deputy #3 in his fifth year with the department, was working the downtown beat. He heard the dispatch "*that one person had been shot and two people were being held at gunpoint*." He was only one to one and ½ miles away, so he responded to the call. When asked to clarify, he believed the dispatch was that the shooter had shot his "*father*" and was holding his "*mother and sister at gunpoint in the closet*." He understood the suspect had called 911. He did not recall any other information coming from dispatch.

When he arrived, Deputy #3 did not initially see additional law enforcement present. He parked down the street and walked first to 1027 West McCormick, the house directly east of 1033 West McCormick where other law enforcement officers were already "*stacking*." He went to the back of the house and saw that 1033 West McCormick was "*covered*" so he went back to the north and was the last law enforcement officer in the "*stack*" of officers on the northwest corner of 1027 West McCormick.

FINCH 000334

Deputy #3 estimated he had been in that position for 1 to 2 minutes when he saw a white male civilian, later identified as Andrew Finch, step on to the front porch. The officers began to yell, "*get your hands up*," and initially, Mr. Finch moved his hands up "*above his head.*" Deputy #3 saw Mr. Finch look around. Deputy #3 described the look on Mr. Finch's face as "*confused, like he didn't know what was going on or he was trying to figure out what was going on.*" Mr. Finch then reached down, "*about waist level.*" Mr. Finch was standing in the door frame at that time, so when he reached down and back (south), this put his hand in the interior of the residence. As a consequence, the deputy "*lost view of his hand*" as it "*went into the doorframe.*" The deputy wondered whether Mr. Finch was reaching for a doorknob. Mr. Finch turned his head. The deputy heard a shot fired and saw sparks from what he assumed was a bullet striking a metal door.

When asked why he did not shoot, Deputy #3 stated that he was not fearful of being shot because he had been close enough to see the right arm of Mr. Finch and had not seen a gun. He could not see Mr. Finch's right hand when Mr. Finch reached behind, but the Deputy had not previously seen a gun.

The deputy said that a short time later, three people from inside the house came out a door on the east side of the house. He contacted a teenage girl before he helped move Mr. Finch, to Seneca Street for access to medical assistance.

Deputy #3 was subsequently interviewed by an investigator with the Office of the District Attorney in March of 2018. Deputy #3 again described seeing Mr. Finch drop his right hand to "*about his waist,*" then "*pivot*" his upper body "towards" Deputy #3. He said he did not fire his own weapon because he did not perceive an immediate threat to himself, "*it looked to me like he was reaching for a, a door handle to either pull the door shut cause it was cold out that night.*" He clarified that he could not see what Mr. Finch was reaching for when he reached back (south), because he (Deputy #3) lost sight of Mr. Finch's right hand: "*it wasn't visible between and the door frame cause he was so close to it.*"

### Civilian Residents of 1033 West McCormick

**Mr. Finch's Mother** was interviewed the night of the shooting. She told investigators that she lived at the residence with 6 other people, including (1) her son, Andrew Finch, the shooting victim; (2) a 17 year old granddaughter, A.F., who was home at the time; (3) her 16 year old grandson who was not

home at the time of the shooting;  (4) an adult male roommate, A.A.; (5) an adult female who rents a room, T.V-C. (subsequently determined not to have been home at the time of the shooting); and (6) T.V-C.'s teenage son, M.J.  Ms. Finch believed she moved into 1033 West McCormick in March of 2017.

Ms. Finch stated that her room was located on the first floor of the residence at 1033 West McCormick, in the southeast corner of the building.  The adult male roommate lives in a separate room on the first floor.  The remaining residents have rooms upstairs on the second floor, though her son, Andrew, often slept on the couch in the living room on the first floor.

That evening, Ms. Finch was in her room, *"getting ready to eat. Watching TV."* She saw *"red and blue lights flashing"* in her window, so she *"got up to see what was going on."*  She then heard her son, Andrew, yell though she could not discern what if anything he said.  After she heard her son yell, she heard *"a shot, a shot fired."*  She went out the *"side"* door on the east side of the residence and the officers told her to come out with her *"hands up."*  The remaining residents of the home came out the same door except for her granddaughter, A.F., who went to the front door where Andrew had been shot.

Once outside, she heard officers saying that law enforcement had responded to a call that shots had been fired inside the house. She made clear to the detective questioning her later that night that no shots had been fired in her home and that her son, Andrew, did not possess a firearm.

Once outside, the officers moved the civilian residents of 1033 West McCormick two houses away, handcuffed them and asked them to remain quiet.  She was unable to *"judge the time"* they were outside, but at some point, the officers put each of the civilian residents of 1033 West McCormick in separate police cars.

The detective asked questions concerning any problems at the home and whether she knew of anyone with a motive to have made a false call to her home.

**Mr. Finch's 17 year old niece, A.F.**, was interviewed the night of the shooting.  She told the detective who interviewed her that she and her younger brother lived at 1033 West McCormick with

FINCH 000336

her grandmother, her uncle, "Andy," and an adult female roommate and that woman's son. A.F.'s room was on the south side of the house on the second story.

That evening, she was upstairs when she heard sirens. She said that because sirens were not atypical in the area, she did not immediately "*think anything of it*." She looked out a side window and saw "*police officers with guns . . .*" close together. At about the same time, she heard a gunshot and came downstairs to see "*what was going on*." At the bottom of the stairs, she saw her uncle on the floor, bleeding. She clarified that she thought she saw an officer shoot when she looked out the side window while she was still upstairs. She based this belief on the way the officer moved, but added she "*didn't know really*." She stated she did not hear any commands being given prior to hearing the one shot.

She then walked into the "*living room*" and officers were telling her to "*come towards them*." She exited the house through the door on the east of the house. She walked towards the officers. She was handcuffed initially.

She stated that she had seen her uncle, Andrew, arrested by police "*more than once*," but stated he had "*always been cooperative*."

**A.A.**, an adult male occupant of the 1033 West McCormick was interviewed the night of the shooting. That evening, he had been at home in his bedroom on the southwest corner of the first floor with his door shut. He heard "*a commotion and then a gunshot and then the lights flashing everywhere*." He added that "*for some reason the lights, I didn't see them till after the gunshot*." He stepped outside his door and saw Mrs. Finch, Andrew's mother. The two of them then walked to the living room and to the east door where officers outside "*said you sir, put your hands up*" so he and Mrs. Finch stepped outside. A.A. said the last time he had seen "Andy" that night, Mr. Finch was laying on the living room couch.

**M.J.**, the 18 year old son of the adult female renter, T.V-C., was interviewed the night of the shooting. He told the detective who conducted the interview that he was inside the residence at 1033 West McCormick the night of the shooting (though he had just moved in two weeks prior and did not remember the address). He and his mother each pay Mrs. Finch weekly rent.

FINCH 000337

He had been asleep since around noon. As he woke up that evening, he heard something downstairs. *"I don't know what I really heard,"* but he thought maybe it was voices in a fight. Then he heard a *"bang."* He said he hears gunshots *"all the time,"* so he was not concerned. He heard police on a *"microphone"* saying if you are inside come out. He grabbed his jacket and came down the stairs and law enforcement told him to go with them. He saw the guy who lives in the living room, *"Andy"* lying on the ground.

**T.V.-C.**, the mother of M.J, who rented a room from Mr. Finch's mother, was interviewed the night of the shooting. She was not at the residence the night of the shooting. She was interviewed regarding the habits and associates of the people living at 1033 West McCormick in an effort to identify who might have made the false call of a shooting inside the residence that evening.

## CRIME SCENE INVESTIGATION

Wichita Police Department Crime Scene Investigators processed the scene of the shooting. The scene was photographed and diagrammed.

Crime Scene Investigators located, photographed and collected multiple items of physical evidence. Investigators documented and collected a single .223 cartridge casing from the driveway of 1038 West McCormick, which is located north and slightly west of 1033 West McCormick.

A Crime Scene Investigator also arrived at St. Francis Hospital at 18:57(6:57 p.m.) where medical personnel were attending to Mr. Finch's injuries. When Mr. Finch was pronounced deceased at 19:03 hrs (7:03 p.m.), the investigator began to photograph and document Mr. Finch's injuries. Bullet fragments consistent with the .223 round fired by Officer #1 were collected at the autopsy.

The photo below is an aerial view of 1033 West McCormick and the surrounding homes/businesses.

FINCH 000338



FINCH 000339



View looking south to 1033 West McCormick from 1038 West McCormick, on the north side of McCormick Street.

FINCH 000340



View of North facing porch of 1033 West McCormick. This photo was taken from 1027 West McCormick, from the east, looking west. This photograph was taken from the approximate vantage point of three Sedgwick County Sheriff's Deputies and two WPD officers who were standing at the northwest corner of 1027 West McCormick at the time of the shooting.

FINCH 000341



FINCH 000342



FINCH 000343

The image on page 33 is a photo taken looking through the non-magnifying rifle optic of Officer #1 from the location he stood at the time of the shooting.

The image on page 34 represents the approximate trajectory based on information from witnesses and the placement of the defect in the storm door. The reconstruction presumes the screen door was mounted to the west door jam during the shooting incident. It should be noted that the trajectory is approximate due to the positioning of the door and the weak, damaged wood along the west door jam, which originally held the screen door in place. The photo was taken from just inside the threshold of the North exterior entrance to 1033 West McCormick and the camera is facing South to North with the residence of 1038 W. McCormick Ave. in the background.



The image directly above is an image generated from the leica scanner. The image contains the following measurements:

1. Approximate distance between Mr. Finch and WPD Officer #1:    122' 3.3"
2. Approximate distance between Mr. Finch and officers to the east:    47' 4.4"

## AUTOPSY RESULTS

An autopsy was performed on the body of Andrew Finch on December 29, 2017 at the Sedgwick County Regional Forensic Science Center.

FINCH 000344

The autopsy revealed the upper torso of Mr. Finch had been struck by multiple bullet fragments. The pathological diagnosis was that a gunshot wound to the "trunk" entered his "anterior chest," through his sternum, heart, aorta and middle lobe of the right lung." A small yellow jacketed projectile was recovered from the "subcutaneous tissue of the right mid back." The projectile travelled "backward, right and down." The range was listed as "indeterminate."

The forensic pathologist was contacted and clarified that based on the location of injuries identified on the body of Mr. Finch, the forensic pathologist could not speculate as to the relative position of Mr. Finch's hands or arms at the time of the shooting. Given the fact that the bullet fragments entered the "anterior" chest of Mr. Finch, the forensic pathologist determined that it is fair to conclude that Mr. Finch was facing the shooter at the time he was shot.

Toxicology analysis showed no drugs or alcohol in Mr. Finch's blood

Mr. Finch died as a result of injuries caused by gunshot, when bullet fragments entered his chest after the bullet fired by Officer #1's rifle struck the north facing edge of the screen/storm door and fragmented (broke into pieces) then continued to travel south into Mr. Finch's upper chest.

## KANSAS LAW

In Kansas all persons, including law enforcement officers, are entitled to defend themselves and others against the use of unlawful force. **Kansas Statutes Annotated** 21-5220 (formerly 21-3211) states:

> (a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such force is necessary to defend such person or a third person against such other's imminent use of unlawful force.
> (b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.
> (c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person.

The term "use of force" includes words or actions directed at or upon another person or thing that reasonably convey the threat of force, the presentation or display of the means of force or the application of physical force, including by a weapon. "Use of deadly force" means the application of

any physical force which is likely to cause death or great bodily harm to a person.

The Kansas Supreme Court has made clear that the analysis of a self-defense claim presents a "two prong test":

> "The first is <u>subjective</u> and requires a showing that McCullough sincerely and honestly believed it was necessary to kill to defend herself or others. The second prong is an <u>objective</u> standard and requires a showing that a reasonable person in [the same] circumstances would have perceived the use of deadly force in self-defense as necessary." <u>State v. McCullough,</u> 293 Kan. 970 (2012).

With respect to a law enforcement officer's use of force, in <u>Graham v. Connor,</u> 490 U.S. 386, 396 (1989), the United States Supreme Court clarified that any assessment of objective reasonableness must take into account the contextual realities faced by the officer:

> "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

> "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."

## A. Immunity

In 2010, the Kansas Legislature enacted a series of statutes addressing the use of force, including the use of deadly force, in the defense of a person or property, including a person's dwelling. See K.S.A. (2016 Supp.) 21-5220 et seq. The new statutes became effective on July 1, 2011, and are commonly known as this state's "stand your ground law." <u>State v. Younger,</u> *unpublished opinion,* No. 116, 441 (Feb. 16, 2018).

*Kansas Statutes Annotated* 21-5231 (2016 Supp.) **Immunity from Prosecution**, reads,

    (a) A person who uses force which is subject to the provisions of K.S.A. 21-5226, and amendments thereto, is justified pursuant to K.S.A. 21-5222, 21-5223 or 21-5225, and amendments thereto, is immune from criminal prosecution and civil action for the use of such force, unless the person against whom force was used is a law enforcement officer who was acting in the performance of such officer's official duties and the officer identified the officer's self in accordance with any applicable law or the person using force knew or reasonably should have known that the person was a law enforcement officer.

FINCH 000346

*Kansas Statutes Annotated* (2016 Supp.) 21-5222, **Defense of A Person, . . . no duty to Retreat,** reads,

(a)     A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

(b)     A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of force is necessary to prevent imminent death or great bodily harm to such person or a third person.

*Kansas Statutes Annotated* (2016 Supp.) 21-5223, **Defense of Dwelling, . . . no duty to Retreat,** reads,

. . .

(c)     A person is justified in the use of deadly force to prevent or terminate unlawful entry into or attack upon any dwelling, place of work or occupied vehicle if such person reasonably believes that such use of force is necessary to prevent imminent death or great bodily harm to such person or another.

*Kansas Statutes Annotated* (2016 Supp.) 21-5224, **Use of Force; presumptions,** reads,

(a)     . . . a person is presumed to have a reasonable belief that deadly force is necessary to prevent imminent death or great bodily harm to such person or another person if:
(1) The person against whom the force is used, at the time the force is used:
(A) Is unlawfully or forcefully entering or has unlawfully entered and is present within, the dwelling, place or work or occupied vehicle of the person using the force; or
(B) has removed or is attempting to remove another person against such person's will from the dwelling, place of work or occupied vehicle of the person using the force; and
(2) the person using the force knows or has reason to believe that any of the conditions set forth in paragraph (1) is occurring or has occurred.

On March 10, 2017, in State v. Hardy, 305 Kan. 1001, 390 P.3d30 (2017), the Kansas Supreme Court recognized that immunity granted by K.S.A. 21-5231 is distinct from self-defense, citing with approval the dissent in State v. Evans, 51 Kan.App.2d 1043 (2015):

Self-defense and immunity are clearly distinct concepts. If immunity were the same as self-defense, there would have been no need to adopt a specific immunity statute because K.S.A. 2014 Supp. 21–5222 would have sufficed. Perhaps most importantly, because K.S.A. 2014 Supp. 21–5231 grants immunity from arrest and prosecution rather than a mere defense to liability, it is effectively lost if a case is erroneously permitted to go to trial. [citation omitted] . . . [a] prosecutor must rebut a claim of statutory immunity before the case can go to trial. Hardy, 305 Kan. at 1009-1010.

FINCH 000347

No such presumption of reasonableness exists if the person utilizing force does so against a law enforcement officer per K.S.A. 21-5224(b)(4).

## B.  Use of Force During Arrest

**Kansas Statutes Annotated** 21-5227 (formerly 21-3215), Use of Force; law enforcement officer making an arrest, States:

> "A law enforcement officer, or any person whom such law enforcement officer has summoned or directed to assist in making a lawful arrest need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. Such officer is justified in the use of any force which such officer reasonably believes to be necessary to effect the arrest and the use of any force which such officer reasonably believes to be necessary to defend the officer's self or another from bodily harm while making the arrest. However, such officer is justified in using deadly force only when such officer reasonably believes that such force is necessary to prevent death or great bodily harm to such officer or another person, or when such officer reasonably believes that such force is necessary to prevent the arrest from being defeated by resistance or escape and such officer has probable cause to believe that the person to be arrested has committed or attempted to commit a felony involving death or great bodily harm or is attempting to escape by use of a deadly weapon, or otherwise indicates that such person will endanger human life or inflict great bodily harm unless arrested without delay."

FINCH 000348

## CONCLUSION

On December 28, 2017, officers with the Wichita Police Department and deputies with the Sedgwick County Sheriff's Department responded to a shooting call at 1033 West McCormick. The calling party told the 911 "call taker" that he had shot his father in the head and was actively holding his mother and little brother at gunpoint in a closet inside the house.

As officers arrived, Officer #1 was placed across the street to provide cover for other officers including the response team comprised of officers and deputies that staged at the northwest corner of 1027 West McCormick, directly east of 1033 West McCormick.

Without being directly contacted by law enforcement, Mr. Finch stepped into the threshold of the front door of his residence. In response, officers to the east and north gave immediate verbal warnings. Mr. Finch initially complied, raising his hands to roughly shoulder level. Depending on their vantage point, officers described seeing Mr. Finch lower his hands, reach for his waistband, possibly to lift his pants, and reach behind his body with what appeared to be his right hand.

The Axon body cameras worn by WPD Sgt. #1 and Officer #2 confirm that Mr. Finch initially raised his hands, appears to turn his upper torso to the east at which time his right arm is not visible, then it appears his right arm comes up directly in front of his body.

Officer #1 believed Mr. Finch was the suspect who had shot his own father and had been holding his younger brother and mother hostage in a closet. Officer #1 perceived these movements and believed the subject (Mr. Finch) was reaching for the gun he had used to shoot his father. Officer #1 believed he saw a gun coming up in Mr. Finch's hand. Officer #1 stated he discharged his weapon thinking Mr. Finch presented an imminent risk to the officers directly east of 1033 West McCormick.

The bullet struck the metal frame of the storm door at the North entrance to the residence, facing McCormick Street. The projectile fragmented on impact with the metal frame and

FINCH 000349

pieces of the bullet then struck the upper chest and arm of Andrew Finch, penetrating his anterior chest.

Under K.S.A. 21-5222(b), a person may employ deadly force when the person reasonably believes that deadly force is necessary to prevent imminent risk of great bodily harm to another.

Under K.S.A. 21-5223(b), a person may employ deadly force to "terminate" an attack on any dwelling, when the person reasonably believes deadly force is necessary to prevent death or great bodily harm to another.

Since 2011, under Kansas law, one who acts in defense of himself or to protect a third party is immune from prosecution. See K.S.A. 21-5231. Meaning, a person may not be charged, prosecuted (or subsequently sued) unless the state can establish that they were not acting reasonably under the circumstances. In Graham v. Connor, the United States Supreme Court made clear that assessment as to the reasonableness of an officer's decision to utilize deadly force must be made within the context in which the officer found himself – not from the perspective of "20/20 hindsight."

In this case, Officer #1 mistook Mr. Finch's movement of his hand to his waist and then behind his body as an effort to retrieve a gun. In isolation, the mere movement of a subject's hands may not be reasonably interpreted as a threat. However, the context of this case is wholly unique. Officer #1 was there, positioned with a rifle to offer cover for the officers to the east, because he and other law enforcement officers had been dispatched to the scene to confront a man who claimed to have shot his father in the head and who was actively holding his mother and sibling hostage. What is now clear, was not in that moment. The call was a hoax, ostensibly intended to draw a law enforcement presence to the residence. None of the officers on the scene in that moment knew this.

Other officers also perceived Mr. Finch to be the calling party. Some believed he was reaching for a weapon but did not fire because of the fear of cross-fire with other officers. Two of the sheriff's deputies, staged east of the residence, lost sight of Mr. Finch when he

Page | 41

reached behind his own body and entered back into the threshold of the door. One officer was readying himself to move to the north to change the background and be in a position to shoot. Other officers thought Mr. Finch was retreating into the house, or reaching for the door. While still others with a different vantage point, did not shoot because they did not see a gun in his hand.

This shooting should not have happened. But this officer's decision was made in the context of the false call. To charge Officer #1 would require evidence—not 20/20 hindsight—that it was unreasonable for him to believe in that moment that the man who came to the door posed a risk to the officers near the house. Given the evidence provided to the officers by dispatch and Mr. Finch's physical movements after opening the door, there is insufficient evidence to establish that Officer 1 acted in an unreasonable manner in the defense of the officers east of the house. There is insufficient evidence to overcome self-defense immunity under Kansas law.

Under Kansas law and the facts of this case, I conclude that no criminal charges will be filed against the officer for the death of Andrew Finch.


District Attorney Marc Bennett
*18th Judicial District of Kansas*

FINCH 000351