# EXHIBIT 33

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA G. FINCH, Individually, as     )
Co-Administrator of the Estate      )
of Andrew Thomas Finch,             )
deceased, and as Next Friend        )
for her minor granddaughter,        )
AF; DOMINICA C. FINCH, as           )
Co-Administrator of the Estate      )
of Andrew Thomas Finch,             )
deceased; and ALI ABDELHADI,        )
                                    )
           Plaintiffs,              )
                                    )
      vs.                           ) Case No.
                                    ) 18-CV-01018-JWB-KGS
CITY OF WICHITA, KANSAS;            )
JOHN DOE POLICE OFFICERS 1-10,      )
                                    )
           Defendants.              )
                                    )

DEPOSITION DEEMED CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

D E P O S I T I O N

The videotape deposition of LIEUTENANT BLAKE MUMMA
taken on behalf of the Plaintiff pursuant to the Federal
Rules of Civil Procedure before:
    RICK J. FLORES, CSR
    KELLEY REPORTING ASSOCIATES, LTD.
    515 South Main, Suite 108
    Wichita, Kansas 67202

a Certified Shorthand Reporter of Kansas, at 455 North
Main, 13th Floor, Wichita, Sedgwick County, Kansas, on
the 18th day of April, 2019, at 10:31 a.m.

1

A P P E A R A N C E S

PLAINTIFFS:
    MACARTHUR JUSTICE CENTER
    Ms. Sheila Bedi
    Ms. Germaine Habell
    Northwestern Pritzker School of Law
    375 E. Chicago Ave., 8th Floor
    Chicago, IL 60611
    (312) 503-1336
    sheila.bedi@law.northwestern.edu

    CONLEE SCHMIDT & EMERSON, LLP
    Mr. Rick E. Bailey
    Suite 300
    200 West Douglas
    Wichita, KS 67202
    (316) 264-3300
    Fax: (316) 264-3423
    rbailey@fcse.net

DEFENDANTS:
    FISHER PATTERSON SAYLER & SMITH, LLP
    Mr. J. Steven Pigg
    3550 S.W. 5th Street
    Topeka, KS 66606
    (785) 232-7761
    Fax: (785) 232-6604
    spigg@fisherpatterson.com

VIDEOGRAPHER:
    Advanced Document Imaging
    Mr. Brian Fouch
    Ms. Cindy Rosales
    515 S. Main, Suite 108
    Wichita, KS 67202
    (316) 267-8200
    Fax: (316) 267-9382
    video@kelleyreporting.com

2

I N D E X

LIEUTENANT BLAKE MUMMA
Direct Examination by Ms. Bedi:         6
Cross-Examination by Mr. Pigg:        218

Mumma Exhibits
No. 75 - Deposition Notice (3 pgs)                        9
No. 76 - WPD Policy 904 - Member Involved                12
         Incidents (3 pgs)
No. 77 - Summary of WPD-Involved Shootings              15
         1-13-13 to 12-28-17 (2 pgs)
No. 78 - Summary of WPD Firearm Discharges              17
         Resulting in Discipline (1 pg)
No. 79 - Summary of WPD Shootings From                  20
         2013 to 2017 (1 pg)
No. 80 - WPD Policy 901 - Administrative                39
         Internal Investigations (3 pgs)
No. 81 - WPD Policy 218 - Early Intervention            82
         System (3 pgs)
No. 82 - WPD Policy 913 - Reporting and                 91
         Investigating Force (12 pgs)
No. 83 - WPD Regulation 4.0 Weapons/Use                101
         Of Force Requirements (11 pgs)
No. 84 - City of Wichita Ordinance                     104
         No. 50-912 - Wichita Citizen
         Review Board (8 pgs)
No. 85 - Officer Involved Use of Deadly                138
         Force administrative Investigation
         Stacy Richard Incident (94 pgs)

3

I N D E X Cont'd

Mumma Exhibits
No. 86 - Officer Involved Use of Deadly                151
         Force administrative Investigation
         Icarus Randolph Incident (48 pgs)
No. 87 - Officer Involved Use of Deadly                177
         Force administrative Investigation
         Andrew Villa Incident (31 pgs)
No. 88 - Officer Involved Use of Deadly                192
         Force administrative Investigation
         Jose Ortiz Incident (38 pgs)
No. 89 - Officer Involved Use of Deadly                197
         Force Administrative Investigation
         Kevin Perry Incident (20 pgs)
No. 90 - Guidebook for the Implementation of           213
         New or Revitalized Police Oversight
         National Association for Civilian
         Oversight of Law Enforcement
         Ch. 17 - Characteristics of
         Effective Oversight (2 pgs)

SIGNATURE OF WITNESS                                   220
CERTIFICATE                                            221

4

```
 1   A.  I looked at Policy 913, reporting an
 2       investigating force.  I looked at our
 3       regulation number 4, weapons and use of force
 4       requirements.  Specifically, I looked at
 5       those relating to use of force reporting
 6       guidelines.  I looked at Policy 218, Early
 7       Intervention System.  This is 904, which I
 8       said I looked at previously.
 9           And I've looked at aspects, as I do on
10       almost a regular basis, of our regulations,
11       Chapters 1, 2, 3, 4 and 5.
12   Q.  And can you just tell me what Chapters 1, 2,
13       3, 4 and 5 are?
14   A.  This is the -- this is -- Chapter number 1 is
15       code of ethics definition.  So it's
16       definitions of different wording or phrases
17       that are used throughout our regulations.
18       Chapter 2 is disciplinary code or penalties.
19       Chapter 3 is the chapter applying to
20       professional conduct regulations.  Chapter 4
21       is weapons/use of force requirements.  And
22       then Chapter 5 is administrative personnel
23       regulations.
24   Q.  Thank you.  And you said that in addition to
25       the policies, you looked at some other
                                                      13
```

```
 1       documents.
 2              What were those other documents?
 3   A.  We looked at some of the -- I looked at a
 4       document pertaining to shootings that have
 5       occurred from 2017 to 2013.
 6   Q.  And what is that document?
 7   A.  It is simply a document where we check --
 8       where we track on paper the officer-related
 9       shootings.
10   Q.  And that is being tracked by the PSB?
11   A.  Yes, ma'am.
12              MS. BEDI:  Counsel, has that
13       document been produced?
14              MR. PIGG:  No.
15              MS. BEDI:  We would ask that we
16       would be produced.
17   A.  And then --
18              MR. PIGG:  It's right here.
19   A.  We've also -- I looked at -- we produced
20       this.  I had one of the investigators that's
21       familiar with IAPro produce this is a
22       document pertaining to firearm discharges
23       related from the years 2013 to 2019.
24   Q.  Could I see the first document?
25   A.  Yes, ma'am.
                                                      14
```

```
 1   Q.  So I'd like to mark this document as Exhibit
 2       76.
 3              MR. PIGG:  '7.
 4              MS. BEDI:  Yep, 77.
 5              (Mumma Exhibit No. 77 was marked for
 6       identification.)
 7   BY MS. BEDI:
 8   Q.  And can you just walk me through this
 9       document, what this is.
10   A.  This is just a timeline, a basis of incidents
11       of shootings.  These are not dog shootings or
12       accidental discharge shootings.  These are
13       shootings involving suspects and individuals.
14       And it goes from the most recent one -- I'm
15       sorry.  It goes from -- it begins with Finch.
16       And it goes back to the first one that we had
17       in 2013, 1-13 of 2013.  And they're in the
18       date order.
19   Q.  And it looks like there are -- there's a
20       number of columns where you're tracking
21       specific information related to each
22       shooting; is that correct?
23   A.  Yes, ma'am.
24   Q.  And what's the information that's being
25       tracked?
                                                      15
```

```
 1   A.  We track them by date, of course.  There's a
 2       case number, which is the WPD case number,
 3       the location in which the incident occurred,
 4       the officers involved in that particular
 5       incident, officer tenure, how many years the
 6       officer has worked for us, number of rounds
 7       that were fired, number of handgun or rifle
 8       rounds, times suspect was struck, whether the
 9       officer was struck, whether the officer was
10       killed, suspect's name, the suspect's age,
11       suspect's race and sex, whether this incident
12       was fatal or not, any criminal offense.  It's
13       basically a synopsis of whether -- the type
14       of offense that it was.  The weapon of the
15       suspect and number of rounds the suspect
16       fired.
17   Q.  Does this document track whether any officers
18       were subject to discipline for their
19       involvement in any of these shootings?
20   A.  This -- this document does not.
21   Q.  Do you have another document that does track
22       whether officers were subject to discipline?
23   A.  We talked about firearm discharges.  Okay.
24       This document checks some incidents which
25       resulted in discipline.  These are -- to the
                                                      16
```

```
 1              Is that a fair statement?
 2   A.  Yes, ma'am, I believe that is a fair
 3       statement.
 4   Q.  Other than the involvement of the KBI, are
 5       there other external agencies that are
 6       involved in investigating the aftermath of a
 7       police shooting where somebody is either
 8       killed or injured?
 9   A.  Yes, the Sedgwick County District Attorney's
10       Office.
11   Q.  And what's the role of the district
12       attorney's office?
13   A.  On the initial investigation, the Sedgwick
14       County District Attorney's Office usually
15       provides personnel that observe and observe
16       only, but they also have investigators of
17       their own that can be involved in further
18       investigation at their direction.
19   Q.  And at the -- when you say at their
20       direction, do you mean at the direction of
21       the district attorney?
22   A.  That is correct.
23   Q.  And does the district attorney have the sole
24       discretion to decide whether or not to have
25       investigators involved in this process?
```
25

```
 1   A.  He does.
 2   Q.  Other than KBI and the district attorney, are
 3       there other external agencies that are
 4       involved in investigating the aftermath of a
 5       fatal police shooting or a police shooting
 6       where someone's been injured?
 7   A.  There has been, in the past, personnel from
 8       the Sedgwick County Sheriff's Department
 9       because they also patrol a -- the same
10       geographic area of the City of Wichita that
11       we do.  Sometimes their personnel do respond
12       to shootings and are involved in those
13       investigations.
14   Q.  And how frequently is the sheriff's office
15       involved in these types of investigations?
16   A.  I can only guess.  I would guess that it
17       happens frequently, but I couldn't give you a
18       number.
19   Q.  Under WPD policy, is there a distinction
20       between a criminal investigation that occurs
21       in the aftermath of a shooting and an
22       administrative investigation?
23   A.  Yes.
24   Q.  What is that distinction?
25   A.  The distinction is is that no internal
```
26

```
 1       investigation is conducted until we have
 2       received a disposition usually from the court
 3       or from the district attorney's office as to
 4       the criminal investigation.
 5            So the internal investigation is held
 6       until the completion of the criminal.
 7   Q.  What are the components of an internal
 8       investigation?
 9   A.  Well, they're different for different things.
10       Are we talking about just a shooting?
11   Q.  Let's focus on shootings for right now.
12   A.  For purposes of a shooting, while the
13       investigation itself is held, an internal
14       investigator or the supervisor or myself
15       might observe the criminal investigation
16       while it was being conducted.  We play a
17       hands off role.  In other words, interviews
18       which are recorded are also available through
19       electronic course.  I could watch an
20       interview from that interview room on my
21       computer.  So I might watch key interviews of
22       officers involved, key witnesses, things like
23       that.
24            In a shooting situation where we've
25       received a disposition from the court, or
```
27

```
 1       when we've received a disposition from the
 2       district attorney's office, we would then
 3       conduct a review of that shooting, reading
 4       the documents, looking at the evidence to
 5       determine if we reasonably believe that a
 6       policy or regulation violation occurred.
 7            If we do see those things, then we
 8       would begin a internal investigation by
 9       providing, according to our contract,
10       notification of the officer, and then our
11       interviews to resolve or determine if that
12       violation had occurred.
13   Q.  So is it fair to say that with regard to
14       police shootings that the administrative
15       investigation relies on the investigative
16       work of the Wichita Police Department, and
17       that the administrative investigation
18       consists of reviewing the criminal
19       investigation to identify if there are -- is
20       a potential for policy violations?
21   A.  That's correct.  But the review that would
22       occur, the internal review could also -- it
23       could also include additional interviews or
24       investigation by the internal investigators.
25       Because there is a difference between a
```
28

```
 1      criminal investigation and an internal
 2      investigation, those could very well likely
 3      occur.
 4   Q. And PSB would not expect -- would not
 5      accept -- expect the personnel involved in
 6      the criminal investigation to engage in an
 7      analysis of policy violations -- to engage in
 8      the administrative investigation; is that
 9      right?
10   A. That's correct. They would be more concerned
11      about state and federal statutes.
12   Q. So the only way to determine whether internal
13      police department policies were violated is
14      through the administrative investigative
15      process; is that correct?
16   A. Yes, ma'am.
17   Q. And the administrative investigative process
18      starts out by a review of the criminal
19      investigation; is that correct?
20   A. Yes, ma'am.
21   Q. And additional interviews could happen as a
22      result of that review; is that right?
23   A. That is correct.
24   Q. And who has the discretion to conduct
25      additional interviews after a criminal
```
                                                                    29

```
 1      investigation is closed?
 2   A. PSB, by organization, is under the direct
 3      supervision of the chief of police. So the
 4      chief of police, ultimately, has the decision
 5      to make those things.
 6           For instance, if a investigator saw
 7      what they believed to be an internal
 8      investigation that had a policy or regulation
 9      violation, he would bring it to the attention
10      of the bureau supervisor; that would be me in
11      these circumstances, and I would bring it to
12      the chief of police with a request to
13      continue further investigation.
14   Q. How long have you served as the bureau
15      supervisor?
16   A. I have only been the bureau supervisor since
17      October of 2018.
18   Q. How long have you worked in PS -- PSB?
19   A. I previously worked in PSB from 2002 to 2007.
20      And then I returned as the supervisor in
21      2018.
22   Q. And I'm looking for just a rough estimate
23      here.
24           During your tenure either as
25      supervisor or as, I assume, as a detective in
```
                                                                    30

```
 1      PSB?
 2   A. Yes, ma'am.
 3   Q. How frequently did an administrative
 4      investigation occur after a closed criminal
 5      investigation?
 6   A. That's a very broad scope because we do other
 7      investigations of incidents that are criminal
 8      investigations, as well.
 9   Q. Let me -- let me cabin it by asking you to
10      respond to that same question in the context
11      of shootings.
12           MR. PIGG: Are you asking before
13      2013, which is the scope of the --
14   A. Right. Before 2013, as a detective, I
15      couldn't tell you how often that occurred. I
16      wouldn't have that number. And I'm not sure
17      that I have that number since 20 -- I'm not
18      sure that I have that number since 2013
19      either.
20   Q. Does PSB have any written policies or
21      directives for individuals who are reviewing
22      criminal investigations that would help a
23      detective identify when an administrative
24      investigation should be opened?
25   A. PSB has a standard operating procedure. I
```
                                                                    31

```
 1      don't think that we have anything pertaining
 2      specifically to when we would conduct a
 3      internal investigation of that -- of a
 4      shooting. I think mostly we're governed by
 5      Policy 901, the administrative internal
 6      investigations.
 7           And as in -- as in any internal
 8      investigation, we make an application of what
 9      we know to be the facts against our policies
10      and our regulations. So I don't know that
11      there's a distinction between a shooting and
12      other investigations. They're done very
13      similar. We take the facts and we apply them
14      to our policies and our regulations.
15   Q. So there's a difference, though, and correct
16      me if I'm wrong here: My understanding is is
17      that in non-shooting cases --
18   A. Uh-huh.
19   Q. -- that PSB does its own investigations; is
20      that correct?
21   A. That's correct.
22   Q. And that in shooting cases, the
23      administrative investigation begins with a
24      review of a criminal investigation that is
25      already completed; is that right?
```
                                                                    32

```
 1    A.  Right, but I think that we're limiting this
 2        to just shootings.  There are other criminal
 3        investigations that occur within the police
 4        department that are not just shootings.  And
 5        then we take those for review and determine
 6        whether we think that there is a policy or
 7        regulation violation, as well.
 8            So do you understand what I'm saying?
 9            I know -- you were to ask me about
10        shootings.  Yes, we review all those
11        shootings to see if there's a policy or
12        regulation, but there are other -- they're
13        not -- shootings are not just the only thing
14        that are investigated criminally.  Other acts
15        by officers can be investigated criminally,
16        and they would go to PSB for review, as well.
17    Q.  And those -- those other acts like, for
18        example, an excessive use of force?
19    A.  It could be any criminal conduct by any
20        officer.  The scope is the, you know, state
21        statutes and federal laws.
22    Q.  And by policy, the criminal investigation
23        must be completed first before there can be
24        an administrative investigation; is that
25        correct?
                                                    33
```

```
 1    A.  Yes, ma'am.
 2    Q.  Do you know why that is?
 3    A.  The criminal investigation can involve --
 4        again, it can be conducted by the Kansas
 5        Bureau of Investigations.  Investigation
 6        could occur by the district attorney
 7        investigators.  Chief could dedicate an
 8        outside agency to investigate that.
 9        Sometimes federal agencies come in and say
10        that they want to review or investigate
11        instances.
12            So to begin an internal investigation
13        and try to make a conclusion whether this
14        person violated our policies and procedures
15        would be inappropriate because we might find
16        exculpatory information that might apply
17        toward our investigation.  So we do our
18        internal investigation last.
19    Q.  So you have absolutely no authority as the
20        head of PSB to run a concurrent
21        administrative investigation; is that right?
22    A.  Yes, ma'am.
23    Q.  And that's by -- that's by WPD policy?
24    A.  Yes, ma'am.
25    Q.  If we can look at the last page of 904.
                                                    34
```

```
 1    A.  Yes, ma'am.
 2    Q.  If we can go to 904.20.
 3    A.  Yes, ma'am.
 4    Q.  It says that "at the direction of the chief
 5        of police or duty chief, personnel from the
 6        Professional Standards Bureau will conduct an
 7        administrative investigation."
 8            Did I read that accurately?
 9    A.  Yes, ma'am, you did.
10    Q.  And does this provision mean that PSB can
11        only conduct investigations at the discretion
12        of the chief?
13    A.  Or the duty chief, yes, ma'am.
14    Q.  Or the duty chief; is that correct?
15    A.  Yes, ma'am.
16    Q.  So PSB has no independent authority to
17        conduct investigations; is that right?
18    A.  That is correct.
19    Q.  And so if the chief of police does not order
20        an administrative investigation or if the
21        duty chief does not order an independent
22        investigation, an independent
23        investigation -- I'm sorry -- an
24        administrative investigation does not occur?
25    A.  Yes, ma'am.
                                                    35
```

```
 1    Q.  Is that right?
 2    A.  Yes, ma'am.
 3    Q.  Generally speaking, under what circumstances
 4        will an administrative investigation be
 5        ordered?
 6    A.  Administrative investigations are initiated
 7        from really all levels of the police
 8        department.  Probably the vast majority of
 9        them are initiated at the street level.  They
10        are initiated by usually street supervisors
11        who receive information that conduct was in
12        violation of policy and procedure.
13            So the other investigations that are
14        initiated may be investigations that come
15        either to the street level supervisors or to
16        PSB themselves through external sources.
17            Any citizen or complainant that walks
18        into a substation or contacts a supervisor or
19        comes to the PSB bureau fills out a complaint
20        form.  They can also do it online.  They can
21        send online complaints to me for review.
22        They can do it by telephone.  We receive
23        letters from people that are incarcerated in
24        the jail.  Sometimes we receive letters from
25        people out in the community or at the
                                                    36
```

```
 1         community at large, abroad.  And those are
 2         the bases from which we look at those
 3         independent situations and make a
 4         determination whether we should conduct an
 5         internal investigation.
 6    Q.   What role does the chief of police have in
 7         determining whether or not, under the
 8         circumstances you just described, an
 9         administrative investigation moves forward?
10    A.   He is the individual that says yes we're
11         going to move forward with an investigation
12         based on the information that you have.
13    Q.   So the chief of police has the authority to
14         say this is not something we need to
15         investigate because the complaint on its face
16         does not look credible; is that fair?
17    A.   Yes, ma'am.
18    Q.   All right.  Is it fair to say that your
19         detectives in PSB have specialized knowledge
20         in investigating policy violations as opposed
21         to criminal violations?
22    A.   Yes, I think that's fair to say that.
23    Q.   And is it fair to say that the detectives in
24         PSB have a specialized knowledge in policy
25         violations that you would not necessarily
```
37

```
 1         expect, let's say, a homicide detective to
 2         have?
 3    A.   Yes, I think they're more experienced in
 4         investigating policies than, say, your
 5         average homicide investigator, yes, ma'am.
 6    Q.   It's a -- and would you agree that the
 7         investigation of a -- that a criminal
 8         investigation, you are looking at a violation
 9         of state and federal criminal law; is that
10         right?
11    A.   Yes, ma'am.
12    Q.   And that for an investigation of WPD policy,
13         you're looking at the violation of very
14         specific detailed policies and regulations;
15         is that right?
16    A.   Yes, ma'am.
17    Q.   There's some overlap, but not always overlap?
18    A.   That is correct.
19    Q.   And one could -- an officer could violate
20         policy but not have committed a crime?
21    A.   Yes, ma'am.
22    Q.   And I imagine that happens quite frequently
23         where officers violate policy, but haven't
24         done anything that rises to the level of a
25         criminal violation.
```
38

```
 1         Is that a fair statement?
 2    A.   Yes, ma'am, I think that's fair.
 3    Q.   So I'm going to now mark Policy 901.  And
 4         this will be 80.
 5              (Mumma Exhibit No. 80 was marked for
 6         identification.)
 7    Q.   One more question about -- actually, let's
 8         focus on this.
 9    A.   Okay.
10    Q.   So you're familiar with this policy, with
11         Policy 901; is that right?
12    A.   Yes, ma'am.
13    Q.   And could you describe just generally
14         speaking what this policy -- what this policy
15         is.
16    A.   This policy pertains to our conducting of
17         administrative internal investigations as
18         opposed to criminal investigations.  The
19         investigation of officers who have violated
20         our policies and our regulations.
21    Q.   And so these are the policies that kind of
22         set forth the charge, the purpose of PSB; is
23         that right?
24    A.   Yes, ma'am.
25    Q.   And these are the types of incidents that PSB
```
39

```
 1         is required to investigate; is that correct?
 2    A.   Yes, ma'am.
 3    Q.   Under 901.02, it states here that -- that PSB
 4         must investigate all incidents involving the
 5         discharge of a firearm.
 6    A.   That is correct.
 7    Q.   Is that accurate?
 8              So there's no discretion there; is
 9         that correct?
10    A.   That is correct.
11    Q.   So is it sufficient and in compliance with
12         this policy for a PSB detective to review a
13         criminal investigation and make a
14         determination based on that criminal
15         investigation that all policies were complied
16         with?
17    A.   I think that I would agree with that except
18         for the portion that says determination.
19              What would happen is that the
20         detective would review that.  And in our
21         current state, he would then prepare a --
22         what they refer to as an after action report
23         saying I've reviewed this, here are some
24         areas that we should look at or talk about;
25         or, I didn't find any areas of concerns.
```
40

```
 1        And then along with that after action
 2   report would be the entirety of that criminal
 3   investigation or review.  The persons that
 4   make the determination whether a policy was
 5   actually violated or not is the command
 6   staff, the chief being in charge of the
 7   command staff themselves.
 8   Q.  So the PSB detective makes a recommendation
 9       about whether there should be a finding that
10       a policy was violated; is that right?
11   A.  Right, he would identify areas of concern
12       based on our policies and our regulations.
13   Q.  Could a PSB detective, based solely on the
14       report from the criminal investigation, read
15       through the criminal investigation and
16       determine no policies were violated?
17   A.  It's possible.
18   Q.  Make that recommendation that no policies
19       were violated?
20   A.  He could say -- I think the only part that I
21       would have -- I would have contention with in
22       your statement is he would not make that
23       conclusion.  He would say, here are areas of
24       concern; or, if he saw no areas of concern,
25       he would say, I see no areas of concern, and
                                                    41
```

```
 1   then he would present all investigative
 2   material over to the command staff.  He would
 3   not make a finding.  PSB investigators do not
 4   make findings or determinations.  That is up
 5   to the command staff to make that
 6   determination.
 7   Q.  Okay.  So a PSB detective could review a
 8       criminal investigation and make a
 9       recommendation based on that criminal
10       investigation that there were no areas of
11       concern and then forward that criminal
12       investigation to the command staff without
13       conducting any additional investigation?
14   A.  That is true.
15   Q.  And that is up to the discretion of the
16       individual PSB detective; is that right?
17   A.  No.  The PSB detective would prepare that
18       document.  That document would then be
19       reviewed by the supervisor over PSB, and then
20       it would be passed on to the command staff
21       members each for review of that information,
22       and then finally the chief himself.
23   Q.  So reviewing the criminal investigation, just
24       merely reviewing the criminal investigation,
25       that would be sufficient to comport with
                                                    42
```

```
 1       901.02, which requires administrative
 2       investigations after a firearm discharge?
 3   A.  Yes, ma'am.
 4   Q.  Why isn't there a requirement that there be
 5       an entirely separate administrative
 6       investigation, along with the criminal
 7       investigation, given the differences that
 8       we've just discussed in the types of
 9       investigations?
10   A.  Again, there's always a possibility that
11       additional investigation can occur.  But
12       since witnesses have now been -- in our day
13       of age of technology have been interviewed by
14       the criminal investigator sometimes more than
15       one time in recorded interviews, which are
16       then saved and availed to the administrative
17       internal investigator, along with the AXON
18       and information, sometimes it's just not
19       necessary.  Those questions have been
20       answered.
21           If the district attorney did an
22       internal -- or did a criminal investigation,
23       documents can be provided by them.  So the
24       internal investigators, they have access to
25       all of this information.  There may just not
                                                    43
```

```
 1       be questions pertaining to whether a policy
 2       or a violation was committed, and so we do
 3       not redo all of that information again.  We
 4       simply review the information that is there
 5       that has been presented to us.
 6   Q.  You also said that the way PSB operates now,
 7       officers who are detectives who are reviewing
 8       the criminal investigation will do an after
 9       action report.
10           Do I have that right?
11   A.  That's correct.
12   Q.  And it sounds like the way you describe the
13       after action report is that it is a
14       summary -- it's an analysis of what happened
15       of the incident and whether or not there were
16       any policy violations.
17           Is that an accurate --
18   A.  Right, it is a -- yes, it is a summary, but
19       more specifically it is a look at that
20       incident through the lens of whether it
21       complied with our policies and our
22       regulations.  It's not concerned with
23       anything else like the scope of that on the
24       criminal side.  Although those documents
25       become -- from the criminal investigation
                                                    44
```

**Page 61**

1  their own investigations of their direct
2  reports; is that accurate?
3  A. I think -- I think that that is true.
4  Q. Would you agree with me that this provision
5  seems to say that supervisors need to
6  investigate their direct reports?
7  A. Right, and I would clarify that by saying
8  that they investigate -- all investigations
9  begin with an inquiry, and that a supervisor
10 in the field that was seeking to conduct a
11 internal investigation involving Garrity and
12 notifications would have to seek additional
13 authority to do that.
14 Q. Is there a policy that prohibits supervisors
15 from conducting investigations of their
16 direct reports?
17 A. That prevents them from doing that, no,
18 there's no policy on that.
19 Q. And just so we can have a clear record,
20 you've made several references to Garrity.
21 A. Uh-huh.
22 Q. And when you are referencing Garrity, what
23 you are talking about is an investigation
24 where an officer is compelled to make a
25 statement in the course of his duties; is

**Page 62**

1  that right?
2  A. That is correct.
3  Q. And you're talking about a Garrity
4  investigation as opposed to a criminal
5  investigation?
6  A. Yes, ma'am.
7  Q. Is that right?
8     And during a criminal investigation,
9  an officer is -- can make a decision to not
10 give an interview?
11 A. That's correct.
12 Q. But under a Garrity investigation, an officer
13 is compelled to do so?
14 A. Yes, ma'am.
15 Q. Is that right?
16    So we're clear about what we're
17 talking about here?
18 A. Yes, ma'am.
19 Q. Okay. All right. So let's look down at
20 paragraph C(b).
21 A. Okay.
22 Q. And here it states: "If the penalty code for
23 the highest alleged violation is either D, E
24 or F, or if the allegation involves the use
25 of force, the member's bureau commander or

**Page 63**

1  his or her designee shall ensure that an
2  initial investigation of the complaint is
3  conducted and then forward an investigative
4  report to the chief of police through
5  channels. The investigative report shall
6  contain a concise explanation of the
7  allegation and include any supporting
8  documentation available at the time of the
9  report."
10    And I read that accurately?
11 A. Yes, ma'am.
12 Q. And this is focused on an administrative
13 investigation; is that -- is that right?
14 A. Yes, ma'am.
15 Q. And this is a requirement for an
16 investigation that must occur, and it must
17 occur separately from any criminal
18 investigation; is that correct?
19 A. Yes, ma'am.
20 Q. And the violations for D, E and F, those are
21 I believe referenced earlier in the policy.
22 So those are referenced under 901.11 on Page
23 3 of the policy; is that -- is that correct?
24 A. That is correct, ma'am.
25 Q. And does PSB make recommendations regarding

**Page 64**

1  discipline?
2  A. We do not.
3  Q. You do not?
4  A. We do not.
5  Q. Who makes the recommendations regarding
6  discipline sanctions?
7  A. Those are made by the command staff and the
8  chief of police.
9  Q. So PSB makes a recommendation about a finding
10 with regard to policy violation, and then the
11 command -- the chain of command then makes a
12 decision about whether discipline will be
13 imposed?
14 A. Yes, ma'am.
15 Q. Is that right? Okay. All right.
16    Let's look at D(2). And this
17 provision of the policy states: "Should the
18 nature of the complaint alleged that a
19 violation of one or more laws has occurred,
20 the Professional Standards Bureau commander
21 shall immediately notify the chief of police.
22 The chief of police shall then determine
23 whether the complaint is to be investigated
24 as an administrative internal investigation
25 by the Professional Standards Bureau or as a

**Page 97**

1    Looking at all of the videos, listening to
2    all the reports, reading all the transcripts.
3    It could be going back and speaking with
4    immediate supervisors about that incident
5    that's not Garrity protected saying "I just
6    want to verify that you were on scene; yes, I
7    was", things of that nature that don't fall
8    under the first definition that you had.  So
9    an administrative review could be involved.
10   It could take a variety of different levels
11   other than just reading the reports
12   themselves so. . .
13   Q.  Is there any written policy that sets out an
14       administrative review -- sets out the
15       requirements of an administrative review?
16   A.  Not that I'm aware of.
17   Q.  Would you agree that an administrative review
18       or an administrative investigation must
19       determine whether every relevant provision of
20       Wichita Police Department policy was complied
21       with?
22   A.  Yeah, I think -- I think that's true.
23   Q.  A PS -- does a PSB detective have the
24       discretion to say there were five policies
25       that were operational here; I'm only going to

**Page 98**

1        look into one of them?
2    A.  No, I think that -- I think that the review
3        or the investigation is always an
4        investigation of an incident to see if all
5        WPD policies and regulations were conformed
6        with, as well as the city also has a
7        guideline of policies, as well, and there may
8        also be SOPs for those particular entities,
9        those bureaus, or those specialty units that
10       may also apply.
11   Q.  Can you give me an example of where the
12       city's policies might apply?
13   A.  I don't think that they would apply as much
14       toward like a -- we've talked extensively
15       about officer-involved shootings as much as
16       it might apply toward how we handle an
17       officer that's on FMLA or something like
18       that.  But the city does have a defined set
19       of policies that we are -- that we work or
20       function under, as well.
21   Q.  If look back at Policy 913 under paragraph
22       (c), it states:  "The investigation shall be
23       conducted consistent with the approved
24       officer individual shooting OIS policy."
25            And it's my interpretation that the

**Page 99**

1        investigation referred to in paragraph (c) is
2        the professional standards investigation
3        discussed in paragraph (b).
4            Would you agree?
5    A.  See, I think individual shooting
6        officer-involved shooting policy is much more
7        a reference toward officer-involved incident
8        policies and not this internal policy.
9        Investigation shall be conducted consistent
10       with the approved officer individual
11       shooting, officer-involved shooting policy.
12   Q.  That was going to be my next question.  Let's
13       clarify the record first.
14            The investigation being referred to
15       here is the administrative investigation that
16       the Professional Standards Bureau conducts;
17       is that right?
18   A.  Uh-huh.  That's correct.
19   Q.  What does -- so then what does paragraph (c)
20       mean?
21   A.  It means that we're going to follow the
22       guidelines also that are set out in a
23       officer-involved shooting incident, any
24       policies that are relevant to that.  And I
25       think this is maybe a reference to the fact

**Page 100**

1        that we are going to conduct our internal
2        investigations after the criminal
3        investigations are completed, that officer
4        involved incident, that officer-involved
5        shooting.
6    Q.  And what policy number is the
7        officer-involved shooting policy, if you
8        know?
9    A.  It's the 904 member involved incidents.
10   Q.  So it's the member involved incidents policy,
11       that's your understanding of the policy
12       that's being incorporated by reference here?
13   A.  I think that it is, yes.
14   Q.  And you think -- it's your understanding that
15       specifically what's being referenced here is
16       904.01 that states:  "The Wichita Police
17       Department will initiate a criminal
18       investigation whenever an officer is involved
19       in an action that either could have resulted
20       in serious injury or death or did result in
21       serious injury or death."
22            Is that accurate?
23   A.  Yes, ma'am.
24   Q.  And I assume your interpretation of this
25       policy provision is also that provision

```
 1       904.19 of this policy which states "criminal
 2       investigations will take precedence over
 3       administrative internal investigations" is
 4       also being incorporated by reference here?
 5   A.  Yes, ma'am.
 6   Q.  So it's fair to say your interpretation of
 7       this provision is that PSB will essentially
 8       stand down from the administrative
 9       investigation until the criminal
10       investigation is completed; is that accurate?
11   A.  Yeah.  Stand down, again, sometimes PSB may
12       monitor information coming in from the
13       criminal investigation.  I referenced the
14       fact that as a supervisor, I might watch
15       those criminal investigative interviews, as
16       well, but we would not initiate an internal
17       investigation.  We would not notify the
18       officer.  We would not start interviewing
19       witnesses independently until the completion
20       of that criminal investigation.
21   Q.  I think -- let's go to Regulation 4.1.  And
22       we'll mark this as 83.
23           (Mumma Exhibit No. 83 was marked for
24       identification.)
25   A.  Thank you, ma'am.  Is this the one that we
                                                    101
```

```
 1       want to put that on?
 2   Q.  Yeah.
 3   A.  Here you go.
 4   Q.  Thank you.  So this is -- these are the
 5       Wichita Police Department regulations about
 6       weapons and use of force requirements; is
 7       that accurate?
 8   A.  Yes, ma'am.
 9   Q.  And these are regulations that the -- that
10       PSB would use as a guide when reviewing any
11       type of use of force; is that right?
12   A.  This is -- yes, this is one of those things
13       that we would look at, yes, ma'am.
14   Q.  And if we look under subparagraph (b), there
15       is a paragraph that states:  "In a stressful
16       situation, a police member's first reaction
17       should be to determine whether the objective
18       can be accomplished without the use of a
19       weapon."
20           Do you see that?
21   A.  Yes, ma'am, I do.
22   Q.  And in evaluating a use of force incident,
23       whether a PSB detective is conducting a
24       review or an investigation, should the PSB
25       detective determine whether that provision of
                                                    102
```

```
 1       the policy has been complied with?
 2   A.  See, I think that subsection (b) that you're
 3       referencing is part of Kansas state statute
 4       21-5227, law enforcement officers making an
 5       arrest.  I think that is an aspect of the
 6       state statute itself.  So I would say that
 7       yes that would be something that we would
 8       look at.
 9           But for clarification purposes, this
10       is part of the state statute, I believe, and
11       not some policy that the Wichita Police
12       Department produced.
13   Q.  Fair.  But would that still be -- the
14       provision of this regulation that I just
15       read, would that still be part of the inquiry
16       that PSB makes when evaluating a use of
17       force?
18   A.  Yes, ma'am, I believe so.
19   Q.  And would you agree that if PSB fails to make
20       an analysis that the officer acted in
21       conformity with this provision that the
22       review or the investigation would be
23       incomplete?
24   A.  Okay.  I think that would be true.  And it
25       might be an aspect -- when we talk about
                                                    103
```

```
 1       this, I want to be clear that PSB is not
 2       making the determination of whether it was
 3       met or not.  PSB would be turning that over
 4       to command staff, and it might be part of
 5       those things that PSB says these are our
 6       areas of concern.  And I think that PSB would
 7       look at this when we're doing our review, and
 8       we would take this into consideration.
 9   Q.  And would PSB also be required, in its
10       review, to determine the requirements set
11       forth in 4.104A that states "when practical,
12       a verbal warning for the suspect to submit to
13       the member shall be given prior to the use of
14       lethal force"?
15   A.  Yes, ma'am.
16   Q.  And would you agree that if this provision is
17       not analyzed that the review or the
18       investigation would be incomplete?
19   A.  Yes, ma'am.
20           (Mumma Exhibit No. 84 was marked for
21       identification.)
22   Q.  I am going to mark this next exhibit as 84.
23       Now this is the ordinance of the -- for the
24       civilian review board.
25   A.  Yes, ma'am.
                                                    104
```

**Page 117**

1  KBI was, in fact, taking the lead on the
2  criminal investigation?
3  A. No.
4  Q. Would PSB make any inquiry to ensure that the
5  criminal investigation occurred consistent
6  with -- with WPD policy?
7  A. They would.
8  Q. What would they do -- what would the PSB
9  detectives do specifically to ensure that the
10 criminal investigation occurred in compliance
11 with WPD policy?
12 A. They would read the reports and the documents
13 and review the recorded interviews and
14 information that is part of that criminal
15 investigation. And they would make a
16 determination whether policy was followed or
17 not.
18 Q. Would PSB detectives be required to make a
19 determination whether policy was followed by
20 the homicide detectives who were
21 investigating the police shooting?
22 A. I would have to say no. I would say that if
23 a PSB investigator sees a policy violation
24 that occurs during an investigation, then
25 that PSB investigator has the ability then to

**Page 118**

1  report that back to the chief, "hey, we have
2  a policy violation. Do you want to
3  investigate this?"
4      But we're not investigating the
5  investigators of the criminal investigation.
6  We're not doing that. We're going to
7  investigate the officers that were involved
8  in that incident, not the investigators.
9  Q. Let's look at 10433. So here it has a list
10 of the people who are involved in this
11 incident, including the suspect, and the --
12 and I'm quoting here "directly involved
13 Wichita Police Department personnel."
14 Do you see that?
15 A. Yes, ma'am.
16 Q. And the individual who is listed here is
17 Officer Justin Rapp?
18 A. Yes, ma'am.
19 Q. And he is the only officer who is -- who is
20 listed here; is that correct?
21 A. Yes, ma'am.
22 Q. So does that mean that this investigation
23 focused solely on Officer Justin Rapp?
24 A. No. I think that the investigation focused
25 on the -- as it said earlier in this, that

**Page 119**

1  the officer had -- the investigator had said
2  officer involved use of deadly force
3  administrative review. In this situation, I
4  know that Officer Justin Rapp was the officer
5  that used the deadly force. But as we are
6  looking -- PSB is looking at that incident in
7  its totality, the focus would be on the
8  totality of the situation. I think the
9  investigator would be concerned with all
10 aspects of what occurred out there, not just
11 Justin Rapp.
12 Q. So would the PSB investigator or the PSB
13 detective who is reviewing this investigation
14 be assessing the actions or inactions of
15 Officer Rapp's supervisor?
16 A. I think that he would be interested in
17 assessing how all aspects, all personnel
18 functioned, not just the supervisor on that
19 scene, but the supervisor, as well as part of
20 the personnel on the scene.
21 Q. Would your expectation be that the PSB
22 detective responsible for reviewing this
23 criminal investigation produce a separate
24 analysis for each WPD officer who was at the
25 scene?

**Page 120**

1      MR. PIGG: Object to form of the
2  question. This has gone beyond the scope of
3  the notice, and this witness is not being
4  produced as a witness to speak on behalf of
5  the City about the Finch investigation.
6      MS. BEDI: We're talking
7  generally about PSB practice and that's what
8  he's here to talk about.
9      MR. PIGG: I disagree.
10     MS. BEDI: Are you going to
11 instruct him not to answer the question?
12     MR. PIGG: I will if you get to a
13 certain point.
14 A. The question is is -- again, you're going to
15 have to give me the question. Okay. I'm
16 sorry.
17 BY MS. BEDI:
18 Q. No, don't. It's no problem.
19     The question is your previous
20 testimony was that the PSB detective would --
21 your expectation of the PSB detective would
22 be that he would be examining the actions of
23 all WPD personnel who are at the scene; is
24 that accurate?
25 A. Right.

Pages 117 to 120

KELLEY REPORTING ASSOCIATES, LTD   515 S. MAIN, STE 105         WICHITA, KANSAS
                                   316.267.8200                 67202

```
 1    Q.  And my question is would you expect that
 2        detective to write an after action report
 3        related to the actions of each WPD officer
 4        who was at a scene?
 5    A.  I would not.
 6            MR. PIGG:  Same objection.
 7    Q.  Why not?
 8    A.  Because we're looking at -- we're not looking
 9        at whether an officer that was on the scene
10        in conjunction with the shooting, whether he
11        followed policy when he spoke to -- when
12        he -- let's say, when they conducted a
13        neighborhood.  If the officer produced a
14        report and it indicated to the professional
15        standards investigator that he did something
16        that is, on its face, and reasonably so, a
17        violation of policy, then that could be
18        looked at.  It can be looked at individually.
19        But this is an investigation, again, of the
20        officer involved use of deadly force
21        administrative review.
22    Q.  So is part of the inquiry, and I'm just
23        speaking generally here --
24    A.  Yes, ma'am.
25    Q.  -- of an administrative review of an officer
                                                    121
 1        involved use of deadly force to analyze the
 2        officer's supervisor's actions or inactions?
 3    A.  I think that when we look -- when we review a
 4        shooting, we review all the totality of the
 5        information.  But we investigate, according
 6        to our policy, that level 3 use of force, and
 7        that's what that's indicated on this page.
 8        If an officer -- if an investigator sees what
 9        he believes to be -- reasonably believes to
10        be a policy violation, then that can be
11        investigated, as well.  So to say that the
12        officer is investigating the supervisor, he
13        is reviewing the reports related to the
14        shooting, which includes the supervisor's
15        report, if he sees a policy violation, then
16        that could be investigated.  But to say that
17        because the supervisor was on the scene,
18        we're not going to investigate the supervisor
19        and all of his actions, I don't believe that
20        that occurred.
21    Q.  Okay.  So if we look on 10434.
22    A.  10434, yes, ma'am.
23    Q.  And this is a part of the report that lays
24        out policy and regulation investigation.
25    A.  Yes, ma'am.
                                                    122
 1    Q.  Do you see that?
 2            And these -- this is a reference to
 3        the policies of the Wichita Police Department
 4        that were relevant to this investigation; is
 5        that -- is that accurate?
 6    A.  Yes, ma'am.
 7    Q.  So I want to confirm that if a policy is not
 8        listed here, it was not then considered in
 9        the review of this action?
10    A.  I don't believe that --
11            MR. PIGG:  Object to form of the
12        question.
13    BY MS. BEDI:
14    Q.  Explain to me why that's not true.
15            MR. PIGG:  Same objection.  It's
16        beyond the scope.
17    A.  The officer -- the PSB officers -- PSB
18        investigators have the ability to look at an
19        investigation and make a determination.  If
20        they see something, again, that reasonably
21        looks like a violation of policy, then
22        that -- this being a summary, he would have
23        included it in here because this is a
24        investigation specifically of, again, of the
25        deadly force.  I believe that that's why
                                                    123
 1        he -- this pertains specifically to that
 2        deadly force.  That's why he's listed it
 3        here.
 4            If he'd have seen or recognized or
 5        reasonably believed there were other policy
 6        violations, then he would have listed them.
 7        This is -- just because he didn't list them
 8        in the summary doesn't mean that -- are aware
 9        of the regulations and were applying the
10        regulations as we looked at or review this
11        incident.
12    Q.  I assume that you're generally aware of
13        Policy 602, which is the policy -- the
14        Wichita Police Department policy about
15        barricaded suspects, sniper and hostage
16        situations SWAT procedures?
17    A.  I am -- I'm aware of it.  It's not one of the
18        policies I reviewed for this.
19    Q.  Understood.  But you're generally aware that
20        that policy exists?
21    A.  Yes, ma'am.
22    Q.  And are you generally aware of the facts of
23        the -- of the Finch case?
24    A.  This is the first -- let me rephrase that.  I
25        had no involvement in the Finch investigation
                                                    124
```

```
 1   Q.  Okay.  Let's go to Page 5 of the
 2       investigation.  It's 010802.
 3   A.  Yes, ma'am.
 4   Q.  And here we've got a listing of criminal
 5       investigators.  This is -- we're looking at
 6       the criminal investigation?
 7   A.  Yes, ma'am.
 8   Q.  And it looks like we've got a list of
 9       individuals who are employed by the Wichita
10       Police Department?
11   A.  Yes, ma'am.
12   Q.  And then there is one individual who is with
13       KBI?
14   A.  Yes.
15   Q.  And two individuals with the district
16       attorney's office; is that right?
17   A.  Yes, ma'am.
18   Q.  And there is -- so nobody from PSB was
19       involved in the criminal investigation; is
20       that accurate?
21   A.  Yes, ma'am.
22   Q.  And that is because the criminal
23       investigation proceeded first?
24   A.  Yes, ma'am.
25   Q.  It is my understanding, based on a review of
```
153

```
 1       these documents, that there was no -- that
 2       after the conclusion of the criminal
 3       investigation, there was no administrative
 4       investigation, that there was a review.
 5           Can you confirm that?
 6           And if you look on 10 -- 010844.
 7   A.  Yes, ma'am.
 8   Q.  But here there is a detective named Lance T.
 9       Oldridge signed an analysis here?
10   A.  Yes, ma'am.
11   Q.  And can you confirm, based on this analysis,
12       that there was no separate administrative
13       investigation; that there was just a review
14       of the criminal investigation here?
15   A.  Yes, ma'am, that is correct.
16   Q.  Then let's look at the last page.
17   A.  Yes, ma'am.
18   Q.  And this is a page where there is a PBS
19       commander, bureau commander, division
20       commander, and there are signatures and a
21       line that says "after review of this
22       investigation by the chief of police and the
23       chain of command, we concur."
24           And then there is a signature here.
25   A.  Uh-huh.
```
154

```
 1   Q.  The chief of police then signs this.
 2           What is this page?
 3           What does this page indicate?
 4   A.  I think that this page normally would be
 5       placed on the front.  It is the
 6       administrative communication that we talked
 7       about.  I don't know why it's on the back.
 8       Whoever copied this, either it's in the book
 9       this way or -- nope.  It's got a page number
10       so they chose to place this at the end, but
11       this is that administrative communication.
12       Whether it's on the front or the back, that's
13       what it is, an administrative communication
14       between the people that reviewed this.  And
15       in this situation, at this time, they were
16       saying concur, don't concur, require
17       additional information.
18   Q.  So it's my understanding that the officers
19       involved in this incident were exonerated of
20       any violations of law or policy, and is it
21       your understanding that what the --
22   A.  Hold on, I got to look and see what his
23       finding was.  Exonerate -- exonerate -- yes,
24       ma'am.  That is correct, ma'am.
25   Q.  And so is it your understanding that the
```
155

```
 1       chain of command here is concurring with the
 2       finding that the officer involved did not
 3       violate law or policy?
 4   A.  Yes, ma'am, I believe that is correct.
 5   Q.  And I assume, because the PSB detective made
 6       a recommendation, that this is an
 7       investigation that happened prior to the
 8       change in policy where -- that is currently
 9       in place where PSB no longer makes a
10       recommendation; is that accurate?
11   A.  I believe that to be true.
12   Q.  Okay.  So let's go to 10830.  If you look at
13       the second paragraph, and this is -- this is
14       at the section of the report where the
15       detectives have summarized witness
16       statements.
17           Do you see that?
18   A.  Yes, ma'am.
19   Q.  And I'm going to read this: "Beard said no
20       one was attempting CPR or checking on Icarus'
21       pulse so she asked the officer several times
22       if they wanted her to check Icarus' pulse.
23       Beard indicated that she said this to Officer
24       Ryan Snyder and he never responded to her.
25       Beard said she never went to check Icarus'
```
156