# EXHIBIT 36

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

## Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA J. FINCH, et al,         )
                              )
                              )
            Plaintiffs,       )
                              )
                              )
     vs.            )Case No.
                    )18-cv-1018-JWB-ADM
                              )
CITY OF WICHITA, KANSAS, et al,   )
                              )
                              )
            Defendants.       )
                              )

D E P O S I T I O N

The VIDEOTAPE deposition of LANCE OLDRIDGE taken on behalf of the Plaintiffs pursuant to the Federal Rules of Civil Procedure before:
     DARLENE K. KELLEY, CSR
     KELLEY REPORTING ASSOCIATES, LTD.
     Suite 108, 515 South Main Street
     Wichita, KS   67202

a Certified Shorthand Reporter of Kansas, at 455 N. Main, 13th Floor, Wichita, Sedgwick County, Kansas, on Thursday, May 23, 2019, at 11:34 a.m.

## Page 2

A P P E A R A N C E S

PLAINTIFFS:
    NORTHWESTERN PRITZKER SCHOOL OF LAW
    Ms. Sheila Bedi
    375 East Chicago Avenue
    8th Floor
    Chicago, Illinois 60611
    (312) 503-2492
    sheila.bedi@law.northwestern.edu

And

    CONLEE, SCHMIDT & EMERSON, LLP
    Mr. Rick E. Bailey
    200 W. Douglas
    Suite 300
    Wichita, Kansas  67202
    (316) 264-3300
    rbailey@fcse.net

DEFENDANTS:
    FISHER, PATTERSON, SAYLER & SMITH, LLP
    Mr. J. Steven Pigg
    3550 S.W. 5th Street
    Topeka, Kansas 66601-0949
    (785) 232-7761
    spigg@fisherpatterson.com

VIDEOGRAPHER:
    ADVANCED DOCUMENT IMAGING
    Mr. Michael Miles
    Suite 108
    515 South Main
    Wichita, Kansas 67202
    (316) 267-0800
    video@kelleyreporting.com

Also present were Mr. Orlando Socme and Mr. Luke Fernbach.

## Page 3

                    I N D E X
                                          Page
LANCE OLDRIDGE
  Direct Examination  By Ms. Bedi           4
  Cross-Examination By Mr. Pigg           134
  Redirect Examination By Ms. Bedi        140
  Recross-Examination By Mr. Pigg         142

                  E X H I B I T S
No.    Description                         Page
101    Quintero investigation report        89

(EXHIBITS BOUND IN SEPARATE EXHIBIT NOTEBOOK)

Signature of Witness                       144
Certificate                                145

## Page 4

         THE VIDEOGRAPHER:  This begins the videotape deposition of Lance Oldridge. Today is May 23rd, 2019, and the time is 11:34 a.m.  Will the court reporter please swear in the witness.
         LANCE OLDRIDGE,
having been first duly sworn on his oath to state the truth, the whole truth, and nothing but the truth, testifies as follows:
         DIRECT EXAMINATION
BY MS. BEDI:
    Q.  Good afternoon, Detective Oldridge.  I introduced myself off of the record, but my name is Sheila Bedi, and I represent the plaintiff in this matter.
    A.  Okay.
    Q.  Have you ever given a deposition before?
    A.  Yes, I have.
    Q.  So you understand some of the ground rules and you know that you are under oath; is that correct?
    A.  Yes, ma'am.
    Q.  And you know that we are making a record of our exchange today.  I'll be asking questions, you'll be giving the answers, and

```
 1      you with a knife, you're talking about
 2      protecting yourself, okay, you know.
 3   Q. Couldn't the officer just have gotten out of
 4      the way?
 5           MR. PIGG:  Object to form.
 6   A. I have no idea.  I know one thing, there was
 7      a car behind him, I know that.  And the
 8      officer doesn't have to get out of the way.
 9      So, hey, there's no legal requirement for the
10      officer to get out of the way, there's no
11      policy requirement for the officer to get out
12      of the way.  And that's putting all the onus
13      on the officer to do something when in this
14      case it was Mr. Randolph who was breaking the
15      law and doing it like that.  There's only
16      time to react.
17   Q. So Mr. Randolph walking across his yard with
18      a knife in his hand, even though the police
19      had no probable cause for any arrest, you
20      would agree with that, right?
21   A. No, they did.  As soon as he took steps at
22      them with a knife, to me, I wasn't there,
23      that's probable cause.
24   Q. That's probable cause?
25   A. Yeah, he's aggravated assault.
                                                    37
```

```
 1   Q. Okay, all right.  So at the moment in your
 2      mind as the PSB investigator here, the moment
 3      Mr. Randolph stepped out of his home with the
 4      knife in his hand, this is no longer a mental
 5      health call, it had turned into a situation
 6      where you had an aggravated assault suspect;
 7      is that fair?
 8   A. No.  I'd say it's still a mental health call
 9      with now the aggravated -- because you said
10      no longer.  No, it's still a mental health
11      call but you added the person's committing an
12      aggravated assault.
13   Q. And the fact that in your mind Mr. Randolph
14      now has committed an aggravated assault, does
15      that go into your analysis and your
16      conclusion that the Taser was in compliance
17      with policy?
18   A. Most definitely.
19   Q. All right.  So let's go on and read on about
20      what happened next.
21   A. Uh-huh.
22   Q. And we're on Page 5.  "The Taser deployment
23      caused Icarus to stop momentarily and Snyder
24      then noticed a knife in Icarus' right hand.
25      After momentarily stopping, Icarus began
                                                    38
```

```
 1      walking towards Snyder again.  Fearing his
 2      life was in danger, Snyder dropped his Taser,
 3      drew his Glock 9 millimeter handgun and fired
 4      four rounds into Icarus' torso."
 5      Did I read that accurately?
 6   A. Yes, ma'am.
 7   Q. There's nothing in this description that
 8      suggests there were any verbal commands given
 9      to Icarus during this interaction; is that
10      right?
11   A. That's correct.
12   Q. Does that violate WPD policy?
13   A. No, ma'am.
14   Q. Why not?
15   A. Because you only have to give -- our policy
16      says or suggests you give a verbal command if
17      prudent or, I mean, if you can.  You don't
18      have to.
19   Q. Do you think it was appropriate for the
20      officers to not give any verbal commands
21      during this encounter?
22   A. In this encounter, yes.
23   Q. Why?
24   A. It happened so quick.
25   Q. Do you know how long the officers were
                                                    39
```

```
 1      engaged with Mr. Randolph before they shot
 2      and killed him?
 3   A. It might be in this report, but my best
 4      recollection, probably about 5 seconds.  I
 5      mean he came out a door and come across the
 6      yard at him.
 7   Q. You think it took them 5 seconds to first
 8      tase him and then shoot at him four times?
 9   A. Oh, no.  That, that probably took a matter of
10      tase, tase, shoot, 2 seconds, I don't, quick.
11      It was like that.
12   Q. Did you calculate it?
13   A. No.
14   Q. And how come?
15   A. I didn't.  I mean somebody else might have
16      like the lab personnel, but -- and if I would
17      have read that, it would be in here, and it
18      might be.  I don't know.  I just don't
19      remember.
20   Q. You didn't think -- it was nothing that you
21      felt particularly relevant to the analysis
22      you were performing?
23   A. No.  Somebody comes out the door, rush across
24      the yard at you with a knife, you tase them,
25      you shoot them, it happens like that.
                                                    40
```

```
 1        And so -- and maybe this would -- so
 2   like Officer Danny Brown, I would read his --
 3   or I did, I read his entire criminal
 4   interview and I summarized that interview for
 5   my report.
 6   Q.  And for each summary that's included in here,
 7   did you use that same process?
 8   A.  Unless -- unless it's noted differently, yes,
 9   ma'am.
10   Q.  And as you previously discussed for this
11   report, you did not conduct any of your
12   own investigation -- I'm sorry, you did not
13   conduct any of your own interviews?
14   A.  To the best of my recollection, that's
15   correct.
16   Q.  So you would read the interviews from the
17   criminal investigation and summarize them for
18   this report --
19   A.  Yes, ma'am.
20   Q.  -- is that accurate?
21   A.  Yes, ma'am.
22   Q.  So one of the interviews that you summarized
23   was the interview of Officer Danny Brown?
24   A.  Yes, ma'am.
25   Q.  And here we see that Officer Brown describes
                                                    49
```

```
 1   Icarus' advance as not running but faster
 2   than a walk.  Do you see that?  Sorry, that's
 3   in the --
 4   A.  Brown, it's right here, advance as not
 5   running but -- yes.
 6   Q.  So now let's go to Page 21.
 7   A.  Uh-huh.  I'm there.
 8   Q.  All right.  And if we look -- if we go to the
 9   third paragraph --
10   A.  Uh-huh.
11   Q.  -- this is a witness statement, a civilian
12   witness statement by a woman named Beverly
13   Alfred-Allen?
14   A.  Uh-huh.
15   Q.  And it appears that you summarized this
16   witness statement; is that right?
17   A.  Yes, ma'am.
18   Q.  And here it states that Mrs. Alfred-Allen
19   described Icarus was walking slowly towards
20   the officers with the knife in his hand.  Do
21   you see that?
22   A.  Yes, ma'am.
23   Q.  So there's a bit of a discrepancy here
24   between the officer saying Icarus
25   was moving -- well, the initial officer
                                                    50
```

```
 1   saying he was moving quickly, then we've got
 2   Officer Brown saying he wasn't running but it
 3   was faster than a walk, and the civilian
 4   witness was saying he was moving slowly?
 5   A.  Yes, ma'am.
 6   Q.  Would you agree that there's a discrepancy?
 7   A.  Yes.  There's actually two discrepancies in
 8   that same sentence.
 9   Q.  So when there's a discrepancy such as this,
10   what is your role as a PSB detective?
11   A.  To look at the evidence and try to determine
12   if there's -- determine what really happened.
13   And sometimes you may not be able to
14   determine what really happened.
15   Q.  Based on the fact that we've got at least
16   three different descriptions of how quickly
17   Icarus was moving when he came out of the
18   house, how did you reconcile that discrepancy
19   in this report?
20   A.  I apologize, but did we talk about how fast
21   he's moving at an officer?  Because you said
22   three.  I have Beverly's and I have Brown's.
23   Did we talk about what Snyder said?
24   Q.  Yes.
25   A.  I just don't remember.
                                                    51
```

```
 1   Q.  If we look on Page 5, Snyder said Icarus was
 2   coming at him fairly fast and he felt Icarus
 3   was attacking him.
 4   A.  Okay.  So there's -- before I can answer that
 5   question, I would have to read all the other
 6   witness statements and see what they said,
 7   too.
 8   Q.  Well, you can just -- what you can do is you
 9   can just tell me what your process would be.
10   At this point we've identified that there's
11   at least three different descriptions of how
12   Icarus was moving when he came out of the
13   house.
14   A.  Right.
15   Q.  So when you're confronted with those three
16   different descriptions, what's your next step
17   as a PBS reviewer?  What do you do next?
18   A.  So you're now asking me in general, on
19   three -- not these three specific witnesses,
20   but three -- because I can't answer that
21   question because there could be other witness
22   statements.  I wouldn't make that
23   determination based on the information you
24   gave me just now.
25   Q.  No.  I'm asking you in general.  You're now
                                                    52
```

**Page 57**

1  facts. You're not giving me facts. Well,
2  you are. You're giving me limited facts.
3  I'm not arguing with you. I'm just telling
4  you --
5  Q. I mean I'm happy to argue with you --
6  A. I'm telling you --
7  Q. -- but we're going to be here for a while if
8  this is how we're going to --
9  A. Okay, ma'am, let's see what every witness
10  said. Then I'll answer your question.
11  Q. Well, I --
12  A. Do you want me to answer your question or
13  not?
14  Q. No, I don't. I'm going to ask you a new
15  question. I want to make sure our record is
16  clear.
17     It's my understanding of your previous
18  testimony that based on what you remember
19  about this case --
20  A. Yes, ma'am.
21  Q. -- the amount of time that Icarus took when
22  he left his -- when he left the house and
23  walked over to the officers was not a
24  critical fact; is that a fair statement?
25  A. You said something about my previous

**Page 58**

1  testimony. What previous testimony?
2  Q. What you just testified to three minutes ago.
3  A. Oh, I mean it's a fact, but how -- in a realm
4  of criticalness, I don't know how critical it
5  is. It is critical to the determination,
6  well, did the officer have time to say stop
7  or did he not, you know. It's not required.
8  With the facts I've been given --
9  Q. Let me re-ask the question.
10     As you sit here today, having
11  refreshed your recollection about this
12  incident --
13  A. Okay.
14  Q. -- is how quickly Icarus was moving, is that
15  a critical fact to this investigation?
16  A. Yes, ma'am.
17  Q. It is a critical fact?
18  A. Yes, ma'am.
19  Q. Okay. So as a critical fact, is that
20  something that should have been reconciled?
21  A. I believe it was reconciled.
22  Q. Well, let's take a look. On Page 39 of the
23  report --
24  A. Yes, ma'am.
25  Q. -- you've got here -- you've got Page 39 and

**Page 59**

1  40 of the report, you've got creditability
2  assessment of officers and/or witnesses.
3  A. Yes, ma'am.
4  Q. Do you see that?
5  A. Yes, ma'am.
6  Q. And here is where you list previous
7  disciplinary histories of the officers; is
8  that right?
9  A. Yes, ma'am.
10  Q. And then on Page 40 you list criminal history
11  of witnesses. Do you see that?
12  A. Yes, ma'am.
13  Q. Is this the place in the report where you
14  would have reconciled any discrepancies in
15  witness statements?
16  A. I think that's actually right before this. I
17  think there's a section on discrepancies and
18  analysis, like starting at Page 36.
19  Q. Right, okay. So why don't you take a minute,
20  and the section of discrepancies and analysis
21  goes from 36 to 38, so why don't you take a
22  minute and skim that and see if it says
23  anything about how quickly Icarus was moving.
24  A. No, I don't see anything related to that.
25  Q. So it's fair to say you did not then in your

**Page 60**

1  discrepancies and analysis section of the
2  report reconcile any of the discrepancies
3  about how quickly Icarus was moving?
4  A. In the report I did not.
5  Q. Okay. Let's go back to Bates 21.
6     MR. PIGG: What page is that?
7     MS. BEDI: That's Page 21.
8  BY MS. BEDI:
9  Q. And if we look at the last full paragraph, it
10  begins, "Beverly said the officer."
11  A. How many lines down? Oh, the top of it.
12  Q. Just the top of it.
13  A. Okay, I'm there.
14  Q. I'm going to then read about midway down the
15  paragraph and it starts, "Beverly said Icarus
16  fell forward and she observed the knife lying
17  on the ground next to Icarus after he fell.
18  That really said she went towards Icarus
19  after he fell because she wanted to hug him
20  and one of the officers told her not to get
21  near him and pointed his gun at her."
22     Did I read that accurately?
23  A. Yes, ma'am.
24  Q. Does that describe a violation of WPD policy,
25  pointing a gun at a grandmother whose son

**Page 61**

1 has -- or whose grandson has just been shot
2 and killed in front of her?
3             MR. PIGG:  Object to form.
4 Misstates the evidence.
5     A.   Can you reask the question, please?
6             MS. BEDI:  Would you mind
7 re-reading that question?
8         (The requested portion of the record
9 was read by the reporter, as follows:
10 Question: "Does that describe a violation of
11 WPD policy, pointing a gun at a grandmother
12 whose son has -- or whose grandson has just
13 been shot and killed in front of her?")
14     A.   I don't have enough information based --
15 that's one person saying that.  I don't have
16 enough, you know, information to answer that.
17     Q.   I'm not asking if it happened, right.  I'm
18 asking you if the allegation is a violation
19 of policy?
20     A.   Well, I don't know if it happened.
21     Q.   I'm not asking you if it happened.  I'm
22 saying is the allegation that the officer who
23 shot Icarus then pointed his gun at Icarus'
24 grandmother when she went to his body, is
25 that a violation of WPD policy?

**Page 62**

1     A.   Well, if you're not asking me if it happened,
2 I'm not -- if you're talking about this
3 specific situation, I don't have all the
4 evidence to tell you.
5     Q.   If it happened, is it a violation of policy?
6     A.   If this happened?
7     Q.   Yes.
8     A.   Given everything else I know about this, no.
9     Q.   No.  Why not?
10     A.   Because it's not a violation of policy.
11     Q.   It's not a violation of policy to -- well, is
12 pointing a gun at somebody a use of force?
13     A.   Yes.
14     Q.   So it's fair to say that this officer used
15 force under WPD policy?
16     A.   Yes, yes.
17     Q.   On Icarus' grandmother?
18     A.   Yes, what she says.  I mean I don't know what
19 the officer says.
20     Q.   Let's just assume that it happened as she
21 said, okay?
22     A.   Yes, ma'am.
23     Q.   If it happened as she said it did, it would
24 have been a use of force?
25     A.   Yes, ma'am.

**Page 63**

1     Q.   And that use of force, based on your
2 understanding of what happened here, would
3 not have been in violation of WPD policy?
4     A.   That's correct.
5     Q.   And why is that?
6     A.   Because there was a knife laying there and
7 these officers just shot her son and she
8 might have been trying to pick the knife up
9 to stab the officers.
10     Q.   Should the officers have given her any verbal
11 instructions prior to pointing their gun at
12 her?
13     A.   What I'm seeing here, they probably didn't
14 have time.
15     Q.   So in your mind it was entirely appropriate
16 for them to point the gun at her?
17     A.   Well, I think they -- she -- didn't we say --
18 where is it at?
19          Yeah, given these, I mean with my
20 recollection given this there wouldn't have
21 been time.  It would have been simultaneous
22 at best.
23     Q.   No time to give her verbal --
24     A.   And I don't know.  The officer may have said
25 he told her.  But you haven't let me look at

**Page 64**

1 that.
2     Q.   And based on your recollection of this
3 investigation, did you conduct any separate
4 investigation into this use of force, the
5 pointing of the gun at the grandmother?
6     A.   Not a separate investigation, no.
7     Q.   No?  Did you take this to your supervisor and
8 say, hey, there's an allegation here that we
9 might need to look into more?
10     A.   No.
11     Q.   Why not?
12     A.   I really don't know.
13     Q.   Do you think you should have?
14     A.   No.
15     Q.   Sitting here today would you have done it any
16 differently?
17     A.   No, not with what you've told me.  I mean
18 there's a whole investigation here.  I've got
19 to -- this happened five years ago.  I've got
20 to -- or probably when I wrote this, four
21 years ago.  I'd have to see all the
22 information.
23     Q.   Well, I'll represent to you that this
24 sentence is the only reference in the entire
25 report to the officers pointing the gun at

```
 1    Q.  Why wouldn't it matter?
 2    A.  Well, to have her (sic) again tell me he was
 3        two feet and her to say he was six feet, I've
 4        got that information.
 5    Q.  But maybe they would have somehow given you
 6        some information that would have shed on
 7        light on the discrepancy or that would have
 8        cleared the discrepancy up?
 9    A.  And two feet and six feet in this situation
10        given all the other facts, it does not
11        matter.
12    Q.  It doesn't matter?
13    A.  No, ma'am.
14    Q.  So there was no point in trying to clarify
15        that discrepancy in your analysis?
16    A.  That's correct.
17    Q.  If we go to Page 29 of the report.
18    A.  Yes, ma'am.
19    Q.  And here Icarus' sister says that the
20        officer, "Officer Snyder began to back up but
21        he didn't get out of Icarus' way."
22    A.  Yes, ma'am.
23    Q.  Do you see that at the top of the --
24    A.  Yes, ma'am.
25    Q.  Do you think Snyder should have been asked
```
69

```
 1        why he didn't get out of the way?
 2    A.  I think he said he tried to back up but there
 3        was a car, if I remember right.
 4    Q.  You believe that Snyder's testimony was that
 5        he tried to back up --
 6    A.  He knew there was a car --
 7    Q.  -- or that he tried to get out of the way?
 8    A.  Or there was car behind -- I'm not saying
 9        he -- I think that he knew consciously there
10        was a car behind him or something, if I
11        remember right.  And I think he knew there
12        was a car behind him, if I remember right.
13    Q.  Let's assume for purposes of the hypothetical
14        that Snyder was never asked why he didn't try
15        to get out of Icarus' way.
16    A.  Right, okay.
17    Q.  Should he have been asked?
18    A.  Not -- no, not necessarily.
19    Q.  Why not?
20    A.  Because sitting here thinking like this, an
21        analogy, if I threw a punch at Mr. Pigg with
22        my right hand and he went like that and I hit
23        him, it would be the same as, well, Mr. Pigg
24        why didn't you swerve your head the other
25        way.  I mean it's hypothetical that, you
```
70

```
 1        know, this all happened this way, this quick.
 2        Just like my hypothetical, it happened, he
 3        reacted.  He didn't have time.
 4        You know, maybe if, you know, there
 5        was a situation where you can try to get out
 6        of the way.  This situation did not appear
 7        that -- you know, he was limited, if I
 8        remember right, because he had a car behind
 9        him.  And if I remember right there was a
10        tree or something over here.  There's another
11        officer over -- if I'm Snyder, there's
12        another officer, I think he was on his right.
13        There's family members in the yard, the guy
14        is coming at him, he reacted lawfully, justly
15        and did what he did.  And I did not see a
16        need to say, did you try to get -- I mean it
17        just happened.
18    Q.  And you didn't feel the need --
19    A.  And I think he did try to get out of the way,
20        as a matter of fact.  If I could look at
21        Snyder's report, I think he did try to get
22        out of the way, but I don't -- I would have
23        to read it.
24    Q.  My question is whether he specifically should
25        have been asked what efforts did you take to
```
71

```
 1        try to avoid engaging with Icarus?
 2    A.  Well, his statement was he did try to get out
 3        of the way, so I wouldn't ask because he did,
 4        if I remember right.
 5    Q.  All right.  Let's look at his statement.  His
 6        statement begins on Page 11.
 7    A.  Yes.
 8    Q.  Goes to Page 18.
 9    A.  So yes.  So reading this statement, what I'm
10        recalling is it was after, according to what
11        I've summarized in here, it was after the
12        Taser fire that Snyder tried to get out of
13        his way.
14    Q.  Let's look at the picture on Page 15.
15    A.  Yes, ma'am, I'm there.
16    Q.  Okay.  You'll see that there is a marker
17        Number 5, which is Snyder's Taser, indicating
18        his position when Icarus approached him, the
19        Taser was deployed and then dropped?
20    A.  Yes.
21    Q.  There's no car backing him up, right?
22    A.  No.  The car is like right here where this
23        person is taking the picture.
24    Q.  But he -- if he wanted to -- if he wanted to
25        but there was no car that was immediately
```
72

KELLEY REPORTING ASSOCIATES LTD   515 S. MAIN, SUITE 105                WICHITA, KS
                            316-267-8200                                      67202

**Page 73**

1 behind him that would have prevented him from
2 backing up?
3 A. From right there, yes, ma'am.
4 Q. Is there a car there?
5 A. Not right where Number 5 is.
6 Q. Okay. So there was nothing that would have
7 prevented him from backing up?
8 A. That's correct.
9 Q. Okay.
10 A. And that's my opinion.
11 Q. Well, based on the picture we're looking at,
12 do you see a picture of a car?
13 A. No.
14 Q. Okay. Let's go back to Page 33 of the
15 report.
16 A. Yes.
17 Q. I'm sorry, let's go to Page 29.
18 A. Yes, ma'am, I'm there.
19 Q. And this is the summary that you prepared of
20 Icarus' sister's statement?
21 A. Uh-huh.
22 Q. It's the second full paragraph.
23 A. Okay.
24 Q. "Brianna said that her mother tried to go
25 over to Icarus on the ground, but Snyder

**Page 74**

1 pointed his gun at her and told her to stay
2 back. Brianna said a neighbor came over and
3 asked if she needed to do CPR and take
4 Icarus' pulse, but the officers wouldn't let
5 anyone touch him. Brianna said the officers
6 never called for help over the radio and that
7 a neighbor was the one who had to call for an
8 ambulance."
9      Did I read that accurately?
10 A. Yes, ma'am.
11 Q. On its face, does that paragraph reflect any
12 violations of WPD policy?
13 A. Well, my answer to that is, first, that
14 clears up what you asked earlier. She's
15 saying the officer did give her a verbal
16 warning, and you asked about that on the
17 pointing the gun at her. So here's a witness
18 that said she heard her mother get a verbal
19 warning from the officer.
20 Q. To clarify the record, what this says was
21 that the officer pointed the gun at the
22 grandmother and told her to stay back --
23 A. Right.
24 Q. -- while pointing the gun?
25 A. Right.

**Page 75**

1 Q. Correct?
2 A. Yes. And you asked earlier, because the one
3 statement from Beverly, there wasn't a verbal
4 warning given. You asked me about should he
5 have done it. Of course, I don't remember
6 how I answered exactly, but it's like I don't
7 have the facts. Well, here's a witness that
8 said the grandmother was issued a verbal
9 warning.
10 Q. She was issued -- you would agree with me
11 that she was issued a verbal warning while
12 the use of force was occurring?
13 A. This doesn't say the order really, but it's
14 probably pretty much simultaneous as fast as
15 this all happened, so -- so really I, you
16 know, I can't say on its face that this
17 paragraph has any policy violations.
18 Q. Does this paragraph on its face raise for you
19 any concerns that should be subject to
20 further investigation?
21 A. Well, on its face you could look and see if
22 they -- you know, what they did for, you
23 know, medical assistance. You know, I know
24 there was an ambulance already there. So
25 number one, I don't know how Brianna would

**Page 76**

1 know the officer didn't call for help over
2 the radio. I mean she would have no idea,
3 okay. And what is help, okay. And then
4 granted this is a summary so I don't know
5 what her exact words are, it's my summary.
6      So yeah, I mean basically on its face
7 what did they do to try to help the guy.
8 Q. That would be a point for further
9 investigation?
10 A. Or you would just try to determine that
11 through everything you have.
12 Q. Is that -- did you make any effort to
13 determine what they did to try to help the
14 guy?
15 A. Just whatever I read.
16 Q. You didn't have any further follow-up with
17 any of the officers about anything they may
18 have done?
19 A. No, no.
20 Q. Why not?
21 A. Apparently in my mind when I read all this
22 they did what was required by policy.
23 Q. And Brianna's suggestions that they impeded
24 aid or did not ask for aid were not worthy of
25 investigation in your mind?

KELLEY REPORTING ASSOCIATES LTD   515 S. MAIN, SUITE 105   WICHITA, KS
316-267-8200   67202

```
 1   A.  Based on all the information they have.
 2   Q.  That's enough to justify lethal use of force?
 3   A.  No.  And they think they're going to do
 4       something with the knife.  Not just think
 5       they have it, but think they're going to do
 6       something, they show they're going to do
 7       something with it.
 8   Q.  Still on Page 15, last paragraph.
 9       "Officer Thompson explained that once she was
10       on the call and armed with her patrol rifle,
11       her transitioning to a less lethal form of
12       force was only done at the last resort due to
13       the limited ability of securing the rifle
14       prior to doing so."
15           Did I read that accurately?
16   A.  Yes, ma'am.
17   Q.  What does that mean?
18   A.  Well, basically what it means is when you
19       have a rifle, I mean most generally it has a
20       sling and it's slung over your shoulder,
21       okay.  So it's always exposed, it's right
22       there.
23           If I have a handgun, versus -- you
24       know, versus a handgun, I can secure a
25       handgun in a holster, okay, before doing --
```
105

```
 1       whether I'm going to handcuff somebody or
 2       whatever I do, it makes it more difficult for
 3       an officer with a patrol rifle to do other
 4       things when that rifle has been deployed.
 5           And she's basically just stating that,
 6       you know, it makes it more difficult to --
 7       she had the patrol rifle out, so in this
 8       situation, you know, Officer Hall, her
 9       partner, transitioned to a less lethal
10       weapon.  I mean I think she's just explaining
11       her thought process.
12   Q.  And I want to understand what your
13       understanding is of her thought process.  So
14       I'm going to try to repeat it back to you.
15           That because Officer Thompson has the
16       rifle and the rifle is so large, it would
17       have been difficult for her to, for example,
18       use the Taser on Quintero without then
19       perhaps putting her in her mind at risk of
20       something happening with the rifle?  Is that
21       your interpretation of what she meant?
22   A.  Yes, and the fact that her partner, it's
23       more -- it's easier for him to transition to
24       less lethal than her.
25   Q.  So once the rifle is out, it's difficult then
```
106

```
 1       for the officer to engage in less than lethal
 2       use of the force.  Is that what the officer
 3       is saying here?
 4   A.  No, it's not more difficult.  It's just you
 5       have a lot more things you need to think
 6       about.
 7   Q.  It limits your options, is that fair to say?
 8   A.  Your options aren't limited.  It just makes
 9       the options more difficult, more things to
10       consider when doing it.
11   Q.  And that was the point that Officer Thompson
12       was trying to get across, one of the reasons
13       why she used lethal force was because her
14       rifle was already out?
15   A.  No, I don't think so.
16   Q.  No?  Well, then what is it that she's saying?
17   A.  I mean just saying that in that -- what I
18       think it's saying is it was more difficult
19       for her to transition to less lethal and in
20       this context, so Hall transitioned to less
21       lethal.
22   Q.  It says that her transitioning to a less
23       lethal form of force is only done as a last
24       resort.  So her transition from holding the
25       rifle and being engaged in a lethal use of
```
107

```
 1       force to being engaged in less lethal use of
 2       force would only happen as a last resort?
 3   A.  That's her words.  I'd have to -- I don't
 4       know if that's what's really stated in our
 5       policy.  That's her words and her perception.
 6   Q.  Do you know why you put it in here?
 7   A.  Because she said it.  I mean I again was
 8       trying to cover...
 9   Q.  Well, I mean I've read the interviews right
10       there of the things that they say.
11   A.  Right.
12   Q.  This isn't a word-for-word transcription of
13       the interviews, right?
14   A.  Uh-huh.
15   Q.  You pick and choose what you put in the
16       reports, correct?
17   A.  And I try to be accurate in mitigating the
18       aggregating statements, all that stuff.
19   Q.  So I'm trying to understand why you made the
20       decision to include this statement.
21   A.  I don't know.
22   Q.  As you sit here today, what relevance does
23       this statement have to your analysis of this
24       incident?
25   A.  The relevance is we're just trying to explain
```
108

**Page 109**

1  what's going through the officer's mind when
2  something this serious happens.
3  Q.  And one of the reasons lethal force was used
4      is because she could only transition to less
5      lethal form of force as a last resort?
6      That's what the officers saying, right?
7  A.  No, that's not saying that's why she used
8      lethal force.
9  Q.  Then what is she saying?
10 A.  She's just saying that transitioning to
11     less -- what she's saying is transitioning to
12     less lethal is more difficult for her having
13     deployed the patrol rifle.  It doesn't say
14     that that's why she did anything.
15 Q.  She's just saying that the transition to less
16     lethal would be the last resort?
17 A.  That's what she says, yes.
18 Q.  Okay.  The other thing that she says is that
19     she's only had about -- this is later on in
20     the same paragraph, she's only had about a
21     50 percent success rate with the Taser, so
22     she never considered transitioning to her
23     Taser in the situation she was faced with.
24     Do you see that?
25 A.  Yes, ma'am.

**Page 110**

1  Q.  50 percent success rate with a Taser, have
2      you ever heard that before?
3  A.  No, I don't know any percent success rates at
4      all.
5  Q.  Did you ask -- did you have any conversation
6      with Officer Thompson about the statement she
7      made in this paragraph?
8  A.  No, I did not.
9  Q.  Did you ask her to clarify anything she said
10     here?
11 A.  No, I did not.
12 Q.  Why not?
13 A.  I didn't feel it was relevant.  Looking back
14     I didn't feel it was relevant to the
15     investigation.
16 Q.  As you sit here today, do you think it's
17     relevant?
18 A.  I don't think about a 50 percent success rate
19     of a Taser is relevant to this investigation.
20     It might be to somebody in administration
21     going, man, are we only getting a 50 percent
22     success rate.  But that's not a policy
23     violation or a regulation violation.
24 Q.  Doesn't policy require officers to evaluate
25     all options and use the options that will,

**Page 111**

1  whenever possible, preserve sanctity of life?
2  A.  I'd have to read that.  I don't -- I mean
3      that's what we are trained to do.  You train
4      to do the job in the less, you know, force
5      possible.
6          I mean they would have liked Quintero
7      to comply, you know.  So I mean they started.
8      I mean they asked him to comply.  He didn't
9      comply, you know.  So they did, they used --
10     they used, you know, their presence, they
11     used a verbal.  He didn't comply.
12 Q.  Well, actually that's not true, right?  They
13     used the gun from the very beginning.  They
14     showed up to the vehicle with the gun out
15     pointed inside the vehicle, right?  So that's
16     where they started.  Now we can walk
17     through --
18 A.  We don't know when Quintero saw the gun, so
19     we can't answer that.  I mean you can assume
20     he saw the gun because he did make statements
21     about the gun, but when he saw the gun, so --
22     but if you want to start there, they had the
23     gun out, okay, yeah.  But the fact is you've
24     got to comply, okay.  And he didn't comply.
25     They thought he was armed.  They used verbal.

**Page 112**

1  They used nonlethal or less lethal I should
2  say and then lethal force.
3         MS. BEDI:  We need to do a tape
4  change, so this might be a good time for us
5  to break.
6         THE VIDEOGRAPHER:  Off the record
7  at 1:32.
8      (A recess was taken from 1:32 p.m. to
9  1:37 p.m.)
10        THE VIDEOGRAPHER:  Back on the
11 are record at 1:37.
12 BY MS. BEDI:
13 Q.  All right.  Let's go to Page 19.
14 A.  I'm there.
15 Q.  And it looks like in this investigation
16     you -- you did conduct an interview of
17     Officer Hall.  Do you see that, bottom of
18     Page 18?
19 A.  Yeah.  I'm just reading it real quick because
20     I don't remember it, but -- yes, that's what
21     it says.
22 Q.  Do you know why you made the decision to
23     conduct an interview of Officer Hall?
24 A.  Well, reading what I wrote in here, you know,
25     I don't specifically remember it, so I'm

KELLEY REPORTING ASSOCIATES LTD   515 S. MAIN, SUITE 105   WICHITA, KS
316-267-8200                                               67202

```
1       trying to recall.
2            So I probably had a question that
3       wasn't, you know, something that I didn't get
4       out of the criminal interview where they
5       asked him or it's just something, a question
6       that I wanted answered that wasn't in the
7       criminal interview about Hall, if you
8       recognize Quintero as the person potentially
9       involved in the disturbance. And -- and
10      maybe -- oh, and asked him about a statement
11      he said he heard Quintero make, like his
12      perception of the statement.
13           So I probably didn't get those
14      questions that I had in my mind out of the
15      criminal interview, so I chose to interview
16      him.
17   Q. Officer Hall told you that he was not aware
18      of a suspect description?
19   A. That's correct.
20   Q. So at the moment that they were engaging with
21      Quintero they didn't know if he was --
22   A. He didn't know.
23   Q. And is it your recollection that
24      Officer Thompson did know?
25   A. See, I thought there was something in there
                                                   113
```

```
1       that she did in reviewing my report but I
2       would have to find it. I don't...
3    Q. Officer Hall, it's clear at least that
4       Officer Hall was not aware who Quintero
5       was --
6    A. That is correct.
7    Q. -- when they were engaging him; is that
8       right?
9    A. That's correct, ma'am.
10   Q. And he couldn't be operating on any
11      assumption that he met any description of the
12      suspect; is that right?
13   A. Reading my report, that would be correct.
14   Q. And then you wrote down here that you asked
15      Hall if he perceived the statement, "I've got
16      one for you, I'll get you," from Quintero to
17      Thompson as a threat to Thompson; is that
18      right, did I read that accurately?
19   A. Yes.
20   Q. And Officer Hall said he did perceive that as
21      a threat to Officer Thompson?
22   A. Yes.
23   Q. Is that how you asked the question?
24   A. I'd have to look at my transcript. I don't
25      know. I mean I don't know if -- I don't know
                                                   114
```

```
1       if that statement, "I've got one for you,
2       I'll kill you," came from the criminal
3       investigation, I don't --
4    Q. It doesn't say I've got one for you, I'll
5       kill you.
6    A. Oh, I'll get you, sorry, sorry, yeah. So the
7       statement, "I've got one for you, I'll get
8       you," I mean if I look at my footnote and --
9       I mean I know that quote was in the PSB
10      interview, but I don't know if the reason I
11      asked it was originally in the criminal. I'd
12      have to research a little bit.
13   Q. Were you trying to clarify whether
14      Officer Hall believed that Officer Thompson
15      was threatened?
16   A. Yeah.
17   Q. That was the purpose of asking the question?
18   A. Yes, ma'am.
19   Q. Page 21, this is a summary that you did of
20      the citizen witness statements?
21   A. Yes, ma'am.
22   Q. Is that right?
23   A. Yes, ma'am.
24   Q. And this is a summary of the statement of
25      Santiago Quintero who was Mr. Quintero's
                                                   115
```

```
1       father; is that right?
2    A. Yes, ma'am.
3    Q. And this is a summary of the statement. You
4       did not independently interview
5       Mr. Quintero's father; is that right?
6    A. That's correct.
7    Q. On Page 21, third paragraph, "Santiago said
8       he yelled out that he, Quintero, didn't have
9       any weapon. Santiago stated he heard the
10      officers order Quintero to put his hands up,
11      and Quintero got out of his Tahoe and walked
12      to the back with the officer."
13           Did I read that accurately?
14   A. Yes, ma'am.
15   Q. You didn't conduct any interviews to
16      determine whether the officers heard Santiago
17      yell that Mr. Quintero was unarmed, did you?
18   A. No, I did not.
19   Q. Why not?
20   A. I don't know.
21   Q. Wasn't that an important fact in evaluating
22      whether or not the officers' actions here
23      were reasonable?
24   A. I mean you could consider it just like -- I
25      mean even if -- even if the officers heard
                                                   116
```

```
 1       down on his knees with his hands up when he
 2       was shot.
 3   Q.  But you didn't have any further conversations
 4       with Ms. Talamantez to determine why she told
 5       officers that he was down on his knees with
 6       his hands up when he was shot; is that right?
 7   A.  No, I did not, that's correct.
 8   Q.  You didn't ask any of the officers was this
 9       guy down on his knees with the hands up when
10       you shot him?
11   A.  No.
12   Q.  Why not?
13   A.  Because he was standing.  Their statement was
14       he was standing.
15   Q.  Well, but why didn't you confront them with
16       the witness statement and ask them, you've
17       got a witness here who says he was on his
18       knees with his hands up?
19   A.  For the same reason I didn't ask them if they
20       tased the guy for two minutes because some
21       guy said he heard the Taser going off for two
22       minutes.  Because one person says something,
23       if you have all these other statements and
24       witnesses and facts that say different,
25       there's no reason to ask every single
```
                                                                      121

```
 1       question like that.
 2   Q.  So Ms. Talamantez's account of what happened
 3       was just not relevant to your analysis?
 4   A.  Oh, no, a lot of it was relevant.  Actually
 5       probably a vast majority, even that's
 6       relevant.
 7   Q.  In what way was this relevant?
 8   A.  Because she's looking out when the incident
 9       happens.  That's pretty relevant.  Now, you
10       know, I don't even think that she probably
11       could see most of what happened past the back
12       of that Tahoe, you know.  She also said
13       that --
14   Q.  Did you do a line of sight analysis to
15       determine what Ms. Talamantez could and could
16       not see?
17   A.  No.
18   Q.  Are you aware of anyone that did a line of
19       sight analysis to determine that she could
20       have been --
21   A.  I'm not aware of that.  But, you know,
22       Ms. Talamantez said -- she also said she
23       heard the officers say drop the knife.
24   Q.  So is it that you found Ms. Talamantez's
25       account not credible?
```
                                                                      122

```
 1   A.  No, it's just her -- some of this is just her
 2       perception.  One witness said she saw -- I
 3       believe saw the knife in Quintero's hand when
 4       the officers shot him.  We know that's not
 5       true.  But I didn't go and say, now, why did
 6       you think you saw a knife, you know, because
 7       she said she did.  I didn't go to the officer
 8       and say, hey, a witness said the guy had a
 9       knife in his hand because they already gave a
10       statement that they thought it was in his
11       waistband at the time.
12   Q.  Let's go to Page 38 of the report.
13   A.  38?
14   Q.  Uh-huh.
15   A.  Okay.
16   Q.  This is the section of your report where you
17       talk about discrepancies and analysis; is
18       that right?
19   A.  Yes.
20   Q.  And this is where you take the different
21       statements that may contradict each other and
22       try to make sense of them; is that accurate?
23   A.  Yeah.  I try to pick out the big ones, the
24       majority of something that might be relevant.
25   Q.  Uh-huh.  And you summarized in part Samantha
```
                                                                      123

```
 1       Talamantez's testimony or witness statement;
 2       is that right?
 3   A.  On 38?
 4   Q.  Uh-huh.  Yes, on 38.
 5   A.  What paragraph?
 6   Q.  The second paragraph.
 7   A.  Okay.  Yes, that looks like I am summarizing
 8       that in this discrepancies and analysis
 9       section.
10   Q.  In this section you don't say anything about
11       the fact that Ms. Talamantez says that
12       Mr. Quintero was on his knees with his hands
13       up when he was shot and tased, do you?
14   A.  No, I did not.
15   Q.  Why not?
16   A.  I don't know.
17   Q.  Don't you think that's a pretty important
18       discrepancy that should have been analyzed
19       here?
20   A.  Yeah, I probably could have put it in there.
21   Q.  As you sit here today, should it have been in
22       here?
23   A.  Looking back, I don't know if it should have,
24       but it could have.
25   Q.  Why shouldn't it have been in here if it's an
```
                                                                      124