# EXHIBIT 39

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

January 14, 2020

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA G. FINCH, Individually, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased, and as Next Friend )
for her minor granddaughter, )
AF; DOMINICA C. FINCH, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased; and ALI ABDELHADI, )
 )
         Plaintiffs, )
 )
    vs.          )Case No.
               )18-CV-01018-JWB-KGS
CITY OF WICHITA, KANSAS; )
JOHN DOE POLICE OFFICERS 1-10, )
 )
         Defendants. )
 )

D E P O S I T I O N

The videotape deposition of FRANCOIS DO taken on behalf of the Plaintiffs pursuant to the Federal Rules of Civil Procedure before:

RICK J. FLORES, CSR
KELLEY REPORTING ASSOCIATES, LTD.
515 South Main, Suite 108
Wichita, Kansas 67202

a Certified Shorthand Reporter of Kansas, at 455 North Main, 9th Floor, Wichita, Sedgwick County, Kansas, on the 11th day of June, 2019, at 3:30 p.m.

## Page 2

A P P E A R A N C E S

PLAINTIFFS:
   (VIA VIDEOCONFERENCE)
   MACARTHUR JUSTICE CENTER
   Ms. Sheila Bedi
   Northwestern Pritzker School of Law
   375 E. Chicago Ave., 8th Floor
   Chicago, IL 60611
   (312) 771-2444
   Fax: (312) 641-6866
   sheila.bedi@law.northwestern.edu

   CONLEE SCHMIDT & EMERSON, LLP
   Mr. Rick E. Bailey
   Suite 300
   200 West Douglas
   Wichita, KS 67202
   (316) 264-3300
   Fax: (316) 264-3423
   rbailey@fcse.net

DEFENDANTS:
   FISHER PATTERSON SAYLER & SMITH, LLP
   Mr. J. Steven Pigg
   3550 S.W. 5th Street
   375 East Chicago Avenue - 8th Floor
   Topeka, KS 66606
   (785) 232-7761
   Fax: (785) 232-6604
   spigg@fisherpatterson.com

VIDEOGRAPHER:
   Advanced Document Imaging
   Mr. Michael Miles
   515 S. Main, Suite 108
   Wichita, KS 67202
   (316) 267-9380
   Fax: (316) 267-8200
   video@kelleyreporting.com

## Page 3

I N D E X

FRANCOIS DO
Direct Examination by Ms. Bedi:      4
Cross-Examination by Mr. Pigg:      66

Do Exhibits
No. 109 - Transcript of Denzel McGee     26
   Interview 3-19-17 (16 pgs)
No. 110 - PSB Administrative Investigation   49
   #15PSB-3850 - Re: Reed shooting
   (51 pgs)

SIGNATURE OF WITNESS      70
CERTIFICATE         71

## Page 4

VIDEOGRAPHER: This begins the videotape deposition of Francois Do. Today is June 11, 2019, and the time is 3:30 p.m.

Will the court reporter please swear in the witness.

FRANCOIS DO
having been first duly sworn on his oath to state the truth, the whole truth, and nothing but the truth, testifies as follows:

DIRECT EXAMINATION
BY MS. BEDI:

Q. Good afternoon, Detective Do.
A. Hi.
Q. Did you just say something? I couldn't hear you.
A. Sorry. Hi.
Q. Do I have that right? Is it Detective Do?
A. That's right.
Q. My name is Sheila Bedi, and I represent the Finch family in this matter, and I will be taking your deposition today.
   Have you ever given a deposition before?
A. No.
Q. All right. I'm going to go over some of the

Page 21

    that.
Q. How does an administrative review differ from a criminal investigation?
A. Okay. So a criminal investigation, obviously, we're looking at loss of, you know, freedom and whatnot. In the criminal investigation, it's handled by outside of our section, naturally. The criminal investigation is handled by an outside agency. So we usually partner with the Sedgwick County Sheriff's Department. So they'll look at the criminal portion of it.
    Whereas, with the administrative review, we've taken a look at what they've done on the criminal side, and from what we can tell that there does not appear to be any violations of policy or regulation. And, you know, we're going to make sure that all the proper steps have been followed. We'll go through all the transcripts, all the interviews. And at that point just making sure that our -- we -- as a department, we followed all of our policies and regulations and the involved department members have followed policies and regulations.

Page 22

Q. All right. Let's -- I believe you have some exhibits -- an exhibit binder in front of you, or you will have an exhibit binder in front of you. And let's look at what was previously marked as Exhibit 89.
    And on Page 1 of this exhibit, your name is on here, and I believe that's also your signature; is that correct?
A. That's correct.
Q. And this is a review you conducted of Perry shooting; is that right?
A. That's correct.
Q. What steps did you take in conducting this review?
A. Once the homicide detective had all of the pertinent information that was submitted to the DA's office, I received all of that information, and then I went through all of the interviews, all of the paperwork that was available at the time, all of the AXON video, and then essentially had to put together all the AXON video, which right now is kind of a -- it was kind of a mixed jumble. So trying to make sense of dozens of officers and figure out where they happened in time,

Page 23

but -- so that was kind of challenging in and of itself. But, essentially, taking and making sense of the entire incident and making sure that, you know, all the questions were asked when it came to what happened and what every officer had involvement with and who did what, essentially.
    So it's basically a giant puzzle, figuring out all these pieces that's basically handed over by the criminal investigators, making sense of it, and then creating a document that helps to summarize and make sense of all of the information that I was able to look at, and point out any -- you know, the highlights, I guess, you could say, of the entire incident with my report.
Q. And you authored this report in Exhibit 89; is that correct?
A. That's right.
Q. And it looks like on the last page of the report, you made a conclusion that the use of lethal force here was reasonable and met the guidelines of the -- of the U.S. -- of the U.S. Constitution?
A. Yes.

Page 24

Q. Is that accurate?
A. That's accurate.
Q. And that's on -- 20 of this exhibit.
    MR. PIGG: Repeat that. We couldn't --
BY MS. BEDI:
Q. That was on Page 20 of this exhibit. Your conclusion is on Page 20.
A. That's right.
Q. Is that right?
    The review of the Perry shooting, that was -- that was a review, not an internal investigation; is that right?
A. That's correct.
Q. You did not conduct any independent interviews related to this matter; is that correct?
A. I did not.
Q. All right. Let's look at Page 3 of the report.
A. Okay.
Q. Here you've got a case summary and you've listed out here where the -- under force applied, and there is lethal force handgun, lethal force rifle, less lethal K-9.

**Page 29**

questioning beforehand.
　　Do I have concerns about leading questions, in general?
　　Sure, I do.
　　I want to make sure that, you know, the officers are testifying accurately to what happened and they're able to articulate for themselves. So yeah, I do have concerns about it. But regarding those two particular questions, I would need to see what the questioning is before that because this could be a simple clarifying question where the officer may have described defending himself, but maybe wasn't quite as clear at spelling it out at the very end.
Q.　So you don't have any concerns with a detective who is investigating a shooting asking those kinds of clarifying leading questions?
　　MR. PIGG: Object to form.
A.　Like I said, it all depends on what the questioning is beforehand.
　　So for example, if an officer is talking to me, and he's basically describing the elements of self-defense, but he hasn't

**Page 30**

quite just flat out said so; he's describing all of the -- all the things that I think are relevant, and in summation, basically, they're describing defending themselves. At the end, after they've already given all that information: Okay. Well, this looks like what you're telling me is that you did it in self-defense; is that correct?
　　I don't have a problem with that. I do have a problem if that's the first question that's fired off: Well, you fired in self-defense, didn't you?
　　Without anything leading up to that, that's a problem for me, yeah.
Q.　Let's go back to the report Exhibit 89.
A.　Okay.
Q.　And I'd like to focus on your evaluation of the reasonableness of the use of the K-9.
A.　Okay.
Q.　And if we could go to Page 7 of the report.
A.　Okay.
Q.　Here is a summary that you wrote. And you did write this summary; is that correct?
A.　That's right.
Q.　And what you summarize here, when Mr. Perry

**Page 31**

steps out of his residence, he's got a flashlight. The officers engage with him. They tell him to put his hands up. They identify themselves as police officers. Mr. Perry says that he needs to see some identification and turns to walk back into his residence. Perry -- one of the officers quotes Perry as saying: "Nope, that's not going to happen. You're going to have to shoot me." One of the officers then sees him with a gun, and at that point the K-9 is deployed.
　　Would you agree that that is an accurate summary of what we have here on Page 7 of this exhibit?
A.　Yes.
Q.　At the moment that Perry was walking back into his home, he was no threat to the officers; is that right?
A.　Well, he had a gun so there is always the possibility. He wasn't pointing it at any of the officers at that point. The officers were concerned that there were potential victims or other people that were unknown back in his trailer. And they didn't know

**Page 32**

what other capabilities he would have by entering back into there and for them to lose visual of him at that point.
Q.　So given the fact that he had a gun and was walking away from the officers, the deployment of the K-9 was in compliance with policy?
A.　Yes.
Q.　And do you base that on your reading of Regulation 4?
A.　Yes.
Q.　Was there any kind of information gathering that the officers were required to do at the scene to determine who may have been in the trailer and who may have been outside of the trailer and what exactly the risks were?
A.　In terms of required, what do you mean by required?
Q.　Well, I mean when officers are responding to a call such as -- such as the one that came through in the Perry matter, are they required to do any information gathering and planning prior to engaging with any suspects?
A.　Well, it's a pretty fluid situation. So there's no requirement that says you cannot

Page 49:

```
 1        When we did investigations prior to
 2   this, we were doing findings at the
 3   conclusion of the incident, and we were
 4   including every -- everything in the report.
 5   Q.  So is it fair to say that the witness
 6        interviews weren't included because you
 7        didn't find them to be useful to your
 8        analysis?
 9   A.  Everything was consistent, and so when you
10        have, essentially, ten people telling the
11        right -- I don't want to say the right story,
12        but telling the same story, I don't want to
13        tell the same story ten times with -- does
14        that make sense?
15             So what I did was I consolidated the
16        consistency of the stories.  If I notice any
17        discrepancies like -- like this particular
18        officer heard this, and then officer B heard
19        this, then I would interject those minor
20        differences that were in there.  A large part
21        of their interviews were included in the very
22        beginning before the officers had -- which is
23        really where all of it happened, the witness
24        portions.
25             So going from page -- Page 4 up until
```

Page 50:

```
 1   when the officers have contact, the
 2   differences are pointed out with whichever
 3   particular witness there is.
 4   Q.  There's no witness statements that verify the
 5        officers' accounts as cited here; is that
 6        correct?
 7   A.  That's correct, because those other people
 8        were moved to a point of safety and being
 9        talked to or interviewed by other officers.
10             MS. BEDI:  All right.  Let's move
11   on to the Reed investigation, and Rick,
12   you've got a copy of this.
13             MR. BAILEY:  Is that 11125?
14             MS. BEDI:  Yep, you got it.  We
15   need to mark this.  We'll mark this --
16             MR. BAILEY:  Exhibit 110.
17             MS. BEDI:  What number is it?
18   110?
19             MR. BAILEY:  Yes.
20             MS. BEDI:  Okay.  Great.  Thank
21   you.
22        (Do Exhibit No. 110 was marked for
23        identification.)
24   BY MS. BEDI:
25   Q.  Detective Do, is -- did you conduct a review
```

Page 51:

```
 1        of the Reed shooting?
 2   A.  Yes, actually, this was an investigation.
 3   Q.  And how did this become an investigation?
 4   A.  Prior to the Perry shooting, all
 5        officer-involved shootings were just done as
 6        an investigation.  So the officer would
 7        receive a notice that there was an
 8        investigation into their use of force.  And
 9        we would have a determination at the end of
10        our report which resulted in either
11        sustained, not sustained, unfounded or
12        exonerated.
13   Q.  Did you conduct any independent
14        investigations related to this investigation?
15   A.  I reviewed all of the criminal investigation
16        and the evidence, the AXON.  I didn't see any
17        additional need for interviews or other
18        investigation.
19   Q.  So this is an investigation because of the
20        conclusions that you have here or in what
21        way -- I'm just trying to understand how this
22        is different from the Perry review.
23   A.  Sure.  Absolutely.  So at the time when I did
24        this, I had a different commander.  I had
25        Captain Leeds, I believe, and we had a new
```

Page 52:

```
 1   chief.  And I also had Lieutenant Randy
 2   Reynolds.  And after a transition period,
 3   Chief Ramsay wanted us to be able to not --
 4   not have our investigations quite as lengthy
 5   because we were defaulting to investigations
 6   for all officer-involved shootings.  So
 7   that's where the difference lay.
 8        We also changed how we did things in
 9   professional standards where, traditionally,
10   we would investigate the investigation, and
11   we would have a finding of fact, which were
12   points of facts throughout the investigation,
13   essentially, a summary.  And then we would
14   come to a regulation violation that we --
15   that we -- that we determined.  And then we
16   determined that there was a finding from the
17   detective which was confirmed by the
18   lieutenant, then the captain, and then
19   confirmation would go all the way up to the
20   chief.
21   Q.  But in terms of the specific acts that you
22        would take, it sounds like you could do an
23        internal review that would still consist of
24        reviewing the interviews that were conducted
25        in a criminal investigation; is that right?
```

```
 1      people.
 2          Actually, if we go back, let me find
 3      the quote here where he is talking about his
 4      shots.  So looking at Page 16, at the bottom,
 5      he's saying:  I'm still looking to make sure
 6      nobody's in that pool, nobody's in the foyer.
 7      I can't let this individual get into the
 8      school.  He's closing the distance.  He's
 9      passing me.  I'm aware of my backdrop.  I've
10      scanned it.  I'm trying to keep a front bead
11      on him, which I interpret to mean the front
12      sight.  He couldn't get the front sight
13      focused, but he recalled his left rear sight
14      on him.  So he knows he's got a decently good
15      shot.  I can actually see the background at
16      this point.  I can see the people in the gym.
17      He's getting closer to that door.  Tried to
18      adjust my angle with the firearm in a
19      downward motion.  He knows it's concrete.  I
20      know the pool is there.
21          So he is very consciously aware of
22      exactly where his shot needs to go in
23      consideration with a suspect who's running
24      full speed, a moving suspect, and he is still
25      making every effort to make sure that there's
```
65

```
 1      nobody in his backdrop.  So I didn't have any
 2      concerns.  I mean, he did the best job that
 3      he could.
 4  Q.  And Detective Crouch -- sorry.  Please
 5      finish.
 6  A.  Essentially, he did the best job that he
 7      could.  And he was a -- he had the training
 8      to support his abilities, which I don't know
 9      if that came out or not, but I know he was a
10      SWAT officer so he had quite a bit of
11      training.  So it wasn't like an officer who
12      had mediocre capabilities trying to do an
13      impossible shot.  I knew that he was using
14      his training and basically doing the best job
15      that he could, given the situation.
16  Q.  And Detective Crouch, I believe, the next
17      paragraph talks about he fired three rounds;
18      is that right?
19  A.  That's what's described in the -- in the
20      interview.
21  Q.  And did you evaluate the reasonableness of
22      each round?
23  A.  Yes.
24  Q.  And did you use some of your Force Science
25      training to make that evaluation?
```
66

```
 1  A.  Yes.
 2  Q.  Give us just one minute.
 3  A.  Okay.
 4          (Off-the-record discussion.)
 5              MS. BEDI:  I actually think we're
 6      about to be done so give us one second.
 7          (Off-the-record discussion.)
 8              MS. BEDI:  All right.  We've got
 9      nothing further.
10              CROSS-EXAMINATION
11  BY MR. PIGG:
12  Q.  Detective Do, you were asked about the
13      purported leading questions in Mr. McGee's
14      interview, Exhibit 109, and you indicated
15      that it was important what he'd already said.
16          If you'd look at Page 9 and 10 of that
17      exhibit, in response to an open question,
18      doesn't Officer McGee explain that he
19      perceived himself to be subjected to an
20      imminent threat?
21              MS. BEDI:  Sorry.  We're having a
22      hard time hearing you.  Could you please
23      repeat that question.
24              MR. PIGG:  I can't.  Rick might
25      be able to.
```
67

```
 1          (The requested portion of the record
 2      was read by the reporter, as follows:
 3      Question:  "Detective Do, you were asked
 4      about the purported leading questions in
 5      Mr. McGee's interview, Exhibit 109, and you
 6      indicated that it was important what he'd
 7      already said.
 8          If you'd look at Page 9 and 10 of that
 9      exhibit, in response to open questions
10      doesn't Officer McGee explain that he
11      perceived himself to be subjected to an
12      imminent threat?")
13  A.  Yeah, so at the bottom of Page 9, McGee's
14      talking about how he hears somebody yelling
15      gun, I hear a pop, I see a muzzle flash
16      coming from him, and so then I fire.  And he
17      says:  I assumed he's shooting at us 'cause
18      we're the ones he initially saw.  I don't
19      think he would have saw Schepis 'cause
20      Schepis was way back there, you know, by the
21      truck for concealment.  And, of course, he
22      would have never seen these two officers
23      right here.
24  Q.  Also, you did an analysis of the AXON video
25      that confirmed the officers' interviews,
```
68