# EXHIBIT 49

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**January 14, 2020**

```
                                              1           I N D E X
         UNITED STATES DISTRICT COURT          2                                    Page
          FOR THE DISTRICT OF KANSAS           3    KEVIN REAL
                                               4      Direct Examination By Ms. Bedi      4
    LISA J. FINCH, et al,     )                5      Cross-Examination By Mr. Pigg      80
                              )                6
                              )                7
               Plaintiffs,    )                8
                              )                9
         vs.          )Case No.               10    Signature of Witness               82
              )18-cv-1018-JWB-ADM             11    Certificate                        83
                              )               12
    CITY OF WICHITA, KANSAS, et al, )          13
                              )                14
                              )                15
               Defendants.    )                16
                              )                17
                                               18
              D E P O S I T I O N              19
      The VIDEOTAPE deposition of KEVIN REAL taken on    20
   behalf of the Plaintiffs pursuant to the Federal Rules of    21
   Civil Procedure before:                     22
         DARLENE K. KELLEY, CSR                23
         KELLEY REPORTING ASSOCIATES, LTD.     24
         Suite 108, 515 South Main Street      25
         Wichita, KS  67202                    26
                                               27
   a Certified Shorthand Reporter of Kansas, at 455 N. Main,
   13th Floor, Wichita, Sedgwick County, Kansas, on
   Thursday, May 23, 2019, at 2:30 p.m.

                                 1                                                          3
```

```
         A P P E A R A N C E S                 1           THE VIDEOGRAPHER:  This begins
   PLAINTIFFS:                                 2    the videotape deposition of Kevin Real.
      NORTHWESTERN PRITZKER SCHOOL OF LAW      3    Today is May 23, 2019, and the time is
      Ms. Sheila Bedi                          4    2:30 p.m.  Will the court reporter please
      375 East Chicago Avenue                  5    swear in the witness.
      8th Floor                                6           KEVIN REAL,
      Chicago, Illinois 60611                  7    having been first duly sworn on his oath to
      (312) 503-2492                           8    state the truth, the whole truth, and nothing
      sheila.bedi@law.northwestern.edu         9    but the truth, testifies as follows:
                                              10           DIRECT EXAMINATION
      AND                                     11    BY MS. BEDI:
                                              12    Q.  Good afternoon, Detective Real.
      CONLEE, SCHMIDT & EMERSON, LLP          13    A.  Good afternoon.
      Mr. Rick E. Bailey                      14    Q.  I introduced myself off the record, but my
      200 W. Douglas                          15        name is Sheila Bedi and I represent the
      Suite 300                               16        plaintiff in this matter.
      Wichita, Kansas 67202                   17    A.  Okay.
      (316) 264-3300                          18    Q.  Have you ever given a deposition before?
      rbailey@fcse.net                        19    A.  No, ma'am.
                                              20    Q.  All right.  Well, I'm going to go through
   DEFENDANTS:                                21        some of the ground rules with you.
      FISHER, PATTERSON, SAYLER & SMITH, LLP  22    A.  All right.
      Mr. J. Steven Pigg                      23    Q.  You understand that you're under oath; is
      3550 S.W. 5th Street                    24        that right?
      Topeka, Kansas 66601-0949               25    A.  Yes, ma'am.
      (785) 232-7761
      spigg@fisherpatterson.com

   VIDEOGRAPHER:
      ADVANCED DOCUMENT IMAGING
      Mr. Michael Miles
      Suite 108
      515 South Main
      Wichita, Kansas 67202
      (316) 267-0800
      video@kelleyreporting.com

   Also present were Mr. Orlando Socme and Mr. Luke
   Fernbach, Law Clerks.

                                 2                                                          4
```

**Page 29**

1  in effect at the time you were conducting
2  this review?
3  A. Not right now, not off the top of my head.
4  Q. Are you familiar with the term CIT trained
5     officers?
6  A. I am today.
7  Q. Were you then?
8  A. I don't recall.
9  Q. Did you conduct any inquiry about whether any
10    of these officers were CIT trained?
11 A. I don't know that there were CIT officers
12    then.
13 Q. So it's your testimony that you don't know if
14    in 2000 -- in February 2015 there were CIT
15    trained officers in the Wichita Police
16    Department?
17 A. Not in 2014 when this incident occurred, I
18    don't know if there were or not.
19 Q. And you didn't make any inquiry or any kind
20    of analysis in your report about whether
21    there was any sort of CIT training needed for
22    these officers?
23 A. Ma'am, I may not have the known what CIT was
24    in 2014. I can't sit here and give you an
25    honest answer as to whether or not I even

**Page 30**

1     knew what CIT meant in 2014. I don't know
2     when that policy came on or when the first
3     officers got trained in CIT.
4  Q. So even in the absence of a specific policy,
5     what would common sense policing require of
6     an officer who encounters a man who is
7     holding a gun to his head and who is alone in
8     a house?
9  A. Oh, I think these officers did a pretty good
10    job --
11 Q. I'm speaking generally. What would --
12 A. -- trying to get him to lower the weapon.
13 Q. And how should an officer try to get a man
14    who is a threat only to himself to lower the
15    weapon?
16 A. The way Officer Stevens did.
17 Q. Which was to do what?
18 A. I don't remember his exact wording, but it
19    was basically please show us your hands and
20    empty -- empty your hands.
21 Q. Empty your hands?
22 A. I believe that's what he said.
23 Q. Did the officer engage with Mr. Richards as
24    if he was a suspect?
25 A. No, I don't think so.

**Page 31**

1  Q. You don't think so?
2  A. Show us your hands and empty your hands. If
3     somebody has a gun in their hand, then I
4     would want it out of their hand.
5  Q. Are you aware of at any point the officers
6     involved in this incident saying things like
7     our training tells us we need to back out?
8  A. Yes.
9  Q. Okay. What do you think that's about?
10 A. Well, I asked them about that. It was
11    training that Officer Arterburn and
12    Officer Stevens were involved in. I think it
13    was training new recruits. And this specific
14    scenario was something similar to this where
15    a gentleman was in a room and two officers
16    encounter him, he's suicidal, he's armed.
17    And ultimately it's to try to safely back out
18    and call SWAT, if I remember correctly.
19 Q. And so that was the training these officers
20    received?
21 A. Yes.
22 Q. That's not what happened in this incident?
23 A. No, ma'am.
24 Q. So isn't that a violation of training?
25 A. That's why I asked them about it.

**Page 32**

1  Q. And what did you ultimately conclude?
2  A. That what they said, they didn't have time to
3     do that. They didn't think they were able to
4     do that safely.
5  Q. And you concluded that they weren't able to
6     do that safely because of the way the
7     officers perceived that Mr. Richards pointed
8     the gun at the officers?
9  A. Well, they were waiting on the rest of the
10    house to be cleared. Sergeant O'Brien and
11    Officer Johnson were still clearing the
12    residence. They wanted to make sure there
13    was no one left in there, no other people
14    left in there. They were still on the other
15    side of the residence. Sergeant O'Brien was
16    still clearing the residence because he was
17    in another room at the time that the shots
18    started.
19         Their explanation was they were
20    waiting on the rest of the residence to be
21    cleared before they could even think about
22    backing out.
23 Q. So I'm glad you brought that up because
24    that's one of the things that troubled me
25    when I read this was the fact that you have

**Page 41**

1  **But as you sit here today can you name any**
2  **officers who knew what Michlle said about**
3  **Richards being alone in the house?**
4  A. Other than Sergeant O'Brien, no, not a
5     hundred percent which ones she said that to.
6  **Q. Is it Wichita Police Department policy when**
7  **conducting a welfare check to clear the house**
8  **first before actually engaging with somebody**
9  **who might be in harm's way?**
10 A. I'm sorry, what was that again? Is it
11    Wichita Police Department's policy?
12           MS. BEDI: Could you re-read my
13    question.
14           (The requested portion of the record
15    was read by the reporter, as follows:
16    Question: "Is it Wichita Police Department
17    policy when conducting a welfare check to
18    clear the house first before actually
19    engaging with somebody who might be in harm's
20    way?")
21 A. I can't -- I can't quote you policy right off
22    the top of my head. I don't know what the
23    policy says, if it specifically says if you
24    get somewhere, make sure you talk to a
25    possible involved party first. I can't quote

**Page 42**

1     the policy to you off the top of my head. I
2     apologize.
3  **Q. No, I'm not asking you to quote policy. I**
4  **mean you're an experienced law enforcement**
5  **professional. Based on your experience, is**
6  **it your understanding that what is required**
7  **either from policy or from just general**
8  **policing practices when you're responding to**
9  **a welfare call to first clear the house?**
10 A. General policing practices per my experience,
11    if I have somebody available to talk to, I
12    would talk to them first, yes.
13 **Q. Meaning you would first talk to Mr. Richards**
14 **prior to clearing the house?**
15 A. Mister, no. Ms. Richards.
16 **Q. Ms. Richards. You would first have done a --**
17 **you would have had a conversation with**
18 **Ms. Richards before entering the house,**
19 **that's what you're saying?**
20 A. Yes, ma'am.
21 **Q. Once you entered the house, what would you**
22 **do?**
23 A. I wouldn't have entered the house.
24 **Q. Why wouldn't you have entered the house?**
25 A. Because Mr. Richards was uninjured and was

**Page 43**

1     only a threat to himself.
2  **Q. Why doesn't this report reflect that fact?**
3  A. I think it's pretty clear when I sustained
4     them for that what my opinion was.
5  **Q. Well, you --**
6  A. I'm not going to put in there that I myself
7     wouldn't enter a house. We aren't supposed
8     to put our opinions in an administrative
9     investigation.
10 **Q. Well, it's not your opinion, it's your**
11 **analysis, right?**
12           MR. PIGG: Object to form.
13 A. No, that's an opinion.
14 **Q. Why wouldn't you enter the house?**
15 A. I just told you.
16 **Q. Because he's unharmed and he's armed?**
17 A. And he's a threat to himself at that point.
18 **Q. So what would you do?**
19 A. I would have done what they originally did
20    and started covering off the residence, would
21    have got more information from Ms. Richards.
22    And I would have -- Sergeant O'Brien was on
23    scene so it's up to him whether or not a SWAT
24    notification or a hostage negotiator is
25    called to the scene.

**Page 44**

1  **Q. Did you make any inquiry as to why a hostage**
2  **negotiator was not called to the scene here?**
3  A. I believe I asked them if they ever
4     considered a SWAT callout which would include
5     a hostage negotiator.
6  **Q. And what was the response?**
7  A. I think it was Sergeant O'Brien, but I would
8     have to consult my report that says they did
9     not discuss it.
10 **Q. And is part of the reason they didn't discuss**
11 **it because of Officer Mackey's experience**
12 **with SWAT?**
13 A. I don't know what their decision was, why
14    they didn't call SWAT.
15 **Q. But in your judgment SWAT should have been**
16 **called?**
17 A. I don't know whether they should have or not.
18    I mean they could have walked away from this
19    once everybody else was out of the house if
20    he's not a threat to anyone else inside the
21    residence. I'm not saying SWAT had to be
22    called.
23 **Q. You're saying once they determined that there**
24 **was no threat to anybody else, they could**
25 **have walked away?**

```
 1    A.  They absolutely could have.
 2    Q.  Is it your understanding that Wichita Police
 3        Department policy requires a de-escalation
 4        prior to using the use of force?
 5    A.  Currently or at the time of this shooting?
 6    Q.  At the time of this shooting.
 7    A.  I don't know that that was policy at the time
 8        of this shooting.
 9    Q.  Is it your understanding that Wichita Police
10        Department policy currently requires
11        de-escalation prior to a use of force?
12    A.  I don't know that it requires it.  I think
13        it's if possible.
14    Q.  Let's assume that --
15    A.  An attempt if possible.
16    Q.  Let's assume that the same policy was in
17        effect at the time of the shooting, okay,
18        that required an attempted de-escalation
19        policy if possible.  Are you with me?
20    A.  All right.
21    Q.  Would it have been part of your job in
22        reviewing this to determine whether or not
23        the officers de-escalated?
24    A.  That's a lot of assumptions.
25    Q.  Uh-huh.
                                                    45
```

```
 1    A.  I don't want to assume.  I don't know how to
 2        answer that.
 3    Q.  Well, assume the policy that's in --
 4    A.  Put myself --
 5    Q.  -- place today was in place when you
 6        conducted this review --
 7    A.  Do you have the policy that --
 8    Q.  -- would part of your job have been to
 9        determine whether the officers did
10        de-escalate appropriately?
11    A.  Attempt to de-escalate?
12    Q.  Attempt to de-escalate.
13    A.  Yes.
14    Q.  Did you make any inquiry here to determine
15        whether the officers de-escalated?
16    A.  Whether they attempted to de-escalate?  I
17        mean their actions were right there on
18        camera.
19    Q.  Did you make any inquiry to determine whether
20        they attempted to de-escalate?
21    A.  I don't think they were trying to escalate
22        it.  I mean it's right there.  To me they
23        were trying to de-escalate it.  They were
24        using calm language when they were talking to
25        him.  They weren't egging him on or anything
                                                    46
```

```
 1        like that.  To me they were trying to
 2        de-escalate it once they encountered him.
 3    Q.  Well, de-escalating could also be leaving,
 4        right?
 5            MR. PIGG:  Object to the form.
 6    A.  Could be.
 7    Q.  Could be.  They didn't do that?
 8    A.  No, ma'am, they didn't.
 9    Q.  Did you ask them why they just didn't leave?
10    A.  I sure did.
11    Q.  And what was their answer?
12    A.  We've already gone over that.  That was, the
13        house was still being cleared on the other
14        side of the residence.  They didn't feel they
15        should back out at that time.  By the time --
16        well, it still wasn't cleared in the
17        officers' opinion that were there and the
18        shooting already took place by then.
19    Q.  Let's go to Page 16 of the report.  Are you
20        on Page 16?
21    A.  Yes.
22    Q.  Okay.  Second paragraph.  "Officer Mackey
23        said Stacy did not look like a person who was
24        going to de-escalate, put down the weapon and
25        give up.  Officer Mackey advised that the
                                                    47
```

```
 1        look he saw from Stacy told him it was
 2        getting ready to turn into a lethal
 3        encounter."
 4            Did I read that accurately?
 5    A.  Yes.
 6    Q.  What's the relevance of that statement to
 7        your analysis here?
 8    A.  I was summarizing his criminal interview.
 9    Q.  And how is it relevant to your analysis of
10        the policy violations?
11    A.  It goes towards, I guess, Officer Mackey's
12        mindset, what he believed was going on at the
13        time based on his experience.
14    Q.  What does it mean to you that Officer Mackey
15        is saying Stacy doesn't look like a person
16        who is going to de-escalate?
17    A.  Based on what Officer Mackey said that he had
18        been in situations like this before and he
19        didn't believe Stacy was going to put the gun
20        down.
21    Q.  And Officer Mackey is saying here because
22        Stacy didn't look like he was going to
23        de-escalate, I didn't have to de-escalate?
24    A.  That's not what he's saying.
25    Q.  No?  What's he saying?
                                                    48
```

1  Q. Well, sure you do. I mean you recommended an
2     officer for discipline because he failed to
3     appropriately communicate.
4  A. I thought we were talking about this specific
5     point in time.
6  Q. Well, we are talking about this point in
7     time.
8  A. Okay.
9  Q. But I'm saying that clearly you understand
10    how important communication is when you're
11    engaging in an exercise like this?
12 A. It's important. I don't know that it's an
13    obligation.
14 Q. You don't know if communication is an
15    obligation. You don't know if communication
16    is an obligation when an officer has made an
17    decision to use lethal force?
18 A. Would it help, absolutely.
19 Q. Does policy require it?
20 A. One officer to tell them, no, I don't know
21    where that would be pointed out in policy
22    that it's an obligation. Obligation means a
23    requirement.
24 Q. Wouldn't communicating about the use of
25    force, wouldn't that be something that would

65

1     also ensure the protection of other officers?
2  A. If there's time, yes.
3  Q. Is it your belief there wasn't time for that
4     kind of communication here?
5  A. Not at the time he lowered his gun toward
6     them, no.
7  Q. Does the fact that Officer Phillips says
8     essentially here he doesn't know why he was
9     shooting. He thought maybe Mr. Richards was
10    shooting, he knew the other officers were
11    shooting, so he shot. Does that suggests to
12    you that maybe Mr. Phillips -- Officer
13    Phillips needs some new training?
14 A. No.
15 Q. No? Why not?
16 A. Because his belief, he even used the term
17    returning fire, he believed he was being
18    fired at.
19 Q. So because he believed when his fellow
20    officers were shooting, that Mr. Richards was
21    shooting, that's enough for you? You don't
22    think he needs new training and he certainly
23    doesn't need to be disciplined?
24 A. No.
25 Q. I've got that right?

66

1  A. Correct.
2  Q. Did you make any inquiry into whether
3     Mr. Richards ever shot his gun at the
4     officers?
5  A. Yes, we did. I think the criminal
6     investigators did.
7  Q. And what was the outcome of that inquiry?
8  A. After it was over, I think some of them
9     weren't sure, and at least one of them didn't
10    believe that he actually fired.
11 Q. Well, there was a whole ballistics
12    investigation, wasn't there?
13 A. Yes.
14 Q. They found what?
15 A. I don't recall at this point.
16 Q. You don't recall?
17 A. No, ma'am.
18 Q. So as you sit here today you think it's
19    possible that Mr. Richards may have shot his
20    gun at those officers?
21 A. Oh, at them?
22 Q. Yes.
23 A. I don't know, but I don't think so.
24 Q. Well, if Mr. Richards shot his gun at those
25    officers, I can represent to you that it's

67

1     not included in your report.
2  A. Right.
3  Q. And if Mr. Richards had shot his gun, it
4     would have been in your report?
5  A. Correct.
6  Q. That's an important fact, right?
7  A. Yes.
8  Q. Not one you would have missed?
9  A. Correct.
10 Q. We talked about this. The officers are heard
11    saying that our training requires us to back
12    out.
13 A. Our training is to and the other one finished
14    the sentence and said back out.
15 Q. Back out?
16 A. Yes, ma'am.
17 Q. And so -- but none of the officers backed
18    out?
19 A. They did not.
20 Q. Given the fact that the officers were trained
21    to back out and failed to do so, did you make
22    a recommendation that any of these officers
23    need to get updated training?
24 A. No, because they explained why they didn't
25    back out.

68

**Page 69**

1  Q.  And you found their explanation sufficient?
2  A.  I did.
3  Q.  And therefore you did not think they needed
4     to be retrained?
5  A.  That's correct.
6  Q.  And you believe that they acted in conformity
7     with their training?
8  A.  Yes.
9  Q.  Even though their training said they should
10    have backed out?
11 A.  They explained why they didn't back out.
12 Q.  What's the explanation they gave that you
13    found adequate to justify their failure to
14    back out?
15 A.  They believed that the residence was still
16    being cleared, they wanted to make sure there
17    was no one else inside the residence.
18 Q.  So because the officers were relying on a
19    belief that there may have been somebody else
20    in the residence, that justified their
21    failure to back out?
22 A.  Yes.
23 Q.  And is that why you felt like it was
24    important to find a policy violation for the
25    officers who failed to communicate?

**Page 70**

1  A.  Yes. I felt they should have never went in
2     the house in the first place.
3  Q.  And the fact that you felt that they should
4     never have gone in the house in the first
5     place, shouldn't that have resulted in not a
6     disciplinary recommendation, but a
7     recommendation for more training for all of
8     the officers that were involved in this
9     incident?
10 A.  I don't make training recommendations. I
11    give the facts of the case to command staff.
12    They determine any discipline or training
13    recommendations.
14 Q.  Can you make a recommendation for some sort
15    of intervention that is short of a policy
16    violation?
17 A.  Me personally? I don't recall ever doing
18    that. I don't know that I --
19 Q.  Do you have the authority to do it?
20 A.  No, I don't think so. Can you give me an
21    example, and then a scenario, and I can tell
22    you if it's something that I was able to do?
23 Q.  Well, if you would look on the first page of
24    your report, it says that you were making two
25    inquiries, one whether disciplinary action

**Page 71**

1     should be recommended, or if modifications to
2     policy and procedures, regulations or
3     training should be considered.
4  A.  Okay.
5  Q.  It says right there that's what you're doing,
6     right?
7  A.  Okay.
8  Q.  That's what you signed in the cover memo to
9     this report.
10 A.  Okay. You'll have to forgive me because
11    normally we don't make those type of
12    recommendations. And this is the only
13    shooting format that I -- this is the only
14    one I've done in this format. So if this
15    says that I could make training
16    recommendations, this is the only time that
17    would have been able to happen.
18 Q.  But the form says -- the form with your name
19    on it says you could make training
20    recommendations, right?
21 A.  Yes, but I -- I still think those training
22    recommendations came from command staff after
23    they reviewed my report because it was
24    supposed to be if command staff deemed it
25    necessary after reviewing my report, like a

**Page 72**

1     round table that would have brought in like
2     training and firearms instructors, people of
3     that nature. I still don't think that I was
4     the one giving the training recommendations.
5  Q.  Well, why didn't you put in training
6     recommendations in here, particularly given
7     the fact you don't think they should have
8     ever entered the house?
9  A.  I am not the one that assigns discipline or
10    training.
11 Q.  No, but you make recommendations?
12 A.  I do? I'm asking you, I do?
13 Q.  Well, you made the recommendation about the
14    policy violations.
15 A.  Correct, and that's my job.
16 Q.  And your job also, according to your cover
17    memo, was to make recommendations about
18    training?
19 A.  Yes. Well, that's your interpretation of it.
20    I'm telling you that's -- sitting here today
21    that's not my recollection. My recollection,
22    this was very new, this format when I did
23    this. If this wasn't the first one we did,
24    it was very close to the first one. And I
25    think training recommendations were supposed

**Page 73**

1   to come from like firearms instructors,
2   training staff and people like that. That's
3   my recollection of how this was supposed to
4   happen.
5   Q. So it never occurred to you that you could
6       make training recommendations?
7   A. No.
8   Q. Now that you know you could make training
9       recommendations, would you?
10  A. You're giving me that authority.
11  Q. I'm reading your memo.
12  A. No, you're --
13  Q. I'm reading your memo and telling you --
14  A. No, your interpreting what my memo says.
15      That's not what it says.
16  Q. "The purpose of the administrative
17      investigation of the officer involved in the
18      use of deadly force is to determine,"
19      skipping over one, "two, whether disciplinary
20      action should be recommended or if
21      modifications to policy, procedures,
22      regulations or training should be
23      considered."
24  A. Okay.
25  Q. Okay. That's what it says. What does that

**Page 74**

1       mean you?
2   A. That doesn't mean that I personally can
3       because in the same sentence you just read,
4       disciplinary action, I don't have that
5       authority either.
6   Q. But when you're making recommendations about
7       findings and fact that there have been policy
8       violations --
9   A. Yes.
10  Q. -- that is going to subject, or that may
11      subject someone to discipline?
12  A. It may, yes.
13  Q. All right. And you made a finding of fact
14      here that two officers should be subject --
15      or should be found that they violated policy?
16  A. Yes, ma'am.
17  Q. Okay. Did it ever occur to you to make any
18      kind of finding that officers needed to be
19      retrained specifically about interacting with
20      people who may be a threat only to
21      themselves?
22  A. No, because again that is not my role.
23  Q. As you sit here today, having reread what is
24      in Paragraph 2, do you believe you should
25      have made --

**Page 75**

1   A. No.
2   Q. -- a recommendation these officers needed to
3       be retrained?
4   A. No.
5   Q. Why not?
6   A. Because again that is not my role. My
7       role is --
8   Q. Did you think the officers needed to be
9       retrained?
10  A. On what specifically?
11  Q. On specifically how to engage with and
12      respond to someone who is suicidal and a
13      threat only to themselves?
14  A. I think their actions, once they encountered
15      Mr. Richard, were appropriate.
16  Q. What about prior to the time they encountered
17      Mr. Richards?
18  A. While they were outside the residence?
19  Q. Yes.
20  A. I thought there was more they could have
21      done.
22  Q. Do you think they should have had additional
23      training to help them navigate that situation
24      should they encounter it again?
25  A. Well, I mean to me at that point training

**Page 76**

1       would have been punitive because in my
2       opinion that was just common sense. They
3       needed to slow down and ask more questions.
4       I don't -- me pointing that out to them, to
5       me is -- I mean I don't know what else you
6       would retrain them on. That's just basic, in
7       my opinion, is asking those pertinent
8       questions. So I don't know that there's any
9       additional training. I mean I'm already
10      pointing out to them what I felt should have
11      been asked of Ms. Richard.
12  Q. Is it only Mackey and O'Brien who needed more
13      training?
14      MR. PIGG: Object to form.
15  BY MS. BEDI:
16  Q. I'm sorry, is it only Mackey and O'Brien who
17      needed to slow down and ask more questions?
18  A. Yes. The other officers were following what
19      those two were doing.
20  Q. So because those two officers had essentially
21      taken control and were calling the shots, it
22      was the responsibility of those two officers
23      to slow down the incident and ask the right
24      questions?
25  A. Yes.