# EXHIBIT 53

Lisa G. Finch, et al. vs. City of Wichita, Kansas

Case No. 18-cv-1018-JWB-ADM

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

January 14, 2020

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA G. FINCH, Individually, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased, and as Next Friend )
for her minor granddaughter, )
AF; DOMINICA C. FINCH, as )
Co-Administrator of the Estate )
of Andrew Thomas Finch, )
deceased; and ALI ABDELHADI, )
                  )
      Plaintiffs, )
                  )
vs.       )Case No.
                  )18-CV-01018-JWB-KGS
CITY OF WICHITA, KANSAS; )
JOHN DOE POLICE OFFICERS 1-10, )
                  )
      Defendants. )
                  )

D E P O S I T I O N

The videotape deposition of JOSEPH SHAWN PICHLER taken on behalf of the Plaintiffs pursuant to the Federal Rules of Civil Procedure before:
    RICK J. FLORES, CSR
    KELLEY REPORTING ASSOCIATES, LTD.
    515 South Main, Suite 108
    Wichita, Kansas 67202

a Certified Shorthand Reporter of Kansas, at 455 North Main, 9th Floor, Wichita, Sedgwick County, Kansas, on the 12th day of June, 2019, at 12:06 p.m.

## Page 2

APPEARANCES

PLAINTIFFS:
  (VIA VIDEOCONFERENCE)
  MACARTHUR JUSTICE CENTER
  Ms. Sheila Bedi
  Northwestern Pritzker School of Law
  375 E. Chicago Ave., 8th Floor
  Chicago, IL 60611
  (312) 771-2444
  Fax: (312) 641-6866
  sheila.bedi@law.northwestern.edu

  CONLEE SCHMIDT & EMERSON, LLP
  Mr. Rick E. Bailey
  Suite 300
  200 West Douglas
  Wichita, KS 67202
  (316) 264-3300
  Fax: (316) 264-3423
  rbailey@fcse.net

DEFENDANTS:
  FISHER PATTERSON SAYLER & SMITH, LLP
  Mr. J. Steven Pigg
  3550 S.W. 5th Street
  375 East Chicago Avenue - 8th Floor
  Topeka, KS 66606
  (785) 232-7761
  Fax: (785) 232-6604
  spigg@fisherpatterson.com

VIDEOGRAPHER:
  Advanced Document Imaging
  Mr. Michael Miles
  515 S. Main, Suite 108
  Wichita, KS 67202
  (316) 267-9380
  Fax: (316) 267-8200
  video@kelleyreporting.com

## Page 3

I N D E X

JOSEPH SHAWN PICHLER
Direct Examination by Ms. Bedi:    4
Cross-Examination by Mr. Pigg:    46
Redirect Examination by Ms. Bedi:  49

Pichler Exhibits
No. 114 - Detective Pichler's After-Action  38
    Report, Re: Detention of
    Witnesses During Finch Incident
    (7 pgs)

SIGNATURE OF WITNESS    51
CERTIFICATE    52

## Page 4

    VIDEOGRAPHER: This begins the videotape deposition of Joseph Shawn Pichler. Today is June 12th, 2019, and the time is 12:06 p.m.
    Will the court reporter please swear in the witness.
    JOSEPH SHAWN PICHLER having been first duly sworn on his oath to state the truth, the whole truth, and nothing but the truth, testifies as follows:
    DIRECT EXAMINATION
BY MS. BEDI:
  Q.  Good afternoon, Detective Pichler.
  A.  Good afternoon.
  Q.  My name is Sheila Bedi and I am one of the lawyers who represents the plaintiff in this matter, and I will be taking your deposition today.
    Have you given a deposition before?
  A.  Yes, I have.
  Q.  So I'm going to briefly review the rules of a deposition with you.
    Do you understand that you are under oath today?
  A.  Yes, I do.

Page 5:

1  Q.  And you understand there's a court reporter
2      there who will be taking down my questions
3      and your answers.  Because of that, it's very
4      important that you, number one, let me get
5      out my full question before you answer, and
6      number two, answer all questions verbally.
7      No uh-huh, um-hm, nothing like that.
8          Does that make sense?
9  A.  Yes.
10 Q.  You also have a right to a clear question.
11     If you can't understand me either because our
12     connection gets fuzzy or because I trip over
13     my words, just please ask me to rephrase my
14     question and I will do so; however, if you
15     answer my question, I'm going to assume that
16     you understand it.
17         Is that fair?
18 A.  Yes.
19 Q.  What did you do to prepare for today's
20     deposition?
21 A.  I read over my documents of the -- my review
22     of the Finch case and several other shootings
23     that I've done, Taraz (ph) and Holden, and
24     also looked over our policy and procedure.
25     And I also met with --

Page 6:

1  Q.  What policy and procedures --
2  A.  The Regulation 4.
3  Q.  Apologies.
4  A.  I'm sorry.  Regulation 4 and 901 I read over
5      this morning.
6  Q.  Other than conversations you may have had
7      with your lawyer, and I don't want to know
8      about any of those, did you have
9      conversations with anybody else about today's
10     deposition?
11 A.  My lieutenant, he had called me.  I've been
12     home with a replacing a knee, and he had
13     called me and told me about the deposition
14     and give me a choice of times.
15         Also, after his deposition, he came
16     down after five hours and said he was done.
17     That was about all the conversation I had
18     with him about it.
19         This morning I walked in and Detective
20     Amy was sitting at his desk.  And I asked him
21     how it went, and he said good.  And same with
22     Detective Do, I asked him how his went, and
23     he said good.
24 Q.  Did you speak with either Detective Amy or
25     Detective Do about the substance of your

Page 7:

1      deposition?
2  A.  No.
3  Q.  Who is your current employer?
4  A.  City of Wichita.
5  Q.  And what position do you hold with the City
6      of Wichita?
7  A.  I'm a detective with the Professional
8      Standards Bureau.
9  Q.  And -- excuse me.  Is the Professional
10     Standards Bureau frequently referred to as
11     PSB?
12 A.  Yes, PSB, that's correct.
13 Q.  How long -- how long have you been a PSB
14     detective?
15 A.  Since June of 2007, so it will be 12 years.
16 Q.  How long have you worked for the Wichita
17     Police Department?
18 A.  I was hired July of 1993.
19 Q.  Immediately prior to becoming a PSB
20     detective, what position did you hold?
21 A.  I was a AFU hit-and-run officer.
22 Q.  Sorry.  What is the acronym?
23 A.  I'm sorry.  It's accident followup.  I
24     investigated hit-and-runs within the City of
25     Wichita.

Page 8:

1  Q.  And how long did you hold that position?
2  A.  Right at two years, I believe.
3  Q.  How did you become a PSB detective?
4  A.  Well, of course, I took the promotional test
5      and got promoted to a detective status while
6      I was at the -- holding the accident followup
7      hit-and-run officer position.  And the chief
8      of police asked me to go to PSB because the
9      detective that was currently in that
10     assignment was leaving.
11 Q.  What was your understanding of the duties of
12     a PSB detective?
13 A.  Basically to investigate officers and
14     complaints by citizens regarding officers.
15     It's basically to police the police.
16 Q.  As a PSB detective, do you have any duties
17     specific to officer-involved shootings?
18 A.  Yes, we do a review of the officer-involved
19     shootings.
20 Q.  Is there a distinction between a review and
21     an internal investigation?
22 A.  Yes, there is.
23 Q.  What is that distinction?
24 A.  A review, I really don't do any interviews in
25     the review.  The homicide detectives, along

```
 1        with the Kansas Bureau of Investigation, does
 2        all the interviews and does the -- all the
 3        investigation of it.
 4             What I do is I take their information
 5        and look for -- I do the administrative side
 6        of it to do -- see it to make sure the
 7        officers followed policy and procedure.  And
 8        if I do an internal investigation on an
 9        officer, if I had a complaint and the
10        complainant comes in, I do all the
11        investigation.  I interview the complainants,
12        the witnesses, the officers, have everything
13        transcribed and put it all down, all the
14        statements down for the chief of police to
15        review.
16   Q.   In the Finch matter, is it fair to say you
17        conducted a review but not an internal
18        investigation?
19   A.   That would be correct.
20   Q.   What are the -- what is the distinction
21        between an administrative review and the
22        criminal investigation?
23   A.   The administrative review usually comes after
24        the criminal investigation.  The criminal
25        investigation -- actually, they interview the
```
9

```
 1        officer to see if there was any wrongdoing.
 2        They present it to the district attorney's
 3        office, and the district attorney office
 4        determines a decision.
 5             Administrative review is we look at
 6        that information for policy and procedure
 7        violations and present it to the chief of
 8        police to see if there is actually any -- if
 9        the officer violated policy.
10   Q.   During an administrative review, do you make
11        recommendations about whether there should be
12        a finding that an officer violated policy?
13   A.   It's a collaborative effort between everybody
14        in our office.  Actually, we don't make -- we
15        put areas of concern down, I guess.  It's
16        really not recommendations.  And the chief of
17        police, the deputy chief or then the captain
18        of the bureau of that officer is who makes
19        the recommendations that violates the policy
20        and procedure.  We don't do any findings as
21        of sustained findings, even in our internal
22        investigations.
23   Q.   Who, ultimately, is responsible for making
24        findings?
25   A.   It'd be the chief is the ultimate decision
```
10

```
 1        maker.
 2   Q.   Is it true that a criminal investigation
 3        takes precedence over administrative internal
 4        investigations?
 5   A.   Yes, that's my opinion.
 6   Q.   And what does that mean?
 7   A.   What does that mean?
 8             If an officer -- they do a criminal
 9        investigation, and if the officer violated
10        the law, he is charged in District Court.
11        And after the outcome of that, we would do an
12        administrative investigation of it -- what
13        it -- so --
14   Q.   So to be clear:  A criminal investigation
15        must terminate prior to the commencement of
16        an administrative review; is that correct?
17   A.   Most of the time.  We have done them side by
18        side, too.
19   Q.   Did you do the Finch -- we just lost your
20        video.  I don't know if you can still hear
21        us.
22   A.   I can hear you.
23             MR. BAILEY:  We can hear you.
24             MS. BEDI:  We can't see you.
25             REPORTER:  Can we go off?
```
11

```
 1             MS. BEDI:  Yeah, there you go.
 2        Okay.  You're back.
 3   BY MS. BEDI:
 4   Q.   In the Finch matter, did you conduct your
 5        review -- oh, sorry.
 6   A.   Do --
 7             MR. PIGG:  I don't think we have
 8        a question yet.
 9   A.   Okay.
10   Q.   Can you hear me?
11   A.   Yes.
12             MR. BAILEY:  Yes, we can hear
13        you.
14   BY MS. BEDI:
15   Q.   Okay.  All right.  In the Finch matter, did
16        you -- did you complete your review after the
17        criminal investigation was terminated?
18   A.   I was working on it.  The criminal
19        investigation was over at the DA's office.  I
20        had been typing on it, just typing the
21        summaries of the officers' interviews with
22        the criminal investigators and -- but it was
23        completed after the DA's ruling -- ruling,
24        yes.
25   Q.   So during the pendency of the criminal
```
12