IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


LISA G. FINCH and DOMINICA C. FINCH,
*as co-Administrators of the Estate of*
*Andrew Thomas Finch, Deceased,*

                    Plaintiffs,

v.                                          Case No. 18-1018-JWB

CITY OF WICHITA, KANSAS;
JUSTIN RAPP; and
BENJAMIN JONKER,

                    Defendants.


## MEMORANDUM AND ORDER

Plaintiffs are the co-administrators of the estate of Andrew Thomas Finch. Plaintiffs filed this action under 42 U.S.C. 1983 after Finch was shot and killed by a Wichita police officer. The matter is now before the court on the following: Defendants' motion for summary judgment (Doc. 165); Plaintiffs' motions to exclude expert testimony (Docs. 160, 162); and Defendants' motion to exclude expert testimony (Doc. 164). The motions have been fully briefed and are ripe for decision. (Docs. 166, 190, 187; 161, 173, 184; 163, 172, 182; and 164, 177, 183.) For the reasons stated herein, Defendants' motion for summary judgment (Doc. 165) is GRANTED as to Defendants City of Wichita and Benjamin Jonker, and DENIED as to Defendant Rapp. The parties' motions to exclude expert testimony (Docs. 160, 162, 164) are GRANTED or GRANTED IN PART as stated in this order.

**I. Facts**

In keeping with the standards governing summary judgment, the following statement of facts views the evidence, and all reasonable inferences therefrom, in the light most favorable to Plaintiffs as the non-moving parties. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) (evidence is viewed in the light most favorable to the non-moving party because credibility determinations, weighing conflicting evidence, and drawing appropriate inferences are jury, rather than judge, functions).

At 6:10 p.m. on December 28, 2017, a City of Wichita security screener received a phone call and referred it to 911 emergency dispatchers. The caller hung up and called back multiple times.  At 6:18 p.m., Sedgwick County 911 dispatchers made contact with the caller, who told them he was located at 1033 W. McCormick in Wichita ("the residence"); that he had shot his father in the head and his father was not breathing; that he was holding his mother and brother hostage at gun point in a closet; and that he wanted to kill himself and light the house on fire.  At approximately 6:19 p.m., a dispatcher radioed over the air that a suspect at 1033 W. McCormick in Wichita had shot his father in the head, that his father was not breathing, and that he was holding his mother and brother hostage at gun point in a closet.  (Doc. 166 at 2.)

Officers normally respond to calls based on the information they receive from dispatch, even if the information is not correct.  Their response is also based on information they learn from on-scene investigation.  (Doc. 190 at 2.)

As a result of the dispatch, Wichita Police Department ("WPD") officers and Sedgwick County Sheriff's deputies responded to the scene believing they were responding to a barricaded shooter scenario with hostages where a male had reported shooting his father and holding additional family members at gunpoint.  (Doc. 166 at 2.)

Sedgwick County deputies David Headings and Noah Stephens-Clark, who were part of a high-risk warrant entry team, responded within a minute or two of the call and were the first officers on scene.  Headings grabbed a ballistic shield and Stephens-Clark was armed with a rifle. The deputies parked and approached the east side of the residence on foot, walking through the yards between the houses as additional officers began arriving on the west side.  WPD officers Kyle Perry and Chris Ronen also responded and joined Headings and Stephens-Clark to the east of the residence.  Stephens-Clark was closest to the residence, Deputy Headings was to his right, and the WPD officers fell in behind the deputies.  (*Id.* at 3.)  The officers gathered at the first house to the east of the residence.  Although it was dark, the officers on the east side could discern that there were officers to the west of the house, patrol vehicles with lights flashing blocking traffic on McCormick, and officers to the north of the house.

WPD Sgt. Benjamin Jonker had been driving when dispatch first broadcast the shooting call. Jonker asked dispatch about other calls from that address and was informed that the only prior call was a report of a person having a stroke. Jonker was the only supervisor in sight when he arrived at the scene, so he assumed that he was in command.  He parked to the southwest of the residence and began to assess how many officers he had.  (*Id.*at 3.)

WPD officers Justin Rapp and Powell, both "SCAT" officers [Special Community Action Team], responded and parked on the southwest side of the residence. Rapp retrieved his rifle, on which he had been trained and was certified for use up to 50 yards. Rapp was told by WPD Officer Gumm that he could see movement in the upstairs window of the residence and that it looked like someone was doing CPR.  (*Id.* at 3-4.)

Jonker and Rapp regularly responded to "high risk" incidents reported to 911.  It would not be unusual for the subject of such a call to have mental health problems.

Jonker quickly realized there were no exits on the west side of the house.  He knew Gumm had indicated there was movement coming from the windows.  Jonker wanted officers on the front (north) side of the residence, so he directed Rapp and Powell to follow him to the front of the house. Gumm stayed as cover on the back of the residence.  (*Id.* at 4.)

Jonker was checking over the radio to determine whether there were sufficient officers on the perimeter and giving instructions on where to block traffic.  Jonker did not hear any screaming, gunshots or cries of distress from the house. (Doc. 190 at 8.) Jonker asked the next incoming units to block off McCormick Street.  WPD Officer Dustin Fussell responded to the scene and pulled his patrol car onto McCormick to block the eastbound lanes as requested by Jonker.  Jonker, Rapp, and Powell were running by Fussell at that point, and Fussell heard Jonker asking dispatch for more information on where the call came from. (Doc. 166 at 4.)

Jonker told Rapp to be "long cover" because Rapp had a rifle.  Jonker did not tell Rapp how to perform this duty and gave him no additional commands.  Based on his years of law enforcement experience, Rapp understood his duties as cover officer were to look out for the safety of everyone in the general vicinity, including perimeter officers, to keep watch of the residence, to identify any movement, to alert other officers of movement, and to assist in identifying any potential threats. (*Id.* at 4-5.)

Rapp positioned himself behind a parked car just to the north of McCormick street.  The residence was located just south of McCormick street, about 40 yards (120 feet) away.  Rapp had an unobstructed view of the front porch, most of the front yard, and the entire sidewalk.  Although there were lights in the area, including streetlights from the Seneca/McCormick intersection northwest of the residence, it was evening and the sun had gone down, which made it more difficult to see things clearly.  Rapp raised his rifle and pointed it south as he scanned the entire front of the

house looking for movement.  Officer Matthew Powell was within arm's distance to Rapp's right, and Jonker was a little further to Rapp's right. (*Id.* at 5.)  Rapp understood from Jonker and radio traffic that officers were present to the east and west of the residence.  Rapp could not see the officers on the east side of the residence.  Although the parties have not cited evidence establishing how far away from the residence the officers on the east side were at the time of the incident, there is some evidence they were about 45 feet away from the residence's front door.  (Doc. 180-3 at 19.)

Because there were four officers on the east side, including one with a shield, one of those officers, Deputy Perry, communicated to Jonker that he and the other three would form a contact team if necessary.  As soon as Perry said this, Andrew Thomas Finch ("Finch") opened the front door of the house.  The front door was on a porch on the north side of the house.  The door was located toward the west end of the porch. (*Id.*)  Jonker thought the officers had a "decent" perimeter in place at that time, but everything happened so fast that he was still confirming that a perimeter was in place when Finch appeared. Jonker was still formulating a plan on how to respond to the incident.  He intended to designate the officers east of the residence as a "takedown" team but had not yet done so.  (*Id.* at 5-6.)

Rapp had only been in his position for about 40 seconds when Finch opened the front door, pushed the screen door open with his left hand, and took a step or two out onto the porch.  He remained within the arc of the screen door and was holding it open with his shoulder or foot.  The only information from dispatch that Rapp could use to compare Finch to the suspect caller was that the caller was male.  Jonker heard someone say, "the door's opening," and he looked up and saw Finch standing just outside the front door threshold.  Stephens-Clark turned on the light on his rifle when Finch came onto the porch. (*Id.* at 6.)

Jonker yelled "show your hands." He heard officers to the east or elsewhere also yelling commands. (Doc. 174-4 at Depo. p. 219.) Jonker yelled "walk this way." At that point there were multiple people yelling multiple commands from different directions. (Doc. 190 at 2.) Jonker wanted to be the primary contact with Finch; he had not assigned anyone else that task. Stephens-Clark, on the east side, started giving Finch verbal commands to put his hands up or show his hands and "step off the porch." Stephens-Clark could not understand the commands being given by officers on the north side. Headings also initially began hollering commands but stopped because he had been trained that one person needs to issue commands to eliminate confusion. (*Id.*)

Rapp could see that the front door to the house remained open as Finch stepped out. Finch appeared to be holding the outside screen door open with his shoulder. (Doc. 166-4 at 20.) Finch appeared to be about six feet tall and weighed perhaps 220 pounds. He was wearing a dark "hoodie" sweatshirt. Rapp was not close enough to see his facial expressions or his eyes. (*Id.* at 20, 23.)

Although there is some evidence to the contrary, for purposes of summary judgment it is uncontroverted that none of the officers identified themselves as "police." Some officers were dressed in black vests, shirts, and pants, with their identification obstructed. It was dark outside, although there was a fair amount of light on the residence. A jury could reasonably infer that the persons yelling at Finch were not immediately recognizable to him as law enforcement officers and that Finch was confused by the situation. One or more officers could see that Finch appeared to be startled by the officers and by the commands they were yelling. When Finch emerged from the front door, there was "loud shouting from all over the area" and he appeared to be squinting across the street and then looking to the east. (Doc. 166-9 at 8.) One or more of the officers shone a flashlight on Finch, which may have made it difficult for Finch to see. Body camera video from

an officer located west of the front porch showed a very bright beam of light emanating from the group of officers located east of the porch, and that light was trained on Finch.  (Doc. 181, Exh. 15, at 4:58.)  Similarly, body camera video from an officer located north of the porch showed the light reflecting off Finch's face and upper body, to which Finch appeared to react by using his left arm to shield his face from the light.  (*Id.*, Exh. 6, at 1:52.)  Rapp testified that he yelled a command at Finch to "get your hands up" or "show me your hands." (Doc. 166-4 at 21.)  Rapp did so because they were responding to a reported shooting where the suspect was a male, and because "we don't know his [Finch's] status at this point," they would "order him to show his hands so we can either confirm or eliminate him as a suspect in this incident."  (*Id.*)  Finch initially appeared to comply with officers' commands because he raised his hands up to about ear-level. Officers, including Rapp, could see that he was not holding anything in his hands.  Then, Finch started to lower his hands.  (Doc. 174-10 at 3.) Rapp could hear officers on the east side of the house again yelling commands but could not see the officers.  (Doc. 174-4 at 16.)  Rapp did not know how far away the officers to the east were from the front door of the residence.  (Doc. 166-4 at 16.) There was testimony that Finch raised his hands and lowered them a second time while moving back toward the doorway threshold. (Doc. 166-7 at 9.)  The commands that were yelled from multiple directions during the encounter included, "walk this way," "step off the porch," and (more than once) "show me your hands."  Sgt. Jonker testified he did not want Finch to even know that officers were on the east side of the residence, so when those officers started yelling, Jonker vividly remembers

> wanting to yell louder so he would pay attention to me and walk this way…. I believe I was the only person saying "walk this way." Everyone else had said "put your hands up" or something to that effect to do with your hands. I wanted him to come off of the porch and come towards me. So I remember in my head, I got to be louder than these guys so he is focusing on me and not figuring about this [sic].

(Doc. 166-3 at 24.)

Rapp testified that Finch then:

> [G]rabbed the right side of his hoodie or sweatshirt, whatever he was wearing, lifted it up, made a motion like he was drawing a firearm and dipped his shoulder forward … and put his hand straight back down kind of on the back half of his right thigh.

(Doc. 174-4 at 18.)  According to Rapp, Finch was facing and looking toward the northeast, when his right arm "started to come up" toward the officers on the east side of the house.  (*Id.* at 19.) Rapp testified he thought that Finch "was obviously not compliant with our commands, and that he was going to use his firearm to fire on [the] police." (Doc. 166-4 at 24.) Rapp testified he could clearly see the entirety of Finch's right hand as it came up.  (*Id.*)  Rapp testified he thought he saw a gun in Finch's hand.  (Doc. 174-4 at 19-20.)  From his vantage point about 40 yards away, Rapp fired one shot from his rifle, which hit Finch in the chest or ricocheted into his chest. (Some evidence indicates the bullet struck the screen door first.) Rapp indicated in testimony that he fired the shot as Finch's arm "was in the process of being raised" and was not yet parallel to the ground. (*Id.* at 20.) Rapp testified he fired the shot to protect the other officers because he believed Finch presented a threat of imminent serious injury or death to officers on the east side of the residence. (Doc. 166 at 10.)  Rapp testified he did not think there was time to warn Finch or to take other action, because Finch could have fired multiple shots at officers before any alternative action was taken.  The shot occurred at 6:28 p.m., less than ten minutes after dispatch had notified officers of the 911 call.

There is evidence in the record which, if believed by a jury, contradicts or casts doubt on Rapp's testimony about what he saw when he fired the shot.  Deputy Noah Stevens-Clark, who was positioned on the east side of the house, testified that from his perspective he saw nothing that indicated a threat to the officers, although he said he lost sight of Finch when Finch backed up into the doorway threshold.  (Doc. 166-7 at 9.) Another officer on the east side, David Headings, testified that Finch moved his hand towards the small of his back as he moved back into the threshold of the door, such that the officer was "not sure whether he was reaching or what he was

doing." (Doc. 174-5 at 7.) Headings perceived the movement as a potential threat because Finch could have been reaching for a weapon, but conceded the movement was also consistent with non-threatening actions "like maybe even pushing his shirt … or reaching back behind him and maybe his elbow hit the door and pushed it that location." (*Id.*) Headings agreed with the characterization that what he saw was a "potentially" threatening motion rather than an actual threat. (*Id.*) Another officer on the east side of the residence, Christopher Ronen, testified that when Finch first lowered his hands after having initially raised them, "people start[ed] yelling really loud again," with more urgency, and his hands went back up. (Doc. 166-9 at 11.) According to Ronen, "the next thing that I remember is [Finch] turning towards us and his hands going back down, and then a shot being fired." (*Id.*) Prior to the shot, Ronen saw Finch's hands go down; he did not see Finch reach in a pocket or toward his waistband or "anything like that." (*Id.*) Ronen considered Finch's movements to be "concerning" but not threatening. (*Id.*) Officer Kyle Perry, who was on the east side (and therefore closer to Finch than Rapp), testified he would not have been able to see a firearm if Finch had had one in his pants or waistband "because it was so dark and his [baggy] clothing and my distance." (Doc. 174-6 at Depo. p. 45.) Officer Matthew Powell, who was positioned on the north side of McCormick near Officer Rapp, indicated in testimony that he saw Finch reach back with his right hand and place it on the front door knob. (Doc. 174-12 at 3.) Powell viewed Finch's movement as indicating that he was struggling to get back into the house because he was startled by the officers. (*Id.*) Sgt. Jonker testified that he saw Finch lower his hands and then start to raise his hand or hands. Jonker believed Finch was doing so in response to commands from officers. (Doc. 166-3 at 25.) At that point, Jonker testified, his (Jonker's) attention shifted to the officers on the east side, when he heard the shot go off. (*Id.*) Video

evidence indicates that Jonker had started to repeat, "Walk this way," when the shot was fired. (Doc. 181, Exhs. 6, 7).

In addition to the conflicting testimony concerning Finch's movements at the time of the shot, there is recorded video from police body cameras from which a jury could find that Finch simply moved his arms, at a time when officers were giving him multiple commands, including to show his hands, when the shot was fired. A jury viewing the video footage in connection with all of the other evidence could conclude that Finch appeared confused but was attempting to comply with the officers' commands, that his movements did not reasonably indicate hostile or threatening action on his part, and that the shot was fired before Finch had a chance to speak or to fully comply with any clear directive. (Doc. 169, Exh. K; Doc. 181, Exhs. 6, 7). Approximately ten seconds elapsed from the time Finch first opened the door until the shot was fired.

Jonker did not give any officer, including Rapp, any instructions on when to shoot or what to do when Finch came onto the porch. The shot occurred within three minutes of when Jonker first arrived at the scene and about 45 seconds after he and Rapp went to the north side of the residence. (*Id.* at 11.) Jonker had not requested a SWAT team. It would have taken a SWAT team about 45 minutes to arrive. (*Id.*)

After being shot, Finch fell backwards into the residence. He died shortly thereafter. He was 28 years old. He had no firearm on him, nor was there any hostage situation or murder scene at the residence. Unbeknownst to anyone at the scene, the whole episode resulted from a "swatting" call – a hoax call to 911 – by a Los Angeles, California, resident who had no connection to Finch. That individual later pled guilty to federal offenses stemming from the incident and was sentenced to 240 months in prison.

The WPD has responsibility for investigating officer-involved shootings.  It sometimes receives assistance with witness interviews and other matters from the Kansas Bureau of Investigation (KBI).  The WPD typically gathers the evidence and then reports it to the District Attorney (DA) in a meeting between the DA, WPD, and KBI. (Doc. 166-12 at 4.)

Sedgwick County DA Marc Bennett is responsible for determining whether criminal charges should be filed against WPD officers in use-of-force incidents.  When an officer causes death or serious bodily injury, Bennett generally responds to the scene of an officer involved shooting and observes the initial interviews and watches body camera footage. When the investigation is complete, Bennett and a charging attorney in the DA's office confirm the investigation is complete and review the case for charging decisions.  (Doc. 166 at 12-13.)  After his review in this case, Bennett concluded he could not prove beyond a reasonable doubt that Rapp was not engaging in the lawful defense of others under Kansas law. (Doc. 174 at 6; Doc. 180-3 at 34.)

Lt. Blake Mumma oversees the WPD's Professional Standards Bureau ("PSB"), which is responsible for reviewing internal and external complaints of officer conduct relating to conformance to WPD rules, regulations policies and procedures, and standard operating policies. WPD policy 901 requires PSB to investigate all incidents involving the discharge of a firearm. WPD policy 904.01 requires WPD to perform a criminal investigation whenever an officer is involved in an action that either could have resulted in serious injury or death or did result in serious injury or death. (Doc. 166 at 13.)  Pursuant to a policy of WPD Chief Gordon Ramsay, a PSB investigation can gather some information prior to the conclusion of a criminal investigation into an officer-involved shooting, but the PSB administrative process should not interfere with the criminal investigation and is essentially on hold pending conclusion of the criminal investigation.

Ramsay testified he adopted this practice to avoid interfering with or tainting criminal investigations. (Doc. 174-19 at 8.)

At the time of the incident, both Rapp and Jonker were aware that any officer-involved shooting would be investigated both criminally and administratively.  (Doc. 166 at 14-15.)

Rapp was exonerated by PSB for the Finch shooting.  Rapp was never interviewed by PSB. Chief Ramsay and command officers signed off on the exoneration in July 2018.  WPD classified the Finch shooting incident as a "justifiable homicide" on January 29, 2018. (Doc. 190 at 10-11.)

WPD policies provide in part that in a stressful situation, a police officer's first reaction should be to determine if the objective can be achieved without the use of a firearm; and officers shall use only that force which is objectively reasonable, based on the totality of circumstances, while protecting the life of an officer or other person.  (Doc. 174-24 at 015393.)  WPD policy provides that when practical, a verbal warning to a suspect to submit should be given before lethal force is used, unless doing so would increase the danger to others. WPD policy also provides that where lethal force is not authorized, officers should determine which less lethal technique or weapon will best de-escalate and bring the situation under control in a safe manner. (*Id.* at 015394.)

Prior incidents.  Plaintiffs cite evidence of eleven prior shooting incidents involving Wichita police officers between 2012 and 2017 that resulted in no discipline and no findings of policy violations.  (Doc. 190 at 12-15.)  Plaintiffs cite three additional shootings in which officers received allegedly "minimal" discipline.  (*Id.* at 15-16.)   As to each incident, Plaintiffs assert that the PSB's review, analysis, and conclusions were inadequate, unfounded, and ignored numerous policy violations.

The first incident cited by Plaintiffs occurred on April 10, 2014, when a WPD officer shot an individual who approached officers with a knife.  Plaintiffs assert that "an officer initially

claimed the man lifted the knife over his head when he approached officers but body camera evidence shows this claim was false." (Doc. 190 at 12.) Plaintiffs assert that PSB nevertheless "dismissed this discrepancy."  (*Id.*)  Plaintiffs further allege PSB ignored policy violations in the incident such as "failure to deescalate, precipitous use of force, and failure to call specialized units (CIT) [Crisis Intervention Team]."  (*Id.*)

The PSB report recounts the following facts, which Plaintiffs have not challenged: the suspect refused to stop his vehicle after a WPD officer attempted a traffic stop; a vehicle pursuit followed in which two Sedgwick County Sheriff's deputies joined; the suspect eventually stopped and immediately exited his car and walked directly toward the WPD officer; the suspect ignored officers' commands to stop and continued to approach; the officers backed up; when the suspect was about eight feet from the officers, he opened a knife with his right hand; the suspect continued even as the officer drew a weapon and pointed it at the suspect; one of deputies then used a taser on the suspect but it had little effect; the second deputy also used a taser on the suspect but it was likewise ineffective; after use of the second taser, the suspect turned and began walking aggressively toward the second deputy; the suspect raised his right hand with a knife in it and closed in on the second deputy; the WPD officer then fired his weapon at the suspect, killing him. (Doc. 180-4 at 29-30.)

The PSB report following the incident included the statement of the WPD officer that the suspect "*started to raise* the open knife up and was moving quicker toward the deputy," leading the officer to believe the suspect was going to attack the deputy with the knife.  (Doc. 180-4 at 14-15) (emphasis added.) The report examined various witness statements, video evidence, physical evidence, policy implications, and witness credibility factors.  It noted two discrepancies in testimony, including the statement by one of the deputies that the suspect had raised the knife "over

his head." (*Id.* at 25.)  In its analysis, the PSB report pointed out the video showed the suspect "moving his arms up and down" but not over his head.  (Doc. 180-4 at 26.)  The report attributed the erroneous statement to the deputy's perception resulting from "a very stressful situation." (*Id.*) Ultimately, the report concluded it was reasonable for the WPD officer to use deadly force to protect the deputy from being attacked by the suspect with the knife, and it found no policy violations or training deficiencies. (*Id.* at 26-28.)  DA Marc Bennett, after reviewing the matter, concluded the officer's use of force was "lawful and justified." (*Id.* at 43.)  Considering the report as a whole, no reasonable inference arises that the discrepancy about the exact position of the suspect's hand at the time of the shooting was material to the lawfulness of the officer's use of deadly force. The fact that the suspect was closing in on the deputy with a knife in his hand, after having ignored commands to stop and two attempts with non-lethal force to stop him, rendered the officer's belief reasonable that the use of deadly force was necessary to prevent an imminent attack on the deputy.

Plaintiffs similarly summarize the PSB or WPD reviews of ten additional incidents, and cite the opinions of their police expert, Scott DeFoe, that these incidents show numerous "policy violations and unlawful practices."  DeFoe offers up a smorgasbord of criticisms of the way in which the WPD and PSB investigates and reviews such use-of-force incidents.  (Doc. 174-16.) Among the policy violations he identifies in these prior incidents are: failure to de-escalate; precipitous use of force; failure to call specialty units (SWAT or Crisis Intervention Teams); failure to issue verbal commands; failure to plan and communicate effectively; failure to make announcements or give warnings; and failure to retreat.  (Doc. 190 at 11-16.) DeFoe's opinion is "that if the Wichita Police Department and if the Chief of Police and Professional Standards Bureau Detectives had identified the above patterns of deficiencies in the use of force, systemic

changes could have been made that could have prevented the Finch incident from unfolding as it did." (*Id.* at 14.)

## II. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Id*. The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III. Summary Judgment Analysis

1. Excessive force claim against Defendant Rapp. Plaintiffs contend Rapp is liable under 42 U.S.C. § 1983 for violating Finch's Fourth Amendment rights by using unreasonable and excessive force.[1] (Doc. 158 at 13.) Defendants argue Rapp is entitled to summary judgment because his actions were objectively reasonable, such that they did not violate the Fourth Amendment, and because even if the shooting did amount to excessive force, Rapp is entitled to the defense of qualified immunity. (Doc. 166 at 18-23.)

---

[1] Section 1983 generally makes a person liable who, acting under color of state law, deprives another person of a federal right. 42 U.S.C. § 1983. It is undisputed here that the officers were acting under color of state law at the time of the seizure.

A. <u>Fourth Amendment standards</u>. The Fourth Amendment provides in part that "the right of the people to be secure in their persons … against unreasonable … seizures, shall not be violated."   U.S. Const., amend. IV. Claims that law enforcement officials have used excessive force in the course of an arrest or other seizure are analyzed under the "reasonableness" standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).

Determining whether the force used to make a particular seizure is reasonable requires balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake."  *Id.* at 396 (citations omitted.)  The test takes into account the facts and circumstances of each particular case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The question is whether the totality of the circumstances justifies a particular sort of seizure.  *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

The Tenth Circuit has held that "the *Graham* framework allows the use of deadly force where 'a reasonable officer ... would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others.'" *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1171 (10th Cir. 2020) (citing *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)). *Cf. Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985) ("Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.")  "Where feasible, an officer is required to warn a suspect that he is going to shoot before doing so." *Cordova v. City of Albuquerque*, 816 F.3d 645, 660 (10th Cir. 2016). The following factors are relevant in

determining whether there was probable cause to believe there was a threat of serious physical harm to others: (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.  *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017) (quoting *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citation omitted.) "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

As in other Fourth Amendment contexts, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted.)  Because the test is an objective one that does not depend upon an officer's subjective intent, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

B.  Application to Rapp's actions.  The first *Graham* factor looks at the severity of the crime at issue.  Officer Rapp and the other officers involved had reason to believe they were responding to a violent and volatile situation involving a threat to the lives of themselves and other persons, based on the 911 call reporting a murder and hostage situation by a man with a firearm.

The fact that these "crimes" were actually made up is not dispositive; the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  *Graham*, 490 U.S. at 396.  The officers had not yet confirmed any of the information reported by the 911 caller when they surrounded the residence and encountered Finch, but based on the 911 call they had an objectively reasonable basis for suspecting that the circumstances involved an armed man who posed a serious threat to the officers and others.

The second *Graham* factor looks at whether the suspect posed an immediate threat to the safety of the officers or others.  The disputed evidence concerning what Rapp may or may not have seen at the time he fired the shot becomes especially significant in assessing this factor.  Because it is the function of a jury, not a judge, to make credibility determinations and to resolve genuine conflicts in the evidence, on summary judgment the court is bound to consider the evidence and all reasonable inferences therefrom in the light most favorable to Plaintiffs. Under that standard, a jury looking at the evidence could conclude that Rapp did not possess facts that would allow him to reasonably believe that Finch posed an immediate threat to the safety of the officers or others. Among other things, a jury might find that Rapp's ability to see Finch's movements, as he claimed, was diminished by darkness and distance.  Alternatively, a jury might find that Rapp could see well enough that he could clearly see there was no firearm in Finch's hand.  A jury could reasonably conclude that Rapp could hear commands telling Finch to "show his hands" or "raise his hands" and that he should have been able to see that Finch was doing exactly that when Rapp fired the shot.  Or, a jury might conclude that Rapp could not hear all of the commands being directed at Finch by officers to the east of the residence, such that an officer in Rapp's position could not reasonably conclude that Finch's movements indicated he was intentionally disobeying

commands. In that regard, a jury could find the commands yelled at Finch were, if not contradictory, at least confusing.  There were multiple officers in multiple locations in the dark simultaneously yelling different commands. There is evidence that the officers never identified themselves as police and were difficult to see. When Finch emerged from the residence, some officers yelled "show your hands," which Finch apparently did, allowing Rapp and others to see that he had nothing in his hands. Defendants note that Finch proceeded to lower his hands, but they cite no evidence that anyone ever directed Finch to *keep his hands up* in the air after showing them.  Meanwhile, an officer to the east was yelling at Finch to "step off the porch," which itself was ambiguous; it could have indicated that Finch should come out, walk towards the officers, and step down from the porch, or it could have indicated that Finch should retreat back off the porch into the house. At the same time, an officer to the north was trying to divert Finch's attention from the foregoing commands by yelling more loudly, "walk this way," under circumstances (multiple officers in the dark yelling from multiple locations) that would have made it difficult for an individual to know which way was "this way."

A jury weighing the credibility of the witnesses and their various statements could also reject Rapp's assertion that Finch suddenly grabbed his sweatshirt and "made a motion like he was drawing a firearm," and could instead conclude that Rapp precipitously fired the shot when Finch's actions did not objectively indicate the presence of any threat.  In that regard, a jury could find credible the testimony of one officer who indicated the shot was fired when Finch was *lowering* his hands, not raising them in the direction of the officers on the east side. Or a jury might accept the testimony of another officer who indicated the shot was fired when Finch started to raise his arm in apparent compliance with an officer's command to show his hands, after Finch had already shown that he had no firearm in his hands, and that he did not make any movement "like he was

drawing a firearm." In those circumstances, a jury could find that an officer in Rapp's position would not have had reasonable grounds to believe that Finch's movements posed a threat of serious physical harm to others. *Cf. Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1263 (10th Cir. 2008) (officer reasonably concluded there was a serious threat where "[t]he undisputed facts … show that Larsen ignored at least four police commands to drop his weapon and then turned and stepped toward the officer with a large knife raised in a provocative motion."); *Herington v. City of Wichita*, No. 6:14-CV-01094-JTM, 2017 WL 76930, at *12 (D. Kan. Jan. 9, 2017) (officer entitled to qualified immunity after hot pursuit of a suspect after a reported shooting; the suspect fled on foot following a dangerous high speed chase and ignored commands to stop; the suspect carried a bag with a heavy item in it; the suspect disobeyed the officer's command to drop what he was carrying or get on the ground; and the suspect started turning toward the officer and raised the bag in his hands to a position from which he could have been attempting to fire a gun at the officer.)

It is a relevant consideration that Rapp had a split-second to make a decision in unpredictable circumstances. It is also relevant that Rapp and other officers had reasonable grounds to suspect that Finch may have been the 911 caller. If what the man who called 911 said was true – and the officers could not have *known* at the time it was *not* true – then from their perspective the man who opened the front door of the residence and emerged was more likely to be the 911 caller than a hostage who was sent out to talk to the police or someone completely unconnected to the reported events. The officers were certainly reasonable insofar as they approached the residence – and Finch – with a suspicion that he might be armed and dangerous. Rapp thus had grounds to be acutely concerned about whether Finch had a weapon and whether he might attempt to use it. But at the same time, neither Officer Rapp nor any of the other officers

at the scene had *any* confirmation of these suspicions. They had no corroboration at all that Finch was the 911 caller or that he was armed.  Nor did they have confirmation of any details recounted in the 911 call or evidence that the reported crimes had in fact taken place.[2] Officer Rapp effectively conceded as much in his deposition when he was asked if he believed Finch was the shooter described by dispatch when Finch first came out.  Rapp testified he "was not sure who he [Finch] was" at that point but believed it was "possible" that he was the 911 caller "because he was male."   (Doc. 174-3 at 21.)

A belief that Finch *might* be armed and dangerous, even though reasonable, had to be considered with other reasonable possibilities, including the possibility that Finch was one of the hostages of the reported 911 caller, that he was an innocent person unconnected to the reported crimes, or that there were no crimes at all.  The mere fact that Finch lowered his arms after he showed there was nothing in his hands, or raised his arms while officers were yelling "show your hands," would not give a reasonable officer probable cause to believe Finch posed a threat of serious physical harm to others that justified the use of deadly force.  If a jury viewed the evidence in the light most favorable to Plaintiffs, it could find that Finch's movements on the porch did not reasonably suggest he was attempting to draw a firearm or fire it at the officers. A jury could also reject as factually unsupported Rapp's asserted belief that Finch was "obviously not compliant with our commands."  In that regard, no evidence is cited that officers ever told Finch to keep his hands up in the air or warned him he would be shot if he lowered his hands.  Finch "showed" his hands at least once, if not twice, as he was directed, and officers could see he did not have a firearm in his hands.

---

[2] Defendants argue there was corroboration because of testimony that an officer told Rapp he saw movement in a window that "looked like" someone was doing CPR.  But when viewed in the light most favorable to Plaintiffs, the statement was equivocal and adds only marginal support for the officers' suspicions. The officer stated that the movements "looked like" someone was doing CPR, suggesting he was not sure and that it was only an impression.

The third *Graham* factor examines whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  For reasons indicated above, there is evidence from which a jury might conclude that an officer in Rapp's position could see that Finch was not actively resisting the officers' commands.  Alternatively, a jury might find that an officer in that position could not have known whether Finch was moving in compliance with officers' commands, because he was too far removed to hear all of the commands. As for attempted flight, no evidence is cited that Rapp observed or was aware of Finch attempting to flee.  Some evidence is cited that Finch's actions indicate he moved backwards such that he may have been trying to go back in the residence.  But a jury would not have to credit that evidence, and in any event a jury could find from the evidence that Rapp was unaware of any movement indicating Finch was attempting to go back in the house when Rapp fired the shot.

Under the *Graham* framework, the use of deadly force is reasonable where a reasonable officer would have had probable cause to believe there was a threat of serious physical harm to others.  *Estate of Smart*, 951 F.3d at 1171.  "Probable cause" does not require an actual showing of such a threat; it "requires only a probability or substantial chance." *See Dist. of Columbia v. Wesby,* 138 S. Ct. 577, 586 (2018) (discussing probable cause to arrest); *Illinois v. Gates,* 462 U.S. 213, 231-32 (1983) (probable cause does not require "hard certainties" but only a level of probability "on which reasonable and prudent men … act.")  Relevant factors in determining whether there was probable cause to believe there was a threat of serious physical harm to others include: (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect. *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017). For reasons

indicated above, a jury could find from the evidence that Rapp fired the shot when he could see that Finch's hands were empty and that Finch was simply lowering his hands.  Alternatively, a jury could find the shot was fired when Rapp could see that Finch was raising his arms in compliance with directives to do so, when Rapp should have been able to see that Finch had no firearm in his hands. No commands to drop a firearm or warnings that deadly force could be used were given. The nearest officers were over forty feet away from Finch when the shot was fired. All of this occurred when Rapp had no confirmation whatsoever that Finch even possessed a firearm, that any crime had in fact occurred, or who Finch was or what his role was in the incident. Viewing the evidence in Plaintiffs' favor, a reasonable officer in Rapp's position would not have had probable cause to believe that Finch's movements posed a threat of serious physical harm to others that made it reasonable to apply deadly force.  Plaintiffs have thus shown a genuine issue of fact exists as to whether Rapp violated Finch's Fourth Amendment rights.

C.  Qualified immunity. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004).

A "clearly established right" is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Mullenix,* 136 S. Ct. at 308 (citation omitted.)  This does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-*

*Kidd,* 563 U.S. 731, 741 (2011)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

In determining whether the law was clearly established, the dispositive question is "whether the violative nature of *particular* conduct is clearly established," which "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (citations and quotation marks omitted) (emphasis in *Mullenix*.) This is particularly important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the doctrine of excessive force applies to the particular situation the officer confronts. *Id.* The clearly established standard is satisfied where "at the time of the conduct in question, there existed 'a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts ... found the law to be as the plaintiff maintains.'" *Estate of Smart*, 951 F.3d at 1168-69 (citation omitted.)

The court concludes the law was clearly established as of December 28, 2017, that using deadly force in the circumstances confronting Rapp was a violation of the Fourth Amendment. It bears pointing out again that, at this stage of the proceedings, this determination is made viewing the evidence and all reasonable inferences therefrom in the light most favorable to Plaintiffs. Thus, the facts used in determining whether the law was clearly established include inferences that Rapp could see that Finch did not have a firearm in his hands, that Finch did not make any movement like he was drawing a firearm (but merely raised or lowered his hands), and that Finch made no motion indicating he was about to shoot at the officers. *Cf. King v. Hill*, 615 F. App'x 470, 475-76 (10th Cir. 2015) ("Deputy Hill contends various facts show that Mr. King posed an immediate threat to the officers …. But he presents these facts in the light most favorable to himself. He

ignores many facts and inferences favorable to Mr. King, the non-movant. Supreme Court precedent forbids this approach on summary judgment motions, including those involving qualified immunity.") (citing *Tolan v. Cotton*, ––– U.S. –––, 134 S. Ct. 1861, 1866–68 (2014)). Given this assumed set of facts, the law was clearly established at the time that using deadly force in response to Finch's movements was a violation of the Fourth Amendment.  Although the parties have not pointed to any case with identical facts (and it is unlikely there would be a case identical in all particulars), the Tenth Circuit case law in effect at the time makes clear that the use of deadly force in highly similar circumstances was unlawful, such that precedent "placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S at 741. A reasonable officer would have known that using deadly force when Finch displayed no weapon and made no overtly threatening movement was unlawful.

This conclusion is illustrated by a series of Tenth Circuit cases, including the following. In *King, supra,* officers received a report during daylight hours that a man with mental illness was making threats against his spouse and had broken a water line at their residence. *King,* 615 F. App'x at 471. The spouse reported there were no known weapons in the house.  The responding officers encountered the spouse in a neighbor's driveway; she informed them the suspect had not hit or injured her. The officers proceeded to the suspect's house and saw him walking or running toward his house from his yard.  He was wearing a camouflage jacket and was carrying another camouflage jacket over his arm.  One of the officers testified he believed the man could have had a long gun under the jacket on his arm. *Id.* at 472.  A neighbor, however, testified the suspect's hands were showing under the jacket and that he did not have anything in his hands, and that the suspect could not have been holding a long gun or it would have been sticking out.  An officer retrieved his rifle. The man was near the front porch of the house.  Officers told the man to put

down whatever was in his hands and said they just wanted to talk.  The man responded by shouting at them to get off his property, and then made some reference to having enough black powder or explosives in the house to "blow you-all's asses up" or "blow this place up."  *Id.* There was disputed testimony concerning the man's movements.  The officer with the rifle testified the man moved his hands up closer to his face and said, "that's it, mother fuckers," at which point the officer fired his rifle, later asserting that he did so in part because he feared for the safety of the other officers.  *Id.*at 473.  A neighbor testified the man was not making any threatening motion at the time. There was also testimony that an officer had yelled for the man to show his hands, and that the man "responded by starting to raise his hands, which he did in a manner that was not threatening," when the officer fired his rifle. *Id.* at 472.  The officer fired two or three additional shots because he did not think the man had been hit. *Id.* at 473.  Investigation showed the man was not carrying a firearm at the time.  *Id.*  The Tenth Circuit denied the officer's defense of qualified immunity.  The court pointed out the Supreme Court had long ago held that an "officer may not seize an unarmed, nondangerous suspect by shooting him dead."  *Id.* at 477 (citing *Tennessee v. Garner,* 471 U.S. 1 (1985).  *King* then proceeded to examine a trio of Tenth Circuit cases: *Zuchel v. Spinharney*, 890 F.2d 273 (10th Cir.1989), *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150 (10th Cir.2010), and *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir.2006), all of which, according to *King,* showed the law was clearly established that an officer could not shoot an unarmed man who did not pose any actual threat to the officer or to others. *Id.* at 479.[3]

---

[3] Defendants accurately point out that *King* is an unpublished decision and therefore is not considered precedent. (Doc. 187 at 8, n.7). *Cf. Cummings v. Dean*, 913 F.3d 1227, 1244 (10th Cir.), *cert. denied sub nom. Cummings v. Bussey*, 140 S. Ct. 81 (2019) (citing *Mecham v. Frazier*, 500 F.3d 1200, 1206 (10th Cir. 2007) (noting that an unpublished opinion "provides little support for the notion that the law is clearly established") and *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018) (acknowledging the "little support" rule of *Mecham*, but on the other hand, "an unpublished opinion can be quite relevant in showing that the law was not clearly established.") Nevertheless, the published decisions cited in *King* show the state of clearly established law, and *King's* application of the law to the facts has some persuasive value here.

In *Zuchel v. Spinharney,* 890 F.2d 273 (10th Cir. 1989), officers approached a man who was confronting a group of teenagers. One of the teenagers yelled that the man had a knife. According to an officer, the man moved toward him, threatened to kill one of the teenagers, and cursed the officer, telling him "you'll have to kill me." *Zuchel,* 890 F.2d at 275. Although there was testimony that the man charged at the officer, disregarded commands to stop, and jabbed at the officer, prompting the officer to shoot him, there was also evidence that the man was standing ten feet away and was trying to explain himself when the shots were fired. As it turned out, the suspect had only been carrying a pair of fingernail clippers. *Id.* at 274. The Tenth Circuit affirmed the denial of the officer's motion for summary judgment on qualified immunity. *Id.* at 276.

In *Zia Trust Co.,* officers responded to a reported domestic disturbance involving a man and his adult son. Dispatch informed the officers the son had mental health issues and that there were two firearms present at the residence. After being flagged down by the man who reported the incident, one officer got out of his car, with his gun drawn, and approached a van that was backing out of the residence's driveway. The van had gotten stuck on a pile of rocks next to the driveway. A man (only later identified as the son) was in the driver's seat and a child was in the passenger seat. The officer positioned himself in front of the van. Another officer approached from the side, yelling for the man to get out of the vehicle. The van, although still stuck on the rocks, jumped forward about a foot. In response, the officer in front of the van fired a shot, which hit the man in the neck. The man got out of the van and was subdued with a taser. He later died from his gunshot wound. The court noted that at the time of the shot, neither officer had confirmation of who the man was or what his role was in the domestic violence call. *Zia Trust Co.,* 597 F.3d at 1153. In finding that the plaintiff had cited evidence of a Fourth Amendment violation, the court noted conflicting evidence on whether the officer could see in the dark which

way the van's front tires were pointing and how far away the officer was, which made it unclear whether the son "manifested an intent to harm [the officer] or anyone else at the scene." *Id.* at 1155. The court also found the law to be clearly established that it was unreasonable to use deadly force "when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself." *Id.* Viewing the evidence in the plaintiff's favor, the officer "did not have 'probable cause to believe that there was a serious threat of physical harm' to himself or others," and he thus violated clearly established law by using deadly force. *Id.* Defendants accurately point out that *Zia Trust Co.* did not involve any reported use of a firearm or barricaded suspect. (Doc. 187 at 8.) But the case is still relevant insofar as it shows that when the evidence would allow a jury to find that a suspect did not make any movement that manifested an intent to harm others, the law is clearly established that the use of deadly force is unlawful.

In the third case cited by *King, Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006), a police officer named Peterson and other officers responded to a dispatch about a suspect who may have been en route to harm his family. Peterson encountered the suspect and attempted to box his car in, but the man was able to drive off, and he led the officers on a vehicle chase before stopping in the family's driveway. Peterson pulled in behind the man's car. The man got out and moved away. Peterson drew his gun. The man pulled a knife or box-cutter out of his pocket and held it to his wrist with his hands straight out, about chest high, with his left wrist bent and exposed. Peterson was a little over twenty feet away. The man's family members shouted to Peterson that the man did not have a gun. Peterson later testified that he believed the man was holding a gun, specifically a .38 special with a two-inch barrel. Peterson pulled the trigger on his gun, but it did not fire because he had inadvertently hit the clip release button when drawing the gun. The man started to lower his hands, as though he were going to run from the officers, but before he could

do anything, Peterson popped the clip back in and fired, hitting the man.  A second officer on the scene, Clayton, was about sixty feet away kneeling behind his car when he heard the shots. He did not see anything that looked like a gun in the man's hands, but he concluded he was in danger because the man swung toward him in a "classic pistol stance."  Clayton opened fire, hitting the man.  After the shooting, the officers discovered the man had only a knife and not a gun. *Id.* at 1157-59.

The Tenth Circuit concluded a jury could find that Peterson used unreasonable force, noting among other things that the man had made no threats, was not advancing on anyone, and was only holding a small knife to his own wrist.  Although Peterson said he believed the man had a gun, "this belief was not reasonable, if plaintiff's version of events is accepted," in part because "the amount of light on the scene should have permitted Officer Peterson to ascertain that he was not holding a gun in a shooting stance."  *Id.* at 1160.  The court also rejected the defense of qualified immunity, finding it was "specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect."  *Id.* (citing *Zuchel,* 997 F.2d at 735-36).  The court made similar findings with respect to Clayton's conduct, concluding that whether he reasonably believed he was in danger was a factual question that precluded summary judgment, and that if all inferences were drawn in the plaintiff's favor, the facts showed the violation of a right that was clearly established. *Id.* at 1161.  Defendants contend *Walker* is distinguishable from the instant case because the suspect's wrist was "clearly visible," such that the officer should have seen that the man did not have a firearm.  (Doc. 187 at 8.) But a jury could similarly find that Rapp could see the entirety of

Finch's hand as he brought it up, such that he should have seen that he had no firearm. Moreover, Finch raised his hand at a time when officers were yelling for him to do just that.

These cases and others show the right not to be subjected to deadly force was clearly established in the circumstances faced by Rapp (viewed in Plaintiffs' favor) – that is, where an officer was able to see that a non-resisting suspect did not have a firearm in his hand and was not making any motion reasonably indicating an attempt to draw a weapon or otherwise threaten anyone. Such circumstances are distinguishable from cases finding qualified immunity where officers had a mistaken but reasonable perception that a suspect was threatening them, such as where officers knew or could see that a suspect had a firearm and was moving it around, where a suspect pointed an object at them that they reasonably believed to be a firearm, or where a suspect disobeyed clear commands and moved in a way that manifested an intent to acquire or brandish a firearm. *Cf. Partridge v. City of Benton, Ark.*, 929 F.3d 562, 566 (8th Cir. 2019) (collecting Eighth Circuit cases). In such circumstances, "the salient question" is whether the officer's mistaken perceptions were reasonable, because qualified immunity applies regardless of whether an officer's error is a mistake of law, a mistake of fact, or some mixture of the two. *Estate of Smart,* 951 F.3d at 1171 (citing *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)). But if a jury finds all the disputed facts here in Plaintiffs' favor, then Officer Rapp's alleged perceptions that Finch was attempting to draw a firearm or had a firearm in his hand were simply not reasonable, and there could have been no reasonable belief of a threat of serious physical harm to the officers. *Cf. id.* at 1173 (explaining that *Zuchel* and *King* did not apply where officers actually saw a man shoot a gun into a crowd of people, and the officers then mistakenly identified a different man as the shooter and used force on him; "[u]nlike the officers in those cases, Officers Froese and Chaffee saw a suspect brandishing and firing a gun – although they may have been mistaken in identifying

30

that suspect as Mr. Smart.");   The law prohibiting the use of deadly force in such circumstances was clearly established by cases such as *King, Zuchel, Zia Trust Co.,* and *Walker.*   Defendant Rapp's motion for summary judgment is accordingly denied.

2. Excessive force and supervisory liability claims against Defendant Jonker. Plaintiffs allege that Jonker is liable under the Fourth Amendment for "recklessly and deliberately precipitating the circumstances under which Rapp fired his weapon."  (Doc. 158 at 13.) Plaintiffs further allege Jonker is liable as a supervisor because he "personally participated in the Finch shooting by directing, exercising control over, and failing to supervise Rapp and other officers," and thereby "set in motion a series of events that he knew, or reasonably should have known, would violate Finch's Fourth Amendment" rights. (*Id.* at 14.)  Defendant Jonker denies that his actions violated the Fourth Amendment and further contends he is entitled to the defense of qualified immunity.  (Doc. 166 at 24-26.)

A. Supervisor liability standards. Section 1983 does not authorize liability under a theory of respondeat superior. *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).  Governmental officials bear liability under 1983 only for their own misconduct.  *Peterson v. Creany,* 680 F. App'x 692, 696 (10th Cir. 2017) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009)).   Although a supervisor can be liable in some circumstances for the unconstitutional act of a subordinate employee, supervisory status alone is insufficient.  *Id.* (citing *Dodds v. Richardson,* 614 F.3d 1185, 1195 (10th Cir. 2010)). A plaintiff must show an "affirmative link" between the supervisor and the constitutional violation, which requires a showing of (1) personal involvement in the deprivation, (2) causation, and (3) the state of mind required to show a violation of the right.  *Burke v. Regalado,* 935 F.3d 960, 997 (10th Cir. 2019).

31

The element of personal involvement may be satisfied if a supervisory police officer actively participated in a use of excessive force.  *Estate of Booker v. Gomez,* 745 F.3d 405, 422 (10th Cir. 2014) (all officers who actively applied force, including a sergeant who used a taser on the plaintiff, could be liable).  It may also be satisfied where a supervisor was aware of the use of excessive force by someone else and failed to intervene to prevent it despite an opportunity to do so.  *See Mick v. Brewer,* 76 F.3d 1127, 1136 (10th Cir. 1996) (citing *Lusby v. T.G.& Y. Stores, Inc.,* 749 F.2d 1423, 1433 (10th Cir. 1984) (officer may be liable under § 1983 if he had the opportunity to intervene but failed to do so), *vacated on other grounds,* 474 U.S. 805 (1985)).  Additionally, personal involvement may be shown if a supervisor promulgated, created, implemented or possessed responsibility for the continued operation of a policy that caused the constitutional harm.  *Brown*, 662 F.3d at 1164 (citation omitted).

B.  <u>Application to Jonker's actions; qualified immunity</u>. Plaintiffs cite no evidence that Jonker actively participated in Rapp's use of force.  There is no evidence that Jonker ordered or encouraged Rapp to fire his weapon when Finch emerged on the porch, such that Jonker might be considered as having joined in the act.  *Cf. Estate of Booker,* 745 F.3d at 422 (evidence showed that all defendants joined in the use of force.)  Plaintiffs argue Jonker "did direct the use of force by ordering Rapp to target Finch with a sniper rifle" (Doc. 190 at 28), but merely positioning Rapp and directing him to provide "long cover" was not a directive to use force.  At most, it was an implied directive to use force *if a serious threat emerged* and if *the use of force became necessary*.[4] The fact that Jonker prepared the scene in this manner did not make him an active participant in Rapp's decision to use force.  Nor do Plaintiffs cite any evidence that Jonker bypassed an

---

[4] Placing Rapp at the scene and directing him to provide cover to the other officers was reasonable given the 911 call claiming there was a homicidal kidnapper with a firearm in the residence. While that claim was unconfirmed when officers surrounded the house, Jonker cannot be faulted for preparing to respond in case the report was true.

opportunity to intervene to prevent Rapp's use of deadly force.  There is no evidence that Jonker had any warning that Rapp was about to shoot, such that Jonker had time to intervene and prevent it. *Cf. Lynch v. Bd. of Cty. Commissioners of Muskogee Cty., Oklahoma*, 786 F. App'x 774, 781 (10th Cir. 2019) (an officer who observes excessive force may be held liable under section 1983 for failing to intervene so long as there is a realistic opportunity to stop or prevent it).

The crux of Plaintiffs' claim against Jonker is that he "exercised control over the law enforcement response" and thereby "set in motion the events by which Finch was gunned down…." (Doc. 190 at 29.)  That is very close to a respondeat superior theory, which is not permitted under § 1983. *Cf. Graves v. Malone*, No. 18-2296, 2020 WL 1900458, at *5 (6th Cir. Apr. 17, 2020) ("Mere creation of the circumstances in which force is ultimately deployed does not give rise to a constitutional violation.")  "[S]upervisory liability 'must be based upon active unconstitutional behavior' and 'more than a mere right to control employees.'" *Serna v. Colo. Dep't. of Corr.*, 455 F.3d 1146, 1153 (10th Cir. 2006) (citation omitted).  Plaintiffs offer an attenuated theory of how Jonker's supervisory actions (or omissions) might have caused Rapp's use of excessive force, asserting that Jonker could have "mitigate[d] the risk" of deadly force if he had "gathered information, made announcements, called in specialized teams, prevented conflicting commands, and appointed a contact person." (Doc. 190 at 29.)  The Tenth Circuit has construed the causation element to mean a supervisor must have set in motion a series of events that he "knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Estate of Booker v. Gomez,* 745 F.3d 405, 435 (10th Cir. 2014).  It is doubtful whether any of the evidence cited by Plaintiffs could be said to show that Jonker should have known that his actions would result in the use of deadly force against Finch.  It is one thing to trace events backwards, with the full benefit of hindsight, and another to anticipate future events

when many of the critical facts are unknown. Had the 911 call been true, and had a man suddenly burst forth from the house firing a weapon at nearby officers, Jonker might have been faulted had he not had an officer positioned with a rifle so as to protect the officers near the house.  Plaintiffs also fail to adequately account for the fact that Finch emerged from the house within ten minutes of the first WPD dispatch and within one minute of Jonker's arrival at the front of the residence. Jonker's ability to implement a plan, to appoint a take down team, or take alternative measures was obviously cut short by Finch's appearance.  In light of that fact, there is no reasonable basis in the evidence for concluding the shooting would not have occurred had Jonker tried to gather more information or put in a call for SWAT. It is possible that events might have turned out differently had Jonker appointed someone to act as a sole contact point prior to Finch's emergence from the house, but even that is highly speculative.  At any rate, the court ultimately need not resolve the constitutional question here because, even assuming Jonker's actions could be a Fourth Amendment violation, Plaintiffs have failed to meet their burden to overcome qualified immunity by showing that Jonker's actions violated clearly established law.

Plaintiffs cite three cases in support of their argument that the law applicable to Jonker's actions was clearly established: *Stewart v. City of Prairie Village, Kan*., 904 F. Supp. 2d 1143, 1157 (D. Kan. 2012), *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014), and *Fogarty v. Gallegos*, 523 F.3d 1147, 1164 (10th Cir. 2008).  (Doc. 190 at 31.) But none of these cases provides any basis for denying Jonker qualified immunity.

In *Stewart,*[5] a mentally ill woman who was known to the police called 911 demanding that officers bring her cigarettes and stating that she wanted to commit "suicide by cop" and would

---

[5] As a district court case, *Stewart* does not show that the law was clearly established.  *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (for the law to be clearly established, ordinarily there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains).

give them a reason to kill her.  *Stewart,* 904 F. Supp. 2d at 1150-51.  Officers arriving at the

woman's apartment briefly negotiated with the woman, who threatened to kill herself, before a

supervisor decided the police would enter the apartment and remove her.  "The operation plan did

not include any provision for use of methods – further negotiations, the use of chemical munitions,

or the use of non-lethal weapons – other than to forcibly enter the apartment and remove" the

woman. *Id.* at 1151. The police gave the woman two minutes to come out and then battered down

her door and entered. After attempts to use a taser on the woman failed, officers shot her three

times – including once in the back – as she allegedly grabbed for a knife. None of the shots was

fired at close range.  *Id.* at 1152. Among other things, the court found:

> [I]t was clearly established at the time of this incident that an officer acts
> unreasonably when he aggressively confronts an armed and suicidal or emotionally
> disturbed individual without gaining additional information or approaching him in
> a nonthreatening manner. Acting in such a manner is likely to result in the use of
> deadly force and is objectively unreasonable.

*Id.* at 1158 (citing *Hasting v. Barnes,* 252 F. App'x 197 (10th Cir. 2007)).  In denying a

supervising officer's motion to dismiss on the pleadings, the court found:

> Defendant Lovett had tactical command of the scene at Stuckey's apartment,
> decided not to use an officer trained in hostage negotiations, ordered that Stuckey
> be given a two-minute deadline to surrender, approved Defendant Roberson's
> substandard plan for entering the apartment, and ordered the forced entry itself. The
> facts also support an inference that Defendant Lovett was closely supervising the
> officers on the scene. Based on the Court's determination, under Plaintiff's alleged
> facts, that Defendant Roberson's plan unreasonably escalated the situation and
> aggressively precipitated the use of deadly force against Stuckey, the Plaintiff
> shows an affirmative link between a constitutional deprivation and Defendant
> Lovett's exercise of control or direction and his failure to supervise. Thus, the Court
> denies Defendant Lovett's motion to dismiss….

*Id.* at 1159–60.

The differences between *Stewart* and the instant case are numerous and significant.  In contrast to the instant case, the woman in *Stewart* was not suspected of any crime and was not suspected of having a firearm.  She was not an unknown person but was known to the police to be mentally ill. There was no suspicion that the lives of other persons in the apartment were in imminent danger.  There was no report of a murder or hostage situation.  And most significantly, the police in *Stewart* decided to batter down the woman's door and forcibly enter the dwelling after breaking off negotiations, thereby precipitating a confrontation with the woman.  None of those material circumstances is close to the facts confronted by Jonker, where a man whom officers did not know suddenly and unexpectedly emerged from a house that was reported to be the scene of a murder and kidnapping.

*Estate of Booker* bears even less resemblance to this case.  The plaintiff in that case was under arrest in a detention facility.  In response to his alleged insubordination, deputies pinned the man to the ground, put him in a choke hold for an extended period, applied pressure to his back, and used a taser on him.  He died as a result. *Estate of Booker,* 745 F.3d at 413-15. In finding that a supervisory officer who joined in and used a taser could be liable, the Tenth Circuit found the elements of personal participation and causation were satisfied because a jury "could find [the supervisor] actively participated in—and failed to intervene and prevent—the use of excessive force." *Id.* at 435.  As discussed previously, there is no evidence that Jonker actively participated in Rapp's use of force or that he bypassed an opportunity to intervene.  *Estate of Booker* does not show that Jonker's actions violated clearly established law.

The third case cited by Plaintiffs, *Fogarty*, likewise teaches nothing about the lawfulness of Jonker's actions. *Fogarty* involved a public anti-war protest, including a group of drummers, and a supervising police captain who ordered subordinates to "remove the drums," which the

officers understood as a directive to arrest the drummers. *Id.* at 1152.  The plaintiff, who had been drumming, was standing on a street corner when he was shot by an officer with a "pepper ball" projectile, dragged by several officers through an area of heavy tear gas, and then forced to the ground before being arrested. *Id.*  The Tenth Circuit found (under the plaintiff's version of the facts) that the arrest was unlawful because officers had no probable cause to believe the plaintiff's actions constituted disturbing the peace. *Id.*at 1158.  In finding that the supervising captain could be liable, the Tenth Circuit pointed to evidence that the captain had ordered the arrest and the use of tear gas and had also witnessed the use of excessive force against the plaintiff but failed to intervene. *Id.* at 1163. The court said the captain could be liable as a supervisor because he "set[ ] in motion a series of acts by others ..., which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Id.* at 1164 (quoting *Motley v. Parks*, 383 F.3d 1058, 1067 (9th Cir.2004)). The court "thus affirm[ed] the district court's denial of qualified immunity" to the captain. *Id.*  Although the court did not elaborate on why the captain "should have known" his actions would cause others to inflict constitutional injury, it was apparently because he ordered the unlawful arrest and failed to intervene when he saw the use of excessive force.  Again, these facts are in no way comparable to the instant case. Not only are the factual scenarios completely dissimilar (a political protest on public streets versus a reported murder and hostage situation in a residence), but unlike the supervisor in *Fogarty*, Jonker did not order Rapp to commit an unlawful act and did not fail to intervene after becoming aware of the use of excessive force.

None of the foregoing cases is sufficiently similar to put an officer in Jonker's position on notice of "the violative nature of [the] particular conduct" that allegedly violated the Fourth Amendment in "the specific context of th[is] case." *Choate v. Huff*, 773 F. App'x 484, 488 (10th

Cir. 2019), *cert. denied*, 140 S. Ct. 935 (2020) (quoting *Mullenix*, 136 S. Ct. at 308 (internal

quotation marks omitted)). The Supreme Court has made clear that

> [I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

*City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S.

Ct. 1148, 1152 (2018)). Plaintiffs have failed to cite any case showing that an official acting under

circumstances similar to Jonker's was found to have violated the Constitution. *Cf. Perry v.

Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018) (plaintiff must show that clearly established law

would have put a reasonable official on notice that his supervisory conduct would violate the

victim's constitutional rights); *Choate v. Huff*, 773 F. App'x 484, 488–89 (10th Cir. 2019), *cert.

denied*, 140 S. Ct. 935 (2020) ("Plaintiff cites to no cases in which an officer was held liable for

another officer's use of force where this use of force was sudden, unannounced, and short in

duration."). Defendant Jonker is therefore entitled to summary judgment based on the defense of

qualified immunity.

  3. <u>Claim of municipal liability against City of Wichita</u>.

  Plaintiffs claim the City of Wichita is liable for the alleged excessive force against Finch

for two reasons. First, Plaintiffs contend the City has a custom of using excessive lethal force

against civilians. (Doc. 158 at 7.)  Plaintiffs contend the City knew or should have known that its

officers were using excessive lethal force and that its failure to stop the practice shows its deliberate

indifference to the risk that WPD officers would continue to violate citizens' rights, such that its

"purposeful inaction" led to Finch's death. (*Id.*)  Second, Plaintiffs claim the City is liable "for

WPD's inadequate disciplinary and accountability procedures for officers who use lethal force,"

which permits WPD officers "to engage in clearly identifiable patterns of policy violations and misconduct with impunity," and which was "the moving force behind the Finch shooting." (*Id.* at 8-9.)  In their motion for summary judgment, Defendants argue Plaintiffs have only cited evidence of violations of police department procedures and policies in prior shootings, not constitutional violations, such that Plaintiffs have no evidence of a pattern or custom of violating constitutional rights through the use of deadly force.   Additionally, Defendants contend Plaintiffs have no evidence showing the required causal connection between any prior failures of discipline and the shooting in this case. (Doc. 166 at 28.)[6]

A.   Standards of municipal liability.  A municipality may not be held liable under § 1983 solely because it employs an officer who committed a violation.   Rather, a plaintiff must identify a municipal "policy" or "custom" that caused the injury. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citation omitted). An act performed pursuant to a custom that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is "so widespread as to have the force of law." *Id.* at 404. But it is not enough to identify conduct attributable to a municipality; a "plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* (emphasis in original.)  In other words, a plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

"Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."

---

[6] Defendants also argued the City could not be liable because no officer violated Finch's Fourth Amendment rights (Doc. 166 at 27), but the court has determined that a jury could find Rapp's use of force was excessive.

*Id.* at 405. "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013)). Additionally, "for claims of inadequate hiring, training, or other supervisory practices, a plaintiff 'must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'" *Id.* (quoting *Brown*, 520 U.S. at 407). Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. *Id.* (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Id.* (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)). "In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction…." *Estate of Holmes by & through Couser v. Somers*, 387 F. Supp. 3d 1233, 1261-62 (D. Kan. 2019) (quoting *Carr v. Castle,* 337 F.3d 1221, 1229 (10th Cir. 2003)).

  B. <u>Application to the City</u>. Plaintiffs assert that there were 23 shootings by WPD officers between 2012 and early 2018 in which citizens' rights were violated "because either the force was unreasonable at the moment it was used … or officers recklessly precipitated the use of force."

(Doc. 190 at 32.)[7]  To support that assertion, Plaintiffs cite a description of fourteen specific incidents, with details gathered from WPD and PSB reviews of the incidents, as supplemented by the opinions of Plaintiffs' expert, Scott A. DeFoe.  (Doc. 190 at 11-16, para. 122-124.)  DeFoe is a consultant who is a retired police officer and detective of the Los Angeles Police Department. (Doc. 174-16.)

The WPD/PSB reports of the incidents cited by Plaintiffs provide no basis upon which a jury could reasonably conclude that the incidents were part of a pattern that put the City of Wichita on notice of its officers using unlawful deadly force.  Plaintiffs cite DeFoe's opinion that each of these incidents involved "policy violations and unlawful practices" – although the unlawfulness is not specified – which they identify as: failure to de-escalate; precipitous use of force; failure to call specialty units (SWAT or Crisis Intervention Teams); failure to issue verbal commands; failure to plan and communicate effectively; failure to make announcements or give warnings; and failure to retreat.  (Doc. 190 at 11-16.)  As discussed below, the court concludes this evidence is insufficient as a matter of law to show that the City was on notice of violations similar to the one alleged in this case, such that the City could be said to be deliberately indifferent to the unconstitutional use of deadly force, or that indifference to such alleged violations can be considered the cause of Rapp's use of deadly force against Finch.

Some of the prior actions cited by Plaintiffs were determined by the WPD to be departmental policy violations, and some resulted in some form of discipline or correction, although in DeFoe's opinion the discipline was minimal and rare, and he believes many policy violations were overlooked or dismissed based on investigators' failure to "reconcile

---

[7] *Cf. Herington v. City of Wichita*, No. 6:14-CV-01094-JTM, 2017 WL 76930, at *13 (D. Kan. Jan. 9, 2017) (statistics purportedly showing Wichita had a high rate of police shootings, as compared to certain other cities, did not constitute evidence of a high rate of improper or unjustified use of deadly force by WPD officers).

discrepancies" in witness statements or other evidence.  In other instances, the PSB or WPD resolved factual issues contrary to DeFoe's view of the evidence, leading DeFoe to conclude that policies were violated or the force used was improper. Evidence of prior complaints can be sufficient to show that a municipal defendant ignored officer misconduct. *Estate of Holmes by & through Couser v. Somers*, 387 F. Supp. 3d 1233, 1263 (D. Kan. 2019) (citing *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("A failure to investigate or reprimand might also cause a future violation by sending a message to officers that such behavior is tolerated.")).  But Plaintiffs have not shown that these incidents resulted in complaints of unlawful force or that they show a pattern of excessive force under circumstances that made the Finch shooting a predictable consequence of the City's actions.  Plaintiffs cite no evidence that there was a pattern of incidents resulting in jury verdicts or judicial findings that WPD officers used deadly force in violation of the Fourth Amendment.[8]  Nor do they cite evidence of a pattern of incidents resulting in settlements under circumstances suggesting that unlawful deadly force was used. Rather, Plaintiffs point to evidence of *departmental policy* violations as shown by the City's own internal reviews. To prove the existence of a pattern of tortious conduct, a plaintiff must show a pattern of "similar violations." *Id.* (citations omitted).  Plaintiffs cite no evidence of a pattern of *Fourth Amendment violations* similar to the one alleged in this case. *Cf. Connick,* 563 U.S. at 63 ("Because those incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation."); *Lonker v. Chambers*, No. 16-2097-

---

[8] In their statement of facts, Plaintiffs cite evidence that a lawsuit was brought following the 2012 shooting death of Marquez Smart by WPD officers, and that Rapp had been present at the scene of that shooting.  (Doc. 190 at 18.)  The federal claims in that lawsuit were dismissed by the district court on August 8, 2018, although one of the claims was recently revived on appeal. *Estate of Smart v. City of Wichita*, No. 14-2111-JPO, 2018 WL 3744063, at *1 (D. Kan. Aug. 7, 2018), *aff'd in part, rev'd in part and remanded sub nom. Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161 (10th Cir. 2020).  Because these decisions occurred after the incident in the instant case, the decisions could not have provided the City with notice of a pattern of unconstitutional conduct by its officers prior to the shooting of Finch.

JWL, 2017 WL 1738024, at *7 (D. Kan. May 4, 2017) ("the evidence does not reflect knowledge of any constitutional violations similar to the violation alleged here."); *Waller,* 932 F.3d at 1289 ("The first four allegations relate to deputy misconduct generally, rather than to uses of force specifically, and we are not convinced that they establish the requisite 'direct causal link between the municipal action and the deprivation of federal rights.'") (quoting *Brown*, 520 U.S. at 404). And while it is true, as Plaintiffs contend, that a municipal custom (including a failure to discipline) does not itself have to be unconstitutional to support section 1983 liability, the challenged custom ordinarily must still *produce* similar constitutional violations before a municipality can be said to be on notice of and deliberately indifferent to the violation of constitutional rights. *Cf. Brown*, 520 U.S. at 407 ("If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for.")

Plaintiffs contend that "if the Wichita Police Department and if the Chief of Police and Professional Standards Bureau Detectives had identified [these] patterns of deficiencies in the use of force, systemic changes could have been made that could have prevented the Finch incident from unfolding as it did." (Doc. 190 at 19) (citing opinion of Scott DeFoe). The "deficiencies" relied upon, however, are not similar to the instant case and for the most part involve departmental policies rather than constitutional requirements. An officer who fails to "de-escalate" or "plan effectively" may have violated departmental policy, but that does not mean the officer violated the Fourth Amendment. It is not even clear what bearing, if any, many of the alleged policy violations could have with respect to the ten-minute window officers had to get to the Finch residence or to the ten-second interaction between the officers and Finch before the shot was fired. Plaintiffs' argument that the City's failure to review and discipline departmental policy violations to a greater extent was the cause of the shooting is arguably a variation on the "broken windows" theory of

policing, which asserts that strict enforcement of lesser violations will reduce the incidence of greater ones.  That may be a valid policy approach.  But it does not satisfy the "rigorous standards of culpability and causation" adopted by the Supreme Court to ensure that municipalities are not held liable for constitutional violations under a respondeat superior theory.  *Brown*, 520 U.S. at 405; *see also Connick*, 563 U.S. at 68 (proving that an injury could have been avoided if an employee had had more or better training, sufficient to equip him to avoid the particular injury-causing conduct, will not suffice) (citation omitted.)  Those standards require evidence of "a direct causal link between the municipal action and the deprivation of federal rights" and evidence that the municipality "disregarded a known or obvious consequence" of its actions. *Brown,* 520 U.S. at 404, 410.  Because Plaintiffs have failed to cite evidence that could reasonably support those elements, the City is entitled to summary judgment on the claim against it.

### IV. Motions to Exclude Expert Testimony

In view of the court's foregoing summary judgment rulings, most of the *Daubert* issues raised by the parties are now moot.  Expert opinions relating to Plaintiffs' claims against Defendants Jonker and the City of Wichita are excluded as irrelevant to the sole issue remaining for trial: whether Defendant Rapp violated Finch's Fourth Amendment rights through the use of excessive force.

1.  <u>Rule 702 and *Daubert* standards</u>. Federal Rule of Evidence 702, which controls the admission of expert witness testimony, provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under this rule, the district court must satisfy itself that the testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony. *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (citing *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (*en banc*)). The district court must first determine whether the witness is qualified by knowledge, skill, training, experience, or education to render an opinion. *Id.* If so, the district court must determine whether the witness's opinion is reliable by assessing the underlying reasoning and methodology. *Id.* at 1283.

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court identified four factors that trial courts should consider in performing their "gatekeeping" role of determining the reliability of expert testimony: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community. *Id.* at 593–94. "The Supreme Court has emphasized, however, that these four factors are not a 'definitive checklist or test,' and that a court's … inquiry about reliability 'must be tied to the facts of a particular case.'" *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1164869, at *3 (D. Kan. Mar. 10, 2020) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).  In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience, rather than the *Daubert* factors and scientific foundation." *Id.* (citing *Kuhmo Tire Co.,* 526 U.S. at 150) (internal quotation marks omitted).  For such testimony to satisfy the reliability standard, it must be based on actual knowledge, and not mere subjective belief or unsupported speculation. *Id.* (citing, *inter alia*, *Pioneer Ctrs. Holding*

*Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1341–42 (10th Cir. 2017)).

The court is not required to admit opinion evidence that is "connected to existing data only by the *ipse dixit* of the expert," and may exclude the opinion if "there is simply too great an analytical gap between the data and the opinion offered." *Id.* (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)). But the rejection of expert testimony is the exception rather than the rule, and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 596 (1993).

"The court has discretion to determine how to perform its gatekeeping function under *Daubert*." *In re EpiPen*, 2020 WL 1164869, at *3 (citing *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019)). The most common method of fulfilling that role is by conducting a *Daubert* hearing, "although such a process is not specifically mandated." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). "[T]he district court may satisfy its gatekeeping role without a formal *Daubert* hearing 'so long as the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* (quoting *Goebel*, 215 F.3d at 1087 (quoting *Daubert*, 509 U.S. at 597).

2. Plaintiffs' Motion to Exclude Testimony of James W. Borden. (Docs. 160, 161, 173, 184). Plaintiffs move to exclude expert opinion testimony of James W. Borden, arguing that Borden's opinions are unreliable because they rely on unproven concepts of "Force Science"; that Borden lacks expertise to testify about scientific matters including "human performance factors"; that Borden's opinions are conclusory and rely upon the expertise of others; and that Borden's

testimony would not assist the finder of fact.  (Doc. 161.)  For reasons explained herein, the motion to exclude Borden's opinions will be granted except as to two matters:  (1) Borden's opinions concerning the time it takes an officer to react and to use force after perceiving a threat; and (2) what an examination of body camera footage from the shooting shows with respect to Finch's movements and Officer Rapp's reaction time.

Borden's resume shows he is a retired sergeant with the Henderson, Nevada, Police Department.  (Doc 161-2 at 2.) He has over fifteen years' experience with that department, including as a trainer on the use of force and investigating critical incidents.  He identifies his area of expertise as "Law Enforcement Procedure and Law Enforcement Training & associated Human Performance and Factors, Police Use-of-force, [and] Video Analysis related to use of force and police related contact."  (Doc. 161-2 at 4.)  Aside from having over twenty years' total experience as a law enforcement officer, he has accumulated 30 credit hours of formal study in the field of criminal justice and 15 hours "with a focus on human behavior and psychology at CSN, the SDRPA Police Academy and The Force Science Institute." (*Id.* at 3.)  He states that he has "a total of 1,370 hours of current and continuing focused education, and application in the field of Human Behavior and Human Factors as it relates to law enforcement," although it is not clear what that education consists of.  (*Id.*)  He has extensively attended law enforcement seminars and is currently "a member of the HFES (Human Factors and Ergonomics Society) as a professional working in the capacity of Senior Instructor for the Force Science Institute, lecturing on the application of the scientific study of human performance and decision making related to law enforcement."  (Doc. 161-3 at 8.) Borden's opinions were "formulated with a foundation as a professional in the field of force investigations and analysis related to law enforcement, police practice, human

performance related to law enforcement, and forensic video examination related to police use of force." (Doc. 161-2 at 54.)

The court will not pass upon the reliability of "Force Science" generally, as that term appears to be more of a trademark than the name of a field of scientific study. *Cf. Green v. City of Mission*, No. 7:18-CV-49, 2019 WL 3217033, at *4 (S.D. Tex. July 17, 2019) (finding defendants did not provide objective validation for the techniques relied on by the Force Science Institute in general or in the specific certification course completed by the witness). The court gathers that the concept generally involves examining how scientific principles governing human behavior apply to police work. Whatever the specific approach or method of an expert witness may be called, the court is required to examine it under the principles of Rule 702 and *Daubert*. Under those standards, it is clear that a number of Borden's opinions turn on scientific concepts that are outside of his area of expertise as a police officer. For example, he opines:

> The identification of focus of attention is essential in this incident. The only access we have as investigators to identifying focus of attention is by reviewing statements made by witnesses and corroborating those statements with other physical or forensic evidence from the incident. Attention is the behavioral and cognitive process of selectively concentrating on a discrete aspect of information, which can be either subjective or objective, while unable to attend to other perceivable information. It is the taking possession by the mind, in clear and vivid form, of one object out of what seems to be several simultaneous objects or trains of thought. Focalization and concentration of consciousness are at the core of what constitutes "attention." Attention has also been referred to as the allocation of limited processing resources. (Anderson, 2005).

> 80. Thus, by Deffenbacher's (1994) integrative theoretical formulation, if a task elicits the arousal mode of attention control, then memory will be enhanced for the most informative aspects of the stimulus display, those aspects on which the orienting response is focused. If, on the other hand, a task elicits the activation mode of attention control, then memory will either be modestly enhanced or drastically reduced, depending on the relative amounts of cognitive anxiety and physiological activation present. (Kenneth A. Deffenbacher); (Anderson, 2005).

> 81. An investigator must be able to decipher whose focus of attention yields the most accurate information. Here, the most accurate information would most likely come from the perspective of Officer Rapp, concerning the actual shooting, as he

was the person most directly involved as the shooting officer. At the moment of contact with Finch, Officer Rapp was most likely focused intently on the potential deadly threat being posed by Finch as depicted in Officer Rapp's statements. * * *

82. Based on the context and movements of Finch, Officer Rapp believed Finch was drawing a weapon and that the officers to the east of the target residence were in danger of being shot. The information initially perceived by Officer Rapp was inaccurate only in hindsight. This is due to the human limitation of focus of attention and time compression. Perceptual distortions are at work in every critical incident, however, they are not the same for every person. Understanding the limitations experienced by a human being in a critical incident is paramount. The tactics applied in this incident were appropriate based on the context of the information known to the officers. There are inconsistencies in between statements of the involved and the witnesses, however, this does not make the inconsistencies between statements untruthful. It also does not make any particular person's account more viable over any other person's account. * * *

(Doc. 161-2 at 44-46.) Opinions about the limits and characteristics of human attention, its relation to memory, and why these things allegedly show that the "most accurate information" likely came from Officer Rapp are matters clearly outside the scope of Borden's training and experience as a law enforcement officer. Similarly outside his expertise as a law enforcement officer are opinions that Rapp's "inaccurate perception" was "due to the human limitations of focus of attention and time compression." Borden may have read studies or attended courses relating to attention and memory, but no showing is made that he has the training, experience, or learning necessary to make informed judgments about issues within specialized fields of the behavioral sciences such as psychology and cognitive science. *Cf. Cole v. Perry*, No. 1:16-CV-3081-WTL-MJD, 2019 WL 4165304, at *6 (S.D. Ind. Apr. 30, 2019), *on reconsideration*, No. 1:16-CV-3081-WTL-MJD, 2019 WL 2210809 (S.D. Ind. May 22, 2019) (finding Mr. Borden is not an expert in the academic field of behavioral science). "To qualify as an expert witness, the witness must possess 'such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in [its] search for truth.'" *In re EpiPen*,

2020 WL 1164869, at *2 (citing *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th

Cir. 2004).  Defendants have not shown that these are matters within Borden's expertise.[9]

Other opinions appear to merely advocate on behalf of Officer Rapp based on Borden's

personal views, without any showing these opinions are tethered to a reliable method of analysis:

> 107. Opinion. Perceived weapon. It is my opinion that, in a dynamic and swiftly moving incident such as this, Officers cannot be held to an arbitrary standard of certainty or account for every detail of an incident when the potential results are death or substantial bodily harm. Officers in a rapidly evolving critical incident like this one, do not have the luxury of analyzing a static representation of the incident, an object, or a particular action for the benefit of optimal decision making. My opinion is that the context in which an Officer perceives volatile information guides the Officer's decisions. In this incident there was not time for image consolidation; meaning, it is a low light (regardless of visibility), critical and quickly evolving incident, with the perceived consequence of life and death. Additionally, the weapon was described as a "black handgun." If the officer tried to specifically focus on the weapon itself and not the overall context, with respect to timing in particular, a minimum of two shots could potentially be fired at officers in the time it takes to clearly perceive, react and respond with a shot fired to stop the perceived threat (Dr. Bill Lewinski, 2000). The theory of an officer waiting to see a weapon, in the corresponding context of a critical incident, is burdened with human, environmental, and geographical limitations affecting perception and decision-making. Officer Rapp made the decision in low light, from a relatively long distance, with the dynamic of human movement, and with a contextually critical consequence. For an officer to make an optimal decision in this incident, it would have required impossible foresight, perfect lighting and additional information that the officers on scene simply did not have time to ascertain.

(Doc. 161-2 at 58-59.)  Aside from the fact that the court does not see how these opinions would

be helpful to a jury in determining the facts of the case, Defendants have not met their burden to

show that such opinions are the product of reliable principles and methods as required by Rule

702. *See Kumho Tire*, 526 U.S. at 157 ("nothing in either *Daubert* or the Federal Rules of Evidence

---

[9] Defendants' response relies in part on the asserted expertise of the Executive Director of the Force Science Institute, William Lewinski, who it says holds a Ph.D. in Psychology with a concentration in police psychology, and who apparently conducted some of the studies on which Borden relied. (Doc. 173 at 5-6.) But Dr. Lewinski's asserted expertise does not render Borden's opinions admissible on subjects on which Borden is not an expert.

requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.")

Other opinions by Borden fail to meet Rule 702's requirement that the evidence must "help the trier of fact to understand the evidence or to determine a fact in issue."  For example, Borden's opinions concerning whether Rapp's conduct complied with WPD policies would not, in the court's view, be helpful to the jury.  As an initial matter, Officer Rapp or other officers who were present at the scene are able to testify to and explain WPD policies to the extent they have any relevance.  A jury would not likely need the benefit of expert testimony to understand that evidence or to judge whether Rapp's actions were in keeping with such policies.  Moreover, whether Rapp's actions were consistent with departmental policies is not an issue the jury must decide, and having an expert focus on and render opinions about policy compliance runs the risk of confusing the jury about the standards by which they must decide whether Rapp's actions violated the Fourth Amendment.  The vast majority of Borden's opinions (Docs. 161-2, 161-3) likewise would not be helpful to the jury in understanding the evidence.  They consist largely of Borden offering justifications and making factual and legal arguments that Defendant Rapp – or his attorneys – can provide the jury without the need for expert opinion.  (*See* Doc. 161-2 at 40) ("The fact that the threat perceived by Officer Rapp was not "actual" does not negate the fact that, based upon the information Officer Rapp had at the moment force was used, the threat was believed to be actual, and appeared to be malevolent based on the visual stimulus described by Officer Rapp, which was corroborated by other statements and available video.")

The court finds the motion to exclude Borden's testimony should be denied – at least at this point –[10] with respect to two specific and related issues.  First, Borden will be permitted to

---

[10] This pretrial ruling concerning this testimony is preliminary in nature.  The court may reconsider, expand, or restrict the ruling at trial, depending upon the specific testimony sought to be introduced.

offer limited testimony about reaction times of officers who decide to use force in response to perceived threats.  In support of Borden's opinion on that issue, his report cites a study on officer reaction times conducted or supervised by Dr. Lewinski of the Force Science Institute, under whom Borden has studied and trained, as well as Borden's own familiarity with "real world scenarios, reality-based training and the analysis of force encounters" he has conducted.  (Doc. 161-2 at 50.)  Borden also testified in his deposition that the results from these sources were consistent with reaction time studies published in accident reconstruction manuals. (Doc. 173-2 at 3.) This indicates Borden has sufficient training, knowledge, and experience to express an opinion about the amount of time it may take an officer to use force after the officer sees a threat. (This does not extend to discussions or opinions by Borden about cognitive processes – just the amount of time it may take an officer to fire a weapon in response to a threat.)  Second, Borden has some training and experience in forensic video and audio analysis relating to use of force incidents. (*See* Doc. 161-5 at 7; Doc. 173-1 at 5-6.)  The court concludes he has sufficient training and experience to use the video recordings of the incident and testify about what they show with respect to the timing of Finch's movements and Rapp's reaction.  The court has in mind testimony of an essentially technical nature, using the video to calculate time and to correlate Finch's movements with the point at which Rapp decided to use force, taking into account the amount of time it may have taken Rapp to react and fire his weapon. Such testimony could be helpful to a jury given the central role that the video may play in the jury's determination of this case. Because lay persons are unlikely to know with any precision how much time it takes an officer to react to a perceived threat and to fire a weapon, this testimony could aid the jury in using the video to ascertain what

Finch was doing at the moment Rapp decided to use force.[11] Plaintiffs' motion to exclude Borden's testimony is denied to that extent.

3. <u>Plaintiff's Motion to Exclude Testimony of John J. Ryan</u>. (Docs.  162, 164, 177, 183.)

Plaintiffs move to exclude portions of the expert opinion testimony of John J. Ryan.  First, they argue certain opinions by Ryan should be excluded because they invade the province of the jury.  Included in that category are opinions by Ryan that:

> "Any reasonable and well-trained officer would have concluded that the hostages were in immediate danger of serious bodily harm or death from the subject throughout the law enforcement response."  [and] "[A]ny reasonable and well-trained officer would have recognized the imminent threat to the hostages and concluded that the use of deadly force to stop the threat was consistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations."

(Doc. 163 at 4-5.)  Ryan testified in his deposition that because the Fourth Amendment applies an objective standard, the shooting was reasonable whether Rapp did so because of the threat he perceived to the officers "or whether he shot [Finch] because he was trying to get back in the house, or he perceived he was trying to get back in the house…."  (Doc. 172 at 5.)  Plaintiffs argue these opinions are improper, among other reasons, because Rapp testified he only fired the shot because he thought Finch posed a serious danger to the officers on the east side.[12]  (Doc. 163 at 6.) Defendants respond that it does not matter what Rapp's specific motive was because "the issue in evaluating an officer's use of force is based on the standard of an objectively reasonable officer, not the subjective thought process of the officer involved."  Defendants are correct about the

---

[11] Such testimony is essentially reflected in paragraphs 85-87 and 89-97 of Borden's report.  (Doc. 161-2.)

[12] Defendants, citing Rapp's deposition testimony, assert that "Finch potentially presented a lethal threat to the hostages the officers believed were inside." (Doc. 166 at 10.) In his deposition, Rapp testified he shot Finch because he believed Finch presented a lethal threat to officers on the east side of the residence, and answered "no" when asked if there were any other reason why he fired his weapon. (Doc. 166, Exh. 4 at 27-28.) When asked if he believed Finch was a threat to anyone else, Rapp said Finch "could potentially be a lethal threat to the hostages we believed were inside…." (*Id.* at 28.) The subsequent deposition testimony suggests this was the first time Rapp offered such an explanation. Rapp had not said anything about a threat to hostages when he was interviewed by officers and prosecutors after the shooting. (*Id.*)

objective nature of the inquiry; the relevant question under the Fourth Amendment is whether it was objectively reasonable for Rapp to use force under the facts known to him. *See e.g., Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019) (we ask whether the circumstances, viewed objectively, justify the challenged action, and if so, conclude that action was reasonable whatever the subjective intent motivating the relevant officials). Officer Rapp's particular state of mind is thus "simply irrelevant." *Id.* But Defendants overlook the factual basis upon which that determination is made. An officer's state of mind is irrelevant "except for the facts that he knows." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). That factual predicate is the basis on which the reasonableness of the officer's actions is judged. *Cf. id.* (the officer's "subjective reason for making the arrest need not be the criminal offense *as to which the known facts* provide probable cause.") (emphasis added.) Defendants have cited no uncontroverted evidence that Rapp saw movement by Finch, or knew any other facts, indicating that Finch was attempting to go back in the house.[13] If the facts known to Rapp did not indicate Finch was retreating into the house, the fact that other officers may have seen such movements would not make it objectively reasonable for Rapp to use force under the circumstances known to him. Ultimately, Rapp's testimony shows he thought Finch was drawing a gun, not retreating into the house. That is the basis on which Rapp's conduct must be evaluated. Ryan's opinions on this matter will thus be excluded because Defendants have not shown they have proper factual support in the evidence.[14]

Plaintiffs also move to exclude opinions by Ryan about "WPD's disciplinary, accountability and use of force/planning systems." (Doc. 163 at 6.) Under the court's ruling

---

[13] Defendants' own filings acknowledge this point. (*See, e.g.,* Doc. 164 at 2 (asserting that Rapp fired to protect his fellow officers, not to protect the alleged hostages).) When Rapp was asked whether it was possible, based on what he personally observed that night, that "when he saw what you thought was a gun drawing motion [it] was just Finch going back into the house because he was frightened by the armed police response?" Rapp responded, "I suppose it's possible." (Doc. 166-4 at 29.)

[14] In view of this finding, the court need not address whether these opinions should be excluded for other reasons.

granting summary judgment to the City, Ryan's opinions on these issues are not relevant to the remaining issues for trial.  Accordingly, they will be excluded.

4.  <u>Defendants' Motion to Exclude Opinions of Scott DeFoe</u>.  (Docs. 164, 177, 183.)

Defendants move to exclude various expert opinions of Scott DeFoe.  They first move to exclude opinions numbered 4, 5, and 6 from DeFoe's report of March 4, 2019, Doc. 164-2. Opinion number 4 states in part: "It is my opinion that a reasonable officer acting consistent with standard police practices would not have considered Mr. Andrew Finch a lethal threat to law enforcement officers and or the community." (Doc. 164-2 at 11.)  The court agrees that this opinion should be excluded for at least three reasons.  First, as Defendants point out, DeFoe's rationale for this opinion apparently includes facts that could not have been known by Rapp at the time force was used.  *See id.* ("Mr. Andrew Finch had no firearm or weapon on his person or inside of his residence at the time of the shooting. Mr. Finch had not committed a crime and was not engaging in criminal activity when he was killed by Officer Justin Rapp.")  The reasonableness of Rapp's use of force depends upon the facts known to him at the time, not on facts disclosed by subsequent investigation. Second, DeFoe's opinion includes an explanation of why he believes Rapp violated WPD policies governing the use of force.  The court concludes such testimony would not be helpful to the jury.  As indicated previously, expert testimony about whether the officers' actions complied with WPD policies is both unnecessary and potentially confusing.  The jury is to determine whether the use of force was reasonable under constitutional standards, and Plaintiffs have not shown that expert testimony concerning policy compliance would be helpful in that inquiry.  Third, to the extent DeFoe offers additional explanations for his opinion about the reasonableness of Rapp's use of force, that testimony likewise would not be helpful to the jury. (*Id.* at 11-12.)  A jury should be fully capable of understanding the issues presented in this case

without the aid of expert opinion – opinions that in many respects simply duplicate the factual and legal arguments that lay witnesses and lawyers will present to the jury.  For largely the same reasons, the court concludes DeFoe's opinion number 6 (*id.* at 13-14) should be excluded.  This opinion contains extensive factual and legal arguments that would not be helpful to the jury in understanding the evidence or deciding the issues presented.  *See id.* at 14 ("The authority to [exercise police powers] does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who put their trust in law enforcement to use that power with the utmost care and restraint. Therefore, it is important to emphasize that peace officers do with the utmost [sic] care and restraint, not confer 'police powers' on themselves.")

DeFoe's opinion number 5 (*Id.* at 12) is "that a reasonable officer acting consistent with standard police practices would have given a verbal warning to Mr. Andrew Finch that he was going to fire his service weapon."  The applicable constitutional standard – which the court will instruct the jury on – provides that where feasible, some warning must be given before an officer may constitutionally use deadly force against a suspect. *Estate of Smart*, 951 F.3d at 1174 (citing *Garner*, 471 U.S. at 11–12)).  Plaintiffs offer no reason why a jury would be aided by DeFoe's opinion in determining whether it was feasible for officers to give Finch a warning before shooting. Nor is any such reason indicated by DeFoe's report. The court concludes a jury will be able to fully understand the evidence and to make an informed determination from the evidence, including from direct and cross-examination of the witnesses who were present at the scene.  The motion to exclude this opinion is accordingly granted.

Defendants also move to exclude a number of other opinions, including DeFoe's Opinions 1, 2, and 3 (containing criticisms of the WPD's dispatcher (for failure to summon a SWAT team) and Jonker's supervision of the situation at the residence), Opinions 7 and 9 (criticism of the City's

training), opinions concerning the City's liability, and opinions in DeFoe's Supplemental Report (concerning the City's investigative and disciplinary processes). In view of the court's determination that the City and Jonker are entitled to summary judgment, DeFoe's opinions concerning those two Defendants will be excluded as irrelevant to the issues to be decided by the jury.

### V.  Conclusion

Defendant's Motion for Summary Judgment (Doc. 165) is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED as to Defendants City of Wichita and Benjamin Jonker; the claims against those Defendants are dismissed.  The motion is DENIED as to the claims against Defendant Rapp.

Plaintiffs' Motion to Exclude Testimony of James W. Burden (Doc. 160) is GRANTED IN PART and DENIED IN PART.  The motion is DENIED, as stated in this order, as to opinions concerning police reaction time and how that relates to body camera video footage of the incident. The motion is otherwise GRANTED.

Plaintiffs' Motion to Exclude Testimony of John J. Ryan (Doc. 162) and Defendants' Motion to Exclude Testimony of Scott DeFoe (Doc. 164) are GRANTED as stated in this order.

IT IS SO ORDERED this 19th day of June, 2020.


_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE